# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| M.J., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:18-cv-1901 (EGS) |
| | ) |
| THE DISTRICT OF COLUMBIA, et al., | ) **ORAL HEARING REQUESTED** |
| | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFFS' MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL

JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW
1090 Vermont Avenue, NW, Suite 220
Washington, D.C. 20005
202-467-5730

NATIONAL CENTER FOR YOUTH LAW
1313 L Street NW, Suite 130
Washington, D.C. 20005
Tel.: (202) 868-4786

DISABILITY RIGHTS DC AT UNIVERSITY LEGAL SERVICES
220 I Street NE, Suite 130
Washington, D.C. 20002
Tel: (202) 547-0198

SCHULTE ROTH & ZABEL LLP
901 15th Street, NW, Suite 800
Washington, D.C. 20005
Tel.: (202) 729-7470

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................. 1

II.    BACKGROUND .................................................................................................. 4

III.   STANDARD OF REVIEW .................................................................................. 9

IV.    ARGUMENT ...................................................................................................... 11

   A.   The Class Consists of Hundreds of Vulnerable Children, Thus Satisfying the
       Numerosity Requirement. .................................................................................12

   B.   Plaintiffs' Allegations Revolve Around Defendants' Uniform Policies and
       Practices That Affect All Class Members and Lend Themselves to Common
       Answers That Will Drive Resolution of the Litigation...................................17

   C.   The Named and Proposed Plaintiff Children's Claims Are Typical of the Claims
       of the Class Members Because They Are Based on the Same Legal Theory and
       Stem from the Same Systemic Failure Perpetuated by Defendants..............23

   D.   Plaintiffs Will Adequately Represent the Class Because They Seek Identical
       Relief for All Class Members, and Plaintiffs' Counsel Are Well Qualified with
       Extensive Class-Action Litigation Experience. ...............................................30

   E.   Defendants Have Acted and Refused to Act on Grounds That Apply Generally
       to the Class; As Such, Class Certification under Rule 23(b)(2), as Well as
       Injunctive Relief for the Class, Is Appropriate. ...............................................34

   F.   The Class Is Sufficiently Definite and Ascertainable. ...................................39

   G.   Class Counsel Should Be Appointed Pursuant to Fed. R. Civ. P. 23(g). .......41

V.    CONCLUSION AND REQUEST FOR RELIEF.............................................. 43

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Afghan & Iraqi Allies v. Pompeo*,
    334 F.R.D. 449 (D.D.C. 2020)..........................................................................22

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)........................................................................................34

*Blackman v. District of Columbia*,
    454 F. Supp. 2d 1 (D.D.C. 2006)..............................................................32, 41

*Bond v. Fleet Bank (RI), N.A.*,
    No. 1-177, 2002 WL 31500393 (D.R.I. Oct. 10, 2002)........................................12

*Borum v. Brentwood Vill., LLC*,
    324 F.R.D. 1 (D.D.C. 2018).............................................................................30

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
    290 F.R.D. 409 (S.D.N.Y. 2012) ....................................................................22

*Brown v. District of Columbia*,
    928 F.3d 1070 (D.C. Cir. 2019) ................................................................ *passim*

*Bynum v. District of Columbia*,
    214 F.R.D. 27 (D.D.C. 2003)...........................................................................23

*Charles H. v. District of Columbia*,
    No. 21-cv-00997-CJN, 2021 WL 2946127 (D.D.C. June 16, 2021) ......................12

*Coleman through Bunn v. District of Columbia*,
    306 F.R.D. 68 (D.D.C. 2015)....................................................................... *passim*

*D.L. v. District of Columbia*,
    302 F.R.D. 1 (D.D.C. 2013), *vacated on other grounds*,
    713 F.3d 120 (D.C. Cir. 2013) ...........................................................16, 17, 21, 39

*D.L. v. District of Columbia*,
    860 F.3d 713 (D.C. Cir. 2017)..................................................................... *passim*

*In re District of Columbia*,
    792 F.3d 96 (D.C. Cir. 2015)............................................................3, 10, 18, 34

*Dixon v. Barry*,
    967 F. Supp. 535 (D.D.C. 1997)................................................................32, 41

*Dunakin v. Quigley*,
99 F. Supp. 3d 1297 (W.D. Wash. 2015).................................................................4

*Equal Emp. Opportunity Comm'n v. Printing Indus. of Metro. Wash., D.C., Inc.*
92 F.R.D. 51 (D.D.C. 1981)......................................................................................31

*Garnett v. Zeilinger*,
301 F. Supp. 3d 199 (D.D.C. 2018) ................................................................23, 24

*Garza v. Hargan*,
304 F. Supp. 3d 145 (D.D.C. 2018), *aff'd in part, vacated in part on other grounds sub nom., J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) ..........................13

*Healthy Futures of Tex. v. Dep't of Health and Human Servs.*,
326 F.R.D. 1 (D.D.C. 2018)................................................................................11, 32

*Hoyte v. District of Columbia*,
325 F.R.D. 485 (D.D.C. 2017)...........................................................................13, 23

*Huashan Zhang v. U.S. Citizenship & Immigr. Servs.*,
344 F. Supp. 3d 32 (D.D.C. 2018), *aff'd*, 978 F.3d 1314 (D.C. Cir. 2020) ...............10, 24, 39

*Katie A., ex rel. Ludin v. Los Angeles County*,
481 F.3d 1150 (9th Cir. 2007) ............................................................3, 32, 33, 41

*Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*,
293 F.R.D. 254 (D.N.H. 2013) ..............................................................4, 6, 14, 29

*Lane v. Kitzhaber*,
283 F.R.D. 587 (D. Or. 2012) ..................................................................4, 22, 39

*McCuin v. Sec'y of Health & Hum. Servs.*,
817 F.2d 161 (1st Cir. 1987).....................................................................................13

*McKinney v. U.S. Postal Serv.*,
No. 11–cv–631 (RLW), 2013 WL 164283 (D.D.C. Jan. 16, 2013).........................22

*N.B. v. Hamos*,
26 F. Supp. 3d 756 (N.D. Ill. 2014) ................................................................ *passim*

*Nat'l Veterans Legal Servs. Program v. United States*,
235 F. Supp. 3d 32 (D.D.C. 2017) .........................................................................31

*O.B. v. Norwood*,
No. 15 C 10463, 2016 WL 2866132 (N.D. Ill. May 17, 2016) ........................20, 29

*Olmstead v. L.C.*,
527 U.S. 581 (1999)............................................................................................ *passim*

*Olson v. Brown*,
284 F.R.D. 398 (N.D. Ind. 2012) ............................................................................ 17

*Parko v. Shell Oil Co.*,
739 F.3d 1083 (7th Cir. 2014) ............................................................................... 13

*Pigford v. Glickman*,
182 F.R.D. 341 (D.D.C. 1998) ........................................................................... 10, 39

*Primavera Familienstiftung v. Askin*,
178 F.R.D. 405 (S.D.N.Y. 1998) ............................................................................ 16

*R.I.L-R v. Johnson*,
80 F. Supp. 3d 164 (D.D.C. 2015) .......................................................................... 24

*R.P.-K. ex rel. C.K. v. Dep't of Educ., Hawaii*,
272 F.R.D. 541 (D. Haw. 2011) ............................................................................. 31

*Ramirez v. U.S. Immigr. and Customs Enf't*,
338 F. Supp. 3d 1 (D.D.C. 2018) ....................................................................... 11, 39

*Richardson v. L'Oreal USA, Inc.*,
991 F. Supp. 2d 181 (D.D.C. 2013) ........................................................................ 12

*S.R. ex rel. Rosenbauer v. Penn. Dep't of Hum. Servs.*,
325 F.R.D. 103 (E.D. Pa. 2018) ............................................................... 4, 20, 21, 22

*Shenk v. Mallinckrodt PLC*,
300 F. Supp. 3d 279 (D.D.C. 2018) ........................................................................ 23

*Shulman v. Ritzenberg*,
47 F.R.D. 202 (D.D.C. 1969) ................................................................................ 30

*Thorpe v. District of Columbia*,
303 F.R.D. 120 (D.D.C. 2014), *aff'd*, *In re District of Columbia*, 792 F.3d 96
(D.C. Cir. 2015) ........................................................................................... *passim*

*Twelve John Does v. District of Columbia*,
117 F.3d 571 (D.C. Cir. 1997) .............................................................................. 30

*United States v. Mississippi*,
400 F. Supp. 3d 546 (S.D. Miss. 2019) .................................................................. 2, 6

*Wagner v. Taylor*,
836 F.2d 578 (D.C. Cir. 1987) .............................................................................. 23

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ...................................................................................... *passim*

## Statutes & Regulations

Americans with Disabilities Act ("ADA"), ........................................................ *passim*

    ADA Title II, 42 U.S.C. §§ 12132 *et. seq* ..............................................2

Medicaid Act ..................................................................................... *passim*

    EPSDT, 42 U.S.C. § 1396a(a)(43) ...........................................................2

    EPSDT, 42 U.S.C. § 1396d(a)(4)(B) .........................................................2

    EPSDT, 42 U.S.C. § 1396d(r) ................................................................2

    EPSDT, 42 U.S.C. § 1396d(r)(5) ...........................................................3, 4

Rehabilitation Act, Section 504,
29 U.S.C. § 794 .................................................................................2

28 C.F.R. § 35.130(b)(7) .........................................................................3

28 C.F.R. § 35.130(d) ...........................................................................3

## Rules

Fed. R. Civ. P. 23 ..............................................................................*passim*

Fed. R. Civ. P. 23(a) .........................................................................9, 10, 43

Fed. R. Civ. P. 23(a)(1) ........................................................................9, 12

Fed. R. Civ. P. 23(a)(2) .......................................................................*passim*

Fed. R. Civ. P. 23(a)(3) ........................................................................10, 23

Fed. R. Civ. P. 23(a)(4) ........................................................................10, 30

Fed. R. Civ. P. 23(b)(2) ......................................................................10, 34, 43

Fed. R. Civ. P. 23(g) ............................................................................41

## Other Authorities

McLaughlin on Class Actions § 4:5 (11th ed. 2014) ...................................................13

1 Newberg on Class Actions § 3:7 (5th ed. 2021) ......................................................39

1 Newberg on Class Actions § 3:20 (5th ed. 2021) .....................................................18

U.S. Dep't of Just., *West Virginia Children's Mental Health System Findings Letter* (June 1, 2015), https://tinyurl.com/7jn3a56t ..................................................................7

## INDEX OF SUPPORTING MATERIALS

Although there are no exhibits to this Memorandum, for the convenience of the Court, set forth below is an index of the Declarations and Affirmation offered in support of the instant Motion, all of which are filed concurrently herewith except where indicated below.  Certain declarants are identified by their initials for the reasons set forth in Plaintiffs' Motion for Leave to File Documents Under Seal and Proceed Anonymously, filed concurrently herewith.

| Title | Abbreviation |
|---|---|
| Declaration of Gail Avent in Support of Plaintiffs' Motion for Class Certification | Avent Decl. |
| Declaration of B.T. in Support of Plaintiffs' Motion for Class Certification | B.T. Decl. |
| Declaration of Sandra Bernstein in Support of Plaintiffs' Motion for Class Certification | Bernstein Decl. |
| Declaration of Betsy A. Biben in Support of Plaintiffs' Motion for Class Certification | Biben Decl. |
| Declaration of Cornelius Bird in Support of Plaintiffs' Motion for Class Certification | Bird Decl. |
| Declaration of Maria Blaeuer in Support of Plaintiffs' Motion for Class Certification | Blaeuer Decl. |
| Declaration of Rebecca Bloch in Support of Plaintiffs' Motion for Class Certification | Bloch Decl. |
| Declaration of Sara Boyd, Ph.D. in Support of Plaintiffs' Motion for Class Certification | Boyd Decl. |
| Declaration of Jane Brown (Oct. 30, 2018)[1] | Brown Decl. I |
| Declaration of Jane Brown in Support of Plaintiffs' Motion for Class Certification (July 14, 2021) | Brown Decl. II |
| Declaration of Ira Burnim in Support of Plaintiffs' Motion for Class Certification | Burnim Decl. |

---

[1] Previously filed; ECF No. 41.

