UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.J., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| - against - | ) |
| | ) Civ. No. 1:18-cv-1901 (EGS) |
| | ) |
| The District of Columbia, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECLARATION OF BETSY A. BIBEN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Betsy A. Biben, of full age, hereby certify as follows:

1. I am over 18 years of age and competent to testify regarding the matters described herein.

2. I am licensed in the District of Columbia as an Independent Clinical Social Worker (LICSW), and I am a member of the Academy of Certified Social Workers (ACSW) and the National Association of Social Workers. I was formerly registered in the District of Columbia as an Addiction Counselor. I earned my Masters of Social Work from the University of Connecticut School of Social Work in 1982.

3. I am the Chief of the Office of Rehabilitation & Development (ORD) at the Public Defender Service (PDS) for the District of Columbia. I have served in this role since 2002.

4. I joined PDS in 1982 as a "Program Developer," re-titled Forensic Social Worker, advocating for adult and juvenile clients in D.C. Superior Court matters. I performed that role until my elevation to Deputy Chief of ORD in 2001 and my eventual promotion to Chief in 2002.

5.  Before and during my tenure at PDS, I have developed extensive experience working

    with prisoner populations as a social worker and consultant. From 1985 to 2000, I acted

    as a consultant for The Sentencing Project, providing technical assistance in establishing

    additional and expanded defense-based alternative sentencing programs throughout the

    country, through education and training.  From 1984 to 1986, I consulted and provided

    training for the National Correctional Training Institute in Austin, Texas, advising non-

    administrators on the District of Columbia's courts and criminal system; assisting in the

    development, design and implementation of local programs; and instructing courses in

    misdemeanor and felony diversion programs. In 1981 and 1982, I developed sentencing

    memoranda for public defenders and provided psychotherapy services for retained clients

    at the law firm French & DeLapp, while also acting as a part-time consultant developing

    alternative sentencing proposals for the National Center on Institutions and Alternatives.

6.  As ORD Chief at PDS, I am responsible for day-to-day division management operation

    and hiring and firing recommendations as well as supervision and training of division

    staff.  I have developed individualized treatment plans for sentencing and post-conviction

    purposes including psychosocial assessments, specific service recommendations, and also

    placement and reentry recommendations.  I have provided written and oral testimony in

    court and provided case-related individual, family, and couples counseling and

    psychotherapy.  I consult with attorneys, judges, probation/parole officers, the District of

    Columbia Department of Behavioral Health, the District of Columbia Department of

    Corrections, the Federal Bureau of Prisons, and the Department of Youth Rehabilitation

    Services regarding individual clients and cases.

7.  My familiarity with juvenile cases in the District of Columbia stems from both my own experience as a Forensic and Clinical Social Worker as well as from supervising licensed Forensic Social Workers and Professional Counselors in ORD at PDS. I have also developed familiarity with juvenile cases through participating in partnerships across PDS divisions and programs, in which I hear about youth cases from attorneys, social workers, and investigators on youth teams.  I have personally worked on cases in juvenile court, and visited clients at both the DYRS Youth Services Center (YSC) and New Beginnings Youth Development Center (NB) many times.

8.  The Forensic Social Workers and Professional Counselors I directly supervise advocate for juvenile clients in Superior Court matters from the time the client is detained prior to adjudication, through to the end of the client's commitment to DYRS. This role entails assisting clients and their families with their service and support needs, and conferring with trial attorneys about issues in the client's developmental, educational, family, and service histories that may affect sentencing. Typically, client and family needs might involve housing, education, substance abuse, food insecurity, transportation, accessing social services, mental health, physical health, parenting, and other disabilities services. The social workers or counselors are often the only clinicians involved in a client's case at PDS. This gives them a unique perspective on our juvenile cases, enabling them to perceive how and why some social services may be less beneficial for some clients than others, how housing and in-community supports might affect a young person's educational, treatment, and other outcomes, and whether court-ordered psychiatric evaluations are relevant or accurate for a particular client.  Social workers and counselors also stay with the clients throughout their cases, providing continuity for the clients that

3

do not otherwise exist. Finally, the social workers and counselors work with the families

of the clients. This is crucial as parents and family members rarely receive explanations

or guidance on their children's cases. The social workers and counselors help the families

support their children by implementing services in all areas of their lives: to work to

understand what the families are experiencing with the child, what behavioral health

(mental) services the child has gotten or sought in the past, what has worked and what

hasn't, whether the child has an individualized education program (IEP) plan for special

education services, and whether that IEP has been fully implemented.

