UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.J., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| - against - | ) |
| | )  Civ. No. 1:18-cv-1901 (EGS) |
| The District of Columbia, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECLARATION OF SARA BOYD IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Sara Boyd, of full age, hereby certify as follows:

1.      I am over 18 years of age and competent to testify regarding the matters described herein.

2.      I am in private practice and affiliated with the Institute of Law, Psychiatry, and Public Policy at the University of Virginia.

3.      I am licensed in clinical psychology in West Virginia, Virginia, Kentucky, and the District of Columbia.  I am board certified in the forensic specialty with the American Board of Professional Psychology.

4.      Over the past 17 years, I have evaluated the psychoeducational and mental health needs of hundreds of children with disabilities, and the mental health services and educational programs provided to those children, in West Virginia, Virginia, Kentucky, New York, and the District of Columbia.

5.      I have been retained to act as an expert witness for Plaintiffs in the above-captioned action.  This includes reviewing the mental health services provided to a subset of individuals

within a group of randomly-selected children and youth that may be members of the putative plaintiff class in the above-captioned action.

6.      I respectfully submit this declaration in support of Plaintiffs' Motion for Class Certification.

7.      Annexed hereto as Exhibit A is a true and correct copy of my July 19, 2021 Report in support of Plaintiffs' Motion for Class Certification, and the appendices attached thereto (collectively, my "report").

8.      My report describes the opinions I formed from conducting the above review, as well as the primary data and other information I considered in forming my opinions.

9.      My curriculum vitae is attached to my report as Appendix 1, and sets forth my qualifications.

10.      A list of cases in which I testified as an expert at trial or by deposition in the last four years is attached to my report as Appendix 2.

11.      A list of materials I reviewed in connection with this review is attached to my report as Appendix 3.

12.      I am compensated for my work on this report at the rate of $250 per hour.

13.      I respectfully adopt and incorporate into this Declaration my report, which describes the testimony I am offering in support of Plaintiffs' Motion for Class Certification.

14.      I understand and intend that my report is to be presented to the Court with the same weight and consequences as if I had stated the report orally, under oath, in a court of law.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 18th day of July 2021, in Warrenton, Virginia.

_____
Sara Boyd, Ph.D.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.J., et al.,        ) | |
|        ) | |
|       Plaintiffs,        ) | |
|        ) | |
|     - against -        ) | Civ. No. 1:18-cv-1901 (EGS) |
|        ) | |
| The District of Columbia, et al.,        ) | |
|        ) | |
|       Defendants.        ) | |
|        ) | |

**EXPERT REPORT OF SARA BOYD, PH.D.**
**July 18, 2021**

## TABLE OF CONTENTS

I.     INTRODUCTION AND ASSIGNMENT ..................................................................1

II.    QUALIFICATIONS .................................................................................................1

III.   COMPENSATION .................................................................................................4

IV.   OVERVIEW ...........................................................................................................4

V.    WORK PERFORMED ...........................................................................................7

     A.    Methodology ...............................................................................................8

     B.    Summary of the Individuals .......................................................................9

          1.    D.B. .................................................................................................10

          2.    G.D. ................................................................................................20

          3.    J.G. .................................................................................................34

          4.    B.T. .................................................................................................42

          5.    L.T. .................................................................................................57

          6.    T.W. ...............................................................................................68

          7.    V.R. ................................................................................................69

     C.    Observations .............................................................................................69

          1.    Lack of Engagement of Family Members By Providers ...........................69

          2.    Assessments ...................................................................................71

          3.    Lack of Trauma Treatment .............................................................72

          4.    Residential Placements ...................................................................73

          5.    Lack of Adequate Crisis Planning ..................................................74

          6.    Unmet Mental Health Needs and the School-to-Prison Pipeline..............75

VI.   CONCLUSIONS....................................................................................................76

## I.      INTRODUCTION AND ASSIGNMENT

1.      I am a licensed clinical psychologist in private practice and affiliated with the Institute of Law, Psychiatry, and Public Policy at the University of Virginia.  Over the past 17 years, I have evaluated the psychoeducational and mental health needs of hundreds of children with disabilities, and the mental health services and educational programs provided to those children, in West Virginia, Virginia, Kentucky, New York, and the District of Columbia.

2.      I have been retained to review the mental health services provided to a subset of individuals within a group of randomly selected children and youth that may be members of the putative plaintiff class in the action *M.J. v. District of Columbia*.  I reserve the right to supplement my opinions should I become aware of additional facts or information, or if I am asked to perform additional analyses.

## II.      QUALIFICATIONS

3.      I am licensed in clinical psychology in West Virginia, Virginia, Kentucky, and the District of Columbia.  I am board certified in the forensic specialty with the American Board of Professional Psychology.

4.      My work at the University of Virginia and in private practice involves providing evaluation and consultation in adult and juvenile civil and criminal legal matters.  As part of that work, through testing, observation, and interviews, I evaluate youth with disabilities who are residing in the community, youth in the custody of juvenile authorities, and youth who are in residential treatment placements.   In these cases, I address referral questions related to competency, adequacy of educational interventions, diagnostic clarification, risk assessment, mitigation, and developing treatment and placement recommendations.

5.      The youth I evaluate often have been diagnosed with a serious emotional disturbance, have developmental or intellectual disabilities, or have multiple co-occurring

impairments (one or more psychiatric or developmental disabilities concurrently present in a child).  These evaluations review and assess a child's performance in school with respect to behavior and cognition, and I recommend and conduct behavioral and other psychological assessments.  I frequently review interventions, services, and placement for children with psychiatric and developmental disabilities.  I am often called to testify about my evaluations and recommendations in civil and criminal court.

6.     I have a specialty in intellectual and developmental disabilities ("IDD"), and have evaluated hundreds of children, adolescents, and adults with IDD over the course of my career. "Developmental disabilities" refers to a group of conditions that arise during the developmental period (i.e., prior to age 22).  Developmental disabilities cause an impairment in physical ability, learning, language, or behavior, to a degree that affects the person's ability to function independently in their day-to-day activities.  Developmental disabilities are typically life-long, although interventions and accommodations can improve the person's functioning over time. Intellectual disability ("ID") is a type of developmental disability.  ID indicates significantly sub-average intellectual functioning that impairs an individual's ability to live, work, socialize, and care for themself independently.[1]  All individuals with intellectual disabilities have a developmental disability, however not all individuals with developmental disabilities have intellectual disabilities.  For example, a person with an autism spectrum disorder has a developmental disability, but they may be intellectually typical or even above average.

7.     Before beginning my work with the University of Virginia in 2016, I worked with a private psychological consulting firm in Woodbridge, Virginia, from 2014 to 2016.  In that

---

[1] ID was formerly called "mental retardation."  Clinical nomenclature has shifted from "mental retardation" to "intellectual disability," and the most recent edition of the *Diagnostic and Statistical Manual-Fifth Edition* ("DSM-5") formalized this change in nomenclature.

position, I provided evaluations and recommendations in civil and juvenile criminal matters.  I also provided psychotherapy services to children with involvement in civil and criminal matters.

8.      I received my Ph.D. in clinical psychology from the University of Kentucky in 2013.  I also have received two master's degrees, in counseling psychology and clinical psychology, from the University of Kentucky.  I also earned a certificate in developmental disabilities from the University of Kentucky University Center on Disability, the state's University Center for Excellence in Developmental Disabilities ("UCEDD").  I was a postdoctoral psychology fellow at the Institute of Law, Psychiatry, and Public Policy from 2013 to 2014, and a predoctoral psychology fellow at Westchester Jewish Community Services from 2012 to 2014.  In both fellowships, I focused much of my work on evaluating and developing programs for serving children, adolescents, and adults with developmental and intellectual disabilities.

9.      I started as a direct services provider for adults with IDD before pursuing my undergraduate degree, and I continued performing respite work (assisting with providing care when an individual's primary caregiver needs a temporary break) while pursuing my master's degrees.  As a direct service provider, I supported adults with developmental disabilities in a variety of residential settings, including institutional settings, group homes, supported apartment living, and respite.  Some of these individuals were young adults with IDD who were living apart from their family members for the first time.

10.     My focus in academic research has been on children and adults with developmental disabilities.  I have co-authored a number of papers and presented regularly at national and regional conferences on treatment, evaluations, and accommodations for children and youth with developmental or intellectual disabilities.  As a graduate student, I received awards for this work

from the American Psychological Association and the Association of University Centers on Disability.

11.     I routinely develop and conduct trainings for mental health professionals and attorneys on topics related to forensic mental health services for individuals with developmental, intellectual, and/or psychiatric disabilities.

12.     My curriculum vitae is attached to this report as Appendix 1.  A list of cases in which I testified as an expert at trial or by deposition in the last four years is attached to this report as Appendix 2.

## III.    COMPENSATION

13.     I am compensated for my work on this report at the rate of $250 per hour, which is the same rate the University of Virginia bills clients for my services as an evaluator in similar types of evaluations.  This compensation is not in any way contingent on the nature of the findings presented or the outcome of this lawsuit.

## IV.    OVERVIEW

14.     I have read the Complaint in this action, which describes "intensive community-based services" ("ICBS") as a set of services including:

    a. *Intensive care coordination* **("ICC")**—an intensive form of case management in which a provider convenes a "child and family team," including the child, the child's family, service providers, and other individuals identified by the family, to design and supervise a plan that provides and coordinates services for children with mental health disabilities;

    b. *Intensive behavior support services*—individualized therapeutic interventions provided on a frequent and consistent basis that are designed to improve behavior and delivered to children and families in any setting where the child is naturally located; and

    c. *Mobile crisis services*—a mobile, onsite, in-person response, available at any time or place to a child experiencing a crisis, for the purpose of identifying, assessing, and stabilizing the situation and reducing any immediate risk of

4

harm.   These services may be delivered in the child's home, school, or community.

Complaint, ¶ 39.  The Complaint further notes that "[t]o benefit from ICBS, children may also need therapeutic foster care, a short-term, intensive, therapeutic placement."  Complaint, ¶ 40.

15.     I agree with this description of ICBS in the Complaint, as it is consistent with my experience and knowledge regarding mental health services for children and youth and my understanding of how the term is used in the field of children's mental health.  This description of ICBS incorporates an individualized, coordinated planning and service delivery process that focuses on the strengths and needs of the child, while including the family and other natural supports as full partners in supporting the child.  This is often referred to as a "wraparound" approach or model.  Individualized, person-centered, community-based models of intervention and treatment planning that draw on natural as well as formal supports are, generally speaking, the predominant evidence-supported model for supporting children and adults with disabilities with a sufficient degree of intensity to meet their needs, while also preserving their autonomy and participation in their communities to the maximum extent possible.

16.     The coordination of the child, their family and other sources of support, their caregivers, therapists, and other providers, as well as individuals who can work with the child to build skills or serve as a role model, are all critical to ensure effective interventions in the home and community.  Because these youth are often involved in multiple systems with different treatments, it is essential to have coordination among the youth and their caregivers, providers, and other individuals involved in a treatment plan to ensure effective supports for the youth and their family.

17.     ICBS also includes as needed a variety of services and supports that a youth and family may need to address crises and acute situations, such as a crisis response team and plan.

5

Such a crisis plan is important to respond to urgent situations, from suicide risk to confrontations with others.  It is important for youth and families to have access to a mobile crisis service as an alternative to calling 911, which is ill-equipped to deal with youth in mental health crises and can result in unhelpful police involvement.

18.     ICBS also can include other services, including group therapy and transition planning for adulthood for older youth.  Parents often need parenting support and advocacy due to the needs of the youth and, at times, their own challenges.  Respite services are also an important tool to assist parents and caregivers to allow for short-term placements when needed rather than resorting to longer out-of-home placements and institutionalization.

19.     The Complaint also states that under Washington, D.C. ("District") law, a child has a serious emotional disturbance when:

> (a) the child has a mental health condition and (b) that condition causes the child to have a functional impairment that—on an episodic, recurrent, or continuous basis— either substantially limits the child's functioning in family, school, or community activities; or limits the child from achieving or maintaining one or more developmentally appropriate social, behavioral, cognitive, communicative, or adaptive skills.

Complaint, ¶ 14.  For purposes of this report, when I use the term "serious emotional disturbance," it is in reference to this definition.

20.     The Complaint also refers to institutionalization of youth, including placement in carceral settings, psychiatric hospitalization, psychiatric residential treatment facilities, and other residential treatment centers.  Complaint, ¶¶ 52, 57, 61-62.  I agree that each of those settings constitutes institutionalization, and for purposes of this report I include them when I refer to institutionalization, unless otherwise specified.

21.     This report provides a summary of the procedures undertaken, my findings, and opinions with respect to the clinical status of the youth I was asked to evaluate, the treatment needs

of these youth, the treatments provided to these youth and the adequacy of these interventions, and, where applicable, the risk of institutionalization of these youth posed by a lack of provision of comprehensive, appropriate, and responsive assessments and interventions.  I have reviewed this information in much the same way as I review interventions, services, and placement for children in my other professional work.

22.     A list of the materials I have reviewed in connection with this assignment is attached to this report as Appendix 3.

## V.     WORK PERFORMED

23.     In connection with this report, I was assigned a group of seven children and youth to evaluate by Plaintiffs' counsel.  These seven individuals are identified in this report by their initials:  D.B., G.D., J.G., V.R., B.T., L.T., and T.W.

24.     It is my understanding that these seven children and youth were drawn from a sample of individuals who agreed to participate in the study and authorized access to records concerning their mental health and treatment.  This sample is a subgroup of a larger group of children and youth randomly selected by Plaintiffs' counsel of children and youth that were identified by the District as being Medicaid-eligible and having received certain mental health services.  It is my understanding that both the seven children and youth I reviewed and the larger randomly selected group selected by Plaintiffs' counsel were identified by an expert in conducting human subjects studies engaged by Plaintiffs' counsel.

25.     I am one of several experts working on case reviews for Plaintiffs' counsel in this case.  Each of the case review experts was assigned a group of cases to review.  The case review experts were not involved in the assignment process.

26.     I reviewed available healthcare, educational, and other pertinent records of the seven individuals and interviewed the youths, their family members, and professionals who

worked with them.  While I had access to more information regarding some individuals than others, my review of each individual has been sufficient for reaching the conclusions in this report, unless otherwise noted.  My methodology and review of each individual is described in detail below.

A. **Methodology**

27.     Other experts working with Plaintiffs (Kimmberly Campbell, Narell Joyner, and Bruce Kamradt) and I designed the client review process through a series of conversations beginning in 2019.  In these conversations, we noted our agreement with the District's definition of serious emotional disturbance.  We agreed upon the array of supports and services included in ICBS, and also on circumstances indicating that a youth is at risk of institutionalization.  We also identified relevant information about the services and placements provided to children and youth that Plaintiffs used to request a sample of youth to review from the District.  We advised Plaintiffs' counsel regarding the records we wished to review and the interviews we wanted to conduct (along with sample interview questions), in order to make conclusions about the needs of youth participants.  We also discussed methods to use to ensure the consistency and completeness of the expert review process.

28.     I reviewed the developmental, family, school, and service histories of the seven youth assigned to me, including significant life events, and analyzed their strengths and needs, including whether they need ICBS.  I was provided with a variety of available records, including records maintained by the youths' treatment providers and school records.  Some of the youth whose cases I reviewed are or have been incarcerated, and I reviewed court records and records from the District's Department of Youth Rehabilitation Services ("DYRS") for those youth.  The records I reviewed provided information about the youths' developmental history, family history, clinical presentation including diagnoses, treatment provision history, case management services,

contacts with juvenile authorities, and out-of-home placements including detention, foster care, and therapeutic placements.

29.     For each youth whose case I reviewed, I attempted to interview the youth and their caregiver(s), to ask them questions about the services they received, their perceived treatment and support needs, and their experiences interacting with service providers.  I also spoke with other individuals identified in the records or by the youth or parent, including clinicians, social workers, or attorneys, where available.  I also attempted to interview other family members and other professionals, including probation officers, therapists, and teachers.

30.     I performed the case reviews during the first half of 2021.  Because of the COVID-19 pandemic, all of my interviews were conducted through phone calls or videoconferencing.  As noted above, before beginning our case reviews, between 2019 and 2021 the other experts and I met several times to discuss the protocols for reviewing records and conducting interviews.  We also spoke generally about approaches to interviews, so that our interview process would be consistent.  While we were reviewing cases, we met about once every three weeks to present cases to each other.  This allowed us to discuss our findings and gave us the opportunity to ask each other questions about our findings regarding individual children and youth.

   **B.     Summary of the Individuals**

31.     Below, I summarize each youth's history, including their age, diagnoses, special education they may have received, any residential treatment or detention placements, trauma history, response to treatments, and identified gaps and/or inadequacies in treatment for each youth.

1.    **D.B.**

32.    D.B. is a 23-year-old Black male who is currently awaiting trial at the District Department of Corrections ("DOC").  He has resided at the DOC since 2019.

33.    I reviewed educational and mental health records for D.B.  On June 10, 2021 and June 24, 2021 I interviewed D.B. via Webex from the DOC.  I also conducted a phone interview with his mother.

*Background*

34.    D.B. was diagnosed with bipolar disorder that first emerged during his teenage years, according to his mother.  She did not indicate that D.B. experienced significant developmental delays, though she noted that her pregnancy was complicated by some of her health conditions.  She described D.B. as bright and intellectually capable, but impaired by longstanding mood symptoms.  D.B. was reportedly removed from his mother's custody and placed in foster care when he was about 15 years old.  He indicated that he had some extended family in the area, as well as two younger siblings.  D.B. indicated that he had received special education service since elementary school.  His mother indicated that this was because he was "a little bit behind" with his learning, and his school records indicated that he received special education services with a classification of Specific Learning Disability.

35.    According to DYRS records, D.B. was placed on juvenile probation when he was an adolescent.  He was also reportedly placed at Clarinda Academy in Iowa, as ordered by a juvenile court judge.  D.B. and his mother both characterized his time in Iowa in positive terms. D.B. reported that it was easier for him to focus on school and sports because he was not constantly attending to potential threats to his safety, as he was in the District.  Records from Clarinda Academy were consistent with D.B.'s report during interview regarding his relatively good performance and functioning at Clarinda Academy in Iowa.

36.     After D.B. obtained his high school diploma in Iowa, by his account he was offered a track & field scholarship.  He stated that he opted to return to the District, despite his success in Iowa and the scholarship offer, because he missed his family and did not "know anybody [or] know how [he] would get around [in Iowa]."  After returning to the District, he was later arrested and incarcerated for serious offenses.[2]

*Findings*

37.     D.B. was diagnosed with bipolar disorder, according to his mother.  His mother indicated that she also had been diagnosed with bipolar disorder, as had other family members, by her account.  D.B. stated that he believed he had been diagnosed with post-traumatic stress disorder ("PTSD"), and he indicated that his trauma-related symptoms began when he was in his early teens.  His records from Hillcrest Children & Family Center ("Hillcrest") included a diagnosis of PTSD, consistent with D.B.'s account.  Records from Community Connections, a provider of mental health services to children and youth in the District, also noted a diagnosis of major depressive disorder, and D.B. reported that he had struggled with depressed mood since he was a small child.

38.     D.B's educational records indicated that D.B. was referred for a special education evaluation by 2010 (age 12 or 13).  There was some divergence in the descriptions by D.B. and his mother.  D.B.'s mother described a learning disability-type impairment, whereas D.B. reported that he believed he received special education services for his behavior.  It is possible that he received services for both, and/or had more than one concurrent or consecutive classification.  Educational records from 2014 showed that his classification at that time was based on Specific

---

[2] D.B.'s case is still in the pretrial phase.  That creates challenges for querying and recording his account of the alleged offense, since he has not entered a guilty plea or been to trial yet.

Learning Disability.  His 2014 individualized education program ("IEP") also showed that his program included one hour of behavior supports per week.  The transition plan from his time at Clarinda Academy in Iowa noted that he lacked information about how to apply to college, and what to consider/do if he wanted to pursue enlistment in the Navy, despite Navy enlistment and college enrollment being D.B.'s identified goals according to those records.  In terms of identified supports, the IEP stated that he was to receive 45 minutes per month of advising services.  However based on D.B.'s account at the time of our interview, he did not learn much useful information from any advising that was offered, and he did not pursue college enrollment or enlistment in the military upon completing his education at Clarinda Academy.

39.     The available treatment records for D.B. were somewhat limited compared to most of the other youth whose cases I reviewed.  For example, he had only 18 pages of records from Community Connections.  These records were sparse with respect to their contents as well as their overall length.  Basic information, such as gender identity, emergency contact, and primary language were blank, and fields that would typically be completed in order to document the individual's history and current functioning were also empty.  The only sections of the Community Connections records related to intake that were completed were sections related to diagnoses and Z-codes associated with psychosocial factors (for example, problems related to D.B.'s legal circumstances).  Two progress notes were contained in the records, documenting a total of about 45 minutes spent with D.B. over the course of two visits.  These records have progress notes that acknowledged trauma and mood-related symptoms, however there was no recommendation or identifiable treatment strategy implemented to address trauma-related symptoms.  In short, D.B.'s contact with Community Connections, as described in the records, appears to have been brief,

generally limited to medication management issues, and lacking in acknowledgement or treatment planning related to his trauma-related symptoms.

40.     D.B. received crisis services, as documented in records related to his involuntary hospitalization at the Psychiatric Institute of Washington ("PIW") in 2012.  He reportedly received mobile crisis services through the Child and Adolescent Mobile Psychiatric Service ("ChAMPS") just prior to the admission, and he remained at PIW for about one week.  He was prescribed an antidepressant medication while at PIW.  Upon discharge, his diagnosis was Depressive Disorder Not Otherwise Specified and he had a Global Assessment of Functioning ("GAF") score of 50.  A GAF score of 50 indicates that the person is still experiencing serious problems and may have accompanying significant impairment in their ability to work, care for themselves, or attend school.

