UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.J., et al., | ) |
|                     Plaintiffs, | ) ) ) |
| - against - | ) ) Civ. No. 1:18-cv-1901 (EGS) |
| The District of Columbia, et al., | ) ) |
|                     Defendants. | ) ) |

**DECLARATION OF KIMBERLY PERRY IN SUPPORT OF
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Kimberly Perry, of full age, hereby certify as follows:

1. I am over 18 years of age and competent to testify regarding the matters described herein.

2. I am the Executive Director of DC Action, a 501(c)(3) nonprofit, nonpartisan organization in the District of Columbia (the District). DC Action works alongside legislators and community leaders to advocate for racial equity; early childhood development; economic justice; education reform; health and safety; and voting and democracy reform on behalf of District youth. We also conduct research on current trends and developments in children's well-being and coordinate city-wide coalitions to advance reform. Our vision is to make the District a place where all our kids can grow up safe, resilient, powerful, and heard. We do this by using research, data, and a racial equity lens to break down barriers that stand in the way of every young person reaching their full potential.

3. DC Action is the result of a merger between DC Action for Children, which was founded in 1992 as an anti-poverty, children's rights organization, and DC Alliance of Youth

1

Advocates (DCAYA), which was founded in 2006 to advocate for District youth. These two organizations merged in 2020 and publicly re-branded in February 2021 as DC Action. Merging during the COVID-19 pandemic was critical as the pandemic brought to light the need for an even stronger independent collective advocacy that is separate from the District's government to ensure delivery of services to District youth.

4. DC Action is home to four critical advocacy coalitions: DC Out-of-School Time Coalition, DC Home Visiting Council, Under 3 DC, and the Youth Homeless Advocacy Coalition (YHAC). We are also home to DC Kids Count, a data advocacy initiative that tracks hundreds of indicators of children and youth well-being in the District.

5. YHAC formed more than ten years ago under DCAYA to remediate the District's response to runaway youth. While individual organizations provided charitable responses to meet the need, youth service organizations did not collaborate to coordinate mental health support, temporary housing, education services, workforce coaching or other support to help clients.

6. Currently, there are eleven members of the Youth Homeless Advocacy Coalition (YHAC): Covenant House Greater Washington DC, DC Doors, DC Fiscal Policy Institute, Healthy Babies Projects, HER Resiliency Center, Latin American Youth Center (LAYC), National Center for Children and Families, Sasha Bruce Youthworks, Supporting and Mentoring Youth Advocates and Leaders (SMYAL), StandUP for Kids, and the Wanda Alston Foundation. These Coalition members, apart from DC Fiscal Policy Institute, are providers of services to homeless youth, including shelters for youth and families. DC Fiscal Policy Institute is a public policy, tax, and budget organization which monitors the financing of homelessness programs in the District.

7. YHAC meets twice a month during the District's legislative budget session, and once a month outside of that window. During these meetings, we discuss updates from the members (for example, new shelter openings), the Coalition members' individual programs, and we discuss the holes and gaps in the system that prevent youths' needs from being met.

8. We often discuss the failings of mental health services for homeless youth and the need for additional investments to provide needed services. For example, there are no mental health services designed for homeless youth in the District. Most mental health services are school-based or provided in outpatient clinics, but the young people served by YHAC Coalition members are often disconnected from school and family, so these services do not work for them. Homeless youth move frequently between different locations (shelters, foster placements, other residential facilities, and home), and when services are not coordinated to follow youth as they move, any change in placement disrupts services. Moreover, homeless youth have typically experienced trauma from continued placement changes, and instances of abuse, neglect, and housing insecurity that are typically intertwined with a long history of familial conflict. As a result, our youth often need family mediation to fully resolve their individual trauma and to access needed supports independently. Yet, CSAs do not typically provide this support. YHAC has advocated for investments in this population for many years, but unfortunately the demand has not been met.

9. YHAC members banded together to coordinate these services through the "Coordinated Entry" program. When a young person presents at any member facility in need of services, they go through an intake and assessment process. The Coordinated Entry Team

then matches the youth to the facility with services that meet their needs. For example, when an LGBTQ youth presents to any YHAC facility, the Coordinated Entry Team will likely place them at SMYAL or at the Wanda Alston Foundation – two providers specializing in trauma-informed care for LGBTQ youth. Coordinated Entry helps save dollars and coordinates limited resources to best serve District youth.

