**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **M.J.**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 18-1901 (EGS)** |
| **DISTRICT OF COLUMBIA**, *et al.*, | |
| **Defendants.** | |

<u>**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

TABLE OF EXHIBITS ............................................................................................. v

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 2

   I.   Behavioral Health Services for Youth in the District............................................... 2

      A.   Community-Based Interventions......................................................................... 3

      B.   High Fidelity Wraparound ............................................................................. 4

      C.   Mobile Crisis Response Services ..................................................................... 5

      D.   Assertive Community Treatment ..................................................................... 6

   II.   Rates of Youth Institutionalization in the District................................................... 6

   III.   Plaintiffs' Allegations....................................................................................... 7

LEGAL STANDARD............................................................................................... 9

ARGUMENT ...................................................................................................... 10

   I.   Plaintiffs' Proposed Class Is Not Ascertainable.............................................. 10

      A.   Plaintiffs' Proposed Class Definition Is Impermissibly Fail-Safe. ............................... 11

      B.   Adjusting the Class Definition Cannot Cure This Deficiency Because Plaintiffs Have Not Established Medical Necessity for Any Children.................................................... 13

      C.   The Class Definition Hinges on Vague Terms and Indiscernible Future Members. ..... 16

   II.   Plaintiffs Do Not Meet the Rule 23(a) Prerequisites for a Class Action.......................... 18

      A.   Plaintiffs Cannot Establish Commonality Because They Have Not Identified Any Common Questions Pertinent to Either of Their Claims. ............................................. 18

      B.   Plaintiffs Cannot Establish Typicality Because They Have Received the Very Services They Allege the District Fails to Provide. ..................................................... 24

      C.   Plaintiffs Cannot Adequately Serve as Class Representatives Because They Have No Incentive To Seek Additional Services They Do Not Need. .......................................... 29

      D.   Plaintiffs Have Not Met Their Burden To Show Numerosity Because Their Methodology Did Not Meet the Reliability Standards They Proposed. ........................ 29

   III.   Certification Is Improper Under Rule 23(b)(2) Because Plaintiffs Have Not Established That Injunctive Relief Can Address Their Alleged Injuries............................................. 30

      A.   Plaintiffs' Requested Injunction Is Fatally Vague. ............................................. 31

      B.   An Injunction Would Require Individually Tailored Relief. ........................................ 34

CONCLUSION.................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*A.A. by and through P.A. v. Phillips*, Civil Action No. 19-00770, 2021 WL 2102829 (M.D. La. 2021) .................................................................................................................... 13, 14, 15

*Alvarez v. Keystone Plus Construction Corp.*, 303 F.R.D. 152 (D.D.C. 2014) ............... 24, 25, 27

*Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974) ........................................................... 11, 16

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................................ 29

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013) .................................. 10

*Andrews v. Plains All Am. Pipeline, L.P.*, Civil Action No. 15-4113, 2017 WL 10543402 (C.D. Cal. Feb. 28, 2017) .................................................................................................................. 32

*Arias v. Marriott Int'l, Inc.*, 324 F.R.D. 307 (D.D.C. 2018) ........................................... 24, 26, 29

*Atwell v. Gabow*, 248 F.R.D. 588 (D. Colo. 2008) ...................................................................... 32

*Brown v. District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019) .......................................... 21, 22

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020) .................................................................... 34

*Califano v. Yamasaki*, 442 U.S. 682 (1979) ................................................................................... 9

*Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281 (D.D.C. 2018) ..................... 10, 11

*Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68 (D.D.C. 2015) .......................... 23

*D.L. v. District of Columbia*, 860 F.3d 713 (D.C. Cir. 2017) ...................................................... 29

*Feinman v. FBI*, 269 F.R.D. 44 (D.D.C. 2010) .............................................................................. 9

*Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006) ........................................................................ 9

*Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147 (1982) ............................................................... 9

*Hoyte v. District of Columbia*, 325 F.R.D. 485 (D.D.C. 2017) ..................................................... 9

*In re McCormick & Co., Inc., Pepper Prods. Marketing & Sales Practices Litig.*, 422 F. Supp. 3d 194 (D.D.C. 2019) .................................................................................................................... 10

*In re Methyl Tertiary Butyl Ether ("MBTE") Prods. Liability Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002) .................................................................................................................................... 34

*In re Navy Chaplaincy*, 306 F.R.D. 33 (D.D.C. 2014) ................................................... 35

*Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64 (1967) .............. 31

*J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) ........................................................ 10, 29

*Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481 (7th Cir. 2012) ............................. 10, 34, 35, 36

*Katie A. ex rel Ludin v. Los Angeles Cnty.*, 481 F.3d 1150 (9th Cir. 2007) ................................. 33

*Littlewolf v. Hodel*, 681 F. Supp. 929 (D.D.C. 1988) ................................................... 24

*Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521 (5th Cir. 2007) ......................................... 31

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802 (7th Cir. 2012) ............................... 11

*Monreal v. Potter*, 367 F.3d 1224 (10th Cir. 2004) ..................................................... 31

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015) ..................................... 11

*N.B. v. Hamos*, 26 F. Supp. 3d 756 (N.D. Ill. 2014) ........................................... passim

*O.B. v. Norwood*, 15 C 10463, 2016 WL 2866132 (E.D. Ill. May 17, 2016) ............ 13, 14, 18, 20

*Olmstead v. L.C. ex Rel. Zimring*, 527 U.S. 581 (1999) ......................................... 8, 21

*Parent/Professional Advocacy League v. City of Springfield, Mass.*, 934 F.3d 13 (1st Cir. 2019) ................................................................................. 34

*Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266 (11th Cir. 2000) ....................................... 19

*S.E.C. v. Wash. Inv. Network*, 475 F.3d 392 (D.C. Cir. 2007) ..................................... 32

*S.R., by and through Rosenbauer v. Penn. Dep't of Human Servs.*, 325 F.R.D. 103 (M.D. Pa. 2018) ................................................................................. 14, 20

*Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc.*, 821 F.3d 992 (8th Cir. 2016) .............. 10

*Schmidt v. Lessard*, 414 U.S. 473 (1974) ................................................... 31

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) ........................ 9

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597 (10th Cir. 2008) ........ 31, 33, 34

*Soseeah v. Sentry Ins.*, 808 F.3d 800 (10th Cir. 2015) ................................................... 34

*Steimel v. Minott*, Civil Action No. 13-957, 2014 WL 1213390 (S.D. Ind. Mar. 24, 2014) ........ 23

*Steimel v. Wernert*, 823 F.3d 902 (7th Cir. 2016) ................................................... 11, 12

iii

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001) .......................................................... 24

*Thorpe v. District of Columbia*, 303 F.R.D. 120 (D.D.C. 2014) ................................. 11

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ........................................... passim

*White v. Hilton Hotels Ret. Plan*, Civil Action No. 16-856, 2020 WL 5946066 (D.D.C. Oct. 7, 2020) ................................................................................................................. 11

*Zhang v. United States Citizenship & Immigration Servs.*, 344 F. Supp. 3d 32 (D.D.C. 2018) ... 10

**Rules**

Fed. R. Civ. P. 23 ...................................................................................................... 9

Fed. R. Civ. P. 23(a) ................................................................................................. 9

Fed. R. Civ. P. 23(a)(1) ........................................................................................... 29

Fed. R. Civ. P. 23(a)(2) ........................................................................................... 18

Fed. R. Civ. P. 23(b)(2) ..................................................................................... 10, 34

Fed. R. Civ. P. 65(d)(1) ........................................................................................... 31

**Statutes**

D.C. Code § 16-2315 ............................................................................................... 27

**Regulations**

22 A DCMR § 3425.15 ............................................................................................... 4

22-A DCMR § 1201.1 ................................................................................................ 2

22-A DCMR § 3425.1 ................................................................................................ 3

22-A DCMR § 3425.19 ............................................................................................... 4

22-A DCMR § 3425.23 ............................................................................................... 4

22-A DCMR § 3425.6 ................................................................................................ 4

22-A DCMR § 3425.6(b) ............................................................................................ 3

22-A DCMR § 3499.1 ............................................................................................... 15

22-A DCMR §§ 3425.11 .............................................................................................. 4

22-A DCMR §§ 3425.30(a)-(k) .................................................................................... 3

## TABLE OF EXHIBITS

| Designation | Title |
|---|---|
| Exhibit A | Declaration of Barbara Paulson |
| Exhibit B | Declaration of Patrina Anderson |
| Exhibit C | Plaintiffs' Objections and Responses to Defendants' Second Set of Interrogatories to Plaintiffs L.R. and University Legal Services |

**INTRODUCTION**

Plaintiffs L.R., B.T., M.W., and University Legal Services (which does business as Disability Rights D.C.) seek class certification in this action, brought against the District of Columbia, Mayor Muriel Bowser, Director of the Department of Behavioral Health (DBH) Dr. Barbara Bazron, and Director of the Department of Health Care Finance (DHCF) Wayne Turnage (collectively, the District), alleging that the District does not provide a cluster of mental health services they call "intensive community-based services" (ICBS) in violation of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act (Section 504), and the Medicaid Act's early and periodic screening, diagnostic, and treatment (EPSDT) provision under 42 U.S.C. § 1983. Plaintiffs cannot meet their burden to show certification is warranted for several reasons.

