UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.J., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| - against - | ) |
| | ) Civ. No. 1:18-cv-1901 (EGS) |
| The District of Columbia, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DECLARATION OF SARA BOYD IN SUPPORT OF
PLAINTIFFS' SUPPLEMENT TO THEIR MOTION FOR CLASS CERTIFICATION**

I, Sara Boyd, of full age, hereby certify as follows:

1.       I am over 18 years of age and competent to testify regarding the matters described herein.

2.       I am in private practice and affiliated with the Institute of Law, Psychiatry, and Public Policy at the University of Virginia.

3.       I am licensed in clinical psychology in West Virginia, Virginia, Kentucky, and the District of Columbia.  I am board certified in the forensic specialty with the American Board of Professional Psychology.

4.       Over the past 18 years, I have evaluated the psychoeducational and mental health needs of hundreds of children with disabilities, and the mental health services and educational programs provided to those children, in West Virginia, Virginia, Kentucky, New York, and the District of Columbia.

5.       I have been retained to act as an expert witness for Plaintiffs in the above-captioned action.  Last year, I was asked to review the mental health services provided to a subset of individuals within a group of randomly-selected children and youth that may be members of the

putative plaintiff class in the above-captioned action.  My findings in that review are included in Exhibit A to my July 18, 2021 Declaration, which is a true and correct copy of my July 18, 2021 Report in Support of Plaintiffs' Motion for Class Certification.  *See* Exhibit A to Declaration of Sara Boyd (Doc. 74-22).  I was also asked to respond to declarations of Patrina Anderson and Barbara Paulson and certain statements in Defendants' Opposition to Plaintiffs' Motion for Class Certification.  That response is set forth in my December 24, 2021 Reply Declaration.  Reply Declaration of Sara Boyd (Doc. 90-8).

6.      Recently, I was asked to review information and conduct interviews with an additional youth for purposes of a supplement to Plaintiffs' motion for class certification.

7.      I respectfully submit this declaration in support of Plaintiffs' Supplement to their Motion for Class Certification.

8.      Annexed hereto as Exhibit A is a true and correct copy of my June 24, 2022 Supplemental Report in support of Plaintiffs' Supplement to their Motion for Class Certification, and the appendices attached thereto (collectively, my "Report").

9.      My Report describes the opinions I formed from conducting the review of the additional youth, as well as the primary data and other information I considered in forming my opinions.

10.     Attached to my Report as Appendix 1 is my curriculum vitae, which sets forth my qualifications.

11.     Attached to my Report as Appendix 2 is a list of cases in which I testified as an expert at trial or by deposition in the last four years.

12.     Attached to my Report as Appendix 3 is a list of materials I reviewed in connection with this review of the additional youth.

13.    I am compensated for my work on this report at the rate of $250 per hour.

14.    I respectfully adopt and incorporate into this Declaration my Report, which describes the testimony I am offering in support of Plaintiffs' Supplement to their Motion for Class Certification.

15.    I understand and intend that my report is to be presented to the Court with the same weight and consequences as if I had stated the report orally, under oath, in a court of law.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of June, 2022, in Warrenton, Virginia.

Sara Boyd, Ph.D.

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.J., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| - against - | ) |
| | ) Civ. No. 1:18-cv-1901 (EGS) |
| The District of Columbia, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**SUPPLEMENTAL EXPERT REPORT OF SARA BOYD, PH.D.**
**June 24, 2022**

## TABLE OF CONTENTS

I.     INTRODUCTION AND ASSIGNMENT ..................................................................1

II.    OVERVIEW ....................................................................................................................1

III.   WORK PERFORMED .....................................................................................................4

     A.     Methodology ............................................................................................5

     B.     Summary of I.C. ......................................................................................5

     C.     Observations .........................................................................................22

           1.      Lack of Engagement of Family Members By Providers ...........................23

           2.      Inadequate Assessment Procedures ..........................................24

           3.      Lack of Trauma Treatment ........................................................26

           4.      Insufficient Rationales for Residential Placements .................................26

           5.      Lack of Crisis Planning...............................................................27

           6.      Lack of Appropriate Treatment Contributing to Increased Contact with Juvenile Justice Authorities ...............................................................28

IV.   CONCLUSIONS.............................................................................................................28

## I.   INTRODUCTION AND ASSIGNMENT

1.     I am a licensed clinical psychologist in private practice and affiliated with the Institute of Law, Psychiatry, and Public Policy at the University of Virginia.  Over the past 18 years, I have evaluated the psychoeducational and mental health needs of hundreds of children with disabilities, and the mental health services and educational programs provided to those children, in West Virginia, Virginia, Kentucky, New York, and the District of Columbia.

2.     I have been retained to act as an expert witness for Plaintiffs in the above-captioned action.  Last year, I was asked to review the mental health services provided to a subset of individuals within a group of randomly-selected children and youth that may be members of the putative plaintiff class in the above-captioned action.  My findings in that review are included in Exhibit A to my July 18, 2021 Declaration, which is a true and correct copy of my July 18, 2021 Report in Support of Plaintiffs' Motion for Class Certification.  *See* Exhibit A to Declaration of Sara Boyd (Doc. 74-22).  I was also asked to respond to declarations of Patrina Anderson and Barbara Paulson and certain statements in Defendants' Opposition to Plaintiffs' Motion for Class Certification.  That response is set forth in my December 24, 2021 Reply Declaration.  Reply Declaration of Sara Boyd (Doc. 90-8).

3.     Recently, I was asked to review information and conduct interviews with an additional youth, who is identified by his initials, I.C., for purposes of a supplement to Plaintiffs' motion for class certification.  I reserve the right to supplement my opinions should I become aware of additional facts or information, or if I am asked to perform additional analyses.

## II.   OVERVIEW

4.     I have read the Complaint in this action, which describes "intensive community-based services" ("ICBS") as a set of services including:

1

a. ***Intensive care coordination* ("ICC")**—an intensive form of case management in which a provider convenes a "child and family team," including the child, the child's family, service providers, and other individuals identified by the family, to design and supervise a plan that provides and coordinates services for children with mental health disabilities;

b. ***Intensive behavior support services***—individualized therapeutic interventions provided on a frequent and consistent basis that are designed to improve behavior and delivered to children and families in any setting where the child is naturally located; and

c. ***Mobile crisis services***—a mobile, onsite, in-person response, available at any time or place to a child experiencing a crisis, for the purpose of identifying, assessing, and stabilizing the situation and reducing any immediate risk of harm.  These services may be delivered in the child's home, school, or community.

Complaint, ¶ 39.  The Complaint further notes that "[t]o benefit from ICBS, children may also need therapeutic foster care, a short-term, intensive, therapeutic placement."  Complaint, ¶ 40.

5.      I agree with this description of ICBS in the Complaint, as it is consistent with my experience and knowledge regarding mental health services for children and youth and my understanding of how the term is used in the field of children's mental health.  This description of ICBS incorporates an individualized, coordinated planning and service delivery process that focuses on the strengths and needs of the child, while including the family and other natural supports as full partners in supporting the child.  This is often referred to as a "wraparound" approach or model.  Individualized, person-centered, community-based models of intervention and treatment planning that draw on natural as well as formal supports are, generally speaking, the predominant evidence-supported model for supporting children and adults with disabilities with a sufficient degree of intensity to meet their needs, while also preserving their autonomy and participation in their communities to the maximum extent possible.

6.      The coordination of the child, their family and other sources of support, their caregivers, therapists, and other providers, as well as individuals who can work with the child to

build skills or serve as a role model, are all critical to ensure effective interventions in the home and community.  Because these youth are often involved in multiple systems with different treatments, it is essential to have coordination among the youth and their caregivers, providers, and other individuals involved in a treatment plan to ensure effective supports for the youth and their family.

7.     ICBS also includes, as needed, a variety of services and supports that a youth and family may need to address crises and acute situations, such as a crisis response team and plan. Such a crisis plan is important to respond to urgent situations, from suicide risk to confrontations with others.  It is important for youth and families to have access to a mobile crisis service as an alternative to calling 911, which is ill-equipped to deal with youth in mental health crises and can result in unhelpful police involvement.

8.     ICBS also can include other services, including group therapy and transition planning for adulthood for older youth.  Parents often need parenting support and advocacy due to the needs of the youth and, at times, their own challenges.  Respite services are also an important tool to assist parents and caregivers to allow for short-term placements when needed, rather than resorting to longer out-of-home placements and institutionalization.

9.     The Complaint also states that under Washington, D.C. ("District") law, a child has a serious emotional disturbance when:

> (a) the child has a mental health condition and (b) that condition causes the child to have a functional impairment that—on an episodic, recurrent, or continuous basis— either substantially limits the child's functioning in family, school, or community activities; or limits the child from achieving or maintaining one or more developmentally appropriate social, behavioral, cognitive, communicative, or adaptive skills.

Complaint, ¶ 14.  For purposes of this report, when I use the term "serious emotional disturbance," it is in reference to this definition.

10.     The Complaint also refers to institutionalization of youth, including psychiatric hospitalization and placement in psychiatric residential treatment facilities, other residential treatment centers, and carceral settings.  Complaint, ¶¶ 52, 57, 61-62.  I agree that each of those settings constitutes institutionalization, and for purposes of this report I include them when I refer to institutionalization, unless otherwise specified.

11.     This report provides a summary of the procedures undertaken, my findings, and opinions with respect to the clinical status of I.C., the treatment needs of I.C., the treatments provided to I.C. and the adequacy of these interventions, and the risk of institutionalization of I.C. posed by a lack of provision of comprehensive, appropriate, and responsive assessments and interventions.  This report also explains how my observations regarding I.C. are largely consistent with my observation of six broad trends across the cases of the youth I reviewed in connection with my July 18, 2021 report.

12.     A list of the materials I have reviewed in connection with this assignment is attached to this report as Appendix 3.  I have reviewed I.C.'s information in much the same way as I review interventions, services, and placement for children in my other professional work.

## III.     WORK PERFORMED

13.     In connection with this report, I was asked by Plaintiff's counsel to evaluate a youth who is identified by his initials:  I.C.  It is my understanding that I.C. has agreed to serve as a named plaintiff in this action.

14.     I reviewed I.C.'s available medical, educational, and other pertinent records, including records concerning I.C.'s juvenile justice system involvement and psychological and psychiatric evaluation reports.  I also interviewed I.C. three times, on April 13, 2022, May 6, 2022, and June 17, 2022, and his mother, on May 6, 2022, via videoconference and phone.  My review of I.C. is similar to my prior review of records and interviews concerning the other youth discussed

4

in my original Report in this matter (D.B., G.D., J.G., V.R., B.T., L.T., and T.W.).  I had access to sufficient information regarding I.C. to reach the conclusions in this report.  My methodology and review of information concerning I.C. is described in detail below.

### A.    Methodology

15.    As with the other youth I have evaluated in connection with this matter, I reviewed I.C.'s developmental, family, school, and service histories, including significant life events, and analyzed his strengths and needs, including whether he needs ICBS.  I was provided with a variety of records, including records maintained by I.C.'s treatment providers, school records, and records concerning I.C.'s juvenile justice system involvement and placements.  I reviewed these records, and they provided information about I.C.'s developmental history, family history, clinical presentation including diagnoses, treatment provision history, case management services, contacts with juvenile authorities, and out-of-home placements.

