## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **M.J.** *et al.*, | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:18-cv-1901-ACR** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS'
## MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

TABLE OF EXHIBITS .................................................................................................. v

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

   I.   Behavioral Health Services for Youth in the District ............................................. 2

      A.   Community-Based Interventions ..................................................................... 3

      B.   High Fidelity Wraparound ............................................................................. 4

      C.   Mobile Crisis Response Services ................................................................... 5

      D.   Assertive Community Treatment .................................................................... 6

   II.   Rates of Youth Institutionalization in the District .............................................. 7

   III.   Plaintiffs' Allegations ................................................................................... 7

LEGAL STANDARD .................................................................................................. 10

ARGUMENT ........................................................................................................... 11

   I.   Plaintiffs Do Not Meet the Rule 23(a) Prerequisites for a Class Action. ................... 11

      A.   Plaintiffs Have Not Met Their Burden To Show Numerosity. ....................... 11

      B.   Plaintiffs Cannot Establish Commonality Because They Have Not Identified Any Common Questions Pertinent to Either of Their Claims. ................................ 14

      C.   Plaintiffs Cannot Establish Typicality Because They Have Received the Very Services They Allege the District Fails to Provide. ....................................... 22

      D.   Plaintiffs Cannot Adequately Serve as Class Representatives Because They Have No Incentive To Seek Additional Services They Do Not Need. ......................... 29

   II.   Certification Is Improper Under Rule 23(b)(2) Because Plaintiffs Have Not Established That Injunctive Relief Can Address Their Alleged Injuries. ............................... 31

      A.   Plaintiffs' Requested Injunction Is Fatally Vague. ....................................... 31

      B.   An Injunction Would Require Individually Tailored Relief. ......................... 34

CONCLUSION ........................................................................................................ 37

# TABLE OF AUTHORITIES

**Cases**

*A.A. by and through P.A. v. Phillips*, Civil Action No. 19-00770, 2021 WL 2102829 (M.D. La. 2021)...................................................................................................................... 12, 16

*A.A. v. Phillips*, Case No. 21-30580, 2023 WL 334010 (5th Cir. Jan. 20, 2023) ........................ 15

*Alvarez v. Keystone Plus Construction Corp.*, 303 F.R.D. 152 (D.D.C. 2014).......... 22, 24, 25, 26

*Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974) ................................................................ 12

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013). .................................. 11

*Andrews v. Plains All Am. Pipeline, L.P.*, Civil Action No. 15-4113, 2017 WL 10543402 (C.D. Cal. Feb. 28, 2017) ............................................................................................................. 32

*Arias v. Marriott Int'l, Inc.*, 324 F.R.D. 307 (D.D.C. 2018) ................................................. passim

*Atwell v. Gabow*, 248 F.R.D. 588 (D. Colo. 2008)......................................................................... 32

*Brown v. District of Columbia*, 928 F.3d 1070 (D.C. Cir. 2019) ........................................... 19, 20

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020)...................................................................... 35

*Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68 (D.D.C. 2015) ......................... 21

*D.L. v. District of Columbia*, 860 F.3d 713 (D.C. Cir. 2017) ....................................................... 30

*Feinman v. FBI*, 269 F.R.D. 44 (D.D.C. 2010) ............................................................................ 10

*Garcia v. Johanns*, 444 F.3d 625 (D.C. Cir. 2006)....................................................................... 10

*Hoyte v. District of Columbia*, 325 F.R.D. 485 (D.D.C. 2017) .................................................... 10

*In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 209 F.R.D. 323 (S.D.N.Y. 2002) ....... 34

*In re Navy Chaplaincy*, 306 F.R.D. 33 (D.D.C. 2014) ................................................................. 35

*In re White*, 64 F.4th 302 (D.C. Cir. 2023).............................................................. 11, 12, 14, 23

*J.D. v. Azar*, 925 F.3d 1291 (D.C. Cir. 2019) ............................................................................. 30

*Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481 (7th Cir. 2012) ........................................... 35, 36

*Katie A. ex rel Ludin v. Los Angeles Cnty.*, 481 F.3d 1150 (9th Cir. 2007) ................................. 33

*Littlewolf v. Hodel*, 681 F. Supp. 929 (D.D.C. 1988) .................................................. 22

*Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521 (5th Cir. 2007) .......................... 31

*Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015)...................................... 12

*N.B. v. Hamos*, 26 F. Supp. 3d 756 (N.D. Ill. 2014)............................................ passim

*O.B. v. Norwood*, 15 C 10463, 2016 WL 2866132 (E.D. Ill. May 17, 2016)........................ 12, 18

*Olmstead v. L.C. ex Rel. Zimring*, 527 U.S. 581 (1999) ................................................ 8

*Parent/Professional Advocacy League v. City of Springfield, Mass.*, 934 F.3d 13 (1st Cir. 2019) ....................................................................................................... 34

*Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266 (11th Cir. 2000) ...................... 15

*S.E.C. v. Wash. Inv. Network*, 475 F.3d 392 (D.C. Cir. 2007)...................................... 32

*S.R. v. Pa. Dep't of Human Servs.,* 325 F.R.D. 103 (M.D. Pa.) ................................... 18

*Schmidt v. Lessard*, 414 U.S. 473 (1974) .................................................................... 32

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010) ....... 10

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597 (10th Cir. 2008).. 31, 32, 34, 35

*Soseeah v. Sentry Ins.*, 808 F.3d 800 (10th Cir. 2015) ................................................ 35

*Steimel v. Minott*, Civil Action No. 13-957, 2014 WL 1213390 (S.D. Ind. Mar. 24, 2014) ....... 21

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001)....................................................... 22

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) .................................... 10, 14, 31

**Statutes**

42 U.S.C. § 1396d ........................................................................................................... 8

42 U.S.C. § 1983 ............................................................................................................. 1

D.C. Code § 16-2315 ..................................................................................................... 26

**Rules**

Fed. R. Civ. P. 65 ............................................................................................. 31, 33, 34

Fed. R. Civ. Pr. 23....................................................................................................... passim

**Regulations**

22-A DCMR § 1201.1................................................................................................ 2

22-A DCMR § 3425.1............................................................................................... 3

22-A DCMR § 3425.11............................................................................................. 4

22-A DCMR § 3425.19............................................................................................. 4

22-A DCMR § 3425.23............................................................................................. 4

22-A DCMR § 3425.6........................................................................................... 3, 4

22-A DCMR § 3499.1............................................................................................. 17

**TABLE OF EXHIBITS**

| Designation | Title |
|:---:|:---:|
| Exhibit A | Declaration of Meghan Sullivan |
| Exhibit B | Declaration of Patrina Anderson |
| Exhibit C | Supplemental Declaration of Patrina Anderson |
| Exhibit D | Plaintiffs' Objections and Responses to Defendants' Second Set of Interrogatories to Plaintiffs L.R. and University Legal Services |

## INTRODUCTION

Plaintiffs I.C., L.R., B.T., M.W., and University Legal Services (which does business as Disability Rights D.C.) seek class certification in this action alleging that the District does not provide a cluster of mental health services they call "intensive community-based services" (ICBS) in violation of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act (Section 504), and the Medicaid Act's early and periodic screening, diagnostic, and treatment (EPSDT) provision under 42 U.S.C. § 1983.  Plaintiffs cannot meet their burden to show certification is warranted.

First, Plaintiffs have not met their burden to establish the four components necessary for certification under Rule 23(a)—numerosity, commonality, typicality, and adequacy.  Plaintiffs have not shown numerosity because, if they are unsuccessful in their claims, the class would include zero members.  Plaintiffs have not shown commonality because they have failed to identify any question under either of their legal claims that is common across the entire class.  Plaintiffs have not shown typicality because they have received needed mental health services— many of which they allege the District does not provide—leaving them atypical of the putative class as a whole.  And Plaintiffs have not shown adequacy because they have no incentive to seek an injunction requiring the District to provide needed services they are already receiving, or have received, and because three of them are not, or soon will not be, members of the class.

Second, Plaintiffs cannot establish that certification would be proper under Rule 23(b)(2).  Plaintiffs seek an injunction that is impermissibly vague, and the ultimate relief they seek would have to be individually tailored to the needs of each class member.

Because Plaintiffs cannot meet their burden to show all of the above factors, their motion should be denied.