| | |
|---|---|
| Declaration of Kimmberly Campbell in Support of Plaintiffs' Motion for Class Certification | Campbell Decl. |
| Declaration of Evan Cass in Support of Plaintiffs' Motion for Class Certification | Cass Decl. |
| Declaration of Robert Friedman, Ph.D. in Support of Plaintiffs' Motion for Class Certification | Friedman Decl. |
| Declaration of Seth Galanter in Support of Plaintiffs' Motion for Class Certification | Galanter Decl. |
| Declaration of J.J.[2] | J.J. Decl. |
| Declaration of Narell Joyner in Support of Plaintiffs' Motion for Class Certification | Joyner Decl. |
| Declaration of Bruce J. Kamradt in Support of Plaintiffs' Motion for Class Certification | Kamradt Decl. |
| Declaration of K.R. in Support of Plaintiffs' Motion for Class Certification | K.R. Decl. |
| Declaration of L.M. in Support of Plaintiffs' Motion for Class Certification | L.M. Decl. |
| Declaration of L.R. in Support of Plaintiffs' Motion for Class Certification | L.R. Decl. |
| Declaration of M.W. in Support of Plaintiffs' Motion for Class Certification | M.W. Decl. |
| Declaration of Louise W. Missildine in Support of Plaintiffs' Motion for Class Certification | Missildine Decl. |
| Affirmation of Jason T. Mitchell in Support of Plaintiffs' Motion for Class Certification | Mitchell Aff. |
| Declaration of M.P. in Support of Plaintiffs' Motion for Class Certification | M.P. Decl. |
| Declaration of Kimberly Perry in Support of Plaintiffs' Motion for Class Certification | Perry Decl. |

---

[2] Previously filed; ECF No. 60.

| | |
|---|---|
| Declaration of E. Sally Rogers in Support of Plaintiffs' Motion for Class Certification | Rogers Decl. |
| Declaration of Rachel Russo in Support of Plaintiffs' Motion for Class Certification | Russo Decl. |
| Declaration of John Sargent, M.D. in Support of Plaintiffs' Motion for Class Certification | Sargent Decl. |
| Declaration of Howard Schiffman in Support of Plaintiffs' Motion for Class Certification | Schiffman Decl. |
| Declaration of Penelope Spain in Support of Plaintiffs' Motion for Class Certification | Spain Decl. |

## I.      INTRODUCTION

For over two decades since the Supreme Court's seminal ruling in *Olmstead v. L.C.*, 527 U.S. 581 (1999), courts across the country have protected individuals with mental health disabilities by enforcing the "integration mandate" of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act.  Although "*Olmstead*" cases come in many forms, the D.C. Circuit has recognized that *Olmstead* class actions seeking to remedy systemic harms with injunctive relief are ideal cases for class certification under Federal Rule of Civil Procedure 23, specifically Rule 23(b)(2).[3]  This *Olmstead* action is no different.  Certifying the proposed class, for both Plaintiffs' *Olmstead* claim and their Medicaid Act ("Medicaid") claim, would be consistent with precedent and the purpose of Rule 23(b)(2).  Class certification would enable the Court to address the failures in Defendants' service systems identified in Plaintiffs' Complaint in one fell swoop, rather than burden the Court and individual members of the putative class—who are particularly vulnerable as Medicaid-eligible children with mental health disabilities who are institutionalized or at risk of institutionalization—from piecemeal litigation.

Plaintiffs bring this putative class action to remedy Defendants' ongoing, systemic failure to provide medically necessary intensive community-based services ("ICBS") to hundreds of children with mental health disabilities in the District of Columbia (the "District").  Plaintiffs

---

[3] *See Brown v. District of Columbia*, 928 F.3d 1070, 1083 (D.C. Cir. 2019) (noting, in an *Olmstead* class action, that the case was a "prime example of what (b)(2) is meant to capture" and that Rule 23(b)(2) "exists so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms and demand injunctive relief") (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 361 (2011) (internal citations and quotation marks omitted) and *D.L. v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017)).

include L.R., who is a representative member of the class;[4] M.W. and B.T., putative class members whom Plaintiffs seek to include as individual named Plaintiffs in their First Amended Complaint;[5] and Disability Rights DC at University Legal Services ("Disability Rights DC"), whose constituents include members of the Plaintiff class.[6]  L.R., M.W., B.T., and the other members of the Plaintiff class (together, the "Plaintiff Children") are entitled under federal law to receive ICBS, which they need in order to avoid unnecessary institutionalization and to improve their mental health conditions.  With such services, the Plaintiff Children can live in their homes and communities, the most integrated setting appropriate for them.  Without ICBS, they are needlessly institutionalized in psychiatric hospitals, residential treatment facilities, and other institutional settings, and cycle in and out of those institutions where they are segregated and isolated from their families and communities.  As courts have found in similar cases, "[t]his process of 'cycling admissions' is 'the hallmark of a failed system.'"  *United States v. Mississippi*, 400 F. Supp. 3d 546, 555 (S.D. Miss. 2019) (internal citation omitted).

Plaintiffs seek declaratory and injunctive relief under Title II of the ADA, 42 U.S.C. §§ 12132 *et. seq*.; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"); and the Early and Periodic Screening, Diagnostic, and Treatment ("EPSDT") provisions of the Medicaid Act, 42 U.S.C. §§ 1396a(a)(43), 1396d(a)(4)(B), and 1396d(r).  Both the ADA and Section 504 prohibit the unjustified segregation in institutions of individuals with disabilities and require that covered entities provide services in the most integrated setting appropriate—the "integration

---

[4] On February 25, 2020, the Court granted Plaintiffs' motion to withdraw M.J. as an individual named Plaintiff in this matter.  *See* Feb. 25, 2020 Minute Order granting ECF No. 56.

[5] *See* Plaintiffs' Motion to Amend Complaint, Ex. A, filed concurrently herewith.

[6] *See* Class Action Complaint for Injunctive and Declaratory Relief (ECF No. 3) ("Compl."), ¶¶ 6, 15, 67; Pls.' Opp. to Defs.' Mot. to Dismiss Compl. (ECF No. 29) at 16-19; Brown Decl. I (ECF No. 41), ¶¶ 18-22.

regulation" or "integration mandate"—unless doing so would work a "fundamental alteration" in the nature of the services.  *See Olmstead*, 527 U.S. at 592 (citing 28 C.F.R. §§ 35.130(b)(7), 35.130(d)).  Moreover, Medicaid imposes on states the "extremely broad" obligation to provide eligible children with any services that are "medically necessary."  *Katie A., ex rel. Ludin v. Los Angeles County*, 481 F.3d 1150, 1154 (9th Cir. 2007) (citing 42 U.S.C. § 1396d(r)(5)).

Plaintiffs seek a single, class-wide order enjoining Defendants from subjecting the Plaintiff Children to policies and practices that violate their rights under these laws.  To achieve that end, Plaintiffs request certification of the following class:

> All Medicaid-eligible District of Columbia children who now or in the future are under the age of 21, have a mental health disability, are not receiving medically necessary intensive community-based services, and are unnecessarily institutionalized or at serious risk of institutionalization.[7]

Such a class is ascertainable and satisfies the prerequisites of Rule 23(a):  (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of Plaintiff L.R. (and proposed Plaintiffs M.W. and B.T.) are typical of the claims or defenses of the class; and (4) Plaintiffs will fairly and adequately protect the interests of the class.  Further, Plaintiffs seek injunctive and declaratory relief that would benefit all members of the class, satisfying Rule 23(b)(2).

Courts have routinely certified similar classes in cases seeking to enforce the integration mandate of the ADA and Section 504, and the EPSDT mandate of the Medicaid Act.[8]  Likewise, class certification is warranted here.

---

[7] For the sake of convenience, this memorandum refers to members of the putative class, including those aged between 18 and 21, as "children."

[8] *See, e.g.*, *Thorpe v. District of Columbia*, 303 F.R.D. 120, 144-52 (D.D.C. 2014) (certifying a class of individuals with physical disabilities institutionalized in nursing facilities or at risk thereof), *aff'd*, *In re District of Columbia*, 792 F.3d 96 (D.C. Cir. 2015), and *Brown*, 928 F.3d at

## II.    BACKGROUND

Plaintiff L.R., proposed Plaintiffs M.W. and B.T., and the members of the putative Plaintiff class are Medicaid-eligible children who have a mental health disability, by virtue of having a "serious emotional disturbance," and who are needlessly institutionalized or at serious risk of institutionalization because Defendants fail to provide them medically necessary ICBS as required by federal law.   ICBS includes the following key components:   intensive care coordination ("ICC"),[9] intensive behavior support services,[10] and mobile crisis services.[11]   When these or other services[12] are medically necessary to correct or ameliorate a Medicaid-eligible child's mental health condition, the District must provide them.   *See* 42 U.S.C. § 1396d(r)(5).   Still, the District

1079-83; *S.R. ex rel. Rosenbauer v. Penn. Dep't of Hum. Servs.*, 325 F.R.D. 103, 107–12 (E.D. Pa. 2018) (certifying class of children with mental health disabilities alleging that state failed to provide them with services in the most integrated setting appropriate); *Dunakin v. Quigley*, 99 F. Supp. 3d 1297, 1324–35 (W.D. Wash. 2015) (certifying class of nursing home residents with intellectual and developmental disabilities); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 762–75 (N.D. Ill. 2014) (certifying Title II class based on denial of community-based services to children); *Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 263-71 (D.N.H. 2013) (certifying class of individuals with a mental health disability who had been, or were at serious risk of being, institutionalized); *Lane v. Kitzhaber*, 283 F.R.D. 587, 594–602 (D. Or. 2012) (certifying a class of persons with developmental disabilities in segregated employment workshops).

[9] ICC is an intensive form of case management in which a provider convenes a "child and family team," including the child, the child's family, service providers, and other individuals identified by the family, to design and supervise a plan that provides and coordinates services for children with mental health disabilities. *See* Compl. ¶ 39 & n.6 (citing judicial opinion and agency guidance explaining ICBS).

[10] Intensive behavior support services are individualized therapeutic interventions provided on a frequent and consistent basis that are designed to improve behavior and delivered to children and families in any setting where the child is naturally located. *See id.*

[11] Mobile crisis services are a mobile, onsite, in-person response, available at any time or place to a child experiencing a crisis, for the purpose of identifying, assessing, and stabilizing the situation and reducing any immediate risk of harm.   These services may be delivered in the child's home, school, or community. *See id.*

[12] To benefit from ICBS, children may also need therapeutic foster care, a short-term, intensive, therapeutic placement. *Id.* ¶ 40.

4

does not offer the Plaintiff Children all of the components of ICBS, which are collectively necessary to improve their mental health conditions and help them avoid harmful separation from their homes, families, and communities.  Compl. ¶ 41.

In the absence of needed ICBS, hundreds of Medicaid-eligible children in the District with serious emotional disturbance have been unnecessarily institutionalized or are at serious risk of institutionalization.  For example, from September 1, 2016, to September 27, 2019, 98 of these children were placed in a psychiatric residential treatment facility ("PRTF").  Kamradt Decl., ¶ 33.  Over 200 of these children had multiple psychiatric hospital admissions.  Because there are no PRTFs in the District, all children admitted to PRTFs were sent out of the District—in some cases hundreds or thousands of miles away.[13]  Most of those institutional placements were avoidable.  *See* Friedman Decl., ¶¶ 19 (discussing national study of 76 "system of care" communities that found children receiving ICBS were less likely to be hospitalized for inpatient psychiatric services), 22 (over five years of Massachusetts' statewide implementation of ICBS, there was reduction of almost 32% in youth hospitalized for behavioral health conditions, and a 30%

---

[13] *See* Campbell Decl., ¶¶ 45-46, 64, 67 (describing youth with placements in Florida, Tennessee, and Virginia); Bird Decl., Ex. 1 (Report), at 21, 29 (describing youth with placements in Maryland, Georgia, and Pennsylvania); Boyd Decl., Ex. A (Report), ¶¶ 35, 111 (describing youth with placements in Iowa, Pennsylvania, and Maryland); Sargent Decl., ¶ 71 (describing youth placed over 18 months in Nebraska following placement in Virginia for about 1 year); Biben Decl., ¶ 15 (describing placement of clients as far away as Arizona); Cass Decl., ¶¶ 7a, 8c, 8e (describing clients placed in Georgia, Florida, and Indiana); B.T. Decl., ¶ 23 (institutionalized in Pennsylvania); Brown Decl. II, ¶¶ 14, 15 (describing clients placed in Tennessee, South Carolina, and Virginia); Avent Decl., ¶ 11 (describing clients placed in residential treatment facilities in South Carolina, Georgia, Florida, Arkansas, Texas, Utah, and Massachusetts); L.R. Decl., ¶ 34 (describing institutionalization in Maryland, Virginia, and Florida); Russo Decl., ¶ 12 (describing clients placed in facilities in New Jersey, Pennsylvania, Georgia, Florida, Arkansas, Michigan, and Arizona); Spain Decl., ¶ 10 (describing clients sent to Pennsylvania, Georgia, North Dakota, and Arizona); M.P. Decl., ¶¶ 18-22, 48-50 (describing placement of great-grandson in Virginia and Tennessee); L.M. Decl., ¶ 26 (describing placement of daughter in three separate facilities in Florida).