9.  I touch every case out of the dozens that comes through ORD each year. When PDS

attorneys refer a case to ORD, I read the case documents, assess the needs of the client,

provide emergency consultation to attorneys with new referrals as needed, and assign the

case to one of our social workers or counselors. I work with the attorneys to understand

what services the client needs and what kind of support a social worker or counselor

should provide.

10. Moreover, as Chief, I sit on community stakeholder committees that pertain to juvenile

justice, and I attend District Superior Court and Family Court conferences. I have spoken

at and participated in Summits of the National Juvenile Defenders Center, and I have

consulted for the Center's former director. I have also consulted with school social work

staff at DYRS facilities about issues related to confidentiality under the National

Association of Social Work (NASW) Code of Ethics.

11. I have reviewed the Complaint filed in this case dated August 14, 2018, which alleges

that Medicaid-eligible children with mental health disabilities are needlessly

institutionalized or at serious risk of institutionalization because the District fails to

provide them medically necessary intensive community-based services, including

intensive care coordination, intensive in-home supports, and mobile crisis services.

12. In my experience, about 80 percent of PDS juvenile clients are Medicaid-eligible

residents of the District of Columbia.  Others may receive Medicaid in other jurisdictions.

The clear majority of our clients who reside in the District are enrolled in the District's

Medicaid program.  Others reside in the District and are Medicaid-eligible but they

and/or their families have not yet enrolled in Medicaid.

13. A significant number of the juveniles with whom I work or with whom the staff members

I supervise work have one or more mental health conditions or disorders.  These include

"Axis I" psychiatric disorders identified in the Diagnostic and Statistical Manual of

Mental Disorders (DSM-V), such as anxiety disorders (including post-traumatic stress

disorder), mood disorders such as major depression and bipolar disorder, eating disorders,

psychotic disorders such as schizophrenia, dissociative disorders (disorders that involve

experiencing a disconnection between thoughts, surroundings, actions, and identity, often

in reaction to past trauma), and substance use disorders.  In my experience, juveniles in

the delinquency system often have other disorders like attention deficit hyperactivity

disorder (ADHD), oppositional defiant disorder (ODD), and other conduct disorders.  I

also see a significant number of juveniles with intellectual disabilities and developmental

disabilities such as autism spectrum disorder.

14. In my experience, a significant number of juveniles in the delinquency system have

behavioral and learning challenges associated with having experienced trauma. They

often lack a connection to a core service agency or other mental health care provider.

Sometimes they had services in the past that have lapsed, or their mental health issues

have never been treated. In my experience, a significant number of the children in the delinquency system have experienced childhood trauma but few have been diagnosed with or treated for their trauma-related problems.

15.  Many juveniles in the District's delinquency system have been sent outside the District to residential treatment facilities. Sometimes these facilities are relatively close to the juveniles' homes, such as those in Maryland or Virginia, but sometimes the facilities are as far away as Arizona, Colorado, Michigan, and Florida.

16. I have seen many juveniles with needs beyond what the District's mental health system has met. I am aware of juveniles with diagnoses that community mental health providers struggle to support.  In my experience, when DBH core service agencies that are supposed to provide community-based mental health services determine that they cannot support a young person in the community, they have ended services, and the young person ends up in DYRS custody. This has often meant that the young person was sent to YSC for detention and to await placement.  DYRS often places these young people in residential treatment facilities.  In many cases, the residential placement is unequipped to provide the young people the treatment they need, and returns them to DYRS.  They are sent back to YSC, and the cycle begins all over again.  I have seen this all too often with young people whose mental health needs or other disabilities are difficult to treat.  DYRS and DBH do not know what to do with them, so they are warehoused in inadequate residential facilities where they do not receive the treatment they need.

17. Recently, there has been a trend of young people who are committed to DYRS being housed at New Beginnings Youth Development Center in Maryland.  My understanding is that DYRS says that it is doing this because New Beginnings is closer to the District

than many other residential treatment centers.  I have seen or become aware of significant

problems with the behavioral health programming and staff at New Beginnings. For

example, a child will be assigned a therapist, but if the child is not comfortable with the

therapist, and does not see much value in the therapy, such that the child's symptoms do

not improve, there is no other option for him.  To my knowledge, there seems to be a

one-size-fits-all approach to providing mental health treatment at New Beginnings, with

clinicians who all take the same therapeutic approaches, regardless of whether the

approaches work for the child in question.