41.     D.B. described symptoms that were prototypical for PTSD.  For example, he reported having dreams about "getting shot at."  He also reported hypervigilance, anxiety, and emotional dysregulation.  His account of his symptom history was also consistent with mood disorder.  He reported both depression and possible elevated mood symptoms.  These elevated mood symptoms are characteristic of bipolar disorder.

42.     D.B. has a four-year-old daughter.  His mother stated that D.B. appeared to be particularly distressed about his separation from his daughter.  She noted an additional stressor was her own poor health, stating "he takes things so seriously when it comes to me and my health. I don't want to cause any more problems."

*Treatments and Supports Provided*

43.     Based on the records I reviewed and his self-report, D.B.'s treatment history appeared to be limited to some treatment at Hillcrest, an admission to PIW in 2012, his placement

at Clarinda Academy in Iowa, and brief treatment at Community Connections.  Most mental health

interventions appeared to include medication management.  His medication management included

prescribing trazadone, Celexa, and Seroquel.  Trazadone has antidepressant, antianxiety, and

sedative effects; Celexa is an antidepressant medication; Seroquel is a mood stabilizer often used

to treat bipolar disorder.  Records from Community Connections show that D.B. was also

prescribed antidepressant medication.  At the time of D.B.'s interview, while incarcerated in the

DOC, he was reportedly prescribed trazadone, but no other medications.

*Treatments and Supports Not Provided*

44.     D.B. indicated that he had not been offered Trauma-Focused Cognitive Behavioral

Therapy ("TF-CBT").  TF-CBT is one of the gold standard interventions for children with

significant trauma-related symptoms.  This intervention incorporates a youth's caregiver into

sessions and provides them with useful psychoeducation about how trauma affects children and

how to support their child.  D.B. stated that he believed that therapy would be very helpful to him,

but it was not provided, nor did D.B. describe being offered any other evidence-based trauma

treatments.  He stated that he was never part of any treatment teams, and he expressed a strong

desire to share information about himself, his experiences, and his plans and hopes for the future.

He stated that he felt ill-equipped to cope with the stress of incarceration, particularly under the

heightened stress conditions associated with the COVID-19 pandemic.[3]  D.B stated that he was

unable to utilize any coping strategies in the jail.  For example, he stated that in the past he would

often walk around in order to cope with stress.  He also indicated that he struggled to access mental

---

[3] Throughout 2020 and into 2021, the adult detention facilities in the District have frequently been
on lock-down status, sometimes referred to as "23 and 1" because the incarcerated individuals are
in their cells for 23 hours a day and have one hour for recreation, making phone calls, and taking
showers.  No social visits have been permitted since the initial pandemic procedures were
implemented.

health services in the jail, stating, "when I try to tell people, tell them I need to talk to somebody, they don't pay attention."

45.     It did not appear that D.B. had a sufficient discharge or transition plan to address his needs after leaving Clarinda Academy in Iowa.  His reasoning for returning to the Washington, D.C. area appears to be largely based on missing his family members and a lack of knowledge and support related to independent living.  Records from Clarinda Academy were not available for review, thus it is not possible to offer more specific comment about whether D.B. had a discharge plan and what that plan entailed.  In any event, D.B. did not appear to have information that would have permitted him to make a successful transition from this residential placement to the community.  If such information was recorded in his records at Clarinda Academy, it was not transmitted or explained to D.B. in a manner that would permit him to access and apply the information.  It appeared that although D.B. and his mother stated that he benefitted from the services at Clarinda Academy, the geographically remote location and inadequate transition plan appear to have limited D.B.'s ability to generalize the gains he made, and to continue his progress with his education, upon discharge.  Notably, according to media reports, the company that operates Clarinda Academy, Sequel Youth & Family Services, announced in early 2021 that the facility would be shut down due to decreasing enrollment following numerous investigations of the facility in response to allegations of abuse.[4]  In particular, Disability Rights Washington completed an investigation of Clarinda Academy in 2018 that concluded the facility improperly used restraints and was a "very restrictive and segregated institution where the policies, training,

---

[4] Lauren Dake, *US Lawmakers Request Investigation Into Youth Congregate Care Facilities, Including One Oregon Relied Heavily On*, OREGON PUBLIC BROADCASTING, (Feb. 16, 2021), https://www.opb.org/article/2021/02/17/oregon-lawmakers-investigation-sequel-students/.

and oversight do not adequately protect against the risk of abusive restraints."[5]  Numerous states – California, Maryland, Minnesota, Oregon, and Washington – reportedly have severed ties with the company.[6]

*Conclusions Regarding D.B.*

46.     Serious Emotional Disturbance:  D.B. meets the District's definition of serious emotional disturbance based on his diagnoses of major depressive disorder, as well as the information indicating that he meets or has met criteria for PTSD and bipolar disorder.  He has co-occurring disorders related to intellectual/developmental disabilities, but these are co-occurring rather than differential diagnoses.  His disabilities have resulted in significant functional impairments that have substantially interfered with his family, school, and community activities, and have limited his ability to achieve developmentally appropriate educational, social/interpersonal, and behavioral goals.  His bipolar symptoms are reportedly more episodic and cyclical, in keeping with the nature of the disorder.  However, his depression and PTSD symptoms appear to have been consistently present for years.

47.     ICBS Needs:  D.B. needed and continues to need ICBS.  Specifically, he needed and would have benefitted from the convening of a child and family team that included D.B., his mother, an educational advocate, clinical social worker, psychiatrist or psychiatric nurse practitioner, and case management services to facilitate (i) treatment planning and provision of practical supports to reduce D.B.'s mood and trauma-related symptoms, and (ii) securing a safe and stable housing arrangement (safety is a key prerequisite for trauma treatment).  Furthermore, mobile crisis services would have greatly benefited D.B., since he indicated that he had been in

---

[5]  *Let Us Come Home*, DISABILITY RIGHTS WASHINGTON, (October 2018), https://www.disabilityrightswa.org/reports/let-us-come-home/.
[6] Dake, *supra* note 4.

crisis in the past (e.g., at the time of the PIW admission in 2012), without a crisis plan or knowledge about how to seek crisis services effectively. It did not appear that a detailed and individualized crisis plan was developed for D.B. after his aunt called ChAMPS and his PIW hospitalization in 2012.

48.    Harm Arising from Lack of Access to ICBS: ICBS would have helped D.B. with his major depressive disorder ("MDD"), bipolar disorder, and PTSD. Individuals with MDD, bipolar disorder, and PTSD are at risk of psychiatric crisis due to self-injurious, suicidal, high-risk self-destructive, and sometimes aggressive behavior caused by hypervigilance, dysregulated emotions, impulsivity, and dysphoric mood, as well as a sense of foreshortened future. Services in the home and community that could have helped D.B. better manage his symptoms include individual therapy within the TF-CBT framework, distress tolerance and emotion regulation skills (typically taught via a combination of individual therapy and group treatment), case management, detailed crisis planning with engagement from natural and formal supports, mentoring, medication management (which he did appear to receive), functional family therapy, and multisystemic therapy ("MST").[7] Such interventions could have been incorporated into discharge and transition planning when he was a teenager. The TF-CBT clinical benefits would likely have improved his emotion regulation and alleviated trauma symptoms such as hypervigilance and dysregulated anger. Distress tolerance and emotion regulation skills could have addressed his suicidality and been incorporated as skills he could use as part of a crisis management plan to decrease the likelihood of acute crisis (such as crisis that could result in psychiatric hospitalization), including

_____

[7] MST is an intensive community-based and family-centered intervention for youth who are either at high risk of engaging in risky activities or who are already engaged in high-risk activities. MST typically provides 24/7 access to therapists and coordinates adult and other natural supports across the environments where the youth lives, socializes, and pursues educational and/or vocational goals. It can be a form of ICBS.

self-injurious or otherwise self-destructive behavior.  Case management services could have assisted D.B. with achieving stable housing and work (or additional education) upon discharge from Clarinda Academy.  This would promote lifestyle stability that would alleviate his mood and PTSD symptoms.  Mentoring services could have promoted D.B.'s psychosocial maturity and decision-making during adolescence.  Functional family therapy and MST are interventions that are commonly used to assist high-risk youth via intensive community-based interventions that strengthen the child's access to reliable and supportive adults, provide 24/7 access to counselors in the event of an acute development/crisis, and coordinate the expectations and responses of adults across the child's environments (e.g., home, school, and recreation).

49.     In addition, ICBS could have eliminated the need for a placement as remote as Iowa, or at least a more planned and supported transition back to the District.  D.B.'s placement in Iowa, although evidently not harmful with respect to the treatment and supports delivered at that location, was harmful because D.B. was removed from his family.  He was not able to use the skills he learned in Iowa back in the District, because of insufficient supports and planning for his discharge back to his community; when D.B. returned to the District, he reportedly faced the same community violence stressors that had contributed to the original emergence of his mood and trauma-related symptoms.  Ultimately he was incarcerated and remains incarcerated as of the date of this report, which is a significant harm to D.B.  As noted in the foregoing, there is not enough information about D.B.'s alleged offense in the pending case to ascertain whether or not there was a direct relationship between his alleged offense conduct, or the circumstances giving rise to his alleged offense conduct, and his serious emotional disturbance symptoms.  If additional information becomes available, I may revise this opinion.  However, D.B. made statements indicating that he perceived a relationship between his trauma-related symptoms, lack of effective

coping strategies, and his historical aggressive and rule-breaking behavior.  It is certainly possible for severe mood disorder symptoms and PTSD symptoms to substantially contribute to a person's history of aggressive and rule-breaking behavior.  To the extent there is a relationship between D.B.'s symptoms and his incarceration, his incarceration could be viewed as a consequence of inadequate service provision, since his PTSD has evidently been untreated (with respect to evidence-based, empirically-supported interventions for PTSD) for years.  Furthermore, without effective treatment, he is at risk of future re-incarceration.  Notably, opportunities for PTSD treatment in the Federal Bureau of Prisons are very limited.

50.     Institutionalization:  A lack of access to ICBS appears to have contributed to D.B.'s current incarceration, because the lack of a sufficient transition and discharge plan resulted in him becoming unhoused and disconnected from services once he returned to the District after discharge from Clarinda Academy.  The continued denial of ICBS to D.B. puts him at risk of future incarceration or other forms of institutionalization.  Furthermore, D.B. remains at risk of institutionalization, specifically both re-incarceration and psychiatric hospitalization, because (i) he is currently in a high-stress environment with limited access to programming or educational/vocational opportunities that would enable psychosocial maturity processes; (ii) the high stress environment at the DOC (and in the Federal Bureau of Prisons, if he is transferred there) includes a high risk of witnessing severe violence and victimization by others, which would be expected to exacerbate his PTSD and mood symptoms; and (iii) relatively lower-quality psychiatric and psychological care available in carceral settings, compared to community-based settings.  Bipolar disorder in particular, due to the cyclical nature of symptoms that most individuals experience, requires careful monitoring of medications and mood symptoms.  The prison setting does not allow for such monitoring, except in some highly specialized placements.

2.     **G.D.**

51.     G.D. is a 15-year-old Black and Hispanic female who has resided at Boys Town, a residential treatment facility in Nebraska, for over a year and a half.  According to G.D. and her mother, while at Boys Town G.D. is only permitted visits from family twice per year and one phone call with her mother each week for an hour, and she has all her phone calls monitored.  Prior to living at the Nebraska facility, G.D. resided at a facility in Newport News, Virginia for just over a year.  G.D. said she has "not been allowed to step foot" in the District for the past few years. She reported that she wants to be back with her mother, but has been told that she cannot go home. She has lost hope and motivation, by her account.

52.     I reviewed court-related, educational, and mental health records, among others, for G.D.  I also interviewed G.D.'s mother on June 10, 2021 and interviewed G.D. on June 30, 2021. I also received a set of written responses to written questions I posed to a school-based mental health clinician who had been assigned to G.D.'s case.

*Background*

53.     G.D. was exposed to trauma early in life through major disruptions to her caregiver relationships and exposure to domestic violence in the home.  She reportedly had an active case with the Child and Family Services Agency ("CFSA") around age 11, after she disclosed that her stepfather physically abused her.  Records indicated that G.D. and her mother experienced housing instability due to her mother's efforts to escape G.D.'s stepfather.  For most of her childhood, she reportedly resided with her mother, stepfather, and two younger siblings in the District.  Records repeatedly noted that G.D.'s family struggled with significant financial stress.  Her biological father was reportedly deported to El Salvador around 2016.  Records indicated that G.D. began to have significant behavioral and mood difficulties around that time.

20

54.     The available education records indicate that, when G.D. was around four years old, G.D.'s mother referred her for assessment related to her developmental milestones and possible need for early intervention and special education services.  These records indicated that G.D.'s school did not find her to be eligible for special education services.

55.     In 2011, when G.D. was approximately five years old, there was a meeting at her school including her mother.  Documentation related to that meeting indicated that G.D.'s mother informed her school that she believed G.D.'s emotional problems were related to missing her father.  The documented responses from teachers and special education coordinators were unsympathetic and appeared to reflect a lack of knowledge about G.D.'s home life and living situation.  For example, a teacher recommended that G.D. be able to see her father sometimes, and G.D.'s mother explained that the "court does not allow for him to see her."  When G.D.'s mother expressed her concern that talk therapy had not produced a benefit, G.D.'s general education teacher responded, "you still need to hold [G.D.] accountable."

56.     Around the time that her father was deported and she disclosed the physical abuse by her stepfather, G.D. reportedly began to experience more significant behavioral and psychiatric problems.  G.D. reportedly had some suspensions from school related to marijuana use and "defiant behavior."

57.     G.D. was again referred for assessment around the sixth grade, and the records related to this referral indicated that she was frequently absent from school, without explanation or examination of why G.D. was not attending school.  The documentation associated with her mother's request for evaluation included a 2018 Analysis of Existing Data.  However, this three-page document had the same paragraph cut and pasted about eight times.  Furthermore, the

paragraph that was cut and pasted had essentially no academic or psychological information.  The

paragraph stated:

> [G.D.] is currently truant to school.  She is currently enrolled at Choice Academy
> as a result of a violation of Chapter 25.  [G.D.] often skips school and her classes.
> Due to her consistent non-completion of her coursework, either on Summit or
> individualized, [G.D.] is currently failing the 6th grade.  As a result of her academic
> failure, her mother has asked for evaluations to determine the student's ability to
> meet qualification for specialized instruction.

The only formal testing cited in the 2018 Analysis of Existing Data was a measure of reading

ability that had been administered in 2010.

58.    Around 2018, G.D. began to have contacts with juvenile authorities related to

truancy and running away from home.  The available records do not indicate much investigation

as to why G.D. wanted to run away from home.  She was referred as a Person in Need of

Supervision ("PINS"), which placed her on juvenile probation.  Her contacts with authorities

increased over time and records indicated that G.D. had difficulty complying with the requirements

of juvenile probation, which resulted in escalating and progressively more intrusive interventions

by authorities.  DYRS records showed that G.D. was detained at the District's Youth Services

Center ("YSC") eight times in 2018.  During that same year, G.D. was also placed in a group home

and two PINS shelters.

59.    Around this same time, G.D. was admitted to PIW based on her report of suicidal

ideation.  G.D. says she was "lost" there, and does not know how long she was at PIW.  She also

stated that she was not suicidal, but had made an impulsive statement in court that was

characterized by adults as suicidal.  She states she remembers being sedated with pills and

injections, and slept for "three days straight," while hospitalized at PIW.  She also says she was

not being given food.  The constant haze she was in likely made it hard for her to work with her

lawyer, as she indicated during our interview.

60.     Shortly after that, G.D. was placed at Newport News Behavioral Health Center, a residential psychiatric treatment facility in Newport News, Virginia, which G.D. described as "horrible."  While there, she only had two or three visits with her mother, and they were limited to only an hour or two.  She told me that facility staff told her she could go home afterwards, but instead she was taken directly to her current placement in Nebraska.

61.     At her current placement, G.D. has not been given a discharge plan.  However, the staff have told her that she needs to go to foster care or a kinship placement.[8]

*Findings*

62.     Information about G.D.'s early development history indicated that G.D.'s development was normal without significant delays.  She reportedly began to exhibit significant behavioral problems around age nine, but records indicated that she was participating in therapy by age five (however, no records related to that therapy were available for review, so it is not possible to offer information about the purpose or goals of that treatment).  Records related to subsequent treatment tended to focus on risky behavior and oppositionality.  G.D.'s records reflected diagnoses of oppositional defiant disorder ("ODD")[9] and other specified trauma- and stressor-related disorder.[10]

---

[8] A kinship placement is a type of out-of-home placement with relatives, godparents, or other individuals who are not a child's parent but have a family or other close relationship with the child.

[9] Oppositional defiant disorder is a pattern of angry/irritable mood, argumentative/defiant behavior, and vindictiveness that creates distress and disruption for the individual or others in their immediate social context, such as family, peers, or work colleagues.  ODD should not be diagnosed if the behavior only occurs during an episode of bipolar, depressive, disruptive mood dysregulation, substance abuse, or psychotic disorders.  ODD is frequently first diagnosed in children or adolescents.  ODD is considered more severe the more different settings (e.g., home, school, work) in which the symptoms manifest.

[10] Other specified trauma- and stressor-related disorder is used to describe presentations in which trauma- and stressor-related symptoms cause clinically significant distress or impairment, but do not meet the full criteria for other disorders in the trauma- and stressor-related category of the DSM-5.

63.     The most detailed treatment records available for review were from interventions conducted at Lincoln Middle School.  These records are primarily related to services that were delivered in 2018.  Also in 2018, G.D. received services from Latin American Youth Center ("LAYC"), including "Community-Based Intervention" services ("CBI").  LAYC describes such services as being time-limited, intensive mental health services delivered to youth who have a history of involvement with Child Protective Services or juvenile court, a history of negative involvement with schools due to behavioral issues, or who are at risk of out-of-home placement. Records related to this treatment indicated that the objectives were primarily focused on addressing risky behavior and supporting G.D. in complying with school and probation rules and requirements.  Despite the identified provider objectives, G.D. and her mother both provided input that G.D. was focused on her performance as a "scholar," and her mother also emphasized the practical and financial challenges her family was facing due to requirements for attending court and treatment appointments.  Other notes from G.D.'s treatment during this time highlighted concerns of treatment staff that G.D. might be involved with gangs and potentially was either a victim of human trafficking or was at risk of human trafficking.  G.D. was referred for services related to human trafficking, but evidently opted not to access those services, and G.D. stated that she had no experience with human trafficking victimization and felt this concern was misplaced. Records noted that G.D.'s mother was distressed because she felt that "workers only caused and stirred up more trouble" for her and her family.

64.     G.D.'s mother shared that G.D.'s CBI team "has not been very supported [sic]." Mental health providers appeared to pathologize G.D.'s mother's behavior, and noted that staff working with the family had discussed G.D.'s mother with G.D.'s probation officer regarding "the ways [G.D.'s mother] reinforces splitting between providers and herself."  Splitting is a clinical

term typically used to refer to individuals with borderline personality disorder, and refers to a tendency to see situations in black and white. It is sometimes misapplied to describe manipulation of the relationships between other people.

65. Overall, contacts with formal authorities appeared to worsen G.D.'s behavioral and emotional problems, and increase her risky behavior, as well as increase family stress. During a detention at YSC in 2018, G.D. was placed on suicide precautions, and the records related to the suicide precautions noted that G.D. was "seemingly depressed and not very verbal." Of note, suicide precautions tend to be highly stressful. The YSC records related to the suicide precautions indicated that all objects were removed from G.D.'s room, she had to wear a paper gown instead of clothing, had to sleep without bedding, was permitted to have finger foods only, and was placed on one-to-one supervision at arm's length. A few days after being placed on suicide precautions, G.D. was reportedly released from suicide precautions because she was no longer verbalizing suicidal thoughts. Records associated with this episode of suicidality appear to show that G.D. was recommended for admission to PIW, and this referral may have been the impetus for the admission to PIW that G.D. described during her interview. Another order indicated that G.D. was to be placed at Hermitage Hall, a residential behavioral health treatment facility in Tennessee. However, she was not sent to Hermitage Hall, and instead was sent to Newport News Behavioral Health Center prior to her current placement in Nebraska.

*Treatments and Supports Provided*

66. As noted above, G.D. received services at school, and these services were coordinated with G.D.'s probation officer, who evidently worked closely with the treatment providers. Her treatment tended to focus on risky and oppositional behavior, and promoting compliance with probation and court requirements. G.D.'s mother indicated that G.D. was

hospitalized in the District, but she did not know the name of the hospital (she appears to have been referring to PIW, in light of the information received in this case). G.D.'s mother indicated that staff at the hospital gave G.D. sedative medication without her mother's consent. Her mother reported that G.D. has been prescribed several medications, stating that some were for anxiety, and some were for sleep.

67.     Aside from the hospitalization in the District referenced by G.D.'s mother, G.D. was also reportedly admitted to Newport News Behavioral Health Center, as indicated above. G.D.'s mother indicated that G.D. was there for longer than one year. Her mother described this treatment setting as harsh and abusive, and she alleged that the children in the facility were beaten and were prevented from communicating with their families. G.D.'s mother also reported that her communication with G.D. at her current residential placement in Nebraska was monitored and restricted, with visits allowed only every six months. G.D.'s mother estimated that G.D. had been at this current placement for about two years.

*Treatments and Supports Not Provided*

68.     The available information did not indicate that G.D. and her mother were offered TF-CBT and her mother stated her family was not offered TF-CBT, however the records were incomplete and so it is possible that another provider may have offered these services.

69.     Records indicate that G.D.'s mother's requests for material assistance with transportation and childcare were conceptualized as treatment barriers, rather than needs. There is no indication that any such assistance was provided.