10. Coordinated Entry operates completely outside of the District's government. I have been doing this type of work for more than 25 years, and I have never seen a state coordinate resources the way YHAC does. In fact, as a result of YHAC's Coordinated Entry program, the District was just named as the top-rated state combating youth homelessness.

11. Identifying the mental health needs of youth is a major component of Coordinated Entry's work. Each YHAC member is then responsible for securing the mental health services for youth in their care (after Coordinated Entry determined the placement). Through the Coordinated Entry program, YHAC has identified that continuity of care is a major problem for this highly mobile and transient population of youth.

12. I have reviewed the Complaint in this case and understand Plaintiffs' allegations against the District. I also understand the intensive community-based services (ICBS) that are described in the Complaint, as Plaintiffs' attorneys have explained them to me. YHAC strongly believes that the District government needs to build capacity to adequately serve the District's youth with serious emotional disturbance, and that its current offerings to youth experiencing homelessness is inadequate. Many YHAC clients need ICBS that can be provided to them wherever they are in the community, including in the housing programs that YHAC members operate for the District's homeless youth.

13. Our YHAC members serve many homeless youth who have significant emotional disturbances. They face significant barriers to getting the services they need to be stabilized and successful in the community.

14. Sometimes youth enter a YHAC program but then present with mental health symptoms and need more intensive mental health support than the YHAC member can provide. The youth often enter without any treatment plans, without information about their mental health diagnoses, and without information about the mental health services they have received. As a result, staff are left to piece together the youth's service history – including past diagnoses, medication use, and service plan recommendations – and to connect with the District's core service agencies (CSAs), which contract with D.C.'s Department of Behavioral Health (DBH) to provide community-based services to Medicaid-eligible youth in D.C., to determine whether the youth or their family has received any mental health services or is enrolled with a CSA.

15. If the youth is already connected to a CSA, the YHAC program will contact that CSA to reconnect with or re-enroll the youth. If the youth does not have a connection to a CSA, or if the youth does not wish to re-connect to the CSA that served them in the past, YHAC program staff typically call the D.C. Access HelpLine to help connect the youth to a CSA. If the CSA does not timely and effectively engage the youth in services however, the youth does not get the support they need, unless a crisis occurs. We have seen CSA staff wait weeks to follow up with the youth after a connection is made, call the youth sporadically to check in, not visit the youth in the YHAC homes where they reside, and routinely changing the workers assigned to the youth.

16. Even when a YHAC program successfully connects a youth in its care to a CSA, if the youth or family misses a few counseling sessions – in-person or virtual, the CSA usually discharges them. DBH does not have a proactive and effective process for engaging the youth and family with another CSA after the youth is discharged.  Instead, YHAC members are told that their staff must call the Access HelpLine again, and wait for an intake with another CSA.  This can take weeks, and during this time the youth is not receiving any mental health services from a CSA. This is true even when parents raise concerns with the CSA prior to discharge that its services are not working and the youth needs something different. Even in cases where the young person clearly needs continuity of mental health services, there is not a process for a smooth transition from one CSA to another.

17. The youth and families with whom YHAC works are frustrated because they want help, but the CSAs are generally unable to ramp up services to meet the youth's needs in a timely way, or to modify or change services when they are not working. This hampers their ability to effectively engage youth who are homeless or between homes, and the result is often that the youth or family stops engaging with services that are not working for them.  Then, after they are discharged for lack of engagement, youth and families do not know where to turn for help.

18. D.C.'s mental health system for children and youth does not seem to activate until a youth experiences a crisis (when the youth has hurt themselves or someone else, or threatened to, or if they have been charged with committing an offense). During a crisis, it is common for the youth to experience hospitalization or, if the youth was committed to its supervision following an adjudication, for D.C.'s Department of Youth Rehabilitation

Services (DYRS) to take over as the lead agency. Sometimes DYRS will mandate counseling. However, it is common that once the youth is discharged from the hospital or returned from DYRS custody, mental health services do not follow the youth to subsequent placements. YHAC member staff report a total lack of clarity about who is responsible for providing the youth services after hospitalization or commitment ends.

19. As a result, YHAC clients too often do not receive the proper intensity of services. One YHAC member reported that the majority of the youth they serve likely have a serious emotional disturbance, yet only a few of the youth have received the services that D.C. makes available to youth with intensive needs through the CSAs. Only a few of the youth in YHAC programs have received Community-Based Intervention (CBI), only a handful of them have received Assertive Community Treatment (ACT), and very few – if any – have received High Fidelity Wraparound.