First, plaintiffs' proposed class violates Federal Rule of Civil Procedure 23's implied requirement of "ascertainability." The proposed class is impermissibly "fail-safe" because it defines membership based on ultimate success on the merits. The proposed class also employs vague criteria and includes indiscernible future members, leaving it impossible to determine membership.

Second, plaintiffs have not met their burden to establish the four components necessary for certification under Rule 23(a). They have not shown commonality because they have failed to identify any question under either of their clams that is common across the entire class. They have not shown typicality because records show the named plaintiffs have received needed mental health services, many of which plaintiffs allege the District does not provide, leaving them atypical of the putative class as a whole. They have not shown adequacy because the named plaintiffs have no incentive to seek an injunction requiring the District to provide needed services when they have been receiving those very services. And they have not shown numerosity because they did not follow a sound methodology for sampling the putative class in a statistically valid way.

Third, plaintiffs cannot establish that certification would be proper under Rule 23(b)(2). Plaintiffs seek an injunction that is impermissibly vague, and the ultimate relief they seek would have to be individually tailored to the needs of each class member.

Because plaintiffs cannot meet their burden to show all of the above factors, their motion should be denied.

## BACKGROUND

## I. <u>Behavioral Health Services for Youth in the District</u>

Over the past decade, the District has comprehensively reformed its children's metal health system of care to ensure that children with serious emotional disturbances (SED)[1] receive high-quality, integrated care. *See* Ex. A, Declaration of Barbara Paulson (Paulson Decl.) ¶ 6. The District currently implements various evidence-based practices to provide a robust array of intensive at-home and community-based services, and coordinates across agencies to reduce unnecessary placements in more restrictive settings. *Id.*

The District offers a number of intensive mental health services delivered to children in the community. Four in particular are relevant here. First, community-based interventions (CBI) provide mental health supports to children and their families in their communities, schools and homes. *Id.* ¶ 8. Second, the District offers high fidelity wraparound (HFW) services, which focus on a child and family team based on a nationally recognized model of care. *See id.* ¶¶ 26–27. Third,

---

[1]     SED is defined by District law to mean individuals who have, or have had during the prior year, a diagnosable mental, behavioral, or emotional disorder that: (1) is sufficient to meet diagnostic criteria of the DSM-IV or the ICD9-CM equivalent, except for DSM-IV "V" codes; (2) results in (or will result in) a functional impairment that either substantially interferes with or limits the child's role or function in family, school, or community activities, or that limits the child from achieving or maintaining one or more developmentally-appropriate social, behavioral, cognitive, communicative, or adaptive skills; and (3) includes functional impairments of episodic, recurrent, and continuous duration. 22-A DCMR § 1201.1.

mobile crisis services are provided through Children and Adolescent Mobile Psychiatric Services (ChAMPS), which is available 24 hours per day, seven days a week to respond to and stabilize children experiencing crises without the need for law enforcement intervention. *See id.* ¶ 35. Fourth, Assertive Community Treatment (ACT) provides a comprehensive and integrated set of medical and psychosocial services for the treatment of the youth's mental health condition in the community and is available to youth ages 18 through 21. *Id.* ¶¶ 42–43. Each is described in detail below.[2]

### A.   Community-Based Interventions

CBI are intensive, evidence-based mental health services provided to children and youth ages six through twenty-one in the child or youth's natural environment, including their home, school or community, and, in collaboration with their families. CBI is "intended to prevent the utilization of out-of-home" placements. *See id.* ¶ 8; 22-A DCMR § 3425.1. CBI services are individually designed by the provider for each child and their family to minimize intrusion, maximize independence and achieve treatment goals. Paulson Decl. ¶ 8.

The District provides four levels of CBI services corresponding to different modalities of intervention, each based on the kinds of risks the child's behavior and history present. *See* 22-A DCMR § 3425.6(b); Paulson Decl. ¶ 9. Central to each level of CBI is family involvement, and all CBI providers are required by regulation to provide services with a family focus and to engage families and natural supports, where applicable, through a team-based approach. *See* Paulson Decl. ¶¶ 9, 19 (citing 22-A DCMR §§ 3425.30(a)-(k)). For example, CBI providers are required to conduct a child and family team meeting within seven days of admission for youth in the

---

[2]     Most children's mental health services in the District are coordinated through the Department of Behavioral Health (DBH). Several other agencies provide limited services to children in particular settings, such as in the District's public schools, youth detention facilities, or foster care. Because plaintiffs' proposed class extends to all Medicaid-eligible children with SED, the District will focus primarily on services coordinated through DBH.

community, and within 14 days of admission for youth discharged from an acute care facility. Paulson Decl. ¶ 9. All four levels of CBI include services that reduce family conflict, stabilize the family unit, and increase family support. *Id.* ¶ 20.

Although each level of CBI services is initially time-limited by regulation, *see* 22-A DCMR §§ 3425.11; 3425.15; 3425.19; 3425.23, services at all levels can be—and routinely are—extended for as long as the services remain medically necessary for the child.[3] Paulson Decl. ¶ 22. Further, each level of CBI includes a care coordination component that requires CBI providers to coordinate and link children and youth to other Medicaid-covered services and supports to prevent the utilization of residential treatment. *See* Paulson Decl. ¶ 24; 22-A DCMR § 3425.6 (f). To ensure CBI services are consistently provided to fidelity, the District contracts with a third party to independently audit each of the CBI providers, all of whom meet fidelity standards. *Id.* ¶ 25.

**B.     High Fidelity Wraparound**

In addition to CBI, the District also provides HFW services through a contract with MBI Health Services, LLC (MBI). *Id.* ¶ 26. HFW incorporates a range of treatment services and supports, including community-based care coordination, emergency response teams, programs in child development centers and public schools, evidence-based practices, substance use disorder prevention and treatment programs, and ongoing services provided by community-based providers. *Id.* ¶ 27. As DBH's HFW provider, MBI is required to adhere to the National Wraparound Initiative model, through which a collaborative child and family team implements, tracks, and adapts an individualized plan of care to help the child achieve positive outcomes at home, in school and in the community. *Id.*; *see also id.* ¶ 31 (citing National Wraparound Initiative,

---

[3]     In fact, each of the named plaintiffs here received multiple authorizations for at least one level of CBI services. *See* Paulson Decl. ¶ 22.

Ten Principles of the Wraparound Process (2004), available at https://nwi.pdx.edu/pdf/TenPrincWAProcess.pdf). Intensive care coordination is a fundamental component of HFW. With the help of a wraparound team, consisting of a variety of participants from the child's community, the child and family choose a team vision, set goals, and develop a plan to achieve them. *Id.* ¶ 28. This process is facilitated by a care coordinator, who works to link the child and family to appropriate services in the community. *Id.* The District also provides "flex funding" to children receiving HFW to cover the cost of non-Medicaid funded services and supports, such as tutoring or family recreation, that are included in the child's wraparound plan. *Id.* ¶ 32.

Most children who received HFW services in FY19 and FY20 benefitted from the services. Notably, of the children who received HFW in FY19, 97 percent were diverted from placement in a PRTF. *Id.* ¶ 34. That percentage remained steady in FY20. *Id.* Further, in FY20, 91 percent of HFW participants incurred no new criminal charges, 83 percent maintained their school placement, and only eight percent experienced an abscondence. *Id.*

### C.   Mobile Crisis Response Services

For children with SED who experience a behavioral health crisis, the District also provides mobile crisis services through the ChAMPS program. *Id.* ¶ 35. Mobile crisis services are available 24 hours a day, 365 days a year and are provided in home, school and community settings. *Id.* ChAMPS dispatches providers to engage in psychiatric stabilization, screening for mental health and substance use disorder services, rapport development, and the provision of support while assisting with a child and family's immediate behavioral health needs. *Id.* ¶ 36. Mobile crisis services aim to prevent unnecessary law enforcement involvement, emergency room use, hospitalization and placement disruption for children experiencing behavioral health emergencies.

*Id.* In FY19, only 15 percent of ChAMPS deployments resulted in hospitalization; in FY21, that number fell to 11 percent. *Id.* ¶ 39.