16.    I also interviewed I.C. and his mother to ask them questions about the services they received, their perceived treatment and support needs, and their experiences interacting with service providers.  Due to the ongoing COVID-19 pandemic, I conducted my interviews through videoconference and phone.

### B.    Summary of I.C.

17.    Below, I summarize I.C.'s background and my findings.  I then describe the treatments and supports that were or were not provided to I.C.  Finally, I explain my conclusions, which are that I.C. (1) has a serious emotional disturbance; (2) needed and continues to need ICBS; (3) has been harmed by the lack of access to ICBS; and (4) has been unnecessarily institutionalized and remains at risk for further unnecessary institutionalization.

*Background*

18.     I.C. is an 18-year-old Black male from the District who is currently under the custody of the Department of Youth Rehabilitation Services ("DYRS").

19.     I.C. is a lifetime resident of the District of Columbia-Maryland-Virginia region. During his childhood, he primarily resided with his mother, who has lived and still lives in the District.  His records indicate a normal developmental history with respect to his gestation, birth and delivery, and infancy.  He met all developmental milestones within normal timeframes and did not have major medical problems or sensory impairments.  I.C. attended preschool at Stanton Road Elementary School.  Around age four, I.C. began to exhibit "temper tantrums" and conflicts with peers.  He began to report not wanting to attend school and began resisting school attendance.

20.     I.C.'s behavioral challenges reportedly increased in severity over a period of about two years, resulting in his initial referral for a psychoeducational evaluation.  The report from that evaluation, dated January 24, 2011, summarized the results of intelligence, achievement, and psychopathology assessments.  At the time of the 2011 evaluation, I.C. exhibited several positive behaviors and qualities, such as his sense of humor, his fondness for his mother, and his interests in physical activity and play.  He also exhibited several areas of concern:  risky behavior such as running out of the home and into the community when he was distressed, aggressive verbal and physical behavior, and an oppositional attitude and response to direction from adults.

21.     Records indicate that in his early school years, I.C. did not have significant problems with academic performance.  However, his emotional and behavioral challenges had already resulted in a total of eight days of suspension from school at the time of the 2011 report (when he was six years old).  Interviews with his educators show that I.C. struggled with attention and concentration, hyperactivity, peer conflict, and completing tasks.  His relationships with

teachers varied; his records and his statements to me indicate that he developed good rapport with some teachers, but at other times he struggled to develop rapport, and records characterized him as "disrespectful and noncompliant with directives" at times.  Reports indicate that although I.C. wanted to have friends, and was capable of friendly behavior, he struggled with resolving conflicts and tolerating perceived peer rejection, and at times he preferred to play alone rather than interact with peers.

22.     The 2011 evaluation indicates that I.C. had a full-scale I.Q. of 69, which fell into the extremely low range.  The evaluation also shows differences in his abilities.  He scored highest on measures of processing speed and verbal comprehension, while he scored lowest on measures of nonverbal reasoning and working memory (i.e., short-term memory).  His academic achievement testing results were generally consistent with his I.Q. test results, with most results falling into the low-average to extremely low ranges.  His grapho-motor abilities (i.e., hand-eye coordination for fine motor tasks) fell roughly into the average range.

23.     Other non-cognitive testing described in the 2011 evaluation reveals themes of conflict, aggression, insecurity, and immaturity.  For instance, the report notes that I.C. appeared to be particularly sensitive to, and consumed by, feelings of rejection.  The evaluators recommended that I.C. receive special education services, consultation with a psychiatrist, supportive counseling, and a more in-depth clinical evaluation of his "emotional issues."  They also gave him a referral for occupational therapy, recommended he be placed in a small and highly-structured classroom, and recommended conducting a functional behavior analysis and the use of a behavior modification plan.  Lastly, the evaluators noted that integrating physical activity

opportunities during the day, at school, and at home could help I.C. engage in pro-social activities[1] with his siblings.

24.     Following the 2011 evaluation, I.C. received special education services.  He was made eligible for special education due to his emotional disturbance.  School records noted that many of I.C.'s academic challenges were attributable to emotional dysregulation and poor frustration tolerance, rather than an inability to learn.  Despite the records' characterizations of the relative contributions of I.C.'s social-emotional difficulties to his academic challenges, these records do not show that his historically low full-scale I.Q. testing results were taken into account, either with respect to the broader conceptualization of I.C.'s challenges and strengths, or with respect to his needs for supports or accommodations related to cognitive impairment specifically. He received relatively intensive services, including a dedicated one-on-one aide.  He also received behavioral supports[2]  at school and on the school bus.

25.     However, it does not appear that I.C. was ever provided a comprehensive, direct functional behavior assessment to ascertain what is driving and maintaining his behaviors, pro-social behaviors that could be substituted, and relevant and effective reinforcement strategies. I.C.'s educational records were replete with incident reports, including incidents that resulted in school personnel calling the police on I.C.  His records also show dozens of incidents in which he was subject to physical restraint.  Despite the unusually high volume of incident reports and use of restraint procedures, the records do not indicate that any type of comprehensive review was conducted to determine why these incidents continued to occur and what strategies could be used

---

[1] Pro-social activities are those that promote pro-social behavior, which is behavior characterized by a concern for the feelings and welfare of others and benefits other people or society as a whole.

[2] Behavioral supports are strategies and actions to prevent or decrease unwanted behaviors and/or increase pro-social behaviors.

as alternatives to behavior support approaches that were clearly failing.  I.C. reported to me that he felt that school personnel did not use de-escalation techniques, such as verbal communication, before launching into physical holds or other more restrictive and punitive strategies, such as contacting law enforcement.

26.     For example, a June 6, 2019 student behavior report created by staff at the Pathways Schools describes an instance where "[I.C.] brought balloons to school.  He was blowing them [sic] and popping them and filling them up with water and popping them."  The report details staff efforts to get I.C. to put the balloons away, first demanding that he put them away, then attempting to negotiate exchanging the balloons for food. However, these attempts failed and the situation escalated until the staff called the police.  When the police arrived, I.C. attempted to jump out of a window.  He was handcuffed and taken to the police station.  He was fifteen years old.

27.     Many other incident reports describe a similar pattern to the aforementioned example:  I.C. would exhibit a mildly disruptive, but not dangerous, behavior, staff confronted him aggressively, and it resulted in escalation that typically ended in staff placing their hands on I.C. The physical contact between staff and I.C. reliably resulted in even more intense resistance and distress exhibited by I.C., which staff often responded to by escalating their use of physical restraints, such as physical holds by multiple staff.  Records of these restraint episodes show that I.C. would often cry and ask to be let go when he was restrained.

28.     Troublingly, many incident reports detailed I.C.'s suicidal ideations, including statements that he wanted to kill himself, and efforts to obtain means to harm himself (for example, by reaching for extension cords that he could use to strangle himself).  These records do not indicate that any type of crisis intervention was developed or utilized specifically to respond to his suicidal ideation or episodes of aggressive behavior that placed I.C. at risk of harming himself.

Remarkably, it did not appear that I.C. was referred for assessment of his suicidal ideation, despite the records showing that he repeatedly made statements that he wanted to kill himself, that he had significant impulsivity, and that he was clearly emotionally distressed.

29.     Records also mention vague "external factors" that appeared to be affecting I.C.'s behavior, mood, and sleep, but the records do not show that these "external factors" were investigated.  He reported difficulties with sleep, and records note that at times he slept for hours at school.  It did not appear that this information was appropriately highlighted and communicated to I.C.'s mother or his medical providers.  When I interviewed I.C., he reflected that the sleepiness he experienced at school may have occurred because his "medication was wearing off."  It is not uncommon for children with attention deficit-hyperactivity disorder ("ADHD") to experience fatigue and sleepiness during the afternoon and evening as a result of waning medication levels, though this depends on the specific type of medication and timing of administration.  If the school had communicated to I.C.'s medical prescribers regarding his sleepiness at school, it is possible that the provider could have made adjustments to the medication to resolve the problem.

30.     Records also indicate that I.C. may have experienced events that would qualify as traumatic stressor events, as defined in the Diagnostic and Statistical Manual, Fifth Edition, Text-Revision.  For example, records indicate that I.C. reported that a person tried to rob him and put a gun in his face.   He also experienced symptoms potentially indicative of trauma-related psychological disorder, such as dysregulated anger, sadness, and sensitivity to rejection.

31.     I.C. began having contact with juvenile justice authorities by age 12.  Although he initially tended to receive probation or diversion, he was ultimately committed to DYRS custody by the District of Columbia Family Court in late 2020.  He has remained under DYRS custody through the time of my interviews with him.  While under DYRS custody, he was detained at the

Youth Services Center ("YSC") in 2021, and then stepped-down to a shelter house (group home alternative to detention) before being detained at YSC again.

32.     As with many youth in the District, when I.C. was removed from his home and placed in restrictive settings, the quality and type of special education services provided to him decreased markedly.  In addition, during the COVID-19 pandemic, I.C. was provided with packets of material to complete independently, and he reportedly encountered barriers to accessing virtual education services.  That is contrary to the identified needs and interventions described in his IEP.

33.     It appears that in the past year, I.C. has shown some improvement, although it is not clear that the improvement is attributable to intervention, rather than typical adolescent development associated with psychosocial maturation.  At the time of my first interview with him (April 2022), he had been residing at New Beginnings, a secure residential treatment facility operated by DYRS, for about nine months.  At the time of my last two interviews with I.C., he had been discharged by DYRS from New Beginnings to a foster home in a suburb of Baltimore. Although he had not been in the foster home for more than a few weeks, he made positive statements about this placement to me, in contrast to statements he made to me about his desire to be discharged from New Beginnings.  Regarding the improvement that I.C. experienced at New Beginnings and the foster home, I.C. stated that school has historically been difficult for him, though he said that, "if they are teaching me in a way that I can learn, I'll understand it."  It appears that interpersonal aspects of his education were important factors as well; for example, I.C. stated that his ability to master material and his motivation varied based on whether or not he "got a good relationship with somebody."  He reported that he had attended his most recent IEP meeting, and he reported that the IEP was explained to him in a way that was understandable.  He was also asked for his input prior to the meeting, and he appeared to appreciate that.

34.     Overall, it appears that I.C. and his mother believed the structured environment of New Beginnings provided some benefits.  Part of this may be due to the relationships he has made, as he stated that he had good relationships with a teacher, a treatment provider, and an attorney.  However I.C. said he was anxious to be discharged from New Beginnings.

35.     I.C. also indicated that he recognized some of the expectations for his community behavior, including attendance at school and doing "what I'm supposed to do at foster care."  However, he did not have much knowledge of what he was "supposed to do" specifically.  He stated that he still does not have a crisis plan.

36.     Records indicate—and I.C. has reported—that I.C. has relatively longstanding diagnoses of bipolar disorder and ADHD, as well as co-occurring symptoms of depression and anxiety.  He has been treated with stimulant medications for his ADHD, and was taking stimulant medications at the time of my interviews with him.  When I asked I.C. about his experience with prescribing professionals, he indicated that he had not had difficulty obtaining medication or refills, and he was satisfied with his treating provider's explanations of the benefits and risks of medication.  However, he did state that, although he was asked "how would you feel about this and that," in his experience, his "input didn't really have no say-so."  Additionally, despite his mood problems and a recommendation that he be prescribed a mood-stabilizing medication, it does not appear that he has received trials of mood-stabilizing or anti-depressant medications since the mood-stabilization medication recommendation was offered by Dr. Susan Theut.