## BACKGROUND

### I.   Behavioral Health Services for Youth in the District

Over the past decade, the District has comprehensively reformed its children's mental health system of care to ensure that children with serious emotional disturbances (SED)[1] receive high-quality, integrated care.  *See* Ex. A, Declaration of Meghan Sullivan (Sullivan Decl.) ¶ 6. The District currently implements various evidence-based practices to provide a robust array of intensive at-home and community-based services, and coordinates across agencies to reduce unnecessary placements in more restrictive settings.  *Id.*

The District offers a number of intensive mental health services delivered to children in the community.  Four in particular are relevant here.  First, community-based interventions (CBI) provide mental health supports to children and their families in their communities, schools and homes.  *Id.* ¶ 8.  Second, the District offers high fidelity wraparound (HFW) services, which focus on a child and family team based on a nationally recognized model of care.  *See id.* ¶¶ 26– 28.  Third, mobile crisis services are provided through Children and Adolescent Mobile Psychiatric Services (ChAMPS), which is available 24 hours per day, seven days a week, to respond to and stabilize children experiencing crises without the need for law enforcement intervention.  *See id.* ¶ 35–36.  Fourth, Assertive Community Treatment (ACT) provides a comprehensive and integrated set of medical and psychosocial services for the treatment of the

---

[1]      SED is defined by District law to mean individuals who have, or have had during the prior year, a diagnosable mental, behavioral, or emotional disorder that: (1) is sufficient to meet diagnostic criteria of the DSM-IV or the ICD9-CM equivalent, except for DSM-IV "V" codes; (2) results in (or will result in) a functional impairment that either substantially interferes with or limits the child's role or function in family, school, or community activities, or that limits the child from achieving or maintaining one or more developmentally-appropriate social, behavioral, cognitive, communicative, or adaptive skills; and (3) includes functional impairments of episodic, recurrent, and continuous duration.  22-A DCMR § 1201.1.

youth's mental health condition in the community and is available to youth ages 18 through 21.

*Id.* ¶¶ 42–43.  Each is described in detail below.[2]

A.    **Community-Based Interventions**

CBI are intensive, evidence-based mental health services provided to children and youth ages six through twenty-one in the child or youth's natural environment, including their home, school or community, and in collaboration with their families.  CBI is "intended to prevent the child's out-of-home" placement.  *See id.* ¶ 8; 22-A DCMR § 3425.1.  CBI services are individually designed by the provider for each child and their family to minimize intrusion, maximize independence, and achieve treatment goals.  Sullivan Decl. ¶ 8.

The District provides three levels of CBI services corresponding to different modalities of intervention, each based on the kinds of risks the child's behavior and history present.  *See* 22-A DCMR § 3425.6(b); Sullivan Decl. ¶ 9.[3]  Central to each level of CBI is family involvement, and all CBI providers are required by regulation to provide services with a family focus and to engage families and natural supports, where applicable, through a team-based approach.  *See* Sullivan Decl. ¶¶ 9, 19 (citing 22-A DCMR §§ 3425.30(a)-(k)).  For example, CBI providers are required to conduct a child and family team meeting within seven days of admission for youth in the community, and within 14 days of admission for youth discharged from an acute care

---

[2]    Most children's mental health services in the District are coordinated through the Department of Behavioral Health (DBH).  Several other agencies provide limited services to children in particular settings, such as in the District's public schools, youth detention facilities, or foster care.  Because Plaintiffs' proposed class extends to all Medicaid-eligible children with SED, the District will focus primarily on services coordinated through DBH.

[3]    Prior to November 2022, the District provided four levels of CBI.  Sullivan Decl. ¶ 9.  In November 2022, Functional Family Therapy was removed from CBI and is now offered as a standalone Evidence-Based Practice.  *Id.*

facility. Sullivan Decl. ¶ 9. All three levels of CBI include services that reduce family conflict, stabilize the family unit, and increase family support. *Id.* ¶ 20.

Although each level of CBI services is initially time-limited by regulation, *see* 22-A DCMR §§ 3425.11; 3425.19; 3425.23, services at all levels can be—and routinely are—extended for as long as the services remain medically necessary for the child.[4] Sullivan Decl. ¶ 22. Further, each level of CBI includes a care coordination component that requires CBI providers to coordinate and link children and youth to other Medicaid-covered services and supports to prevent the utilization of residential treatment. *See id.* ¶ 24; 22-A DCMR § 3425.6 (f). To ensure CBI services are consistently provided to fidelity, the District contracts with a third party to independently audit each of the CBI providers, all of whom meet fidelity standards. Sullivan Decl. ¶ 25.

### B.     High Fidelity Wraparound

In addition to CBI, the District provides HFW services through a contract with MBI Health Services, LLC (MBI). *Id.* ¶ 26. HFW incorporates a range of treatment services and supports, including community-based care coordination, emergency response teams, programs in child development centers and public schools, evidence-based practices, substance use disorder prevention and treatment programs, and ongoing services provided by community-based providers. *Id.* ¶ 27. As DBH's HFW provider, MBI is required to adhere to the National Wraparound Initiative model, through which a collaborative child and family team implements, tracks, and adapts an individualized plan of care to help the child achieve positive outcomes at home, in school, and in the community. *Id.*; *see also id.* ¶ 31 (citing National Wraparound

---

[4]     In fact, named Plaintiffs L.R., B.T., and M.W. each received multiple authorizations for at least one level of CBI services. *See* Sullivan Decl. ¶ 22.

Initiative, Ten Principles of the Wraparound Process (2004), available at https://nwi.pdx.edu/pdf/TenPrincWAProcess.pdf).  Intensive care coordination is a fundamental component of HFW.  With the help of a wraparound team, consisting of a variety of participants from the child's community, the child and family choose a team vision, set goals, and develop a plan to achieve them.  *Id.* ¶ 28.  This process is facilitated by a care coordinator who works to link the child and family to appropriate services in the community.  *Id.*  The District also provides "flex funding" to children receiving HFW to cover the cost of non-Medicaid funded services and supports, such as tutoring or family recreation, that are included in the child's wraparound plan.  *Id.* ¶ 32.

Most children who received HFW services in fiscal year 2019 (FY19) and fiscal year 2020 (FY20) benefitted from the services.  Notably, of the children who received HFW in FY19, 97 percent were diverted from placement in a PRTF.  *Id.* ¶ 34.  That percentage remained steady in FY20.  *Id.*  Further, in FY20, 91 percent of HFW participants incurred no new criminal charges, 83 percent maintained their school placement, and only eight percent experienced an abscondence.  *Id.*  More recently, in fiscal year 2022 (FY22), 99 percent of HFW participants were diverted from placement in a PRTF, 94 percent did not incur new criminal charges, and 85 percent maintained their placement.  *Id.*  In fiscal year 2023 (FY23), the District contracted with an additional provider, MECCA Group, and HFW will soon be available in 12 District schools. *Id.* ¶ 26.

## C.   Mobile Crisis Response Services

For children with SED who experience a behavioral health crisis, the District also provides mobile crisis services through the ChAMPS program.  *Id.* ¶ 35.  Mobile crisis services are available 24 hours a day, 365 days a year, and are provided in home, school, and community settings.  *Id.*  ChAMPS dispatches providers to engage in psychiatric stabilization, screening for

mental health and substance use disorder services, rapport development, and the provision of support while assisting with a child and family's immediate behavioral health needs.  *Id.* ¶ 36. Mobile crisis services aim to prevent unnecessary law enforcement involvement, emergency room use, hospitalization, and placement disruption for children experiencing behavioral health emergencies.  *Id.*  In FY19, only 15 percent of ChAMPS deployments resulted in hospitalization; in fiscal year 2021 (FY21), that number fell to 11 percent and in FY22, to 5 percent.  *Id.* ¶ 39.

### D.   Assertive Community Treatment

Some individuals ages 18 to 21 also receive services through Assertive Community Treatment (ACT).[5]  *Id.* ¶ 42.  ACT is an intensive, integrated, rehabilitative treatment, providing mental health community support services and crisis emergency support services delivered 24 hours per day, seven days per week.  *Id.*  ACT teams provide a comprehensive and integrated set of medical and psychosocial services for the treatment of mental health conditions in non-office settings.  *Id.*

The District offers youth-specific ACT through Transitional Age Community Treatment (TACT) teams to youth ages 18 through 29.  *Id.* ¶ 43.  TACT teams operate using the Transition to Independence Process (TIP) model, a framework that focuses on providing young adults who have emotional or behavioral difficulties with developmentally appropriate, non-stigmatizing, culturally competent, and appealing supports.  *Id.* ¶ 43.  The TIP model involves young adults, their families, and other community supports working to prepare the young adult for greater self-sufficiency and toward the successful achievement of their goals.  *Id.*

---

[5]    ACT is an evidence-based practice intended to help adults with severe mental illness lead more stable lives in the community.  Sullivan Decl. ¶ 45.  Because ACT's evidence base has been researched in adult populations, it is generally viewed as a service that is appropriate for adults ages 18 and older.  *Id.*

## II.        Rates of Youth Institutionalization in the District

Although the District provides youth mental health services in the community when appropriate, some children with SEDs nevertheless require care in an institutional setting.  The District makes every effort to keep children in the community when possible and has experienced a significant reduction in children placed in institutional settings over the past decade.  The District has seen a decrease in the number of Medicaid-enrolled children admitted to Psychiatric Residential Treatment Facilities (PRTFs) in recent years.[6]  For example, from FY19 to FY20, the number of Medicaid-enrolled children with SEDs placed in PRTFs declined from 40 to 31.  *See* Sullivan Decl. ¶ 7.  In FY21, that number fell again to 23, and in FY22, only 16 children were admitted to a PRTF.  *Id.*

## III.        Plaintiffs' Allegations

According to the Second Amended Complaint, Plaintiffs I.C., L.R., B.T., and M.W. are individuals with SEDs enrolled in the District's Medicaid program.  Sec. Am. Compl. [99] ¶¶ 11–15.  Plaintiff Disability Rights D.C. is a non-profit District corporation that advocates for individuals with disabilities.  *Id.* ¶ 17.  Only I.C., L.R., B.T., and M.W. seek to be class representatives here.  *See* Mem. in Support of Pls.' Mot. for Class Cert. (Pls.' Mem.) [112-1] at 32.