decrease in the number of days spent in the hospital), 24 (after initiating "system of care/wraparound approach," New Jersey placed fewer children in out-of-state residential placements, and closed state children's psychiatric hospital and state-operated residential treatment centers), 31-32 (by 2014, 15 studies showed positive results of implementing intensive care coordination/wraparound; "[d]ays in residential placements were significantly reduced"), 82 (significant number of District children experiencing needless institutionalization and hospitalization because they are not receiving ICBS); Kamradt Decl., ¶ 32 (over 13 years, Wraparound Milwaukee reduced number of residential placements from 375 to 90, and over 17 years reduced the annual number of days in psychiatric hospital care from 5,000 to under 200); Missildine Decl., Ex. 1 (Report), at 71-72 (with ICBS, "the child can get the supports they need at home, or in another home-like setting where appropriate, and not in a residential placement or psychiatric hospital"); Joyner Decl., Ex. 1 (Report), at 52 (without needed ICBS, "the youth tended to cycle among providers, and often among institutional settings (including carceral settings)"); Boyd Decl., Ex. A, ¶ 191 ("If the youth [who I reviewed] had been provided ICBS, they would not have been needlessly placed in . . . "residential facilities" that "failed to provide a benefit," "remov[ed] the natural supports they had," and "subjected [them] to seclusion and restraint").[14]

Had Defendants timely provided the children with ICBS, they could have lived in their homes and communities, thereby increasing their chances of improved school performance and attendance, increased behavioral and emotional strengths, improved clinical and functional

---

[14] *See also, e.g.*, *United States v. Mississippi*, 400 F. Supp. 3d 546, 569 (S.D. Miss. 2019) (noting that experts found that "nearly all, if not all, of the 154 patients [interviewed in a sample of putative class members] would have spent less time or avoided hospitalization if they had had reasonable services in the community"); *Kenneth R.*, 293 F.R.D. at 261 (noting that experts found that "80-96% of [individuals reviewed] would have avoided institutionalization . . . if they were fully informed of and had access to community-based treatment services.").

outcomes, reduced suicide attempts, and decreased contact with law enforcement.  *See* Compl. ¶¶ 23, 48; *see also* U.S. Dep't of Just., *West Virginia Children's Mental Health System Findings Letter*, 9 (June 1, 2015), https://tinyurl.com/7jn3a56t); Friedman Decl., ¶¶ 15-18 (discussing findings that a competitive grant program that provided funding for jurisdictions to develop and implement ICBS resulted in "decreased behavioral and emotional problems, suicide rates, substance use, and juvenile justice involvement, as well as increased strengths, school attendance and grades, and stability of living situations"), 79 (quoting federal agency's view that ICBS "enable children with complex mental health needs—many of whom have traditionally been served in restrictive settings like residential treatment centers, group homes, and psychiatric hospitals—to live in community settings and participate fully in family and community life").[15]

In short, Defendants' failure to provide ICBS has deprived the Plaintiff Children of the services that they medically need and to which they are legally entitled.  Accordingly, on August 14, 2018, Plaintiffs L.R. and Disability Rights DC[16] filed their Complaint on behalf of themselves and the putative class seeking declaratory and injunctive relief to vindicate these federal civil

---

[15] *See also* Kamradt Decl., ¶¶ 28-30 (among positive outcomes for youth receiving services through Wraparound Milwaukee, in 2018, 79% of youth returned to permanent living situation, rather than staying in out-of-home placement; youth attend school "approximately 87 percent of the time"; and their reoffending rates were significantly reduced); Sargent Decl., ¶ 51 (with ICBS, youth studied "could re-enroll and advance in higher education, develop skills in an area of professional interest, and have an adult life in which she can be successful"); Spain Decl., ¶ 26 (describing success resulting from ICBS); Bloch Decl., ¶ 19 (clients receiving coordinated community-based services diverted from incarceration).

[16] At the time of that filing, Plaintiffs also included another youth, M.J.  M.J. subsequently withdrew from this action after her inability to obtain adequate care in the District resulted in her relocation to live with her godmother in another state to access different services.  *See* ECF No. 56-1 at 2; J.J. Decl. (ECF No. 60), ¶¶ 8-12.  In the words of her mother, "if M.J. had been provided necessary [ICBS] here in the [District], [I believe] these steps could have been avoided and that M.J. could have remained at home while being successful."  J.J. Decl., ¶ 12.

rights.  On October 3, 2018, Defendants filed a motion to dismiss the Complaint.  Defs.' Mot.

Dismiss, ECF No. 21.  On July 25, 2019, the Court denied Defendants' motion, concluding in part:

> *Olmstead* stands for the proposition that it is a violation of the ADA, the Rehabilitation Act, and their implementing regulations to require disabled individuals to obtain treatment in residential institutions when such individuals have the ability and desire to receive treatment in more integrated community settings. This is exactly what the plaintiffs allege—that the failure of the State to provide required services forces them to reside in institutions even though they are able and willing to engage in community-based treatment.  At this stage of the litigation, allegations that defendants failed to provide mandated services, which has the effect of segregating plaintiffs, are sufficient to state a claim of discrimination under *Olmstead*.

Memorandum Opinion at 20, ECF No. 45 (citation omitted).

Subsequently, on November 4, 2019, the Court entered a scheduling order that bifurcated

discovery concerning class certification and discovery concerning the merits of the suit, and set a

March 9, 2020 deadline for Plaintiffs' Motion for Class Certification.  Min. Order, Nov. 4, 2019.

Two months later, Plaintiffs filed a motion to compel discovery, after Defendants' refused to

produce names and contact information for certain members of the putative class that had been

identified through random sampling.  Pls.' Mot. Compel, ECF No. 55.  Plaintiffs sought this

information to engage in a study of those randomly selected Medicaid-eligible District children

and youth known to Defendants who had received services indicating that they might be members

of the putative class.  Through this study, Plaintiffs (and the Court) could better understand how

many children and youth (out of a total of 1,900 such children and youth that Defendants had

anonymously identified) had been denied medically necessary ICBS and were either

institutionalized or at serious risk of avoidable institutionalization, like the named Plaintiffs and

other constituents of Disability Rights DC.  *See* ECF No. 55-1 at 3-8; *see also* Rogers Decl., ¶¶

17-23 (describing process).  While the Motion to Compel was pending, the deadline for this Motion

was extended in response to Plaintiffs' unopposed motion and later stayed *sua sponte* by the Court

pending resolution of the Motion to Compel.  Min. Order Granting Pls.' Mot. Extension of Time, Feb. 21, 2020; Min. Order Staying Briefing Schedule, Apr. 6, 2020.

On July 1, 2020, Magistrate Judge Harvey issued a Memorandum Opinion and Order granting Plaintiffs' Motion to Compel in part and requiring Defendants to produce contact information regarding 198 children and youth randomly selected by Plaintiffs.  ECF No. 66 at 8-16.  Over the next six months, Defendants provided contact information in their possession concerning those 198 children and youth, as well as a supplemental group of 128 children and youth whose information Plaintiffs requested after they determined that the contact information Defendants had provided was no longer current and/or was unusable.  *See* Rogers Decl., ¶¶ 25-32. Although Plaintiffs were unable to make contact with the majority of the children and youth using the contact information provided by Defendants (*see id.* ¶ 34), they were able to obtain agreements and authorizations for records from 29 such children and youth—and 32 in total—to participate in a study by expert consultants to evaluate whether those children and youth did in fact fall within the putative class identified by Plaintiffs.[17]  *See id.* ¶ 38.  The deadline for this Motion was further extended during that process, in part due to challenges presented by the COVID-19 pandemic. *See, e.g.,* Joint Status Report, ECF No. 70; Min. Order, Feb. 16, 2021.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 23, which governs class certification, requires a party moving for class certification to first satisfy four prerequisites:

(1) the class must be so numerous that joinder of all the members is impracticable;

(2) there must be questions of law or fact common to the class;

---

[17] One of those 29 youths was already a client of Disability Rights DC at the time he was identified by Defendants as part of the random sampling process.  *See* Campbell Decl., ¶ 17.  Another youth who originally agreed to participate subsequently withdrew his authorization.  Rogers Decl., ¶ 44.

(3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and

(4) the representative parties must fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4); *see Brown v. District of Columbia*, 928 F.3d 1070, 1079 (D.C. Cir. 2019). These four Rule 23(a) elements are respectively known as "numerosity," "commonality," "typicality," and "adequate representation." *Huashan Zhang v. U.S. Citizenship & Immigr. Servs.*, 344 F. Supp. 3d 32, 61 (D.D.C. 2018), *aff'd*, 978 F.3d 1314 (D.C. Cir. 2020). Plaintiffs must also satisfy one of Rule 23(b)'s sub-provisions. Here, Plaintiffs seek certification under Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *Brown,* 928 F.3d at 1082. As the D.C. Circuit has explained, Rule 23(b)(2) "was intended for civil rights cases" such as this one. *In re District of Columbia*, 792 F.3d 96, 102 (D.C. Cir. 2015); *see also Brown*, 928 F.3d at 1083.

In addition to the Rule 23 requirements, some courts, including this one, have considered whether the class is "clearly defined" and "sufficiently ascertainable"—in other words, that the class exists, and that it is "administratively feasible for the Court to determine whether a particular individual is a member" of the class. *Huashan Zhang*, 344 F. Supp. 3d at 61-62 (quoting *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998)).

Although Plaintiffs must "'affirmatively demonstrate compliance with'" Rule 23 by "'demonstrating compliance in fact,'" the Court "*may not* consider merits questions that do not overlap with Rule 23's requirements," *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 75, 77 (D.D.C. 2015) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original)). "[C]ourts in this Circuit have routinely applied a preponderance of the

evidence standard" in evaluating whether plaintiffs have met the Rule 23 requirements. *Ramirez v. U.S. Immigr. and Customs Enf't,* 338 F. Supp. 3d 1, 43 (D.D.C. 2018) (internal quotation marks and citations omitted); *see also Healthy Futures of Tex. v. Dep't. of Health and Human Servs.,* 326 F.R.D. 1, 5 (D.D.C. 2018).

## IV.   ARGUMENT

Plaintiffs' putative class—all Medicaid-eligible children in the District who are under the age of 21, have a mental health disability, are not receiving medically necessary intensive community-based services, and are unnecessarily institutionalized or at serious risk of institutionalization—satisfies each of Rule 23's requirements.

First, the class is sufficiently numerous, composed of hundreds of children with disabilities, making joinder impracticable.  Second, the class members share common questions of law and fact that lead to common answers that will drive the resolution of the litigation:  namely, Plaintiffs raise questions about whether Defendants have satisfied their legal obligations by providing required mental health services to the class and whether the District's "*Olmstead* Plan" is adequate and effective.  The answers to these common questions will be crucial for the entire class's claims. Third, Plaintiff L.R.'s claims, and those of proposed additional named Plaintiffs M.W. and B.T., are typical of those of the class; they are based on the same legal theory and stem from the same systemic failures perpetuated by Defendants against all of the class members.  Fourth, the named and proposed representatives will fairly and adequately represent the class because their interests align with those of all class members and Plaintiffs' counsel are well-qualified in class-action litigation addressing the civil rights of individuals with disabilities.  Furthermore, the proposed class falls squarely within the purview of Rule 23(b)(2), which "was designed for exactly this sort of suit," namely, civil rights actions in which "common claims arise from systemic harms that

11

demand injunctive relief." *D.L. v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017). Finally, in addition to those express requirements under Rule 23, the class is also sufficiently definite and ascertainable such that Defendants and the class members themselves will be able to determine whether they are members. Accordingly, the class should be certified, and Plaintiffs' counsel should be appointed pursuant to Rule 23(g).

### A.   The Class Consists of Hundreds of Vulnerable Children, Thus Satisfying the Numerosity Requirement.

A proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticability of joinder means only that it is difficult or inconvenient to join all class members, not that it is impossible to do so." *Coleman*, 306 F.R.D. at 76 (citing *Bond v. Fleet Bank (RI), N.A.*, No. 1-177, 2002 WL 31500393, at *4 (D.R.I. Oct. 10, 2002)). There is no minimum threshold number of members making joinder impracticable, but "'[i]n this district, courts have found that numerosity is satisfied when a proposed class has at least forty members.'" *Charles H. v. District of Columbia*, No. 21-cv-00997-CJN, 2021 WL 2946127, at *13 (D.D.C. June 16, 2021). (quoting *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 196 (D.D.C. 2013)); *see also Coleman*, 306 F.R.D. at 76 (same). Still, the inquiry is fact-specific, and this Court has held that "as few as 25–30 class members should raise a presumption that joinder would be impracticable," *Coleman*, 306 F.R.D. at 76, n.2 (internal citations omitted).

Further, "the Court need only find an approximation of the size of the class, not an exact number of putative class members." *Id.* at 76 (internal quotation marks and citations omitted). Plaintiffs must provide "some evidentiary basis beyond a bare allegation"[18] of a sufficiently

---

[18] Plaintiffs may satisfy this evidentiary basis by relying upon a government agency's own records, as well as any expert affidavits. *See Garza v. Hargan*, 304 F. Supp. 3d 145, 155 (D.D.C. 2018), *aff'd in part, vacated in part on other grounds sub nom., J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019); *Hoyte v. District of Columbia,* 325 F.R.D. 485, 492, 495-96 (D.D.C. 2017).

numerous class, but the court may draw "reasonable inferences from the facts presented to find the requisite numerosity." *Id.* (citing *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 167 (1st Cir. 1987)).  Moreover, the numerosity determination "does not entail an assessment of how many putative class members ultimately will have meritorious claims." *Id.* at 77 (quoting McLaughlin on Class Actions § 4:5 (11th ed. 2014)); *see also Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("How many (if any) of the class members have a valid claim is the issue to be determined *after* the class is certified." (emphasis in original)).