18. To my knowledge, it is also very difficult for young people to achieve timely discharge

from New Beginnings. DYRS requires young people to "graduate" through a series of

behavioral levels in order to be discharged, but the levels are not easy to meet, so young

people end up staying there for longer periods of time than is strictly necessary for

treatment.

19. To my knowledge, DYRS is sending young people to New Beginnings without

exhausting treatment options in the community. DYRS is quick to give up on

community-based treatment, and at the first sign that the young person is not responding

fully to the services they are receiving from the core service agencies, the attitude seems

to be: "Well, we tried; send him to New Beginnings."

20. One of the primary problems with out-of-District residential placements is the lack of

family engagement. When a young person is taken away to a residential, they may

receive some services, learn some skills and some strategies, and receive some

medication evaluation and prescriptions, but the family rarely receives any services or

supports.  Then, when the young person returns to the District, they may be in a different

place emotionally and psychologically, but the family is not.  The young person reenters

a home environment that has remained the same.

21. Moreover, DYRS generally does not provide enough opportunities for engagement

between the young person and family during residential placements.  DYRS offers

families an opportunity to visit their children during residential placements, but for young

people who are placed hundreds of miles away, this can mean that a client sees their

family only once, if that, during a placement of a year or more.  For many families,

DYRS policies lacking in cultural competence prevent any family visits at all.  DYRS

travel options are inflexible. The families of some of the youth with whom I or my

supervised staff have worked with have never flown on a plane before, and some are

reluctant or terrified to do so. This barrier can mean that a youth does not see any family

in person for most or all of their time in an RTF.

22. Family therapy has also been a problem during residential placements.  During the

COVID-19 pandemic, some facilities have provided family video conferencing, but

before the pandemic, family therapy was provided over speaker phone. For many of these

young people, family therapy is a critical element of their treatment, but such therapy is

most effective when done in person.  Families and young people feel that the speaker-

phone family therapy is silly or ineffective, and they struggle to engage.

23. The District consistently fails to provide young people an effective transition back to the

community following a placement at a residential facility, YSC, or at New Beginnings.

DYRS has not been connecting the children to services until after they are discharged

from a residential placement or DYRS facility. This is too late, and as a result, there is a

scramble to timely connect the young person to services as soon as possible after they

return to the community.  But this is not easy to do.  There are long waiting lists for many

services; failure to begin the process of connecting a young person and their families to

those services in advance of the young person's discharge can cause a gap in services

stretching weeks or even months after the young person returns to the community.

24. These significant service gaps are particularly troubling because young people leaving

residential treatments or DYRS facilities are often at their most vulnerable immediately

after their discharge. They are leaving a structured, 24-hour, secure environment and

often returning to a completely unstructured environment where their families have rarely

been given the tools and the resources to support them in the home and the community.

25. When a young person is not connected to necessary services during this critical time, they

may be at risk of receiving additional delinquency or criminal charges.  Or they may

experience behavioral crises that DYRS thinks require another residential placement.  Or

the young person or family may move or become unavailable for another reason.  It is a

common scenario that a child is sent home from a residential placement, faces a gap in

services due to a late start on planning and waitlists for services, does not receive services

for a month or more, and then receives additional charges, which prompts yet another

residential placement.

26. This is unacceptable. Services need to be in place before young people leave their

residential placements and certainly before they arrive back in the community. They need

a chance to meet with and form a relationship with the clinician that will be serving them

in the community. DYRS provides this advance relationship-building with the Credible

Messenger Program, but, to my knowledge few, if any, of the credible messengers are

clinicians, and they are not equipped to address these young people's disabilities. The treatment must begin before they return to the community.

27. Some juveniles in the District's delinquency system who are hospitalized at the Psychiatric Institute of Washington (PIW) or Children's National Hospital with mental health issues are quickly discharged or reluctantly readmitted when they are involved in the delinquency system.

28. To my knowledge, when children in the delinquency system are in crisis and go to Children's, Children's either sends them home without admitting them or discharges them in less one week.