70.     G.D.'s mother stated that she advised the mental health providers from the CBI team that, in order to be effective, the treatment providers needed to engage with G.D.'s friends

and peers.  Based on the interviews and records I reviewed in this case, her mother's input was not implemented by providers.

71.     It does not appear that G.D. was offered individualized in-home interventions. Some of these interventions, such as TF-CBT, require specific types of credentialing and training to ensure treatment fidelity.[11]  However, other interventions related to behavior management and parent training could be delivered by paraprofessionals under the supervision of clinicians. Delivering services in the home and neighborhood would have ameliorated the childcare-related logistical barriers identified by G.D.'s mother, provided clinicians and paraprofessionals with the opportunity to observe family life and other aspects of G.D.'s living conditions, and provided an opportunity for providers to interact with G.D.'s peers, as was recommended by G.D.'s mother.

72.     G.D.'s records noted her educational aspirations but did not indicate that they were substantially incorporated into her treatment goals.  Furthermore, there is no indication in the available records that G.D.'s documented educational needs were met.  For example, a 2018 "Evaluation Summary Report" from the District of Columbia Public Schools Office of Special Education identifies that in 2010, G.D. had "difficulty with reading" and "difficulty identifying the letters of the alphabet," but there is no indication that there was any follow-up regarding those needs at any point in the 2018 Evaluation Summary Report.  That same document also fails to identify specific strengths or concerns in G.D.'s progress note, and instead repeatedly copies and pastes the same paragraph over and over regarding G.D.'s truancy.  That document also notes that a psychological evaluation was requested in 2018, but G.D.'s Psychological Due Diligence Report indicates that no such evaluation was completed, and instead just repeatedly states, "[t]he psychologist made an attempt to complete psycho-educational testing with [G.D.]  The student

---

[11] Treatment fidelity refers to the degree to which an intervention is delivered as intended.

was not in school and was removed from the Aspen system of record."  The same document confirms that no records review, teacher interviews, or other interviews were conducted, all of which should have been possible even if G.D. herself were not available for such testing.

73.     Records reflected some degree of acknowledgement of G.D.'s trauma history.  For example, the LAYC records included the following observation by Marisa Parrella, LCSW: "behind the behavioral difficulties, the client has extensive trauma history which may be at the root of her defiant behavior."  However, records did not indicate that evidence-based trauma treatment was offered or incorporated into the services offered to G.D. and her family.  G.D.'s mother stated that she believed that, "rather than helping, [the CBI interventions] made things worse."  She expressed frustration, stating that she reached out for help, expecting that she and G.D. would receive psychological help, but instead the responses from juvenile authorities and mental health providers were more punitive.  G.D.'s mother also noted that treatment providers did not appear to be concerned with the family's financial struggles and the difficulties she faced in attempting to meet her daughter's needs while functioning as a single parent.

74.     It does not appear that G.D. and her family were offered services accounting for family strengths and challenges, including financial factors.  A note from August 15, 2018 indicated that, although the CBI worker "wanted to discuss how youth had missed last check-in with P.O.," G.D.'s mother was focused on more practical concerns:  "Mom shared that she felt really overwhelmed, and wasn't able to make ends meet with jobs."  It appeared that G.D.'s mother's work responsibilities limited her ability to supervise G.D., and ensure that G.D. attended school.  By the time G.D.'s CBI worker made a referral for G.D.'s mother to seek her own services at Mary's Center (a community health center that provides mental health services as a Core Service Agency for the District) with a community support worker, G.D.'s mother appeared to be less

invested in seeking support through formal systems, and evidently was overwhelmed by her existing responsibilities with respect to supporting and supervising her children while attempting to help G.D. meet court requirements.  G.D.'s mother reportedly stated that she "felt overwhelmed by so many providers."

75.    During an August 1, 2018 meeting with treatment providers, G.D.'s mother stated that she felt the workers "shared promises but did not follow through when the time came."  A lack of practical and material supports also contributed to G.D.'s abusive stepfather's return to the home in the fall of 2017, according to records indicating that G.D.'s mother felt she had to accept him back into the home due to "not having daycare accommodations and the need for help with the two younger siblings."  The presence of G.D.'s stepfather at home was described as one of the reasons that G.D. was frequently running away, according to records.  It appears that in late August 2018, G.D.'s CBI case was closed and G.D. was recommended for a psychiatric residential treatment facility ("PRTF").  Records related to this recommendation stated the following:

> Youth does not engage with CBI services despite several attempts to engage with Mom and youth in community.  Youth is not able at this time to assess the risks she is posing to herself and others and within the community.  Youth's involvement with gang and trafficking poses a risk to her and her family.  Youth is not able to assess the risk she is in.  Mom refused to engage with services and asked for support in other ways.  At this time youth is not ready or able to engage with community-based services and is recommended to PRTF.

This note appears to reflect provider priorities related to risk of trafficking and gang involvement, although risk of trafficking and gang involvement appeared to be more a product of provider concerns than evidence suggesting that these factors were in fact present.[12]  The note characterizes G.D.'s mother as refusing to engage in services, but the records indicate that her mother did attend

---

[12] Aside from the statements from providers about concern with regard to trafficking and gang involvement, I did not review other information showing that G.D. had confirmed gang involvement or that she had associations with known traffickers.  G.D. reported that these concerns were baseless, and she reported no gang membership or history of association with traffickers.

appointments and communicated with the CBI worker.  The note does not mention the family's material stressors or the risk of domestic violence posed by G.D.'s stepfather's presence in the home.  The note also appears to characterize responsibility for treatment failure as a product of lack of interest or participation on the part of the family, rather than addressing whether the ways in which services were offered and delivered were potentially inadequate or could be improved. This failure of engagement is not a sufficient clinical rationale for placement of a child in a PRTF. The concern regarding gangs and trafficking is understandable in some respects, however the injuries that G.D. has actually suffered, and the documented harm that she experienced, arose from domestic violence in the home, not gang-related or trafficking activity.

76.    Although a risk to her herself, others, and the community were mentioned in mental health records in the months prior to G.D.'s referral to a PRTF, records did not indicate that any assessment was conducted with respect to G.D. herself, to ascertain her strengths and needs, including the likelihood that she would be a risk to herself or others.  Such assessments are vital to ensure that the interventions offered to a youth meet their needs, and their responsivity to such interventions.  These assessments also provide guidance for points of psychosocial interventions that can decrease a child's risk of aggression or criminal activity.

77.    G.D.'s mother stated that although she was provided with interpreter services, at times she believed the interpreter purposefully misrepresented what G.D.'s mother had said.  For example, G.D.'s mother stated that an interpreter at the LAYC was interpreting for G.D.'s mother and G.D.'s probation officer, and the interpreter reportedly told the probation officer that G.D.'s mother said that G.D. was at risk, had firearms, and that G.D.'s mother wanted G.D. to be treated with inpatient care.  G.D.'s mother stated that she did not convey these opinions and observations, and when she realized that her statements had been presented incorrectly, she reportedly tried to

correct the information.  G.D.'s mother stated, "they said I recanted, that I was being negligent at home, that I didn't understand danger and what that meant."

78.     G.D.'s mother stated that she has lost hope that G.D. would return to living with her family while she is a teenager.  She stated that she did not know why her daughter had not yet been discharged and returned to the community, indicating that G.D.'s mother has not been appropriately engaged in treatment planning by G.D.'s providers.

*Conclusions Regarding G.D.*

79.     Serious Emotional Disturbance:  G.D. meets the criteria for serious emotional disturbance based on her diagnoses of ODD and other specified trauma- and stressor-related disorder.  The records strongly suggest that she may meet criteria for PTSD and/or complex-PTSD[13] in recent years.  A PTSD-related diagnosis would likely supplant the earlier other specified trauma- and stressor-related disorder diagnoses in her records.  The available information was not supportive of the presence of a developmental disability, and though concerns about substance use were noted in her records, this does not appear to be a primary source of impairment and may be better understood as an expression of her trauma-related symptoms.  She has been substantially impaired by her trauma-related symptoms with respect to her ability to function safely in her home, community, and school, although with appropriate intervention and support she likely would have been better able to achieve educational and interpersonal goals even in light of her psychiatric impairments.

80.     ICBS Needs:  G.D. needed and continues to need ICBS to improve her mental health, be reunited with her mother and community and thrive in that setting, and avoid further

---

[13] Complex-PTSD is a subtype of PTSD, sometimes referred to as Disorders of Extreme Stress Not Otherwise Specified ("DESNOS") or developmental trauma, which refers to the symptoms associated with (typically repeated) exposure to traumatic stress during childhood.

institutionalization.  G.D. needs and would have benefitted from participation in a child and family team, particularly if this had been offered when she first began to exhibit significant difficulties around age nine or ten.   A team with members who had educational advocacy, trauma-related/interpersonal violence, crisis management, and peer intervention expertise would have been appropriate, given her and her family's history and needs.  In order to promote cultural competence, the team members would need to be bilingual or employ an interpreter.  She also needed efforts to engage her peers, as was recommended by her mother according to records, and to promote engagement and buy-in by G.D. to motivate her participation in treatment.  This could have been achieved through mentorship-type interventions as well as MST.  G.D. also needed and would have benefitted from behavior support services to promote prosocial engagement with healthy peers, interpersonal effectiveness in her family and other social relationships, and consistent school attendance.   Mobile crisis services would have been appropriate, and individualized, detailed crisis planning and prevention could have enabled G.D. and her mother to avoid involvement with law enforcement when she ran away.  To the extent that it was difficult to engage G.D. in interactions with mental health providers, this was a failure on the part of those providers and systems, not the fault of the (then 12-year-old) child or her single mother, both of whom had been victims of interpersonal violence and were impoverished.

81.    Harm Arising from Lack of Access to ICBS: If G.D.'s and her mother's views on their family's support and treatment needs had been better taken into account, prioritized, and documented, G.D.'s stepfather might not have returned to her household, which could have decreased the risk of G.D. running away and then facing intervention by juvenile authorities.  Such a team also could have provided an alternative to PINS proceedings and other involvement by

juvenile authorities, which appears to have ultimately harmed G.D. by entrenching her further into formal authority systems that have led to increasingly restrictive placements.

82.     According to the available information, G.D. has now spent years in out-of-state placements, where contact with her family is restricted and monitored.  Given that she is not alleged to have engaged in actual violence against herself or others, and the absence of an acute psychiatric condition such as schizophrenia spectrum disorder or bipolar I disorder, and the absence of less restrictive, evidence-based interventions having been attempted prior to residential psychiatric placement, it is difficult to ascertain why G.D. was placed in these facilities, and why she has remained there so long.  Her mother did not appear to have information about when G.D. might be discharged, or the contents of any discharge planning, which appears to indicate that her mother has not been involved in G.D.'s treatment planning for some time.  A child and family team would have been better equipped to explore community-based treatments and supports for G.D., as an alternative to her placement in a PRTF.

83.     As an additional consequence, G.D.'s mother evidently feels betrayed by mental health providers and the juvenile court system, and has regret with respect to reaching out for help with her daughter, because her mother feels that reaching out for help led to her daughter's challenges and emotional pain becoming criminalized and punished.  Re-engaging this family in services will likely require time and effort to establish the trust that was damaged by their prior encounters with mental health and law enforcement systems.

84.     Institutionalization:  G.D.'s lack of receipt of ICBS has led to inappropriate institutionalization, and puts her at risk of future institutionalization.  G.D.'s already-lengthy history of institutionalization in residential facilities, and detention in juvenile facilities, places her at risk of further psychiatric institutional placement, as well as incarceration in adult prison later

in life.  As a girl with delinquency system involvement, G.D. is also at very high risk of revictimization, including intimate partner violence, and medical health problems, compared to boys in the system.  Girls in the delinquency system are disproportionately more likely to suffer from trauma exposure, intimate partner violence, substance abuse, and other mental and medical health problems.

### 3.   J.G.

85.    J.G. is a 13-year-old Latino male who resides in the District with his mother and younger sister.

86.    I reviewed school and mental health records for J.G.  I also interviewed his mother on February 28, 2021 and April 1, 2021, and interviewed J.G. on May 5, 2021.  An interpreter assisted my interview with J.G.'s mother, whose primary language is Spanish.

*Background*

87.    J.G.'s developmental history reportedly included a delivery via emergency caesarean section due to the umbilical cord wrapping around his neck.

88.    J.G. was referred for initial evaluation due to speech and language problems by age five, in March 2013.  He has received special education services in the school since at least May 2013.  He was initially classified as having a Speech and Language Impairment; however, in 2016 his classification was revised to Emotional Disturbance in his educational records.

89.    J.G.'s family history includes domestic violence between his parents and a contentious custody dispute that resulted in J.G.'s school being changed when he went to live with his father in 2018.  This is notable because J.G. was doing relatively well at the school where he was enrolled prior to going to live with his father (High Road School of Prince George's County, Maryland ("High Road")).  After going to live with his father, J.G. was transferred to Brookland Middle School ("Brookland"), reportedly because it was more geographically proximal to his

father.  When he was at Brookland, he reportedly regressed with respect to behavioral challenges and academic functioning, compared to how he was performing at High Road.  J.G. indicated during an interview that he preferred High Road, and felt he did better there.  J.G.'s mother, likewise, reflected that J.G. did well at the High Road School, noting that she did not receive complaints and that his grades were improved.

90.     Records indicated that J.G.'s parents have made allegations of abuse and neglect of J.G. against each other, and against extended family members.  According to J.G.'s records from MBI Health Services LLC ("MBI"), J.G.'s mother informed treatment providers that J.G. was placed in foster care for about one month in 2019.  Thereafter, he was returned to his mother's custody and began attending middle school at Cardozo Education Campus, a District public school ("Cardozo").

91.     Not long after beginning middle school at Cardozo, the onset of the COVID-19 pandemic necessitated remote learning strategies for J.G.'s education.  He reportedly did not do well with virtual learning and remote administration of services such as speech-language therapy. However, in recent months he began attending the Student Support Center at Cardozo, for in-person academic and technology support during the pandemic, and his educational and behavioral performance improved significantly, according to educational records.

92.     Records acknowledged J.G.'s exposure to traumatic stressor events related to his family, and school records noted that his responses to trauma could be a significant factor in his behavior and academic performance at school.  Although J.G. was returned to live with his mother, it appears that some of the custody dispute issues between his mother and father may be unresolved.  Records noted that there are protective orders for J.G. against his father, his paternal aunt, and his cousin.  This family history of domestic violence and a contentious custody dispute

is relevant because it bears on J.G.'s psychological functioning, access to social/familial supports, and changes in his Local Education Agency and school placement.

*Findings*

93.     As noted above, J.G.'s initial referral was for speech-language difficulties, according to records.  Evaluations and educational records noted the following signs and symptoms:  impulsivity, "outbursts," easily distracted, articulation problems, poor social skills, work refusals, irritability, and vulnerability to negative peer influence.  Educational and treatment records referred to "aggression" without much detail about the precise nature of the aggression (for example, whether the aggression was verbal or physical), with the exception of some notes about property destruction at home.

94.     Diagnoses included attention-deficit/hyperactivity disorder ("ADHD"), PTSD, and disruptive mood dysregulation disorder.  He has been treated with medications including fluoxetine (antidepressant), hydroxyzine (antihistamine and anti-anxiety medication), and melatonin (a hormone typically used to treat sleep disruption).  His use of fluoxetine was reportedly discontinued due to adverse effects.

95.     J.G.'s cognitive functioning, as reflected in records, is impaired.  J.G.'s records indicated that he was functioning roughly at the 8th percentile for broad cognitive functioning.  His academic functioning likewise has also demonstrated deficits, though his performance is even lower than would be expected based on the intellectual testing results reflected in the records.  For example, his Academic Skills scale results from a 2019 administration of the Woodcock-Johnson, 4th Edition, fell at the 2nd percentile.

96.     The findings with respect to J.G.'s language challenges were significant in that, although he has reportedly required ongoing services and supports related to speech and language,

during the COVID-19 pandemic he evidently was not able to benefit from the remote version of these services that was offered.  He was evaluated for speech-language difficulties in 2016, and the testing showed that he was significantly below average in all domains, with his lowest score appearing on the Expressive Language scale.  Expressive Language refers to a person's ability to formulate, crystallize, and intelligibly communicate to others.  The intelligibility of his speech was characterized in the records as about 80 percent.  The records also noted that some of his speech difficulties were exacerbated by "loud tantrums or yelling."

*Treatments and Supports Provided*

97.     Benefits from the community interventions attempted with J.G. appear to have been mixed, in that he appears to have achieved some clinical benefit from some services, but other experiences with providers were incomplete (e.g., MST, which in the District is provided as one version—"Level I"—of CBI).  Additionally, there were some relatively intensive treatments that were noted in the records and mentioned during interviews, but for which records were not available (for example, a 2018 in-patient hospitalization in the Baltimore, Maryland area).

98.     J.G. was referred to ChAMPS multiple times, but few details were available about the clinical findings and recommendations associated with these encounters.  School records from the 2016-2017 school year stated that school personnel called an ambulance to take J.G. to Children's National Hospital due to some type of psychiatric crisis, but those records were also unavailable.

99.     J.G. reportedly received CBI for a relatively short period of time in 2019.  J.G. was referred for MST, to be provided by MBI, but it appears that the intervention was very brief (less than four months), was conducted entirely by telehealth, and did not include some of the typical strategies utilized in MST, such as identifying adults who can serve as sources of support and

supervision across multiple environments.  Records from MBI noted a plan to utilize Parent Management Training ("PMT"), an evidence-based program involving weekly training sessions for caregivers of children with moderate to severe behavioral challenges.  However, it was not clear that any manualized,[14] evidence-based parent behavior management interventions were in fact implemented.  It appeared that these services ended around March 2021; records indicate that the providers anticipated that MST would be a short-term intervention with this family.

100.    J.G.'s mother appeared to be dissatisfied with the MST services, which she said were conducted exclusively over the phone, and she stated that she received a call in March 2021, informing her that the program had ended.  J.G.'s mother indicated that she did not understand how the program worked or what she needed to do.

101.    As noted above, J.G. also has received medication management and this was ongoing as of the time of my interviews with him and his mother.

*Treatments and Supports Not Provided*

102.    Despite a diagnosis of PTSD, it did not appear that J.G. and his mother were provided with the option of participating in TF-CBT despite its demonstrated efficacy in studies concerning Latinx children.

103.    Although J.G. did receive two indirect functional behavior assessments, he did not receive applied behavior analysis ("ABA") services.[15]  It was not clear why ABA services were not provided and there was no indication that they were considered, given that there were times

---

[14] A manualized intervention has a written manual that specifically directs the order, content, and objectives of treatment.  Manualized interventions can promote consistency, fidelity, structure, and accountability.

[15] ABA is a scientific approach to understanding behavior that focuses on how an individual's behaviors change and are affected by their environment.  The goal of ABA services is to increase behaviors that are helpful and decrease behaviors that are harmful or affect learning.

when his maladaptive behaviors were relatively frequent and sufficiently serious to reportedly warrant emergency transfer by ambulance from his school to a psychiatric hospital. Records stated that he also was the subject of two manifestation determination review ("MDR") meetings in 2017, reportedly due to incidents of physical aggression toward other students and staff.[16] An MDR meeting follows disciplinary actions by a school in anticipation of expulsion or a change in placement in which the school determines whether the student's misconduct resulted from their disability. These issues appear to be the impetus for J.G.'s transfer to High Road where he began attendance less than one month after his second 2017 MDR meeting. Behavior supports provided to J.G. were described as a consequence system and self-soothing strategies, as well as behavior support counseling.

104.    Parent Management Training was noted as an intervention to be provided by MBI, but it did not appear that a manualized evidence-based parent management training was in fact provided to J.G.'s mother. Based on the clinical findings and the family history of conflict, a typical recommendation would have been for Parent Child Interaction Therapy ("PCIT"). PCIT is an empirically supported intervention that provides psychoeducation and coaching (including live coaching) for parents and their children. There was no reference to PCIT or a similar program being provided or offered to J.G. and his family.

105.    Lastly, despite several episodes of crisis, it did not appear that a crisis intervention plan was developed for J.G. There was no information in the records indicating that there was a structured plan to assist and support him in deescalating his behavior, short of calling emergency services such as ChAMPS. Given that he has had more than one psychiatric crisis, such a plan would be appropriate for clinical and safety reasons.

---

[16] The contents of the MDR meetings themselves were not available for review.

*Conclusions Regarding J.G.*

106.     Serious Emotional Disturbance:   J.G. meets the criteria for serious emotional disturbance based on his extant diagnoses of ADHD, PTSD, and disruptive mood dysregulation disorder ("DMDD").   He appears to have a co-occurring developmental disability, but this is a concurrent disorder/disability, not a candidate differential diagnosis.[17]   He has experienced substantial interference, arising from his serious emotional disturbance, with respect to his ability to function at home and at school, as evidenced by his reported psychiatric hospitalization, placement in special education with a classification of Emotional Disturbance, and behavioral self-regulation challenges at home.

107.     ICBS Needs:  J.G. needed and continues to need ICBS.  His mother has limited English proficiency, so team members should be bilingual or utilize a qualified interpreter.  The team should include individuals with clinical and educational expertise in developmental disabilities and evidence-based positive behavior supports, an educational advocate, and a bilingual or Spanish-speaking peer support for his mother.  At least one team member should have expertise in culturally competent, developmentally appropriate crisis planning, and a crisis plan should be developed and shared with all team members, then revised as needed (or at least every six months).  J.G. would also benefit from applied behavior analysis interventions to help promote more academic engagement, prosocial behaviors, and skillful social interactions at home and school.  I strongly recommend that the team develop a checklist to ensure that J.G.'s and his family's strengths and challenges are taken into account methodically when making decisions

---

[17] A differential diagnosis is one that should be considered among other possibilities.  Some psychological signs and symptoms overlap between several different diagnoses; consequently, it sometimes becomes necessary to demarcate a candidate differential diagnosis so that providers can consider whether or not it might apply in substitution for existing diagnoses that the person may have.

about treatment and supports. For example, one checklist item should be consideration of his expressive language challenges, with a prompt to consider whether or not any given intervention or support is (a) reliant on executive functioning and verbal skills, which is undesirable, or (b) would provide an opportunity to enhance J.G.'s ability to communicate with others.