20. The Coalition does not believe that CBI and ACT are delivered consistently with fidelity to the model. Whether youth in YHAC programs benefit from these services is dependent on the agency or worker providing CBI or ACT. It is the Coalition's experience that CBI and ACT workers generally do not have the resources or requisite training to meet homeless youths' specific needs. As a result, YHAC members must try to provide the needed support and additional clinical services. Some of our members have resources for this work; others do not. ICBS as described in Plaintiffs' Complaint and wrapped around the youth would help alleviate this added burden on YHAC members. It would also help CSAs timely coordinate CBI, ACT, and other therapeutic interventions to youth when they enter YHAC facilities.

21. ICBS could coordinate the teaming approach YHAC members already implement through the Coordinated Entry program with other services and supports for the youth. If the youth is receiving services through a CSA before placement in a YHAC program, our providers would be eager to include intensive care coordinators in the Coordinated Entry process to ensure that a youth's mental health service plan is incorporated in the team's placement recommendation, and that there is coordination between the YHAC member staff CSA workers, and the youth. Where a CSA connection does not exist before the youth is admitted to a YHAC program, ICBS could help the Coordinated Entry team make an timely and appropriate referral to a CSA for service as needed.

22. Without this level of care coordination, YHAC members rely heavily on D.C.'s Access HelpLine and the District's Child and Adolescent Mobile Psychiatric Service (ChAMPS) to connect youth to services. Unfortunately, these services fall short.

23. YHAC members frequently engage ChAMPS and believe it can be a useful resource for screening youth for whether they need follow-up services, and for developing a safety plan to use when the youth engages in concerning behavior. However, the program has many flaws. ChAMPS is sometimes unavailable to respond, or cannot respond quickly enough to a crisis. When this occurs, YHAC members are directed to call a Crisis Intervention Officer (CIO) through the D.C. Metro Police Department (MPD). CIOs do not typically have training in working with youth in general, let alone transient youth experiencing a mental health crisis. As a result of this inexperience, the outcome often involves the transport of the youth to an emergency room.

24. Even where ChAMPS responds and engages youth, our YHAC members report that most of the time ChAMPS also transports the youth away from the shelter, to either Children's

National Hospital or the Psychiatric Institute of Washington (PIW). It is rare for ChAMPS to de-escalate the situation in the community.

25. In these situations, or even when ChAMPS does de-escalate the situation onsite, ChAMPS typically does not follow-up with parents or youth after providing services in order to connect the family to a CSA. Typically, a parent or youth receive a list of phone numbers they can call – nothing more. Additionally, if the youth does not want to engage with ChAMPS (or runs away), ChAMPS leaves without engaging the youth or offering alternative resources.

26. Our YHAC members tell me that hospitalizing youth may temporarily stabilize them, but does not meet their longer-term needs for mental health services. Youth who are hospitalized at Children's National or PIW are not linked to community-based mental health services, even when they are already enrolled with a CSA. One YHAC member reported that trying to help a youth receive any type of assessment or evaluation by their CSA while the youth is hospitalized, so that services can be changed to meet the youth's needs, can be extremely difficult. YHAC clients are frequently discharged from hospitalization in a matter of hours and returned to the care of YHAC members without a revised service plan. More often than not, the youth returns to the YHAC's care with only discharge papers that explain how the client presented and what medication is needed.

27. For example, one young person at a YHAC shelter had expressed suicidal ideations. When facility staff saw a noose in her room, they called ChAMPS. ChAMPS transported the youth to Children's National. Five hours later ChAMPS brought her back to the facility with a generic safety plan that did not include any information that was specific to

9

the youth's elevated needs or suicidal ideations. Shortly thereafter, the youth re-escalated and was hospitalized again.

28. Another YHAC client had a mental health crisis in a home operated by the organization. The YHAC member called ChAMPS and ChAMPS transported the youth to a psychiatric hospital. He was discharged within 72 hours. Minutes after he returned to the provider with only discharge papers, he escalated again. Because no transition plan had been developed for the client, including a plan for what to do in a crisis, staff felt they had no choice but to call ChAMPS again.

29. YHAC clients report that hospitalization is not helpful to them. They don't feel like anyone in the hospital helps them understand what to do when they go home and start to feel depressed or anxious or angry. Their parents end up losing a day (and missing work) in the emergency room for no reason and are sent home without resources or any information about what to do in crisis situations. Typically, the recommendation is for youth to continue with the services they were receiving before going to the hospital, even when those services are clearly ineffective.