### D.   Assertive Community Treatment

Some individuals ages 18 to 21 also receive services through Assertive Community Treatment (ACT).[4] *Id.* ¶ 42. ACT is an intensive, integrated, rehabilitative treatment, providing mental health community support services and crisis emergency support services delivered 24 hours per day, 7 days per week. *Id.* ACT teams provide a comprehensive and integrated set of medical and psychosocial services for the treatment of mental health conditions in non-office settings. *Id.*

The District offers youth-specific ACT through Transitional Age Community Treatment (TACT) teams to youth ages 18 through 29. *Id.* ¶ 43. TACT teams operate using the Transition to Independence Process (TIP) model, a framework that focuses on providing young adults who have emotional or behavioral difficulties with developmentally appropriate, non-stigmatizing, culturally competent and appealing supports. *Id.* ¶ 43. The TIP model involves young adults, their families and other community supports who work to prepare the young adult for greater self-sufficiency and toward the successful achievement of their goals. *Id.*

### II.   Rates of Youth Institutionalization in the District

Although the District provides youth mental health services in the community when appropriate, some children with SEDs nevertheless require care in an institutional setting. The District makes every effort to keep children in the community when possible and has experienced

---

[4]    ACT is an evidence-based practice intended to service adults with severe mental illness lead more stable lives in the community. Paulson Decl. ¶ 45. Because ACT's evidence base has been researched in adult populations, it is generally viewed as a service that is appropriate for adults ages 18 and older. *Id.*

a significant reduction in children placed in institutional settings over the past decade. The District has seen a decrease in the number of Medicaid-enrolled children admitted to Psychiatric Residential Treatment Facilities (PRTFs) in recent years.[5] For example, from fiscal year 2019 (FY19) to fiscal year 2020 (FY20), the number of Medicaid-enrolled children with SED placed in PRTFs declined from 40 to 31, and from an average stay of 279 days to 263 days. *See* Paulson Decl. ¶ 7. Both numbers fell again from FY20 to fiscal year 2021 (FY21). From FY20 to FY21, the number of Medicaid-enrolled children with SED placed in PRTFs fell from 31 to 23, and from an average stay of 263 days to 183 days. *Id.*

## III.   Plaintiffs' Allegations

According to their allegations, plaintiffs L.R., B.T., and M.W. are three 20-year-olds with SEDs enrolled in the District's Medicaid program. Am. Compl. [78] ¶¶ 11-14. Plaintiff Disability Rights D.C. is a non-profit District corporation that advocates for individuals with disabilities. *Id.* ¶ 16. Only L.R., B.T., and M.W. seek to be class representatives here. *See* Mem. in Support of Pls.' Mot. for Class Cert. (Pls.' Mem.) [74-1] at 30–31.

Plaintiffs' claims center around a cluster of mental health services, which they refer to as "intensive community-based services" (ICBS). *See* Am. Compl. ¶ 40. According to plaintiffs, ICBS consists of three broad components:   a team-based case management system called "intensive care coordination" (ICC); therapeutic behavioral interventions called "intensive behavior support services"; and "mobile crisis services," a round-the-clock response service that

---

[5]     Although plaintiffs allege as part of their *Olmstead* claim that they are at risk of being placed into detention facilities as well as psychiatric treatment facilities, *see* Am. Compl. ¶ 3, plaintiffs have not argued—and have identified no authorities establishing—that incarceration (or the risk of incarceration) can give rise to a valid *Olmstead* claim in the first place.

dispatches providers to assist children experiencing crises in their home, school, or community.[6]
Am. Compl. ¶ 40. Beyond these broad definitions, plaintiffs offer no further clarification as to
what they believe each of the three components consists of, or what services they believe the
District fails to provide.

Plaintiffs allege that some District mental health providers offer some components of
ICBS, but no single service provider offers all of them. *Id.* ¶ 42. They further allege that L.R., B.T.,
and M.W. have not received ICBS. *Id.* ¶¶ 52, 60, 67. For B.T. and M.W., they allege that each has
not "receive[d] the ICBS he needs to avoid institutionalization." *Id.* ¶¶ 64, 72. For L.R., they allege
that she "is interested in receiving ICBS, but the District has not worked with her to arrange for
her to receive these services while she has lived in the community." *Id.* ¶ 57.[7] Plaintiffs contend
the District's failure to provide these services violates the Medicaid Act's EPSDT provision, *see*
42 U.S.C. § 1396d(a)(4)(A), and that their resulting institutionalization or risk thereof violates the
ADA and Section 504 under *Olmstead v. L.C. ex Rel. Zimring*, 527 U.S. 581 (1999).

Plaintiffs filed their lawsuit on August 14, 2018 [3], and moved for leave to amend their
complaint on July 19, 2021 [76]. On the same day, plaintiffs filed their motion for class
certification [74]. The Court granted plaintiffs' motion for leave to amend on July 20, 2021. *See*
July 20, 2021 Minute Order. Plaintiffs bring two separate claims, one under 42 U.S.C. § 1983 for
an alleged violation of the Medicaid Act's EPSDT provision, and one under the ADA and Section
504 for violating the "integration mandate" as specified in *Olmstead*. *See* Am. Compl. ¶¶ 74–81.

---

[6]     Although plaintiffs mention "therapeutic foster care" as a fourth component, this Court has
previously concluded that "[t]herapeutic foster care is not at issue in this case." *See* Mem. Op. on
Mot. to Dismiss [45] at 5 n.2.

[7]     Plaintiffs nevertheless proffer a declaration from Kimberly Campbell opining that a review
of L.R.'s history and records shows she needs but has not received ICBS. *See* Campbell Decl. [74-
12] ¶ 50.

Plaintiffs' Amended Complaint seeks certification of the following class: "All Medicaid-eligible District of Columbia children who now or in the future are under the age of 21, have a mental health disability, are not receiving medically necessary intensive community-based services, and are unnecessarily institutionalized or at serious risk of institutionalization." *Id.* ¶ 23.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 sets out the requirements for class certification. Fed. R. Civ. P. 23. A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). Thus, a class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites [for class certification] have been satisfied." *Feinman v. FBI*, 269 F.R.D. 44, 49–50 (D.D.C. 2010) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). The plaintiff bears the burden of persuasion to show each and every requirement of Rule 23 has been met, generally by a preponderance of the evidence. *Hoyte v. District of Columbia*, 325 F.R.D. 485, 491 (D.D.C. 2017).

First, the plaintiff must meet all four requirements of Rule 23(a) by showing that:  (1) the proposed class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

Second, if the plaintiff can meet all the requirements of Rule 23(a), the plaintiff must then show certification is warranted under one of the three categories set forth in Rule 23(b). *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *Garcia v. Johanns*, 444 F.3d 625, 631 n.6 (D.C. Cir. 2006). Plaintiffs here seek certification under Rule 23(b)(2). Pls.' Mem. at 34–39. Rule 23(b)(2) permits certification of a class seeking declaratory or injunctive

relief only upon a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respective the class as a whole." Fed. R. Civ. P. 23(b)(2).

Finally, in addition to all of these express requirements, most courts recognize an additional requirement implied by Rule 23:  that a class "must be sufficiently definite that its members are ascertainable." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 493 (7th Cir. 2012); *see also Sandusky Wellness Ctr., LLC v. Medtox Scientific, Inc.*, 821 F.3d 992, 995 (8th Cir. 2016) (collecting cases from most circuits requiring showing of ascertainability); *In re McCormick & Co., Inc., Pepper Prods. Marketing & Sales Practices Litig.*, 422 F. Supp. 3d 194, 241–43 (D.D.C. 2019) (undertaking ascertainability analysis); *Zhang v. United States Citizenship & Immigration Servs.*, 344 F. Supp. 3d 32, 61 (D.D.C. 2018) (same).[8]

Although analytically distinct from the issue of class certification, courts may consider the underlying merits on a motion for class certification "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## ARGUMENT

### I.    Plaintiffs' Proposed Class Is Not Ascertainable.

Plaintiffs' proposed class is not sufficiently ascertainable and should not be certified. Rule 23 contains a widely recognized "implied requirement" that any class "be 'adequately defined' and 'clearly ascertainable' before it can be certified." *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 313 (D.D.C. 2018) (quoting *Thorpe v. District of Columbia*, 303 F.R.D. 120, 139

---

[8]    To date, the D.C. Circuit "has not addressed whether Rule 23 contains an ascertainability requirement for class certification." *J.D. v. Azar*, 925 F.3d 1291, 1320 (D.C. Cir. 2019).

(D.D.C. 2014)); *see, e.g.*, *Steimel v. Wernert*, 823 F.3d 902, 917-18 (7th Cir. 2016) (affirming denial of class certification in *Olmstead* action where proposed class definition "was too vague"). The proposed class here fails to clear this hurdle.

### A.    Plaintiffs' Proposed Class Definition Is Impermissibly Fail-Safe.

First, plaintiffs have proposed a classic "fail-safe" class. Among other things, the ascertainability requirement prohibits scenarios in which a proposed class definition "depend[s] on the merits of the underlying claim." *Campbell*, 311 F. Supp. 3d at 313 (citing cases). That is, a class cannot be "defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *White v. Hilton Hotels Ret. Plan*, Civil Action No. 16-856, 2020 WL 5946066, at *3 (D.D.C. Oct. 7, 2020) (internal quotation marks omitted) (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012)). Such "fail-safe" classes cannot be certified because a judgment favoring the defendant would by definition reduce the class size to zero, leaving no one bound by the judgment and "subject[ing] the defendant to another round of litigation." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015); *see also Campbell*, 311 F. Supp. 3d at 314 (fail-safe class of employees alleging wrongful termination prohibited where defense verdict would reduce class to zero and leave "supposed class members … free to file new lawsuits attributing their adverse employment decisions to some other impermissible criteria, thereby depriving the judgment of any preclusive effect"); *cf. Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547 (1974) (1966 amendments to Rule 23 "were designed, in part, specifically … to assure that members of the class would be identified before trial on the merits and would be bound by all subsequent orders and judgments").