*Findings*

37.     As noted in the foregoing, I.C. carries a bipolar disorder diagnosis.  Bipolar disorder is a serious mental illness that affects a person's emotion regulation, energy levels, sleep, impulsivity, and executive functioning.  Bipolar disorder can be disabling for some individuals.

In addition, for younger people it is particularly important to carefully supervise the course and patterns of their symptoms in order to identify new psychopathology that emerges, whether symptoms worsen, and how they respond to treatment interventions.

38.     I.C. has had significant impairment at home and at school, and the lack of appropriate services has resulted in contact with juvenile justice authorities, as well as out-of-home placement in restrictive settings, including detention and residential treatment.

39.     I.C. has not been provided with tailored, individualized, evidence-based interventions and supports that would have prevented not only many (potentially all) of his out-of-home placements, but also would have prevented many—if not nearly all—of the incidents involving the use of restraints.  Specifically, he would have benefitted from a direct functional behavior analysis,[3] with observations and recommendations for home and school.  He would also have benefitted from collaboration and communication between his medical providers and his treatment and educational service providers.  In-home counseling that addressed skills deficits and included psychoeducation would have benefitted him by providing him the opportunity to develop rapport with a mental health professional who could provide guidance to him and to his mother about how to best monitor and treat his mood symptoms.  In-home counseling would have also facilitated regular observation of I.C.'s mood, energy, and executive functioning over time and enabled providers to ascertain patterns in them.

---

[3] A functional behavior analysis is a process for identifying problem behaviors and the reasons for those behaviors, and developing interventions to improve or eliminate those behaviors.  A *direct* functional behavior analysis involves the assessor directly observing the individual and contemporaneously documenting information that is observed.  This is in contrast to an *indirect* functional behavior analysis, which tends to rely more on interviews with adults and a review of existing records.

*Treatments and Supports Provided*

40.     I.C. has educational records that reference strategies for behavioral support. However, these records largely focused on documenting crises and other critical incidents, rather than describing plans for resolving the causes of his challenges or a methodical review of why the previously-utilized behavioral support strategies were consistently failing.  He had some mental health evaluations as a younger child; however, it appears that the recommendations from the evaluators were not consistently implemented.  April 2022 IEP records indicate that I.C.'s current school has a school-wide behavior management program.  However, school-wide supports are not individualized to account for I.C.'s specific needs.  The April 2022 IEP records also reference an "updated Functional/Behavioral plan."  However, the records provide no detail regarding when the plan was updated, what the plan entails, anticipated date for updating the plan in the future, or hypotheses that were developed to explain the function of I.C.'s behaviors.  I did not review information showing how I.C.'s instructors and support personnel would be trained on any behavior support plans for I.C.

41.     I.C. has been treated in recent years in a secure residential placement facility (New Beginnings), and he has been held at youth shelter houses due to his juvenile justice system involvement.  He evidently received some therapy sessions, although the treatment typically ceased upon leaving the detention or other residential setting.  When he has been suicidal in the past two years, the intervention appeared to be limited to placement on suicide watch, which is not a therapeutic intervention.

42.     Most of the medication treatment that I.C. has received appears to have been focused on treating his ADHD, as opposed to his mood problems.  In August of 2021, Susan Theut, M.D., M.P.H. conducted a psychiatric evaluation, and she specifically recommended that he be

prescribed a mood-stabilizing medication. However, it does not appear that he has taken a mood stabilizer since this recommendation was made. None of the information I reviewed shows that I.C. has opposed taking medication in recent years, and at the time of my interviews with him, I.C. was taking two medications (for ADHD), so it does not appear that I.C. is generally opposed to taking medication.

43.     Dr. Susan Theut also recommended functional family therapy, regular meetings with a psychiatrist, individual therapy at a frequency of two times per week, and group therapy with other youth. It appears that I.C. has received some of these services at New Beginnings, namely some counseling and medication management; however, it does not appear that functional family therapy was implemented or that a plan was created to connect him with functional family therapy services upon his return to the community.

*Treatments and Supports Not Provided*

44.     Many necessary treatments and supports were not provided to I.C. For instance, as I explain in the following paragraphs, I.C. did not receive an evidence-based direct functional behavior analysis or a crisis plan. He did not receive therapeutic treatment that, along with a crisis plan, would have addressed his suicide risk. He did not receive evidence-based trauma assessment. He has not been referred for an application to the District's Medicaid waiver program so that he could receive services for persons with intellectual or developmental disabilities. And his I.Q. and executive functioning deficits were not taken into account when planning his treatment.

45.     The two most striking deficiencies regarding I.C.'s treatment are the absence of an evidence-based direct functional behavior analysis, and the absence of a crisis plan. It is remarkable that a youth could experience the sheer number of critical incidents, use of restraint, and disciplinary responses without some kind of methodical, empirical behavior analysis. Instead,

the records reflect that the same traumatic, confrontational, and ineffective responses, such as physical holds by multiple staff, were utilized for years.

46.     It is also remarkable that throughout this whole time, providers have failed to create a crisis plan for I.C.  A crisis plan would have reduced the risk of aggressive or elopement behavior. For instance, I.C.'s mother reported that as a younger child, I.C. would at times become acutely distressed and impulsively flee his home into the community.  His mother would then have to drive around looking for him.  A crisis plan could also have addressed suicidal ideation as well as risky behavior arising from episodic increases in elevated mood symptoms (i.e., bipolar disorder).

47.     In addition, the failure to effectively manage I.C.'s suicide risk using evidence-based strategies has put his life in danger.  The records document at least a dozen disclosures of suicidal ideation by I.C.  In addition, I.C. has acted on his suicidal ideation at least two times.  He was reportedly hospitalized around age 12 after a suicide attempt wherein he put a bag over his head.  And in 2021, at age 17, he reportedly attempted to hang himself in his room while detained at the Youth Services Center.  Rather than give I.C. therapeutic intervention or create a crisis plan with him, providers placed him on suicide watch or ignored his disclosures.  At the time of my interviews with him, I.C. still did not have a crisis plan.

48.     I also saw no indication in I.C.'s records that he was formally evaluated using an evidence-based trauma assessment.  This is in spite of his history of traumatic stressor events and symptoms consistent with a trauma-related psychological disorder.

49.     It is not clear whether I.C. has been referred for an application to the District's intellectual disability ("ID") Medicaid waiver program.  His historical testing results and records strongly support a possible ID diagnosis, and in my opinion he is likely eligible for the waiver. The Medicaid waiver could provide funding for transportation, housing, residential supports

(including direct care staff), psychiatric treatment, psychological and behavior management interventions, job training, and job coaching, as well as other supports.  These Medicaid waivers are intended to prevent institutionalization of individuals with disabilities such as I.C.'s by funding supports that enable them to live safely in the community.

50.    The information I reviewed also did not show that treatment providers took I.C.'s documented low I.Q. and executive functioning deficits into account during treatment planning. For example, recommendations for treatment did not acknowledge his low I.Q. or describe how his cognitive limitations might be accommodated during counseling sessions or as part of other behavior supports.  This could be important, because certain forms of treatment, like introspective talk therapy, are often ill-suited for individuals with cognitive limitations.

51.    Moreover, some of I.C.'s educational documents mischaracterize I.C.'s academic achievement results, describing them as falling into the average or low-average range.  However, I.C.'s scores have primarily fit into the low-average to extremely low ranges;  for example, he performed at a third grade level in reading and math, at age 15.  Such a mischaracterization prevents I.C. from receiving proper treatment and is part of an overall pattern of failing to appropriately integrate information about I.C.'s cognitive functioning into educational and treatment planning.

*Conclusions Regarding I.C.*

52.    <u>Serious Emotional Disturbance</u>:  I.C. meets the District's definition of serious emotional disturbance based on his diagnosis of bipolar disorder.  His bipolar disorder has limited, and continues to substantially limit, I.C.'s functioning in family, school, and community activities. It has also limited, and continues to limit, I.C. from achieving developmentally appropriate social, behavioral, cognitive, communicative, or adaptive skills, such as independent living skills, self-

advocacy skills, and skills needed to independently manage his mental health symptoms and treatment.

53.     ICBS Needs:  I.C. needed and continues to need ICBS, including intensive care coordination, intensive behavior support services, and mobile crisis services.

54.     I.C. needed and continues to need intensive care coordination.   Intensive care coordination is an intensive form of case management in which a "child and family team," including the child, the child's family, services providers, and others, designs and supervises a plan that provides and coordinates services.  This would have incorporated input from I.C. and his mother into I.C.'s treatment plan, which is necessary for a well-informed approach.  It also would have included the coordination of multiple providers and services, which helps ensure the providers and services are working together and that services and information do not fall through the gaps.  For instance, I.C. was taking medication, but it does not appear that he has received psychoeducation about how to effectively monitor his mental health symptoms, and what to do if he notices a significant change in his mental health.  In addition, a survey of I.C. indicated that assistive technology for communication purposes may be useful.  However, I.C.'s full IEP flatly states that assistive technology is not needed, without reference to an assistive technology assessment or other rationale.  There is a gap between what is recommended and what is implemented.

55.     Intensive care coordination is especially important with respect to transition planning.  I.C. needs, and will continue to need, intensive care coordination to facilitate his transition between settings and prepare him for adulthood.  For example, I.C. is currently adjusting to community living in a foster home after months of residing in a secure residential treatment facility.  However, it does not appear that the foster family is engaged in functional family therapy.

I.C. also indicated that he had obtained employment in food service, but it does not appear that he was engaged in structured transition planning for his needs as a young adult in the community. I.C. told me that he has recently toured a new school, with hopes of attending.  He will need intensive care coordination to support his transition to that school and his subsequent transition to becoming an independent young adult in the community.

56.     I.C. has also needed (and has not received) intensive behavior support services, and he continues to require access to intensive behavior support services.  Intensive behavior support services are individualized therapeutic interventions provided on a frequent and consistent basis that are designed to improve behavior and are delivered to children and families in any setting where the child is naturally located.  Given the cyclical nature of bipolar disorder symptoms, it is particularly important that I.C. have flexible access to intensive behavior support services, because his need for those services is likely to vary according to the intensity of his symptoms.

57.     I.C. has needed mobile crisis services in the past, and he continues to need them now.  Mobile crisis services are mobile, onsite, in-person responses, available at any time or place to a child experiencing a crisis, for the purpose of identifying, assessing, and stabilizing the situation and reducing any immediate risk of harm.  It is my view that if I.C. had access to such services, many incidents of restraint could have been avoided.  For example, instead of staff escalating a situation when I.C. is experiencing crisis, and placing him in physical holds and/or calling the police, a mobile crisis service could have been called, and that team may have employed more effective strategies to address the situation.  The use of mobile crisis services can also help avoid psychiatric hospitalization, because mobile crisis services may be able to stabilize the situation and reduce risk of harm to oneself.  I.C. also needs mobile crisis services in the future, in the sense that mobile crisis services are likely to be needed as a component of crisis planning for

I.C., although the objective of appropriate and tailored crisis planning will be to avoid escalation to the point at which I.C. might need mobile crisis services and/or psychiatric hospitalization.