Plaintiffs' claims center around a cluster of mental health services, which they refer to as "intensive community-based services" (ICBS).  *See* Sec. Am. Compl. ¶ 41.  According to Plaintiffs, ICBS consists of three broad components:  a team-based case management system

---

[6]        Although Plaintiffs allege as part of their *Olmstead* claim that they are at risk of being placed into detention facilities as well as psychiatric treatment facilities, *see* Sec. Am. Compl. ¶ 3, Plaintiffs have not argued—and have identified no authorities establishing—that incarceration (or the risk of incarceration) can give rise to a valid *Olmstead* claim in the first place.

called "intensive care coordination" (ICC); therapeutic behavioral interventions called "intensive behavior support services"; and "mobile crisis services," an around-the-clock response service that dispatches providers to assist children experiencing crises in their home, school, or community.[7] *Id.* Beyond these broad definitions, Plaintiffs offer no further clarification as to what they believe each of the three components consists of, or what services they believe the District currently fails to provide.

Plaintiffs allege that some District mental health providers offer some components of ICBS, but no single service provider offers all of them. *Id.* ¶ 43. They further allege that I.C., L.R., B.T., and M.W., have not received ICBS. *Id.* ¶¶ 53, 61, 68, 76. For I.C., B.T., and M.W., they allege that each has not "receive[d] the ICBS he needs to avoid institutionalization." *Id.* ¶¶ 65, 73, 81. They further allege that L.R., "is interested in receiving ICBS, but the District has not worked with her to arrange for her to receive these services while she has lived in the community." *Id.* ¶ 58.[8] Plaintiffs contend that the District's failure to provide these services violates the Medicaid Act's EPSDT provision, 42 U.S.C. § 1396d(a)(4)(A), and that their resulting institutionalization or risk thereof violates the ADA and Section 504 under *Olmstead v. L.C. ex Rel. Zimring*, 527 U.S. 581 (1999).

Plaintiffs filed their lawsuit on August 14, 2018. [3]. The District moved to dismiss, and the Court (Sullivan, J.) denied the motion. Mem. Op. on Mot. to Dismiss [45]. The District argued that Plaintiffs had failed to state a claim under the Social Security Act, the ADA, and

---

[7]     Although Plaintiffs mention "therapeutic foster care" as a fourth component, Judge Sullivan previously concluded that "[t]herapeutic foster care is not at issue in this case." *See* Mem. Op. on Mot. to Dismiss [45] at 5 n.2.

[8]     Plaintiffs nevertheless proffer a declaration from Kimberly Campbell opining that a review of L.R.'s history and records shows she needs but has not received ICBS. *See* Campbell Decl. [112-19] ¶ 50.

Section 504 because they alleged only inadequate provision of services, not actual denials, as required to show violations of those laws.  *E.g.*, *id.* at 18, 25.  Judge Sullivan agreed that the applicable standards concern denials of service—not the adequacy of services offered—but understood Plaintiffs to be alleging complete failure to provide certain services.  *Id.* at 18–19 ("Plaintiffs have alleged that because defendants have failed to provide required services in their homes, or in the community, they are unnecessarily institutionalized," supporting their claims under the ADA and Section 504); *id.* at 25 ("The defendants' argument that plaintiffs take issue with the delivery method of the services, not whether the services are offered, is belied by plaintiffs' complaint," supporting their claims under the Medicaid Act).

On July 19, 2021, Plaintiffs moved for leave to amend their complaint (to add and subtract plaintiffs, and to substitute a defendant) [76] and filed their motion for class certification [74].  The Court granted Plaintiffs' motion for leave to amend on July 20, 2021.  *See* July 20, 2021 Minute Order.  On December 24, 2021, the motion for class certification was fully briefed.  On June 24, 2022, Plaintiffs moved to amend their Complaint a second time to add an additional named Plaintiff.  [92].  The Court granted Plaintiffs' second motion for leave to amend on June 28, 2022, *see* Minute Order, and the Parties then filed supplemental briefing on Plaintiffs' motion for class certification on October 21, 2022 [106].  After this case was reassigned (Reyes, J.), the Court denied Plaintiffs' motion for class certification without prejudice and entered a scheduling order directing the Plaintiffs to re-file their motion by May 17, 2023.  *See* April 4, 2023 Minute Order; May 1, 2023 Minute Order.

Plaintiffs bring two separate claims, one under 42 U.S.C. § 1983 for an alleged violation of the Medicaid Act's EPSDT provision, and one under the ADA and Section 504 for violating the "integration mandate" as specified in *Olmstead*.  *See* Sec. Am. Compl. ¶¶ 83–90.  Plaintiffs'

Second Amended Complaint seeks certification of the following class: "All Medicaid-eligible District of Columbia children who now or in the future are under the age of 21, have a mental health disability, are not receiving medically necessary intensive community-based services, and are unnecessarily institutionalized or at serious risk of institutionalization." *Id*. ¶ 24.

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 sets out the requirements for class certification. Fed. R. Civ. P. 23. A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)). Thus, a class "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites [for class certification] have been satisfied." *Feinman v. FBI*, 269 F.R.D. 44, 49–50 (D.D.C. 2010) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). The plaintiff bears the burden of persuasion to show each and every requirement of Rule 23 has been met, generally by a preponderance of the evidence. *Hoyte v. District of Columbia*, 325 F.R.D. 485, 491 (D.D.C. 2017).

First, the plaintiff must meet all four requirements of Rule 23(a) by showing that: (1) the proposed class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

Second, if the plaintiff can meet all the requirements of Rule 23(a), she must then show certification is warranted under one of the three categories set forth in Rule 23(b). *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010); *Garcia v. Johanns*, 444 F.3d 625, 631 n.6 (D.C. Cir. 2006). As relevant here, Pls.' Mem. at 35–40, Rule 23(b)(2)

10

permits certification of a class seeking declaratory or injunctive relief only upon a showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Although analytically distinct from the issue of class certification, courts may consider the underlying merits on a motion for class certification "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

## ARGUMENT

## I.      Plaintiffs Do Not Meet the Rule 23(a) Prerequisites for a Class Action.

The requirements of Rule 23 are "carefully calibrated" and "provide[ ] strong protection against circular or indeterminate class definitions." *In re White*, 64 F.4th 302, 313 (D.C. Cir. 2023). For the reasons discussed below, Plaintiffs' proposed class definition does not meet the requirements of Rule 23.

### A.      Plaintiffs Have Not Met Their Burden To Show Numerosity.

Plaintiffs have not established numerosity. Numerosity requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "That numerosity must exist throughout the litigation." *White*, 64 F.4th at 314. If a class "could be defined to have zero members if the plaintiffs lose[, it] is not numerous at all." *Id.* Here, Plaintiffs' proposed class definition is limited to qualifying children who "are not receiving medically necessary intensive community-based services, and are unnecessarily institutionalized or at serious risk of institutionalization." Pls.' Mem. at 3. The very issues Plaintiffs must prove to prevail on the merits are: (1) whether the District indeed fails to provide them and similarly situated children medically necessary ICBS (under the Medicaid Act); and, if so, (2) whether this

causes Plaintiffs to be unnecessarily segregated into residential institutions (under the ADA and Section 504). *See* Mem. Op. on Mot. to Dismiss [45] at 19, 27–28. If they cannot prove these, a class previously certified under Plaintiffs' proposed definition would lose its entire membership. Such a class definition cannot meet the requirements of numerosity. *See White*, 64 F.4th at 314; *cf. Mullins v. Direct Digital, LLC*, 795 F.3d 654, 660 (7th Cir. 2015) ("Defining the class in terms of success on the merits is a problem because a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." (internal quotation omitted)); *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 547 (1974) (1966 amendments to Rule 23 "were designed, in part, specifically … to assure that members of the class would be identified before trial on the merits and would be bound by all subsequent orders and judgments").[9]

Purporting to answer this critique, Plaintiffs suggest that class membership could be discerned by looking only at whether any given child: "(1) is a Medicaid-eligible child (under the age of 21) who; (2) has a mental health disability." Pls.' Mem. at 41. Those criteria, however, are squarely in tension with the class definition they have proposed, which seeks to extend class