Although the precise size of Plaintiffs' proposed class is unknown, it plainly satisfies the numerosity requirement.  In June 2021, the District reported that in fiscal year 2020, it had served over 2,500 District children with mental health disabilities through its public mental health system. *See* Friedman Decl., ¶ 53.  Almost all of these children are Medicaid-eligible.  *Id.*  Between September 1, 2016, and September 27, 2019, at least 98 unique District children eligible for Medicaid were admitted to PRTFs—facilities serving only children with mental health disabilities. *See id.* ¶ 62; Kamradt Decl., ¶ 33.  During the same time period, over 200 unique District children were admitted on more than one occasion to one of the District's two psychiatric hospitals, Children's National Hospital and the Psychiatric Institute of Washington.  Friedman Decl., ¶ 62; Kamradt Decl., ¶ 33.  Additionally, during that time period, hundreds of Medicaid-eligible District children were institutionalized in other residential treatment centers while under the custody of the Department of Youth Rehabilitation Services ("DYRS"), the District's agency responsible for the custody of youth in the delinquency system.  *See*  Friedman Decl., ¶ 62; Kamradt Decl., ¶ 33.  A February 2019 independent report commissioned by the District to assess its children's behavioral health system found that the District "currently supports about 100-125 young people in (congregate) out-of-home care placements."  Mitchell Aff., ¶ 3, Ex. 1 at 40.

13

In addition to the estimated hundreds who have already been institutionalized, the Plaintiff Children are *all* at serious risk of future institutionalization.  *See* Friedman Decl., ¶¶ 82 ("[T]here is a significant number of District children who need but are not receiving effective [ICBS] and who are experiencing needless institutionalization and hospitalization as a result."), 67 (noting that of youth reviewed by panel of experts, "just a few youth . . . were not considered at risk for institutionalization"); Rogers Decl., ¶¶ 39 (reports of expert reviewers suggest "significant unmet current and past needs" for ICBS, placing them "at greater risk for institutionalization"), 5 (experts' findings "can be generalized to the larger universe of" 1,900 children with similar placement and service histories); Sargent Decl., ¶ 5 (children reviewed by Plaintiffs' experts and found to be at risk of institutionalization "are representative of other children in the District of Columbia with serious emotional disturbance. . . . These children and youth would likely qualify for and receive ICBS if they lived in Massachusetts"); Kamradt Decl., ¶ 37 (based on experience with Wraparound Milwaukee, "in a city of a similar size and socioeconomic strata, I would expect that there are at least 1,000 children in the District" who need ICBS).  Among others, factors that place the Plaintiff Children "at risk" for institutionalization include whether the children: "(1) had multiple hospitalizations; (2) used crisis or emergency room services for psychiatric reasons; (3) had criminal justice involvement as a result of their mental illness, or (4) were unable to access needed community services."  *Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 265 (D.N.H. 2013); *cf.* Rogers Decl., ¶ 17 (factors identified by Plaintiffs for use in study of putative class are "logical and appropriate.  These criteria have been the subject of significant research in their ability to predict future outcomes").  Plaintiffs allege that because the Plaintiff Children are unable to receive the ICBS they need, they instead have needlessly cycled in and out of psychiatric hospitals, residential placements, detention facilities, and other institutional settings.

Compl. ¶¶, 3-5, 10, 48, 59–61.  The District's own data (*see* Kamradt Decl., ¶¶, 33-35; Friedman Decl., ¶¶ 54-62) and the reports of local advocates[19] reveal as much, demonstrating that the Plaintiff Children are at serious risk of institutionalization.

Although the above evidence regarding the number of putative class members alone is sufficient to establish numerosity, other factors exist that make joinder impracticable—namely, the unique vulnerability of the class members that affects their financial resources and their ability to institute individual lawsuits.  Here, *Coleman* is instructive.  In *Coleman*, the plaintiffs sought to certify a class of individuals who failed to pay District property taxes and were thus subject to foreclosure proceedings.  *Coleman*, 306 F.R.D. at 81.  Despite the proposed class consisting of fewer than 40 people who were easy to identify and geographically concentrated, this Court

---

[19] *See* Biben Decl., ¶¶ 15 (describing many Public Defender Service ("PDS") clients sent to out-of-District residential placements), 16 (when agencies contracting with District determine they cannot provide community-based services they end them; youth ends up in DYRS custody, DYRS places youth in residential facilities, and "[i]n many cases, the residential placement is unequipped to provide the young people the treatment they need . . . . They are sent back to YSC, and the cycle begins all over again"); Avent Decl., ¶¶ 3, 11 (about 60% of Total Family Care Coalition ("TFCC") clients have experienced at least one residential placement; TFCC serves as many as 600 children annually), 19 (some TFCC clients spend years in residential placements), 21-22 (TFCC clients may be admitted to psychiatric hospitalization for as long as six months, and some have been hospitalized as many as ten times); Brown Decl. II, ¶¶ 13 (Disability Rights DC represents children "who have experienced numerous and/or lengthy stays" in residential treatment centers); Blaeuer Decl., ¶¶ 13-17 (many Advocates for Justice and Education ("AJE") clients have been hospitalized in District's psychiatric hospitals for children, some several times), 19 (some AJE clients have been sent to out-of-District residential placements); Spain Decl., ¶¶ 10 (Open City Advocates ("OCA") has had many clients sent to residential placements outside the District), 22 (some clients experience multiple psychiatric hospitalizations); Russo Decl., ¶¶ 11-12 (approximately 75% of School Justice Project ("SJP") clients have experienced episodes of institutionalization; many have histories of multiple residential placements), 14, 17 (many SJP clients have been hospitalized on multiple occasions, including at St. Elizabeths Hospital for adults), 13 (discussing SJP clients being sent to DYRS detention facilities); Cass Decl., ¶¶ 7-8 (describing Children's Law Center ("CLC") clients with histories of out-of-District residential placements, group home placements, and hospitalizations); Perry Decl., ¶¶ 26-32 (describing how youth served by District's Youth Homeless Advocacy Coalition ("YHAC") members experience .multiple or longer hospitalizations at Children's National Hospital or Psychiatric Institute of Washington).

certified the class in large part because of the vulnerability of some of the class members.  *See id.* at 80–82 ("Rule 23, in permitting the aggregation of claims, embodies a 'principle of protection of weaker plaintiffs.'" (quoting *Primavera Familienstiftung v. Askin*, 178 F.R.D. 405, 411 (S.D.N.Y. 1998)).  In analyzing the proposed class's vulnerabilities, the Court inferred from the class definition and supporting facts that at least some members of the class lacked financial resources and the ability to manage their legal affairs.  *Id.* at 81–82; *see also D.L. v. District of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013) , *vacated on other grounds*, 713 F.3d 120 (D.C. Cir. 2013) (putative class of "the District's youngest and most vulnerable pupils, many of whom are 'indigent and unable to obtain legal services'" was "an example of the economic reality . . . that petitioner's suit [must] proceed as a class action or not at all" (internal citations omitted)).

Just as in *Coleman* and *D.L.*, the putative class members here are uniquely vulnerable: by definition, they are minor children with disabilities who have been institutionalized or are at serious risk thereof, and many of the class members—all of whom are Medicaid-eligible—lack the financial resources or ability to pursue litigation on their own.[20]  Some are in institutions

---

[20] *See* Cass Decl., ¶¶ 6-9 (describing CLC clients enrolled in Medicaid); Biben Decl., ¶ 12 (about 80% of PDS clients are Medicaid-eligible District residents); Avent Decl., ¶ 9 (95% of TFCC clients are Medicaid-eligible or enrolled); Brown Decl. II, ¶¶ 14-16 (describing Disability Rights DC clients enrolled in Medicaid); Blaeuer Decl., ¶ 9 (many AJE clients are Medicaid-eligible); Spain Decl., ¶ 8 (almost all OCA clients enrolled in Medicaid); Russo Decl., ¶ 7 (many SJP clients are Medicaid-eligible); Bloch Decl., ¶ 7 (clients with histories of residential placements are all indigent and Medicaid-eligible); *see also* L.R. Decl., ¶ 3 (named Plaintiff is enrolled in Medicaid); M.W. Decl., ¶ 3 (proposed named Plaintiff enrolled in Medicaid); B.T. Decl., ¶ 2 (same); L.M. Decl., ¶ 3 (describing putative class member with mental health disability and history of institutionalization who is enrolled in Medicaid); K.R. Decl., ¶ 3 (putative class member with mental health disability and history of hospitalizations is enrolled in Medicaid).

located throughout the country, also making individual litigation of their cases in the District difficult.  *See* note 11, *supra*. These vulnerabilities further establish that joinder is impracticable.[21]

### B.      Plaintiffs' Allegations Revolve Around Defendants' Uniform Policies and Practices That Affect All Class Members and Lend Themselves to Common Answers That Will Drive Resolution of the Litigation.

Plaintiffs also must establish that "there are questions of law or fact common to the class," or commonality.  Fed. R. Civ. P. 23(a)(2).  To establish commonality, class members must have "suffered the same injury," and the class claims must "depend on a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart,* 564 U.S. at 350.  "The touchstone of the commonality inquiry is 'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'"  *Coleman*, 306 F.R.D. at 82 (quoting *Wal-Mart*, 564 U.S. at 390 (internal citations omitted) (emphasis in original)); *see also Brown*, 928 F.3d at 1080 ("*Wal-Mart* establishes that Rule 23(a)(2) is satisfied if resolution of each plaintiff's claim turns on a common question (or questions) and if common proof leads to a common answer (or answers) to that question for each plaintiff." (emphasis omitted)).  "[E]ven a single common question will do."  *Wal-Mart*, 564 U.S. at 359 (internal quotation marks, alterations, and citations omitted).

A class may satisfy commonality "even if factual distinctions exist among the claims of putative class members." *Coleman*, 306 F.R.D. at 83.  In particular, commonality often exists,

---

[21] Another factor demonstrating the impracticability of joinder here is that "the class seeks prospective relief for future class members, whose identities are currently unknown and who are therefore impossible to join."  *D.L. v. District of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013) ("[F]uture members make joinder inherently impracticable because there is no way to know who they will be.") (citing *Olson v. Brown*, 284 F.R.D. 398, 408 (N.D. Ind. 2012)).

notwithstanding factual distinctions among individual claims, where plaintiffs allege harm due to a generally applicable or uniform policy or practice. *D.L.,* 860 F.3d at 724 (holding that commonality is satisfied if there is "a uniform policy or practice" that affects all class members, causing "common harm[s] . . . susceptible to common proof, and curable by a 'single injunction'") (citing *Wal-Mart*); *Coleman*, 306 F.R.D. at 82; *Thorpe v. District of Columbia*, 303 F.R.D. 120, 145 (D.D.C. 2014), *aff'd*, *In re District of Columbia*, 792 F.3d 96 (D.C. Cir. 2015); *see also* 1 Newberg on Class Actions § 3:20 (5th ed. 2021) ("When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected."). Moreover, the Supreme Court's analysis of commonality in *Wal-Mart* has "limited relevance" in cases where, as here, "liability does not depend on the reason for a defendant's failure and plaintiffs need not show why their rights were denied to establish that they were." *D.L.*, 860 F.3d at 725.