29. In my experience, PIW also provides children in the delinquency system the shortest possible course of treatment before discharging them. To my knowledge, regardless of the length of stay, it is rare for there to be any communication with a youth's community health provider and no follow up from the hospital after discharge.

30. I am aware of the District's Child Adolescent Mobile Psychiatric Service (ChAMPS), which the District holds out as its mobile crisis services for children and young people. But I am not aware of any young people who has had contact with ChAMPS while they are involved in the delinquency system. It is my belief that many children and their families do not call ChAMPS because they believe calling ChAMPS will lead to an arrest or a hospitalization. People do not want to call ChAMPS because they assume the police will arrive in response to the call and make the situation worse. To my knowledge, the police are part of the ChAMPS response to calls, so families' fears are not unfounded.

31. In my experience, ChAMPS does not deescalate mental health crises. Many families report that the outcome of calling ChAMPS is that the young person is sent to jail, sent to

the hospital, or ChAMPS leaves without de-escalating the crisis or linking the young

person and family to other, longer-term services.

32. I am aware of youth who have received the "Community-Based Intervention" (CBI)

service.  Some have had good experiences with CBI, but it very much depends on the

provider and the worker who is assisting the child and family.

33. CBI has two components: one worker who responds to crisis and is present in the home,

and another worker who provides therapy to understand the crisis and prevent future

occurrences.  A CBI client should be getting both components of the service at the same

time, but this rarely happens.

34. To my knowledge, CBI is a service that the District represents is an intensive

community-based service.  It is a service that DYRS and DBH requires many children

who are placed in the community, either in the family home or in a group home, to

participate in.  But not all core services agencies in the District offer CBI.  Even if it were

provided with fidelity to the two-component model, there is just not enough to meet the

needs of young people in the District with significant mental health conditions.

35. I am well aware of a service called "Assertive Community Treatment" (ACT). My

understanding is that ACT teams consist of a multidisciplinary set of providers that work

together to provide multidimensional mental health care. I am not aware of any children

in the delinquency system who have received services from an ACT team. I am aware of

many young people who would have benefited from working with an ACT team, but

because the services typically begin after the age of 18, they have not received such

services due to their age. I am aware of young people being enrolled in the ACT service

before they turn 18 for the sake of continuity, and that has been helpful to the young

persons.

36. The Complaint refers to a service called "High-Fidelity Wraparound." While I am very

familiar with the term "wraparound" services, I only began to hear the term "High-

Fidelity Wraparound" services within the past few years when MBI became the

provider.[1] It is still not clear to me what exactly "High-Fidelity Wraparound" entails, or

how it differs from the "wraparound" services with which I am familiar.

37. In my experience, the quality and effectiveness of wraparound services in the District has

been inconsistent. For example, in talking with my staff, I learned that a previous

provider of wraparound services, D.C. Choices, did some great work to engage and

incentivize family participation. I now know of justice-involved families who were food-

insecure, so D.C. Choices would order a full meal at every single meeting. They put their

money where the client and family needed it. Unfortunately, their services were still

lacking in team coordination and management.

38. When MBI became the District provider, it was the hope that "High-Fidelity

Wraparound" would mean that children in the delinquency system would get a better and

more consistent version of the wraparound services than in past experiences. It is

essential to engage the child, the parent or caregiver and mentor/Credible Messenger,

DYRS, the service providers, and the PDS social worker and/or attorney to be part of the

individualized service planning for the young person.  It is my understanding that the

High-Fidelity Wraparound that DBH contracted with MBI to provide turned out to be

---

[1] I know now that D.C. Choices was also designated as a "High-Fidelity Wraparound" provider before MBI, but the first I remember hearing the term was when MBI took over.

worse than previous iterations of wraparound services. To my knowledge, the High-Fidelity Wraparound Care Coordinators did not facilitate the child and family teams effectively, nor did they coordinate and monitor services effectively. To my knowledge, High-Fidelity Wraparound Care Coordinators might schedule meetings with the team, but they were either late to or absent from these meetings.  The Care Coordinators did not communicate or coordinate with other providers working with clients. The youth, in turn, received no more service coordination than they had with previous wraparound providers.

39. It seems to me that DBH fails to provide oversight of or publicity for High-Fidelity Wraparound. It is unclear to me, and to my knowledge also unclear to my colleagues, how to access High-Fidelity services for clients or what the standards are for how High-Fidelity Wraparound is accomplished.