108.     Harm Arising from Lack of Access to ICBS: J.G's lack of ICBS likely harmed his ability to function in school and may have contributed to his psychiatric hospitalization. In his school records, J.G.'s trauma-related symptoms were repeatedly linked to his behavioral difficulties. His limited progress in school, particularly prior to returning to in-person classes, could have been mitigated by appropriate behavior supports that were coordinated across home and school environments. Thus, lack of treatment for his trauma appears to have exerted a direct effect on his ability to function at school. In addition, the lack of crisis planning may have contributed to his contacts with emergency services and the inpatient psychiatric hospitalization in 2018, along with the emergency transfer from school to Children's National Hospital in 2016. These past crises might have been avoidable with provision of appropriate crisis management strategies, particularly if he had a crisis plan that addressed a continuum of symptoms of distress rather than only addressing relatively more escalated emotional distress and dysregulated behavior.

109.     Furthermore, the lack of ICBS is especially harmful due to J.G.'s lack of positive peer relationships, his family history of domestic violence, victimization, and his cognitive and language impairments, all of which enhance his vulnerability to negative peer influence. The issue of negative peer influence is particularly salient and high-priority at this time due to J.G.'s age. During adolescence, the trajectory and pace of brain development renders youth much more vulnerable and sensitive to peer influence than they are at any other time in their lifespan. As a result, from roughly ages 14 to 22, research shows a well-documented increase in risky behaviors

41

that tend to decline after adolescent brain development is complete in the early 20s. For J.G., these next few years represent an opportunity to address the gaps in his treatment and educational services during a time period when his brain has enhanced plasticity. These next few years, however, also represent an era of significant vulnerability and lost opportunity if services and supports are not provided.

110.   Institutionalization: J.G. is at risk of institutionalization. My concerns for future negative consequences due to a lack of ICBS and the concomitant evidence-based interventions and supports that match J.G.'s strengths and challenges include potential criminal justice system involvement due to aggression. Placement in juvenile detention and ultimately adult incarceration settings means J.G. would most likely not receive accommodations for his disability and would be at very high risk of exploitation and victimization by others. A lack of treatment for his trauma-related symptoms confers a risk of future domestic violence perpetration and victimization, which could result in criminal or clinical institutionalization. He is vulnerable to negative peer influence, and so if he were detained or incarcerated the harm of such exposure to peers with negative behaviors (sometimes referred to as "deviancy training" in the research literature on juvenile offending) would likely exert cascading effects long after he served his commitment or sentence.

### 4.   **B.T.**

111.   B.T. is a 20-year-old Black male who was residing in YSC in the District, but whom was scheduled to be imminently discharged from YSC as of the time of this report. He has spent time at residential facilities in Maryland, Pennsylvania, and the District over at least the past three years.

112.   I have reviewed educational, mental health, and delinquency-related records for B.T. I have also interviewed Dr. Robert Haxter, who conducted psychological testing and a

records review for B.T. in 2020, and multiple members of B.T.'s team of advocates:  his juvenile attorney, his forensic counselor, and his education rights attorney.

*Background*

113.    B.T.'s developmental history reportedly included possible anoxia (a lack of oxygen to the body or brain) resulting from the umbilical cord wrapping around his neck during labor/delivery.  His family relationships were fraught and he was reportedly placed in two separate family reunification homes as well as two shelter homes.  According to records and interviews, his parents appeared to have their own mental health challenges, but it was not clear if they were referred for or ever received mental health services themselves.  B.T. had a history of exposure to major traumatic stressor events including witnessing community violence, according to records.

114.    In 2020, B.T. was sent to a group home operated by Umbrella Therapeutic Services Inc. ("Umbrella") in the District.  At this facility, he initially did relatively well, according to his team of advocates.  However, according to those same interviewees, B.T. reportedly began to exhibit more frustration, disengagement, and oppositionality when the criteria for his discharge from the facility were unilaterally modified.  Despite little indication that substance abuse was a key issue, B.T. was next sent to an Abraxas substance treatment facility in Pennsylvania.  Again, B.T. appeared to do well initially, but then he began to have behavioral challenges, including conflicts with staff (e.g., when staff confronted B.T. about smoking cigarettes).  Some of these conflicts escalated and culminated in the use of physical restraint techniques by staff on B.T.  Interviews with the professionals involved in B.T.'s legal and educational services and supports consistently reported that when other professionals "moved the goalposts" with respect to discharge criteria and planning, B.T. appeared frustrated and tended to disengage with treatment, often initially refusing his medications (which may then have triggered increased mood symptoms,

which caused increased oppositional behaviors and irritability) and sometimes culminating in his absconding from facilities.

*Findings*

115.   It is unclear when B.T. was initially found eligible to receive special education services, but he was receiving special education services with a classification of Multiple Disabilities by his 7th grade year, according to Dr. Haxter's report.  He had challenges with attendance, behavior, and poor grades according to records.

116.   B.T. was reportedly diagnosed with a serious mental disorder (bipolar disorder) around age 12.  Records indicated that he was also diagnosed with ODD; reaction to severe stress, unspecified;[18] DMDD; ADHD; developmental disorder (motor-type); and mixed developmental disorder.[19]  His symptoms reflected in the records included insomnia, decreased need for sleep, mood lability, irritability, anger, argumentativeness, social withdrawal, poor concentration, poor motivation, and episodic increased goal-directed activity.[20]  His tested I.Q. has consistently fallen within the range required for an ID diagnosis, with a full-scale I.Q. around the low 70s.

117.   B.T.'s clinical history also included significant traumatic stressor events, including the death of his grandfather in 2010, witnessing a shooting in his community, and witnessing domestic violence between his parents.  He has also been subjected to use of physical restraints, multiple times, while in out-of-home placements.

---

[18] Reaction to severe stress, unspecified, is a formal diagnostic term for a trauma-related disorder, in the World Health Organization's *International Classification of Diseases and Related Health Problems, 10th Revision* (2019 Version).

[19] Mixed developmental disorder is a developmental disability with a variety of delays and impairments across domains, present since childhood.

[20] Increased goal-directed activity is a mood disorder symptom that is typically associated with bipolar disorder, and is characterized by a higher-than-normal activity level that is purposeful and volitional rather than disorganized or aimless activity.  Examples could include cleaning the house or writing.

*Treatments and Supports Provided*

118.    B.T. is currently eligible for special education as a student with multiple disabilities, and he has an IEP, with provisions for specialized instruction and behavior support services.  A recent IEP from 2020 indicated that B.T. requires the following in order to be maintained in the least restrictive environment:[21]  clinical crisis intervention, frequent behavioral feedback, frequent rewards for positive behavior, social skills training, repeated oral directions, step-by-step written directions, simplified directions, and reduced length and breadth of assignments.

119.    B.T.'s transition plan, as reflected in his IEP, included goals related to attending a program in culinary arts, completing a budget worksheet with 80 percent accuracy, and working as a chef after graduation.

120.    B.T. has experienced many out-of-home placements in his life.  They include at least 28 detentions at YSC as well as placements in Our House Youth Home, Buddy's Place, Hope House PINS Shelter, the Umbrella group home, Abraxas (in a Pennsylvania location), and Grandma's House.

121.    B.T. was placed at Abraxas for the purpose of substance use treatment. Professionals who participated in interviews regarding B.T. consistently expressed puzzlement with respect to why substance use treatment was prioritized over addressing B.T.'s cognitive impairments, mood disorder, and trauma-related symptoms.  Abraxas records did not include acknowledgement of B.T.'s cognitive limitations and developmental disability.  The diagnoses listed in the Abraxas records were limited to cannabis use disorder, alcohol use disorder, conduct

---

[21] With the correct supports, the least restrictive environment for B.T. would be a general education setting in school, and residing in an apartment or house in the community with some direct care staffing for a few hours per day (likely ultimately tapered to a few hours per week once he is able to acquire the needed independent living skills).

disorder, and moderate mood disorder by history.  Treatment recommendations at Abraxas relied heavily on verbal and cognitive skills.  For example, B.T.'s treatment plan recommended the use of cognitive behavioral therapy ("CBT"), "appropriate handouts," and workbooks.  Initially, he was not prescribed medications, despite his longstanding mood disorder diagnoses and history of taking medications to manage these mood symptoms.  Later treatment plan updates indicated that B.T. was ultimately prescribed the same medications that he had been taking in the community.

122.    At Abraxas, B.T. was subjected to multiple episodes of physical restraint by the staff.  These episodes, as described in the unusual incident reports, originated with non-aggressive but somewhat oppositional behavior by B.T., subsequently escalated by the staff, and culminating in physical restraints that often included multiple personnel.  An episode on September 3, 2020 reportedly included physical restraints by at least two adults lasting about seven minutes.  Records from YSC also show that B.T. was subjected to use of physical restraint at least four times.

123.    Other incident reports focused on relatively minor behaviors, such as medication refusal and smoking cigarettes.  At times, staff refusals to permit B.T. to go outside or eat food from outside the facility escalated into more serious conflicts.  It did not appear that the staff at the Umbrella group home or Abraxas were utilizing formal, individualized behavior support plans or crisis plans with data collection to ascertain their effectiveness, based on the records and the accounts of the interventions provided in the Unusual Incident reports.

124.    B.T. has been prescribed medications to manage mood and behavior, as well as to address ADHD symptoms.  These medications have included mood stabilizing, antipsychotic stimulant, antidepressant, and sedative medications.

125.    With respect to services that B.T. has received in the community, he received treatment from First Home Care as early as 2016.  Records from 2017 did not include

acknowledgement or accommodations related to B.T.'s cognitive impairments or his mood disorder. His primary diagnosis was identified as reaction to severe stress, unspecified. A diagnosis of ODD was also included in these records. Most sessions appear to be focused on ODD-related goals, with interventions focused on cognitive processing and role-playing conflict resolution strategies. The identified coping strategies also included walking away from difficult negative situations. Records also indicated that the staff providing services often utilized worksheets and other written materials, despite B.T.'s documented difficulties with written language and his cognitive impairments. Progress notes did not indicate that B.T.'s I.Q. or mood symptoms were taken into account in the provision of psychotherapy to him. Records indicated that the treatment providers' conceptualization of B.T. was largely focused on his qualities and decision-making, rather than incorporating adults and other members of his community into treatment and treatment planning. Environmental factors were discussed primarily with regard to how B.T. might handle conflicts with peers in the community.

126.    B.T. was also provided with medication management services and some counseling. Records from Umbrella were mostly related to services provided in 2020. The records indicated acknowledgment of his mood symptoms, but not his cognitive impairments. Recommendations made for his treatment did not include accommodations to help him understand and participate in his treatment. In the records from Umbrella, B.T. demonstrated strengths with regard to his ability to describe what he needed and wanted from treatment. Specifically, he requested medication for his mental health. The records also noted that B.T. reportedly indicated some interest in treating anger issues; however, the records related to this statement used feminine-gendered pronouns, and it is not clear if this was a typo or possibly text related to a different consumer. B.T. informed staff at Umbrella that he wanted to reside with his family, and ultimately

to rent his own place.  Thus, B.T. identified case management and treatment needs.  Records from B.T.'s treatment at Umbrella included goals, but these goals were often too vague to be useful.  For example, one goal stated, "[B.T.] will be able to identify triggers and utilize coping techniques to live independently without feelings of anger."  Suggesting that an individual should live without experiencing feelings of anger is not a reasonable expectation, regardless of disability status.

127.   B.T. was also treated at Hillcrest in 2018 and some records indicated that he generally had a favorable view of his treatment experience there.  Records from Hillcrest included acknowledgement of B.T.'s mood symptoms; however, these records also did not acknowledge B.T.'s cognitive limitations or a need for accommodations in the provision of his mental health treatment.  Interventions offered by Hillcrest were focused on using cognitive skills to cope with stressful situations, and these interventions relied on the ability to use metacognition.  Metacognition is, essentially, the ability to think about one's own thought processes.  Metacognition is necessary to observe, label, and communicate about emotions and to describe thought processes retrospectively and in the present.  As with the Umbrella records, some of the notes in the Hillcrest records had incorrectly gendered pronouns, and again it was unclear if these were typos or potentially related to a different consumer.  Hillcrest records did not include acknowledgement of B.T.'s significant trauma history and trauma-related symptoms (discussed below).

128.   Crisis planning for B.T. has been limited.  For example, at Hillcrest, the crisis plan consisted solely of an instruction to "contact ER with [suicidal ideation], [homicidal ideation], extreme agitation, and psychosis."  Other crisis plans contained in his records were incomplete and boilerplate.

*Treatments and Supports Not Provided*

48

129.    The information I obtained from interviews with the members of B.T.'s advocate team was consistent in that they reported that he was not sufficiently involved in treatment decisionmaking, and when he did offer input, it was not meaningfully taken into account. According to members of B.T.'s team of advocates, this lack of accommodation and respect for B.T.'s input contributed to his disengagement with treatment, and possibly some medication refusals.  According to records and interviews, B.T. has intrinsic motivations, such as a desire to be dressed well, that could have been utilized to encourage and reward his participation in educational and vocational opportunities.  Treatment records likewise indicated that he tended to perform best when the behavioral goals were clearly identified, remained consistent (rather than being unilaterally modified by staff), and included valued rewards such as a home visit.  It is notable that utilizing home visits and social contact with loved ones can be problematic when these supports are utilized as a reinforcer.[22]  Building relationships with family members and other sources of social support is a therapeutic intervention in and of itself, and utilizing contacts with family members as a reinforcer necessarily implies that the contact could then be withheld if the individual does not meet the goal required to receive the reinforcer.

130.    As noted above, many of B.T.'s goals and treatment records were not related to his cognitive impairments and associated needs.  According to interviews with members of B.T.'s advocate team, few of these professionals that were engaged to monitor and provide treatment to B.T. have had specific expertise in intellectual and developmental disabilities.  Goals and interventions consistently failed to include acknowledgment and integration of information related

---

[22] A reinforcer is a response that increases the frequency of the prompting behavior.  For example, verbal praise could be a reinforcer for a student completing their classwork.  In this framework, the student may experience the verbal praise as rewarding, and in response increase the frequency with which they complete their classwork.

to B.T.'s cognitive impairments.   Interventions also tended to rely on verbal, executive functioning, and metacognition capacities that appear to be substantially impaired in B.T.   Dr. Haxter stated during his interview that, based on the information he had about B.T., "there is just no indication that he is a candidate for talk therapy."   Dr. Haxter also emphasized that B.T.'s cognitive limitations were sufficiently severe that B.T. would need significant assistance and support in order to identify and navigate the services that he needs in the community.

131.    With respect to psychological assessments, the overall picture is one of inadequacy, with the exception of Dr. Robert Haxter's 2020 report.  As Dr. Haxter noted in his report, "[g]iven that measures of [B.T.'s] intellectual ability fell within the I.Q. range of individuals with an intellectual disability during both [Child Guidance Clinic] evaluations, [it] is unclear why neither evaluator investigated the presence of intellectual disability by completing an adaptive behavior assessment."   The evaluations showed that B.T. had highly consistent I.Q. scores when he was formally tested, and the scores he obtained were within the range required to satisfy one of the diagnostic requirements for ID.  The other two requirements are:  (i) significant deficits in adaptive functioning, which refers to how well the person is able to independently care for themselves in the community; and (ii) onset during the developmental period (i.e., before age 18).  Because B.T. was relatively young at the time of his prior assessments, a thorough assessment would have documented onset prior to age 18.

132.    With respect to adaptive functioning, as noted above, the evaluators at Child Guidance Clinic ("CGC") opted not to include an adaptive functioning assessment in their evaluation.  Additionally, they did not offer a diagnosis of ID, and instead characterized B.T.'s cognitive impairment with a diagnosis of borderline intellectual functioning.  Of note, borderline intellectual functioning is not a formal diagnosis according to the current DSM-5, but rather is a

descriptive V-code (a circumstance other than a disease or injury that is either related to the reason the person is being seen by a healthcare provider or to current or future treatment considerations). The CGC reports related to B.T. appear to reflect a lack of either understanding or attention to the significance of his cognitive impairments.  Unfortunately, these assessments were then relied upon by the District of Columbia Department of Disability Services when they rejected B.T.'s application for the District's ID Medicaid waiver.  A subsequent comprehensive evaluation by Dr. Haxter included assessment of B.T.'s adaptive functioning, and Dr. Haxter ultimately concluded that B.T. met the criteria for ID.  Documenting B.T.'s clinical history and diagnoses in an accurate and comprehensive fashion is vital because such documentation can essentially determine whether or not an individual with a mental health and/or developmental disability will be able to access the supports they need to live safely in the community.

133.    B.T.'s history, as reflected in records and interviews, was marked by several traumatic experiences.  In the records, B.T. explicitly linked some of his psychiatric symptoms to specific traumatic stressor events.  For example, he indicated that his sleep difficulties began after there was a shooting in his community.  Records from First Home Care also appeared to acknowledge a link between B.T.'s functioning and his exposure to traumatic stressor events: "[B.T.'s] grades dropped significantly after he found out his 25-year-old brother was not returning to [the District] and after his father asked for a DNA test to make sure of his paternity, according to [B.T.'s mother]."  Other records noted the relationship between B.T.'s experience of trauma and his other psychiatric symptoms.  Records from First Home Care stated:

> The circumstances which gave rise to the development of criteria indicating ODD may very well be the same circumstances which now present more concretely related to an unspecified stress/trauma disorder.  Continued assessment for worsening presentation of this condition is warranted given that [B.T.] currently uses marijuana multiple times per day to calm himself down and buffer against anxious, overactive thoughts.

This conceptualization of B.T. is remarkable because the care provider explicitly linked B.T.'s trauma, and associated symptoms, to other behavioral concerns (oppositional behavior and marijuana use).  This would support a clinical approach that treats B.T.'s trauma and need for safety as a key point of intervention and treatment, since the trauma appears to function as a root cause.  Instead, providers tended to focus on the substance use and oppositional behavior without addressing B.T.'s trauma-related symptoms.  According to the records reviewed and interviews conducted in relation to B.T., it appears that he has never been provided with evidence-based trauma treatment.

134.    Records were clear that B.T.'s parents had a high-conflict relationship.  Records that described B.T.'s father's behavior, as observed by mental health treatment providers, characterize his father as aggressive and overbearing.  B.T. reportedly observed domestic violence between his parents in the household when he was a young child.  He recently became a father of an infant, born in early 2021, and B.T. appears to highly value his new role as a father.  Taking on age-appropriate social roles, such as a parent, can promote psychosocial maturity.  Psychosocial maturity is a developmental process of transition from the dependency of childhood/adolescence to the self-sufficiency of adulthood.  Attaining psychosocial maturity includes accomplishing mastery and competence, developing stable social relationships, and creating a positive sense of self-worth related to moral and responsible behavior even in the absence of external supervision.  Promoting psychosocial maturity is particularly important for youth with a history of criminal justice system involvement, because improved psychosocial maturity appears to be associated with a higher probability of criminal desistance in young adulthood.[23]   Given B.T.'s cognitive

---

[23]*See* Edward P. Mulvey, et al., *Trajectories of Desistance and Continuity in Antisocial Behavior Following Court Adjudication Among Serious Adolescent Offenders*, 22 DEVELOPMENT AND

impairments, his family history of domestic violence, and his mood disorder symptoms, he will likely need support in order to parent his child effectively. The child's mother, who maintains a bond with B.T. as of the time of this report, was consistently described as a positive influence; however, this does not obviate the need for B.T. to develop his own parenting skills and understanding of child development. Although records acknowledged that B.T. had a child on the way, and that he was highly motivated to be a good father to her, there were no indications that he had received any kind of parent training or psychoeducation about child development that took his need for accommodations and his family history of domestic violence into account.

*Conclusions Regarding B.T.*

135. Serious Emotional Disturbance: B.T. meets the criteria for serious emotional disturbance based on his extant diagnoses of bipolar disorder, ODD, reaction to severe stress, unspecified, and disruptive mood dysregulation disorder. He has historical diagnoses related to co-occurring psychiatric and developmental disabilities. His developmental disabilities have certainly impaired his ability to function at a developmentally and culturally appropriate level in the community, but his mood symptoms have made separate contributions to the dysregulated mood and behavior that have been the basis of many of his more serious behavioral, familial/interpersonal, and educational challenges. In the letter from the District's Department on Disability Services ("DDS") indicating the B.T. was determined to be ineligible for the Medicaid Waiver, the reasoning offered by the author was based on a flawed assessment of (i) the relationship between B.T.'s cognitive limitations and co-occurring psychiatric symptoms, and (ii) the quality of the CGC evaluations of B.T. with respect to the applicability of an ID diagnosis.

---

PSYCHOPATHOLOGY 453, at 17, 20 of manuscript (May 2010), manuscript available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2908904/.

Despite these issues, B.T.'s emotional disabilities have made distinct contributions to his adaptive functioning, educational, and interpersonal impairment above and beyond what would be expected by low I.Q. alone.  The elevated mood symptoms associated with bipolar disorder do appear to be episodic, consistent with the often cyclical nature of the disorder's course as well as issues with medication administration and compliance that can affect mood symptoms.