30. Some youth who experience longer hospitalizations are connected to CSAs, yet the hospital does not typically arrange services, schedule appointments, or ensure that the youth's other providers are informed about recommended next steps. The CSA might send a Community Support Worker (CSW) who visits briefly to talk, but there does not seem to be any intentional work by the hospital or CSA to ensure the stability of long-term supports upon discharge. On rare occasions, a CSW will deliver a youth's medication to their group home and check in with the youth after discharge. Typically, YHAC staff are required to do this follow-up coordination.

DocuSign Envelope ID: 6FEF8A30-DCF9-40F2-99E3-1509595B6814

31. As a result of not being linked to services in the community while they are hospitalized, at least a few YHAC clients have reported that they feel safest at the hospital and try to return to the hospital to keep themselves and others safe. This is extremely disconcerting. No child should feel safest in an institutional setting.

32. Cycling in and out of the hospital also impacts a youth's ability to attend school on a consistent basis and to receive mental health services at school. Children's National and the Psychiatric Institute of Washington (PIW) do not typically provide education to young people while they are admitted, so their education only resumes upon return to the community. Before the COVID-19 pandemic, schools seemed to be proactively engaging our youth with psychologists and therapy at school. Now, because of COVID-19 and virtual schooling, services seemed to be dependent on the youth's desire to engage and can be difficult to arrange, especially for this transient population.

33. The youth who enter YHAC homes typically stay for a short period of time, and often come and go repeatedly. Unfortunately, when a youth leaves a YHAC group home, services arranged for them before, during, or after their stay typically do not transition with them. When youth exit a YHAC program, our members are often unable to track whether the youth continued to engage with mental health services. If the youth return to the YHAC program, tracing any services the youth received in the interim to continue those services is difficult. These frequent stops and starts prevent meaningful progress for the youth. The District's mental health service system should ensure continuity of care wherever these youth go, but all too often it does not.

34. Without a system of coordinated care among behavioral health providers, it should not be a surprise that so many children and youth fail to receive the mental health services they

need. We attempted to fix one gap in the delivery system through the Coordinated Entry program, but this same level of coordination is needed among the CSAs, schools, and other providers for the delivery of mental health care to youth and families.

35. Once a youth leaves the care of a YHAC member, CSAs do not typically engage our members to learn about their successes and missteps with the youth. This is unfortunate because YHAC members work diligently to acquire missing information and coordinate services for YHAC clients. This knowledge is lost and the next YHAC member with whom the youth is placed is left to begin at square one.

36. Because of the gaps in the District's behavioral health services for youth, YHAC members do a significant amount of extra work to help connect clients to the services they need (typically long after the need begins) and to keep clients stable, which drains resources available to other youth. Our coalition is eager for more support.

37. The Coalition believes firmly that coordination meetings are necessary to understand the needs of a young person who is placed in our care, to learn their unique history, and to ensure successful hand-offs to other service providers. Despite playing a major role in our client's lives and the delivery of mental health supports, YHAC members are not included consistently in meetings that CSAs convene to discuss a youth's treatment plan. In the past, YHAC members have been invited to case conferences or treatment plan meetings with clients, but these invitations have tapered off in recent years.

38. Instead, YHAC members often have to initiate these meetings with CSAs. These "Stabilization Meetings" for youth typically involve the parent, the youth, CSA staff working with the youth, and YHAC case managers. YHAC members help the parents navigate the system, attempt to coordinate services between the school and other service

providers, and help them figure out how to manage the best they can when they cannot get connected to the right services.

39. Service plans should be coordinated and shared across the provider network, including with YHAC member agencies. Without care coordination that involves and informs all of the youth's providers, youth will continue to receive inconsistent services.

40. Youth also need to be provided with consistent support from their CBI workers, ACT team members, and CSWs – these youth need consistent relationships wherever they are in the community.

41. YHAC also believes that the District's behavioral health system often lacks cultural competency. Particularly in the Black community, mental health is still stigmatized and there seems to be a lack of awareness that mental health does not discriminate. Our CSAs and schools need to provide youth – especially Black youth – with culturally competent education about mental health so that youth want to engage.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of July, 2021, in Washington, D.C. .

DocuSigned by:

*Kimberly Perry*
266251D13C6B4A6...
Kimberly Perry