The Seventh Circuit rejected one such class in *Steimel*. The plaintiffs there, Medicaid eligible individuals with disabilities in Indiana, brought a putative class action alleging an *Olmstead* violation based on Indiana's decision to move them from one Medicaid waiver program

to another. *Steimel*, 823 F.3d at 906. The lawsuit alleged that the new waiver program, which imposed a cap on services, deprived them of previously available services that had enabled them to spend more time in their communities. *Id.* The plaintiffs attempted to bring their action on behalf of all individuals terminated from the previous waiver program "who require more services each year than are available through the [new waiver] and who are not enrolled in [an alternative program]." *Id.* at 917. The Seventh Circuit, however, held that the word "require" made this definition impermissibly vague, explaining that the term left it unclear who exactly would be covered by any eventual judgment. *Id.* at 917-18. Additionally, the court observed that if "required" meant "[r]equired so as not to violate the [ADA's] integration mandate," such a definition "would risk making this class an impermissible 'fail-safe' class." *Id.* at 918.

Plaintiffs here have proposed a class consisting only of those with valid Medicaid Act and *Olmstead* claims on the merits, in direct conflict with the prohibition on fail-safe classes. Plaintiffs' proposed class consists of Medicaid-eligible children with mental health disabilities who "are not receiving medically necessary intensive community-based services, and are unnecessarily institutionalized or at serious risk of institutionalization." Am. Compl. ¶ 23. Yet the very issues plaintiffs must prove on the merits are (1) whether the District indeed fails to provide them and similarly situated children medically necessary ICBS (under the Medicaid Act) and, if so, (2) whether this causes plaintiffs to be unnecessarily segregated into residential institutions (under the ADA and Section 504). *See* Mem. Op. on Mot. to Dismiss [45] at 19, 27-28. If they cannot prove these, a class previously certified under plaintiffs' proposed definition would lose its entire membership. They have thus proposed a textbook fail-safe class.

Courts have repeatedly rejected fail-safe class definitions in actions brought under the Medicaid Act's EPSDT requirement. *See, e.g.*, *N.B. v. Hamos*, 26 F. Supp. 3d 756, 767-68 (N.D.

Ill. 2014) (rejecting class definition consisting of Illinois youth who "are not receiving" home- and community-based services recommended by physicians on grounds that doing so "would result in a 'fail-safe' class"); *A.A. by and through P.A. v. Phillips*, Civil Action No. 19-00770, 2021 WL 2102829, at *9 (M.D. La. 2021), *appeal filed*, No. 21-30580 (5th Cir. 2021) (rejecting class definition consisting of Louisiana youth "not receiving" specified services on grounds that class definition "creates an impermissible 'fail safe' class"); *see also O.B. v. Norwood*, 15 C 10463, 2016 WL 2866132, at *2 (E.D. Ill. May 17, 2016) ("[C]lass membership does not, and should not, be tied to Defendant's ultimate liability in the case[,] lest it create an impermissible fail-safe class …." (internal quotation marks omitted)). In this case, too, plaintiffs cannot maintain a class action on behalf of a class defined only by their eventual success on the merits at a later stage.

### B.   Adjusting the Class Definition Cannot Cure This Deficiency Because Plaintiffs Have Not Established Medical Necessity for Any Children.

Even if plaintiffs proposed modifying the class definition to cure the fail-safe problem, they could not succeed in doing so. That is because there is no manageable way to identify which services, if any, are "medically necessary" for any putative class member, or which services have not been received. *See* Am. Compl. ¶ 23.

Although some courts faced with EPSDT and *Olmstead* lawsuits have resolved similar problems by modifying the class definition, those solutions are not available here. Some courts, for instance, have adjusted the proposed class definition to remove all references to the non-receipt of services, limiting class membership solely to those children with a need for the services at issue. *See, e.g.*, *N.B.*, 26 F. Supp. 3d at 768; *A.A.*, 2021 WL 2102829, at * 10. But those courts have only done so upon finding that there was a readily discernable way to determine need. In *N.B.*, for example, the court certified a class only after limiting membership to "those children who have received a diagnosis and recommendation by an appropriate provider for the home or community

13

based services" at issue. *See N.B.*, 26 F. Supp. 3d at 768. As the court noted there, limiting class membership to those children whose providers had already recommended the relevant services would ensure that any "individualized determinations are complete at the time a plaintiff's membership in the class is determined," *id.*, rather than requiring a series of separate adjudications. Similarly, in *A.A.*, the court limited class membership to those children "for whom a licensed practitioner of the healing arts has recommended" the services in question. *A.A.*, 2021 WL 2102829, at *10. As the court there explained, limiting the class "to children whose physicians have *already recommended*" the services in question would obviate the need for individualized inquiries into medical necessity. *See id.* at *8 (emphasis in the original). The same was true in several other cases cited by plaintiffs here. *See, e.g.*, *O.B.*, 2016 WL 2866132, at *2 (approving of class definition limited to Illinois children "who have been approved for in-home shift nursing services by the Defendant"); *S.R., by and through Rosenbauer v. Penn. Dep't of Human Servs.*, 325 F.R.D. 103, 112 (M.D. Pa. 2018) (permitting class made up of youth who "are adjudicated dependent and have diagnosed mental health disabilities").

Here, this Court has likewise concluded that establishing the requisite need for the claims plaintiffs have brought requires that "a competent medical provider finds specific care to be 'medically necessary' to improve or ameliorate a child's condition." Mem. Op. on Mot. to Dismiss at 27. Yet plaintiffs have offered no evidence that they or any putative class members have been recommended for ICBS by their own providers. Rather, the only basis they provide for establishing medical necessity, and thus class membership, is the proffered declarations by consultants they have retained to provide secondhand review of partial records and histories. The District, however, disputes those assessments and maintains that the various services plaintiffs refer to as ICBS were either not medically necessary for plaintiffs and the putative class, or that plaintiffs and the putative

class received necessary services. *See generally*, Ex. B, Declaration of Patrina Anderson (Anderson Decl.); *accord, e.g.*, Joyner Decl. [74-16] at 9 (putative class member M.B. prescribed and received CBI); Campbell Decl. [74-12] ¶¶ 49 (L.R. provided TACT services), 84 (putative class member K.R. prescribed and received CBI). Resolving these disputes would require the Court to weigh the evidence—likely through evidentiary hearings—and assess whether each child's services were in fact "medically necessary" as defined under applicable law. *See* 22-A DCMR § 3499.1 (defining "Medical Necessity" as "Health care services or products that a prudent provider would provide to a client for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or its symptoms in a manner that is: (a) in accordance with generally accepted standards of health care practice; (b) clinically appropriate in terms of type, frequency, extent site, and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the client or treating provider."). That would require the Court to make individual medical determinations about each putative class member before determining membership—a task both unnecessary and undesirable for a court to engage in. *See A.A.*, 2021 WL 2102829, at \*9 ("Clearly, the Court cannot make determinations of medical necessity in the first instance …."); *N.B.*, 26 F. Supp. 3d at 767-68.

Without evidence that any putative class member or named plaintiff has received a recommendation from their provider for the services plaintiffs refer to as ICBS, plaintiffs cannot establish a class of discernable membership based on objective criteria. *See N.B.*, 26 F. Supp. 3d at 768–69 (rejecting class definition tied to any standard of need for which "only expert opinion could establish a likelihood of future institutionalization, and that opinion would be subject to competing testimony"). Relying instead on plaintiffs' declarations would trigger a cascade of individualized evidentiary disputes and turn what is supposed to be a single class action into dozens

of consolidated trials—all before ever reaching the merits of the case. That would undermine the aims of Rule 23. So would the alternative of leaving class membership unknown. *See Am. Pipe & Const.*, 414 U.S. at 547 (Rule 23 "designed … to assure that members of the class would be identified before trial on the merits").[9]

### C.   The Class Definition Hinges on Vague Terms and Indiscernible Future Members.

Beyond the fail-safe problem created by plaintiffs' method of determining which children need which services, plaintiffs' proposed class is insufficiently ascertainable because it leaves class membership impossible to define. There are several reasons why this is.