58.    <u>Harm Arising from Lack of Access to ICBS</u>:  I.C. has been, and continues to be, harmed due to the lack of access to ICBS.  In addition to the harms described in the previous section (ICBS Needs), the lack of access to ICBS has negatively impacted I.C.'s education, resulted in unnecessary out-of-home placements, deprived him of necessary transition planning, and put his life at risk.  These harms are also ongoing.

59.    ICBS would have integrated I.C.'s behavioral and mental health needs with his education plan.  It also would have reduced the number of incidents that led to suspensions and out-of-home placements, which interrupt schooling.  While in the custody of DYRS, I.C. reportedly received substandard educational accommodations for his disabilities, such as work packets that he was expected to complete independently without the accommodations specified in his IEPs.  ICBS also may have prevented DYRS custody in the first place.

60.    In my opinion, many—potentially all—of I.C.'s out-of-home placements could have been prevented through implementation of ICBS, because it would entail evidence-based behavioral assessments and interventions, in combination with crisis planning.  Instead, he experienced one crisis after another, resulting in reduced educational access, difficulties in his family and peer relationships, and placement in detention and residential treatment settings that removed him from his family and community-based interventions.

61.    I.C.'s needs for transition planning are described in the foregoing.  Without such transition planning, he is deprived of the opportunity to learn how to safely participate in the community and live independently.

62.     The lack of access to ICBS has also put I.C.'s life at risk.  The therapeutic interventions and crisis planning that would be provided as a part of ICBS would better address I.C.'s suicidality.  I believe this could have prevented some of his suicide attempts.  Additionally, his placement in detention settings (which may have been avoided if ICBS was provided) created barriers for I.C. to access therapeutic interventions to decrease acute suicidality and generate crisis planning that could have decreased the probability of future episodes of suicidality.  Staff at carceral environments such as youth detention typically respond to suicidality in a punitive fashion, for example, by placing the individual experiencing suicidal crisis on suicide watch, rather than treating them.  As reflected in Dr. Susan Theut's report, I.C. reported that he was placed on suicide watch while detained in Upper Marlboro (the detention facility name was not specified).  Suicide watch is not therapeutic, and the individuals I have evaluated who have experienced being placed on suicide watch describe it as punitive, degrading, and emotionally painful.  The punitive nature of suicide watch also inhibits the likelihood that an individual will disclose suicidal ideations.  Typically when an individual is placed on suicide watch, they are isolated in a bare and unfurnished room, often without even a mattress.  Their clothing is restricted to a paper gown or a "suicide smock."  Their food choices are restricted to finger foods.  Their ability to participate in educational, recreational, social, and therapeutic interventions is highly restricted, or not permitted at all.  And they are typically under near-constant surveillance.  In some suicide watch settings, the lights are left on for 24 hours a day, which is particularly harmful to youth with mood disorders, like I.C.

63.     Institutionalization:  I.C. has already been needlessly institutionalized, and he remains at risk of future needless institutionalization due to a lack of access to ICBS.  I.C. has been held in youth detention, been placed in residential treatment facilities for months, has been placed

in out-of-home detention alternatives like shelter houses, and has also been committed to DYRS custody since 2020.

64.     Many—potentially all—of these institutionalizations could have been avoided if I.C. had received ICBS.  For instance, records indicate that I.C. reported an increase in mood symptoms, such as irritability and impulsivity, just before many of his arrests.  This strongly suggests that better management of his psychiatric symptoms could have prevented conduct that resulted in his arrests, detention, and commitment to the custody of DYRS.

65.     I.C. has also reportedly received treatment at Children's National Hospital and reportedly was hospitalized at the Psychiatric Institute of Washington ("PIW").  Without the medical records from Children's National or PIW, I cannot currently comment on the appropriateness of that treatment/hospitalization or the likelihood that they could have been avoided with ICBS.

66.     Moreover, I.C. remains at risk of needless institutionalization because of inadequate treatments and his prior justice system involvement (which itself could likely have been avoided had I.C. received ICBS).  Future hospitalization may be avoidable if I.C. is provided with sufficient crisis planning and other community-based interventions associated with ICBS.  In addition, exposure to the justice system at a young age increases a youth's likelihood of continued justice system involvement.  I.C. has had exposure to the justice system since a young age.  I.C. also remains in custody of DYRS, which increases his likelihood of institutionalization.

### C.     Observations

67.     In my July 18, 2021 report regarding several District youth, I detailed my observation of six broad trends that appeared consistently across the youths' cases: (1) a lack of engagement of family members by providers; (2) inadequate assessment procedures; (3) a lack of trauma treatment; (4) insufficient rationales for restrictive residential placements; (5) a lack of

crisis planning; and (6) a lack of appropriate treatment contributing to increased contact with juvenile justice authorities.  My observations regarding I.C. are largely consistent with these trends.

### 1.   Lack of Engagement of Family Members By Providers

68.   I.C. and his mother were insufficiently engaged by providers.  Although I.C. and his mother noted that their input was sometimes sought out for meetings such as IEP meetings, both noted that their suggestions were often not integrated into the treatment that was actually delivered.  For instance, I.C. stated that he wished that providers would not ask him what services he needed because he did not feel that his input resulted in meaningful responses: "like, when I asked, if I asked for something, and you tell me something and you say … 'We got this type of program,' and I say, 'Alright, I'm gonna think about it,' and then I tell you and you say, 'We can't give you this type of program.' You told me you got something, and when I tell you what I want to do, you said that you don't got it."

69.   Proper engagement would result in greater access to information about I.C.'s strengths and resources.  Records did not detail explicit consideration of I.C.'s strengths and resources with regard to how those positive characteristics could be integrated into educational and clinical intervention planning.  For example, records indicate, and I.C. reports, that he performed better when he was able to establish rapport with teachers and providers.  This information could be used to develop intervention plans that capitalize on the most positive and supportive relationships in I.C.'s life, across settings.

70.   In addition, I.C.'s mother reported that she had insufficient information about her son's treatment processes and the rationales behind them, stating,

> I really don't even know the details of like, him going to residential.  They made it seem like DYRS sent him there for safety purposes.  That is why he is not allowed to come into DC, even for appointments.  It is crazy but him on a residential was

kind of, I believe, that the only reason, he didn't have no choice but to go there. But back on, to, I don't know of, there could have been other services they could have connected him to, to get a job, but they didn't explore those services, or we didn't know of them.

I.C.'s mother stated that she had to do her own "legwork" to a significant degree, and she indicated that providers often did not respond to her calls.  She stated that she contacted the mayor of the District of Columbia in an effort to communicate her frustration and to seek help obtaining services for her child.  However, this outreach does not appear to have produced a meaningful change in I.C.'s circumstances.

71.     I.C. also states that he would like to return to his mother's home, but he does not know when he will be permitted to do so, nor does he know the specifics of any plan.  I.C. indicated that he was told that he was supposed to "go to school, do what I was supposed to do at foster care. They gonna have different types of programs."  I.C. appears to understand that there is a plan of some kind, that he will be provided with programs, and that there will be behavioral expectations of him.  However, he stated that he did not have information about what programs he might have access to, what his options would be with respect to treatment, and the specific behavioral expectations of him across settings.

## 2.     Inadequate Assessment Procedures

72.     There were three main issues with I.C.'s assessment history.  First, as explained in the foregoing, I.C. did not receive an evidence-based direct functional behavior analysis.

73.     Second, I.C. did not receive a thorough assessment for a possible diagnosis of intellectual disability ("ID"), despite his consistently low full-scale I.Q. scores and low academic achievement.  I.C.'s mental health providers need to understand whether and how his cognitive strengths and weaknesses, and his adaptive functioning, should be accommodated as part of their provision of behavioral interventions.  I.C.'s current transition plan, as reflected in his April 2022

IEP records, includes acknowledgment of skills gaps with respect to I.C.'s adaptive functioning. A thorough assessment of ID would include assessment of his adaptive functioning, which could then be used to inform the specific goals and interventions that could be used to overcome the skills gap. In addition, I.C. needed and continues to need a standardized adaptive functioning assessment, because impaired adaptive functioning is a required element to establish eligibility for a Medicaid waiver based on an ID diagnosis.

74.   Third, records do not show that I.C. was formally evaluated using evidence-based trauma-related assessments as part of a differential diagnosis process.[4] I.C. described witnessing community violence, and this was recorded in his records. For example, records state that I.C. reported that someone tried to rob him and put a gun in his face. He has also experienced numerous episodes of use of restraint by adults (the negative effects of the use of restraint are detailed in my July 18, 2021 report). These events can cause psychological trauma, including trauma-related psychological disorders. He also exhibited significant problems with dysregulated anger and sadness, both of which can be symptoms of trauma-related disorders. However, his records do not indicate that he was formally evaluated using evidence-based assessments, such as the Trauma Symptom Checklist for Children. Such an evaluation could uncover I.C.'s trauma-related cues,[5] which could be relevant for understanding I.C.'s historical response to confrontation, criticism, and physical restraint use by adults. Because this has not been methodically explored via transparent

---

[4] A differential diagnosis process is a method of analysis to distinguish the relative contributions of different mental disorders to the clinical picture for a particular person. Sometimes a differential diagnosis process is used to determine which diagnoses are appropriate and which are not.

[5] Trauma-related cues are stimuli that evoke recollections, and thus responses, associated with past traumatic events. For example, a person may encounter a smell or sound that they associate with a past traumatic event, and experience acute distress because the stimulus reminds them of a distressing past experience.

and standardized assessment procedures, providers, I.C., and his family, are left without that potentially vital information.

### 3.     Lack of Trauma Treatment

75.     As noted above, I.C. has not received the type of evaluation that would provide information about his suitability for trauma-focused treatment such as Trauma-Focused Cognitive Behavioral Therapy.   Therefore, I cannot make a conclusion as to whether I.C. has received *sufficient* trauma treatment.   However, records do not indicate that I.C. has received evidence-based trauma treatment.

### 4.     Insufficient Rationales for Residential Placements

76.     The information I received did not show that there was a valid clinical and risk-management rationale for most of I.C.'s out-of-home placements, especially his placement at New Beginnings.  Placement in a secure residential treatment facility, such as New Beginnings, is rarely appropriate for children, because it segregates them from their non-disabled peers, aggregates youth with psychiatric and behavioral difficulties in settings where they can exert negative social influences on one another (sometimes referred to as deviancy training), does not permit children to learn and practice new skills in the same environments where they will ultimately need to use them, and rarely permits close contact with the child's sources of social support, such as their family members.   Additionally, research does not support the view that more restrictive settings produce better clinical or risk-related outcomes for children and adolescents.   Moreover, because the setting is so restrictive, the process undertaken to determine the child's treatment and placement needs should be comparably intensive.   Specifically, restrictive institutional placements should not be implemented for youth like I.C. without DYRS first undertaking a comprehensive evidence-based risk assessment process completed by a qualified evaluator with expertise and training in juvenile risk assessment, who can recommend whether there are less restrictive

alternatives to providing treatment in facilities like New Beginnings, and offer consultation to members of the child's treatment or education team.