---

[9]    Courts in other Circuits have treated the issue of whether a class is "fail-safe" or "defined in terms of success on the merits" as part of an implied ascertainability requirement. *See, e.g., Mullins*, 795 F.3 at 657. Under that analysis, courts have repeatedly rejected fail-safe class definitions in actions brought under the Medicaid Act's EPSDT requirements. *See, e.g.*, *N.B. v. Hamos*, 26 F. Supp. 3d 756, 767-68 (N.D. Ill. 2014) (rejecting class definition consisting of Illinois youth who "are not receiving" specified home- and community-based services recommended by physicians on grounds that doing so "would result in a 'fail-safe' class"); *A.A. by and through P.A. v. Phillips*, Civil Action No. 19-00770, 2021 WL 2102829, at *9 (M.D. La. 2021), *rev'd on other grounds*, 2023 WL 334010 (Jan. 20, 2023) (rejecting class definition consisting of Louisiana youth "not receiving" specified services on grounds that class definition "creates an impermissible 'fail safe' class"); *see also O.B. v. Norwood*, 15 C 10463, 2016 WL 2866132, at *2 (E.D. Ill. May 17, 2016) ("[C]lass membership does not, and should not, be tied to Defendant's ultimate liability in the case[,] lest it create an impermissible fail-safe class …." (internal quotation marks omitted)).

membership to all Medicaid-eligible children in the District who "are not receiving medically necessary intensive community-based services, and are unnecessarily institutionalized or at serious risk of institutionalization."  Pls.' Mem. at 3.  A class definition looking only at Medicaid eligibility and whether a child has a mental health disability would be overly broad in scope, sweeping in children who have no need for ICBS.  If Plaintiffs mean to suggest that all children with mental health disabilities in fact need ICBS, they have offered no support for that proposition.  And if they mean to suggest that all children with mental health disabilities in the District are at "serious risk of institutionalization," their own evidence belies that assertion.  *See* Bird Decl. [112-6] at 49–52 (asserting G.P. has a SED, has not received ICBS, and is not at risk of institutionalization); Missildine Decl. [112-22] Ex. A at 64–67 (asserting D.D. has an SED, did not receive ICBS despite needing such services, and is not at risk of institutionalization).

Further, Plaintiffs' methodology for sampling putative class members did not meet the reliability standards they proposed.  Plaintiffs proffer the declaration of E. Sally Rogers on the validity of their sampling methodology.  *See* Rogers Decl. [112-7].  Ms. Rogers advised that from the pool of 1,900 Medicaid-eligible children with mental health disabilities who have been institutionalized or utilized certain services, examining 66 should obtain a representative sample of the pool.  *See id.* ¶ 19.  Plaintiffs' efforts notwithstanding, their proffered experts only examined 32—and only 29 of whom were randomly selected.  *Id.* ¶ 38.  Of those 29, 24 were found to be in need of some component of ICBS, and only about 20 were found to be institutionalized or at risk of institutionalization.  *See generally* Bird Decl. [112-6]; Campbell Decl. [112-19]; Missildine Decl. [112-22]; Joyner Decl. [112-26]; Boyd Decl. [112-33].

As discussed further below, the District vigorously disputes the analysis of Plaintiffs' declarants, *see* Sections I.B. and I.C, and submits that Plaintiffs' declarants had incomplete

information and did not reach valid conclusions.  Plaintiffs have not put forward adequate evidence to establish any need for services that they did not receive, or any risk of institutionalization, based on the District's alleged failure to provide such services.  They similarly lacked complete information as to the remaining sample of children and did not draw valid conclusions as to them, either.  Even so, it is unclear what, if anything, Plaintiffs' unrepresentative sample shows.  As explained above, Plaintiffs have not followed the methodology that, according to their own evidence, would be required to draw statistically valid conclusions.  Plaintiffs have therefore failed to meet their burden to establish numerosity by a preponderance of the evidence.  Plaintiffs' motion for class certification should be denied.

### B.    Plaintiffs Cannot Establish Commonality Because They Have Not Identified Any Common Questions Pertinent to Either of Their Claims.

Commonality requires that plaintiffs show "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  For the commonality requirement to be satisfied, class members' claims must depend on "a common contention … [that] is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at 350.  "Rule 23 does not allow for … a 30,000 foot view of commonality."  *White*, 64 F.4th at 314.  Plaintiffs have failed to identify any common questions as to either of the two claims central to this case.

### 1.    Plaintiffs Have Not Identified Any Common Question as to Their Medicaid Act Claim.

Plaintiffs contend that their Medicaid Act claim gives rise to a single common question: "whether all class members who need ICBS—which under the Medicaid Act must be provided to all child enrollees for whom it is 'medically necessary'—have received it."  Pls.' Mem. at 20.  If Plaintiffs mean to signal a distinction between putative class members "who need ICBS" and

those who do not, this question fails under the most basic rubric of commonality:  Common questions must pertain to the entire class, not just to a subset of it.  *See Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1281 (11th Cir. 2000) (rejecting class certification where plaintiffs alleging state's failure to provide Home and Community Based Waiver (HCBW) services under Medicaid Act had not made "threshold showing of eligibility for HCBW services" for all class members). But even if the proposed class encompasses only those children who do need ICBS, Plaintiffs have still failed to identify a common question.

First, Plaintiffs have not defined "ICBS" with enough specificity to raise any common questions.  *Cf. A.A. v. Phillips*, Case No. 21-30580, 2023 WL 334010, at *3 (5th Cir. Jan. 20, 2023) (finding that proposed class was flawed because "it is not clear which care coordination services and behavioral services are 'intensive,' falling within the [intensive home- and community-based services] definition, and which are not" and knowing which services were covered was essential to determining who was in the class).  Plaintiffs define ICBS as encompassing broad categories of services without a feasible method for identifying what services are at issue or which children need which services, thus precluding the possibility of any common questions.  Sec. Am. Compl. ¶ 41.

When asked in interrogatories to identify what specific services within "ICBS" the District fails to provide, Plaintiffs simply restated the three broad categories of services they identify in their Complaint.  *See* Ex. D, Pls.' Objections and Responses to Defs.' Second Set of Interrogatories to Pls. L.R. and University Legal Services, Inc., at 4–8.  Indeed, they seemingly concede that the District *does* provide the relevant services; they take issue instead with the adequacy and intensity of those services—without specifying what additional or alternate services, other than an individualized mix of things, would satisfy their amorphous sufficiency

15

standard. *See, e.g.*, *id.* at 5 (explaining that the District's "high fidelity wraparound" service of intensive care coordination "has not produced outcomes for children and youth consistent with those jurisdictions that" provide the service with better fidelity to the national model); *id.* at 5 (explaining that "intensive behavior support services" are "individualized therapeutic interventions" and that these "services must be individualized to meet the needs of the children"), 7 (explaining only that mobile crisis services "must include sufficient services to stabilize a youth during a crisis"). Thus, according to Plaintiffs' own responses in discovery, even determining "whether all class members who need ICBS … have received it" necessarily requires assessing each child individually. *Id.* This should be fatal to their Motion because it shows the lack of questions common to the class, and the Court cannot determine who is in the class or provide putative members with relief on anything broader than a case-by-case basis.

Further, as Judge Sullivan previously recognized in this case, "[c]ourts construing EPSDT requirements have ruled that so long as a competent medical provider finds specific care to be 'medically necessary' to improve or ameliorate a child's condition, the Medicaid statute requires a participating state to cover it." Mem. Op. on Mot. to Dismiss at 27. But Plaintiffs have offered no evidence that any Medicaid-eligible child in the District has received a provider recommendation for ICBS as they define it, and have failed to limit their class to children for whom a medical provider has made a finding of medical necessity for any given service. Therefore, determining which services were in fact "medically necessary" for putative class members under the applicable law would require the Court to weigh the evidence for each putative class member—a task both unnecessary and undesirable for any court to engage in. *See A.A. by and through P.A. v. Phillips*, Civil Action No. 19-00770, 2021 WL 2102829, at *9 (M.D. La. 2021), *rev'd on other grounds*, 2023 WL 334010 ("Clearly, the Court cannot make

determinations of medical necessity in the first instance ….”); *N.B. v. Hamos*, 26 F. Supp. 3d 756, 767-68 (N.D. Ill. 2014); *see also* 22-A DCMR § 3499.1 (defining “Medical Necessity” as “Health care services or products that a prudent provider would provide to a client for the purpose of preventing, diagnosing, or treating an illness, injury, disease, or its symptoms in a manner that is: (a) in accordance with generally accepted standards of health care practice; (b) clinically appropriate in terms of type, frequency, extent site, and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the client or treating provider.”).

As the detailed reports proffered by Plaintiffs’ declarants make clear, both need and services received vary significantly from child to child.  The declarations incorporate painstaking analyses of individual cases, going into great detail about the histories of each child, each child’s mental health conditions, symptoms, diagnoses, and the services he or she has received based on significant volumes of documentation.  *See, e.g.*, Campbell Decl. Ex. B at 1–37 (listing over 800 individual records reviewed for L.R. totaling thousands of pages).  For some children, Plaintiffs’ declarants reach conclusions about whether the child in question has received ICBS, while for others they concede there is insufficient information to reach a conclusion one way or the other. *See, e.g.*, Campbell Decl. ¶¶ 50 (“L.R. needs, but has not received, the ICBS described in the complaint”); 94–127 (no determination that putative class member T.W. needs ICBS); 154 (no determination that putative class member D.G. needs ICBS, and unable to offer an opinion on sufficiency of services received); 164 (same as to putative class member J.S.).