Consistent with the principles articulated above, the D.C. Circuit recently found that Rule 23's commonality requirement was satisfied in an *Olmstead* action challenging systemic policies and procedures alleged to have resulted in unnecessary institutionalization and segregation in violation of the ADA and Section 504. In *Brown v. District of Columbia*, the D.C. Circuit affirmed the district court's certification of a class of individuals with physical disabilities who sought community-based care to help them transition out of District nursing homes. 928 F.3d at 1073. The panel in *Brown* emphasized the need for "common *proof* leading to a common *answer* to the common *question at the heart of each plaintiff's claim*." *Id.* at 1080 (emphasis in original). With respect to the District's defense that it had an adequate "*Olmstead* Plan" for transitioning putative class members out of the nursing homes and into the community, the court held that "common proof will establish whether the District's plan is 'comprehensive' and 'effectively working' and

18

whether its waiting list for transition to the community 'moves at a reasonable pace.'"[22]  *Id.* at 1082.  With respect to the requested remedies, including services to help the nursing home residents transition, the court, considering the District's "fundamental alteration" defense, held that "[c]ommon proof will establish, first, how costly it would be to provide all class members with these services and, second, whether it is reasonable to require the District to use its limited resources to pay this cost, considering the District's obligations to other disabled individuals."  *Id.* (emphasis omitted).  On the trial record, the panel concluded, "there does not appear to be a Rule 23(a)(2) deficiency."  *Id.*

Here, as in *Brown*, Plaintiffs' class *Olmstead* claims satisfy commonality because common proof will establish whether the District's "*Olmstead* Plan" comprehensively and effectively ensures class members are not unnecessarily institutionalized, the cost of providing all class members with ICBS they need to avoid unnecessary institutionalization, and whether it is reasonable to require the District to use its resources to pay that cost.  Similarly, Plaintiffs' Medicaid claim satisfies commonality because common proof establishes whether all class members who need ICBS—which under the Medicaid Act must be provided to all child enrollees for whom it is "medically necessary"—have received it.  *See, e.g.*, Friedman Decl., ¶ 82 (based on findings from multiple studies, "significant number" of District children need ICBS); Kamradt Decl., ¶ 37 (based on experience administering ICBS system in Milwaukee, "at least 1,000"

---

[22] *See Olmstead v. L.C.,* 527 U.S. 581, 584 (1999) ("If . . . the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its populations fully populated," state's *Olmstead* obligations would be met).  Plaintiffs are not aware that Defendants have any plan for providing the ICBS needed to prevent the unnecessary institutionalization of District children with mental health disabilities at serious risk of such institutionalization, but submit that this question likely will be litigated as part of Defendants' "fundamental alteration" defense to class liability.

District children need ICBS); *see also* Campbell Decl., ¶ 179 (of six children reviewed for whom opinions were developed, all need but have not received ICBS); Bird Decl., Ex. 1, at 55 (all five youth reviewed have needed and still need ICBS); Missildine Decl., Ex. 1, at 67 (all seven youth reviewed needed and continue to need ICBS, but have not received it); Joyner Decl., Ex. 1, at 53 (five youth reviewed need and have not received ICBS); Boyd Decl., Ex. A, ¶ 194 (all five youth with mental health disabilities reviewed for whom conclusions were provided "needed and continue to need ICBS or else they will suffer dramatically curtailed life opportunities")[23]  At their core, Plaintiffs' allegations involve a single overarching question:   whether Defendants systematically fail to provide medically necessary ICBS to the Plaintiff Children in violation of the ADA, Section 504, and the EPSDT provision of the Medicaid Act. [24]  "Plaintiffs and the

---

[23] *See also* Sargent Decl., ¶¶ 4 (agreeing with experts Campbell, Bird, Missildine, Joyner, and Boyd that five youth reviewed all need ICBS), 88 ("These are not the only youth with [mental health disabilities] in the District of Columbia.  My impression is that the 32 children that the other experts reviewed, including the five whose records I reviewed, are the tip of the iceberg."); Rogers Decl., ¶ 41 (youth reviewed by other experts "are representative of the larger universe of Medicaid-eligible children and youth with mental health disabilities under the age of 21 in the District").

[24] Since *Wal-Mart* was decided, other federal courts have certified classes asserting systematic ADA and Medicaid violations on the basis of similar common questions.  *See S.R.*, 325 F.R.D. at 108-09 (finding common questions satisfied Rule 23(a)(2), including "whether DHS's Medicaid program fails to provide putative class members with medically necessary mental health services . . . to which they are entitled and do so with reasonable promptness" and "whether DHS's policies and/or practices discriminate against dependent youth with mental health disabilities by failing to provide them with mental health services through the Child Welfare and/or Medicaid systems in the most integrated settings appropriate to meet their needs"); *O.B. v. Norwood*, No. 15 C 10463, 2016 WL 2866132, at *4 (N.D. Ill. May 17, 2016) (certifying a class of Medicaid-eligible children with disabilities seeking in-home shift nursing services and finding question of whether Director of Illinois Department of Healthcare and Family Services "violated the Medicaid Act or discriminated against [plaintiffs] on the basis of their disabilities" satisfied commonality requirement by raising "a 'systematic failure' to comply with the Medicaid Act's EPSDT component that has harmed all putative plaintiffs"); *N.B.*, 26 F. Supp. 3d at 772 (certifying class and noting that the common questions proposed by plaintiffs, including "[w]hether the Defendant's failure to provide medically necessary home and community-based services to children with behavioral and emotional disorders violates the EPSDT mandate" of the Medicaid Act and "[w]hether the Defendant violated the [ADA] and Rehabilitation Act by failing to provide

putative class allege that systemic deficiencies in the availability of [community-based] placements and services cause each violation of [the Medicaid Act], and that the policies and practices for allocating placements and services in general cause discrimination under the ADA and Section 504." *S.R. ex rel. Rosenbauer v. Penn. Dep't of Hum. Servs.*, 325 F.R.D. 103, 110 (E.D. Pa. 2018). As such, "[t]his is exactly the type of 'common mode' or practice predicating each alleged violation that was noticeably absent from [*Wal-Mart v. Dukes*]." *Id.*

The proof necessary to reach common answers to the common questions will be the same because Plaintiffs allege injury from a systemic violation; specifically, a common harm due to a generally applicable or "uniform policy or practice" that affects all class members. *D.L.*, 860 F.3d at 724. Whether Defendants provide ICBS or have a policy or practice of not providing ICBS is not a unique question with unique underlying facts that will result in different answers for each member of the class. Rather, the question applies universally to the class, and the underlying evidence—and ultimate answer—will be the same. Similarly, because Plaintiffs allege a systemic violation based on a generally applicable policy or practice, it does not matter why Defendants failed to provide ICBS in a given circumstance, nor does it matter why Plaintiffs' rights were denied; it only matters that ICBS was not provided on a systemic level, and Plaintiffs' rights accordingly were denied. *See id.* at 725.

---

medically necessary services in the most integrated setting"—did more than "simply ask whether the class members all 'suffered a violation of the same provision of law'" in that the questions "ask whether home and community-based treatment found to be 'medically necessary,' and therefore mandatory for the state to provide, is nevertheless unavailable"); *see also Brown*, 928 F.3d at 1081-82 (holding that Rule 23(a)(2) is satisfied by questions of (1) whether the District has an adequate "*Olmstead* Plan" in place and (2) whether the plan is "comprehensive" and "effectively working" or that "the District's waiting list does not 'move at a reasonable pace'"); *D.L.*, 860 F.3d at 725 (holding common questions of whether the District failed to identify certain children as disabled or provide them required "smooth and effective transition" to preschool satisfied Rule 23(a)(2)).

As other courts have held, the existence of factual differences among the class members' disabilities does not mean that remedying their common harms requires individualized determinations. *See, e.g.*, *Afghan & Iraqi Allies v. Pompeo*, 334 F.R.D. 449, 459 (D.D.C. 2020) (noting that "courts regularly certify classes where individual members have different factual circumstances" (internal citations omitted)).  Rather, if, as Plaintiffs allege, Defendants' failure to provide ICBS results in unnecessary institutionalization for the Plaintiff Children, "then every plaintiff is suffering the same injury as a result of a general policy of the State—even if the services recommended for each patient vary among the class members." *N.B. v. Hamos*, 26 F. Supp. 3d 756, 773 (N.D. Ill. 2014).[25]

Simply put, either Defendants provide ICBS in accordance with their legal obligations or they do not.  Common proof will provide a common answer to that question, which lies at the bottom of this case and will drive its outcome.  This common question—along with its common answer and common proof—satisfies the commonality requirement of Rule 23(a)(2) as interpreted

---

[25] Federal courts in this District and elsewhere have repeatedly certified classes despite factual distinctions existing among class members. *See, e.g.*, *Afghan & Iraqi Allies v. Pompeo*, 334 F.R.D. 449, 459 (D.D.C. 2020) ("Here, the factual variations among the class members . . . are not fatal to commonality because they do not undermine the class's common characteristics. . . ."); *McKinney v. U.S. Postal Serv.*, No. 11–cv–631 (RLW), 2013 WL 164283, at *6 (D.D.C. Jan. 16, 2013) (holding that factual variations among class members do not defeat certification "so long as a single aspect or feature of the claim is common to all proposed class members."); *see also S.R.* 325 F.R.D. at 108-09 (rejecting argument that the "individualized nature of placement and service decisions for each child in the dependency and delinquency systems makes classwide resolution' impossible" because the "putative class seeks declaratory and injunctive relief to address systemic deficiencies with the Pennsylvania child welfare program that will not require individualized determinations regarding the putative class members' placements"); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 418 (S.D.N.Y. 2012) (finding that the proposed class met commonality for class of individuals with disabilities challenging city's emergency and disaster plan even though "the class members have diverse disabilities and will not all be affected by the alleged omissions in the City's plan the same way."); *Lane v. Kitzhaber*, 283 F.R.D. 587, 598 (D. Or. 2012) (concluding that the commonality requirement was met even where the class members, individuals with disabilities, "are not identically situated").

by the Supreme Court and the D.C. Circuit, and by other courts certifying similar classes of children with disabilities.

**C.    The Named and Proposed Plaintiff Children's Claims Are Typical of the Claims of the Class Members Because They Are Based on the Same Legal Theory and Stem from the Same Systemic Failure Perpetuated by Defendants.**

Typicality exists when "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Plaintiffs' claims must be "based on the same legal theory" and their injuries must "arise from the same course of conduct . . . . " *Coleman*, 306 F.R.D. at 83 (quoting *Bynum v. District of Columbia*, 214 F.R.D. 27, 35 (D.D.C. 2003)).  This alignment of legal theory and course of conduct occurs when, as here, "the plaintiffs' claims all arise from a common statutory background and raise identical legal questions."  *Id.*

Neither the claims nor the relevant facts need to be identical across class members to maintain typicality, which "refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff."  *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 209 (D.D.C. 2018) (quoting *Hoyte v. District of Columbia*, 325 F.R.D. 485, 490 (D.D.C. 2017)); *see Wagner v. Taylor*, 836 F.2d 578, 591 (D.C. Cir. 1987) ("Courts have held that typicality is not destroyed by factual variations."); *Shenk v. Mallinckrodt PLC*, 300 F. Supp. 3d 279, 282 (D.D.C. 2018) ("[A] movant's claims need not be identical with the absent class members . . . .").  Typicality only requires "sufficient factual and legal similarity" so that "the representative's interests are in fact aligned with those of the absent class members."  *Garnett*, 301 F. Supp. at 209 (internal citations omitted).

Typicality exists here for many of the same reasons that support commonality.[26]  First, named Plaintiff L.R., and proposed additional Plaintiffs M.W. and B.T., allege that Defendants harmed both them and the absent class members by violating common statutory schemes—the ADA, Section 504, and the Medicaid Act—in the same way.  The violation of each of these statutory schemes and the related legal questions are common to Plaintiff L.R., to M.W. and B.T., and to each absentee plaintiff.  *See supra* Section IV.B.  Analyzing Defendants' alleged violations of the statutory schemes involves identical legal questions for each class member, and does not depend on individual facts, circumstances, or allegations.  Rather, by failing to provide ICBS in contravention of those statutes and failing to ensure the District's "*Olmstead* Plan" is effective and comprehensive, Defendants violated each class member's rights in the exact same way.

Second, the injury to L.R., as well as to M.W., B.T., and to the absent class members—unnecessary institutionalization and the serious risk of same—is based on "the same course of conduct by the District" in creating and maintaining a system that provides services to the Plaintiffs in institutional settings, instead of providing them ICBS in the community.  *Coleman*, 306 F.R.D. at 83.  Like the putative class members, L.R., as well as M.W. and B.T., have not received the ICBS they need to improve their mental health conditions, despite their desire for such services. *See* Campbell Decl., ¶ 50 (finding L.R. needs but has not received ICBS); L.R. Decl., ¶¶ 52-73 (describing insufficient services provided and desire to receive ICBS); Campbell Decl., ¶¶ 141-43 (finding M.W. has needed but did not receive ICBS; still needs "extensive supports" through "teaming approach"); M.W. Decl., ¶ 39 (stating desire to receive ICBS); Boyd Decl., Ex. A, ¶ 135

---

[26] "The commonality and typicality requirements often overlap because both serve as guideposts to determine whether a class action is practical and whether the representative plaintiffs' claims are sufficiently interrelated with the class claims to protect absent class members." *Huashan Zhang v. U.S. Citizenship & Immigr. Servs.*, 344 F. Supp. 3d 32, 63 (D.D.C. 2018) (quoting *R.I.L.-R. v. Johnson*, 80 F. Supp. 3d 164, 181 (D.D.C. 2015)), *aff'd*, 978 F.3d 1314 (D.C. Cir. 2020).