40. To my knowledge, many youth advocates have stopped referring clients to the MBI High-Fidelity Wraparound service. The only benefit of High-Fidelity Wraparound for the youth seemed to be the program's ability to pay for certain items the youth needed, like a cell phone. But getting money to do this seemed to be a fight every single time. To my knowledge, some advocates have decided that it's not worth spending so much time to complete the long High-Fidelity Wraparound referral process, when it does not seem to benefit their clients.  I have not heard a single success story come out of High-Fidelity Wraparound.

41. To provide services effectively under the "wraparound" approach, the provider of intensive care coordination services should effectively coordinate the various agencies and providers participating on the child and family team and responsible for providing services identified in the child's treatment plan, so that tasks that need to get done get

13

done.  This means being an effective point person and communicating regularly with all team members to ensure they are providing the services identified in the plan – not just checking in during team meetings.  Good Care Coordinators should respond to calls for help or problem-solving within 48 hours of receiving them.  They should schedule team meetings, lead the meetings, and follow up on the meetings team recommendations. The Coordinators should explain the array of services available for the child and family to the child and family themselves, and to other team members as necessary.  They should explain from the outset how and when check-ins with the child and family will be scheduled, and how the team will meet the family's material needs.  They should make sure that the services the team prescribes for the child are actually provided, and help the team monitor whether they are working, and change them if they are not.  This include attending school meetings or court hearings to share with other stakeholders the client's progress and treatment plan. A good Care Coordinator ensures that the young person for whom the treatment plan is designed receives the services they want, and benefits from them.

42. Across all of these services – CBI, ACT, and High-Fidelity Wraparound – to my knowledge, there is a dearth of family involvement and engagement.  Some clinicians or case workers are better than others, but generally providers do not engage in consistent, reliable work with families to help families understand what is happening with their child and what their role is in their child's care.

43. I have never heard DYRS or DBH service providers engage families to help them understand their child's diagnosis, or how that diagnosis is manifesting itself in their child's behaviors. Parents do not get information about possible reasons for their child's

behavior. There is no communication about how best to parent and support their child. Then, when their child violates a curfew or has an incident, and DYRS wants to send them to a residential placement, families readily agree because they see no other option. In my experience, without a better understanding of their child's needs and behaviors, many parents get fed up and agree to residential placements, because they think there are no other options.

44. Families are also still dealing with stigma around mental health. Some families are not ready to recognize that their child is different. There are taboos around medication as well.  I have not seen the District do enough to engage these families to address these challenges. The families are left in the dark.

45. Another problem with the District's mental health service system for children and young people with special challenges is that families need opportunities for a break from each other – a brief respite.  We need to give families and young people a way to take some time away from each other as needed to deescalate conflict.  Families need space and time to cool down, followed by the opportunity to engage in appropriate counseling.  In the District today, young people are often sent to group homes for anywhere between 30 and 90 days.  Such a long separation from family can be detrimental. It should be possible for families to have a break from each other that provides sufficient respite, enough time apart to avoid conflicts getting out of hand, but not so long that the separation itself becomes detrimental to the family relationship.

46. The Complaint describes intensive community-based services (ICBS), including intensive care coordination, intensive in-home supports, and mobile crisis services. I am not aware of any juveniles in the delinquency system who have received those kinds of

services, but I know of a number of such juveniles for whom ICBS would be useful. I think ICBS could help many justice-involved youth avoid moving from juvenile to adult criminal court.  ICBS could impact the removal of young people from the home, increase access to education, and prevent children from entering the criminal system.

47. I believe that many justice-involved youths and families do not know how to access the services they need. And for a young person, if their parent or caregiver is unable or unwilling to help them get services, they may lack the capacity to find services themselves.  The care coordination and in-home supports available through ICBS could help a young person to engage help without relying on a parent or family member.

48. I believe that ICBS could help stop the pipeline that leads youth involved in the delinquency system to end up in the adult criminal system. So often, this happens because services are not in place. Our current system in the District treats young people like they are their bad behaviors, and that is all they are – like they are bad kids. The focus is on compliance with the rules DYRS sets for them. And when young people are punished for having needs instead of having those needs understood and met, they are quick to give up. When they become 18, things continue down a path that too often leads to the adult system. The District's young people deserve a better system.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16 day of July, 2021, in Washington, D.C.

_____
Betsy A. Biben
ACSW, LICSW