136.    ICBS Needs:  B.T. needed and continues to need ICBS.  B.T. would benefit from wraparound services and a child and family team incorporating his natural supports (e.g., his girlfriend and mother) and priorities that are established by B.T. in collaboration with providers rather than the providers' unilateral assessment of his needs and priorities.  He would benefit from inclusions of a peer support, a consultant with expertise in IDD to ensure that team procedures and documentation are accessible to B.T., a board-certified behavior analyst, a clinician with expertise in individuals who have IDD and psychiatric disabilities, and a case manager who can assist with practical matters such as appealing the DDS Medicaid waiver decision, applying for Social Security, and obtaining other resources that might be available to B.T. based on his documented disabilities.  Continued participation by B.T.'s current advocates (i.e., his juvenile attorney and his forensic counselor) is strongly encouraged.  The available information in this case indicates that the team should adopt a smaller team size, promote greater team member accountability, and consider who should be members in light of B.T.'s needs to ensure that there are no unnecessary team members and that there are no gaps in the team skill sets.

137.    In addition to a child and family team, B.T. would benefit from crisis management services, including mobile crisis services, to help the team develop a positive behavior support plan for B.T. with specific, individualized provisions for crisis management (including de-escalation strategies that avoid power struggles and take B.T.'s strengths and challenges into

account).  Any staff or caregivers who will be responsible for providing supports to B.T. should be trained on the behavior support plan and the crisis plan.  The behavior support plan should be developed by someone with experience in developing positive support plans for persons with co-occurring disabilities, such as a board-certified behavior analyst, or in close consultation with such a person, who should be available for consultation if staff, caregivers, or B.T. have questions or concerns about behavior support strategies.  Behavior support plans should include:  (i) clear and concrete descriptions of both challenging and prosocial behaviors; (ii) scripts for staff and caregivers so that expectations and guidance are understandable; (iii) multiple practical rewards that B.T. finds reinforcing; and (iv) a plan for assessing progress using measurable benchmarks that are the product of collaborative team processes and not unilateral decision-making by behavior support workers or other individual team members or agencies.  Capitalizing on B.T.'s intrinsic motivations with respect to his child and his interests in fashion, shoes, and having income will be key, and this element appears to have been missing from prior interventions.

138.    Harm Arising from Lack of Access to ICBS:  B.T.'s lack of access to ICBS has resulted in numerous detentions at YSC, multiple placements in facilities far from his community and family, and loss or denial of access to services.  This has harmed his mental health and jeopardized his transition back into the community.  As noted in the foregoing, B.T. has been detained at YSC more than 20 times.  He has had numerous other placements, some of which were local.  However, when he was placed at Abraxas (in Pennsylvania), he was significantly geographically removed from his community and social supports.  Due to the number of placements and the instability associated with these frequent changes of location, B.T. has had very limited ability to establish stable relationships with providers.  During the interview with Dr. Haxter, he observed that the only person with sufficient knowledge of B.T.'s adaptive functioning

over time was his forensic counselor.  Given that B.T. has been separated from his family in restrictive placements for years, it is not surprising that he did not have any family members who could have provided observations about how he functions in the community.  This speaks to the degree of isolation from social supports that is a consequence of the inappropriate placements to which B.T. has been subjected.

139.    Also, according to interviews, B.T. lost access to services, such as the Credible Messenger program, due to his placement at Abraxas.  According to B.T.'s forensic counselor, she assisted B.T. with his application to the Rehabilitation Services Administration ("RSA"), which provides vocational services to people with disabilities.  She said he was approved for RSA services, but when he was placed at Abraxas the RSA referral was closed.  At B.T.'s age, RSA services would have been particularly helpful as part of his transition plan, as well as for the purpose of promoting psychosocial maturity through employment.  In addition, when B.T. applied for the District's ID Medicaid waiver program, he was denied.  The denial letter from DDS specifically cited to the CGC evaluations and the failure of those evaluations to diagnose B.T. with ID.  Thus, even if a collection of appropriate, evidence-based, individualized ICBS were available for B.T., these inadequate psychological evaluations and inappropriate placements served as obstacles to B.T.'s attempts to access supports and funding that may have facilitated independent living in the community.

140.    Due to B.T.'s young age, lack of experience parenting or caring for a small child, and his need for accommodations and education related to parenting, I am concerned that he and his young family are at risk of involvement with the CFSA.  This could potentially be avoided if B.T. is provided with ICBS.

141.    Institutionalization:    B.T. has already suffered from inappropriate institutionalization, and is at risk of continued institutionalization due to a lack of access to ICBS. A lack of ICBS means that conflicts and power struggles with staff as well as B.T.'s vulnerability to negative peer influence are not properly addressed, which puts B.T. at risk of incarceration.  If B.T. is incarcerated, his developmental disability subjects him to substantially enhanced risk of victimization in the carceral setting.  Aside from the issues with victimization and exploitation in and of themselves, further traumatic stressor events would likely worsen his trauma-related symptoms and potentially exacerbate his mood disorder.

### 5.    **L.T.**

142.    L.T. is a 22-year old Black male who is currently at the DOC.

143.    The records I reviewed for L.T. included DYRS records, educational records, and medical and mental health treatment records.  I also reviewed student participant written input forms completed by L.T. as part of his IEPs.  In addition, I interviewed L.T. on May 6, 2021 and June 23, 2021, and I interviewed his mother and his aunt on June 28, 2021.

*Background*

144.    L.T. was one of two fraternal twins who were born prematurely at seven months. Both children were significantly underweight; L.T. was reportedly one pound at birth.  Records indicated that he may have required resuscitation at some point during the first few weeks of his life.  He and his twin sister were hospitalized in the neonatal intensive care unit at Children's Hospital for about 3-4 months, according to records.  Records also indicated that his mother may have been using cocaine and tobacco, and possibly taking antidepressant medication, during her pregnancy.

145.    Records suggest that L.T. experienced some mild developmental delays, with more pronounced deficits in adaptive functioning that were reportedly observed when L.T. entered

kindergarten.  He also had difficulties with speech, including stuttering, and as a result he received speech therapy in kindergarten.

146.    L.T.'s family history included placement with his maternal aunt during early childhood.  His aunt ultimately served as his legal guardian, and she cared for L.T., his twin sister, and his brother (it was not clear whether his brother is a half-brother or full brother).  L.T.'s biological mother reportedly recently reentered his life.  L.T.'s father died when L.T. was about five years old, and records were somewhat contradictory with respect to cause of death.  In addition, records alluded to a family history of mental illness without many specifics about what diagnoses were present for which family members.  It appeared that his mother was reportedly diagnosed with bipolar disorder, and L.T.'s brother may have been diagnosed with bipolar disorder as well.

147.    L.T. was diagnosed with neurodevelopmental disability when he was about five years old.  He was reportedly receiving special education services by early elementary school.  His special education classification was listed as ID throughout his school records.  Testing conducted by the school and outside psychologists consistently reflected a level of cognitive functioning consistent with his classification of ID.  He received relatively intensive services in restrictive environments.  For example, when he was in middle school, he was placed in a self-contained classroom with other children who reportedly had similar disabilities.  He also reportedly received specialized instruction in school.  Once L.T. reached high school, where he was enrolled at Ballou Senior High School ("Ballou"), reports indicate that he began experiencing "overwhelming feelings of shame and performance anxiety," including as a result of being "placed in large classes and so-called regular classes."

148.    Despite the intensive interventions in restrictive environments, L.T. continued to show very poor academic achievement.  For example, in 2016, at age 17, L.T. was reading at a first-to-second grade level.  Of note, L.T. currently is reportedly in the 12th grade, but has been limited in his access to educational services and programming due to the COVID-19 pandemic. He told me that he had access to a tablet for educational purposes, but stated that he would rather be instructed in person because there might be something that he did not understand and for which he required one-on-one assistance.

149.    L.T.'s records indicated a consistent lack of accommodations and other interventions that would have permitted L.T. to have greater knowledge and self-advocacy opportunities with respect to his education and treatment.  For example, he responded to questionnaires related to his IEP with informative responses that described his educational challenges, likes and dislikes, support needs, and goals.  The records showed that he repeatedly informed his IEP team that the academic work in his classes was too hard and that this created difficulties for his motivation.  He provided concrete recommendations for what he wanted; for example, he stated "I am not involved in any extracurricular or social activities.  I want to join the basketball team."  He also stated, "I would like the work to be on my level.  I don't want the work to be too hard or too easy."  Records do not indicate that this input was directly acknowledged and incorporated into educational, treatment, and recreation planning, including transition planning. L.T. stated that, because he was not able to get sufficient assistance, and because his schoolwork was too difficult, he "felt frustrated.  [He] wanted to leave out the class."  In other words, L.T. indicated that the excessively challenging schoolwork, and resultant experiences of repeated failure, led to his disengagement and reduced attendance at school.

150.    According to records, L.T.'s first placement in youth detention occurred in April 2014 when he was detained at YSC.  Records indicated that he was detained at YSC at least 12 times from 2014-2017.  He was placed in shelters, including an Umbrella family shelter, DuPont III Shelter, Kennedy Shelter, and Triangle Shelter.  For some of these shelters, he had multiple placements.  It appeared that he ran away from several of these placements.  As noted above, he was detained at the DOC at the time of my interview with him.

*Findings*

151.    The most notable clinical findings and observations noted in the records related to L.T.'s dysregulated mood symptoms and low intellectual ability.

152.    L.T. also had a significant history of traumatic bereavement.  Both of his siblings were murdered; his brother was reportedly murdered at the age of 20 and his twin sister was the victim of a homicide in 2020.  L.T.'s removal from his mother's custody as an infant also represents an additional significant stressor event.  Symptoms and signs reported by L.T. and reflected in records included expressive and receptive language problems, trauma-related symptoms such as nightmares, and overall low intellectual ability with impaired adaptive functioning (consistent with his intellectual disability).  Mood symptoms included dysregulated anger, sadness, decreased need for sleep, hyperactivity, irritability, and inattentiveness.

153.    L.T. has received several evaluations, most of which related to his intellectual functioning, academic achievement, and language.  His I.Q. scores ranged from a full-scale I.Q. of 56 (this score was reported in educational records without additional detail, for example which measure was used) to a full-scale I.Q. of 72 on administration of the Wechsler Intelligence Scale for Children, 4th Edition.  Generally speaking, formal intellectual ability testing showed that he had a roughly similar degree of impairment across domains of ability; in other words, there were

not large differences between different types of abilities, such as verbal vs. non-verbal reasoning. His receptive and expressive language deficits were significant according to formal testing that was reflected in the records, but it did not appear that his speech and language functioning had been evaluated comprehensively in recent years.

154.    In 2016, L.T. was the subject of a psychiatric evaluation by Dr. Janice Hutchinson. Dr. Hutchinson noted L.T.'s mood problems and observed that L.T. would benefit from more intensive outpatient support to treat his conditions in the community.  Dr. Hutchinson offered the following observations with respect to L.T.'s "negative behaviors":  "it is noteworthy that [L.T.] attributes his negative behaviors in school to his lack of understanding of his schoolwork and the frustration that ensued.  It is possible, therefore, that he responds to many situations from the same space.  His family has noted that he does not seem to understand meanings and that one has to repeat oneself several times before he understands.  His lack of comprehension may fuel his frequent non-compliance."

155.    The diagnoses reflected in Dr. Hutchinson's report included ADHD, mood disorder (not otherwise specified), and cannabis abuse, with a recommendation for ruling out learning disabilities.  Dr. Hutchinson noted "intellectual/cognitive deficits," but she did not specifically note L.T.'s ID diagnosis.  She recommended that L.T. receive a neurological examination, consultation and management by a child and adolescent psychiatrist, use of a mood stabilizing medication, placement in an after-school program, and a (ostensibly updated) speech and language evaluation.  Dr. Hutchinson described L.T. as having "multiple emotional deficits," and she offered the opinion that, as a result of these deficits, "he is *de facto* a threat to others as well as himself."

156.    In 2017, L.T. was the subject of a neuropsychoeducational evaluation conducted by staff at the District's CGC.  The referral for this evaluation was related to L.T.'s involvement with

the court at that time.  Findings from this evaluation included very low I.Q. score results.  His full-scale I.Q. on the Wechsler Adult Intelligence Scale, 4th Edition, was 70.  This score falls at the 2nd percentile, meaning that only about 2 percent of same-aged peers obtained lower scores.  This I.Q. test administration did not reveal any significant relative strengths, and the sub-test scores showed that L.T. had significant difficulties with his fund of information, verbal reasoning ability, short-term memory, and processing speed (on tasks requiring fine motor skills).   His academic achievement testing at the time of the 2017 evaluation was consistent with his historical pattern of showing very low academic achievement across subjects, with performance that was below what would be expected even in light of his low I.Q. scores.   The provided report was incomplete (missing the last 11 pages), and did not include the findings from language, neuropsychological, trauma, and general psychopathology testing that was reportedly administered according to page 2 of the same report.

*Treatments and Supports Provided*

157.    Records indicated that L.T. may have received some services at "PSI," which appears to be a reference to PSI Family Services ("PSI"), a District behavioral health service provider; however, records from PSI were not available for review.  L.T. recalled receiving services at PSI; however, he indicated that the services were limited to medication management, with brief non-therapeutic (by L.T.'s account) interactions with mental health staff.

158.    Records indicated that L.T. received individual psychotherapy for about 3 years starting at age eleven; however, further details were not available.  He was prescribed stimulant medication for his ADHD and a mood stabilizer medication for behavioral and mood problems.  The mood stabilizer medication's side effects reportedly included a weight gain of about 30

pounds.  He also was prescribed an atypical antipsychotic, and L.T. indicated that this medication helped him to remain calm.

159.    L.T. reflected on his treatment history, stating that it was harder for him to communicate when he felt angry.  He stated that he had an effective psychiatrist at Children's National Hospital, but this provider reportedly left to reside in New York.  L.T. stated that this provider was different from the others in that she appeared to understand and care about what happened to him.  It appeared that this was his only positive treatment experience, from his perspective.  He stated that one of the challenges of treatment was that he was attending by himself, and that it was "hard to express things [verbally]."

160.    L.T. showed a marked strength in his ability to identify his treatment and support needs, though it appeared he had limited effective influence.  As noted above, he provided written input about his needs and challenges with respect to his IEPs in school.  During his interview, he indicated that he hoped to reside with his family, spend more time with his nieces and nephews, attend school in person, and play sports.  With respect to his outstanding needs, he stated that he needed life skills, mental health treatment, "a trade," and social skills.  He stated that he felt he had been able to ask for help, but explained, "when I ask people for help, they act like they don't want to help me."

*Treatments and Supports Not Provided*

161.    It was not clear whether L.T. has been referred for an application to the District's ID Medicaid waiver program.  L.T. stated that he was unfamiliar with the Medicaid waiver program, and he said that no one recommended that he apply for such a waiver.  His historical testing results and records strongly support his ID diagnosis, and in my opinion he is likely eligible for the waiver.  The Medicaid waiver could provide funding for transportation, housing, residential

supports (including direct care staff), psychiatric treatment, psychological and behavior management interventions, job training, and job coaching, among other supports. These Medicaid waivers are intended to prevent institutionalization of individuals with L.T.'s disabilities by funding supports that enable individuals with disabilities to live safely in the community with adequate supports.

162.   Records from DYRS indicate that the agency was not taking L.T.'s co-occurring disabilities into account when making determinations about his placement and supervision status. This was reflected in classification documents that included a checklist of considerations that might indicate a need for a change in placement. The forms related to L.T. repeatedly showed question marks for the checklist items related to mental illness/mental disabilities and intellectual disabilities/low I.Q./IEP. This absence of information about his disabilities, when his disabilities would have been a relevant consideration for placement and services provided by DYRS, appeared in his records as early as January 2016. In other words, L.T. had about 10 years of documentation about his intellectual disability prior to the time when DYRS was recording question marks with respect to his mental and intellectual disability status.

163.   Based on my interviews with L.T., it appeared that the psychological evaluations, psychiatric assessments, and a prior Youth Act study were not provided to L.T., nor were the findings and recommendations reviewed with him to ensure that he understood them. Although he attempted to advocate for himself with respect to educational interventions, his input did not appear to be incorporated and addressed in the educational programs themselves. He stated that he did not know if he had a transition plan. He was appointed an education rights attorney in 2016. However, L.T. did not recall ever having an education rights attorney and it did not appear that he had much contact with that attorney.

164.    Despite L.T.'s numerous out-of-home placements, L.T.'s records did not reflect the development of a crisis plan.  He indicated that, at times, he felt he had been in crisis, particularly with respect to acute mood symptoms of depression and anger.  He stated that he could not recall ever discussing a crisis plan with any provider.

*Conclusions Regarding L.T.*

165.    Serious Emotional Disturbance:  L.T. meets the criteria for serious emotional disturbance on the basis of his extant diagnosis of ADHD and Mood Disorder Not Otherwise Specified.  In my view, he likely meets the criteria for ID, given his adaptive functioning impairments, tested I.Q., and age of onset.  His mood and attentional problems appear to be co-occurring, rather than candidate differential diagnoses.  Individuals with ID have high rates of comorbid psychiatric conditions such as ADHD and Mood Disorder; it is therefore not surprising that L.T. appears to have both psychiatric and developmental disabilities.  His cognitive impairments and mood difficulties appear to have interacted with respect to his impairments in educational settings.  His challenges in avoiding truancy at school also appear to be a combination of his accumulated experiences of failure due to inadequate accommodations for his ID in combination with subjectively intolerable feelings of shame that he felt in response.  The lack of accommodations for his cognitive limitations in the delivery of mental health services have also rendered these services less effective.  L.T. is best understood as an individual who has both emotional and cognitive impairments that contribute separately and in a synergistic manner to his poor functioning in the home, community, and school.

166.    ICBS Needs:  L.T. needed and continues to need ICBS.  Specifically, he needs a supportive team of individuals who know and care about him, with services and supports wrapped around him in order to live in the community.  At his current age, the framework for his support

team would be best structured according to person-centered planning principles for young adults with disabilities, rather than the child and family team model appropriate for younger individuals, although I recommend that his family members be included to the extent possible.  Suggested goals to explore include:  (i) consideration and application for supports/benefits that could fund job training, housing, transportation, and psychiatric treatment supports in the community, such as services available through the Medicaid waiver; (ii) a plan for transition to the community upon release from incarceration; (iii) identifying L.T.'s other personal and professional goals; (iv) building his network of natural supports (individuals from his family and community who can support him in meeting his goals); and (v) crisis planning.

167.    Harm Arising from Lack of Access to ICBS:  Lack of access to ICBS has resulted in the following consequences for L.T.:  (i) inadequate assessments and treatment planning; (ii) lack of adequate educational progress and academic skill acquisition; (iii) placement in a carceral environment where he has had virtually no access to educational accommodations during the COVID-19 pandemic, is in isolation from natural supports; and lacks the support, care, and treatment related to his traumatic stress experiences, which included his siblings dying of homicide; and (iv) continued risk of institutionalization in the form of incarceration.

168.    The ICC component of ICBS includes the facilitation of a child and family team made up of the child, the child's family, service providers, and other individuals identified by the family.  Lack of an adequate child and family team when L.T. was younger resulted in poor quality assessments and little integration of existing assessment data into treatment planning.   For example, DYRS records showed little if any acknowledgment of L.T.'s cognitive impairments in records related to his placement and treatment within that system, and in my view this contributed to the lack of benefit (and the harm) caused by his poor quality care in the DYRS system.

169.    L.T.'s lack of access to ICBS also harmed his education.  His education records and psychological reports were clear that L.T. repeatedly conveyed a sense of academic failure and he communicated that his schoolwork was too challenging.  The 2015 CGC report indicated that:

> Since enrolling in Ballou, [L.T.] reports being engulfed by overwhelming feelings of shame and performance anxiety.  Furthermore, this profound shame has propelled [L.T.] out of the school doors, compelling him to stay away from school because his feelings of depression, anxiety and inadequacy became too much to bear.

This statement in the CGC Report regarding L.T.'s views clearly links the lack of adequate mental health and educational supports to L.T.'s avoidance of school.  Notably, at the time of the evaluation, he had been referred for evaluation of his competency to stand trial for a charge of being habitually truant from school.  L.T.'s evaluation also notes that he stated he wished to be in classes with "others like himself" rather than general education classes that were too advanced for him, yet those specific requests from L.T. evidently were not addressed, indicating he was not meaningfully included in planning for his own supports.  Records in the ensuing years appeared to show that L.T. suffered additional significant consequences, including restrictive out-of-home placements and placement in youth detention, related to truancy issues and other difficulties related to his compliance with youth probation requirements.  It is notable that the youth probation documentation did not reflect meaningful acknowledgment of his significant cognitive limitations or recommendations for accommodating L.T.'s disabilities rather than simply punishing and blaming him for noncompliance.

170.    In addition, once he was in the DYRS system, it appeared that L.T.'s significant disabilities were not taken into account at all, based on the available records and L.T.'s report.  Because his disabilities were not taken into account, he felt a sense of failure and hopelessness with respect to school, and he stopped attending, which triggered truancy proceedings that essentially snowballed into ever-deeper involvement with formal juvenile authorities.  Thus, in

L.T.'s case, there is a relatively strong established linkage between a failure to provide community-based supports and educational services to his entry and progress through juvenile and ultimately adult criminal justice systems.  His lack of access to educational accommodations while incarcerated during the COVID-19 pandemic therefore stems from his previous lack of access to ICBS.  So too does L.T.'s isolation from natural supports and lack of support, care, and treatment that are caused by his current incarceration.  These negatively affect L.T.'s mental health, and they put him at risk for future institutionalization, as explained below.

171.    Institutionalization:    L.T.'s lack of access to ICBS resulted in his current incarceration, as I described above.  It also contributes to his risk of continued incarceration, because he is not receiving needed services while incarcerated and is instead surrounded by stressors, negative peer influence, and increased risk of exposure to traumatic stressor events.  All of these factors are currently serving to increase his risk of being reincarcerated in the future, as well as potential "therapeutic" institutionalization.

6.    **T.W.**[24]

172.    T.W. is a 21-year-old Black male who is currently at Roxbury Correctional Institution in Maryland.  As of the date of this report, T.W. may be facing impending transfer to another carceral facility.