First, plaintiffs have not defined "ICBS" with enough specificity to determine whether any given child's need for particular services puts them within the confines of the putative class. As discussed in further detail below, plaintiffs define "ICBS" as encompassing broad categories of services that do not lend themselves to easy identification. *See* Section II.A below. And, as discussed above, they likewise do not identify a feasible method for identifying which children need which of these components. *See* Section I.B. above. Based on their current approach,

---

[9]      Toward the end of their brief, plaintiffs suggest that class membership could be discerned by looking only at whether any given child "(1) is a Medicaid-eligible child (under the age of 21) who; (2) has a mental health disability." Pls.' Mem. at 40. Those criteria, however, are squarely in tension with the class definition they have proposed, which seeks to extend class membership to all Medicaid-eligible children in the District who "are not receiving medically necessary intensive community-based services, and are unnecessarily institutionalized or at serious risk of institutionalization." Pls.' Mem. at 3. A class definition looking only at Medicaid eligibility and whether a child has a mental health disability would be overly broad in scope, sweeping in children who have no need for ICBS. If plaintiffs mean to suggest that all children with mental health disabilities in fact need ICBS, they have offered no support for that proposition. And if they mean to suggest that all children with mental health disabilities in the District are at "serious risk of institutionalization," their own evidence belies that assertion. *See* Bird Decl. [74-5] at 49–52 (asserting G.P has an SED, has not received ICBS, and is not at risk of institutionalization); Missildine Decl. [74-14] Ex. A at 64–67 (asserting D.D. has an SED, did not receive ICBS despite needing such services, and is not at risk of institutionalization).

plaintiffs could point to any discrete mental health service, contend it falls within the umbrella of ICBS, and proffer a declarant to attest that a given child needs that service.[10] Without an adequate way to circumscribe the applicable services *ex ante*, membership in the proposed class is impossible to discern.

Second, plaintiffs' proposed class includes children who are either "unnecessarily" institutionalized or "at serious risk of institutionalization." Pls.' Mem. at 3. But this, too, leaves it impossible to determine class membership. Plaintiffs offer no objective way to establish who is institutionalized "unnecessarily" or at a sufficiently "serious risk" of future institutionalization. Without an "objective standard" for making such determinations, "only expert opinion could establish a likelihood of future institutionalization, and that opinion would be subject to competing testimony." *N.B.*, 26 F. Supp. 3d at 768-69. As defined, plaintiffs' class definition would require a series of evidentiary hearings to determine membership, defeating the very purpose of a class action.

Third, plaintiffs' proposed class includes children who, in the future, will require certain mental health services and not receive them. *See* Am. Compl. ¶ 23. As discussed above, determining which children in fact need the services plaintiffs categorize as ICBS requires a set of individualized determinations:  the Court must go one by one and assess competing analyses of whether each child needed additional services he or she did not receive, and if so, what those

---

[10]    When asked in interrogatories to identify what specific services within "ICBS" the District fails to provide, plaintiffs simply restated the three broad categories of services they identify in their Complaint. *See* Ex. C, Pls.' Objections and Responses to Defs.' Second Set of Interrogatories to Pls. L.R. and University Legal Services, Inc., at 4-8. Indeed, they seemingly concede that the District *does* provide the relevant services but take issue instead with the adequacy and intensity of those services—without specifying what sufficient services would consist of. *See, e.g.*, *id.* at 5, 7. Regardless, the issue in this case is only whether the District offers the relevant services at all. *See* Mem. Op. on Defs.' Mot. to Dismiss at 25-26.

services are. *See* Section I.B. above. That is not a viable method for determining class membership among those who plaintiffs contend need ICBS currently. But even if it were, that method would still fail to identify those who will need ICBS in the future. And indeed, no method could. Courts regularly reject similar proposed classes defined to include indiscernible future members. *See, e.g.*, *N.B.*, 26 F. Supp. 3d at 768 (rejecting future Medicaid eligibility and future segregation as parameters for class definition as rendering class "too indefinite to certify"); *see also O.B.*, 2016 WL 2866132 at *3 (certifying class only upon concluding membership limited to those currently approved for in-home shift nursing). Plaintiffs' proposed class is not ascertainable and should not be certified.

## II.    Plaintiffs Do Not Meet the Rule 23(a) Prerequisites for a Class Action.

### A.    Plaintiffs Cannot Establish Commonality Because They Have Not Identified Any Common Questions Pertinent to Either of Their Claims.

Plaintiffs' proposed class does not meet the requirements of commonality. Commonality requires that plaintiffs show "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). For commonality to be satisfied, class members' claims must depend on "a common contention … [that] is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Plaintiffs, however, have failed to identify any common questions as to either of the two claims central to this case.

#### 1.    Plaintiffs Have Not Identified Any Common Question as to Their Medicaid Act Claim.

Plaintiffs contend that their Medicaid Act claim gives rise to a single common question: "whether all class members who need ICBS—which under the Medicaid Act must be provided to all child enrollees for whom it is 'medically necessary'—have received it." Pls.' Mem. at 19. If plaintiffs mean to signal a distinction between putative class members "who need ICBS" and those

who do not, this question fails under the most basic rubric of commonality:  Common questions must pertain to the entire class, not just to a subset of it. *See Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1281 (11th Cir. 2000) (rejecting class certification where plaintiffs alleging state's failure to provide Home and Community Based Waiver (HCBW) services under Medicaid Act had not made "threshold showing of eligibility for HCBW services" for all class members).

But even if the proposed class encompasses only those children who do need ICBS, plaintiffs have still failed to identify a common question. Determining "whether all class members who need ICBS … have received it" necessarily requires assessing each child individually, and plaintiffs have not offered evidence that could turn that into a single class-wide inquiry. As discussed above, plaintiffs have offered no evidence that any Medicaid-eligible child in the District has received a provider recommendation for ICBS as they define it. And, as the detailed reports proffered by plaintiffs' declarants make clear, both need and services received vary significantly from child to child. The declarations plaintiffs have proffered incorporate painstaking analyses of individual cases, going into great detail about the histories of each child, each child's mental health conditions, symptoms, diagnoses, and the services he or she has received based on significant volumes of documentation. *See, e.g.*, Campbell Decl. Ex. B at 1–37 (listing over 800 individual records reviewed for L.R. totaling thousands of pages). For some children, plaintiffs' declarants reach conclusions about whether the child in question has received ICBS, while for others they concede there is insufficient information to reach a conclusion one way or the other. *See e.g.*, Campbell Decl. ¶¶ 50 ("L.R. need, but has not received, the ICBS described in the complaint); 94–127 (no determination that putative class member T.W. needs ICBS); 154 (no determination that putative class member D.G. needs ICBS, and unable to offer an opinion on sufficiency of services received); 164 (same as to J.S). The District, by contrast, vigorously disputes any conclusions that

some children have not received needed services and has proffered evidence explaining how plaintiffs have mischaracterized, misinterpreted, or misunderstood the needs and services of the sample children, often basing their conclusions on incomplete information. *See generally* Anderson Decl. Determining need or receipt of services for "all class members," Pls.' Mem. at 19, would thus require weighing the evidence for each individual child—the antithesis of a common question that could resolve the relevant claims "in one stroke." *See Wal-Mart,* 564 U.S. at 350.

Plaintiffs point to a number of Medicaid Act class actions post-*Wal-Mart* in which courts have found commonality, presumably to suggest the same would be possible here. *See* Pls.' Mem. at 20 n.24 (citing cases). But each of the cases they cite presented common questions keyed to the existence or non-existence of government policies and practices, not whether individual class members needed or had received services. *See S.R.,* 325 F.R.D. at 108-09 (listing eight common questions concerning whether Pennsylvania offered particular services or had certain policies in place); *O.B.*, 2016 WL 2866132, at *4 (common question of "illegal and systemic failures to provide approved EPSDT services consistent with" requirement "that certain services are made available to Medicaid-eligible children" (internal quotation marks omitted)); *N.B.*, 26 F. Supp. 3d at 772 (common question of "whether the state provides intensive mental health treatment to children only in hospitals and institutions and fails to provide *any* intensive, individualized care that is community-based or in the home" (emphasis in the original)). Here, by contrast, plaintiffs have keyed their purportedly common question to individual class members, asking "whether all class members who need ICBS … have received it." *See* Pls.' Mem. at 19.[11] To answer that

---

[11]    Despite expressly positing only this lone common question, plaintiffs subsequently contend that their "allegations involve a single overarching question:  whether Defendants systematically fail to provide medically necessary ICBS to the Plaintiff Children in violation of" the various legal provisions at issue. Pls.' Mem. at 20. Even if plaintiffs seek to pitch this as an

question, the Court must look at each child one by one, determine whether that child needs ICBS, and then determine whether he or she received it. That is the opposite of a common inquiry. Thus, plaintiffs have not identified any common questions related to their Medicaid Act claim.

> ## 2.   Plaintiffs Have Not Identified Any Common Questions as to Their *Olmstead* Claim.

Plaintiffs likewise have not shown any common questions pertaining to their disability discrimination claim. As this Court has previously stated, individuals can show entitlement to community-based services under *Olmstead* only if: (1) "such services are appropriate"; (2) "the individuals do not oppose community-based services"; and (3) "the individuals' placement in a community-based setting can be reasonably accommodated, considering the resources available to the [providing] entity and the needs of others who are receiving those services." Mem. Op. on Mot. to Dismiss at 18 (citing *Olmstead*, 527 U.S. at 607). It is the plaintiff's burden to affirmatively show the first two of these; only then does the burden shift to the defendant to show that the requested accommodation is not reasonable. *See Brown v. District of Columbia*, 928 F.3d 1070, 1078 (D.C. Cir. 2019) ("[T]he State bears the burden of proving the unreasonableness of a requested accommodation once the individual satisfies the first two [*Olmstead*] requirements.").