77.     I.C.'s treatment needs and risk-management needs could have been effectively addressed in the community, and he was not provided with the opportunity to benefit from ICBS before he was placed in secure residential placement.  I.C.'s residential placements have occurred through DYRS and juvenile justice systems, but in my view it is likely that these placements could have been avoided had appropriate, individualized, and evidence-based interventions (i.e., ICBS) been offered to him earlier in his life.

### 5.     Lack of Crisis Planning

78.     I.C.'s case is particularly striking in regard to the lack of crisis planning and the potential for disastrous consequences.  He has a history of potentially lethal suicide attempts while in detention-type settings, and his records show that he made suicidal statements at times when he was highly distressed, yet he has not received evidence-based suicide risk management and has generally had his cries for help either punished or ignored.  A child who is communicating suicidal intent, has a history of high lethality-risk attempts, and who has a severe mood disorder like bipolar disorder is at significantly increased risk of serious injury or death.  Bipolar disorder on its own confers significantly elevated risk of suicide attempts and completed suicide.  It is remarkable that a child with I.C.'s history and mood disorder has not been provided with crisis planning.

79.     Additionally, records indicate that I.C. reported an uptick in elevated mood symptoms occurring prior to the incidents that resulted in petitions/criminal charges.  It is possible that crisis planning could have reduced the risk of those incidents and his risk of contact with juvenile justice authorities and placement in detention.

### 6.    Lack of Appropriate Treatment Contributing to Increased Contact with Juvenile Justice Authorities

80.    The lack of ICBS likely increased I.C.'s contact with juvenile justice authorities. I.C.'s serious mental health and behavioral challenges emerged before he was six years old.  By age 12, he had initial contact with juvenile justice authorities.   And by the time I interviewed him, he had nearly 20 juvenile justice contacts.  I believe the lack of appropriate and effective treatment and crisis planning by a child and family team including I.C. and his mother contributed to his contacts with juvenile justice authorities and difficulties navigating juvenile justice systems effectively.   For example, school records show a pattern of failed responses to I.C.'s emotional, social, and behavioral challenges.  This resulted in school personnel calling the police and I.C. being arrested for relatively minor initial behaviors.

## IV.    CONCLUSIONS

81.    I.C. is enrolled in the District's Medicaid program.

82.    I.C. has a serious emotional disturbance, as that term is defined in the District regulation that is cited in the Complaint.

83.    I.C. needed and continues to need ICBS.  The lack of ICBS has curtailed his life opportunities and inadequately addressed his suicidality.

84.    I.C. has been unnecessarily institutionalized, and he remains at risk for unnecessary institutionalization.

_____
Sára Boyd, Ph.D.

_____June 24, 2022_____
Date

28

# APPENDIX 1



**Sara Boyd, Ph.D.** Licensed Clinical Psychologist

**ph:** 571.317.0979 | **fax:** 844.598.6534

*Institute of Law, Psychiatry, & Public Policy at the University of Virginia, &*
*Boyd Forensic Psychology  Services, LLC*

## EDUCATION

**Graduate:**

**Doctor of Philosophy,** Clinical Psychology**,** University of Kentucky, August 2013.

**Master of Science**, Clinical Psychology, University of Kentucky, 2010.

**Master of Science**, Counseling Psychology, University of Kentucky, 2005.

**Certificate in Developmental Disabilities**, University of Kentucky, 2005.

**Undergraduate:**

**Bachelor of Science**, Psychology, University of Illinois, May 2003.

## PROFESSIONAL LICENSES & CREDENTIALS

**Diplomate, American Board of Professional Psychology (ABPP), Forensic Specialty**, November 2019 to present. Diploma no. 9023

**Licensed Clinical Psychologist**, Virginia Department of Health Professionals, July 3, 2014, to present. License number: 0810005036

**Licensed Clinical Psychologist**, District of Columbia Department of Health Professional Licensing, February 10, 2015, to present. License number: PSY1001030

**Licensed Clinical Psychologist**, West Virginia Board of Examiners of Psychologists, August 24, 2016, to present. License no. 1149

**Licensed Psychologist**, Kentucky Board of Examiners of Psychologists, October 20, 2020, to present. License no. 251807

**National Register Health Psychologist** #54431

## CLINICAL EXPERIENCE & EMPLOYMENT

**Institute of Law, Psychiatry, and Public Policy, University of Virginia Health System, Licensed Clinical Psychologist/Forensic Evaluator.** Charlottesville, Virginia. June 2016 to Present.
Providing forensic evaluation and consultation in adult and juvenile criminal and civil matters. Supervising postdoctoral fellows and graduate students, and developing/presenting professional trainings for forensic evaluators and attorneys.

**Woodbridge Psychological Associates, P.C., Licensed Clinical Psychologist,** Woodbridge, Virginia, September 2014 to June 2016.
Providing forensic evaluation and consultation in adult and juvenile criminal and civil matters.

**Institute of Law, Psychiatry, and Public Policy, University of Virginia Health System, Forensic Psychology Postdoctoral Fellow,** Charlottesville and Staunton, Virginia, August 2013 to August 2014.
Postdoctoral fellowship consisted of two primary assignments: Western State Hospital, and the Institute of Law, Psychiatry, and Public Policy forensic clinic at the University of Virginia.

> *Western State Hospital—Virginia Department of Behavioral Health and Developmental Services*
> - Conducted mental state at the time of offense and competency to stand trial evaluations in an inpatient forensic setting.
> - Provide training and consultation on intellectual disability, forensic, domestic/sexual violence, and LGBTQ-related topics for mental health providers.

> *Institute of Law, Psychiatry, and Public Policy*
> - Conducted gender dysphoria evaluations for Virginia Department of Corrections, general psychological evaluations, sex offender risk assessment, violence risk assessment, mental state at the time of offense, and competency to stand trial evaluations in an outpatient forensic clinic.
> - Developed and provided training and consultation services to private and public mental health professionals.

**Westchester Jewish Community Services, APA-Accredited Internship, Psychology Fellow**, Yonkers and Hartsdale, New York, July 2012 to July 2013.
Pre-doctoral Internship at community mental health agency composed of rotations in a treatment and evaluation program for juvenile sex offenders, court assessment program, treatment center for survivors of trauma and abuse, a program for individuals with developmental disabilities (DD), an autism evaluation clinic, and a learning center. Provided consultation to multidisciplinary teams on such matters as psychological assessment, research, and empirically-supported treatment.

> *Treatment Center for Trauma and Abuse*
> - Utilized Skills Training in Affective and Interpersonal Regulation/Narrative Story-Telling (STAIR/NST), Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), Prolonged

Exposure, behavioral activation, and other empirically-based methods to treat child, adolescent, and adult survivors of trauma, sexual and physical abuse, and domestic violence.

- Conducted focal and comprehensive psychological assessments to assist in treatment planning. Provided feedback to clients, families, and clinicians.

*Autism Evaluation Program*

- Assessed and determined diagnoses of adults and children referred due to suspected Autism Spectrum Disorders (ASDs). Utilized ADOS-2, adaptive functioning, intellectual ability, achievement and neuropsychological measures, in addition to in-depth clinical interview, collateral interviews, and record review.

*Developmental Disabilities Program*

- Utilized cognitive-behavioral therapy (CBT) and parent management training interventions with children and adults with intellectual and developmental disabilities (ID/DD) and their families.
- Provided diagnostic clarification, crisis management services, and psychotherapy to individuals recently discharged from inpatient settings.
- Co-led a social skills group for 5- and 6-year-old children with ASDs.

*Juveniles Starting Over Program*

- Conducted risk and safety assessments, including ERASOR, for adjudicated juvenile sex offenders and children and adolescents with sexual behavior problems.
- Provided individual and family therapy to adjudicated juvenile sex offenders and non-adjudicated youth with sexual behavior problems.

*Court Assessment Program*

- Co-evaluated custody/visitation, termination of parental rights, delinquency, abuse/neglect, and probation cases.
- Co-performed specialized evaluations of juvenile sex offenders.
- Consulted to psychiatrists, judges, court staff, and guardians.
- Conducted brief psychoeducational screenings.

*Learning Center*

- Conducted comprehensive and focal cognitive, educational, and personality assessments of children, adolescents, and adults.
- Evaluated individuals with potential learning disabilities, executive function deficits,

Attention-Deficit Hyperactivity Disorder (ADHD), and other psychiatric diagnoses.
- Developed comprehensive educational, social, and vocational recommendations as part of an integrative written report, and provided feedback to clients, families, and clinicians.

**Bluegrass Mental Health/Mental Retardation Board**, **Eastern State Hospital, Forensic/Inpatient Psychology Trainee**, Lexington, Kentucky, June 2010 to July 2011.
Provided forensic assessments to individuals with serious mental disorders in an inpatient setting. Assisted in evaluations of competency to stand trial and criminal responsibility for misdemeanors and felonies. Consulted to psychologists on forensic cases involving individuals with ID/DD. Administered adjunct malingering and neuropsychological testing for the supervising forensic psychologist. Other rotations included assessment and individual and group therapy on a high-risk unit, geriatric/medically fragile unit, and a day treatment program. Developed special expertise in intervention and testing of dually diagnosed consumers with ID/DD and severe mental illness.

**University of Kentucky**, **Harris Psychological Services Center, Graduate Student Therapist**, Lexington, Kentucky, July 2007 to July 2011.
Assessed risk as part of employment screening for weapons-handling personnel at an international security company. Conducted integrative assessments for ADHD and learning disabilities. Provided individual psychotherapy for clients with ASDs, major depression, adjustment disorder, conversion disorder, generalized anxiety disorder, post-traumatic stress disorder, and borderline personality disorder.

**University of Kentucky**, **Harris Psychological Services Center, Social Skills Group Co-Leader**, Lexington, Kentucky, September 2008 to December 2008.
Conducted intakes for potential group members, and co-led a manualized skills-based intervention group for children with social impairments. Met with parents to exchange feedback, and conducted pre- and post-intervention behavioral assessments. Group members had ASD and/or anxiety disorders.

**University of Kentucky**, **Harris Psychological Services Center, Assessment Coordinator**, Lexington, Kentucky, July 2007 to August 2008.
Responsible for all aspects of outpatient clinic testing. Supervised assessments; performed intakes; participated in administrative meetings to determine the appropriateness and disposition of potential clients; reviewed clinic policies and procedures; researched, identified, and ordered new instruments; engaged in community outreach; and maintained clinic assessment records.

**Bluegrass Rape Crisis Center**, **Crisis Counselor**, Lexington, Kentucky, September 2005 to September 2006.
Provided crisis counseling services at a community agency for survivors of sexual assault. Accompanied survivors (including survivors with disabilities) to the local emergency room, provided advocacy and support throughout the medical examination and detectives' questioning, and answered crisis line calls.

**Center for Women, Children, and Families**, **Counseling Psychology Trainee**, Lexington, Kentucky, January 2006 to May 2006.
Led psychoeducational groups for adult survivors of domestic violence who had lost custody of their children and were seeking reunification. Conducted intakes and provided individual CBT to children and adults. Diagnoses included Fragile X and other developmental disabilities, post-traumatic stress, adjustment, acute stress, and major depressive disorders.