The District, by contrast, vigorously disputes any conclusions that some children have not received needed services and has proffered evidence explaining how Plaintiffs have mischaracterized, misinterpreted, or misunderstood the needs and services of the sample

children, often basing their conclusions on incomplete information.  *See generally*, Ex. B,

Declaration of Patrina Anderson (Anderson Decl.); *see also* Joyner Decl. [112-26] at 9 (putative

class member M.B. prescribed and received CBI); Campbell Decl. ¶ 49 (L.R. provided TACT

services), ¶ 84 (putative class member K.R. prescribed and received CBI).  Determining need or

receipt of services for "all class members," Pls.' Mem. at 20, would thus require weighing the

evidence for each individual child—the antithesis of a common question that could resolve the

relevant claims "in one stroke."  *See Wal-Mart,* 564 U.S. at 350.

     Plaintiffs point to a number of Medicaid Act class actions post-*Wal-Mart* in which courts

have found commonality, presumably to suggest the same would be possible here.  *See* Pls.'

Mem. at 21 n.21 (citing cases).  But each of the cases they cite presented common questions

keyed to the existence or non-existence of government policies and practices, not whether

individual class members needed or had received services.  *See S.R. v. Pa. Dep't of Human*

*Servs.,* 325 F.R.D. 103, 108–09 (M.D. Pa.) (listing eight common questions concerning whether

Pennsylvania offered particular services or had certain policies in place); *O.B. v. Norwood*, 15 C

10463, 2016 WL 2866132, at *4 (E.D. Ill. May 17, 2016) (common question of "illegal and

systemic failures to provide approved EPSDT services consistent with" requirement "that certain

services are made available to Medicaid-eligible children" (internal quotation marks omitted));

*N.B.*, 26 F. Supp. 3d at 772 (common question of "whether the state provides intensive mental

health treatment to children only in hospitals and institutions and fails to provide *any* intensive,

individualized care that is community-based or in the home" (emphasis in the original)).  Here,

by contrast, Plaintiffs have keyed their purportedly common question to individual class

members, asking "whether all class members who need ICBS … have received it."  *See* Pls.'

Mem. at 20.[10]  To answer that question, the Court must look at each child one by one, determine whether that child needs ICBS, and then determine whether he or she received it.  That is the opposite of a common inquiry.  Thus, Plaintiffs have not identified any common questions related to their Medicaid Act claim.

### 2.    Plaintiffs Have Not Identified Any Common Questions as to Their *Olmstead* Claim.

Plaintiffs likewise have not shown any common questions pertaining to their disability discrimination claim.  As Judge Sullivan previously noted, individuals can show entitlement to community-based services under *Olmstead* only if: (1) "such services are appropriate"; (2) "the individuals do not oppose community-based services"; and (3) "the individuals' placement in a community-based setting can be reasonably accommodated, considering the resources available to the [providing] entity and the needs of others who are receiving those services."  Mem. Op. on Mot. to Dismiss at 18 (citing *Olmstead*, 527 U.S. at 607).  It is the plaintiff's burden to affirmatively show the first two of these; only then does the burden shift to the defendant to show that the requested accommodation is not reasonable.  *See Brown v. District of Columbia*, 928 F.3d 1070, 1078 (D.C. Cir. 2019) ("[T]he State bears the burden of proving the unreasonableness of a requested accommodation once the individual satisfies the first two [*Olmstead*] requirements.").

---

[10]    Despite expressly positing only this lone common question, Plaintiffs subsequently contend that their "allegations involve a single overarching question:  whether Defendants systematically fail to provide medically necessary ICBS to the Plaintiff Children in violation of" the various legal provisions at issue.  Pls.' Mem. at 21.  Even if Plaintiffs seek to pitch this as an alternative common question, the result is no different.  Adding the word "systematically" does not change the reality that any analysis would center on whether the District "provide[s] medically necessary ICBS to the Plaintiff Children," a question that is inherently individualized for all the reasons stated above.

Under this standard, Plaintiffs contend their *Olmstead* claim gives rise to three common questions: (1) "whether the District's '*Olmstead* Plan' comprehensively and effectively ensures class members are not unnecessarily institutionalized," (2) "the cost of providing all class members with ICBS they need to avoid unnecessary institutionalization," and (3) "whether it is reasonable to require the District to use its resources to pay that cost." Pls.' Mem. at 20. But none of these three questions will arise at all unless Plaintiffs can first meet their burden to show the first two *Olmstead* elements. *See Brown*, 928 F.3d at 1077. The comprehensiveness, effectiveness, cost, and reasonableness of providing class members with ICBS go only to the District's potential defense that the desired accommodations here are not reasonable. *See id.* at 1083–84 (holding that, where case "turn[ed] on whether the District can establish that the plaintiffs' requested accommodations are in fact unreasonable …" under the third *Olmstead* element, the District could show either "that it has a 'comprehensive, effectively working plan'" for community transition, or that all accommodations the plaintiffs requested would impose unreasonable cost). But as the D.C. Circuit has made clear, that defense does not even come into play until Plaintiffs make a showing of the first two *Olmstead* factors: that the community-based services are appropriate for and unopposed by those requesting them. *Id.*; Mem. Op. on Mot. to Dismiss at 18. Plaintiffs identify no common questions going to either of those elements.[11]

Nor could they on this record. On the merits, Plaintiffs will not even get to the three questions they identify as common inquiries unless they can first show that the alleged absence

---

[11] For this reason, Plaintiffs' reliance on *Brown* is misplaced, as the first two *Olmstead* factors were not at issue there. *See Brown*, 928 F.3d at 1083 ("Thus, this litigation boils down to resolution of the third *Olmstead* question: are the requested accommodations reasonable?"). Plaintiffs have not—and could not—identify any common questions pertaining to the first two prongs of the *Olmstead* standard given that they have keyed their class definition to each class member's need for services and provided no objective criteria for determining such need.

of ICBS has caused *all* putative class members to be deprived of "appropriate" community services that *each* of them did not oppose—determinations that Plaintiffs leave to child-by-child inquiries.  *See* Mem. Op. on Mot. to Dismiss at 22 ("At a later stage, plaintiffs will be required to provide evidence to back up their claims that community-based treatment was appropriate ….").  That defies the "touchstone of the commonality inquiry," which asks whether class-wide adjudication will "generate common *answers* apt to *drive the resolution* of the litigation." *Coleman through Bunn v. District of Columbia*, 306 F.R.D. 68, 82 (D.D.C. 2015) (second emphasis added); *see also Steimel v. Minott*, Civil Action No. 13-957, 2014 WL 1213390, at *15 (S.D. Ind. Mar. 24, 2014) ("[T]he 'truth or falsity' of whether the [challenged policy] caused the institutionalization of class members must be 'capable of classwide resolution' such that the Court can resolve the issue for 'each one of the claims in one stroke.'" (quoting *Wal-Mart*, 564 U.S. at 350)).  Even if they could help resolve this litigation, the questions Plaintiffs identify will only come long after a panoply of individual questions about whether services in the community would have been appropriate for each child.[12]

Moreover, even if Plaintiffs could identify questions pertinent to the first two *Olmstead* factors, they could not show any such questions are common across the class as they have defined it.  Plaintiffs attempt to combine into one class those children who are (or are at risk of being) institutionalized in psychiatric facilities, those who are (or are at risk of being) incarcerated in detention facilities, those who are (or are at risk of being) in residential placements, and those who are (or are at risk of being) placed into "other institutional settings."

---

[12]     Plaintiffs' characterization notwithstanding, the District is not arguing that mere "factual distinctions existing among class members" are what stands in the way of commonality.  *See* Pls.' Mem. at 23 n.22.  It is the individualized nature of the first two *Olmstead* inquiries, and Plaintiffs' failure to offer any common questions as to either, that presents the barrier.

*See* Pls.' Mem. at 15.[13]  But the relevance of what services they have or have not received, and the relevance of what services the District does or does not provide, is not the same for each of those discrete groups.  On a theoretical level, the connection between not receiving mental health services in the community and ending up in a psychiatric treatment facility is much more direct than the connection between not receiving mental health services in the community and ending up in a detention facility.  Many more intervening factors might be relevant to the latter. Plaintiffs therefore cannot establish commonality as to their *Olmstead* claims.