(finding B.T. needed and continues to need ICBS); B.T. Decl., ¶¶ 30-31 (stating desire for ICBS);
*see also* L.M. Decl., ¶ 47 (stating desire for daughter to receive ICBS); M.P. Decl., ¶ 57 (indicating

desire for great-grandson to receive ICBS). That is consistent with the views of experts that have

studied members of the putative class and the District's service system and concluded that those

children did not receive ICBS, which the District does not provide. *See, e.g.,* Joyner Decl., Ex. 1,

at 53 (five youth reviewed need ICBS); Bird Decl., Ex. 1, at 55 (same); Missildine Decl., Ex. 1, at

67 ("All seven youth [I reviewed] have needed and continue to need ICBS."); Sargent Decl., ¶ 84

(agreeing with other experts that youth reviewed need ICBS); Rogers Decl., ¶ 48 (other experts'

opinions "can be extended to the universe of children with similar service and placement histories

in the District"); *see also* Brown Decl., II, ¶ 12 (District does not provide ICBS); Blaeuer Decl.,

¶ 28 (District schools not "viable option" for intensive services for children due to limited capacity

and family mobility; District children need "community-based option for receiving intensive

services"); Russo Decl., ¶ 23 ("My clients tell us, and their records indicate, that they have not

received the individualized planning and services in their own homes, schools, and neighborhoods

that Plaintiffs are seeking in the Complaint. . . . They did not receive the services described in the

Complaint before they became court-involved and/or were placed in DYRS or DOC custody.").

The named and proposed plaintiffs are at serious risk of institutionalization due to the

District's failure to provide ICBS, as reflected by their histories of cycling in and out of institutions.

*See* Campbell Decl., ¶¶ 57 ("L.R. remains at high risk of further institutionalization, including

incarceration in a jail or prison setting."); L.R. Decl., ¶¶ 20, 25, 27, 32-35, 39-40 (discussing

history of cycling through institutions); Campbell Decl., ¶ 148 (finding M.W. at "high risk of

future engagement" with criminal system, and also at risk for future hospitalization); M.W. Decl.,

¶¶ 25, 30-31 (describing history of institutionalization); Boyd Decl., Ex. A, ¶ 141 (finding B.T. at

risk of continued institutionalization, including incarceration); B.T. Decl., ¶¶ 15-28 (describing

history of institutionalization).  The same is true of the putative class members.  *See* Joyner Decl.,

Ex. 1, at 53 (four of five youth fully reviewed are currently institutionalized or at risk of same);

Bird Decl., Ex. 1, at 58 (four of five youth reviewed are at risk of institutionalization; three are or

have been  incarcerated); Missildine Decl., Ex. 1, at 71 (five of six youth reviewed are at risk of

institutionalization; three have been hospitalized for psychiatric treatment, and two others were

taken to psychiatric hospital for evaluation but not admitted); Rogers Decl., ¶ 43 (youth identified

as "at risk" by other experts representative of larger universe of Medicaid-eligible District youth

with mental health disabilities); *see also* Biben Decl., ¶ 16 (discussing cycle of institutionalization

for PDS clients); Cass Decl., ¶ 8 (describing history of institutionalization of client); Avent Decl.,

¶ 22 (describing "frequent flyer" clients with frequent hospitalizations).[27]

   None of the Plaintiff Children have received needed services in the most integrated setting

appropriate, which for all of them is in their own homes and communities or in another family or

foster home with ICBS.  *See* Kamradt Decl., ¶ 52 ("The community-based nature of [ICBS] . . .

enables children to receive them in the least restrictive environment."); Friedman Decl., ¶ 9 (ICBS

"allow many children to live and function in the community, instead of being placed in restrictive

---

[27] *See also* Brown Decl. II, ¶¶ 14-16 (discussing two Disability Rights DC clients with histories of
out-of-district placements); K.R. Decl., ¶¶ 15, 20, 23 (declarant was admitted 12 times to
Children's National Hospital and twice to PIW); L.M. Decl., ¶¶ 21-22, 26 (describing daughter's
history of institutionalization); M.P. Decl., ¶¶ 18-53 (describing great-grandson's history of
institutionalizations in residential treatment centers and group homes); Blaeuer Decl., ¶¶ 17-18
(clients with more serious needs "end up hospitalized and then, after another crisis, re-
hospitalized"); Spain Decl., ¶ 22 (clients with repeated hospitalizations);Perry Decl., ¶ 32
(describing experiences of homeless youth, and stating "[c]ycling in and out of the hospital . . .
impacts a youth's ability to attend school on a consistent basis"); Russo Decl., ¶¶ 15-18 (describing
SJP clients with multiple hospitalizations at Children's National, PIW, and St. Elizabeths; another
client was placed in residential facilities in Arkansas, Michigan, and Florida after being placed
under DYRS custody; on return to District, client was hospitalized several times before being
charged with crimes and detained in jail in the District and in Prince George's County).

residential placements or cycling in and out of psychiatric hospitals"); Boyd Decl., Ex. A, ¶ 192 ("[M]ultiple youths could have avoided detention at YSC . . . and incarceration at the DOC . . . had they received ICBS, which would have addressed their psychiatric needs . . . . With appropriate ICBS, such unnecessarily institutionalization could have been avoided and allowed the youth to remain in their homes and communities."); Bird Decl., Ex. 1, at 55 ("Through ICBS and the 'wraparound' approach, services can be organized by a child and family team so that they are available to the youth within the home and the community."); Missildine Decl., Ex. 1, at 71-72 (with ICBS, "the child can get the supports they need at home, or in another home-like setting where appropriate, and not in a residential placement or psychiatric hospital"); Joyner Decl., Ex. 1, at 53 (District "must do more" to ensure that youth receive "the ICBS that they need, where they are naturally located, in their family or foster homes, in their schools, and elsewhere in the community"); Sargent Decl., ¶ 85 (youth reviewed "are children that my hospital and I would refer for" intensive community-based services provided to Medicaid-eligible children in Massachusetts).

As a result, Plaintiffs allege they have all been harmed in the same manner, *compare* Compl. ¶¶ 2-3, 5, 44-48 (describing harms experienced by all class members) *with id.* ¶¶ 57 (describing harms experienced by L.R.), and that the provision of ICBS can remedy their harms, *see id.* ¶¶ 4, 38, 48.[28] Experts who have studied members of the putative class and the District's

---

[28] *See also* L.R. Decl., ¶¶ 35-37, 73 (discussing harms from institutionalization, including, among other things, preventing visits with her family and disrupting her education; she wants ICBS to "feel stable and healthy, finish school, get permanent housing, and have a career"). The same is true of the proposed named Plaintiffs. *See* M.W. Decl., ¶¶ 29-30, 39 (M.W. was restrained in school and detained at YSC; ICBS could help him "understand what life is like and what I need to do to be independent"); B.T. Decl., ¶¶ 23-24, 31 (B.T. missed daughter's birth while in out-of-District residential treatment center; he wants ICBS "so that I can transition into the community and be a good dad to my baby girl"). It is also true for other putative class members. *See* L.M.

services agree.  *See* Friedman Decl., ¶¶ 10 ("ICBS is both necessary and effective for a significant number of Medicaid-eligible children with mental disabilities.  There is no reason to think that children in the [District] are different from children studied elsewhere for whom these services have been found necessary and effective."), 75 (youth reviewed by other experts "ha[d] a number of strengths to build on. . . . [but] failed to receive the [ICBS] that they needed").[29]  So too do local services providers for youth in the putative class who have experience with the District's mental health and juvenile systems.  *See* Spain Decl., ¶¶ 13, 21, 31 (describing how clients' experiences of frustration and abandonment in out-of-District placements lead to new charges in other jurisdictions, and how clients who turn 18 while institutionalized face homelessness upon return to the District because their families are no longer required to take them in; concluding that ICBS would benefit youth, including "increased collaboration among DBH, DYRS, CSS, CFSA, and other youth serving agencies").[30]

---

Decl., ¶¶ 30-32, 48 (daughter experienced physical and sexual assaults while in congregate placements; she needs ICBS "that will create a safety net for her that is more than just a social worker dropping in to check on her.  She needs a team of people she trusts to help her.").

[29] *See also* Campbell Decl., ¶ 177 ("Some youth [I reviewed] have criminal charges that they could have avoided if the mental health system had provided appropriate services and supports at the right intensity for their needs.  For children involved in the child welfare system . . . intensive support [was needed] at an early age, but was not provided."); Missildine Decl., Ex. A, at 70 ("For a number of the youth I reviewed, their relationships with their parents or caregivers have been significantly damaged. . . . a child and family team with [ICC] could . . . give parents and caregivers support in managing their child's services [and] give these exhausted and overwhelmed parents and caregivers respite when they need it."); Boyd Decl., Ex. A, ¶ 194("If the youths had been provided ICBS, they would not have been needlessly placed in . . . residential facilities.").

[30] *See also* Avent Decl., ¶¶ 15-16, 22 (youth get in trouble when they transition from institutions without community-based services, and their education is interrupted while institutionalized; clients want a team "to solve problems, help families communicate, and be there when there are emergencies"); Blaeuer Decl., ¶¶ 23-24, 28 (youth experience trauma in institutions, and institutionalization disrupts existing treatment when youth cannot timely access treatment afterward; ICBS needed); Russo Decl., ¶¶ 23, 29-30 (SJP clients did not receive ICBS before becoming court-involved and/or placed in DYRS or DOC custody; although they feel "beaten

Finally, there are no differences in facts or defenses here that destroy typicality. As with any class action, individual circumstances will exist amongst class members, including differences in their disabilities and the individualized services that each class member would receive if the Defendants' systemic failure to provide ICBS were cured. But federal courts across the country nonetheless have continued to conclude typicality exists in *Olmstead* class actions notwithstanding differences in class members' individual circumstances.[31]

A court in this district has recently reached a similar conclusion: In *Thorpe v. District of Columbia*, Plaintiffs brought an *Olmstead* action concerning the District's failure to provide adequate transition assistance services for nursing facilities. 303 F.R.D. at 124. The court granted Plaintiffs' motion for class certification, rejecting the District's arguments against typicality, including its assertions that the contested services would vary based on each individual's particular circumstances and that the named plaintiffs failed to meet the class definition due to unique factual

---

down by the system in the District," they want "to take ownership of their lives and want services and additional education that will help them get jobs and either stay with their families or move into their own apartments"); Biben Decl., ¶ 46 ("I am not aware of any juveniles in the [District's] delinquency system who have received [ICBS], but I know of a number of such juveniles for whom ICBS would be useful."); Perry Decl., ¶ 20 (ICBS would help coordinate mental health services with other services for homeless youth).

[31] *See. e.g.*, *O.B.*, 2016 WL 2866132, at *4 (finding typicality despite differences in individual disabilities and required services among the class members, because plaintiffs there "challenge[d] the same alleged systemic failure to provide 'medically necessary' EPSDT services that harms every other class member"); *N.B.*, 26 F. Supp. 3d at 771 (typicality existed where "named plaintiffs all suffer from mental illness and/or behavioral or emotional disorders . . . [and] all of them are alleged to have been denied to [ICBS] based on the failure of [the state] to make them available, in violation of EPSDT and the integration mandate"); *Kenneth R.*, 293 F.R.D. at 270 (typicality existed, notwithstanding individual factual differences among class members, because each class member had "an abiding interest in securing the availability of community-based services options sufficient to preclude unnecessary institutionalization" because each class member "continues to experience unnecessary institutionalization, has experienced unnecessary institutionalization in the past, or although currently not institutionalized, is otherwise at serious risk of being unnecessarily institutionalized").

differences.  *Id.* at 147–49 ("the concept of a system of transition assistance is sufficiently definite" to be a practice which violates *Olmstead*'s integration mandate and injures class members in the same way, if it contributes to failure to provide community-based services).  Here, Plaintiffs allege, and substantiate, that Defendants are causing the Plaintiff Children to suffer unnecessary institutionalization and serious risk thereof by failing to provide medically necessary and legally required community-based services.  Any factual differences that exist amongst class members concerning their conditions do not prevent typicality:  "[i]f the services are 'medically necessary,' the origin of the condition is irrelevant." *N.B.*, 26 F. Supp. 3d at 771.

**D.**    **Plaintiffs Will Adequately Represent the Class Because They Seek Identical Relief for All Class Members, and Plaintiffs' Counsel Are Well Qualified with Extensive Class-Action Litigation Experience.**

Finally, Rule 23(a) requires that the representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To satisfy this requirement, "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class" and "must appear able to vigorously prosecute the interests of the class through qualified counsel."  *Coleman*, 306 F.R.D. at 84 (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)); *Thorpe*, 303 F.R.D. at 150 (same).  The court need only find one adequate class representative. *See Borum v. Brentwood Vill., LLC*, 324 F.R.D. 1, 1 (D.D.C. 2018); *Shulman v. Ritzenberg*, 47 F.R.D. 202, 206 (D.D.C. 1969) ("Even one member of a class can provide the kind of representation for all that is contemplated by the class suit" because "it is the *quality* of representation that is crucial in determining adequacy and fairness of representation.").