173.    I reviewed records for T.W. from Children's National Hospital, most of which related to medical (non-psychiatric) concerns.  I also conducted a video interview with T.W.'s mother on June 16, 2021, and I conducted a video interview with T.W. on July 9, 2021.

*Conclusions Regarding T.W.*

---

[24] There are two youths with the initials "T.W." in this client review study.  This is a different T.W. than the T.W. reviewed by Kimmberly Campbell.

174.    According to his mother, T.W. does not appear to have a mental health diagnosis that would meet the criteria for serious emotional disturbance.  However, his records included an evaluation by CGC staff from 2018 that had a diagnosis of DMDD and possible bipolar disorder, either of which constitutes a serious emotional disturbance.  Based on this available information, T.W. may have a serious emotional disturbance, but there was not enough information to determine if he needed or would benefit from ICBS, what services have been provided and whether they fit with the ICBS model, and any risk or harm to T.W. resulting from lack of access to services.  Also, insufficient information is available to determine if he is at risk of future re-institutionalization.

7.    **V.R.**

175.    V.R. is a 20-year-old Black male who was recently released from DOC.

176.    Insufficient information was available to offer an opinion with respect to V.R.'s clinical and diagnostic picture, treatment needs, history of service provision, and response to intervention.  Thus, I have not offered opinions with respect to whether or not he meets the criteria for serious emotional disturbance, his need or lack of need for ICBS, and any harms or risk of institutionalization V.R. would suffer due to lack of ICBS.

**C.    Observations**

177.    Plaintiffs' counsel asked me to provide my observations about trends in services provided to and placements experienced by the youths whose cases I reviewed.   Those observations are summarized below.

**1.    Lack of Engagement of Family Members By Providers**

178.    The records I reviewed and the interviews I conducted both indicated a lack of meaningful involvement of family members and youth in youth treatment planning and service provision.   Youths repeatedly expressed clear and concrete preferences with respect to their priorities for treatment and how services could best be delivered to them.  However, their input,

while often recorded, did not appear to be substantively integrated into the actual treatment plans that were generated, including discharge plans. The failure to sufficiently integrate the youths' expressed needs and priorities into treatment planning resulted in a lack of investment and motivation to participate in treatment. Additionally, opportunities for capitalizing on reinforcers valued by the youths and intrinsic motivation on the part of the youths were lost.

179. In addition, there appeared to be issues with power struggles between youth and providers, and between families and providers. More than one parent expressed feeling overwhelmed by the demands of treatment providers and the courts. Taking the families' input into account would have ameliorated these issues. Additionally, professionals who were interviewed described significant dysfunction, including excessively large and poorly coordinated teams, challenges in generating accountability for team members, and lack of collaboration within teams.

180. Overall, the treatment planning for these youths appeared to be more reflective of provider priorities than the families' and youths' priorities. This led to inappropriate prioritization of treatment goals that were not particularly pressing or important, when viewed in light of the total clinical picture, challenges, and strengths of individual children and families. Consequently, youths who had primary problems related to traumatic stress and cognitive impairments instead received substance use treatment (such as in the case of B.T.) and other interventions that did not match the youths and families' stated needs and priorities, or other clinical priorities. Since psychological and other mental health interventions are not one-size-fits-all, and because resources are limited and thus should be allocated according to valid priorities, the consequence of prioritizing provider concerns resulted in neglect of the youths' treatment needs, and lost time that could have been utilized more productively from a treatment and psychosocial support perspective.

Additionally, providing services that were perceived as unneeded, and ignoring families' and youths' objectives, appears to have resulted in disengagement and decreased interest in participating in future interventions on the part of families and youth.

        **2.**    **Assessments**

181.    My review of these cases, specifically those of L.T., B.T., and J.G., indicated that their assessment history was inadequate, and most of their psychological and psychiatric assessments were conducted by individuals who lacked specific training and expertise with IDD. This is significant because serious emotional disturbance and intellectual or developmental disabilities often co-occur.  Furthermore, careful assessment by knowledgeable professionals can produce information not only about the child's current functioning, but also about suggested treatment priorities, and strategies for accommodations to treatment interventions and other supports.  Poor quality evaluations are not harmless, and the youths with IDD whose cases were reviewed appear to have suffered significant negative consequences (e.g., denial of Medicaid waiver services in B.T.'s case) as a result of poor quality assessments by mental health professionals.  In some cases, the youths' assessments were not appropriately updated or needed assessments were not administered (e.g., B.T. needed adaptive functioning assessments that were not conducted, and it does not appear that G.D. has ever received trauma-specific psychological assessment).

182.    In the children who have a serious emotional disturbance in addition to a developmental disability, the following themes emerged:  (i) a lack of attention to cognitive impairment in treatment planning and clinical conceptualization; (ii) a lack of integration of information related to cognitive functioning in transition planning; (iii) a lack of consideration given to potential means of funding based on the child's IDD (e.g., need to apply for the Medicaid waiver); and (iv) a lack of accommodations for the cognitive impairments in psychotherapy

interventions, such as excessive reliance on talk therapy in children with expressive language impairments.

183.    Other assessment-related documentation, e.g., Child and Adolescent Functional Assessment System ("CAFAS") records, were incomplete, with blank fields and a lack of substantive information.  This highlights both inadequate recordkeeping, as well as a lack of attention to vital components of an effective treatment plan.  In multiple youths' records, for example, there were a number of CAFAS forms, but they were consistently incomplete. Specifically, for each domain of functioning, the assessor has the following fields to complete: item (i.e., mode of functioning), strengths, goals, and plan.  For every CAFAS form I reviewed, the assessors only filled out the item field.  As noted in the District's Children's Plan Performance Report, "[t]he implementation of the CAFAS has the potential to increase the understanding of both strengths and concerns for an individual child across agency lines, and better inform treatment and practice at both agency and citywide levels."[25]  If the objective of utilizing CAFAS is to understand the child's strengths, and to inform treatment and practice, all the fields should be completed.

### 3.    Lack of Trauma Treatment

184.    The lack of trauma treatment, specifically evidence-based and empirically supported trauma treatments, was striking across the cases I reviewed.  Although records acknowledged the presence of significant trauma in these children's lives, it did not appear that they were offered services specifically to address their trauma.  Instead, treatment interventions tended to focus on behaviors and symptoms that were explicitly identified as potentially caused by

---

[25] Government of the District of Columbia Department of Behavioral Health, *Children's Plan Performance Report – Fiscal Years 2009-2013*, 44, https://dmv.dc.gov/sites/default/files/dc /sites/dmh/publication/attachments/Children's%20Plan%20Performance%20Report.pdf.

trauma (e.g., substance use, running away, emotional dysregulation), rather than the identifiable root cause. Furthermore, lack of attention to families' needs for material and financial assistance appeared to increase some of the children's risk of experiencing violence at home. For example, in the case of G.D., providers focused on her conduct and her need to comply with court requirements, even though providers acknowledged that she had experienced domestic violence in her family home and that fear of this domestic violence was likely driving at least some of her conduct difficulties. As a result of G.D.'s mother's lack of access to childcare, she reportedly had to accept G.D.'s abuser back into the family home.

### 4.  Residential Placements

185.    Regarding youths who were placed in residential treatment, there were typically insufficient clinical rationales for how that youth would benefit from, or why they required, restrictive residential placements that separated them from their families, communities, and other natural supports.

186.    The services offered at the residential programs where some of these youths were placed did not match the youths' needs, and they lacked components that would address the youths' primary disabilities and challenges (trauma, cognitive impairments, educational barriers). Additionally, some of the professionals I interviewed expressed concerns about discrimination and discomfort associated with the placement of youth of color in geographically remote, largely White locations.

187.    An additional issue raised by residential placements is their reliance on seclusion and restraint, which are often not permitted in less-restrictive, community-based treatment settings. Mental health professionals have acknowledged the traumatic impact of seclusion and restraint on psychiatrically vulnerable children and adolescents who have an extraordinarily high rate of traumatic exposures in their pasts. There is an absence of support for the use of seclusion and

restraint as effective therapeutic techniques.  Moreover, in practice, seclusion and restraint have

not been used only as a last resort.  A 2010 publication by the Substance Abuse and Mental Health

Services Administration ("SAMHSA") states that

> [T]here is a common misconception that seclusion and restraint are used only when
> absolutely necessary as crisis response techniques.  In fact, seclusion and restraint
> are most commonly used to address loud, disruptive, noncompliant behavior and
> generally originate from a power struggle between consumer and staff.  The
> decision to apply seclusion or restraint techniques is often arbitrary, idiosyncratic,
> and generally avoidable.  Moreover, some studies indicate that seclusion and
> restraint use leads to an increase in the behaviors that staff members are attempting
> to control or eliminate.[26]

188.    At least one of the youths I reviewed was placed in a setting where the use of

restraints was permitted.  B.T. was subjected to manual physical restraints in a facility that did not

have an elaborated and individualized crisis plan for him, and where his cognitive and language

impairments were not taken into account with respect to the rules imposed on him and the de-

escalation strategies that were utilized for him. Two of the youths, B.T. and G.D., were subjected

to seclusion procedures during detention and in residential treatment placements.

### 5.    Lack of Adequate Crisis Planning

189.    None of the youths whose records I reviewed had an adequate crisis plan.  This was

true even in cases where records and mental health professionals indicated concern about the

youths' potential risks to themselves or others, and in cases where youths already had one or more

crisis events.  For some youth, adequate crisis planning also requires some degree of evidence-

based, empirically-supported risk assessment to ensure methodical consideration of potential

contributing factors and avenues for effective interventions.  There is formal guidance for best

---

[26] U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services
Administration, *Promoting Alternatives to the Use of Seclusion and Restraint Issue Brief #1*, 2
(March 2010), https://www.samhsa.gov/sites/default/files/topics/trauma_and_violence/seclusion-
restraints-1.pdf (citations omitted).

practices with respect to crisis planning, and best practices include incorporating considerations specific to diverse populations, developmental considerations, and disability status.[27]   The crisis plans that were contained in these youths' records did not address developmental and cultural elements relevant to crisis planning, or the presence of co-occurring disabilities.   To the extent crisis planning was explicit, it tended to be incomplete and boilerplate, rather than individualized and comprehensive.

### 6.   Unmet Mental Health Needs and the School-to-Prison Pipeline

190.   In the cases of B.T., L.T., and G.D., issues related to unmet psychiatric and developmental disability-related treatment needs, as well as insufficient educational accommodations, appear to have resulted in their initial referral to juvenile authorities.   Contact with juvenile authorities appears to assert an iatrogenic effect on youth.   Iatrogenic effects are illnesses or injuries that are caused by intervention.   Early contact with juvenile authorities decreases the likelihood that a youth will complete their education, and increases their likelihood of incarceration as an adult.   When youth are detained, they are also removed from access to community-based treatment and natural supports.   If their educational needs are not met while they are detained, they also effectively lose access to education.

191.   Youth who are ultimately incarcerated in adult prisons in the District typically serve their prison sentence in the Federal Bureau of Prisons ("BOP").   Although the Department of Justice has regulations prohibiting discrimination based on disability, the BOP maintains that none

---

[27] *See* U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, *National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit*, (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.

of these regulations are relevant to education services provided by the BOP.[28]   In addition, the BOP does not receive Individuals with Disabilities Education Act ("IDEA") funding, therefore the provisions of IDEA purportedly do not apply to the BOP.[29]   After release from prison, most of these youth from the District have lost access to needed services due to aging out.

## VI.    CONCLUSIONS

192.    All seven youths are or have been enrolled in the District's Medicaid program.

193.    Five of the youths—D.B., G.D., J.G, B.T., and L.T.—have a serious emotional disturbance, as that term is defined in the District regulation that is cited in the Complaint.  I do not observe information indicating that one of the youths, T.W., has a serious emotional disturbance.  I did not have enough information to determine whether V.R. has a serious emotional disturbance.

194.    The five youths with a serious emotional disturbance needed and continue to need ICBS or else they will suffer dramatically curtailed life opportunities.  These five youths were all harmed due to the lack of access to ICBS.  As explained above, the youths suffered due to a lack of access to ICBS because the youths and their families were not sufficiently involved in the treatment planning and service provision processes, which is a key part of the ICC component of ICBS.   This resulted in a lack of investment and motivation to participate in treatment, inappropriate prioritization of treatment goals, and improper treatments or residential placements.  In addition, the assessments of the youths were often inadequate or conducted by individuals who lacked specific training and expertise in IDD.  Because ICBS includes services that are intensive and individualized, it requires adequate assessments conducted with sufficient frequency by

---

[28] U.S. Department of Justice Federal Bureau of Prisons, *Federal Bureau of Prisons Education Program Assessment – Final Report*, Appx. 4, (Nov. 29, 2016), https://www.justice.gov/archives /dag/page/file/914026/download.
[29] *Id*.

individuals with the proper training and expertise, in order to ensure that the appropriate treatments are used. This has resulted in the youths not receiving necessary treatment or being denied necessary benefits. In addition, the failure to provide appropriately individualized interventions led to a lack of trauma treatment, which would have benefitted multiple youths I reviewed. It also led to inappropriate residential placements that not only failed to provide a benefit, but took the youths out of their community, removing the natural supports they had. If the youths had been provided ICBS, they would not have been needlessly placed in such residential facilities. They also likely would not have been subjected to seclusion and restraint, as in the cases of B.T. and G.D. Furthermore, the lack of ICBS meant that there were inadequate crisis plans and inadequate mobile crisis services for the youths, rather than individualized, comprehensive crisis plans.

195. Many of the youths have been unnecessarily institutionalized in prisons or residential treatment facilities, and are at risk of future or continued institutionalization. For instance, I think it is likely that multiple youths could have avoided detention at YSC (in the cases of B.T., G.D., and L.T.) and incarceration at the DOC (in the cases of D.B. and L.T.), had they received ICBS, which would have addressed their psychiatric needs. Involvement in the justice system also increases those youths' likelihood of future incarceration. In addition, multiple youths were unnecessarily placed in residential treatment facilities. It does not appear that any of those youths who have returned from such placements received long-term benefits from them, or that the out-of-home placements resulted in positively changed behavior. In fact, as explained above, some of those placements were harmful for the youths given their use of restraint and seclusion procedures, in addition to their separation from their homes, communities, and natural supports. With appropriate ICBS, such unnecessary institutionalization could have been avoided and allowed the youths to remain in their homes and communities.

196.    The District government could have provided services more effectively.   For instance, the CGC and other agencies should have properly trained professionals that can be engaged when working with youths with certain disabilities.   There should be a greater emphasis on recognizing co-occurring disabilities.   Checklists should be used to determine whether a threshold has been reached and trauma-focused treatment should be offered.   Certain conditions, such as a particular I.Q. score threshold, should trigger the use of certain properly trained professionals and certain diagnostic tests.   In addition, certain interventions, like placement at a residential facility, should require an independent review.   Instruments that are used to assess the fidelity and comprehensiveness of plans and interventions should be completed in full, rather than partially completed.   Additionally, use of measures such as the Wraparound Fidelity Index should be implemented to provide objective assessment and transparency.   Standards for the development of crisis intervention plans, which utilize instructions facilitating individualization, responsiveness, and empirically-supported practices, should be developed and implemented for all youth who are at risk of crisis (including youth who have already experienced crises, such as emergency psychiatric hospitalization or referral for mobile crisis services).   Agencies that commonly serve youth with a serious emotional disturbance should also be required to maintain professional staff positions that specifically require expertise in IDD, given how common it is for youth with a serious emotional disturbance to have a co-occurring developmental disability.

_____                   July 18, 2021
Sara Boyd, Ph.D.                                   _____
                                                   Date

# APPENDIX 1



**Sara Boyd, Ph.D.** Licensed Clinical Psychologist

**ph:** 571.317.0979 | **fax:** 844.598.6534

*Institute of Law, Psychiatry, & Public Policy at the University of Virginia, &*
*Boyd Forensic Psychology  Services, LLC*

## EDUCATION

**Graduate:**

    **Doctor of Philosophy,** Clinical Psychology**,** University of Kentucky, August 2013.

    **Master of Science**, Clinical Psychology, University of Kentucky, 2010.

    **Master of Science**, Counseling Psychology, University of Kentucky, 2005.

    **Certificate in Developmental Disabilities**, University of Kentucky, 2005.

**Undergraduate:**

    **Bachelor of Science**, Psychology, University of Illinois, May 2003.

## PROFESSIONAL LICENSES & CREDENTIALS

**Diplomate, American Board of Professional Psychology (ABPP), Forensic Specialty**, November 2019 to present. Diploma no. 9023

**Licensed Clinical Psychologist**, Virginia Department of Health Professionals, July 3, 2014 to present. License number: 0810005036

**Licensed Clinical Psychologist**, District of Columbia Department of Health Professional Licensing, February 10, 2015 to present. License number: PSY1001030

**Licensed Clinical Psychologist**, West Virginia Board of Examiners of Psychologists, August 24, 2016 to present. License no. 1149

**Licensed Psychologist**, Kentucky Board of Examiners of Psychologists, October 20, 2020 to present. License no. 251807

**National Register Health Psychologist** #54431

## CLINICAL EXPERIENCE & EMPLOYMENT

**Institute of Law, Psychiatry, and Public Policy, University of Virginia Health System, Licensed Clinical Psychologist/Forensic Evaluator.** Charlottesville, Virginia. June 2016 to Present.
Providing forensic evaluation and consultation in adult and juvenile criminal and civil matters. Supervising postdoctoral fellows and graduate students, and developing professional trainings for forensic evaluators and attorneys.

**Woodbridge Psychological Associates, P.C., Licensed Clinical Psychologist,** Woodbridge, Virginia, September 2014 to June 2016.
Providing forensic evaluation and consultation in adult and juvenile criminal and civil matters.

**Institute of Law, Psychiatry, and Public Policy, University of Virginia Health System, Forensic Psychology Postdoctoral Fellow,** Charlottesville and Staunton, Virginia, August 2013 to August 2014.
Postdoctoral fellowship consisted of two primary assignments: Western State Hospital, and the Institute of Law, Psychiatry, and Public Policy forensic clinic at the University of Virginia.

*Western State Hospital—Virginia Department of Behavioral Health and Developmental Services*
- Conducted mental state at the time of offense and competency to stand trial evaluations in an inpatient forensic setting.
- Provide training and consultation on intellectual disability, forensic, domestic/sexual violence, and LGBTQ-related topics for mental health providers.

*Institute of Law, Psychiatry, and Public Policy*
- Conducted gender dysphoria evaluations for Virginia Department of Corrections, general psychological evaluations, sex offender risk assessment, violence risk assessment, mental state at the time of offense, and competency to stand trial evaluations in an outpatient forensic clinic.
- Developed and provided training and consultation services to private and public mental health professionals.

**Westchester Jewish Community Services, APA-Accredited Internship, Psychology Fellow**, Yonkers and Hartsdale, New York, July 2012 to July 2013.
Pre-doctoral Internship at community mental health agency composed of rotations in a treatment and evaluation program for juvenile sex offenders, court assessment program, treatment center for survivors of trauma and abuse, a program for individuals with developmental disabilities (DD), an autism evaluation clinic, and a learning center. Provided consultation to multidisciplinary teams on such matters as psychological assessment, research, and empirically-supported treatment.

*Treatment Center for Trauma and Abuse*
- Utilized Skills Training in Affective and Interpersonal Regulation/Narrative Story-Telling (STAIR/NST), Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), Prolonged

Exposure, behavioral activation, and other empirically-based methods to treat child, adolescent, and adult survivors of trauma, sexual and physical abuse, and domestic violence.

- Conducted focal and comprehensive psychological assessments to assist in treatment planning. Provided feedback to clients, families, and clinicians.

*Autism Evaluation Program*
- Assessed and determined diagnoses of adults and children referred due to suspected Autism Spectrum Disorders (ASDs). Utilized ADOS-2, adaptive functioning, intellectual ability, achievement and neuropsychological measures, in addition to in-depth clinical interview, collateral interviews, and record review.

*Developmental Disabilities Program*
- Utilized cognitive-behavioral therapy (CBT) and parent management training interventions with children and adults with intellectual and developmental disabilities (ID/DD) and their families.
- Provided diagnostic clarification, crisis management services, and psychotherapy to individuals recently discharged from inpatient settings.
- Co-led a social skills group for 5- and 6-year-old children with ASDs.

*Juveniles Starting Over Program*
- Conducted risk and safety assessments, including ERASOR, for adjudicated juvenile sex offenders and children and adolescents with sexual behavior problems.
- Provided individual and family therapy to adjudicated juvenile sex offenders and non-adjudicated youth with sexual behavior problems.

*Court Assessment Program*
- Co-evaluated custody/visitation, termination of parental rights, delinquency, abuse/neglect, and probation cases.
- Co-performed specialized evaluations of juvenile sex offenders.
- Consulted to psychiatrists, judges, court staff, and guardians.
- Conducted brief psychoeducational screenings.

*Learning Center*
- Conducted comprehensive and focal cognitive, educational, and personality assessments of children, adolescents, and adults.
- Evaluated individuals with potential learning disabilities, executive function deficits,

Attention-Deficit Hyperactivity Disorder (ADHD), and other psychiatric diagnoses.
- Developed comprehensive educational, social, and vocational recommendations as part of an integrative written report, and provided feedback to clients, families, and clinicians.

**Bluegrass Mental Health/Mental Retardation Board**, **Eastern State Hospital, Forensic/Inpatient Psychology Trainee**, Lexington, Kentucky, June 2010 to July 2011.
Provided forensic assessments to individuals with serious mental disorders in an inpatient setting. Assisted in evaluations of competency to stand trial and criminal responsibility for misdemeanors and felonies. Consulted to psychologists on forensic cases involving individuals with ID/DD. Administered adjunct malingering and neuropsychological testing for the supervising forensic psychologist. Other rotations included assessment and individual and group therapy on a high-risk unit, geriatric/medically fragile unit, and a day treatment program. Developed special expertise in intervention and testing of dually diagnosed consumers with ID/DD and severe mental illness.