Under this standard, plaintiffs contend their claims give rise to three common questions: (1) "whether the District's '*Olmstead* Plan' comprehensively and effectively ensures class members are not unnecessarily institutionalized," (2) "the cost of providing all class members with ICBS they need to avoid unnecessary institutionalization," and (3) "whether it is reasonable to require the District to use its resources to pay that cost." Pls.' Mem. at 19. But none of these three

---

alternative common question, the result is no different. Adding the word "systematically" does not change that any analysis would center on whether the District "provide[s] medically necessary ICBS to the Plaintiff Children," a question that is inherently individualized for all the reasons stated above.

questions will arise at all unless plaintiffs can first meet their burden to show the first two *Olmstead* elements. *See Brown*, 928 F.3d at 1077. The comprehensiveness, effectiveness, cost, and reasonableness of providing class members with ICBS go only to the District's potential defense that the desired accommodations here are not reasonable. *See id.* at 1083–84 (holding that, where case "turn[ed] on whether the District can establish that the plaintiffs' requested accommodations are in fact unreasonable …" under third *Olmstead* element, the District could show either "that it has a 'comprehensive, effectively working plan'" for community transition, or that all accommodations plaintiffs requested would impose unreasonable cost). But as the D.C. Circuit has made clear, that defense does not even come into play until plaintiffs make a showing of the first two *Olmstead* factors: that the community-based services are appropriate for and unopposed by those requesting them. *Id.*; Mem. Op. on Mot. to Dismiss at 18. Plaintiffs identify no common questions going to either of those.[12]

Nor could they on this record. On the merits, plaintiffs will not even get to the three questions they identify as common inquiries unless they can first show that the alleged absence of ICBS has caused *all* putative class members to be deprived of "appropriate" community services that *each* of them did not oppose—determinations that plaintiffs leave to a child-by-child determination. *See* Mem. Op. on Mot. to Dismiss at 22 ("At a later stage, plaintiffs will be required to provide evidence to back up their claims that community-based treatment was appropriate …."). That defies the "touchstone of the commonality inquiry," which asks whether class-wide

---

[12]     For this reason, plaintiffs' reliance on *Brown* is misplaced, as the first two *Olmstead* factors were not at issue there. *See Brown*, 928 F.3d at 1083 ("Thus, this litigation boils down to resolution of the third *Olmstead* question: are the requested accommodations reasonable?"). Plaintiffs have not—and could not—identify any common questions pertaining to the first two prongs of the *Olmstead* standard given that they have keyed their class definition to each class member's need for services, and provided no objective criteria for determining such need.

adjudication will "generate common *answers* apt to *drive the resolution* of the litigation." *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 82 (D.D.C. 2015) (second emphasis added); *see also Steimel v. Minott*, Civil Action No. 13-957, 2014 WL 1213390, at *15 (S.D. Ind. Mar. 24, 2014) ("[T]he 'truth or falsity' of whether the [challenged policy] caused the institutionalization of class members must be 'capable of classwide resolution' such that the Court can resolve the issue for 'each one of the claims in one stroke.'" (quoting *Wal-Mart*, 564 U.S. at 350)). Even if they could help resolve this litigation, the questions plaintiffs identify will only come long after a panoply of individual questions about whether services in the community would have been appropriate for each child.[13]

Moreover, even if plaintiffs could identify questions pertinent to the first two *Olmstead* factors, they could not show any such questions are common across the class as they have defined it. Plaintiffs attempt to combine into one class those children who are (or are at risk of being) institutionalized in psychiatric facilities, those who are (or are at risk of being) incarcerated in detention facilities, those who are (or are at risk of being) in residential placements, and those who are (or are at risk of being) placed into "other institutional settings." *See* Pls.' Mem. at 14. But the relevance of what services they have or have not received, and the relevance of what services the District does or does not provide, is not the same for each of those. On a theoretical level, the connection between not receiving mental health services in the community and ending up in a psychiatric treatment facility is much more direct than the connection between not receiving mental health services in the community and ending up in a detention facility. Many more

---

[13]     Plaintiffs' characterization notwithstanding, the District is therefore not arguing that mere "factual distinctions existing among class members" are what stands in the way of commonality. *See* Pls.' Mem. at 22 n.25. It is the individualized nature of the first two *Olmstead* inquiries, and plaintiffs' failure to offer any common questions as to either, that presents the barrier.

intervening factors might be relevant to the latter. Plaintiffs therefore cannot establish commonality as to their *Olmstead* claims.

**B.** **Plaintiffs Cannot Establish Typicality Because They Have Received the Very Services They Allege the District Fails to Provide.**

Additionally, plaintiffs cannot establish typicality as required under Rule 23(a)(3). The central purpose of the typicality requirement is to ensure that class members and the named plaintiffs have claims "sufficiently similar so that the representatives' acts are also acts on behalf of, and safeguard the interests of, the class." *Littlewolf v. Hodel*, 681 F. Supp. 929, 935 (D.D.C. 1988), *aff'd sub nom.*, *Littlewolf v. Lujan*, 877 F.2d 1058 (D.C. Cir. 1989); *see also Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001) ("The typicality inquiry centers on whether the interest of the named plaintiffs align with the interests of the absent members."). Typicality is not met unless each named plaintiff can point to the "same course of events" and "make[] similar legal arguments to prove the defendant's liability." *Alvarez v. Keystone Plus Construction Corp.*, 303 F.R.D. 152, 161 (D.D.C. 2014) (citation and internal quotation marks omitted); *see, e.g.*, *Arias v. Marriott Int'l, Inc.*, 324 F.R.D. 307, 312 (D.D.C. 2018) (typicality not met in putative class action alleging unlawful working conditions where circumstances of named plaintiff's claims "concern[ed] Plaintiff alone and involve details specific to her" employment and termination).

If plaintiffs' class definition is adopted, the class will consist of those children who both need and have not received the services described in the Complaint as ICBS. *See* Am. Compl. ¶ 23. Anyone who has received ICBS would thus fall outside of that definition, as would anyone for whom such services are not necessary. Plaintiffs' proffered evidence makes clear that all three of them are atypical of that putative class.

**1.  L.R.**

L.R. is not typical of the putative class here for several reasons. First, L.R.'s records show

she has received mental health services according to her identified needs. L.R. has received CBI Level IV, and, on several occasions, CBI Level II, both of which involve the use of child and family teams. Anderson Decl. ¶ 15. L.R. has received HFW with a team actively involved in coordinating her treatment. *Id.* ¶¶ 16–17. L.R. has also received ACT services (a functional equivalent to TACT services), *id.* ¶ 20–21, which plaintiffs' own proffered expert describes as "a form of ICBS." Campbell Decl. ¶¶ 49, 54. Plaintiffs' declarant Ms. Campbell describes these services as designed to contain what plaintiffs believe are the necessary components of ICBS, despite taking issue with how services have actually been delivered to L.R. *See id.* ¶ 54. L.R. has also received mobile crisis services through ChAMPS on at least one occasion, which did not result in L.R. being hospitalized or detained. Anderson Decl. ¶ 19. The record contains no evidence that any provider determined L.R. has a need for any other services that she did not receive, let alone by virtue of the District's failure to provide that service. *Id.* ¶ 24. If plaintiffs' putative class consists of those deprived of needed ICBS, L.R. is not among them.[14] *See Alvarez*, 303 F.R.D. at 161 (typicality requires named plaintiffs to allege "same course of events" and "similar legal theories" to class members).

Second, many of L.R.'s treatments, and her prospects for treatment in the community, have been complicated by factors unique to her individual circumstances. For example, records show that during a PRTF placement in 2015, L.R.'s father attempted to undermine her therapy by recommending that she act aggressively, and in 2017, L.R.'s father demanded that she be discharged early from a PRTF against the advice of providers. Anderson Decl. ¶ 21. Moreover,

---

[14]     Ms. Campbell also alleges gaps in L.R.'s services, such as a discharge from a PRTF placement in 2016 without community-based mental health services in place. *See* Campbell Decl. ¶ 45. In fact, L.R. promptly completed intake and enrolled with a service provider, and began receiving CBI Level II services shortly thereafter. *See* Anderson Decl. ¶ 22 n.5.

L.R. herself suggests that she has in fact been offered and received the very services plaintiffs say the District does not provide but is simply unsatisfied with some of the services provided to her. *See* L.R. Sealed Decl. [75-5]. L.R.'s complicated treatment history reveals that whether she received needed services will turn on events unique to her own case, making her atypical of the putative class. *See Arias*, 324 F.R.D. at 312.

### 2. B.T.

B.T. is also not typical of the putative class for similar reasons. First, B.T. has over the years received services responsive to his identified mental health needs. Although plaintiffs' declarant, Ms. Boyd, purports to review the services B.T. received, Ms. Boyd focuses heavily on records of B.T.'s institutional placements, not services received in the community. Boyd Decl. ¶¶ 121-23, 125-26, 127-128. B.T.'s records, however, show that he has received various mental health services in the community responsive to his identified needs. For example, B.T. has been enrolled in CBI Levels I and II, both of which incorporate the very child and family teams that plaintiffs contend are missing from the District's services.[15] *See* Anderson Decl. ¶¶ 10, 12. B.T. is also currently enrolled in ACT. *Id.* ¶ 10. DBH records provide no indication that any provider found B.T. required—or even would be eligible for—HFW services. *Id.* ¶ 11. The record contains no evidence that any provider determined B.T. has a need for any other services that he did not receive, let alone by virtue of the District's failure to provide that service. *Id.* This, too, would set him apart from the rest of the class. *See Arias*, 324 F.R.D. at 312.