## PROFESSIONAL & COMMUNITY SERVICE ACTIVITIES

**Virginia Department of Behavioral Health and Developmental Services, Structured Measures of Intellectual Functioning Review Panel**. Commonwealth of Virginia, 2020 to 2021 (death penalty was abolished in Virginia in 2021).
Invited to join the five-member professional panel, selected by the DBHDS Forensic Evaluation Oversight Manager, to provide guidance with regard to updating the list of psychological measure of intellectual functioning for use in death penalty cases in Virginia, as required by § 19.2-264.3:1.1 and 19.2-264.3:1.2.

**University of Kentucky, Department of Psychology, Diversity Committee Founding Member**, Lexington, Kentucky, February 2012 to August 2012.
Identified need, and assisted in assembling members and faculty support for, a graduate student-led committee to revise departmental policies relating to sexual and gender minority students and Psychology Department clinic clients. Advised faculty and community supervisors regarding training requirements, materials, and procedures. Developed multimedia training materials ultimately implemented in graduate curriculum.

**Project SAFE (Safety and Accessibility for Everyone), Coordinator**, Frankfort, Kentucky, September 2005 to September 2006.
Created project to increase physical and attitudinal accessibility of domestic violence shelters and rape crisis centers in Kentucky. Identified and invited representatives from state agencies addressing domestic and sexual violence, disability rights, and crime victim advocacy to provide project leadership. Scheduled and led meetings. Project SAFE became an ongoing organization and was awarded a three-year Department of Justice Violence Against Women Act grant for $750,000 in 2008.

**Consumer Advisory Council of Kentucky**, **Board Member**, Frankfort, Kentucky, November 2006 to November 2008.
Assisted in senior level decision-making regarding priorities and policies of the Human Development Institute, with special emphasis on creating an inclusive environment for people with disabilities. Reviewed and provided feedback on Institute research, funding, and grant applications. Monitored organization's compliance with the strategic plan.

## RESEARCH EXPERIENCE

**Westchester Jewish Community Services, Co-Principal Investigator**, "Sexual Knowledge and Attitudes of Adolescents and Young Adults with Developmental Disabilities, Before and After a Psycho-Educational Intervention." White Plains and Hartsdale, New York, July 2012 to July 2013.
Co-originated study concept, developed methodology, identified appropriate assessment instruments, and generated hypotheses for a study examining outcomes for adolescents and young adults with ASDs who participated in a psycho-educational healthy sexuality group.Variables included sexual knowledge and attitudes, Axis I psychopathology, and intellectual functioning.

**University of Kentucky, Principal Investigator**, "General Personality, Personality Disorder, Psychopathology, and Adaptive Functioning in Adults with Intellectual Disabilities." Lexington, Kentucky, October 2011 to August 2013.
Wrote literature review, developed study methodology and hypotheses, obtained IRB approval, recruited participants from vulnerable populations, and collected, analyzed, and interpreted data. Dissertation.

**University of Kentucky, Co-Investigator**, "Gender Identity, Sexual Orientation, and Personality." Lexington, Kentucky, September 2012 to 2013.
This project is comprised of three studies examining the relations among non-normative gender identity, personality, and sexuality. Generated research idea, developed study methodology, obtained IRB approval, and collected, analyzed, and interpreted data for study one. Co-principal investigator: Tory Eisenlohr-Moul, Ph.D.

**University of Kentucky, Widiger Personality Laboratory, Graduate Researcher**, Lexington, Kentucky, September 2005 to July 2012.
Administered the Personality Disorder Interview-IV and Structured Interview for the Five Factor Model to participants in studies of personality disorders; generated ideas for laboratory research; co-developed methodology for studies of Five Factor Model personality; coded semi-structured interviews for reliability; read and critiqued papers submitted for publication; and identified test items for use in Five Factor Model research. Principal Investigator: Thomas Widiger, Ph.D.

**University of Kentucky**, **Department of Behavioral Sciences**, **Graduate Research Assistant**, Lexington, Kentucky, June 2008 to May 2010.
Collected, analyzed, and interpreted data, co-authored manuscripts, and wrote annual reports for funding sources.

**University of Kentucky, Preservice Health Training Project, Research Assistant**, Lexington, Kentucky, August 2005 to June 2008.
Assisted in a project evaluating outcomes of online training modules for health professionals serving people with disabilities. Co-authored six manuscripts published in peer-reviewed journals; collected, analyzed, and

interpreted data; co-developed study methodology; and coordinated and edited contributions by co-authors. Principal Investigator: Harold Kleinert, Ed.D.

**University of Illinois, Korol Sex Steroids and Behavior Rodent Laboratory, Research Assistant**, Lexington, Kentucky, May 2002 to August 2002.
Assisted in a study of rodent spatial navigation strategies, resulting in a *Neuroscience* publication. Performed rodent surgeries, including ovariectomy and cannulae implantation in the striatum and hippocampus, tested rodent behavior, and performed histology on frozen brain tissue. Principal Investigator: Donna Korol, Ph.D.

## PUBLICATIONS

Campbell, W., Miller, S.L., **Boyd, S.E.**, Farmer, D.D., & Olezeski, C.L. (in press). Incarcerated While Transgender (book chapter). In P. Magaleta, M. Ternes, & M. Patry (Eds.) *History and future of correctional psychology*. New York: Springer.

**Boyd, S. E.** (2012). Five Factor Model personality functioning in adults with intellectual disabilities. In T.A. Widiger & P.T. Costa (Eds.), *Personality Disorders and the Five Factor Model of Personality* (3rd ed.) (pp. 209 - 217). Washington, D.C.: American Psychological Association.

Adams, Z., and **Boyd, S.E.** [shared first-authorship] (2010). Ethical challenges in the treatment of individuals with intellectual disabilities. *Ethics and Behavior*, *20*, 407-418.

**Boyd, S.,** Sanders, C., Kleinert, H., Huff, M., Lock, S., Johnson, S., et al. (2008). Virtual patient training to improve reproductive healthcare for women with intellectual disabilities. *Journal of Midwifery and Women's Health*, *53*, 453-460.

Kleinert, H. K., Fisher, S., Sanders, C., & **Boyd, S.** (2007). Improving physician assistant competencies in developmental disabilities using virtual patient modules. *Journal of Physician Assistant Education*, *18*, 33-40.

Kleinert, H. K., Sanders, C. B., Mink, J., Nash, D., Johnson, J., **Boyd, S.,** et al. (2007). Improving student dentist competencies and comfort in delivering care to children with developmental disabilities using a virtual patient module. *Journal of Dental Education*, *71*, 279-286.

Knudsen, H. K., Studts, J. L., **Boyd, S. E.,** & Roman, P. M. (2010). Structural and cultural barriers to the adoption of smoking cessation services in addiction treatment organizations. *Journal of Addictive Diseases, 29*, 294-305.

Knudsen, H. K., **Boyd, S. E.,** Studts, J. L. (2010). Substance abuse treatment counselors and tobacco use: a comparison of comprehensive and indoor-only smoking bans. *Nicotine and Tobacco Research, 12*, 1151-1155.

Sanders, C. L., Kleinert, H. K., Free, T. F., Slusher, I., Clevenger, K., Johnson, **S., Boyd, S.** E. (2007). Caring for children with intellectual and developmental disabilities: Virtual patient instruction improves students' knowledge and comfort level. *Journal of Pediatric Nursing*, *22*, 457-466.

Sanders, C. L., Kleinert, H. K., Free, T. F., Slusher, I., Clevenger, K., **Boyd, S.,** et al. (2007). Caring for children with intellectual and developmental disabilities: Virtual patient instruction improves students' knowledge and comfort level. *Journal of Pediatric Nursing*, *22*, 457-466.

Sanders, C. L., Kleinert, H. K., **Boyd, S. E.** Herren, C., Theiss, L., & Mink, J. (2008). Virtual patient instruction for dental students: can it improve dental care access for persons with special needs? *Special Care Dentistry, 28,* 205-213.

Sanders, C. L., Kleinert, H. K., Free, T. F., Slusher, I., Clevenger, K., **Boyd, S.,** et al. (2008). Developmental disabilities: improving competence in care using virtual patients. *Journal of Nursing Education, 47,* 66-73.

Widiger, T. A., & **Boyd, S.** (2009). Personality disorder assessment instruments. In J. N. Butcher (Ed.), *Oxford handbook of personality assessment (3rd ed.)(pp. 336-363).* New York: Oxford University Press.

Zurkovsky, L., Brown, S. L., **Boyd, S.,** & Korol, D. L. (2007). Estrogen modulates learning in female rats by acting directly at distinct memory systems. *Neuroscience, 144*, 26-37.

## TEACHING & TRAINING EXPERIENCE

**Conducting Forensic Mental Health Evaluations with Individuals Who Are Transgender or Gender Non-Conforming**. Part 1: December 10, 2020, Part 2: April 9, 2021.
One of four presenters describing basic information about individuals who are transgender and gender non-conforming in the criminal justice context, ethical considerations, example language and queries for taking a gender development history, relevant case law, and referral considerations. Attendees were mental health professionals.

**Capital Area Immigrants' Rights (CAIR) Coalition, Detained Children's Program webinar presenter: Detention Conditions, Health Impact of Detention on Children, & Legal Issues of Children's Detention.** Washington, DC, July 2019.
One of three presenters providing overviews of legal, health, and psychological realities and risks for immigrant children in detention. Webinar attendees were stakeholders and grant foundations.

**University of Virginia Health Services, Panelist: How Experience Might Inform Ethical Practice. Transgender Youth and Systems-Level Reforms for Girls**. Charlottesville, VA, April 2019.
One of three panelists reviewing potential ethical considerations, and responding to training participant questions, regarding forensic assessment of transgender and gender non-conforming individuals.

**District of Columbia Department of Behavioral Health, Training Presenter.** Washington, D.C., December 2018.
Developed training materials and presented on the topic of adjudicative competency restoration for adults with Intellectual Disabilities.

**National Legal Aid & Defender Association Presenter.** Philadelphia, PA, June 2018.
Developed training materials, and co-presented with Joette James, Ph.D., as well as presenting (solo) regarding accommodations-related assessments for defendants with cognitive and psychiatric disabilities, and about psychopathy and Antisocial Personality Disorder, respectively.

**Georgetown Juvenile Justice Initiative and National Juvenile Defender Center Symposium: Race and Juvenile Justice 50 Years after *Gault* Presenter/Panelist.** Washington, D.C., May 2017.
Co-panelist with Daniel Murrie, Ph.D., for discussion of race and risk assessment of juveniles.

**Georgetown Juvenile Justice Center Presenter.** November 2016.
Developed and presented a training for public defenders regarding common errors in risk assessment reports and strategies for critical reading of risk assessment evaluations.

**Superior Court Judicial and Senior Manager Spring Conference Presenter.** Washington, D.C., April 2015.
Developed and presented training materials for Superior Court Judges as part of a panel on risk assessment of juvenile and adult defendants.

**Training for Attorneys Preparing to Represent Defendants on the Prince William Mental Health Court Docket.** Manassas, Virginia, April 2015, April 2016, & April 2018.
Prepared and presented a training for attorneys and judges about psychiatric disorders and forensic psychology considerations relevant to defendants with suspected or confirmed psychiatric disorders.

**Institute of Law, Psychiatry, and Public Policy, Presenter.** Charlottesville, Virginia, 2014 to present.
Developed and presented training curriculum for forensic evaluators assessing risk-related online behaviors in juveniles.