   **C.**   **Plaintiffs Cannot Establish Typicality Because They Have Received the Very Services They Allege the District Fails to Provide.**

   Additionally, Plaintiffs cannot establish typicality as required under Rule 23(a)(3).  The central purpose of the typicality requirement is to ensure that class members and the named plaintiffs have claims "sufficiently similar so that the representatives' acts are also acts on behalf of, and safeguard the interests of, the class." *Littlewolf v. Hodel*, 681 F. Supp. 929, 935 (D.D.C. 1988), *aff'd sub nom.*, *Littlewolf v. Lujan*, 877 F.2d 1058 (D.C. Cir. 1989); *see also Stewart v. Abraham*, 275 F.3d 220, 227 (3d Cir. 2001) ("The typicality inquiry centers on whether the interest of the named plaintiffs align with the interests of the absent members.").  Typicality is not met unless each named plaintiff can point to the "same course of events" and "make[] similar legal arguments to prove the defendant's liability." *Alvarez v. Keystone Plus Construction Corp.*, 303 F.R.D. 152, 161 (D.D.C. 2014) (citation and internal quotation marks omitted); *see, e.g.*, *Arias v. Marriott Int'l, Inc.*, 324 F.R.D. 307, 312 (D.D.C. 2018) (typicality not met in

---

[13]   Plaintiffs further offer no objective way to establish who is at sufficiently "serious risk" of any future institutionalization.  Without an "objective standard" for making such determinations, "only expert opinion could establish a likelihood of future institutionalization, and that opinion would be subject to competing testimony," and thus not appropriate for class-wide determination. *See N.B.*, 26 F. Supp. 3d at 768–69.

putative class action alleging unlawful working conditions where circumstances of named plaintiff's claims "concern[ed] [the p]laintiff alone and involve details specific to her" employment and termination).

If Plaintiffs' class definition is adopted, the class will consist of those children who both need and have not received the services described in the Complaint as ICBS.  *See* Sec. Am. Compl. ¶ 24; Mem. Op. on Mot. to Dismiss [45] at 18–19, 25–26.  Anyone who has received ICBS would thus fall outside of that definition, as would anyone for whom such services are not necessary.  Plaintiffs' proffered evidence makes clear that all four of them are atypical of that putative class.  *See White*, 64 F.4th at 314 ("Typicality … should be a hard hill to climb if the named plaintiffs might not be members of the class come final judgment.").

### 1.   L.R.

L.R. is not typical of the putative class here for several reasons.  First, L.R.'s records show that she has received mental health services according to her identified needs.  L.R. has received CBI Level IV and, on several occasions, CBI Level II, both of which involve the use of child and family teams.  Anderson Decl. ¶ 15.  L.R. has received HFW with a team actively involved in coordinating her treatment.  *Id.* ¶¶ 16–17.  L.R. has also received ACT services (a functional equivalent to TACT services), *id.* ¶ 20–21, which Plaintiffs' own proffered expert describes as "a form of ICBS."  Campbell Decl. ¶¶ 49, 54.  Plaintiffs' declarant, Ms. Campbell, describes these services as designed to contain what Plaintiffs believe are the necessary components of ICBS, despite taking issue with how services have actually been delivered to L.R.  *See id.* ¶ 54.  L.R. has also received mobile crisis services through ChAMPS on at least one occasion, which did not result in L.R. being hospitalized or detained.  Anderson Decl. ¶ 19.  The record contains no evidence that any provider determined L.R. has a need for any other services

that she did not receive, let alone by virtue of the District's failure to provide them.  *Id.* ¶ 24.  In other words, if Plaintiffs' putative class consists of those deprived of needed ICBS, L.R. is not within the putative class membership.[14]  *See Alvarez*, 303 F.R.D. at 161 (typicality requires named plaintiffs to allege "same course of events" and "similar legal theories" to class members).

Second, many of L.R.'s treatments, and her prospects for treatment in the community, have been complicated by factors unique to her individual circumstances.  For example, records show that during a PRTF placement in 2015, L.R.'s father attempted to undermine her therapy by recommending that she act aggressively, and in 2017, L.R.'s father demanded that she be discharged early from a PRTF against the advice of providers.  Anderson Decl. ¶ 21.  Moreover, L.R. herself suggests that she has in fact been offered and received the very services Plaintiffs say the District does not provide; she is simply unsatisfied with some of them.  *See* L.R. Redacted Decl. [112-21].  L.R.'s complicated treatment history reveals that whether she received needed services will turn on events unique to her own case, making her atypical of the putative class, as Plaintiffs have elected to define it.  *See Arias*, 324 F.R.D. at 312.

### 2.  B.T.

B.T. is also not typical of the putative class for similar reasons.  First, B.T. has, over the years, received services responsive to his identified mental health needs.  Although Plaintiffs' declarant, Ms. Boyd, purports to review the services B.T. received, Ms. Boyd focuses heavily on records of B.T.'s institutional placements, not services received in the community.  Boyd Decl.

---

[14]     Ms. Campbell also alleges gaps in L.R.'s services, such as a discharge from a PRTF placement in 2016 without community-based mental health services in place.  *See* Campbell Decl. ¶ 45.  In fact, L.R. promptly completed intake and enrolled with a service provider, and began receiving CBI Level II services shortly thereafter.  *See* Anderson Decl. ¶ 22 n.5.

¶¶ 121–23, 125–26, 127–28.  B.T.'s records, however, show that he has received various mental health services in the community responsive to his identified needs.  For example, B.T. has been enrolled in CBI Levels I and II, both of which incorporate the very child and family teams that Plaintiffs contend are missing from the District's services.[15]  *See* Anderson Decl. ¶¶ 10, 12.  B.T. is also currently enrolled in ACT.  *Id.* ¶ 10.  DBH records provide no indication that any provider found B.T. required—or even would be eligible for—HFW services.  *Id.* ¶ 11.  The record contains no evidence that any provider determined B.T. has a need for any other services that he did not receive, let alone by virtue of the District's failure to provide them.  *Id.*  This, too, would set him apart from the rest of the class.  *See Arias*, 324 F.R.D. at 312.

Second, however, even if B.T. had not received certain needed services by virtue of them being unavailable, Plaintiffs' own evidence suggests that B.T. would not be eligible for those services.  Plaintiffs' declarant, Ms. Boyd, opines that B.T. has not received adequate psychological evaluations and was denied the use of a vocational service because of a placement in a drug rehabilitation/detox program.  Boyd Decl. ¶ 139.  From this, Ms. Boyd concludes that "even if a collection of appropriate, evidence-based, individualized ICBS were available for B.T., these inadequate psychological evaluations and inappropriate placements served as obstacles to B.T.'s attempts to access supports and funding that may have facilitated independent living in the community."  *Id.*  If true, an order that the District provide ICBS will not help B.T. because he has not received proper diagnostics in the first place.  B.T.'s purported injury— inadequate psychological evaluations—would therefore give rise to a distinct legal claim not common to the putative class or typical of its membership.  *See Alvarez*, 303 F.R.D. at 161.

---

[15]     Records show that for CBI Level I, B.T. received one authorization for 180 days, and for CBI Level II, B.T. received three authorizations for 180 days each.  *See* Sullivan Decl. ¶ 22.

Third, although Plaintiffs point to examples of B.T. being placed into certain shelters and substance use treatment centers, no records indicate that B.T. has ever been placed in inpatient psychiatric care or has ever been referred for care at a PRTF.  Anderson Decl. ¶ 13.  Indeed, the residential placements Plaintiffs identify for B.T. are all juvenile justice shelter home placements, not placements made for the purpose of inpatient psychiatric treatment.  *See id.*; Boyd Decl. ¶¶ 111, 113, 114, 120, 121, 141; *see also* D.C. Code § 16-2315.  Plaintiffs do not allege that children are unnecessarily institutionalized because judges order them to be; they allege that the putative class members cycle through institutional placements directly because of the District's alleged failure to offer needed services.  *See, e.g.*, Sec. Am. Compl. ¶ 3.  If the putative class consists of those who are, have been, or are at risk of being institutionalized into psychiatric treatment facilities by virtue of not receiving needed services, Plaintiffs have not met their burden to show B.T. falls within that group.  *See Alvarez*, 303 F.R.D. at 161.

### 3.  M.W.

M.W. is not typical of the putative class, either.  First, M.W., too, has received numerous intensive mental health services in the community:  HFW, ACT, care coordination, psychotherapy, living and coping skills training, vocational goals with supportive employment, nursing case management, care coordination, medication management, and community support.  *See* Anderson Decl. ¶ 26; *accord* Campbell Decl. ¶¶ 141, 146.  Since December 2015, M.W. also received CBI Level I, CBI Level II, and CBI Level III services, as well as multi-systemic therapy, and ACT services.  Anderson Decl. ¶ 26.  Additionally, M.W. received HFW for approximately one year from late 2017 to late 2018.  *Id.* ¶ 27.  This included a family teaming

process.  *Id.*[16]  Once again, if the class as a whole alleges the non-receipt of needed services, M.W. has no basis to raise such a claim.