     1.   The named and proposed class representatives are adequate.

L.R. and the other Plaintiff Children share the same interests in pursuing their rights to receive ICBS in the most integrated setting appropriate in order to improve their mental health

conditions and help them avoid unnecessary institutionalization.  *See* L.R. Decl., ¶¶ 7, 73.  The

remedies sought by L.R—injunctive and declaratory relief requiring that Defendants provide

medically necessary ICBS to the Plaintiff Children—would equally benefit all of the putative class

members.  *See Coleman*, 306 F.R.D. at 84 (noting that where plaintiffs seek "identical" relief for

all class members, "there are no conflicting interests that might derail certification on this prong").

Accordingly, L.R. is an adequate class representative.[32]  Should Plaintiffs' unopposed Motion to

Amend their Complaint be granted, M.W. and B.T. would also be adequate class representatives.

*See* M.W. Decl., ¶¶ 8, 39-40; B.T. Decl., ¶¶ 9, 32.[33]

       2.  Class counsel are adequate.

Class counsel are qualified and able to vigorously prosecute the interests of the class.  Class

counsel are not conflicted and have extensive experience with mental health law, disability law,

youth law, and with litigating class actions in those fields and more generally.  *See Coleman*, 306

---

[32] That L.R. does not seek damages does not defeat L.R.'s adequacy as a class representative.  *See Thorpe,* 303 F.R.D. at 150 (holding that there is no conflict of interest when the claim is a systemic challenge that does not preclude an individual *Olmstead* action for damages).

[33] Plaintiff Disability Rights DC—which has associational standing to prosecute this action for the reasons explained in Plaintiffs' Opposition to Defendants' Motion to Dismiss (*see* Dkt. No. 29 at 16-19)—also would adequately represent the interests of the Plaintiff children, all of whom are its constituents as the protection and advocacy program for people with disabilities in the District.  *See* Brown Decl. I, ¶¶ 18-22.  Similar organizations have been found adequate class representatives when they act in that capacity to protect their constituents.  *See R.P.-K. ex rel. C.K. v. Dep't of Educ., Hawaii*, 272 F.R.D. 541, 543 (D. Haw. 2011) (certifying class with a Protection and Advocacy organization as class representative); *see also, e.g., Nat'l Veterans Legal Servs. Program v. United States*, 235 F. Supp. 3d 32, 36-37, 41-43 (D.D.C. 2017) (holding nonprofit legal service organization adequate class representative); *Equal Emp. Opportunity Comm'n v. Printing Indus. of Metro. Wash., D.C., Inc.*, 92 F.R.D. 51, 54 (D.D.C. 1981) (finding plaintiff labor union adequate class representative on behalf of union's constituents).

F.R.D. at 84 (finding adequacy when class counsel has extensive experience litigating class actions); *Healthy Futures of Texas,* 326 F.R.D. at 7-8 (same).

The Judge David L. Bazelon Center for Mental Health Law ("Bazelon Center") is nationally recognized for its expertise in disability law, including its advocacy for the rights of people with mental health disabilities to live in their own homes and communities. A primary focus of the Bazelon Center's work involves efforts to remedy disability-based discrimination through enforcement of the ADA and the Rehabilitation Act. Since its founding in 1972, the Bazelon Center has played a significant role in enforcement of these laws' integration mandate, including in the *Olmstead v. L.C.* litigation in the Supreme Court. The Bazelon Center has also served as class counsel in a number of actions in which plaintiffs sought medically necessary ICBS to avoid unnecessary institutionalization, including *Katie A. v. Bonta*, No. 02-056662 (AHM) (C.D. Cal., filed 2002), and *J.K. v. Eden*, No. CIV 91-261 TUC JMR (D. Ariz., filed 1991). In addition, the Bazelon Center has longstanding experience advocating on behalf of adults and children with disabilities in the District of Columbia, including as plaintiffs' counsel in two class actions: *Dixon v. Barry*, 967 F. Supp. 535 (D.D.C. 1997) and *Blackman v. District of Columbia*, 454 F. Supp. 2d 1 (D.D.C. 2006). *See* Burnim Decl., ¶¶ 3-6.

Disability Rights DC has been designated by the District as its protection and advocacy organization since 1996, though it was founded and started serving low-income residents of D.C. in 1967. Pursuant to federal and state law, Disability Rights DC has the statutory authority to pursue legal, administrative, and other appropriate remedies to advocate for the rights and interests of people with disabilities. Disability Rights DC's experience includes bringing class action lawsuits against the District on behalf of people with disabilities, including *Evans v. Washington*, 1:76-cv-00293 (D.D.C. filed 1976), and, recently, in *Brown v. District of Columbia*, in which the

District did not challenge the competency of Disability Rights DC as counsel.  Disability Rights DC brings a deep knowledge of the District's mental health system to this case, including extensive experience working with people receiving both institutional and community services.  *See* Bernstein Decl., ¶¶ 5-14.

The National Center for Youth Law ("NCYL") is nationally recognized for its expertise in legal issues affecting low-income children, including education, mental health, child welfare, juvenile justice, and immigration.  A primary focus of NCYL's work is on impact litigation.  Since its founding in 1970, NCYL has served as counsel in many class actions affecting the lives of children with disabilities, including alongside the Bazelon Center in *Katie A. v. Bonta*, No. 02-056662 (AHM) (C.D. Cal., filed 2002).  *See* Galanter Decl., ¶¶ 4-6.

Schulte Roth & Zabel LLP ("SRZ") is a private law firm with over 250 attorneys in the United States, including an office in the District of Columbia.  The firm has broad experience in complex litigation, including class actions.  It has served as local and class counsel in numerous state and federal class matters, including matters related to the right to counsel for indigent criminal defendants and the eviction of families from FEMA-subsidized shelters following Hurricane Katrina.  Schiffman Decl., ¶¶ 4-5.  SRZ has worked with the Bazelon Center for the last ten years as a partner in litigation advancing the rights of children with disabilities, including through actions in Alabama and Mississippi, as well as advocacy before the United States Courts of Appeals for the First and Third Circuits.  *See id.*, ¶ 7.

Plaintiffs' counsel are adequate to represent the class competently, and they have no interests or commitments that are antagonistic to, or that would detract from, their efforts to seek a favorable decision for the Class.  Accordingly, this aspect of Rule 23(a)(4) is also satisfied.

**E.** **Defendants Have Acted and Refused to Act on Grounds That Apply Generally to the Class; As Such, Class Certification under Rule 23(b)(2), as Well as Injunctive Relief for the Class, Is Appropriate.**

Plaintiffs seek to certify this class under Rule 23(b)(2), which requires that defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). As the Supreme Court noted in *Wal-Mart*, "'[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture." 564 U.S. at 361 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997)). Indeed, the D.C. Circuit has described a Rule 23(b)(2) action as an efficient and consolidated way to address systemic harms that are best remedied with an injunction, particularly in civil rights cases like this one. *See D.L.,* 860 F.3d at 726 ("Rule 23(b)(2) exists so that parties and courts, especially in civil rights cases like this, can avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief."); *In re District of Columbia,* 792 F.3d at 102 ("*Olmstead* held there is a common civil right to non-segregation. . . . [a]nd Rule 23(b)(2) was intended for civil rights cases."); *cf. N.B.*, 26 F. Supp. 3d at 774 (Rule 23(b)(2) satisfied where "success on the plaintiffs' claims will require policy modifications to properly implement EPSDT and the [*Olmstead*] integration mandate; by their very nature such policy changes are generally applicable, and therefore would benefit all class members").

"The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Coleman*, 306 F.R.D. at 84 (quoting *Wal-Mart*, 564 U.S. at 360). Although the injunction must provide relief to each class member, "[i]f a certain

34

outcome is legally mandated and an injunction provides each member of the class an increased opportunity to achieve that outcome, Rule 23(b)(2) is satisfied . . . ." *Brown*, 928 F.3d at 1082–83.

Regarding the first component of Rule 23(b)(2)—whether Defendants have "acted or refused to act on grounds that apply generally to the class"—Plaintiffs satisfy their burden. Plaintiffs allege violations of three federal statutes, each of which guarantee the same rights and protections to each putative class member in the same way. At this stage, Plaintiffs have provided ample evidence, including the District's own public records, showing that Defendants fail to provide the legally required ICBS. Kamradt Decl., ¶¶ 33-36 (summarizing Defendants' data, and stating that "[t]he number of residential and other out-of-home placements and hospitalizations taking place in the District suggests to me that the District is not providing [ICBS] to all of the District children who need them"), 37 (based on Defendants' data, and size of District's population, "I would expect that there are at least 1,000 children in the District who need [ICBS]"); Friedman Decl., ¶¶ 62-63 (and stating that "significant" number of District children have been removed from their homes), 75 (other experts' reports "present a picture of a group of youth, primarily Black or African-American, with multiple challenges, who were not able to receive the [ICBS] that they needed. . . . This clearly seems to be a group of young people with serious emotional disturbances who failed to receive the help that they needed"), 82 (based on quantitative and qualitative data describing District's children's mental health system, including other experts' reports, "significant number" of District children need but are not receiving ICBS); Rogers Decl., ¶ 44 (Plaintiffs' qualitative study of District youth is "relevant, instructive, and . . . provides useful information about the larger universe of children and youth"); Mitchell Aff., ¶ 3, Ex. 1 at 3, 6, 40 (DBH, CFSA, DYRS place hundreds of youth in congregate out-of-home placements; provider states that "many children and youth . . . are still needing services," and DBH agency partner states

that "[w]hat is going on with DBH system is frustrating. . . . By the time these children come to us they are bleeding. . . . Services need to support children to be in their home, back home, to receive treatment quickly").

Furthermore, Plaintiffs have proffered evidence indicating that Defendants' failure to provide legally mandated ICBS affects the Plaintiff Children in the same way:  they are unnecessarily institutionalized or at serious risk of institutionalization.  *See* Sections IV.B and IV.C, *supra*.  Without ICBS, the Plaintiff Children cycle unnecessarily in and out of institutions to their detriment.  *See* L.R. Decl., ¶¶ 13-42 (named Plaintiff cycled among hospitals, PRTFs, YSC, and New Beginnings); M.W. Decl., ¶¶ 25, 30-31 (proposed named Plaintiff spent four months at PIW, then went to YSC and group home); B.T. Decl., ¶¶ 15-27 (proposed named Plaintiff cycled from YSC to shelter home to YSC to shelter home to group home to PRTF, to group home, before returning to family home).[34]  Moreover, the District does not have an effective and comprehensive

---

[34] *See also, e.g.,* Boyd Decl., Ex. A, ¶ 188 (two youth reviewed cycled between residential treatment placements, where they experienced restraint and/or seclusion, and District group homes); Bird Decl., Ex. 1, at 11 (youth who experienced about 15 different out-of-home placements while under DYRS custody), 21 (another youth was in at least 18 different out-of-home placements while under DYRS custody between 2017-2020, and is currently at YSC awaiting sentencing to federal prison), 29-30 (another youth placed in residential treatment facilities in Georgia, Pennsylvania, and Maryland, along with several group homes; youth was recently released from DC Jail); Cass Decl., ¶¶ 7-9 (describing one client with two residential placements, another with one hospitalization and four out-of-district residential placements, and a third with hospitalization and group home placements); Brown Decl. II, ¶¶ 13-16 (describing Disability Rights DC clients "who have experienced numerous and/or lengthy stays in . . . [PRTFs] or other residential treatment facilities"); Biben Decl., ¶¶ 15-16 (discussing how youth are "warehoused in inadequate residential facilities where they do not receive the treatment they need"); Avent Decl., ¶ 14 (stating some children do not benefit from residential placements, which can be self-perpetuating:  "[s]ometimes their behavior does not improve; as a result; they 'fail' the program and get sent to another residential placement"); Romero Decl., ¶ 14-24 (describing her 14 hospitalizations); L.M. Decl., ¶¶ 26-31 (daughter spent three years in three PRTFs in Georgia and Florida); M.P. Decl., ¶¶ 9-55 (detailing history of great-grandson's hospitalizations, detentions at YSC and New Beginnings, and out-of-District residential and group home placements); Blaeuer Decl., ¶¶ 19-24 (some clients "have histories of residential placements"); Spain Decl., ¶ 22

"*Olmstead* Plan" to provide needed intensive mental health services to its children and youth in the most integrated setting appropriate. *See* Mitchell Aff., ¶¶ 4-5, Ex. 2, Ex. 3.