**University of Kentucky**, **Harris Psychological Services Center, Graduate Student Therapist**, Lexington, Kentucky, July 2007 to July 2011.
Assessed risk as part of employment screening for weapons-handling personnel at an international security company. Conducted integrative assessments for ADHD and learning disabilities. Provided individual psychotherapy for clients with ASDs, major depression, adjustment disorder, conversion disorder, generalized anxiety disorder, post-traumatic stress disorder, and borderline personality disorder.

**University of Kentucky**, **Harris Psychological Services Center, Social Skills Group Co-Leader**, Lexington, Kentucky, September 2008 to December 2008.
Conducted intakes for potential group members, and co-led a manualized skills-based intervention group for children with social impairments. Met with parents to exchange feedback, and conducted pre- and post-intervention behavioral assessments. Group members had ASD and/or anxiety disorders.

**University of Kentucky**, **Harris Psychological Services Center, Assessment Coordinator**, Lexington, Kentucky, July 2007 to August 2008.
Responsible for all aspects of outpatient clinic testing. Supervised assessments; performed intakes; participated in administrative meetings to determine the appropriateness and disposition of potential clients; reviewed clinic policies and procedures; researched, identified, and ordered new instruments; engaged in community outreach; and maintained clinic assessment records.

**Bluegrass Rape Crisis Center**, **Crisis Counselor**, Lexington, Kentucky, September 2005 to September 2006.
Provided crisis counseling services at a community agency for survivors of sexual assault. Accompanied survivors (including survivors with disabilities) to the local emergency room, provided advocacy and support throughout the medical examination and detectives' questioning, and answered crisis line calls.

**Center for Women, Children, and Families**, **Counseling Psychology Trainee**, Lexington, Kentucky, January 2006 to May 2006.
Led psychoeducational groups for adult survivors of domestic violence who had lost custody of their children and were seeking reunification. Conducted intakes and provided individual CBT to children and adults. Diagnoses included Fragile X and other developmental disabilities, post-traumatic stress, adjustment, acute stress, and major depressive disorders.

## PROFESSIONAL & COMMUNITY SERVICE ACTIVITIES

**Virginia Department of Behavioral Health and Developmental Services, Structured Measures of Intellectual Functioning Review Panel**. Commonwealth of Virginia, 2020 to 2021 (death penalty was abolished in Virginia in 2021).
Invited to join the five-member professional panel, selected by the DBHDS Forensic Evaluation Oversight Manager, to provide guidance with regard to updating the list of psychological measure of intellectual functioning for use in death penalty cases in Virginia, as required by § 19.2-264.3:1.1 and 19.2-264.3:1.2.

**University of Kentucky, Department of Psychology, Diversity Committee Founding Member**, Lexington, Kentucky, February 2012 to August 2012.
Identified need, and assisted in assembling members and faculty support for, a graduate student-led committee to revise departmental policies relating to sexual and gender minority students and Psychology Department clinic clients. Advised faculty and community supervisors regarding training requirements, materials, and procedures. Developed multimedia training materials ultimately implemented in graduate curriculum.

**Project SAFE (Safety and Accessibility for Everyone), Coordinator**, Frankfort, Kentucky, September 2005 to September 2006.
Created project to increase physical and attitudinal accessibility of domestic violence shelters and rape crisis centers in Kentucky. Identified and invited representatives from state agencies addressing domestic and sexual violence, disability rights, and crime victim advocacy to provide project leadership. Scheduled and led meetings. Project SAFE became an ongoing organization and was awarded a three-year Department of Justice Violence Against Women Act grant for $750,000 in 2008.

**Consumer Advisory Council of Kentucky**, **Board Member**, Frankfort, Kentucky, November 2006 to November 2008.
Assisted in senior level decision-making regarding priorities and policies of the Human Development Institute, with special emphasis on creating an inclusive environment for people with disabilities. Reviewed and provided feedback on Institute research, funding, and grant applications. Monitored organization's compliance with the strategic plan.

## RESEARCH EXPERIENCE

**Westchester Jewish Community Services, Co-Principal Investigator**, "Sexual Knowledge and Attitudes of Adolescents and Young Adults with Developmental Disabilities, Before and After a Psycho-Educational Intervention." White Plains and Hartsdale, New York, July 2012 to July 2013.
Co-originated study concept, developed methodology, identified appropriate assessment instruments, and generated hypotheses for a study examining outcomes for adolescents and young adults with ASDs who participated in a psycho-educational healthy sexuality group.
Variables include sexual knowledge and attitudes, Axis I psychopathology, and intellectual functioning.

**University of Kentucky, Principal Investigator**, "General Personality, Personality Disorder, Psychopathology, and Adaptive Functioning in Adults with Intellectual Disabilities." Lexington, Kentucky, October 2011 to August 2013.
Wrote literature review, developed study methodology and hypotheses, obtained IRB approval, recruited participants from vulnerable populations, and collected, analyzed, and interpreted data. Dissertation.

**University of Kentucky, Co-Investigator**, "Gender Identity, Sexual Orientation, and Personality." Lexington, Kentucky, September 2012 to 2013.
This project is comprised of three studies examining the relations among non-normative gender identity, personality, and sexuality. Generated research idea, developed study methodology, obtained IRB approval, and collected, analyzed, and interpreted data for study one. Co-principal investigator: Tory Eisenlohr-Moul, Ph.D.

**University of Kentucky, Widiger Personality Laboratory, Graduate Researcher**, Lexington, Kentucky, September 2005 to July 2012.
Administered the Personality Disorder Interview-IV and Structured Interview for the Five Factor Model to participants in studies of personality disorders; generated ideas for laboratory research; co-developed methodology for studies of Five Factor Model personality; coded semi-structured interviews for reliability; read and critiqued papers submitted for publication; and identified test items for use in Five Factor Model research. Principal Investigator: Thomas Widiger, Ph.D.

**University of Kentucky**, **Department of Behavioral Sciences**, **Graduate Research Assistant**, Lexington, Kentucky, June 2008 to May 2010.
Collected, analyzed, and interpreted data, co-authored manuscripts, and wrote annual reports for funding sources.

**University of Kentucky, Preservice Health Training Project, Research Assistant**, Lexington, Kentucky, August 2005 to June 2008.
Assisted in a project evaluating outcomes of online training modules for health professionals serving people with disabilities. Co-authored six manuscripts published in peer-reviewed journals; collected, analyzed, and

interpreted data; co-developed study methodology; and coordinated and edited contributions by co-authors. Principal Investigator: Harold Kleinert, Ed.D.

**University of Illinois, Korol Sex Steroids and Behavior Rodent Laboratory, Research Assistant**, Lexington, Kentucky, May 2002 to August 2002.
Assisted in a study of rodent spatial navigation strategies, resulting in a *Neuroscience* publication. Performed rodent surgeries, including ovariectomy and cannulae implantation in the striatum and hippocampus, tested rodent behavior, and performed histology on frozen brain tissue. Principal Investigator: Donna Korol, Ph.D.

## PUBLICATIONS

**Boyd, S. E.** (2012). Five Factor Model personality functioning in adults with intellectual disabilities. In T.A. Widiger & P.T. Costa (Eds.), *Personality Disorders and the Five Factor Model of Personality* (3rd ed.) (pp. 209 - 217). Washington, D.C.: American Psychological Association.

Adams, Z., and **Boyd, S.E.** [shared first-authorship] (2010). Ethical challenges in the treatment of individuals with intellectual disabilities. *Ethics and Behavior*, *20*, 407-418.

**Boyd, S.,** Sanders, C., Kleinert, H., Huff, M., Lock, S., Johnson, S., et al. (2008). Virtual patient training to improve reproductive healthcare for women with intellectual disabilities. *Journal of Midwifery and Women's Health, 53*, 453-460.

Kleinert, H. K., Fisher, S., Sanders, C., & **Boyd, S.** (2007). Improving physician assistant competencies in developmental disabilities using virtual patient modules. *Journal of Physician Assistant Education, 18*, 33-40.

Kleinert, H. K., Sanders, C. B., Mink, J., Nash, D., Johnson, J., **Boyd, S.,** et al. (2007). Improving student dentist competencies and comfort in delivering care to children with developmental disabilities using a virtual patient module. *Journal of Dental Education*, *71*, 279-286.

Knudsen, H. K., Studts, J. L., **Boyd, S. E.,** & Roman, P. M. (2010). Structural and cultural barriers to the adoption of smoking cessation services in addiction treatment organizations. *Journal of Addictive Diseases, 29*, 294-305.

Knudsen, H. K., **Boyd, S. E.,** Studts, J. L. (2010). Substance abuse treatment counselors and tobacco use: a comparison of comprehensive and indoor-only smoking bans. *Nicotine and Tobacco Research, 12*, 1151-1155.

Sanders, C. L., Kleinert, H. K., Free, T. F., Slusher, I., Clevenger, K., Johnson, **S., Boyd, S.** E. (2007). Caring for children with intellectual and developmental disabilities: Virtual patient instruction improves students' knowledge and comfort level. *Journal of Pediatric Nursing*, *22*, 457-466.

Sanders, C. L., Kleinert, H. K., Free, T. F., Slusher, I., Clevenger, K., **Boyd, S.,** et al. (2007). Caring for children with intellectual and developmental disabilities: Virtual patient instruction improves students' knowledge and comfort level. *Journal of Pediatric Nursing, 22*, 457-466.

Sanders, C. L., Kleinert, H. K., **Boyd, S. E.** Herren, C., Theiss, L., & Mink, J. (2008). Virtual patient instruction for dental students: can it improve dental care access for persons with special needs? *Special Care Dentistry, 28,* 205-213.

Sanders, C. L., Kleinert, H. K., Free, T. F., Slusher, I., Clevenger, K., **Boyd, S.,** et al. (2008). Developmental disabilities: improving competence in care using virtual patients. *Journal of Nursing Education, 47*, 66-73.

Widiger, T. A., & **Boyd, S.** (2009). Personality disorder assessment instruments. In J. N. Butcher (Ed.), *Oxford handbook of personality assessment (3rd ed.)(pp. 336-363).* New York: Oxford University Press.

Zurkovsky, L., Brown, S. L., **Boyd, S.,** & Korol, D. L. (2007). Estrogen modulates learning in female rats by acting directly at distinct memory systems. *Neuroscience, 144*, 26-37.

## TEACHING & TRAINING EXPERIENCE

**Capital Area Immigrants' Rights (CAIR) Coalition, Detained Children's Program webinar presenter: Detention Conditions, Health Impact of Detention on Children, & Legal Issues of Children's Detention.** Washington, DC, July 2019.
One of three presenters providing overviews of legal, health, and psychological realities and risks for immigrant children in detention. Webinar attendees were stakeholders and grant foundations.

**University of Virginia Health Services, Panelist: How Experience Might Inform Ethical Practice. Transgender Youth and Systems-Level Reforms for Girls**. Charlottesville, VA, April 2019.
One of three panelists reviewing potential ethical considerations, and responding to training participant questions, regarding forensic assessment of transgender and gender non-conforming individuals.

**District of Columbia Department of Behavioral Health, Training Presenter.** Washington, D.C., December 2018.
Developed training materials and presented on the topic of adjudicative competency restoration for adults with Intellectual Disabilities.

**National Legal Aid & Defender Association Presenter.** Philadelphia, PA, June 2018.
Developed training materials, and co-presented with Joette James, Ph.D., as well as presenting (solo) regarding accommodations-related assessments for defendants with cognitive and psychiatric disabilities, and about psychopathy and Antisocial Personality Disorder, respectively.

**Georgetown Juvenile Justice Initiative and National Juvenile Defender Center Symposium: Race and Juvenile Justice 50 Years after *Gault* Presenter/Panelist.** Washington, D.C., May 2017.
Co-panelist with Daniel Murrie, Ph.D., for discussion of race and risk assessment of juveniles.

**Georgetown Juvenile Justice Center Presenter.** November 2016.
Developed and presented a training for public defenders regarding common errors in risk assessment reports and strategies for critical reading of risk assessment evaluations.

**Superior Court Judicial and Senior Manager Spring Conference Presenter.** Washington, D.C., April 2015.
Developed and presented training materials for Superior Court Judges as part of a panel on risk assessment of juvenile and adult defendants.

**Training for Attorneys Preparing to Represent Defendants on the Prince William Mental Health Court Docket.** Manassas, Virginia, April 2015, April 2016, & April 2018.
Prepared and presented a training for attorneys and judges about psychiatric disorders and forensic psychology considerations relevant to defendants with suspected or confirmed psychiatric disorders.

**Institute of Law, Psychiatry, and Public Policy, Presenter.** Charlottesville, Virginia, 2014 to present.
Developed and presented training curriculum for forensic evaluators assessing risk-related online behaviors in juveniles.

**Institute of Law, Psychiatry, and Public Policy, Presenter.** Charlottesville, Virginia, October 2014 to present.
Developed and presented training curriculum for evaluating competency to stand trial and mental state at the time of offense in defendants with intellectual disabilities and borderline intellectual functioning.

**Institute of Law, Psychiatry, and Public Policy, Training Faculty.** Richmond, Virginia, and Charlottesville, Virginia, May 2015 and September 2014.
Developed and presented a one-day training curriculum on assessing online behavior of forensic evaluees, with emphasis on issues relevant to problematic sexual behavior online, applicable statutes, and recommendations for supervision.

**Washington, District of Columbia, Department of Behavioral Health, Presenter.** August 2014.
Developed and presented a training curriculum on evaluating adjudicative competency of defendants with intellectual disabilities. Trainees were forensic psychologists and psychiatrists employed by the Department of Behavioral Health.

**Department of Behavioral Health and Developmental Services, Presenter.** August 2014.
Developed and presented a grand rounds for mental health service providers at Western State Hospital; topic was introduction to internet culture, and how and why to query online activities of individuals with severe mental illness.

**Department of Behavioral Health and Developmental Services, Presenter.** July 2014.
Developed and presented Psychology Department inservice training concerning adapting empirically-supported PTSD treatments for inpatient forensic populations.

**Department of Behavioral Health and Developmental Services, Training Facilitator,** Richmond, Roanoke, and Newport News, Virginia, April 2014 to May 2014.
Developed and presented a training curriculum on customizing outpatient restoration of competency to stand trial services for individuals with intellectual disabilities. Trainees were community mental health providers.

**Institute of Law, Psychiatry, and Public Policy, Presenter.** Charlottesville, Virginia, March 2014 to present.
Developed and presented training curriculum on assessing online behavior of forensic evaluees, with emphasis on issues relevant to problematic sexual behavior online.

**Western State Hospital, Department of Behavioral Health and Developmental Services, Presenter,** Staunton, Virginia, November 2013.
Developed and presented a grand rounds for mental health providers, concerning personality disorders in adults with intellectual disabilities, also developed and presented a psychology department inservice training focused on adapting evidence-based trauma treatment interventions for inpatient forensic populations.

**Westchester Jewish Community Services, Instructor,** Yonkers and Hartsdale, New York, September 2012 to July 2013.
Developed training curriculum on assessing online activity of children, adolescents, and young adults. Presented training to an outpatient trauma treatment center, a violence intervention and prevention program, and a program for teen parents.

**University of Kentucky, University Center for Excellence in Developmental Disabilities, Curriculum Development and Project Coordinator**, Lexington, Kentucky, January 2012 to July 2012.
Originated concept, generated learning objectives and teaching strategies, and developed content for an inter-disciplinary, multi-media online training for mental health professionals to provide more competent and ethical care to adults with ID/DD. Wrote scripts, cast actors, and filmed and edited illustrative video vignettes. Applied for and obtained continuing education credits from the Kentucky Psychological Association.

**University of Kentucky, Human Development Institute, Instructor**, Lexington, Kentucky, 2008 to 2011.
Lectured on sexual abuse of adults with disabilities to students enrolled in the interdisciplinary Graduate Developmental Disabilities Certificate Program. Converted lecture to online format for the distance learning section of program.

**Migrant Network Coalition, Workshop Co-Leader**, Lexington, Kentucky, August 2010.
Researched and developed materials and co-led a training workshop on the intersection of disability and immigration status.

**University of Kentucky**, **Department of Behavioral Sciences**, **Graduate Student Trainee**, Lexington, Kentucky, August 2007 to May 2009.
Developed training materials and facilitated *in vivo* experiences to prepare medical students for treating patients with DD and their families. Developed student/family mentorship program, still in use by the medical school.

**University of Kentucky, Human Development Institute, Project Supervisor**, Lexington, Kentucky, November 2007 to July 2008.
Researched and developed instructional content of a multi-media online training package for direct service professionals who support adults with DD. Coordinated marketing and distribution of training program to Medicaid waiver providers. Funded by the Kentucky Department of Behavioral Health, Developmental and Intellectual Disabilities.

**University of Kentucky, Preservice Health Training, Project Assistant**, Lexington, Kentucky, August 2005 to June 2008.
Helped identify training needs of professionals (e.g., dentistry, nursing, women's health) treating individuals with ID/DD; researched and wrote content for training materials; and co-scripted video vignettes for an award-winning series of online, multi-media, interdisciplinary training modules.

**Project SAFE (Safety and Accessibility for Everyone), Coordinator**, Frankfort, Kentucky, September 2005 to September 2006.
Created and presented three trainings on the topic of sexual and domestic violence perpetrated against individuals with disabilities. Audience included team members from a coalition of state agencies dealing with sexual assault, domestic/interpersonal violence, disability rights, and crime victims' advocacy.

**Commonwealth of Kentucky, Coalition of State Disability and Employment Agencies, Training Facilitator**, Frankfort, Kentucky, April 2005 to June 2005.
Coordinated disability-awareness trainings, led by facilitators with disabilities, for state employees of Kentucky One-Stop Job Centers.

## PRESENTATIONS

**Boyd, S.,** Brodsky, S. (chair), Murrie, D.M., & Stejskal, W.J. (2016, March). *Bias in Forensic Mental Health Evaluations.* Symposium at the American Psychology-Law Society Conference. Atlanta, Georgia.

**Boyd, S.,** Barretto, R., & Zelle, H. (2015, June). *Using Advance Directives for Self-Advocacy and Planning: An Overview and Example of the Process.* Presentation at the 14th Annual Philadelphia Trans Health Conference. Philadelphia, PA.

**Boyd, S.** (2010, November). *Personality, motives, and adaptive functioning in adults with intellectual disability.* Poster presented at the Association of University Centers on Disability conference, Crystal City, VA.

# APPENDIX 2

**Expert Testimony (May 2017 – Present)**

<u>2017 Testimony</u>

- *Commonwealth of Virginia v. James Sprouse*, No. CR16000058-01 (Charlottesville Cir. Ct.)

- *Commonwealth of Virginia v. Kerianne Frickel*, No. FE-2016-871 (Fairfax County Cir. Ct.)

- *State of Georgia v. Tabatha Lynn*, No. 26204 (Gordon County Super. Ct.)

- *Commonwealth of Virginia v. Edgard Cruz*, No. CR17000252-00 (Prince William County Cir. Ct.)

- *Commonwealth of Virginia v. Oleh John Kuziw*, No. CR16002828-00 (Prince William County Cir. Ct.)

- *Commonwealth of Virginia v. Troy Vandiver*, No. CR16000625-01 (Prince William County Cir. Ct.)

- *United States v. William S. Hunt*, No. 2014 CF1 001927 (D.C. Super. Ct., 2017)

<u>2018 Testimony</u>

- *Commonwealth of Virginia v. Gregory Murphy*, No. CF000517 (Alexandria Cir. Ct.)

- *Commonwealth of Virginia v. Adam Agostini*, No. FE20170001146 (Fairfax County Cir. Ct.)

- *Commonwealth of Virginia v. Joaquin Ramey*, No. FE-2016-419 (Fairfax County Cir. Ct.)

- *Commonwealth of Virginia v. Ian Florance*, No. CR00031218-00 (Loudoun County Cir. Ct.)

- *Commonwealth of Virginia v. Trevon Rector*, No. CR01025427-00 (Loudoun County Cir. Ct.)

- *United States v. Antonio Taylor MCL*, No. 2013 CF1 021375 (D.C. Super. Ct.)

- *USA v. Dobbins*, No. 4:17-cr-00129-MSD-RJK (E.D. Va.)

- *Commonwealth of Virginia v. James Armel*, No. CR17000443-00 (Winchester County Cir. Ct.)

2019 Testimony

- *West Virginia v. Devin Michael Collin*, No. 16-M19F-00361 (23d Judicial Cir. Ct.)

- *West Virginia v. Molly Jo Delgado*, No. CC-0202017-F-149 (23d Judicial Cir. Ct.)

- *West Virginia v. Seth Beathard*, No. CC-33-2019-F-3 (23d Judicial Cir. Ct.)

- *Timothy Lee Hurst v. State of Florida*, No. 1998-CF-001795 (Escambia County Cir. Ct.)

- *Normand v. Brown*, No. CL2018-07653 (Fairfax County Cir. Ct.)

- *Commonwealth of Virginia v. Robert Campbell*, No. CR17004221-00 (Prince William County Cir. Ct.)

- *Doe v. Fairfax County School Board*, No. 1:18-cv-00614-LO-MSN (E.D. Va.)

- *USA v. Hooks et al.*, 2:18-cr-00249-LSC-JHE (N.D. Ala.)

- *Commonwealth of Virginia v. Nicholas Hamman*, No. CR18000746-00 (Winchester County Cir. Ct.)

- *Fortner v. Runyon*, No. CT-001847-11 (Shelby County Cir. Ct.)

2020 Testimony

- *United States v. Smith, Preston G JAS*, No. 1991 FEL 010665 (D.C. Super. Ct.)