Second, however, even if B.T. had not received certain needed services by virtue of them being unavailable, plaintiffs' own evidence suggests that B.T. would not be eligible for those

---

[15]     Records show that for CBI Level I, B.T. received one authorization for 180 days, and for CBI Level II, B.T. received three authorizations for 180 days each. *See* Paulson Decl. ¶ 22.

services. Plaintiffs' declarant, Ms. Boyd, opines that B.T. has not received adequate psychological evaluations and was denied the use of a vocational service because of a placement in a drug rehabilitation/detox program. Boyd Decl. ¶ 139. From this, Ms. Boyd concludes that "even if a collection of appropriate, evidence-based, individualized ICBS were available for B.T., these inadequate psychological evaluations and inappropriate placements served as obstacles to B.T.'s attempts to access supports and funding that may have facilitated independent living in the community." *Id.* If true, an order that the District provide ICBS will not help B.T. if he has not received proper diagnostics in the first place. B.T.'s purported injury, inadequate psychological evaluations, would therefore give rise to a distinct legal claim not applicable to the class. *See Alvarez*, 303 F.R.D. at 161.

Third, although plaintiffs point to examples of B.T. being placed into certain shelters and substance use treatment centers, no records indicate that B.T. has ever been placed in inpatient psychiatric care or has ever been referred for care at a PRTF. Anderson Decl. ¶ 13. Indeed, the residential placements plaintiffs identify for B.T. are all juvenile justice shelter home placements, not placements made for the purpose of inpatient psychiatric treatment. *See id.*; Boyd Decl. ¶¶ 111, 113, 114, 120, 121, 141; *see also* D.C. Code § 16-2315. Plaintiffs do not allege that children are unnecessarily institutionalized because judges order them to be; they allege that the putative class members cycle through institutional placements directly because of the District's alleged failure to offer needed services. *See, e.g.*, Am. Compl. ¶ 3. If the putative class consists of those who are, have been, or are at risk of being institutionalized into psychiatric treatment facilities by virtue of not receiving needed services, plaintiffs have not met their burden to show B.T. falls within that group. *See Alvarez*, 303 F.R.D. at 161.

### 3.   M.W.

M.W. is not typical of the putative class, either. First, M.W., too, has received numerous intensive mental health services in the community:  HFW, ACT, care coordination, psychotherapy, living and coping skills training, vocational goals with supportive employment, nursing case management, care coordination, medication management, and community support. *See* Anderson Decl. ¶ 26; *accord* Campbell Decl. ¶¶ 141, 146. Since December 2015, M.W. also received CBI Level I, CBI Level II, and CBI Level III services, as well as multi-systemic therapy, and ACT services, which he continues to receive at present. Anderson Decl. ¶ 26. Additionally, M.W. received HFW for approximately one year from late 2017 to late 2018. *Id.* ¶ 27. This included a family teaming process. *Id.*[16] Once again, if the class as a whole alleges the non-receipt of needed services, M.W. has no basis to raise such a claim.

Second, Ms. Campbell opines that M.W. "needs to live in a supervised independent living setting." Campbell Decl. ¶ 143. Nowhere do plaintiffs suggest that a supervised independent living setting would fall within the services they call ICBS. Indeed, M.W.'s provider records do not indicate he has ever sought and been denied a medically necessary behavior health service, let alone any such service plaintiffs describe in their Complaint. Anderson Decl. ¶ 30. M.W., like L.R.

---

[16]     Plaintiffs' declarant, Ms. Campbell, acknowledges that M.W. received wraparound services through MBI, complete with a "child and family team," noting only that M.W.'s medical records do not contain thorough notes about whether the services were "implemented with fidelity." Campbell Decl. ¶ 141. Ms. Campbell also acknowledges that M.W. receives mental health services through Community Connections, and has a crisis plan that includes the following services:  "MHRS-ACT, psychotherapy, living/coping skills training, vocational goals with supportive employment, nursing case management, and care coordination." *Id*. ¶ 146. Ms. Campbell does not dispute that M.W. received these services, taking issue only with the consistency of a therapist, and the lack of records on whether the providers worked through a teaming process. *Id.* M.w. himself acknowledges he received intensive mental health services in the community from Community Connections, despite taking issue with the quality of some of them. *See, e.g.*, M.W. Sealed Decl. [75-6] ¶¶ 31-35.

and B.T., is therefore atypical of the class as a whole. *See Arias*, 324 F.R.D. at 312. Certification

should be denied on this basis.

### C.   Plaintiffs Cannot Adequately Serve as Class Representatives Because They Have No Incentive To Seek Additional Services They Do Not Need.

For similar reasons, plaintiffs cannot establish the fourth and final requirement under Rule

23(a), adequacy, for which they must show "that the named plaintiff[s] must 'fairly and adequately

protect the interests of the class.'" *D.L. v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017)

(quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). This requires that they (i)

"must not have antagonistic or conflicting interests with the unnamed members of the class," and

they (ii) "must appear able to vigorously prosecute the interests of the class through qualified

counsel." *J.D. v. Azar*, 925 F.3d 1291, 1312 (D.C. Cir. 2019).

As described above, plaintiffs have all received numerous mental health services in

accordance with their identified needs. *See* Section II.B above. If plaintiffs seek an injunction on

behalf of the class that would require the District to provide additional services based on children's

needs, plaintiffs will have no incentive to seek such services when they themselves do not need

them. Accordingly, plaintiffs are not adequate class representatives "able to vigorously prosecute

the interests of the class." *See J.D.*, 925 F.3d at 1312.

### D.   Plaintiffs Have Not Met Their Burden To Show Numerosity Because Their Methodology Did Not Meet the Reliability Standards They Proposed.

Plaintiffs also have not established numerosity. Numerosity requires that the class be "so

numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1).

Plaintiffs proffer the declaration of E. Sally Rogers on the validity of their sampling

methodology. *See* Rogers Decl. [74-7]. Ms. Rogers advised that from the pool of 1,900 Medicaid-

eligible children with mental health disabilities who have been institutionalized or utilized certain

services, examining 66 should obtain a representative sample of the pool. *See id.* ¶ 19. Plaintiffs'

efforts notwithstanding, their proffered experts only examined 32—and only 29 of whom were randomly selected. *Id.* ¶ 38. Of those 29, 24 were found to be in need of some component of ICBS, and only about 20 were found to be institutionalized or at risk of institutionalization. *See generally* Bird Decl. [74-5]; Campbell Decl.; Missildine Decl.; Joyner Decl.; Boyd Decl. [74-22].

As discussed above, the District vigorously disputes the analysis of plaintiffs' declarants, *see* Sections I.B. and II.C above, and contends that plaintiffs' declarants had incomplete information and did not reach valid conclusions. Plaintiffs have not put forward adequate evidence to establish any need for services that they did not receive, or any risk of institutionalization, based on the District's alleged failure to provide such services. They similarly lacked complete information as to the remaining sample of children and did not draw valid conclusions as to them, either. Even so, however, it is unclear what, if anything, plaintiffs' unrepresentative sample shows. As explained above, plaintiffs have not followed the methodology their own evidence establishes would be required to draw statistically valid conclusions. They have therefore failed to meet their burden to establish numerosity. Plaintiffs have not met the requirements of Rule 23(a), and their motion for class certification should be denied.

**III.    <u>Certification Is Improper Under Rule 23(b)(2) Because Plaintiffs Have Not Established That Injunctive Relief Can Address Their Alleged Injuries.</u>**

Rule 23(b)(2) requires that a plaintiff seeking class-wide injunctive relief show that the defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This requires two separate showings. First, the plaintiff must show that the class is "sufficiently cohesive that any classwide injunctive relief can satisfy the limitations of Federal Rule [of] Civil Procedure 65(d)—namely, the requirement that [the injunction] 'state its terms specifically; and describe in reasonable detail … the act or acts restrained or required.'"

30

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (Gorsuch, J.) (quoting Fed. R. Civ. P. 65(d)(1)); *see also Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007) (injunctive relief sought under Rule 23(b)(2) "must be specific"). Second, the plaintiff must show that "relief specifically tailored to each class member would [not] be necessary to correct the allegedly wrongful conduct of the defendant." *Shook*, 543 F.3d at 604 (quoting 5 Moore's Fed. Practice § 23.43(2)(b) at 23-195 (3d 2000)). That is because "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. Plaintiffs here have failed to make either showing.