**Institute of Law, Psychiatry, and Public Policy, Presenter.** Charlottesville, Virginia, October 2014 to present.
Developed and presented training curriculum for evaluating competency to stand trial and mental state at the time of offense in defendants with intellectual disabilities and borderline intellectual functioning.

**Institute of Law, Psychiatry, and Public Policy, Training Faculty.** Richmond, Virginia, and Charlottesville, Virginia, May 2015 and September 2014.
Developed and presented a one-day training curriculum on assessing online behavior of forensic evaluees, with emphasis on issues relevant to problematic sexual behavior online, applicable statutes, and recommendations for supervision.

**Washington, District of Columbia, Department of Behavioral Health, Presenter.** August 2014.
Developed and presented a training curriculum on evaluating adjudicative competency of defendants with intellectual disabilities. Trainees were forensic psychologists and psychiatrists employed by the Department of Behavioral Health.

**Department of Behavioral Health and Developmental Services, Presenter.** August 2014.
Developed and presented a grand rounds for mental health service providers at Western State Hospital; topic was introduction to internet culture, and how and why to query online activities of individuals with severe mental illness.

**Department of Behavioral Health and Developmental Services, Presenter.** July 2014.
Developed and presented Psychology Department inservice training concerning adapting empirically-supported PTSD treatments for inpatient forensic populations.

**Department of Behavioral Health and Developmental Services, Training Facilitator,** Richmond, Roanoke, and Newport News, Virginia, April 2014 to May 2014.
Developed and presented a training curriculum on customizing outpatient restoration of competency to stand trial services for individuals with intellectual disabilities. Trainees were community mental health providers.

**Institute of Law, Psychiatry, and Public Policy, Presenter.** Charlottesville, Virginia, March 2014 to present.
Developed and presented training curriculum on assessing online behavior of forensic evaluees, with emphasis on issues relevant to problematic sexual behavior online.

**Western State Hospital, Department of Behavioral Health and Developmental Services, Presenter,** Staunton, Virginia, November 2013.
Developed and presented a grand rounds for mental health providers, concerning personality disorders in adults with intellectual disabilities, also developed and presented a psychology department inservice training focused on adapting evidence-based trauma treatment interventions for inpatient forensic populations.

**Westchester Jewish Community Services, Instructor**, Yonkers and Hartsdale, New York, September 2012 to July 2013.
Developed training curriculum on assessing online activity of children, adolescents, and young adults. Presented training to an outpatient trauma treatment center, a violence intervention and prevention program, and a program for teen parents.

**University of Kentucky, University Center for Excellence in Developmental Disabilities, Curriculum Development and Project Coordinator**, Lexington, Kentucky, January 2012 to July 2012.
Originated concept, generated learning objectives and teaching strategies, and developed content for an inter-disciplinary, multi-media online training for mental health professionals to provide more competent and ethical care to adults with ID/DD. Wrote scripts, cast actors, and filmed and edited illustrative video vignettes. Applied for and obtained continuing education credits from the Kentucky Psychological Association.

**University of Kentucky, Human Development Institute, Instructor**, Lexington, Kentucky, 2008 to 2011.
Lectured on sexual abuse of adults with disabilities to students enrolled in the interdisciplinary Graduate Developmental Disabilities Certificate Program. Converted lecture to online format for the distance learning section of program.

**Migrant Network Coalition, Workshop Co-Leader**, Lexington, Kentucky, August 2010.
Researched and developed materials and co-led a training workshop on the intersection of disability and immigration status.

**University of Kentucky**, **Department of Behavioral Sciences**, **Graduate Student Trainee**, Lexington, Kentucky, August 2007 to May 2009.
Developed training materials and facilitated *in vivo* experiences to prepare medical students for treating patients with DD and their families. Developed student/family mentorship program, still in use by the medical school.

**University of Kentucky, Human Development Institute, Project Supervisor**, Lexington, Kentucky, November 2007 to July 2008.
Researched and developed instructional content of a multi-media online training package for direct service professionals who support adults with DD. Coordinated marketing and distribution of training program to Medicaid waiver providers. Funded by the Kentucky Department of Behavioral Health, Developmental and Intellectual Disabilities.

**University of Kentucky, Preservice Health Training, Project Assistant**, Lexington, Kentucky, August 2005 to June 2008.
Helped identify training needs of professionals (e.g., dentistry, nursing, women's health) treating individuals with ID/DD; researched and wrote content for training materials; and co-scripted video vignettes for an award-winning series of online, multi-media, interdisciplinary training modules.

**Project SAFE (Safety and Accessibility for Everyone), Coordinator**, Frankfort, Kentucky, September 2005 to September 2006.
Created and presented three trainings on the topic of sexual and domestic violence perpetrated against individuals with disabilities. Audience included team members from a coalition of state agencies dealing with sexual assault, domestic/interpersonal violence, disability rights, and crime victims' advocacy.

**Commonwealth of Kentucky, Coalition of State Disability and Employment Agencies, Training Facilitator**, Frankfort, Kentucky, April 2005 to June 2005.
Coordinated disability-awareness trainings, led by facilitators with disabilities, for state employees of Kentucky One-Stop Job Centers.

## PRESENTATIONS

**Boyd, S.,** Brodsky, S. (chair), Murrie, D.M., & Stejskal, W.J. (2016, March). *Bias in Forensic Mental Health Evaluations*. Symposium at the American Psychology-Law Society Conference. Atlanta, Georgia.

**Boyd, S.,** Barretto, R., & Zelle, H. (2015, June). *Using Advance Directives for Self-Advocacy and Planning: An Overview and Example of the Process*. Presentation at the 14th Annual Philadelphia Trans Health Conference. Philadelphia, PA.

**Boyd, S.** (2010, November). *Personality, motives, and adaptive functioning in adults with intellectual disability*. Poster presented at the Association of University Centers on Disability conference, Crystal City, VA.

**Boyd, S.,** & Adams, Z. (2008, April; shared first authorship). *Ethical considerations in the treatment of individuals with Intellectual Disability*. Award Presentation session at the annual American Psychological Association conference ,Boston, MA.

**Boyd, S.** (2008, month) *Traits, motives, and behavior: comparing the NEO PI-R and the Reiss Profile*. Poster Presented on September 26 at the 2008 Society for Research in Psychopathology conference, Pittsburgh, PA.

Kleinert, H. K., Caldwell, S., **Boyd, S.** (2006, October).  *Interactive virtual training for residential physicians and student dentists on caring for patients with developmental disabilities*. Concurrent session presented at the annual Association of University Centers on Disability conference, Washington, D.C.

## SUPERVISION

**Institute of Law, Psychiatry, & Public Policy Graduate Student and Postdoctoral Fellow Supervisor,** Charlottesville, Virginia. August 2017 to present.
Supervised graduate students and postdoctoral fellows in reviewing and conducting forensic psychological evaluations. Presented at case conferences for student and practitioner attendees.

**Westchester Jewish Community Services, Clinical Psychology Extern Supervisor**, Hartsdale, New York, September 2012 to July 2013.
Supervised a graduate-level psychology extern in providing evidence-based treatments to a clinic population. Discussed differential diagnoses, case formulations, treatment goals, interventions, and collateral services. Provided ongoing feedback and conduct formal written evaluations.

**University of Kentucky, Student Supervisor**, Lexington, Kentucky, May 2008 to June 2012.
Supervised four undergraduate student assistants in laboratories investigating psychopathology, personality, and self-regulation. Oversaw data collection and analysis, manuscript preparation, and conference presentations. Provided guidance on professional development, including graduate school applications.

## HONORS

**2012 Research Endowment Award**, from the Human Development Institute, University of Kentucky.

**2011 Research Funding Award**, from the Department of Psychology, University of Kentucky.

**2008 Winner, American Psychological Association (APA) of Graduate Students ethics paper contest**.
Awarded at the APA annual conference in Boston, MA, August 2008. Paper, co-authored with Z.W. Adams, titled: Ethical Considerations in Psychotherapy with Adults with Intellectual Disabilities.

**2008 Research Funding Award**, from the Department of Psychology, University of Kentucky.

**2007 Burberry Award**, from the Human Development Institute, University of Kentucky, a University Center for Excellence in Developmental Disabilities.
This award recognizes outstanding academic achievement and advocacy efforts in graduate student trainees.

**2006 Travel Award**, from the Department of Psychology, University of Kentucky.

**2006 Anne Rudiger Award**, from the Association of University Centers on Disability (AUCD).
This national award recognizes academic and advocacy-related achievement among graduate student trainees in the AUCD network.

**1998-1999 James Scholar Honors Program**, University of Illinois.

## PROFESSIONAL MEMBERSHIPS

American Psychological Association (APA)
      APA Division 25: *Behavior Analysis*
      APA Division 33: *Intellectual and Developmental Disabilities/Autism Spectrum Disorders*
      APA Division 35: *Society for the Psychology of Women*
      APA Division 44: *Society for the Psychology of Sexual Orientation and Gender Diversity*
      APA Division 46: *American Psychology-Law Society*
      APA Division 56: *Trauma Psychology*

American Association on Intellectual and Developmental Disabilities (AAIDD)

Association for the Treatment of Sexual Abusers (ATSA)

Fellow, American Board of Forensic Psychology (ABFP)

# APPENDIX 2

**Expert Testimony (2018 – Present)**

2018 Testimony

- *Commonwealth of Virginia v. Gregory Murphy*, No. CF000517 (Alexandria Cir. Ct.)

- *Commonwealth of Virginia v. Adam Agostini*, No. FE20170001146 (Fairfax County Cir. Ct.)

- *Commonwealth of Virginia v. Joaquin Ramey*, No. FE-2016-419 (Fairfax County Cir. Ct.)

- *Commonwealth of Virginia v. Ian Florance*, No. CR00031218-00 (Loudoun County Cir. Ct.)

- *Commonwealth of Virginia v. Trevon Rector*, No. CR01025427-00 (Loudoun County Cir. Ct.)

- *United States v. Antonio Taylor MCL*, No. 2013 CF1 021375 (D.C. Super. Ct.)

- *USA v. Dobbins*, No. 4:17-cr-00129-MSD-RJK (E.D. Va.)

- *Commonwealth of Virginia v. James Armel*, No. CR17000443-00 (Winchester County Cir. Ct.)

2019 Testimony

- *West Virginia v. Devin Michael Collin*, No. 16-M19F-00361 (23d Judicial Cir. Ct.)

- *West Virginia v. Molly Jo Delgado*, No. CC-0202017-F-149 (23d Judicial Cir. Ct.)

- *West Virginia v. Seth Beathard*, No. CC-33-2019-F-3 (23d Judicial Cir. Ct.)

- *Timothy Lee Hurst v. State of Florida*, No. 1998-CF-001795 (Escambia County Cir. Ct.)

- *Normand v. Brown*, No. CL2018-07653 (Fairfax County Cir. Ct.)

- *Commonwealth of Virginia v. Robert Campbell*, No. CR17004221-00 (Prince William County Cir. Ct.)

- *Doe v. Fairfax County School Board*, No. 1:18-cv-00614-LO-MSN (E.D. Va.)

- *USA v. Hooks et al.*, No. 2:18-cr-00249-LSC-JHE (N.D. Ala.)