Second, Ms. Campbell opines that M.W. "needs to live in a supervised independent living setting."  Campbell Decl. ¶ 143.  Nowhere do Plaintiffs suggest that a supervised independent living setting would fall within the services they call ICBS.  Indeed, M.W.'s provider records do not indicate he has ever sought and been denied a medically necessary behavior health service, let alone any such service Plaintiffs describe in their Complaint.  Anderson Decl. ¶ 30.  M.W. is therefore atypical of the class as a whole.  *See Arias*, 324 F.R.D. at 312.

### 4.  I.C.

I.C.'s records show that he has received mental health services from the District for the past seven years according to his identified needs.  Around February 2015, I.C. began receiving medication management in addition to his special education services, including a dedicated aid in the classroom and on the school bus.  *See* Ex. C, Suppl. Declaration of Patrina Anderson (Anderson Suppl. Decl.) ¶ 6; Suppl. Declaration of Dr. Sara Boyd (Suppl. Boyd Decl.) ¶ 24 [112-34].  In July 2015, he began receiving community support.  Anderson Suppl. Decl. ¶ 6.

---

[16]     Plaintiffs' declarant, Ms. Campbell, acknowledges that M.W. received wraparound services through MBI, complete with a "child and family team," noting only that M.W.'s medical records do not contain thorough notes about whether the services were "implemented with fidelity."  Campbell Decl. ¶ 141.  Ms. Campbell also acknowledges that M.W. receives mental health services through Community Connections, and has a crisis plan that includes the following services:  "MHRS-ACT, psychotherapy, living/coping skills training, vocational goals with supportive employment, nursing case management, and care coordination."  *Id.* ¶ 146.  Ms. Campbell does not dispute that M.W. received these services, taking issue only with the consistency of a therapist, and the lack of records on whether the providers worked through a teaming process.  *Id.*  M.W. himself acknowledges he received intensive mental health services in the community from Community Connections, despite taking issue with the quality of some of them.  *See, e.g.*, M.W. Redacted Decl. [112-24] ¶¶ 31–35.

From June 2016 through October 2019, I.C. was enrolled with Life Enhancement Services (LES), a core services agency, where he received community-based behavioral health services. *Id.* ¶ 8.  This included a Diagnostic Assessment, the creation of a Plan of Care with input from I.C.'s mother, and Community Based Intervention (CBI) beginning in July 2016.  *Id.*

At I.C.'s mother's request, I.C. was transferred from LES to Better Morning in October 2019, where he continued to receive Medicaid-funded community-based behavioral health services.  *Id.* ¶ 10.  From February to May 2020, I.C. regularly participated in community support, and in March 2020, he was authorized for CBI services, which he received until August 2020.  *Id.*  And, in fact, I.C. expressed satisfaction with the services that he receives from Better Morning, stating the following about his provider:

> [My provider] used to come to my house and take me out to Starbucks because she knows I like coffee.  She worked with me on improving and controlling my emotions.  She also helped me deal with my grief when my grandparents passed away when I was 15.  I feel like she understood me and paid attention to what I was saying to her.  [She] is the first person I remember asking me what I needed.  She helped me with long-term stuff too.  Because whether I chose to use it or not in the moment, it would still be stuck in my memory to use later.

I.C. Redacted Decl. [112-11] ¶ 17.  Although he was not able to regularly communicate with his provider throughout his detention, he has again connected with her since his release from New Beginnings in April 2022, and continues to receive community support services from Better Morning.  *Id.*; Anderson Suppl. Decl. ¶ 13.

Further, the record contains no evidence that I.C. has ever sought and been denied medically necessary behavioral health services, let alone by virtue of the District's failure to provide them.  Anderson Suppl. Decl. ¶ 15.  Plaintiffs' declarant, Ms. Boyd, purports to have reviewed "records maintained by I.C.'s treatment providers, school records, and records concerning I.C.'s juvenile justice involvement and placement," before concluding that "I.C.

28

needed and continues to need ICBS." *See* Boyd Suppl. Decl.¶¶ 15, 83.  In fact, her review focused almost exclusively on I.C.'s educational records and did not include a review of the mental health services he has received in the community for the past seven years.  *See* Anderson Suppl. Decl. ¶ 3.

I.C. is also atypical because his receipt of mental health treatment has been complicated due to his unique circumstances.  In June 2017, for example, I.C.'s mother terminated his CBI. *See id.* ¶ 9.  I.C.'s treatment notes indicate that his mother "no longer wish[ed] to receive service for [I.C.]," and that if he needed services in the future, she knew how to access them.  *See id.*  In addition, I.C. has had many interactions with the juvenile justice system, including considerable time spent in detention facilities, which have interrupted his community-based mental health services.  *Id.* ¶ 11.

Lastly, Plaintiffs assert that the class members have been harmed by the District's "creat[ion] and maint[enance of] a system that provides services to the Plaintiffs in institutional settings, instead of providing them ICBS in the community."  *See* Pls.' Mem. at 25.  But I.C. alleges just the opposite—that during his periods of institutionalization, he received very few if any services, making him atypical.  *See* I.C. Decl. ¶¶ 16, 20–24.  And although Dr. Boyd states that "the lack of appropriate services has resulted in contact with juvenile justice authorities, as well as out-of-home placement in restrictive settings, including detention," Boyd Suppl. Decl. ¶ 38, Dr. Boyd's conclusions solely relied on commitments that were court ordered, and any connection to an alleged lack of mental health services is attenuated.  I.C., like the other named Plaintiffs, is atypical of the class as a whole.  *See Arias*, 324 F.R.D. at 312.  Certification should be denied on this basis.

### D.    Plaintiffs Cannot Adequately Serve as Class Representatives Because They Have No Incentive To Seek Additional Services They Do Not Need.

For similar reasons, Plaintiffs cannot establish the fourth and final requirement under Rule 23(a), adequacy, for which they must show "that the named plaintiff[s] must 'fairly and adequately protect the interests of the class.'"  *D.L. v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).  This requires that they: (1) "must not have antagonistic or conflicting interests with the unnamed members of the class," and (2) "must appear able to vigorously prosecute the interests of the class through qualified counsel."  *J.D. v. Azar*, 925 F.3d 1291, 1312 (D.C. Cir. 2019).  Though not dispositive, the moot claims of named plaintiffs "can raise 'adequacy concerns.'"  *Id.* (quoting *D. L.*, 860 F.3d at 726).

As described above, Plaintiffs have all received numerous mental health services in accordance with their identified needs.  *See* Section I.C above.  If Plaintiffs seek an injunction on behalf of the class that would require the District to provide additional services based on children's needs, Plaintiffs will have no incentive to seek such services when they themselves do not need them.

Moreover, L.R. and M.W. are over 21 years of age, and B.T. is either 21 or very close, but the class Plaintiffs seek to certify includes only children and adolescents under the age of 21.  Sec. Am. Compl. ¶¶ 11–13, 24.  Thus, L.R., M.W. and possibly B.T.'s claims for declaratory and injunctive relief are moot, and they have no incentive to seek injunctive relief on behalf of a class that they are not a part of and that will not impact them.  Plaintiffs cannot show they will "vigorously" defend the interests of the unnamed class members, because each of the named plaintiffs has a different—or nonexistent—interest in the outcome of the lawsuit.  *See J.D.*, 925 F.3d at 245. They thus cannot meet their burden to show they can adequately represent the interests of the class.

30

II.     **Certification Is Improper Under Rule 23(b)(2) Because Plaintiffs Have Not Established That Injunctive Relief Can Address Their Alleged Injuries.**

Rule 23(b)(2) requires that a plaintiff seeking class-wide injunctive relief show that the defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This requires two separate showings. First, the plaintiff must show that the class is "sufficiently cohesive that any classwide injunctive relief can satisfy the limitations of Federal Rule [of] Civil Procedure 65(d)—namely, the requirement that [the injunction] 'state its terms specifically; and describe in reasonable detail … the act or acts restrained or required.'" *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) (Gorsuch, J.) (quoting Fed. R. Civ. P. 65(d)(1)); *see also Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007) (injunctive relief sought under Rule 23(b)(2) "must be specific"). Second, the plaintiff must show that "relief specifically tailored to each class member would [not] be necessary to correct the allegedly wrongful conduct of the defendant." *Shook*, 543 F.3d at 604 (quoting 5 Moore's Fed. Practice § 23.43(2)(b) at 23-195 (3d 2000)). That is because "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360. Plaintiffs here have failed to make both showings.

A.     **Plaintiffs' Requested Injunction Is Fatally Vague.**

First, Plaintiffs' requested relief fails to meet the requirements of Rule 65(d), which provides that any injunction issued by a court must "state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). As the Supreme Court has emphasized, "the specificity provisions of Rule 65(d) are no mere technical

requirements," but rather are "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) (citing *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 74-76 (1967)).  The rule both promotes "basic fairness" by requiring "explicit notice of precisely what conduct is outlawed," and facilitates judicial review by ensuring an appellate court will "know precisely what it is reviewing." *Id.* at 476–77.  For instance, "injunctions simply requiring the defendant to obey the law are too vague to satisfy Rule 65." *Shook*, 543 F.3d at 604 (quoting *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004)); *accord S.E.C. v. Wash. Inv. Network*, 475 F.3d 392, 407 (D.C. Cir. 2007) (rejecting injunction against "future violations of" specified statutory provisions as "insufficiently specific").