In addition to their institutionalization, the Plaintiff Children are at high risk of doing poorly in school, which further increases their chances of becoming involved in the delinquency and criminal systems and, as they transition to adulthood, being unable to obtain a job or live independently. *See* L.R. Decl., ¶¶ 9-32 (after therapy that "didn't do anything for" her, named Plaintiff had fights and suspensions at school and hospitalizations at PIW and Children's National, leading to placement under DYRS custody); M.W. Decl., ¶¶ 25-30 (after months-long hospitalization, proposed named Plaintiff was placed under DYRS custody and detained at YSC); B.T. Decl., ¶¶ 11-15 (proposed named Plaintiff was suspended and expelled without receiving counseling; he was placed under DYRS custody at age 14). Those experiences are typical based on what experts observed during their study of putative class members. *See* Campbell Decl., ¶ 177 (finding most youth fully reviewed "are functioning below grade level at school"; some have criminal charges); Bird Decl., Ex. 1, at 58 (youth reviewed "have not been successful in school"; three have been under DYRS supervision, with multiple out-of-home placements); Missildine Decl., Ex. 1, at 70 ("[M]ost of the youth [I reviewed have] experienced significant challenges in school, including issues relating to behavior, academics, attendance, suspension, and interactions with peers."); Boyd Decl., Ex. A, ¶¶ 190-91 (discussing "unmet mental health needs and the school-to-prison pipeline"); Joyner Decl., Ex. A, at 53 (explaining how schools dis-enroll youth

---

(recounting experiences of clients with multiple hospitalizations); Russo Decl., ¶ 14 ("Many of our clients have a history of multiple out-of-District residential placements . . . . it is not uncommon for one of our clients to be placed in two or three facilities outside the District over the course of two years or more, for a stay of between two and nine months in each facility [and placement] at YSC for 30 days or more in between each residential placement.").

due to mental health issues, re-enroll them later, but do nothing to ensure youth is linked to mental health services, including during transition from one educational placement to another).[35] Accordingly, as in *Thorpe*, "it is sufficient that plaintiffs have proffered evidence of systemic deficiencies in the District's system . . . and that those deficiencies appear to be affecting the class." 303 F.R.D. at 151.

In terms of the second component of Rule 23(b)(2)—whether final injunctive relief is appropriate for the class as a whole—the answer is again yes. Defendants are already legally mandated to provide the Plaintiff Children with ICBS to treat their conditions and help them avoid unnecessary institutionalization. Plaintiffs seek injunctive and declaratory relief that settles the legality of the District's conduct and requires Defendants to provide the needed ICBS. *See Brown*, 928 F.3d at 1082 ("If a certain outcome is legally mandated and an injunction provides each member of the class an increased opportunity to achieve that outcome, Rule 23(b)(2) is satisfied.").

Unlike cases where "each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant," this Court can resolve Plaintiffs' claims "in one stroke" by issuing a single injunctive order requiring Defendants to modify their policies and practices to provide ICBS to the Plaintiff Children who need it. *Wal-Mart*, 564 U.S. at 350,

---

[35] They also are consistent with the experience of service providers in the District and other members of the putative class. *See* Cass Decl., ¶ 9 (after client was not engaged in services, she ran away from group home and was placed under DYRS custody); Avent Decl., ¶ 16 (when youth are not connected to supports in community, "children end up getting in trouble, often by getting involved with other kids who are a bad influence, and sometimes committing crimes"); Brown Decl. II, ¶¶ 14-15 (describing clients who experienced truancy from school and psychiatric hospitalizations before being placed under DYRS custody); Russo Decl., ¶ 23 (all SJP clients are court involved and many are in the custody of DYRS or Department of Corrections); Bloch Decl., ¶¶ 9, 12 (some of criminal attorney's 500 clients over past six years were placed in residential treatment centers when they were youth, one for at least nine months; one 20-year-old client currently at St. Elizabeths); L.M. Decl., ¶¶ 15-19 (after multiple school transfers and multiple suspensions, daughter referred to DYRS for fighting); M.P. Decl., ¶¶ 9-53 (great-grandson had behavioral issues at school, leading to arrests and DYRS custody at YSC and New Beginnings).

360 (emphasis in original); *cf. Lane*, 283 F.R.D. at 602 (Rule 23(b)(2) satisfied where the "injunctive relief focuses on defendants' conduct, not on the treatment needs of each class member" and "is aimed at providing classwide alternatives to [segregation], regardless of a person's individualized support needs, by modifying the way defendants fund, plan, and administer the existing . . . service system"). Classwide relief to remedy the ongoing civil rights violation by Defendants against Plaintiff Children is not only an appropriate remedy—it is the only remedy that can sufficiently address Defendants' conduct. Thus, certification under Rule 23(b)(2) is warranted.

### F. The Class Is Sufficiently Definite and Ascertainable.

In addition to the express requirements of Rule 23, this Court and others in this Circuit have also applied an implied requirement that a putative class be sufficiently definite before it can be certified. *Huashan Zhang*, 344 F. Supp. 3d at 61-62; *Thorpe*, 303 F.R.D. at 139. Although this prerequisite is not "particularly stringent," it typically requires a class to be "adequately defined" and "clearly ascertainable." *Thorpe*, 303 F.R.D. at 139 (citing *Pigford v. Glickman*, 182 F.R.D. 341, 346 (D.D.C. 1998)). Yet, in Rule 23(b)(2) classes such as this one where plaintiffs only seek an injunction and notice is not required, "precise ascertainability" is not required. *D.L.*, 302 F.R.D. at 17 (quoting Newberg § 3:7); *see also Ramirez*, 2018 WL 4178176, at *48 ("it is far from clear that there exists in this district a requirement that a class certified under Rule 23(b)(2) must demonstrate ascertainability to merit certification"). Rule 23(b)(2) classes are sufficiently ascertainable "as long as plaintiffs can establish the existence of a class and propose a class definition that accurately articulates the general demarcations of the class of individuals who are being harmed by the alleged deficiencies." *Thorpe*, 303 F.R.D. at 139 (internal citations and quotation marks omitted). It must also be "administratively feasible" to determine who is in the proposed class—that is, counsel and putative class members should be able to determine who is in

the class "simply by reading the [class] definition." *Coleman*, 306 F.R.D. at 75 (internal citations omitted) (alteration in original).

The class here clearly exists and is well-defined; accordingly, it is sufficiently definite. A potential class member only needs to answer whether he or she: (1) is a Medicaid-eligible child (under the age of 21) who; (2) has a mental health disability.[36] Plaintiffs allege that Defendants do not provide—and, thus, no class members receive—medically necessary ICBS, and that the Plaintiff Children are therefore unnecessarily institutionalized or at serious risk thereof. In other words, the remaining elements of the proposed class definition (concerning the class member's non-receipt of needed ICBS and risk of institutionalization) are automatically satisfied by nature of being a Medicaid eligible child residing in the District who has a mental health disability. Thus, "simply by reading the [class] definition," children in the District (or their guardians) will be able to determine whether they are class members. *See, e.g., Coleman*, 306 F.R.D. at 75.

Furthermore, Defendants possess data that could be readily used to identify the Medicaid-eligible children residing in the District who are under the age of 21 and have a mental health disability. *See* Friedman Decl., ¶¶ 48-62; Kamradt Decl., ¶ 33. Because "absolute precision is not required" in Rule 23(b)(2) cases, the Court may find the class sufficiently ascertainable even if it concludes that "it is impossible to identify specifically who needs" ICBS "without individualized determinations." *Thorpe*, 303 F.R.D. at 140. As in *Thorpe*, "[i]f plaintiffs ultimately prevail, the District may have to implement a system that identifies which residents need [the sought after services] and what assistance they need, but, until then, there is no reason for the Court to insist on a more definitive class definition." *See id.* at 141.

---

[36] *See* Compl., ¶¶ 13-14 (defining "mental health disability" by reference to definition of "serious emotional disturbance" in District of Columbia regulation).

### G.  **Class Counsel Should Be Appointed Pursuant to Fed. R. Civ. P. 23(g).**

Plaintiffs are represented by the Bazelon Center, Disability Rights DC, NCYL, and SRZ, each of which brings unique resources, experience, and skills to this case.  *See* Section IV.D.2, *supra*.  Together these attorneys request appointment as co-class counsel pursuant to Federal Rule of Civil Procedure 23(g).

Ira Burnim is the Legal Director at the Bazelon Center.  Burnim Decl., ¶ 2.  He joined the staff in 1988 and has served as legal director since 1990, litigating numerous class actions affecting the rights of individuals with mental disabilities.  *See id.,* ¶¶ 2, 6, 12.  Prior to joining the Bazelon Center, he was the legal director of the Children's Defense Fund and a senior attorney at the Southern Poverty Law Center.  *See id.,* ¶ 12.  He has served as lead counsel on a number of federal class actions, including *Katie A.*, *Dixon*, and *Blackman*.  *See id.,* ¶ 6.  Lewis Bossing, a senior staff attorney at the Bazelon Center, also has extensive federal court litigation experience, particularly focusing on individuals with disabilities.  *See id.,* ¶ 15.  He has over ten years of experience working at the Bazelon Center on actions similar to the instant case, including in the *Blackman* litigation.  *See id*., ¶¶ 6, 15.  Prior to joining the Bazelon Center, he worked as an attorney in the Disability Rights Section in the Civil Rights Division of the U.S. Department of Justice and with the Legal Aid Society-Employment Law Center of San Francisco, where he litigated to protect the rights of adults and children with disabilities under the ADA.  *See id*.  Brittany Vanneman joined the Bazelon Center in 2020 as the David and Mickey Bazelon Fellow.  *Id.,* at ¶ 16.

Sandra Bernstein is the Legal Director at Disability Rights DC.  Bernstein Decl., ¶ 3.  Since joining the organization in 1997, she has provided direct representation to hundreds of individuals with disabilities to ensure they are fully integrated in their community.  *See id.,* ¶¶ 7, 10.  She has also served as plaintiff's counsel in various class actions, including *Evans*.  *Id*., ¶ 10.  Mary Nell

Clark has been a Managing Attorney at Disability Rights DC since she joined the organization in 2003. *See id.,* ¶ 11. Prior to joining the organization, she worked with the U.S. Department of Justice for almost ten years litigating class action lawsuits. *See id.* While at Disability Rights DC, she has been lead counsel for several cases, including litigation against the District to protect the rights of residents of St. Elizabeths Hospital, the District's historic institution for adults with mental health disabilities. *See id.*

Seth Galanter is a Senior Director of Legal Advocacy at NCYL. Galanter Decl., ¶ 3. With over 25 years of experience, he has litigated in the Appellate Section in the Civil Rights Division of the U.S. Department of Justice, and served as the Acting Assistant Secretary and the Principal Deputy Assistant Secretary in the U.S. Department of Education's Office for Civil Rights. *See id.,* ¶ 8. While in private practice, he argued two cases before the Supreme Court and was named Pro Bono Lawyer of the Year by the District of Columbia Bar for his work in a federal lawsuit against the District concerning accessibility for individuals with mobility impairments. *Id.*

Howard Schiffman is a partner at SRZ. Schiffman Decl., ¶ 3. With over 40 years of experience, he has represented clients in a vast array of civil litigation matters including complex securities litigation. *See id.,* ¶ 7. Prior to joining the firm, he worked as a trial attorney at the SEC Division of Enforcement. *Id.*. Jason Mitchell is Special Counsel at SRZ, where he has worked for over 14 years. *Id.*, ¶ 8. He has substantial litigation experience in class actions and complex commercial matters. *Id.* Through his pro bono work, he has litigated a class action in New York State with the New York Civil Liberties Union to ensure that indigent criminal defendants receive their right to counsel, and worked with the Innocence Project on behalf of wrongly convicted individuals. *See id.*, ¶¶ 5, 8.

## V.    CONCLUSION AND REQUEST FOR RELIEF

For the reasons set forth above, Plaintiffs respectfully request that the Court, pursuant to

Fed. R. Civ. P. 23(a) and 23(b)(2), certify a class consisting of:

> All Medicaid-eligible District of Columbia children who now or in the future are under the age of 21, have a mental health disability, are not receiving medically necessary intensive community-based services, and are unnecessarily institutionalized or at serious risk of institutionalization.

In addition, Plaintiffs respectfully request that the Court appoint the Judge David L. Bazelon

Center for Mental Health Law, Disability Rights DC, the National Center for Youth Law, and

Schulte Roth & Zabel LLP as class counsel in this action pursuant to Rule 23(g).

Respectfully submitted this 19th day of July, 2021.

*/s/ Jason T. Mitchell*

Sandra J. Bernstein (D.C. Bar No. 455355)
Mary Nell Clark (D.C. Bar No. 419732)
DISABILITY RIGHTS DC AT UNIVERSITY LEGAL SERVICES
220 I Street NE, Suite 130
Washington, D.C. 20002
202-547-0198

Ira A. Burnim (D.C. Bar No. 406154)
Lewis L. Bossing (D.C. Bar No. 984609)
Brittany Vanneman (D.C. Bar No. 1736194)
JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW
1090 Vermont Avenue, NW, Suite 220
Washington, D.C. 20005
202-467-5730

Seth M. Galanter (D.C. Bar No. 479919)
NATIONAL CENTER FOR YOUTH LAW
1313 L Street NW, Suite 130
Washington, D.C. 20005
202-868-4786

Howard Schiffman (D.C. Bar No. 358814)
Jason T. Mitchell (D.C. Bar No. 1005757)
SCHULTE ROTH & ZABEL LLP
901 Fifteenth Street NW, Suite 800
Washington, D.C. 20005
202-729-7470

*Attorneys for Plaintiffs*

44