- *USA v. Boutros*, No. 1:20-cr-00082-APM (D.D.C.)

- *USA v. Johnson et al.*, No. 1:19-cr-00351-RDA-1 (E.D. Va.)

- *USA v. Sizemore*, No. 3:19-cr-00120-JAG (E.D. Va.)

2021 Testimony

- *Commonwealth of Virginia v. Rodolfo Rivera-Valencia*, No. CR19000179-00 (Arlington Cir. Ct.)

- *Commonwealth v. Rodriguez, Tammy Marie*, No. 19-CR-01493 (Fayette County Cir. Ct.)

- *Commonwealth v. Roberson, Demetrius*, No. 17-CR-00220 (Logan County Cir. Ct.)

- *Commonwealth of Virginia v. John Pleasant Johnson Jr.*, No. CR20000938-00 (Prince William County Cir. Ct.)

- *Commonwealth of Virginia v. Justin Harvey*, No. CR18F03463-00 (Richmond County Cir. Ct.)

- *Commonwealth of Virginia v. Mary Purviance*, No. CR19F01179-00 (Richmond County Cir. Ct.)

- *United States v. Byrd, Brandon A MJD*, No. 2016 CF1 012762 (D.C. Super. Ct.)

- *United States v. Winston, Marcus K MO*, No. 1997 FEL 004943 (D.C. Super. Ct.)

- *Dinardo v. It's My Amphitheater, Inc.*, No. 8:19-cv-01841-CBD (D. Md.)

- *G.T. v. Kanawha County Sch.*, No. 2:20-cv-00057 (S.D.W. Va.)

- *Commonwealth of Virginia v. Anthony Natale* (Frederick County Circuit Court, V.A.)

- *West Virginia v. Evan Ottey* (Berkeley County Circuit Court, W.V.)


## Sealed Juvenile Court Cases (Not Publicly Available)

2017 Testimony

- *In re J.G.* (D.C. Super. Ct. Juv. Ct.)

2018 Testimony

- *In re. J.P.* (D.C. Civil Commitment Comm'n)

- *In re D.L.* (D.C. Super. Ct. Juv. Ct.)

- *In re D.S.* (D.C. Super. Ct. Juv. Ct.)

2019 Testimony

- *In re. K.M.* No. 19-020 (Charleston W. Va. Special Educ. Due Process)

2020 Testimony

- *United States of America v. Brandon Byrd* (D.C. Super. Ct)

2021 Testimony

- *In re D.M.* (D.C. Juv. Ct.)

- *In re E.J.* (D.C. Juv. Special Educ. Due Process)

- *In re W.B.* (D.C. Super. Ct. Juv. Ct.)

# APPENDIX 3

**Materials Reviewed**

**Court Filings**

- Complaint, *M.J.et al. v. District of Columbia et al.*, Civil Action No. 18-1901, In the United States District Court for the District of Columbia, filed August 14, 2018.

**Documents Concerning Individual Youth**

    Documents concerning each youth that I reviewed are listed below by beginning Bates Number (where available).  My understanding is that documents that are listed by their description did not have an available Bates Number at the time of this report but will be produced by Plaintiffs' counsel in the litigation.

D.B.

| | | |
|---|---|---|
| MJ-PL-00044470 | MJ-PL-00068357 | Records from Clarinda Academy |
| MJ-PL-00045686 | MJ-PL-00068434 | |
| MJ-PL-00068182 | MJ-PL-00068489 | |
| MJ-PL-00068292 | MJ-PL-00068492 | |

G.D.

| | | |
|---|---|---|
| MJ-PL-00051935 | MJ-PL-00056513 | MJ-PL-00063392 |
| MJ-PL-00051936 | MJ-PL-00056514 | MJ-PL-00063393 |
| MJ-PL-00051937 | MJ-PL-00056523 | MJ-PL-00063394 |
| MJ-PL-00051938 | MJ-PL-00056530 | MJ-PL-00063395 |
| MJ-PL-00051941 | MJ-PL-00056532 | MJ-PL-00063399 |
| MJ-PL-00051946 | MJ-PL-00056534 | MJ-PL-00063401 |
| MJ-PL-00051948 | MJ-PL-00056535 | MJ-PL-00063403 |
| MJ-PL-00051955 | MJ-PL-00056536 | MJ-PL-00063406 |
| MJ-PL-00051956 | MJ-PL-00056541 | MJ-PL-00063409 |
| MJ-PL-00051959 | MJ-PL-00056546 | MJ-PL-00063410 |
| MJ-PL-00051961 | MJ-PL-00056548 | MJ-PL-00063411 |
| MJ-PL-00051964 | MJ-PL-00056552 | MJ-PL-00063412 |
| MJ-PL-00051971 | MJ-PL-00056554 | MJ-PL-00063414 |
| MJ-PL-00051972 | MJ-PL-00056558 | MJ-PL-00063421 |
| MJ-PL-00051974 | MJ-PL-00056565 | MJ-PL-00063428 |
| MJ-PL-00051976 | MJ-PL-00056567 | MJ-PL-00063429 |
| MJ-PL-00051980 | MJ-PL-00056571 | MJ-PL-00063430 |
| MJ-PL-00051987 | MJ-PL-00056578 | MJ-PL-00063433 |
| MJ-PL-00054559 | MJ-PL-00056580 | MJ-PL-00063436 |
| MJ-PL-00056500 | MJ-PL-00056583 | MJ-PL-00063438 |
| MJ-PL-00056501 | MJ-PL-00056584 | MJ-PL-00063439 |
| MJ-PL-00056504 | MJ-PL-00056585 | MJ-PL-00063440 |
| MJ-PL-00056510 | MJ-PL-00063390 | MJ-PL-00063441 |
| MJ-PL-00056512 | MJ-PL-00063391 | MJ-PL-00063442 |

- MJ-PL-00063443
- MJ-PL-00063445
- MJ-PL-00063447
- MJ-PL-00063449
- MJ-PL-00063450

- MJ-PL-00063451
- MJ-PL-00063455
- MJ-PL-00063459
- MJ-PL-00063460
- MJ-PL-00063461

- MJ-PL-00063463
- July 9, 2021 email from Miranda Dore to Jason Mitchell et al.

J.G

- MJ-PL-00049177
- MJ-PL-00049241
- MJ-PL-00049242
- MJ-PL-00049244
- MJ-PL-00049246
- MJ-PL-00049248
- MJ-PL-00049250
- MJ-PL-00049254
- MJ-PL-00049255
- MJ-PL-00049259

- MJ-PL-00049260
- MJ-PL-00049262
- MJ-PL-00049265
- MJ-PL-00049269
- MJ-PL-00049273
- MJ-PL-00049277
- MJ-PL-00049279
- MJ-PL-00049281
- MJ-PL-00049283
- MJ-PL-00049288

- MJ-PL-00049291
- MJ-PL-00049292
- MJ-PL-00049294
- MJ-PL-00053777
- MJ-PL-00054087
- MJ-PL-00054238
- MJ-PL-00054416
- MJ-PL-00054484

B.T.

- MJ-PL-00043635
- MJ-PL-00043651
- MJ-PL-00043665
- MJ-PL-00043671
- MJ-PL-00043674
- MJ-PL-00043675
- MJ-PL-00043681
- MJ-PL-00043687
- MJ-PL-00043690
- MJ-PL-00043696
- MJ-PL-00043704
- MJ-PL-00043712
- MJ-PL-00043718
- MJ-PL-00043719
- MJ-PL-00043727
- MJ-PL-00043736
- MJ-PL-00043743
- MJ-PL-00043750
- MJ-PL-00043756
- MJ-PL-00043763
- MJ-PL-00043766
- MJ-PL-00043769
- MJ-PL-00043772
- MJ-PL-00043773
- MJ-PL-00043774

- MJ-PL-00043775
- MJ-PL-00043776
- MJ-PL-00043779
- MJ-PL-00043781
- MJ-PL-00043784
- MJ-PL-00043785
- MJ-PL-00043786
- MJ-PL-00043787
- MJ-PL-00043791
- MJ-PL-00043792
- MJ-PL-00043793
- MJ-PL-00043794
- MJ-PL-00043805
- MJ-PL-00043807
- MJ-PL-00043808
- MJ-PL-00043813
- MJ-PL-00043817
- MJ-PL-00043822
- MJ-PL-00043824
- MJ-PL-00043846
- MJ-PL-00043847
- MJ-PL-00043848
- MJ-PL-00043851
- MJ-PL-00043852
- MJ-PL-00043853

- MJ-PL-00043855
- MJ-PL-00043856
- MJ-PL-00043860
- MJ-PL-00043863
- MJ-PL-00043864
- MJ-PL-00043866
- MJ-PL-00043868
- MJ-PL-00043870
- MJ-PL-00043874
- MJ-PL-00043878
- MJ-PL-00043883
- MJ-PL-00043884
- MJ-PL-00043887
- MJ-PL-00043888
- MJ-PL-00043889
- MJ-PL-00043891
- MJ-PL-00043892
- MJ-PL-00043895
- MJ-PL-00043898
- MJ-PL-00043899
- MJ-PL-00043905
- MJ-PL-00043906
- MJ-PL-00043909
- MJ-PL-00043913
- MJ-PL-00043935

- MJ-PL-00043939
- MJ-PL-00043940
- MJ-PL-00043941
- MJ-PL-00043942
- MJ-PL-00043947
- MJ-PL-00043952
- MJ-PL-00043956
- MJ-PL-00043962
- MJ-PL-00043963
- MJ-PL-00043964
- MJ-PL-00043968
- MJ-PL-00043970
- MJ-PL-00043971
- MJ-PL-00043972
- MJ-PL-00043973
- MJ-PL-00043975
- MJ-PL-00043979
- MJ-PL-00043980
- MJ-PL-00043981
- MJ-PL-00043983
- MJ-PL-00043984
- MJ-PL-00043987
- MJ-PL-00043990
- MJ-PL-00043992
- MJ-PL-00043996
- MJ-PL-00043997
- MJ-PL-00043998
- MJ-PL-00044002
- MJ-PL-00044005
- MJ-PL-00044006
- MJ-PL-00044007
- MJ-PL-00044009
- MJ-PL-00044011
- MJ-PL-00044013
- MJ-PL-00044015
- MJ-PL-00044016
- MJ-PL-00044020
- MJ-PL-00044029
- MJ-PL-00044030
- MJ-PL-00044032
- MJ-PL-00044036
- MJ-PL-00044040
- MJ-PL-00044041
- MJ-PL-00044042

- MJ-PL-00044043
- MJ-PL-00044044
- MJ-PL-00044048
- MJ-PL-00044050
- MJ-PL-00044052
- MJ-PL-00044053
- MJ-PL-00044054
- MJ-PL-00044055
- MJ-PL-00044056
- MJ-PL-00044057
- MJ-PL-00044059
- MJ-PL-00044083
- MJ-PL-00044085
- MJ-PL-00044087
- MJ-PL-00044097
- MJ-PL-00044104
- MJ-PL-00044105
- MJ-PL-00044108
- MJ-PL-00044111
- MJ-PL-00044117
- MJ-PL-00044118
- MJ-PL-00044122
- MJ-PL-00044123
- MJ-PL-00044129
- MJ-PL-00044131
- MJ-PL-00044135
- MJ-PL-00044159
- MJ-PL-00044163
- MJ-PL-00044165
- MJ-PL-00044168
- MJ-PL-00044169
- MJ-PL-00044172
- MJ-PL-00044174
- MJ-PL-00044175
- MJ-PL-00044176
- MJ-PL-00044177
- MJ-PL-00044178
- MJ-PL-00044179
- MJ-PL-00044180
- MJ-PL-00044181
- MJ-PL-00044187
- MJ-PL-00044188
- MJ-PL-00044192
- MJ-PL-00044194

- MJ-PL-00044196
- MJ-PL-00044197
- MJ-PL-00044201
- MJ-PL-00044202
- MJ-PL-00044203
- MJ-PL-00044207
- MJ-PL-00044208
- MJ-PL-00044209
- MJ-PL-00044210
- MJ-PL-00044211
- MJ-PL-00044213
- MJ-PL-00044214
- MJ-PL-00044228
- MJ-PL-00044234
- MJ-PL-00044444
- MJ-PL-00044446
- MJ-PL-00044448
- MJ-PL-00044450
- MJ-PL-00044452
- MJ-PL-00044454
- MJ-PL-00044456
- MJ-PL-00044458
- MJ-PL-00044460
- MJ-PL-00044462
- MJ-PL-00044464
- MJ-PL-00044466
- MJ-PL-00044468
- MJ-PL-00046152
- MJ-PL-00046196
- MJ-PL-00046263
- MJ-PL-00046468
- MJ-PL-00046541
- MJ-PL-00046653
- MJ-PL-00046782
- MJ-PL-00046873
- MJ-PL-00046960
- MJ-PL-00047478
- MJ-PL-00062654
- MJ-PL-00062712
- MJ-PL-00062964
- MJ-PL-00062967
- MJ-PL-00067374
- MJ-PL-00067418
- MJ-PL-00067485

- MJ-PL-00067690
- MJ-PL-00067763

- MJ-PL-00067875
- MJ-PL-00068004

- MJ-PL-00068095
- DDA Application

L.T.

- MJ-PL-00052984
- MJ-PL-00052990
- MJ-PL-00052991
- MJ-PL-00052994
- MJ-PL-00052995
- MJ-PL-00052996
- MJ-PL-00053004
- MJ-PL-00053006
- MJ-PL-00053008
- MJ-PL-00053010
- MJ-PL-00053013
- MJ-PL-00053014
- MJ-PL-00053018
- MJ-PL-00053020
- MJ-PL-00053031
- MJ-PL-00053032
- MJ-PL-00053033
- MJ-PL-00053035
- MJ-PL-00053036
- MJ-PL-00053037
- MJ-PL-00053039
- MJ-PL-00053040
- MJ-PL-00053041
- MJ-PL-00053042
- MJ-PL-00053043
- MJ-PL-00053044
- MJ-PL-00053045
- MJ-PL-00053047
- MJ-PL-00053048
- MJ-PL-00053049

- MJ-PL-00053050
- MJ-PL-00053052
- MJ-PL-00053053
- MJ-PL-00053054
- MJ-PL-00053055
- MJ-PL-00053056
- MJ-PL-00053057
- MJ-PL-00053058
- MJ-PL-00053059
- MJ-PL-00053060
- MJ-PL-00053061
- MJ-PL-00053062
- MJ-PL-00053064
- MJ-PL-00053066
- MJ-PL-00053067
- MJ-PL-00053069
- MJ-PL-00053071
- MJ-PL-00053073
- MJ-PL-00053086
- MJ-PL-00053087
- MJ-PL-00053088
- MJ-PL-00053089
- MJ-PL-00053091
- MJ-PL-00053132
- MJ-PL-00053155
- MJ-PL-00053184
- MJ-PL-00053221
- MJ-PL-00053280
- MJ-PL-00053321
- MJ-PL-00053361

- MJ-PL-00053488
- MJ-PL-00053555
- MJ-PL-00053667
- MJ-PL-00053672
- MJ-PL-00053678
- MJ-PL-00053684
- MJ-PL-00059819
- MJ-PL-00061059
- MJ-PL-00061061
- MJ-PL-00061063
- MJ-PL-00061065
- MJ-PL-00061069
- MJ-PL-00061081
- MJ-PL-00061091
- MJ-PL-00061092
- MJ-PL-00061095
- MJ-PL-00061169
- MJ-PL-00061177
- MJ-PL-00061189
- MJ-PL-00061191
- January 2014 Eligibility Determination Report
- January 2016 IEP
- November 2016 IEP
- January 2017 Neuro Psychoeducational Evaluation

T.W.

- MJ-PL-00043175
- MJ-PL-00043176
- MJ-PL-00043177
- MJ-PL-00043178
- MJ-PL-00043179
- MJ-PL-00043180
- MJ-PL-00062726
- MJ-PL-00069158

- MJ-PL-00069159
- MJ-PL-00069162
- MJ-PL-00069174
- MJ-PL-00069179
- MJ-PL-00069183
- MJ-PL-00069184
- MJ-PL-00069187
- MJ-PL-00069188

- MJ-PL-00069189
- MJ-PL-00069190
- MJ-PL-00069194
- MJ-PL-00069196
- MJ-PL-00069200
- MJ-PL-00069201
- MJ-PL-00069202
- MJ-PL-00069203

- MJ-PL-00069205
- MJ-PL-00069206
- MJ-PL-00069208
- MJ-PL-00069211
- MJ-PL-00069215
- MJ-PL-00069218
- MJ-PL-00069220
- MJ-PL-00069225
- MJ-PL-00069236
- MJ-PL-00069251
- MJ-PL-00069255

- MJ-PL-00069256
- MJ-PL-00069260
- MJ-PL-00069261
- MJ-PL-00069262
- MJ-PL-00069264
- MJ-PL-00069266
- MJ-PL-00069268
- MJ-PL-00069270
- MJ-PL-00069272
- MJ-PL-00069278
- MJ-PL-00069294

- MJ-PL-00069310
- MJ-PL-00069320
- MJ-PL-00069332
- MJ-PL-00069336
- MJ-PL-00069338
- MJ-PL-00069378
- MJ-PL-00069406

V.R.

- MJ-PL-00042664
- MJ-PL-00042665
- MJ-PL-00042666
- MJ-PL-00042667
- MJ-PL-00042668
- MJ-PL-00042669
- MJ-PL-00042670
- MJ-PL-00067102
- MJ-PL-00067103
- MJ-PL-00067104
- MJ-PL-00067105
- MJ-PL-00067106
- MJ-PL-00067107
- MJ-PL-00067108
- MJ-PL-00068678
- MJ-PL-00068679
- MJ-PL-00068680
- MJ-PL-00068682
- MJ-PL-00068684
- MJ-PL-00068686
- MJ-PL-00068687
- MJ-PL-00068688
- MJ-PL-00068689
- MJ-PL-00068691
- MJ-PL-00068692
- MJ-PL-00068696
- MJ-PL-00068697
- MJ-PL-00068701
- MJ-PL-00068705
- MJ-PL-00068706
- MJ-PL-00068708

- MJ-PL-00068709
- MJ-PL-00068711
- MJ-PL-00068714
- MJ-PL-00068799
- MJ-PL-00068802
- MJ-PL-00068803
- MJ-PL-00068811
- MJ-PL-00068813
- MJ-PL-00068816
- MJ-PL-00068819
- MJ-PL-00068821
- MJ-PL-00068823
- MJ-PL-00068825
- MJ-PL-00068830
- MJ-PL-00068833
- MJ-PL-00068843
- MJ-PL-00068880
- MJ-PL-00068886
- MJ-PL-00068907
- MJ-PL-00068921
- MJ-PL-00068923
- MJ-PL-00068925
- MJ-PL-00068927
- MJ-PL-00068939
- MJ-PL-00069015
- MJ-PL-00069020
- MJ-PL-00069025
- MJ-PL-00069029
- MJ-PL-00069034
- MJ-PL-00069035
- MJ-PL-00069038

- MJ-PL-00069041
- MJ-PL-00069045
- MJ-PL-00069050
- MJ-PL-00069056
- MJ-PL-00069061
- MJ-PL-00069080
- MJ-PL-00069082
- MJ-PL-00069091
- MJ-PL-00069092
- MJ-PL-00069094
- MJ-PL-00069100
- MJ-PL-00069101
- MJ-PL-00069107
- MJ-PL-00069113
- MJ-PL-00069114
- MJ-PL-00069116
- MJ-PL-00069121
- MJ-PL-00069125
- MJ-PL-00069129
- MJ-PL-00069133
- MJ-PL-00069134
- MJ-PL-00069135
- MJ-PL-00069136
- MJ-PL-00069137
- MJ-PL-00069138
- MJ-PL-00069139
- MJ-PL-00069140
- MJ-PL-00069141
- MJ-PL-00069142
- MJ-PL-00069143
- MJ-PL-00069144

- MJ-PL-00069145
- MJ-PL-00069149

- MJ-PL-00069150
- MJ-PL-00069151

- MJ-PL-00069155
- MJ-PL-00069157

**Publicly Available Documents**

- American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013).

- Edward P. Mulvey, et al., *Trajectories of Desistance and Continuity in Antisocial Behavior Following Court Adjudication Among Serious Adolescent Offenders*, 22 DEVELOPMENT AND PSYCHOPATHOLOGY 453, (May 2010), manuscript available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2908904/.

- Government of the District of Columbia Department of Behavioral Health, *Children's Plan Performance Report – Fiscal Years 2009-2013*, https://dmv.dc.gov/sites/default/files/dc /sites/dmh/publication/attachments/Children's%20Plan%20Performance%20Report.pdf.

- Lauren Dake, *US Lawmakers Request Investigation Into Youth Congregate Care Facilities, Including One Oregon Relied Heavily On*, OREGON PUBLIC BROADCASTING, (Feb. 16, 2021), https://www.opb.org/article/2021/02/17/oregon-lawmakers-investigation-sequel-students/.

- *Let Us Come Home*, DISABILITY RIGHTS WASHINGTON, (October 2018), https://www.disabilityrightswa.org/reports/let-us-come-home/.

- U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, *Promoting Alternatives to the Use of Seclusion and Restraint Issue Brief #1*, (March 2010), https://www.samhsa.gov/sites/default/files/topics /trauma_and_violence/seclusion-restraints-1.pdf.

- U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, *National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit*, (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.

- U.S. Department of Justice Federal Bureau of Prisons, *Federal Bureau of Prisons Education Program Assessment – Final Report*, Appx. 4, (Nov. 29, 2016), https://www.justice.gov/archives/dag/page/file/914026/download.

- World Health Organization, *International Classification of Diseases and Related Health Problems, 10th Revision* (2019 Version), https://icd.who.int/browse10/2019/en.

**Any other materials cited in this Report**