### A.   Plaintiffs' Requested Injunction Is Fatally Vague.

First, plaintiffs' requested relief fails to meet the requirements of Rule 65(d), which provides that any injunction issued by a court must "state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). As the Supreme Court has emphasized, "the specificity provisions of Rule 65(d) are no mere technical requirements," but rather are "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citing *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 74-76 (1967)). The rule both promotes "basic fairness" by requiring "explicit notice of precisely what conduct is outlawed," and facilitates judicial review by ensuring an appellate court will "know precisely what it is reviewing." *Id.* at 476-77. For instance, "injunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65." *Shook*, 543 F.3d at 604 (quoting *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004)); *accord S.E.C. v. Wash. Inv. Network*, 475 U.S. 392, 407 (D.C.

31

Cir. 2007) (rejecting injunction against "future violations of" specified statutory provisions as "insufficiently specific").

In their Complaint, plaintiffs only ask this Court to enjoin the District "from subjecting the named individual Plaintiffs and members of the Plaintiff class to policies and practices that violate their rights under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Medicaid Act." Am. Compl. at 22. Such an injunction would run headlong into Rule 65's most basic requirements. *See Wash. Inv. Network*, 475 F.3d at 407; *Andrews v. Plains All Am. Pipeline, L.P.*, Civil Action No. 15-4113, 2017 WL 10543402, at * 3 (C.D. Cal. Feb. 28, 2017) (denying class certification under Rule 23(b)(2) where proposed injunction requiring defendant oil pipeline companies "to abide by existing pipeline safety regulations" was "superfluous and vague" in violation of Rule 65); *Atwell v. Gabow*, 248 F.R.D. 588, 596 (D. Colo. 2008) (denying class certification where proposed injunction prohibited defendants "from 'violating' federal antidiscrimination laws and from engaging in 'unlawful' or discriminatory practices").

Perhaps acknowledging this deficiency, plaintiffs propose in their motion that on the merits, the Court could issue "a single injunctive order requiring Defendants to modify their policies and practices to provide ICBS to the Plaintiff Children who need it." Pls.' Mem. at 38. Once again, if plaintiffs mean to suggest that some class members need ICBS and some do not, they cannot establish common questions across the class, let alone a single injunction that would pertain to all class members at once as required by Rule 23(b)(2). *See* Section II.A above.

Regardless, such an injunction would still violate Rule 65(d). Plaintiffs' proposed injunction does not specify how the District would have to "modify [its] policies and practices" to comply. Indeed, based on the wording, adequate policy modification would seemingly depend on whether all children are in fact receiving ICBS in accordance with their individual needs. But that

provides no clearer guidance. As discussed, what plaintiffs call "ICBS" is not a single unified service offered by providers but rather three different categories comprised of various services, each of which plaintiffs define only at a high level of generality. *See* Am. Compl. ¶ 40. Providers may also offer those services in different forms and under different names—which, despite plaintiffs' insinuation to the contrary, is permissible under the Medicaid Act. *See Katie A. ex rel Ludin v. Los Angeles Cnty.*, 481 F.3d 1150, 1159 (9th Cir. 2007). For example, plaintiffs' declarants proffer numerous examples of specific services they say may be necessary for some— but not all—children under the rubric of "intensive behavior support services," including "peer support services" and "group therapy," Campbell Decl. ¶ 33; "mentoring and skill-building supports," Missildine Decl. Ex. A at 19; "[t]rauma-focused therapy," "[i]ndividualized therapy," "[g]rief counseling," "[t]herapy and instruction about sexual and emotional intimacy," and "[a]nger management training," Joyner Decl. at 15; "[f]amily therapy," and "[m]edication management or other coping mechanisms (like mindfulness)," *id.* at 32, a "Transition to Independence Process (TIP)," and vocational assessment, Campbell Decl. ¶ 143. Plaintiffs' declarants repeatedly emphasize that the adequate provision of ICBS depends on whether services "are intensive and individualized," and involve "appropriately individualized interventions." *See, e.g.*, Boyd Decl. at 76-77.

An injunction ordering the District to provide each class member with medically necessary ICBS would thus leave it impossible to determine what the District must in fact do. That is precisely why, under Rule 65, the required actions "must ultimately be capable of description in a sufficiently objective way that both the defendant and the court can determine if the former is complying …." *Shook*, 543 F.3d at 606. Whether a general order to modify their policies so as to provide every child with needed "ICBS" or a mere order to follow the law, plaintiffs' proposed

injunction would make it impossible for the District—and for the Court—to know whether compliance has been attained. This does not meet the requirements of Rule 65 or Rule 23(b)(2). *See Parent/Professional Advocacy League v. City of Springfield, Mass.*, 934 F.3d 13, 31 (1st Cir. 2019) (declining to certify class of public school students alleging city's failure under the ADA to provide "school-based behavior services (SBBS)" based on findings that "the term SBBS … does not refer to a single program that has been formally studied and found effective for students like those in the proposed class," and that plaintiffs' proposed question of whether "the failure to provide SBBS violate[s] the ADA … is likely to yield individualized rather than common answers"); *In re Methyl Tertiary Butyl Ether ("MBTE") Prods. Liability Litig.*, 209 F.R.D. 323, 345 (S.D.N.Y. 2002) (denying class certification under Rule 23(b)(2) where plaintiffs' desired injunction against water providers seeking "the provision of clean water" and "remediation of contaminated wells" was rejected as "too broad to satisfy Rule 65(d)").

### B.   An Injunction Would Require Individually Tailored Relief.

Second, plaintiffs cannot show that an injunction would remedy their alleged injuries without "relief specifically tailored to each class member." *Shook*, 543 F.3d at 604. Plaintiffs have made their theory of injury clear:  they believe each class member has not been receiving the mental health services he or she needs, and has been put at unnecessary risk of institutionalization as a result. *See, e.g.*, Pls.' Mem. at 20. No injunction, therefore, could remedy their injuries without accounting for each child's individual needs. This would be true even of an injunction prescribing a uniform process for assessing children's needs and determining what services are appropriate for them. That is because certification under Rule 23(b)(2) requires that "[t]he injunctive or declaratory relief sought must be 'final' to 'the class as a whole.'" *Jamie S.*, 668 F.3d at 499 (quoting Fed. R. Civ. P. 23(b)(2)); *see also Soseeah v. Sentry Ins.*, 808 F.3d 800, 811 n.5 (10th Cir. 2015); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 206 (D.D.C. 2020). "[I]t is not enough for class

plaintiffs to 'superficially structure[] their case around a claim for class-wide injunctive and declaratory relief … if as a substantive matter the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final.'" *In re Navy Chaplaincy*, 306 F.R.D. 33, 56 (D.D.C. 2014) (quoting *Jamie S.*, 668 F.3d at 498-99).

Plaintiffs' proposed injunction would mirror the very scenario the Seventh Circuit rejected in *Jamie S.* There, the district court certified a class consisting of Milwaukee Public School students "eligible for special education services … who are, have been or will be either denied or delayed entry or participation in the processes which result in a properly constituted meeting between the IEP team and the parents or guardians of the student." *Jamie S.*, 668 F.3d at 487-88. Pursuant to a partial settlement, the parties then proceeded to a remedial phase in which the district court ordered the creation of "hybrid IEP teams," each led by a court-appointed monitor, to identify students, determine whether they required IEPs, and assess whether to award compensatory education, among other things. *Id.* at 489. On appeal, the Seventh Circuit reversed the district court's certification as improper under Rule 23(b)(2) precisely because the plaintiffs' purported class-wide injury and requested relief allowed for "no single injunction that provides final relief to the class as a whole," as the district court's remedial process laid bare. *Id.* at 499.

What plaintiffs seek here is the provision of individualized mental health services to each class member in accordance with his or her needs. But ordering a change to "policies and practices" would not guarantee that, as each child's needs must still be assessed on a case-by-case basis. Plaintiffs' reliance on *N.B.*, *see* Pls.' Mem. at 34 (citing *N.B.*, 26 F. Supp. 3d at 774), is once again misplaced. In determining whether to certify a (b)(2) class, the court in *N.B.* observed that unlike in *Jamie S.*, "[a]ny 'highly individualized determinations' required in this case have already been

made," noting that the class at issue "would consist only of children who are not receiving services that *have been prescribed* as 'medically necessary' …." 26 F. Supp. 3d at 774-75 (emphasis added). In other words, because providers for the class member children had already determined what services they needed, an injunction could fully resolve all class members' injuries by ordering the state to provide those services. But as discussed above, plaintiffs have offered no evidence that any such determinations have been made for any class member. The only way to provide the putative class members with relief would be to conduct individual evaluations of each class member at some juncture, either before issuing an injunction or after. Doing so before would turn this putative class action into hundreds of individualized mini-trials. Doing so after would mean that the injunction itself has not provided anyone with full relief. *See Jamie S.*, 668 F.3d at 499. Neither is permissible under Rule 23(b)(2).

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for class certification.

Dated:  October 27, 2021.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Assistant Deputy Attorney General

*/s/ Micah Bluming*
MICAH BLUMING [1618961]
HONEY MORTON [1019878]
MATEYA B. KELLEY [888219451]
Assistant Attorneys General
Equity Section
400 Sixth Street, N.W., Suite 10100
Washington, D.C. 20001

Phone: (202) 724-7272
Fax: (202) 730-1833
micah.bluming@dc.gov

*Counsel for Defendants*