- *Commonwealth of Virginia v. Nicholas Hamman*, No. CR18000746-00 (Winchester County Cir. Ct.)

- *Fortner v. Runyon*, No. CT-001847-11 (Shelby County Cir. Ct.)

2020 Testimony

- *United States v. Smith, Preston G JAS*, No. 1991 FEL 010665 (D.C. Super. Ct.)

- *USA v. Boutros*, No. 1:20-cr-00082-APM (D.D.C.)

- *USA v. Johnson et al.*, No. 1:19-cr-00351-RDA-1 (E.D. Va.)

- *USA v. Sizemore*, No. 3:19-cr-00120-JAG (E.D. Va.)

2021 Testimony

- *Commonwealth of Virginia v. Rodolfo Rivera-Valencia*, No. CR19000179-00 (Arlington Cir. Ct.)

- *Commonwealth v. Rodriguez, Tammy Marie*, No. 19-CR-01493 (Fayette County Cir. Ct.)

- *Commonwealth v. Roberson, Demetrius*, No. 17-CR-00220 (Logan County Cir. Ct.)

- *Commonwealth of Virginia v. John Pleasant Johnson Jr.*, No. CR20000938-00 (Prince William County Cir. Ct.)

- *Commonwealth of Virginia v. Justin Harvey*, No. CR18F03463-00 (Richmond County Cir. Ct.)

- *Commonwealth of Virginia v. Mary Purviance*, No. CR19F01179-00 (Richmond County Cir. Ct.)

- *United States v. Byrd, Brandon A MJD*, No. 2016 CF1 012762 (D.C. Super. Ct.)

- *United States v. Winston, Marcus K MO*, No. 1997 FEL 004943 (D.C. Super. Ct.)

- *Dinardo v. It's My Amphitheater, Inc.*, No. 8:19-cv-01841-CBD (D. Md.)

- *G.T. v. Kanawha County Sch.*, No. 2:20-cv-00057 (S.D. W. Va.)

- *Commonwealth of Virginia v. Anthony Natale*, No. CR20000190-00 (Frederick County Circuit Court, Va.)

- *West Virginia v. Evan Ottey*, No. CC-02-2019-F-247 (Berkeley County Circuit Court, W. Va.)

- *USA v. Viscomi*, No. 2:12-cr-00134 (E.D. Va.)

- *Commonwealth of Virginia v. Joseph Shaner Carlock*, No. CR20000371-00 (Rockbridge County Cir. Ct.)

- *United States v. Raphael Parker*, No. 1993 FEL 006266 (D.C. Super. Ct.)

- *Commonwealth of Virginia v. Daniel Farrell*, Nos. CR CR200000017-00, -18-00, -19-00 (Rockingham County Cir. Ct.)

- *Watson v. NY Doe 1, et al.*, No. 1:19-cv-522 (S.D.N.Y.)

2022 Testimony

- *USA v. Brandon Sabol*, No. 3:21-cr-00020 (N.D. W. Va.)

- *USA v. Otis Goodman*, No. 3:20-cr-00134-001 (E.D. Va.)

- *Doe v. Manor College*, No. 2:19-cv-05309 (E.D. Pa.)

- *David Matias v. Commonwealth*, No. CL21-3182 (County of Arlington Cir. Ct.)

- *Commonwealth of Virginia v. Roscoe Shaw*, No. CR21000393-00 (County of Arlington Cir. Ct.)

- *USA v. Hooks*, No. 2:18-cr-00249 (resentencing) (N.D. Ala.)

- *USA v. Max B. Schafer*, No. 1:21-cr-00071 (S.D. Ind.)

**Sealed Juvenile Court Cases (Not Publicly Available)**

2018 Testimony

- *In re. J.P.* (D.C. Civil Commitment Comm'n)

- *In re D.L.* (D.C. Super. Ct. Juv. Ct.)

- *In re D.S.* (D.C. Super. Ct. Juv. Ct.)

2019 Testimony

- *In re. K.M.* No. 19-020 (Charleston W. Va. Special Educ. Due Process)

2020 Testimony

- None

2021 Testimony

- *In re D.M.* (D.C. Juv. Ct.)

- *In re E.J.* (D.C. Juv. Special Educ. Due Process)

- *In re W.B.* (D.C. Super. Ct. Juv. Ct.)

2022 Testimony

- None

# APPENDIX 3

**Materials Reviewed**

**Documents Concerning I.C.**

Documents concerning I.C. that I reviewed are listed below by control number.  My understanding is that they have not yet been produced to Defendants at the time of this report, but that they will be produced to Defendants and their corresponding Bates Numbers will be provided to Defendants following their production.

- CNTRL00118520
- CNTRL00118521
- CNTRL00118522
- CNTRL00118523
- CNTRL00118524
- HR_00002296
- HR_00002297
- HR_00002298
- HR_00002299
- HR_00002300
- HR_00002302
- HR_00002303
- HR_00002304
- HR_00002308
- HR_00002309
- HR_00002310
- HR_00002311
- HR_00002312

- HR_00002313
- HR_00002314
- HR_00002315
- HR_00002316
- HR_00002317
- HR_00002318
- HR_00002319
- HR_00002320
- HR_00002321
- HR_00002322
- HR_00002323
- HR_00002324
- HR_00002325
- HR_00002326
- HR_00002327
- HR_00002328
- HR_00002329
- HR_00002330

- HR_00002331
- HR_00002332
- HR_00002333
- HR_00002334
- HR_00002335
- HR_00002336
- HR_00002337
- HR_00002338
- HR_00002339
- HR_00002340
- HR_00002341
- HR_00002342
- HR_00002343
- HR_00002344
- HR_00002345
- HR_00002346
- HR_00002347
- HR_00002348

- HR_00002349
- HR_00002350
- HR_00002351
- HR_00002352
- HR_00002353
- HR_00002354
- HR_00002355
- HR_00002356
- HR_00002357
- HR_00002358
- HR_00002359
- HR_00002360
- HR_00002361
- HR_00002362
- HR_00002363
- HR_00002364
- HR_00002365
- HR_00002366
- HR_00002367
- HR_00002368
- HR_00002369
- HR_00002370
- HR_00002371

- HR_00002372
- HR_00002373
- HR_00002374
- HR_00002375
- HR_00002376
- HR_00002377
- HR_00002378
- HR_00002379
- HR_00002380
- HR_00002381
- HR_00002382
- HR_00002383
- HR_00002384
- HR_00002385
- HR_00002386
- HR_00002387
- HR_00002388
- HR_00002389
- HR_00002390
- HR_00002391
- HR_00002392
- HR_00002393
- HR_00002394

- HR_00002395
- HR_00002396
- HR_00002397
- HR_00002398
- HR_00002399
- HR_00002400
- HR_00002401
- HR_00002402
- HR_00002403
- HR_00002404
- HR_00002405
- HR_00002406
- HR_00002407
- HR_00002408
- HR_00002409
- HR_00002410
- HR_00002411
- HR_00002412
- HR_00002413
- HR_00002414
- HR_00002415
- HR_00002416
- HR_00002417

- HR_00002418
- HR_00002419
- HR_00002420
- HR_00002421
- HR_00002422
- HR_00002423
- HR_00002424
- HR_00002425
- HR_00002426
- HR_00002427
- HR_00002428
- HR_00002429
- HR_00002430
- HR_00002431
- HR_00002432
- HR_00002433
- HR_00002434
- HR_00002435
- HR_00002436
- HR_00002437
- HR_00002438
- HR_00002439
- HR_00002440

- HR_00002441
- HR_00002442
- HR_00002443
- HR_00002444
- HR_00002445
- HR_00002446
- HR_00002447
- HR_00002448
- HR_00002449
- HR_00002450
- HR_00002451
- HR_00002452
- HR_00002453
- HR_00002454
- HR_00002455
- HR_00002456
- HR_00002457
- HR_00002458
- HR_00002459
- HR_00002460
- HR_00002461
- HR_00002462
- HR_00002463

- HR_00002464
- HR_00002465
- HR_00002466
- HR_00002467
- HR_00002468
- HR_00002469
- HR_00002470
- HR_00002471
- HR_00002472
- HR_00002473
- HR_00002474
- HR_00002475
- HR_00002476
- HR_00002477
- HR_00002478
- HR_00002479
- HR_00002480
- HR_00002481
- HR_00002482
- HR_00002483
- HR_00002484
- HR_00002485
- HR_00002486

- HR_00002487
- HR_00002488
- HR_00002489
- HR_00002490
- HR_00002491
- HR_00002492
- HR_00002493
- HR_00002494
- HR_00002495
- HR_00002496
- HR_00002497
- HR_00002498
- HR_00002499
- HR_00002500
- HR_00002501
- HR_00002502
- HR_00002503
- HR_00002504
- HR_00002505
- HR_00002506
- HR_00002507
- HR_00002508
- HR_00002509
- HR_00002510
- HR_00002511
- HR_00002512
- HR_00002513
- HR_00002514
- HR_00002515
- HR_00002516
- HR_00002517
- HR_00002518
- HR_00002519
- HR_00002520
- HR_00002521
- HR_00002522
- HR_00002523
- HR_00002524
- HR_00002525
- HR_00002526
- HR_00002527
- HR_00002528
- HR_00002529
- HR_00002530
- HR_00002531
- HR_00002532
- HR_00002533
- HR_00002534
- HR_00002535
- HR_00002536
- HR_00002537
- HR_00002538
- HR_00002539
- HR_00002540
- HR_00002541
- HR_00002542
- HR_00002543
- HR_00002544
- HR_00002545
- HR_00002546
- HR_00002547
- HR_00002548
- HR_00002549
- HR_00002550
- HR_00002551
- HR_00002552
- HR_00002553
- HR_00002554
- HR_00002555

- HR_00002556
- HR_00002557
- HR_00002558
- HR_00002559
- HR_00002560
- HR_00002561
- HR_00002562
- HR_00002563
- HR_00002564
- HR_00002565
- HR_00002566
- HR_00002567
- HR_00002568
- HR_00002569
- HR_00002570
- HR_00002571
- HR_00002572
- HR_00002573
- HR_00002574
- HR_00002575
- HR_00002576
- HR_00002577
- HR_00002578

- HR_00002579
- HR_00002580
- HR_00002581
- HR_00002582
- HR_00002583
- HR_00002584
- HR_00002585
- HR_00002586
- HR_00002587
- HR_00002588
- HR_00002589
- HR_00002590
- HR_00002591
- HR_00002592
- HR_00002593
- HR_00002594
- HR_00002595
- HR_00002596
- HR_00002597
- HR_00002598
- HR_00002599
- HR_00002600
- HR_00002601

- HR_00002602
- HR_00002603
- HR_00002604
- HR_00002605
- HR_00002606
- HR_00002607
- HR_00002608
- HR_00002609
- HR_00002610
- HR_00002611
- HR_00002612
- HR_00002613
- HR_00002614
- HR_00002615
- HR_00002616
- HR_00002617
- HR_00002618
- HR_00002619
- HR_00002620
- HR_00002621
- HR_00002622
- HR_00002623
- HR_00002680

- HR_00002763
- HR_00002764
- HR_00002765
- HR_00002766
- HR_00002767

**Any other materials cited in this Report**