In their Complaint, Plaintiffs only ask this Court to enjoin the District "from subjecting the named individual Plaintiffs and members of the Plaintiff class to policies and practices that violate their rights under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Medicaid Act." Sec. Am. Compl. at 24.  Such an injunction would run headlong into Rule 65's most basic requirements. *See Wash. Inv. Network*, 475 F.3d at 407; *Andrews v. Plains All Am. Pipeline, L.P.*, Civil Action No. 15-4113, 2017 WL 10543402, at * 3 (C.D. Cal. Feb. 28, 2017) (denying class certification under Rule 23(b)(2) where proposed injunction requiring defendant oil pipeline companies "to abide by existing pipeline safety regulations" was "superfluous and vague" in violation of Rule 65); *Atwell v. Gabow*, 248 F.R.D. 588, 596 (D. Colo. 2008) (denying class certification where proposed injunction prohibited defendants "from 'violating' federal antidiscrimination laws and from engaging in 'unlawful' or discriminatory practices").

Perhaps acknowledging this deficiency, Plaintiffs propose in their motion that on the merits, the Court could issue "a single injunctive order requiring Defendants to modify their policies and practices to provide ICBS to the Plaintiff Children who need it." Pls.' Mem. at 38. Once again, if Plaintiffs mean to suggest that some class members need ICBS and some do not, they cannot establish common questions across the class, let alone a single injunction that would pertain to all class members at once as required by Rule 23(b)(2). *See* Section I.B above.

Regardless, such an injunction would still violate Rule 65(d). Plaintiffs' proposed injunction does not specify how the District would have to "modify [its] policies and practices" to comply. Indeed, based on the wording, adequate policy modification would seemingly depend on whether all children are in fact receiving ICBS in accordance with their individual needs. But that provides no clearer guidance. What Plaintiffs call "ICBS" is not a single unified service offered by providers but rather three different categories comprised of various services, each of which Plaintiffs define only at a high level of generality. *See* Sec. Am. Compl. ¶ 41. Providers may also offer those services in different forms and under different names—which, despite Plaintiffs' insinuation to the contrary, is permissible under the Medicaid Act. *See Katie A. ex rel Ludin v. Los Angeles Cnty.*, 481 F.3d 1150, 1159 (9th Cir. 2007). For example, Plaintiffs' declarants proffer numerous examples of specific services they say may be necessary for some— but not all—children under the rubric of "intensive behavior support services," including "peer support services" and "group therapy," Campbell Decl. ¶ 33; "mentoring and skill-building supports," Missildine Decl. Ex. A at 19; "[t]rauma-focused therapy," "[i]ndividualized therapy," "[g]rief counseling," "[t]herapy and instruction about sexual and emotional intimacy," and "[a]nger management training," Joyner Decl. at 15; "[f]amily therapy," and "[m]edication management or other coping mechanisms (like mindfulness)," *id.* at 32, a "Transition to

Independence Process (TIP)," and vocational assessment, Campbell Decl. ¶ 143.  Plaintiffs'
declarants repeatedly emphasize that the adequate provision of ICBS depends on whether
services "are intensive and individualized," and involve "appropriately individualized
interventions." *See, e.g.*, Boyd Decl. at 76-77.

      An injunction ordering the District to provide each class member with medically
necessary ICBS would thus leave it impossible to determine what the District must in fact do.
That is precisely why, under Rule 65, the required actions "must ultimately be capable of
description in a sufficiently objective way that both the defendant and the court can determine if
the former is complying …." *Shook*, 543 F.3d at 606.  Whether a general order to modify their
policies so as to provide every child with needed "ICBS" or a mere order to follow the law,
Plaintiffs' proposed injunction would make it impossible for the District—and for the Court—to
know whether compliance has been attained.  This does not meet the requirements of Rule 65 or
Rule 23(b)(2).  *See Parent/Professional Advocacy League v. City of Springfield, Mass.*, 934 F.3d
13, 31 (1st Cir. 2019) (declining to certify class of public school students alleging city's failure
under the ADA to provide "school-based behavior services (SBBS)" based on findings that "the
term SBBS … does not refer to a single program that has been formally studied and found
effective for students like those in the proposed class," and that plaintiffs' proposed question of
whether "the failure to provide SBBS violate[s] the ADA … is likely to yield individualized
rather than common answers"); *In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 209
F.R.D. 323, 345 (S.D.N.Y. 2002) (denying class certification under Rule 23(b)(2) where
plaintiffs' desired injunction against water providers seeking "the provision of clean water" and
"remediation of contaminated wells" was rejected as "too broad to satisfy Rule 65(d)").

### B.    <u>An Injunction Would Require Individually Tailored Relief.</u>

      Second, Plaintiffs cannot show that an injunction would remedy their alleged injuries

without "relief specifically tailored to each class member." *Shook*, 543 F.3d at 604.  Plaintiffs

have made their theory of injury clear:  they believe each class member has not been receiving

the mental health services he or she needs and has been put at unnecessary risk of

institutionalization as a result.  *See, e.g.*, Pls.' Mem. at 21.  No injunction, therefore, could

remedy their injuries without accounting for each child's individual needs.  This would be true

even of an injunction prescribing a uniform process for assessing children's needs and

determining what services are appropriate for them.  That is because certification under Rule

23(b)(2) requires that "[t]he injunctive or declaratory relief sought must be 'final' to 'the class as

a whole.'"  *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 499 (7th Cir. 2012) (quoting Fed. R.

Civ. P. 23(b)(2)); *see also Soseeah v. Sentry Ins.*, 808 F.3d 800, 811 n.5 (10th Cir. 2015); *C.G.B.

v. Wolf*, 464 F. Supp. 3d 174, 206 (D.D.C. 2020).  "[I]t is not enough for class plaintiffs to

'superficially structure[] their case around a claim for class-wide injunctive and declaratory relief

… if as a substantive matter the relief sought would merely initiate a process through which

highly individualized determinations of liability and remedy are made; this kind of relief would

be class-wide in name only, and it would certainly not be final.'"  *In re Navy Chaplaincy*, 306

F.R.D. 33, 56 (D.D.C. 2014) (quoting *Jamie S.*, 668 F.3d at 498–99).

Plaintiffs' proposed injunction would mirror the very scenario the Seventh Circuit

rejected in *Jamie S.*  There, the district court certified a class consisting of Milwaukee Public

School students "eligible for special education services … who are, have been or will be either

denied or delayed entry or participation in the processes which result in a properly constituted

meeting between the IEP team and the parents or guardians of the student."  *Jamie S.*, 668 F.3d

at 487–88.  Pursuant to a partial settlement, the parties then proceeded to a remedial phase in

which the district court ordered the creation of "hybrid IEP teams," each led by a court-appointed

monitor, to identify students, determine whether they required IEPs, and assess whether to award compensatory education, among other things.  *Id.* at 489.  On appeal, the Seventh Circuit reversed the district court's certification as improper under Rule 23(b)(2) precisely because the plaintiffs' purported class-wide injury and requested relief allowed for "no single injunction that provides final relief to the class as a whole," as the district court's remedial process laid bare.  *Id.* at 499.

What Plaintiffs seek here is the provision of individualized mental health services to each class member in accordance with his or her needs.  But ordering a change to "policies and practices" would not guarantee that, at least in so far as Plaintiffs' evidence can establish, because each child's needs must still be assessed on a case-by-case basis.  Plaintiffs' reliance on *N.B.*, *see* Pls.' Mem. at 35 (citing *N.B.*, 26 F. Supp. 3d at 774), is once again misplaced.  In determining whether to certify a (b)(2) class, the court in *N.B.* observed that unlike in *Jamie S.*, "[a]ny 'highly individualized determinations' required in this case have already been made," noting that the class at issue "would consist only of children who are not receiving services that *have been prescribed* as 'medically necessary' …."  26 F. Supp. 3d at 774–75 (emphasis added).  In other words, because providers for the class member children had already determined what services they needed, an injunction could fully resolve all class members' injuries by ordering the state to provide those services.  But as discussed above, Plaintiffs have offered no evidence that any such determinations have been made for any class member.  The only way to provide the putative class members with relief would be to conduct individual evaluations of each class member at some juncture, either before issuing an injunction or after.  Doing so before would turn this putative class action into hundreds of individualized mini-trials.  Doing so after would mean that the injunction itself has not provided anyone with full relief.  *See Jamie S.*, 668 F.3d at

499.  Neither is permissible under Rule 23(b)(2).

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion for class certification.

Dated: June 7, 2023.

Respectfully Submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Helen M. Rave*
HONEY MORTON [1019878]
MATEYA B. KELLEY [888219451]
HELEN M. RAVE [90003876]
Assistant Attorneys General
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7520
Email: helen.rave@dc.gov

*Counsel for Defendants*