**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| M.J., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-1901 (ACR) |
| | ) | |
| THE DISTRICT OF COLUMBIA, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY DECLARATION OF SARA COHEN IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Sara Cohen, of full age, hereby certify as follows:

1.  I am over 18 years of age and competent to testify regarding the matters described herein.

2.  My name is Sara Cohen.  I am a rising third-year law student pursuing my Juris Doctor at the University of California, Berkeley, School of Law.  Before law school, I studied at the University of Chicago, where I majored in Anthropology and graduated in March 2019 with a Bachelor of Arts.

3.  I am one of the summer 2023 legal interns at the Bazelon Center for Mental Health Law. I work 40 hours per week at the Bazelon Center.  As a legal intern I assist the attorneys at the Bazelon Center by conducting legal and policy research, writing legal and policy memoranda, attending policy and litigation strategy meetings, and helping organize and prepare documents for litigation.  My supervisor at the Bazelon Center is Senior Staff Attorney Lewis Bossing.

4.  I have edited and updated a chart that previous Bazelon Center legal intern Abby Goldstein developed compiling Plaintiffs' evidence from several declarations and documents

relevant to the *MJ v. District of Columbia* case.  This updated chart is attached as Exhibit A to this Declaration.

5.   I provide this declaration to describe the process of creating this chart.

6.   On June 7, 2023, Defendants filed a declaration from Dr. Meghan Sullivan in support of their refiled Opposition to Plaintiffs' Motion for Class Certification.  The Sullivan Declaration closely tracks the Declaration of Ms. Barbara Paulson, previously filed in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification on October 27, 2021.  The Sullivan Declaration asserts, among other things, that the District of Columbia Department of Behavioral Health (DBH) "provides a robust system of behavioral health services for children with [severe emotional disturbance]."  Sullivan Decl. at ¶ 6.

7.   The Sullivan Declaration repeats, verbatim, many of the statements made in the Paulson Declaration.  I compiled statements from Dr. Sullivan's Declaration, including any changes to statements originally made by Ms. Paulson, about the services the District of Columbia provides to children and youth with severe emotional disturbance (SED).  I listed these separate statements from the Sullivan Declaration in the first column of the chart that is attached as Exhibit A.

8.   Next, I read through other declarations supporting Plaintiffs' Motion for Class Certification, including those filed since Plaintiffs filed Abby Goldstein's declaration in December 2021, and compiled statements made in those declarations that refute the assertions Dr. Sullivan made in her Declaration.  I also read a number of publicly-available documents and documents produced by Defendants in this litigation that also rebut statements made by Dr. Sullivan.  I listed this testimonial and documentary evidence in the second column of the chart that is attached as Exhibit A.

9.  A list of declarations containing statements rebutting assertions made in Dr. Sullivan's declaration, and identified in Exhibit A, includes:

- Declaration of Gail Avent in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Betsy A. Biben in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Cornelius R. Bird in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Maria Blaeuer in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Rebecca Bloch in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Sara Boyd in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Jane Brown in Support of Plaintiffs' Motion for Class Certification;

- Declaration of B.T. in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Kimberly Campbell in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Robert Friedman, Ph.D., in Support of Plaintiffs' Motion for Class Certification;

- Declaration of J.J.;

- Declaration of Narell Joyner in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Bruce J. Kamradt in Support of Plaintiffs' Motion for Class Certification;

- Declaration of L.R. in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Louise W. Missildine in Support of Plaintiffs' Motion for Class Certification;

- Affirmation of Jason T. Mitchell in Support of Plaintiffs' Motion for Class Certification;

- Declaration of M.P. in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Kimberly Perry in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Rachel Russo in Support of Plaintiffs' Motion for Class Certification;

- Declaration of John Sargent, M.D., in Support of Plaintiffs' Motion for Class Certification;

- Declaration of Penelope Spain in Support of Plaintiffs' Motion for Class Certification;

- Reply Declaration of Betsy A. Biben in Support of Plaintiffs' Motion for Class Certification;

- Reply Declaration of Sara Boyd in Support of Plaintiffs' Motion for Class Certification;

- Reply Declaration of Kimberly Campbell in Support of Plaintiffs' Motion for Class Certification;

- Reply Declaration of Bruce J. Kamradt in Support of Plaintiffs' Motion for Class Certification;

- Reply Declaration of Kimberly Perry in Support of Plaintiffs' Motion for Class Certification;

- Declaration of I.C. in Support of Plaintiffs' Supplement to their Motion for Class Certification;

- Declaration of Sara Boyd in Support of Plaintiffs' Supplement to their Motion for Class Certification; and

- Reply Declaration of Sara Boyd in Support of Plaintiffs Supplement to their Motion for Class Certification.

10. The additional documents that I reviewed and listed in Exhibit A include the following:

    a. Attached hereto as Exhibit B is a true and correct copy of a document titled "MHEASURES Annual Report FY20 (Oct. 1, 2019-Sept. 30, 2020)," dated January 2021 and accessed on June 26, 2023 from the DBH website at https://dbh.dc.gov/page/reports-01;

    b. Attached hereto as Exhibit C is a true and correct copy of a document titled "MHEASURES Annual Report FY21 (Oct. 1, 2020-Sept. 30, 2021)," dated

January 2022 and accessed on June 26, 2023 from the DBH website at

https://dbh.dc.gov/page/reports-01;

c.   Attached hereto as Exhibit D is a true and correct copy of a document titled

"MHEASURES Annual Report FY22 (Oct. 1, 2021-Sept. 30, 2022)," dated

January 2023 and accessed on June 26, 2023 from the DBH website at

https://dbh.dc.gov/page/reports-01;

d.   Attached hereto as Exhibit E is a true and correct excerpted copy of a document

titled "Department of Behavioral Health FY19-20 Performance Oversight

Questions," accessed on June 26, 2023 from the Council of the District of

Columbia website at https://dccouncil.us/wp-content/uploads/2020/02/dbh.pdf;

e.   Attached hereto as Exhibit F is a true and correct copy of a document titled "DBH

Response FY 20 Oversight Question 47," accessed on June 26, 2023 from the

Council of the District of Columbia website at https://dccouncil.us/wp-

content/uploads/2020/02/dbh.pdf;

f.   Attached hereto as Exhibit G is a true and correct copy of a document titled

"DBH Response FY 20 Oversight Question 49," accessed on June 26, 2023 from

the Council of the District of Columbia website at https://dccouncil.us/wp-

content/uploads/2020/02/dbh.pdf;

g.   Attached hereto as Exhibit H is a true and correct copy of a document titled

"DBH Response FY 20 Oversight Question 57," accessed on June 26, 2023 from

the Council of the District of Columbia website at https://dccouncil.us/wp-

content/uploads/2020/02/dbh.pdf;

h.  Attached hereto as Exhibit I is a true and correct copy of a document titled "DBH
Response FY 20 Oversight Question 71," accessed on June 26, 2023 from the
Council of the District of Columbia website at https://dccouncil.us/wp-
content/uploads/2020/02/dbh.pdf;

i.  Attached hereto as Exhibit J is a true and correct copy of a document titled
"Evidence-Based Associates Families First/DC SEED Activity Dashboard:
Results for the Time Period Oct-20 Through Sep-21," accessed on June 26, 2023
from the Evidence-Based Associates website at
https://evidencebasedassociates.com/dist-of-columbia/;

j.  Attached hereto as Exhibit K is a true and correct copy of a document titled
"Evidence-Based Associates Families First/DC SEED Activity Dashboard:
Results for the Time Period Oct-21 Through Sep-22," accessed on June 25, 2023
from the Evidence-Based Associates website at
https://evidencebasedassociates.com/dist-of-columbia/;

k.  Attached hereto as Exhibit L is a true and correct copy of a document titled
"Evidence-Based Associates Families First/DC SEED Activity Dashboard:
Results for the Time Period Oct-22 Through May-23," accessed on June 25, 2023
from the Evidence-Based Associates website at
https://evidencebasedassociates.com/dist-of-columbia/;

l.  Attached hereto as Exhibit M is a true and correct copy of a document produced in this litigation bearing Bates numbers MJ-DEF-0000350-353, titled "ChAMPS DBH Monthly Report February 2018;"[1]

m.  Attached hereto as Exhibit N is a true and correct copy of a document produced in this litigation bearing Bates numbers MJ-DEF-0000284-288, titled "ChAMPS DBH Monthly Report March 2018;"

n.  Attached hereto as Exhibit O is a true and correct copy of a document produced in this litigation bearing Bates numbers MJ-DEF-0000230-236, titled "ChAMPS DBH Monthly Report November 2018;"

o.  Attached hereto as Exhibit P is a true and correct copy of a document produced in this litigation bearing Bates numbers MJ-DEF-0000309-316, titled "ChAMPS DBH Monthly Report April 2019;"

p.  Attached hereto as Exhibit Q is a true and correct copy of a document produced in this litigation bearing Bates numbers MJ-DEF-0000257-256, titled "ChAMPS DBH Monthly Report August 2019;"

q.  Attached hereto as Exhibit R is a true and correct copy of a document produced in this litigation bearing Bates numbers MJ-DEF-0000300, titled "FY2018 ChAMPS Service Statistics;"

---

[1] For her Declaration, Abby Goldstein reviewed all of the "ChAMPS DBH Monthly Reports" produced to Plaintiffs in this litigation, for the months August 2017 to August 2019 (excepting May 2018, August 2018, and May 2019), but only included five of the twenty-one ChAMPS Monthly Reports that were produced in the Exhibit A chart, as a general representation of the information included in the Monthly Reports.  I have also reviewed all of the ChAMPS DBH Monthly Reports.

r.  Attached hereto as Exhibit S is a true and correct copy of a document titled "Department of Behavioral Health FY20-21 Performance Oversight Questions," accessed on June 26, 2023 from the Council of the District of Columbia website at https://dccouncil.us/wp-content/uploads/2021/06/dbh.pdf;

s.  Attached hereto as Exhibit T is a true and correct copy of a document titled "Department of Behavioral Health FY21-22 Performance Oversight Questions," accessed on June 26, 2023 from the Council of the District of Columbia website at https://dccouncil.gov/wp-content/uploads/2022/01/dbh.pdf;

t.  Attached hereto as Exhibit U is a true and correct copy of a document titled "Department of Behavioral Health FY2022 Performance Oversight Questions," accessed on June 26, 2023 from the Council of the District of Columbia website at https://dccouncil.gov/wp-content/uploads/2023/03/FY-22-DBH-Oversight-Questions-and-Responses_One-Doc.pdf;

u.  Attached hereto as Exhibit V is a true and correct copy of a document titled "DBH Response FY 21 Oversight Question 15," accessed on June 26, 2023 from the Council of the District of Columbia website at https://dccouncil.gov/wp-content/uploads/2022/01/dbh.pdf;

v.  Attached hereto as Exhibit W is a true and correct copy of a document titled "DBH Response FY 21 Oversight Question 16," accessed on June 26, 2023 from the Council of the District of Columbia website at https://dccouncil.gov/wp-content/uploads/2022/01/dbh.pdf;

w.  Attached hereto as Exhibit X is a true and correct copy of a document titled "DBH Response FY 22 Oversight Question 36," accessed on June 26, 2023 from

the Council of the District of Columbia website at https://dccouncil.gov/wp-content/uploads/2023/03/FY-22-DBH-Oversight-Questions-and-Responses_One-Doc.pdf;

x.  Attached hereto as Exhibit Y is a true and correct copy of a document titled "DBH Response FY 21 Oversight Question 41," accessed on June 26, 2023 from the Council of the District of Columbia website at https://dccouncil.gov/wp-content/uploads/2022/01/dbh.pdf;

y.  Attached hereto as Exhibit Z is a true and correct copy of a document titled "DBH Response FY 21 Oversight Question 42," accessed on June 26, 2023 from the Council of the District of Columbia website at https://dccouncil.us/wp-content/uploads/2021/06/dbh.pdf;

z.  Attached hereto as Exhibit AA is a true and correct copy of a document titled "DBH Response FY 21 Oversight Question 43," accessed on June 26, 2023 from the Council of the District of Columbia website at https://dccouncil.gov/wp-content/uploads/2022/01/dbh.pdf;

aa. Attached hereto as Exhibit BB is a true and correct copy of a document titled "DBH Response FY 21 Oversight Question 48," accessed on June 26, 2023 from the Council of the District of Columbia website at https://dccouncil.gov/wp-content/uploads/2022/01/dbh.pdf;

bb. Attached hereto as Exhibit CC is a true and correct copy of a document titled "DBH Response FY 22 Oversight Question 65," accessed on June 26, 2023 from the Council of the District of Columbia website at https://dccouncil.gov/wp-

content/uploads/2023/03/FY-22-DBH-Oversight-Questions-and-Responses_One-Doc.pdf; and

cc. Attached hereto as Exhibit DD is a true and correct copy of a document titled "Fixing the District's Youth Behavioral Health System: Ending the Cycle of Institutionalization and Achieving True Community Integration through Intensive Community-Based Services," accessed on June 27, 2023 from the University Legal Services - Disability Rights DC website at https://www.uls-dc.org/media/1258/fixing-the-districts-youth-behavioral-health-system.pdf.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of June, 2023, in Washington, D.C.

Sara Cohen

10

# EXHIBIT A

EXHIBIT A TO DECLARATION OF SARA COHEN

| STATEMENTS IN SULLIVAN DECLARATION | PLAINTIFFS' EVIDENCE REBUTTING SULLIVAN DECLARATION |
|---|---|
| ¶ 6: "[T]he District . . . provide[s] a robust array of intensive community-based services for children. . . ." | **Avent Decl. ¶ 15:** "There is a missing piece in the District that has resulted in so many residential placements: effective community-based services." <br><br> **Bird Decl., Ex. A, pp. 54-55:** "As a general matter, what treatment the youth have received has not been effective. Services have not been consistently delivered. Based on the records I reviewed, when services were provided, they mostly consisted of outpatient 'talk' therapy in the provider's office, or sometimes at school, instead of working with the youth in the community. When provider staff went to the home, they did not address the root causes of the youth's behavior, including the traumas the youth experienced. Services did not generally include working with a 'natural support,' a parent or other person in the youth's life who the youth has a connection with, to help them learn how to work through challenges, and navigate home, school, and the community. Nor did services involve such individuals in developing a support plan, or to be involved in creating a 'what could go wrong' plan to address crises. The results have been further isolation of youth within the family, and from a frustrated parent or caregiver." <br><br> **Campbell Decl. ¶ 175:** "In general, the services provided to the children whose cases I reviewed were sporadic and transient, and turnover was high. Based on what I heard from speaking with children, parents, and professionals, and what I saw in children's records, services were provided on an intermittent basis, which makes it highly unlikely that the services would have been effective. Some children remained with one agency but experienced high turnover within that agency, other children had frequent changes of agencies, and some children experienced high turnover both within and between agencies. Stability in treatment providers is important to create a deep relationship and build rapport to support a child getting real benefit from the services as well as minimize the number of times a child has to repeat their story, which in and of itself can be traumatizing. When a child has one worker for 1-3 months and then a new worker, they will not invest in the relationship because they cannot trust the individual to stay in their lives." <br><br> **Joyner Decl., Ex. A, p. 52:** "I did not see the District offer the intensive community-based services that I believe are necessary for each of the youth whose cases I reviewed. As a result, the youth tended to cycle among providers, and often among institutional settings (including carceral settings)." <br><br> **Kamradt Decl. ¶ 36:** "The number of residential and other out-of-home placements and hospitalizations taking place in the District suggests to me that the District is not providing the intensive community-based services described in Plaintiffs' Complaint to all of the District children who need them." |

**Russo Decl. ¶ 23:**  "I believe that our clients with mental health disabilities would benefit from the intensive community-based services described in the Complaint.  My clients tell us, and their records indicate, that they have not received the individualized planning and services in their own homes, schools, and neighborhoods that Plaintiffs are seeking in the Complaint."

**Boyd Supp. Decl., Ex. A, ¶ 60:**  "In my opinion, many—potentially all—of I.C.'s out-of-home placements could have been prevented through implementation of ICBS, because it would entail evidence-based behavioral assessments and interventions, in combination with crisis planning.  Instead, he experienced one crisis after another, resulting in reduced educational access, difficulties in his family and peer relationships, and placement in detention and residential treatment settings that removed him from his family and community-based interventions."

**Boyd Supp. Decl., Ex. A, ¶ 62:**  "The lack of access to ICBS has also put I.C.'s life at risk.  The therapeutic interventions and crisis planning that would be provided as a part of ICBS would better address I.C.'s suicidality. I believe this could have prevented some of his suicide attempts.  Additionally, his placement in detention settings (which may have been avoided if ICBS was provided) created barriers for I.C. to access therapeutic interventions to decrease acute suicidality and generate crisis planning that could have decreased the probability of future episodes of suicidality."

**Boyd Supp. Decl., Ex. A, ¶¶ 62-66:**  "I.C. has already been needlessly institutionalized, and he remains at risk of future needless institutionalization due to a lack of access to ICBS.  I.C. has been held in youth detention, been placed in residential treatment facilities for months, has been placed in out-of-home detention alternatives like shelter houses, and has also been committed to DYRS custody since 2020. . .  Moreover, I.C. remains at risk of needless institutionalization because of inadequate treatments and his prior justice system involvement (which itself could likely have been avoided had I.C. received ICBS).  Future hospitalization may be avoidable if I.C. is provided with sufficient crisis planning and other community-based interventions associated with ICBS."

**Boyd Supp. Decl., Ex. A, ¶ 62-66:**  "I.C.'s treatment needs and risk-management needs could have been effectively addressed in the community, and he was not provided with the opportunity to benefit from ICBS before he was placed in secure residential placement.  I.C.'s residential placements have occurred through DYRS and juvenile justice systems, but in my view it is likely that these placements could have been avoided had appropriate, individualized, and evidence-based interventions (i.e., ICBS) been offered to him earlier in his life."

**Boyd Supp. Decl., Ex. A, ¶ 77:** "I.C.'s treatment needs and risk-management needs could have been effectively addressed in the community, and he was not provided with the opportunity to benefit from ICBS before he was placed in secure residential placement. I.C.'s residential placements have occurred through DYRS and juvenile justice systems, but in my view it is likely that these placements could have been avoided had appropriate, individualized, and evidence-based interventions (i.e., ICBS) been offered to him earlier in his life."

**Boyd Supp. Reply Decl., ¶¶ 12-13:** "At no time during those seven years did the District offer ICBS to I.C. The services that I.C. received ***were not*** intensive, individualized, tailored to his specific needs, coordinated with sufficient input from his mother and other community support resources, engaging, or even provided frequently and consistently as ICBS requires. Nor is there even any evidence that I.C. was provided a proper crisis plan, which could have aided I.C. with his well-documented struggles with emotional dysregulation and helped him avoid his repeated interactions with juvenile criminal institutions. . . [T]he interventions [I.C. received] were not integrated, coordinated, or sufficiently informed by input from I.C. and his mother—key parts of ICBS."

**Boyd Supp. Reply Decl., ¶ 15:** "[T]he community support that I.C. received—it was not ICBS. Based on my review of these records—and my interviews with I.C. and his mother—the community support I.C. received did not incorporate input from I.C. or his mother, was not individualized to I.C. to address the impact of I.C.'s mood and trauma symptoms, and did not appear to address the symptoms and behaviors contributing to the episodes of restraint and seclusion that were occurring at school."

*See also:*

**B.T. Decl. ¶¶ 29-30:** "I don't feel like I got enough help from mental health service providers in my schools or in the community when I was coming up. I feel like someone could have shown up for me and helped put me on a different path. I feel like someone could have tried harder to understand me. It was just my mom who was helping me with my anger and my fighting—no one else did. It was only ever my mom that tried to help or talked to me about how I was feeling. . . . I think if I'd gotten intensive community-based services as they've been explained to me, that would have made a difference for me."

**L.R. Decl. ¶ 69:** "Despite receiving some mental health services from service agencies in Washington, D.C., I have never received the intensive community-based services that are defined in the Complaint. I have never had a team that really listened to what I wanted and helped me get the services that I thought would help me."

**M.P. Decl. ¶ 57:** "E.H. has many strengths, but I don't think that that his service providers have actually followed through for him. He always wants to be home with me, but his service providers haven't given him the option of getting services at home. I don't think he would have had to go to residential placements if he had received services that helped him live at home. I don't think he would have received charges or had to go to YSC if he had received services that helped him live at home."

**I.C. Decl. ¶ 13:** "I don't remember getting any services that helped me when I was suspended [in elementary school]. I remember seeing some therapists in elementary school, but they didn't help me. . . . They would talk most of the time. And they would ask me questions that felt off-topic. . . They weren't talking about how I felt or the situation I had been in when I got mad. They were asking about life generally. It wasn't specific to me. It was like they were getting questions from a book instead of paying attention to me and seeing what they should ask me specifically."

**I.C. Decl. ¶ 28:** "[T]he therapists and service providers were just talking to talk. The services I did get weren't individualized for me, and my mother and I were not involved in developing a plan for my services."

**Cohen Reply Decl., Ex. B (District of Columbia Department of Behavioral Health MHEASURES report 15 (Jan. 2021))** (between FY17-FY20 the number of children receiving mental health services from the DBH steadily decreased).

**Cohen Reply Decl., Ex. C (District of Columbia Department of Behavioral Health MHEASURES report 15 (Jan. 2022))** (between FY17-FY21 the number of children receiving mental health services from the DBH steadily decreased)).

**Cohen Reply Decl., Ex. D (District of Columbia Department of Behavioral Health MHEASURES report (Jan. 2023))** (although numbers of children receiving assessments and "community support" from the DBH increased, the number of children receiving "Community Behavioral Intervention (CBI)" declined, from 630 in FY21 to 392 in FY22).

**Cohen Reply Decl., Ex. I (District of Columbia Department of Behavioral Health, 2020-2021 DBH Counsel Oversight Response 71 (Jan. 2021))** ("During the October 2019 through March 2020, the months before the pandemic, the number of children served was trending up-from 3,329 to 3,413 compared to the same time the year before. However, this trend stopped in April and the number of children served declined. During the

| | pandemic months from April through September 2020, the number served was 3,193 compared to 3,371 in the same time period—a decrease of 220 or about six percent."). |
|---|---|
| | **Cohen Reply Decl., Ex. DD (Disability Rights DC, *Fixing the District's Youth Behavioral Health System* 2 (2022))** (between FY20 and FY21, number of District children receiving Mental Health Rehabilitation Services decreased by 6%, and number of District children receiving these services upon discharge from PRTFs decreased by 11%). |
| **¶ 6:** "[T]he District . . . coordinat[es] across agencies . . . ." | **Biben Decl. ¶ 23:** "The District consistently fails to provide young people an effective transition back to the community following a placement at a residential facility, YSC, or at New Beginnings. DYRS has not been connecting the children to services until after they are discharged from a residential placement or DYRS facility. This is too late, and as a result, there is a scramble to timely connect the young person to services as soon as possible after they return to the community." |
| | **Campbell Decl. ¶ 175:** "I have not seen any evidence that anyone within the system is overseeing transitions within or between agencies, and I have not seen evidence of any effective transition services in any case that I have reviewed." |
| | **Perry Decl. ¶ 12:** "YHAC strongly believes that the District government needs to build capacity to adequately serve the District's youth with serious emotional disturbance, and that its current offerings to youth experiencing homelessness is inadequate. Many YHAC clients need ICBS that can be provided to them wherever they are in the community, including in the housing programs that YHAC members operate for the District's homeless youth." |
| | **Boyd Supp. Decl., Ex. A, ¶ 55:** "I.C. needs, and will continue to need, intensive care coordination to facilitate his transition between settings and prepare him for adulthood. For example, I.C. is currently adjusting to community living in a foster home after months of residing in a secure residential treatment facility. However, it does not appear that the foster family is engaged in functional family therapy. I.C. also indicated that he had obtained employment in food service, but it does not appear that he was engaged in structured transition planning for his needs as a young adult in the community." |
| | **Boyd Supp. Reply Decl., ¶ 18:** "Universal provider notes state that I.C. indicated that an obstacle to consistently attending psychiatry appointments was his reliance on his mother for transportation, whom he said was "tired after working all-day [sic]." However, there was no documentation that providers followed up on this input by creating a plan or making a referral for transportation, arranging telehealth options, or arranging to meet I.C. rather than asking I.C. to travel to an office." |

**EXHIBIT A TO DECLARATION OF SARA COHEN**

| | |
|---|---|
| | *See also:*<br><br>**I.C. Decl. ¶ 18:** "There was no one organizing everything. Like the people with the school and the people with Better Morning. Each group had different supervisors. There was a supervisor for therapy, another one for education, another one for other services. And other than Ms. Lighty, no one was working with my family. It made it complicated for me to get what I needed. If there had been one person over everything, I think my services would have worked better and faster. It would have taken stress off everyone who was overworking themselves. And then my service providers would have been able to spend more energy and time helping me. Instead, everything was slow, and everyone was stressed. . . If there had been someone coordinating services and organizing everything, I could have gotten services I needed sooner, and I don't think things would have happened the way they did."<br><br>**Cohen Reply Decl., Ex. DD (Disability Rights DC, *Fixing the District's Youth Behavioral Health System* 6 (2022))** ("Many children in the District are involved in more than one child-serving government system—for example, the behavioral health, special education, child welfare, or delinquency systems—and advocates have observed little coordination of care between these systems."). |
| **¶ 6:** "[T]he District has worked to . . . reduce unnecessary placements in more restrictive settings, such as hospitals and Psychiatric Residential Treatment Facilities." | **Avent Decl. ¶ 13:** "[T]he District sends [children] to residential placements. Instead of strictly applying the official criteria, I hear agency representatives talk very generally about the need to keep kids 'safe.' We all want our children to be safe, but in my view the District's reliance on residential placements doesn't work."<br><br>**Avent Decl. ¶ 14:** "Some of our children do not benefit from their residential placements. Being sent away makes them see themselves as not worthy of being at home in their families. Sometimes their behavior does not improve; as a result they 'fail' the program and are sent to another residential placement . . . . When they get home, they behave in the same challenging way they did before they left."<br><br>**Avent Decl. ¶ 15:** "The providers have not been successful at engaging families in services that families find valuable, before sending children to residential treatment facilities."<br><br>**Biben Decl. ¶ 16:** "In my experience, when DBH core service agencies that are supposed to provide community-based mental health services determine that they cannot support a young person in the community, they have ended services, and the young person ends up in DYRS custody. . . . DYRS and DBH do not know what to do with them, so they are warehoused in inadequate residential facilities where they do not receive the treatment they need."<br><br>**Biben Decl. ¶ 19:** "To my knowledge, DYRS is sending young people to New Beginnings without exhausting treatment options in the community. DYRS is quick to give up on community-based treatment, and at the first |

sign that the young person is not responding fully to the services they are receiving from the core service agencies, the attitude seems to be: 'Well, we tried; send him to New Beginnings.'"

**Blaeuer Decl. ¶ 23:** "Unfortunately, in my experience, District children who are sent to residential placements are away from their families a long time, and they do not come back in better shape. Too often they come back in worse shape than before they left."

**Boyd Decl., Ex. A ¶ 185:** "Regarding youths who were placed in residential treatment, there were typically insufficient clinical rationales for how that youth would benefit from, or why they required, restrictive residential placements that separated them from their families, communities, and other natural supports."

**Boyd Supp. Decl., Ex. A., ¶ 63-66:** "I.C. has already been needlessly institutionalized, and he remains at risk of future needless institutionalization due to a lack of access to ICBS. I.C. has been held in youth detention, been placed in residential treatment facilities for months, has been placed in out-of-home detention alternatives like shelter houses, and has also been committed to DYRS custody since 2020. . . Moreover, I.C. remains at risk of needless institutionalization because of inadequate treatments and his prior justice system involvement (which itself could likely have been avoided had I.C. received ICBS). Future hospitalization may be avoidable if I.C. is provided with sufficient crisis planning and other community-based interventions associated with ICBS. In addition, exposure to the justice system at a young age increases a youth's likelihood of continued justice system involvement. I.C. has had exposure to the justice system since a young age. I.C. also remains in custody of DYRS, which increases his likelihood of institutionalization."

**Boyd Supp. Decl., Ex. A., ¶ 76:** "The information I received did not show that there was a valid clinical and risk-management rationale for most of I.C.'s out-of-home placements, especially his placement at New Beginnings."

**Boyd Supp. Reply Decl., ¶ 55:** "There appears to be no established effort to attempt to interrupt the historical cycle of I.C. receiving inadequate and nonindividualized services in the community, followed by increases in elevated mood symptoms (e.g., irritability, increased impulsivity, dysregulated anger), resulting in contact with juvenile justice authorities and placement in restrictive institutional settings."

**Cohen Reply Decl., Ex. H (District of Columbia Department of Behavioral Health, 2019-2020 DBH Counsel Oversight Response 57 (Jan. 2020)**)) ((1) 81 children and/or youth received treatment in a PRTF in FY18; of the 81, 44 were new admissions, and six of the 44 received Mental Health Rehabilitation Services (MHRS) from DBH within six months prior to admission; (2) in FY19, 81 children and/or youth required treatment in a PRTF; of the 81, 43 were new admissions, and two of the 43 received MHRS from DBH within

six months prior to treatment; (3) as of January 2020, in FY20 37 youth received treatment in a PRTF; eleven of the 37 are new admissions, none of whom received MHRS within six months prior to admission).

**Cohen Reply Decl., Ex. AA (District of Columbia Department of Behavioral Health, 2020-2021 DBH Council Oversight Response 42 (Jan. 2021))** (In FY21, 30 youth were admitted to a PRTF for treatment; 19 of the 30 received MHRS from DBH six months prior to admission).

**Cohen Reply Decl., Ex. F (District of Columbia Department of Behavioral Health, 2020-2021 DBH Council Oversight Response 47 (Jan. 2021))** ("During FY 20, there were 42 PRTF discharges. Of the 42 discharges, 20 children and/or youth were referred to CBI services. Of those, 17 youth were seen within 30 days, another two within 60 days, and the last one within 90 days.").

**Cohen Reply Decl., Ex. Y (District of Columbia Department of Behavioral Health, 2021-2022 DBH Council Oversight Response 41 (Jan. 2022))** ("In FY 21, 40 youth were discharged from a Psychiatric Residential Treatment Facility (PRTF). Out of the 40 youth discharged, 22 youth were referred to CBI. Of that number, 16 youth received CBI within 30 days, one youth was seen within 60 days, and five youth in 90 or more days.").

*See also:*

**B.T. Decl. ¶ 24:** "I think that was the worst part of everything: DYRS sent me out to a residential placement away from home when my daughter was about to be born. DYRS and Abraxas didn't even give me a home pass to go to her birth. I only got to see her on Zoom for months. I felt like my DYRS case coordinator and the staff at Abraxas didn't get what was important to me. Or they didn't care. I wanted to stay in the community, but DYRS sent me off anyway."

**L.R. Decl. ¶ 69:** "I was bounced around from hospital to hospital, from placement to placement. I didn't receive the services and support I needed in order for me to be mentally healthy, to have a proper education, and to feel loved and safe. I felt like I was punished over and over because of my issues."

**L.R. Decl. ¶ 73:** "I am interested in receiving intensive community-based services so that I could feel stable and healthy, finish school, get permanent housing, and have a career, but the District has not worked with me to

**EXHIBIT A TO DECLARATION OF SARA COHEN**

| | arrange those services while I have lived at home.  Instead, it has sent me to a lot of residential placements or put me in detention." |
|---|---|
| | **M.P. Decl. ¶ 57:**  "E.H. has many strengths, but I don't think that that his service providers have actually followed through for him.  He always wants to be home with me, but his service providers haven't given him the option of getting services at home.  I don't think he would have had to go to residential placements if he had received services that helped him live at home.  I don't think he would have received charges or had to go to YSC if he had received services that helped him live at home." |
| | **I.C. Decl. ¶ 16: "**I remember going to the hospital for my mental health when I was 13 or 14. . .  The hospital was Psychiatric Institute of Washington ("PIW"). . .  I didn't like it there.  It was just like being locked up.  It didn't help me. . .  It just makes you worse.  It just felt like another place where someone made me go that wasn't useful.  Nothing changed for me in there, and I just felt the same when I got out as I had when I went in.  Nothing improved.  And no one set up any services for me when I left." |
| | **I.C. Decl. ¶ 18:** "No one ever put together a crisis plan for me, even when I first got locked up.  Things were really bad then, and a crisis plan would have been helpful.  It would have been better if I had something to stop me from doing what I was doing.  If I had had something planned instead of having extra time.  I remember when I was getting locked up, I didn't have anything else to do." |
| ¶ 7:  The District has "significantly reduced the number of annual PRTF placements . . . among children who receive D.C. Medicaid and have a diagnosis of SED." | **Biben Reply Decl. ¶ 5:**  "PDS continues to have clients placed in PRTFs, however.  We have had several clients placed in these facilities this year, and we expect that other clients will receive PRTF placements in the near future." <br><br> **Cohen Reply Decl., Ex. G (District of Columbia Department of Behavioral Health, 2020-2021 DBH Counsel Oversight Response 49 (Jan. 2021))** ("In FY19, the total number of children and youth that received treatment in a PRTF was 69, of whom 32 were new admissions. . . .  In FY20, the total number of children and youth that required treatment in a PRTF was 97, of whom 36 were new admissions. . . .  In FY21 to date, the total number of children and youth who require treatment in a PRTF is 60, of whom eight were new admissions."). |
| ¶ 7:  "In fiscal year 2019 (FY19), 40 Medicaid-enrolled children in the District with serious mental illness (SMI) or SED were placed in PRTFs . . . . In fiscal year 2020 | *Compare:* <br><br> **Cohen Reply Decl., Ex. G (District of Columbia Department of Behavioral Health, 2020-2021 DBH Counsel Oversight Response 49 (Jan. 2021))** ("In FY19, the total number of children and youth that received treatment in a PRTF was 69, of whom 32 were new admissions. . . .  In FY20, the total number of children and |

EXHIBIT A TO DECLARATION OF SARA COHEN

| | |
|---|---|
| (FY20), 31 D.C. Medicaid-enrolled children with an SMI or SED diagnosis were placed in PRTFs . . . . In fiscal year 2021 (FY21), only 23 children were placed in PRTFs . . . ." | youth that required treatment in a PRTF was 97, of whom 36 were new admissions. . . .  In FY21 to date, the total number of children and youth who require treatment in a PRTF is 60, of whom eight were new admissions."). |
| | **Cohen Reply Decl., Ex. Z (District of Columbia Department of Behavioral Health, 2021-2022 DBH Council Oversight Response 42 (Jan. 2022)** (in response to request to list "the total number of psychiatric residential treatment facility (PRTF) and the total number of residential treatment center (RTC) admissions of a child and youth receiving MHRS," replying that "[RTCs] are more aligned with the Juvenile Justice System[.]  During FY 21, 30 youth were admitted to a PRTF for treatment . . . ."). |
| ¶ 9:  "Central to each level of CBI is family involvement." | **Biben Decl. ¶ 42:**  "Across all of these services – CBI, ACT, and High-Fidelity Wraparound – to my knowledge, there is a dearth of family involvement and engagement.  Some clinicians or case workers are better than others, but generally providers do not engage in consistent, reliable work with families to help families understand what is happening with their child and what their role is in their child's care." |
| | **Biben Decl. ¶ 43:**  "I have never heard DYRS or DBH service providers engage families to help them understand their child's diagnosis, or how that diagnosis is manifesting itself in their child's behaviors.  Parents do not get information about possible reasons for their child's behavior.  There is no communication about how best to parent and support their child.  Then, when their child violates a curfew or has an incident, and DYRS wants to send them to a residential placement, families readily agree because they see no other option.  In my experience, without a better understanding of their child's needs and behaviors, many parents get fed up and agree to residential placements, because they think there are no other options." |
| | **Biben Reply Decl. ¶ 9:**  "Based on our experience at PDS, this statement is misleading.  Family involvement in CBI has been inconsistent.  In a number of cases of our clients' cases, the parent or guardian is not meaningfully involved with whatever the CBI team is doing.  In some of our cases, the CBI worker may check in with the parent or guardian every few weeks, or only immediately before a decision has to be made about whether the service will be reauthorized.  In other cases, the parent or guardian indicates that they do not want to be involved with the CBI process because, they say, the CBI workers did not explain what CBI does or how it should work, or try to engage them in participating in the service.  The CBI worker may believe that they are honoring the parent's preference, but we have heard from parents that they didn't feel they had enough information about the CBI service, how it was benefitting the child, or how their participation in CBI's therapeutic interventions would matter." |

| | |
|---|---|
| | **Boyd Decl. ¶ 178:** "The records I reviewed and the interviews I conducted both indicated a lack of meaningful involvement of family members and youth in youth treatment planning and service provision." |
| | **Boyd Supp. Decl., Ex. A, ¶ 68-70:** "I.C. and his mother were insufficiently engaged by providers. Although I.C. and his mother noted that their input was sometimes sought out for meetings such as IEP meetings, both noted that their suggestions were often not integrated into the treatment that was actually delivered. . . I.C.'s mother reported that she had insufficient information about her son's treatment processes and the rationales behind them. . . and she indicated that providers often did not respond to her calls." |
| | **Boyd Supp. Reply Decl., ¶ 10:** "The records reflect that I.C.'s mother was neither consistently engaged nor kept informed by the District about what services I.C. was eligible for, what steps were needed to obtain those services, what to expect from service providers, and what I.C. and his mother needed to do to self-advocate within that system when services were not satisfactory. For example, neither I.C. nor his mother were notified in advance of changes to the staff providing his treatment." |
| | **Boyd Supp. Reply Decl., ¶ 26:** "The District's CBI providers rarely effectively engage children's families or other natural supports, and they consistently fail to support families and help them develop and improve their ability to care for the children." |
| | *See also:* |
| | **I.C. Decl. ¶ 26-27:** "When I tell [DYRS] what I need and what would help me, they don't listen to me. And I don't feel like they work with my family. Like my credible messenger will work with my mother and take me out places, but the DYRS social worker and staff don't listen to us or work with us." |
| **¶ 9:** "DBH-certified CBI providers are required to conduct a child and family team meeting within 7 days of CBI admission for children in the community, and 14 days of CBI admission for children discharged from an acute care facility." | **Biben Reply Decl. ¶ 10:** "This statement is also misleading. If by 'child and family team meeting' the Declaration means that the CBI worker contacts the client and parent—generally by phone—to set up a schedule for later meetings, these contacts may be happening within the time frames the Declaration identifies, for our PDS clients. But this is not a 'child and family team meeting' in which a provider organizes a meeting that includes the child, the parent or guardian, other family members, and others who know the child or who are responsible for providing services, to begin the work of assessing the child's needs and developing a service plan. For our clients, meetings in which the child's team actually sits down together to begin the process of service planning happen only very rarely—maybe five percent of the time. We have had clients for whom there is no child and family team meeting during the three or six months that the service is authorized." |

| | |
|---|---|
| | **Friedman Decl. ¶ 70:** "Clearly absent were child and family teams that met regularly, pulled together the best information and resources for the youth and their families, monitored progress, and made adjustments as needed in the youth's service plan." |
| | **Kamradt Reply Decl. ¶ 11:** "I suspect that the CBI 'family teaming' identified in the Declaration does not meet the definition of a child and family team, as part of intensive care coordination provided with fidelity to an ICBS/wraparound model. . . . I did not see that the District's CBI, as described in the materials I reviewed, provided for the child and family team's development of a service plan, or required that the child and family team meet at least every 30 days.  A clinician providing CBI can and should invite the child and family to a meeting to discuss treatment goals, but that is not the same thing as a child and family identifying their own strengths and needs and, with a team of others who know and can support the family, driving the process by which the child's needs are met under a wraparound service model." |
| | **Sargent Decl. ¶ 86:** "I did not see child and family teams that would bring the family together with mental health and medical providers to develop and monitor an individualized and coordinated plan." |
| | **Boyd Supp. Reply Decl., ¶ 27:** "The CBI services that I.C. received did not create a child and family team and incorporate input from such team." |
| **¶ 9:** "Care coordination is also an integral part of CBI services, of which family teaming is a component." | **Biben Reply Decl. ¶ 12:** "Based on our experience at PDS, I disagree.  CBI workers do not typically coordinate care for our clients in a manner that meets our clients' needs, including across the multiple agencies with which they are typically involved, or outside the CSA with which the CBI team is affiliated.  CBI workers may reach out to other employees at their CSA—for example, to help schedule an appointment with a psychiatrist affiliated with the CSA so that the client can be seen for medication management.  But this does not meet the coordination needs of our clients, who generally have multiple medical and mental health needs and are multi-system involved, and involved with more providers than just the CSA providing CBI.  Effective care coordination would mean organizing needed care and support activities for the youth and family with all providers or other entities that are or should be providing service and supports, and sharing information among the child, family, and providers to achieve better outcomes.  In our experience at PDS, CBI workers do not do this work." |
| | **Biben Reply Decl. ¶ 13:** "In many of our cases, it falls to our team of attorneys, licensed Forensic Social Workers, and Licensed Professional Counselors to provide care coordination for our clients who are receiving CBI services.  We try to treat the CBI worker with respect, as a clinical professional, but we often have to do the work of coordinating services for our clients, and facilitating communication among providers and agency staff in order to support our clients and their families." |

**Friedman Decl. ¶ 70:** "There was very little case management, and very little use of the wraparound process, a process that has been identified as particularly important and helpful for children and families with multiple needs such as this group."

**Kamradt Reply Decl. ¶ 11:** "'Family teaming' is not the same thing as the formation of a 'child and family team' under the wraparound approach."

**Kamradt Reply Decl. ¶ 12:** "It would be appropriate for a provider of CBI-type services, including FFT and MST, to identify community-based services that would benefit the child and family, and help the family obtain them.  However, this is not intensive care coordination following a 'wraparound' model, which is a more active role.  In the intensive care coordination provided as part of the ICBS that Plaintiffs seek in their Complaint, an intensive care coordinator convenes and facilitates a child and family team that identifies the child's and family's strengths and needs; helps the family identify, obtain, and coordinate services identified by the family to meet that child's specific needs; and develops and monitors a wraparound service plan."

**Kamradt Reply Decl. ¶ 13:** "Additionally, the [ Declaration does not indicate, and my review of the District's regulation and policies relating to the provision of CBI did not find, that CBI workers are expected to coordinate care across child-serving systems.  In Milwaukee, because Wraparound Milwaukee serves children who are involved in multiple systems, including behavioral health, public schools, child welfare, and the delinquency system, intensive care coordinators are expected to coordinate the services provided and processes required by all of these systems, to keep every agency working with the child and family on the same page regarding the monitoring and implementation of the wraparound service plan.  Most versions of CBI that I am familiar with, including FFT and MST, are therapeutic services, and CBI workers do not and are not expected to coordinate across systems to provide other needed services the way that intensive care coordinators under a ICBS/"wraparound" model do."

**Perry Decl. ¶ 14**: "Sometimes youth enter a YHAC program but then present with mental health symptoms and need more intensive mental health support than the YHAC member can provide.  The youth often enter without any treatment plans, without information about their mental health diagnoses, and without information about the mental health services they have received. As a result, staff are left to piece together the youth's service history—including past diagnoses, medication use, and service plan recommendations—and to connect with the District's core service agencies (CSAs), which contract with D.C.'s Department of Behavioral Health (DBH) to provide community-based services to Medicaid-eligible youth in D.C., to determine whether the youth or their family has received any mental health services or is enrolled with a CSA."

| | |
|---|---|
| | **Spain Decl. ¶ 25:** "Although many of our clients are referred to CBI, their experiences have not always been positive.  First, there is significant staff turnover within CBI.  Second, there is a lack of collaboration and cooperation between DYRS and the CBI program.  CBI workers may attend DYRS team meetings with the youth and may offer helpful input on the youth's service plan.  However, DYRS may not follow through on those recommendations and, at times, has even ignored the CBI worker's input entirely." |
| | **Boyd Supp. Reply Decl., ¶ 35:** "I.C.'s mother repeatedly informed providers about feeling overwhelmed by the frequent change in providers throughout his CBI services. . . [She] indicated that providers did not communicate with her, that turnover was high, and that she and I.C. did not receive notice when providers changed or left the agency.  The lack of consistency among providers, and the lack of notice provided to I.C. and his mother when a provider was changing or leaving, and the absence of any transition process to facilitate an informed transfer of services constitute repeated abandonment experiences for I.C." |
| **¶ 10:**  "DBH has standardized the authorization process for CBI services to reduce barriers to service access." | **Mitchell Aff., Exhibit 1 (AIR Report), pp. 7–8:**  "The entry and approval system need to be streamlined for DBH referral and approval.  Sometimes we have to work with four different systems to get approval to accept a youth into services.  These approval processes are not coordinated.  There needs to be a designated place for all information to be entered into the system, and for all providers to be able to see the information on behalf of the child/youth." <br><br> ***See also* Pls.' Evidence Rebutting Sullivan Decl. ¶ 22,** *infra.* |
| **¶ 10:**  "A child may access CBI services by contacting the DBH Access HelpLine . . . ." | **Biben Reply Decl. ¶ 14:**  "This statement is also misleading.  We often contact the Access HelpLine with our clients or their parents or guardians.  Staff at the Access HelpLine are often short with our clients, and do not ask follow-up questions to try to understand which services would be appropriate for the client.  They will ask the client or parent where they live, what service the client or parent is seeking, and then ask them which CSA they want to work with.  They do not list the types of services that may be available to the client, or identify which CSA currently has capacity to provide the services it contracts with DBH to provide.  Access HelpLine staff also do not help the youth or parent understand which services that might meet the child's needs.  If our staff were not on the phone with our client or the client's parent, I cannot imagine the client or parent having enough information to make an informed choice about which service or which CSA to be linked to, assuming that more than one option is provided." <br><br> **Perry Decl. ¶¶ 15-16:** "YHAC program staff typically call the D.C. Access HelpLine to help connect the youth to a CSA.  If the CSA does not timely and effectively engage the youth in services however, the youth does not get the support they need, unless a crisis occurs.  We have seen CSA staff wait weeks to follow up with the youth after a connection is made, call the youth sporadically to check in, not visit the youth in the YHAC homes where |

| | |
|---|---|
| | they reside, and routinely changing the workers assigned to the youth. . . . [when a youth is discharged], YHAC members are told that their staff must call the Access HelpLine again, and wait for an intake with another CSA. This can take weeks, and during this time the youth is not receiving any mental health services." <br><br> *See also:* <br><br> **Cohen Reply Decl., Ex. CC (District of Columbia Department of Behavioral Health, 2021-2022 DBH Council Oversight Response 65 (Jan. 2022))** ("AHL [Access HelpLine] has 14 staff onboard and 17 vacancies for which 2 candidates have been selected and are in the pre-employment process. . . behavioral health staff shortages are severe and projected to worsen."). |
| **¶ 12:** "MST's primary focus is to empower the child's parent or guardian to establish control in the home by implementing behavior plans and safety strategies that target the child's risk behaviors and re-engage the parent or guardian with multiple systems surrounding the child, including the home, community, school, and peers." | **Avent Decl. ¶ 15:** "The District relies on services such as [MST] and [FFT]. My clients tell me that they don't see these services as effective, and that they don't want these clinicians in their homes several times a week. What my clients say works is not a 'one-size-fits-all' approach, but a more flexible model, where professional staff come together with the child's family and other natural supports as a team, to solve problems, help families communicate, and be there when there are emergencies, including on nights and weekends." <br><br> **Boyd Reply Decl. ¶ 31:** "The primary goal of MST is not achieving control in the home. MST interventions begin with assessment aimed at uncovering the origin of the child's behavioral problems, and addressing the child's challenges within their natural ecology of environments. This often means engaging natural support systems outside of the parents and home, such as neighbors or grandparents. One of the benefits of MST is the acknowledgement that children are best able to make good choices and demonstrate growth when they have consistent, positive, and supportive adult attention across the various environments where the child lives, learns, and socializes. District providers' narrow focus on biological parents and long-term caregivers has resulted in less attention to engaging informal support sources and assisting the child in achieving prosocial behavior in environments outside of the home." <br><br> *See also:* <br><br> **Cohen Reply Decl., Ex. J (Evidence-Based Associates, Families First/DC SEED Activity Dashboard: Results for the Time Period Oct-20 Through Sep-21)** (during FY21, average of 60% of MST therapists positions filled, resulting in "poor" rating, and average capacity of providers to provide MST was 57%, also rated "poor"). |

| | |
|---|---|
| | **Cohen Reply Decl., Ex. L (Evidence-Based Associates, Families First/DC SEED Activity Dashboard: Results for the Time Period Oct-22 Through May-23)** (during FY23, only 25 children received MST, and average capacity to provide MST was 57%, still rated "poor"). |
| **¶ 17:** "FFT model. . . . is a family focused intervention for at-risk and juvenile justice-involved children ages 11 through 18.  The focus of FFT is to re-establish family communication, bonding, and alignment to sustain the child in the home and community." | **L.R. Decl. ¶ 27:** "Community Connections stopped providing FFT to me and my dad even though we had not resolved our issues." <br><br> **Boyd Supp. Decl., Ex. A, ¶ 43:** "[I]t does not appear that functional family therapy was implemented [for I.C.] or that a plan was created to connect him with functional family therapy services upon his return to the community." <br><br> **Boyd Supp. Decl., Ex. A, ¶ 55:** "[I]t does not appear that [I.C.'s current] foster family is engaged in functional family therapy." <br><br> *See also:* <br><br> **Cohen Reply Decl., Ex. I (Evidence-Based Associates, Families First/DC SEED Activity Dashboard: Results for the Time Period Oct-20 Through Sep-21)** (during FY21, average of 64% of FFT therapists positions filled, resulting in "poor" rating; average capacity of providers to provide FFT was 70%, also rated "poor"; and 70% of discharges from FFT were deemed "successful," also resulting in "poor" rating, with only 1 of 3 discharges deemed successful in September 2021). <br><br> **Cohen Reply Decl., Ex. J (Evidence-Based Associates, Families First/DC SEED Activity Dashboard: Results for the Time Period Oct-21 Through Sep-22)** (during FY22, although FFT staffing and capacity now rated "fair," 58% of outcomes for children receiving FFT were rated "poor"). <br><br> **Cohen Reply Decl., Ex. K (Evidence-Based Associates, Families First/DC SEED Activity Dashboard: Results for the Time Period Oct-22 Through May-23)** (during FY23, although FFT staffing and capacity now rated "optimal," 52% of outcomes for children receiving FFT were rated "poor"). |
| **¶ 19:** "All CBI providers in the District are required by regulation to provide services with a family focus and to engage families and natural supports, where applicable, through a team-based approach." | **Biben Reply Decl. ¶ 11:** "In our experience with clients receiving CBI Levels II and III, there are some cases where the CBI worker does engage family members and other natural supports, but this does not happen in all cases.  In some cases, the CBI workers engages only with the parent or guardian of our client, and then only briefly and infrequently." |

**Boyd Reply Decl. ¶ 33:** "[W]hat a regulation says and what the District's providers actually do are two different things.  Based on my experience, the records I have reviewed, and the interviews I have conducted as detailed in my prior Declaration and this Declaration, the providers rarely effectively engage children's families or other natural supports."

**Campbell Reply Decl. ¶ 32:** "Some audits [that I reviewed] stated that the clinical supervisor wrote the assessment and the plan for the team.  Children and families are supposed to participate in the development of their own goals, and it is inconsistent with a team-based approach for a clinical supervisor to develop the plan alone.  Further, several audit documents indicated that child and family team plans were not even disseminated to the family or the other members of the team."

**Kamradt Decl. ¶ 45:** "Although the District's CBI is intended to be provided in the home and community, the documents that I reviewed do not describe a robust child-and-family-team process that empowers the child and family to decide on what services, including non-traditional services such as mentoring or peer supports for the child or family, may incentivize the child to engage in adaptive behaviors.  Nor do the documents describe a robust child-and-family-team process for monitoring whether those services are working and implementing new or additional services if they are not."

**Perry Reply Decl. ¶ 8:** "[H]omeless youth have specific needs that are not being met by the District's provision of CBI. . . . CSAs rarely engage family members or other natural supports in the delivery of CBI.  They certainly do not include our Coalition member staff.  Our providers and their clients report that CBI providers do not typically understand the needs of this population to build and sustain a relationship, and they do not seem to understand how to engage the youth's natural supports."

**Perry Reply Decl. ¶ 10:** "Based on the experiences shared with me by Coalition members and their clients, I do not believe that the District's Core Service Agencies (CSAs) use a team-based approach when delivering CBI.  This conclusion is not 'based on incorrect assumptions.' . . . I communicate with Coalition providers on an almost daily basis to discuss issues in the service delivery system.  Additionally, as referenced above, Coalition providers also meet at least monthly to tackle shared concerns and discuss patterns of practice – this is, indeed, the point of the Coalition's work.  If CBI services were being effectively delivered, Case Managers employed by Coalition direct-service member facilities would be reporting these interactions, as would their clients, and these reports would be elevated to me or to the committee."

EXHIBIT A TO DECLARATION OF SARA COHEN

| | |
|---|---|
| | **Perry Reply Decl. ¶ 12:** "The fact that the District has regulations that mandate a team-based approach does not mean that CBI is delivered that way in practice—especially to homeless youth. It certainly has not been the experience of YEJHC providers who interact with CSAs, or of their clients. Clearly there is a disconnect between the District's intention and the actual practices of CSAs delivering CBI services." |
| **¶ 20:** "All CBI providers must also offer services that reduce family conflict, stabilize the family unit, and increase family support." | **Avent Decl. ¶ 17:** "Another problem with the District's overreliance on residential placements is that families are not supported while the child is in the residential setting. . . . [T]he child's parent gets no supports or services while the child is away. . . .  The District does nothing to support parents so that they can be successful caretakers when the child returns, with connections to supports in the community and a toolkit of strategies to help the child work on goals that were set in the institution.  Neither the District nor the institution give parents the tools they need once the child comes home." <br><br> **Avent Decl. ¶ 22:** "Many of our clients have been hospitalized more than once. . . .  In my view, this is a symptom of a system that lacks adequate supports wrapped around the family, provided by individuals who have learned from working with the family what that family needs." <br><br> **Boyd Reply Decl. ¶ 34:** "CBI providers fail to support the children's families and do not engage their families to develop and improve their ability to care for the children. . . .  This approaches do not develop and improve the ability of parents, legal guardians, or significant others to care for the youth.  Rather, in my experience, they alienate caregivers who reflect on these negative experiences when they have opportunities to seek help in the future." <br><br> **Campbell Reply Decl. ¶ 32:** "I did not see evidence of clinical services designed to improve family functioning in L.R. or M.W.'s records.  Additionally, most of the audits I reviewed indicated a need to improve identification and engagement of natural supports and a need to focus on child and family strengths." <br><br> **Joyner Decl., Ex. A, p. 52:** "Most of the families I interviewed seemed completely alone in their efforts to access and navigate the District's mental health services.  I did not see the District take any approach, consistent or otherwise, to link families to community health providers, or to provide information about the expertise of different providers to help families make decisions that matched their needs.  This was the case even where the child or youth's record clearly indicated that they had a serious emotional disturbance and needed more intensive support." <br><br> *See also:* |

| | |
|---|---|
| | **I.C. Decl. ¶ 26:** "My mother has to come all the way out to my foster home to see me and then go all the way back to the District. It takes her about 45 minutes to get up here. And she has to pay for her gas to get up here. I don't see any other family besides my mother. I feel isolated. The foster home where I'm living is OK, but I don't need foster care. I don't need a group home. I have a stable home and my mother wants me home."<br><br>**I.C. Decl. ¶ 27:** "They also aren't helping me get enrolled in school. I'm not enrolled right now. . . I told the DYRS social worker about this, and the social worker isn't helping me with it. My mother and I are visiting schools, but she had to set all of that up. No one helped her set up the visits. I'm frustrated because I want to learn and I want to graduate high school. But I'm just not making any progress right now." |
| **¶ 21:** "CBI Levels II and III services are provided according to the IHCBS model, which is flexible and permits children who are in CFSA custody or the juvenile system and lack a permanent caregiver to receive clinically appropriate CBI services." | *Compare:*<br><br>**Kamradt Decl. ¶ 46:** "Both MST and FFT [CBI Levels I and IV] require that a "permanent caregiver" participate in the service for its duration."<br><br>**Kamradt Reply Decl. ¶ 15:** "[I]t is unclear whether children and youth who have been placed in residential centers under the custody of the District's juvenile justice agency, the Department of Youth Rehabilitative Services, or who have been incarcerated in the District's jail or in a federal prison in another state, receive CBI services."<br><br>*See also:*<br><br>**I.C. Decl. ¶ 20:** "[W]hen I was committed to DYRS custody, I couldn't do the [YSC] boxing program anymore, and I stopped meeting with my probation officer. When I first got committed and went to YSC in September 2020, there was a whole year where I didn't get any type of services. The pandemic was going on, and people weren't allowed in the building. But I don't understand why people couldn't visit or talk to me on Zoom or call me. I was able to talk to Ms. Lighty one time that year, and that was when I went to court. . . I didn't get to talk to her again after that one meeting." |
| **¶ 22:** "[The CBI] initial time limits are merely administrative controls related to authorizations and billing. CBI services can be—and routinely are—extended for as long as the services are medically necessary for the child." | **Biben Reply Decl. ¶ 16:** "This statement does not tell the whole story. We have had CBI services reauthorized for clients, but sometimes this only happens after we hear that the CBI worker blamed our client or their parent or guardian for missing appointments. In these cases, the reauthorization is conditioned on the client or parent stating that they will participate in the service going forward. This has happened in several of our cases. Our families are working or have other demands on their time, and have valid reasons for missing appointments. This should not provoke an ultimatum about participation in the service, which introduces an element of coercion into the therapeutic process that does not benefit our clients or the therapeutic relationship." |

**Biben Reply Decl. ¶ 17:**  "Also, in many cases even though CBI services are reauthorized and extended, staff turnover means that the client and family does not fully benefit from the service.  In many cases, either the CBI therapist or the CBI worker will leave after the service is reauthorized, and may not be immediately replaced by the CSA.  Our clients tell us that this makes it feel like they are starting all over with CBI."

**Campbell Reply Decl. ¶ 34:**  "Although it is true that CBI services can be extended, the fidelity audits indicate that the time limits are not merely administrative controls.  Some providers received lower scores on their fidelity audits because they exceeded CBI time limits in a significant percentage of cases or higher scores because they discharged most of their client population within the time limits.  Penalizing providers who extend services is likely to create an incentive for providers to prematurely discharge children and youth for whom services remain medically necessary."

**Kamradt Decl. ¶ 48:**  "Another limitation on the District's CBI is that it is time-limited.  The District appears to anticipate that all of the levels of CBI can be provided in six months or less.  This includes the short-term, crisis-level intervention available in Level III, which is only available for 90 days.  I suspect that some levels of the service can be reauthorized as needed, but the strict time limit may create an expectation that the service should not be needed for a longer time.  This is not consistent with my experience serving children with serious emotional disturbance at risk of institutionalization in Milwaukee.  The average time for a child participating in ICBS in Wraparound Milwaukee has been 18 months. . . .  In my experience, the class of children described in the Complaint will need ICBS for over a year at least, to ensure that the service plan designed and implemented by the child and family team produces sustained positive outcomes, including avoiding institutionalization whenever possible.  For CBI level III, what happens after 90 days if the child still needs an intensive level of support?  In my view, it is a problem that the District's CBI is time-limited, and that the limit is not long enough for many children."

*See also:*

**Joyner Decl., Ex. A, pp. 52-53:**  "I understand that the District offers CBI in a time-limited duration.  Yet, the youth that I reviewed who completed CBI did not 'graduate' to less intensive services.  They were discharged by their providers shortly after the CBI concluded, usually for 'lack of engagement.'  The District's core agencies must provide youth with a more seamless transition between providers and between services to ensure that youth continue receiving the care they need."

| | |
|---|---|
| **¶ 23:** "There are currently no waitlists for CBI services at any level. DBH has not experienced waitlists for such services since FY20, when DBH maintained short waitlists for CBI I and IV services." | **Biben Decl. ¶ 23:** "There are long waiting lists for many services; failure to begin the process of connecting a young person and their families to those services in advance of the young person's discharge can cause a gap in services stretching weeks or even months after the young person returns to the community." |
| | **Biben Decl. ¶ 34:** "Even if [CBI] were provided with fidelity to the two-component model, there is just not enough to meet the needs of young people in the District with significant mental health conditions." |
| | **Biben Reply Decl. ¶ 15:** "This statement may be technically true, but is again misleading. When the Access HelpLine worker links our client or their parent or guardian to a particular CSA, the next step for the parent or advocate is to reach out to the CSA to schedule an intake appointment. Sometimes it is hard to reach the CSA with the number we are given by the Access HelpLine. When we do reach the CSA, we have been told that the CSA to which our client was linked by the Access HelpLine does not have the capacity to provide the service we are trying to obtain for our client. For example, we have been told that CBI therapists at CSAs to which our clients have been linked through the Access HelpLine would not be available for 90 days or more. The CSA will tell us that if our clients wants CBI therapy sooner than that, they will have to be linked with another CSA to obtain the service—which means calling the Access HelpLine again to start the process all over." |
| | **Blaeuer Decl. ¶14:** "Some of these children are hospitalized because there is a shortage of urgent mental health care for children in the community, or because there are long waitlists for follow-up care after a hospital stay." |
| | **Cohen Reply Decl., Ex. DD (Disability Rights DC, *Fixing the District's Youth Behavioral Health System* 5 (2022))** ("If new to the system . . . it can take weeks or even months to get a first appointment with a [DBH Core Service Agency], causing lengthy gaps in critical services."). |
| **¶ 24:** "CBI providers must coordinate and link children to other Medicaid-covered services and supports to prevent the utilization of residential treatment . . . ." | **Campbell Reply Decl. ¶ 33:** "The fidelity audits [that I reviewed] reflect that adherence to this requirement varies across providers. Importantly, connecting children to services is not equivalent to the intensive care coordination that forms part of ICBS." |
| | **Kamradt Decl. ¶ 45:** "The care coordination described by the District as a function of CBI seems more like traditional management of traditional clinical services, such as identifying and scheduling appointment with providers, and not the convening of the child and family team and development and implementation of the team's individualized and flexible service plan." |
| | **Kamradt Reply Decl. ¶ 14:** "At any rate, the [Sullivan; originally Paulson] Declaration appears to admit that the District's CBI service does not provide the intensive care coordination that Plaintiffs seek in their Complaint |

| | |
|---|---|
| | or that children with mental health disabilities typically need, as '[c]hjldren and youth receiving CBI who require more robust care coordination are referred to' the High Fidelity Wraparound (HFW) program."<br><br>***See also:***<br><br>**Perry Reply Decl. ¶ 11:** "All of our providers report that their clients experience a long delay before receiving services after being connected to a CSA (typically our providers initiate the connection to DBH services), and many clients have reported that they have been discharged from CBI after a change in placement interfered with their ability to participate." |
| **¶ 24:** CBI providers must "assist[] children to transition to less restrictive services . . . ." | **Avent Decl. ¶ 16:** "[T]here is no transition planning so that children are connected to services when they return to the District. The residential treatment facility staff say, in a cursory way, that it isn't their job to plan for a child's transition back to the community."<br><br>**Boyd Supp. Reply Decl., ¶ 35:** "The lack of consistency among providers, and the lack of notice provided to I.C. and his mother when a provider was changing or leaving, and the absence of any transition process to facilitate an informed transfer of services constitute repeated abandonment experiences for I.C."<br><br>***See also:***<br><br>**I.C. Decl. ¶ 23:** "[Services] should be for the long-term so when you go back into the community, you don't do the same things that got you detained. . . My therapist . . . wasn't talking about how to deal with things when I got out of New Beginnings. He wasn't helping me cope with things in my life or understand the feelings I was having and how to address them in a future situation."<br><br>**I.C. Decl. ¶ 25:** "I want DYRS to let me go back now, at least sometimes, so I can already be adjusted to the community when I go back in September. They don't let me go into the District at all, even for therapy or doctor's appointments. I don't think they understand reality and the fact that I need to get back into the services I was getting in the community before I was locked up."<br><br>**Cohen Reply Decl., Ex. DD (Disability Rights DC, *Fixing the District's Youth Behavioral Health System* 5 (2022))** ("When children leave institutional placements and return to their families, homes, and communities, they frequently receive few or ineffective follow-up community-based behavioral services due to inadequate service planning."). |

| ¶ 24: CBI providers must "support[] and consult[] with the child's family or support system directed exclusively to the child's well-being and benefit." | *Compare:*<br><br>**Avent Decl. ¶ 30:** "When our families experience crises or have needs during evenings, weekends—any time outside the CBI worker's usual workday—the family might call the CBI worker, but the worker won't come. . . . In my experience, parents and children need and expect support from providers on a 24/7 basis, whenever they need it. If they don't get support when they need it, they won't see the value."<br><br>**Boyd Supp. Decl. ¶ 68:** "I.C. and his mother were insufficiently engaged by providers. Although I.C. and his mother noted that their input was sometimes sought out for meetings such as IEP meetings, both noted that their suggestions were often not integrated into the treatment that was actually delivered."<br><br>**Boyd Supp. Reply Decl. ¶ 37:** "In my opinion, I.C.'s mother's alleged decision to decline the purposeless and unproductive CBI services (which are not ICBS) for I.C. was a consequence of provider failures, not an informed decision to decline effective treatment she no longer wanted for her child." |
| ¶ 25: "DBH contracts with Case Western Reserve University to independently conduct fidelity audits for each of its CBI providers. All DBH-certified CBI providers meet fidelity standards according to the independent audits." | **Biben Reply Decl. ¶ 8:** "The level of fidelity to the CBI models described in the [Sullivan; originally Paulson] Declaration varies from CSA to CSA, and from CBI worker to CBI worker. We have had clients who have received CBI services that far more resemble what I would expect from a mentor: the client's parent would report that the CBI worker might take the child to an appointment, or take the child out to lunch, but did not appear to be implementing therapeutic interventions. As a result, we have parents who become confused about what the CBI worker's role is—who do not understand what service the worker is providing, and who are unsure about whether their child is benefiting from the service. It seems to be a matter of luck whether the child and family receives CBI delivered with fidelity to the model."<br><br>**Boyd Reply Decl. ¶¶ 28-29:** "[B]ased on my experience and my review of records for a number of District youth who have received the service, the CBI that the District provides does not meet the standards or goals described by [Sullivan; originally Paulson] or of ICBS. . . . For example, in B.T.'s case, the services described as CBI were not individualized to B.T., did not maximize his independence, did not engage his family, and did not achieve treatment goals."<br><br>**Boyd Reply Decl. ¶ 36:** "As the Case Western Reserve audits (which [Sullivan; originally Paulson] cite) indicate, broadly speaking, safety planning was deficient across all agencies reviewed. Comments from the reviewers indicated that plans were completed 'hastily,' that plans were 'reactive' rather than focused on prevention of crises, that plans were not provided to the families, and that plans did not include assessment of |

triggers for behavioral issues or actionable crisis steps.  Also, safety plans were not regularly updated nor were they updated after crisis events, as would be best practice."

**Campbell Reply Decl. ¶ 30:**  "The audit documents indicate a review of selected cases, interviews with staff, and reference access to additional data, however, they do not explain what additional data was reviewed as part of the audit process.  There is no indication that children and their families were interviewed as part of the fidelity audit.  There is no information on the sample size nor how it was selected.  The audit documents do not include sufficient detail to determine how fidelity scores were reached in each of the clinical components.  The audits nonetheless reveal significant shortcomings in core aspects of the District's CBI services, including a lack of strengths-based service planning and an over-emphasis on behavior management rather than strengths and skills development, insufficient engagement with families and natural supports, inadequate safety planning, and a lack of qualified staff and embedded clinical services."

**Campbell Reply Decl. ¶ 31:**  "[T]he 2021 CBI II and CBI III fidelity audits for many providers indicate that there is no therapist able to provide individual and family counseling as an embedded member on the team.  Other audits indicate that the provider recently added therapy but there remains a need for additional licensed staff.  In my professional opinion, it is not possible to deliver this service with fidelity if the team does not include a licensed therapist."

**Perry Decl. ¶ 20:**  The Youth Homeless Advocacy Coalition "does not believe that CBI and ACT are delivered consistently with fidelity to the model.  Whether youth in YHAC programs benefit from these services is dependent on the agency or worker providing CBI or ACT.  It is the Coalition's experience that CBI and ACT workers generally do not have the resources or requisite training to meet homeless youths' specific needs.  As a result, YHAC members must try to provide the needed support and additional clinical services."

**Perry Reply Decl. ¶ 13:**  "Based on my personal experiences, observations, and communications on the ground with our service providers and clients, CBI and ACT are not delivered with fidelity to homeless youth in the District."

**Russo Decl. ¶ 27:**  "[I]n most cases, our clients do not find CBI to be helpful.  We have had experiences with CBI workers who do not appear to know how to work with teenagers, or who otherwise just were not very effective, because they were unreliable or inconsistent.  Also, CBI workers are often replaced fairly quickly, which prevents our clients from forming good relationships with workers.  These deficiencies are a problem for

| | our clients, because cultivating trust and experiencing consistency are key elements of developing a beneficial working relationship." |
|---|---|
| **¶ 27:** "The District's [High Fidelity Wraparound] services are individualized, holistic, community-based, committed to the practice of unconditional care, family-driven, intensive, coordinated, comprehensive, and culturally and linguistically competent." | **Boyd Reply Decl. ¶ 37:** "Regardless of how Ms. [Sullivan; originally Paulson] or the District characterize the District's [High Fidelity Wraparound (HFW)] services, they are not intensive care coordination. . . . [T]hese services are not unconditional. As [I discussed] with respect to B.T. . . . holding the youth and family enrolled in HFW as responsible for engagement with the service, and blaming them when they do not engage—with discharge as a consequence—is inconsistent with the principle of unconditional care."<br><br>**Friedman Decl. ¶ 77:** "A system for providing these intensive services appear to be lacking. Very few children appear to have received 'wraparound' intensive community-based services, for example, and while there are some examples of treatment teams being in operation, the use of child-and family teams as a foundational piece for treatment planning and monitoring is lacking. Intensive care management seems to be seriously lacking as well."<br><br>*See also:*<br><br>**L.R. Decl. ¶ 58:** "That summer I had a few more wraparound meetings. . . . I felt like Dr. Powell [at MBI] didn't really listen to me in meetings and didn't respond to my mental health needs. Everyone I talked to about my problems just put me on more medication. I felt like the people from DYRS that came to the meetings also were not interested in my needs and just wanted me to leave DYRS custody as soon as possible so they wouldn't have to deal with me anymore." |
| **¶ 28:** In the District's HFW, "[w]ith the help of the team, the child and family create a Wraparound Plan, which involves choosing a team vision, setting goals and developing creative and individualized services and supports to achieve them." | **Bird Decl., Ex. A, p. 55:** "With rare exceptions, these teams did not include the youth, the parent or caregiver, and persons who know the youth (and whom the youth could choose), who could have helped identify the youth's strengths and helped support the youth." |
| **¶ 28:** In the District's HFW, "[t]he Care Coordinator oversees and facilitates the Wraparound Plan, including linking the child and family to appropriate services in the | **Biben Reply Decl. ¶ 21:** "In our experience, when D.C. Choices was the provider for the HFW service, its intensive care coordinators would check in regularly with agency representatives, including from DYRS, to ensure that those representatives who were members of the child and family team actually provided the supports to the child and family, such as food or clothing vouchers, that the agency promised to provide. The intensive care coordinators would regularly check in with our client and their family to ask whether they were getting the |

| | |
|---|---|
| community, identifying appropriate natural and informal supports for the family, and collaborating with community providers to develop responsive and flexible resources to facilitate appropriate community-based interventions and supports." | services and supports identified in the plan.  If there was an issue with the child's progress under their plan—for example, if the child wasn't in school when the intensive care coordinator visited the school—the intensive care coordinator would ask the family why, and then raise any issues relating to school attendance at the next child and family team meeting.  The coordinator would send notes from the meeting to the team members identifying action items and the individuals or agencies responsible for their completion.  In our experience, none of this happens now.  The HFW worker will occasionally contact our clients or their parents to check in, but these brief contacts are not effective at keeping the wraparound process on track, or in helping our clients achieve better life outcomes.  Our clients tell us that they do not understand the HFW worker's role or why they are calling.  This is not intensive care coordination delivered with fidelity to the wraparound model." |
| | **J.J. Decl. ¶ 5:**  "I do not believe that our family received much benefit from the service.  I understood that High Fidelity Wraparound would conduct regular meetings with M.J.'s service providers to better coordinate services.  There were meetings and I had many conversations with M.J.'s High Fidelity Wraparound caseworker but, again, I felt like I was doing all of the work of organizing M.J.'s services and dealing with crises when they arose." |
| | **J.J. Decl. ¶ 6:**  "[T]he High Fidelity Wraparound caseworker was not proactive.  Only after M.J.'s repeated absences from school became a crisis did the High Fidelity Wraparound team put together a plan to help her get to school, by hiring cars to drive her there.  Also, to my knowledge the High Fidelity Wraparound caseworker never contacted M.J.'s therapist for help in figuring out how to support M.J. in attending school regularly." |
| | *See also:* |
| | **Avent Decl. ¶ 26:**  "The DC Choices care coordinator would not work with the family after 5:00 pm.  My understanding is that care coordinators were not paid for evening or weekend work.  This is a problem.  Families need supports in the evening, because there are a lot of things that can happen in the home after 5:00 pm." |
| **¶ 28:**  In the District's HFW, "[r]egularly, the team meets to actualize wraparound goals, support the family and modify goals as necessary." | **Brown Decl. ¶ 17:**  "Instead of coordinating and actually connecting the family with other community services and resources that will help to address the child's needs, the provider simply convenes a monthly meeting.  At the meeting the child and child's parents are asked to express their concerns and their interests in services like skill-building, mentoring, or tutoring, but after the meeting the provider often does not or is not able to take the needed steps to ensure that concerns are met or services provided.  Parents, guardians, and the children themselves tell us that they [are] deeply disillusioned with the District's service system when nothing changes through these meetings." |
| | *See also:* |

| | |
|---|---|
| | **Avent Decl. ¶ 27:** "I don't think DC Choices really got the support they needed from the District to help families understand the benefits of the 'wraparound' model.  DBH didn't lay the groundwork to introduce the service to families."<br><br>**J.J. Decl. ¶ 6:** "I just did not feel as though the High Fidelity Wraparound service really wrapped supports around my family.  Eventually it just felt like a waste of time, and given all the other issues we were dealing with I ended the service." |
| **¶ 30:** "In FY20 and FY21, the District had the capacity under the MBI contract to provide HFW to 85 children at any time.  During FY20, 93 unique children were enrolled in HFW with MBI.  In FY21, 91 unique children received HFW services with MBI." | **Kamradt Reply Decl. ¶ 6:** "I note that, according to the [Sullivan; originally Paulson] Declaration, the District provided the HFW service to 93 children in fiscal year 2020.  Given that the eligibility criteria for the District's HFW program are substantively similar to those used by Wraparound Milwaukee for its 'wraparound' program, and the fact that Washington has a population that is similar to Milwaukee in size and demographics, I continue to believe that at least hundreds of District children with serious emotional disturbance need and are not receiving the ICBS that Plaintiffs seek in their Complaint, including intensive care coordination on a 'wraparound' model." |
| **¶ 31:** "The District's HFW contract specifically stipulates that MBI must provide HFW services using the National Wraparound Initiative Model." | **Bird Decl., Ex. A, p. 55:** "[M]eetings were provider-led and mostly concerned with placement within the DYRS system and did not follow the ICBS/wraparound child-and-family-*centered* model."<br><br>**Brown Decl. ¶ 17:** "[R]eports and our experiences with provider staff have raised concerns for us that the 'High Fidelity Wraparound' service provided by the District is not in fact provided with fidelity to the national model for the wraparound approach, described by the National Wraparound Initiative and others, which has been shown to produce good outcomes for children with mental health disabilities."<br><br>**Campbell Decl. ¶ 5:** "Even though L.R. and at least one of the other children have been enrolled in a service called 'High Fidelity Wraparound,' this service does not appear to have been provided to them, or was not provided with fidelity to this model, and has not prevented their hospitalizations, out-of-home residential and foster placements, and incarceration in juvenile detention facilities." |
| **¶ 31:** "Family voice and choice, family teaming, engagement of natural supports, and collaboration are all core tenants of the National Wraparound Initiative Model, which are required by contract to be | **Avent Decl. ¶ 29:** "[MBI] ha[s] told me they want to partner with [the Total Family Care Coalition] to make High Fidelity Wraparound more effective for children and families, but this has not happened.  It makes me wonder if the contract pays MBI enough so that MBI can pay peer support providers to support families receiving the High Fidelity Wraparound service." |

| | |
|---|---|
| part of the District's HFW service delivery system." | **Biben Reply Decl. ¶ 20:** "The HFW child and family team meetings do not consistently and effectively function as a time for team members to come together to develop and monitor the child's service plan, to keep each other informed about the child's progress, and to hold each other accountable for providing the child and family with services and supports identified in the plan. Everyone is friendly, but nothing is accomplished—unless, as has happened on a number of occasions, our PDS staff takes on the role of facilitating the work of the team." |
| **¶ 32:** "Children in the HFW program currently receive up to $1,000.00 in flex funding to cover non-Medicaid funded services and supports that are components of the Wraparound Plan or are otherwise needed to support the family to maintain the child in the community." | **Russo Decl. ¶ 26:** "I understand that what the District calls 'High Fidelity Wraparound' used to have more financial resources to support clients with more flexible or nontraditional services that could be individualized to meet a client's needs and interests, but that these resources are no longer available. This is a problem, because for many high-needs clients, a traditional approach and services may not be effective, especially at the outset, or barriers might exist that make it difficult for the client to engage with services. *See also:* **Kamradt Reply Decl. ¶ 8:** "When I was director of Wraparound Milwaukee, as a general rule we expected that families participating in the wraparound program should have access to at least $100 per month, which is a similar annual sum to that described by [Sullivan; originally Paulson]. However, families may need, and the child and family team and intensive care coordinator should be able to authorize, more than $1,000 per year if that is what the child and family needs to meet a child's behavioral health needs. For example, there may be an unexpected or emergent need for housing, including security deposit and/or pieces of furniture, such as a bed or a dresser after the child has been in an out-of-home placement through the child welfare or delinquency system, for which several thousand dollars may be needed. Also, if a youth needs several hundred dollars to cover tuition for a course in an area of interest or strength for the youth, such as art or music, this could be an expense for which flex funds should be available. Wraparound Milwaukee has regularly made flex funds available for such purposes. Once one-time or emergent needs [are] met, on average the child and family participating in wraparound may well use only about $1,000 in flex funds, but an annual limit of $1,000 in flex fund expenditures may not be sufficient to meet every family's needs." |
| **¶ 33:** "The District's HFW contract with MBI requires MBI to adhere to the tenants of HFW service delivery as established by the National Wraparound Initiative. The National Wraparound Initiative delineates strict guidelines for how all components of the HFW process | **Biben Decl. ¶ 37:** "In my experience, the quality and effectiveness of wraparound services in the District has been inconsistent." **Biben Decl. ¶ 38:** "It is my understanding that the High-Fidelity Wraparound that DBH contracted with MBI to provide turned out to be worse than previous iterations of wraparound services. To my knowledge, the High-Fidelity Wraparound Care Coordinators did not facilitate the child and family teams effectively, nor did they coordinate and monitor services effectively. To my knowledge, High-Fidelity Wraparound Care Coordinators might schedule meetings with the team, but they were either late to or absent from these meetings. The Care |

| | |
|---|---|
| must be delivered, including but not limited to care coordination." | Coordinators did not communicate or coordinate with other providers working with clients. The youth, in turn, received no more service coordination than they had with previous wraparound providers."<br><br>**Biben Reply Decl. ¶ 21:** "Based on our office's experiences, the District's HFW service is not being implemented with fidelity to the NWI model described in the [Sullivan; originally Paulson] Declaration."<br><br>**Campbell Reply Decl. ¶ 41:** "[M]y review of MBI HFW files for M.W. and L.R. indicates that the District is not providing services following the Wraparound approach with fidelity. For example, . . . . L.R.'s HFW team did not include her family or natural supports. . . . Wraparound is a specific approach to coordinating intensive home and community-based services in partnership with children and families as equal partners, and it is not accurate to say that the District has Wraparound if the approach is not implemented according to the model." |
| **¶ 34:** "Under the terms of the HFW contract, MBI is required to submit to DBH monthly reports detailing statistics about enrollment, discharge and flex funding expenditures. MBI also communicates with DBH regarding administrative and clinical needs, participates in meetings and holds sessions to inform community members of the availability of HFW to increase utilization. DBH provides further oversight of the HFW program through individual case file reviews and through monthly meetings with MBI's HFW program manager." | **Biben Decl. ¶ 39:** "It seems to me that DBH fails to provide oversight of or publicity for High-Fidelity Wraparound. It is unclear to me, and to my knowledge also unclear to my colleagues, how to access High-Fidelity services for clients or what the standards are for how High-Fidelity Wraparound is accomplished."<br><br>**Campbell Reply Decl. ¶ 40:** "Although Ms. [Sullivan; originally Paulson] discusses fidelity reviews for CBI and ACT, she does not mention any external fidelity reviews of the District's HFW program, which suggests to me that the District is not conducting fidelity checks of its HFW program." |
| **¶ 36:** "Through the District's Mobile Crisis model, providers are dispatched to engage a child in psychiatric stabilization, screen for mental health and/or substance use disorder services, develop rapport, | **Avent Decl. ¶ 24:** "At [Total Family Care Coalition] we used to call ChAMPS regularly, because we were told that ChAMPS was the District's 'rapid response' for youth. This wasn't our experience, however. Although ChAMPS has been helpful for teaching my staff how to de-escalate a child's behavior, their mobile crisis team's response time could be long — too long to get to the scene when we need them. We had to learn and practice the de-escalation techniques ourselves, so we could be the rapid response when our clients need it." |

| | |
|---|---|
| and provide support while assisting with a child and his family's immediate behavioral health needs." | **Mitchell Aff., Ex. 1 (AIR Report), p. 34:** "ChAMPS has four workers for the whole city. Foster parents call and are told they cannot receive ChAMPS because their child is in custody of CFSA. People call and are put on hold in emergencies. . . . Mobile crisis stabilization teams should have staff well-trained in de-escalation and positive behavior support techniques; and should have the capacity to support (foster) parents as well as youth in crisis."<br><br>**Spain Decl. ¶ 23:** "ChAMPS does not always arrive promptly and the crisis can escalate while the family waits for ChAMPS."<br><br>**Kamradt Reply Decl. ¶¶ 21-22:** "The monthly reports [from ChAMPS] indicate issues of concern regarding the functioning of the ChAMPS mobile crisis service over the two-year period. There appear to have been persistent and significant staffing vacancies, including for mental health clinicians, peer crisis workers (generally, individuals with lived experience with behavioral health conditions who had participated in services and who had received specialized training, including in de-escalation), and team leaders who supervised phone and in-person responders. . . . Perhaps because of staffing shortages, in almost every month over the two-year period, a significant number of calls were cancelled because no teams were available to respond at the time of the call; when a team eventually became available, according to the reports, assistance was no longer needed. A mobile crisis should respond within an hour – in Milwaukee, our mobile crisis teams respond on average in 20 minutes. In no situation should a response to a crisis call take over an hour."<br><br>**Cohen Reply Decl., Ex. M (ChAMPS Report February 2018)** ("With the increase in call volume, the program is often without a team available to deploy to the community. During the month of February, there were 34 (26% of the total calls) calls in which the team was not able to respond to because ChAMPS was fully deployed.").<br><br>**Cohen Reply Decl., Ex. N (ChAMPS Report March 2018)** ("With the increase in call volume, the program is often without a team available to deploy to the community. During the month of March, there were 23 (16% of the total calls) calls in which the team was not able to respond to because the program was fully deployed.").<br><br>**Cohen Reply Decl., Ex. O (ChAMPS Report November 2018)** ("24 calls were cancelled because there was no team available to respond to the call and when a team was available, assistance was no longer needed.").<br><br>**Cohen Reply Decl., Ex. P (ChAMPS Report April 2019)** ("Of the calls cancelled by the callers, many calls were cancelled because no teams were available to respond at the time of the call, and when a team was available, assistance was no longer needed."). |

**EXHIBIT A TO DECLARATION OF SARA COHEN**

| | |
|---|---|
| | **Cohen Reply Decl., Ex. Q (ChAMPS Report August 2019)** ("Of the calls cancelled by the callers, some calls were cancelled because no teams were available to respond at the time of the call, and when a team was available, assistance was no longer needed.")<br><br>**Cohen Reply Decl., Ex. V (District of Columbia Department of Behavioral Health, 2021-2022 DBH Council Oversight Response 15 (Jan. 2022))** ("Due to the pandemic, hiring for licensed behavioral health practitioners has been a challenge, which has been a reported challenge nationwide. In addition to difficulty with hiring, the pandemic has also impacted the Anchor's staffing matrix for ChAMPS, as staff who tested positive or staff who had been placed in quarantine were unable to participate in the field for 10 days.")<br><br>**Cohen Reply Decl., Ex. X (District of Columbia Department of Behavioral Health, FY2022 DBH Council Oversight Response 36 (Jan. 2023))** ("Contractually, ChAMPS was required to have seven teams available in FY22 and FY23 Q1. However due to workforce challenges they were understaffed, often with the Clinical Manager completing deployments as well. Currently, ChAMPS has four teams available.")<br><br>*See also:*<br><br>**M.P. Decl. ¶ 32:** "I remember that a couple of times the staff at Monument called ChAMPS, which they told me was a service that would come help E.H. stabilize at school. My understanding is that by the time ChAMPS got there and talked to E.H., the crisis was already over. He had already calmed down."<br><br>**Boyd Supp. Decl., Ex. A, ¶ 57:** "I.C. has needed mobile crisis services in the past, and he continues to need them now. . . It is my view that if I.C. had access to such services, many incidents of restraint could have been avoided. For example, instead of staff escalating a situation when I.C. is experiencing crisis, and placing him in physical holds and/or calling the police, a mobile crisis service could have been called, and that team may have employed more effective strategies to address the situation."<br><br>**Cohen Reply Decl., Ex. DD (Disability Rights DC, *Fixing the District's Youth Behavioral Health System* 4 (2022))** (between FY20 and FY21, number of children served by ChAMPS decreased by over 40%). |
| **¶ 36:** "Mobile Crisis Services aim to prevent unnecessary law enforcement involvement, emergency room use, | **Spain Decl. ¶ 23:** "If the crisis escalates and ChAMPS is unable to come to the home quickly, the family is more likely to call the police, who often arrive faster than ChAMPS. If families had confidence that ChAMPS would come promptly when it is called, this would likely help prevent some children from being arrested when the police are called." |

**EXHIBIT A TO DECLARATION OF SARA COHEN**

| | |
|---|---|
| hospitalization and placement disruption for children experiencing behavioral health emergencies." | *See also:* |
| | **Perry Decl. ¶ 25:** "[E]ven when ChAMPS does de-escalate the situation onsite, ChAMPS typically does not follow-up with parents or youth after providing services in order to connect the family to a CSA. Typically, a parent or youth receive a list of phone numbers they can call – nothing more. Additionally, if the youth does not want to engage with ChAMPS (or runs away), ChAMPS leaves without engaging the youth or offering alternative resources." |
| **¶ 37:** "ChAMPS providers administer onsite assessments and endeavor to effectively stabilize children in the community to avert inpatient hospitalization and placement disruptions." | **Avent Decl. ¶ 25:** "[W]hen ChAMPS does come to assist, they typically assess the situation and the child and then take the child to the hospital—and then they are out of the picture. They do not stay with the family to de-brief the situation and help the family connect to longer-term services and supports. We have had to do that ourselves." |
| | **Biben Reply Decl. ¶ 25:** "Many of the cases in which our clients experience ChAMPS services occur when they are at school. In these cases it is school staff that calls ChAMPS. This raises the concern that a school resource officer who is stationed at the school will be involved with the situation, or that outside MPD patrol officers will be called. We have had cases where this affected the client's school placement, because their behavior is categorized as an act of aggression or destruction of school property that violates the school's code of conduct. We have had clients who are arrested and charged on these occasions, and that threatens our client's community-based placement and freedom, making it more likely that the client will be placed in a more restrictive setting." |
| | **Boyd Reply Decl. ¶ 40:** "[T]he records I have reviewed indicate that ChAMPS is not provided with fidelity to the standards of mobile crisis services under ICBS. For instance, ChAMPS does not follow evidence-based practices for reducing suicide or self-harm. ChAMPS records for B.T, M.W., and L.R. make no mention of ChAMPS providers performing a 'safety sweep' of the youth's residence. A safety sweep refers to a search to ensure that there are no medications or objects that a person can harm themself with. In addition, a ChAMPS record for M.W. indicates that the providers relied on contracting for safety, which refers to an agreement between the patient and clinician whereby the patient agrees not to harm themselves. Contracting is a disfavored approach, because the intervention is not effective and can lead to clients feeling there is a lack of care, and providers believing that their obligations to provide care are satisfied by the contract. Contracting is particularly ineffective when there is a lack of rapport between the mental health provider and the patient, and during mobile crisis interventions, the lack of a pre-existing or ongoing relationship between the ChAMPS provider and the youth makes suicide contracting particularly unsuitable." |

**Boyd Reply Decl. ¶ 41:**  "The records also demonstrate that ChAMPS inadequately documents interactions.  For instance, an M.W. ChAMPS record refers to a crisis support plan as well as use of the Crisis Assessment Tool (CAT).  However, neither the actual crisis support plan, nor the CAT responses are included in these records, nor are they sufficiently described."

**Boyd Reply Decl. ¶ 42:**  "[C]risis providers such as ChAMPS must not only generate and disseminate detailed records, they must also ensure that they provide useful, practical, concrete, and understandable recommendations to the child's caregivers.  ChAMPS often fails to do that.  For instance, M.W.'s ChAMPS records from March 2018 show two contacts initiated by a concerned family member of M.W.  However, these records do not indicate that the providers attempted to provide information or referrals to his family member, and this represents a missed opportunity to develop and improve the ability of a concerned family member to care for M.W.  There is also no indicate that information regarding safety planning was provided to the youths' families or providers with whom the youth have a relationship."

**Kamradt Reply Decl. ¶ 23:**  "Although the [Sullivan; originally Paulson] Declaration states that DBH has not received any complaints about whether ChAMPS has failed to provide linkages to community-based services, the ChAMPS monthly reports indicate that between September 2017 and August 2019 a significant number of children and families assisted by ChAMPS were not linked to services.  For example, in December 2018, out of 63 ChAMPS mobile crisis team deployments, 28 of the children, comprising 41 percent of those seen, were not linked to services during the initial deployment.  The ChAMPS report for the month suggests that parents or caregivers were in some cases the barrier to successful linkages; I do not know if this is true, but it begs for further investigation, to ensure that both the ChAMPS team and the community-based providers to which linkages were attempted were effective at engaging the family in considering the utility of longer-term services and supports."

**Missildine Decl., Ex. A, pp. 70–71:**  "In my review, I did not see evidence of mobile crisis teams attempting to resolve crises in the community. For several youth – E.F. and H.R. – the records indicated that the ChAMPS mobile psychiatric service for children and adolescents was called.  However, in each of these cases, calling the ChAMPS team resulted in inpatient psychiatric hospitalization.  Moreover, there was no indication in the records that the ChAMPS team made an effort to address the crisis where it occurred.  All of the youth whose cases I reviewed have experienced crises in which they would have benefited from having access to a community-based mobile crisis team, which could de-escalate crises onsite whenever possible, making it less likely that the child would be taken to the hospital."

| | |
|---|---|
| **¶39:** "During the past three fiscal years, ChAMPS has resolved the overwhelming majority of calls received without referring the child for hospitalization." | **Biben Decl. ¶ 31:** "In my experience, ChAMPS does not deescalate mental health crises. Many families report that the outcome of calling ChAMPS is that the young person is sent to jail, sent to the hospital, or ChAMPS leaves without de-escalating the crisis or linking the young person and family to other, longer-term services."<br><br>**Blaeuer Decl. ¶ 18:** "I have had good experiences with ChAMPS workers, but this model is not sustainable if there are not enough long-term services to which ChAMPS can refer children and families for longer-term stabilization. So clients. . . . with more serious needs, end up hospitalized and then, after another crisis, re-hospitalized."<br><br>**Perry Decl. ¶ 24:** "Even where ChAMPS responds and engages youth, our YHAC members report that most of the time ChAMPS also transports the youth away from the shelter, to either Children's National Hospital or the Psychiatric Institute of Washington (PIW). It is rare for ChAMPS to de-escalate the situation in the community."<br><br>**Perry Reply Decl. ¶ 14:** "[Coalition] providers frequently engage ChAMPS and have reported to me many instances where ChAMPS has failed to de-escalate a youth and failed to provide linkages to needed services. As a result, the youth are returned to the care of our Coalition members and our providers are tasked with the responsibility of coordinating services through the D.C. Access Helpline."<br><br>**Cohen Reply Decl., Ex. R (ChAMPS Service Statistics FY 2018)** (in the last quarter of FY 2018, 65.52% of calls resulted in hospitalization in July and 61.54% resulted in hospitalization in August).<br><br>*See also:*<br><br>**Bird Decl., Ex. A, p. 58:** "When mobile crisis was called to assist with K.P., the team helped transport him to the DBH Comprehensive Psychiatric Emergency Program."<br><br>**Cohen Reply Decl., Ex. W (District of Columbia Department of Behavioral Health, 2021-2022 DBH Counsel Oversight Response 16 (Jan. 2022))** ("During the pandemic months of FY20, the number of [ChAMPS] calls decreased compared to the pre-pandemic months. In the pre-pandemic months of October 2019 through March 2020, there were 1,066 calls that resulted in 541 deployments. During the pandemic months of April through September, the number dropped in half to 568 calls that resulted in 265 deployments."). |

| | |
|---|---|
| | **Cohen Reply Decl., Ex. V (District of Columbia Department of Behavioral Health, 2021-2022 DBH Council Oversight Response 15 (Jan. 2022))** (In FY21 ChAMPS calls went down to 1237 calls, with 457 deployments. In Quarter 1 of FY22, there were only 329 calls which resulted in 117 deployments. "The data shows a significant decrease in calls during the pandemic. DBH is working with Anchor to identify factors affecting the number of calls. One change during the pandemic is that most calls were from parents while during the pre-pandemic months, the majority were from public schools.")<br><br>**Cohen Reply Decl., Ex. DD (Disability Rights DC, *Fixing the District's Youth Behavioral Health System* 5 (2022))** ("With respect to [ChAMPS] . . . advocates have observed numerous problems, including inadequate staffing, long wait times for crisis response deployments, deployments far too often resulting in psychiatric hospitalization or police encounters, and a lack of follow-up to ensure proper connection to community-based services. Once a new crisis happens, a child may be institutionalized again or placed at serious risk of hospitalization."). |
| **¶ 40:** "Law enforcement is not a regular component of DBH's mobile crisis model and is only asked to support the mobile crisis team when a child escalates to violence or displays homicidal tendencies." | **Biben Decl. ¶ 30:** "It is my belief that many children and their families do not call ChAMPS because they believe calling ChAMPS will lead to an arrest or a hospitalization. People do not want to call ChAMPS because they assume the police will arrive in response to the call and make the situation worse. To my knowledge, the police are part of the ChAMPS response to calls, so families' fears are not unfounded."<br><br>**Biben Reply Decl. ¶ 23:** "As a general matter, we appreciate the need for a clinical response to the behavior of District children and youth with mental health disabilities whose behavior has escalated. We want a clinician to respond to a crisis. But PDS is concerned that when our clients and their families contact ChAMPS during these times, the police also arrive in response to the call. ChAMPS has told us that they will ask Metropolitan Police Department (MPD) officers to respond to their calls in certain circumstances. The [Sullivan; originally Paulson] Declaration confirms this. . . . In practice, however, police almost always arrive at the scene when ChAMPS is called, and this increases the likelihood that the situation will escalate. When we are involved in these calls, we end up speaking much more often with police officers who are called to the scene than we do speaking with the ChAMPS staff. A police presence as part of the response to calls to ChAMPS makes it more likely that either our client or their family will engage in behavior that will provoke the police, and result in additional criminal or juvenile charges. This may mean that our client's community placement will be revoked, and that the client will be detained at YSC."<br><br>**Bird Decl., Ex. A, pp. 57–58:** "I did not see that mobile crisis teams consistently provided services to any of the youth that resolved crises in the community. When G.P. contacted a hotline for help when she was experiencing distress, police came to the home. When mobile crisis was called to assist with K.P., the team helped transport |

| | him to the DBH Comprehensive Psychiatrist Emergency Program.  For the other youth, I did not see reference to mobile crisis services in the records.  Two parents told me that they were not aware of the ChAMPS service, and that had they known would have taken advantage of the services." |
|---|---|
| | **Perry Decl. ¶ 23:**  "ChAMPS is sometimes unavailable to respond, or cannot respond quickly enough to a crisis.  When this occurs, YHAC members are directed to call a Crisis Intervention Officer (CIO) through the D.C. Metro Police Department (MPD).  CIOs do not typically have training in working with youth in general, let alone transient youth experiencing a mental health crisis.  As a result of this inexperience, the outcome often involves the transport of the youth to an emergency room." |
| | **Perry Reply Decl. ¶ 16:**  "ChAMPS is sometimes unavailable to respond to our providers' calls for assistance.  When this occurs, our providers are referred to a Crisis Intervention Officer (CIO) employed by D.C.'s Metropolitan Police Department.  Our providers report that when a CIO is engaged, it is much more likely for a youth in their care to be hospitalized.  These reports are hardly 'unsupported anecdotes.' . . .  They are the experiences of real providers and real clients." |
| | **Cohen Reply Decl., Ex. BB (District of Columbia Department of Behavioral Health, 2021-2022 DBH Council Oversight Response 48 (Jan. 2022))** ("When callers are assessed to be at imminent risk of suicide or harming themselves or others, the Access Help Line (AHL) routes the caller to 9-1-1, operated by the DC Office of Unified Communications (OUC) to dispatch an ambulance or MPD.  When law enforcement is needed, AHL requests that a Crisis Intervention Officer (CIO) respond to the scene."). |
| **¶ 42:**  "ACT teams provide a comprehensive and integrated set of medical and psychosocial services for the treatment of the youth's mental health condition in non-office settings." | **Avent Decl. ¶ 31:**  "In my experience, the District's ACT service has not been effective for youth.  Too often, the ACT team tells the youth what they need, rather than listening to the youth and letting the youth tell the team what they think they need. . . . ACT teams tell children what they need and don't let them lead the team.  Does the team belong to the youth or does the youth belong to the team?  I struggle with seeing this happen.  When it does, the child is not benefitting from the service." |
| | **Bloch Decl. ¶ 17:**  "[T]he ACT service is inconsistent . . . .  Some of my clients have had helpful ACT team leaders, but others have had team leaders who were unhelpful.  Some of them do not seem to have much training on how to provide the service.  Others do not seem to have the right ideology: either the ACT team leaders don't listen when my clients tell them what they want or think they need, or the team leaders aren't available when my clients need them." |
| | *See also:* |

| | |
|---|---|
| | **Biben Reply Decl. ¶ 27:** "When we contact the Access HelpLine to help our clients who are between the ages of 18 and 20 connect to services, staff who answer the phone never mention ACT or TACT or TIP. We have heard about these services, but not every CSA provides them to youth, and it can be hard to understand which CSA offers the service and has the capacity to timely provide it. If our staff cannot find the services, and the Access HelpLine does not tell callers about them, it is unlikely that our families have the time and resources to learn about them." |
| **¶ 44:** "DBH contracts with the University of North Carolina at Chapel Hill Institute for Best Practices to conduct annual fidelity reviews for all DBH-certified ACT providers using the Tool for the Measurement of Assertive Community Treatment to ensure that all ACT providers are adhering to the ACT model. " | **Boyd Reply Decl. ¶ 27:** "The ACT audit reports, which Ms. [Sullivan; originally Paulson] cites, indicate that Family Preservation and Community Connections have multiple deficiencies in their ACT programs. Family Preservation had an excessive focus on medication compliance, as opposed to a person-centered autonomy-enhancing approach. The audit report also noted that a very high percentage of the team's census was living in an institutional setting, and that the agency needed to hire a housing specialist. The interventions themselves that were delivered by Family Preservation were reportedly not solution-focused or clearly evidence-based, and the reviewers recommended that the staff be trained in more evidence-based practices. The reviewers also indicated that the agency needed to learn how to effectively recruit and retain nursing staff, and there were some concerns expressed about 'the extent to which contacts [with clients] are driven by how the team is being reimbursed, the number of units allotted, and internal productivity expectations.' . . . The audits also indicate deficiencies in Community Connections' provision of ACT services. According to one of the ACT audit reports that [Sullivan; originally Paulson] cites, the reviewers recommended greater participation by nursing staff and psychiatric care providers in regular meetings, that the agency improve their adherence to evidence-based practices, and that they remedy understaffing with respect to nursing."

**Boyd Reply Decl. ¶ 38:** "[T]he University of North Carolina at Chapel Hill Institute for Best Practices (UNC) audits that Ms. [Sullivan; originally Paulson] references in her declaration indicate there are serious deficiencies with respect to the provision of ACT services, and this is an issue across multiple agencies. In addition to the issues mentioned [above], common concerns noted across providers included lack of access to medical providers, lack of sufficient training in psychosocial evidence-based practices, excessively high caseloads, and prescriptive, authoritarian attitudes that served as barriers to person-centered planning."

**Boyd Reply Decl. ¶ 39:** "[T]he 2021 *Summary of Observations of Strengths and Needs* audit report states 'Washington, D.C. has not reviewed their ACT team since 2015.' . . . The document further states that 'implementing and sustaining high-fidelity ACT is a developmental process that takes years of investment and attention in the foreground, followed with continued ongoing support.' . . . Failing to conduct any independent |

audits for about five years is not consistent with 'years of investment and attention in the foreground, followed with continued ongoing support.'"

**Brown Decl. ¶ 20**:  "[B]ecause of staff turnover hindering the development of positive working relationships, ACT has been inconsistently effective at meeting our clients' needs.  Also, as with the 'High Fidelity Wraparound' service, the ACT service provided by the District is not provided with fidelity to models for ACT delivery that have been shown to produce good outcomes for children."

**Campbell Reply Decl. ¶ 37:**  "[I]t is not accurate to say that DBH contracts with [the University of North Carolina at Chapel Hill] to conduct annual fidelity reviews.  The ACT Quality Review documents state that the District's ACT program has not been subject to a full annual fidelity review since 2015.  UNC was contracted to conduct annual reviews starting in 2019 but this was postponed because of the COVID-19 Pandemic.  UNC instead conducted a quality review in 2021 that did not include a final rating."

**Campbell Reply Decl. ¶ 36:**  "[The] ACT Quality Review documents highlight substantial limitations and needs that must be addressed for the program to be implemented with fidelity.  They do not support a conclusion that the District's ACT services are provided with fidelity."

**Campbell Reply Decl. ¶ 38:**  "The Quality Review documents show that all of the providers had challenges meeting the indicators of fidelity.  The providers did not have enough staff and had vacancies across teams, including shortages of specialty staff and nurses and psychiatric staff.  Some specialists were not qualified or eligible to hold their positions.  Additionally, some providers were not conducting daily team meetings, recording team participation, or implementing evidence-based practices that are required for ACT.  Specifically, when providers were asked to submit notes of evidence-based practices for the Quality Review, the vast majority of the submitted notes were not representative of evidence-based or best practice work.  The reviews also indicated that some providers used compliance language instead of strength-based language and drove the goals instead of letting the client drive the goals. . . .  It is my professional opinion that the above issues show pervasive shortcomings across the District's ACT programs."

**Campbell Reply Decl. ¶ 39:**  "[C]ontracting to conduct an annual review of ACT services does not mean that the service is provided with fidelity, as evidenced by the [University of North Carolina at Chapel Hill] ACT Quality Review documents showing significant shortcomings across all providers.  It is not clear from the documents what, if anything, the District is doing to respond to the problems identified in the Quality Review up to and including corrective action or de-certification."

|  | **Perry Decl. ¶ 20:** "The Coalition does not believe that CBI and ACT are delivered consistently with fidelity to the model. Whether youth in YHAC programs benefit from these services is dependent on the agency or worker providing CBI or ACT." |
| --- | --- |
| **¶ 45:** "[T]he treatment goal for children who receive high-acuity behavioral health services is to prevent the need for child to receive services like ACT in adulthood. To that end, DBH offers children CBI services as a corollary to adult ACT services, as well as to prevent out-of-home placements. . . CBI. . . is designed to be relatively brief, intensive and is not meant to follow children into adulthood." | ***Compare:***<br><br>**Kamradt Reply Decl. ¶ 25:** "In systems providing ACT to transition-age youth, the service is usually provided to youth with a serious mental illness (SMI), such as a psychotic condition or schizophrenia. Many transition-age youth with mental health disabilities, and severe mental health needs, may not have this type of condition, but still need a team approach to help them move toward greater self-sufficiency and achievement of short-term and long-term goals. Wraparound Milwaukee provides such a service to transition-age youth aged 16-23 called Older Youth and Emerging Adult Heroes (O-YEAH). O-YEAH helps youth with mental health disabilities with mental health services and assistance with housing, employment and developing independent living skills. The O-YEAH model resembles the Transition to Independence Program (TIP) discussed in the [Sullivan; originally Paulson] Declaration. The Declaration states that the District's TACT teams incorporate TIP principles, and that the service was provided to 48 youth in fiscal year 2020. The [Sullivan; originally Paulson] Declaration also states that one District provider provides TIP-type services separate from TACT, and that transition-age youth may participate in an ACT team for adults, but the Declaration does not indicate how many District youth are enrolled in those services. It is unclear whether the District provides adequate ACT, TACT, or TIP services to meet the needs of its transition-aged youth, or whether these services meet these needs of these youth for ICBS."<br><br>**Kamradt Reply Decl. ¶ 26:** "The [Sullivan; originally Paulson] Declaration does not indicate, and I have not seen in my review of District policies relating to CBI, whether and how youth reaching transition age, and their child and family teams, are assisted in deciding whether a service such as ACT, TACT, or TIP would be appropriate for them as they transition into adulthood. In Wraparound Milwaukee, each child who participates in the wraparound program must have a transition plan developed by their child and family team when they reach age 16. In this way, the youth, family, and team have a clear roadmap for what the youth's goals will be during late adolescence and early adulthood, and can ensure that the youth's service plan includes services and supports to assist the youth and family during this critical time."<br><br>**Cohen Reply Decl., Ex. AA (District of Columbia Department of Behavioral Health, 2021-2022 DBH Council Oversight Response 43 (Jan. 2022))** ("The number of youth served [by TIP] decreased from 703 in FY20 to 558 in FY21. TIP experienced 77% turnover which impacted the capacity."). |

# EXHIBIT B

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

MHEASURES Annual Report<br>FY20 (Oct 1, 2019-Sept 30, 2020)

## Section 1: Overview

### Overview

The mission of the Department of Behavioral Health (DBH) is to support prevention, treatment, resiliency, and recovery for District residents with mental health and substance use disorders through the delivery of high quality, integrated services. DBH serves children and youth with a diagnosis of severe emotional disturbance (SED) and adults with severe mental illness, as well as youth and adults with substance use disorders. District residents who meet the enrollment criteria are eligible to receive the full range of behavioral health services and supports. Integrated services are available for individuals who have co-occurring disorders.  Services are provided by a combination of contracted providers and DBH staff and are paid via Medicaid and locally-funded claims, as well as contracts and grants.

This report contains data on the number of individuals served, their demographics, the types of services used, and expenditures (i.e., based on Medicaid payments and/or DBH locally funded claims) for the period of Oct 1, 2019-September 30, 2020.  Previous versions of this report contained data only for services documented and paid by Medicaid and DBH via fee-for-service claims.  This report contains data for a more comprehensive set of services, including behavioral health services provided by Medicaid Managed Care Organizations (MCOs), services provided by Free Standing Mental Health Clinics, and DBH operated and contracted services (e.g., Saint Elizabeths Hospital, urgent care services, school-based behavioral health services, and the Children and Adolescent Mobile Psychiatric Service). This new information provides a more complete picture of the services provided by DBH to District residents.

### Mental Health

DBH provides an array of mental health services and supports through Health Homes and the Mental Health Rehabilitation Services (MHRS) options. This report also includes data on services offered by Free Standing Mental Health (FSMH) Clinics.  For reporting purposes, FSMH services were incorporated into three existing MHRS categories: Diagnostic and Assessment, Counseling, and Medication.

DBH contracts with 61 providers to deliver the majority of mental health services.  Five of these providers are classified as FSMH clinics; 22 are classified as MHRS providers; and 34 are both MHRS and FSMH providers.  Eleven providers are also certified to provide SUD treatment.  In addition, DBH operates adult and child clinics that provide urgent care and crisis emergency services. Outreach and treatment services related to

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

both mental health and substance use are also provided through the Community Response Team (CRT).

**Substance Use**

DBH also contracts with 28 treatment and recovery providers that provide services for adolescents and adults with substance use disorders (SUD). Eleven of these providers are also certified to provide mental health treatment. Individuals who want to obtain SUD services go through the Access and Referral Center (ARC) or community intake sites operated by treatment providers. In FY20, all SUD providers were required to begin providing intake services, unless approved for a waiver. During the intake process, clients receive an assessment to determine the appropriate level of treatment.

A comprehensive continuum of substance abuse recovery and treatment services, including outpatient, intensive outpatient, residential, detoxification and stabilization, and medication assisted treatment is available within the system of care.

SUD services for adolescents are provided through the Adolescent Substance Abuse Treatment Expansion Program (ASTEP). Three certified substance use disorder treatment providers offer these specialized services. Screening, assessment, out-patient and in-patient treatment, and recovery services and supports are provided.

DBH supports four Prevention Centers that conduct community education and engagement activities related to substance use prevention across all eight wards. This includes youth empowerment trainings, social media outreach and supporting Prevention Centers' capacity-building efforts. DBH has developed the Prevention Policy Consortium made up of more than 15 District agencies and national leaders to bolster the substance use prevention infrastructure and system.

**Limitations**

Since the FY20 MHEASURES annual report also includes data on behavioral health services provided by Medicaid MCOs, expenditure data are reported only at the aggregate level. Unlike previous years, this report does not include expenditure data disaggregated by service type or age groups. The report also does not include client-level data for services provided through MCOs, as such data cannot be integrated across programs to count a total unduplicated number of people served.

2

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

**Key Findings**

- Community mental health services: District Medicaid and local funds paid $188.6 million for mental health services claims in FY20. There was an increase in both consumers served (6% increase) and expenditures (30% increase) from FY19 to FY20.
- Substance use treatment: District Medicaid and local funds paid $26.4 million for substance use services claims in FY20. There was a decrease in both clients served (13% decrease) and expenditures (3% decrease) from FY19 to FY20.
- The trend of increasing use of Medication Assisted Treatment (MAT) for opioid use disorder continued.  In addition, more clients received buprenorphine or naltrexone than methadone in FY20.
- Fewer individuals were served at Saint Elizabeths Hospital than in the previous four years.

**List of Figures**

- Satisfaction survey data is presented in *Figures 1 and 2*;
- A summary of DBH operated services is presented in *Figures 3 and 4*;
- Individuals receiving services from both mental health and substance use providers are shown in *Figure 5;*
- Gender and race distribution for individuals receiving services from both mental health and substance use providers is shown in *Figures 6 and 7;*
- Mental health consumers served are shown in *Figure 8*;
- Utilization of Specific Claims-Based Behavioral Health Services are shown in *Figure 9*;
- Timeliness of initial services is shown in *Figure 10*;
- Substance use disorder intake data are shown in *Figure 11*;
- Substance use disorder clients served are shown in *Figure 12*;
- Substance use services by Level of Care are shown in *Figure 13*;
- Primary drug of choice is presented in *Figure 14;*
- Medication Assisted Treatment data are shown in *Figure 15*;
- Contracted children's services are summarized in *Figures 16-18*;
- Saint Elizabeths Hospital census data are shown in *Figures 19-21*;
- Expenditure data are shown in *Figures 22-25*.

# Mental Health and Substance Use Report on Expenditures and Services

### District of Columbia Department of Behavioral Health
### Barbara J. Bazron, Ph.D., Director

**Section 2: System Changes and Consumer Feedback**

Medicaid 1115 Behavioral Health Waiver

On November 6, 2019, the Centers for Medicare and Medicaid Services (CMS) approved the District's Behavioral Health Transformation demonstration with an effective date of January 1, 2020.  The demonstration allows the District's Medicaid program to pay for services provided to adults with serious mental illness (SMI)/serious emotional disturbance (SED) or substance use disorder (SUD) residing in an institution for mental disease (IMD). Additionally, the demonstration adds new community-based services designed to improve behavioral health treatment capacity and strengthen transitions from emergency, inpatient and residential treatment.  These community-based services include: Clubhouse services; Recovery support services; Supported employment for people with serious mental illness and substance use disorders; Trauma-targeted services; Crisis stabilization (including DBH's Comprehensive Psychiatric Emergency Program, psychiatric crisis stabilization programs; youth mobile crisis, and adult mobile crisis and behavioral health outreach); and transition planning services.

Certification of Free-Standing Mental Health Clinics

DBH began the process of certifying Free Standing Mental Health (FSMH) Clinics in October 2020.  As of the publication of this report, five FSMH clinics have been certified.  Previously, providers had enrolled with the Department of Health Care Finance (DHCF).  DBH worked closely with FSMH clinics during FY20 to prepare for the integration.  The services provided by FSMH clinics are similar to corresponding Mental Health Rehabilitative Services (MHRS) services, and a large proportion of providers and consumers are in both systems.

Public Health Emergency (COVID-19)

At the onset of the public health emergency, DBH's objectives were to maintain continuity of services and supports, provide clear guidance to providers around service delivery in the new environment, maximize telemedicine opportunities and online support, support providers with resources and increased technical assistance, and take advantage of the easing of federal regulations for innovative service options. DBH leadership monitored data trends in order to take action as needed.  DBH, in collaboration with the Department of Health Care Finance (DHCF) successfully advocated for an enhanced rate to assist Adult Substance Abuse Rehabilitation Services (ASARS) providers in maintaining financial viability during the pandemic. DBH clinics provided Coronavirus testing, and direct staff ensured consumers and clients continued to receive services without interruption.  DBH supported the expansion of the use of telemedicine.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Satisfaction Survey**

Every year, DBH conducts surveys of consumers, clients, and individuals in care to better understand their satisfaction with services.  It is an important opportunity to hear the voices of people served.  The questions in the survey are grouped into domains and scored on a five-point Likert scale, ranging from Very Unsatisfied to Very Satisfied.  The response options "Satisfied" and "Very Satisfied" were added together. Figure 1 shows the percent of respondents satisfied or very satisfied with the domains measured.  Not all domains are applicable to all surveys, as a customized version of the survey is used for the following areas: adult mental health (MH), child and youth mental health, adult substance use, and Saint Elizabeths Hospital (SEH). Figure 2 shows the response rate, based on the number of contacts made to the people in the sample.



# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

| Figure 2. Satisfaction Survey Response Rate | | | |
|---|---|---|---|
| Survey | Contacts Made | Number of Responses (Completed Surveys) | Response Rate (number of completed surveys/number of contacts made) |
| Adult MH | 1879 | 502 | 27% |
| Child/Youth MH | 1032 | 437 | 42% |
| Adult Substance Use | 129 | 69 | 53% |
| Saint Elizabeths Hospital | 195 | 119 | 61% |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Section 3: DBH Operated Services**

| Figure 3. Description of DBH Operated Services | | | |
|---|---|---|---|
| **Program** | **Metric** | **FY20 Data** | **Description** |
| Access HelpLine (AHL) | Number of answered calls | 67,005 | Residents can get immediately connected to services provided by the DBH and its certified behavioral health care providers by calling the AHL.  This 24-hour, seven-day-a-week telephone line is staffed by behavioral health professionals who can refer a caller to immediate help to address crises or to ongoing care. |
| Assessment and Referral Center (ARC) | Number of intakes completed | 2,845 | The ARC provides same-day assessment and referral for individuals seeking treatment for substance use disorders. |
| Assessment Center | Number of assessments completed | 429 | The Assessment Center provides the Superior Court of the District of Columbia with court-ordered, comprehensive mental health consultations, and psychological and psychiatric evaluations for children and related adults with child welfare, juvenile justice or family court involvement. |
| Comprehensive Psychiatric Emergency Program (CPEP) | Unduplicated count of people served | 2,615 | CPEP is a twenty-four hour/seven day a week operation that provides emergency psychiatric services and extended observation beds for individuals 18 years of age and older. |
| Community Response Team (CRT) | Number of interventions | 10,347 | The DBH Community Response Team is a twenty-four hour/seven day a week multidisciplinary direct service team that expands our community based direct service efforts—including homeless outreach, mobile crisis, and pre-arrest diversion. |
| Consumer and Family Affairs (CFAA) | Count of actively certified peers | 168 | CFAA promotes and protects the rights of individuals with behavioral health disorders; encourages and facilitates consumer and client and family leadership of treatment and recovery plans, and ensures consumer and client voice in the development of the behavioral health system. CFAA also promotes consumer and client leadership, manages the peer certification training, and provides expertise on the consumer and client perspective. |

# Mental Health and Substance Use Report on Expenditures and Services

### District of Columbia Department of Behavioral Health
### Barbara J. Bazron, Ph.D., Director

| | | | |
|---|---|---|---|
| **Forensic Outpatient Department (FOPD)** | Number of consumers monitored in the community | 65 | FOPD monitors forensic consumers assigned to outpatient mental health providers, to ensure consumers are safely treated in the community in the least restrictive environment. FOPD monitors the consumer's psychiatric conditions and compliance with the conditions of release. FOPD also provides psychoeducational trainings to core service agencies on the best practices for maintaining forensic consumers in an outpatient mental health setting. |
| **The Parent Infant Early Childhood Enhancement Program (PIECE) and Physicians Practice Group (PPG)** | Unduplicated count of children served | 206 | The PIECE program has two components: providing screening, assessment, individual, family, play art therapy, Parent Child Interaction Therapy and Child Parent Psychotherapy for Family Violence; and offering psycho-educational parenting groups, home visits, and maternal mental health services to families with children from birth to seven years old. The PPG mainly serves children and youth ages 6-21. Services include clinical assessment of safety, diagnostic evaluations, and recommendations for treatment. Additional services include court ordered evaluations, medication assessments and medication management. |
| **Saint Elizabeths Hospital (SEH)** | Unduplicated count of individuals served | 465 | Saint Elizabeths Hospital is the District's public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. Saint Elizabeths also provides mental health evaluations and care to patients committed by the courts. |
| **School Based Behavioral Health Program (SBBH)** | Number of children served | 2,855 | Through the School-Based Behavioral Health Program, DBH collaborates with students, families, schools, community-based organizations and other partners to provide behavioral health prevention, early intervention and treatment services that reduce barriers to learning, foster resiliency and maximize students' potential to become successful learners and responsible citizens. |
| **Urgent Care (35 K Street)** | Number of people served | 2,406 | Urgent Care services include assessment, counseling, psychiatric evaluation and medication management. Consumers may also utilize the onsite pharmacy. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 4: Number of Individuals Served by DBH Operated Services in FY20**

| Adult & Transition Aged Youth Services | | Children, Adolescent & Family Services | Conumer and Family Services |
|---|---|---|---|
| Assesment and Referral Center: 2,845 Intakes | Forensic Outpatient Department: 65 Consumers Monitored | Assessment Center: 429 Assessments | Access HelpLine (AHL): 67,005 Calls |
| Community Response Team: 10,347 Interventions | Urgent Care (35K): 2,406 Consumers Served | PIECE/PPG Program: 206 Children Served | Consumer and Family Affairs: 168 Certified Peers |
| Comprehensive Psychiatric Emergency Program: 2,615 Consumers Served | Saint Elizabeths Hospital: 465 Individuals Served | School-Based Behavioral Health: 2,855 Children Served | |

Note: This chart of services does not align with DBH's organizational chart.

9

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Section 4: Claims-based Services – Mental Health and Substance Use Disorder**

This section describes behavioral health services documented and paid via claims.  Most of these claims are paid by Medicaid, but for specific services that are not billable to Medicaid or for people who do not have Medicaid, local funding is used.  Individuals covered by Medicaid may either be enrolled with a Managed Care Organization (MCO) and/or receive treatment on a Fee for Service (FFS) basis.  In previous annual reports, only FFS claims for MHRS, ASARS, and ASTEP were included.  DBH now has access to claims data for services billed by FSMH clinics and paid by MCOs, as well as data for those receiving buprenorphine and naltrexone for Opioid Use Disorder (OUD).  This comprehensive universe of services is included in both the FY20 and historical data in this report.

Figures 5-7 show the universe of individuals receiving mental health and substance use services and the overlap of those who received both in FY20.

10

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 5. Individuals Who Received Mental Health and Substance Use Services – FY 2020**

MH Consumers 31,521

SUD Clients 5,112

2,656 People Received Both Mental Health and Substance Use Services/Supports

Figure 5 shows that 36,633 individuals obtained MH or SUD services in FY20.  Of those individuals, 2,656 were served by both MH and SUD providers.  Individuals receiving both MH and SUD services comprised 8% of all MH consumers and 52% of SUD clients.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 6 shows that a similar proportion of males and females received mental health services in FY20; however, males are a larger share (two-thirds) of consumers receiving substance use disorder services, and/or both mental health and substance use disorder services.

12

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 7 shows that the majority of residents receiving mental health services, substance use disorder services, and those receiving both mental health and substance use disorder services are Black.

13

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

## MENTAL HEALTH SERVICES

## Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



NOTE: As the data now include a broader set of services and providers, the numbers for previous fiscal years differ from what has been reported in previous MHEASURES.

Figure 8 shows that the total number of consumers receiving community-based mental health services remained stable from FY17 to FY19, with a slight increase in FY20.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

### Figure 9. FY20 Utilization of Claims-Based Mental Health Services

| Service Group | Children Served | Adults Served | Total Served | Average Number of Services per Consumer |
|---|---|---|---|---|
| **Assertive Community Treatment (ACT)** | 0 | 2,756 | 2,756 | 291 |
| **Community Behavioral Intervention (CBI)** | 481 | 65 | 546 | 83 |
| **Clinical Care Coordination** | 293 | 1,167 | 1,460 | 1 |
| **Community Support** | 2,513 | 22,453 | 24,966 | 324 |
| **Crisis Intervention** | 319 | 2,323 | 2,642 | 5 |
| **Diagnostic & Assessment (D&A)** | 1,907 | 12,368 | 14,275 | 3 |
| **Day Rehabilitation** | 0 | 1,306 | 1,306 | 87 |
| **DBH Local Only Services*** | 38 | 499 | 537 | 15 |
| **Health Homes** | 0 | 1,285 | 1,285 | 15 |
| **Medication Management** | 1,281 | 15,103 | 16,384 | 15 |
| **Supported Employment** | 0 | 438 | 438 | 33 |
| **Therapy (e.g., individual/family/group)** | 2,240 | 8,760 | 11,000 | 43 |

NOTE: Free Standing Mental Health Clinic services were integrated into the service groups of diagnostic and assessment, therapy, and medication management.

*DBH Local Only Services are those that are not billable to Medicaid (i.e., Team Meeting, Jail Diversion, and Transition Planning).

Figure 9 shows that the three most frequently used services are community support (24,966 individuals), medication management (16,384 individuals), and diagnostic & assessment (14,275 individuals).

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 10 shows the proportion of consumers, both adults and children, who were newly-enrolled in mental health services or transferred to a new provider who had their first service within 30 days of assignment to a new provider. Performance has improved in the past two years, from 65% to 83% of consumers getting a timely first service.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

## SUBSTANCE USE SERVICES

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



NOTE: ARC (DBH's Assessment and Referral Center); AR (Community-Based Provider Assessment and Referral Sites)

Figure 11 shows there was a 60% decline in adult SUD intake assessments in the initial month following the start of the COVID 19 public health emergency.  After April, SUD intakes gradually increased.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 12 shows a fairly consistent number of people receiving SUD services in FY17-FY19, with a decline in FY20. This decline in FY20 appeared to be related to the public health emergency.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**



NOTE: Data are limited to enrollments that occur during the fiscal year. As a result of data quality issues, enrollments for withdrawal management are not available for FY20.

Figure 13 shows that the level of care with the highest number of enrollments each year has consistently been residential, followed by outpatient (with the exception of FY16).

**Withdrawal Management** (detoxification) is for clients with sufficiently severe signs and symptoms of withdrawal from psychoactive substances who require medical monitoring and nursing care, but for whom hospitalization is not indicated. **Residential Treatment** (inpatient) programs focus on helping individuals change their behaviors in a highly structured setting. **Outpatient** services provide counseling and monitoring several times a week in a supportive group setting.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



NOTE: If a client received services from an Opioid Treatment Program across multiple fiscal years, their primary drug of choice is only reported for the year they were admitted.

Figure 14 shows that the primary drug of choice for individuals with an admission during the past four fiscal years was alcohol. Heroin was the second most frequently reported drug of choice in FY20 and in previous years.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



NOTE: Methadone is administered in Opioid Treatment Programs (OTPs), while Buprenorphine and Naltrexone are prescribed in primary care settings. DBH certifies the OTP providers, and the Department of Health Care Finance monitors prescribers of Buprenorphine and Naltrexone.

Figure 15 shows the clients using one of the two forms of MAT increased steadily for the past five years.  The number of clients prescribed buprenorphine and naltrexone has roughly doubled over the past five years (from 1,020 in FY16 to 2, 033 in FY 20), while the number of clients prescribed methadone declined slightly (from 1,626 in FY16 to 1,467 FY20).

23

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**CHILDREN'S CONTRACTED PROGRAMS**

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

| Figure 16. Description of Contracted Children's Programs | | | |
|---|---|---|---|
| **Program** | **Metric** | **FY20 Data** | **Program Description** |
| **Children and Adolescent Mobile Psychiatric Service (ChAMPS)** | Number of deployments | 806 | ChAMPS provides on-site immediate help to children facing a behavioral or mental health crisis whether in the home, school or community. Services are geared toward children and youth 6-21 years of age with the goal of stabilization to avert inpatient hospitalization or placement disruptions.  The mobile crisis teams also make follow up visits and connect families to needed support services. |
| **DC Mental Health Access to Pediatrics (DCMAP)** | Number of screenings | 41,845 | DCMAP supports pediatric providers addressing mental health concerns, provides telephone consultation with clinicians, completes community resource referrals and face to face consultations as clinically indicated, and provides mental health education and training for primary care providers.  In addition to the over 40,000 screenings, 957 consultations were completed in FY20. |
| **Healthy Futures** | Number of early childhood facilities | 60 | Healthy Futures is a program wherein clinical specialists provide consultation services to child development centers and home-based facilities in order to improve outcomes for children, parents, and staff; and ultimately eliminate early childhood expulsions and suspensions. Services include classroom observations, prevention/early intervention activities, modeling, and consultation with parents, teachers, and center directors. |
| **High Fidelity Wraparound (HFW)** | Number of children served | 93 | HFW is a collaborative team-based care coordination service where a family and service team plans, implements, tracks and adapts an individualized plan of care to meet complex needs; address risks of out of home placement, school disruption and high utilization of acute care; and achieve the youth and family's long term vision of positive outcomes in the home, school and community. |
| **HOPE Court** | Number of children served | 46 | Here Opportunities Prepare you for Excellence (HOPE) Court is a voluntary behavioral health diversion or "treatment" court wherein eligible youth are connected to behavioral health and other community-based supportive services. HOPE Court specializes in the support of youth who are at risk or are confirmed survivors of commercial sexual exploitation of children (CSEC). Youth may have their charges dismissed or probation shortened through successful completion of the program in the case of a juvenile matter and/or once permanency is achieved in the case of neglect. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

| | | | |
|---|---|---|---|
| **Juvenile Behavior Diversion Program (JBDP)** | Number of children served | 60 | JBDP is a voluntary behavioral health diversion court or "treatment court" wherein eligible youth are connected to behavioral health and other community-based supportive services. Youth may have their charges dismissed or probation shortened through successful completion of the program in the case of a juvenile matter and/or once permanency is achieved in the case of neglect. |
| **Primary Project** | Number of children served | 163 | Primary Project is an evidence-based early intervention and prevention program for children in pre-Kindergarten through third grade who have been identified with mild adjustment issues in the classroom. Through one-to-one, non-directive play sessions, the program reduces social, emotional and school adjustment difficulties to improve school-related competencies in task orientation, behavior control, assertiveness, and peer social skills. *NOTE: As a result of the pandemic, this program was suspended in March, 2020.* |
| **Psychiatric Residential Treatment Facility (PRTF)** | Unduplicated number of children served | 95 | A PRTF is an accredited facility that provides inpatient psychiatric services for individuals, typically under the age of 18 who have complex behavioral health needs and meet medical necessity requirements for inpatient rather than community-based services. DBH oversees enrollment and care; and collaborates with PRTFs, families and community-based service providers to ensure youth are able to successfully return to their home and community upon discharge. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

## Figure 17. Overview of Children's Contracted Programs in FY20

ChAMPS:

806 Deployments

DC Mental Health Access to Pediatrics:

41,845 Screenings

Healthy Futures:

60 Early Childhood Facilities Served

High Fidelity Wraparound:

93 Children Served

HOPE Court:

46 Children Served

Juvenile Behavioral Diversion Program:

60 Children Served

Primary Project: 163 Children Served

Psychiatric Residential Treatment Facilities:

95 Children Served

27

# Mental Health and Substance Use Report on Expenditures and Services

### District of Columbia Department of Behavioral Health
### Barbara J. Bazron, Ph.D., Director

| Figure 18. Evidence Based Practices | | |
|---|---|---|
| **Model** | **Children Served FY20** | **Description** |
| **Child Parent Psychotherapy (CPP-FV)** | 67 | CPP-FV is a therapeutic intervention for young children with a history of trauma exposure or maltreatment, and their caregivers. CPP-FV supports child development, restores the child-parent relationship and the overall feelings of safety, while reducing symptoms associated with the experience of trauma. |
| **Functional Family Therapy (FFT)** | 162 | CBI level IV, FFT, is a family focused intervention for at-risk and juvenile justice involved youth. |
| **Multi-Systemic Therapy (MST)** | 46 | CBI level I, MST, is an intensive community-based treatment for families and youth with antisocial behaviors putting them at risk of out of home placement, who are living with or returning to a parent/caregiver with whom the youth have a long-term relationship and who is willing to participate in treatment. Emphasis is on empowering parents/caregivers to assist youth in making and sustaining change in individual, family, peer, and school systems. |
| **Parent Child Interaction Therapy (PCIT)** | 87 | PCIT is a supported treatment for young children who are experiencing extreme behavioral difficulties. It places emphasis on improving the quality of the parent-child relationship and changing parent-child interaction patterns. |
| **Trauma-Focused Cognitive Behavioral Therapy (TF-CBT)** | 78 | TF-CBT is an intervention designed to help children, youth, and their parents overcome the negative effects of traumatic life events and address feelings. |
| **Trauma Systems Therapy (TST)** | 23 | TST is a comprehensive model for treating traumatic stress in children and adolescents that adds to individually-based approaches by specifically addressing the child's social environment and/or system of care. TST is designed to provide an integrated and highly coordinated system of services guided by the specific understanding of the nature of child traumatic stress. TST focuses on the interaction between the child's difficulties regulating their emotions and the deficits within the child's social environment. |
| **Transition into Independence (TIP)** | 703 | TIP is a practice model which prepares youth and young adults (ages 14-29) with emotional and behavioral challenges for the transition to adult roles by engaging them in their own futures planning while providing developmentally-appropriate supports. TIP involves youth/young adults, their families, and other key players in a process that facilitates movement towards greater self-sufficiency and successful achievement of their goals. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Section 5: Saint Elizabeths Hospital**

Saint Elizabeths Hospital is the District's public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. Saint Elizabeths also provides mental health evaluations and care to patients committed by the courts. The Hospital develops a personalized treatment plan to help each patient achieve the highest quality mental health outcomes.

Saint Elizabeths Hospital has implemented infection control practices guided by DC Health and the CDC to keep patients and staff safe while maintaining clinical care during this COVID-19 pandemic.  Patients and employees are tested every 14 days to quickly isolate anyone who was COVID positive, including those without symptoms, to reduce the spread.  All patients admitted to the hospital are quarantined for 14 days to ensure that they are not infected with the coronavirus.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 19 shows that while total admissions were relatively steady for FY16-19, the number of admissions declined by 39% in FY20 as result of efforts to minimize transmission of the coronavirus.  In each year, the vast majority of admissions were for individuals with a pre-trial status, meaning they had not yet had their legal charges adjudicated.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 20 shows that discharges remained steady between FY16 and FY19, but fewer discharges occurred in in FY20 than in prior years.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 21 shows that, as with admissions and discharges, the number remained steady between FY16 and FY19.  The average daily census at SEH declined in FY20 due to the District policy to reduce admissions during the pandemic.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Section 6:  Expenditures**

The expenditure data in this report include selected behavioral health services paid for by Medicaid (directly by DHCF under fee-for-service (FFS) and by managed care organizations (MCOs) on behalf of DHCF) and by DBH local programs. Medicaid is funded with a combination of local and federal dollars, while DBH programs are funded by District appropriated funds and grant dollars.

While this report continues to include payments to MHRS and ASARS providers, it reflects a broader Medicaid universe than in prior years due to the inclusion of: FFS payments to freestanding mental health clinics; FFS payments for MAT drugs beyond methadone (specifically those containing buprenorphine, buprenorphine/naloxone combinations, and naltrexone); and Medicaid MCO payments for MAT drugs and services with an MHRS or freestanding provider type.   MCOs play a major role in the provision of reimbursement for lower acuity behavioral health services to Medicaid beneficiaries (e.g., diagnosis, counseling, and medication monitoring), but many behavioral health services (including MHRS and ASARS) are carved out of MCO contracts and paid by DHCF on a fee-for-service basis.

Expenditure totals for behavioral health services provided to Medicaid beneficiaries are based on aggregated Medicaid FFS claims and MCO encounter data.  It is important to note that not all Medicaid behavioral health expenditures are reflected here; for example, services provided by federally qualified health centers (FQHCs), licensed practitioners billing independently (such as psychologists and social workers), and psychiatric and acute care hospitals are excluded.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



NOTE: Medicaid data were provided by DHCF for mental health service claims paid as of 2/17/21. Local data were extracted from DBH's Procurement Automated Support System (PASS) for services paid as of 1/4/21. Payments to hospitals for mental health inpatient stays are not included in the expenditure data (see text for additional information on the universe of services reflected here). DHCF and DBH expenditures are for services provided through 9/30/20.

Figure 22 shows that $188.6 million was spent on claims-based mental health services in FY20. This amount reflected a 30% increase in spending on mental health services from FY19 to FY20. DBH local funds accounted for about 6% ($11.5 million) of FY20 spending on claims-based mental health services.

34

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



NOTE: Medicaid data were provided by DHCF for substance use service claims paid as of 2/17/21. Local data were extracted from DBH's Procurement Automated Support System (PASS) for services paid as of 1/4/21.  Payments to hospitals for withdrawal management services are included in DBH's local data. There are no payments to hospitals included in the DHCF data (see text for additional information on the universe of services reflected here). DHCF and DBH expenditures are for services provided through 9/30/20.

Figure 23 shows $26.4 million was spent on claims-based substance use services in FY20.  After two years of increases, overall expenditures on substance use services declined in FY20 by about 3%. DBH local funds accounted for about 47% ($12.3 million) of FY20 spending on claims-based substance use services.

35

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 24. Medicaid Mental Health Telemedicine Expenditures - FY20

$50,911,216

$142,920,645

Total Mental Health Medicaid Expenditures: $193,831,861

■ Medicaid Telehealth  ■ Medicaid Non-telehealth



Figure 25. Medicaid Substance Use Telemedicine Expenditures - FY20

$724,321

$15,578,654

Total Substance Use Medicaid Expenditures: $16,302,975

■ Medicaid Telehealth  ■ Medicaid Non-telehealth

NOTE: Medicaid data were provided by DHCF for behavioral health services claims paid by 1/16/21. Data are for services provided through 9/30/20.

Figures 24 shows that about a one-quarter (26%) of Medicaid mental health expenditures were for services via telemedicine (i.e., use of telephonic or video telecommunications technology that met required standards of care). Figure 25 shows that 5% of Medicaid substance use expenditures were for services delivered via telemedicine.

# EXHIBIT C

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

MHEASURES Annual Report
FY21 (Oct 1, 2020-Sept 30, 2021)

**Section 1:  Overview**

**Overview**

The mission of the Department of Behavioral Health (DBH) is to support prevention, treatment, resiliency, and recovery for District residents with mental health and substance use disorders through the delivery of high quality, integrated services. DBH serves children and youth with a diagnosis of severe emotional disturbance (SED) and adults with severe mental illness, as well as youth and adults with substance use disorders. District residents who meet the enrollment criteria are eligible to receive the full range of behavioral health services and supports. Services are integrated for individuals who have co-occurring disorders.  Whole person care is the goal.  Services are provided by a combination of contracted providers and DBH staff and are paid via Medicaid and locally-funded claims, as well as contracts and grants.

This report contains data on the number of individuals served, their demographics, the types of services used, and expenditures (i.e., based on Medicaid payments and/or DBH locally funded claims) for the period of Oct 1, 2020-March 30, 2021.  Previous versions of this report contained data only for services documented and paid by Medicaid and DBH via fee-for-service claims.  This report contains data for a more comprehensive set of services, including behavioral health services provided by Medicaid Managed Care Organizations (MCOs).

**Mental Health**

DBH provides an array of mental health services and supports through Health Homes and the Mental Health Rehabilitation Services (MHRS) options. This report also includes data on services offered by Free Standing Mental Health (FSMH) Clinics.  For reporting purposes, FSMH services were incorporated into three existing MHRS categories: Diagnostic and Assessment, Counseling, and Medication.

DBH contracts with 55 providers to deliver the majority of mental health services.  Four of these providers are classified as only a FSMH clinic; 34 are classified as MHRS-only providers; and 17 are both MHRS and FSMH providers.  Thirteen mental health providers are also certified to provide SUD treatment.  In addition, DBH operates adult and child clinics that provide urgent care and crisis emergency services. Outreach and treatment services related to both mental health and substance use are also provided through the Community Response Team (CRT).

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

**Substance Use**

DBH also contracts with 29 treatment and recovery providers that provide services for adolescents and adults with substance use disorders (SUD).  Thirteen of these providers are also certified to provide mental health treatment. Individuals who want to obtain SUD services go through the Access and Referral Center (ARC) or community intake sites operated by treatment providers. Beginning in FY20, all SUD providers were required to provide assessment, intake and referral services, unless approved for a waiver.  During the intake process, clients receive an assessment to determine the appropriate level of treatment.

A comprehensive continuum of substance abuse recovery and treatment services, including outpatient, intensive outpatient, residential, detoxification and stabilization, and medication assisted treatment is available within the system of care.

SUD services for adolescents are provided through the Adolescent Substance Abuse Treatment Expansion Program (ASTEP). Three certified substance use disorder treatment providers offer these specialized services. Screening, assessment, out-patient and in-patient treatment, and recovery services and supports are provided.

DBH supports four Prevention Centers that conduct community education and engagement activities related to substance use prevention across all eight wards. This includes youth empowerment trainings, social media outreach and Prevention Centers capacity-building efforts. DBH has developed the Prevention Policy Consortium made up of more than 15 District agencies and national leaders to bolster the substance use prevention infrastructure and system of care.

2

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Key Findings**

- Community mental health services: District Medicaid and local funds paid $228.4 million for mental health services claims in FY21. There was an increase in both consumers served (14% increase) and expenditures (22% increase) from FY20 to FY21.
- Substance use treatment: District Medicaid and local funds paid $24.1 million for substance use services claims in FY21. There was a slight decrease in clients served (2% decrease) and a slight increase in expenditures (2% increase) from FY20 to FY21.
- Use of Medication Assisted Treatment (MAT) for opioid use disorder decreased by 3% between FY20 and FY21, but use of Naltrexone increased 18%.
- Fewer individuals were served at Saint Elizabeths Hospital than in the previous four years.

**List of Figures**
- Satisfaction survey data is presented in *Figures 1 and 2*;
- A summary of DBH operated services is presented in *Figures 3 and 4*;
- Individuals receiving services from both mental health and substance use providers are shown in *Figure 5;*
- Gender and race distribution for individuals receiving services from both mental health and substance use providers is shown in *Figures 6 and 7;*
- Mental health consumers served are shown in *Figure 8*;
- Utilization of Specific Claims-Based Behavioral Health Services are shown in *Figure 9*;
- Timeliness of initial services is shown in *Figure 10*;
- Substance use disorder intake data are shown in *Figure 11*;
- Substance use disorder clients served are shown in *Figure 12*;
- Substance use services by Level of Care are shown in *Figure 13;*
- Primary drug of choice is presented in *Figure 14;*
- Medication Assisted Treatment data are shown in *Figure 15*;
- Contracted children's services are summarized in *Figures 16-18*;
- Saint Elizabeths Hospital census data are shown in *Figures 19-21*;
- Expenditure data are shown in *Figures 22-27*.

3

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Section 2: Consumer Feedback**

Every year, DBH conducts surveys of consumers, clients, and individuals in care to better understand their satisfaction with services.  It is an important opportunity to hear the voices of people served.  The questions in the survey are grouped into domains and scored on a five-point Likert scale, ranging from Very Unsatisfied to Very Satisfied.  The response options "Satisfied" and "Very Satisfied" were added together. Figure 1 shows the percent of respondents satisfied or very satisfied with the domains measured.  Four domains are not applicable to the Saint Elizabeths Hospital survey, as a customized version of the survey is used for the following areas: adult mental health (MH), child and youth mental health, adult substance use, and Saint Elizabeths Hospital (SEH). Figure 2 shows the response rate, based on the number of contacts made to the people in the sample.



Figure 1. Percent of Consumers Satisfied by Survey Domain - FY21

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

| Figure 2. Satisfaction Survey Response Rate – FY21 | | | |
|---|---|---|---|
| **Survey** | **Contacts Made** | **Number of Responses (Completed Surveys)** | **Response Rate (number of completed surveys/number of contacts made)** |
| Adult MH | 1315 | 421 | 32% |
| Child/Youth MH | 1133 | 406 | 36% |
| Adult Substance Use | 1519 | 313 | 21% |
| Saint Elizabeths Hospital | 393 | 240 | 61% |

5

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Section 3: DBH Operated Services**

## Figure 3. Description of DBH Operated Services

| Program | Metric | FY21 Data | Description |
|---|---|---|---|
| Access HelpLine (AHL) | Number of answered calls | 77,793 | Residents can get immediately connected to services provided by the DBH and its certified behavioral health care providers by calling the AHL.  This 24-hour, seven-day-a-week telephone line is staffed by behavioral health professionals who can refer a caller to immediate help to address crises or to ongoing care. |
| Assessment and Referral Center (ARC) | Number of intakes completed | 2,071 | The ARC provides same-day assessment and referral for individuals seeking treatment for substance use disorders. |
| Assessment Center | Number of assessments completed | 488 | The Assessment Center provides the Superior Court of the District of Columbia with court-ordered, comprehensive mental health consultations, and psychological and psychiatric evaluations for children and related adults with child welfare, juvenile justice or family court involvement. |
| Comprehensive Psychiatric Emergency Program (CPEP) | Unduplicated count of people served | 3,028 | CPEP is a twenty-four hour/seven day a week operation that provides emergency psychiatric services and extended observation beds for individuals 18 years of age and older. |
| Community Response Team (CRT) | Number of interventions | 5,452 | The DBH Community Response Team is a twenty-four hour/seven day a week multidisciplinary direct service team that expands our community based direct service efforts—including homeless outreach, mobile crisis, and pre-arrest diversion. |
| Consumer and Family Affairs (CFAA) | Count of actively certified peers | 164 | CFAA promotes and protects the rights of individuals with behavioral health disorders; encourages and facilitates consumer and client and family leadership of treatment and recovery plans, and ensures consumer and client voice in the development of the behavioral health system. CFAA also promotes consumer and client leadership, manages the peer certification training, and provides expertise on the consumer and client perspective. |

# Mental Health and Substance Use Report on Expenditures and Services

District of Columbia Department of Behavioral Health

Barbara J. Bazron, Ph.D., Director

| | | | |
|---|---|---|---|
| **Forensic Outpatient Department (FOPD)** | Number of consumers monitored in the community | 62 | FOPD monitors forensic consumers assigned to outpatient mental health providers, to ensure consumers are safely treated in the community in the least restrictive environment. FOPD monitors the consumer's psychiatric conditions and compliance with the conditions of release. FOPD also provides psychoeducational trainings to core service agencies on the best practices for maintaining forensic consumers in an outpatient mental health setting. |
| **Intellectual and Developmental Disabilities (IDD) Program (35 K Street)** | Number of people served | 184 | The IDD program provides services to individuals with intellectual and developmental disabilities who have a co-occurring psychiatric diagnosis to include diagnostic assessments, medication somatic services, community support and counseling. |
| **The Parent Infant Early Childhood Enhancement Program (PIECE) and Physicians Practice Group (PPG)** | Unduplicated count of children served | 336 | The PIECE program has two components: providing screening, assessment, individual, family, play art therapy, Parent Child Interaction Therapy and Child Parent Psychotherapy for Family Violence; and offering psycho-educational parenting groups, home visits, and maternal mental health services to families with children from birth to seven years old. The PPG mainly serves children and youth ages 6-21. Services include clinical assessment of safety, diagnostic evaluations, and recommendations for treatment. Additional services include court ordered evaluations, medication assessments and medication management. |
| **Saint Elizabeths Hospital (SEH)** | Unduplicated count of individuals served | 369 | Saint Elizabeths Hospital is the District's public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. Saint Elizabeths also provides mental health evaluations and care to patients committed by the courts. |
| **School Based Behavioral Health Program (SBBH)** | Number of children served | 1,976 | Through the School-Based Behavioral Health Program, DBH collaborates with students, families, schools, community-based organizations (CBOs) and other partners to provide behavioral health prevention, early intervention and treatment services that reduce barriers to learning, foster resiliency and maximize students' potential to become successful learners and responsible residents. Data reported includes children served by DBH and CBO clinicians. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

| | | | |
|---|---|---|---|
| **Pharmacy (35 K Street)** | Number of people served | 1,805 | The pharmacy serves as a safety net by filling prescriptions of psychotropic medication to uninsured residents of the District of Columbia, acting as the outpatient pharmacy for CPEP, and filling prescriptions for discharge medication for St. Elizabeths Hospital. |
| **Urgent Care (35 K Street)** | Number of people served | 2,377 | Urgent Care services include assessment, counseling, psychiatric evaluation and medication management. |

8

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

## Figure 4: Number of Individuals Served by DBH Operated Services in FY21

**Adult & Transition Aged Youth Services**

Assesment and Referral Center:
2,071 Intakes

Intellectual and Developmental Disabilities Program:
184 Individuals Served

Community Response Team:
5,452 Interventions

Pharmacy:
1,805 Individuals Served

Comprehensive Psychiatric Emergency Program:
3,028 Consumers Served

Urgent Care (35K):
2,377 Consumers Served

Forensic Outpatient Department:
62 Consumers Monitored

Saint Elizabeths Hospital:
369 Individuals Served

**Children, Adolescent & Family Services**

Assessment Center:
488 Assessments

PIECE/PPG Program:
336 Children Served

School-Based Behavioral Health:
1,976 Children Served

**Consumer and Family Services**

Access HelpLine (AHL):
77,793 Calls

Consumer and Family Affairs:
164 Certified Peers

Note: This chart of services does not align with DBH's organizational chart.

9

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

**Section 4: Claims-based Services – Mental Health and Substance Use Disorder**

This section describes behavioral health services documented and paid via claims.  Most of these claims are paid by Medicaid, but for specific services that are not billable to Medicaid or for people who do not have Medicaid, local funding is used.  Individuals covered by Medicaid may either be enrolled with a Managed Care Organization (MCO) and/or receive treatment on a Fee for Service (FFS) basis.  The universe of services included in Section 4 is comprised of MHRS, FSMH, Crisis, ASARS, ASTEP, and buprenorphine and naltrexone for Opioid Use Disorder (OUD).

Figures 5-7 show the universe of individuals receiving mental health and substance use services and the overlap of those who received both in FY21.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 5. Individuals Who Received Mental Health and Substance Use Services – FY 2021**

MH Consumers 35,837

SUD Clients 4,985

3,179 People Received Both Mental Health and Substance Use Services/Supports

Figure 5 shows that 37,643 individuals obtained MH or SUD services in FY21.  Of those individuals, 3,179 were served by both MH and SUD providers.  Individuals receiving both MH and SUD services comprised 9% of all MH consumers and 64% of SUD clients.

11

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 6 shows that a similar proportion of males and females received mental health services in FY21; however, males are a larger share (two-thirds) of consumers receiving substance use disorder services, and/or both mental health and substance use disorder services.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 7 shows that the majority of residents receiving mental health services, substance use disorder services, and those receiving both mental health and substance use disorder services are Black.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

## MENTAL HEALTH SERVICES

14

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 8 shows that the total number of consumers receiving community-based mental health services increased by 14% from FY20 to FY21.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

### Figure 9. FY21 Utilization of Claims-Based Mental Health Services

| Service Group | Children Served | Adults Served | Total Served | Average Number of Services per Consumer |
|---|---|---|---|---|
| **Assertive Community Treatment (ACT)** | 0 | 2,859 | 2,859 | 83 |
| **Community Behavioral Intervention (CBI)** | 630 | 0 | 630 | 44 |
| **Community Support** | 2,630 | 27,911 | 30,541 | 44 |
| **Crisis Intervention** | 380 | 4,175 | 4,555 | 10 |
| **Diagnostic & Assessment (D&A)** | 1,942 | 15,322 | 17,264 | 2 |
| **Day Rehabilitation** | 0 | 909 | 909 | 66 |
| **DBH Local Only Services*** | 16 | 259 | 275 | 4 |
| **Health Homes** | 0 | 934 | 934 | 7 |
| **Medication Management** | 1,209 | 18,728 | 19,937 | 6 |
| **Supported Employment** | 0 | 522 | 522 | 7 |
| **Therapy (e.g., individual/family/group)** | 2,093 | 9,297 | 11,390 | 9 |

NOTE: Free Standing Mental Health Clinic services were integrated into the service groups of diagnostic and assessment, therapy, and medication management.

*DBH Local Only Services are those that are not billable to Medicaid (i.e., Team Meeting, Jail Diversion, and Transition Planning).

Figure 9 shows that the three most frequently used services are community support (30,541 individuals), medication management (19,937 individuals), and diagnostic & assessment (17,264 individuals).

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 10 shows the proportion of consumers, both adults and children, who were newly-enrolled in mental health services or transferred to a new provider who had their first service within 30 days of assignment to a new provider.  Performance has improved in the past four years, from 65% to 87% of consumers getting a timely first service.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

## SUBSTANCE USE SERVICES

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



NOTE: ARC (DBH's Assessment and Referral Center); AR (Community-Based Provider Assessment and Referral Sites)

Figure 11 shows adult SUD intake assessments generally increased throughout FY21 as the system continued to recover from the COVID 19 public health emergency.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 12 shows a decline in clients served between FY19 and FY20.  The decline in FY20 appeared to be related to the public health emergency. There was a slight decline (2%) in FY21.

20

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 13. New Substance Use Program Enrollments by Level of Care and Fiscal Year**

NOTE: Data are limited to enrollments that occur during the fiscal year. Individuals who have an enrollment in more than one level of care are counted once in each level of care. Individuals who were enrolled in a previous year but continued to receive services are only shown in the year of their program enrollment.

Figure 13 shows that the level of care with the highest number of enrollments each year has consistently been residential, followed by outpatient.

**Opioid Treatment Programs** involve the use of medications, in combination with counseling and behavioral therapies, to provide a whole-patient approach to the treatment of opioid use disorders. **Withdrawal Management** (detoxification) is for clients with sufficiently severe signs and symptoms of withdrawal from psychoactive substances who require medical monitoring and nursing care, but for whom hospitalization is not indicated. **Residential Treatment** (inpatient) programs focus on helping individuals change their behaviors in a highly structured setting. **Outpatient** services provide counseling and monitoring several times a week in a supportive group setting.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 14. Primary Drug of Choice by Fiscal Year**

NOTE: If a client received services from an Opioid Treatment Program across multiple fiscal years, their primary drug of choice is only reported for the year they were admitted.

Figure 14 shows that the primary drug of choice for individuals with an admission during the past five fiscal years was alcohol.  Heroin was the second most frequently reported drug of choice in FY21 and in previous years.

22

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 15. Medication Assisted Treatment (MAT) by Medication and Fiscal Year

NOTE: Methadone is administered in Opioid Treatment Programs (OTPs), while Buprenorphine and Naltrexone are prescribed in primary care settings. DBH certifies the OTP providers, and the Department of Health Care Finance monitors prescribers of Buprenorphine and Naltrexone.

Figure 15 shows the total clients receiving MAT decreased by 3%, but Naltrexone use increased by 18%.

23

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

**CHILDREN'S CONTRACTED PROGRAMS**

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

## Figure 16. Description of Contracted Children's Programs

| Program | Metric | FY21 Data | Program Description |
|---|---|---|---|
| The Children and Adolescent Mobile Psychiatric Service (ChAMPS) | Number of deployments | 457 | ChAMPS provides on-site immediate help to children facing a behavioral or mental health crisis whether in the home, school or community. Services are geared toward children and youth 6-21 years of age with the goal of stabilization to avert inpatient hospitalization or placement disruptions. The mobile crisis teams also make follow up visits and connect families to needed support services. |
| DC Mental Health Access to Pediatrics (DCMAP) | Number of screenings | 19,498 | DCMAP supports pediatric providers addressing mental health concerns, provides telephone consultation with clinicians, completes community resource referrals and face to face consultations as clinically indicated, and provides mental health education and training for primary care providers. In addition to the over 40,000 screenings, 957 consultations were completed in FY20. |
| Healthy Futures | Number of early childhood facilities | 83 | Healthy Futures is a program wherein clinical specialists provide consultation services to child development centers and home-based facilities in order to improve outcomes for children, parents, and staff; and ultimately eliminate early childhood expulsions and suspensions. Services include classroom observations, prevention/early intervention activities, modeling, and consultation with parents, teachers, and center directors. |
| High Fidelity Wraparound (HFW) | Number of children served | 94 | HFW is a collaborative team-based care coordination service where a family and service team plans, implements, tracks and adapts an individualized plan of care to meet complex needs; address risks of out of home placement, school disruption and high utilization of acute care; and achieve the youth and family's long term vision of positive outcomes in the home, school and community. |
| HOPE Court | Number of children served | 49 | Here Opportunities Prepare you for Excellence (HOPE) Court is a voluntary behavioral health diversion or "treatment" court wherein eligible youth are connected to behavioral health and other community-based supportive services. HOPE Court specializes in the support of youth who are at risk or are confirmed survivors of commercial sexual exploitation of children (CSEC). Youth may have their charges dismissed or probation shortened through successful completion of the program in the case of a juvenile matter and/or once permanency is achieved in the case of neglect. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

| | | | |
|---|---|---|---|
| **Juvenile Behavior Diversion Program (JBDP)** | Number of children served | 53 | JBDP is a voluntary behavioral health diversion court or "treatment court" wherein eligible youth are connected to behavioral health and other community-based supportive services. Youth may have their charges dismissed or probation shortened through successful completion of the program in the case of a juvenile matter and/or once permanency is achieved in the case of neglect. |
| **Primary Project** | Number of children served | N/A | Primary Project is an evidence-based early intervention and prevention program for children in pre-Kindergarten through third grade who have been identified with mild adjustment issues in the classroom. Through one-to-one, non-directive play sessions, the program reduces social, emotional and school adjustment difficulties to improve school-related competencies in task orientation, behavior control, assertiveness, and peer social skills. *NOTE: As a result of the pandemic, this program was suspended in March, 2020.* |
| **Psychiatric Residential Treatment Facility (PRTF)** | Unduplicated number of children served | 59 | A PRTF is an accredited facility that provides inpatient psychiatric services for individuals, typically under the age of 18 who have complex behavioral health needs and meet medical necessity requirements for inpatient rather than community-based services. DBH oversees enrollment and care; and collaborates with PRTFs, families and community-based service providers to ensure youth are able to successfully return to their home and community upon discharge. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

## Figure 17. Overview of Children's Contracted Programs in FY21

ChAMPS:

457 Deployments

DC Mental Health Access to Pediatrics:

19,498 Screenings

Healthy Futures:

83 Early Childhood Facilities Served

High Fidelity Wraparound:

94 Children Served

HOPE Court:

49 Children Served

Juvenile Behavioral Diversion Program:

53 Children Served

Primary Project: NA

Psychiatric Residential Treatment Facilities:

59 Children Served

27

# Mental Health and Substance Use Report on Expenditures and Services

### District of Columbia Department of Behavioral Health
### Barbara J. Bazron, Ph.D., Director

| Figure 18. Evidence Based Practices | | |
|---|---|---|
| **Model** | **Children Served FY21** | **Description** |
| **Child Parent Psychotherapy (CPP-FV)** | 48 | CPP-FV is a therapeutic intervention for young children with a history of trauma exposure or maltreatment, and their caregivers. CPP-FV supports child development, restores the child-parent relationship and the overall feelings of safety, while reducing symptoms associated with the experience of trauma. |
| **Functional Family Therapy (FFT)** | 139 | CBI level IV, FFT, is a family focused intervention for at-risk and juvenile justice involved youth. |
| **Multi-Systemic Therapy (MST)** | 40 | CBI level I, MST, is an intensive community-based treatment for families and youth with antisocial behaviors putting them at risk of out of home placement, who are living with or returning to a parent/caregiver with whom the youth have a long-term relationship and who is willing to participate in treatment. Emphasis is on empowering parents/caregivers to assist youth in making and sustaining change in individual, family, peer, and school systems. |
| **Parent Child Interaction Therapy (PCIT)** | 56 | PCIT is a supported treatment for young children who are experiencing extreme behavioral difficulties. It places emphasis on improving the quality of the parent-child relationship and changing parent-child interaction patterns. |
| **Trauma-Focused Cognitive Behavioral Therapy (TF-CBT)** | 78 | TF-CBT is an intervention designed to help children, youth, and their parents overcome the negative effects of traumatic life events and address feelings. |
| **Trauma Systems Therapy (TST)** | 20 | TST is a comprehensive model for treating traumatic stress in children and adolescents that adds to individually-based approaches by specifically addressing the child's social environment and/or system of care. TST is designed to provide an integrated and highly coordinated system of services guided by the specific understanding of the nature of child traumatic stress. TST focuses on the interaction between the child's difficulties regulating their emotions and the deficits within the child's social environment. |
| **Transition into Independence (TIP)** | 558 | TIP is a practice model which prepares youth and young adults (ages 14-29) with emotional and behavioral challenges for the transition to adult roles by engaging them in their own futures planning while providing developmentally-appropriate supports. TIP involves youth/young adults, their families, and other key players in a process that facilitates movement towards greater self-sufficiency and successful achievement of their goals. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

**Section 5: Saint Elizabeths Hospital**

Saint Elizabeths Hospital is the District's public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. Saint Elizabeths also provides mental health evaluations and care to patients committed by the courts. The Hospital develops a personalized treatment plan to help each patient achieve the highest quality mental health outcomes.

Saint Elizabeths Hospital has implemented infection control practices guided by DC Health and the CDC to keep patients and staff safe while maintaining clinical care during this COVID-19 pandemic.  Patients and employees are tested every 14 days to quickly isolate anyone who was COVID positive, including those without symptoms, to reduce the spread.  All patients admitted to the hospital are quarantined for 14 days to ensure that they are not infected with the coronavirus.

As of the writing of this report, 93% of Saint Elizabeths Hospital staff were vaccinated against COVID-19.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**



Figure 19 shows that while total admissions were relatively steady for FY17-19, the number of admissions declined in FY20 as result of efforts to minimize transmission of the coronavirus.  Admissions declined again, by 31%, in FY21. In each year, the vast majority of admissions were for individuals with a pre-trial status, meaning they had not yet had their legal charges adjudicated.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 20 shows that discharges remained steady between FY17 and FY19, but fewer discharges occurred in in FY20 than in prior years. Discharges decreased by 48% in FY21.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 21 shows that, as with admissions and discharges, the number remained steady between FY17 and FY19.  The average daily census at SEH declined in FY20 due to the District policy to reduce admissions during the pandemic. It decreased again, by 14%, in FY21.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

**Section 6:  Expenditures**

The expenditure data in this report include selected behavioral health services paid for by Medicaid (directly by DHCF under fee-for-service (FFS) and by managed care organizations (MCOs) on behalf of DHCF) and by DBH local programs. Medicaid is funded with a combination of local and federal dollars, while DBH programs are funded by District appropriated funds and grant dollars.

Expenditures include: FFS payments to freestanding mental health clinics; FFS payments for MAT drugs beyond methadone (specifically those containing buprenorphine, buprenorphine/naloxone combinations, and naltrexone); and Medicaid MCO payments for MAT drugs and services with an MHRS or freestanding provider type.   MCOs play a major role in the provision of reimbursement for lower acuity behavioral health services to Medicaid beneficiaries (e.g., diagnosis, counseling, and medication monitoring), but many behavioral health services (including MHRS and ASARS) are carved out of MCO contracts and paid by DHCF on a fee-for-service basis.

Expenditure totals for behavioral health services provided to Medicaid beneficiaries are based on aggregated Medicaid FFS claims and MCO encounter data.  It is important to note that not all Medicaid behavioral health expenditures are reflected here; for example, services provided by federally qualified health centers (FQHCs), licensed practitioners billing independently (such as psychologists and social workers), and psychiatric and acute care hospitals are excluded.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**



NOTE: Medicaid mental health paid claims data were provided by DHCF. Local paid claims data were extracted from DBH's Incedo system.  Payments to hospitals for mental health inpatient stays are not included in the expenditure data (see text for additional information on the universe of services reflected here).  DHCF and DBH expenditures are for services provided through 9/30/21.

Figure 22 shows that $228.3 million was spent on claims-based mental health services in FY21.  This amount reflected a 22% increase in spending on mental health services from FY20 to FY21.  DBH local funds accounted for about 6% ($13.3 million) of FY21 spending on claims-based mental health services.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



NOTE: Medicaid mental health paid claims data were provided by DHCF. Local paid claims data were extracted from DBH's WITS system.   Payments to hospitals for withdrawal management services are included in DBH's local data. There are no payments to hospitals included in the DHCF data (see text for additional information on the universe of services reflected here). DHCF and DBH expenditures are for services provided through 9/30/21.

Figure 23 shows $24.1 million was spent on claims-based substance use services in FY21.  This was a 2% increase over expenditures in FY20.  DBH local funds accounted for about 31% ($7.4 million) of FY21 spending on claims-based substance use services.

35

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figures 24 shows that a little over half (51%) of mental health expenditures were for services via telehealth (i.e., use of telephonic or video telecommunications technology that met required standards of care).  Figure 25 shows that 10% of substance use expenditures were for services delivered via telehealth.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 26 shows expenditures for both adults and children have increased each year from FY18 to FY21.

37

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 27 shows adult expenditures increased between FY20 and FY21, while youth expenditures decreased. Though expenditures paid by claims decreased, DC's Changing and Improving Treatment for our Youth (DC CITY) Grant spent $541,350 to enhance DBH services for youth (ages 12-18) and transition-age youth (ages 18-25) to provide a comprehensive, family centered, trauma-informed, evidence-based, coordinated system of care from early intervention through recovery.

# EXHIBIT D

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

## MHEASURES Annual Report
## Fiscal Year 22 (Oct 1, 2021-Sept 30, 2022)

### Section 1:  Overview

**Overview**

The mission of the Department of Behavioral Health (DBH) is to support prevention, treatment, resiliency, and recovery for District residents with mental health and substance use disorders through the delivery of high quality, integrated services. DBH serves children and youth with a diagnosis of severe emotional disturbance (SED) and adults with severe mental illness, as well as youth and adults with substance use disorders. District residents who meet the enrollment criteria are eligible to receive the full range of behavioral health services and supports. Services are integrated for individuals who have co-occurring disorders.  Whole person care is the goal.  Services are provided by a combination of contracted providers and DBH staff and are paid via Medicaid and locally-funded claims, as well as contracts and grants.

This report contains data on the number of individuals served, their demographics, the types of services used, and expenditures (i.e., based on Medicaid payments and/or DBH locally funded claims) for the period of Oct 1, 2021-September 30, 2022.  Previous versions of this report contained data only for services documented and paid by Medicaid and DBH via fee-for-service claims.  This report contains data for a more comprehensive set of services, including behavioral health services provided by Medicaid Managed Care Organizations (MCOs) and medication assisted treatment (MAT) provided via prescriptions for buprenorphine and naltrexone.

**Mental Health**

DBH provides an array of mental health services and supports through Health Homes and the Mental Health Rehabilitation Services (MHRS) options. This report also includes data on services offered by Free Standing Mental Health (FSMH) Clinics.  For reporting purposes, FSMH services were incorporated into three existing MHRS categories: Diagnostic and Assessment, Counseling, and Medication.

DBH contracts with 50 providers to deliver the majority of mental health services.  Four of these providers are classified as only a FSMH clinic; 30 are classified as MHRS-only providers; and 16 are both MHRS and FSMH providers.  Ten mental health providers are also certified to provide SUD treatment.  In addition, DBH operates adult and child clinics that provide urgent care and crisis emergency services. Outreach and treatment services related to both mental health and substance use are also provided through the Community Response Team (CRT), outreach contractors funded through the District's State Opioid Response (SOR) grant and the locally funded Community Engagement Team.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Substance Use**

DBH also contracts with 24 treatment and recovery providers that provide services for adolescents and adults with substance use disorders (SUD).  Thirteen of these providers are also certified to provide mental health treatment. Individuals who want to obtain SUD services go through the Access and Referral Center (ARC) or community intake sites operated by DBH certified treatment providers. Beginning in FY20, all SUD providers were required to provide assessment, intake and referral services, unless a waiver exemption is approved.  During the intake process, clients receive an assessment to determine the appropriate level of treatment.

A comprehensive continuum of substance abuse recovery and treatment services, including outpatient, intensive outpatient, residential, detoxification and stabilization, and medication assisted treatment is available within the system of care.

SUD services for adolescents are provided through the Adolescent Substance Abuse Treatment Expansion Program (ASTEP). Two certified substance use disorder treatment providers offer these specialized services. Screening, assessment, out-patient and in-patient treatment, and recovery services and supports are provided.

DBH supports four Prevention Centers that conduct community education and engagement activities related to substance use prevention across all eight wards. This includes youth empowerment trainings, social media outreach and Prevention Centers capacity-building efforts. DBH has developed the Prevention Policy Consortium made up of more than 15 District agencies and national leaders to bolster the substance use prevention infrastructure and system of care.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

**Key Findings**

- Community mental health services: District Medicaid and local funds paid $294.1 million for mental health services claims in FY22. There was an increase in both consumers served (8% increase) and expenditures (22% increase) from FY21 to FY22.
- Substance use treatment: District Medicaid and local funds paid $25.6 million for substance use services claims in FY22. There was an increase in clients served (6% increase) and a decrease in expenditures (8% decrease) from FY21 to FY22.
- Use of Medication Assisted Treatment (MAT) for opioid use disorder increased by 2% between FY21 and FY22. Use of Methadone decreased by 8%; Buprenorphine utilization increased by 9%; Naltrexone utilization increased by 11%.
- Forty-eight percent of mental health expenditures were for services delivered via telehealth, and nine percent of substance use disorder expenditures were for telehealth.
- The average daily census at Saint Elizabeths Hospital remained nearly the same as in FY21.

**List of Figures**

- Satisfaction survey data are presented in *Figures 1 and 2*;
- A summary of DBH operated services is presented in *Figures 3 and 4*;
- Individuals receiving services from both mental health and substance use providers are shown in *Figure 5;*
- Gender and race distribution for individuals receiving services from both mental health and substance use providers is shown in *Figures 6 and 7;*
- Mental health consumers served are shown in *Figure 8*;
- Utilization of Specific Claims-Based Behavioral Health Services are shown in *Figure 9*;
- Timeliness of initial services is shown in *Figure 10*;
- Substance use disorder intake data are shown in *Figure 11*;
- Substance use disorder clients served are shown in *Figure 12*;
- Substance use services by Level of Care are shown in *Figure 13;*
- Primary drug of choice is presented in *Figure 14;*
- Medication Assisted Treatment data are shown in *Figure 15*;
- Contracted children's services are summarized in *Figures 16-18*;
- Saint Elizabeths Hospital census data are shown in *Figures 19-22*;
- Expenditure data are shown in *Figures 23-28*.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Section 2: Consumer Feedback**

Every year, DBH conducts surveys of consumers, clients, and individuals in care to better understand their satisfaction with services.  It is an important opportunity to hear the voices of the people served.  The questions in the survey are grouped into domains and scored on a five-point Likert scale, ranging from Strongly Disagree (1) to Strongly Agree (5). Figure 1 shows the percent of respondents with scores greater than 3.5 (i.e., % satisfied per domain).* Saint Elizabeths Hospital data are shown in Figure 19. Figure 2 shows the response rate, based on the number of contacts made to the people in the sample.



Figure 1. Percent of Consumers Satisfied by Survey Domain - FY22

*Note: For ADULT MH, the Likert Scale ranges from Strongly Agree (1) to Strongly Disagree (5) and satisfaction is indicated by scores less than 2.5.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

| Figure 2. Satisfaction Survey Response Rate – FY22 | | | |
|---|---|---|---|
| **Survey** | **Contacts Made** | **Number of Responses (Completed Surveys)** | **Response Rate (number of completed surveys/number of contacts made)** |
| Adult MH | 1251 | 408 | 33% |
| Child/Youth MH | 1634 | 392 | 24% |
| Adult Substance Use | 570 | 205 | 36% |

# Mental Health and Substance Use Report on Expenditures and Services

District of Columbia Department of Behavioral Health
Barbara J. Bazron, Ph.D., Director

**Section 3: DBH Operated Services**

| Figure 3. Description of DBH Operated Services | | | |
|---|---|---|---|
| **Program** | **Metric** | **FY22 Data** | **Description** |
| Access HelpLine (AHL) | Number of answered calls | 76,173 | Residents can get immediately connected to services provided by the DBH and its certified behavioral health care providers by calling the AHL.  This 24-hour, seven-day-a-week telephone line is staffed by behavioral health professionals who can refer a caller to immediate help to address crises or to ongoing care. The nationwide 988 initiative was implemented in FY22 and is managed by AHL for the District of Columbia. |
| Assessment and Referral Center (ARC) | Number of intakes completed | 1,923 | The ARC provides same-day assessment and referral for individuals seeking treatment for substance use disorders. |
| Assessment Center | Number of assessments completed | 410 | The Assessment Center provides the Superior Court of the District of Columbia with court-ordered, comprehensive mental health consultations, and psychological and psychiatric evaluations for children and related adults with child welfare, juvenile justice or family court involvement. |
| Comprehensive Psychiatric Emergency Program (CPEP) | Unduplicated count of people served | 1,428 | CPEP is a twenty-four hour/seven day a week operation that provides emergency psychiatric services and extended observation beds for individuals 18 years of age and older. |
| Community Response Team (CRT) | Number of interventions | 3,149 | The DBH Community Response Team is a twenty-four hour/seven day a week multidisciplinary direct service team that expands our community based direct service efforts—including homeless outreach, mobile crisis, and pre-arrest diversion. |
| Consumer and Family Affairs (CFAA) | Count of actively certified peers | 143 | CFAA promotes and protects the rights of individuals with behavioral health disorders; encourages and facilitates consumer and client family leadership of treatment and recovery plans, and ensures consumer and client voice in the development of the behavioral health system. CFAA also promotes consumer and client leadership, manages the peer certification training, and provides expertise on the consumer and client perspective. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

## Figure 3. Description of DBH Operated Services

| | | | |
|---|---|---|---|
| **Forensic Outpatient Department (FOPD)** | Number of consumers monitored in the community | 62 | FOPD monitors forensic consumers assigned to outpatient mental health providers, to ensure consumers are safely treated in the community in the least restrictive environment. FOPD monitors the consumer's psychiatric conditions and compliance with the conditions of release. FOPD also provides psychoeducational trainings to core service agencies on the best practices for maintaining forensic consumers in an outpatient mental health setting. |
| **Intellectual and Developmental Disabilities (IDD) Program (35 K Street)** | Number of people served | 165 | The IDD program provides services to individuals with intellectual and developmental disabilities who have a co-occurring psychiatric diagnosis to include diagnostic assessments, medication somatic services, community support and counseling. |
| **The Parent Infant Early Childhood Enhancement Program (PIECE) and Physicians Practice Group (PPG)** | Unduplicated count of children served | 409 | The PIECE program has two components: providing screening, assessment, individual, family, play art therapy, Parent Child Interaction Therapy and Child Parent Psychotherapy for Family Violence; and offering psycho-educational parenting groups, home visits, and maternal mental health services to families with children from birth to seven years old. The PPG mainly serves children and youth ages 6-21. Services include clinical assessment of safety, diagnostic evaluations, and recommendations for treatment. Additional services include court ordered evaluations, medication assessments and medication management. |
| **Saint Elizabeths Hospital (SEH)** | Unduplicated count of individuals served | 380 | Saint Elizabeths Hospital is the District's public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. Saint Elizabeths also provides mental health evaluations and care to patients committed by the courts. |
| **School Based Behavioral Health Program (SBBH)** | Number of children served | 2,547 | Through the School-Based Behavioral Health Program, DBH collaborates with students, families, schools, community-based organizations (CBOs) and other partners to provide behavioral health prevention, early intervention and treatment services that reduce barriers to learning, foster resiliency and maximize students' potential to become successful learners |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

| Figure 3. Description of DBH Operated Services | | | |
|---|---|---|---|
| | | | and responsible residents. Data reported includes children served by DBH and CBO clinicians. |
| **Pharmacy (35 K Street)** | Number of people served | 1,317 | The pharmacy serves as a safety net by filling prescriptions of psychotropic medication to uninsured residents of the District of Columbia, acting as the outpatient pharmacy for CPEP, and filling prescriptions for discharge medication for St. Elizabeths Hospital. |
| **Urgent Care (35 K Street)** | Number of people served | 1,709 | Urgent Care services include assessment, counseling, psychiatric evaluation and medication management. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 4: Number of Individuals Served by DBH Operated Services in FY22**

**Adult & Transition Aged Youth Services**

Assesment and Referral Center:
1,923 Intakes

Intellectual and Developmental Disabilities Program:
165 Individuals Served

Community Response Team:
3,149 Interventions

Pharmacy:
1,317 Individuals Served

Comprehensive Psychiatric Emergency Program:
1,428 Consumers Served

Urgent Care (35K):
1,709 Consumers Served

Forensic Outpatient Department:
62 Consumers Monitored

Saint Elizabeths Hospital:
380 Individuals Served

**Children, Adolescent & Family Services**

Assessment Center:
410 Assessments

PIECE/PPG Program:
409 Children Served

School-Based Behavioral Health:
2,547 Children Served

**Consumer and Family Services**

Access HelpLine (AHL):
76,173 Calls

Consumer and Family Affairs:
143 Certified Peers

Note: This chart of services does not align with DBH's organizational chart.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

**Section 4: Claims-based Services – Mental Health and Substance Use Disorder**

This section describes behavioral health services documented and paid through claims.  Most of these claims are paid by Medicaid, but for specific services that are not billable to Medicaid or for people who do not have Medicaid, local funding is used. Many uninsured individuals are beneficiaries of the Alliance program, and their services are included.  Individuals covered by Medicaid may either be enrolled with a Managed Care Organization (MCO) and/or receive treatment on a Fee for Service (FFS) basis.  The universe of services included in Section 4 is comprised of MHRS, FSMH, Crisis, ASARS, ASTEP, and buprenorphine and naltrexone for Opioid Use Disorder (OUD).

Figures 5-7 show the universe of individuals receiving mental health and substance use services and the overlap of those who received both in FY22.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 5. Individuals Who Received Mental Health and Substance Use Services – FY 2022**

MH Consumers 41,560

SUD Clients 5,265

3,188 People Received Both Mental Health and Substance Use Services/Supports

Figure 5 shows that 43,637 individuals obtained MH or SUD services in FY22.  Of those individuals, 3,188 were served by both MH and SUD providers.  Individuals receiving both MH and SUD services comprised 8% of all MH consumers and 61% of SUD clients.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 6 shows that a similar proportion of males and females received mental health services in FY22; however, males are a larger share (nearly two-thirds) of consumers receiving substance use disorder services, and/or both mental health and substance use disorder services.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 7 shows that the majority of residents receiving mental health services, substance use disorder services, and those receiving both mental health and substance use disorder services are Black.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

**MENTAL HEALTH SERVICES**

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 8. Consumers Receiving Mental Health Services by Fiscal Year**

Figure 8 shows that the total number of consumers receiving community-based mental health services increased by 8% from FY21 to FY22.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

### Figure 9. FY22 Utilization of Claims-Based Mental Health Services

| Service Group | Children Served | Adults Served | Total Served | Average Number of Services per Consumer | Expenditures | Percentage of Total Expenditures |
|---|---|---|---|---|---|---|
| **Assertive Community Treatment (ACT)** | 0 | 2,646 | 2,646 | 83 | $37,092,956 | 13% |
| **Community Behavioral Intervention (CBI)** | 392 | 0 | 392 | 35 | $4,012,119 | 1% |
| **Community Support** | 3,095 | 30,772 | 33,867 | 54 | $201,116,002 | 68% |
| **Crisis Intervention** | 309 | 2,845 | 3,154 | 4 | $5,322,388 | 2% |
| **Diagnostic & Assessment (D&A)** | 2,761 | 18,468 | 21,229 | 1 | $3,234,276 | 1% |
| **Day Rehabilitation** | 0 | 909 | 909 | 79 | $8,874,776 | 3% |
| **Health Homes** | 0 | 461 | 461 | 6 | $382,334 | 0% |
| **Medication Management** | 1,363 | 22,281 | 23,644 | 6 | $19,171,789 | 7% |
| **Supported Employment** | 0 | 348 | 348 | 7 | $193,749 | 0% |
| **Therapy (e.g., individual/family/group)** | 2,482 | 10,401 | 12,883 | 10 | $14,756,532 | 5% |

NOTE: Free Standing Mental Health Clinic services were integrated into the service groups of diagnostic and assessment, therapy, and medication management.

Figure 9 shows that the three most frequently used services are community support (33,867 individuals), medication management (23,644 individuals), and diagnostic & assessment (21,229 individuals).  Sixty-eight percent of expenditures were for community support.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 10 shows the proportion of consumers, both adults and children, who were newly-enrolled in mental health services or transferred to a new provider who had their first service within 30 days of assignment to a new provider. Performance improved for four years but declined slightly between FY21 and FY22.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

## SUBSTANCE USE SERVICES

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 11. SUD Intake Assessments - FY22 by Month

NOTE: ARC (DBH's Assessment and Referral Center); AR (Community-Based Provider Assessment and Referral Sites)

Figure 11 shows adult SUD intake assessments were generally consistent in FY22, with an average of 274 per month. There were a total of 3,293 intakes, a 14% increase compared to 2,895 in FY21.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 12 shows a 6% increase in clients served between FY21 and FY22.  This is a reversal in the previous two-year decline.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 13. New Substance Use Program Enrollments by Level of Care and Fiscal Year

NOTE: Data are limited to enrollments that occur during the fiscal year. Individuals who have an enrollment in more than one level of care are counted once in each level of care.  Individuals who were enrolled in a previous year but continued to receive services are only shown in the year of their program enrollment.

Figure 13 shows that the level of care with the highest number of enrollments for the past three years has been withdrawal management, followed by residential.  A second withdrawal management provider began serving clients in FY20.  Residential providers were under COVID-19 restrictions regarding capacity between June, 2020, and June, 2021.

**Opioid Treatment Programs** involve the use of medications, in combination with counseling and behavioral therapies, to provide a whole-patient approach to the treatment of opioid use disorders. **Withdrawal Management** (detoxification) is for clients with sufficiently severe signs and symptoms of withdrawal from psychoactive substances who require medical monitoring and nursing care, but for whom hospitalization is not indicated. **Residential Treatment** (inpatient) programs focus on helping individuals change their behaviors in a highly structured setting. **Outpatient** services provide counseling and monitoring several times a week in a supportive group setting.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 14. Primary Drug of Choice by Fiscal Year**

NOTE: If a client received services from an Opioid Treatment Program across multiple fiscal years, their primary drug of choice is only reported for the year they were admitted.

Figure 14 shows that the primary drug of choice for individuals with an admission during the past five fiscal years was alcohol.  Heroin was the consistently the second-most frequently reported drug of choice.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 15. Medication Assisted Treatment (MAT) by Medication and Fiscal Year**

NOTE: Methadone is administered in Opioid Treatment Programs (OTPs), while Buprenorphine and Naltrexone are prescribed in primary care settings. DBH certifies the OTP providers, and the Department of Health Care Finance monitors prescribers of Buprenorphine and Naltrexone.

Figure 15 shows the total clients receiving MAT increased by 2%. Clients receiving Methadone declined by 8%; those receiving Buprenorphine increased by 9%, and those receiving Naltrexone increased by 11%.

# Mental Health and Substance Use Report on Expenditures and Services

District of Columbia Department of Behavioral Health

Barbara J. Bazron, Ph.D., Director

**CHILDREN'S CONTRACTED PROGRAMS**

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

## Figure 16. Description of Contracted Children's Programs

| Program | Metric | FY22 Data | Program Description |
|---|---|---|---|
| The Children and Adolescent Mobile Psychiatric Service (ChAMPS) | Number of deployments | 420 | ChAMPS provides on-site immediate help to children facing a behavioral or mental health crisis whether in the home, school or community. Services are geared toward children and youth 6-21 years of age with the goal of stabilization to avert inpatient hospitalization or placement disruptions. The mobile crisis teams also make follow up visits and connect families to needed support services. |
| DC Mental Health Access to Pediatrics (DCMAP) | Number of screenings | 25,845 | DCMAP supports pediatric providers addressing mental health concerns, provides telephone consultation with clinicians, completes community resource referrals and face to face consultations as clinically indicated, and provides mental health education and training for primary care providers. In addition to the over 40,000 screenings, 957 consultations were completed in FY20. |
| Healthy Futures | Number of early childhood facilities | 97 | Healthy Futures is a program wherein clinical specialists provide consultation services to child development centers and home-based facilities in order to improve outcomes for children, parents, and staff; and ultimately eliminate early childhood expulsions and suspensions. Services include classroom observations, prevention/early intervention activities, modeling, and consultation with parents, teachers, and center directors. |
| High Fidelity Wraparound (HFW) | Number of children served | 76 | HFW is a collaborative team-based care coordination service where a family and service team plans, implements, tracks and adapts an individualized plan of care to meet complex needs; address risks of out of home placement, school disruption and high utilization of acute care; and achieve the youth and family's long term vision of positive outcomes in the home, school and community. |
| HOPE Court | Number of children served | 33 | Here Opportunities Prepare you for Excellence (HOPE) Court is a voluntary behavioral health diversion or "treatment" court wherein eligible youth are connected to behavioral health and other community-based supportive services. HOPE Court specializes in the support of youth who are at risk or are confirmed survivors of commercial sexual exploitation of children (CSEC). Youth may have their charges dismissed or probation shortened through successful completion of the program in the case of a juvenile matter and/or once permanency is achieved in the case of neglect. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

| Figure 16. Description of Contracted Children's Programs | | | |
|---|---|---|---|
| **Juvenile Behavior Diversion Program (JBDP)** | Number of children served | 46 | JBDP is a voluntary behavioral health diversion court or "treatment court" wherein eligible youth are connected to behavioral health and other community-based supportive services. Youth may have their charges dismissed or probation shortened through successful completion of the program in the case of a juvenile matter and/or once permanency is achieved in the case of neglect. |
| **Primary Project** | Number of children served | 686 | Primary Project is an evidence-based early intervention and prevention program for children in pre-Kindergarten through third grade who have been identified with mild adjustment issues in the classroom. Through one-to-one, non-directive play sessions, the program reduces social, emotional and school adjustment difficulties to improve school-related competencies in task orientation, behavior control, assertiveness, and peer social skills. |
| **Psychiatric Residential Treatment Facility (PRTF)** | Unduplicated number of children served | 31 | A PRTF is an accredited facility that provides inpatient psychiatric services for individuals, typically under the age of 18 who have complex behavioral health needs and meet medical necessity requirements for inpatient rather than community-based services. DBH oversees enrollment and care; and collaborates with PRTFs, families and community-based service providers to ensure youth are able to successfully return to their home and community upon discharge. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

## Figure 17. Overview of Children's Contracted Programs in FY22

ChAMPS:

420 Deployments

DC Mental Health Access to Pediatrics:

25,845 Screenings

Healthy Futures:

97 Early Childhood Facilities Served

High Fidelity Wraparound:

76 Children Served

HOPE Court:

33 Children Served

Juvenile Behavioral Diversion Program:

46 Children Served

Primary Project:

686 Children Served

Psychiatric Residential Treatment Facilities:

31 Children Served

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

| Figure 18. Evidence Based Practices | | |
|---|---|---|
| **Model** | **Children Served FY22** | **Description** |
| **Child Parent Psychotherapy (CPP)** | 33 | CPP is a therapeutic intervention for young children ages 0-6 with a history of trauma exposure or maltreatment, and their caregivers. CPP supports child development, restores the child-parent relationship and the overall feelings of safety, while reducing symptoms associated with the experience of trauma. |
| **Functional Family Therapy (FFT)** | 134 | CBI level IV, FFT, is a family focused intervention for at-risk and juvenile justice involved youth ages 11-18. |
| **Multi-Systemic Therapy (MST)** | 53 | CBI level I, MST, is an intensive community-based treatment for families and youth ages 12-17 with antisocial behaviors putting them at risk of out of home placement, who are living with or returning to a parent/caregiver with whom the youth have a long-term relationship and who is willing to participate in treatment. Emphasis is on empowering parents/caregivers to assist youth in making and sustaining change in individual, family, peer, and school systems. |
| **Parent Child Interaction Therapy (PCIT)** | 38 | PCIT is a supported treatment for young children ages 2-6 who are experiencing extreme behavioral difficulties. It places emphasis on improving the quality of the parent-child relationship and changing parent-child interaction patterns. |
| **Trauma-Focused Cognitive Behavioral Therapy (TF-CBT)** | 57 | TF-CBT is an intervention designed to help children and youth ages 3-18 and their parents overcome the negative effects of traumatic life events and address feelings. |
| **Trauma Systems Therapy (TST)** | 14 | TST is a comprehensive model for treating traumatic stress in children and adolescents ages 6-18 that adds to individually based approaches by specifically addressing the child's social environment and/or system of care. TST is designed to provide an integrated and highly coordinated system of services guided by the specific understanding of the nature of child traumatic stress. TST focuses on the interaction between the child's difficulties regulating their emotions and the deficits within the child's social environment. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

| Figure 18. Evidence Based Practices | | |
|---|---|---|
| **Transition into Independence (TIP)** | 430 | TIP is a practice model which prepares youth and young adults (ages 14-29) with emotional and behavioral challenges for the transition to adult roles by engaging them in their own futures planning while providing developmentally appropriate supports. TIP involves youth/young adults, their families, and other key players in a process that facilitates movement towards greater self-sufficiency and successful achievement of their goals. |

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**

**Barbara J. Bazron, Ph.D., Director**

**Section 5: Saint Elizabeths Hospital**

Saint Elizabeths Hospital is the District's public psychiatric facility for individuals with serious and persistent mental illness who need intensive inpatient care to support their recovery. Saint Elizabeths also provides mental health evaluations and care to patients committed by the courts. The Hospital develops a personalized treatment plan to help each patient achieve the highest quality mental health outcomes.

Saint Elizabeths Hospital has implemented infection control practices guided by DC Health and the CDC to keep patients and staff safe while maintaining clinical care during this COVID-19 pandemic. Patients and employees are tested every 14 days to quickly isolate anyone who was COVID positive, including those without symptoms, to reduce the spread. All patients admitted to the hospital are quarantined for 14 days to ensure that they are not infected with the coronavirus.

As of the writing of this report, 98% of Saint Elizabeths Hospital staff were vaccinated against COVID-19.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Figure 19. Percent of SEH Individuals in Care Satisfied by Survey Domain by Fiscal Year**

SEH conducts a satisfaction survey twice a year, so the same individual may be surveyed both times. In FY22, 177 surveys were completed. Social Connectedness was the survey domain with the highest satisfaction (69%), followed by Participation in Treatment Planning (67%).

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 20. SEH Admissions by Fiscal Year and Legal Status

Figure 20 shows admissions declined in FY20 as result of efforts to minimize transmission of the coronavirus.  Admissions declined again in FY21 but increased slightly in FY22. In each year, the majority of admissions were for individuals with a pre-trial status, meaning they had not yet had their legal charges adjudicated.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 21. SEH Discharges by Fiscal Year and Legal Status

Figure 21 shows that discharges declined each year from FY18 to FY21 but increased by 8% in FY22. While the number of admissions and discharges is usually similar from year to year, the number of discharges was higher in FY20 than the number of admissions because court-ordered release requirements were adjusted. The goal was to safely release as many people as possible due to the COVID-19 public health emergency.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 22 shows the average daily census at SEH has declined for the past four years.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**

**Section 6:  Expenditures**

The expenditure data in this report include selected behavioral health services paid for by Medicaid (directly by DHCF under fee-for-service (FFS) and by managed care organizations (MCOs) on behalf of DHCF) and by DBH local programs. Medicaid is funded with a combination of local and federal dollars, while DBH programs are funded by District appropriated funds and grant dollars.

Expenditures include: FFS payments to freestanding mental health clinics; FFS payments for MAT drugs beyond methadone (specifically those containing buprenorphine, buprenorphine/naloxone combinations, and naltrexone); and Medicaid MCO payments for MAT drugs and services with an MHRS or freestanding provider type.   MCOs play a major role in the provision of reimbursement for lower acuity behavioral health services to Medicaid beneficiaries (e.g., diagnosis, counseling, and medication monitoring), but many behavioral health services (including MHRS and ASARS) are carved out of MCO contracts and paid by DHCF on a fee-for-service basis.

Expenditure totals for behavioral health services provided to Medicaid beneficiaries are based on aggregated Medicaid FFS claims and MCO encounter data.  It is important to note that not all Medicaid behavioral health expenditures are reflected here; for example, services provided by federally qualified health centers (FQHCs), licensed practitioners billing independently (such as psychologists and social workers), and psychiatric and acute care hospitals are excluded.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 23. Mental Health Claims Expenditures by Payer Type and Fiscal Year

NOTE: Medicaid mental health paid claims data were provided by DHCF. Local paid claims data were extracted from DBH's Incedo system. Payments to hospitals for mental health inpatient stays are not included in the expenditure data (see text for additional information on the universe of services reflected here). DHCF and DBH expenditures are for services provided through 9/30/22.

Figure 22 shows that $294 million was spent on claims-based mental health services in FY22. This amount reflected a 22% increase in spending on mental health services from FY21 to FY22. DBH local funds accounted for about 4% ($11.8 million) of FY22 spending on claims-based mental health services.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 24. Substance Use Claims Expenditures by Payer Type and Fiscal Year

NOTE: Medicaid substance use paid claims data, including pharmacy expenditures for MAT, were provided by DHCF. Local paid claims data were extracted from DBH's WITS system.   Payments to hospitals for withdrawal management services are included in DBH's local data. There are no payments to hospitals included in the DHCF data (see text for additional information on the universe of services reflected here). DHCF and DBH expenditures are for services provided through 9/30/22.

Figure 24 shows $24.1 million was spent on claims-based substance use services in FY22.  This was an 8% decrease in expenditures as compared to FY21.  DBH local funds accounted for about 27% ($7 million) of FY22 spending on claims-based substance use services.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figures 25 shows that a little less than half (48%) of mental health expenditures were for services via telehealth (i.e., use of telephonic or video telecommunications technology that met required standards of care).  Figure 26 shows that 9% of substance use expenditures were for services delivered via telehealth.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



Figure 27 shows expenditures for both adults and children have increased each year from FY18 to FY22.

# Mental Health and Substance Use Report on Expenditures and Services

**District of Columbia Department of Behavioral Health**
**Barbara J. Bazron, Ph.D., Director**



**Fig. 28 Substance Use Claims Expenditure by Age Group and Fiscal Year**

Figure 28 shows adult expenditures decreased between FY21 and FY22, while youth expenditures increased slightly.

# EXHIBIT E

**COUNCIL OF THE DISTRICT OF COLUMBIA
COMMITTEE ON HEALTH
CHAIRMAN VINCENT C. GRAY
COUNCILMEMBER, WARD 7**



**Department of Behavioral Health
Oversight Questions**

1. Please provide a current organizational chart for DBH. Please provide information to the activity level. In addition, please identify the number of full time equivalents (FTEs) at each organizational level and the employee responsible for the management of each program and activity. If applicable, please provide a narrative explanation of any organizational changes made during FY19 and to date in FY20.

2. Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY19 and to date in FY20. In addition, please describe any variance between the amount budgeted and actually spent for FY19 and to date in FY20:
   - At the agency level, please provide information broken out by source of funds and by Comptroller Source Group and Comptroller Object;
   - At the program level, please provide the information broken out by source of funds and by Comptroller Source Group and Comptroller Object; and,
   - At the activity level, please provide the information broken out by source of funds and by Comptroller Source Group.

3. Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY19 and to date in FY20.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.

4. Please provide a complete accounting of all reprogramings received by or transferred from DBH in FY19 and to date in FY20.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.

5. Please provide a complete accounting of all of DBH's Special Purpose Revenue Funds for FY19 and to date in FY20. Please include the following:
   - Revenue source and code;
   - Source of the revenue for each special purpose revenue fund (*i.e. license fee, civil fine*);
   - Total amount of funds generated by each source or program in FY19 and to date in FY20;
   - DBH activity that the revenue in each special purpose revenue source fund supports; and,

- The FY19 and to date FY20 expenditure of funds, including purpose of expenditure.

6. Please provide copies of any investigations, reviews or program/fiscal audits completed on programs and activities within DBH during FY19 and to date in FY20. This includes any reports of the DC Auditor, the Office of the Inspector General, or the Office of Accountability. In addition, please provide a narrative explanation of steps taken to address any issues raised by the program/fiscal audits. Please include the following:

7. Did DBH meet the objectives set forth in the performance plan for FY19? Please provide a narrative description of what actions DBH undertook to meet the key performance indicators.  For any performance indicators that were not met, if any, please provide a narrative description for why they were not met and any remedial actions taken.  In addition, please provide a narrative description of the performance objectives for FY20 and what actions DBH has undertaken to meet them to date.

8. Please provide DBH's capital budgets for FY19 and FY20, including amount budgeted and actual dollars spent. In addition, please provide an update on all capital projects undertaken in FY19 and FY20. In your response, please include information regarding the iCAMS project or its successor.

9. Please provide a list of all FTE positions detailed <u>to</u> DBH, broken down by program and activity for FY19 and to date in FY20.  In addition, please provide which agency the detailee originated from and how long they were detailed to DBH.

10. Please provide a list of all FTE positions detailed <u>from</u> DBH to another agency in FY19 and to date in FY20.  In addition, please provide which agency the employee was detailed to and for how long.

11. Please provide the Committee with the following:
    - A list of all employees who receive cell phones, personal digital assistants, or similar communication devices;
    - A list of travel expenses for FY19 and to date FY20, arranged by employee; and,
    - A list of employees who earn $100,000 or more in FY19 or to date in FY20, including their names, position, salary, grade, step, position description, and agency within DBH.

12. Please provide the following information for all grants awarded to DBH during FY19 and to date in FY20, broken down by DBH program and activity:
    - Grant Number/Title;
    - Approved Budget Authority;
    - Funding source;
    - Expenditures (including encumbrances and pre-encumbrances);
    - Purpose of the grant;
    - Grant deliverables;
    - Grant outcomes, including grantee performance;

- Any corrective actions taken or technical assistance provided;
- DBH program and activity supported by the grant; and,
- DBH employee responsible for grant deliverables.

13. Please provide a complete accounting of all grant lapses including a detailed statement as to why the lapse occurred and any corrective action taken by DBH.  Please provide accounting of any grant carryover from FY17 to FY18 or FY19 to FY20 and a detailed explanation as to why it occurred.

14. Please provide the following information for all Human Care Agreements (HCA) and task orders issued during FY19 and to date in FY20, broken out by DBH program and activity:
    - Vendor name;
    - Services provided;
    - Funding source;
    - HCA amount;
    - Task order amount;
    - Actual expenditures;
    - Status of performance; and,
    - DBH employee responsible for monitoring the HCA and task order.

15. Please provide a list and narrative description of any DBH partnerships with District agencies, if any, in FY19 and to date in FY20 to address employment for DBH consumers.  In addition, please provide the number of individuals served, the types of employment placements available, and the employee/s responsible for coordinating the partnership.

    - Please provide an update on the MOU with the Department of Human Services Economic Security Administration to provide Supported Employment services to individuals with serious mental illness who receive Temporary Assistance for Needy Families (TANF). How many individuals participated in this program in FY19? To date in FY20?

16. Please provide a description of all housing programs administered by DBH. For each, please provide the following information:
    - Name of the program and services provided;
    - Number of individuals served in FY19 and to date in FY20;
    - Capacity of the program;
    - Performance measures and associated outcomes for each program;
    - The name and title of the DBH employee responsible for administering the program;
    - The average wait time for a consumer to access housing through the program;
    - The number of individuals on waiting lists for the program; and,
    - Of those individuals on the wait list, whether any are homeless or in other housing programs.

17. Please provide an update on the work of the children mobile crisis teams. What services are provided? How many individuals were served in FY19? To date in FY20? Please be sure to specifically speak to the work of the Children and Adolescent Mobile Psychiatric Service (ChAMPS), as well as any related services.
    - What is the process in determining what calls are deployable and non-deployable?
    - What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY19 and FY20 to date.
    - How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?
    - Please explain the nature of the training DCPS staff participated in as well as the number of staff who were trained.

18. How many days, on average, does it take to connect children who have been screened as needing mental health services to a core service agency? What is being done to ensure timely access to care?
    - To the extent possible, please break down days based on type of care (e.g. medication management, CBI, community support, etc.).

19. How many days, on average, does it take for a child who has been referred to a core service agency to receive a diagnostic needs assessment? How many days, on average, elapse between the development of the diagnostic needs assessment and the implementation of services on the treatment plan? What is being done to ensure timely access to care? To the extent possible, please break down days based on type of care (e.g. medication management, CBI). Please provide a comparison between FY18, FY19 and to date in FY20.

20. Please explain the work the Department has been doing with the Child and Family Services Agency on trauma-informed care.

21. Please explain the work the Department is doing with Child and Family Services Agency to better serve the mental health needs of foster children in the District. How long does it take for a child who has been identified as needing mental health services before they are connected to those services? During FY19, what percentage of children were screened within 30 days of entering or re-entering care? Has there been a decrease in time to linkage to first services from FY18 to FY19? If available, please provide any documentation that shows children are receiving more timely services. What efforts have been made to improve more timely services?

22. Please explain the current work the Department is doing to serve DC youth who have been identified as commercially sexually exploited. Are there any evidence-based practices that DBH plans to employ to provide options for this population? What increases in capacity will be necessary for the Department to provide said practices? Does DBH have beds available for this population when they do not have housing options?  Please also describe the collaborative work the Department is doing with DC Courts, MPD, and CFSA to address the behavioral and mental health needs of DC youth

who have been identified as commercially sexually exploited. Please provide any MOAs or MOUs related to this subject.

23. Please describe what substance abuse services are offered to children and youth and the process for obtaining these services. Are there any plans for FY20 to expand the types of services offered to children and youth? How many children and youth have received services through the Adolescent Community Reinforcement Approach (A-CRA) in FY19 and FY20 to date?

24. Please explain the work the Department is doing with the Department of Health Care Finance to improve care coordination.

25. Please provide an update on the Department's School Mental Health Program including a list of all schools that participate. For each school, please also include:
    a. The number of student who met with a clinician;
    b. The number of students who were referred to care;
    c. The outcomes of all care linkages;
    d. The most common diagnosis;
    e. The referral source (i.e. walk-in, teacher);
    f. The number of students participating in prevention programs;
    g. Whether the current programs are meeting the existing need for services, and if not, what is being done to meet the total need;
    h. What prevention programs and services were offered through the SMHP in FY19 and FY20 to date;
    i. Any plans to expand the program and barriers to expansion; and
    j. The number of FTEs serving in each school.

26. Please provide an update on the status of implementation of the public health model for school-based mental health.  Please include the following information for Cohort 1 and Cohort 2:
    - List all schools in each cohort
    - Number of schools matched with a CBO, and identify which CBO has been matched with which schools
    - Number of schools where a CBO clinician has been hired and is working in the schools and identify which schools
    - Number of schools where a CBO clinician has been hired, but is not yet working in the school, and identify which schools and provide the reason why the CBO clinician is not yet working in the school
    - Number of schools where the CBO clinician has not yet been hired, and identify which schools and provide the reason why the CBO clinician has not yet been hired
    - Please describe any obstacles or barriers to having CBO clinicians working in schools at the start of the school year

- For all CBO clinicians working in schools since the start of implementation, please provide a breakdown of how much of their time has been spent on Tier 1, Tier 2, and Tier 3 services.
-

27. Please provide a description of plans to implement the public health model for school-based mental health for Cohort 3.  Please include the following information
    - How many schools will be included in Cohort 3, and identify which schools
    - Timeline for implementation, including funding CBO grants, completing CBO matching process, and hiring CBO clinicians
    - Anticipated obstacles or barriers to having CBO clinicians working in all Cohort 3 schools at the start of the school year (Fall 2020), and plans to mitigate/remove these barriers

28. Please provide an update on the status of completion of the School Strengthening Tool and Work Plan for all schools in Cohorts 1 and 2.  Please include the following information:
    - How many schools in each cohort have completed the School Strengthening Tool and identify which schools?
    - How many schools in each cohort have completed the Work Plan and identify which schools?
    - For each school that has not completed the School Strengthening Tool, please provide the reason why this has not been done?
    - For each school that has not completed the Work Plan, please provide the reason why this has not been done?
    - How many schools in each cohort have identified an individual to serve as the School Behavioral Health Coordinator and identify which schools
    - For each school that has not identified an individual to serve as the School Behavioral Health Coordinator, please provide the reason why this has not been done?
    - Please describe any obstacles or barriers to completing the School Strengthening Tool and Work Plan and identifying the School Behavioral Health Coordinator.

29. Please provide an update on staffing levels for DBH clinicians working in schools.  Please include the following information:
    - How many schools have DBH clinicians working full-time, identify which schools, and the amount of time in each school?
    - For all DBH clinicians working in schools, please provide a breakdown of how much of their time has been spent on Tier 1, Tier 2, and Tier 3 services.

31. In last year's oversight responses, DBH stated that it was discontinuing the Provider Scorecard and was in the process of replacing the Scorecard metrics with separate compliance indicators and Results Based Accountability indicators.  Please provide an update on this effort, to include the following information:
    - Description of compliance indicators and Results Based Accountability indicators being used
    - Rationale for using these indicators

- Results of applying these indicators to providers in FY19
- What services or support is DBH providing to ~~these~~ struggling providers?
- What corrective action has DBH taken against providers receiving extremely low marks?

30. Please provide an update on the extent to which CBO and DBH clinicians have been able to bill their services to Medicaid, private insurance, or other sources of funds outside of local dollars.  Please also discuss plans to bill additional services in the future.

31. (2) Please provide description and status update on the Memorandum of Understanding between DBH, DCPS, and OSSE providing for 1 full-time staff person at DCPS and 1 full-time staff person at OSSE to support the implementation of School-Based Mental Health.  Please include the following information:
    - A copy of the MOU and any other relevant interagency agreements
    - Job descriptions for the two positions
    - Plans for funding and supporting these two positions next year, and in the future

32. Please provide an update on the status of establishing a community of practice for school-based mental health.  Please include the following information:
    - An overview of the current organization structure, and plans for the future
    - List of events, trainings, or other convenings with brief summaries of the purpose of each event, target audience, planned number of participants, and actual number of participants
    - List of planned events, training, regular meetings, or other convenings with brief summaries of the purpose of each event, target audience, and planned number of participants
    - Estimated timeline for fully establishing the community of practice
    - Plans for assessing the effectiveness and utilization rate for the community of practice

33. Please provide an update on the status of implementing and completing an assessment or evaluation of the effectiveness of the public health model for school-based mental health.  Please include the following information:
    - Timeline for implementation and completion
    - Description of planned assessment or evaluation tools
    - If using an outside contractor, please identify

34. Please provide the results of the midyear and last year's end of the year surveys that were distributed to school administrators to measure the satisfaction of services provided by SMHP clinicians. In your response, please indicate any actions taken to address concern raised in previous surveys regarding the need to have additional of full-time SMHP clinicians in schools.

35. Please provide a list of children's mental health services which are currently being funded with local dollars - not Medicaid dollars. For each service, please update the Committee on steps taken to receive Medicaid reimbursement for this service.  Please include the total amount spent on these services and a comparison to the last 5 fiscal years.

36. How many DBH clients relied entirely on local dollars for all of the services they received from DBH in FY19?  How does this compare to the last 5 fiscal years?

    o What are the demographics of this population?
    o Of this population, how many have expressed a need for bilingual therapists and/or clinicians, if collected?
    o How many therapists and/or clinicians providing DBH services are bilingual?
    o What behavioral health services are available to this population?

37.  Please provide the list of services available as part of the Mental Health Rehabilitation Services (MHRS) system. Specifically, please provide a description of each service and indicate whether or not it is available as part of the Medicaid MHRS program, the non-MHRS program, or both.  In addition, please provide the FY19 and current reimbursement rates for each service.

        -
38. Please provide the monthly MHRS utilization data for FY19 and to date in FY20. Specifically, please include the following:
    - A breakdown of Medicaid MHRS vs. non-Medicaid MHRS;
    - For Medicaid MHRS, please provide a breakdown by managed care vs. fee-for-service (and include a breakdown by specific managed care organization);
    - For non-Medicaid MHRS enrollees, please indicate whether the individual had coverage via the DC Healthcare Alliance or was uninsured; and,
    - For non-Medicaid MHRS enrollees, please provide a breakdown by income.

39. Please provide the name of all certified MHRS providers. For each provider, please provide the following information for FY18, FY19 and to date in FY20:
    - Whether or not the provider utilizes the Medicaid MHRS program, the locally-funded MHRS program, or both;
    - The amount of their Human Care Agreements (HCA);
    - The amount of their purchase orders;
    - Actual expenditures under the purchase order;
    - Any modifications that were made to a HCA or purchase order, including an explanation for the modification;

40. Please describe some of the positive results seen from the Live.Long.DC Strategic Plan. Is the District on track to becoming overdose-free?

41. How much money was dedicated to providing services to DBH clients who relied entirely on local dollars for the services that they receive from DBH over the last fiscal year? How much money was dedicated to providing services to DBH clients who relied entirely on local dollars for the services that they received from DBH over each of the last five fiscal years?

42. Over the last fiscal year, how much money was dedicated to providing services to DBH clients who relied partially on local dollars for the services that they received from DBH? Over each of the last five fiscal years, how much money was dedicated to providing services to DBH clients who relied partially on local dollars for the services that they received from DBH?

43. Please provide an update on the DBH services to consumers under the custody of the Department of Corrections, including services provided in the READY Center.

44. What are the average and median wait times for an intake meeting for children referred to CSAs? What is the average and median wait time for a first appointment with a psychiatrist?

45. Are there any services provided through Core Service Agencies or other mental health providers that are not currently reimbursed by Medicaid, and please indicate whether these services could be reimbursed under a 1915(i) state plan option, a waiver, or a demonstration project?

46. Provide an update on the status of establishing medical necessity criteria for mental health consumers.

47. DBH regulations provide that DBH conduct targeted compliance reviews of CSAs supported housing assessments and report the results to each CSA under review. DBH policies also require that DBH monitor certified providers to ensure compliance with DBH's housing procedures and programs, and that DBH utilize routine oversight and monitoring activities to determine whether CSAs are meeting their supported housing objectives. How does DBH conduct targeted compliance reviews and monitor certified providers to ensure compliance with its housing procedures and programs? What type of oversight and monitoring does DBH conduct to determine whether CSAs are meeting their supported housing objectives?

48. What percentage of Mental Health Community Residential Facilities (MHCRF), as a whole, are wheelchair accessible?

49. What percentage of Supported Independent Living (SIL) providers within the DBH system, as a whole, are wheelchair accessible?

50. What is the average wait time for consumers to access an accessible Mental Health Community Residential Facility (MHCRF)? What is the average wait time for Supported Independent Living providers (SIL)?

51. DBH does not currently have a process to prioritize applicants who need wheelchair accessible Mental Health Community Residential Facilities (MHCRF). Creating a process for accessible Mental Health Community Residential Facilities (MHCRF) is increasingly important as the DBH population ages and needs accessible housing. Will DBH update its application process to include whether applicants need an accessible room and any other reasonable accommodations? Will DBH develop a process to prioritize consumers who need accessible housing and create policies and procedures for providers to follow?

52. Of the total number of consumers that DBH serves, what is the number of consumers who are homeless?

53. In FY19, what array of services and support did DBH provide to homeless consumers? What were DBH's outcomes? How many DBH consumers in FY19, who were homeless, were placed in housing?

54. How does DBH ensure quality of mental health services within its provider network? Does DBH interview consumers of Core Service Agencies while conducting satisfaction surveys?

55. Please provide an update on the High Fidelity Wraparound Program.

- What is the current capacity of wraparound?

- Since MBI was awarded the Care Management Entity (CME) contract in 2017 with a reduced capacity to serve 94 youth in the community, how many youth were served in FY19 and to date in FY20?

- We understand that there has been a decrease in the flexible funding available per youth ($1,000 per youth). Please explain the decrease in funding? Are there any short term or long term plans to increase available flexible funding? Will DBH take steps to change high fidelity

wraparound from a locally-funded pilot program to a Medicaid-funded permanent MHRS service? If so, what steps have been taken to date?

56. Please provide an update on DBH's efforts to identify providers to provide Multisystemic Therapy (MST) and Functional Family Therapy (FFT) to youth to fill the gap, in part, created by the abrupt closures of Youth Villages in June 2017, the only MST provider in the District, and First Home Care, an FFT provider, in October 2017. Please describe the barriers to identifying providers, including whether caused by low Medicaid reimbursement rates, billing limitations, and/or burdensome reporting requirements, and what steps will DBH take to attempt to overcome those barrier(s).

57. For FY 18, FY 19, and FY20 to date, please list: a) the total number of psychiatric residential treatment facility (PRTF) and the total number of residential treatment center (RTC) admissions of a child and youth receiving MHRS (may include duplicate counts of those children or youth with multiple admissions during the Fiscal Year), b) the unduplicated number of children, and of youth, receiving MHRS and served in a PRTF or RTC.

58. What resources, and how many FTEs, are assigned to the Access Help Line? Will there be any changes during the remainder of FY20? How is DBH standardizing operating procedures, practices, manuals, or other business process and workflow systems for the Access Help Line? How will Access Help Line staff members be trained to carry out changes to their process, and if needed, to their roles and responsibilities? How can callers to the Access Help Line escalate concerns when they believe contact is not successfully connecting consumers or eligible District residents to needed services? If concerns are escalated, how does DBH define a timely response? How often are escalated concerns currently addressed in a timely manner?

59. Please provide detailed information about proposed changes to the ARC. When consumers who are not enrolled in services arrive at a DBH certified community-based provider, what will the new enrollment process be? Will changes to the ARC mean SUD providers are now allowed to bill for initial assessment services? Does the budget reflect this additional expense for SUD providers?

60. District contracts are usually offered as a base year plus four option years. Has DBH considered aligning its provider certification process with the five year contract cycle? So long as other periodic reviews of critical information continue, what would be DBH's major concerns with extending the provider organization certification to match the

period for which contracts normally last? Are there other steps DBH could reasonably take to reduce duplication of administrative activities and paperwork by sharing information between DBH certification and recertification efforts and OCP solicitations and post-award documentation?

61.  How many children (0-20) received a service through MHRS during FY19? How does this compare to the number who received a service in FY17 and FY18.

62.  Please provide an updated list of all Evidence-Based Practices (EBP) and for each EBP please note:

- The name of each provider who offers it;
- Each provider's capacity;
- Each provider's current enrollment;
- Whether the EBP is Medicaid-reimbursable and if so, under what code or rate;
- Any quality assessment or outcome measure that have been put in place to assess the program; and
- Whether the EBP is trauma-informed.

63.  Please provide a description and an update on the Behavioral Court Diversion program including:

- A description of which youth are eligible to participate in the program;
- The process or protocol of selecting or referring youth to the program;
- The number of youth who participated in FY19 and to date in FY20, the type of status offense they were alleged to have committed, the referral source (i.e., judge, probation officer, prosecutor, etc.) and the outcomes for youth in the program;
- The recidivism rate of the youth participants and an explanation of how recidivism rates are measured;
- Any costs associated with the program; and
- The program's capacity and any expansion plan or barriers to expansion.

64.  Please provide an update on the Agency's early childhood mental health projects, including any studies or reports.

- For the Parent Child Infant Early Childhood Enhancement Program include a description of the services provided, the type of clinicians employed, their capacity, and the number of children served, and how the

cases ended (e.g. successful completion, closure for lack of attendance, etc.) in FY19 and to date in FY20.

- For the Early Childhood Mental Health Consultation Project, list the child care centers, homes, and schools that are participating, the services they have received and provide any progress/outcome measure available.

- For the Behavioral Health Access Project, list the number of individual patients who participate in the Project, the number of pediatric primary care providers who have been using the Project, and any efforts made by DBH to engage other pediatric primary care providers in using the Project.

65. Please provide an update on the implementation of the DC SEED Grant.

66. Please provide an update on the implementation of the DC Opioid Response (DCOR) Faith-Based Recovery Month Grant.  Did the programs funded by this grant prove successful?

67. Please provide an update on the "Now is the Time" Transitional Age Youth Grant. Please describe the status of the project, including the following information:
    - Which community-based organizations participated in the grant in FY19?
    - What services were provided under the grant in FY19? Are any of these services time-limited? If so, which services and what are their time limits?
    - To date, which community-based providers are certified to deliver transition age youth-specific services and supports?
    - To date, how many Transition Aged Youth (TAY) have received services under the Now is the Time grant, broken down by service type and dates of service?
    - How much of the grant funding was used in FY19 for direct services?
    - Please provide any outcome evaluations or reports of the program from the past.

68. Please provide an update on the Department's work with the DC Collaborative for Mental Health in Pediatric Primary Care.

69.  During FY19, what percentage of children discharged from a hospital were seen within the community within seven days? When children are not seen until after the 7-day deadline, what are the reasons? Provide numbers and percentages.

70. Please explain the work the Department is doing with CFSA to better serve the mental health needs of District foster children in Maryland.

71. Please provide an update on the collaboration between DBH, DYRS, DHS, CFSA, OSSE, DCPS, and DC Public Charter Schools to implement CAFAS and PECFAS. In your response, please provide an update on the plan to develop the data warehouse that will allow for CAFAS/PECFAS results to be shared with all of a specific child/youth's providers.

72. Please provide an update on the online behavioral health training program for all child development facilities and public schools that was launched in the first quarter of FY15. How many teachers and other personnel completed the online training in FY19 and FY20 to date?

**Department of Behavioral Health Organizational Chart**

Updated 01/21/2020

**Wilbur Giles**
Office of Contracts & Procurement

**Barbara J. Bazron, Ph.D.**
Director

**Joyce Jeter**
Agency Fiscal Officer

**Steward Beckham**
Chief Operating Officer

- Melvin Barry
  Claims Billing
- Anthony Baffour
  Fiscal Services
- Mark Larkins
  Interim Chief Information Officer
- Jennifer Mumford
  Fiscal Monitor
- Renee Evans-Jackman
  Grants Management Officer
- Sabriana Clark
  Records Management

**Mark Chastang**
Saint Elizabeths
CEO

- Lori Yerrell-Carter
  Office of Chief Nursing Executive - Interim
- Philip Candilis
  Office of Medical Director
- Shelita Martin
  Office of Chief Quality Data, Training & Performance Management

- Vacant
  Office of the Chief of Staff
- Richard Gontang
  Office of the Chief Clinical Office
- K. Singh Taneja
  Office of the Chief Operating Officer

**Matt Caspari**
General Counsel
Office of the General Counsel

**Marsha Lillie-Blanton**
Senior Policy Advisor

- Jennifer Cannistra
  Director, Systems Transformation

**Marc Dalton**
Chief Clinical Officer

- Vacant
  Clinical Services and Supports
  Deputy Clinical Officer
- Shannon Goodhue
  Disaster Behavioral Health and Support Services

**Phyllis Jones**
Chief of Staff

- Patricia Thompson
  Director, Office of Ombudsman
- Frankie Wheeler
  Director, Human Resources
- Erica Cunningham
  Director, Communications
- Raphaelle Richardson
  Director, Consumer & Family Affairs
- Davida Crockett
  Legislative Affairs

**Atiya Jackson**
Director
Accountability

**Richard Bebout**
Deputy Director
Adult Services
(TAY/Adult/Older)

- Vacant
  Comprehensive Psychiatric Emergency Program
- Adina Madden
  Director Assessment and Referral Center
- Johari Eligan
  Director
  Access Helpline
- Nancy Black
  Director
  Behavioral Health Services

- Terri Spencer
  Director, Specialty Care
- Sharon Hunt
  Director, SOR Grant
- Alvin Hinkle
  Director, Residential Support and Continuity of Services
- Brandi Gladden
  Director, Housing Development

- Chad Tillbrook
  Director
  Forensic Services
- Anthony Hall
  Director
  Community Response Team

**Barbara Parks**
Deputy Director
Child/Adolescent/Family Services

- Shermain Bowden
  Program Manager
  PIECE Program
- Meghan Sullivan
  Project Director
  Project DC SEED
- Physician Practice Group
- Eric Chapman
  SUD Prevention

- Sharon Dietsche
  Director, Prevention & Early Intervention
- Patrina Anderson
  Director, Linkages and Assessments
- Amina Smith
  Services Coordinator
  Community-Based Services

**DBH**
DEPARTMENT OF BEHAVIORAL HEALTH

*Q1. Please provide a current organizational chart for DBH. Please provide information to the activity level. In addition, please identify the number of full time equivalents (FTEs) at each organizational level and the employee responsible for the management of each program and activity. If applicable, please provide a narrative explanation of any organizational changes made during FY19 and to date in FY20.*

**DBH Response**

With the appointment of the new director in April 2019, the organizational structure was reconfigured in the following ways for greater visibility internally and externally and to strengthen accountability:

- Community Services Administration was divided into the Children/Adolescent/Family Services Division and the Adult Services Division which now includes forensic services and the DBH operated services
- Systems Transformation Division was reconfigured to transfer Network Development which provides onboarding of new providers and ongoing technical assistance to the provider network to the Accountability Administration to strengthen interaction with providers on quality of services and partner continuous quality improvement with compliance
- Consumer and Family Affairs and Human Resources were moved to the Chief of Staff to elevate the voice of consumers/clients and their families and to provide focused attention on recruitment and retention, and labor management relations, and a
- Senior Policy Advisor positon was established to guide system redesign including implementation of the 1115 Behavioral Health Transformation waiver.

Question 2: Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY 19 and to date in FY20

| | | | | | | | | | Fiscal Year | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 2019 | | | 2020 | | |
| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Comp Object | Comp Object Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| 1000 | AGENCY MANAGEMENT | 0100 | LOCAL FUND | | | | | | 17318826.16 | 17317715.82 | 6110.34 | 16321546.32 | 1598224.08 | 4767025.07 |
| | | 0100 Total | | | | | | | 17318826.16 | 17317715.82 | 6110.34 | 16321546.32 | 1598224.08 | 4767025.07 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 700657.02 | 737335.13 | -36678.11 | 855836.1 | 266278.83 | 589557.27 |
| | | | | | 0011 Total | | | | 700657.02 | 737335.13 | -36678.11 | 855836.1 | 266278.83 | 589557.27 |
| | | | | | 0012 | REGULAR PAY - OTHER | 0125 | TERM FULL-TIME | 25194.86 | 25194.99 | -0.13 | 101663.27 | 0 | 101663.27 |
| | | | | | 0012 Total | | | | 25194.86 | 25194.99 | -0.13 | 101663.27 | 0 | 101663.27 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0134 | TERMINAL LEAVE | | | | 0 | 593.02 | -593.02 |
| | | | | | | | 0174 | SEVERANCE PAY | | | | 0 | 10970.4 | -10970.4 |
| | | | | | 0013 Total | | | | | | | 0 | 11563.42 | -11563.42 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 436.57 | -436.57 | 0 | 147.94 | -147.94 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 72784.18 | -72784.18 | 0 | 24248.55 | -24248.55 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 171917.35 | 0 | 171917.35 | 259482.33 | 0 | 259482.33 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 45279.35 | -45279.35 | 0 | 16525.61 | -16525.61 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 576.52 | -576.52 | 0 | 183.39 | -183.39 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 1736.09 | -1736.09 | 0 | 552.7 | -552.7 |
| | | | | | | | 0157 | PREPAID LEGAL | 0 | 1248.44 | -1248.44 | 0 | 203.65 | -203.65 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 10589.53 | -10589.53 | 0 | 4068.33 | -4068.33 |
| | | | | | | | 0159 | RETIREMENT | 0 | 38126.53 | -38126.53 | 0 | 13313.86 | -13313.86 |
| | | | | | | | 0160 | DC METRO BENEFITS | 0 | 108.6 | -108.6 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 3529.92 | -3529.92 | 0 | 1249.66 | -1249.66 |
| | | | | | 0014 Total | | | | 171917.35 | 174415.73 | -2498.38 | 259482.33 | 60493.69 | 198988.64 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 0 | 1692.74 | -1692.74 | 0 | 856.59 | -856.59 |
| | | | | | 0015 Total | | | | 0 | 1692.74 | -1692.74 | 0 | 856.59 | -856.59 |
| | | | | PS Total | | | | | 897769.23 | 938638.59 | -40869.36 | 1216981.7 | 339192.53 | 877789.17 |
| | | 0200 Total | | | | | | | 897769.23 | 938638.59 | -40869.36 | 1216981.7 | 339192.53 | 877789.17 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 9448.04 | 9411.86 | 36.18 | | | |
| | | | | | 0011 Total | | | | 9448.04 | 9411.86 | 36.18 | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0136 | SUNDAY PAY | 0 | 36.18 | -36.18 | | | |
| | | | | | 0013 Total | | | | 0 | 36.18 | -36.18 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 1235.86 | 0 | 1235.86 | | | |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 0 | 585.86 | -585.86 | | | |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 8.88 | -8.88 | | | |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 28.17 | -28.17 | | | |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 136.85 | -136.85 | | | |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 470.55 | -470.55 | | | |
| | | | | | | | 0159 | RETIREMENT | | | | | | |
| | | | | | 0014 Total | | | | 1235.86 | 1235.86 | -5.68434E-14 | | | |
| | | | | PS Total | | | | | 10683.9 | 10683.9 | -5.68434E-14 | | | |
| | | 0700 Total | | | | | | | 10683.9 | 10683.9 | -5.68434E-14 | | | |
| | AGENCY MANAGEMENT Total | | | | | | | | 18227279.29 | 18260338.31 | -34759.02 | 17538528.02 | 1937416.61 | 5644814.24 |
| 1000 Total | | | | | | | | | 18227279.29 | 18260338.31 | -34759.02 | 17538528.02 | 1937416.61 | 5644814.24 |
| 100F | AGENCY FINANCIAL OPERATIONS (BUDGET) | 0100 | LOCAL FUND | | | | | | 2000547.48 | 1935609.2 | 64888.28 | 2099143.53 | 368924.97 | 1662798.56 |
| | | 0100 Total | | | | | | | 2000547.48 | 1935609.2 | 64888.28 | 2099143.53 | 368924.97 | 1662798.56 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 0 | 0 | 0 | | | |
| | | | | | 0011 Total | | | | 0 | 0 | 0 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 0 | 0 | | | |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | -0.6 | 0.6 | | | |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 0 | 1.57 | -1.57 | | | |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | -0.44 | 0.44 | | | |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | -0.01 | 0.01 | | | |
| | | | | | | | 0155 | DENTAL PLAN | 0 | -0.01 | 0.01 | | | |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | -0.11 | 0.11 | | | |
| | | | | | | | 0159 | RETIREMENT | 0 | -0.37 | 0.37 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | -0.03 | 0.03 | | | |
| | | | | | 0014 Total | | | | 0 | 2.77556E-17 | -2.77556E-17 | | | |
| | | | | PS Total | | | | | 0 | 2.77556E-17 | -2.77556E-17 | | | |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 0210 | GENERAL | 2978 | 0 | 2978 | 10810.33 | 0 | 10810.33 |
| | | | | | 0020 Total | | | | 2978 | 0 | 2978 | 10810.33 | 0 | 10810.33 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0402 | TRAVEL - OUT OF CITY | 0 | 6920.56 | -6920.56 | 15040 | 0 | 15040 |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 19837.56 | 34320 | -14482.44 | 10810.33 | 0 | 2170.33 |
| | | | | | | | 0410 | OFFICE SUPPORT | | | | 28903 | 0 | 28903 |
| | | | | | 0040 Total | | | | 48240.56 | 41240.56 | 7000 | 25850.33 | 0 | 17210.33 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 0506 | GRANTS AND GRATUITIES | -25000 | 0 | -25000 | | | |
| | | | | | | | 0523 | AGENCY INDIRECT COST | 25000 | 0 | 25000 | 25000 | 0 | 25000 |
| | | | | | 0050 Total | | | | 0 | 0 | 0 | 25000 | 0 | 25000 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0702 | PURCHASES - EQUIPMENT AND MACHINERY | 20905.32 | 0 | 20905.32 | 810.33 | 0 | 810.33 |
| | | | | | | | 0704 | PURCHASES - OTHER EQUIPMENT | -10344.62 | 0 | -10344.62 | | | |
| | | | | | | | 0706 | RENTALS - MACHINERY AND EQUIPMENT | -5905.32 | 0 | -5905.32 | | | |
| | | | | | 0070 Total | | | | 4655.38 | 0 | 4655.38 | 810.33 | 0 | 810.33 |
| | | | | NPS Total | | | | | 55873.94 | 41240.56 | 14633.38 | 62470.99 | 0 | 53830.99 |
| | | 0200 Total | | | | | | | 55873.94 | 41240.56 | 14633.38 | 62470.99 | 0 | 53830.99 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | NPS | 0040 | OTHER SERVICES AND CHARGES | 0402 | TRAVEL - OUT OF CITY | 0 | 3449.9 | -3449.9 | | | |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 60000 | 54366 | 5634 | 60000 | 0 | 0 |
| | | | | | 0040 Total | | | | 60000 | 57815.9 | 2184.1 | 60000 | 0 | 0 |
| | | | | NPS Total | | | | | 60000 | 57815.9 | 2184.1 | 60000 | 0 | 0 |
| | | 0250 Total | | | | | | | 60000 | 57815.9 | 2184.1 | 60000 | 0 | 0 |
| | AGENCY FINANCIAL OPERATIONS (BUDGET) Total | | | | | | | | 2116421.42 | 2034715.66 | 81705.76 | 2221614.52 | 368924.97 | 1721129.55 |
| 100F Total | | | | | | | | | 2116421.42 | 2034715.66 | 81705.76 | 2221614.52 | 368924.97 | 1721129.55 |
| 1800 | MENTAL HEALTH AUTHORITY (BUDGET) | 0100 | LOCAL FUND | | | | | | 5399043.14 | 5397712.27 | 1330.87 | 5357698.71 | 948481.78 | 3774906.11 |
| | | 0100 Total | | | | | | | 5399043.14 | 5397712.27 | 1330.87 | 5357698.71 | 948481.78 | 3774906.11 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 80087.51 | 109541.29 | -29453.78 | 121875.01 | 36180.64 | 85694.37 |
| | | | | | 0011 Total | | | | 80087.51 | 109541.29 | -29453.78 | 121875.01 | 36180.64 | 85694.37 |
| | | | | | 0012 | REGULAR PAY - OTHER | 0125 | TERM FULL-TIME | 37035.66 | 22015.73 | 15019.93 | 66542.12 | 0 | 66542.12 |
| | | | | | 0012 Total | | | | 37035.66 | 22015.73 | 15019.93 | 66542.12 | 0 | 66542.12 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0136 | SUNDAY PAY | 0 | 49.94 | -49.94 | | | |
| | | | | | 0013 Total | | | | 0 | 49.94 | -49.94 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 86.68 | -86.68 | 0 | 21.57 | -21.57 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 27301.66 | -27301.66 | 0 | 5622.26 | -5622.26 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 41467.56 | 0 | 41467.56 | 51061.04 | 0 | 51061.04 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 7614.22 | -7614.22 | 0 | 2095.67 | -2095.67 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 137.16 | -137.16 | 0 | 31.34 | -31.34 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 460.69 | -460.69 | 0 | 101.75 | -101.75 |
| | | | | | | | 0157 | PREPAID LEGAL | 0 | 164.52 | -164.52 | | | |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 1780.75 | -1780.75 | 0 | 531.17 | -531.17 |
| | | | | | | | 0159 | RETIREMENT | 0 | 6577.94 | -6577.94 | 0 | 1809.07 | -1809.07 |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 1294.39 | -1294.39 | 0 | 260.93 | -260.93 |
| | | | | | 0014 Total | | | | 41467.56 | 45418.01 | -3950.45 | 51061.04 | 10473.76 | 40587.28 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 0 | 2554.82 | -2554.82 | 0 | 95.97 | -95.97 |
| | | | | | 0015 Total | | | | 0 | 2554.82 | -2554.82 | 0 | 95.97 | -95.97 |
| | | | | PS Total | | | | | 158590.73 | 179579.79 | -20989.06 | 239478.17 | 46750.37 | 192727.8 |
| | | | | NPS | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0701 | PURCHASES - FURNITURE AND FIXTURES | 20000 | 0 | 20000 | | | |
| | | | | | | | 0702 | PURCHASES - EQUIPMENT AND MACHINERY | 0 | 0 | 0 | | | |

Question 2: Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY 19 and to date in FY20

| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Comp Object | Comp Object Title | 2019 Sum of Budget | 2019 Sum of Actuals | 2019 Sum of Variance | 2020 Sum of Budget | 2020 Sum of Actuals | 2020 Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1800 | MENTAL HEALTH AUTHORITY (BUDGET) | 0200 | FEDERAL GRANT FUND | NPS | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0706 | RENTALS - MACHINERY AND EQUIPMENT | -20000 | 0 | -20000 | 0 | 0 | 0 |
| | | | | | 0070 Total | | | | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | NPS Total | | | | | -20000 | 0 | -20000 | 0 | 0 | 0 |
| | | 0200 Total | | | | | | | 158590.73 | 179579.79 | -20989.06 | 239478.17 | 46750.37 | 192727.8 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 132044.53 | 94119.53 | 37925 | 166459.74 | 24710.99 | 141748.75 |
| | | | | | 0011 Total | | | | 132044.53 | 94119.53 | 37925 | 166459.74 | 24710.99 | 141748.75 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 52.64 | -52.64 | 0 | 14.28 | -14.28 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 6413.12 | -6413.12 | 0 | 1541.82 | -1541.82 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 40346.59 | 0.27 | 40346.32 | 45110.59 | 0 | 45110.59 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 5609.86 | -5609.86 | 0 | 1476.47 | -1476.47 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 56.04 | -56.04 | 0 | 14.14 | -14.14 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 177.91 | -177.91 | 0 | 44.66 | -44.66 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 1311.99 | -1311.99 | 0 | 366.66 | -366.66 |
| | | | | | | | 0159 | RETIREMENT | 0 | 4705.89 | -4705.89 | 0 | 1235.55 | -1235.55 |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 314.6 | -314.6 | 0 | 73.99 | -73.99 |
| | | | | | 0014 Total | | | | 40346.59 | 18642.32 | 21704.27 | 45110.59 | 4767.57 | 40343.02 |
| | | | | PS Total | | | | | 172391.12 | 112761.85 | 59629.27 | 211570.33 | 29478.56 | 182091.77 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 0408 | PROF SERVICE FEES AND CONTR | 825950.88 | 825950.88 | 0 | | | |
| | | | | | 0040 Total | | | | 825950.88 | 825950.88 | 0 | | | |
| | | | | NPS Total | | | | | 825950.88 | 825950.88 | 0 | | | |
| | | 0250 Total | | | | | | | 998342 | 938712.73 | 59629.27 | 211570.33 | 29478.56 | 182091.77 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 0 | 1113.48 | -1113.48 | | | |
| | | | | | 0011 Total | | | | 0 | 1113.48 | -1113.48 | | | |
| | | | | | 0012 | REGULAR PAY - OTHER | 0121 | TEMPORARY FULL-TIME | 0 | 0 | 0 | 16794.98 | 0 | 16794.98 |
| | | | | | | | 0125 | TERM FULL-TIME | 0 | 0 | 0 | | | |
| | | | | | 0012 Total | | | | 0 | 0 | 0 | 16794.98 | 0 | 16794.98 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0134 | TERMINAL LEAVE | 0 | 0 | 0 | 0 | 167.02 | -167.02 |
| | | | | | 0013 Total | | | | 0 | 0 | 0 | 0 | 167.02 | -167.02 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | -2829.88 | 2829.88 | | | |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 1332.79 | -1332.79 | | | |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 1351.88 | 0 | 1351.88 | 4551.44 | 0 | 4551.44 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 849.91 | -849.91 | 0 | 10.36 | -10.36 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 9.83 | -9.83 | | | |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 28.73 | -28.73 | | | |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 198.64 | -198.64 | 0 | 2.42 | -2.42 |
| | | | | | | | 0159 | RETIREMENT | 0 | 584.64 | -584.64 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 63.74 | -63.74 | | | |
| | | | | | 0014 Total | | | | 1351.88 | 238.4 | 1113.48 | 4551.44 | 12.78 | 4538.66 |
| | | | | PS Total | | | | | 1351.88 | 1351.88 | 2.344790e-13 | 21346.42 | 179.8 | 21166.62 |
| | | 0700 Total | | | | | | | 1351.88 | 1351.88 | 2.344790e-13 | 21346.42 | 179.8 | 21166.62 |
| | MENTAL HEALTH AUTHORITY (BUDGET) | Total | | | | | | | 6557327.75 | 6517356.67 | 39971.08 | 5830093.63 | 1024890.51 | 4170892.3 |
| 1800 Total | | | | | | | | | 6557327.75 | 6517356.67 | 39971.08 | 5830093.63 | 1024890.51 | 4170892.3 |
| 3800 | SAINT ELIZABETHS HOSPITAL | 0100 | LOCAL FUND | | | | | | 90574327.05 | 90569293.83 | 5033.22 | 94033949.25 | 23174482.25 | 61970262.4 |
| | | 0100 Total | | | | | | | 90574327.05 | 90569293.83 | 5033.22 | 94033949.25 | 23174482.25 | 61970262.4 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 722062.92 | 787288.61 | -65225.69 | 870499.9 | 322834.41 | 547665.49 |
| | | | | | 0011 Total | | | | 722062.92 | 787288.61 | -65225.69 | 870499.9 | 322834.41 | 547665.49 |
| | | | | | 0012 | REGULAR PAY - OTHER | 0121 | TEMPORARY FULL-TIME | 182762.12 | 0 | 182762.12 | | | |
| | | | | | | | 0122 | CONTINUING PART-TIME | 99816.5 | 75030.74 | 24785.76 | 99816.5 | 17573.95 | 82242.55 |
| | | | | | | | 0125 | TERM FULL-TIME | 201595.36 | 181521.12 | 20074.24 | 313273.87 | 0 | 313273.87 |
| | | | | | 0012 Total | | | | 484173.98 | 256551.86 | 227622.12 | 413090.37 | 17573.95 | 395516.42 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0131 | SHIFT DIFFERENTIAL | 0 | 25160.7 | -25160.7 | 0 | 7760.09 | -7760.09 |
| | | | | | | | 0134 | TERMINAL LEAVE | 0 | 0 | 0 | | | |
| | | | | | | | 0135 | HOLIDAY PAY | 0 | 23205.82 | -23205.82 | 0 | 7470.88 | -7470.88 |
| | | | | | | | 0136 | SUNDAY PAY | 0 | 28555.51 | -28555.51 | 0 | 8239.22 | -8239.22 |
| | | | | | 0013 Total | | | | 0 | 76922.03 | -76922.03 | 0 | 23470.19 | -23470.19 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 659.01 | -659.01 | 0 | 199.94 | -199.94 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 144066.35 | -144066.35 | 0 | 40577.91 | -40577.91 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 260844.77 | -17250 | 278094.77 | 347852.95 | 0 | 347852.95 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 75882.94 | -75882.94 | 0 | 22907.26 | -22907.26 |
| | | | | | | | 0152 | RETIREMENT CONTRIBUTION - CIVIL SERVICE | 0 | 5252 | -5252 | 0 | 2207.88 | -2207.88 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 1045.9 | -1045.9 | 0 | 298.18 | -298.18 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 3252.62 | -3252.62 | 0 | 936.9 | -936.9 |
| | | | | | | | 0157 | PREPAID LEGAL | 0 | 6.33 | -6.33 | | | |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 19750.22 | -19750.22 | 0 | 6287.96 | -6287.96 |
| | | | | | | | 0159 | RETIREMENT | 0 | 40068.58 | -40068.58 | 0 | 13089.69 | -13089.69 |
| | | | | | | | 0160 | DC METRO BENEFITS | 0 | 25 | -25 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 4700.77 | -4700.77 | 0 | 1305.42 | -1305.42 |
| | | | | | 0014 Total | | | | 260844.77 | 277459.62 | -16614.85 | 347852.95 | 87811.14 | 260041.81 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 0 | 183988.28 | -183988.28 | 0 | 61883.08 | -61883.08 |
| | | | | | 0015 Total | | | | 0 | 183988.28 | -183988.28 | 0 | 61883.08 | -61883.08 |
| | | | | PS Total | | | | | 1467081.67 | 1582210.4 | -115128.73 | 1631443.22 | 513572.77 | 1117870.45 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 0201 | OFFICE SUPPLIES | 16705.04 | 5553.82 | 11151.22 | 16705.04 | 0 | -10565496 |
| | | | | | | | 0202 | CUSTODIAL AND MAINTENANCE | 11364.03 | 31322.56 | -19958.53 | 11364.03 | 388.28 | 11364.03 |
| | | | | | | | 0203 | MEDICAL, SURGICAL AND LAB | 134263.54 | 150814.45 | -16550.91 | 145402.88 | 0 | 145402.88 |
| | | | | | | | 0204 | EDUCATIONAL | 13362.52 | 431.66 | 12930.86 | 13362.52 | 48.04 | 13362.52 |
| | | | | | | | 0205 | RECREATIONAL | 0 | 1616.39 | -1616.39 | | | |
| | | | | | | | 0207 | CLOTHING AND UNIFORMS | 5341.01 | 5830.72 | -489.71 | 5341.01 | 3660.55 | 5341.01 |
| | | | | | | | 0209 | FOOD PROVISIONS | 96138.76 | 90229.55 | 5909.21 | 96138.76 | 0 | 36138.76 |
| | | | | | | | 0210 | GENERAL | 291717.66 | 171778.9 | 119938.76 | 291717.66 | 47073.77 | 121147.36 |
| | | | | | | | 0212 | CULINARY PRODUCTS | 0 | 64743.63 | -64743.63 | | | |
| | | | | | | | 0213 | SECURITY SUPPLIES | 5500 | 0 | 5500 | 5500 | 0 | 5500 |
| | | | | | | | 0218 | CLEANING SUPPLIES | 0 | 5033.08 | -5033.08 | | | |
| | | | | | 0020 Total | | | | 574392.56 | 527354.76 | 47037.8 | 585531.9 | 51170.64 | 232601.6 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0401 | TRAVEL - LOCAL | 16023.02 | 2863.44 | 13159.58 | 16023.02 | 300 | 16023.02 |
| | | | | | | | 0402 | TRAVEL - OUT OF CITY | 10682.01 | 10466.84 | 215.17 | 10682.01 | 540 | 10142.01 |
| | | | | | | | 0403 | TRANS CHARGES - MATERIALS | 80000 | 30410.87 | 49589.13 | 80000 | 0 | 80000 |
| | | | | | | | 0404 | MAINTENANCE AND REPAIRS - AUTO | 0 | 2686.43 | -2686.43 | | | |
| | | | | | | | 0405 | MAINTENANCE AND REPAIRS - MACH | 0 | 0 | 0 | | | |
| | | | | | | | 0406 | MAINTENANCE AND REPAIRS - LAND, BUILDING | 0 | 19810.92 | -19810.92 | | | |
| | | | | | | | 0407 | MAINTENANCE AND REPAIRS - OTHER | 94917.81 | 117974.1 | -23056.29 | 94917.81 | 0 | 1709.7 |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 189923.3 | 130674.5 | 59248.8 | 189923.3 | 10553.53 | 92377.3 |
| | | | | | | | 0410 | OFFICE SUPPORT | 0 | 8137 | -8137 | 0 | 0 | 0 |
| | | | | | | | 0416 | POSTAGE | 0 | 84.04 | -84.04 | | | |
| | | | | | | | 0419 | TUITION FOR EMPLOYEE TRAINING | 0 | 1649.97 | -1649.97 | | | |
| | | | | | | | 0425 | PAYMENT OF MEMBERSHIP DUES | 40341.01 | 603.99 | 39737.02 | 40341.01 | 19487.75 | 24812.26 |
| | | | | | | | 0429 | PROFESSIONAL SERVICES | 0 | 78555.34 | -78555.34 | 0 | 28327.38 | -88131.2 |
| | | | | | | | 0441 | IT HARDWARE MAINTENANCE | 0 | 0 | 0 | 0 | 457.65 | 0 |
| | | | | | | | 0499 | INT PENALTIES QUICK PAY CLS 40 | 0 | -52.33 | -52.33 | | | |
| | | | | | 0040 Total | | | | 431887.15 | 403969.77 | 27917.38 | 431887.15 | 59666.31 | 136933.09 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 0409 | CONTRACTUAL SERVICES - OTHER | 319720.86 | 304470.73 | 15250.13 | 319720.86 | 45019.69 | 15491.86 |
| | | | | | 0041 Total | | | | 319720.86 | 304470.73 | 15250.13 | 319720.86 | 45019.69 | 15491.86 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0701 | PURCHASES - FURNITURE AND FIXTURES | 1068.2 | 7782 | -6713.8 | 1068.2 | 0 | -31036.84 |
| | | | | | | | 0702 | PURCHASES - EQUIPMENT AND MACHINERY | 33410.08 | 15727.08 | 17683 | 33410.08 | 0 | 8694.08 |
| | | | | | | | 0704 | PURCHASES - OTHER EQUIPMENT | 16023.02 | 2469.76 | 13553.26 | 16023.02 | 0 | 16023.02 |

Question 2: Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY 19 and to date in FY20

| | | | | | | | | | Fiscal Year Values | | | | | |
| | | | | | | | | | 2019 | | | 2020 | | |
| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Comp Object | Comp Object Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3800 | SAINT ELIZABETHS HOSPITAL | 0200 | FEDERAL GRANT FUND | NPS | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0706 | RENTALS - MACHINERY AND EQUIPMENT | | | | 0 | 0 | 0 |
| | | | | | | | 0707 | RENTALS - OTHER | | | | 0 | 27522.86 | 0 |
| | | | | | | | 0708 | LIBRARY BOOKS | 13352.52 | 0 | 13352.52 | 13352.52 | 0 | 13352.52 |
| | | | | | | | 0709 | TEXT BOOKS | 0 | 304 | -304 | | | |
| | | | | | | | 0710 | IT HARDWARE ACQUISITIONS | 0 | 10699.19 | -10699.19 | | | |
| | | | | | | | 0711 | IT SOFTWARE ACQUISITIONS | 0 | 1948.37 | -1948.37 | | | |
| | | | | | | 0070 Total | | | 63853.82 | 38930.4 | 24923.42 | 63853.82 | 27522.86 | 7032.78 |
| | | | | | NPS Total | | | | 138984.39 | 1274725.66 | 115128.73 | 1400993.73 | 183379.5 | 392059.33 |
| | | 0200 Total | | | | | | | 2856936.06 | 2856936.06 | 2.72848E-12 | 3032436.95 | 696952.27 | 1509929.78 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | NPS | 0040 | OTHER SERVICES AND CHARGES | 0403 | TRANS CHARGES - MATERIALS | 0 | 22003.06 | -22003.06 | | | |
| | | | | | | | 0405 | MAINTENANCE AND REPAIRS - MACH | 0 | 13600 | -13600 | | | |
| | | | | | | | 0407 | MAINTENANCE AND REPAIRS - OTHER | 0 | 0 | 0 | | | |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 845000 | 808228.15 | 36771.85 | | | |
| | | | | | | 0040 Total | | | 845000 | 843831.21 | 1168.79 | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0704 | PURCHASES - OTHER EQUIPMENT | 80000 | 78481.46 | 1518.54 | | | |
| | | | | | 0070 Total | | | 80000 | 78481.46 | 1518.54 | | | |
| | | | | NPS Total | | | | 925000 | 922312.67 | 2687.33 | | | |
| | | 0250 Total | | | | | | | 925000 | 922312.67 | 2687.33 | | | |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0020 | SUPPLIES AND MATERIALS | 0201 | OFFICE SUPPLIES | 6077.84 | 0 | 6077.84 | 40000 | 0 | 33000 |
| | | | | | | | 0209 | FOOD PROVISIONS | 0 | 6077.84 | -6077.84 | 0 | 6967.03 | -19884.45 |
| | | | | | | | 0210 | GENERAL | 0 | 0 | 0 | | | |
| | | | | | 0020 Total | | | 6077.84 | 6077.84 | 0 | 40000 | 6967.03 | 13115.55 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0401 | TRAVEL - LOCAL | 0 | 14514.17 | -14514.17 | 0 | 186.96 | -186.96 |
| | | | | | | | 0402 | TRAVEL - OUT OF CITY | 0 | 36086.78 | -36086.78 | 0 | 1850 | -1850 |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 122450.74 | 60544.77 | 61905.97 | 175000 | 3847.5 | 77900 |
| | | | | | | | 0410 | OFFICE SUPPORT | 0 | 0 | 0 | | | |
| | | | | | | | 0416 | POSTAGE | 0 | 0 | 0 | | | |
| | | | | | | | 0424 | CONFERENCE FEES LOC OUT OF CITY | 0 | -149 | 149 | | | |
| | | | | | | | 0425 | PAYMENT OF MEMBERSHIP DUES | 0 | 750 | -750 | 0 | 19412.8 | -19412.8 |
| | | | | | | | 0428 | PERSONAL SERVICES CONTRACTS | 0 | 10699 | -10699 | | | |
| | | | | | | | 0499 | INT PENALTIES QUICK PAY CLS 40 | 0 | 5.02 | -5.02 | | | |
| | | | | | 0040 Total | | | 122450.74 | 122450.74 | 4.07496E-12 | 175000 | 25297.26 | 56450.24 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0701 | PURCHASES - FURNITURE AND FIXTURES | 0 | 0 | 0 | 0 | 0 | -5000 |
| | | | | | | | 0704 | PURCHASES - OTHER EQUIPMENT | 409.44 | 0 | 409.44 | 25000 | 0 | 25000 |
| | | | | | | | 0709 | TEXT BOOKS | 15000 | 0 | 15000 | 15000 | 0 | 15000 |
| | | | | | | | 0710 | IT HARDWARE ACQUISITIONS | 0 | 13646.56 | -13646.56 | | | |
| | | | | | | | 0711 | IT SOFTWARE ACQUISITIONS | 0 | 1762.88 | -1762.88 | | | |
| | | | | | 0070 Total | | | 15409.44 | 15409.44 | 9.09495E-13 | 40000 | 0 | 35000 |
| | | | | NPS Total | | | | 143938.02 | 143938.02 | 4.54747E-12 | 255000 | 32264.29 | 104565.79 |
| | | 0400 Total | | | | | | | 143938.02 | 143938.02 | 4.54747E-12 | 255000 | 32264.29 | 104565.79 |
| | | 0450 | PRIVATE DONATIONS | NPS | 0020 | SUPPLIES AND MATERIALS | 0201 | OFFICE SUPPLIES | 0 | 4523.83 | -4523.83 | 0 | 0 | -1301 |
| | | | | | | | 0203 | MEDICAL, SURGICAL AND LAB | 0 | 7778.23 | -7778.23 | 0 | 1004.03 | 0 |
| | | | | | | | 0204 | EDUCATIONAL | 0 | 173.34 | -173.34 | | | |
| | | | | | | | 0205 | RECREATIONAL | 0 | 2054.98 | -2054.98 | | | |
| | | | | | | | 0209 | FOOD PROVISIONS | 0 | 3227.78 | -3227.78 | 0 | 655.55 | 0 |
| | | | | | | | 0210 | GENERAL | 30383.47 | 10323.88 | 20059.59 | 12000 | 488.42 | -3312.48 |
| | | | | | | | 0214 | PHOTO SUPPLIES | 0 | 2133.53 | -2133.53 | | | |
| | | | | | | | 0219 | IT SUPPLIES | 0 | 167.9 | -167.9 | | | |
| | | | | | 0020 Total | | | 30383.47 | 30383.47 | 8.52651E-14 | 12000 | 2258.95 | -16333.48 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0401 | TRAVEL - LOCAL | 0 | 7038.13 | -7038.13 | | | |
| | | | | | | | 0402 | TRAVEL - OUT OF CITY | 0 | 7178.84 | -7178.84 | | | |
| | | | | | | | 0405 | MAINTENANCE AND REPAIRS - MACH | 0 | 60 | -60 | | | |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 75626.63 | 56188.69 | 19437.94 | 135463.55 | 76858.39 | 88101.55 |
| | | | | | | | 0410 | OFFICE SUPPORT | 0 | 2783.76 | -2783.76 | | | |
| | | | | | | | 0416 | POSTAGE | 0 | 7.41 | -7.41 | | | |
| | | | | | | | 0419 | TUITION FOR EMPLOYEE TRAINING | 0 | 1339.8 | -1339.8 | | | |
| | | | | | | | 0441 | IT HARDWARE MAINTENANCE | 0 | 1030 | -1030 | | | |
| | | | | | 0040 Total | | | 75626.63 | 75626.63 | -2.50111E-12 | 135463.55 | 76858.39 | 88101.55 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0701 | PURCHASES - FURNITURE AND FIXTURES | 0 | 0 | 0 | 0 | 0 | -12500 |
| | | | | | | | 0702 | PURCHASES - EQUIPMENT AND MACHINERY | 2993.9 | 0 | 2993.9 | 13689.19 | 0 | 13689.19 |
| | | | | | | | 0704 | PURCHASES - OTHER EQUIPMENT | 0 | 2993.9 | -2993.9 | | | |
| | | | | | 0070 Total | | | 2993.9 | 2993.9 | 0 | 13689.19 | 0 | 1189.19 |
| | | | | NPS Total | | | | 109004 | 109004 | -2.27374E-12 | 161152.74 | 79117.34 | 72957.26 |
| | | 0450 Total | | | | | | | 109004 | 109004 | -2.27374E-12 | 161152.74 | 79117.34 | 72957.26 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYP | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 1345760.76 | 1202022.24 | 143738.52 | 1364999.4 | 429996.98 | 935002.42 |
| | | | | | 0011 Total | | | 1345760.76 | 1202022.24 | 143738.52 | 1364999.4 | 429996.98 | 935002.42 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0131 | SHIFT DIFFERENTIAL | 0 | 35293.56 | -35293.56 | 0 | 12033.14 | -12033.14 |
| | | | | | | | 0134 | TERMINAL LEAVE | 0 | 1885.07 | -1885.07 | | | |
| | | | | | | | 0135 | HOLIDAY PAY | 0 | 48919.19 | -48919.19 | 0 | 17873.07 | -17873.07 |
| | | | | | | | 0136 | SUNDAY PAY | 0 | 69186.77 | -69186.77 | 0 | 24317.36 | -24317.36 |
| | | | | | 0013 Total | | | 0 | 155284.59 | -155284.59 | 0 | 54223.57 | -54223.57 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 777.69 | -777.69 | 0 | 241.05 | -241.05 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 181435.65 | -181435.65 | 0 | 48228.22 | -48228.22 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 335108.3 | -13296.09 | 348404.39 | 369914.84 | 0 | 369914.84 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 82197.29 | -82197.29 | 0 | 29367.42 | -29367.42 |
| | | | | | | | 0152 | RETIREMENT CONTRIBUTION - CIVIL SERVICE | 0 | 5242.18 | -5242.18 | 0 | 1230.21 | -1230.21 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 1059.74 | -1059.74 | 0 | 295.84 | -295.84 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 3599.63 | -3599.63 | 0 | 998.59 | -998.59 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 20297.11 | -20297.11 | 0 | 7542.98 | -7542.98 |
| | | | | | | | 0159 | RETIREMENT | 0 | 58953.71 | -58953.71 | 0 | 20526.4 | -20526.4 |
| | | | | | | | 0160 | DC METRO BENEFITS | 0 | 28 | -28 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 8628.84 | -8628.84 | 0 | 2271.71 | -2271.71 |
| | | | | | 0014 Total | | | 335108.3 | 348923.75 | -13815.45 | 369914.84 | 110702.42 | 259212.42 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 102132.02 | 76657.24 | 25474.78 | 44701.15 | 29545.51 | 15155.64 |
| | | | | | 0015 Total | | | 102132.02 | 76657.24 | 25474.78 | 44701.15 | 29545.51 | 15155.64 |
| | | | | PS Total | | | | 1783001.08 | 1782887.82 | 113.26 | 1779615.39 | 624468.48 | 1155146.91 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 0408 | PROF SERVICE FEES AND CONTR | 70176.2 | 70295.2 | -119 | 100000 | 460 | 66383 |
| | | | | | 0040 Total | | | 70176.2 | 70295.2 | -119 | 100000 | 460 | 66383 |
| | | | | NPS Total | | | | 70176.2 | 70295.2 | -119 | 100000 | 460 | 66383 |
| | | 0600 Total | | | | | | | 1853177.28 | 1853183.02 | -5.74 | 1879615.39 | 624928.48 | 1221529.91 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 576661.21 | 750174.03 | -173512.82 | 609632.13 | 186720.59 | 422911.54 |
| | | | | | 0011 Total | | | 576661.21 | 750174.03 | -173512.82 | 609632.13 | 186720.59 | 422911.54 |
| | | | | | 0012 | REGULAR PAY - OTHER | 0125 | TERM FULL-TIME | 52948.02 | 22826.04 | 30121.98 | 55987.37 | 0 | 55987.37 |
| | | | | | 0012 Total | | | 52948.02 | 22826.04 | 30121.98 | 55987.37 | 0 | 55987.37 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0129 | RN ON CALL PAY | 0 | 0 | 0 | 0 | 374.2 | -374.2 |
| | | | | | | | 0131 | SHIFT DIFFERENTIAL | 0 | 19707.84 | -19707.84 | 0 | 5620.51 | -5620.51 |
| | | | | | | | 0135 | HOLIDAY PAY | 0 | 18538.12 | -18538.12 | 0 | 6456.17 | -6456.17 |
| | | | | | | | 0136 | SUNDAY PAY | 0 | 23145.92 | -23145.92 | 0 | 7289.52 | -7289.52 |
| | | | | | 0013 Total | | | 0 | 61391.88 | -61391.88 | 0 | 19740.4 | -19740.4 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 568.58 | -568.58 | 0 | 152.51 | -152.51 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 75271.18 | -75271.18 | 0 | 18831.65 | -18831.65 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 156772.68 | -99200 | 255972.68 | 180382.9 | 0 | 180382.9 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 62458.32 | -62458.32 | 0 | 13564.89 | -13564.89 |
| | | | | | | | 0152 | RETIREMENT CONTRIBUTION - CIVIL SERVICE | 0 | 8299.16 | -8299.16 | 0 | 2257.97 | -2257.97 |

Question 2: Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY 19 and to date in FY20

| | | | | | | | | | Fiscal Year Values | | | | | |
| | | | | | | | | | 2019 | | | 2020 | | |
| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Comp Object | Comp Object Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3800 | SAINT ELIZABETHS HOSPITAL | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0154 | OPTICAL PLAN | 0 | 747.11 | -747.11 | 0 | 183.26 | -183.26 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 6573.41 | -6573.41 | 0 | 578.26 | -578.26 |
| | | | | | | | 0157 | PREPAID LEGAL | 0 | 0.57 | -0.57 | | | |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 15030.46 | -15030.46 | 0 | 3592.41 | -3592.41 |
| | | | | | | | 0159 | RETIREMENT | 0 | 27576.91 | -27576.91 | 0 | 7088.7 | -7088.7 |
| | | | | | | | 0160 | DC METRO BENEFITS | 0 | 0 | 0 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 3317.77 | -3317.77 | 0 | 803.37 | -803.37 |
| | | | | | | 0014 Total | | | 156772.68 | 106643.47 | 56139.21 | 180382.9 | 47053.02 | 133329.88 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 0 | 110005.72 | -110005.72 | 0 | 44619.17 | -44619.17 |
| | | | | | 0015 Total | | | | 0 | 110005.72 | -110005.72 | 0 | 44619.17 | -44619.17 |
| | | | | PS Total | | | | | 786381.91 | 1045041.14 | -258659.23 | 846002.4 | 298133.18 | 547869.22 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 0203 | MEDICAL, SURGICAL AND LAB | 0 | 50269.82 | -50269.82 | | | |
| | | | | | | | 0209 | FOOD PROVISIONS | 0 | 97876.11 | -97876.11 | | | |
| | | | | | | | 0210 | GENERAL | 185000 | 35027.43 | 149972.57 | | | |
| | | | | | 0020 Total | | | | 185000 | 183173.36 | 1826.64 | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0401 | TRAVEL - LOCAL | 0 | 47 | -47 | | | |
| | | | | | | | 0402 | TRAVEL - OUT OF CITY | 0 | 13051.82 | -13051.82 | | | |
| | | | | | | | 0407 | MAINTENANCE AND REPAIRS - OTHER | 0 | 35000 | -35000 | | | |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 275482.73 | 338127.65 | -62644.92 | 10507.73 | 45461 | -284304.82 |
| | | | | | | | 0410 | OFFICE SUPPORT | 0 | 0 | 0 | | | |
| | | | | | | | 0425 | PAYMENT OF MEMBERSHIP DUES | 0 | 1973 | -1973 | | | |
| | | | | | | | 0429 | PROFESSIONAL SERVICES | 369959.31 | 0 | 369959.31 | 369959.31 | 0 | 369959.31 |
| | | | | | 0040 Total | | | | 645442.04 | 388199.47 | 257242.57 | 380467.04 | 45461 | 85654.49 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0704 | PURCHASES - OTHER EQUIPMENT | 0 | 409.98 | -409.98 | | | |
| | | | | | 0070 Total | | | | 0 | 409.98 | -409.98 | | | |
| | | | | NPS Total | | | | | 830442.04 | 571782.81 | 258659.23 | 380467.04 | 45461 | 85654.49 |
| | | 0700 Total | | | | | | | 98079206.36 | 98071491.55 | 7714.81 | 100588623.8 | 24951338.81 | 65512768.85 |
| 3800 Total | SAINT ELIZABETHS HOSPITAL  Total | | | | | | | | 98079206.36 | 98071491.55 | 7714.81 | 100588623.8 | 24951338.81 | 65512768.85 |
| 4800 | MENTAL HEALTH SERVICES AND SUPPORTS | 0100 | LOCAL FUND | | | | | | 0 | -1993.71 | 1993.71 | | | |
| | | 0100 Total | | | | | | | 0 | -1993.71 | 1993.71 | | | |
| | MENTAL HEALTH SERVICES AND SUPPORTS  Total | | | | | | | | 0 | -1993.71 | 1993.71 | | | |
| 4800 Total | | | | | | | | | 0 | -1993.71 | 1993.71 | | | |
| 4900 | ACCOUNTABILITY | 0100 | LOCAL FUND | | | | | | 407876.87 | 407574.12 | 4102.75 | 3898712.67 | 710071.78 | 3167172.69 |
| | | 0100 Total | | | | | | | 407876.87 | 407574.12 | 4102.75 | 3898712.67 | 710071.78 | 3167172.69 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 108800.38 | 109024.06 | -223.68 | | | |
| | | | | | 0011 Total | | | | 108800.38 | 109024.06 | -223.68 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0147 | MISC FRINGE BENEFITS | 8714.74 | 0 | 8714.74 | | | |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 6759.49 | -6759.49 | | | |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 50.79 | -50.79 | | | |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 160.29 | -160.29 | | | |
| | | | | | | | 0157 | PREPAID LEGAL | 0 | 166.08 | -166.08 | | | |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 1580.86 | -1580.86 | | | |
| | | | | | 0014 Total | | | | 8714.74 | 8717.51 | -2.77 | | | |
| | | | | PS Total | | | | | 117515.12 | 117741.57 | -226.45 | | | |
| | | 0200 Total | | | | | | | 117515.12 | 117741.57 | -226.45 | | | |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 99940.67 | 97981.09 | 1959.58 | 105930.43 | 3494.49 | 102435.94 |
| | | | | | 0011 Total | | | | 99940.67 | 97981.09 | 1959.58 | 105930.43 | 3494.49 | 102435.94 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0134 | TERMINAL LEAVE | 0 | 388.28 | -388.28 | 0 | 6600.71 | -6600.71 |
| | | | | | | | 0135 | HOLIDAY PAY | | | | | | |
| | | | | | 0013 Total | | | | 0 | 388.28 | -388.28 | 0 | 6600.71 | -6600.71 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0142 | HEALTH BENEFITS | 0 | 5992.64 | -5992.64 | 0 | 230.18 | -230.18 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 24885.23 | 0 | 24885.23 | 28707.15 | 0 | 28707.15 |
| | | | | | | | 0152 | RETIREMENT CONTRIBUTION - CIVIL SERVICE | 0 | 6858.58 | -6858.58 | 0 | 244.61 | -244.61 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 52.65 | -52.65 | 0 | 2.02 | -2.02 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 166.14 | -166.14 | 0 | 6.38 | -6.38 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 1354.1 | -1354.1 | 0 | 143.65 | -143.65 |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 340.38 | -340.38 | 0 | 13.06 | -13.06 |
| | | | | | 0014 Total | | | | 24885.23 | 14764.49 | 10120.74 | 28707.15 | 639.9 | 28067.25 |
| | | 0250 Total | | | | | | | 124825.9 | 113133.86 | 11692.04 | 134637.58 | 10735.1 | 123902.48 |
| | | | | PS Total | | | | | 124825.9 | 113133.86 | 11692.04 | 134637.58 | 10735.1 | 123902.48 |
| | ACCOUNTABILITY  Total | | | | | | | | 432217.89 | 430664.55 | 15568.34 | 4033350.25 | 720806.88 | 3291075.17 |
| 4900 Total | | | | | | | | | 432217.89 | 430664.55 | 15568.34 | 4033350.25 | 720806.88 | 3291075.17 |
| 5800 | CLINICAL SERVICES DIVISION | 0100 | LOCAL FUND | | | | | | 2693183.66 | 2693138.296 | 452.7 | 2640374.277 | 547393.562 | 1504193.96 |
| | | 0100 Total | | | | | | | 2693183.66 | 2693138.296 | 452.7 | 2640374.277 | 547393.562 | 1504193.96 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 929926.76 | 1547828.72 | -617901.96 | 1462843.55 | 551675.77 | 911167.78 |
| | | | | | 0011 Total | | | | 929926.76 | 1547828.72 | -617901.96 | 1462843.55 | 551675.77 | 911167.78 |
| | | | | | 0012 | REGULAR PAY - OTHER | 0125 | TERM FULL-TIME | 1148063.4 | 317598.48 | 830464.92 | 990535.11 | 9387.76 | 981147.35 |
| | | | | | 0012 Total | | | | 1148063.4 | 317598.48 | 830464.92 | 990535.11 | 9387.76 | 981147.35 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0131 | SHIFT DIFFERENTIAL | 0 | 7994.27 | -7994.27 | 0 | 4805.68 | -4805.68 |
| | | | | | | | 0134 | TERMINAL LEAVE | 0 | 17557.77 | -17557.77 | | | |
| | | | | | | | 0135 | HOLIDAY PAY | 0 | 3427.03 | -3427.03 | 0 | 3104.36 | -3104.36 |
| | | | | | | | 0136 | SUNDAY PAY | 0 | 7030.94 | -7030.94 | 0 | 5441.43 | -5441.43 |
| | | | | | 0013 Total | | | | 0 | 36010.01 | -36010.01 | 0 | 13351.47 | -13351.47 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 1366.59 | -1366.59 | 0 | 403.27 | -403.27 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 190985.15 | -190985.15 | 0 | 58157.16 | -58157.16 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 445945.68 | 0 | 445945.68 | 664865.61 | 0 | 664865.61 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 98610.8 | -98610.8 | 0 | 29941.7 | -29941.7 |
| | | | | | | | 0152 | RETIREMENT CONTRIBUTION - CIVIL SERVICE | 0 | 16585.07 | -16585.07 | 0 | 5046.95 | -5046.95 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 1571.97 | -1571.97 | 0 | 452.27 | -452.27 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 4949.04 | -4949.04 | 0 | 1436.54 | -1436.54 |
| | | | | | | | 0157 | PREPAID LEGAL | 0 | 2411.43 | -2411.43 | 0 | 697.04 | -697.04 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 26054.6 | -26054.6 | 0 | 8535 | -8535 |
| | | | | | | | 0160 | RETIREMENT | 0 | 73354.34 | -73354.34 | 0 | 20866.41 | -20866.41 |
| | | | | | | | 0160 | DC METRO BENEFITS | 0 | 412.5 | -412.5 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 8760.39 | -8760.39 | 0 | 2660.81 | -2660.81 |
| | | | | | 0014 Total | | | | 445945.68 | 425061.88 | 20883.8 | 664865.61 | 128197.15 | 536668.46 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 0 | 76568.54 | -76568.54 | 0 | 20281.75 | -20281.75 |
| | | | | | 0015 Total | | | | 0 | 76568.54 | -76568.54 | 0 | 20281.75 | -20281.75 |
| | | | | PS Total | | | | | 2523935.84 | 2403067.63 | 120868.21 | 3118244.27 | 722893.9 | 2395350.37 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 0201 | OFFICE SUPPLIES | -679.77 | 0 | -679.77 | | | |
| | | | | | | | 0210 | GENERAL | 15000 | 14320.23 | 679.77 | | | |
| | | | | | 0020 Total | | | | 14320.23 | 14320.23 | 0 | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0401 | TRAVEL - LOCAL | 0 | 624 | -624 | | | |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 97038.79 | 100414.79 | -3376 | | | |
| | | | | | | | 0410 | OFFICE SUPPORT | 4000 | 0 | 4000 | | | |
| | | | | | 0040 Total | | | | 101038.79 | 101038.79 | 0 | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 0409 | CONTRACTUAL SERVICES - OTHER | 8206.67 | 8206.67 | 0 | | | |
| | | | | | 0041 Total | | | | 8206.67 | 8206.67 | 0 | | | |
| | | | | NPS Total | | | | | 123565.69 | 123565.69 | 0 | | | |
| | | 0200 Total | | | | | | | 2647501.53 | 2526633.32 | 120868.21 | 3118244.27 | 722893.9 | 2395350.37 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | 0409 | CONTRACTUAL SERVICES - OTHER | 482474 | 478091.82 | 4382.18 | | | |
| | | | | | 0041 Total | | | | 482474 | 478091.82 | 4382.18 | | | |
| | | | | NPS Total | | | | | 482474 | 478091.82 | 4382.18 | | | |

Question 2: Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY 19 and to date in FY20

| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Comp Object | Comp Object Title | 2019 Sum of Budget | 2019 Sum of Actuals | 2019 Sum of Variance | 2020 Sum of Budget | 2020 Sum of Actuals | 2020 Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5800 | CLINICAL SERVICES DIVISION | 0250 Total | | | | | | | | | | | | |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 0402 | TRAVEL - OUT OF CITY | 482474 | 478091.82 | 4382.18 | | | |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 0 | 579.11 | -579.11 | | | |
| | | | | | 0040 Total | | | | 2817.75 | 2238.64 | 579.11 | | | |
| | | | | NPS Total | | | | | 2817.75 | 2817.75 | 0 | | | |
| | | 0400 Total | | | | | | | 2817.75 | 2817.75 | 0 | | | |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYP | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 0 | 0.07 | -0.07 | | | |
| | | | | | 0011 Total | | | | 0 | 0.07 | -0.07 | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0136 | SUNDAY PAY | 0 | 0.01 | -0.01 | | | |
| | | | | | 0013 Total | | | | 0 | 0.01 | -0.01 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | -0.01 | 0.01 | | | |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | -4.8 | 4.8 | | | |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 0.12 | -0.12 | | | |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | -0.02 | 0.02 | | | |
| | | | | | | | 0155 | DENTAL PLAN | 0 | -0.08 | 0.08 | | | |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 0.03 | -0.03 | | | |
| | | | | | | | 0159 | RETIREMENT | 0 | -0.81 | 0.81 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | -0.25 | 0.25 | | | |
| | | | | | 0014 Total | | | | 0 | -5.82 | 5.82 | | | |
| | | | | PS Total | | | | | 0 | -5.74 | 5.74 | | | |
| | | 0600 Total | | | | | | | 0 | -5.74 | 5.74 | | | |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 2897458.45 | 3038603.28 | -141144.83 | 4518662.44 | 1221833.23 | 3296829.21 |
| | | | | | 0011 Total | | | | 2897458.45 | 3038603.28 | -141144.83 | 4518662.44 | 1221833.23 | 3296829.21 |
| | | | | | 0012 | REGULAR PAY - OTHER | 0122 | CONTINUING PART-TIME | 99816.5 | 28427.99 | 71388.51 | 99816.5 | 16776.96 | 83039.54 |
| | | | | | | | 0125 | TERM FULL-TIME | 0 | 19709.39 | -19709.39 | | | |
| | | | | | | | 0127 | WORKER'S COMP INJURY EARNINGS | 0 | 0 | 0 | | | |
| | | | | | 0012 Total | | | | 99816.5 | 48137.38 | 51679.12 | 99816.5 | 16776.96 | 83039.54 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0131 | SHIFT DIFFERENTIAL | 0 | 86375.27 | -86375.27 | 0 | 23594.61 | -23594.61 |
| | | | | | | | 0134 | TERMINAL LEAVE | 0 | 24775.1 | -24775.1 | 0 | 2376.55 | -2376.55 |
| | | | | | | | 0135 | HOLIDAY PAY | 258 | 60864.32 | -60606.32 | 0 | 21088.61 | -21088.61 |
| | | | | | | | 0136 | SUNDAY PAY | 0 | 74077.15 | -74077.15 | 0 | 23914.09 | -23914.09 |
| | | | | | 0013 Total | | | | 258 | 246091.84 | -245833.84 | 0 | 70973.86 | -70973.86 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 2779.88 | -2779.88 | 0 | 804.56 | -804.56 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 378189.77 | -378189.77 | 0 | 96934.62 | -96934.62 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 746257.67 | -399274.26 | 1145531.93 | 1251607.81 | 0 | 1251607.81 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 199072.6 | -199072.6 | 0 | 39897.11 | -39897.11 |
| | | | | | | | 0152 | RETIREMENT CONTRIBUTION - CIVIL SERVICE | 0 | 38791.3 | -38791.3 | 0 | 10780.07 | -10780.07 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 2630.9 | -2630.9 | 0 | 700.54 | -700.54 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 8427.45 | -8427.45 | 0 | 2246.45 | -2246.45 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 67233.66 | -67233.66 | 0 | 20251.67 | -20251.67 |
| | | | | | | | 0159 | RETIREMENT | 0 | 176856.87 | -176856.87 | 0 | 50741.13 | -50741.13 |
| | | | | | | | 0160 | DC METRO BENEFITS | 0 | 477.08 | -477.08 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 15721.29 | -15721.29 | 0 | 3972.22 | -3972.22 |
| | | | | | 0014 Total | | | | 746257.67 | 490906.54 | 255351.13 | 1251607.81 | 226328.37 | 1025279.44 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 387 | 18412.32 | -18025.32 | 0 | 104842.31 | -104842.31 |
| | | | | | 0015 Total | | | | 387 | 18412.32 | -18025.32 | 0 | 104842.31 | -104842.31 |
| | | | | PS Total | | | | | 3744177.62 | 3842151.36 | -97973.74 | 5870086.75 | 1640754.73 | 4229332.02 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 0408 | PROF SERVICE FEES AND CONTR | -9840.88 | 75560 | -85400.88 | | | |
| | | | | | 0040 Total | | | | -9840.88 | 75560 | -85400.88 | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 0409 | CONTRACTUAL SERVICES - OTHER | 364401 | 181026.38 | 183374.62 | | | |
| | | | | | 0041 Total | | | | 364401 | 181026.38 | 183374.62 | | | |
| | | | | NPS Total | | | | | 354560.12 | 256586.38 | 97973.74 | | | |
| | | 0700 Total | | | | | | | 4098737.74 | 4098737.74 | 1.16415E-10 | 5870086.75 | 1640754.73 | 4229332.02 |
| | CLINICAL SERVICES DIVISION | Total | | | | | | | 34163366.68 | 34037657.85 | 125708.83 | 35392073.79 | 7837584.25 | 21666619.35 |
| 5800 Total | | | | | | | | | 34163366.68 | 34037657.85 | 125708.83 | 35392073.79 | 7837584.25 | 21666619.35 |
| 5900 | SYSTEM TRANSFORMATION | 0100 | LOCAL FUND | | | | | | 7184863.41 | 7182457.32 | 2406.09 | 6997879.28 | 1699475.89 | 5252455.53 |
| | | 0100 Total | | | | | | | 7184863.41 | 7182457.32 | 2406.09 | 6997879.28 | 1699475.89 | 5252455.53 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 399760.38 | 407192.23 | -7431.85 | 436414.44 | 58834.85 | 377579.59 |
| | | | | | 0011 Total | | | | 399760.38 | 407192.23 | -7431.85 | 436414.44 | 58834.85 | 377579.59 |
| | | | | | 0012 | REGULAR PAY - OTHER | 0125 | TERM FULL-TIME | 0 | 17318.6 | -17318.6 | | | |
| | | | | | 0012 Total | | | | 0 | 17318.6 | -17318.6 | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0134 | TERMINAL LEAVE | 0 | 7287.42 | -7287.42 | | | |
| | | | | | 0013 Total | | | | 0 | 7287.42 | -7287.42 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 238.34 | -238.34 | 0 | 33.95 | -33.95 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 34398.66 | -34398.66 | 0 | 4111.76 | -4111.76 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 90606.42 | 0 | 90606.42 | 118268.31 | 0 | 118268.31 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 25534.67 | -25534.67 | 0 | 3464.76 | -3464.76 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 245.57 | -245.57 | 0 | 28.98 | -28.98 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 786.37 | -786.37 | 0 | 91.44 | -91.44 |
| | | | | | | | 0157 | PREPAID LEGAL | 0 | 195.66 | -195.66 | 0 | 54.24 | -54.24 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 5971.82 | -5971.82 | 0 | 897.93 | -897.93 |
| | | | | | | | 0159 | RETIREMENT | 0 | 21225.75 | -21225.75 | 0 | 2941.79 | -2941.79 |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 2005.38 | -2005.38 | 0 | 210.94 | -210.94 |
| | | | | | 0014 Total | | | | 90606.42 | 90602.22 | 4.2 | 118268.31 | 11835.79 | 106432.52 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 0 | 47.11 | -47.11 | | | |
| | | | | | 0015 Total | | | | 0 | 47.11 | -47.11 | | | |
| | | | | PS Total | | | | | 490366.8 | 522447.58 | -32080.78 | 554682.75 | 70670.64 | 484012.11 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 0201 | OFFICE SUPPLIES | 0 | 2305 | -2305 | | | |
| | | | | | | | 0210 | GENERAL | 0 | 0 | 0 | | | |
| | | | | | 0020 Total | | | | 0 | 2305 | -2305 | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0405 | MAINTENANCE AND REPAIRS - MACH | 0 | 0 | 0 | | | |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 1750694.39 | 1741984.03 | 9303.41 | 593511.75 | -675 | 467726.6 |
| | | | | | | | 0410 | OFFICE SUPPORT | 0 | 6400.49 | -6400.49 | | | |
| | | | | | | | 0429 | PROFESSIONAL SERVICES | 0 | 495 | -495 | | | |
| | | | | | | | 0499 | INT PENALTIES QUICK PAY CLS 40 | 0 | 145.87 | -145.87 | | | |
| | | | | | 0040 Total | | | | 1750694.39 | 1749025.39 | 1669 | 593511.75 | -675 | 467726.6 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 0501 | MAINTENANCE OF PERSONS | 0 | 0 | 0 | | | |
| | | | | | | | 0506 | GRANTS AND GRATUITIES | 419592.81 | 419592.81 | 0 | 1199201.23 | 52000 | 737584.23 |
| | | | | | 0050 Total | | | | 419592.81 | 419592.81 | 0 | 1199201.23 | 52000 | 737584.23 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0701 | PURCHASES - FURNITURE AND FIXTURES | -15000 | 0 | -15000 | | | |
| | | | | | | | 0702 | PURCHASES - EQUIPMENT AND MACHINERY | 1661 | 25 | 1636 | | | |
| | | | | | | | 0704 | PURCHASES - OTHER EQUIPMENT | 14000 | 0 | 14000 | | | |
| | | | | | 0070 Total | | | | 661 | 25 | 636 | | | |
| | | | | NPS Total | | | | | 2170948.2 | 2174948.2 | | 1792712.98 | 51325 | 1205310.83 |
| | | 0200 Total | | | | | | | 2661315 | 2693395.78 | -32080.78 | 2347395.73 | 121995.64 | 1689322.94 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 267792.31 | 272534.16 | -4741.85 | 263800.26 | 78010.14 | 185790.12 |
| | | | | | 0011 Total | | | | 267792.31 | 272534.16 | -4741.85 | 263800.26 | 78010.14 | 185790.12 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 152.96 | -152.96 | 0 | 44.74 | -44.74 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 12991.9 | -12991.9 | 0 | 6899.32 | -6899.32 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 66680.28 | -0.03 | 66680.28 | 71489.87 | 0 | 71489.87 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 15801.47 | -15801.47 | 0 | 3358.02 | -3358.02 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 136.63 | -136.63 | 0 | 43.13 | -43.13 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 390.19 | -390.19 | 0 | 129.67 | -129.67 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 3777.28 | -3777.28 | 0 | 1135.27 | -1135.27 |

Question 2: Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY 19 and to date in FY20

| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Comp Object | Comp Object Title | 2019 Sum of Budget | 2019 Sum of Actuals | 2019 Sum of Variance | 2020 Sum of Budget | 2020 Sum of Actuals | 2020 Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5900 | SYSTEM TRANSFORMATION | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0159 | RETIREMENT | 0 | 13626.82 | -13626.82 | 0 | 3900.51 | -3900.51 |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 695.14 | -695.14 | 0 | 367.95 | -367.95 |
| | | | | | 0014 Total | | | | 66680.28 | 47572.36 | 19107.92 | 71489.87 | 15878.61 | 55611.26 |
| | | | | PS Total | | | | | 334472.59 | 320106.52 | 14366.07 | 335290.13 | 93888.75 | 241401.38 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 0201 | OFFICE SUPPLIES | 5000 | 0 | 5000 | 5000 | 0 | 5000 |
| | | | | | | | 0219 | IT SUPPLIES | 0 | 13464.27 | -13464.27 | | | |
| | | | | | 0020 Total | | | | 5000 | 13464.27 | 5000 | 5000 | 0 | 0 |
| | | | | | 0031 | TELECOMMUNICATIONS | 0308 | TELEPHONE, TELETYPE, TELEGRAM, ETC | 0 | 38213.16 | -38213.16 | | | |
| | | | | | 0031 Total | | | | 0 | 38213.16 | -38213.16 | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0402 | TRAVEL - OUT OF CITY | 0 | 92.59 | 0 | | | |
| | | | | | | | 0403 | TRANS CHARGES - MATERIALS | 11592 | 0 | 11592 | 11592 | 0 | 11592 |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 1154490.4 | 184389.53 | 976288.23 | 1277117.4 | 112885.46 | 1009509.73 |
| | | | | | | | 0410 | OFFICE SUPPORT | 0 | -26761.08 | 0 | | | |
| | | | | | | | 0411 | PRINTING, DUPLICATING, ETC | 0 | 0 | 0 | | | |
| | | | | | | | 0419 | TUITION FOR EMPLOYEE TRAINING | 50000 | 0 | 50000 | 50000 | 0 | 50000 |
| | | | | | | | 0441 | IT HARDWARE MAINTENANCE | 0 | 77823.02 | -77823.02 | | | |
| | | | | | | | 0442 | IT SOFTWARE MAINTENANCE | 128085.3 | 1184694.5 | -1052527.76 | 612618.3 | 843030.48 | -735097.39 |
| | | | | | | | 0499 | INT PENALTIES QUICK PAY CLS 40 | 0 | 0 | 0 | | | |
| | | | | | 0040 Total | | | | 1344167.7 | 1420238.56 | -92470.55 | 1951327.7 | 955915.94 | 336004.34 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 0409 | CONTRACTUAL SERVICES - OTHER | 14533 | 14818.42 | 2650 | | | |
| | | | | | | | 0459 | CONTRACTUAL SERVICES - IT | 470000 | 464328.63 | 5671.37 | | | |
| | | | | | 0041 Total | | | | 484533 | 479147.05 | 8321.37 | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0702 | PURCHASES - EQUIPMENT AND MACHINERY | 89698.53 | 0 | 89698.53 | 89698.53 | 0 | 89698.53 |
| | | | | | | | 0704 | PURCHASES - OTHER EQUIPMENT | 33688 | 0 | 33688 | 33688 | 0 | 33688 |
| | | | | | | | 0708 | LIBRARY BOOKS | 0 | 37000 | -37000 | | | |
| | | | | | | | 0710 | IT HARDWARE ACQUISITIONS | 200000 | 124950.46 | 75049.54 | 0 | 0 | -135649.99 |
| | | | | | | | 0711 | IT SOFTWARE ACQUISITIONS | 22384.64 | 76168.35 | -53783.71 | 22384.64 | 0 | 22384.64 |
| | | | | | 0070 Total | | | | 345771.17 | 238118.81 | 107652.36 | 145771.17 | 0 | 10121.18 |
| | | | | NPS Total | | | | | 2179471.87 | 2189181.85 | -9709.98 | 2102098.87 | 955915.94 | 346125.52 |
| | | | 0250 Total | | | | | | 2513944.46 | 2509288.37 | 4656.09 | 2437389 | 1049804.69 | 587526.9 |
| | | 0400 | PRIVATE GRANT FUND | PS | 0012 | REGULAR PAY - OTHER | 0125 | TERM FULL-TIME | 0 | 0 | 0 | | | |
| | | | | | 0012 Total | | | | 0 | 0 | 0 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0147 | MISC FRINGE BENEFITS | 0 | 0 | 0 | | | |
| | | | | | 0014 Total | | | | 0 | 0 | 0 | | | |
| | | | | PS Total | | | | | 0 | 0 | 0 | | | |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 0408 | PROF SERVICE FEES AND CONTR | 136364 | 136364 | 0 | 137362.64 | 0 | 14887.64 |
| | | | | | | | 0410 | OFFICE SUPPORT | 0 | 0 | 0 | | | |
| | | | | | 0040 Total | | | | 136364 | 136364 | 0 | 137362.64 | 0 | 14887.64 |
| | | | | NPS Total | | | | | 136364 | 136364 | 0 | 137362.64 | 0 | 14887.64 |
| | | | 0400 Total | | | | | | 136364 | 136364 | 0 | 137362.64 | 0 | 14887.64 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYP | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 34900.46 | 34292.47 | 607.99 | 37004.03 | 9321.57 | 27682.46 |
| | | | | | 0011 Total | | | | 34900.46 | 34292.47 | 607.99 | 37004.03 | 9321.57 | 27682.46 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0129 | RN ON CALL PAY | 0 | 4799.4 | -4799.4 | 0 | 2893.11 | -2893.11 |
| | | | | | | | 0131 | SHIFT DIFFERENTIAL | 0 | 109.28 | -109.28 | 0 | 111.48 | -111.48 |
| | | | | | 0013 Total | | | | 0 | 4908.68 | -4908.68 | 0 | 3004.59 | -3004.59 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 7.45 | -7.45 | 0 | 5.47 | -5.47 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 8690.22 | 2246.55 | 6443.67 | 10028.09 | 0 | 10028.09 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 1128.45 | -1128.45 | 0 | 764.21 | -764.21 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 14.93 | -14.93 | 0 | 11.75 | -11.75 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 51.28 | -51.28 | 0 | 41.14 | -41.14 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 263.83 | -263.83 | 0 | 189.72 | -189.72 |
| | | | | | | | 0159 | RETIREMENT | 0 | 664.54 | -664.54 | 0 | 466.04 | -466.04 |
| | | | | | | | 0160 | DC METRO BENEFITS | 0 | 12.5 | -12.5 | | | |
| | | | | | 0014 Total | | | | 8690.22 | 4389.53 | 4300.69 | 10028.09 | 1478.33 | 8549.76 |
| | | | | PS Total | | | | | 43590.68 | 43590.68 | 6.82121E-13 | 47032.12 | 13804.49 | 33227.63 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 0408 | PROF SERVICE FEES AND CONTR | 0 | 11315.25 | -11315.25 | 0 | -8624.67 | -3774.33 |
| | | | | | | | 0419 | TUITION FOR EMPLOYEE TRAINING | 25000 | 0 | 25000 | 25000 | 0 | 25000 |
| | | | | | 0040 Total | | | | 25000 | 11315.25 | 13684.75 | 25000 | -8624.67 | 21125.67 |
| | | | | NPS Total | | | | | 68590.68 | 54905.93 | 13684.75 | 72032.12 | 5179.82 | 54453.3 |
| | | | 0600 Total | | | | | | 126958.52 | 126926.88 | 31.84 | 131242.32 | 34912.5 | 96329.82 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 126958.52 | 126926.88 | 31.84 | 131242.32 | 34912.5 | 96329.82 |
| | | | | | 0011 Total | | | | 126958.52 | 126926.88 | 31.84 | 131242.32 | 34912.5 | 96329.82 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 240.78 | -240.78 | 0 | 66.37 | -66.37 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 12764.37 | -12764.37 | 0 | 3445.89 | -3445.89 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 24436.71 | 0 | 24436.71 | 35566.67 | 0 | 35566.67 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 498.79 | -498.79 | 0 | 141.32 | -141.32 |
| | | | | | | | 0152 | RETIREMENT CONTRIBUTION - CIVIL SERVICE | 0 | 8324.02 | -8324.02 | 0 | 2284.35 | -2284.35 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 96.42 | -96.42 | 0 | 25.58 | -25.58 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 333.4 | -333.4 | 0 | 89.89 | -89.89 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 1778.16 | -1778.16 | 0 | 519.39 | -519.39 |
| | | | | | | | 0159 | RETIREMENT | 0 | 400.77 | -400.77 | 0 | 113.97 | -113.97 |
| | | | | | | | 0160 | DC METRO BENEFITS | 0 | 0 | 0 | | | |
| | | | | | 0014 Total | | | | 24436.71 | 24436.71 | -3.63798E-12 | 35566.67 | 6687.16 | 28879.51 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 0 | 31.87 | -31.87 | | | |
| | | | | | 0015 Total | | | | 0 | 31.87 | -31.87 | | | |
| | | | | PS Total | | | | | 151395.23 | 151395.26 | -0.03 | 166808.99 | 41599.66 | 125209.33 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 0408 | PROF SERVICE FEES AND CONTR | 175572.98 | 141442.98 | 34130 | | | |
| | | | | | | | 0442 | IT SOFTWARE MAINTENANCE | 0 | 34130 | -34130 | | | |
| | | | | | 0040 Total | | | | 175572.98 | 175572.98 | 0 | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0701 | PURCHASES - FURNITURE AND FIXTURES | 0 | 9981.62 | -9981.62 | | | |
| | | | | | | | 0702 | PURCHASES - EQUIPMENT AND MACHINERY | -453.39 | 89564.96 | -90018.35 | | | |
| | | | | | | | 0704 | PURCHASES - OTHER EQUIPMENT | 100000 | 0 | 100000 | | | |
| | | | | | | | 0705 | RENTALS - AUTOMOTIVE EQUIPMENT | 0 | 0 | 0 | | | |
| | | | | | 0070 Total | | | | 99546.61 | 99546.58 | 0.03 | | | |
| | | | | NPS Total | | | | | 275119.59 | 275119.56 | 0.03 | | | |
| | | | 0700 Total | | | | | | 426514.82 | 426514.82 | -1.45519E-11 | 166808.99 | 41599.66 | 125209.33 |
| | SYSTEM TRANSFORMATION | Total | | | | | | | 12991592.37 | 13002926.22 | -11333.85 | 12158867.76 | 2918055.7 | 7723855.64 |
| 5900 Total | | | | | | | | | 12991592.37 | 13002926.22 | -11333.85 | 12158867.76 | 2918055.7 | 7723855.64 |
| 6900 | COMMUNITY SERVICES | 0100 | LOCAL FUND | | | | | | 95163742.06 | 95154340.52 | 9401.54 | 111165714.5 | 24383189.04 | 51398075.44 |
| | | 0110 | LOCAL FUND | | | | | | | | | 200000 | | 200000 |
| | | 0110 Total | | | | | | | | | | 200000 | 0 | 200000 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 1539440.02 | 1772920.55 | -233480.53 | 2078749.69 | 424783.34 | 1653966.35 |
| | | | | | 0011 Total | | | | 1539440.02 | 1772920.55 | -233480.53 | 2078749.69 | 424783.34 | 1653966.35 |
| | | | | | 0012 | REGULAR PAY - OTHER | 0121 | TEMPORARY FULL-TIME | 0 | 0 | 0 | 0 | 104701.98 | 104701.98 |
| | | | | | | | 0125 | TERM FULL-TIME | 438215.6 | 331043.54 | 107172.06 | 419806.74 | 99956.66 | 319850.08 |
| | | | | | 0012 Total | | | | 438215.6 | 331043.54 | 107172.06 | 524508.72 | 99956.66 | 424552.06 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0134 | TERMINAL LEAVE | 0 | 7760.31 | -7760.31 | 0 | 1741.75 | -1741.75 |
| | | | | | | | 0136 | SUNDAY PAY | 0 | 320.33 | -320.33 | | | |
| | | | | | 0013 Total | | | | 0 | 8080.64 | -8080.64 | 0 | 1741.75 | -1741.75 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 1383.08 | -1383.08 | 0 | 347.88 | -347.88 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 20397.96 | -20397.96 | 0 | 48721.07 | -48721.07 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 516381.92 | 8441.03 | 524822.95 | 670409.53 | 0 | 670409.53 |
| | | | | | | | 0148 | RETIREMENT CONTRIBUTION - FICA | 0 | 120512.91 | -120512.91 | 0 | 29241.1 | -29241.1 |

Question 2: Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY 19 and to date in FY20

| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Comp Object | Comp Object Title | 2019 Sum of Budget | 2019 Sum of Actuals | 2019 Sum of Variance | 2020 Sum of Budget | 2020 Sum of Actuals | 2020 Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6900 | COMMUNITY SERVICES | 0200 | FEDERAL GRANT FUND | PS | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0152 | RETIREMENT CONTRIBUTION - CIVIL SERVICE | 0 | 7655.61 | -7655.61 | 0 | 2113.85 | -2113.85 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 1677.9 | -1677.9 | 0 | 399.4 | -399.4 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 5265.58 | -5265.58 | 0 | 1251.66 | -1251.66 |
| | | | | | | | 0157 | PREPAID LEGAL | 0 | 939.67 | -939.67 | 0 | 162.72 | -162.72 |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 29731.74 | -29731.74 | 0 | 7805.27 | -7805.27 |
| | | | | | | | 0159 | RETIREMENT | 0 | 82277.17 | -82277.17 | 0 | 21530.4 | -21530.4 |
| | | | | | | | 0160 | DC METRO BENEFITS | 0 | 112 | -112 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 9935.99 | -9935.99 | 0 | 2256.28 | -2256.28 |
| | | | | | | **0014 Total** | | | 516381.92 | 455022.18 | 61359.74 | 670409.53 | 113829.63 | 556579.9 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 0 | 4979.66 | -4979.66 | 0 | 2371.3 | -2371.3 |
| | | | | | **0015 Total** | | | | 0 | 4979.66 | -4979.66 | 0 | 2371.3 | -2371.3 |
| | | | | **PS Total** | | | | | 2494037.54 | 2572046.57 | -78009.03 | 3273667.94 | 642682.68 | 2630985.26 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 0201 | OFFICE SUPPLIES | -66176.55 | 2919.51 | -69096.06 | 0 | 0 | 0 |
| | | | | | | | 0203 | MEDICAL, SURGICAL AND LAB | 0 | 4992.76 | -4992.76 | 0 | | -7500 |
| | | | | | | | 0204 | EDUCATIONAL | 0 | 7893.81 | -7893.81 | 0 | 5149.7 | 0 |
| | | | | | | | 0205 | RECREATIONAL | 0 | 208.02 | -208.02 | | | -5000 |
| | | | | | | | 0207 | CLOTHING AND UNIFORMS | | | | 26000 | 0 | 26000 |
| | | | | | | | 0209 | FOOD PROVISIONS | 0 | 302.95 | -302.95 | | | |
| | | | | | | | 0210 | GENERAL | 85247 | 1748.41 | 83498.59 | 17419 | 0 | 17419 |
| | | | | | | | 0214 | PHOTO SUPPLIES | 0 | 700 | -700 | | | |
| | | | | | **0020 Total** | | | 19070.45 | 18765.46 | 304.99 | 43419 | 5149.7 | 30919 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0401 | TRAVEL - LOCAL | 10701 | 770 | 9931 | 10701 | 0 | 10701 |
| | | | | | | | 0402 | TRAVEL - OUT OF CITY | 34919 | 12252.83 | 22666.17 | 0 | 4678.15 | -1503.43 |
| | | | | | | | 0408 | PROF SERVICE FEES AND CONTR | 6201165.84 | 6111235.49 | 89930.35 | 12743841.48 | 193206.25 | 9876146.46 |
| | | | | | | | 0410 | OFFICE SUPPORT | 4742.88 | 0 | 4742.88 | | | |
| | | | | | | | 0419 | TUITION FOR EMPLOYEE TRAINING | 0 | 3903 | -3903 | | | |
| | | | | | | | 0424 | CONFERENCE FEES LOC OUT OF CITY | 0 | 9340.8 | -9340.8 | 0 | 550 | 0 |
| | | | | | | | 0429 | PROFESSIONAL SERVICES | 0 | 123577.11 | -123577.11 | | | |
| | | | | | | | 0441 | IT HARDWARE MAINTENANCE | 0 | 206.44 | -206.44 | | | |
| | | | | | | | 0499 | INT PENALTIES QUICK PAY CLS 40 | 0 | 530.85 | -530.85 | | | |
| | | | | | **0040 Total** | | | 6251528.72 | 6261816.52 | -10287.8 | 12754542.48 | 198434.4 | 9885344.03 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 0409 | CONTRACTUAL SERVICES - OTHER | 1104874.3 | 914312.35 | 190561.95 | 8768760 | 149951.31 | 6432925.24 |
| | | | | | | | 0459 | CONTRACTUAL SERVICES - IT | 0 | 150000 | -150000 | | | |
| | | | | | **0041 Total** | | | 1104874.3 | 1064312.35 | 40561.95 | 8768760 | 149951.31 | 6432925.24 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 0501 | MAINTENANCE OF PERSONS | 2560170.87 | 1120280.33 | 1439890.54 | 633693.46 | 0 | 633693.46 |
| | | | | | | | 0506 | GRANTS AND GRATUITIES | 6592352.72 | 8072911.48 | -1480558.76 | 11683279.71 | 353276.19 | 10065711.09 |
| | | | | | | | 0507 | SUBSIDIES | 200000 | 159161.73 | 40838.27 | | | |
| | | | | | | | 0599 | INT PENALTIES QUICK PAY CLS 50 | 0 | 91.83 | -91.83 | | | |
| | | | | | **0050 Total** | | | 9352523.59 | 9352445.37 | 78.22 | 12316973.17 | 353276.19 | 10699404.55 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0701 | PURCHASES - FURNITURE AND FIXTURES | 0 | 0 | 0 | | | |
| | | | | | | | 0702 | PURCHASES - EQUIPMENT AND MACHINERY | 107772.09 | 81904.2 | 25867.89 | | | |
| | | | | | | | 0704 | PURCHASES - OTHER EQUIPMENT | 0 | 25754 | -25754 | | | |
| | | | | | | | 0706 | RENTALS - MACHINERY AND EQUIPMENT | 16000 | 0 | 16000 | 5000 | 0 | 5000 |
| | | | | | | | 0710 | IT HARDWARE ACQUISITIONS | 0 | 8585.2 | -8585.2 | | | |
| | | | | | | | 0711 | IT SOFTWARE ACQUISITIONS | 0 | 1512.96 | -1512.96 | | | |
| | | | | | **0070 Total** | | | 123772.09 | 117756.36 | 6015.73 | 5000 | 0 | 0 |
| | | | | **NPS Total** | | | | | 16851769.15 | 16815096.06 | 36673.09 | 33888694.65 | 706811.6 | 27048592.82 |
| | | | | **0200 Total** | | | | | 19345806.69 | 19387142.63 | -4135.94 | 37162362.59 | 1349494.28 | 29679578.08 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | 0409 | CONTRACTUAL SERVICES - OTHER | 350000 | 435231.01 | -85231.01 | | | |
| | | | | | **0041 Total** | | | 350000 | 435231.01 | -85231.01 | | | |
| | | | | **NPS Total** | | | | | 350000 | 435231.01 | -85231.01 | | | |
| | | | | **0250 Total** | | | | | 350000 | 435231.01 | -85231.01 | | | |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 0408 | PROF SERVICE FEES AND CONTR | 40208 | 31708 | 8500 | 23982 | 0 | 3582 |
| | | | | | | | 0442 | IT SOFTWARE MAINTENANCE | 0 | 8500 | -8500 | | | |
| | | | | | **0040 Total** | | | 40208 | 40208 | 0 | 23982 | 0 | 3582 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 0506 | GRANTS AND GRATUITIES | 0 | 0 | 0 | 20000 | 0 | 20000 |
| | | | | | **0050 Total** | | | 0 | 0 | 0 | 20000 | 0 | 20000 |
| | | | | **NPS Total** | | | | | 40208 | 40208 | 0 | 43982 | 0 | 23582 |
| | | | | **0400 Total** | | | | | 40208 | 40208 | 0 | 43982 | 0 | 23582 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYP | PS | 0012 | REGULAR PAY - OTHER | 0125 | TERM FULL-TIME | 0 | 0 | 0 | | | |
| | | | | | **0012 Total** | | | 0 | 0 | 0 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0147 | MISC FRINGE BENEFITS | 0 | 0 | 0 | | | |
| | | | | | **0014 Total** | | | 0 | 0 | 0 | | | |
| | | | | **PS Total** | | | | | 0 | 0 | 0 | | | |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 0210 | GENERAL | 0 | 0 | 0 | | | |
| | | | | | **0020 Total** | | | 0 | 0 | 0 | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0408 | PROF SERVICE FEES AND CONTR | 380633.65 | 121684.98 | 258948.67 | 400000 | 0 | 400000 |
| | | | | | | | 0429 | PROFESSIONAL SERVICES | 0 | 149000 | -149000 | | | |
| | | | | | | | 0441 | IT HARDWARE MAINTENANCE | 0 | 38749.17 | -38749.17 | | | |
| | | | | | | | 0442 | IT SOFTWARE MAINTENANCE | 0 | 71199.5 | -71199.5 | | | |
| | | | | | **0040 Total** | | | 380633.65 | 380633.65 | 1.45519E-11 | 400000 | 0 | 400000 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 0409 | CONTRACTUAL SERVICES - OTHER | | | | | | |
| | | | | | **0041 Total** | | | | | | | | |
| | | | | **NPS Total** | | | | | 380633.65 | 380633.65 | 1.45519E-11 | 400000 | 0 | 400000 |
| | | | | **0600 Total** | | | | | 380633.65 | 380633.65 | 1.45519E-11 | 400000 | 0 | 400000 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 0111 | CONTINUING FULL TIME | 797704.05 | 1056728.08 | -259024.03 | 1076663.62 | 262736.58 | 813927.04 |
| | | | | | **0011 Total** | | | 797704.05 | 1056728.08 | -259024.03 | 1076663.62 | 262736.58 | 813927.04 |
| | | | | | 0012 | REGULAR PAY - OTHER | 0121 | TEMPORARY FULL-TIME | 0 | 0 | 0 | 88986 | 0 | 88986 |
| | | | | | | | 0125 | TERM FULL-TIME | 778026.33 | 556247.22 | 221779.11 | 1170652.55 | 191040.32 | 979612.23 |
| | | | | | **0012 Total** | | | 778026.33 | 556247.22 | 221779.11 | 1259638.55 | 191040.32 | 1068598.23 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 0134 | TERMINAL LEAVE | 0 | 17927.03 | -17927.03 | 0 | 2130.27 | -2130.27 |
| | | | | | | | 0135 | HOLIDAY PAY | 0 | 354.2 | -354.2 | 0 | 56.58 | -56.58 |
| | | | | | | | 0136 | SUNDAY PAY | 0 | 56.58 | -56.58 | | | |
| | | | | | **0013 Total** | | | 0 | 18337.81 | -18337.81 | 0 | 2186.85 | -2186.85 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 0141 | GROUP LIFE INSURANCE | 0 | 708.84 | -708.84 | 0 | 237.07 | -237.07 |
| | | | | | | | 0142 | HEALTH BENEFITS | 0 | 140983.11 | -140983.11 | 0 | 48519.61 | -48519.61 |
| | | | | | | | 0147 | MISC FRINGE BENEFITS | 423479.42 | 54865.65 | 368613.77 | 641603.12 | 0 | 641603.12 |
| | | | | | | | 0152 | RETIREMENT CONTRIBUTION - FICA | 0 | 76056.16 | -76056.16 | 0 | 24764.63 | -24764.63 |
| | | | | | | | 0153 | RETIREMENT CONTRIBUTION - CIVIL SERVICE | 0 | 9658.36 | -9658.36 | 0 | 2571.07 | -2571.07 |
| | | | | | | | 0154 | OPTICAL PLAN | 0 | 983.83 | -983.83 | 0 | 323.14 | -323.14 |
| | | | | | | | 0155 | DENTAL PLAN | 0 | 6365.57 | -6365.57 | 0 | 985.27 | -985.27 |
| | | | | | | | 0157 | PREPAID LEGAL | 0 | 4.65 | -4.65 | | | |
| | | | | | | | 0158 | MEDICARE CONTRIBUTION | 0 | 18142 | -18142 | 0 | 6338.68 | -6338.68 |
| | | | | | | | 0159 | RETIREMENT | 0 | 52661.21 | -52661.21 | 0 | 14801.07 | -14801.07 |
| | | | | | | | 0160 | DC METRO BENEFITS | 0 | 284.93 | -284.93 | | | |
| | | | | | | | 0161 | DC HEALTH BENEFIT FEES | 0 | 6415.74 | -6415.74 | 0 | 2261.35 | -2261.35 |
| | | | | | **0014 Total** | | | 423479.42 | 367130.05 | 56349.37 | 641603.12 | 100801.89 | 540801.23 |
| | | | | | 0015 | OVERTIME PAY | 0133 | OVERTIME PAY | 0 | 766.64 | -766.64 | 0 | 206.86 | -206.86 |
| | | | | | **0015 Total** | | | 0 | 766.64 | -766.64 | 0 | 206.86 | -206.86 |
| | | | | **PS Total** | | | | | 1999209.8 | 1999209.8 | -1.05729E-11 | 2977905.29 | 556972.5 | 2420932.79 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 0201 | OFFICE SUPPLIES | -12900 | 0 | -12900 | | | |
| | | | | | | | 0204 | EDUCATIONAL | 12900 | 0 | 12900 | | | |
| | | | | | **0020 Total** | | | 0 | 0 | 0 | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 0402 | TRAVEL - OUT OF CITY | 0 | 7960 | -7960 | | | |

Question 2: Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY 19 and to date in FY20

| | | | | | | | | | Fiscal Year Values | | | | | |
| | | | | | | | | | 2019 | | | 2020 | | |
| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Comp Object | Comp Object Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6900 | COMMUNITY SERVICES | 0700 | OPERATING INTRA-DISTRICT FUNDS | NPS | 0040 | OTHER SERVICES AND CHARGES | 0408 | PROF SERVICE FEES AND CONTR | 119058.63 | 111098.63 | 7960 | 23107.13 | 0 | 23107.13 |
| | | | | | 0040 Total | | | | 119058.63 | 119058.63 | 0 | 23107.13 | 0 | 23107.13 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 0409 | CONTRACTUAL SERVICES - OTHER | 831911.45 | 831911.45 | 0 | 464818.31 | 0 | 464818.31 |
| | | | | | 0041 Total | | | | 831911.45 | 831911.45 | 0 | 464818.31 | 0 | 464818.31 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 0501 | MAINTENANCE OF PERSONS | 0 | 0 | 0 | 284600 | 0 | 284600 |
| | | | | | | | 0503 | REHABILITATION VENDOR SERVICES | 4300000 | 4300000 | 0 | 4300000 | 0 | 4300000 |
| | | | | | 0050 Total | | | | 4300000 | 4300000 | 0 | 4584600 | 0 | 4584600 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 0702 | PURCHASES - EQUIPMENT AND MACHINERY | 0 | 19409.97 | -19409.97 | | | |
| | | | | | | | 0704 | PURCHASES - OTHER EQUIPMENT | -4590.03 | 0 | -4590.03 | | | |
| | | | | | | | 0710 | IT HARDWARE ACQUISITIONS | 24000 | 0 | 24000 | | | |
| | | | | | 0070 Total | | | | 19409.97 | 19409.97 | 0 | | | |
| | | | | NPS Total | | | | | 5270380.05 | 5270380.05 | 0 | 5072525.44 | 0 | 4972525.44 |
| | | 0700 Total | | | | | | | 7269589.85 | 7269589.85 | -1.09139E-11 | 8050430.73 | 556972.5 | 7393458.23 |
| | COMMUNITY SERVICES | Total | | | | | | | 122549980.3 | 122667145.7 | -117165.41 | 157513918.8 | 26289655.82 | 89094693.75 |
| 6900 Total | | | | | | | | | 122549980.3 | 122667145.7 | -117165.41 | 157513918.8 | 26289655.82 | 89094693.75 |
| Grand Total | | | | | | | | | 299007392 | 298897987.8 | 109404.25 | 335277070.6 | 66048673.55 | 198825848.9 |

*Q2. Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY19 and to date in FY20. In addition, please describe any variance between the amount budgeted and actually spent for FY19 and to date in FY20:*

- *At the agency level, please provide information broken out by source of funds and by Comptroller Source Group and Comptroller Object;*
- *At the program level, please provide the information broken out by source of funds and by Comptroller Source Group and Comptroller Object; and,*
- *At the activity level, please provide the information broken out by source of funds and by Comptroller Source Group.*

**DBH Response**

Please see the attached budget reports at the agency, program and activity levels.
In FY 19, the variance in the amount budgeted and actually spent is due to vacant FTEs, primarily in hard-to-fill clinician positions at Saint Elizabeths Hospital.

*Question 3: Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY 19 and to date in FY 20. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

| PROGRAM/PCA   FY 2020 | Source of Funds | Org Code | Prg Code | Intra-District Amount | Partner Agency | Comments/Description |
|---|---|---|---|---|---|---|
| **Transmitted Funds (Buyer)** | | | | | | |
| Accountability (4900); Office of Accountability (4905) | Local | 4900 | 4905 | $ 20,000.00 | Department of Health | Bedbug inspection at DBH licensed MHCRF (Mental Health Community Residence Facilities). |
| Community Services (6900); Prevention and Early Intervention (6912) | Local | 6900 | 6912 | $ 300,000.00 | Department of Health | To focus on increasing access to MAT, reducing unmet treatment needs, and reducing opioid overdose related deaths in DC through the provision of prevention, treatment, and RSS to individuals with OUD. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 425,595.00 | Department of Human Services | DBH and DHS's on-going partnership to serve DC residents will collaborate under the DC Opioid Response Initiative. |
| Community Services (6900); Behavioral Health Rehab Local Match (6980) | Local | 6900 | 6980 | $ 654,771.35 | Department of Health Care Finance | Adult Substance Abuse Rehabilitative Services (ASARS) benefit for enrollees in the District of Columbia. Medicaid program and operational procedures to carry out those duties, rights, and responsibilities. |
| Community Services (6900); Behavioral Health Rehab (6970) | Local | 6900 | 6970 | $ 962,062.95 | Department of Health Care Finance | Health Homes model and implement Health Home certification standards to ensure quality provision of Health Home services covered by the District of Columbia State Plan. |
| Community Services (6900); Behavioral Health Rehab (6970);Behavioral Health Rehab Local Match (6980) | Local | 6900 | 6970;6980 | $ 26,339,837.53 | Department of Health Care Finance | Funding to expand, improve, and continue access to community-based rehabilitative mental health services, implementing certification standards to ensure quality provision of mental health services covered by the District of Columbia State Plan for Medical Assistance. |
| Community Services (6900); Behavioral Health Rehab Local Match (6980) | Local | 6900 | 6980 | $ 38,034.87 | Department of Health Care Finance | Funding to expand, improve, and coordinate access to community-based substance abuse services for youth under 21 on the Youth Substance Abuse Treatment (YSATS) ( ASTEP). |
| | **Total** | | | **$ 28,740,301.70** | | |

*Question 3: Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY 19 and to date in FY 20. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

| PROGRAM/PCA   FY 2020 | Source of Funds | Org Code | Prg Code | Intra-District Amount | Partner Agency | Comments/Description | Advance: Yes/No |
|---|---|---|---|---|---|---|---|
| **Received Funds (Seller)** | | | | | | | |
| Community Services (6900); Implementation of Drug Treatment Choice (6960) | Intra-District | 6900 | 6960 | $        284,600.00 | Department of Human Services - Economic Security Administration | Reimbursable MOU- Provides the necessary substance abuse treatment & prevention services that are not provided or reimbursed through Medicaid. | NO |
| Community Services (6900); Linkage and Assessment-Co-Located (6932); Housing Development (6940) | Intra-District | 6900 | 6932;6940 | $        480,395.31 | Department of Human Services - Economic Security Administration | Collaboration & Coordination of resources, services, & expertise to better assist TANF customers who need to address & overcome mental health related barriers & to assist in customers re-engaging in work activities. | NO |
| Community Services (6900); Linkage and Assessment (6930) | Intra-District | 6900 | 6930 | $        100,000.00 | Child & Family Services Agency | DBH will manage contracts with the Choice Providers (doctors, psychologists, & mental health coordinators for children entering foster care and those within the Child & Family Services Agency. | NO |
| Various | Intra-District | Various | Various | $     8,412,725.81 | Department of Health Care Finance (Medicaid FY20) | Medicaid Claims for Saint Elizabeth Hospital and Behavioral Health Services & Supports. | NO |
| Community Services (6900); Behavioral Health Rehab (6970); Behavioral Health Rehab Local Match (6980) | Intra-District | 6900 | 6970;6980 | $     4,300,000.00 | Department of Health Care Finance | DBH will provide MHRS Day Treatment Services to individuals formerly enrolled in the Fee-for-Service Day Treatment Program. | NO |
| Community Services (6900); Linkage and Assessment-Co-Located (6932) | Intra-District | 6900 | 6932 | $        220,000.00 | Deputy Mayor for Planning and Economic Development | Co-Location of two DBH Staff. Behavioral health clinicians hired to provide services to families and individuals in need of assistance overcoming health and personal barriers to improve their lives and social standing. | YES |
| Community Services (6900); Prevention and Early Intervention (6912) | Intra-District | 6900 | 6912 | $        907,868.00 | Office of the State Superintendent of Education | Pre-K Enhancement and Expansion Program to improve outcomes for young children. | NO |
| Community Services (6900); Prevention and Early Intervention (6912) | Intra-District | 6900 | 6912 | $        516,452.00 | Office of the State Superintendent of Education | Project AWARE - Project Advancing Wellness and Resilience Education. | NO |
| Community Services (6900); Linkage and Assessment (6930) | Intra-District | 6900 | 6930 | $        113,101.21 | Department of Employment Services | Identify and hire a qualified practitioner with the appropriate licensure and experience to serve as the on-site qualified practitioner for TEPD participants. | NO |
| **Total** | | | | $   **15,335,142.33** | | | |

*Q3. Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY19 and to date in FY20.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

**DBH Response**

See Attachment. Intra-District Transfer Report

**Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY19 and to date in FY20.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.**

## Reprogramming's for FY 2019

| Source of Funding | Amount | (Program/PCA) | (Program/PCA) | Purpose |
|---|---|---|---|---|
| Federal (8200) | $300,000.00 | System Transformation (5900); Strategic Management & Policy (5920) | System Transformation (5900); Strategic Management & Policy (5920) | To ensure the budget is aligned with the program's planned allocations. |
| Private Grant (8400) | $23,982.00 | Community Services (6900); Implementation of Drug Treatment Choice (6960) | Community Services (6900); Implementation of Drug Treatment Choice (6960) | To realign the fiscal year 2019 budget to the appropriate cost centers to support needed IT software services related to the data dashboard. |
| Federal (8200) | $35,796.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To align the budget with program's planned allocations for the Positive Transitions for Youth Adults Grant. |
| Federal (8200) | $50,000.00 | Community Services (6900); Office of Community Services (6905), Specialty Care (6920) | Community Services (6900); Office of Community Services (6905), Specialty Care (6920) | To realign the fiscal year 2019 budget to the appropriate cost centers to support needed services and agreements. |
| Federal (8200) | $149,105.00 | System Transformation (5900); Strategic Management & Policy (5920) | System Transformation (5900); Strategic Management & Policy (5920) | To align the budget with program's planned allocations to reflect the appropriate fiscal year. |
| Federal (8200) | $11,400.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To ensure the budget is aligned with the program's grants and gratuities. |
| Federal (8200) | $97,610.27 | Community Services (6900); Specialty Care - New Initiatives (6922) & Behavioral Health Authority (1800); Legal Services (1888) | Community Services (6900); Specialty Care - New Initiatives (6922) | To safeguard that the DC Opioid Grant successfully completes the expectations and deliverables indicated in the federal grant award. |
| Federal (8200) | $98,000.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To ensure the budget is aligned with the program's planned allocations. |
| Federal (8200) | $133,875.00 | System Transformation (5900); Strategic Management & Policy (5920) | System Transformation (5900); Strategic Management & Policy (5920) | To realign the preliminary budget load for Fiscal Year 2019 to accurately reflect program planned expenditures. |
| Federal (8200) | $124,505.92 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To align the budget with program's planned allocations for the Changing and Improving Treatment for our Youth Grant. |

**Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY19 and to date in FY20.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.**

## Reprogramming's for FY 2019

| FY2019 Source of Funding | Amount | From(Program/PCA) | To (Program/PCA) | Purpose |
|---|---|---|---|---|
| Intra-District (0799) | $1,700,000.00 | Clinical Services Division (5800); Behavioral Services -Adult Services (5831) & CPEP-Psychiatric Emergency (5841) | Saint Elizabeth's Hospital (3800); Fiscal & Support Services (3820),  System Transformation (5900); ISIDA (5910) & Community Services (6900); Housing Development (6940). | To realign the fiscal year 2019 budget to the appropriate cost centers to address program needs for crisis beds, supported independent living, phlebotomy, SUD lab specimen pick up/analysis, acute care services, food provisions food services workers, medical supplies, and CRF-supported residences. |
| Federal (8200) | $50,000.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To align the budget with program's planned allocations to reflect the appropriate fiscal year. |
| Federal (8200) | $144,227.91 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To align the budget with the projected expenditures for patient services within the accurate funding stream. |
| Federal (8200) | $10,000.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To properly align the budget with the projected expenditures for the remainder of the fiscal year. |
| Intra-District (0702) | $18,000.00 | Community Services (6900); Prevention & Early Intervention - School Mental Health (6912) | Community Services (6900); Prevention & Early Intervention - School Mental Health (6912) | To supporty the program with the necessary IT supplies required to achevie the goals outlined in the Memorandum of Understanding. |
| Intra-District (0751) | $98,000.00 | Community Services (6900); Housing Development (6940) | Community Services (6900); Linkage & Assessment - Co-located Programs (6932) | To align the budget with program's planned allocations for other services and charges. |
| Federal (8200) | $31,000.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To ensure the budget is parallel to support training and contractually obligated requirements used for recovery coach training. |
| Federal Medicaid  (8250) | $200,000.00 | System Transformation (5900); Information Systems Innovation & Data Analytics (ISIDA) (5910) | System Transformation (5900); Information Systems Innovation & Data Analytics (ISIDA) (5910) | To support ongoing costs and ongoing needs within the nformation Systems Innovation & Data Analytics |

**Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY19 and to date in FY20.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.**

## Reprogramming's for FY 2019

| FY2019 Source of Funding | Amount | From(Program/PCA) | To (Program/PCA) | Purpose |
|---|---|---|---|---|
| Federal Medicaid  (8250) | $80,000.00 | Saint Elizabeth's Hospital (3800); Office of the Chief Executive (3805), | Saint Elizabeth's Hospital (3800); Housekeeping (3830) | To ensure the budget is aligned with the program's planned housekeeping expenditures. |
| Intra-District (0799) | $314,401.00 | Clinical Services Division (5800); Behavioral Health Services - Adult Services (5831) | Saint Elizabeth's Hospital (3800); Office of the Chief Executive (3805), Clinical Services Division (5800); BHS -Adult Services (5831), ISIDA (5910) | To ensure the budget is aligned with the program's planned allocations. |
| Intra-District (0766) | $23,622.00 | Community Services (6900); Specialty Care - Community Based Services (6921) | Community Services (6900); Specialty Care - Community Based Services (6921) | To align the budget with the contractual funded through the Intra-District specific to the Memorandum of Understanding (MOU) requirements. |
| Intra-District (0758) | $7,900.00 | Community Services (6900); Prevention & Early Intervention - School Mental Health (6912) | Community Services (6900); Prevention & Early Intervention - School Mental Health (6912) | To ensure the budget is aligned with the program's planned allocations. |
| Federal (8200) | $20,000.00 | DBH Financial Operations (100FA); DBH Budget Operations (110F) | Behavioral Health Authority (1800); Office of the Director/CEO (1810) | To align the budget with program's planned allocations for the Positive Transitions for Youth Adults Grant. |
| Federal (8200) | $11,527.00 | System Transformation (5900); Strategic Management & Policy (5920) | System Transformation (5900); Strategic Management & Policy (5920) | To align the budget with program's planned allocations to reflect the appropriate fiscal year. |
| Federal (8200) | $15,000.00 | DBH Financial Operations (100FA); DBH Budget Operations (110F) | System Transformation (5900); Information Systems Innovation & Data Analytics (ISIDA) (5910) | To assure the Social, Emotional and Early Delopment Project Grant budget is in accordance with the programs planned expenditures |
| Local (0100) | $2,982,382.18 | DBH Financial Operations (100FA); DBH Budget Operations (110F), Clinical Services Division (5800); CPEP (5880), Community Services (6900); Prevention & Early Intervention - School Mental Health (6912), Community Services (6900); Housing Development (6940), | DBH Financial Operations (100FA); DBH Budget Operations (110F), Clinical Services Division (5800); CPEP (5880), Community Services (6900); Prevention & Early Intervention - School Mental Health (6912), Community Services (6900); Housing Development (6940), | To realign the fiscal year 2019 budget to the appropriate cost centers to support needed services and agreements. |

**Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY19 and to date in FY20. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.**

## Reprogramming's for FY 2020 to date.

| FY2020 Source of Funding | Amount | From(Program/PCA) | To (Program/PCA) | Purpose |
|---|---|---|---|---|
| Federal (8200) | $3,957,871.14 | Community Services (6900); Office of Community Services (6905), Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To safeguard that the DC Opioid Grant successfully completes the expectations and deliverables indicated in the federal grant award. |
| Federal (8200) | $5,495,502.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To safeguard that the DC Opioid Grant successfully completes the expectations and deliverables indicated in the federal grant award to the supplemental correct index. |
| Federal (8200) | $90,000.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To support ongoing operational costs and ongoing needs within behavioral health services. |
| Federal (8200) | $215,867.04 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To properly align the budget with the projected expenditures for the remainder of the fiscal year. |
| Federal (8200) | $120,000.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To align the budget with the projected expenditures for patient services within the accurate funding stream. |
| Federal (8200) | $100,000.00 | Community Services (6900); Prevention Substance Use Disorder (6913) | Community Services (6900); Prevention Substance Use Disorder (6913) | To align the budget with program's planned allocations for the correct comptroller source group that supports professional services and fees. |

*Q4. Please provide a complete accounting of all reprogramings received by or transferred from DBH in FY19 and to date in FY20.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.*

**DBH Response**

See Attached Reprogramming Report

**Question #5 - SPECIAL PURPOSE REVENUE**

Provide a complete accounting of all DBH's Special Purpose Revenue Funds for FY19 and to date FY20.
Agency Name (Code): Department of Behavioral Health (RM0)

| REVENUE SOURCE NAME | CODE | SOURCE OF FUNDING | Program/ Activity | PROGRAM DESCRIPTION | FY 2019 GENERATED FUNDS | FY 2019 EXPENDITURES | FY 2020 BUDGET | FY 2020 COLLECTIONS TO DATE | FY 2020 EXPENDITURES/TO DATE |
|---|---|---|---|---|---|---|---|---|---|
| Federal Beneficiary Reimbursement 0610 | D.C. Code 44-908/ D.C. Code 1-204.24d | Reimbursement | St. Elizabeths Hospital/Various Activities | Forensic Patients legally incarcerated by the court system. Funds are used to reimburse the District for services provided to patients in care. | 1,826,592 | 1,783,007 | 1,779,615 | 714,203 | 723,112 |
| Federal Beneficiary Reimbursement 0610 | D.C. Code 44-908/ D.C. Code 1-204.24d | Reimbursement | System Transformation/Information Systems | IT Staff support Forensic Patients legally incarcerated by the court system. | 0 | 43,591 | 47,032 | 0 | 15,863 |
| Self Pay & 3rd Party Reimbursement 0640 | 7-1131.04./DC Code 2-586/DC Code 24-501 | Reimbursement | St. Elizabeths Hospital/Various Activities | Self Pay & 3rd Party Reimbursement. | 32,578 | 70,176 | 100,000 | 0 | 460 |
| Self Pay & 3rd Party Reimbursement 0640 | 7-1131.04./DC Code 2-586/DC Code 24-501 | Reimbursement | Community Services/Prevention and Early Intervention | Self Pay & 3rd Party Reimbursement. | 414,231 | 380,634 | 400,000 | 149,705 | 0 |
| Self Pay & 3rd Party Reimbursement 0640 | 7-1131.04./DC Code 2-586/DC Code 24-501 | Reimbursement | Clinical Services Division/Forensics | Self Pay & 3rd Party Reimbursement. | 4,001 | 0 | 0 | 0 | 0 |
| DBH Enterprise Fund Establishment 0641 | D.C Code 1-325.281 | Reimbursement | System Transformation/Training Institute | Collection of fees charged for training and Continuing Education Units | 34,978 | 11,315 | 25,000 | 1,037 | 8,625 |
| | | | | **TOTAL** | **2,312,380** | **2,288,723** | **2,351,647** | **864,945** | **748,059** |

*Q5. Please provide a complete accounting of all of DBH's Special Purpose Revenue Funds for FY19 and to date in FY20. Please include the following:*

- *Revenue source and code;*
- *Source of the revenue for each special purpose revenue fund (i.e. license fee, civil fine);*
- *Total amount of funds generated by each source or program in FY19 and to date in FY20;*
- *DBH activity that the revenue in each special purpose revenue source fund supports; and,*
- *The FY19 and to date FY20 expenditure of funds, including purpose of expenditure.*

**DBH Response**

See Attachment. Special Purpose Revenue

| PROVIDER | DATE RECEIVED | COMPLAINT TYPE | REFFERAL SOURCE | TYPE OF REPORT | SUMMARY NATURE OF COMPLAINT OR ALLEGATIONS | CONCLUSIONS | RECOMMENDATIONS/ OUTCOMES | DATE COMPLETE |
|---|---|---|---|---|---|---|---|---|
| Samaritan Inns | 10/20/2018 | MUI | Consumer | Investigation | Theft (consumer's property taken from provider's lockers) | Substantiated | New property security SOPs,  Limit Access. | 3/6/2019 |
| United Medical Center | 10/20/2018 | MUI | Hospital Staff | Major Investigation | Sexual Assault (staff accused of assaulting consumer) | Substantiated for violating MUI Policy. | Required to ensure timely reporting of incidents. | 3/12/2019 |
| Samaritan Inns | 11/01/18 | MUI | Staff | Major Investigation | Sexual Harrassment | Unsubstantiated | | 03/14/19 |
| PIW | 01/10/19 | MUI | ULS | Reffered to DOH | Restraint/Injury | Fowarded Info to DOH for | | 11/04/19 |
| Saint Elizabeths Hospital | 02/07/19 | UI | Staff | Major Investigation | Improper Use of Restraint | Substantiated | Retraining on Use of Restraint, No response | 07/02/19 |
| Hillcrest | 02/11/19 | Complaint | Consumer | Memo Completed | Housing Matter.  Forwarded to Housing and Development Division | Not a MUI | | 06/04/19 |
| MBI Health Services | 3/1/2019 | MUI | CSA | Major Investigation | Reported Crime (Homicide) | Substantiated | FOPD procedural/policy changes to be implemented | 10/18/2019 |
| CPEP | 04/01/19 | MUI | MHCRF | Major Investigation | Physical Assault (staff accused of improper restraint) | Substantiated | Staff received new training. Referred to Human | 08/22/18 |
| DBH School Mental Health | 7/15/2019 | MUI | Staff | Major Investigation | Failure to Report (involving minor) | Substantiated | Referred to Human Resources | 7/31/2019 |
| PIW | 7/23/2019 | MUI | Staff | Memo Completed | Sexual Assault (Upon leaving CPEP, reported to PIW that he was raped) | Unsubstantiated (denied rape to MPD) | | 12/4/2019 |
| Jered Facility, Inc | 7/29/2019 | MUI | MHCRF | Major Investigation | Physical Assault (Consumer stabbed staff and other consumers) | Substantiated | Consumer Arrested; MUI violations. Staff retraining | 10/21/2019 |
| Saint Elizabeths Hospital | 8/8/2019 | Complaint | ULS | Major Investigation | Improper Use of Restraint /Neglect and Abuse | Substantiated | Retraining on Use of Restraint, No response | 9/29/2019 |
| Saint Elizabeths Hospital | 8/19/2019 | UI | ULS | Memo Completed | Abuse (SEH investigation found unsubstantiated) | Unable to interview complainant | Unable to conduct interview; Video only | 12/1/2019 |
| Saint Elizabeths Hospital | 8/29/2019 | MUI | | Major Investigation | Workplace Violence (staff on staff) | Substantiated | Referred to Human Resources | 11/6/2019 |
| Saint Elizabeths Hospital | 8/13/2019 | Complaint | ULS | Major Investigation | Improper Use of Restraint | Substantiated | Retraining on Use of Restraint, No response | 9/29/2019 |
| Saint Elizabeths Hospital | 6/16/2019 | Complaint | Mayors Office | Major Investigation | Abuse (Alleged staff intentionally abused consumer) | Unsubstantiated | Review of video evidence cleared staff of wrong- | 8/7/2019 |
| DBH | 4/1/2019 | Complaint | Staff | Major Investigation | Misconduct (Ethics) | Substantiated | Referred to Human Resources | 7/27/2019 |

*Q6. Please provide copies of any investigations, reviews or program/fiscal audits completed on programs and activities within DBH during FY19 and to date in FY20. This includes any reports of the DC Auditor, the Office of the Inspector General, or the Office of Accountability. In addition, please provide a narrative explanation of steps taken to address any issues raised by the program/fiscal audits. Please include the following:*

## DBH Response

The Center for Court Excellence on behalf of the DC Auditor is conducting an audit of substance use disorder services to justice involved individuals across agencies including DBH. The Audit Period" is defined as January 1, 2015 – September 1, 2018. DBH is providing requested documents and staff are participating in interviews as requested.  No investigations, reports or reviews were conducted by the Office of the Inspector General.

## OFFICE OF ACCOUNTABILITY

### Claims Audits

The Accountability Administration conducts audits of paid claims for each fiscal year for every provider.  The auditing process is retrospective and generally crosses fiscal years. Audits are conducted annually for all MHRS, ASARS and Health Homes providers on a sample universe which includes all paid claims.  All annual audit samples are random, statistically valid, and generated using RAT-STATS, a tool developed for this purpose by the Federal government. In addition, focused audits are conducted for a variety of reasons and the sample universe may be tailored to the reason for the audit.  Focused audit samples may be generated using methods appropriate to the purpose of the audit. The corrective action plan section below explains what happens in response to audits and reviews by the Accountability Administration.

In FY19 and to date in FY20, the following audits and audit activities were conducted:

- 19 audit of FY18 MHRS claims
- 8 focused audits of FY19 MHRS claims
- 8 audits of FY18 Substance Use Disorder claims
- 5 audits of FY18 Health Homes claims

For FY18 audits, every Claims Review Committee included provider participation. (The Claims Review Committee reviews and evaluates failed claims about which the provider and DBH disagree). Based on the results of the audits, DBH sent eight letters (seven to MHRS providers and one to a Health Home provider) to recoup the following amount for rejected claims for local and Medicaid funds. The remaining 32 FY18 and FY19 recoupment letters are in process.

Value on recoupment letters to date:

| | |
|---|---|
| Medicaid | $8,775.41 |
| Local | $    0.00 |
| Total | $8,775.41 |

Appeals for FY18 Recoupments:
No appeals were directed to the Director

Annual FY19 audits are scheduled to begin in April 2020.  All providers with an FY18 fail rate 40% or greater will be audited. Preliminary audit results will be completed by the end of September 2020.

**Corrective Action Plans**

The Accountability Administration requires providers to submit Corrective Action Plans (CAPs) for compliance and quality deficiencies identified during the Claim Audits or during other routine monitoring. Statements of Deficiencies (SOD) are issued to Mental Health Community Residence Facility (MHCRF) operators for failure to comply with licensure regulations.  SODs are also issued for failure to comply with DBH certification regulations.  Each provider is assigned a primary accountability staff person who monitors CAPs and SODs.  In addition, Accountability is available to provide training on compliance planning and proper claiming.  This training is developed and modified to address specific issues identified during Claim Audits. Information from audits and other reviews is also used to inform the overall technical assistance plan for providers, which includes the technical assistance provided by Network Development and the Community Services Administration.

**Investigations**

Please see Attachment. The Accountability Administration reports include recommendations for policy changes, training, corrective action plans, or disciplinary action when allegations are substantiated.

**FY 19 Oversight Question 7, Attachment 1 of 2:  FY19 Performance Plan Key Performance Indicator Status**

| KPI | FY 19 Total Target | FY19 Performance | KPI Status | Explanation for Performance |
|---|---|---|---|---|
| 1. Number of new Certified Peer Specialists to include those in specialty tracks of family and youth in FY19. | 20 | 38 | Met | DBH held multiple training classes and exceeded its goal of newly-certified peer specialists. |
| 2. Number of people trained in Recovery Coaching in FY19. | 20 | 136 | Met | DBH held multiple training classes and exceeded its goal of newly-certified recovery coaches. |
| 3. Achieve a five percent increase in the number of developmental/ behavioral health screenings completed by primary care providers over the previous fiscal year total. | 55,160 | 55,087 | Nearly met | DBH worked with participating physician groups to encourage use of behavioral health screening tools. |
| 4. Achieve two percent increase in the number of individuals (adults and youth) reached through planned prevention strategies over previous fiscal year. | 7,859 | 33,511 | Met | The four prevention centers held 368 activities across the city throughout the year. |
| 5. Percent of post fall assessments conducted within 72 hours of event. | 90% | 96% | Met | St. Elizabeths Hospital has a protocol to assess individuals after incidents involving a fall and to carefully track any necessary follow-up. |

| KPI | FY 19 Total Target | FY19 Performance | KPI Status | Explanation for Performance |
|---|---|---|---|---|
| 6. Child mental health consumers receive their first service within 30 days of enrollment. | 75% | 73% | Nearly met | There has been a significant increase in the delivery of timely services since September 2018, from 57% in Q1 to 87% in Q4. DBH provided technical assistance to providers to improve their intake workflow and minimize the time between enrollment and the first service. Providers were also given monthly summaries and client-level data showing when their new consumers received their first service. |
| 7. Adult mental health consumers receive their first service within 30 days of enrollment. | 75% | 82% | Met | DBH provided technical assistance to providers to analyze their intake workflow and minimize the time between enrollment and the first service. Providers were also given monthly summaries and client-level data showing when new consumers received their first service. |
| 8. Percent of inpatient consumers restored to competency. | 80% | 88% | Met | St. Elizabeths Hospital has a robust competency restoration program and carefully tracks their assessments and court orders. |

| KPI | FY 19 Total Target | FY19 Performance | KPI Status | Explanation for Performance |
|---|---|---|---|---|
| 9. Consumers who are in need of linkage support at the Department of Corrections who are actually linked by DBH staff. | 80% | 88% | Met | DBH has co-located staff who conducted assessments and linked individuals to services. |
| 10. Percent of the individuals referred to a Resiliency Specialist, who were linked to bereavement services. | 90% | NA | NA | DC's Child Fatality Review Committee refers to DBH appropriate individuals who have lost children; during this fiscal year, there were no referrals made to DBH. When DBH receives a referral, it will work to connect the individual to a Resiliency Specialist for bereavement services. |
| 11. Number of housing subsidies to individuals who are mentally ill and homeless. | 50 | 27 | Not met | Overall, 889 consumers were supported with vouchers during FY19. Due to budgetary constraints, only 27 new vouchers were issued in FY19. Funding for the DBH voucher program largely pays the expense of subsidy payments for existing consumers in the voucher program, leaving minimal funding for new vouchers. The cost per voucher was higher in FY19 than previous years, due to rent increases for existing consumers and rising rents for new consumers. The increase |

| KPI | FY 19 Total Target | FY19 Performance | KPI Status | Explanation for Performance |
|---|---|---|---|---|
| | | | | in cost per consumer led to a smaller number of consumers being able to receive new vouchers. |
| 12. Achieve a ten percent increase in website traffic over the previous fiscal year. | 935,000 | 579,050 | Not met | During FY19, there was turnover and an extended gap in staffing for the area responsible for this KPI. |
| 13. Achieve a twenty percent increase in social media hits (Facebook and Twitter) over baseline established in FY17 previous fiscal year. | 176,201 | 130,831 | Not met | During FY19, there was turnover and an extended gap in staffing for the area responsible for this KPI. |
| 14. Increase number of public events over baseline established in FY17 | 699 | 659 | Nearly met | During FY19, there was turnover and an extended gap in staffing for the area responsible for this KPI. |

**FY 19 Oversight Question 7, Attachment 2 of 2:  FY20 Performance Plan Key Performance Indicator**

| Measure | Frequency | FY20 Total Target |
|---|---|---|
| 1. Percent of certified peers employed | Quarterly | 80% |
| 2. Percent of consumers surveyed in the Behavioral Health Satisfaction Survey who were satisfied with the person-centered planning process | Annual | 80% |
| 3. Percent of Mental Health Rehabilitative Services (MHRS) consumers who were discharged from a psychiatric hospital and had a follow-up service within 30 days | Quarterly | 70% |
| 4. Percent of children newly-enrolled in mental health rehabilitative services (MHRS) services who had their first service within 30 days of enrollment | Quarterly | 75% |
| 5. Percent of adults newly-enrolled in  mental health rehabilitative services (MHRS) services who had their first service within 30 days of enrollment | Quarterly | 80% |
| 6. Percent of consumers who completed  competency restoration program who were found competent | Quarterly | 90% |
| 7. Percent of school-based behavioral health partnership schools with a school-based behavioral health clinician | Semi-annual | 80% |
| 8. Percent of Individuals from Saint Elizabeths Hospital readmitted within 30 days | Quarterly | 2% |
| 9. Percent of SUD withdrawal management clients who stepped down to a lower level of care | Quarterly | 75% |
| 10. Percent of SUD residential clients who stepped down to a lower level of care | Quarterly | 50% |
| 11. Percent of methadone clients who were served in two consecutive quarters | Quarterly | 95% |
| 12. Percent of children receiving MH services whose acuity was initially high who had significant improvement in functioning on their most recent functional assessment | Quarterly | 80% |
| 13. Percent of consumers who remained in the CRF placement for at least 90 days from move-in date, with no psychiatric hospitalizations, incarcerations, crisis bed placements, or involuntary discharges. | Quarterly | 90% |
| 14. Percent of vendors not selling tobacco to minors | Annual | 90% |

*Q7. Did DBH meet the objectives set forth in the performance plan for FY19? Please provide a narrative description of what actions DBH undertook to meet the key performance indicators. For any performance indicators that were not met, if any, please provide a narrative description for why they were not met and any remedial actions taken. In addition, please provide a narrative description of the performance objectives for FY20 and what actions DBH has undertaken to meet them to date.*

**DBH Response**

Please see Attachment One of Two for the report on the FY 19 performance plan Key Performance Indicators (KPIs) and a description of the status of each. See Attachment Two for FY20 KPIs.

Question 8:  Please provide DBH's capital budgets for FY19 and FY20. including amount budgeted and actual dollars spent.  In addition please provide an upate on all capital projects undertaken in FY19 and FY20.  In your response, please include infc regarding the iCAMS project or its successor.

**Capital LTD Activity and FY2021 - 2026 Planned Allotments - All Capital Funds (excl Intra-District funds)**

*(Project/Fund Detail with Lifetime Balances Only)*

Source: SOAR/BFA

**(Report Date: Jan 17, 2020)**

| Owner Agency | Project No | Project Title | Implementing Agency | Approp Fund | Agy Fund | Lifetime Budget | LTD Allotments | Allotments in FY 2019 | Expenditures in FY 2019 | Allotments in FY 2020 | LTD Expenditures | Unspent Allotments | Encumbrances | Pre Encumbrances | ID Advances | Allotment Balance | LifeTime Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RM0 | DB202C | THERMAL DOCKING STATION SYSTEM | RM0 | 0300 | 0300 | 500,000 | 500,000 | 0 | 0 | 500,000 | 0 | 500,000 | 0 | 0 | 0 | 500,000 | 500,000 |
| | DB203C | INTERCOM SYSTEM | RM0 | 0300 | 0300 | 300,000 | 300,000 | 0 | 0 | 300,000 | 0 | 300,000 | 0 | 0 | 0 | 300,000 | 300,000 |
| | HX201C | ST. ELIZABETHS GENERAL IMPROVEMENTS (HX2 | RM0 | 0300 | 0300 | 29,410,584 | 29,410,584 | 0 | 0 | 0 | 29,410,583 | 1 | 1 | 0 | 0 | 0 | 0 |
| | HX403C | HOUSING INITIATIVES - DBH | RM0 | 0300 | 0300 | 37,366,910 | 37,366,910 | 0 | 0 | 0 | 37,677,605 | (310,695) | 0 | 0 | (310,695) | 0 | 0 |
| | | | | | 0301 | 1,000,000 | 1,000,000 | 0 | 0 | 0 | 689,305 | 310,695 | 0 | 0 | 310,695 | | |
| | HX501C | NEW MENTAL HEALTH HOSPITAL | RM0 | 0300 | 0300 | 38,983,364 | 38,983,364 | 0 | 0 | 0 | 38,920,864 | 62,500 | 0 | 0 | 62,500 | 0 | 0 |
| | HX703C | DBH FACILITIES SMALL CAPITAL IMPROVEMENT | RM0 | 0300 | 0300 | 2,258,767 | 2,258,767 | 0 | 333,942 | 0 | 1,861,463 | 397,304 | 5,900 | 337,977 | 53,427 | 0.38 | 0 |
| | | | | | 0301 | 283,954 | 283,954 | 0 | 0 | 0 | 59,954 | 224,000 | 0 | 0 | 224,000 | | |
| | HX805C | VEHICLE ACQUISITION-DBH | KT0 | 0300 | 0304 | 360,000 | 360,000 | 0 | 329,839 | 0 | 329,839 | 30,161 | 0 | 0 | 0 | 30,161 | 30,161 |
| | HX990C | FACILITY UPGRADES | RM0 | 0300 | 0300 | 1,185,000 | 1,185,000 | 835,000 | 0 | 350,000 | 0 | 1,185,000 | 0 | 0 | 270,300 | 914,700 | 914,700 |
| | HX993C | PHARMACY MEDICINE DISPENSING UPGRADE (PY | RM0 | 0300 | 0300 | 1,038,000 | 1,038,000 | 0 | 0 | 1,038,000 | 0 | 1,038,000 | 0 | 824,628 | 0 | 213,372 | 213,372 |
| | HX997C | FLOORING REPLACEMENT | RM0 | 0300 | 0300 | 1,085,000 | 1,085,000 | 1,085,000 | 0 | 0 | 0 | 1,085,000 | 0 | 0 | 0 | 1,085,000 | 1,085,000 |
| | HX998C | HVAC MODERNIZATION AT SAINT ELIZABETHS H | RM0 | 0300 | 0300 | 1,825,000 | 1,825,000 | 500,000 | 0 | 1,325,000 | 0 | 1,825,000 | 0 | 0 | 0 | 1,825,000 | 1,825,000 |
| | XA537C | RENOVATION SEH BUILDINGS | RM0 | 0300 | 0300 | 18,673,477 | 18,673,477 | 0 | 0 | 0 | 18,673,477 | 0 | 0 | 0 | 0 | 0 | 0 |
| | XA655C | AVATAR UPGRADE | RM0 | 0300 | 0300 | 1,655,000 | 1,655,000 | 0 | 0 | 0 | 1,621,308 | 33,692 | 10,721 | 0 | 0 | 22,970.81 | 22,971 |
| | XA854C | INTEGRATED CARE APPLICATIONS MGMT (ICAM) | RM0 | 0300 | 0300 | 3,546,082 | 3,546,082 | 0 | 0 | 0 | 3,542,785 | 3,296 | 3,296 | 0 | 0 | 0 | 0 |
| **Grand Total** | | | | | | 139,471,137 | 139,471,137 | 2,420,000 | 663,781 | 3,513,000 | 132,787,183 | 6,683,954 | 19,918 | 1,162,605 | 610,227 | 4,891,204 | 4,891,204 |

*Q8. Please provide DBH's capital budgets for FY19 and FY20, including amount budgeted and actual dollars spent. In addition, please provide an update on all capital projects undertaken in FY19 and FY20. In your response, please include information regarding the iCAMS project or its successor.*

**DBH Response**

See Attachment. Capital Budgets

*Q9. Please provide a list of all FTE positions detailed <u>to</u> DBH, broken down by program and activity for FY19 and to date in FY20.  In addition, please provide which agency the detailee originated from and how long they were detailed to DBH.*

**DBH Response**

There are no FTE positions detailed to DBH.

*Q10. Please provide a list of all FTE positions detailed <u>from</u> DBH to another agency in FY19 and to date in FY20.  In addition, please provide which agency the employee was detailed to and for how long.*

**DBH Response**

There are no FTE positions detailed from DBH.

| Cell Phone | Name1 | Department | Device Type | Entity |
|---|---|---|---|---|
| 841-2793 | Nina Cadney | Social Worker | Hot Spot | St. Elizabeth Hospital |
| 590-6635 | Sabrina Clark | Medical Records | Hot Spot | 64 New York Ave |
| 329-1179 | Alvin Hinkle | R.S.S & Care Continuity Care | Hot Spot | 64 New York Ave |
| 579-7134 | Evgheni Resetneac | It Specialist Sytems Analyis | Hot Spot | 64 New York Ave |
| 579-5227 | Cicely Mcfarlane | Social Worker | Hot Spot | St. Elizabeth Hospital |
| 329-2580 | Antoine Patterson | Information Technology Specialist | Hot Spot | 64 New York Ave |
| 570-6956 | Jennifer Cannistra | Systems Transformation | Hot Spot | 64 New York Ave |
| 441-7260 | Boateng Kwadwo | Project Manager | Hot Spot | 64 New York Ave |
| 754-2441 | Cheryl Copeland | School Mental Health | Hot Spot | 821 Howard Rd |
| 578-7044 | Angelica Clarkbrown | School Mental Health | Hot Spot | 64 New York Ave |
| 821-7074 | Erica Barnes | School Mental Health | Hot Spot | 64 New York Ave |
| 815-6395 | Adina Madden | Accessment and Referral- Arc | Hot Spot | 64 New York Ave |
| 809-4019 | Marjorie Smith-Cooper | Clinical Case Manager -Arc | Hotspot | 64 New York Ave |
| 809-1962 | Mary Lewis | Clinical Nurse-Arc | Hot Spot | 64 New York Ave |
| 281-0473 | Donald Clarke | Help Desk Branch -Avatar | Hot Spot | 64 New York Ave |
| 809-1585 | Carrie Grundmyer | School Mental Health | Hot Spot | 64 New York Ave |
| 794-0166 | Donald Clarke | Help Desk Branch -Avatar | Hot Spot | 64 New York Ave |
| 596-4960 | Barbara Bazron | Chief Department Of Behavioral Health | Hot Spot | 64 New York Ave |
| 591-6699 | Erica Barnes | School Mental Health | Hot Spot | 64 New York Ave |
| 580-5671 | Erica Barnes | School Mental Health | Hot Spot | 64 New York Ave |
| 579-7134 | Erica Barnes | School Mental Health | Hot Spot | 64 New York Ave |
| 579-5228 | Erica Barnes | School Mental Health | Hot Spot | 64 New York Ave |
| 794-0189 | Erica Barnes | School Mental Health | Hot Spot | 64 New York Ave |
| 579-8528 | Erica Barnes | School Mental Health | Hot Spot | 64 New York Ave |
| 591-5640 | Sara Jones | School Mental Health | Hot Spot | 64 New York Ave |
| 329-8349 | Perette Arrington | School Mental Health | Hot Spot | 64 New York Ave |
| 794-0177 | Erica Barnes | School Mental Health | Hot Spot | 64 New York Ave |
| 591-6617 | Nancy Parris | School Mental Health | Hot Spot | 64 New York Ave |
| 725-8296 | April Preston | School Mental Health | Hot Spot | 64 New York Ave |
| 725-6749 | Nikiya Ford-Jackson | School Mental Health | Hot Spot | 64 New York Ave |
| 579-1343 | Jackie Droddy | School Mental Health | Hot Spot | 64 New York Ave |
| 536-8050 | Patrina Anderson | Linkage & Assessment Service | Hot Spot | 64 New York Ave |
| 579-7136 | Janice Jackson | School Mental Health | Hot Spot | 64 New York Ave |
| 821-7070 | Gillian Daniels | School Mental Health | Hot Spot | 64 New York Ave |
| 380-6620 | Jonathan Ward | Comprehensive Emergency Program | Hot Spot | 1905 E St. S.E |
| 365-0478 | Jonathan Ward | Comprehensive Emergency Program | Hot Spot | 1905 E St. S.E |
| 596-4961 | Jonathan Ward | Comprehensive Emergency Program | Hot Spot | Cpep |
| 657-7836 | Karende Bryant | Information Technology Specialist | Hot Spot | 64 New York Ave |
| 329-2046 | Kristin Adams | Youth Project Coordinator | Hot Spot | 64 New York Ave |
| 657-7835 | Linda Morman | School Mental Health | hotspot | Howard Rd |
| 821-7071 | Mark Larkins | Interim CIO | Hot Spot | 64 NY |
| 579-7135 | Gillian Daniels | School Mental Health | Hotspot | 35 k st. N.E |
| 641-1679 | Marcus Warren | Information Technology Specialist | Hotspot | 64 New York Ave |
| 590-6637 | Melvin Barry | Claims Billing Division | Hotspot | 64 New York Ave |
| 631-3186 | Neil Curameng | It Specialist | Hot Spot | 64 New York Ave |
| 579-5226 | Oron Gan | School Mental Health | hotspot | Howard Rd |
| 579-5230 | Patricia Moody | School Mental Health | hotspot | Howard Rd |
| 365-0173 | Raphaelle Richardson | School Mental Health | hotspot | Howard Rd |
| 841-2795 | Robin Queen | CYSD | Hot Spot | 64 NY |
| 236-7129 | Charneta Scott | School Mental Health | Hot Spot | Howard Rd |
| 494-6164 | Jackie Droddy | School Mental Health | Hotspot | Howard rd |
| 657-7495 | Sharmaine Bowden | School Mental Health | Hot Spot | Howard Rd |
| 365-0194 | Sharon Hardy | School Mental Health | hotspot | Howard Rd |
| 841-2614 | Sheryl Jenkins | Resident Services | hotspot | 64 NY |
| 579-8984 | Pradeep Hariharan | ES | Hotspot | 64 NY |
| 841-2747 | Gillian Daniels | PPG Dr. | Hot Spot | 35 K |
| 379-6211 | Sylvia B.Ratliff | CYSD | Hot Spot | 64 NY |
| 870-6836 | Christine Taylor | IS | Hot Spot | 64 NY |
| 536-9566 | Nicole Denny | School Mental Health | Hotspot | SMHP |
| 329-7469 | Margaret Patterson | IS | Hot Spot | 64 NY |
| 495-8365 | Phyllis Jones | Chief of Staff | Hot Spot | 64 NY |
| 510-5449 | Cassandra Jackson | Medical Records | Hot Spot | 64 NY |
| 807-8773 | Travis-Dread-Hughes | Arc | Hot Spot | 64 ny ave |
| 657-3006 | Venida Hamilton | Network Development | Hot Spot | 64 NY |

| 578-6100 | Sheila Kelly | Office of Accountability | HotSpot | 64 |
| 578-8030 | Drew Sweat | Office of Accountability | HotSpot | 64 ny |
| 641-6263 | Winston Miller | IS | Hot Spot | 64 NY |
| 578-7445 | Keisha Davis | Licensure | HotSpot | 64 |
| 590-6635 | Renee Bivins | Facilities | Hotspot | St Elizabeth |
| 570-3151 | Frankie Wheeler | Human Resources | Hotspot | 64 NY |
| 302-8548 | Leslie Ann- Byam | Community Services Administration | Hotspot | 64 NY |
| 805-3875 | Gloria Mensah | System Transformation | Hotspot | 64 NY |
| 834-6349 | Christiane Brady | School Mental Health | Hotspot | 35 k st. |
| 365-0668 | Carrie Grunmyer | School Mental Health | Hotspot | 64 NY |
| 603-6004 | Venida Hamilton | Network Development | Hotspot | 64 Ny |
| 657-7835 | Kimberly Harrington | School Mental Health | Hotspot | Howard Road |
| 306-1139 | Jackie Droddy | School Mental Health | Hotspot | Howard Road |
| 763-6127 | Jackie Droddy | School Mental Health | Hot spot | 64 ny ave |
| 834-2416 | Marina Soto | Executive Assistant | Hotspot | 64 NY |
| 897-5681 | Christine Phillips | Office of Accountability | Hotspot | 64 NY |
| 834-2102 | Danike Grant | Office of Accountability | Hotspot | 64 NY |
| 807-8449 | Steward Beckham | Chief Operating Officer | Hotspot | 64 NY |
| 807-8419 | Vincent Muse | IS | Hot spot | St Elizabeth |
| 807-8440 | Marc Dalton | Chief Clinical Officer | Hot spot | 64 NY |
| 578-6535 | Dana Brooks | Clinical Services Administration | Hot spot | 35 K |
| 763-4395 | Haican Arslan | Contractor | Hot spot | 64 NY |
| 763-5341 | Carolyn Horton | IT | Hot spot | 64 New York Av |

Department of Behavioral Health
Fiscal Year 2020
Travel Expenses

| Fiscal Year | Employee Name | | Travel Dates | Destination | Purpose of the Travel | Total Travel Expense |
|---|---|---|---|---|---|---|
| 20 | Adewale | Benjamin | 10/2/19 - 10/8/19 | San Diego, CA | 32nd Annual Psych Congress 2019 | $3,770.53 |
| 20 | Akai | Maxine | 10/14/2019 | Cincinnati, OH | JUST Conference | $0.00 |
| 20 | Akpama | Juliana | 10/2/19-10/5/19 | New Orleans, LA | American Psychiatric Nurses Association 33rd Annual Conference | $645.00 |
| 20 | Bazron | Barbara | 9/9/19 - 9/14/19 | Washington, DC | NASMHPD | $165.00 |
| 20 | Bazron | Barbara | 12/3/19 - 12/4/19 | New York NY | Bloomberg Opiod Partner Meeting | $156.00 |
| 20 | Bebout | Richard | 10/12/19 - 10/16/19 | Ft. Lauderdale, FL | National Conference in Correctional Health Care | $1,570.32 |
| 20 | Bebout | Richard | 10/30/19 - 11/1/19 | Miami, FL | Reforming States Group Meeting | $0.00 |
| 20 | Bello | Jimmy | 10/2/19-10/5/19 | New Orleans, LA | American Psychiatric Nurses Association 33rd Annual Conference | $645.00 |
| 20 | Bloodworth | Natalie | 1/15/2020 - 1/17/2020 | Online | Dialectical Behavioral Therapy Certificate Course | $0.00 |
| 20 | Boesch | Richard | 1/23/2020 - 1/25/2020 | New York NY | Cognitive Behavioral Therapy Certiifctae Course | $899.59 |
| 20 | Boley | Natasha | 12/3/19 - 12/5/20 | Silver Spring, MD | Certified Investigators Course | $599.00 |
| 20 | Boswell | Alexandria | 11/13/19 - 11/15/19 | Louisville, KY | 2019 Annual KPA Convention | $872.92 |
| 20 | Brooks | Dana | 10/24/19-10/27/19 | Baltimore, MD | American Academy of Psychiatry and the Law | $758.00 |
| 20 | Brooks | Dana | 10/31/2019 | Williamsburg, VA | Forensic Treatment Plan Meeting | $45.70 |
| 20 | Caspari | Matthew | 11/21/19 - 11/22/22 | Washington, DC | NELI 40th Annual Employment Law Conference | $1,045.00 |
| 20 | Clark | Rachel | 1/23/2020 | Catonsville, MD | Art Based Techniques as Clinical Intervention for Suicidal Clients | $0.00 |
| 20 | Clark | Rachel | 10/30/2019 | Rockville, MD | New Advanced Parenting Strategies for your Clients | $65.00 |
| 20 | Clarke | Unek | 12/13/19;1/10/20; 2/14/20; 3/13/20; 4/3/20; 5/8/22 | Columbia, MD | University of Maryland - School of Medinine | $1,600.00 |
| 20 | Coles | Monique | 11/13/19 - 11/17/22 | Phoenix, AZ | 33rd National Federation of Families for Children's Mental Health Conference | $1,831.01 |
| 20 | Copeland | Cheryl | 10/20/19 - 11/3/19 | Kansas City, MO | Celebrating 50 Years of Healing through Art | $0.00 |
| 20 | Dalton | Marc | 10/30/2019 | Williamsburg, VA | Forensic Treatment Plan Meeting | $45.70 |
| 20 | Davis | Belinda | 11/14/19 - 11/15/19 | Washington, DC | Supporting grieving & Traumatized Teens | $250.00 |
| 20 | Del Valle-Ortiz | Carmen | 10/2/19- 10/6/19 | San Diego, CA | 32nd Psychiatric Congress - 2019 | $1,716.02 |
| 20 | Delaney | Tyanne | 10/1/19-10/5/19 | New Orleans, LA | American Psychiatric Nurses Association 33rd Annual Conference | $1,824.45 |
| 20 | Douglas | Monique | 10/2/2019 - 10/5/2019 | Hollywood, FL | Dive I: Zero to Three Annual Conference | $1,653.37 |
| 20 | Douglas | Monique | 12/13/19;1/10/20; 2/14/20; 3/13/20; 4/3/20; 5/8/22 | Columbia, MD | University of Maryland - School of Medinine | $1,600.00 |
| 20 | Doyle | Keri-Lynn | 1/23/2020 - 1/25/2020 | New York NY | Cognitive Behavioral Therapy Certiifctae Course | $899.59 |
| 20 | Dutta | Trina | 11/11/2019 - 11/13/19 | Washington, DC | National Association of Medicaid Directors | $600.00 |
| 20 | Earlington | Di-Ann | 12/13/19;1/10/20; 2/14/20; 3/13/20; 4/3/20; 5/8/23 | Columbia, MD | University of Maryland - School of Medinine | $1,600.00 |

Department of Behavioral Health
Fiscal Year 2020
Travel Expenses

| 20 | Edwards | Andre | 10/16/19 - 10/18/19 | On-Line | QPR Gatekeeper: Training Certificate Course | $495.00 |
|----|---------|-------|---------------------|---------|--------------------------------------------|---------|
| 20 | Harrington | Kimberly | 11/7/2019 | Baltimore, MD | Beyond Cutting:  An In-Depth Look at Self-Injury | $125.00 |
| 20 | Hodges | Margot | 1/23/2020 | Catonsville, MD | Art Based Techniques as Clinical Intervention for Suicidal Clients | $0.00 |
| 20 | Huntley | Yvonne | 11/13/19 - 11/17/23 | Phoenix, AZ | 34th National Federation of Families for Children's Mental Health Conference | $1,831.01 |
| 20 | Jackson | Annette | 11/13/19 - 11/17/21 | Phoenix, AZ | 32nd National Federation of Families for Children's Mental Health Conference | $1,831.01 |
| 20 | Kohlrieser | Chaz | 10/16/19 - 10/18/19 | On-Line | QPR Gatekeeper: Training Certificate Course | $495.00 |
| 20 | Krishnan | Shilpa | 11/12/19 - 11/16/19 | San Diego, CA | CEP Contemporary Issue in Forensic Psychology | $2,625.98 |
| 20 | Lam | Jonathan | 3/19/2020 - 3/21/2020 | Washington, DC | 2020 Psychotherapy Network Symposium | $679.99 |
| 20 | Mack-Lewis | Qutina | 12/9/19 - 12/11/19 | Las Vegas, NV | Training & Poster Presentation at ASHP Mid Year Conference | $1,687.08 |
| 20 | Manocchio | Teresa | 11/11/19 - 11/13/19 | Washington, DC | National Association of Medicaid Directors | $600.00 |
| 20 | Marsh | Alicia | 1/23/2020 - 1/25/2020 | New York NY | Cognitive Behavioral Therapy Certiifctae Course | $899.59 |
| 20 | Mathis | Gladys | 11/13/19 - 11/17/24 | Phoenix, AZ | 35th National Federation of Families for Children's Mental Health Conference | $1,831.01 |
| 20 | Mathur | Raj | 12/12/19 - 12/13/19 | Baltimore, MD | Pri -Med | $45.00 |
| 20 | Minor | Nevena | 11/11/19 - 11/13/20 | Washington, DC | National Association of Medicaid Directors | $600.00 |
| 20 | Muchemi | Sheila | 10/3/10 - 10/4/19 | Towson, MD | 7th Biennial Trauma Conference | $672.82 |
| 20 | O'Connor | Stephen | 10/2/2019 - 10/5/2019 | Hollywood, FL | Dive I: Zero to Three Annual Conference | $1,653.37 |
| 20 | Olsen | Mia | 11/17/19 -11/19/19 | Chicago, IL | AHLA' Fundamentals of Law | $1,772.59 |
| 20 | Olsen | Mia | 11/21/19 - 11/22/21 | Washington, DC | NELI 40th Annual Employment Law Conference | $1,045.00 |
| 20 | Palmer | Marquita | 11/13/19 - 11/17/20 | Phoenix, AZ | 31st National Federation of Families for Children's Mental Health Conference | $1,831.01 |
| 20 | Parks | Barbara | 11/19/19 - 11/21/19 | Philadelphia, PA | Fall 2019 BUILD State Partner Meeting | $0.00 |
| 20 | Parris | Nancy | 12/13/19;1/10/20; 2/14/20; 3/13/20;  4/3/20; 5/8/21 | Columbia, MD | University of Maryland - School of Medinine | $1,600.00 |
| 20 | Patterson | Jenise | 11/13/19 - 11/17/19 | Phoenix, AZ | 30th National Federation of Families for Children's Mental Health Conference | $1,831.01 |
| 20 | Phillips | Christine | 12/3/19 - 12/5/19 | Silver Spring, MD | Certified Investigators Course | $599.00 |
| 20 | Pizzarello | Scott | 3/3/2020 - 3/8/2020 | New Orleans, LA | American Psychology Law Society Conference | $762.58 |
| 20 | Prentiss | Audrey | 2/11/2020 | Ellicott City, MD | Alzhimer's Dosease & Other Dementias Certification Training | $249.99 |
| 20 | Richardson | Tracey | 10/24/19 - 10/27/19 | Baltimore, MD | American Academy of Psychiatry and the Law, 50th Annual Conference | $953.43 |
| 20 | Richardson | Tracey | 11/21/19 - 11/22/20 | Washington, DC | NELI 40th Annual Employment Law Conference | $1,045.00 |
| 20 | Richardson | Raphaelle | 12/11/19 - 12/12/19 | Hagerstown, MD | SAMHSA: Regional 3 Peers Summit | $273.77 |
| 20 | Richardson | Iris | 1/7/2020 - 1/10/2020 | Fordyce, AR | Site Visit: Millcreek of Arkansas | $1,488.16 |
| 20 | Shah | Renu | 10/21/19 - 10/27/19 | Baltimore, MD | AAPL Forensic Psych Review Course and Annual Meeting | $1,825.00 |

Department of Behavioral Health
Fiscal Year 2020
Travel Expenses

| 20 | Stone | Sheila | 2/18/20 - 2/20/20 | Columbia, MD | Complex PTSD Training Conference | $599.00 |
|----|-------|--------|-------------------|--------------|----------------------------------|---------|
| 20 | Suardi | Enrico | 10/17/19 - 10/20/19 | Boston, MA | 2019 Psychopharmacology Conference | $2,319.75 |
| 20 | Sullivan | Meghan | 11/14/19 - 11/16/19 | Phoenix, AZ | 30th National Federation of Families for Children's Mental Health Conference | $1,745.25 |
| 20 | Thomas | Joetta | 1/23/2020 | Catonsville, MD | Art Based Techniques as Clinical Intervention for Suicidal Clients | $0.00 |
| 20 | Tillbrook | Chad | 10/24/19-10/27/19 | Baltimore, MD | American Academy of Psychiatry and the Law | $758.00 |
| 20 | Tillbrook | Chad | 11/1/2019 | Williamsburg, VA | Forensic Treatment Plan Meeting | $45.70 |
| 20 | Touschstone | Tanya | 11/20/2019 | Fort Dix, NJ | Fort Dix Federal Correction Institution | $41.25 |
| 20 | Toussaint-Green | Ghislaine | 11/13/19 -11/16/19 | Phoenix, AZ | 30th National Federation of Families for Children's Mental Health Conference | $2,078.04 |
| 20 | Toussaint-Green | Ghislaine | 12/13/19;1/10/20; 2/14/20; 3/13/20;  4/3/20; 5/8/20 | Columbia, MD | University of Maryland - School of Medinine | $1,600.00 |
| 20 | Walker | Myra | 11/13/19 - 11/18/19 | Phoenix, AZ | 30th National Federation of Families for Children's Mental Health Conference | $1,902.46 |
| 20 | Williams | Anndreeze | 11/21/19 - 11/22/19 | Washington, DC | NELI 40th Annual Employment Law Conference | $1,045.00 |
| 20 | Yavi | Mani | 10/15/19 - 10/19/19 | Houston, TX | American Psyciatric Nurses Assoication Conference | $2,094.64 |
| 20 | Yerrell-Garrett | Lori | 10/1/19-10/5/19 | New Orleans, LA | American Psychiatric Nurses Association 33rd Annual Conference | $2,048.85 |
| 20 | Zaidi | Muhammad | 11/6/19 - 11/11/19 | Colorado Springs, CO | 2019 Neuroscience Education Institute Congress | $1,831.35 |

| NAME | POSITION | JOB_TITLE | GRADE | STEP | SALARY | AGENCY |
|------|----------|-----------|-------|------|--------|--------|
| Acharya,Monika | 00027851 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 4 | $243,373.00 | S.E.H. |
| Adade,Otema Alice | 00000288 | MEDICAL OFFICER PSYCHIATRY | 6C | 4 | $129,066.50 | B.H.A. |
| Adams,Myla D. | 00069821 | Quality Assessment Specialist | 13 | 5 | $103,905.00 | B.H.A. |
| Adebayo,Oluwafemi Isaac | 00014760 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Adebusola,Funmi | 00006046 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Adeleye,John A | 00001210 | Supervisory Psychiatric Nurse | 14 | 0 | $128,564.60 | B.H.A. |
| Adeso,Relindis A | 00010586 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| Adewale,Benjamin A | 00013245 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 8 | $263,291.00 | S.E.H. |
| Adeyemi,Oluwakemi | 00009413 | Utilization Review Specialist | 12 | 0 | $100,225.00 | S.E.H. |
| Adurota,Olagunwa F | 00008199 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $107,178.14 | S.E.H. |
| Agbara,Emmanuel N | 00002839 | PSYCHIATRIC NURSE | 11 | 9 | $111,562.00 | S.E.H. |
| Ahaghotu,Georginia Onyinyechi | 00001738 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | B.H.A. |
| Aje,Oluwakemi A | 00003276 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 0 | $167,944.00 | S.E.H. |
| Akhtar,Saleha | 00000511 | MEDICAL OFFICER (PSYCHIATRY) | 5 | 8 | $252,908.00 | B.H.A. |
| Akinlosotu,Raymond O | 00012576 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Akpuaka,Aloysius I | 00000124 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Akwar,Philip A | 00008361 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Albury,Lisa Evans | 00031664 | Evid-Based Svcs Prog Mgr | 14 | 0 | $110,473.98 | B.H.A. |
| Alexander,Antoinette C | 00011542 | Administrative Svcs Manager | 14 | 0 | $120,178.29 | B.H.A. |
| Allen Williams,Debra | 00021112 | Human Resources Spec (Empl & L | 14 | 8 | $126,897.00 | B.H.A. |
| Allen,Ada R | 00009174 | Nurse Practitioner | 12 | 10 | $121,046.00 | S.E.H. |
| Allen,Debbie L | 00002549 | ASSESSMENT CENTER COORDINATOR | 13 | 0 | $105,738.82 | B.H.A. |
| Allen,Jennifer Eileen | 00007104 | Evaluation and Quality Coord | 13 | 8 | $116,145.00 | B.H.A. |
| Allen,Rhonda L | 00027862 | MEDICAL OFFICER (PSYCHIATRY) | 5C | 7 | $264,359.00 | B.H.A. |
| Allen,Shirley Michele | 00003213 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $120,000.00 | S.E.H. |
| Alleyne,Joycelyn P | 00000665 | Network Development Spec | 13 | 10 | $122,227.00 | B.H.A. |
| Alleyne,Karen C | 00005905 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 8 | $263,291.00 | S.E.H. |
| Amaechi,Philo N | 00001060 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Anderson,Cynthia R. | 00002531 | MEDICAL OFFICER GENERAL PRACTI | 3 | 8 | $188,345.00 | S.E.H. |
| Anderson,Deborah A | 00045776 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Anderson,Patrina Ann | 00012997 | Director, Link & Assessment Di | 15 | 0 | $136,276.99 | B.H.A. |
| Anderson,Shawn J | 00026729 | Recreation Therapist | 12 | 5 | $100,224.00 | S.E.H. |
| Aneto,Dorothy C | 00002758 | PSYCHIATRIC NURSE | 11 | 10 | $106,534.00 | B.H.A. |
| Anokam,Theresa A | 00025221 | Nurse Practitioner | 12 | 10 | $121,046.00 | S.E.H. |
| Apraku-Gyau,Kwasi | 00008477 | Administrative Operations Mana | 15 | 0 | $128,961.41 | B.H.A. |
| Arotimi,Margaret | 00045768 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $112,530.96 | S.E.H. |
| Arrington,Perette L | 00039209 | CLINICAL PSYCHOLOGIST | 13 | 7 | $104,523.00 | B.H.A. |
| Aruna,Theresa I | 00015026 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Atanga,Theresa M | 00023836 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| Atique,Muhammad | 00025700 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 8 | $248,167.00 | S.E.H. |
| Augustus,Todd Matthew | 00008585 | MEDICAL OFFICER (PSYCHIATRY) | 5C | 5 | $254,101.00 | B.H.A. |
| Austin,Jerome W | 00020905 | ACCOUNTANT | 13 | 9 | $110,191.00 | S.E.H. |
| Ayernor,Kerniba Y | 00009963 | Director of Nursing Operations | 14 | 0 | $133,100.51 | S.E.H. |
| Ayodeji-Coker,Lateefat A | 00006221 | PSYCHIATRIC NURSE | 11 | 7 | $104,125.00 | S.E.H. |
| Baffour,Anthony | 00076917 | Administrative Services Manage | 15 | 0 | $137,473.92 | B.H.A. |
| Bah,Fatmata B | 00006372 | PSYCHIATRIC NURSE | 11 | 7 | $104,125.00 | S.E.H. |
| Bailey,Derrick C. | 00082131 | Provider Relations Manager | 14 | 0 | $121,338.65 | B.H.A. |
| Baker,Mionna L. | 00045749 | ACCOUNTABILITY ANALYST | 13 | 6 | $110,063.00 | B.H.A. |
| Ballard III,James M | 00088338 | Clinical Outreach Manager | 13 | 0 | $113,236.00 | B.H.A. |
| Barber,Julie G. | 00005247 | Recreation Therapist | 12 | 5 | $100,224.00 | S.E.H. |
| Barbot,Henry C | 00007748 | MEDICAL OFFICER (PSYCHIATRY) | 5C | 8 | $269,681.00 | B.H.A. |

| NAME | POSITION | JOB_TITLE | GRADE | STEP | SALARY | AGENCY |
|------|----------|-----------|-------|------|--------|--------|
| Barnard,Marvin | 00047925 | MEDICAL OFFICER GENERAL PRACTI | 3 | 8 | $170,639.00 | B.H.A. |
| Barnes Power,Peggie | 00025138 | Care Manager | 13 | 7 | $113,104.00 | B.H.A. |
| Barnes,Erica Lynn | 00031775 | Program Manager | 14 | 0 | $122,184.81 | B.H.A. |
| Barnes,Rhonda L | 00003493 | Program Manager | 13 | 0 | $105,600.53 | B.H.A. |
| Barrett,Linda T | 00013449 | Human Resources Specialist | 14 | 10 | $133,537.00 | B.H.A. |
| Barrett,Shurnett A | 00093763 | Nurse Educator | 13 | 8 | $107,380.00 | S.E.H. |
| Barry,Melvin L | 00027677 | Director of Operations | 16 | 0 | $152,241.67 | B.H.A. |
| Bazemore,Alfreda D | 00023831 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Bazron,Barbara Jean | 00011599 | Director of Mental Health | E5 | 0 | $195,163.02 | B.H.A. |
| Bebout,Richard R | 00006816 | Deputy Director, Adult Service | 16 | 0 | $180,250.00 | B.H.A. |
| Beckham,Steward D | 00012656 | Chief Operating Officer | 16 | 0 | $165,006.00 | B.H.A. |
| Bekele,Muluberhan | 00009498 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | B.H.A. |
| Bello,Jimmy A | 00001284 | PSYCHIATRIC NURSE | 11 | 8 | $107,844.00 | S.E.H. |
| Beyder-Kamjou,Irina | 00012656 | Chief Operating Officer | 16 | 0 | $157,080.00 | B.H.A. |
| Bhise,Gauri T | 00037522 | Reports Developer | 13 | 3 | $100,940.00 | B.H.A. |
| Binks,Sidney W | 00000795 | CLINICAL PSYCHOLOGIST | 13 | 10 | $112,956.00 | S.E.H. |
| Bippe,Raphael N | 00015044 | PSYCHIATRIC NURSE | 11 | 6 | $100,403.00 | S.E.H. |
| Bivins,Renee T | 00046300 | Director of Hospital Operation | 15 | 0 | $136,160.62 | B.H.A. |
| Black,Nancy Burgess | 00025150 | Supv Medical Officer Psych | MD6 | 0 | $271,965.20 | B.H.A. |
| Blake-Smith,Michelle DM | 00031782 | Compl & Perform Imprv Ofcr | 14 | 0 | $121,342.49 | S.E.H. |
| Blocker,Adrienne F | 00068436 | Special Project Coordinator | 13 | 7 | $113,104.00 | B.H.A. |
| Bloodworth,Natalie J | 00039206 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Boateng,Kwadwo A | 00003096 | IT Project Manager | 13 | 5 | $107,022.00 | B.H.A. |
| Boesch,Richard P | 00031757 | Supvy. Clinical Psychologist | 14 | 0 | $145,494.17 | S.E.H. |
| Bowden,Shermain M | 00024232 | Program Manager | 14 | 0 | $114,219.85 | B.H.A. |
| Boyd,Nancy Frances | 00045765 | Nurse Educator | 13 | 7 | $104,569.00 | B.H.A. |
| Boyer,Marie A | 00010491 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $108,584.76 | B.H.A. |
| Brady,Christiane | 00082674 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Brooks,Dana A | 00001265 | Supervisory Clinical Administr | 14 | 0 | $107,843.04 | B.H.A. |
| Brooks,Ericka Oliver | 00009148 | Comm Services Review Analyst | 13 | 6 | $110,063.00 | B.H.A. |
| Brown,Carol L | 00001811 | Human Resources Specialist | 13 | 8 | $107,380.00 | B.H.A. |
| Brown,Denise | 00043373 | Clinical Administrator | 13 | 0 | $115,863.81 | S.E.H. |
| Brown,Mariam R | 00001571 | Human Resources Specialist | 13 | 10 | $113,002.00 | B.H.A. |
| Bryant,Karende S | 00013179 | Information Technology Special | 13 | 10 | $122,227.00 | B.H.A. |
| Burroughs,Terredell H | 00016707 | Continuous QI Prog Spec | 14 | 5 | $126,479.00 | B.H.A. |
| Burton,John H | 00095074 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Byam,Leslie-Ann P | 00085808 | Transitional Age Youth Proj Di | 14 | 0 | $121,489.39 | B.H.A. |
| Cabinda,Irene L | 00015869 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| Cadney Baucum,Nina Sattia'M'Lee | 00020666 | SOCIAL WORKER | 12 | 10 | $101,276.00 | S.E.H. |
| Campbell,James Spencer | 00025848 | SUPERVISORY SOCIAL WORKER | 13 | 0 | $107,374.55 | B.H.A. |
| Campbell,Mary E | 00012288 | Risk Mgr & Spec Svcs Coord | 15 | 0 | $162,865.37 | B.H.A. |
| Campbell-Smith,Samantha | 00077969 | Supvy Business Analyst (IT) | 15 | 0 | $127,883.01 | B.H.A. |
| Candilis,Philip J | 00031776 | Supv Medical Officer (Psychiat | MD6 | 0 | $271,842.75 | S.E.H. |
| Cannistra,Jennifer | 00012939 | Director, Sys Transform Admin | 16 | 0 | $177,467.35 | B.H.A. |
| Carlock,Jason J | 00002146 | Incident Investigation Manager | 14 | 0 | $111,933.75 | S.E.H. |
| Carter,Katrina L. | 00095030 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Carter,Nancy D. | 00045782 | PSYCHIATRIC NURSE | 11 | 10 | $106,534.00 | S.E.H. |
| Casazza,Holly R | 00011896 | CLINICAL PSYCHOLOGIST | 13 | 7 | $104,523.00 | S.E.H. |
| Caspari,Matthew W | 00043662 | SUPERVISORY ATTORNEY ADVISOR | 2 | 0 | $183,711.64 | B.H.A. |
| Chapman II,Eric J | 00046906 | Prevention Services Program Ma | 14 | 0 | $120,471.88 | B.H.A. |
| Chapman,Naomi R | 00020084 | Supvy Human Resources Spec | 15 | 0 | $145,087.79 | B.H.A. |

| NAME | POSITION | JOB_TITLE | GRADE | STEP | SALARY | AGENCY |
|------|----------|-----------|-------|------|--------|--------|
| Chastang,Mark J. | 00001934 | Health System Administrator | 11 | 0 | $195,051.77 | S.E.H. |
| Cherry,Joybell A | 00009460 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Chesley Brown,Saundra E | 00025592 | MEDICAL OFFICER GENERAL PRACTI | 3 | 8 | $170,639.00 | B.H.A. |
| Chuukwu,Rose Akutta | 00085401 | Clinical Nurse | 11 | 7 | $104,125.00 | B.H.A. |
| Clark Brown,Angelica N | 00070931 | Early Childhood Clin Spec | 13 | 4 | $103,981.00 | B.H.A. |
| Clarke,Donald L. M. | 00043607 | Information Technology (Proj M | 14 | 0 | $115,198.75 | B.H.A. |
| Cobbs,Sylvia W | 00010289 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Colbert-Ellis,Janice M | 00031649 | Forensic Svcs Advisor & Liaiso | 13 | 10 | $118,670.00 | B.H.A. |
| Colombel,Allison M | 00011925 | Behavioral Health Program Coor | 13 | 8 | $116,145.00 | B.H.A. |
| Cook,Malcolm A | 00094834 | Nurse Practitioner | 12 | 9 | $117,140.87 | S.E.H. |
| Cooper-Smith,Marjorie C | 00073603 | Clinical Case Manager | 13 | 4 | $103,981.00 | B.H.A. |
| Cox,Nelda T | 00009171 | Recreation Therapist | 12 | 5 | $100,224.00 | S.E.H. |
| Crockett,Davida L | 00001303 | Legislative Affairs Specialist | 13 | 7 | $104,569.00 | B.H.A. |
| Croson,Kathryn M | 00010878 | CLINICAL PSYCHOLOGIST | 13 | 7 | $104,523.00 | S.E.H. |
| Crutchfield,Melody Y | 00006018 | Employment Manager (Evid-Based | 13 | 0 | $107,842.56 | B.H.A. |
| Cunningham,Erica W | 00083148 | Director of Communications | 14 | 0 | $126,215.00 | B.H.A. |
| Curameng,Neil M | 00002480 | IT Specialist (Systems Analysi | 13 | 5 | $107,022.00 | B.H.A. |
| Curtis,Chaka A | 00019251 | PSYCHIATRIC NURSE | 11 | 7 | $104,125.00 | S.E.H. |
| Dabney,Rosetta S. | 00018750 | Clinical Care Coordinator | 12 | 10 | $105,339.00 | B.H.A. |
| Dalili,Ali | 00012840 | PHARMACIST | 12 | 10 | $105,339.00 | S.E.H. |
| Dalkilic,Alican | 00043376 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 7 | $258,124.00 | S.E.H. |
| Dalton,Marc E | 00011669 | Supv Medical Officer Psych | MD6 | 0 | $280,124.15 | B.H.A. |
| Dang,Vu Tuong | 00006797 | Chief of Staff | 16 | 0 | $178,549.47 | B.H.A. |
| Daniels,Gillian R | 00012564 | ADMIN OFFICER | 13 | 8 | $107,380.00 | B.H.A. |
| Daramola,Victoria B | 00023406 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| David,Olusegun | 00045786 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| Davis Shelton,Madeleine | 00001488 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Davis,Merrien J | 00024673 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Davis,Paul W | 00025774 | Audio Visual Services Speciali | 13 | 9 | $119,186.00 | S.E.H. |
| Davis-DeBose,Natasha Denise | 00073373 | Program and Policy Coordinator | 13 | 6 | $101,758.00 | B.H.A. |
| DeBoard,Nicole Y | 00002415 | Supervisory Dietitian | 14 | 0 | $107,841.48 | S.E.H. |
| Del Valle ortiz,Carmen | 00001089 | MEDICAL OFFICER (PSYCHIATRY) | 5 | 8 | $252,908.00 | S.E.H. |
| Delaney,Tyanne V | 00045790 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $106,765.76 | S.E.H. |
| DeValera,Karen A | 00016551 | Dstr, Emer & Colbr Supt Svc Pr | 14 | 0 | $117,724.33 | B.H.A. |
| Dickerson,Angela | 00011281 | Quality Improvement Specialist | 13 | 6 | $106,858.00 | S.E.H. |
| Dietsche,Sharon S | 00000979 | Dir, Prev & Early Intervnt Div | 15 | 0 | $119,706.00 | B.H.A. |
| Doby Copeland,Cheryl | 00021065 | Clinical Program Coordinator | 12 | 8 | $100,225.00 | B.H.A. |
| Dogboe,Edem Kofi | 00045779 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $110,313.00 | S.E.H. |
| Droddy,Jacqueline Lynn | 00033016 | SUPERVISORY SOCIAL WORKER | 13 | 0 | $110,595.79 | B.H.A. |
| Dugdill,Jonathan C. | 00093760 | Supvy. Clinical Psychologist | 14 | 0 | $114,378.79 | S.E.H. |
| Dunbar,Denise Althea | 00006816 | Director, Comm Services Admin | 16 | 0 | $167,186.18 | B.H.A. |
| Dutta,Trina | 00077968 | Director, Strategic Management | 15 | 0 | $164,300.45 | B.H.A. |
| Earlington,Di-Ann G | 00004998 | CLINICAL PSYCHOLOGIST | 13 | 10 | $112,956.00 | S.E.H. |
| Ebiringa,Goodness Ihuoma | 00019721 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Ekwe,Benneth I | 00013095 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Eligan,Johari J | 00004916 | Director, Division of Care Coo | 14 | 0 | $107,842.80 | B.H.A. |
| Ellis,Aisha M | 00045679 | Nurse Practitioner | 12 | 9 | $113,729.00 | S.E.H. |
| Ellis,Vivian | 00010967 | Human Resources Specialist | 13 | 8 | $107,380.00 | B.H.A. |
| Emeagwali,Obianuju E | 00013014 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Emeruem,Grace | 00014762 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| Evans Jackman,Renee M | 00077991 | Grants Program Coordinator | 14 | 0 | $135,466.24 | B.H.A. |

| NAME | POSITION | JOB_TITLE | GRADE | STEP | SALARY | AGENCY |
|------|----------|-----------|-------|------|--------|--------|
| Ezimorah,Janefrances C | 00005032 | PSYCHIATRIC NURSE | 11 | 10 | $106,534.00 | S.E.H. |
| Faiz,Saeeda | 00000027 | PSYCHIATRIC NURSE | 9 | 10 | $102,984.00 | B.H.A. |
| Farooqui,Azra A. | 00002222 | MEDICAL OFFICER (PSYCHIATRY) | 5 | 5 | $238,528.00 | B.H.A. |
| Fayomi,Christianah | 00005837 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Fegan,Gerard E | 00001363 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 8 | $263,291.00 | S.E.H. |
| Flower,Travis D. | 00043371 | CLINICAL PSYCHOLOGIST | 13 | 8 | $107,334.00 | S.E.H. |
| Forbes,Ayana M. | 00083147 | Continuous Qual Improv Prog Of | 14 | 3 | $119,295.63 | B.H.A. |
| Ford Jackson,Nikiya Fanee | 00046627 | PROGRAM ANALYST | 13 | 5 | $107,022.00 | B.H.A. |
| Fortin,Amy Elizabeth | 00012635 | Juvenile Behav Div Prog Coordi | 13 | 8 | $116,145.00 | B.H.A. |
| Francis,Ngozi V | 00024402 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Frazier,Acquanetta L. | 00001214 | MEDICAL OFFICER GENERAL PRACTI | 3B | 8 | $197,432.00 | B.H.A. |
| Fulton,Karen E | 00016324 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Fulwood,Anglia C | 00010534 | Program Specialist | 13 | 6 | $101,758.00 | B.H.A. |
| Gan,Oron G | 00003026 | CLINICAL PSYCHOLOGIST | 13 | 7 | $104,523.00 | B.H.A. |
| Garcia,Anne | 00000535 | Clinical Qual & Education Coor | 13 | 10 | $113,002.00 | B.H.A. |
| Garcia,Danilo A | 00000266 | MEDICAL OFFICER GENERAL PRACTI | 3 | 8 | $188,345.00 | S.E.H. |
| Garcia,Todd R | 00015691 | Program Specialist | 12 | 8 | $100,225.00 | B.H.A. |
| Gladden,Brandi V | 00040036 | Director, Housing Development | 15 | 0 | $119,704.97 | B.H.A. |
| Gnahoui,Wanda L | 00041452 | MEDICAL OFFICER PSYCHIATRY | 6C | 6 | $267,880.00 | B.H.A. |
| Godwin,Michele P | 00045664 | CLINICAL PSYCHOLOGIST | 13 | 9 | $110,145.00 | S.E.H. |
| Gontang,Richard A | 00003432 | Chief Clinical Officer | 15 | 0 | $167,586.53 | S.E.H. |
| Goodhue,Shannon M | 00012255 | Director, Disaster & Supt Beha | 15 | 0 | $119,704.97 | B.H.A. |
| Gore,T Allen | 00045738 | MEDICAL OFFICER (PSYCHIATRY) | 5C | 8 | $269,681.00 | B.H.A. |
| Gossett,Jasmine | 00083148 | Director of Communications | 14 | 0 | $126,936.96 | B.H.A. |
| Graham,Kendall J. | 00019785 | Health Systems Specialist | 13 | 5 | $107,022.00 | B.H.A. |
| Grant,Danike Cary | 00002032 | Compliance Specialist | 13 | 8 | $116,145.00 | B.H.A. |
| Grant,Teresa M | 00001158 | CLINICAL PSYCHOLOGIST | 13 | 10 | $112,956.00 | B.H.A. |
| Gray,Veronica | 00024738 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| Green,Madonna M | 00020093 | ACCOUNTABILITY ANALYST | 13 | 5 | $107,022.00 | B.H.A. |
| Grekova,Natalia | 00045670 | MEDICAL OFFICER (PSYCHIATRY) | 5 | 1 | $220,938.00 | S.E.H. |
| Griffin,Christopher M | 00020789 | Care Manager | 13 | 6 | $110,063.00 | B.H.A. |
| Griffin,J'wan S | 00073374 | School Primary Project Manager | 13 | 0 | $111,649.16 | B.H.A. |
| Grundmayer,Carrie Ann | 00033070 | SUPERVISORY SOCIAL WORKER | 13 | 0 | $112,719.01 | B.H.A. |
| Gulley,Jordan E | 00047908 | CRT Site Coordinator | 14 | 0 | $107,843.00 | B.H.A. |
| Haith,L'Tanya A. | 00043377 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 8 | $263,291.00 | S.E.H. |
| Hakim,Ana Maria | 00070752 | Early Childhood Clin Spec | 12 | 8 | $100,225.00 | B.H.A. |
| Hall III,Bert S | 00012126 | Supv Dental Officer | MD3 | 0 | $167,811.11 | S.E.H. |
| Hall,Anthony Rashad | 00095039 | CRT Director | 15 | 0 | $132,255.97 | B.H.A. |
| Hamer,Kelly C | 00013575 | Instructional Design/Trng Spec | 13 | 4 | $103,981.00 | B.H.A. |
| Hamilton,Venida Y | 00004601 | Director, Network Development | 15 | 0 | $149,209.72 | B.H.A. |
| Hammock,Monica L | 00082688 | SUPERVISORY SOCIAL WORKER | 13 | 0 | $113,052.11 | B.H.A. |
| Handal,Hazel | 00085469 | Reports Developer | 13 | 5 | $107,022.00 | B.H.A. |
| Hardy,Sharon R | 00012946 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Hariharan,Pradeep | 00013824 | Info Technology Manager (APPSW | 15 | 0 | $119,704.94 | B.H.A. |
| Harper Jr.,Ambus H | 00024152 | CLINICAL SUPERVISOR | 13 | 0 | $109,614.00 | B.H.A. |
| Harrell,Andrea R | 00001730 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Harris,Emerson A | 00024882 | CLINIC MGR | 13 | 9 | $115,717.00 | B.H.A. |
| HART,LAKEASHA L | 00006995 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Hawkins,Cynthia A | 00024928 | Human Resources Manager | 14 | 0 | $140,162.22 | B.H.A. |
| Hawkins,Delores N | 00020585 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Heaven,Laura Nicole | 00001897 | Chief, Data & Perform Mgmt | 15 | 0 | $143,645.76 | B.H.A. |

| NAME | POSITION | JOB_TITLE | GRADE | STEP | SALARY | AGENCY |
|------|----------|-----------|-------|------|--------|--------|
| Hill,Angela Maria | 00013289 | Revenue Manager | 14 | 0 | $104,701.75 | B.H.A. |
| Hinkle Jr.,Alvin H | 00002954 | Director, Resid. Spt. Svc. & C | 15 | 0 | $121,295.18 | B.H.A. |
| Hnatowski,Lauren Elizabeth | 00041846 | Attorney Advisor | 14 | 2 | $121,760.00 | B.H.A. |
| Hogan,Carol | 00011093 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Holness,E Gail Anderson | 00000051 | Faith Based Outreach Coordinat | 13 | 6 | $101,758.00 | B.H.A. |
| Howard-Clark,Sabriana Antoinette | 00031701 | Medical Records Administrator | 14 | 0 | $121,295.17 | B.H.A. |
| Humphrey,Stephony K | 00002811 | Behavioral Health Analyst | 13 | 4 | $103,981.00 | B.H.A. |
| Hunt,Sharon R | 00077650 | Deputy Director, Comm Svcs Adm | 15 | 0 | $158,010.32 | B.H.A. |
| Ibeh,Godwin O | 00015948 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Ibeh,Sybil | 00032612 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| Ibetoh,Angela Ngozi | 00000850 | Psychiatric Nurse | 9 | 10 | $106,074.00 | S.E.H. |
| Ibijemilusi,Caroline A | 00045777 | PSYCHIATRIC NURSE | 11 | 9 | $111,562.00 | S.E.H. |
| Ibikunle,Jimmy O | 00001313 | Supv Medical Officer Psych | MD6 | 0 | $280,123.72 | B.H.A. |
| Idowu,Josephus O | 00006120 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | B.H.A. |
| Ihegbe,Ngozi A | 00001817 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | B.H.A. |
| Iwuji,Raphael O. | 00017083 | PSYCHIATRIC NURSE | 11 | 7 | $104,125.00 | S.E.H. |
| Jackson,Atiya Sokoni Marie | 00009869 | Senior Deputy Director | 16 | 0 | $177,513.77 | B.H.A. |
| Jackson,Cassandra G | 00032978 | Medical Records Admin | 14 | 0 | $112,502.79 | S.E.H. |
| Jackson,James V | 00035359 | Administrative Program Officer | 15 | 0 | $162,705.29 | B.H.A. |
| Jackson,Laura A | 00085475 | Compliance Specialist | 12 | 10 | $102,268.00 | B.H.A. |
| Jaji,Abayomi I | 00047905 | MEDICAL OFFICER (PSYCHIATRY) | 5C | 7 | $264,359.00 | B.H.A. |
| Jenkins,Sheryl D | 00031751 | Care Manager | 13 | 5 | $107,022.00 | B.H.A. |
| Johnson,Nicole R. | 00031692 | Supvy Med Ofcr (Psych-Forensic | MD6 | 0 | $236,491.91 | B.H.A. |
| Johnson,Olayinka M | 00011728 | MEDICAL OFFICER (PSYCHIATRY) | 5C | 7 | $264,359.00 | S.E.H. |
| Jones,Eric T | 00000958 | CLINICAL PSYCHOLOGIST | 13 | 10 | $112,956.00 | S.E.H. |
| Jones,Helen | 00085504 | Program Monitor | 13 | 10 | $122,227.00 | B.H.A. |
| Jones,Phyllis G | 00006797 | Chief of Staff | 16 | 0 | $185,960.32 | B.H.A. |
| Jones,Sarah P | 00089382 | Early Childhood Clin Spec | 13 | 3 | $100,940.00 | B.H.A. |
| Jordan,Valerie B. | 00069775 | Public Health Analyst | 13 | 5 | $107,022.00 | B.H.A. |
| Kamal,Sana | 00014793 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 3 | $238,692.00 | B.H.A. |
| Karim,Amina T. | 00016824 | Investigative Analysis Special | 13 | 5 | $107,022.00 | B.H.A. |
| Kasaci,Arda | 00027801 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 7 | $258,124.00 | B.H.A. |
| Kasem,Safaa M. | 00001400 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 6 | $253,084.00 | B.H.A. |
| Keita,Shomarka O | 00011631 | MEDICAL OFFICER GENERAL PRACTI | 3 | 8 | $188,345.00 | S.E.H. |
| Kelley,Christine G | 00005462 | CLINICAL PSYCHOLOGIST | 13 | 6 | $101,712.00 | S.E.H. |
| Kelly,Sheila Long | 00009690 | Director of Licensure | 15 | 0 | $134,490.57 | B.H.A. |
| Kennedy,Timothy A. | 00046649 | PROGRAM ANALYST | 13 | 6 | $110,063.00 | B.H.A. |
| Koehne,Susan L | 00024167 | Program Analyst (Qual Improv) | 13 | 6 | $110,063.00 | B.H.A. |
| Kolansky,Saul K | 00003505 | MEDICAL OFFICER PSYCHIATRY | 6C | 8 | $222,496.00 | S.E.H. |
| Krahling,Debra B | 00025263 | Clinical Administrator | 13 | 0 | $122,043.00 | S.E.H. |
| Krishnan,Shilpa | 00010498 | Depy. Director Forensic Servs. | 15 | 0 | $128,073.29 | B.H.A. |
| Kromah,Mildred T | 00045787 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $112,317.82 | S.E.H. |
| Lam,Jonathan H. | 00015889 | CLINICAL PSYCHOLOGIST | 13 | 8 | $107,334.00 | S.E.H. |
| Lane,Julie O | 00085844 | Prevention Program Coordinator | 14 | 4 | $100,952.00 | B.H.A. |
| Larkins,Mark Anthony | 00022472 | SUPV INFO TECH SPECIALIST | 15 | 0 | $126,530.53 | B.H.A. |
| Larry,Lamont W | 00002131 | CLINICAL PSYCHOLOGIST | 13 | 10 | $112,956.00 | S.E.H. |
| Lee,Hyun Ah | 00088704 | Supervisory Pharmacist | 14 | 0 | $150,979.26 | B.H.A. |
| Lewis Marlin,Robin | 00069817 | Compliance Specialist | 13 | 7 | $113,104.00 | B.H.A. |
| Lewis,Mary L | 00085386 | Clinical Nurse | 11 | 10 | $115,283.00 | B.H.A. |
| Lewis,Michelle C | 00033565 | Interpreter American Sign Lang | 12 | 9 | $102,782.00 | B.H.A. |
| Lewis,Qutina S. | 00088703 | Lead Pharmacist | 13 | 8 | $116,145.00 | S.E.H. |

| NAME | POSITION | JOB_TITLE | GRADE | STEP | SALARY | AGENCY |
|------|----------|-----------|-------|------|--------|--------|
| Lillie-Blanton,Marsha D | 00001611 | Senior Policy Advisor | 16 | 0 | $169,950.00 | B.H.A. |
| Linder,Detra | 00045774 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Lingle,Timothy | 00009223 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $107,178.14 | S.E.H. |
| Livingood,John M | 00011980 | MEDICAL OFFICER PSYCH TRAINING | 5B | 8 | $131,645.50 | S.E.H. |
| Lugo-Axtmann,Anais D | 00089379 | Early Childhood Clin Spec | 13 | 3 | $100,940.00 | B.H.A. |
| Madden,Adina Kaleia | 00070288 | Chief, SUD Access and Referral | 14 | 0 | $134,454.89 | B.H.A. |
| Majekodunmi,Ruth Kappy O | 00005847 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $103,524.33 | S.E.H. |
| Malcolm,Maurice Andrew | 00037344 | Chief Information Officer | 15 | 0 | $162,000.00 | B.H.A. |
| Malik,Rizwan A | 00005041 | MEDICAL OFFICER (PSYCHIATRY) | 5C | 6 | $259,166.00 | S.E.H. |
| Malone,Sophia Adrianna | 00001793 | SUPERVISORY SOCIAL WORKER | 13 | 0 | $109,175.88 | S.E.H. |
| Manocchio,Teresa M | 00094832 | Policy Analyst | 14 | 6 | $130,071.00 | B.H.A. |
| Marquez,Claudia M | 00044555 | Policy Officer | 13 | 10 | $113,002.00 | S.E.H. |
| Marsh,Alicia M. | 00045665 | CLINICAL PSYCHOLOGIST | 13 | 7 | $104,523.00 | S.E.H. |
| Martin Stebbins,Leatrice | 00012096 | PHARMACIST | 12 | 10 | $105,339.00 | S.E.H. |
| Martin,Kevin O | 00019734 | Network Development Spec | 13 | 10 | $122,227.00 | B.H.A. |
| Martin,Shelita S. | 00016618 | Chief, Quality, Data, Training | 15 | 0 | $135,702.53 | S.E.H. |
| Maskittie,Beverly | 00021543 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Mathieux,Myrtha R | 00019997 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| Mathur,Raj P | 00025592 | MEDICAL OFFICER GENERAL PRACTI | 3 | 8 | $188,345.00 | B.H.A. |
| Mbuh,Samuel | 00045766 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $119,869.00 | S.E.H. |
| McAllister,Tyreese R | 00045740 | CRT Site Coordinator | 14 | 0 | $107,843.06 | B.H.A. |
| McCarty-Jones,Brendolyn R | 00025128 | SUPV HUMAN RESOURCES SPEC | 14 | 0 | $125,923.34 | B.H.A. |
| McFarlane,Cicely Lilla | 00007087 | SOCIAL WORKER | 12 | 10 | $101,276.00 | S.E.H. |
| McKain,Denise P | 00010958 | Supervisory Psychiatric Nurse | 14 | 0 | $123,784.23 | S.E.H. |
| Meikle,Jamie S | 00045739 | Investigative Analysis Special | 13 | 7 | $109,811.00 | B.H.A. |
| Michael,Regina N | 00006764 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Miller,Winston J | 00026183 | Information Technology Special | 13 | 10 | $122,227.00 | B.H.A. |
| Minor,Nevena A | 00003426 | Policy Analyst | 14 | 5 | $126,479.00 | B.H.A. |
| Mohyuddin,Farooq | 00031792 | Supv Medical Officer Psych | MD4 | 0 | $238,106.35 | S.E.H. |
| Moliki-nee Agbor,Serah F. | 00045781 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Moore,Thomas Edward | 00087589 | Compliance Specialist | 13 | 4 | $100,952.00 | B.H.A. |
| Morales,Luis A. | 00082689 | SUPERVISORY SOCIAL WORKER | 13 | 0 | $112,333.66 | S.E.H. |
| Moss-Baker,Angele D | 00009618 | Behavioral Health Trng Spec | 13 | 8 | $116,145.00 | B.H.A. |
| Mowbray,Mary Catherine | 00027773 | Creative Arts Therapist (Art) | 12 | 5 | $100,224.00 | S.E.H. |
| Muhammad,LaDonna K | 00069818 | ACCOUNTABILITY ANALYST | 13 | 7 | $113,104.00 | B.H.A. |
| Mumford,Jennifer D | 00076916 | Supervisory Program Monitor | 14 | 0 | $124,158.26 | B.H.A. |
| Mumuney,Queen | 00045778 | Supvy. Psychiatric Nurse | 13 | 0 | $116,111.62 | S.E.H. |
| Murphy,Kelly Laura | 00097339 | Project Director (SOR) | 14 | 0 | $129,387.00 | B.H.A. |
| Murray,Yvette R | 00020376 | Human Resources Specialist | 13 | 7 | $104,569.00 | B.H.A. |
| Naqvi,Syed Akhtar | 00043379 | MEDICAL OFFICER (PSYCHIATRY) | 5C | 7 | $264,359.00 | S.E.H. |
| Nash,Keri A. | 00003855 | Policy Analyst | 14 | 1 | $112,111.00 | B.H.A. |
| Ndubuizu,Ngozi M | 00025445 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Nebafu,Gladys M. | 00009882 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Nelson Pierre,Susan D | 00004103 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Nelson,Keli-Lloyd Alecia | 00023648 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Norvell,Carolyn S | 00015906 | PHARMACIST | 12 | 10 | $105,339.00 | B.H.A. |
| Nwaobilor,Obioma U | 00045769 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| Nwonye,Florence N | 00011382 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| O'Connor,Stephen J | 00008759 | Program Manager | 14 | 0 | $115,700.25 | B.H.A. |
| Ogwuegbu,Regina | 00019678 | PSYCHIATRIC NURSE | 11 | 10 | $106,534.00 | S.E.H. |
| Ohashi,Masako | 00021108 | Creative Arts Therapist (Art) | 12 | 5 | $100,224.00 | S.E.H. |

| NAME | POSITION | JOB_TITLE | GRADE | STEP | SALARY | AGENCY |
|------|----------|-----------|-------|------|--------|--------|
| Ojo,Caroline C | 00009954 | PSYCHIATRIC NURSE | 11 | 6 | $100,403.00 | B.H.A. |
| Ojomo,Adebayo | 00045775 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Okeh,Anthony Chinaka | 00002496 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Okoroafor,Ndubuisi I | 00027063 | PSYCHIATRIC NURSE | 11 | 6 | $100,403.00 | S.E.H. |
| Okpala,Bernardine N | 00032552 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Okparaeke,Rosemary N | 00001471 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| OLANIYAN,MODUPE ADE | 00031783 | Clinical Care Coordinator | 12 | 10 | $105,339.00 | B.H.A. |
| Olsen,Mia Faye | 00041847 | Attorney Advisor | 14 | 2 | $125,415.00 | B.H.A. |
| Olson,Wendy A | 00017100 | Supvy. Clinical Psychologist | 14 | 0 | $112,054.83 | S.E.H. |
| Olugbemi,Funmilayo O | 00002248 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Olumese,Elizabeth Ire | 00024950 | Nurse Practitioner | 12 | 10 | $121,046.00 | S.E.H. |
| Onuekwusi,Kevin O | 00045783 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Onwuche,Nkechi Christine | 00023665 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $111,457.44 | B.H.A. |
| Onyemenem,Augustine E | 00034796 | PRTF Coordinator | 13 | 8 | $116,145.00 | B.H.A. |
| Orimolade,Kehinde B | 00003570 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $112,530.96 | S.E.H. |
| Owens,Karen S | 00025290 | Supv Dental Officer | MD3 | 0 | $200,715.41 | S.E.H. |
| Owolabi,Motunrayo I | 00024639 | PSYCHIATRIC NURSE | 9 | 9 | $102,653.00 | S.E.H. |
| Paige Young,Vaughnetta | 00070695 | Program Monitor | 12 | 8 | $100,225.00 | B.H.A. |
| Park,James | 00012665 | PHARMACIST | 12 | 10 | $105,339.00 | B.H.A. |
| Parks,Barbara J | 00008477 | Deputy Director of Child/Youth | 16 | 0 | $148,500.00 | B.H.A. |
| Parris,Nancy E | 00071590 | Early Childhood Clin Spec | 13 | 10 | $122,227.00 | B.H.A. |
| Patterson,Antoine C | 00031781 | Information Technology Special | 13 | 9 | $119,186.00 | B.H.A. |
| Patterson,Ulrich D | 00020864 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Pengrin,Lauren M | 00095060 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 2 | $234,126.00 | S.E.H. |
| Perrin,Paul S | 00022193 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Perry,Tamil N | 00012112 | Training Administrator | 14 | 0 | $120,028.04 | S.E.H. |
| Phillips,Christine Jallah | 00071990 | Director of Certification Divi | 15 | 0 | $137,014.15 | B.H.A. |
| Phillips,Sharon | 00016748 | Lead Pharmacist | 13 | 10 | $122,227.00 | B.H.A. |
| Pipkin,Cherylyn Y | 00012061 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Plater,Laverne D | 00025524 | Nurse Consultant | 12 | 10 | $121,046.00 | S.E.H. |
| Points Jr.,Bruce D | 00076943 | Program Manager | 13 | 0 | $104,620.25 | B.H.A. |
| Pollock,Andrew H | 00026820 | Deputy Director of Accountabil | 16 | 0 | $151,525.76 | B.H.A. |
| Pontes,Martha G | 00045785 | Supervisory Psychiatric Nurse | 14 | 0 | $128,184.31 | S.E.H. |
| Poole,Laressa J | 00009264 | Network Development Manager | 14 | 0 | $125,102.80 | B.H.A. |
| Porter,Willie | 00003076 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Potter,Edgar | 00045678 | Supv. Medical Officer (General | MD5 | 0 | $219,228.00 | S.E.H. |
| Powell,Dorothy J | 00025794 | PODIATRIST | 1 | 8 | $143,213.00 | S.E.H. |
| Prentiss,Audrey J | 00012762 | CLINICAL PSYCHOLOGIST | 13 | 10 | $112,956.00 | S.E.H. |
| Preston,April Y | 00089383 | Early Childhood Clin Spec | 13 | 4 | $103,981.00 | B.H.A. |
| Pryor,Michael | 00085471 | Community Prevention Specialis | 13 | 7 | $113,104.00 | B.H.A. |
| Queen,Robin Young | 00009877 | Care Manager | 13 | 8 | $116,145.00 | B.H.A. |
| Rajnauth-Suralie,Linda | 00011551 | Dental Officer (Periodontics) | 3 | 8 | $94,172.50 | S.E.H. |
| Randolph,Thomas | 00070289 | Public Health Advisor | 13 | 7 | $113,104.00 | B.H.A. |
| Ratliff,Sylvia B | 00018436 | Compliance Specialist | 13 | 10 | $122,227.00 | B.H.A. |
| Ray,Kim A | 00039268 | Chief, Co-Located Programs Bra | 14 | 0 | $111,029.47 | B.H.A. |
| Reaves,Juanita Y | 00008597 | Planning & Performance Mgmt Of | 15 | 0 | $149,490.23 | B.H.A. |
| Reed,Martin | 00003865 | PGM ANALYST | 13 | 10 | $113,002.00 | B.H.A. |
| Reipa,Rokas | 00002239 | IT Specialist (Data Mgmt) | 14 | 3 | $119,295.00 | B.H.A. |
| Renix,Robert A. | 00014008 | Supervisory Chaplain | 14 | 0 | $107,841.45 | S.E.H. |
| Reyes,Josephine G | 00002596 | MEDICAL OFFICER GENERAL PRACTI | 3 | 8 | $170,639.00 | S.E.H. |
| Richardson,Estelle | 00010290 | Change Management Director | 15 | 0 | $156,927.30 | B.H.A. |

| NAME | POSITION | JOB_TITLE | GRADE | STEP | SALARY | AGENCY |
|------|----------|-----------|-------|------|--------|--------|
| Richardson,Raphaelle K | 00005092 | Director, Consumer & Family Af | 15 | 0 | $136,578.00 | B.H.A. |
| Richardson,Tracey Ballard | 00041845 | SUPERVISORY ATTORNEY ADVISOR | 2 | | $156,907.11 | B.H.A. |
| Robinson,Chele L | 00082130 | Network Development Spec | 13 | 4 | $103,981.00 | B.H.A. |
| Robinson,Crystal B | 00008921 | Program Manager, Rehabilitatio | 14 | 0 | $123,897.51 | S.E.H. |
| Robinson,Tracie R | 00013582 | Creative Arts Ther (Dance) | 12 | 5 | $100,224.00 | S.E.H. |
| Rodgers,Estes | 00001992 | Incident Review Specialist | 13 | 7 | $113,104.00 | S.E.H. |
| Rodgers,Jessica A | 00024566 | Recreation Therapist | 12 | 5 | $100,224.00 | S.E.H. |
| Rogers,Roy | 00001647 | Social Worker | 12 | 10 | $101,276.00 | B.H.A. |
| Rosado Nelson,Leila | 00027507 | Supervisory Clinical Administr | 14 | 0 | $108,480.33 | S.E.H. |
| Ross,Collin R. | 00009692 | Program Cooardinator | 12 | 10 | $105,339.00 | S.E.H. |
| Rouse,Shamar E | 00043372 | Suvpy Clinical Administrator | 13 | 0 | $103,152.85 | S.E.H. |
| Route,Jocelyn C | 00007168 | Strategic Planning, Pol, & Eng | 14 | 4 | $122,887.24 | B.H.A. |
| Royster,Tanya A | 00011599 | Director of Mental Health | E5 | 0 | $211,773.00 | B.H.A. |
| Sadasivan,Avanti | 00007456 | CLINICAL PSYCHOLOGIST | | 0 | $101,712.00 | S.E.H. |
| Saffell,Lynne M | 00075295 | Program Monitor | 12 | 8 | $100,225.00 | B.H.A. |
| Sands Jr.,Robert E. | 00088707 | Occupational Therapist | 12 | 9 | $110,452.00 | S.E.H. |
| Sanzi,Cheri C | 00047573 | Deputy Director of Admin Opera | 15 | 0 | $139,461.90 | B.H.A. |
| Schapiro,Moses | 00008369 | SOCIAL WORKER | 12 | 10 | $101,276.00 | S.E.H. |
| Schwartz,Andrew | 00000354 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 8 | $263,291.00 | S.E.H. |
| Scott,Charneta C | 00007592 | Project Manager | 14 | 0 | $134,404.33 | B.H.A. |
| Scott,Cortez Todarro | 00007531 | Clinical Administrator | 13 | 0 | $103,321.71 | S.E.H. |
| Secarea,Cristina M | 00003180 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 1 | $229,671.00 | S.E.H. |
| Shah,Renu | 00043375 | MEDICAL OFFICER PSYCHIATRY | 6C | 4 | $258,133.00 | S.E.H. |
| Shah,Yasir | 00085472 | Grant Specialist | 13 | 5 | $107,022.00 | B.H.A. |
| Shapiro,David Adam | 00024543 | Learning and Development Dir | 15 | 0 | $123,790.74 | B.H.A. |
| Shere,Jeremy M | 00073455 | ACCOUNTABILITY ANALYST | 13 | 7 | $113,104.00 | B.H.A. |
| Sherron,Robert Lee | 00012445 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 8 | $263,291.00 | S.E.H. |
| Shokunbi,Tinuola T | 00013421 | PSYCHIATRIC NURSE | 11 | 7 | $104,125.00 | S.E.H. |
| Sices,Shanetha R | 00012180 | Incident Review Specialist | 13 | 4 | $103,981.00 | S.E.H. |
| Simo Mukam,Bern Megang | 00012021 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | S.E.H. |
| Singh,Anjali | 00009221 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 8 | $263,291.00 | B.H.A. |
| Singh,Kunverjit | 00010191 | Reports Developer | 13 | 7 | $113,104.00 | B.H.A. |
| Smith,Amina A. | 00031664 | Evid-Based Svcs Prog Mgr | 13 | 0 | $117,724.37 | B.H.A. |
| Smith,Gail C | 00012226 | Treatment Team Coordinator | 13 | 0 | $106,084.43 | S.E.H. |
| Smith,Tamisha N.K. | 00007619 | Medicaid Eligib & Compl Ofcr | 14 | 0 | $104,701.75 | B.H.A. |
| Snoddy,Michael | 00070696 | Program Monitor | 13 | 10 | $122,227.00 | B.H.A. |
| Sofela,Abiodun J | 00011281 | Quality Improvement Coordinato | 13 | 7 | $113,104.00 | S.E.H. |
| Sofola,Kolawole R | 00019154 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $112,531.13 | S.E.H. |
| Soto,Marina Isabel | 00069822 | Executive Assistant | 13 | 6 | $101,758.00 | B.H.A. |
| Spencer,Deborah Lynn | 00020663 | Executive Assistant | 13 | 9 | $110,191.00 | B.H.A. |
| Spencer,Terri R.B. | 00071744 | Director, Specialty Care Divis | 15 | 0 | $129,930.70 | B.H.A. |
| Steiner,Erik B | 00003755 | Recreation Therapist | 12 | 5 | $100,224.00 | S.E.H. |
| Stewart,Craig S | 00000551 | Director of Investigations Div | 15 | 0 | $129,433.92 | B.H.A. |
| Stewart,Darryl | 00045679 | Nurse Practitioner | 12 | 9 | $117,141.00 | S.E.H. |
| Stiller,John W | 00000658 | MEDICAL OFFICER NEUROLOGY | 5B | 0 | $220,348.00 | S.E.H. |
| Stone,Sheila M | 00024814 | Program Administrator | 14 | 0 | $119,704.58 | S.E.H. |
| Street,Darin | 00031719 | CFSA Mental Health Coord | 13 | 5 | $103,905.00 | B.H.A. |
| Stuart,Philippa S | 00033325 | Program Analyst (Qual Improv) | 13 | 4 | $103,981.00 | B.H.A. |
| Suardi,Enrico Mario | 00093764 | Supvy. Medical Officer (Psychi | MD6 | 0 | $246,330.00 | S.E.H. |
| Sullivan,Meghan K | 00092089 | Project Director (DC Seed) | 13 | 0 | $112,530.53 | B.H.A. |
| Sweat,Drew L | 00015613 | Health Systems Specialist | 13 | 6 | $110,063.00 | B.H.A. |

| NAME | POSITION | JOB_TITLE | GRADE | STEP | SALARY | AGENCY |
|------|----------|-----------|-------|------|--------|--------|
| Taddesse,Haregnesh | 00015194 | Claims Management Analyst | 13 | 3 | $100,940.00 | B.H.A. |
| Talleyrand,Alix | 00002993 | Mental Health Curriculum Dev. | 13 | 9 | $119,186.00 | S.E.H. |
| Taneja,Kanwaljit Singh | 00019933 | Chief Operating Officer | 16 | 0 | $178,549.47 | S.E.H. |
| Tanyi,George S | 00020337 | PSYCHIATRIC NURSE | 11 | 10 | $115,283.00 | B.H.A. |
| Tapp,Lisa L | 00001538 | Equal Employment Manager | 13 | 8 | $107,380.00 | B.H.A. |
| Taylor,Christine A | 00026526 | Claims Revenue Manager | 14 | 0 | $109,614.00 | B.H.A. |
| Teegarden,Elizabeth A | 00000928 | CLINICAL PSYCHOLOGIST | 13 | 7 | $104,523.00 | B.H.A. |
| Tesfaye,Yoseph | 00009017 | PROGRAM ANALYST | 13 | 10 | $122,227.00 | B.H.A. |
| Thompson,Patricia C | 00020832 | Project Director II | 14 | 0 | $125,641.50 | B.H.A. |
| Thornton,Gabrielle | 00008934 | Recreation Therapist | 12 | 5 | $100,224.00 | S.E.H. |
| Thullah Bangura,Mary T | 00019678 | PSYCHIATRIC NURSE | 11 | 7 | $104,125.00 | S.E.H. |
| Tillbrook,Chad E | 00023792 | Director, Forensic Division | 16 | 0 | $185,960.32 | B.H.A. |
| Timmons,LaRena S | 00045746 | ACCOUNTABILITY ANALYST | 13 | 5 | $107,022.00 | B.H.A. |
| Tisdale,Bruce B | 00082131 | Network Development Manager | 14 | 0 | $117,724.37 | B.H.A. |
| Tsegay,Temertsa | 00004128 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Tu,Yi-Ling E | 00035155 | Infection Control Coordinator | 14 | 0 | $118,399.79 | S.E.H. |
| Tzeggai,Sara | 00025821 | Dietitian | 12 | 9 | $102,782.00 | S.E.H. |
| Tzeuton,Adele Leonie | 00007681 | PSYCHIATRIC NURSE | 11 | 9 | $111,562.00 | S.E.H. |
| Ugochukwu,Josephine O | 00045780 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $107,619.04 | S.E.H. |
| Umaru,Aminu C | 00094838 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $117,950.86 | S.E.H. |
| Unaegbu,Elizabeth Ngozi | 00007248 | SUPERVISORY PSYCHIATRIC NURSE | 13 | 0 | $107,178.14 | S.E.H. |
| Uzoma,Hyacinth N. | 00002889 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 5 | $248,167.00 | S.E.H. |
| Uzoukwu,Chinyere E | 00020833 | PSYCHIATRIC NURSE | 9 | 10 | $106,074.00 | S.E.H. |
| Valentine,Kelly L | 00085470 | Community Prevention Specialis | 13 | 7 | $113,105.33 | B.H.A. |
| Valentine,Ti'Shema Y | 00070182 | IT Specialist (System Analysis | 13 | 7 | $113,104.00 | B.H.A. |
| Varghese,Sophy Mary | 00019552 | Supvy Social Worker | 14 | 0 | $114,733.50 | S.E.H. |
| Venson,Alvin D. | 00046644 | Facilities Operations Manager | 14 | 0 | $114,801.89 | S.E.H. |
| Veria,Ana Maria | 00036272 | Policy Analyst | 14 | 6 | $130,070.46 | B.H.A. |
| Villier,Jean Joel | 00006211 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 8 | $263,291.00 | S.E.H. |
| Volkov,Igor | 00027872 | MEDICAL OFFICER (PSYCHIATRY) | 5 | 6 | $243,204.00 | B.H.A. |
| Volkov,Janna | 00027551 | MEDICAL OFFICER (PSYCHIATRY) | 5B | 7 | $258,124.00 | S.E.H. |
| Wadhawan,Abhishek | 00002075 | MEDICAL OFFICER (PSYCHIATRY) | 5 | 1 | $220,938.00 | S.E.H. |
| Ward,Jonathan F | 00001041 | Deputy Director, Crisis and Em | 15 | 0 | $139,322.69 | B.H.A. |
| Waters,Crystal M | 00027384 | Supervisory Nurse Practitioner | 13 | 0 | $124,557.92 | S.E.H. |
| Watson,Howard Purvis | 00036937 | Program Coordinator | 13 | 8 | $107,380.00 | B.H.A. |
| Wellington,David L | 00046654 | Supvy. Inventory Management Sp | 13 | 0 | $107,635.96 | S.E.H. |
| Wheeler,Frankie T | 00011789 | Director of Human Resources | 16 | 0 | $170,510.66 | B.H.A. |
| White,Sharon M | 00011900 | Consumer Grievance Spec | 13 | 10 | $122,227.00 | B.H.A. |
| White,Tony | 00001416 | Comm Svcs Review Ana (Adult) | 13 | 10 | $122,227.00 | B.H.A. |
| Wilkerson,Shandra A | 00036280 | Deputy Director, Behav. Hlth. | 15 | 0 | $122,939.77 | B.H.A. |
| Williams,Anndreeze H | 00043434 | Attorney Advisor | 15 | 5 | $161,798.00 | B.H.A. |
| Williams,Crystal D | 00000707 | PROGRAM ANALYST | 13 | 6 | $110,063.00 | B.H.A. |
| Williams,Lanada N | 00003297 | Provider Relations Specialist | 13 | 6 | $110,063.00 | B.H.A. |
| Williams,Soammes F | 00011052 | Info Tech Spec (Sys Admin) | 12 | 10 | $105,339.00 | B.H.A. |
| Williams,Terrence | 00012656 | Chief Operating Officer | 16 | 0 | $158,816.15 | B.H.A. |
| Williams,Tyanna Marie | 00005483 | Chief, New Initiatives Branch | 14 | 0 | $107,843.06 | B.H.A. |
| Wilson,Richard | 00002596 | MEDICAL OFFICER GENERAL PRACTI | 3C | 8 | $203,024.00 | S.E.H. |
| Wilson,Wanda M | 00087479 | SOCIAL WORKER | 12 | 10 | $101,276.00 | B.H.A. |
| Wooden,Eugene R | 00021832 | Coord of Assertive Comm Treatm | 14 | 0 | $107,841.91 | B.H.A. |
| Woodland,Calvin | 00085473 | Community Outreach Coordinator | 13 | 5 | $107,022.00 | B.H.A. |
| Worsley,Jacqueline | 00045702 | Administrative Specialist | 13 | 8 | $107,380.00 | B.H.A. |

| NAME | POSITION | JOB_TITLE | GRADE | STEP | SALARY | AGENCY |
|------|----------|-----------|-------|------|--------|--------|
| Wotring,James R. | 00009869 | Senior Deputy Director | 16 | 0 | $180,544.90 | B.H.A. |
| Yerrell-Garrett,Lori Ann | 00015499 | Assistant Chief Nursing Execut | 15 | 0 | $160,882.95 | S.E.H. |
| Zaidi,Syed I.H. | 00031669 | MEDICAL OFFICER (PSYCHIATRY) | 5C | 8 | $269,681.00 | S.E.H. |
| Zaidi,Syed M | 00015380 | MEDICAL OFFICER GENERAL PRACTI | 3C | 8 | $203,024.00 | S.E.H. |
| Zhang,Lixin | 00003737 | Information Technology Special | 13 | 6 | $110,063.00 | B.H.A. |

*Q11. Please provide the Committee with the following:*
  - *a. A list of all employees who receive cell phones, personal digital assistants, or similar communication devices;*
  - *b. A list of travel expenses for FY19 and to date FY20, arranged by employee; and,*
  - *c. A list of employees who earn $100,000 or more in FY19 or to date in FY20, including their names, position, salary, grade, step, position description, and agency within DBH.*

**DBH Response:**

See Attachment 1 of 3. Communications Devices
See Attachment 2 of 3. Travel
See Attachment 3 of 3. Salaries

Q. 12 Attachment 1 of 1

| Grant Number/Title | FY 2019 Revised Budget | Funding Source | FY 2019 Expenditures | FY 2020 Revised Budget | Funding Source | FY 2020 Expenditures (inc. encumbrances & pre-encumbrances, intra-district) | Purpose of Grant | Grant Deliverables | Grant Outcomes/ Grantee Performance | Corrective Actions/TA Provided | DBH Program & Activity Supported By Grant | DBH Employee Responsible for Grant Deliverables |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6U79TI025317/State Adolescent Treatment Enhancement and Dissemination/(61SATD) | $22,040.00 | Substance Abuse and Mental Health Services Administration (SAMHSA) | $22,040.00 | $0.00 | SAMHSA | $0.00 | Establish a sustainable evidence-based program to provide treatment and recovery support services to adolescents and transitional aged youth with co-occurring substance use and mental health disorders and their families, and build infrastructure to effectively address the needs of co-occurring clients. | Evidence based treatment and recovery support services to Adolescents | Evidence based treatment and recovery support services to Adolescents | None | Community Services Division, Specialty Care - 6922 | Sharon Hunt |
| 6H79SM061903/Positive Transitions Youth - Young Adult/(81PTYA) | $1,193,700.98 | SAMHSA | $1,193,700.98 | $250,000.00 | SAMHSA | $100,684.89 | Design and implement a youth-focused system of care with Core Support Agencies providing transition age youth-specific care planning, wraparound, evidence-based practices and recovery supports. | Provide transition aged youth with a system of care | Provide transition aged youth with a system of care | None | Community Services Division, Specialty Care - 6922 | Tyanna Williams |
| 5U79SP020706/ DC Strategic State and Tribal Initiative/ (81SPSF) | $1,807,116.53 | SAMHSA | $1,807,116.53 | $250,000.00 | SAMHSA | $0.00 | Strategic Prevention Framework, Partnerships for Success Initiatve (SPF-PFS) will support 8 high-need wards in reducing underage drinking and marijuana use among persons ages 12-25 through; Plan Development, Community Prevention Network Enhancement, Community Capacity for Change, Community Changes, and Ward Infrastructure. | Identified evidence-based preventive intervention strategies in the community, evaluation of SPF-PFS activities, District of Columbia Epidemiological Outcomes Workgroups (DCEOW), "There is a Reason" ads, flyers, etc. bringing awareness to underage drinking and marijuana use campaign | Identified evidence-based preventive intervention strategies in the community, evaluation of SPF-PFS activities, District of Columbia Epidemiological Outcomes Workgroups (DCEOW), "There is a Reason" ads, flyers, etc. bringing awareness to underage drinking and marijuana use campaign | None | Community Services, Office of Prevention Services - 6913 | Eric Chapman |
| 2B08TI010008/ Substance Abuse and Prevention and Treatment/ (82APBG/SUD Block Grant) | $1,050,578.89 | SAMHSA | $1,050,578.89 | $0.00 | SAMHSA | $0.00 | The Substance Abuse and Prevention and Treatment (SAPT) block grant is used for the purpose of planning, carrying out, and evaluating activities to prevent and treat substance abuse and for related activities as authorized by the statute. | Substance abuse prevention, treatment, and recovery support services | Substance abuse prevention, treatment, and recovery support services | None | Multiple Activities - (6913 - Prevention and Substance Use Disorder,6920 - Specialty Care) | Sharon Hunt |
| 2B08TI010008/ Substance Abuse and Prevention and Treatment/ (92APBG/SUD Block Grant) | $5,687,595.49 | SAMHSA | $5,687,595.49 | $1,610,097.51 | SAMHSA | $256,108.94 | The Substance Abuse and Prevention and Treatment (SAPT) block grant is used for the purpose of planning, carrying out, and evaluating activities to prevent and treat substance abuse and for related activities as authorized by the statute. | Substance abuse prevention, treatment, and recovery support services | Substance abuse prevention, treatment, and recovery support services | None | Multiple Activities - (6921 - Specialty Care - Community Based Services,6922 - Specialty Care - New Initiatives,6940 - Housing Development,1030 - Property Management,1050 - Financial Managment,1089 - Health Information Managment,1820 - Consumer and Family Affairs,1889 - Legislative and Public Affairs,4930 - Certification, 5870 - Access Helpline,5890 - Assessment and Referral Center, | Sharon Hunt |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2B08TI010008/ Substance Abuse and Prevention and Treatment/ (02APBG/SUD Block Grant) | $0.00 | SAMHSA | $0.00 | $6,934,702.10 | SAMHSA | $1,520,429.55 | The Substance Abuse and Prevention and Treatment (SAPT) block grant is used for the purpose of planning, carrying out, and evaluating activities to prevent and treat substance abuse and for related activities as authorized by the statute. | Substance abuse prevention, treatment, and recovery support services | Substance abuse prevention, treatment, and recovery support services | None | Multiple Activities - (6921 - Specialty Care - Community Based Services,6922 - Specialty Care - New Initiatives,6940 - Housing Development,1030 - Property Management,1050 - Financial Management,1089 - Health Information Management,1088 - Claims Administration, 1820 - Consumer and Family Affairs,1889 - Legislative and Public Affairs,4940 - Program Integrity, 5870 - Access Helpline,5990 | Sharon Hunt |
| 3B09SM010008/ State Mental Health Block Grant/ (82MHBG) | $1,627,261.18 | SAMHSA | $1,627,261.18 | $0.00 | SAMHSA | $0.00 | Funding is used to develop and support community mental health services such as; DBH Strategic Plan, building a cadre of Peer Support Providers, recruiting and supporting child providers, as well as informing mental health professionals and community members about first episode psychosis. | Mental Health Services | Mental Health Services | None | System Transformation, Strategic Management and Policy - 5920 | Raessa Singh |
| 3B09SM010008/ State Mental Health Block Grant/ (92MHBG) | $543,687.03 | SAMHSA | $543,687.02 | $1,196,462.98 | SAMHSA | $439,402.15 | Funding is used to develop and support community mental health services such as; Peer Services, continued support for Clubhouse infrastructure, DBH Strategic Planning and Results Based Accountability efforts. | Mental Health Services | Mental Health Services | None | System Transformation, Strategic Management and Policy - 5920 | Raessa Singh |
| 3B09SM010008/ State Mental Health Block Grant/ (02MHBG) | $0.00 | SAMHSA | $0.00 | $596,250.00 | SAMHSA | $148,000.00 | Funding is used to develop and support community mental health services such as; Peer Services, continued support for Clubhouse infrastructure, DBH Strategic Planning and Results Based Accountability efforts. | Mental Health Services | Mental Health Services | None | System Transformation, Strategic Management and Policy - 5920 | Raessa Singh |
| 2X06SM016009/ Projects for Assistance in Transition from Homelessness/(91MHPH) | $227,677.06 | SAMHSA | $227,677.06 | $0.00 | SAMHSA | $0.00 | Provides services to people with serious mental illness, including those with co-occurring substance use disorders, who are experiencing homelessness or are at imminent risk of becoming homeless. | Assistance in housing homeless individuals | Assistance in housing homeless individuals | None | Clinical Services Division, Homeless Outreach / Mobile Crisis - 5842 | Anthony Hall |
| 2X06SM016009/ Projects for Assistance in Transition from Homelessness/(01MHPH) | $0.00 | SAMHSA | $0.00 | $269,783.62 | SAMHSA | $82,234.55 | Provides services to people with serious mental illness, including those with co-occurring substance use disorders, who are experiencing homelessness or are at imminent risk of becoming homeless. | Assistance in housing homeless individuals | Assistance in housing homeless individuals | None | Clinical Services Division, Homeless Outreach / Mobile Crisis - 5842 | Anthony Hall |
| DC0079L3G001605/ Shelter Plus Care Program/ (95MHSP) | $40,701.00 | Housing and Urban Development (HUD) | $40,701.00 | $0.00 | HUD | $0.00 | Provides housing assistance to homeless individuals. | Housing Assistance | Housing Assistance | None | Community Services, Housing Development - 6940 | Brandi Gladden |
| DC0079L3G001706/ Shelter Plus Care Program/ (91MHSP) | $199,161.73 | HUD | $199,161.73 | $0.00 | HUD | $0.00 | Provides housing assistance to homeless individuals. | Housing Assistance | Housing Assistance | None | Community Services, Housing Development - 6940 | Brandi Gladden |
| Shelter Plus Care Program/ (01MHSP) | $0.00 | HUD | $0.00 | $200,000.00 | HUD | $0.00 | Provides housing assistance to homeless individuals. | Housing Assistance | Housing Assistance | None | Community Services, Housing Development - 6940 | Brandi Gladden |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5H79SM063426/ District of Columbia Social, Emotional and Early Development (DC SEED) Project (81SEED) | $1,225,957.04 | SAMHSA | $1,225,957.04 | $0.00 | SAMHSA | $0.00 | Implement a 4-year System of Care (SOC) to address the highly specific, largely unmet needs of infants and young children (birth-6) residing in DC who are at high imminent risk for and diagnosed with Serious Emotional Disturbance (SED). | Early Childhood System of Care | Early Childhood System of Care | None | Community Services, Specialty Care - 6922 | Meghan Sullivan |
| 5H79SM063426/ District of Columbia Social, Emotional and Early Development (DC SEED) Project (91SEED) | $0.00 | SAMHSA | $0.00 | $972,568.99 | SAMHSA | $474,709.24 | Implement a 4-year System of Care (SOC) to address the highly specific, largely unmet needs of infants and young children (birth-6) residing in DC who are at high imminent risk for and diagnosed with Serious Emotional Disturbance (SED). | Early Childhood System of Care | Early Childhood System of Care | None | Community Services, Specialty Care - 6922 | Meghan Sullivan |
| 6H79TI026050/ DC Coop Agreement to Benefit Homeless/ (71CABH) | $1,302,468.84 | SAMHSA | $1,302,468.84 | $0.00 | SAMHSA | $0.00 | The District Homeless Action Project (DHAP) will support and enhance a housing-first sustainable system of coordinated entry to connect the target population of homeless veterans and chronically homeless individuals experiencing substance use disorders, serious mental illnesses (SMI), or co-occurring disorders with evidence-based housing, treatment, and recovery support services (RSS) to eliminate health disparities and homelessness in these populations. | Enhance coordinated entry system infrastructure | Enhance coordinated entry system infrastructure | None | Community Services -(6905 - Office of Community Services, 6920 - Specialty Care) | Kelly Valentine |
| 2016-MO-BX-0014/Justice Mental Health Collaboration Program (72JMHC) | $100,414.79 | Department of Justice (DOJ) | $100,414.79 | $0.00 | DOJ | $0.00 | DBH in collaboration with Metropolitian Police Department (MPD), Criminal Justice Coordinating Council (CJCC), Department of Corrections (DOC), Fire and Emergency Management System (FEMS), Office of Unified Communication (OUC) to consolidate and analyze local data in order to identify and address the needs of "super-utilizers" - individuals with mental illness and co-occurring substance abuse disorders who repeatedly cycle through multiple service systems. | Increase collaboration between mental health, and criminal justice agencies to address the needs of super-utilizers by providing targeted services and interventions. | Increase collaboration between mental health, public safety, and criminal justice agencies to address the needs of super-utilizers by providing targeted services and interventions. | None | Clinical Services Division, Forensics - 5880 | Chad Tillbrook |
| 5H79TI080229/DC Opioid Targeted Strategy (DOTS) Project (81DOTS) | $1,330,515.91 | SAMHSA | $1,330,515.91 | $200,000.00 | SAMHSA | -$37,468.02 | Activities will address all individuals in the District with or at risk for Opioid Use Disorders (OUDs), but will specifically target middle-aged heroin-using African American males. | Engage in strategic planning focused on District-wide OUD needs; Decrease the incidence of OUD through prevention; Increase access to OUD treatment and improve care coordination for medication-assisted treatment (MAT) clients; Expand recovery support services (RSS) for individuals with OUD; and Enhance recruitment and engagement for individuals with OUDs. | Engage in strategic planning focused on District-wide OUD needs; Decrease the incidence of OUD through prevention; Increase access to OUD treatment and improve care coordination for medication-assisted treatment (MAT) clients; Expand recovery support services (RSS) for individuals with OUD; and Enhance recruitment and engagement for individuals with OUDs. | None | Community Services, Specialty Care - 6920 | Petrina Williams |
| 1H79TI081707-01/District of Columbia Opioid Response (DCOR) (81DCOR) | $9,314,837.06 | SAMHSA | $9,314,837.06 | $0.00 | SAMHSA | $0.00 | Initiative will focus on increasing access to medication assisted treatment (MAT), reducing unmet treatment needs, and reducing opioid overdose related deaths in DC through the provision of prevention, treatment, and recovery support services (RSS) to individuals with opioid use disorder (OUD). | Implement a multi-pronged approach aimed at enhancing its ability to divert potential opioid abuse, effectively treating individuals with OUD and supporting them and their families throughout and into recovery. | Implement a multi-pronged approach aimed at enhancing its ability to divert potential opioid abuse, effectively treating individuals with OUD and supporting them and their families throughout and into recovery. | Yes | Community Services, Specialty Care - 6922, Legal Services - 1888 | Sharon Hunt |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5H79TI081707-02/District of Columbia Opioid Response (DCOR) (91DCOR) | $0.00 | SAMHSA | $0.00 | $31,141,696.25 | SAMHSA | $6,155,998.74 | Initiative will focus on increasing access to medication assisted treatment (MAT), reducing unmet treatment needs, and reducing opioid overdose related deaths in DC through the provision of prevention, treatment, and recovery support services (RSS) to individuals with opioid use disorder (OUD). | Implement a multi-pronged approach aimed at enhancing its ability to divert potential opioid abuse, effectively treating individuals with OUD and supporting them and their families throughout and into recovery. | Implement a multi-pronged approach aimed at enhancing its ability to divert potential opioid abuse, effectively treating individuals with OUD and supporting them and their families throughout and into recovery. | Yes | Community Services, Specialty Care - 6922 | Sharon Hunt |
| 1H79TI081212-01/District of Columbia Changing and Improving Treatment for our Youth (81CITY) | $192,562.63 | SAMHSA | $192,562.63 | $0.00 | SAMHSA | $0.00 | Enhance DBH services for youth (ages 12-18) and transition age youth (ages 18-25) to provide a comprehensive, family-centered, trauma-informed, evidence-based, coordinated system of care from early intervention through recovery. Provide tobacco use counseling and interventions as a standard of practice. Increase access for youth/TAY and their families to co-occurring substance use disorder/mental health services. Develop and implement education and messaging on making healthy choices regarding substance use and emotional wellness. | Provide other supports such as tobacco, vaping use counseling and intervention and cessation. Reduce the stigma associated with youth entering substance abuse treatment. Expand the reach of substance abuse treatment services for children and youth by establishing partnerships with other District agencies such DC Health, DYRS, CFSA, and DOES. | Provide other supports such as tobacco, vaping use counseling and intervention and cessation. Reduce the stigma associated with youth entering substance abuse treatment. Expand the reach of substance abuse treatment services for children and youth by establishing partnerships with other District agencies such DC Health, DYRS, CFSA, and DOES. | None | Community Services, Specialty Care - 6920 | Eric Chapman |
| 5H79TI081212-02/District of Columbia Changing and Improving Treatment for our Youth (91CITY) | $0.00 | SAMHSA | $0.00 | $525,372.00 | SAMHSA | $22,431.24 | Enhance DBH services for youth (ages 12-18) and transition age youth (ages 18-25) to provide a comprehensive, family-centered, trauma-informed, evidence-based, coordinated system of care from early intervention through recovery. Provide tobacco use counseling and interventions as a standard of practice. Increase access for youth/TAY and their families to co-occurring substance use disorder/mental health services. Develop and implement education and messaging on making healthy choices regarding substance use and emotional wellness. | Provide other supports such as tobacco, vaping use counseling and intervention and cessation. Reduce the stigma associated with youth entering substance abuse treatment. Expand the reach of substance abuse treatment services for children and youth by establishing partnerships with other District agencies such DC Health, DYRS, CFSA, and DOES. | Provide other supports such as tobacco, vaping use counseling and intervention and cessation. Reduce the stigma associated with youth entering substance abuse treatment. Expand the reach of substance abuse treatment services for children and youth by establishing partnerships with other District agencies such DC Health, DYRS, CFSA, and DOES. | None | Community Services, Specialty Care Community Based-Services - 6920 | Eric Chapman |
| 1H79SM081976-01/OurTime: Exploration (91EXPL) | $18,096.09 | SAMHSA | $18,096.09 | $0.00 | SAMHSA | $0.00 | Focus on wards 1 and 6 to increase the self-efficacy and meaningful participation in transition plans of young adults ages 16-25 who have mental health and/or co-occurring substance use disorders. Improve and expand treatment recovery and support support services and strengthen evidenced-based practices that address all life domains. | Increase the number of unduplicated youth receiving direct treatment services and/or recovery support. Increase community buy-in and ownership of TAY outcomes and increase community knowledge, support, and responsiveness to TAY. | Increase the number of unduplicated youth receiving direct treatment services and/or recovery support. Increase community buy-in and ownership of TAY outcomes and increase community knowledge, support, and responsiveness to TAY. | None | Community Services, Specialty Care - 6922 | Leslie-Ann Byum |
| | $25,884,372.25 | $0.00 | $25,884,372.24 | $44,146,933.45 | $0.00 | $9,162,531.28 | | | | | | |

*Q12. Please provide the following information for all grants awarded to DBH during FY19 and to date in FY20, broken down by DBH program and activity:*

- *Grant Number/Title;*
- *Approved Budget Authority;*
- *Funding source;*
- *Expenditures (including encumbrances and pre-encumbrances);*
- *Purpose of the grant;*
- *Grant deliverables;*
- *Grant outcomes, including grantee performance;*
- *Any corrective actions taken or technical assistance provided;*
- *DBH program and activity supported by the grant; and,*
- *DBH employee responsible for grant deliverables.*

**DBH Response**

See Attachment. Grant Report

Q. 13 Attachment 1 of 1

| Department of Behavioral Health, FY 19 - FY 20 Grant Lapse Report | | | | | | | |
|---|---|---|---|---|---|---|---|
| Grant Name | Grant Number | Grant Phase | Grant Begin Date | Grant End Date | Total Grant Award Amount | Total Obligations | Grant Lapse | Comments |
| Adolescent Treatment Enhancement | 61SATD | 16 | 9/1/2016 | 1/31/2019 | $1,405,530.00 | $975,008.54 | $430,521.46 | Two youth SUD providers closed which led to lower than anticipated enrollment. Also, a no-cost extension was granted was for 3 months onlynot one year as requested which was insufficient time to award and stand up new grants. |
| DC COOP Agreement to Benefit Homeless | 71CABH | 17 | 9/30/2017 | 9/29/2019 | $3,750,000.00 | $3,731,276.54 | $18,723.46 | As the end of the grant neared, staff in the CABHI providers  transitioned to other jobs. |
| DC Strategic & Tribal Initiative | 81SPSF | 18 | 9/30/2018 | 9/29/2019 | $2,041,000.00 | $1,807,116.53 | $233,883.47 | The initial release of the RFA  for 8 High Need Community sub-grantees to work in each ward resulted in five awards. The RFA was released a second time to select three addtional subgrantees whose grant period was not a full year whcih resulted in underspending. |
| PATH Grant | 91MHPH | 19 | 9/30/2018 | 9/29/2019 | $300,000.00 | $227,677.06 | $72,322.94 | The underspending is due to a vacant FTE in the homeless outreach program. When the program merged with the newly established Community Response Team, the position description was changed. |
| Positive Transitions Youth | 81PTYA | 18 | 9/30/2018 | 9/29/2019 | $1,608,539.00 | $1,193,700.98 | $414,838.02 | DBH was granted a no cost extnsion to March 29, 2020.Plans are underway to spend the balance. |
| Justice and Mental Health Collaboration | 72JMHC | 17 | 10/1/2016 | 9/30/2019 | $250,000.00 | $194,954.50 | $55,045.50 | Underspending in personnel costs due to a staff resignation. |
| District of Columbia Opioid Response | 81DCOR | 18 | 9/30/2018 | 9/29/2019 | 22,140,062.75* | $9,314,837.06 | $12,825,225.69 | DBH has requested carry over authority to spend the balance of the Year One Grant and expects a response in March 2020. Though SAMHSA annouced the grant award effective October 1, 2018, after multiple reviews by SAMSHA  of the District's spending plan, DBH did not receive  spending authority tuntil December 2018 resulting in a nine month award period. |
| DC-CITY: Changing and Improving Treatment for our Youth | 81CITY | 18 | 9/30/2018 | 9/29/2019 | $541,350.00 | $192,562.63 | $348,787.37 | Although the grant was awarded at the start of FY2019, the grant funds were not made available until the Q2.  In addition, staff turnover led to underspending in personnel costs. |
| Social, Emotional and Early Development | 81SEED | 18 | 9/30/2018 | 9/29/2019 | $1,769,136.00 | $1,225,957.04 | $543,178.96 | Underspending was due primarily with challenges attracting and retaining certified Fsmily Peer Specialists and  late approval of the carryover authority affected ability to spend. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Substance Abuse Prevention | 82APBG | 18 | 10/1/2017 | 9/30/2019 | $6,968,530.00 | $6,963,066.02 | $5,463.98 | Underspending in nonpersonnel services led to a small surplus |
| **TOTAL** | | | | | **$18,634,085.00** | **$25,826,156.90** | **$14,947,990.85** | |

*spending authority for total award of $32,154,971
including $11 million for Year One and Year Two

*Q13. Please provide a complete accounting of all grant lapses including a detailed statement as to why the lapse occurred and any corrective action taken by DBH.  Please provide accounting of any grant carryover from FY17 to FY18 or FY19 to FY20 and a detailed explanation as to why it occurred.*

**DBH Response**

See Attached Grants Lapse Report

FY 19 Oversight Question 14. Attachment 1 of 4. FY 19 HCA. MHRS

| FY2019 Local MHRS Allocations | Purchase Order Number1 | Purchase Order Number2 | FY2019 PO Funding of HCA | Processed e-invoice Payments |
|---|---|---|---|---|
| | | | A | B |
| Absolute Healthcare Resources | PO601926 | | 10,000.00 | 8,991.11 |
| Abundant Grace Health Services | PO599212 | | 25,000.00 | 19,388.40 |
| | | | | |
| Amazing Love Health Services | PO596047 | | 175,000.00 | 169,180.73 |
| Amazing Love Health Services | | PO601931 | 216,469.00 | 203,039.98 |
| Amazing Love Health Services | | PO611082 | 30,000.00 | 28,080.55 |
| | | | | |
| Anchor Mental Health Association, Inc | PO590906 | | 949,000.00 | 908,136.67 |
| Better Morning | PO594641 | | 55,000.00 | 51,657.03 |
| | | | | |
| City Care Health Services | PO591551 | | 150,000.00 | 138,458.70 |
| City Care Health Services | PO602859 | | 50,000.00 | 39,437.88 |
| | | | | |
| Community Connections, Inc. | PO590790 | | 872,000.00 | 871,593.96 |
| | | | | |
| Community Wellness Ventures | PO594884 | | 90,000.00 | 89,740.55 |
| Community Wellness Ventures | PO611079 | | 10,000.00 | 9,979.56 |
| | | | | |
| Deaf - REACH, Specialty Services | PO591078 | | 40,000.00 | 37,569.94 |
| Dedicated Health Care | PO605622 | | 25,000.00 | 24,847.62 |
| District Health Care Services | PO606365 | | 5,000.00 | 4,992.51 |
| Family Preservation Services | PO592199 | | 410,000.00 | 408,192.47 |
| | | | | |
| Family Solutions of Ohio | PO590905 | | 15,000.00 | 21,160.25 |
| Family Solutions of Ohio | PO608823 | | 10,000.00 | - |
| | | | | |
| Family Wellness Center | PO594639 | | 40,000.00 | 39,683.27 |
| | | | | |
| Goshen Healthcare Management | PO606007 | | 2,000.00 | - |
| | | | | |
| Global Resources & Supports | PO590889 | | 9,688.00 | 1,687.39 |
| Global Resources & Supports | PO604737 | | 5,000.00 | - |
| | | | | |
| Hillcrest Children's Center | PO590851 | | 350,000.00 | 349,504.33 |
| | | | | |
| Holy Health Care Services | PO591385 | | 20,000.00 | 19,223.47 |
| Holy Health Care Services | PO605403 | | 20,000.00 | 7,851.67 |
| | | | | |
| Inner City Family Services | PO591143 | | 120,000.00 | 119,646.64 |
| Integrated Health Resouces | PO600515 | | 5,000.00 | - |
| Kahak | PO599213 | | 5,000.00 | - |
| | | | | |
| Kinara Health & Home Care Services | PO592180 | | 40,000.00 | 39,836.81 |
| Kinara Health & Home Care Services | PO611083 | | 25,000.00 | 24,890.60 |
| | | | | |
| Latin America Youth Ctr (LAYC) | PO590734 | | 15,000.00 | 4,612.56 |
| Life Care | PO591022 | | 80,001.00 | 70,406.24 |
| Life Changing Solutions | PO601014 | | 5,000.00 | - |
| | | | | |
| Life Enhancement Services (LES) | PO591550 | | 30,000.00 | 28,937.86 |
| Life Enhancement Services (LES) | PO597399 | | 75,001.00 | 72,942.92 |
| | | | | |
| Life Stride, Inc | PO590718 | | 245,000.00 | 244,993.01 |
| Maryland Family Resources (MD/DC) | PO591322 | | 10,000.00 | 6,809.15 |

FY 19 Oversight Question 14. Attachment 1 of 4. FY 19 HCA. MHRS

| FY2019 Local MHRS Allocations | Purchase Order Number1 | Purchase Order Number2 | FY2019 PO Funding of HCA | Processed e-invoice Payments |
|---|---|---|---|---|
| | | | A | B |
| Mary s Center Maternal Child Care, Inc. | PO591259 | | 190,000.00 | 188,080.36 |
| | | | | |
| MBI Health Services | PO591179 | | 2,700,000.00 | 2,686,971.59 |
| MBI Health Services | PO610564 | | 250,000.00 | 249,997.81 |
| | | | | |
| McClendon Center, Specialty Services | PO591366 | | 240,000.00 | 239,983.24 |
| | | | | |
| Neighbors Consejo | PO592185 | | 1.00 | - |
| Neighbors Consejo | | PO597398 | 40,000.00 | 39,714.07 |
| Neighbors Consejo | | PO603905 | 100,000.00 | 98,500.37 |
| | | | | |
| New Hope Heath Services | PO600931 | | 15,000.00 | 13,193.72 |
| New Living | PO592183 | | 25,000.00 | 19,457.31 |
| NYA Health Services | PO610354 | | 3,000.00 | - |
| | | | | |
| ONE CARE DC | PO591176 | | 50,000.00 | 47,654.10 |
| ONE CARE DC | PO609237 | | 100,000.00 | 43,094.81 |
| | | | | |
| Outreach Solutions | PO591049 | | 5,000.00 | - |
| | | | | |
| Pathways to Housing D.C., MHRS Services | PO591203 | Line 1 | 350,000.00 | 348,999.19 |
| Pathways to Housing D.C., DCOR Grant | PO591203 | Line 2 | 112,500.00 | 110,552.60 |
| | | | | |
| Prestige Healthcare Resources | PO590736 | | 40,001.00 | 39,219.30 |
| Prestige Healthcare Resources | PO601927 | | 75,000.00 | 74,474.21 |
| | | | | |
| Preventive Measures | PO594665 | | 180,000.00 | 171,002.13 |
| PRS-DC Recovery Academy | PO591027 | | 5,000.00 | 3,219.53 |
| PSI, III | PO592184 | | 220,000.00 | 200,247.05 |
| Psychiatric Center Chartered (PCC) | PO592179 | | 240,000.00 | 237,230.05 |
| RAP, Inc. | PO590717 | | 1.00 | - |
| Restoration Community Alliance | | | | |
| Spring Leaf Solutions | PO600187 | | 20,000.00 | 19,981.68 |
| | | | | |
| Umbrella Therapeutic Services | PO593814 | | 230,000.00 | 229,799.18 |
| Umbrella Therapeutic Services | PO605123 | | 90,000.00 | 79,440.88 |
| | | | | |
| Volunteers of America Chesapeake | PO591273 | | 280,000.00 | 273,497.04 |
| Wellness Healthcare | PO602017 | | 5,000.00 | |
| Woodley House, Inc. | PO591149 | | 35,000.00 | 24,057.87 |
| | | | | |
| Totals | | | 9,839,662.00 | 9,503,841.92 |

Program Index          Object

FY 19 Oversight Question 14. Attachment 2 of 4. FY 19 HCA. SUD

| Provider | Purchase Order (PO) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **FY2019 SUD          Local Claims Allocations** | **Purchase Order Levels I & II** | **Purchase Order Level III** | **Contract End Date** | **Purchase Order - New Option Period** | **FY2019 Allocated Local Fund** | **e-invoicing Payments** | **SUD Local PO Balances** | **Burn-Rate %** |
| Calvary Healthcare | PO590946 | | 9/30/19 | | 15,000.00 | 7,925.90 | 7,074.10 | 52.8% |
| | | | | | | | | |
| Clean and Sober Streets | PO593925 | | 7/5/19 | | 9,000.00 | 8,852.49 | 147.51 | 98.4% |
| Clean and Sober Streets | | PO591258 | 7/20/19 | | 1,750,000.00 | 1,718,603.71 | 31,396.29 | 98.2% |
| Clean and Sober Streets | | | 9/30/19 | PO606123 | 50,000.00 | 15,953.24 | 34,046.76 | 31.9% |
| Clean and Sober Streets | | | 9/30/19 | PO606986 | 183,333.00 | 177,634.92 | 5,698.08 | 96.9% |
| | | | | | | | | |
| Community Connections, Inc. | PO590672 | | 9/30/19 | | 38,000.00 | 22,086.82 | 15,913.18 | 58.1% |
| DC Recovery Alliance | | | | | | | 0.00 | 0.0% |
| | | | | | | | | |
| Family Medical Counseling | PO590703 | | | | 53.20 | 53.20 | 0.00 | 100.0% |
| Family Medical Counseling | PO596011 | | 9/30/19 | | 49,946.80 | 32,109.76 | 17,837.04 | 64.3% |
| | | | | | | | | |
| Federal City Recovery Services | | PO593141 | 7/20/19 | | 3,250,000.00 | 3,249,514.28 | 485.72 | 100.0% |
| Federal City Recovery Services | PO593267 | | 7/5/19 | | 29,000.00 | 28,674.91 | 325.09 | 98.9% |
| Federal City Recovery Services | | | 9/30/19 | PO606124 | 20,000.00 | 19,957.05 | 42.95 | 99.8% |
| Federal City Recovery Services | | | 9/30/19 | PO606984 | 400,000.00 | 399,827.53 | 172.47 | 100.0% |
| | | | | | | | | |
| Foundations for Contemp. (PIDARC) | PO591001 | | 7/5/19 | | 399,000.00 | 365,163.89 | 33,836.11 | 91.5% |
| Foundations for Contemp. (PIDARC) | | | 9/30/19 | PO606182 | 90,000.00 | 38,343.98 | 51,656.02 | 42.6% |
| | | | | | | | | |
| Good Hope Institute (BHG) | PO593608 | | 9/12/19 | | 279,000.00 | 270,674.65 | 8,325.35 | 97.0% |
| Good Hope Institute (BHG) | | | 9/30/19 | PO610180 | 35,000.00 | 14,733.36 | 20,266.64 | 42.1% |
| | | | | | | | | |
| Hillcrest Children's Center **(Youth Tx)** | PO593034 | | 7/5/19 | | | - | 0.00 | 0.0% |
| Hillcrest Children's Center **(Youth Tx)** | | | 9/30/19 | PO606179 | 0.00 | | 0.00 | 0.0% |
| | | | | | | | | |
| Holy Comforter St-Cyprian | PO593157 | | 7/5/19 | | 74,000.00 | 61,131.10 | 12,868.90 | 82.6% |
| Holy Comforter St-Cyprian | | | 9/30/19 | PO606187 | 30,000.00 | 21,928.96 | 8,071.04 | 73.1% |
| | | | | | | | | |
| Inner City Family Services | PO593143 | | 7/5/19 | | 17,000.00 | 6,591.00 | 10,409.00 | 38.8% |
| Inner City Family Services | | | 9/30/19 | PO606181 | 0.00 | - | 0.00 | 0.0% |
| | | | | | | | | |
| La Clinica Pueblo | PO593903 | | 7/5/19 | | 279,000.00 | 273,156.03 | 5,843.97 | 97.9% |
| La Clinica Pueblo | | | 9/30/19 | PO606178 | 50,000.00 | 33,397.27 | 16,602.73 | 66.8% |
| | | | | | | | | |
| Latin America Youth Ctr **(Youth Tx)** | PO591075 | | 9/30/19 | | 49,574.61 | 26,983.78 | 22,590.83 | 54.4% |
| Life Stride, Inc | PO591318 | | 9/30/19 | | 20,000.00 | 15,586.59 | 4,413.41 | 77.9% |
| MBI Health Services | PO591196 | | 7/5/19 | | 10,000.00 | 2,902.61 | 7,097.39 | 29.0% |
| Plant the Seed | | | | | | | | |
| | | | | | | | | |
| Psychiatric Institute of Washington (PIW) | PO596650 | | 8/30/19 | | 2,349,899.00 | 2,337,171.33 | 12,727.67 | 99.5% |
| Psychiatric Institute of Washington (PIW) | PO609173 | | 9/30/19 | | 70,000.00 | 69,980.04 | 19.96 | 100.0% |
| Psychiatric Institute of Washington (PIW) | PO609517 | | 9/30/19 | | 250,000.00 | 249,508.81 | 491.19 | 99.8% |
| Psychiatric Institute of Washington (PIW) | PO610708 | | 9/30/19 | | 140,013.62 | 138,335.85 | 1,677.77 | 98.8% |
| | | | | | | | | |
| RAP, Inc. | | PO593266 | 7/20/19 | | 987,105.00 | 952,528.10 | 34,576.90 | 96.5% |
| RAP, Inc. | | PO590658 | 7/20/19 | | 183,333.00 | 178,103.61 | 5,229.39 | 97.1% |
| RAP, Inc. | | | 9/30/19 | PO606189 | 30,000.00 | 29,888.70 | 111.30 | 99.6% |
| RAP, Inc. | | | 9/30/19 | PO606987 | 200,000.00 | 194,614.33 | 5,385.67 | 97.3% |
| | | | | | | | | |
| Safe Haven Outreach Ministries | PO593138 | | 8/30/19 | | 998,000.00 | 969,195.88 | 28,804.12 | 97.1% |
| Safe Haven Outreach Ministries | PO609435 | | 9/30/19 | | 150,000.00 | 91,377.52 | 58,622.48 | 60.9% |
| | | | | | | | | |
| Salvation Army | PO594125 | | 7/5/19 | | 89,000.00 | 81,623.43 | 7,376.57 | 91.7% |
| Salvation Army | | PO594068 | 9/30/19 | | 90,000.00 | 89,471.12 | 528.88 | 99.4% |
| Salvation Army | | | 9/30/19 | PO606611 | 10,000.00 | 9,234.99 | 765.01 | 92.3% |

FY 19 Oversight Question 14. Attachment 2 of 4. FY 19 HCA. SUD

| FY2019 SUD          Local Claims Allocations | Purchase Order Levels I & II | Purchase Order Level III | Contract End Date | Purchase Order - New Option Period | FY2019 Allocated Local Fund | e-invoicing Payments | SUD Local PO Balances | Burn-Rate % |
|---|---|---|---|---|---|---|---|---|
| Samaritan Inns | | PO593265 | 9/6/19 | | 1,490,000.00 | 1,481,020.74 | 8,979.26 | 99.4% |
| Samaritan Inns | PO593914 | | 7/5/19 | | 99,000.00 | 96,386.10 | 2,613.90 | 97.4% |
| Samaritan Inns | | | 9/30/19 | PO606190 | 10,000.00 | 8,681.72 | 1,318.28 | 86.8% |
| Samaritan Inns | | | 9/30/19 | PO609720 | 149,000.00 | 148,379.10 | 620.90 | 99.6% |
| | | | | | | | | |
| So Others Might Eat (SOME) | PO593916 | | 7/5/19 | | 79,000.00 | 65,454.99 | 13,545.01 | 82.9% |
| So Others Might Eat (SOME) | | | 9/30/19 | PO606609 | 99,000.00 | 78,096.52 | 20,903.48 | 78.9% |
| So Others Might Eat (SOME) (Crisis Beds) | | | | | | | | |
| | | | | | | | | |
| United Planning Organization (UPO) | PO593904 | | 7/5/19 | | 284,000.00 | 281,865.89 | 2,134.11 | 99.2% |
| United Planning Organization (UPO) | | | 9/30/19 | PO606125 | 90,000.00 | 89,028.71 | 971.29 | 98.9% |
| | | | | | | | | |
| Volunteers of America (VOAC) | PO593726 | | 7/5/19 | | 20,000.00 | - | 20,000.00 | 0.0% |
| Volunteers of America (VOAC) | | | 9/30/19 | PO606762 | 5,000.00 | - | 5,000.00 | 98.9% |
| | | | | | | | | |
| **Total Amounts Allocated** | | | | | **14,999,258.23** | **13,156,034.04** | **547,523.72** | **87.7%** |

| | | |
|---|---|---|
| Percent of Fiscal Year | | 99% |
| Program Index | Object | |
| 6960A | 0501 | |

FY 19 Oversight Question 14. Attachment 3 of 4. FY 20 HCA. MHRS                                                  Page 1

| FY2020 Local MHRS PO Funding of HCA's | Purchase Order Number1 | Purchase Order Number2 | FY2020 PO Funding of HCA | e-invoicing Payments | MHRS Local PO Balances | Burn-Rate % |
|---|---|---|---|---|---|---|
| **Update thru - January 17, 2020** | | | A | B | C | |
| Absolute Healthcare Resources | PO613031 | | 120,000.00 | 1,104.20 | 118,895.80 | 1% |
| Abundant Grace Health Services | PO612392 | | 110,000.00 | 20,614.96 | 89,385.04 | 19% |
| Amazing Love Health Services | PO617821 | | 400,000.00 | 178,176.40 | 221,823.60 | 45% |
| Anchor Mental Health Association, Inc | PO612386 | | 1,200,000.00 | 166,467.87 | 1,033,532.13 | 14% |
| Better Morning | PO613541 | | 90,000.00 | 10,168.95 | 79,831.05 | 11% |
| City Care Health Services | PO615872 | | 150,000.00 | 50,206.58 | 99,793.42 | 33% |
| Community Connections, Inc. | PO612438 | | 750,000.00 | 116,910.05 | 633,089.95 | 16% |
| Community Wellness Ventures | PO615363 | | 110,000.00 | 108,982.42 | 1,017.58 | 99% |
| Deaf - REACH, Specialty Services | PO612396 | | 50,000.00 | 5,484.38 | 44,515.62 | 11% |
| Dedicated Health Care | PO613056 | | 20,000.00 | 0.00 | 20,000.00 | 0% |
| District Health Care Services | PO612387 | | 10,000.00 | 7,120.36 | 2,879.64 | 71% |
| Family Preservation Services | PO618335 | | 400,000.00 | 86,278.39 | 313,721.61 | 22% |
| Family Solutions of Ohio | PO613539 | | 95,000.00 | 0.00 | 95,000.00 | 0% |
| Family Wellness Center | PO612397 | | 40,000.00 | 0.00 | 40,000.00 | 0% |
| Goshen Healthcare Management | PO612362 | | 20,000.00 | 6,126.16 | 13,873.84 | 31% |
| Global Resources & Supports | PO612797 | | 40,000.00 | 0.00 | 40,000.00 | 0% |
| Hillcrest Children's Center | PO612360 | | 500,000.00 | 94,895.52 | 405,104.48 | 19% |
| Holy Health Care Services | PO613053 | | 30,000.00 | 0.00 | 30,000.00 | 0% |
| Inner City Family Services | PO612359 | | 120,000.00 | 22,069.01 | 97,930.99 | 18% |
| Integrated Health Resources | PO617514 | | 30,000.00 | 0.00 | 30,000.00 | 0% |
| Kahak | PO612358 | | 20,000.00 | 0.00 | 20,000.00 | 0% |
| Kinara Health & Home Care Services | PO616493 | | 100,000.00 | 0.00 | 100,000.00 | 0% |
| Kinara Health & Home Care Services | PO617633 | | 50,000.00 | 0.00 | 50,000.00 | 0% |
| Latin America Youth Ctr (LAYC) | PO612035 | | 20,000.00 | 0.00 | 20,000.00 | 0% |
| Life Care | PO615838 | | 100,000.00 | 0.00 | 100,000.00 | 0% |
| Life Changing Solutions | PO613047 | | 15,000.00 | 0.00 | 15,000.00 | 0% |
| Life Enhancement Services (LES) | PO611570 | | 40,000.00 | 19,292.43 | 20,707.57 | 48% |
| Life Enhancement Services (LES) | PO618305 | | 250,000.00 | 7,540.39 | 242,459.61 | 3% |
| Life Stride, Inc | PO613049 | | 300,000.00 | 20,298.07 | 279,701.93 | 7% |
| Maryland Family Resources (MD/DC) | | | | | | |
| Mary s Center Maternal Child Care, Inc. | PO615866 | | 200,000.00 | 32,301.83 | 167,698.17 | 16% |
| MBI Health Services | PO612127 | | 500,000.00 | 429,317.62 | 70,682.38 | 86% |
| McClendon Center, Specialty Services | PO612192 | | 250,000.00 | 66,942.02 | 183,057.98 | 27% |
| Neighbors Consejo | PO613051 | | 70,288.11 | 45,583.92 | 24,704.19 | 65% |
| Neighbors Consejo | PO617820 | | 179,711.89 | 0.00 | 179,711.89 | 0% |
| New Hope Heath Services | PO612390 | | 20,000.00 | 19573.84 | 426.16 | 98% |
| New Living | PO612092 | | 10,000.00 | 0.00 | 10,000.00 | 0% |
| NYA Health Services | PO612761 | | 10,000.00 | 0.00 | 10,000.00 | 0% |
| ONE CARE DC | PO613054 | | 80,000.00 | 0.00 | 80,000.00 | 0% |
| Outreach Solutions | PO613052 | | 10,000.00 | 0.00 | 10,000.00 | 0% |
| P&G Behavioral Heatlh | PO619433 | | 5,000.00 | 0.00 | 5,000.00 | 0% |
| Pathways to Housing D.C., MHRS Services | PO612796 | | 730,000.00 | 115,856.25 | 614,143.75 | 16% |
| Prestige Healthcare Resources | PO613544 | | 70,000.00 | 62,531.89 | 7,468.11 | 89% |
| Preventive Measures | PO615706 | | 150,000.00 | 0.00 | 150,000.00 | 0% |
| PRS-DC Recovery Academy | PO615705 | | 5,000.00 | 0.00 | 5,000.00 | 0% |
| PSI, III | PO613632 | | 250,000.00 | 24,162.54 | 225,837.46 | 10% |
| Psychiatric Center Chartered (PCC) | PO613050 | | 250,000.00 | 33,769.19 | 216,230.81 | 14% |
| RAP, Inc. | PO617904 | | 5,000.00 | 0.00 | 5,000.00 | 0% |
| Restoration Community Alliance | | | | | | |
| Spring Leaf Solutions | PO615837 | | 20,000.00 | 16,181.12 | 3,818.88 | 81% |
| Umbrella Therapeutic Services | PO611407 | | 300,000.00 | 62,123.63 | 237,876.37 | 21% |
| Universal Healthcare Management | PO619196 | | 5,000.00 | 0.00 | 5,000.00 | 0% |
| Volunteers of America Chesapeake | PO611696 | | 300,000.00 | 40,461.60 | 259,538.40 | 13% |
| Wellness Healthcare | PO611358 | | 10,000.00 | 0.00 | 10,000.00 | 0% |
| Woodley House, Inc. | PO611432 | | 50,000.00 | 2,542.37 | 47,457.63 | 5% |
| Totals | | | 8,660,000.00 | 1,873,083.96 | 6,786,916.04 | 21.6% |

Program Index                    Object

FY 19 Oversight Question 14. Attachment 3 of 4. FY 20 HCA. MHRS

| FY2020 Local MHRS PO Funding of HCA's | Purchase Order Number1 | Purchase Order Number2 | FY2020 PO Funding of HCA | e-invoicing Payments | MHRS Local PO Balances | Burn-Rate % |
|---|---|---|---|---|---|---|
| | | | | 6970A | 0501 | |

FY 19 Oversight Question 14. Attachment 4 of 4. FY 20 HCA. SUD

| Provider | Purchase Order (PO) | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **FY2020 SUD          Local Claims Allocations** | **Purchase Order Levels I & II** | **Purchase Order Level III** | **Contract End Date** | **Purchase Order - New Option Period** | **FY2020 Allocated Local Fund** | **e-invoicing Payments** | **SUD Local PO Balances** | **Burn-Rate %** |
| **Update - January 17, 2020** | | | | | | | | |
| Calvary Healthcare | PO612366 | | 9/30/20 | | 25,000.00 | 1,186.48 | 23,813.52 | 4.7% |
| Clean and Sober Streets | | PO614613 | 7/20/20 | | 1,300,000.00 | 815,729.94 | 484,270.06 | 62.7% |
| Community Connections, Inc. | PO612134 | | 11/30/19 | | 50,000.00 | 3,548.86 | 46,451.14 | 7.1% |
| Family Medical Counseling | PO612394 | | 11/30/19 | | 75,000.00 | - | 75,000.00 | 0.0% |
| Federal City Recovery Services | PO614196 | | 7/5/20 | | 40,000.00 | 34,431.16 | 5,568.84 | 86.1% |
| Federal City Recovery Services | | PO614612 | 7/20/20 | | 2,500,000.00 | 937,596.06 | 1,562,403.94 | 37.5% |
| Foundations for Contemp. (PIDARC) | PO615259 | | 7/5/20 | | 299,000.00 | 105,444.23 | 193,555.77 | |
| Good Hope Institute (BHG) | PO617515 | | 9/12/20 | | 299,000.00 | 2,983.93 | 296,016.07 | |
| Hillcrest Children's Center  (**Youth Tx**) | PO614437 | | 7/5/20 | | 130,000.00 | - | 130,000.00 | 0.0% |
| Holy Comforter St-Cyprian | PO614438 | | 7/5/20 | | 130,000.00 | 53,711.28 | 76,288.72 | 41.3% |
| Inner City Family Services | PO614520 | | 7/5/20 | | 50,000.00 | - | 50,000.00 | 0.0% |
| La Clinica Pueblo | PO615263 | | 7/5/20 | | 299,000.00 | 121,400.88 | 177,599.12 | |
| Latin American Youth Ctr (**Youth Tx**) | PO614519 | | 9/30/20 | | 45,000.00 | - | 45,000.00 | 0.0% |
| Life Stride, Inc | PO612395 | | 9/30/20 | | 30,000.00 | 3,532.41 | 26,467.59 | 11.8% |
| MBI Health Services | PO614197 | | 7/5/20 | | 50,000.00 | - | 50,000.00 | 0.0% |
| Psychiatric Institute of Washington (PIW) | | PO611695 | 8/30/20 | | 900,000.00 | 435,605.37 | 464,394.63 | 48.4% |
| RAP, Inc. | | PO614411 | 7/20/20 | | 1,400,000.00 | 269,763.61 | 1,130,236.39 | 19.3% |
| Safe Haven Outreach Ministries | | PO617700 | 8/30/20 | | 249,000.00 | 162,673.79 | 86,326.21 | 65.3% |
| Salvation Army | PO613530 | | 7/5/20 | | 100,000.00 | 94,825.31 | 5,174.69 | 94.8% |
| Salvation Army | | PO614103 | 9/30/20 | | 200,000.00 | 11,514.40 | 188,485.60 | 5.8% |
| Samaritan Inns | PO613531 | | 7/5/20 | | 200,000.00 | 199,950.36 | 49.64 | 100.0% |
| Samaritan Inns | | PO615113 | 9/6/20 | | 990,000.00 | 650,826.64 | 339,173.36 | 65.7% |
| So Others Might Eat (SOME) | PO613532 | | 7/5/20 | | 250,000.00 | 10,237.58 | 239,762.42 | 4.1% |
| Total Family Coalition | | | | | | | | |
| United Planning Organization (UPO) | PO612995 | | 7/5/20 | | 299,000.00 | 7,282.93 | 291,717.07 | 2.4% |
| Volunteers of America (VOAC) | PO613055 | | 7/5/20 | | 40,000.00 | - | 40,000.00 | 2.4% |
| **Total Amounts Allocated** | | | | | **9,950,000.00** | **3,922,245.22** | **6,027,754.78** | **39.4%** |

| | | Percent of Fiscal Year | 24% |
|---|---|---|---|
| | | **Program Index** | **Object** |
| | | 6960A | 0501 |

*Q14.* *Please provide the following information for all Human Care Agreements (HCA) and task orders issued during FY19 and to date in FY20, broken out by DBH program and activity:*
- *Vendor name;*
- *Services provided;*
- *Funding source;*
- *HCA amount;*
- *Task order amount;*
- *Actual expenditures;*
- *Status of performance; and,*
- *DBH employee responsible for monitoring the HCA and task order.*

**DBH Response**

See Attachment 1 of 4. FY 19 HCA. MHRS
See Attachment 2 of 4. FY 19 HCA. SUD
See Attachment 3 of 4. FY 20 HCA. MHRS
See Attachment 4 of 4. FY 20 HCA. SUD

*Q15. Please provide a list and narrative description of any DBH partnerships with District agencies, if any, in FY19 and to date in FY20 to address employment for DBH consumers. In addition, please provide the number of individuals served, the types of employment placements available, and the employee/s responsible for coordinating the partnership.*
*-Please provide an update on the MOU with the Department of Human Services Economic Security Administration to provide Supported Employment services to individuals with serious mental illness who receive Temporary Assistance for Needy Families (TANF). How many individuals participated in this program in FY19? To date in FY20?*

**DBH Response**

Department of Disability Services, Rehabilitation Services Administration (RSA): Through an MOU, the RSA supports nine DBH certified evidence-based supported employment (EBSE) providers. Funding from RSA is directed toward job development, job placement, and job retention services. To date in FY20, all DBH certified EBSE providers continue using the milestone payment system to pay for job development, placement, and retention services for all eligible referred consumers. DBH and RSA will be expanding supported employment services to consumers with substance use disorders in FY20 in conjunction with approval of the 1115 System Transformation Waiver,for which DBH partners with DHCF.

The DBH Supported Employment programs served 610 consumers in FY19 and 109 consumers to date in FY20. Through the braided funding agreement between DBH and RSA, 332 consumers have received job placements and retention services in FY19.  Year-to-date in FY20, 190 consumers have received such services.

Department of Disability Services (DDS): The U.S. Department of Labor's Office of Disability Employment Policy contracts with EconSys to coordinate a national employment first community of practice and highly competitive technical assistance agreements with states.  DBH has been active in these initiatives over the past several years, and has partnered with DDS to co-lead the District's successful applications for technical assistance for FY19 and FY20.

In FY19, DBH, RSA, DOES, and OSSE worked together to draft two cross-system MOAs between DBH, RSA, and DOES to start the process for DBH to participate in the Data Vault that is coordinated by OSSE. These MOAs, which are currently under review, are designed to promote co-enrollment, data-sharing, and leveraging of resources across systems to support Individual Placement and Support (IPS) outcomes, and inclusion of people in IPS in the District of Columbia's Career Pathways program.  IPS is the internationally recognized evidence-based model for supported employment.

In FY20, under the Visionary Opportunities to Increase Competitive Employment (VOICE) technical assistance initiative, DDS and DBH jointly received an award for 300 hours of technical assistance to help build the capacity of two DBH IPS supported employment providers. These providers will serve people with opioid use disorders (OUD) and develop best practices that align with IPS.  Lessons learned and best practices will then be replicated at other supported employment

agencies as DBH brings services to scale through the implementation of this service through the 1115 Behavioral Health Waiver.

Competitive employment opportunities were identified for individuals enrolled in the program. In FY19 and to date in FY20, individuals obtained some of the following types of employment placements at some of the listed private and public employers:

| Employment Placements | Employers |
|---|---|
| Security Officer | Amazon |
| Patient Care Tech | Karma Home Designs |
| Field Tech | City Bikes |
| Nursing Assistant | Sunrise Assisted Living |
| Service Manager | The Red Door Spa |
| Overnight Stocker | WMATA |
| Business Development Assistant | Salvation Army |
| Disaster Supervisory Specialist | Washington Hospital Center |
| Maintenance Helper | Verizon Wireless |
| Cashier | Arlington National Cemetery |
| Executive Director | Ludlow Taylor Elementary School |
| CNA Instructor | CVS |
| On-Call Sous Chef | Landmark Theatre |
| Customer Service Representative | National Service Contractors |
| Bakery Packer | Bowl America |
| Cook | City Winery DC |
| Loss Prevention Specialist | The Gap |
| Nursing Assistant | FedEx Field |
| Pharmacy Tech | SOME, Inc. |
| Bus Driver | Forever 21 |
| Front Office Manager | Tenleytown Trash |
| Bicycle Assembler | Harris Teeter |
| Special Police Officer | Mundo Verde |
| Buffet Cook | Revella Consulting Group |
| Construction Worker | Walmart |
| Receptionist | Howard University Hospital |
| Residential Counselor | Macys |
| Meat Clerk | Whole Foods |
| Paper Carrier | First Class Work Solutions |
| Dishwasher | DC Department of Behavioral Health |
| Home Health Aide | Office of Councilmember Brandon Todd |
| Sanitation Crew Member | DC Department of Employment Services |
| Barista | DC Department of Public Works |
| Peer Educator | Library of Congress |
| CDL Driver | U.S. Court House |
| Nail Technician | U.S. Department of Defense |
|  | FEMA |
|  | NIT Federal Credit Union |
|  | PG County Public Schools |
|  | UPS |
|  | Carmines Restaurant |

| | Forman Mills |
|---|---|
| | Aramark |

For FY19, the Department of Human Services (DHS) Economic Security Administration provided funding to DBH to continue its partnership to collaborate and coordinate resources/services to better assist TANF customers that may have mental health related barriers. DBH provides behavioral health screenings and referrals to appropriate clinical services in accordance with the MOU which began in FY14. In FY19, 210 individuals were screened and referred to providers for ongoing behavioral health services. To date in FY20, 81 individuals have been screened and referred for ongoing behavioral health services.

*Q16. Please provide a description of all housing programs administered by DBH. For each, please provide the following information:*

- *Name of the program and services provided;*
- *Number of individuals served in FY19 and to date in FY20;*
- *Capacity of the program;*
- *Performance measures and associated outcomes for each program;*
- *The name and title of the DBH employee responsible for administering the program;*
- *The average wait time for a consumer to access housing through the program;*
- *The number of individuals on waiting lists for the program; and,*
- *Of those individuals on the wait list, whether any are homeless or in other housing programs.*

**DBH Response**

**Home First Housing Voucher Program**
The Home First Program provides housing vouchers for individuals and families who live in the apartment or home of their choice and sign their own leases. Consumers pay thirty percent of their household income toward their rent and the Home First Program subsidizes the balance. The program is administered through an MOU with the DC Housing Authority.

**Supported Independent Living**
The Supported Independent Living (SIL) Program provides an independent home setting with services and supports to assist consumers transitioning to a less restrictive level of care. Training is provided in life skill activities, home management, community services based on individual needs. Weekly home visits and monitoring is conducted by community support workers to support the consumer to maintain community tenure and move to independent living.

**Mental Health Community Residential Facilities (MHCRFs)**
DBH licenses all MHCRFs and contracts for four levels of:
*Intensive Rehabilitative Residence* (IRR) that supports for individuals who have medical issues that put them at risk of needing nursing home care if they do not receive physical health care nursing supports along with the appropriate mental health rehabilitation services
*Supportive Rehabilitative Residence* (SRR) that provides twenty-four hour, structured housing support for consumers with severe and persistent mental illness who need an intense level of support to live within the community. The specific services include: 24-hour awake supervision; assistance to obtain medical care and transportation to appointments; training in life skills; medication monitoring and participation in treatment planning.
*Supportive Residence (SR)* that provide on-site supervision when residents are in the facility; medication monitoring; assistance with activities of daily living; arrangement of transportation; monitoring behaviors to ensure consumer safety; and participation in treatment planning.
*Transitional SR (TSR)* that provide the same services as a SSR. However, consumers in a TSR CRF are provided with skills training with the expectation that they will be ready for independent, apartment living within a year.

**DC Local Rent Supplement Program (LRSP)**

DBH assigns LRSP vouchers attached to newly-renovated or developed units funded with DBH capital dollars for twenty-five (25) years. The LRSP vouchers are attached to single-room occupancy (SRO) units and to apartments. DBH makes referrals for initial occupancy and backfill of vacancies. LRSP vouchers are funded with local dollars. The LRSP is administered by the D.C. Housing Authority (DCHA) and follows the eligibility requirements and rules and regulations of DCHA's federally-funded voucher program.

**Federal Voucher Program/ Shelter Plus Care**

The Shelter Plus Care program funded with a HUD grant to DBH ended in November, 2019. The vouchers are not supported with local dollars.

*Number of Individuals Served in FY19 and to date FY20* and *Capacity of the program*

| Program | FY19 Capacity* | Consumers Served FY19 | FY20 Capacity* | Consumers Served FY20 (through 12/31/19 |
|---|---|---|---|---|
| **Federal Funding** | | | | |
| Federal – DBH Shelter Plus Care | 22 | 20 | 0* | 20 |
| **Local Funding** | | | | |
| **LRSP Vouchers** | | | | |
| DBH Capital-Funded Housing (LRSP Vouchers) | 192 | 192 | 196 | 192 |
| **Supported Housing** | | | | |
| Home First (Vouchers) | 890 | 881 | 850 | 878 |
| Supported Independent Living (SIL) | 375 | 411 | 375 | 346 |
| **Community Residential Facilities (CRFs)** | | | | |
| Intensive Residence (IR) | 10 | 10 | 10 | 9 |
| Supportive Rehabilitative Residence (SRR) | 198 | 182 | 188 | 186 |
| Supportive Residence (SR) | 447 | 422 | 435 | 423 |
| Transitional Supportive Residence (TSR) | 6 | 6 | 6 | 6 |
| **Total** | **2,140** | **2,124** | **2,060** | **2,060** |

The LRSP program added four (4) units through a capital-funded project which became available for occupancy in FY20-1Q.  The Voucher Program's reduced capacity reflects budgetary constraints.

*Performance measures and associated outcomes for each program*

| Outcomes on DBH Housing Performance Measures for Home First Subsidy Recipients | | |
|---|---|---|
| Quality Domain | Performance Measure | Outcome |
| Housing Tenure/Stability | 75% of consumers will maintain community tenure in independent housing for 12 months or longer | 92% of consumers maintained community tenure through September 30, 2019 |
| Housing Occupancy | DBH will maintain an 80% or greater occupancy rate within its subsidized housing program | 100% occupancy rate |
| Availability of Housing Services/Supports | 80% of consumers in subsidized housing will enroll with a CSA to receive mental health services and supports | 97% of consumers are enrolled with a CSA |

- *The name and title of the DBH employee responsible for administering the program;*

Brandi Gladden, Director, Housing Development Division, is the DBH employee responsible for administering the DBH housing programs.

- *The average wait time for a consumer to access housing through the program;*
- *The number of individuals on waiting lists for the program; and,*
- *Of those individuals on the wait list, whether any are homeless or in other housing programs.*

The average time it takes to make housing to become available varies by housing program. For the Home First Program, the average time from receipt of an application to voucher award in FY19 was 2.8 years. Note: Consumers discharging from Saint Elizabeths Hospital or transitioning from CRFs into apartments are voucher priority populations. Housing vouchers for priority consumers are issued within three days of requests from Discharge Planning Team at Saint Elizabeths or following DBH confirmation of level of care assessment for CRF consumer.

The average time between voucher award and lease-up was 3.7 months for all voucher awardees.

For all LRSP vouchers, SROs, and CRFs, the average wait time from application/referral to placement is four weeks.  Individuals self-report on their housing application whether they are homeless which could be living with family or friends, residing in shelters, or living on the streets.  Individuals may apply for other District government housing programs but if permanent housing is received from DHS or DCHA, they are not eligible for a DBH voucher.

*Q17. Please provide an update on the work of the children mobile crisis teams. What services are provided? How many individuals were served in FY19? To date in FY20? Please be sure to specifically speak to the work of the Children and Adolescent Mobile Psychiatric Service (ChAMPS), as well as any related services.*

- *What is the process in determining what calls are deployable and non-deployable?*
- *What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY19 and FY20 to date.*
- *How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?*
- *Please explain the nature of the training DCPS staff participated in as well as the number of staff who were trained.*

**DBH Response:**

The Department of Behavioral Health contracts through the Office of Contracts and Procurement for emergency mobile psychiatric services for children and youth. The contract was awarded to Anchor Mental Health. ChAMPS provides mobile crisis interventions to youth ages six to 17 which includes screening for mental health and substance use needs, and referral to appropriate resources, including longer-term mental health or substance use rehabilitative services. Services are provided in the community, schools, or in homes.  In FY 19, 1,125 youth were served, and 239 youth in FY20 YTD. All calls are triaged and assessed by a licensed clinical manager.

- *What is the process in determining what calls are deployable and non-deployable?*

All calls involving children and youth in psychiatric crisis are deployable calls meaning an onsite response by a clinical team.  The team is not deployed for calls when the caller can be helped by phone such as assistance with problem solving or for calls for services that the team is unable to perform such as removal of child from a home. In the instance in which the request is for removal from the home, the call is referred to Child and Family Services Agency hotline.  A team also is not deployed when the guardian declines assessment or when immediate medical attention is indicated such as a child has ingested a potentially lethal substance. The team is unable to be deployed when a child's location is unknown or the team is otherwise unable to access child.

- *What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY19 and FY20 to date.*

In FY 19, the average response time was 32 minutes with the shortest response time at 31 minutes and the longest response time at 1 hour 35 minutes. In FY 20 YTD, the average response time is 37 minutes with the shortest response time at 35 minutes and the longest response time at 1 hour 17 minutes.

- *How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?*
- *Please explain the nature of the training DCPS staff participated in as well as the number of staff who were trained.*

There are six crisis teams. Typically, team members are deployed in pairs; however, workers can be deployed individually when the program is experiencing high call volume. Staff are scheduled to maximize coverage and the number of available teams. Due to high call volume during daytime/school hours, teams are scheduled most heavily during this time period.  In addition, two clinical Managers can also be deployed if needed. Calls are triaged according to imminent risk and prioritized by 1) danger to self/others; 2) availability of a mental health clinician at the deployment site; and 3) linguistic need. The clinical managers maintain contact with the caller as needed until the crisis team is able to respond to the scene of the crisis.

ChAMPS educates DCPS staff on how to access and utilize ChAMPS services, what to expect regarding crisis response and assessment, goals of crisis intervention and possible outcomes. Champs also is deployed by the DBH school based program.

*Q18. How many days, on average, does it take to connect children who have been screened as needing mental health services to a core service agency? What is being done to ensure timely access to care? To the extent possible, please break down days based on type of care (e.g. medication management, CBI, community support, etc.).*

## DBH Response

Families who call the Access Helpline are connected immediately to a Core Service Agency and are scheduled for an intake appointment at that time. Additionally, many of the CSAs can accommodate patients on a walk in basis and they are seen and linked on that day. This is an expectation of the Access Helpline and our contracted agencies that provide services to children and families.

For children and youth in foster care, Child and Family Services Agency (CFSA) Social Workers can submit a referral directly to the Department of Behavioral Health (DBH) staff co-located at CFSA. DBH Co-located Staff connects children directly with DBH Core Service Agency (CSA) via access to ICAMS. This electronic access ensures referrals are sent quickly to the CSAs. On average, enrollment with a DBH provider occurs within one day. Following an enrollment to a CSA, the CFSA social Worker in consultation with the child's caretaker are tasked with scheduling the diagnostic assessment with the assigned CSA. On average the length of time from enrollment to intake for FY19 was 27 days. In FY20, the average length of time from enrollment to intake is 16 days. The DBH co-located staff provides support in addressing any barriers to scheduling intake appointments to ensure timely access to services.

Children and youth in foster care can also be referred to a CSA following a mental health/trauma screening up to 30 days after entry into foster care. In FY19, between October 2018 and February 28, 2019, the co-located DBH clinicians at CFSA screened 145 children or 90 percent of 160 children eligible for screening. If a child is not screened, it is often due to the child being less than 3 months of age or case closure. Following a positive screening result, on average children that required mental health services were linked to a cores service agency (CSA) the within one day. On March 1, 2019, CFSA clinicians absorbed responsibility of completing mental health screens upon inception of CFSA's internal mental health clinic.

Referrals from DBH are not made for a service type as the CSA determines the appropriate care based on the Diagnostic Assessment. Upon completion of the Diagnostic Assessment, children can receive a combination of services offered by the CSA. However, DBH has standardized the authorization process for high intensity services such as CBI to reduce barriers to service access. The average time to receive CBI level services from enrollment for FY19 was 13 days and in FY20 to date the average time from enrollment to service is 9 days. DBH is continuously working with providers to reduce barriers to providing timely services through technical assistance.

*Q19. How many days, on average, does it take for a child who has been referred to a core service agency to receive a diagnostic needs assessment? How many days, on average, elapse between the development of the diagnostic needs assessment and the implementation of services on the treatment plan? What is being done to ensure timely access to care? To the extent possible, please break down days based on type of care (e.g. medication management, CBI). Please provide a comparison between FY18, FY19 and to date in FY20.*

**DBH Response:**

As indicated by the chart below, the average number of days between enrollment and the receipt of the first service for children was 33 days in FY18, 22 days in FY19, and 10 days in FY20 to date.  Once a child is assessed, they can immediately receive any combination of the core services which can include medication management, community support, counseling, or CBI. The service is determined by their presented needs in the comprehensive Diagnostic Assessment. To ensure timely access to care, DBH monitors system-wide data on the time from referral to the date of the first service.  Additionally, the DBH Integrated Care Application Management System (iCAMS) allows system-level, agency-level and individual data to be more easily collected, reported and analyzed.

| Age 0-17 | FY18 | | FY19 | | FY20 YTD | |
|---|---|---|---|---|---|---|
| Service Type | Total Number of Newly Enrolled Consumers | Avg. Days Between Enrollment and First Service Received | Total Number of Newly Enrolled Consumers | Avg. Days Between Enrollment and First Service Received | Total Number of Newly Enrolled Consumers | Avg. Days Between Enrollment and First Service Received |
| Diagnostic Assessment | 190 | 33 | 228 | 22 | 34 | 10 |

*Q20.    Please explain the work the Department has been doing with the Child and Family Services Agency on trauma-informed care.*

**DBH Response:**

DBH and Child and Family Services Agency (CFSA) have worked very closely to expand trauma informed care within the District since FY 12 with the award of the SAMHSA System of Care (SOC) Expansion Implementation (DC Gateway Project) grant to DBH and the Administration for Children, Youth and Families (ACYF) Trauma grant awarded to CFSA in FY12. As a result of this partnership, there have been several successful initiatives that enhanced access to trauma informed care and promoted sustainability.

During FY19, DBH had staff co-located at CFSA who administered behavioral health and trauma screenings to 145 children and youth.  The screening tools utilized include *Trauma Symptoms Checklist for Children (TSCC),* the *Childhood Stress Disorder Checklist*-Exposure and Commercial Sexual Exploitation of Children (CDSC-CW) and the initial CAFAS or PECFAS Assessment for all children entering care within the first 30 days.  The screenings facilitated a more informative approach to referral for more comprehensive assessments through a core service agency. CFSA also implemented Initial Case Plan Meetings held within 14 days of the child's entry into foster care and allowed for the child's trauma screening results to be discussed with the family and other stakeholders which enhanced the case planning process in a more informative manner. The DBH co-located team participated in these meetings. CFSA also automated and integrated all screenings and assessments in their SACWIS system, provided in-service trauma training for all new direct service staff, increased their array of trauma screenings.

Also during FY19, DBH continued to offer three trauma therapy models: Trauma Systems Therapy (TST), Child Parent Psychotherapy (CPP), Trauma Focus Cognitive Behavioral Therapy (TF-CBT).  In FY19, DBH certified an additional TF-CBT provider which expanded service capacity.

In FY20, DBH and CFSA continues to collaborate in the provision of trauma informed care for youth impacted by trauma.  The new 1115 Behavioral Health Transformation Demonstration waiver includes Trauma-Informed Behavioral Health Services which will further support the work with trauma impacted families. CFSA plans to support the expansion of Functional Family Therapy (FFT) utilizing the Community Based Child Abuse Prevention or (CBCAP) funding to provide intensive therapeutic interventions to families as a key service to prevent or reduce child abuse and neglect.  FFT is an evidenced-based practice that targets families with children between the ages of 11-18 with behavioral or emotional problems such as conduct disorder, violent acting out, and substance abuse disorders. DBH will use the funding to identify, train and monitor the fidelity of the model by a community mental health provider and track the utilization and success of the treatment modality.

*Q21. Please explain the work the Department is doing with Child and Family Services Agency to better serve the mental health needs of foster children in the District. How long does it take for a child who has been identified as needing mental health services before they are connected to those services? During FY19, what percentage of children were screened within 30 days of entering or re-entering care? Has there been a decrease in time to linkage to first services from FY 18 and FY19? If available, please provide any documentation that shows that children are receiving more timely services.  What efforts have been made to improve more timely services?*

**DBH Response**

In its partnership with the Child and Family Services Agency (CFSA), DBH is better able to serve children involved in foster care by having staff co-located at CFSA to assist with screening of mental health needs and timely enrollment to a Core Service Agency (CSA) for behavioral health services.  In FY19, 175 children and youth involved in foster care were referred for mental health assessments and treatment through the DBH co-located staff stationed in the clinical services unit within CFSA. To date in FY20, a total of 30 children and youth were referred to a CSA.

In FY19, from October 1, 2019 to February 28, 2020, two co-located DBH staff administered initial mental health/trauma screenings and functional assessments within 30 days to all eligible children experiencing a new placement or re-entry into foster care. These screenings included the initial CAFAS/PECFAS assessment, Child Stress Disorder Checklist-Child Welfare (CSDC-CW), Trauma System Checklist for Children (TSCC) and Ages and Stages Questionnaire (ASQ-SE).  CFSA and DBH agreed that provision of mental health assessments to children and youth entering care after experiencing trauma will lead to early identification and intervention for this vulnerable population.  The screenings assess whether the child required further assessment/intervention, provided recommendations for evidence based services to include trauma focused therapies and to ensure timely access to mental health services.

In FY2019, during the period of October 1, 2018- February 28, 2019, 145 children received a mental health screening through the DBH co-located staff.  Of the 145 children screened, 117 received mental health screenings within 30 days of entry.

On March 1, 2019, CFSA implemented a Mental Health Redesign which included the onboarding of three mental health clinicians to administer mental health screenings and to provide direct therapeutic interventions.  As a result of this, DBH co-located staff no longer conducted screenings and assessments for children that enter and re-enter foster care and there was a decrease from four (4) to one (1) DBH co-located staff.  The remaining DBH co-located staff person's role is to facilitate timely enrollment of children in behavioral health services within the DBH network but does not conduct screenings and assessments.  Therefore, no children were screened by DBH 3rd and 4th quarter of FY19 and in FY20.

| FY19 - Percentage of Children Screened within 30 days of Entering or Re-entering Foster Care | |
|---|---|
| Total Consumers Screened for FY19 | 145 |
| Total Consumers Screened within 30 days | 117 |
| Percentage Screened within 30 days FY19 | 81% |
| # of days from Linkage to first services in FY18 | 90 |
| # of days from Linkage to first services in  FY19 | 50 |

Time to linkage to receipt of the first service decreased in FY19 compared to FY18.  The amount of time to link for first service in FY19 was 50 days compared to 90 days in FY 18. DBH has worked internally to address barriers to ensure timeliness of services by partnering with Network Development to provide technical assistance on internal processes, infrastructure and hiring practices within each CSA and externally working with CFSA to ensure families are aware of appointment and encouraging the Social Worker attend and/or support in the transportation to scheduled appointments. However, DBH acknowledges that continued improvement is necessary and continues to address identified barriers.

The Department of Behavioral Health continues to assess and enhance the current array of services to meet the mental health needs of the District's children and youth in foster care.  In addition to efforts to build capacity, DBH and Child Family Services Administration (CFSA) developed a process for connecting children and families with Core Service Agencies soon after removal occurs. If a child is currently receiving services or recently enrolled with a mental health provider, the provider is notified of removal and invited to participate in a Review, Evaluate and Direct (RED) Family Team Meeting teaming processes which occurs within 72 hours of the removal. During the RED Team Meeting, details of the cases are discussed; providers begin engagement with family members and schedule appointments at a time most convenient for families which improves the timeliness of service initiation.  CFSA and DBH recognizes that having providers engaged earlier in the process when children are entering care, will increase access to care in a timely manner. The DBH staff co-located in CFSA's clinical unit closely track this data.

**Amendment Letter for Memorandums of Understanding**
**Between**
**District of Columbia Courts and Department of Behavioral Health**
**DCSC-18-MOU-0022**

This Amendment is made to that Memorandum of Understanding (DCSC-18-MOU-0022) previously executed by and between the District of Columbia Superior Courts and Department of Behavioral Health on March 12, 2018. It is mutually understood and agreed by and between the undersigned parties to amend that previously executed MOU as follows:

**Section I Introduction:** The above identified agreement is hereby amended as follows:
The term Memorandum of Understanding (MOU) is replaced with the term Memorandum of Agreement.

**Section III Scope of Services -** the above identified agreement is hereby amended as follows:
The term Memorandum of Understanding (MOU) is replaced with the term Memorandum of Agreement.

**Section VII Period of Performance -** the above identified agreement is hereby amended as follows:
The term Memorandum of Understanding (MOU) is replaced with the term Memorandum of Agreement.

**Section VIII Authority for MOU -** the above identified agreement is hereby amended as follows:
The term Memorandum of Understanding (MOU) is replaced with the term Memorandum of Agreement.

**Section IX Funding Provisions -** the above identified agreement is hereby amended as follows:
The term Memorandum of Understanding (MOU) is replaced with the term Memorandum of Agreement.

**Section XI Payments -** the above identified letter agreement is hereby amended as follows:
The term Memorandum of Understanding (MOU) is replaced with the term Memorandum of Agreement.

**Section XII Modifications -** the above identified letter agreement is hereby amended as follows:
The term Memorandum of Understanding (MOU) is replaced with the term Memorandum of Agreement.

**Section XIII Records Maintenance -** the above identified letter agreement is hereby amended as follows:
The term Memorandum of Understanding (MOU) is replaced with the term Memorandum of Agreement.

It is understood and agreed that all terms and conditions forming a part of the original Agreement, (DCSC-18-MOU-0022) as well as the above stated amendments of sections (I, II, III, VII, VIII, XI, XII, XIII) shall remain in full force and effect during the period of agreement.

By: _____

**Tanya A Royster, M.D.**
**Director**
**Department of Behavioral Health**

Date: 5 | 15 | 2018

By: _____

**Louis W. Parker**
**Contracting Officer**
**District of Columbia Courts**

Date: _____

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**DEPARTMENT OF BEHAVIORAL SERVICES**
**AND THE**
**DISTRICT OF COLUMBIA SUPERIOR COURT**
**DCSC-18-MOU-0022**

## I.    INTRODUCTION

This Memorandum of Understanding or ("MOU") is entered into between the DISTRICT OF COLUMBIA SUPERIOR COURT, the buyer agency ("Buyer" or "DCSC") and the DEPARTMENT OF BEHAVIORAL HEALTH, the seller agency ("Seller" or "DBH"), collectively referred to herein as the "Parties."

DCSC has requested the services of DBH and THE OFFICE OF THE ATTORNEY GENERAL (OAG) to participate in a partnership to expand the Juvenile Behavioral Diversion Program (JBDP), a problem-solving mental health court that links court-involved youth to mental health services in the community and the development and implementation of Here Opportunities Prepare you for Excellence (HOPE) Court which supports children and youth at risk or engaged in commercial sex trafficking. These programs are a partnership with the District of Columbia Family Court's Social Services Division (CSSD). This collaboration is funded by the US Department of Justice, Office of Justice Programs, Bureau of Justice Assistance – Award #: 2017-MO-BX-0033, dated September 21, 2017 and Special Conditions are hereby incorporated in this MOU by reference.

## II.    PROGRAM GOALS AND OBJECTIVES

The DBH is the agency designated to facilitate training and program development for the JBDP and HOPE Court for the District of Columbia. In an effort to increase public safety by facilitating collaboration among the criminal justice, juvenile justice mental health and substance abuse treatment systems to increase access to mental health and other treatment services for those individuals with mental illness or co-occurring mental health and substance use disorders.

## III.    SCOPE OF SERVICES

The scope of this MOU is based on the scope outlined in the grant application to DOJ.

DCSC will provide the seller funding not-to-exceed Two Hundred and Eight Thousand, Five hundred Dollars ($208,500.00) to be used for the following:

### A.    Training for JBDP Expansion

JBDP partner agencies (CSSD, DBH, and OAG) shall train approximately three-hundred (300) people on the JBDP approach and model through at least eighty (80) hours of training in total. Each ninety (90)-minute training session covers seven (7) distinct subject areas: (1) overview of JBDP, (2) referral process, (3) screening tools (Comprehensive Behavioral Rating Scale (CBRS), Sex Trafficking Assessment Review (STAR)), (4) JBDP eligibility review process, (5) mental health rehabilitation services, (6) supervision of JBDP youth and. (7) JBDP research and evaluation (Attachment D).

**B.**   **Training for HOPE Court**

The HOPE Court training will include a learning series of seven courses. DBH has established nine evidence based practices, three of which are trauma models that support youth and their families that will be incorporated in the treatment for children, youth and families involved with the court.

Two models are proposed for use in the HOPE Court: the SERVE Brain and the Stages of Change Models. The SERVE Brain Model, a brain-based approach to addressing complex traumatic stress (Attachment E), focuses on using a synthesized model of neuroscience, attachment theory and evidence-based treatment to effectively treat complex traumatic stress. The SERVE Model training is a two (2) day training. DBH will offer this training eight (8) times during the grant period.

The Stages of Change Model has been utilized with commercially sexually exploited youth to help providers identify where youth are in the change process, and find strategies to help youth transition from one stage to the next.

Additional trainings offered in the learning series will take place four (4) times during the grant period and include: Commercial Sexual Exploitation of Children (CSEC) Context and Lived Experience; CSEC screening and assessment; trauma informed care and practice; CSEC supervision; and CSEC Support Group training (Attachment F outlines each training). The CSEC learning series will train approximately three-hundred (300) people, including selected community members. All trainings will be conducted at DBH or DCSC facilities.

**C.**   **Implementation of the CSEC-HOPE Court**

DBH will be responsible for:

1. Identifying and building the capacity of community CSEC treatment providers;
2. Linking youth and families to CSEC providers through the provider network;
3. Providing oversight and monitoring of services;
4. Identifying individuals to collaborate with CSSD in the case review and treatment recommendations for youth;

5. Hiring a Program Coordinator to support the HOPE Court during hearings, participate on the interagency Treatment Care Review Committee (comprised of DBH, CSSD, and OAG) and staffing; and

6. Appointing a representative to serve as a member of the Suitability Committee/Treatment Case Review Committee.

## IV.   RESPONSIBILITIES OF SELLER

DBH agrees to be bound by all of the terms and conditions of US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics–Award #: 2017-MO-BX-0033 (including grant adjustments) and accomplish the tasks and deliverables as outlined in the approved grant application and budget.  DBH will submit invoices for service rendered monthly to the Court.

## V.   RESPONSIBILITIES OF BUYER

DCSC will be responsible for fulfilling all functions associated with its designation to administer the Juvenile Behavioral Diversion Program and Hope Court for the District of Columbia which include, but are not limited to, program and financial oversight.

## VI.   QUARTERLY REPORTING REQUIREMENTS

Progress Reports: DBH shall prepare quarterly progress reports to include a summary of activities and accomplishments as well as the proposed activities for the upcoming reporting period. In addition to a summary of all grant activity, this report shall state whether DBH has met the established goals and performance measures.

DBH shall provide DCSC with program performance data on a quarterly basis in accordance with the schedule set forth below.

| Performance Data | Report Due Date: |
|---|---|
| January 1, 2018 – March 31, 2018 | April 15, 2018 |
| April 1, 2018 – June 30, 2018 | July 15, 2018 |
| July 1 2018 – September 30, 2018 | October 15, 2018 |
| October 1, 2018 – December 31, 2018 | January 15, 2019 |
| January 1, 2019 – March 31, 2019 | April 15, 2019 |
| April 1, 2019 – June 30, 2019 | July 15, 2019 |
| July 1 2018 – September 30, 2019 | October 15, 2019 |

The DC Courts will provide DBH with templates or formats for preparing reports.

Semi-Annual GMS Programmatic reports: DBH shall provide DCSC with semi-annual programmatic reports for submission to DOJ through the Grant Management System (GMS) system on the following dates:
– January 15, 2018 and July 15, 2018

– January 15, 2019 and July 15, 2019
– October 30, 2019 (final report)

## VII. PERIOD OF PERFORMANCE

The period of performance of this MOU shall begin the date the last party signs this MOU and shall end September 30, 2019.

## VIII. AUTHORITY FOR MOU

Statutory authority to enter into this MOU is set forth in D.C. Official Code §§ 1-301.01(k), 11-1742(b).

## IX. FUNDING PROVISIONS/COST OF SERVICES

Total cost for goods and services under this MOU shall not exceed $208,500.00 Funding for the goods and services shall not exceed the actual cost of the goods and services, including labor and materials. This funding will be spent in accordance with the approved federal grant budget. Any and all unspent funds will be returned to DCSC at the end of the performance period.

## X. INVOICING, BUDGET, AND PERSONNEL REQUIREMENTS

**Invoicing:** DBH shall provide DCSC with monthly invoices for goods and services by the 15th of each month.

**Budget:** Budget shall be allocated as follows:

| Department of Behavioral Health | Federal Budget | Match |
|---|---|---|
| Program Manager | | |
| Program Coordinator | | $ 8,454.40 |
| Program Coordinator: New Hire | | $ 7,511.04 |
| Benefits: | $78,692.35 | |
| Office Supplies | $20,460.00 | |
| Training: | $ 3,347.00 | $ 4,071.21 |
| CSEC 101 - CSEC in Context (4 X   ) | $ 2,200.00 | |
| CSEC 101: The Lived Experience (4 X) | $22,000.00 | |
| CSEC Screening and Assessment (4 X) | | |
| Trauma Informed Care and Practice Training (4X) | | $2,200.00 |
| The SERVE MODEL Training (2 days) (8X) | $30,000.00 | $2,200.00 |
| Stages of Change (4X) | $ 7,800.00 | |
| CSEC Supervisory Training (4X) | $ 6,000.00 | |
| Support Group Training (TOT) (4X) | $ 8,000.00 | |
| CSEC Consultation Hours (Technical Assistance) | $30,000.00 | |
| **TOTAL to DBH:** | **$208,500.00** | **$24,436.65** |

**Match Requirement:** DBH is committed to $24,436.65 in-kind match. DBH will report on the in-kind match contribution with the financial and programmatic reporting according to the reporting schedule.

**Key Personnel Approval:** This program requires the hiring of a program coordinator as a key personnel for this project. The Department of Justice (DOJ) grant requires that DOJ approve the final candidate for the position. DBH will submit the name and credentials of the proposed program coordinator to DCSC for approval.

**Special Conditions and Administrative Requirements:** All the administrative requirements and special conditions outlined by DOJ in the grant awarded to DCSC will also apply to DBH (See Attachment A).

## XI. PAYMENT

Buyer's payment for the goods and services under this MOU shall not exceed $208,500.00.

DBH shall provide documentation supporting the cost of services (i.e., vouchers, receipts, invoices, paid checks, and payroll registers. etc.). The documentation shall explain the amounts billed for that period.

The Parties' DBH's and DCSC's Directors or their designees shall resolve all adjustments and disputes arising from services performed under this MOU. In the event that the Parties are unable to resolve a financial issue, the matter shall be referred to the DC Courts Administrative Services Division, Contracting Officer, Louis W. Parker.

## XII. MODIFICATIONS

The terms and conditions of this MOU may be modified only upon prior written agreement by the DBH and DCSC.

## XIV. RECORDS MAINTENANCE

The DBH shall maintain records pertinent to this MOU for a period of no less than three (3) years. In addition, records pursuant to the resolution of an audit or monitoring finding shall be maintained for a period of not less than three (3) years after resolution.

## REQUIRED AND STANDARD CLAUSES

Non-Discrimination:  The Parties shall abide by the provisions of Executive Order 11246, as amended; Title VI of the Civil Rights Act of 1964, as amended (78 Stat. 252; 42 U.S.C. §§ 2000d et seq.); Title V, Section 504 of the Rehabilitation Act of 1973, as amended (87 Stat. 394; 29 U.S.C. § 794); the Age Discrimination Act of 1975, as amended (89 Stat. 728; 42 U.S.C. §§ 6101 et seq.); and with all other Federal laws and regulations prohibiting discrimination on the grounds of race, color, national origin, disability, religion, or sex, in employment and in providing facilities and services to the public.  Nothing in the advertising for employees shall be done which prevent those covered by these laws from qualifying for employment.

Anti-Deficiency Act: Pursuant to the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1), nothing contained in this MOU shall be construed as binding on the United States or the District of Columbia to expend in any one (1) fiscal year any sum in excess of the appropriations made by Congress for the purposes of this MOU for that fiscal year, or as involving the United States or the District of Columbia in any contract or other obligation for the further expenditure of money in excess of such appropriations.

Interest of Members of Congress: Nothing herein contained shall be deemed to be inconsistent with or contrary to the purpose or intent of any Act of Congress or the law of the District of Columbia establishing, affecting, or relating to this MOU.  Pursuant to 41 U.S.C. § 22, no member of Congress shall be admitted to any share of part of this MOU, or to any benefits that may arise there from.

Lobby Prohibition: The Parties shall abide by the provisions of 18 U.S.C. § 1913, which states:

No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation, law, ratification, policy, or appropriation, whether before or after the introduction of any bill, measure, or resolution proposing such legislation, law, ratification, policy, or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies from communicating to any such Member or official, at his request, or to Congress or such official, through the proper official channels, requests for legislation, law, ratification, policy, or appropriations which they deem necessary for the efficient conduct of the public business, or from making any communication whose prohibition by this section might, in the opinion of the Attorney General, violate the Constitution or interfere with the conduct of foreign policy, counter-intelligence, intelligence, or national security activities.  Violations of this section shall constitute violations of Section 1352(a) of Title 31.

Severance of Terms and Compliance with Applicable Law: The Parties shall comply with all applicable laws, regulations, and rules.  This MOU is subject to all laws, regulations and rules governing the Parties hereinafter enacted or promulgated.  If any term or provision of this MOU is held to be invalid or illegal, such term or provision shall not affect the validity or

enforceability of the remaining terms and provisions of this MOU. Meeting the terms of this MOU shall not excuse any failure to comply with all applicable laws, regulations, and rules, whether or not these laws and regulations are specifically listed in this MOU.

Communications that are required to be in writing, and all concerns regarding the technical implementation and interpretation of this MOU, shall be personally delivered, e-mailed, or mailed to the persons listed below:

**Behavioral Health Department's Authorized Representative is:**

Patrina Anderson
Director, Linkage and Assessment Services Division
DBH
64 New York Avenue, NE
Washington, DC 20002
202-671-2910

**District of Columbia Superior Courts' Authorized Representative is:**

Louis W. Parker
Contracting Officer
Administrative Services Division
DC Courts
616 H Street, NW, Suite 610
Washington, DC 20001
Louise.Parker@dcsc.gov

**District of Columbia Superior Courts' Contracting Officer's Technical Representative (COTR) is:**

Dr. Michael Barnes
Assistant Deputy Director/Clinical Psychologist
515 E Street, NW, Building B
Washington, DC 20001
(202) 508-1751
Michael.Barnes@dcsc.gov

## INSURANCE

1. If any Party hires a contractor or consultant to provide any of the services specified in this MOU, then the contractor or consultant shall procure liability insurance from a responsible company or companies with a minimum limitation of five hundred thousand dollars ($500,000) per person for any one (1) claim, an aggregate limitation of one million dollars ($1,000,000) for any number of claims arising from any one (1) incident, five hundred thousand dollars ($500,000) for property damage for any one (1) claim, and one million dollars ($1,000,000) for property damage for any number of claims arising from any one (1) incident. The policies shall name the District of Columbia as an additional insured, shall specify that the insured shall have no right of subrogation against the District of Columbia for payments of any premiums or deductibles due there under, and shall specify that the insurance shall be assumed by, be for the account of, and be at the insured's sole risk. Prior to beginning the work authorized herein, the contractor shall provide the Party with confirmation of such insurance coverage, including any such coverage required by a third-party, and when requested, a copy of any contractual provisions requiring the third-party to maintain insurance.

## SIGNATORIES

IN WITNESS WHEREOF, the Parties hereto have caused this MOU to be executed as of the date therein written.

By: _____    Date: 2/13/2018
Tanya A. Royster, M.D.
Director
Department of Behavioral Health

By: _____    Date: 3/12/18
Louis W. Parker
DC Courts
Contracting Officer

*Q22. Please explain the work the Department is doing to serve DC youth who have been identified as commercially sexually exploited. Are there any evidence-based practices that DBH plans to employ to provide options for this population? Does DBH have beds available for this population when they do not have housing options?  What increases in capacity will be necessary for the Department to provide said practices? Does DBH have beds available for this population when they do not have housing options?  Please also describe the collaborative work the Department is doing with DC Courts, MPD, and CFSA to address the behavioral and mental health needs of DC youth who have been identified as commercially sexually exploited. Please provide any MOAs or MOUs related to this subject.*

**DBH Response:**

DBH offers three evidence-based practices (EBP) to children, youth, and their families geared toward treating children and youth who have been traumatized, including those identified as commercially sexually exploited: (1) Trauma Focus Cognitive Behavior Therapy (TF-CBT), (2) Child Parent Psychotherapy for Family Violence (CPP-FV), and (3) Trauma Systems Therapy (TST).  DBH also offers the Transition to Independence Process (TIP) service to youth and young adults between the ages of 14-29 years old. TIP is an evidence-supported practice that demonstrates improvement in real-life outcomes for youth and young adults with emotional/behavioral difficulties. To enhance provider knowledge and competency on commercially sexually exploited children (CSEC), in FY18 and FY19, DBH provided a specialized training series on Human Trafficking, Motivational Interviewing, and the application of Stages of Change and the Brain Serve Model (BSM) which supported trauma informed care. The total number of participants that received training was 244. The participants included behavioral health providers, judges, probation officers, and attorneys on specialty courts and CSEC. DBH is an active member of the Strengthening Teens, Enriching Parents (STEP) program operated by Department of Human Services (DHS). STEP supports youth with multiple missing person reports who leave home due to a number of reasons including sex trafficking and their families.

DBH also works closely with the District of Columbia Superior Court to support HOPE Court. Established in FY18 with a two-year $300,000 grant, HOPE Court meets the unique needs of youth at risk of or affected by commercial sexual exploitation.  The grant supported a full time DBH Program Coordinator who provided clinical consultation, coordination, and support to the Court as well as specialized training for behavioral health providers, judges, probation officers, and attorneys on specialty courts and CSEC.  The grant ended in FY19, however, a no cost extension was granted for FY20 to continue training and consultation with behavioral health providers treating youth at risk and active in sexual exploitation. Data on HOPE Court is based on calendar year (CY) not fiscal for research purposes.  HOPE Court served 35 youth in CY2018 and 52 youth in CY2019.  Currently in CY2020, 33 youth are involved in HOPE Court.  Other HOPE Court partners are CFSA, Court Social Services, the Office of the Attorney General (OAG), Courtney's House, Fair Girls, Rights4Girls, and the Public Defender Service.

DBH also participates in a bi-monthly call that reviews youth with pre-existing court matters who may be eligible for a specialized court, such as HOPE Court or the Juvenile Behavioral Diversion Program (JBDP). Members of the CSEC Multidisciplinary Team Committee include the OAG,

CFSA, Court Social Services, Department of Youth Rehabilitation Services (DYRS), Children's National Health System, MPD, and Safe Shores. Each reports on high-risk youth who come to the attention of their respective agencies, youth concerns, case status, and development of a tentative plan to address holistic youth needs, which include, but are not limited to mental health, physical health, placement, and other service needs. DBH along with its partners are in regular communication to allow immediate exchanges of information. DBH works with MPD to support investigations for those suspected of trafficking children including providing information on youth abscondance (previously known locations, social media information, known affiliates, and history) and scheduling forensic interviews.

Regarding housing options, the Wayne Place transitional housing program, operated in partnership with CFSA, is available for eligible young adults. When necessary, DBH works with other government and community partners for referral and placement in their housing resources. In FY18, one youth was referred and accepted to Wayne Place. In FY19 one youth was referred to Wayne Place.

Attachment 1. Executed MOA between the District of Columbia Superior Court and DBH.

*Q23. Please describe what substance abuse services are offered to children and youth and the process for obtaining these services. Are there any plans for FY20 to expand the types of services offered to children and youth? How many children and youth have received services through the Adolescent Community Reinforcement Approach (A-CRA) in FY19 and FY20 to date?*

**DBH Response**

DBH provides substance use disorder services to children and youth and their families across the entire continuum of care which includes prevention, treatment, and recovery. Through the provision of prevention services, engagement takes place by way of planned prevention initiatives implemented by both DBH prevention staff and sub-grantees which include four (4) DC Prevention Centers (DCPCs) and the DC Opioid Response or DCOR prevention grantees. These initiatives include evidence based programs such as implementation of the "Too Good for Drugs" curriculum, the "Hip Hop 2 Prevention" curriculum, and the Botvin "Lifeskills" program. Implementation of environmental strategies such as social marketing campaigns and the development of public service announcements are all aimed at addressing substance use among youth. The prevention sub-grantees are strategically placed throughout the District, thus allowing them to engage youth and families through schools, community centers, and places of worship. Successful meeting of grant deliverables is built upon the engagement of youth and their inclusion in the development and implementation of prevention initiatives. One engagement activity of note was a youth summit that took place in September that had over 200 individuals in attendance. This event was focused on providing safe alternatives to dealing with stress and peer pressure as opposed to using drugs.

Treatment and recovery services are available for children and youth through DBH's substance use disorder (SUD) child and youth provider network. DBH also receives funding from the Substance Abuse and Mental Health Services Administration (SAMHSA) for its Youth and Family TREE grant/DC CITY grant. This five (5) year grant focuses on the provision of treatment services and supports through DBH's local Adolescent Substance Abuse Treatment Expansion Program (ASTEP) providers. The ASTEP program has three providers, Hillcrest, Latin American Youth Center and Federal City. These ASTEP providers adopt the Adolescent Community Reinforcement Approach (A-CRA) or other approaches in their treatment of youth and their families in need of substance abuse treatment services.

During FY2019, a total of 39 youth received services through the A-CRA approach. Year to date for FY2020, a total of seven (7) youth have received services through the A-CRA approach. It should be noted that in FY19 approximately 200 youth ages 12-25 received a substance abuse treatment service. The overarching intent of this effort is to enhance the number and types of treatment services available, and to also address and remove any impediments to accessing these services.

In addition, the DC CITY grant provides other supports such as tobacco and vaping use counseling and intervention and also cessation. The grant will also include social marketing strategies aimed at reducing the stigma associated with youth entering substance abuse treatment. In FY 20, DBH will expand the reach of substance abuse treatment services for children and

youth by establishing partnerships with other District agencies such as DC Health, DYRS, CFSA, and DOES.  It is the hope that these partnerships will improve access for children and youth, along with their families, to enter treatment. These partnerships will also allow for the leveraging of resources such as space where treatment groups can take place and the utilization of tobacco cessation tools such as those coordinated by DC Health. DBH will be providing training and technical assistance to SUD providers on a variety of topics including family and youth engagement, and other evidence-based approaches including Motivational Enhancement Therapy-Cognitive Behavioral Therapy (MET-CBT).

*Q24.    Please explain the work the Department is doing with the Department of Health Care Finance to improve care coordination.*

**DBH Response**

DBH and the Department of Health Care Finance (DHCF) are collaborating on the implementation of the District's 1115 Behavioral Health Transformation waiver demonstration. This will expand the availability of Medicaid resources for services and supports that are critical for high-quality care, including Recovery Support Services (RSS) and Transition Planning Services. Under the waiver, providers of RSS can now bill Medicaid for their case management work. In line with this change, DBH has now made RSS a core service for all treatment providers, with the hope that this will expand individual access to these services.

As of January 1, 2020, the expansion of RSS works in concert with Clinical Care Coordination (CCC). CCC is the collaboration of practitioners via direct face-to-face contact, video-conferencing, or telephone communicates to discuss treatment needs, assessments, and treatment information with external health care providers to facilitates appropriate linkages to care, including transitions into or from higher levels of care or institutional settings. CCC also includes treatment planning and plan of care implementation activities that are separate from the diagnostic assessment service, when the clinician and consumer are meeting face-to-face or via video-conference, and can only be provided by licensed clinicians.

The 1115 wavier also expands Transition Planning Services, which are defined as discharge planning and facilitation of transitions of care for individuals leaving institutional treatment settings by providers of community-based behavioral health services. The components of Transition Planning Services include assessment; development of a service plan; and care coordination and case management. Previously, these services were provided solely by the institution in question, This service will be available in June 2020 to individuals with serious mental illness (SMI) and/or SUD served by Free Standing Mental Health Clinics (FSMHC), federally qualified health centers (FQHCs), providers of MHRS, and providers of adult substance use rehabilitation services.

 DBH has also been working with DHCF to enhance provider connection to DC's Health Information Exchange (HIE), which facilitates a person-centered approach to care delivery that can improve health outcomes for all District residents. In October 2019, DHCF awarded the HIE Connectivity Grant, which supports the HIE connectivity of Medicaid in-patient facilities, behavioral health clinics, dentists, emergency medical services (EMS), and home health providers. One of the six grant goals is to improve care coordination and transitions of care by improving access to information collected across settings of care.

Lastly, DBH will work with DHCF in CY2020 to implement the 18-month Substance Use Disorder Provider Capacity Planning grant received from Centers for Medicare and Medicaid Services (CMS) in September 2019. The capacity grant will support the District's overall objective of providing a more seamless experience of care that integrates behavioral and physical health, improves treatment rates for SUD, and promotes healthier lives for District residents. Planning grant activities  includes: a comprehensive needs  assessment SUD providers; education and

technical assistance; and infrastructure to enable structured data collection and communication providers.

Q25 Attachment 1 of 2

h.  What prevention programs and services were offered through the SMHP in FY19 and
FY20 to date

List of School Mental Health Program Prevention programs implemented in each school during
FY19 (SY18 - SY19) and FY19 (SY19 - SY20) to date.

| School | Evidence Based Prevention Programming Implemented | Early Intervention Programming Implemented |
|---|---|---|
| Aiton Elementary School | Good Touch Bad Touch Parent Café Teacher Training- Classroom Management Parent Workshop- Stress Management Kimochis | Lunch Bunch Groups |
| Amidon Bowen Elementary School | Ask 4Help Good Touch Bad Touch Kimochis CARE in the Classroom Teacher Presentation: Recognizing Safety Concerns in Student | Social Skills Mindfulness Resilience Builders Boys Groups Girls Groups Grif/Loss Groups PBIS Reboot |
| Anacostia High School | Love is Not Abuse SOS | Attachment Group New Heights Cannabis Youth Treatment Coping Strategies Creative Recording Studio |
| Ballou High School | Love Is Not Abuse SOS | Mentor Group Anger Management |
| Beers Elementary School | Too Good for Violence Ask for Help | Girls Group Self-Esteem/Leadership Social Skills |
| Boone Elementary School | Good Touch Bad Touch Presentation for Teachers: Interventions for the Classroom | Lunch Bunch |
| Browne Educational Campus | SOS Zones of Regulation Parent Café Too Good For Drugs | Social Skills Conflict Resolution Girls Groups Boys Groups Girls in Real Life Situations |

| | | |
|---|---|---|
| Cardozo Educational Campus - High School | SOS<br>Love is Not Abuse<br>Too Good For Violence<br>Too Good For Drugs<br>Mindfulness Day | Mindfulness Mondays<br>Pride Day<br>Girls Group<br>Mindfulness Schools |
| Cardozo Educational Campus Middle School | Botvins<br>SOS<br>Healthy Boundaries | |
| Cedar Tree Public Charter School | Parent Café<br>Kimochis<br>Good Touch Bad Touch | |
| Center City- Capitol Hill Public Charter School | Too Good for Drug | Anger Management<br>Social Skills Groups<br>Healthy Relationships |
| Center City- Public Charter School Congress | Too Good For Violence<br>Kimochis<br>Too Good For Drugs<br>Student Presentation: Use of Language/Fostering Relationships | |
| Cesar Chavez Parkside Public Charter School | Student Presentations on:<br>Domestic Violence<br>Anti-Bullying | |
| High School Columbia Heights Educational Campus | Too Good For Drugs<br>SOS<br>Healthy Boundaries<br>Student Presentation: Mental Health 101<br>Staff Workshops: Self-Care and Stress Reduction | |
| Columbia Heights Educational Campus Middle School | Healthy Boundaries<br>SOS<br>Connect With Kids<br>Zones of Regulation<br>Bully Prevention | Middle School Support Group<br>Middle School Transition Group<br>6th Grade Transition Group<br>Drugs/Risk Taking Behavior<br>Conversations about Race<br>Healthy Relationships<br>Mentoring |
| DC International Public Charter School | Parent Workshop: Question, Persuade, Refer<br>SOS | Owning Up Girls group<br>Conflict Resolution |
| Democracy Prep Public Charter School | Too Good For Violence<br>(Whole School completed)<br>Student Presentation:<br>Restorative Circles | Bullying Group<br>Social Skills<br>Say Goodbye to Being Shy |
| Eagle Public Charter School Main | Teacher Presentation: Age Appropriate Behaviors<br>Good Touch Bad Touch | |
| Eagle Public Charter School New Jersey | Connect With Kids<br>Kimochis | Social Skills |

| | | |
|---|---|---|
| EL Haynes Public Charter School Elementary School | Kimochis | Anger Management |
| Friendship Blow Pierce Public Charter School | Staff Presentations On : Bipolar Disorder Impact of Trauma Substance Abuse Mind and Body Managing Disruptive Behavior Surviving Holiday Stress Good Touch Bad Touch Healthy Boundaries | Managing Conflict and Anger Lunch Bunch K2 Concerns |
| Friendship Technology Public Charter School | SOS | |
| Garfield Elementary School | Good Touch Bad Touch | Mindfulness Bully Prevention Social Skills Skill Streaming in EC |
| Inspired Teaching Public Charter School | Too Good For Violence Kimochis Student Presentations On: Sexual Harassment/Bullying Emotional Regulation Safe Hands "Hands of Harry" | Social Skills |
| Jefferson Middle School | Recognizing/Reducing Bullying Understanding Mental Health Too Good For Drugs Dads and Donuts Special Program Girls Leadership Conference | Supports for In-school Suspension 6th Grade Boys Group |
| Johnson Middle School | SOS | |
| Kelly Miller Middle School | | 6th Grade Boys Group |
| Ketchum Elementary School | Teacher Presentation: Vicarious Trauma/Self Care Good Touch Bad Touch Coping with Community Violence-MH Supports Kimochis Bullying Prevention Second Step | Lunch bunch |
| Kramer Middle School | | Healthy Boundaries Too Good For Drugs SOS |
| LAMB Public Charter School | | Social Skills Kimochis |

| | | |
|---|---|---|
| Malcolm X Elementary School | Parent Workshops: Behavior Management, Self Care, Mental Health Awareness, Too Good For Violence | 5th grade Transition Group Social Skills Conflict Resolution Coping Cats Grief/Loss Emotional Regulation Ask 4 Help |
| Maya Angelou Public Charter School | Too Good For Violence LINA | |
| McKinley Tech High School | SOS | Mindfulness Emotional Regulation Girls on The Rise Girls Lunch Group |
| McKinley Tech Middle School | Teacher Training: Impact of Trauma | Too Good For Drugs Too Good For Violence Social-Emotional Skill Building |
| Miner Elementary School | Connect with Kids-Adventures Healthy Boundaries Good Touch Bad Touch | |
| Moten Elementary School | Bully Prevention Acts of Kindness Program Classroom Safety Too Good For Drugs Ask 4 Help Parent Presentation: Helping Your Child with Test Anxiety Good Touch Bad Touch | Social Skills Lunch Bunch |
| Mundo Verde Public Charter School | Too Good For Violence Ask for Help | Coping Cats |
| Patterson Elementary School | Parent Café Kimochis Teacher Presentation: Mindfulness; Self Care; Mandated Reporting SOS Ask 4 Help Second Step Good Touch Bad Touch Bullying Prevention Monthly Parent Meetings | Social Skills Grief Group |
| Payne Elementary School | Second Step Good Touch Bad Touch Stand Up Be Safe Too Good For Drugs Staff Presentation: Stress Management | Social skills |

| Richard Wright Public Charter School | Love is Not Abuse | LGBTQ Group<br>Lunch Bunch<br>Breakfast Bunch |
|---|---|---|
| Sela Public Charter School | Kimochis<br>Too Good For Violence<br>Connect with Kids-Adventures | Social Skills |
| Simon Elementary School | The 3 "R"s<br>Too Good For Drugs<br>Bullying Prevention<br>Family Fitness: Yoga<br>Parent Cafe | Mentor Group<br>Lunch Bunch<br>Rethink<br>Learning to Listen Learning to Care |
| Stanton Elementary School | Too Good For Violence | |
| Stuart Hobson Middle School | SOS<br>Good Touch Bad Touch<br>Too Good For Drugs<br>Mental Health Night<br>Panther Pride (Gay/Straight Alliance)<br>Teacher Training; Becoming a Trauma Informed Teacher | Humane Rescue Alliance<br>SASS |
| Takoma Educational Campus | Bullying Prevention<br>Parent Café<br>Teacher Presentation; Mental Health 101 | Kimochis |
| Neval Thomas Elementary School | Kimochis | |
| Thurgood Marshall Public Charter School | Too Good For Drugs<br>Love is not Abuse<br>SOS | Girls Group<br>Coping Cats<br>Keeping Your Cool |
| Turner Elementary School | Good Touch Bad Touch<br>Too Good For Drugs<br>Parent Wellness Workshop<br>The Three "R"s | Kimochis<br>ISS Social Emotional Group<br>Girls Group |
| Two Rivers Public Charter School | Kimochis<br>Too Good For Violence | Lunch Bunch<br>6th Grade Girls Group<br>4th Grade Boys Group<br>K Lunch Bunch |

| | | |
|---|---|---|
| Two Rivers Public Charter School Young | Too Good For Violence<br>Good Touch Bad Touch<br>Parent Café | Coping Cats<br>Girls in Real Life Situations<br>Conflict Resolution<br>Impulse Control<br>Grief/Loss<br>Anger Management<br>Boys Group<br>Self-esteem Group<br>Restorative Justice Circles |
| Walker Jones Educational Campus | Good Touch Bad Touch<br>Kimochis<br>Parent Presentation: Emotional Needs of Children<br>Self-Regulation | Social Skills<br>Anger Management<br>Behavior Control<br>SOS |
| Washington Met High School | Too Good For Drugs | Social Skills<br>SOS |
| Wheatley Educational Campus | Ask 4 Help | |
| Wilson High School | The Three "R"s<br>Tiger Talk – DC Prevention Center | Mindfulness |
| Washington Yu Ying Public Charter School | Teacher Presentation: Developmental Stages in Children; Mandated Reporting<br>Feelings and Regulation<br>Zones of Regulation | Boys Group<br>Boys To Men |

Q.25 j.  Attachment 2 of 2 SCHOOL LIST – SCHOOL YEAR 2019-2020

| # | WARD | FTE | DCPS/ DCPCS | SCHOOL INFORMATION | GRADE LEVEL | PRINCIPAL | CLINICIAN |
|---|---|---|---|---|---|---|---|
| 1 | 7 | 1 | DCPS | **AITON ELEMENTARY SCHOOL** 533 48th Place, NE Washington, DC 20019 Main# 202-671-6060 Fax# 202-724-4630 | PS – 5th | Malaika Golden Malaika.golden@k12dc.gov | Kelly Baker Cell: 202-573-3493 Email: Kelly.baker1@dc.gov Supervisor: Jackie Droddy |
| 2 | 6 | 1 | DCPS | **AMIDON-BOWEN ELEMENTARY SCHOOL** 401 I Street, SW Washington, DC 20024 Main# 202-724-4867 Fax# 202-724-4868 | PK3-5th | TaMikka Sykes Tamikka.sykes@k12dc.gov | Dorothy Arnold Cell: 202-841-7927 Email: Dorothy.Arnold@dc.gov Supervisor: Luis Morales |
| 3 | 8 | 1 | DCPS | **ANACOSTIA HIGH SCHOOL** 1601 16TH Street, SE Washington, DC 20020 Main# 202-698-2155 Fax# 202-698-2188 | 9TH-12th | William Haith William.haith@k12dc.gov | Nathan Luecking Cell: 202-503-7331 Email: Nathan.Luecking@dc.gov Supervisor: Jackie Droddy |
| 4 | 8 | 1 | DCPS | **BALLOU SENIOR HIGH SCHOOL** 3401 4th Street, SE Washington, DC 20020 Main # 202-645-3400 Fax# 202-645-3397 | 9th- 12th | Willie Jackson Willie.jackson@k12dc.gov | Jonathan Rivers Cell: 202-365-5875 Email: jonathan.rivers@dc.gov Supervisor: Luis Morales |
| 5 | 7 | .5 | DCPS | **BEERS ELEMENTARY SCHOOL** 3600 Alabama Ave, SE Washington, DC 20020 Main # 202-939-4800 Fax # 202-645-3225 | PK3-5th | Gwendolyn Payton Gwendolyn.payton@k12dc.gov | Sharon Hardy Cell: 202-821-5452 Email: Sharon.hardy@dc.gov Supervisor: Erica Barnes |
| 6 | 8 | 1 | DCPS | **BOONE ELEMENTARY SCHOOL** 2200 Minnesota Ave, SE Washington, DC 20020 Main#: 202-671-6240 Fax #: 202-645-3292 | PK3-5th | Carolyn Jackson-King Carolyn.jackson-kingk12@dc.gov | Corrie Clanton Cell: 202-253-3784 Email: corrie.clanton@dc.gov Supervisor: Jackie Droddy |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7 | 5 | 1 | DCPS | **BROOKLAND MIDDLE SCHOOL**<br>1150 Michigan Avenue<br>Washington, DC 20017<br>Main # 202-759-1999<br>Fax #: 202-724- 1530 | 6th-8th | Kerry Richardson<br>Kerry.richardson@k12dc.gov | Ruth Moss<br>Cell:<br>Email: ruth.moss@dc.gov<br>Supervisor: Jackie Droddy |
| 8 | 5 | .5 | DCPS | **BROWNE EDUCATIONAL CAMPUS**<br>850 26th Street, NE<br>Washington, DC 20002<br>Main# 202-671-6210<br>Fax # 202-724-1530 | PS-8th | Dwight Davis<br>Dwight.davis@k12dc.gov | Belinda Davis<br>Cell: 202-631-3458<br>Email:<br>Belinda.davis@dc.gov<br>Supervisor: Luis Morales |
| 9 | 1 | .5 | DCPS | **CARDOZO EDUCATIONAL CAMPUS- MIDDLE**<br>1200 Clifton Street, NW<br>Washington, DC 20009<br>Main # 202-673-7385<br>Fax # 202673-2232 | 6th- 8th | Arthur Mola<br>Arthur.Mola@k12dc.gov | Miata Tucker Zaza<br>Cell: 202-407-2164<br>Email:  Miatta.Tucker-Zaza@dc.gov<br>Supervisor: Luis Morales |
| 10 | 1 | 1 | DCPS | **CARDOZO EDUCATIONAL CAMPUS- HIGH**<br>1200 Clifton Street, NW<br>Washington, DC 20009<br>Main # 202-673-7385<br>Fax # 202673-2232 | 9TH-12TH | Arthur Mola<br>Arthur.Mola@k12dc.gov | Amanda Harvey<br>Cell: 202-439-6231<br>Email:<br>Amanda.Harvey2@dc.gov<br>Supervisor:  Carrie Grundmayer |
| 11 | 1 | 1 | DCPS | **COLUMBIA HEIGHTS EDUCATIONAL CAMPUS – HIGH**<br>3101 16TH Street, NW<br>Washington, DC 20010<br>Main #:  202-939-7700<br>Fax #:  202-576-9174 | 9th- 12th | Maria Tukeva<br>Maria.tukeva@k12dc.gov | Madeline Keefe<br>Cell: 202-577-9403<br>Email:<br>Madelyn.keefe@dc.gov<br>Supervisor: Luis Morales |

| 12 | 1 | 1 | DCPS | **COLUMBIA HEIGHTS EDUCATIONAL CAMPUS – MIDDLE**<br>3101 16TH Street, NW<br>Washington, DC 20010<br>Main #:  202-939-6680<br>Fax #:  202-576-9158 | 6TH- 8TH | Maria Tukeva<br>Maria.tukeva@k12dc.gov | Aaron Feinstein<br>Cell:  202-597-2912<br>Office: 202-939-6686<br>Email:<br>aaron.feinstein@dc.gov<br>Supervisor:  Luis Morales |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 13 | 4 | 1 | DCPS | **DOROTHY HEIGHT ELEMENTARY SCHOOL**<br>1300 Allison Street, NW<br>Washington, DC 20011<br>Main # 202-723-4100<br>Fax# 202-723-6867 | PK4-5th | Masi Peston<br>Masi.Preston@k12dc.gov | Jennifer Murphy<br>Cell: (202)568-0882<br>Email:<br>Jennifer.murphy3@dc.gov<br>Supervisor: Erica Barnes |
| 14 | 8 | 1 | DCPS | **GARFIELD ELEMENTARY SCHOOL**<br>2435 Alabama Ave, SE<br>Washington, DC 20020<br>Main #:  202-671-6140<br>Fax #: 202-698-1614 | PK3-5th | Kennard Branch<br>Kennard.branch@k12dc.gov | Nicole Denny<br>Cell:  202-329-1132<br>Email:<br>Nicole.denny@dc.gov<br>Supervisor:  Erica Barnes |
| 15 | 8 | 1 | DCPS | **HART MIDDLE SCHOOL**<br>601 Mississippi Ave, SE<br>Washington, DC 20032<br>Main #:  202-671-6426<br>Fax #:  202-645-3426 | 6th-8th | Charlette Butler-Strickland<br>Charlette.butler@k12dc.gov | Natasha Carter<br>Cell:  202-597-2894<br>Email:<br>Natasha.carter@dc.gov<br>Supervisor: Carrie Grundmayer |
| 16 | 8 | 1 | DCPS | **HENDLEY ELEMENTARY SCHOOL**<br>425 Chesapeake Street SE<br>Washington, DC 20032<br>Main# 202-645-3450<br>Fax# 202-6457098 | PK3-5th | Sundai Riggins<br>Sundai.Riggins@k12.dc.gov | Vacant |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 17 | 6 | 1 | DCPS | **JEFFERSON MIDDLE SCHOOL** 801 7th Street, SW Washington, DC 20024 Main#: 202-729-3270 Fax #: 202-724-2459 | 6th- 8th | Greg Dohmann greg.dohmann@k12.dc.gov | Lakeasha Hart-Tribue Cell: 202-821-9386 Email: Lakeasha.hart2@dc.gov Supervisor: Carrie Grundmayer |
| 18 | 8 | 1 | DCPS | **JOHNSON MIDDLE SCHOOL** 1400 Bruce Street, SE Washington, DC 20020 Main #: 202-939-3140 Fax #: 202-645-5882 | 6th-8th | Courtney Aldridge Courtney.aldridge2@k12dc.gov | Tiffany Hardy Cell: 202-379-8782 Email: Tiffany.hardy@dc.gov Supervisor: Luis Morales |
| 19 | 7 | 1 | DCPS | **KELLY MILLER MIDDLE SCHOOL** 301 49TH STREET, NE WASHINGTON, DC 20019 Main #: 202-388-6870 Fax #: 202-727-8330 | 6th-8th | Kortni Stafford Kornti.stafford@k12dc.gov | Kimberly Ward Cell: (202) 731-3123 Email: Kimberly.ward@dc.gov Supervisor: Monica Hammock |
| 20 | 8 | 1 | DCPS | **KETCHAM ELEMENTARY SCHOOL** 1919 15TH Street, SE Washington, DC 20020 Main #: 202-698-1122 Fax #: 202-698-1113 | PK3-5th | Maisha Riddlesprigger Maisha.riddlesprigger@k12dc.gov | JoEtta Thomas Cell: 202-441-7835 Email: joetta.thomas@dc.gov Supervisor: Carrie Grundmayer |
| 21 | 8 | .5 | DCPS | **KING ELEMENTARY SCHOOL** 3200 6TH Street SE Washington, DC 20032 Main# 202-939-4900 Fax# 202-645-7308 | PK3-5 | Angel Hunter Angel.hunter@k12dc.gov | Margot Hodges Cell: 202-579-5229 Email: Margot.Hodges@dc.gov Supervisor: Carrie Grundmayer |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 22 | 7 | .5 | DCPS | **KIMBALL ELEMENTARY SCHOOL**<br>3375 Minnesota Avenue, SE<br>Washington, DC 20019<br>Main #:  202-671-6260<br>Fax #:  202-645-3147 | PK3-5th | Johann Lee<br>Johann.lee@k12dc.gov | Vacant |
| 23 | 8 | 1 | DCPS | **KRAMER MIDDLE SCHOOL**<br>1700 Q Street, SE<br>Washington, DC 20020<br>Main #:  202-939-3150<br>Fax 3:  202-698-1171 | 6th-8th | Katreena Shelby<br>Katreena.Shelby@k12.dc.gov | Vacant |
| 24 | 8 | 1 | DCPS | **MALCOLM X ELEMENTARY SCHOOL**<br>1500 Mississippi Ave, SE<br>Washington, DC  20032<br>Main#:  202-645-3409<br>Fax #:  202-645-7219 | PK3- 5th | Zara Berry-Young<br>Zara.berry-young@k12dc.gov | Janice Jackson<br>Cell:  202-744-1849<br>Email:<br>Janice.jackson@dc.gov<br>Supervisor: Luis Morales |
| 25 | 5 | 1 | DCPS | **MCKINLEY TECHNOLOGY MIDDLE SCHOOL**<br>151 T Street, NE<br>Washington, DC 20002<br>Main #:  202-281-3950<br>Fax #:  202- 832-1293 | 6-8th | Mary Louise Jones<br>Loiuse.jones@k12dc.gov | Austin Quinn<br>Cell:  202-763-3208<br>Email:<br>Austin.quinn@dc.gov<br>Supervisor:  Monica Hammock |
| 26 | 5 | 1 | DCPS | **MCKINLEY TECHNOLOGY HIGH SCHOOL**<br>151 T Street, NE<br>Washington, DC 20002<br>Main #:  202-281-3950<br>Fax #:  202- 576-6279 | 9-12th | Mary Louise Jones<br>Loiuse.jones@k12dc.gov | Natalie Bloodworth<br>Cell:  202-536-9569<br>Email:<br>natalie.bloodworth@dc.gov<br>Supervisor:  Monica Hammock |
| 27 | 6 | .5 | DCPS | **MINER ELEMENTARY SCHOOL**<br>601 15th Street, NE<br>Washington, DC  20002<br>Main#:  202-397-3960<br>Fax#:  202-724-4957 | PK3-5th | Bruce Jackson<br>Bruce.jackson@k12dc.gov | Alyson St. Amand<br>Cell:  202-740-0378<br>Email:<br>Alyson.StAmand@dc.gov<br>Supervisor: Jackie Droddy |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 28 | 8 | 1 | DCPS | **MOTEN ELEMENTARY SCHOOL**<br>1565 Morris Road, SE<br>Washington, DC 20020<br>Main #:  202-698-1111<br>Fax 3:  202-698-1112 | PK3-5th | Akela Stanfield- Dogbe<br>Alela.dogbe@k12dc.gov | Karra Hancock<br>Cell:  202-815-0125<br>Email:<br>Karra.hancock4@dc.gov<br>Supervisor: Jackie Droddy |
| 29 | 8 | 1 | DCPS | **PATTERSON ELEMENTARY SCHOOL**<br>4399 South Capitol Terrace, SW<br>Washington, DC 2032<br>Main#:  202-939-5280<br>Fax# :  202-645-3851 | PK3-5th | Victorie Thomas<br>Victorie.thomas@k12dc.gov | Doree Smith<br>Cell: 202-527-2051<br>Email:<br>doree.powell2@dc.gov<br>Supervisor: Erica Barnes |
| 30 | 7 | 1 | DCPS | **RON BROWN COLLEGE PREP HIGH SCHOOL**<br>4800 Meade Street<br>Washington, DC 20019<br>Main# 202-729-4343 | 9-12th | Benjamin Williams<br>Benjamin.williams@k12dc.gov | Pierre Thomas<br>Pierre.thomas1@dc.gov<br>Supervisor: Jackie Droddy |
| 31 | 8 | 1 | DCPS | **SIMON ELEMENTARY SCHOOL**<br>401 Mississippi Ave, SE<br>Washington, DC 20032<br>Main#:  202-645-3360<br>Fax #:  202-645-3359 | PK3-5th | Sharon Holmes<br>sharon.holmes@k12dc.gov | Tina Terrill<br>Cell:  202-578-8650<br>Email:  tina.terrill@dc.gov<br>Supervisor:  Erica Barnes |
| 32 | 8 | 1 | DCPS | **STANTON ELEMENTARY SCHOOL**<br>2710 Naylor Road, SE<br>Washington, DC 20020<br>Main #:  202-671-6180<br>Fax #:  202-645-3264 | PK3-5th | Harold McCray<br>Harold.mccray@k12.dc.gov | Kim Stiven<br>Cell:<br>Email: kim.stiven1@dc.gov<br>Supervisor: Luis Morales |
| 33 | 6 | 1 | DCPS | **STUART HOBSON MIDDLE SCHOOL**<br>410 E Street NE<br>Washington, DC 20002<br>Main#:  202-671-6010<br>Fax#:  202-698-4720 | 6th-8th | Kristofer Comeforo<br>Kristofer.comeforo@k12dc.gov | Kimberly Harrington<br>Cell:  202-557-6404<br>Email:<br>Kimberly.harrington@dc.gov<br>Supervisor:  Carrie Grundmayer |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 34 | 4 | 1 | DCPS | **TAKOMA EDUCATIONAL CAMPUS**<br>7010 Piney Branch Road, NW<br>Washington, DC 20012<br>Main#:  202-671-6050<br>Fax#:  202-671-5305 | PK3-8th | Loren Brody<br>Loren.brody@k12dc.gov | Vanessa Victor<br>Cell:  202-573-6585<br>Email:<br>Vanessa.Haywood@dc.gov<br>Supervisor: Monica Hammock |
| 35 | 7 | 1 | DCPS | **NEVEL THOMAS ELEMENTARY SCHOOL**<br>650 Anacostia Avenue, NE<br>Washington, DC  20019<br>Main#:  202-724-4593<br>Fax#:  202-724-5053 | PK3- 5th | Jaimee Trahan<br>Jaimee.trahan@k12dc.gov | Erin Hollerbach<br>Cell: 202-597-2916<br>Email:<br>erin.hollerbach2@dc.gov<br>Supervisor: Luis Morales |
| 36 | 8 | 1 | DCPS | **TURNER ELEMENTARY SCHOOL**<br>3264 Stanton Road, SE<br>Washington, DC 20020<br>Main #:  202-645-3470<br>Fax 3:  202-645-3467 | PK3-5th | Jessica Johnson<br>Jessica.Morris@k12.dc.gov | Rachel Clark<br>Cell:  (202) 281-6821<br>Email:<br>Rachel.clark1@dc.gov<br>Supervisor: Carrie Grundmayer |
| 37 | 6 | 1 | DCPS | **WALKER-JONES EDUCATIONAL CAMPUS**<br>1125 New Jersey Avenue, NW<br>Washington, DC 20001<br>Main#:  202-939-5934<br>Fax#:  202-535-1307 | PK3-8th | Clinton Turner<br>Clinton.turner@k12dc.gov | LaTonya Moore<br>Cell:<br>Email:<br>LaTonya.Moore@dc.gov<br>Supervisor: Erica Barnes |
| 38 | 1 | 1 | DCPS | **WASHINGTON METROPOLITAN HIGH SCHOOL**<br>300 Bryant Street, NW<br>Washington, DC 20001<br>Main#:  202-939-3610<br>Fax #:  202-671-0086 | 8th-12th | Ronald Bradford<br>Ronald.bradford@k12dc.gov | Brian Wheeler<br>Cell:  202-841-0401<br>Email:<br>Brian.wheeler2@dc.gov<br>Supervisor: Monica Hammock |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 39 | 5 | 2 | DCPS | **WHEATLEY EDUCATIONAL CAMPUS**<br>1299 Neal Street, NE<br>Washington, DC  20002<br>Main #:  202-939-5970<br>Fax #:  202-724-9090 | PK3-8th | Shenora Plenty<br>Shenora.plenty@k12dc.gov | Vacant |
| 40 | 3 | 1 | DCPS | **WOODROW WILSON SENIOR HIGH SCHOOL**<br>3950 Chesapeake Street, NW<br>Washington, DC  20008<br>Main#: 202-282-0120<br>Fax #:  202-282-0077 | 9th-12th | Kimberly Martin<br>Kimberly.martin@k12dc.gov | Perette Arrington<br>Cell:  202-494-3157<br>Email:<br>Perette.arrington@dc.gov<br>Supervisor: Monica Hammock |
| 41 | 8 | 2 | DCPCS | **CENTER CITY PCS CONGRESS HEIGHTS**<br>220 Highview Place, SE<br>Washington, DC 20032<br>Main #:  202-562-7070<br>Fax #:  202-574-5829 | PK3-8th | Niya White<br>Nwhite@centercitypcs.org | Jasmine Tingling Clemmons<br>Cell:  202-438-1810<br>Email: Jasmine.tingling-clemmons@dc.gov<br>Supervisor: Carrie Grundmayer |
| 42 | 6 | 2 | DCPCS | **CENTER CITY PCS CAPITOL HILL**<br>1503 East Capitol Street, SE<br>Washington, DC  20003<br>Main #:  202-537-7556 | PK3-8th | Andre Samuels<br>asamuels@centercitypcs.org | Margot Hodges<br>Cell:  202-579-5229<br>Email:<br>Margot.Hodges@dc.gov<br>Supervisor: Carrie Grundmayer |
| 43 | 8 | 2 | DCPCS | **CEDAR TREE PCS**<br>701 Howard Rd, SE<br>Washington, DC 20020<br>Main#: 202-800-8655<br>Fax #:  202-610-2845 | PK3-K | LaTonya Henderson<br>lhenderson@cedartree-dc.org | Sharon Hardy<br>Cell:  202-821-5452<br>Email:<br>Sharon.hardy@dc.gov<br>Supervisor: Erica Barnes |
| 44 | 7 | 1 | DCPCS | **CESAR CHAVEZ PCS PARKSIDE MIDDLE**<br>3701 Hayes Street, NE<br>Washington, DC 20019<br>Main#: 202-398-2230 | 6th-8th | Kourtney Miller<br>Kourtney.miller@chavezschools.org | Vita Noble<br>Cell:  202-841-7105<br>Email:  vita.noble2@dc.gov<br>Supervisor: Luis Morales |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Fax #: 202-398-1966 | | | |
| 45 | 1 | 1 | DCPCS | **DC INTERNATIONAL SCHOOL**<br>1400 Main Drive, NW<br>Washington, DC 20012<br>Main#: 202-808-9033<br>Fax #: | 6th-12th | Maya Stewart<br>Deidre Bailey<br>maya,stewart@dcinernationalschool.org<br>Deidre.bailey@dcinternationschool.org | Christiane Brady<br>Cell: 202-748-3988<br>Email:<br>Christiane.brady@dc.gov<br><br>Supervisor: Monica Hammock |
| 46 | 6 | 2 | DCPCS | **EAGLE ACADEMY PCS**<br>1017 New Jersey Ave, SE<br>Washington, DC 20003<br>Main#: 202-459-6825<br>Fax#: 202-476-6796 | PK3-2nd | Sabina Ogilvie<br>sogilvie@eagleacademypcs.org | Emily Kahan<br>Cell: 202-480-6765<br>Email: Emily.kahan@dc.gov<br><br>Supervisor: Monica Hammock |
| 47 | 8 | 1 | DCPCS | **EAGLE ACADEMY PCS**<br>3400 Wheeler RD SE<br>Washington, DC 20032<br>Main#: 202-544-2646<br>Fax: 202-544-0187 | PK3-3rd | Melanie Leonard<br>mleonard@eagleacademypcs.org<br><br>Royston Lyttle<br>rlyttle@eagleacademypcs.org | Oron Gan<br>Cell: 202-365-5133<br>Email: oron.gan@dc.gov<br><br>Supervisor: Erica Barnes |
| 48 | 4 | 1 | DCPCS | **EL HAYNES PCS**<br>4501 Kansas Ave, NW<br>Washington, DC 20011<br>Main#: 202-706-5828<br>Fax #: 202-667-8811 | PK3-4th | Brittney Wagner Friel<br>bwagnerfriel@elhaynes.org | Danielle Goldberg<br>Cell: 202-236-4622<br>Email:<br>Danielle.goldberg@dc.gov<br>Supervisor: Jackie Droddy |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 49 | 7 | 1 | DCPCS | **FRIENDSHIP BLOW PIERCE**<br>725 19th Street, NE<br>Washington, DC 20002<br>Main#: 202-572-1070<br>Fax#: 202-399-6157 | PK3-8th | Gregory Spears<br>gspears@friendshipschools.org | Taiwan Lovelace<br>Cell: 202-834-2636<br>Email:<br>Taiwan.lovelace@dc.gov<br>Supervisor: Carrie Grundmayer |
| 50 | 7 | 2 | DCPCS | **FRIENDSHIP SOUTHEAST ACADEMY MIDDLE**<br>2705 Martin Luther Avenue SE<br>Washington, DC 20032<br>Main#: (202) 552-5700<br>Fax#: (202) 986-9240 | 7th | John Snowdy<br>Jsnowdy@friendshipschools.org | Sharryl Jackson<br>Cell: 202-834-6327<br>Email:<br>Sharryl.Jackson@dc.gov<br>Supervisor: Monica Hammock |
| 51 | 7 | .5 | DCPCS | **FRIENDSHIP TECHNOLOGY PREP HS**<br>2705 Martin Luther Avenue SE<br>Washington, DC 20032<br>Main#: (202) 552-5700<br>Fax#: (202) 986-9240 | 9th-12th | Kun Ye Booth<br>kbooth@friendshipschools.org | Sharryl Jackson<br>Cell: 202-834-6327<br>Email:<br>Sharryl.Jackson@dc.gov<br>Supervisor: Monica Hammock |
| 52 | 5 | .5 | DCPCS | **INSPIRED TEACHING DEMONSTRATION PCS**<br>200 Douglas Street, NE<br>Washington, DC 20002<br>Main#: 202-248-6825<br>Fax#: 202-248-6939 | PK3-8th | Deborah Williams | Jasmine Tingling Clemmons<br>Cell: 202-438-1810<br>Email: Jasmine.tingling-clemmons@dc.gov<br>Supervisor: Carrie Grundmayer |
| 53 | 5 | .5 | DCPCS | **LATIN AMERICAN MONTESSORI BILINGUAL**<br>1800 Perry Street, NE<br>Washington, DC 20002<br>Main#: 202-726-6200 | Pre K- 3 | Michelle Mangan<br>michelle@lambpcs.org | Alyson St. Amand<br>Cell: 202-740-0378<br>Email:<br>Alyson.StAmand@dc.gov<br>Supervisor: Jackie Droddy |
| 54 | 5 | 1 | DCPCS | **MUNDO VERDE PUBLIC CHARTER SCHOOL**<br>4401 8th Street NE<br>Washington, DC 20017<br>Main# (202) 803-8967 | PK3-K | | Vacant |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | Fax# (202) 905-0002 | | | |
| 55 | 5 | .5 | DCPCS | **Mundo Verde Public Charter School**<br>30 P Street NW<br>Washington, DC 20001<br>Main# 202-750-7060<br>Fax # 202-905-0002 | PreK-5th | Michelle Johnson<br>mjohnson@mundoverdepcs.org | Miata Tucker Zaza<br>Cell: 202-407-2164<br>Email: Miatta.Tucker-Zaza@dc.gov<br>Supervisor: Luis Morales |
| 56 | 5 | 1 | DCPCS | **PERRY STREET PREP PUBLIC CHARTER SCHOOL**<br>1800 Perry Street, NE<br>Washington, DC 20018<br>Main# 202-529-4400<br>Fax # 202-526-2214 | PK-8th | Rachel Crouch<br>Rachel.crouch@pspdc.org | Kanisha Barnes<br>Cell: 202-821-9698<br>Email:<br>Kanisha.barnes1@dc.gov<br>Supervisor: Jackie Droddy |
| 57 | 6 | 1 | DCPCS | **RICHARD WRIGHT PCS**<br>770 M Street, SE<br>Washington, DC 20001<br>Main#: 202-388-1011<br>Fax #: 202-388-5197 | 8th-12th | Marco Clark<br>Marco.clark@richardwrightpcs.org | Shara Cyrus<br>Cell:<br>Email: Shara.Cyrus@dc.gov<br>Supervisor: Carrie Grundmayer |
| 58 | 4 | 2 | DCPCS | **SELA PCS**<br>6015-17 Chillum Place, NE<br>Washington, DC 20011<br>Main#: 202-670-7352<br>Fax#: 202-722-2968 | PK4-4th | Joshua Bork<br>jbork@selapcs.org | Emily Kahan<br>Cell: 202-480-6765<br>Email: Emily.kahan@dc.gov<br>Supervisor: Monica Hammock |
| 59 | 8 | 1 | DCPCS | **THURGOOD MARSHALL HIGH SCHOOL**<br>2427 Martin Luther King Jr Ave, SE<br>Washington, DC  20020<br>Main#: 202-569-6862<br>Fax #: 202-563-6946 | 9th-12th | Raymond Weeden<br>rweeden@tmapchs.org | Joyce Ericson<br>Cell: 202-669-4116<br>Email:<br>joyce.ericson@dc.gov<br>Supervisor: Jackie Droddy |
| 60 | 6 | 1 | DCPCS | **TWO RIVERS PCS – 4TH STREET**<br>1227 4th Street NE<br>Washington, DC 20002 | Pk3-8TH | Jennifer McCormick<br>jmccormick@tworiverspcs.org<br><br>Caroline Mwendwa-Baker<br>cbaker@tworiverspcs.org | Caitlin Eshelman<br>Cell: 202-253-8583<br>Email:<br>Caitlin.friedrich@dc.gov<br>Supervisor: Erica Barnes |

| 61 | 5 | 2 | DCPCS | **TWO RIVERS PCS** 820 26th Street, NE Washington, DC 20002 | PK3-3rd | Chelsie Jones cjones@tworiverspcs.org | Belinda Davis Cell: 202-631-3458 Email: Belinda.davis@dc.gov Supervisor: Luis Morales |
| 62 | 4 | 1 | DCPCS | **WASHINGTON Yu-Ying** 220 Taylor Street, NE Washington, DC 20017 Main #: 202-635-1950 Fax#: 202-635-1960 | PK3-5th | Maquita Alexander maquita@washingtonyuying.org | William McNulty Cell: 202-295-7036 Email: William.mcnulty@dc.gov Supervisor: Monica Hammock |

## School Mental Health Managers

| | | | |
|---|---|---|---|
| Sharon Dietsche, Director | 202-673-7792 (O) | 202-281-9220 (C) | Sharon.Dietsche@dc.gov |
| Erica Barnes, Branch Chief | 202-299-5847 (O) | 202-295-7037 (C) | Erica.barnes@dc.gov |
| Jacqueline Droddy, Supervisor | 202-673-7127 (O) | 202-222-8785 (C) | Jacqueline.droddy@dc.gov |
| Monica Hammock, Supervisor | 202-299-5296 (O) | 202-380-7400 (C) | monica.hammock@dc.gov |
| Luis Morales, Supervisor | 202-299-5703 (O) | 202-494-8489 (C) | luis.morales3@dc.gov |
| Carrie Grundmayer, Supervisor | 202-299-5702 (O) | 202-494-0664 (C) | carrie.gundmayer@dc.gov |
| J'Wan Griffin, Primary Project | 202-299-5446 (O) | 202-446-4128 (C) | jwan.griffin@dc.gov |

Q25. Please provide an update on the Department's School Mental Health Program including a list of all schools that participate. For each school, please also include:

    a.  The number of student who met with a clinician;
    b.  The number of students who were referred to care;
    c.  The outcomes of all care linkages;
    d.  The most common diagnosis;
    e.  The referral source (i.e. walk-in, teacher);
    f.  The number of students participating in prevention programs;
    g.  Whether the current programs are meeting the existing need for services, and if not, what is being done to meet the total need;
    h.  What prevention programs and services were offered through the SMHP in FY19 and FY20 to date;
    i.  Any plans to expand the program and barriers to expansion; and
    j.  The number of FTEs serving in each school.

**DBH Response:**

The DBH School Mental Health Program consists of 53 clinicians serving 62 schools. This program predates the School-Based Behavioral Health Expansion (Expansion), which has as its goal to expand the multi-tiered system of behavioral health supports to all DC Public and Public Charter Schools. This Expansion began in SY 2018-2019 and being implemented on a three to five year phased implementation plan. The Expansion represents a systems-wide approach to providing behavioral health supports for all children in support of their well-being and academic achievement. The Expansion includes a variety of investments and resources. As a key resource, the DBH School Mental Health Program is considered a part of the Expansion. For purposes of this question, however, we are providing the data only for the School Mental Health Program, as requested.

| | | **School Year (SY)** | |
|---|---|---|---|
| | | **2018-2019** | |
| a. | The number of students who met with a clinician | 3467 | |
| b. | The number of students who were referred to care | 1361 | |
| c. | Outcome for of all care linkages | 100% referrals were followed up on | |
| d. | The most common diagnoses | Adjustment Disorders, Major depressive disorder, ADHD | |
| e. | The referral source | Primary Project | 53% |
| | | School | 22% |
| | | Parents | 15% |
| | | Self Referrals | 10% |
| f. | The number of students participating in prevention programs | 12,512 | |

g. The current programs are meeting the existing needs for services. The goal for the School-Based Mental Health (SBMH) expansion is to have a full time clinician in each DCPS and DCPCS.

h. For FY19 and FY20 each DBH SMHP clinician is required to do programming in either prevention or early intervention each quarter of the fiscal year. The programming is determined by the implementation plan that each clinician develops in collaboration with the school leadership. There is no specific amount of programming that is implemented as it is based on the individual needs of each school that is outlined in the implementation plan. When an issue has presented an increased need for intervention, SMHP has responded by either increasing or adding programming. For example, if a school is experiencing an increase in students expressing suicidal ideation, a clinician may either add the Signs of Suicide program to their implementation plan or increase the amount of classrooms/students receiving the program.

Please see Attachment 1 of 2 that lists prevention and early intervention programs offered through the SMHP in FY 19 and FY 20 to date by school.

i. Currently there are no plans to expand DBH SMHP.  The expansion of mental health services will be completed through the District's SBMH expansion program.

j. Please see Attachment 2 of 2.  List of SMHP schools with the number of FTEs in each school.

Q26. Attachment 1 of 3. Schools in Cohort with CBO Match

**Cohort 1**
1. AITON ELEMENTARY SCHOOL (Howard)
2. ANACOSTIA HIGH SCHOOL (Latin American Youth Center)
3. BALLOU SENIOR HIGH SCHOOL (Hillcrest)
4. CARDOZO EDUCATIONAL CAMPUS (Latin American Youth Center)
5. CESAR CHAVEZ PCS PARKSIDE-MIDDLE (Hillcrest)
6. CESAR CHAVEZ PCS PARKSIDE – HIGH (Hillcrest)
7. COOLIDGE HIGH SCHOOL (Mary's Center)
8. C.W. HARRIS ELEMENTARY SCHOOL (MBI)
9. DEMOCRACY PREP CONGRESS HEIGHTS PCS (Closed)
10. DUNBAR HIGH SCHOOL (Hillcrest)
11. EASTERN HIGH SCHOOL (One Common Unity)
12. ELIOT-HINE MIDDLE SCHOOL (MBI)
13. FRIENDSHIP PCS-BLOW PIERCE (SMILE, INC)
14. FRIENDSHIP PCS – COLLEGIATE (SMILE, INC)
15. GARFIELD ELEMENTARY SCHOOL (Catholic Charities)
16. HART MIDDLE SCHOOL (Hillcrest)
17. HENDLEY ELEMENTARY SCHOOL (Catholic Charities)
18. HOUSTON ELEMENTARY SCHOOL (MBI)
19. IDEA PCS (SMILE, INC)
20. INGENUITY PREP (Awaiting CBO Match)
21. JEFFERSON MIDDLE SCHOOL ACADEMY (Catholic Charities)
22. JOHNSON JOHN HAYDEN MIDDLE SCHOOL (Hillcrest)
23. KELLY MILLER MIDDLE SCHOOL  (MBI)
24. KETCHAM ELEMENTARY SCHOOL (Community of Hope)
25. KIMBALL ELEMENTARY SCHOOL (SMILE, INC)
26. KING ML ELEMENTARY SCHOOL (MBI)
27. KINGSMAN ACADEMY PCS (Hillcrest)
28. KIPP DC-AIM ACADEMY PCS (Catholic Charities)
29. KIPP DC-COLLEGE PREP ACADEMY (Mary's Center)
30. KIPP DC SOMERSET PREP ACADEMY (Catholic Charities)
31. KRAMER MIDDLE SCHOOL (Latin American Youth Center)
32. LUKE C. MOORE ALTERNATIVE HIGH SCHOOL (Howard)
33. MALCOLM X ELEMENTARY SCHOOL AT GREEN (MBI)
34. MONUMENT ACADEMY PCS (SMILE, INC)
35. MOTEN ELEMENTARY SCHOOL (Community of Hope)
36. NATIONAL COLLEGIATE PREPARTORY PCHS (Not joining Cohort/Focusing on preparing for school closure)
37. MAYA ANGELOU PCS HIGH SCHOOL (Howard)
38. PATTERSON ELEMENTARY SCHOOL (Catholic Charities)
39. RIVER TERRACE ELEMENTARY CAMPUS (DBH Clinical Specialist)
40. ROCKETSHIP PCS (Hillcrest)
41. ROOSEVELT HS (One Common Unity)

42. SAVOY ELEMENTARY SCHOOL  (MBI)
43. SEED PCS OF WASHINGTON DC (One Common Unity)
44. SMOTHERS ELEMENTARY SCHOOL (Hillcrest)
45. SOUSA MIDDLE SCHOOL (SMILE, INC)
46. STANTON ELEMENTARY SCHOOL (MBI)
47. ST. COLLETA SPECIAL EDUCATION PCS (DBH Clinical Specialist)
48. THE CHILDREN'S GUILD (DBH Clinical Specialist)
49. TURNER ELEMENTARY SCHOOL (DBH Clinical Specialist)
50. WALKER- JONES EDUCATIONAL CAMPUS (Catholic Charities)
51. WASHINGTON METROPOLITAN HIGH SCHOOL (Howard)
52. WOODSON H.D. HIGH SCHOOL (Hillcrest)

**Cohort 2**
1. ACHIEVEMENT PREP ACADEMY PCS-WAHLER PLACE ELEMENTARY SCHOOL (AprilMay, INC.)
2. ACHIEVEMENT PREP ACADEMY PCS-WAHLER PLACE MIDDLE SCHOOL (AprilMay, INC.)
3. AMIDON-BOWEN ELEMENTARY SCHOOL (Hillcrest)
4. BANCROFT ELEMENTARY SCHOOL (Mary's Center)
5. BARNARD ELEMENTARY SCHOOL (Mary's Center)
6. BEERS ELEMENTARY SCHOOL (MBI)
7. BOONE ELEMENTARY SCHOOL (SMILE, INC)
8. BRIDGES PCS (Mary's Center)
9. BRIGHTWOOD EDUCATION CAMPUS (Latin American Youth Center)
10. BROOKLAND MIDDLE SCHOOL (Howard)
11. BROWNE EDUCATION CAMPUS (One Common Unity)
12. BRUCE-MONROE ELEMENTARY SCHOOL @ PARK VIEW  (Mary's Center)
13. BURRVILLE ELEMENTARY SCHOOL (AprilMay, INC.)
14. CAPITAL CITY PCS-HIGHSCHOOL  (Mary's Center)
15. CEDAR TREE ACADEMY PCS (SMILE, INC)
16. COLUMBIA HEIGHTS EDUCATION CAMPUS-HIGH SCHOOL/MIDDLE SCHOOL (Mary's Center)
17. DC BILINGUAL PCS (Mary's Center)
18. DC INTERNATIONAL SCHOOL (Mary's Center)
19. DC PREP PCS-BENNING ELEMENTARY SCHOOL (Waiting for all of network to join Cohorts)
20. DC PREP PCS-BENNING MIDDLE SCHOOL  (Waiting for all of network to join Cohorts)
21. DC SCHOLARS PCS (Awaiting CBO Match)
22. DEAL MIDDLE SCHOOL (One Common Unity)
23. DOROTHY I. HEIGHT ELEMENTARY SCHOOL (AprilMay, INC.)
24. DREW ELEMENTARY SCHOOL (MBI)
25. EAGLE ACADEMY-CONGRESS HEIGHTS (Hillcrest)
26. E.L. HAYNES PCS-HIGH SCHOOL (Mary's Center)
27. FRIENDSHIP PCS-ARMSTONG  (SMILE, INC.)
28. FRIENDSHIP PCS-SOUTHEAST ACADEMY (SMILE, INC.)

29. FRIENDSHIP PCS-TECHNOLOGY PREP MIDDLE SCHOOL  (SMILE, INC.)
30. H.D. COOKE ELEMENTARY SCHOOL (Mary's Center)
31. HOPE COMMUNITY PCS-TOLSON (DBH Clinical Specialist)
32. J.O. WILSON ELEMENTARY SCHOOL (Hillcrest)
33. KIPP DC-HEIGHTS ACADEMY PCS  (Catholic Charities)
34. KIPP DC-LEAD ACADEMY PCS (Catholic Charities)
35. KIPP DC-NORTHEAST ACADEMY PCS (Mary's Center)
36. KIPP DC-PROMISE ACADEMY PCS (Mary's Center)
37. KIPP DC-QUEST ACADEMY PCS (Catholic Charities)
38. KIPP DC-SPRING ACADEMY PCS  (Mary's Center)
39. LANGDON ELEMENTARY SCHOOL (Hillcrest)
40. LANGLEY ELEMENTARY SCHOOL (MBI)
41. LASALLE-BACKUS EDUCATION CAMPUS (Volunteers of America)
42. LECKIE EDUCATION CAMPUS (MBI)
43. MARIE REED ELEMENTARY SCHOOL (Community of Hope)
44. MARY McLEOD BETHUNE DAY ACADEMY PCS (One Common Unity)
45. MCKINLEY MIDDLE SCHOOL (Howard)
46. MCKINLEY TECHNOLOGY HIGH SCHOOL (Howard)
47. MERIDIAN PCS (Hillcrest)
48. MINER ELEMENTARY SCHOOL (MBI)
49. NALLE ELEMENTARY SCHOOL (Catholic Charities)
50. PAUL PCS- INTERNATIONAL HIGH SCHOOL  (One Common Unity)
51. PERRY STREET PREP PCS (One Common Unity)
52. PLUMMER ELEMENTARY SCHOOL (MBI)
53. POWELL ELEMENTARY SCHOOL (Mary's Center)
54. RAYMOND EDUCATION CAMPUS (Hillcrest)
55. RICHARD WRIGHT PCS FOR JOURNALISM AND MEDIA ART (One Common Unity)
56. SIMON ELEMENTARY SCHOOL (Catholic Charities)
57. STUART HOBSON MIDDLE SCHOOL (One Common Unity)
58. TAKOMA EDUCATION CAMPUS (One Common Unity)
59. THOMAS ELEMENTARY SCHOOL  (Catholic Charities)
60. THURGOOD MARSHALL PCS-HIGH SCHOOL (One Common Unity)
61. TRUESDELL EDUCATION CAMPUS (Mary's Center)
62. TUBMAN ELEMENTARY SCHOOL (Mary's Center)
63. TWO RIVERS PCS-4TH STREET (DBH Clinical Specialist)
64. TYLER ELEMENTARY SCHOOL (DBH Clinical Specialist)
65. WHEATLEY EDUCATION CAMPUS (One Common Unity)
66. WHITTIER EDUCATION CAMPUS (One Common Unity)
67. WOODROW WILSON SENIOR HIGH SCHOOL (Latin American Youth Center)

| SCHOOL | COHORT | MATCHED STATUS | CBO | CLINICIAN STATUS |
|---|---|---|---|---|
| ACHIEVEMENT PREPARATORY ACADEMY ES - WHALER | COHORT 2 | MATCHED | AprilMay | Hired, working |
| ACHIEVEMENT PREPARATORY ACADEMY MS - WHALER | COHORT 2 | MATCHED | AprilMay | Hired, working |
| AITON ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Howard | Hired, working |
| AMIDON-BOWEN ELEMENTARY SCHOOL | COHORT 2 | MATCHED | SMILE | Hired, not working |
| ANACOSTIA HIGH SCHOOL | COHORT 1 | MATCHED | LAYC | Hired, working |
| BALLOU SENIOR HIGH SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working |
| BANCROFT ELEMENTARY SCHOOL @ SHARPE | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| BARNARD ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| BEERS ELEMENTARY SCHOOL | COHORT 2 | MATCHED | MBI | Not Hired |
| BOONE ELEMENTARY SCHOOL | COHORT 2 | MATCHED | SMILE | Hired, working |
| BRIDGES PCS | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| BRIGHTWOOD EDUCATION CAMPUS | COHORT 2 | MATCHED | LAYC | Not Hired |
| BROOKLAND MIDDLE SCHOOL | COHORT 2 | MATCHED | Howard | Hired, not working |
| BROWNE EDUCATIONAL CAMPUS | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| BRUCE-MONROE ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| BURRVILLE ELEMENTARY SCHOOL | COHORT 2 | MATCHED | AprilMay | Not Hired |
| C W HARRIS ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working |
| CAPITAL CITY PCS - HIGH SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| CARDOZO EDUCATIONAL CAMPUS - HIGH | COHORT 1 | MATCHED | LAYC | Hired, working |
| CARDOZO EDUCATIONAL CAMPUS - MIDDLE | COHORT 1 | MATCHED | LAYC | Hired, working |
| CEDAR TREE PCS | COHORT 2 | MATCHED | SMILE | Hired, working |
| CESAR CHAVEZ PCS PARKSIDE HS | COHORT 1 | MATCHED | Hillcrest | Hired, working |
| CESAR CHAVEZ PCS PARKSIDE MS | COHORT 1 | MATCHED | Hillcrest | Hired, working |
| COOLIDGE HIGH SCHOOL | COHORT 1 | MATCHED | Mary's Center | Hired, working |
| COLUMBIA HEIGHTS EDUCATIONAL CAMPUS – HIGH | COHORT 2 | MATCHED | Mary's Center | Hired, working |

| | | | | |
|---|---|---|---|---|
| COLUMBIA HEIGHTS EDUCATIONAL CAMPUS – MIDDLE | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| DC BILINGUAL PCS | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| DC INTERNATIONAL SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| DC SCHOLARS | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| DEAL MIDDLE SCHOOL | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| DOROTHY HEIGHT ELEMENTARY SCHOOL | COHORT 2 | MATCHED | AprilMay | Not Hired |
| DREW ELEMENTARY SCHOOL | COHORT 2 | MATCHED | MBI | Not Hired |
| DUNBAR HIGH SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working |
| EAGLE ACADEMY PCS - CONGRESS HEIGHTS | COHORT 2 | MATCHED | Hillcrest | Hired, working |
| EASTERN HIGH SCHOOL | COHORT 1 | MATCHED | One Common Unity | Hired, working |
| EL HAYNES PCS | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| ELIOT HINE MIDDLE SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working |
| FRIENDSHIP BLOW PIERCE | COHORT 1 | MATCHED | SMILE | Hired, working |
| FRIENDSHIP PCS - ARMSTRONG | COHORT 2 | MATCHED | SMILE | Hired, working |
| FRIENDSHIP PCS COLLEGIATE ACADEMY | COHORT 1 | MATCHED | SMILE | Hired, working |
| FRIENDSHIP SOUTHEAST ACADEMY MIDDLE | COHORT 2 | MATCHED | SMILE | Hired, working |
| FRIENDSHIP TECHNOLOGY PREP HS | COHORT 2 | MATCHED | SMILE | Not Hired |
| GARFIELD ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Catholic Charities | Hired, working |
| H. D. COOKE ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| HARRIET TUBMAN ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| HART MIDDLE SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working |
| HENDLEY ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Catholic Charities | Hired, working |
| HOUSTON ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working |
| IDEA PCS | COHORT 1 | MATCHED | SMILE | Hired, working |
| INGENUITY PREP PCS | COHORT 1 | MATCHED | MBI | Not Hired |
| J.O. WILSON ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Hillcrest | Hired, working |
| JEFFERSON MIDDLE SCHOOL | COHORT 1 | MATCHED | Catholic Charities | Hired, working |
| JOHN HAYDEN JOHNSON MIDDLE SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working |

| KELLY MILLER MIDDLE SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working |
|---|---|---|---|---|
| KETCHAM ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Community of Hope | Hired, working |
| KIMBALL ELEMENTARY SCHOOL | COHORT 1 | MATCHED | SMILE | Hired, working |
| MARTIN LUTHER KING, JR ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, not working |
| KINGSMAN ACADEMY PCS | COHORT 1 | MATCHED | Hillcrest | Hired, working |
| KIPP DC: AIM ACADMEY PCS | COHORT 1 | MATCHED | Catholic Charities | Hired, working |
| KIPP DC: COLLEGE PREPARATORY ACADEMY | COHORT 1 | MATCHED | Mary's Center | Hired, working |
| KIPP DC: HEIGHTS ACADEMY PCS | COHORT 2 | MATCHED | Catholic Charities | Not Hired |
| KIPP DC: LEAD ACADEMY PCS | COHORT 2 | MATCHED | Catholic Charities | Not Hired |
| KIPP DC: NORTHEAST ACADMEY PCS | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| KIPP DC: PROMISE ACADEMY | COHORT 2 | MATCHED | Mary's Center | Not Hired |
| KIPP DC: QUEST ACADEMY PCS | COHORT 2 | MATCHED | Catholic Charities | Not Hired |
| KIPP DC: SOMERSET PREP | COHORT 1 | MATCHED | Catholic Charities | Hired, working |
| KIPP DC: SPRING ACADEMY PCS | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| KRAMER MIDDLE SCHOOL | COHORT 1 | MATCHED | LAYC | Hired, working |
| LANGDON ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Hillcrest | Hired, working |
| LANGELY ELEMENTARY SCHOOL | COHORT 2 | MATCHED | MBI | Hired, working |
| LECKIE EDUCATION CAMPUS | COHORT 2 | MATCHED | MBI | Not Hired |
| LUKE C. MOORE ALTERNATIVE HIGH SCHOOL | COHORT 1 | MATCHED | Howard | Not Hired |
| MALCOLM X ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working |
| MARIE REED ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Community of Hope | Hired, working |
| MARY MCLEOD BETHUNE DAY ACADEMY PCS | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| MAYA ANGELOU PCS - HIGH SCHOOL | COHORT 1 | MATCHED | Howard | Hired, not working |
| MCKINLEY TECHNOLOGY HIGH SCHOOL | COHORT 2 | MATCHED | Howard | Not Hired |
| MCKINLEY TECHNOLOGY MIDDLE SCHOOL | COHORT 2 | MATCHED | Howard | Not Hired |
| MERIDIAN PCS | COHORT 2 | MATCHED | Hillcrest | Hired, working |
| MINER ELEMENTARY SCHOOL | COHORT 2 | MATCHED | MBI | Hired, working |
| MONUMENT ACADEMY PCS | COHORT 1 | MATCHED | SMILE | Hired, working |

| | | | | |
|---|---|---|---|---|
| MOTEN ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Community of Hope | Hired, working |
| NALLE ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Catholic Charities | Hired, working |
| PAUL PCS | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| PERRY STREET PREP PUBLIC CHARTER SCHOOL | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| PLUMBER ELEMENTARY SCHOOL | COHORT 2 | MATCHED | MBI | Hired, working |
| POWELL ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| RAYMOND EDUCATION CAMPUS | COHORT 2 | MATCHED | Hillcrest | Hired, working |
| RICHARD WRIGHT PCS | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| ROCKETSHIP PCS | COHORT 1 | MATCHED | Hillcrest | Hired, working |
| ROOSEVELT HIGHSCHOOL | COHORT 1 | MATCHED | One Common Unity | Hired, working |
| SAVOY ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working |
| SEED PCS OF WASHINGTON DC | COHORT 1 | MATCHED | One Common Unity | Hired, working |
| SIMON ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Catholic Charities | Hired, working |
| SMOTHERS ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working |
| SOUSA MIDDLE SCHOOL | COHORT 1 | MATCHED | SMILE | Hired, working |
| STANTON ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working |
| STUART HOBSON MIDDLE SCHOOL | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| TAKOMA EDUCATIONAL CAMPUS | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| THOMAS ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Catholic Charities | Hired, working |
| THURGOOD MARSHALL HIGH SCHOOL | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| TRUESDELL EDUCATION CAMPUS | COHORT 2 | MATCHED | Mary's Center | Hired, working |
| TURNER ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working |
| WALKER-JONES EDUCATIONAL CAMPUS | COHORT 1 | MATCHED | Catholic Charities | Hired, working |
| WASHINGTON METROPOLITAN HIGH SCHOOL | COHORT 1 | MATCHED | Howard | Not Hired |
| WHEATLEY EDUCATIONAL CAMPUS | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| WHITTIER EDUCATION CAMPUS | COHORT 2 | MATCHED | One Common Unity | Hired, working |
| WOODROW WILSON SENIOR HIGH SCHOOL | COHORT 2 | MATCHED | LAYC | Hired, working |
| WOODSON H D HIGH SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working |

Q26. Attachment 3 of 3. Reasons Regarding School and Hire Status

Cohort 1 Schools with CBO Clinician Hired but not placed in schools and identified reason are:
1. CW Harris: Clinician (awaiting DC License)
2. Martin Luther King Elementary School: Clinician, LPC (starting TBD)

Cohort 2 Schools with CBO Clinician Hired but not placed in schools + reason
1. KIPP: Spring Academy: Clinician, LGSW (starting 1/13/20) (school pushed back start date)
2. Amidon-Bowen Elementary School: Clinician, LGPC (starting TBD, awaiting documents)

Cohort 1 schools without a CBO clinician
1. Washington Metropolitan High School (Howard) The CBO has reported salary restrictions, a competitive market, and that potential qualified candidates have challenges obtaining a license.
2. Maya Angelou PCS - High School (Howard) The CBO has reported salary restrictions, a competitive market, and that potential qualified candidates have challenges obtaining a license.
3. Aiton Elementary School (Howard) The CBO has reported salary restrictions, a competitive market, and that potential qualified candidates have challenges obtaining a license.
4. Luke C. Moore High School (Howard) The CBO has reported salary restrictions, a competitive market, and that potential qualified candidates have challenges obtaining a license.
5. Kingsman Academy PCS (Hillcrest) The CBO leader reports that the last clinician resigned. The CBO reports that potential qualified candidates have challenges obtaining a license and may decline job offers.
6. Ballou HS (Hillcrest) The CBO leader reports that the last clinician resigned. CBO is currently hiring for placement. The CBO reports that potential qualified candidates have challenges obtaining a license and may decline job offers.
7. Ingenuity Prep PCS This school is no longer matched with previous CBO.

Cohort 2 schools CBOs matched and are without a CBO clinician
1. Beers Elementary School (MBI)
   The CBO reports that potential qualified candidates have challenges obtaining a license and may decline job offers.
2. Brookland Middle School (Howard)
   The CBO reports salary restrictions, a competitive market, and that potential candidates have challenges obtaining a license.
3. Brightwood Education Campus (LAYC) The CBO reports that potential qualified candidates have challenges obtaining a license and may decline job offers.
4. Burrville Elementary School (AprilMay)
   The CBO reports salary restrictions, a competitive market, and that potential qualified candidates have challenges obtaining a license.
5. Leckie Education Campus (MBI)
   The CBO reports that potential qualified candidates have challenges obtaining a license and may decline job offers.
6. McKinley Tech Middle School (Howard)

The CBO has reported salary restrictions, a competitive market, and that potential candidates have challenges obtaining a license.

7. McKinley Tech High School (Howard)
   The CBO has reported salary restrictions, a competitive market, and that potential candidates have challenges obtaining a license.

8. KIPP DC: Heights Academy (Catholic Charities)
   The CBO reports salary restrictions, a competitive market, and that potential candidates have challenges obtaining a license.

9. KIPP DC: Quest Academy PCS (Catholic Charities/Project Aware)
   The CBO reports salary restrictions, a competitive market, and that potential candidates have challenges obtaining a license.

10. KIPP: Promise Academy PCS (Mary's Center)
    The CBO reports salary restrictions and a competitive market impact their ability to hire quality candidates.

11. KIPP: Lead (Catholic Charities)

12. The CBO reports salary restrictions, a competitive market, and that potential candidates have challenges obtaining a license.

13. Drew Elementary School (MBI)

14. The CBO reports that potential qualified candidates have challenges obtaining a license and may decline job offers.

15. LaSalle-Backus Education Campus (VOA) This school was matched on 1/15/2020 with a different CBO partner.

*Q26. Please provide an update on the status of implementation of the public health model for school-based mental health.  Please include the following information for Cohort 1 and Cohort 2:*

- *List all schools in each cohort*
- *Number of schools matched with a CBO, and identify which CBO has been matched with which schools*
- *Number of schools where a CBO clinician has been hired and is working in the schools and identify which schools*
- *Number of schools where a CBO clinician has been hired, but is not yet working in the school, and identify which schools and provide the reason why the CBO clinician is not yet working in the school*
- *Number of schools where the CBO clinician has not yet been hired, and identify which schools and provide the reason why the CBO clinician has not yet been hired*
- *Please describe any obstacles or barriers to having CBO clinicians working in schools at the start of the school year*
- *For all CBO clinicians working in schools since the start of implementation, please provide a breakdown of how much of their time has been spent on Tier 1, Tier 2, and Tier 3 services.*

**DBH Response**

Cohort 1 has 50 Participating schools, Cohort 2 has 65 Participating schools for a total of 115 Participating schools.  Of the 119 (total), 2 schools delayed participation, and 2 are not participating due to closures. Of the 119 (total), 108 schools are matched with a CBO, and of these 88 (or 81%) (39 Cohort 1 and 49 Cohort 2) schools have the CBO partner clinician hired and working in the school.  Of the remaining schools matched with CBOs, 4 have hired clinicians who are completing the on-boarding process and not yet working in schools.  The remaining 16 schools matched with CBOs are awaiting the hiring and placement of their CBO clinician.

In addition to the schools matched with CBOs, there are 7 schools, with unique populations or circumstances, which are best served by a DBH Clinical Specialist.

Hiring challenges include multiple entities competing for the same workforce, time needed by a school to find the right clinician match for their school population and climate, and delays as hired clinicians complete all licensing and background requirements.  Additionally, the CBO and the school may decide that a candidate may not have enough experience in a school setting or the candidate may not present with skills that make for success as a school based behavioral health therapist.

Some obstacles or barriers to having CBO clinicians working in schools at the start of the school year include: challenges with obtaining clearance to enter schools, the length of the matching process and, a competitive hiring market. However, it is important to note that since the start of implementation, the CBO clinicians have each month provided an average of 1,426 hours of prevention, 1,694 hours of hours of early intervention, and 4,225 hours of treatment.

Q26. Attachment. Schools in Cohort and CBO Match
Q26. Attachment. Implementation Status
Q26. Attachment. Reasons Regarding School and Hire Status

**District of Columbia Expansion of School-based Behavioral Health – Cohort 3**

| School Code | School Name | RANK | COHORT | Z-Score Composite |
|---|---|---|---|---|
| 318 | Excel Academy | 1 | 3 | 2.21 |
| 1016 | Rocketship DC PCS - Legacy Prep | 2 | 3 | 1.60 |
| 361 | Friendship PCS - Blow Pierce Elementary School | 3 | 3 | 1.43 |
| 436 | Ron Brown College Preparatory High School | 4 | 3 | 1.05 |
| 126 | Briya PCS | 5 | 3 | 1.00 |
| 420 | MacFarland Middle School | 6 | 3 | 0.96 |
| 290 | Noyes Elementary School | 7 | 3 | 0.92 |
| 276 | DC Prep PCS - Anacostia Elementary School | 8 | 3 | 0.91 |
| 146 | E.L. Haynes PCS - Middle School | 9 | 3 | 0.89 |
| 243 | KIPP DC - Valor Academy PCS | 10 | 3 | 0.88 |
| 309 | Seaton Elementary School | 11 | 3 | 0.86 |
| 316 | Randle Highlands Elementary School | 12 | 3 | 0.81 |
| 1122 | KIPP DC - Discover Academy PCS | 13 | 3 | 0.77 |
| 283 | Washington Leadership Academy PCS | 14 | 3 | 0.77 |
| 189 | KIPP DC - KEY Academy PCS | 15 | 3 | 0.64 |
| 130 | DC Prep PCS - Edgewood Elementary School | 16 | 3 | 0.62 |
| 138 | Early Childhood Academy PCS | 17 | 3 | 0.55 |
| 363 | Friendship PCS - Chamberlain Elementary School | 18 | 3 | 0.54 |
| 478 | Phelps Architecture, Construction and Engineering High School | 19 | 3 | 0.52 |
| 471 | Duke Ellington School of the Arts | 20 | 3 | 0.50 |
| 224 | Cleveland Elementary School | 21 | 3 | 0.50 |
| 1164 | Friendship PCS - Technology Preparatory High School | 22 | 3 | 0.45 |
| 1206 | E.L. Haynes PCS - Elementary School | 23 | 3 | 0.42 |
| 364 | Friendship PCS - Chamberlain Middle School | 24 | 3 | 0.41 |
| 236 | KIPP DC - Arts and Technology Academy PCS | 25 | 3 | 0.40 |
| 336 | West Education Campus | 26 | 3 | 0.40 |
| 326 | Thomson Elementary School | 27 | 3 | 0.39 |
| 295 | Payne Elementary School | 28 | 3 | 0.39 |
| 115 | Howard University Middle School of Mathematics and Science PCS | 29 | 3 | 0.37 |
| 292 | Oyster-Adams Bilingual School | 30 | 3 | 0.35 |
| 121 | KIPP DC - WILL Academy PCS | 31 | 3 | 0.35 |
| 184 | Capital City PCS - Lower School | 32 | 3 | 0.31 |
| 263 | Washington Global PCS | 33 | 3 | 0.29 |
| 239 | Garrison Elementary School | 34 | 3 | 0.26 |
| 3069 | Creative Minds International PCS | 35 | 3 | 0.25 |
| 1104 | Center City PCS - Capitol Hill | 36 | 3 | 0.23 |
| 220 | Burroughs Elementary School | 37 | 3 | 0.22 |
| 209 | KIPP DC - Connect Academy PCS | 38 | 3 | 0.20 |
| 1129 | KIPP DC - Grow Academy PCS | 39 | 3 | 0.20 |
| 131 | Hope Community PCS - Lamond | 40 | 3 | 0.17 |
| 170 | Paul PCS - Middle School | 41 | 3 | 0.14 |
| 182 | Capital City PCS - Middle School | 42 | 3 | 0.12 |
| 3065 | Mundo Verde Bilingual PCS | 43 | 3 | 0.12 |

| School Code | School Name | RANK | COHORT | Z-Score Composite |
|---|---|---|---|---|
| 409 | School Without Walls @ Francis-Stevens | 44 | 3 | 0.11 |
| 196 | DC Prep PCS - Edgewood Middle School | 45 | 3 | 0.10 |
| 3064 | Inspired Teaching Demonstration PCS | 46 | 3 | 0.04 |
| 246 | Hardy Middle School | 47 | 3 | 0.03 |
| 219 | Bunker Hill Elementary School | 48 | 3 | 0.00 |
| 271 | Ludlow-Taylor Elementary School | 49 | 3 | -0.03 |
| 1107 | Center City PCS - Shaw | 50 | 3 | -0.04 |
| 1108 | Center City PCS - Trinidad | 51 | 3 | -0.05 |
| 365 | Friendship PCS - Woodridge Elementary School | 52 | 3 | -0.06 |
| 1105 | Center City PCS - Congress Heights | 53 | 3 | -0.08 |
| 333 | Watkins Elementary School (Capitol Hill Cluster) | 54 | 3 | -0.13 |
| 1057 | Friendship PCS - Southeast Middle School | 55 | 3 | -0.14 |
| 1103 | Center City PCS - Brightwood | 56 | 3 | -0.15 |
| 261 | Lafayette Elementary School | 57 | 3 | -0.17 |
| 193 | Latin American Montessori Bilingual PCS | 58 | 3 | -0.19 |
| 1106 | Center City PCS - Petworth | 59 | 3 | -0.21 |
| 402 | Benjamin Banneker High School | 60 | 3 | -0.23 |
| 331 | Van Ness Elementary School | 61 | 4 | -0.25 |
| 366 | Friendship PCS - Woodridge Middle School | 62 | 4 | -0.26 |
| 270 | Two Rivers PCS - Young | 63 | 4 | -0.26 |
| 132 | KIPP DC - LEAP Academy PCS | 64 | 4 | -0.28 |
| 1117 | Washington Yu Ying PCS | 65 | 4 | -0.29 |
| 1118 | Washington Latin PCS - Upper School | 66 | 4 | -0.33 |
| 287 | Murch Elementary School | 67 | 4 | -0.34 |
| 360 | Capitol Hill Montessori School @ Logan | 68 | 4 | -0.40 |
| 1125 | Eagle Academy PCS - Capitol Riverfront | 69 | 4 | -0.41 |
| 1038 | Digital Pioneers Academy PCS | 70 | 4 | -0.42 |
| 125 | Washington Latin PCS - Middle School | 71 | 4 | -0.42 |
| 245 | Harmony DC PCS - School of Excellence | 72 | 4 | -0.45 |
| 159 | Elsie Whitlow Stokes Community Freedom PCS - Brookland | 73 | 4 | -0.46 |
| 258 | Hearst Elementary School | 74 | 4 | -0.49 |
| 3066 | Shining Stars Montessori Academy PCS | 75 | 4 | -0.50 |
| 321 | Stoddert Elementary School | 76 | 4 | -0.51 |
| 3068 | BASIS DC PCS | 77 | 4 | -0.53 |
| 252 | Hyde-Addison Elementary School @ Meyer | 78 | 4 | -0.56 |
| 466 | School Without Walls High School | 79 | 4 | -0.57 |
| 232 | Eaton Elementary School | 80 | 4 | -0.57 |
| 1137 | AppleTree Early Learning Center PCS - Oklahoma Avenue | 81 | 4 | -0.58 |
| 140 | AppleTree Early Learning Center PCS - Columbia Heights | 82 | 4 | -0.59 |
| 254 | Janney Elementary School | 83 | 4 | -0.60 |
| 274 | Maury Elementary School @ Eliot-Hine | 84 | 4 | -0.62 |
| 313 | Shepherd Elementary School | 85 | 4 | -0.63 |
| 3072 | AppleTree Early Learning Center PCS - Douglas Knoll | 86 | 4 | -0.68 |

**District of Columbia Expansion of School-based Behavioral Health  - Cohort 3**

| District of Columbia Expansion of School-based Behavioral Health  - Cohort 3 | | | |
|---|---|---|---|
| School Code | School Name | RANK | COHORT | Z-Score Composite |
| 197 | Sela PCS | 87 | 4 | -0.69 |
| 175 | School-Within-School @ Goding | 88 | 4 | -0.70 |
| 1069 | AppleTree Early Learning Center PCS - Parklands at THEARC | 89 | 4 | -0.72 |
| 173 | Roots PCS | 90 | 4 | -0.76 |
| 212 | Brent Elementary School | 91 | 4 | -0.79 |
| 289 | Breakthrough Montessori PCS | 92 | 4 | -0.82 |
| 228 | Lee Montessori PCS | 93 | 4 | -0.82 |
| 273 | Mann Elementary School | 94 | 4 | -0.88 |
| 272 | Key Elementary School | 95 | 4 | -0.93 |
| 1037 | Statesman College Preparatory Academy for Boys PCS | 96 | 4 | -0.97 |
| 301 | Peabody Elementary School (Capitol Hill Cluster) | 97 | 4 | -1.00 |
| 305 | Ross Elementary School | 98 | 4 | -1.00 |
| 1059 | Elsie Whitlow Stokes Community Freedom PCS - East End | 99 | 4 | -1.01 |
| 3073 | AppleTree Early Learning Center PCS - Lincoln Park | 100 | 4 | -1.08 |

Q27 Attachment Cohort 3 Timeline



Q27. Please provide a description of plans to implement the public health model for school-based mental health for Cohort 3.  Please include the following information
    a.  How many schools will be included in Cohort 3, and identify which schools
    b.  Timeline for implementation, including funding CBO grants, completing CBO matching process, and hiring CBO clinicians
    c.  Anticipated obstacles or barriers to having CBO clinicians working in all Cohort 3 schools at the start of the school year (Fall 2020), and plans to mitigate/remove these barriers

**DBH Response**

Cohort 3 will be comprised of 60 schools. The attachments provide the list of schools and timeline. The anticipated obstacles or barriers to having CBO clinicians working in all Cohort 3 schools at the start of the school year (Fall 2020) include: CBOs experiencing difficulty recruiting bilingual clinicians; difficulty recruiting clinicians with an interest and experience in working with the early childhood or elementary school population; limited workforce pool; difficulty of CBOs to have a competitive salary; and candidates not passing licensing exam. DBH's plans to mitigate/remove barriers include implementing workforce development strategies and activities such as: an internship program in school behavioral health; fostering relationships with local social work and psychology graduate programs to facilitate a graduate school to workforce pipeline; providing funding to CBOs to support supervision of Licensed Graduate Social Workers to incentivize these practitioners to apply for these jobs and partnering with the Office of the State Superintendent of Education (OSSE) to host job fairs with the Community Based Organizations (CBO) to foster interest and excitement in the work of school behavioral health as a career path and to create a database of prospective applicants. The initial job fair is scheduled for 4/3/2020 12pm-5pm on the 1st Floor at the Office of the State Superintendent of Education (OSSE). Additionally, DBH has moved our timeline up to April, 2020 to select additional CBOs and to execute the grant awards sooner.

Q27. Attachment 1 of 2. Ranking Cohort 3 Final
Q27. Attachment 2 of 2. Cohort 3 Timeline

| SCHOOL | COHORT | MATCHED STATUS | CBO | CLINICIAN STATUS | SST STATUS | WORKPLAN STATUS | IDENTIFIED SBHC |
|---|---|---|---|---|---|---|---|
| ACHIEVEMENT PREPARATORY ACADEMY ES - WHALER | COHORT 2 | MATCHED | AprilMay | Hired, working | complete | complete | Identified SBHC |
| ACHIEVEMENT PREPARATORY ACADEMY MS - WHALER | COHORT 2 | MATCHED | AprilMay | Hired, working | complete | complete | Identified SBHC |
| AITON ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Howard | Hired, working | complete | complete | Identified SBHC |
| AMIDON-BOWEN ELEMENTARY SCHOOL | COHORT 2 | MATCHED | SMILE | Hired, not working | not complete | not complete | Identified SBHC |
| ANACOSTIA HIGH SCHOOL | COHORT 1 | MATCHED | LAYC | Hired, working | complete | complete | Identified SBHC |
| BALLOU SENIOR HIGH SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| BANCROFT ELEMENTARY SCHOOL @ SHARPE | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| BARNARD ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| BEERS ELEMENTARY SCHOOL | COHORT 2 | MATCHED | MBI | Not Hired | not complete | not complete | Identified SBHC |
| BOONE ELEMENTARY SCHOOL | COHORT 2 | MATCHED | SMILE | Hired, working | complete | complete | Identified SBHC |
| BRIDGES PCS | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| BRIGHTWOOD EDUCATION CAMPUS | COHORT 2 | MATCHED | LAYC | Not Hired | not complete | not complete | No Identified SBHC |
| BROOKLAND MIDDLE SCHOOL | COHORT 2 | MATCHED | Howard | Hired, not working | complete | complete | Identified SBHC |
| BROWNE EDUCATIONAL CAMPUS | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| BRUCE-MONROE ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |

| BURRVILLE ELEMENTARY SCHOOL | COHORT 2 | MATCHED | AprilMay | Not Hired | complete | complete | Identified SBHC |
|---|---|---|---|---|---|---|---|
| C W HARRIS ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working | complete | complete | Identified SBHC |
| CAPITAL CITY PCS - HIGH SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| CARDOZO EDUCATIONAL CAMPUS - HIGH | COHORT 1 | MATCHED | LAYC | Hired, working | complete | complete | Identified SBHC |
| CARDOZO EDUCATIONAL CAMPUS - MIDDLE | COHORT 1 | MATCHED | LAYC | Hired, working | complete | complete | Identified SBHC |
| CEDAR TREE PCS | COHORT 2 | MATCHED | SMILE | Hired, working | complete | complete | Identified SBHC |
| CESAR CHAVEZ PCS PARKSIDE HS | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| CESAR CHAVEZ PCS PARKSIDE MS | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| COOLIDGE HIGH SCHOOL | COHORT 1 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| COLUMBIA HEIGHTS EDUCATIONAL CAMPUS – HIGH | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| COLUMBIA HEIGHTS EDUCATIONAL CAMPUS – MIDDLE | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| DC BILINGUAL PCS | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| DC INTERNATIONAL SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| DC SCHOLARS | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | not complete | Identified SBHC |
| DEAL MIDDLE SCHOOL | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | not complete | Identified SBHC |
| DOROTHY HEIGHT ELEMENTARY SCHOOL | COHORT 2 | MATCHED | AprilMay | Not Hired | not complete | not complete | Identified SBHC |
| DREW ELEMENTARY SCHOOL | COHORT 2 | MATCHED | MBI | Not Hired | complete | not complete | Identified SBHC |

| DUNBAR HIGH SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
|---|---|---|---|---|---|---|---|
| EAGLE ACADEMY PCS - CONGRESS HEIGHTS | COHORT 2 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| EASTERN HIGH SCHOOL | COHORT 1 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| EL HAYNES PCS | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| ELIOT HINE MIDDLE SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working | complete | complete | Identified SBHC |
| FRIENDSHIP BLOW PIERCE | COHORT 1 | MATCHED | SMILE | Hired, working | complete | complete | Identified SBHC |
| FRIENDSHIP PCS - ARMSTRONG | COHORT 2 | MATCHED | SMILE | Hired, working | complete | complete | Identified SBHC |
| FRIENDSHIP PCS COLLEGIATE ACADEMY | COHORT 1 | MATCHED | SMILE | Hired, working | complete | complete | Identified SBHC |
| FRIENDSHIP SOUTHEAST ACADEMY MIDDLE | COHORT 2 | MATCHED | SMILE | Hired, working | complete | complete | Identified SBHC |
| FRIENDSHIP TECHNOLOGY PREP HS | COHORT 2 | MATCHED | SMILE | Not Hired | complete | complete | Identified SBHC |
| GARFIELD ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Catholic Charities | Hired, working | complete | complete | Identified SBHC |
| H. D. COOKE ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| HARRIET TUBMAN ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| HART MIDDLE SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| HENDLEY ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Catholic Charities | Hired, working | complete | complete | Identified SBHC |
| HOUSTON ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working | complete | complete | Identified SBHC |
| IDEA PCS | COHORT 1 | MATCHED | SMILE | Hired, working | complete | complete | Identified SBHC |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| INGENUITY PREP PCS | COHORT 1 | MATCHED | MBI | Not Hired | complete | not complete | Identified SBHC |
| J.O. WILSON ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| JEFFERSON MIDDLE SCHOOL | COHORT 1 | MATCHED | Catholic Charities | Hired, working | complete | complete | Identified SBHC |
| JOHN HAYDEN JOHNSON MIDDLE SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| KELLY MILLER MIDDLE SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working | complete | complete | Identified SBHC |
| KETCHAM ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Community of Hope | Hired, working | complete | complete | Identified SBHC |
| KIMBALL ELEMENTARY SCHOOL | COHORT 1 | MATCHED | SMILE | Hired, working | complete | complete | Identified SBHC |
| MARTIN LUTHER KING, JR ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, not working | not complete | not complete | Identified SBHC |
| KINGSMAN ACADEMY PCS | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| KIPP DC: AIM ACADMEY PCS | COHORT 1 | MATCHED | Catholic Charities | Hired, working | complete | complete | Identified SBHC |
| KIPP DC: COLLEGE PREPARATORY ACADEMY | COHORT 1 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| KIPP DC: HEIGHTS ACADEMY PCS | COHORT 2 | MATCHED | Catholic Charities | Not Hired | not complete | not complete | Identified SBHC |
| KIPP DC: LEAD ACADEMY PCS | COHORT 2 | MATCHED | Catholic Charities | Not Hired | not complete | not complete | Identified SBHC |
| KIPP DC: NORTHEAST ACADMEY PCS | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| KIPP DC: PROMISE ACADEMY | COHORT 2 | MATCHED | Mary's Center | Not Hired | not complete | not complete | Identified SBHC |
| KIPP DC: QUEST ACADEMY PCS | COHORT 2 | MATCHED | Catholic Charities | Not Hired | not complete | not complete | Identified SBHC |
| KIPP DC: SOMERSET PREP | COHORT 1 | MATCHED | Catholic Charities | Hired, working | complete | complete | Identified SBHC |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KIPP DC: SPRING ACADEMY PCS | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | not complete | Identified SBHC |
| KRAMER MIDDLE SCHOOL | COHORT 1 | MATCHED | LAYC | Hired, working | complete | complete | Identified SBHC |
| LANGDON ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| LANGELY ELEMENTARY SCHOOL | COHORT 2 | MATCHED | MBI | Hired, working | not complete | not complete | No Identified SBHC |
| LECKIE EDUCATION CAMPUS | COHORT 2 | MATCHED | MBI | Not Hired | not complete | not complete | No Identified SBHC |
| LUKE C. MOORE ALTERNATIVE HIGH SCHOOL | COHORT 1 | MATCHED | Howard | Not Hired | complete | complete | Identified SBHC |
| MALCOLM X ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working | complete | complete | Identified SBHC |
| MARIE REED ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Community of Hope | Hired, working | complete | complete | Identified SBHC |
| MARY MCLEOD BETHUNE DAY ACADEMY PCS | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| MAYA ANGELOU PCS - HIGH SCHOOL | COHORT 1 | MATCHED | Howard | Hired, not working | complete | complete | Identified SBHC |
| MCKINLEY TECHNOLOGY HIGH SCHOOL | COHORT 2 | MATCHED | Howard | Not Hired | complete | complete | Identified SBHC |
| MCKINLEY TECHNOLOGY MIDDLE SCHOOL | COHORT 2 | MATCHED | Howard | Not Hired | complete | not complete | Identified SBHC |
| MERIDIAN PCS | COHORT 2 | MATCHED | Hillcrest | Hired, working | not complete | not complete | No Identified SBHC |
| MINER ELEMENTARY SCHOOL | COHORT 2 | MATCHED | MBI | Hired, working | complete | complete | Identified SBHC |
| MONUMENT ACADEMY PCS | COHORT 1 | MATCHED | SMILE | Hired, working | complete | complete | Identified SBHC |
| MOTEN ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Community of Hope | Hired, working | complete | complete | Identified SBHC |
| NALLE ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Catholic Charities | Hired, working | complete | complete | Identified SBHC |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| PAUL PCS | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| PERRY STREET PREP PUBLIC CHARTER SCHOOL | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| PLUMBER ELEMENTARY SCHOOL | COHORT 2 | MATCHED | MBI | Hired, working | complete | complete | Identified SBHC |
| POWELL ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| RAYMOND EDUCATION CAMPUS | COHORT 2 | MATCHED | Hillcrest | Hired, working | complete | not complete | Identified SBHC |
| RICHARD WRIGHT PCS | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| ROCKETSHIP PCS | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| ROOSEVELT HIGHSCHOOL | COHORT 1 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| SAVOY ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working | complete | complete | Identified SBHC |
| SEED PCS OF WASHINGTON DC | COHORT 1 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| SIMON ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Catholic Charities | Hired, working | complete | complete | Identified SBHC |
| SMOTHERS ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| SOUSA MIDDLE SCHOOL | COHORT 1 | MATCHED | SMILE | Hired, working | complete | complete | Identified SBHC |
| STANTON ELEMENTARY SCHOOL | COHORT 1 | MATCHED | MBI | Hired, working | not complete | not complete | Identified SBHC |
| STUART HOBSON MIDDLE SCHOOL | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| TAKOMA EDUCATIONAL CAMPUS | COHORT 2 | MATCHED | One Common Unity | Hired, working | not complete | not complete | Identified SBHC |
| THOMAS ELEMENTARY SCHOOL | COHORT 2 | MATCHED | Catholic Charities | Hired, working | complete | not complete | Identified SBHC |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| THURGOOD MARSHALL HIGH SCHOOL | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| TRUESDELL EDUCATION CAMPUS | COHORT 2 | MATCHED | Mary's Center | Hired, working | complete | complete | Identified SBHC |
| TURNER ELEMENTARY SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |
| WALKER-JONES EDUCATIONAL CAMPUS | COHORT 1 | MATCHED | Catholic Charities | Hired, working | complete | complete | Identified SBHC |
| WASHINGTON METROPOLITAN HIGH SCHOOL | COHORT 1 | MATCHED | Howard | Not Hired | complete | complete | Identified SBHC |
| WHEATLEY EDUCATIONAL CAMPUS | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | complete | Identified SBHC |
| WHITTIER EDUCATION CAMPUS | COHORT 2 | MATCHED | One Common Unity | Hired, working | complete | not complete | Identified SBHC |
| WOODROW WILSON SENIOR HIGH SCHOOL | COHORT 2 | MATCHED | LAYC | Hired, working | complete | complete | Identified SBHC |
| WOODSON H D HIGH SCHOOL | COHORT 1 | MATCHED | Hillcrest | Hired, working | complete | complete | Identified SBHC |

*Q28. Please provide an update on the status of completion of the School Strengthening Tool and Work Plan for all schools in Cohorts 1 and 2.  Please include the following information:*

- *How many schools in each cohort have completed the School Strengthening Tool and identify which schools?*
- *How many schools in each cohort have completed the Work Plan and identify which schools?*
- *For each school that has not completed the School Strengthening Tool, please provide the reason why this has not been done?*
- *For each school that has not completed the Work Plan, please provide the reason why this has not been done?*
- *How many schools in each cohort have identified an individual to serve as the School Behavioral Health Coordinator and identify which schools*
- *For each school that has not identified an individual to serve as the School Behavioral Health Coordinator, please provide the reason why this has not been done?*
- *Please describe any obstacles or barriers to completing the School Strengthening Tool and Work Plan and identifying the School Behavioral Health Coordinator.*

**DBH Response**

In Cohort 1, 43 schools have completed the School Strengthening Tool (SST) and 50 schools have completed the Tool in Cohort 2 schools. Additionally, in terms of the Work Plan, it was completed by 42 schools in Cohort 1 and 41 schools in Cohort 2. The School Behavioral Health Coordinator (SBHC) has a key role in partnering with the Community Based Organization (CBO) clinician in the teaming and partnering for the completion of the School Strengthening Tool and Work Plan. The schools identified as not completing the School Strengthening Tool and/or Work Plan, have similar reasons for this status. The reasons include that there was no CBO clinician to begin the process; no SBHC to initiate the process; or the team experienced challenges in scheduling to begin the process of completing the School Strengthening Tool and/or Work Plan. The specific reasons that each of the seven schools have not completed the School Strengthening Tool or Work Plan are listed below for each school:

**Martin Luther King, JR ES**
The school and the CBO agreed to place a clinician and CSW worker in the building. The CBO ran into challenges hiring for both positions. There was no SBHC identified at the school, and without a CBO clinician, the SST and Work plan process did not start. The CBO does have a candidate in mind for this school. Additionally, the CBO is currently working with the principal to negotiate allowing the clinician to start before the Community Support Worker (CSW).

**Stanton Elementary School**
After the new CBO supervisor was on boarded, the CBO and school team experienced challenges aligning their schedules. The CBO recently hired and placed a clinician at this school, and the school recently identified a SBHC. DBH and this team have experienced challenges in scheduling to begin the process to complete the SST. The DBH Clinical Specialist and the SBHC are currently in the process of scheduling their meeting to begin the School Strengthening Tool completion process.

**Raymond Elementary School**
The DBH Clinical Specialist has worked with the CBO and School team to successfully complete their SST and they are scheduled to submit a completed work plan on January 23rd, 2020.

**Ingenuity Prep**
The previous CBO was not able to hire a clinician for placement at this school. As the new supervisor was on-boarded, DBH and the team experienced challenges in scheduling to begin the process to complete the SST. These challenges contributed to the work plan not being completed. And, recently the school has requested a new CBO partner and is interviewing with three prospective CBOs.

**Meridian Public Charter School:**
A clinician was just hired and placed at this school. The team is in the process of scheduling a meeting to begin the School Strengthening tool and work plan. The School has not identified a SBHC. The CBO Supervisor has prioritized active engagement with this school and is planning a meeting with the School Administrator on 1/24/2020 to initiate the process of completing the SST.

**Amidon Bowden:**
The CBO has selected and hired a candidate for this school but is unable to place the candidate due challenges with the CBO's Human Resource department. The School has not identified a SBHC and the DBH Clinical Specialist is working with the team to schedule a meeting following the CBO Supervisor meeting with the school.  The CBO Supervisor has prioritized active engagement with this school; and the CBO Supervisor is planning a meeting with the School Administrative team on 1/24/2020 to initiate the SST process and to identify a School Behavioral Health Coordinator.

**KIPP: Spring Academy**
The CBO Clinician was recently placed at this school. The DBH Clinical Specialist has worked with the CBO and school team to successfully complete their SST and they are scheduled to submit a completed work plan on February 3rd, 2020.

In Cohort 1, 46 schools have identified an individual to serve as the School Behavioral Health Coordinator.  In Cohort 2, 58 SMHCs have been identified. In Cohort 1, there are no schools that have not identified an individual to serve as the SBHC and in Cohort 2, there are 4 schools that have not identified a SBHC. The obstacles or barriers to completing the School Strengthening Tool and Work Plan and identifying the School Behavioral Health Coordinator often involve a need for understanding the scope of roles and process. The School Behavioral Health Coordinator plays a vital role in the integration and teaming within the best practices of school-based behavioral health. School administrators are continuing to enhance their understanding of the role and expectations of the School Behavioral Health Coordinator. DBH continues to support school leaders and school teams through technical assistance in collaboration with the Community of Practice contractor.

See Attachment. School Strengthening Tool Work Plan and SBHC Status

*Q29 Please provide an update on staffing levels for DBH clinicians working in schools.  Please include the following information: How many schools have DBH clinicians working full-time, identify which schools, and the amount of time in each school? For all DBH clinicians working in schools, please provide a breakdown of how much of their time has been spent on Tier 1, Tier 2, and Tier 3 services.*

**DBH Response:**

DBH clinicians are working in a total of 62 public schools comprised of 44 schools assigned a full-time clinician and 18 schools with a half-time clinician.

The amount of time that each clinician spends on Tier 1 (prevention) Tier 2 (early intervention) and Tier 3 (treatment) services in a school depends on the needs of the school.  At the beginning of the school year, the DBH clinician completes a needs assessment and implementation plan for the school.  This consists of interviews with school personnel at every level of the school—including principals, vice principals, school mental health clinicians, teachers, para-professionals, front office staff, long time security guards, and the janitorial staff—as well  as well as students and parents/caregivers.

Based on this needs assessment, a plan is established for the type and amount of services that covers all three tiers of services.  The needs assessment and implementation plan are working documents and can be amended at any time during the school year as needs of the school may change.

*Q30.    Please provide an update on the extent to which CBO and DBH clinicians have been able to bill their services to Medicaid, private insurance, or other sources of funds outside of local dollars.  Please also discuss plans to bill additional services in the future.*

**DBH Response**

CBOs who are providing services within the District's School-based Behavioral Health expansion have contracts with the Managed Care Organizations and the CBO clinicians are billing for the treatment services. However, it is too early to provide an update on the extent or a determination on success of the billing. There are various issues that the CBOs have expressed as having a negative impact on the CBO clinicians' ability to develop a caseload for treatment services in their partnership Cohort schools. The identified obstacles and barriers have included: limited or varying referral process in the school, 90 day or more delay in hiring, discovering the reality that there is not a caseload available at the onset of clinician's placement in the school, and not all schools have a criteria for referral of their students for treatment services. DBH is providing funds to DCPS and to OSSE to hire a full-time position to support CBO partnerships in DC Public Schools and to support CBO partnerships and school leader support in the DC Public Charter Schools. DBH will work closely with the DCPS and OSSE Managers to support establishing relationships between the CBO partners and their schools as well as trouble-shooting the establishment of a referral criteria and process to support development of the CBO clinician's caseload.

The Department of Behavioral Health School Mental Health Program currently engages in billing treatment services to all Medicaid clients. DBH works to make sure that all Medicaid insurance is linked in the medical records system for timely billing.  DBH SMHP staff also work with families who have lapsed insurance and assist them in whatever process is necessary to get them re-connected to Medicaid. Despite these efforts, at times, it can take a family time to respond or get the appropriate documentation needed. Currently the DBH School Mental Health Program is not billing private insurance clients, on rare occasions there have been instances where single case agreements with a small amount of private insurance companies has occurred and has resulted in billing. However, the majority of private insured clients are referred to providers in their respective networks for treatment services.

 # Request for Superintendent's Signature

*MOU's must be reviewed and signed off (below) by $^{(1)}$ your division's Assistant Superintendent, $^{(2)}$ General Counsel, $^{(3)}$ Chief Operating Officer and $^{(4)}$ the Chief Financial Officer __PRIOR TO__ submitting to the Front Office. All other documents should be reviewed and signed by your division's Assistant Superintendent, Manager, and Director if applicable.*

**Date Submitted to Front Office:**

**Prepared By: DC Department of Behavioral Health/Health & Wellness**

**Division: Health and Wellness**

**Point of Contact: Emily Pigg**

**Subject:  MOU for Intradistrict Transfer of Funds, DBH to OSSE, to Support School-Based Behavioral Health Expansion**

**Requested Return Date: 12/31**

*Please allow a minimum of 3-5 business days for review and approval.*

**Background/Purpose of Document Including Cost and Funding Source:**

This MOU facilitates the intra-district transfer of funds from DBH to OSSE to fund an FTE to support the school-based behavioral health expansion.  Language within the MOU allows for automatic renewal of the agreement.  Corresponding LOI is in progress.

**Review Sign-Offs**

| | Signature | Date |
|---|---|---|
| **Manager/Director** | | 12/19/19 |
| **Assistant Superintendent** | | 12/19/19 |
| **General Counsel (Legal)** *(legal docs only e.g. MOU's)* | *Sarah Harris* | 12/30/19 |
| **COO** (Required) | | 1/6/2020 |
| **CFO** (Required) | *Paris Saunders* | 1/14/20 |
| **COS** | | |

MEMORANDUM OF UNDERSTANDING
FOR INTRA-DISTRICT FUNDING BETWEEN
THE DISTRICT OF COLUMBIA
DEPARTMENT OF BEHAVIORAL HEALTH AND
THE DISTRICT OF COLUMBIA
OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION

## I.    INTRODUCTION

The parties to this Memorandum of Understanding ("MOU") are the District of Columbia Department of Behavioral Health ("DBH"), the buyer agency, and the District of Columbia Office of the State Superintendent of Education ("OSSE"), the seller agency, collectively referred to herein as the "parties."

The mission of DBH is to develop, manage, and oversee a public behavioral health system for adults, children and youth and their families that is consumer driven, community based, culturally competent and supports prevention, resiliency, and recovery and the overall wellbeing of the District of Columbia.

The mission of OSSE is to work urgently and purposefully, in partnership with education and related systems, to sustain, accelerate, and deepen progress for District of Columbia students. Within OSSE, the Division of Health and Wellness plays a unique role, and believes that healthy bodies and minds are the foundation of academic success. The Division leverages programming, partnerships, policy, and data to remove health barriers to learning so that people of all ages and backgrounds are prepared to succeed in school and in life.

## II.    AUTHORITY FOR MOU

D.C. Official Code § 1-301.01(k); and D.C. Official Code § 38-2602(b)(15).

## III.    OVERVIEW PROGRAM GOALS AND OBJECTIVES

The goal of the Comprehensive School Behavioral Health (CSBH) system expansion is to leverage a strategic collaboration between school personnel, community mental health providers, students and families to create a positive school culture, including timely access to high-quality, reliable supports for children, youth, and their families. The school and Community Based Organizations (CBO) teams offer a full array of tiered trauma-informed, culturally-responsive, evidence-based interventions to promote wellness, identify challenges early, and offer treatment services when necessary so that all children and youth succeed and thrive.

The District has a need for a dedicated OSSE role of School Behavioral Health Outreach Manager, who will be assigned to support the D.C. Public Charter Schools and also the overall landscape-wide experience of the Cohort schools within D.C. Public Schools and D.C. Public Charter Schools. The School Behavioral Health Outreach Manager would help school leaders

1

and staff understand the intersection of mental health and academic achievement and help school leaders to use available OSSE data to inform data-driven decision-making. The Manager would also work with the evaluation team and Community of Practice (CoP) through complementing and not duplicating services.

This Full Time Employee (FTE) will provide technical assistance with school-based teams to complement supports from CoP vendor, including matching with CBOs.

## IV.    RESPONSIBILITIES OF THE PARTIES

Pursuant to the applicable authorities and in the furtherance of the shared goals of the parties to carry out the purposes of this MOU expeditiously and economically, the parties agree as follows:

### A.    OSSE RESPONSIBILITIES

OSSE shall employ one FTE to assist with implementation of the CSBH system expansion. The FTE role will:

1. Deepen engagement and support with school leaders to:
   a. Build program knowledge and buy-in;
   b. Leverage the expertise and appropriate services of the CBOs to meet the needs of the students and their families;
   c. Integrate mental health service delivery with other school-wide initiatives (school climate, restorative justice, etc.); and
   d. Consult on use of available OSSE data to inform data driven decision-making;
2. Provide operational support with school-CBO matching process and activities;
3. Support collection and coordination of data from schools and CBOs, to include School Strengthening Tool and work plan logistics (account creation and maintenance, user notifications, and completion tracking), including sharing of the data with DBH; and
4. Maintain regular communication and collaboration with the evaluation team and CoP to prevent duplication of services.

The OSSE FTE will support all D.C. Public Charter Schools. The FTE will focus support in fiscal year 2020 will be provided to schools within cohorts 1 and 2 (See Appendix A).

### B.    DBH RESPONSIBILITIES

1. Transfer funds up to the amount allocated in **Section VI** and Appendix B for District of Columbia fiscal year 2020 (October 1, 2019-September 30, 2020) and each subsequent fiscal year for so long as such funds are available under local law, based upon DBH's approval of OSSE's completion of required responsibilities.

2

## V. DURATION OF MOU

### A. PERIOD

The period of this MOU shall be from the date of the last signature through September 30, 2020, unless terminated in writing by the parties 30 days prior to the expiration of the MOU.

### B. RENEWAL

This MOU shall renew automatically on a fiscal year-to-fiscal year basis unless either party objects in writing at least 30 days prior to the start of the next fiscal year. Renewal of this MOU, according to this provision, is subject to the availability of funds at the time of renewal.

## VI. FUNDING PROVISIONS

### A. COST OF SERVICES

1. Total cost for services under this MOU shall not exceed $88,685.46 for FY 2020. Eighty-eight thousand, six hundred eighty five dollars and forty six cents is the estimated value of the services to be provided by OSSE and represents the pro-rated annual salary and benefits of the School Behavioral Health Outreach Manager. Funding for the services shall not exceed the actual cost of the goods and services.
2. For any subsequent fiscal years, total cost for services under this MOU shall not exceed the amounts specified in Appendix B. The amounts for subsequent fiscal years shall consist of a full year's salary and benefits of the School Behavioral Health Outreach Manager to include annual cost-of-living increases. The amounts for subsequent fiscal years shall only be transferred in the event that the MOU is renewed for the applicable fiscal year. A party shall not pay out or obligate funds for which it has not received budget authority for a fiscal year.
3. In the event of termination of the MOU, payment to OSSE shall be held in abeyance until all required fiscal reconciliation is completed.

### B. PAYMENT

1. Release of local funds under this MOU shall be made through intra-district transfer by DBH to OSSE. DBH shall advance funds to OSSE based on the execution of this MOU. Payment for all services shall not exceed the actual cost of services.
2. OSSE shall obligate all funds received from DBH under this MOU for the operation of the CSBH expansion program by the expiration date of this MOU. All unliquidated funds shall be returned to DBH.
3. OSSE shall submit an annual spending report to DBH by October 30, 2020 and by October 30th of any subsequent option period exercised by DBH. The annual

3

spending report shall detail the total amount of expenditures for the preceding fiscal year.

### C. ANTI-DEFICIENCY CONSIDERATIONS

The parties acknowledge and agree that their respective duties to fulfill financial obligations of any kind pursuant to any and all provisions of this MOU, or any subsequent agreement entered into by the parties pursuant to this MOU, are and shall remain subject to the availability of funds and the provisions of: (i) the federal Anti-Deficiency Act, 31 U.S.C. §§ 1341, 1342, 1349, 1351; (ii) the District of Columbia Anti Deficiency Act, D.C. Official Code§§ 47-355.01 *et seq* (2012 Repl. and 2015 Supp.); (iii) D.C. Official Code§ 47-105 (2012 Repl.); and (iv) D.C. Official Code§ 1-204.46 (2014 Repl. and Supp.), as may be amended, regardless of whether a particular obligation has been expressly so conditioned.

## VII. MODIFICATIONS OF TERMS AND CONDITIONS

The terms and conditions of this MOU may be modified only upon prior written agreement by the parties. Modification of this MOU shall be in the form of an amendment signed and dated by authorized representatives of the parties with a copy of the original or latest version of the agreement attached.

## VIII. CONSISTENT WITH LAW

The parties shall comply with all applicable laws, rules, and regulations whether now in effect or hereafter enacted or promulgated.

## IX. COMPLIANCE AND MONITORING

### A. OSSE may be subject to scheduled and unscheduled monitoring reviews by DBH and/or its designee.

### B. OSSE is required to comply with information and document requests from DBH in order to evaluate the impact of the CSBH system expansion and/or facilitate a monitoring review by DBH.

## X. RECORDS AND REPORTS

OSSE shall maintain records and receipts for the expenditure of all funds provided pursuant to this MOU for a period of no less than three years from the date of expiration or termination of this MOU. However, except in the case of an audit or investigation, in which case records shall be retained until the review has been completed. Upon DBH's request, OSSE shall make these documents available for inspection by duly authorized representatives of DBH and other officials as may be specified by the District of Columbia in its sole discretion.

XI.   **TERMINATION**

    A.   **NOTICE OF TERMINATION**

        Either party may terminate this MOU, in whole or in part, by giving thirty (30) calendar days advance written notice to the other party.

    B.   **WINDING DOWN**

        A party shall not be obligated to perform a service/responsibility under this MOU upon receipt of a written notice of termination.  A party shall be reimbursed for costs incurred, or for costs to which it has already been irrevocably committed, for the performance of approved services as of the day following the date on which that party received written notice of termination.  To the extent a party incurs costs after receipt of written notice of termination due to the actions of another party, the party that caused the costs to be incurred shall be responsible for payment.

XII.   **NOTICES**

The following individuals are the contact points for each party under this MOU:

**A. OSSE:**
Heidi Schumacher, M.D.
Assistant Superintendent
Health and Wellness Division
Office of the State Superintendent of Education (OSSE)
Government of the District of Columbia
1050 First Street, NE
Washington, D.C. 20002
d: 202-481-3755
c: 202-341-9628
Email: Heidi.Schumacher@dc.gov
www.osse.dc.gov

**B. DBH:**
Charneta Scott, PhD
Project Manager
D.C. Department of Behavioral Health
64 New York Ave, NE
Washington, D.C. 20002
Office: 202-654-6175
Email: Charneta.Scott@dc.gov

**C. GENERAL COUNSEL FOR OSSE:**
Sarah Jane Forman, Esq.
General Counsel
Office of the State Superintendent of Education (OSSE)
1050 First Street, NE, 3rd Floor
Washington, D.C. 20002
Office: 202-727-0382
Email: Sarahjane.forman@dc.gov

**D. GENERAL COUNSEL FOR DBH:**
Matthew Caspari
General Counsel
D.C. Department of Behavioral Health
64 New York Ave, NE, 3rd Floor
Washington, D.C. 20002
Office: 202-673-7505
Email: Matthew.Caspari@dc.gov

## XIII.    CONFIDENTIAL INFORMATION

The parties to this MOU shall use, restrict, safeguard and dispose of all information related to services provided by this MOU, in accordance with all relevant federal and local statutes, regulations and policies. Information received by either party in the performance of responsibilities associated with the performance of this MOU shall remain the property of DBH.

## XIV.    RESOLUTION OF DISPUTES

The parties' directors for the respective agencies, or their designees, shall resolve all disputes or adjustments resulting from goods or services provided under this MOU. In the event the parties are unable to resolve a financial issue, the matter shall be referred to the Office of Financial Operations and Systems (OFOS) of the District of Columbia Office of the Chief Financial Officer. The decision of OFOS shall be final.

IN WITNESS WHERE OF, the parties here to have executed this MOU as of the last date written below as follows:

**FOR THE DEPARMENT OF BEHAVIORAL HEALTH**

Barbara J. Bazron, Ph.D., Director

Dec 18 2015

Date

**FOR THE DISTRICT OF COLUMBIA OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION**

Hanseul Kang, State Superintendent

1/14/10

Date

7

APPENDIX A:

List of Schools in Cohorts 1 and 2

**Cohort 1 Schools**

1. AITON ELEMENTARY SCHOOL
2. ANACOSTIA HIGH SCHOOL
3. BALLOU SENIOR HIGH SCHOOL
4. CARDOZO EDUCATIONAL CAMPUS
5. CESAR CHAVEZ PCS PARKSIDE-MIDDLE
6. CESAR CHAVEZ PCS PARKSIDE - HIGH
7. COOLIDGE HIGH SCHOOL
8. C.W. HARRIS ELEMENTARY SCHOOL
9. DEMOCRACY PREP CONGRESS HEIGHTS PCS (Closed)
10. DUNBAR HIGH SCHOOL
11. EASTERN HIGH SCHOOL
12. ELIOT-HINE MIDDLE SCHOOL
13. FRIENDSHIP PCS-BLOW PIERCE
14. FRIENDSHIP PCS - COLLEGIATE
15. GARFIELD ELEMENTARY SCHOOL
16. HART MIDDLE SCHOOL
17. HENDLEY ELEMENTARY SCHOOL
18. HOUSTON ELEMENTARY SCHOOL
19. IDEA PCS
20. INGENUITY PREP
21. JEFFERSON MIDDLE SCHOOL ACADEMY
22. JOHNSON JOHN HAYDEN MIDDLE SCHOOL
23. KELLY MILLER MIDDLE SCHOOL
24. KETCHAM ELEMENTARY SCHOOL
25. KIMBALL ELEMENTARY SCHOOL
26. KING ML ELEMENTARY SCHOOL
27. KINGSMAN ACADEMY PCS
28. KIPP DC-AIM ACADEMY PCS
29. KIPP DC-COLLEGE PREP ACADEMY
30. KIPP DC SOMERSET PREP ACADEMY
31. KRAMER MIDDLE SCHOOL
32. LUKE C. MOORE ALTERNATIVE HIGH SCHOOL
33. MALCOLM X ELEMENTARY SCHOOL AT GREEN
34. MONUMENT ACADEMY PCS
35. MOTEN ELEMENTARY SCHOOL

36. NATIONAL COLLEGIATE PREPARTORY PCHS (Not joining Cohort/Focusing on preparing for school closure)
37. MAYA ANGELOU PCS HIGH SCHOOL
38. PATTERSON ELEMENTARY SCHOOL
39. RIVER TERRACE ELEMENTARY CAMPUS
40. ROCKETSHIP PCS
41. ROOSEVELT HS
42. SAVOY ELEMENTARY SCHOOL
43. SEED PCS OF WASHINGTON DC
44. SMOTHERS ELEMENTARY SCHOOL
45. SOUSA MIDDLE SCHOOL
46. STANTON ELEMENTARY SCHOOL
47. ST. COLLETTA SPECIAL EDUCATION PCS
48. THE CHILDREN'S GUILD
49. TURNER ELEMENTARY SCHOOL
50. WALKER- JONES EDUCATIONAL CAMPUS
51. WASHINGTON METROPOLITAN HIGH SCHOOL
52. WOODSON H.D. HIGH SCHOOL

**Cohort 2 Schools**

1. ACHIEVEMENT PREP ACADEMY PCS-WAHLER PLACE ELEMENTARY SCHOOL
2. ACHIEVEMENT PREP ACADEMY PCS-WAHLER PLACE MIDDLE SCHOOL
3. AMIDON-BOWEN ELEMENTARY SCHOOL
4. BANCROFT ELEMENTARY SCHOOL
5. BARNARD ELEMENTARY SCHOOL
6. BEERS ELEMENTARY SCHOOL
7. BOONE ELEMENTARY SCHOOL
8. BRIDGES PCS
9. BRIGHTWOOD EDUCATION CAMPUS
10. BROOKLAND MIDDLE SCHOOL
11. BROWNE EDUCATION CAMPUS
12. BRUCE-MONROE ELEMENTARY SCHOOL @ PARK VIEW
13. BURRVILLE ELEMENTARY SCHOOL
14. CAPITAL CITY PCS-HIGHSCHOOL
15. CEDAR TREE ACADEMY PCS
16. COLUMBIA HEIGHTS EDUCATION CAMPUS-HIGH SCHOOL/MIDDLE SCHOOL
17. DC BILINGUAL PCS
18. DC INTERNATIONAL SCHOOL
19. DC PREP PCS-BENNING ELEMENTARY SCHOOL (Waiting for all of network to join Cohorts)
20. DC PREP PCS-BENNING MIDDLE SCHOOL  (Waiting for all of network to join Cohorts)
21. DC SCHOLARS PCS
22. DEAL MIDDLE SCHOOL
23. DOROTHY I. HEIGHT ELEMENTARY SCHOOL

24. DREW ELEMENTARY SCHOOL
25. EAGLE ACADEMY-CONGRESS HEIGHTS
26. E.L. HAYNES PCS-HIGH SCHOOL
27. FRIENDSHIP PCS-ARMSTONG
28. FRIENDSHIP PCS-SOUTHEAST ACADEMY
29. FRIENDSHIP PCS-TECHNOLOGY PREP MIDDLE SCHOOL
30. H.D. COOKE ELEMENTARY SCHOOL
31. HOPE COMMUNITY PCS-TOLSON
32. J.O. WILSON ELEMENTARY SCHOOL
33. KIPP DC-HEIGHTS ACADEMY PCS
34. KIPP DC-LEAD ACADEMY PCS
35. KIPP DC-NORTHEAST ACADEMY PCS
36. KIPP DC-PROMISE ACADEMY PCS
37. KIPP DC-QUEST ACADEMY PCS
38. KIPP DC-SPRING ACADEMY PCS
39. LANGDON ELEMENTARY SCHOOL
40. LANGLEY ELEMENTARY SCHOOL
41. LASALLE-BACKUS EDUCATION CAMPUS
42. LECKIE EDUCATION CAMPUS
43. MARIE REED ELEMENTARY SCHOOL
44. MARY McLEOD BETHUNE DAY ACADEMY PCS
45. MCKINLEY MIDDLE SCHOOL
46. MCKINLEY TECHNOLOGY HIGH SCHOOL
47. MERIDIAN PCS
48. MINER ELEMENTARY SCHOOL
49. NALLE ELEMENTARY SCHOOL
50. PAUL PCS- INTERNATIONAL HIGH SCHOOL
51. PERRY STREET PREP PCS
52. PLUMMER ELEMENTARY SCHOOL
53. POWELL ELEMENTARY SCHOOL
54. RAYMOND EDUCATION CAMPUS
55. RICHARD WRIGHT PCS FOR JOURNALISM AND MEDIA ART
56. SIMON ELEMENTARY SCHOOL
57. STUART HOBSON MIDDLE SCHOOL
58. TAKOMA EDUCATION CAMPUS
59. THOMAS ELEMENTARY SCHOOL
60. THURGOOD MARSHALL PCS-HIGH SCHOOL
61. TRUESDELL EDUCATION CAMPUS
62. TUBMAN ELEMENTARY SCHOOL
63. TWO RIVERS PCS-4TH STREET
64. TYLER ELEMENTARY SCHOOL
65. WHEATLEY EDUCATION CAMPUS
66. WHITTIER EDUCATION CAMPUS
67. WOODROW WILSON SENIOR HIGH SCHOOL

APPENDIX B:

| Funding Source | Fiscal Year | Period of Availability | Amount |
|---|---|---|---|
| Local | FY 2020 | 10/1/2019 – 9/30/2020 | $88,685.46 |
| Local | FY 2021* | 10/1/2020 – 9/30/2021 | $121,794.70 |
| Local | FY 2022* | 10/1/2021 – 9/30/2022 | $125,448.54 |

\* The amounts for subsequent fiscal years shall only be transferred in the event that the MOU is renewed for the applicable fiscal year. A party shall not pay out or obligate funds for which it has not received budget authority for a fiscal year.

*Q31(2). Please provide description and status update on the Memorandum of Understanding between DBH, DCPS, and OSSE providing for 1 full-time staff person at DCPS and 1 full-time staff person at OSSE to support the implementation of School-Based Mental Health.  Please include the following information:*
  *a.  A copy of the MOU and any other relevant interagency agreements*
  *b.  Job descriptions for the two positions*
  *c.  Plans for funding and supporting these two positions next year, and in the future*

**DBH Response**

The Memorandum of Understanding (MOU) between DBH and OSSE for the full-time staff person at OSSE was fully executed on January 14, 2020 and the MOU between DBH and DCPS is expected to be finalized within 30 days. While the official job descriptions are undergoing final approval, the duties and responsibilities of each position have been established. The OSSE staff person will be the School Behavioral Health Outreach Manager and will be assigned to support the D.C. Public Charter Schools as well as the overall landscape-wide experience of the Cohort schools within the charter schools and DCPS. The School Behavioral Health Outreach Manager will help student leaders and staff understand the intersection of behavioral health and academic achievement and help school leaders use available OSSE data to inform data-driven decision-making. The Manager also will work with the evaluation team and Community of Practice (CoP) through complementing and not duplicating services.

The DCPS staff person will serve as the Expansion Outreach Manager and will be assigned to manage outreach and partnership between the Community Based Organizations (CBOs) and DCPS.  The Expansion Outreach Manager will promote DCPS participation in the Community of Practice and the application support at the school level. This Expansion Outreach Manager also will monitor the CBO's compliance with the Memorandum of Agreement between DCPS and the CBO.

Funds for these positions are in the DBH budget and each MOU will renew automatically each fiscal year unless either party objects in writing at least 30 days prior to the start of the fiscal year.

See Attachment. DBH and OSSE MOU

*Q31.    In last year's oversight responses, DBH stated that it was discontinuing the Provider Scorecard and was in the process of replacing the Scorecard metrics with separate compliance indicators and Results Based Accountability indicators.  Please provide an update on this effort, to include the following information:*
- *Description of compliance indicators and Results Based Accountability indicators being used*
- *Rationale for using these indicators*
- *Results of applying these indicators to providers in FY19*
- *What services or support is DBH providing to struggling providers?*
- *What corrective action has DBH taken against providers receiving extremely low marks?*
-

**DBH Response**

The Results Based Accountability (RBA) initiative assisted DBH in establishing a set of performance metrics through engagement of providers, internal programs and National Association of State Mental Health Program Directors Research Institute (NRI). In late FY19, DBH implemented an enhanced system of performance management based on activities from the RBA initiative. The foundation of this performance management system are 10 priority metrics, which will be displayed and monitored via internal dashboards. These foundational utilization and performance metrics were selected because they align with agency KPIs and workload measures and represent critical areas of clinical activities that heavily correlate with positive client outcomes.

**Utilization Metrics**
1. Number of consumers receiving MHRS
2. Number of clients receiving ASARS
3. Saint Elizabeths Hospital average daily census
4. Number of Community Response Team interventions

**Performance Metrics**
1. Percentage of MHRS consumers whose first service was within 30 days of enrollment
2. Percentage of MHRS consumers who were discharged from a psychiatric hospital and had a follow-up service within 30 days
3. Percentage of SUD clients stepping down to a lower level of care
4. Percentage of children initially at a high acuity (80) who had a significant (20 point) improvement in functioning (child mental health only)
5. Percentage of consumers satisfied with services (consumer satisfaction survey)
6. Percentage of methadone clients who were served in two consecutive quarters

The establishment of the priority metrics and the implementation of the enhanced performance management system has resulted in increased transparency and strengthened coordination of performance improvement efforts and improved provider census management through regular dissemination of client-level data/reports.  In FY19, DBH met or nearly met 10 of 13 KPIs.

In the spirit of continuous quality improvement, DBH will build upon this enhanced performance management system to identify additional priority metrics that target population-level outcomes. Providers with low marks are offered ongoing technical assistance. Serious deficiencies may lead to corrective action plans or notice to cure.



Q.32 Attachment

| Status | Date | Name/Title | Type | Location | Description | Target Audience | Partners | # Planned | # Registrants | # Attendees |
|---|---|---|---|---|---|---|---|---|---|---|
| Completed | 9/30/2019 | DC School Behavioral Health Community of Practice (DC CoP): Launch Meeting | DC CoP Meeting | National Press Club | Monthly DC CoP meeting. The purpose of this meeting was to celebrate the launch of the DC CoP, provide an overview of the Expansion and CoP, and to define partnership and collaboration in small groups. | Community of Practice (DC CoP) participants and partners | Opening remarks from DBH, OSSE, and City Council representatives | 200 | 124 | 111 |
| Completed | 10/11/2019 | Multi-Tiered Systems of Supports: Best Practices for Implementation | Training | DBH | Training on how to select, implement, and organize Tier 1, Tier 2, and Tier 3 interventions within a multi-tiered system of supports (MTSS). Participants gained an understanding of prevention and early intervention programs and practices to further their School Strengthening Work Plans. The training also featured an array of evidence-based programs for consideration. | School Behavioral Health Coordinators and Clinicians, with a focus on CBO clinicians | DBH Clinical Specialists | 30 | | Approx. 12 |
| Completed | 11/12/2019 | Multi-Tiered Systems of Supports: Best Practices for Implementation | Training | OSSE | Training on how to select, implement, and organize Tier 1, Tier 2, and Tier 3 interventions within a multi-tiered system of supports (MTSS). Participants gained an understanding of prevention and early intervention programs and practices to further their | School Behavioral Health Coordinators and Clinicians, with a focus on CBO clinicians with a focus on Project AWARE schools | | 30 | 25 | 14 |

| | | | | | School Strengthening Work Plans. | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Completed | 11/13/2019 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | OSSE | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. The purpose of the meeting was to develop a shared vision and agenda for the group and to review survey results of resources and support requested by TA providers. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 9 | N/A | 11 |
| Completed | 11/20/2019 | DC School Behavioral Health Community of Practice (DC CoP): Developing Shared Vision for DC CoP & Introducing Practice Groups | DC CoP Meeting | University of the District of Columbia | Monthly DC CoP meeting. The purpose of this meeting was to develop a shared vision for the DC CoP and for Practice Groups to initially convene around current practices in DC and barriers/challenges to implementation. | Community of Practice (DC CoP) participants | | 100 | 57 | 51 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Completed | 12/18/2019 | DC School Behavioral Health Community of Practice (DC CoP): Building Partnerships - Getting Buy-in and Shifting Mindsets | DC CoP Meeting | *Virtual Meeting* | Monthly DC CoP meeting. The purpose of this meeting is to explore assumptions on the implementation of school mental health and to shift mindsets and gain buy-in from key decision-makers and stakeholders. | Community of Practice (DC CoP) participants | | 60 | 56 | 31 |
| Completed | 1/14/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | OSSE | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. The purpose of the meeting was to develop a protocol for assigning Cohort 1 schools to new TA providers and to begin creating forms to collect TA requests and contacts. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | N/A | 9 |

| Planned | 1/22/2020 | DC School Behavioral Health Community of Practice (DC CoP): Trauma-informed Practices in Schools - Using Consultancy Protocol to Address Problems of Practice | DC CoP Meeting | St. Francis Hall | Monthly DC CoP meeting. Monthly DC CoP meeting. The purpose of this meeting is to provide learning content and facilitate peer/social learning activities on the topic of trauma-informed practices in schools. Participants will learn how to use the consultancy protocol to address problems of practice related to the implementation of trauma-informed approaches in schools. The meeting will leverage the expertise and activities of the Trauma-Informed Practices in Schools Practice Group. Practice Group will define their workscope for the next 4 months. | Community of Practice (DC CoP) participants | DC CoP Trauma-Informed Practices in Schools Practice Group | 100 | | |
| Planned | Jan TBD | Skill-Building Session: Trauma-Informed Practices | video conference/chat | Webex | Hour-long call to discuss challenges with implementing trauma-informed practices and/or using the strategies outlined in the previous CoP and to hear from consultants on possible solutions | School Behavioral Health Coordinators and Clinicians, with a focus on CBO and school-based coordinator teams | | 20 | | |

| Planned | 2/4/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | OSSE | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | | |
| Planned | 2/26/2020 | DC School Behavioral Health Community of Practice (DC CoP): Finding Common Ground - Family Engagement/Youth Engagement | DC CoP Meeting | TBD | Monthly DC CoP meeting. Monthly DC CoP meeting. The purpose of this meeting is to provide learning content and facilitate peer/social learning activities on the topic of family and youth engagement. The meeting will leverage the expertise and activities of the Family and Youth Engagement Practice Group. CoP members will create Dialogue Guides on Family Engagement. | Community of Practice (DC CoP) participants | DC CoP Family and Youth Engagement Practice Group | 100 | | |
| Planned | Feb TBD | Mapping SMH Interventions Using an MTSS Framework | Training | TBD | Training on how to select, implement, and organize Tier 1, Tier 2, and Tier 3 interventions within a multi-tiered system of supports (MTSS). Participants gained an understanding of prevention and early intervention programs and practices to further their | School Behavioral Health Coordinators and Clinicians, with a focus on CBO and school-based coordinator teams | DBH Clinical Specialists | 30 | | |

| | | | | | School Strengthening Work Plans. | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Planned | Feb TBD | Skill-Building Session: Family and Youth Engagement | video conference/chat | Webex | Hour-long call to discuss challenges with implementing family engagement strategies and using the strategies outlined in the previous CoP and to hear from consultants on possible solutions | School Behavioral Health Coordinators and Clinicians, with a focus on CBO and school-based coordinator teams | | 20 | | |
| Planned | 3/3/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | DBH | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | | |
| Planned | 3/25/2020 | DC School Behavioral Health Community of Practice (DC CoP): TBD (on School Climate/Social Emotional Learning) | DC CoP Meeting | TBD | Monthly DC CoP meeting. Monthly DC CoP meeting. The purpose of this meeting is to provide learning content and facilitate peer/social learning activities on the topic of positive school climate and social-emotional learning implementation. The meeting will leverage the | Community of Practice (DC CoP) participants | DC CoP School Climate and Social-Emotional Learning Practice Group | 100 | | |

| | | | | | expertise and activities of the School Climate and Social-Emotional Learning Practice Group. | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Planned | March TBD | Mapping SMH Interventions Using an MTSS Framework | Training | TBD | Training on how to select, implement, and organize Tier 1, Tier 2, and Tier 3 interventions within a multi-tiered system of supports (MTSS). Participants gained an understanding of prevention and early intervention programs and practices to further their School Strengthening Work Plans. | School Behavioral Health Coordinators and Clinicians, with a focus on CBO and school-based coordinator teams | DBH Clinical Specialists | 30 | | |
| Planned | March TBD | Effectively Integrating Prominent School-Behavioral Health Frameworks | Webinar | Virtual Meeting | Webinar to share report about lessons learned for how to integrate complementary school-wide behavioral health frameworks, including MTSS, RJ, and Trauma-informed Practices | Education Leaders, School Behavioral Health Coordinators and Clinicians | | 50 | | |
| Planned | March TBD | Skill-Building Session: School Climate/Social Emotional Learning | video conference/chat | webex | Hour-long call to discuss challenges with implementing school climate and SEL practices and using the strategies outlined in the previous CoP and to hear from | School Behavioral Health Coordinators and Clinicians, with a focus on CBO and school-based coordinator teams | | 20 | | |

| | | | | | consultants on possible solutions | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Planned | 4/7/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | OSSE | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | | |
| Planned | 4/22/2020 | DC School Behavioral Health Community of Practice (DC CoP): TBD (on School-based Clinical Supervision) | DC CoP Meeting | *Virtual Meeting* | Monthly DC CoP meeting. The purpose of this meeting is to provide learning content and facilitate peer/social learning activities on the topic of school-based clinical supervision. The meeting will leverage the expertise and activities of the School-based Clinical Supervision Practice Group. | Community of Practice (DC CoP) participants | DC CoP School-based Clinical Supervision Practice Group | 100 | | |
| Planned | April TBD | Mapping SMH Interventions Using an MTSS Framework | Training | TBD | Training on how to select, implement, and organize Tier 1, Tier 2, and Tier 3 interventions within a multi-tiered system of supports (MTSS). Participants gained an understanding of prevention and early intervention programs and | School Behavioral Health Coordinators and Clinicians, with a focus on CBO and school-based coordinator teams | DBH Clinical Specialists | 30 | | |

| | | | | | practices to further their School Strengthening Work Plans. | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Planned | April TBD | Skill-Building Session: School-based Clinical Supervision | video conference/chat | Webex | Hour-long call to discuss challenges with utilizing best practices with school-based clinical supervision and the strategies outlined in the previous CoP and to hear from consultants on possible solutions | School Behavioral Health Coordinators and Clinicians, with a focus on CBO and school-based coordinator teams | | 20 | | |
| Planned | 5/5/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | DBH | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | | |
| Planned | 5/20/2020 | DC School Behavioral Health Community of Practice (DC CoP): TBD (on Crisis Response and Intervention) | DC CoP Meeting | TBD | Monthly DC CoP meeting. The purpose of this meeting is to provide learning content and facilitate peer/social learning activities on the topic of crisis response and intervention. The meeting will leverage the expertise and activities of the Crisis Intervention and Response Practice Group. | Community of Practice (DC CoP) participants | DC CoP Crisis Response and Intervention Practice Group | 100 | | |

| Planned | May TBD | TBD (on YRBS) | Training | *Virtual Meeting* | Virtual meeting/webinar to present the results of DC's Youth Risk Behavior Survey (YRBS) and to improve school health/wellness data literacy for greater understanding of youth risk behaviors and for program planning. | School Behavioral Health Coordinators and Clinicians from middle schools and high schools | OSSE Division of Health and Wellness | 100 | | |
|---------|---------|---------------|----------|-----------|------|------|------|-----|---|---|
| Planned | May TBD | Skill-Building Session: School-based Clinical Supervision | video conference/chat | Webex | Hour-long call to discuss challenges with implementing crisis response and management interventions and using the strategies outlined in the previous CoP and to hear from consultants on possible solutions | School Behavioral Health Coordinators and Clinicians, with a focus on CBO and school-based coordinator teams | | 20 | | |

| Planned | 6/2/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | Q32. Attachment. List of planned events, training, regular meetings, or other convenings with brief summaries of the purpose of each event, target audience, and planned number of participants | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Planned | 6/17/2020 | DC School Behavioral Health Community of Practice (DC CoP): TBD (Share Fair: Sharing Resources and Learnings) | DC CoP Meeting | TBD | Monthly DC CoP meeting. The purpose of this meeting is to showcase learning from throughout the year, celebrate successes, share progress, and plan for the next year. | Community of Practice (DC CoP) participants | | 100 | | |
| Planned | June TBD | TBD (on Teaming) | Training | TBD | Intensive in-person training sponsored by the National Center for School Mental Health/East Central Mental Health Technology Transfer Center on best practices in school mental health teaming. | School Behavioral Health Coordinators and Technical Assistance Providers (Clinical Specialists, TA Managers, AWARE Staff) | National Center for School Mental Health/East Central Mental Health Technology Transfer Center | 50 | | |

| Planned | 7/7/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | DBH | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | |
| Planned | 8/4/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | OSSE | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | |
| Planned | 9/1/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | DBH | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | |
| Planned | 10/6/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | OSSE | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high- | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | quality school behavioral health TA. | | | | | |
| Planned | 11/3/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | DBH | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | | |
| Planned | 12/1/2020 | Technical Assistance (TA) Provider Practice Group (PG) Meeting | Meeting | OSSE | Monthly Practice Group meeting of those providing technical assistance (TA) to schools and CBOs in order to develop structures and processes, and to share best practices to support the delivery of high-quality school behavioral health TA. | DBH Clinical Specialists, Technical Assistance Managers, Project AWARE staff | | 10 | | |

*Q32. Please provide an update on the status of establishing a community of practice for school-based mental health.  Please include the following information:*

  *a.  An overview of the current organization structure, and plans for the future*
  *b.  List of events, trainings, or other convenings with brief summaries of the purpose of each event, target audience, planned number of participants, and actual number of participants*
  *c.  List of planned events, training, regular meetings, or other convenings with brief summaries of the purpose of each event, target audience, and planned number of participants*
  *d.  Estimated timeline for fully establishing the community of practice*
  *e.  Plans for assessing the effectiveness and utilization rate for the community of practice*

**DBH Response**

The D.C. School Behavioral Health Community of Practice (CoP) contract was awarded to the vendor, The Center for Health and Health Care in Schools (CHHCS) at the Milken Institute School of Public Health at the George Washington University. It was launched in September 2019 and the CoP monthly meetings are an opportunity for schools and Community Based Organizations (CBOs) to engage with each other, learn together and solve persistent problems of practice. The voices and perspectives of the CoP members build the shared knowledge, resources, and tools on best practices in school-based behavioral health.

The first attachment shows the organizational structure of the Community of Practice.  Within the current organizational structure of the CoP, there is a focus on the school behavioral health teams within Cohort 1 and Cohort 2 of the District's school-based behavioral health expansion. However, individuals outside of the Cohorts are able to attend the larger monthly sessions. These meetings are open to all School Behavioral Health Coordinators from DC Public Schools (DCPS) and DC Public Charter Schools (DCPCS) in Cohorts 1 and 2; school-based clinicians from participating CBOs; and School Administrators. The CoP is supported by the Department of Behavioral Health (DBH), the Center for Health and Health Care in Schools (CHHCS) at the Milken Institute School of Public Health at the George Washington University, DCPS, DCPCS, the Office of the State Superintendent of Education (OSSE), and CRP, Inc.

The second attachment provides information on events, meetings, trainings, and information informed by what is of the interest of the CoP members at the current point and time. As the contractor learns more about what the CoP members want and need, the team will continue to build infrastructure for creating meaningful engagement around practice change; and more events and opportunities for learning. The CoP team conducts on-going scans to identify and summarize existing resources that may be brought to bear as part of the CoP.
Additionally, Department of Behavioral Health Clinical Specialists and Technical Assistance Managers from the GW team are assigned Cohort schools to support the CBO and school teams through technical assistance. Moreover, the CoP members have leveraged the creation of Practice Groups which include: Trauma-Informed Practices in Schools Practice Group; School-based Clinical Supervision Practice Group; Crisis Intervention & Response Practice Group;

Positive School Climate/Social-Emotional Learning Practice Group; and Family Engagement/Youth Engagement Practice Group.

A webpage is currently under construction and will be located on the DBH website to provide a centralized location for a calendar of CoP monthly meetings, learning activities, events, trainings, webinar recordings, materials, and tools.

The work and practice of school-based behavioral health is dynamic with rapid changes and it is quite complex. The framework that is being utilized in the implementation of the D.C. School Behavioral Health Community of Practice strategically embeds social learning. The learning of the CoP is driven through ongoing learning and feedback loops within a developmental process that incorporates practitioners' experiences being brought back to the group to build new knowledge and to support implementation of best practices in school behavioral health.

As the CoP members experience learning loops that members view as having such values as: immediate value, potential value, applied value, realized value, strategic value, enabling value, and/or transformative value, members will find their rhythm within the membership and participation in the CoP.  It is anticipated that by April, 2020, there will be a consistent increase in participation of both the School Behavioral Health Coordinators and CBO clinicians attending the CoP meetings and identifying their learning loops that have made the learning relevant, adaptive, and dynamic. The evaluation contractor will work very closely with the CoP contractor to assess the fidelity of best practices built upon and implemented within school-based behavioral health in the Cohort schools.

Q32. Attachment 1 of 2. Organizational Structure
Q32. Attachment 2 of 2. Events. Meetings

*Q33. Please provide an update on the status of implementing and completing an assessment or evaluation of the effectiveness of the public health model for school-based mental health. Please include the following information:*
   *a. Timeline for implementation and completion*
   *b. Description of planned assessment or evaluation tools*
   *c. If using an outside contractor, please identify*

**DBH Response**

DBH through the Office of Contracts and Procurement received responses on January 6, 2020 to the solicitation for an outside contractor. The evaluation process is currently in progress. Once a contract is awarded, the initial phase of the assessment and evaluation in the current SY19-20 will be on the process, fidelity, and quality improvement aspects of the implementation of the public health model. The evaluation of the effectiveness of the public health model will be in the second phase of the evaluation of the implementation and begin during SY20-21.

*Q34.Please provide the results of the midyear and last year's end of the year surveys that were distributed to school administrators to measure the satisfaction of services provided by SMHP clinicians. In your response, please indicate any actions taken to address concern raised previous surveys regarding the need to have additional of full-time SMHP clinicians in schools.*

**DBH Response:**

During SY 18-19, seventeen administrators from seventeen different schools (36%) returned the midyear survey (N=47) and twenty-one administrators from twenty one schools (39%) returned the end of the year survey (N=53). Overall, the results from both of the surveys were extremely positive and the administrators were satisfied with the SMHP services.

The majority (90%) of administrators reported that SMHP clinicians were knowledgeable about mental health issues of the students at their schools, were professional and had a caring attitude, and adhered to and complied with the school policies in conjunction with the implementation of the program. In addition, they reported that clinicians were available and provided services and support to children and families, as well as, the teachers and staff. For example, almost all of the administrators at midyear (95%) and at the end of the year (95%) indicated that clinicians worked collaboratively with school staff, parents/guardians and students to meet the mental health needs of the school. Approximately 95% of the administrators also reported that the clinicians were flexible and available to see students and families as needed. In addition, most of the administrators, (88%) at midyear and (95%) at the end of the year, reported that they felt comfortable consulting with the SMHP clinician regarding a student with a social or emotional concern. Additionally, administrators were overwhelmingly satisfied, 94% at midyear and 95% at end of the year, with the services provided by DBH. At the end of the year 100% of the Principals reported they wanted to continue with SMHP.

There were comments on the midyear and year end surveys such as: "We can see the evidence and the impact of Mrs. TC as part of the school community. Teachers are comfortable with seeking out her advice, parents know they can ask directly for if desired, and students enjoy her class sessions. Her sessions and overall approaches, cause students to grow their social-emotional beings which is a great need in this school and community. Another comment say: "We love Ms. Davis. She is culturally aware, sensitive and extremely knowledgeable.

One school requested a change from part time services to full time services at the end of the year. The school has since been matched with a CBO as part of the expansion and they are receiving full-time services.

*Q35. Please provide a list of children's mental health services which are currently being funded with local dollars - not Medicaid dollars. For each service, please update the Committee on steps taken to receive Medicaid reimbursement for this service. Please include the total amount spent on these services and a comparison to the last 5 fiscal years.*

**DBH Response:**

The following chart includes a list of the children's mental health services which are currently funded by local dollars and a comparison of the amount spent over the last five fiscal years.

| Service Children's Services Funded with Local Dollars | FY15 | FY16 | FY17 | FY18 | FY19 |
|---|---|---|---|---|---|
| High Fidelity Wraparound | $2,240,912 | $3,258,388 | $887,916 | $616,851 | $563,865 |
| Court-Ordered Evaluations | $1,046,544 | $1,105,250 | $999,667 | $893,149 | $552,130 |
| School Mental Health Program | $4,915201 | $5,600,889 | $6,177,765 | $5,314,292 | $8,629,644 |
| Primary Project | $367,213 | $387, 332 | $371,618 | $409,316 | $439,320 |
| Healthy Futures | $601,002 | $619,590 | $638,753 | $658,508 | $678,874 |

During FY19, the DC SEED grant team continued to revise and strengthen the DC SEED Strategic Financing Plan that leverages and builds upon ongoing collaboration with the DC Department of Healthcare Finance (DHCF) to support the sustainability of the array of existing and proposed clinical interventions and other supports for young children and their families. Through support of a Zero to Three Technical Assistance project, a group of DC early childhood professionals including participants from DBH, OSSE, DHCR, Children's National Medical Center and the Early Childhood Innovation Network (ECIN) worked together to create an Infant Early Childhood Mental Health (IECMH) Asset Map that displays services and supports across the continuum and includes prenatal, prevention, early intervention, treatment and recovery services. As a part of this effort, the team created a spreadsheet of all early childhood programs and services that aligned Medicaid codes. The spreadsheet also served the purpose of highlighting where there are not billable codes for IECMH services for the purpose of exploring additional funding sources for these services. This multi-disciplinary team will continue to work together in FY20 to strengthen early childhood services and supports within DC and will provide recommendations related to the financing of early childhood services.

*Q36. How many DBH clients relied entirely on local dollars for all of the services they received from DBH in FY19? How does this compare to the last 5 fiscal years?*
*- What are the demographics of this population?*
*-Of this population, how many have expressed a need for bilingual therapists and/or clinicians, if collected?*
*- How many therapists and/or clinicians providing DBH services are bilingual?*
*- What behavioral health services are available to this population?*

## DBH Response

To ensure access to care, behavioral health services are supported with local funds for individuals who are income eligible but not eligible for Medicaid or their eligibility is pending. Local funding is also used for individuals who received a service that is not Medicaid reimbursable but indicated as the appropriate level of care. In FY19, the total number of consumers/clients in these categories was 3,550 individual compared to 9,134 in FY 15—a decrease of 5,584 individuals or 61 percent.

The decrease is primarily in individuals receiving substance use disorder services. The majority of substance use disorder services became eligible for Medicaid reimbursement with the publication of Chapter 63 on 9/04/2015. Prior to that, Medication Assisted Treatment and ASTEP services were billed to Medicaid directly. Since the publication of Chapter 63, 60 percent of clients have been transitioned to Medicaid services. In FY 19, the number of consumers who were not eligible for Medicaid or whose eligibility was pending or received substance use disorder services not Medicaid reimbursable decreased to 2,504 or 63 percent from a total of 6,811 in FY 15. Residential services, which is the biggest cost driver of local dollars, was totally locally funded in FY19. Through the 1115 waiver, the treatment services associated with residential treatment are Medicaid funded as of 01/01/2020. For mental health services, the number decreased to 1,046 in FY 19 or 55 percent from 2,323 in FY 15.

*-What are the demographics of this population?*

The chart below represents the percentage of the population served in FY 19.

| MHRS | % Adults 26>years | % Youth <25 years | % Male | % Female | Transgender | % African American | % White | % Other known* | %Not Known |
|------|------|------|------|------|------|------|------|------|------|
|  | 96 | 4 | 51 | 49 | 1 | 71 | 6 | 11 | 10 |
|  |  |  |  |  |  |  |  |  |  |
| **SUD** | 91 | 8 | 71 | 29 |  | 88 | 4 | 5 | 1 |

*primarily non-white Hispanic

*-Of this population, how many have expressed a need for bilingual therapists and/or clinicians, if collected? How many therapists and/or clinicians providing DBH services are bilingual? What behavioral health services are available to this population?*

Approximately seven percent or 74 individuals were identified as Non-English Primary Language across all consumers. The number of bilingual therapists and/or clinicians reported by the provider network is 149 individuals. All services are available to limited or non-English

speaking individuals and all providers are required to provide language interpretation services. DBH provides interpretation services for patients located at Saint Elizabeths, Comprehensive Psychiatric Emergency Program (CPEP), Behavioral Health Services Division, Forensic Services program, Assessment and Referral Center, School Based Mental Health and DBH trainings. In FY 19, DBH supported 25,385 encounters at a total of $285,000. This includes interpretation services for multiple daily clinical sessions for multiple individuals in care at Saint Elizabeths Hospital. Vital documents also are translated into six required languages: Korean, Mandarin Simple Chinese, Amharic, Spanish, Vietnamese and French. Vital documents are also translated for additional languages as requested.

| Language | Bilingual Staff (tot) | In-person Interpreter (tot) | Telephone-Based Interpreter (tot) | | Total Encounters (tot) |
|---|---|---|---|---|---|
| Amharic | 87 | 1962 | 271 | 0 | 2320 |
| Arabic | 6 | 54 | 8 | 0 | 68 |
| Burmese | 0 | 0 | 2 | 0 | 2 |
| Cantonese | 0 | 0 | 6 | 0 | 6 |
| Chinese | 20 | 178 | 10 | 0 | 208 |
| Creole | 0 | 2 | 0 | 0 | 2 |
| French | 88 | 593 | 33 | 0 | 714 |
| Hindi | 4 | 14 | 0 | 0 | 18 |
| Italian | 1 | 0 | 1 | 0 | 2 |
| Japanese | 2 | 0 | 1 | 0 | 3 |
| Korean | 6 | 73 | 2 | 0 | 81 |
| Mandarin | 3 | 0 | 19 | 0 | 22 |
| Nepali | 0 | 1 | 0 | 0 | 1 |
| Oromo | 0 | 0 | 1 | 0 | 1 |
| Polish | 0 | 0 | 1 | 0 | 1 |
| Portuguese | 0 | 0 | 2 | 0 | 2 |
| Russian | 0 | 0 | 13 | 0 | 13 |
| Serbian | 0 | 0 | 2 | 0 | 2 |
| Spanish | 1612 | 17,077 | 2373 | 0 | 21,062 |
| Thai | 0 | 250 | 0 | 0 | 250 |
| Tigrinya | 1 | 42 | 17 | 0 | 60 |
| Urdu | 0 | 0 | 1 | 0 | 1 |
| Vietnamese | 10 | 503 | 33 | 0 | 546 |
| **Totals (23 groups)** | 1840 | 20,749 | 2796 | 0 | 25,385 |

| MHRS Services | Service Description |
|---|---|
| **Diagnostic / Assessment** | A Diagnostic/Assessment is an intensive clinical and functional evaluation of a consumer's mental health condition by the Diagnostic/Assessment team that results in the issuance of a Diagnostic Assessment report with recommendations for service delivery that provides the basis for the development of an IRP/IPC. A psychiatrist shall supervise and coordinate all psychiatric and medical functions required by a consumer's Diagnostic/Assessment. A Diagnostic/Assessment also determines whether the consumer is appropriate for and can benefit from MHRS based upon the consumer's diagnosis, presenting problems, and recovery goals; and evaluates the consumer's level of readiness and motivation to engage in treatment. |
| **Medication Training/Support Treatment** | Medication/Somatic Treatment services are medical interventions including physical examinations; prescription, supervision or administration of mental-health related medications; monitoring and interpreting results of laboratory diagnostic procedures related to mental health-related medications; and medical interventions needed for effective mental health treatment provided as either an individual or group intervention. Medication/Somatic Treatment services include monitoring the side effects and interactions of medication and the adverse reactions which a consumer may experience, and providing education and direction for symptom and medication self-management. Group Medication/Somatic Treatment services are therapeutic, educational and interactive with a strong emphasis on group member selection, facilitated therapeutic peer interaction and support as specified in the IRP/IPC. |
| **Community Support** | Community Support services are rehabilitation and environmental supports considered essential to assist the consumer in achieving rehabilitation and recovery goals that focus on building and maintaining a therapeutic relationship with the consumer. Community Support services include the following interventions 1.) Participation in the development and implementation of a consumer's IRP/IPC; 2.) Assistance and support for the consumer in stressor situations; 3.) Mental health education, support and consultation to consumers' families and their support system, which is directed exclusively to the well-being and benefit of the consumer; 4.) Individual mental health intervention for the development of interpersonal and community coping skills, including adapting to home, school, and work environments; 5.) Assisting the consumer in symptom self-monitoring and self-management for the identification and minimization of the negative effects of psychiatric symptoms, which interfere with the consumer's daily living, financial management, personal development, or school or work performance; 6.) Assistance to the consumer in increasing social support skills and networks that ameliorate life stresses resulting from the consumer's mental illness or emotional disturbance and are necessary to enable and maintain the consumer's independent living; 7.) Developing strategies and supportive mental health intervention for avoiding out-of-home placement for adults, children, and youth and building stronger family support skills and knowledge of the adult, child, or youth's strengths and limitations; and 8.) Developing mental health relapse prevention strategies and plans. |

| | |
|---|---|
| **Crisis/Emergency** | Crisis/Emergency is a face-to-face or telephone immediate response to an emergency situation involving a consumer with mental illness or emotional disturbance that is available twenty-four (24) hours per day, seven (7) days per week.  Crisis/Emergency services are provided to consumers involved in an active mental health crisis and consist of immediate response to evaluate and screen the presenting situation, assist in immediate crisis stabilization and resolution, and ensure the consumer's access to care at the appropriate level.  Crisis/Emergency services may be delivered in natural settings, and the Crisis/Emergency provider shall adjust its staffing to meet the requirements for immediate response.  Each Crisis/Emergency shall provider the following 1.) Obtain consultation, locate other MHRS and resources, and provide written and oral information to assist the consumer in obtaining follow-up MHRS; 2.) Be a DMH-certified MHRS provider of Diagnostic/Assessment or have an agreement with a CSA or a CSA's affiliated sub-provider to assure the provision of necessary hospital pre-admission screenings; 3.) Demonstrate the capacity to assure continuity of care for consumers by facilitating follow-up mental health appointments and providing telephonic support until outpatient services occur; and 4.) Have an agreement with the DMH Consumer Enrollment and Referral System. |
| **Rehabilitation/Day Services** | Rehabilitation/Day Services is a structured, clinical program intended to develop skills and foster social role integration through a range of social, psycho-educational, behavioral, and cognitive mental health interventions.  Rehabilitation/Day Services are curriculum-driven and psycho-educational and assist the consumer in the retention, or restoration of independent and community living, socialization, and adaptive skills; include cognitive-behavioral interventions and diagnostic, psychiatric, rehabilitative, psychosocial, counseling, and adjunctive treatment; and are offered most often in group settings, and may be provided individually.  Rehabilitation/Day Services shall be founded on the principles of consumer choice and the active involvement of each consumer in the consumer's mental health recovery; provide both formal and informal structures through which consumers can influence and shape service development; facilitate the development of a consumer's independent living and social skills, including the ability to make decisions regarding self care, management of illness, life work, and community participation; promote the use of resources to integrate the consumer into the community; and include education on self-management of symptoms, medications and side effects, the identification of rehabilitation preferences, the setting of rehabilitation goals, and skills teaching and development. |

| Intensive Day Treatment | Intensive Day Treatment is a facility-based, structured, intensive, and coordinated acute treatment program which serves as an alternative to acute inpatient treatment or as a step-down service from inpatient care, rendered by an interdisciplinary team to provide stabilization of psychiatric impairments.  Daily physician and nursing services are essential components of Intensive Day Treatment services.<br><br>Intensive Day Treatment shall be time-limited and provided in an ambulatory setting to consumers who are not in danger but have behavioral health issues that are incapacitating and interfering with their ability to carry out daily activities; be provided within a structured program of care which offers individualized, strengths-based, active, and timely treatment directed toward the alleviation of the impairment which caused the admission to Intensive Day Treatment; be an active treatment program that consists of documented mental health interventions that address the individualized needs of the consumer as identified in the IRP/IPC; consist of structured individual and group activities and therapies that are planned and goal-oriented and provided under active psychiatric supervision; offer short-term day-programming consisting of therapeutically intensive, acute, and active treatment; be services that closely resemble the intensity and comprehensiveness of inpatient services; and include psychiatric, medical, nursing, social work, occupational therapy, Medication/Somatic Treatment, and psychology services focusing on timely crisis intervention and psychiatric stabilization so that consumers can return to their normal daily lives. |
|---|---|
| Community-Based Intervention | CBI services are time-limited, intensive, mental health services delivered to children and youth ages six (6) through twenty-one (21).  CBI services are intended to prevent the utilization of an out-of-home therapeutic resource or a detention of the consumer.  CBI services may be provided at the time a child or youth is identified for a service, particularly to meet an urgent or emergent need during his or her course of treatment.  In order to be eligible for CBI services, a consumer shall have insufficient or severely limited individual or family resources or skills to cope with an immediate crisis; and either individual or family issues, or a combination of individual and family issues, that are unmanageable and require intensive coordinated clinical and positive behavioral interventions.  There are four (4) levels of CBI services available to children and youth, they are as follows:  1.) CBI Level I, delivered using the Multisystemic Therapy (MST) treatment model adopted by DMH; 2.) CBI Level II, delivered using the Intensive Home and Community-Based Services (IHCBS) model adopted by DMH; 3.) CBI Level III, delivered using the IHCBS model adopted by DMH; and 4.) CBI Level IV, delivered using the Functional Family Therapy (FFT) model adopted by DMH.<br><br>The basic goals of all levels of CBI services are to defuse the consumer's current situation to reduce the likelihood of a recurrence, which if not addressed, could result in the use of more intensive therapeutic interventions; coordinate access to covered mental health services and other covered Medicaid services; provide mental health services and support interventions for consumers that develop and improve consumer and family interaction and improve the ability of parents, legal guardians, or caregivers to care for the consumer; and transition the consumer to an appropriate level of care following the end of CBI treatment services. |

| | |
|---|---|
| **Assertive Community Treatment (ACT)** | ACT is an intensive, integrated, rehabilitative, crisis, treatment, and mental health rehabilitative community support service provided by an interdisciplinary team to children and youth with serious emotional disturbance and to adults with serious and persistent mental illness with dedicated staff time and specific staff to consumer ratios.<br><br>Service coverage by the ACT team is required twenty-four (24) hours per day, seven (7) days per week. The consumer's ACT team shall complete a comprehensive or supplemental assessment and develop a self care-oriented IRP (if a current and effective one does not already exist).  Services offered by the ACT team shall include the following 1.) Mental health-related medication prescription, administration, and monitoring; 2.) Crisis assessment and intervention; 3.) Symptom assessment, management, and individual supportive therapy; 4.) Substance abuse treatment for consumers with a co-occurring addictive disorder; 5.) Psychosocial rehabilitation and skill development; 6.) Interpersonal, social, and interpersonal skill training; and 7.) Education, support, and consultation to consumers' families and their support system which is directed exclusively to the well-being and benefit of the consumer.  ACT services shall also include a comprehensive and integrated set of medical and psychosocial services for the treatment of the consumer's mental health condition that is provided in non-office settings by the consumer's ACT team. |
| **Counseling** | Counseling services are individual, group or family face-to-face services for symptom and behavior management, development, restoration or enhancement of adaptive behaviors and skills, and enhancement or maintenance of daily living skills.  Adaptive behaviors and skills and daily living skills include those skills necessary to access community resources and support systems, interpersonal skills, and restoration or enhancement of the family unit and/or support of the family. Mental health supports and consultation services provided to consumers' families are reimbursable only when such services and supports are directed exclusively to the well-being and benefit of the consumer. |
| **Child-Parent Psychotherapy (CPP)** | Child-Parent Psychotherapy for Family Violence (CPP) is a relationship-based treatment intervention for young children with a history of trauma exposure or maltreatment, and their caregivers.  CPP helps restore developmental functioning in the wake of violence and trauma by focusing on restoring the attachment relationship that was negatively affected. Young children aged birth through six (6) years who have experienced traumatic stress often have difficulty regulating their behaviors and emotions during distress.<br><br>They may exhibit fearfulness of new situations, be easily frightened, difficult to console, aggressive or impulsive.  These children may also have difficulty sleeping, lose recently acquired developmental skills and show regression in functioning and behavior.  Under CPP, counselors assess and provide information on how parents' past experiences, including past insecure or abusive relationships, affect their relationships with their children.  Sessions focus on parent-child interactions and Counselors provide support on healthy coping, affect regulation and increased appropriate reciprocity between parent/caregiver and child, resulting in a stronger   relationship between a child and his or her parent or caregiver, and improvement in the child's symptoms. |
| **Trauma-Focused Cognitive** | Trauma-Focused Cognitive Behavioral Therapy (TF-CBT) is a psychotherapeutic intervention designed to help children, working with their parent/caregivers, |

| | |
|---|---|
| **Behavioral Therapy (TF-CBT)** | overcome the negative effects of traumatic life events.  The treatment focuses on parent-child interactions, parenting skills, therapeutic treatment, skills development (such as stress management, cognitive processing, communication, problem solving, and safety), and parental support.  A parent/caregiver treatment component is an integral part of this treatment model. It parallels the interventions used with the child so that parent/caregivers are aware of the content covered with the child and are prepared to reinforce or discuss this material with the child between treatment sessions and after treatment has ended. |
| **Psychosocial Rehabilitation Clubhouse Service (Clubhouse)** | Clubhouse services assist individuals with behavioral health diagnoses to develop social networking, independent living, budgeting, self-care, and other skills that will assist them to live in the community and to prepare for securing and retaining employment.  Clubhouse services utilize behavioral, cognitive or supportive interventions to improve a member's potential for establishing and maintaining social relationships and obtaining occupational or educational achievements, and are provided in a collaborative environment where Clubhouse staff and members work side-by-side.  Clubhouse services adhere to the International Standards for Clubhouse Programs established by Clubhouse International. |
| **Trauma Recovery and Empowerment Model (TREM)** | TREM is a structured group therapy intervention designed for individuals who have survived trauma and have substance use disorders and/or mental health conditions.  TREM draws on cognitive restructuring, skills training, and psychoeducational and peer support to address recovery and healing from sexual, physical, and emotional abuse.  A curriculum for each model outlines the topic of discussion, a rationale, a set of goals, and a series of questions to be posed to the group in addition to an experiential exercise for each session. |
| **Trauma Systems Therapy** | TST is a comprehensive, phase-based model for treating traumatic stress in children and adolescents that adds to individually-based approaches by specifically addressing the child's social environment and/or system of care. TST is designed to provide an integrated highly coordinated system of services guided by the specific understanding of the nature of child traumatic stress. TST focuses on the interaction between the child's difficulties regulating their emotions and the deficits within the child's social environment. The three (3) phases of the model are Safety-Focused, Regulation-Focused, and Beyond Trauma. |
| **Health Home** | A Health Home serves as the coordinating entity for services offered to a person with a serious and persistent mental illness (consumer) who has or is at risk of developing co-occurring chronic medical conditions.  The provider is the central point for coordinating patient-centered and population-focused care for both behavioral health and other medical services.  The Health Home provider is compensated on a per member per month (PMPM) basis to coordinate care between itself as the behavioral health provider, and other physical and specialty health care providers and community-based services and supports.  The purpose and goal of individualized care coordination is to increase collaboration and integration of behavioral, health and community based services, improve management of chronic conditions, and reduce avoidable health care costs, specifically for hospital admissions, readmissions and emergency room visits. |

| Non-Medicaid Services | |
|---|---|
| **Supported Employment** (Note: Supported Employment becomes a Medicaid Service effective 2/1/20 under the 1115 Waiver) | Non-Medicaid services and support provided by a supported employment provider pursuant to a contract with the Department, consisting of services designed for consumers with significant mental health diagnoses for whom competitive employment has been interrupted or intermittent as a result of a significant mental health problem. Supported employment involves obtaining a part-time or full-time job in which the consumer earns at least minimum wage. |
| **Choice Care Coordination** | Choice Care Coordination is care coordination provided by a Child Choice Provider to a child or youth in the legal care and custody of CFSA. Choice Care Coordination is the implementation of the comprehensive care plan through appropriate linkages, referrals, coordination, consultation and follow-up to needed services and support. These locally-funded services and supports are intended to augment the clinical services and increase the therapeutic benefit to consumers. Providers who have contracts with DBH as Child Choice Providers are eligible to bill DBH up to the monthly ceiling that is provided in their contracts. |
| **Flexible Spending Local Funds Program for Child Choice Providers** | These locally-funded services and supports are intended to augment the clinical services and increase the therapeutic benefit to consumers. Providers who have contracts with DBH as Child Choice Providers are eligible to bill DBH up to the monthly ceiling that is provided in their contracts. Child Choice Providers will submit claims for flexible spending reimbursement through under the billing code FLEXN. Eligibility for reimbursement for FLEXN- code services is determined solely by the contract between DBH and the Child Choice Provider and is subject to the availability of appropriated funds. |
| **Mental Health Service Continuity of Care Treatment Planning, Institution services (MHS-CTPI)** | Reimbursable "Mental Health Service – Continuity of Care Treatment Planning, Institution" services (MHS-CTPI) are services to assist consumers in institutional settings. MHS-CTPI is to be used for any mental health service not for discharge treatment planning or Rehab/Day purposes provided by an MHRS provider to any consumer, including those enrolled in Assertive Community Treatment (ACT) or Community-Based Intervention (CBI) services, in an institutional setting. |
| **Mental Health Service – Discharge Treatment Planning, Institution (MHS - DTPI)** | Mental Health Service – Discharge Treatment Planning, Institution (MHS - DTPI) is a service to develop a mental health service plan for treating a consumer after discharge from an institutional setting. It includes modifying goals, assessing progress, planning transitions, and addressing other needs, as appropriate. In order to be eligible for reimbursement, MHS-DTPI shall only be provided by an MHRS provider through a mental health professional or credentialed worker to a Department consumer who is in an institutional setting who is not enrolled in Assertive Community Treatment (ACT) or Community-Based Intervention (CBI). In order to be eligible for reimbursement, MHS-DTPI (ACT) shall be provided only by a member of an MHRS Assertive Community Treatment (ACT) team to a consumer who is enrolled in ACT services and preparing for discharge from the institution setting. In order to be eligible for reimbursement, MHS-DTPI (CBI) shall be provided only by a member of an MHRS Community-Based Intervention (CBI) Team, all levels, to a child or youth who is enrolled in CBI and preparing for discharge from the institutional setting. |

| | |
|---|---|
| **Community Psychiatric Supportive Treatment Program Rehab/Day Services (CPS-Rehab/Day)** | Community Psychiatric Supportive Treatment Program – Rehab/Day Services (CPS-Rehab/Day) is a day treatment program provided in the community designed to acclimate the consumer to community living. In order to be eligible for reimbursement, CPS-Rehab/Day Services shall only be provided by a certified MHRS Rehabilitation/Day Services provider. |

| MHRS Service Category | Procedure Code | Modifier | Place-of-Service | Medicaid Reimbursable (Y or N) | Rate |
|---|---|---|---|---|---|
| Diagnostic / Assessment | T1023 | HE | 11-Office | Y | 259.28 / Occurrence |
| | Diagnostic Assessment | | 12-Home | Y | |
| | (at least 3 hours) | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0002 | | 11-Office | Y | 86.43 / Occurrence |
| | Brief Diagnostic | | 12-Home | Y | |
| | Assessment | | 14-Group Home | Y | |
| | (40-50 minutes in duration to determine | | 53-Community MH center | Y | |
| | eligibility for admission to a mental health treatment program) | | 99-POS not identified | Y | |
| Medication Training/Support Treatment | | | | | 12.58 / 15-min Unit |
| | H0034 | HQ | 11-Office | Y | |
| | Med Training/Support | Group | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 53-Comunty MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0034 | | 04-Homeless Shelter | Y | 50.26 / 15-min Unit |
| | Med Training/Support | Individual | 11-Office | Y | |
| | | | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| Community Support | H0036 | HQ | 04-Homeless Shelter | Y | 6.07 / 15-min Unit |
| | Community Support | Group | 11-Office | Y | |
| | | | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0036 | | 04-Homeless Shelter | Y | $24.27 / 15-min Unit |
| | Community Support | Individual | 11-Office | Y | |
| | | | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | 09-Prison/Correctional facility | N | |

| MHRS Service Category | Procedure Code | Modifier | Place-of-Service | Medicaid Reimbursable (Y or N) | Rate |
|---|---|---|---|---|---|
| | H0036 | UK | 04-Homeless Shelter | Y | 24.27 / 15-min Unit |
| | Community Support | Collateral | 11-Office | Y | |
| | | | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | 09-Prison/Correctional facility | N | |
| | | | | | |
| | H0036 | HS | 04-Homeless Shelter | Y | 24.27 / 15-min Unit |
| | Community Support | Family Without consumer | 11-Office | Y | |
| | | | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0036 | HR | 04-Homeless Shelter | Y | 24.27 / 15-min Unit |
| | Community Support | Family With consumer | 11-Office | Y | |
| | | | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | | | | | |
| | H0036 | U1 | 14-Group Home | Y | 24.27 / 15-min Unit |
| | Community Support | CRF | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | H0036 | AM | 04-Homeless Shelter | Y | 24.27 / 15 min Unit |
| | Physician Team Member | | 11-Office | Y | |
| | | | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0038 | | 04-Homeless Shelter | Y | 24.27 / 15 min Unit |
| | Self-help/Peer Support | | 11-Office | Y | |
| | | | 12-Home | Y | |
| | | | 14-Group Home | Y | |

| MHRS Service Category | Procedure Code | Modifier | Place-of-Service | Medicaid Reimbursable (Y or N) | Rate |
|---|---|---|---|---|---|
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0038 | HQ | 04-Homeless Shelter | Y | 6.07 / 15 min Unit |
| | Self-help/Peer Support | Group | 11-Office | Y | |
| | | | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0038 | HS | 11-Office | Y | 21.97 / 15 min Unit |
| | Self-help/Peer Support | Family | 53-Community MH center | Y | |
| | | Service | 03-School | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0038 | HQ HS | 04-Homeless Shelter | Y | 6.65 / 15 min Unit |
| | Self-help/Peer Support | Fam. Group | 53-Community MH center | Y | |
| | | Service | 03-School | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | | | | | |
| | H2023 | | 11-Office | Y | 24.27 / 15min Unit |
| | Supported Employment | | 53-Community MH center | Y | |
| | (Therapeutic) | | 99-POS not identified | Y | |
| Crisis/Emergency | H2011 | | 04-Homeless Shelter | Y | 59.18 / 15-min Unit |
| | Crisis Emergency | | 11-Office | Y | |
| | | | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 15-Mobile Unit | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| Rehabilitation/Day Services | H0025 | | 53-Community MH center | Y | 116.90 / Day |
| | Day Services | | | | |
| | (1 day at least 3 hours) | | | | |
| Intensive Day Treatment | H2012 | | 53-Community MH center | Y | 164.61 / Day |
| | Intensive Day Treatment | | | | |
| | (1 day at least 5 hours) | | | | |
| Community-Based Intervention | H2022 | | 03-School | Y | 51.96 / 15-min Unit |
| | Community-Based | | 11-Office | Y | |

| MHRS Service Category | Procedure Code | Modifier | Place-of-Service | Medicaid Reimbursable (Y or N) | Rate |
|---|---|---|---|---|---|
| | Intervention - CBI | | 12-Home | Y | |
| | (Level II) IHCBS | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H2022 | | 03-School | Y | 51.96 / 15-min Unit |
| | Community-Based | | 11-Office | Y | |
| | Intervention – CBI | | 12-Home | Y | |
| | (Level III) IHCBS- short term | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | | |
| | | | | | |
| | H2033 | | 03-School | Y | 51.96 / 15-min Unit |
| | Community Based | | 11-Office | Y | |
| | Intervention - CBI | | 12-Home | Y | |
| | (Level I)  MST | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | | | | | |
| | H2033 | HU | 03-School | Y | |
| | Community-Based | | 11-Office | Y | 51.96 / 15-min Unit |
| | Intervention – CBI | | 12-Home | Y | |
| | (level IV) FFT | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| Assertive Community Treatment (ACT) | | | | | 37.15 / 15-min Unit |
| | H0039 | | 04-Homeless Shelter | Y | |
| | Assertive Community | Individual | 11-Office | Y | |
| | Treatment - ACT | | 12-Home | Y | |
| | | | 14-Group Home | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | | | | | |
| | H0039 | HQ | 11-Office | Y | 9.30 / 15-min Unit |
| | Assertive Community | Group | 53-Community MH center | Y | |
| | Treatment – ACT | | 99-POS not identified | Y | |
| | | | | | |
| | | | | | |
| Counseling | H0004 | HQ | 11-Office | Y | 7.21 / 15-min Unit |
| | Counseling | Group | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0004 | | 03-School | Y | 28.81 / 15-min Unit |

| MHRS Service Category | Procedure Code | Modifier | Place-of-Service | Medicaid Reimbursable (Y or N) | Rate |
|---|---|---|---|---|---|
| | Counseling On-site | Individual | 11-Office | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0004 | HS | 03-School | Y | 28.81 / 15-min Unit |
| | Counseling On-site | Family Without consumer | 11-Office | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0004 | HR | 03-School | Y | 28.81 / 15-min Unit |
| | Counseling On-Site | Family with Consumer | 11-Office | Y | |
| | | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | H0004 | HETN | 12-Home | Y | 36.18 / 15-min Unit |
| | Counseling Off-Site | Individual | 14-Group Home | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | | | | | |
| | H0004 | HT | 11-Office | Y | 36.18 / 15-min Unit |
| | Child/Parent | Child/Parent | 53-Community MH center | Y | |
| | Psychotherapy | | 03-School | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | H0004 | ST | 11-Office | Y | 36.18 / 15-min Unit |
| | Cognitive Behavioral | Trauma | 53-Community MH center | Y | |
| | Therapy | Focused | 03-School | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| | (TBD) | | 11-Office | Y | (TBD) |
| | Trauma Recovery and | | 53-Community MH center | Y | (TBD) |
| | Empowerment Model | | 99-POS not identified | Y | (TBD) |
| | (TREM) | | | | |
| | | | | | |
| | Trauma Systems | | 11-Office | | (TBD) |
| | Therapy (TST) | | 53-Community MH center | | (TBD) |
| | | | 99-POS not identified | | (TBD) |
| | | | | | |
| | | | | | |
| Clubhouse | H2031 | | 53-Community MH center | Y | 95.00 / Day |
| | 1 day at least 3 hours | | | | |
| | | | | | |
| | | | | | |

| MHRS Service Category | Procedure Code | Modifier | Place-of-Service | Medicaid Reimbursable (Y or N) | Rate |
|---|---|---|---|---|---|
| **Non-MHRS Medicaid Only Service** | | | | | |
| (prior to 2/1/19) | S0281 | U1 | 11-Office | | **481.00 Case Rate/mo** |
| | Health Home Services; High-Acuity | | 53-Community MH center | | |
| | | | 99-POS not identified | | |
| | | | | | |
| (prior to 2/1/19) | S0281 | U2 | 11-Office | | **349.00 Case Rate/mo** |
| | Health Home Services; Low-Acuity | | 53-Community MH center | | |
| | | | | | |
| (from 2/1/19) | S0281 | U4 | 11-Office | Y | **125.75 Case Rate/mo** |
| | Health Home Services | | 53-Community MH center | Y | |
| | | | 99-POS not identified | Y | |
| | | | | | |
| **DBH Local / Non-Medicaid MHRS Services** | | | | | |
| | H2025 | | | | |
| | Supported Employment | | 11-Office | N | **18.61 / 15-min Unit** |
| | (Non-MHRS Vocational) | | 53-Community MH center | N | |
| | | | 99-POS not identified | N | |
| | | | | | |
| | H2025 | HQ | 11-Office | N | **6.65 / 15-min Unit** |
| | Supported Employment | | 53-Community MH center | N | |
| | Group (non-MHRS Job Club) | | 99-POS not identified | N | |
| | | | | | |
| | | | | | |
| | H2025 | HH | 11-Office | N | **18.61 / 15-minUnit** |
| | Supported Employment | | 53-Community MH center | N | |
| | For CABHI Clients | | 99-POS not identified | N | |
| | | | | | |
| | DMH14 | | 53-Community MH center | N | **331.87 / Day** |
| | Residential Crisis Stabilization | | | | |
| | | | | | |
| | DMH20 | | 11-Office | N | **15.00 / 15-min Unit** |
| | Team Meeting | | 53-Community MH center | N | |
| | | | 99-POS not identified | N | |

| MHRS Service Category | Procedure Code | Modifier | Place-of-Service | Medicaid Reimbursable (Y or N) | Rate |
|---|---|---|---|---|---|
| | DMH22 | | 04-Homeless Shelter | N | |
| | Jail Diversion – (Criminal Justice | | 09-Prison/Correctional facility | N | Rate negotiated by individual contract |
| | System – CJS) | | 11-Office | N | |
| | | | 12-Home | N | |
| | | | 14-Group Home | N | |
| | | | 53-Community MH center | N | |
| | | | 99-POS not identified | N | |
| | | | | | |
| | DMH23 | | 53-Community MH center | N | 331.87 / Day |
| | No-Auth Residential Crisis Stabilization | | | | |
| | | | | | |
| | | | | | |
| | DMH24 | | 99-POS not identified | N | Case Rate |
| | Integrated Community | | | | |
| | Care Project - ICCP | | | | |
| | | | | | |
| | DMH26 | | 11-Office | N | 25.00 / Occurrence |
| | Transitional Service | | 12-Home | N | |
| | | | 53-Community MH center | N | |
| | | | 99-POS not identified | N | |
| | | | | | |
| | H0006 | HU | 11-Office | N | 21.97 / 15-min Unit |
| | Choice Care Coordination | | 12-Home | N | |
| | | | 53-Community MH center | N | |
| | | | 99-POS not identified | N | |
| | | | | | |
| | FLEXN | | 11-Office | N | 1¢ / Unit |
| | FlexN Service | | 12-Home | N | |
| | | | 53-Community MH Ctr | N | |
| | | | 99-POS not identified | N | |
| | | | | | |
| | H0032 | | 09-Prison-Correctional facility | N | 21.97 / 15-min Unit |
| | MH Service – Discharge Treatment Planning | | 21-Inpatient hospital | N | |
| | Institution | | 31-Skilled nursing facility | N | |
| | (MHS-DTPI) | | 32-Nursing facility | N | |
| | | | 51-Inpatient Psychiatric facility | N | |
| | | | 56-Psych. Residential Treatment Center | N | |
| | | | | | |

| MHRS Service Category | Procedure Code | Modifier | Place-of-Service | Medicaid Reimbursable (Y or N) | Rate |
|---|---|---|---|---|---|
| | H0032 | HK | 09-Prison-Correctional facility | N | 21.97 / 15-min Unit |
| | MH Service – COC Treatment Planning – Inst. | | 21-Inpatient hospital | N | |
| | (MHS-CTPI) | | 31-Skilled nursing facility | N | |
| | | | 32-Nursing facility | N | |
| | | | 51-Inpatient Psychiatric facility | N | |
| | | | 56-Psych. Residential Treatment Center | N | |
| | H0046 | HT | 09-Prison-Correctional facility | N | 38.04 / 15 min Unit |
| | MH Service  Discharge Treatment  Planning | | 21-Inpatient hospital | N | |
| | Planning Institution (MHS-DTPI) (ACT) | | 31-Skilled nursing facility | N | |
| | | | 32-Nursing facility | N | |
| | | | 51-Inpatient Psychiatric facility | N | |
| | H0046 | HTHA | 09-Prison-Correctional facility | N | 35.74 / 15 min Unit |
| | MH Service - Discharge Treatment  Planning | | 21-Inpatient hospital | N | |
| | Planning Institution (MHS-DTPI) (CBI) | | 31-Skilled nursing facility | N | |
| | | | 32-Nursing facility | N | |
| | | | 51-Inpatient Psychiatric facility | N | |
| | | | 56-Psych. Residential Treatment Center | N | |
| | H0037 | | 53-Community MH center | N | 116.90 / Day |
| | Community Psychiatric | | | | |
| | Supportive Treatment | | | | |
| | Program – Rehab/Day Services (CPS-Rehab/Day)  (1 day at least 3 hours) | | | | |

*Q37.    Please provide the list of services available as part of the Mental Health Rehabilitation Services (MHRS) system. Specifically, please provide a description of each service and indicate whether or not it is available as part of the Medicaid MHRS program, the non-MHRS program, or both.  In addition, please provide the FY19 and current reimbursement rates for each service.*

**DBH Response**

See Attachment 1 of 2. MHRS Services
See Attachment 2 of 2. Rates

**FY 19 Oversight Question 38.**

### FY2019

| MHRS Monthly | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | May-19 | Jun-19 | Jul-19 | Aug-19 | Sep-19 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medicaid Paid | $9,402,098.97 | $8,784,201.32 | $8,591,124.53 | $9,122,831.01 | $8,504,817.26 | $9,624,638.59 | $9,933,031.74 | $10,404,081.08 | $9,613,677.43 | $10,557,899.12 | $10,436,878.06 | $10,119,119.26 | $115,094,398.37 |
| Medicaid FFP | $6,581,469.28 | $6,148,940.92 | $6,013,787.17 | $6,385,981.71 | $5,953,372.08 | $6,737,247.01 | $6,953,122.22 | $7,282,856.78 | $6,729,574.20 | $7,390,529.39 | $7,305,814.66 | $7,083,383.50 | $80,566,078.92 |
| Local Match | $2,820,629.69 | $2,635,260.40 | $2,577,337.36 | $2,736,849.30 | $2,551,445.18 | $2,887,391.58 | $2,979,909.52 | $3,121,224.30 | $2,884,103.23 | $3,167,369.73 | $3,131,063.40 | $3,035,735.76 | $34,528,319.45 |
| | | | | | | | | | | | | | |
| Local Paid | $622,401.72 | $559,568.16 | $547,744.26 | $585,001.77 | $544,500.66 | $624,015.10 | $614,159.19 | $533,020.42 | $423,334.96 | $604,585.64 | $693,641.65 | $533,687.84 | $6,885,661.37 |
| Total Monthly | **$10,024,500.69** | **$9,343,769.48** | **$9,138,868.79** | **$9,707,832.78** | **$9,049,317.92** | **$10,248,653.69** | **$10,547,190.93** | **$10,937,101.50** | **$10,037,012.39** | **$11,162,484.76** | **$11,130,519.71** | **$10,652,807.10** | **$121,980,059.74** |

### FY2020 to date

| MHRS Monthly | Oct-19 | Nov-19 | Dec-19 | Jan-20 | Feb-20 | Mar-20 | Apr-20 | May-20 | Jun-20 | Jul-20 | Aug-20 | Sep-20 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medicaid Paid | | | | | | | | | | | | | $0.00 |
| Medicaid FFP | | | | | | | | | | | | | |
| Local Match | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| Local Paid | $641,612.98 | $480,049.03 | $275,750.55 | $4,371.65 | | | | | | | | | $1,401,784.21 |
| Total Monthly | **$641,612.98** | **$480,049.03** | **$275,750.55** | **$4,371.65** | | | | | | | | | **$1,401,784.21** |

*Q38. Please provide the monthly MHRS utilization data for FY19 and to date in FY20.*
*Specifically, please include the following:*
- *A breakdown of Medicaid MHRS vs. non-Medicaid MHRS;*
- *For Medicaid MHRS, please provide a breakdown by managed care vs. fee-for-service (and include a breakdown by specific managed care organization);*
- *For non-Medicaid MHRS enrollees, please indicate whether the individual had coverage via the DC Healthcare Alliance or was uninsured; and,*
- *For non-Medicaid MHRS enrollees, please provide a breakdown by income.*

**DBH Response**

Please se Attachment 1 of 1. MHRS Utilization

FY 19 Oversight Question 39. Attachment 1 of 3. FY18  by Payor

| FY2018  MHRS | Local Claims | | | Medicaid Claims | | Total All Paid Claims - Medicaid & LOCAL |
|---|---|---|---|---|---|---|
| | LOCAL MHRS PO Allocations | LOCAL MHRS Warrants | | Medicaid Claims Paid by DHCF | | |
| Amazing Love Health Services | 1,000.00 | 981 | | 67,836 | | 68,817 |
| Anchor Mental Health Association, Inc | 1,379,269.76 | 1,360,411 | | 4,689,511 | | 6,049,922 |
| API | 1,000.00 | 0 | | 30,939 | | 30,939 |
| Better Morning | 1,000.00 | 822 | | 297,352 | | 298,174 |
| CityCare Health Services | 5,000.00 | 4,982 | | 45,190 | | 50,172 |
| Community Connections, Inc. | 537,500.00 | 533,296 | | 12,677,382 | | 13,210,677 |
| Community Wellness Ventures | 7,000.00 | 3,150 | | 14,870 | | 18,020 |
| Contemporary Family Services (Closed) | 732,475.19 | 691,611 | | 9,044,966 | | 9,736,577 |
| Deaf - REACH, Specialty Services | 40,000.00 | 39,974 | | 100,753 | | 140,727 |
| Family Preservation Services | 329,855.00 | 311,371 | | 2,807,540 | | 3,118,911 |
| Family Solutions of Ohio | 500.00 | 0 | | 1,033 | | 1,033 |
| Family Wellness Center | 78,568.00 | 74,527 | | 1,109,475 | | 1,184,001 |
| First Home Care Corporation      (Closed) | 10,000.00 | 9,445 | | 294,433 | | 303,879 |
| Foundations for Home and Community (Closed) | 75,000.00 | 14,004 | | 171,453 | | 185,457 |
| Global Resources & Supports | 500.00 | 428 | | 2,189 | | 2,618 |
| Hillcrest Children's Center | 550,000.00 | 523,015 | | 5,425,211 | | 5,948,227 |
| Holy Health Care Services | 5,000.00 | 0 | | 30,265 | | 30,265 |
| Humility (Closed) | 500.00 | 0 | | 6,289 | | 6,289 |
| Inner City Family Services | 140,000.00 | 137,455 | | 2,676,988 | | 2,814,443 |
| Latin America Youth Ctr | 50,000.00 | 44,009 | | 75,473 | | 119,482 |
| Life Care | 500.00 | 459 | | 3,018 | | 3,477 |
| Life Enhancement Services (LES) | 37,016.74 | 32,311 | | 4,020,618 | | 4,052,929 |
| Life Stride, Inc | 105,813.00 | 103,601 | | 3,072,783 | | 3,176,384 |
| Maryland Family Resources (MDDC) | 8,712.00 | 6,559 | | 915,545 | | 922,103 |
| Mary's Center Maternal Child Care, Inc. | 200,000.00 | 194,552 | | 392,096 | | 586,648 |
| MBI Health Services | 2,865,000.00 | 2,828,943 | | 29,474,118 | | 32,303,061 |
| McClendon Center, Specialty Services | 251,000.00 | 241,721 | | 3,507,928 | | 3,749,649 |
| Neighbors Consejo | 101,218.00 | 100,172 | | 797,980 | | 898,152 |
| One Care DC | 500.00 | 0 | | 0 | | - |
| Outreach Solutions | 4,000.00 | 1,858 | | 305,417 | | 307,275 |
| Pathways to Housing D.C., Specialty Services | 600,000.00 | 592,383 | | 3,855,629 | | 4,448,012 |
| Prestige Healthcare Resources | 1,000.00 | 220 | | 164,375 | | 164,595 |
| Preventive Measures | 30,000.00 | 24,580 | | 2,041,187 | | 2,065,766 |
| PRS-DC Recovery Academy | 5,000.00 | 3,387 | | | | 3,387 |
| PSI, III | 262,379.00 | 262,117 | | 4,223,501 | | 4,485,618 |
| Psychiatric Center Chartered | 180,000.00 | 177,940 | | 1,844,216 | | 2,022,156 |
| RAP | 1.00 | 0 | | 0 | | - |
| Umbrella Therapeutic Services | 55,000.00 | 50,125 | | 665,360 | | 715,485 |
| Volunteers of America Chesapeake | 260,000.00 | 254,154 | | 3,697,098 | | 3,951,252 |
| Washington Hospital Center | 70,000.00 | 68,492 | | 405,545 | | 474,037 |
| Woodley House, Inc. | 80,797.00 | 72,407 | | 153,783 | | 226,190 |
| | | | | | | |
| Community Provider Totals | 9,062,104.69 | 8,765,462 | | 99,109,345 | | 107,874,806 |
| MHSD | N/A | N/A | | 1,137,640 | | 1,137,640 |
| CPEP | N/A | N/A | | 977,578 | | 977,578 |
| All MHRS Provider Totals | 8,367,905.00 | 8,765,461.72 | | 101,224,563 | | 109,990,024 |

FY 19 Oversight Question 39. Attachment 2 of 3. FY19 by Payor

| FY2019 MHRS | LOCAL Claims | | | Medicaid Claims | | Total All Paid Claims - Medicaid & LOCAL |
|---|---|---|---|---|---|---|
| | LOCAL MHRS PO/HCA Allocations | LOCAL MHRS Claims Invoices | | Medicaid Claims Paid by DHCF | | |
| Absolute Healthcare Resources | 10,000.00 | 8,991 | | 262 | | 9,253 |
| Abundant Grace Health Services | 25,000.00 | 19,388 | | 0 | | 19,388 |
| Amazing Love Health Services | 421,469.00 | 400,301 | | 2,739,570 | | 3,139,871 |
| Anchor Mental Health Association, Inc | 949,000.00 | 908,137 | | 4,988,106 | | 5,896,243 |
| Better Morning | 55,000.00 | 51,657 | | 7,557,736 | | 7,609,393 |
| CityCare Health Services | 200,000.00 | 177,895 | | 1,004,230 | | 1,182,125 |
| Community Connections, Inc. | 872,000.00 | 871,594 | | 9,808,723 | | 10,680,317 |
| Community Wellness Ventures | 100,000.00 | 99,720 | | 342,825 | | 442,545 |
| Deaf - REACH, Specialty Services | 40,000.00 | 37,570 | | 165,669 | | 203,239 |
| Dedicated Care Health Services | 25,000.00 | 24,848 | | 673,915 | | 698,763 |
| District Health Care | 5,000.00 | 4,993 | | | | 4,993 |
| Family Preservation Services | 410,000.00 | 408,192 | | 3,396,850 | | 3,805,042 |
| Family Solutions of Ohio | 25,000.00 | 21,160 | | 861,896 | | 883,056 |
| Family Wellness Center | 40,000.00 | 39,683 | | 1,277,825 | | 1,317,508 |
| Global Resources & Supports | 14,688.00 | 1,687 | | 28,794 | | 30,482 |
| Goshen Healthcare Management | 2,000.00 | 0 | | 0 | | - |
| Hillcrest Children's Center | 350,000.00 | 349,504 | | 5,542,061 | | 5,891,565 |
| Holy Health Care Services | 40,000.00 | 27,075 | | 594,379 | | 621,454 |
| Inner City Family Services | 120,000.00 | 119,647 | | 2,483,092 | | 2,602,739 |
| Intergrated Health Resources | 5,000.00 | 0 | | 0 | | - |
| Kahak | 5,000.00 | 0 | | 1,803 | | 1,803 |
| Kinara Health & Home Care | 65,000.00 | 64,727 | | 456,578 | | 521,305 |
| Latin America Youth Ctr | 15,000.00 | 4,613 | | 147,880 | | 152,493 |
| Life Care | 80,001.00 | 70,406 | | 1,062,677 | | 1,133,083 |
| Life Changing Solutions | 5,000.00 | 0 | | 1,338 | | 1,338 |
| Life Enhancement Services (LES) | 105,001.00 | 101,881 | | 2,926,225 | | 3,028,106 |
| Life Stride, Inc | 245,000.00 | 244,993 | | 3,351,541 | | 3,596,534 |
| Maryland Family Resources (MDDC) | 10,000.00 | 6,809 | | 1,046,994 | | 1,053,803 |
| Mary's Center Maternal Child Care, Inc. | 190,000.00 | 188,080 | | 395,146 | | 583,226 |
| MBI Health Services | 2,950,000.00 | 2,936,969 | | 30,178,041 | | 33,115,010 |
| McClendon Center, Specialty Services | 240,000.00 | 239,983 | | 4,004,454 | | 4,244,438 |
| Neighbors Consejo | 141,001.00 | 138,214 | | 1,948,372 | | 2,086,586 |
| New Hope Health Services | 15,000.00 | 13,194 | | 0 | | 13,194 |
| New Living | 25,000.00 | 19,457 | | 98,253 | | 117,711 |
| One Care DC | 150,000.00 | 90,749 | | 719,236 | | 809,985 |
| Outreach Solutions | 5,000.00 | 0 | | 22,944 | | 22,944 |
| Pathways to Housing D.C., Specialty Services | 462,500.00 | 459,552 | | 3,249,666 | | 3,709,218 |
| Prestige Healthcare Resources | 115,001.00 | 113,694 | | 1,632,124 | | 1,745,817 |
| Preventive Measures | 180,000.00 | 171,002 | | 3,339,583 | | 3,510,586 |
| PRS-DC Recovery Academy | 5,000.00 | 3,220 | | 175 | | 3,394 |
| PSI, III | 220,000.00 | 200,247 | | 4,512,864 | | 4,713,111 |
| Psychiatric Center Chartered | 240,000.00 | 237,230 | | 1,947,377 | | 2,184,607 |
| RAP | 1.00 | 0 | | 0 | | - |
| Spring Leaf Solutions | 20,000.00 | 19,982 | | 3,201,477 | | 3,221,459 |
| Umbrella Therapeutic Services | 320,000.00 | 309,240 | | 4,100,016 | | 4,409,256 |
| Volunteers of America Chesapeake | 280,000.00 | 273,497 | | 2,185,631 | | 2,459,128 |
| Wellness Healthcare | 5,000.00 | 0 | | 0 | | - |
| Woodley House, Inc. | 35,000.00 | 31,960 | | 143,317 | | 175,277 |
| **MHRS Community Providers Totals** | **9,837,662.00** | **9,511,743** | | **112,139,647** | | **121,651,389** |
| MHSD | N/A | N/A | | 1,004,546 | | 1,004,546 |
| CPEP | N/A | N/A | | 1,153,554 | | 1,153,554 |

FY 19 Oversight Question 39. Attachment 2 of 3. FY19 by Payor

| FY2019  MHRS | LOCAL MHRS PO/HCA Allocations | LOCAL MHRS Claims Invoices | | Medicaid Claims Paid by DHCF | | Total All Paid Claims - Medicaid & LOCAL |
|---|---|---|---|---|---|---|
| | **LOCAL Claims** | | | **Medicaid Claims** | | |
| All MHRS Provider Totals | 9,837,662.00 | 9,511,742.58 | | 114,297,746 | | 123,809,488 |

FY 19 Oversight Question 39. Attachment 3 of 3. FY20 by Payor

| FY2020  MHRS | LOCAL MHRS PO/HCA Allocations | LOCAL MHRS Claims Invoices | | Medicaid Claims Paid by DHCF | | Total All Paid Claims - Medicaid & LOCAL |
| --- | --- | --- | --- | --- | --- | --- |
| | **LOCAL Claims** | | | **Medicaid Claims** | | |
| Absolute Healthcare Resources | 120,000 | 1,104 | | 27,078 | | 28,182 |
| Abundant Grace Health Services | 110,000 | 20,615 | | 314,792 | | 335,407 |
| Amazing Love Health Services | 400,000 | 178,176 | | 1,821,418 | | 1,999,594 |
| Anchor Mental Health Association, Inc | 1,200,000 | 166,468 | | 887,049 | | 1,053,517 |
| Better Morning | 90,000 | 10,169 | | 240,870 | | 251,039 |
| CityCare Health Services | 150,000 | 50,207 | | 735,325 | | 785,532 |
| Community Connections, Inc. | 750,000 | 116,910 | | 2,546,730 | | 2,663,640 |
| Community Wellness Ventures | 110,000 | 108,982 | | 78,702 | | 187,685 |
| Deaf - REACH, Specialty Services | 50,000 | 5,484 | | 50,221 | | 55,705 |
| Dedicated Care Health Services | 20,000 | - | | 361,512 | | 361,512 |
| District Healh Care | 10,000 | 7,120 | | 814,327 | | 821,447 |
| Family Preservation Services | 400,000 | 86,278 | | 1,030,605 | | 1,116,883 |
| Family Solutions of Ohio | 95,000 | - | | 430,960 | | 430,960 |
| Family Wellness Center | 40,000 | - | | 93,081 | | 93,081 |
| Goshen Healthcare Management | 20,000 | 6,126 | | 123,026 | | 129,152 |
| Global Resources & Supports | 40,000 | - | | 17,320 | | 17,320 |
| Hillcrest Children's Center | 500,000 | 94,896 | | 1,331,453 | | 1,426,349 |
| Holy Health Care Services | 30,000 | - | | 342,723 | | 342,723 |
| Inner City Family Services | 120,000 | 22,069 | | 801,854 | | 823,923 |
| Integrated Health Resources | 30,000 | - | | 0 | | - |
| Kahak | 20,000 | - | | 1,047 | | 1,047 |
| Kinara Health & Home Care | 150,000 | - | | 646,707 | | 646,707 |
| Latin America Youth Ctr | 20,000 | - | | 5,112 | | 5,112 |
| Life Care | 100,000 | - | | 301,003 | | 301,003 |
| Life Changing Solutions | 15,000 | - | | 9,613 | | 9,613 |
| Life Enhancement Services (LES) | 290,000 | 26,833 | | 1,418,359 | | 1,445,192 |
| Life Stride, Inc | 300,000 | 20,298 | | 833,634 | | 853,932 |
| Maryland Family Resources (MDDC) | - | - | | 204,431 | | 204,431 |
| Mary's Center Maternal Child Care, Inc. | 200,000 | 32,302 | | 29,365 | | 61,667 |
| MBI Health Services | 500,000 | 429,318 | | 8,394,872 | | 8,824,190 |
| McClendon Center, Specialty Services | 250,000 | 66,942 | | 914,494 | | 981,436 |
| Neighbors Consejo | 250,000 | 45,584 | | 365,638 | | 411,222 |
| New Hope Health Services | 20,000 | 19,574 | | 245,971 | | 265,545 |
| New Living | 10,000 | - | | 247,246 | | 247,246 |
| NYA Health Services | 10,000 | - | | 60,741 | | 60,741 |
| One Care DC | 80,000 | - | | 358,343 | | 358,343 |
| Outreach Solutions | 10,000 | - | | 197,065 | | 197,065 |
| P&G Behavioral Health | 5,000 | - | | 0 | | - |
| Pathways to Housing D.C., Specialty Services | 730,000 | 115,856 | | 655,300 | | 771,156 |
| Prestige Healthcare Resources | 70,000 | 62,532 | | 946,878 | | 1,009,410 |
| Preventive Measures | 150,000 | - | | 626,326 | | 626,326 |
| PRS-DC Recovery Academy | 5,000 | - | | 0 | | - |
| PSI, III | 250,000 | 24,163 | | 1,047,786 | | 1,071,949 |
| Psychiatric Center Chartered | 250,000 | 33,769 | | 492,332 | | 526,101 |
| RAP | 5,000 | - | | 0 | | - |
| Spring Leaf Solutions | 20,000 | 16,181 | | 317,984 | | 334,165 |
| Umbrella Therapeutic Services | 300,000 | 62,124 | | 1,621,248 | | 1,683,371 |
| Universal Healthcare Management | 5,000 | - | | 0 | | - |
| Volunteers of America Chesapeake | 300,000 | 40,462 | | 317,587 | | 358,049 |
| Wellness Healthcare | 10,000 | - | | 7,077 | | 7,077 |
| Woodley House, Inc. | 50,000 | 2,542 | | 11,675 | | 14,217 |
| **Community Provider Totals** | **8,660,000** | **1,873,084** | | **32,326,879** | | **34,199,963** |

FY 19 Oversight Question 39. Attachment 3 of 3. FY20 by Payor

| FY2020  MHRS | LOCAL Claims | | | Medicaid Claims | | Total All Paid Claims - Medicaid & LOCAL |
|---|---|---|---|---|---|---|
| | LOCAL MHRS PO/HCA Allocations | LOCAL MHRS Claims Invoices | | Medicaid Claims Paid by DHCF | | |
| MHSD | N/A | N/A | | 137,941 | | 137,941 |
| CPEP | N/A | N/A | | 211,070 | | 211,070 |
| All MHRS Provider Totals | 8,660,000 | 1,873,084 | | 32,675,890 | | 34,548,974 |

*Q39.*   *Please provide the name of all certified MHRS providers. For each provider, please provide the following information for FY18, FY19 and to date in FY20:*

-   *Whether or not the provider utilizes the Medicaid MHRS program, the locally-funded MHRS program, or both;*
-   *The amount of their Human Care Agreements (HCA);*
-   *The amount of their purchase orders;*
-   *Actual expenditures under the purchase order;*
-   *Any modifications that were made to a HCA or purchase order, including an explanation for the modification;*

**DBH Response**

See Attachment 1 of 3. FY 18 by payor
See Attachment 2 of 3. FY 19 by payor
See Attachment 3 of 3. FY 20 by payor

*Q40. Please describe some of the positive results seen from the Live.Long.DC Strategic Plan. Is the District on track to becoming overdose-free?*

**DBH Response**

Since October 2017, the District government has convened a group of diverse stakeholders, including more than 100 individuals from over 40 stakeholder groups, to collectively understand the District's opioid crisis and establish a coordinated multi-stakeholder approach to comprehensively address the epidemic. Mayor Bowser released in December 2018, "LIVE.LONG.DC.", Washington, DC's Strategic Plan to Reduce Opioid Use, Misuse, and Related Deaths. The comprehensive strategic plan that included initiatives already underway covers prevention, treatment, and recovery supports through seven goals, with 50 associated strategies, all aimed at reducing opioid use, misuse and opioid-related deaths by 50 percent by 2020.

There have been a number of early achievements including:

- Widespread distribution of life saving naloxone and the reversal of nearly 1,000 reported overdoses due to the administration of naloxone
- A reduction in the death rate due to opioids by 24 percent in 2018 compared to 2017
- Enactment of the provisions in the SAFE DC Act, which criminalizes synthetic drugs, including variants of fentanyl, based on the class of the chemical compounds, rather than the individual compound, strengthening law enforcement officials' ability to test for and prosecute cases against sellers and distributors of these drugs;
- Extension of emergency legislation to make opioid testing kits legal;
- Better characterization of the supply of illegal opioids, including the discovery of new opioids, through advanced testing at the Department of Forensic Sciences (DFS) opioid surveillance lab;
- Availability of medication assisted treatment in community hospitals, community clinics and the DC Jail, and
- Hundreds of opioid users ready to live healthy and addiction free or determined to try again to sustain recovery with support from their peers

These initiatives are highlighted in more detail below. The breath of the work taking place shows that the District is mobilizing communities in all eight wards including providers, advocates, faith leaders and civic leaders to fight the opioid epidemic. Yet, the Chief Medical Examiner has reported that the decline in opioid related deaths slowed in 2019. This sobering news reinforces that opioid addiction is a formidable foe and DBH and its partners are examining our strategies to double down on what's working and incorporate new and best practices from other jurisdictions fighting the opioid epidemic.

Prevention.  Since May 2019, the DC Prevention Centers that cover all eight wards have conducted opioid prevention initiatives that reached over 2,400 youth and 270 adults. Across the

District, four additional sub-grantees have conducted opioid prevention initiatives that reached 3,688 individuals and trained 220 youth in a substance use prevention curriculum with a focus on opioid education and prevention. A Youth Summit in September 2019 to engage and empower District youth drew 260 summit attendees of whom 200 were youth.

Education and Awareness. To improve provider capacity to screen, support, and treat individuals with opioid use disorder, DC Health launched the Opioid Learning Institute to offer providers 12 online CME/CE accredited free training modules. Since the launch on October 1, 2019, 457 individuals have completed a course.

- Faith based grants. DBH awarded grants to 23 faith-based organizations in six wards to host opioid education activities during National Recovery Month (September). More than 4,000 participated in a diverse array of events including naloxone administration training.

- Social Marketing campaigns. DBH launched a social marketing campaign called "I'm Ready." in December in bus ads, interior cards, and digital ads in Metro stations, and community print media targeting Wards 5, 7 and 8 where most of the opioid related deaths occurred.  DC Health's Prescription Opioid Campaign also ran on metro buses, metro trains, and two posters at 14 Metro stations and 10 bike share stations around the city, targeting opioid "hot spots."

- Community Conversations. Conversations were held in all eight wards and attended by over 300 individuals to talk about opioid use and overdoses in the District, harm reduction approaches to drug use, community member experiences and concerns, and information sharing about local resources and supports. Engaging the community in these conversations has been critical to increasing awareness about the opioid epidemic, helping those affected understand how to help family and friends, and be able to better identify the signs of OUD. Naloxone training was provided at each of these events.

- Collaboration with Criminal Justice Partners. DBH is training judges and criminal justice lawyers/defense attorneys about medication-assisted treatment (MAT) as an option and diversion from jail. DBH also created a resource guide that judges can reference to learn where treatment services can be accessed. A discussion is underway to expand the criteria for drug court and allow judges to distribute naloxone to drug court participants and their families.

Outreach and Engagement.  To engage the opioid user and those most at risk, multiple teams have been established including peers who have proven most effective at encouraging g treatment. Through these teams, thousands of engagements have taken place, thousands of naloxone kits have been distributed and hundreds of individuals voluntarily agreed to screenings for referral to treatment. Steady, consistent engagement is showing results with linkages to treatment, including medication assisted treatment (MAT) housing and other supports.

- DC Health Rapid Peer Responder (RPR) team responds on the spot to opioid overdoses survivors who choose not to go to the emergency room to connect them to services and supports.

- Specialized Street Outreach Teams. Six teams are engaging primarily individuals who are experiencing homelessness and visiting Three of the teams were awarded grants to continue in work in FY 20 and they have had 367 face-to-face engagements through December.

- Overdose Survivor's Outreach Program. Peers engage opioid overdose survivors who come to the emergency room and if they refuse treatment, the peers reach out to these individuals for 90 days to try to encourage them to engage in treatment. This team has seen a high referral rate to treatment and recovery support services.
- Community Response Teams. This teams are in the community 24 hours and helping individuals access behavioral health and housing services, making crisis services easily accessible, and saving lives.

Harm Reduction.  More than 1,000 reversals have been reported and naloxone is now widely available. DC Health has expanded its distribution through 26 community partnerships and 17 pharmacies in all eight wards. Nearly 80,000 naloxone kits were purchased in FY 19 compared to about 3,100 in FY 2018.  Nearly 185 individuals were trained in FY18 compared with 590 in FY19.  MPD reports administering naloxone was administered 524 times since March.  Naloxone kits are offered to individuals with opioid use disorders upon discharge and 151 individuals were given naloxone upon release.

Treatment.  Medication assisted treatment is available in community hospitals, community clinics and the DC Jail. The Emergency Department Medication Assisted Treatment induction program is now operating in four hospitals (Howard University, United Medical Center, MedStar Washington Hospital Center, and George Washington University) with an additional two hospitals (Sibley and Georgetown) scheduled to start this year. Since the initiation of the program at three pilot hospitals in May and the fourth hospital in October, the number of screenings has increased from 29 percent in July to 79 percent in December for a total of 74,084 screenings. Linkages to care have increased from 17 percent in July to 24 percent in December, moving towards the goal of 50 percent.  Buprenorphine is now available from six of the District's Federally Qualified Health Centers (FQHCs), a community health clinic, and the Howard University Hospital health clinic.  The DC Health Buprenorphine Drug Assistance Plan (BupDAP) provides buprenorphine to those with limited or no health insurance and in one month there were 75 enrollees.

Recovery Support Services.  To support sustained recovery, three new recovery homes opened for 20 residents. Supported Employment is a new service for individuals with substance use disorders and 46 DC residents with OUD were enrolled in two supported employment programs, with 34 of these individuals simultaneously receiving MAT.  The 1115 Behavioral Health Transformation Demonstration waiver brings Medicaid funding for services for adults with substance use disorders in residential facilities. Additionally, the waiver will add new community-based services designed to improve behavioral health treatment capacity and strengthen transitions from emergency, inpatient, and residential treatment.

*Q4l.   How much money was dedicated to providing services to DBH clients who relied entirely on local dollars for the services that they receive from DBH over the last fiscal year? How much money was dedicated to providing services to DBH clients who relied entirely on local dollars for the services that they received from DBH over each of the last five fiscal years?*

**DBH Response**

See Table below

| | FY16 | FY17 | FY18 | FY19 | FY20 |
|---|---|---|---|---|---|
| Local funding of non-Medical clients who relied entirely on local dollars | $    6,072,252 | $    4,758,222 | $    5,173,635 | 5,671,854 | 1,103,246 |
| Local Funding for services for Medicaid clients a | 4,093,916 | 3,157,636 | 3,496,777 | 3,798,599 | 769,838 |
| Totals | 10,166,168 | 7,915,858 | 8,670,412 | 9,470,453 | 1,873,084 |

*Q42. Over the last fiscal year, how much money was dedicated to providing services to DBH clients who relied partially on local dollars for the services that they received from DBH? Over each of the last five fiscal years, how much money was dedicated to providing services to DBH clients who relied partially on local dollars for the services that they received from DBH?*

**DBH Response**

See Table below

|  | FY16 | FY17 | FY18 | FY19 | FY20YTD |
|---|---|---|---|---|---|
| Local Dollar Funding for consumers/clients who relied partially on local dollars | $28,853,439 | $30,547,722 | $28,800,171 | $30,501,983 | $9,528,110 |

*Q43.  Please provide an update on the DBH services to consumers under the custody of the Department of Corrections, including services provided in the READY Center.*

**DBH Response**

DBH staff co-located at the DC Jail, continue to align their efforts and duties with the evolving mission of the READY Center which is managed by the Department of Corrections (DOC).  Since its formal launch in February 2019, the READY Center has been striving to help returning individuals successfully re-integrate into the community by providing access to vital resources, including behavioral health resources, to make their transition back into the community easier, and to reduce the likelihood of recidivism.

In September, 2019, DBH hired a Certified Peer Specialist to join the team of existing co-located staff members.  We are now fully staffed.  This past year, the focus has been on increasing efficiency of staff doing the linkages by improving documentation and communication with CSAs and other DBH staff.  Staff responsibilities have been better organized to reduce duplicative efforts and reduce the possibility of an individual's transition from DOC to the community from being overlooked.  Additionally, DBH and DOC staff partnered to create a data collection platform that can be exported to a DBH data warehouse, which in turn has the capability of combining multiple databases for robust analyses to better direct our resources and inform our interventions. DBH's in-reach efforts 30-day prior to release have improved, while maintaining our presence to serve walk-ins at the READY Center and transporting consumers to their intake appointments.  Data collection has just commenced and information will be available for FY20 after the end of the year. Updated data-sharing agreements, early identification of arrestees who are known to DBH, and better use of CRISP, DCHF claims data, and prescription data all will allow DBH, Unity, and DOC to better support treatment programming along the entire continuum.

Extensive collaboration is occurring on new initiatives funded by the DCOR grant. DBH meets regularly with DOC and Unity Health Care, its comprehensive health services contractor, including the medical director and the director of the READY Center, to align and strengthen discharge planning efforts and to increase the number of warm hand-offs to MHRS and SUD providers in the community.  This includes linkage to MAT providers both within and outside of DBH's network of contracted providers.  Though we do not have complete data for the District, there is abundant national evidence that behavioral health treatment access and participation at every intercept with the criminal justice system reduces recidivism, from pre-arrest diversion to jail-diversion to services attached to courts (like the District's renowned Court Urgent Care Clinic) to jail-based programming and re-entry services.

Lastly, DBH has applied for a competitive transformation initiative grant through the National Association of State Mental Health Program Directors (NASHMPD) to establish incentives for improving consumers' engagement at first and subsequent outpatient appointments with CSAs. This grant, if funded will utilize DBH's Certified Peer Support Providers to help encourage and support those returning citizens with serious mental illness who are most at-risk of returning to institutional care. We expect this pilot to provide useful guidance for expansion of such

contingency-management strategies.  DBH expects the grant to be awarded by the end of January 2020.

*Q44. What are the average and median wait times for an intake meeting for children referred to CSAs? What is the average and median wait time for a first appointment with a psychiatrist?*

**DBH Response:**
The DBH system has multiple points of entry for consumers.  Consumers can enroll with a Core Service Agency by calling the 24-hour Access Helpline or by simply walking into a Core Service Agency and requesting services. Once an individual is assigned and enrolled with a CSA, a diagnostic assessment is scheduled. Overall the average time between enrollment and a youth receiving any of the MHRS services as a first service was 25 days for FY 19, which was an improvement from FY18 which was 37 days. The median wait time was 40 days for FY19.

DBH does not track wait times for first appointments with a psychiatrist since a psychiatrist can be recommended at any point during a consumer's treatment.  Appointments for a medication somatic service with a psychiatrist as the first service after enrollment occurred within 76 days on average in FY 19, a decrease in wait time from FY 18 which was 84 days.  The median was 26 days in FY19.

*Q45. Are there any services provided through Core Service Agencies or other mental health providers that are not currently reimbursed by Medicaid, and please indicate whether these services could be reimbursed under a 1915(i) state plan option, a waiver, or a demonstration project?*

## DBH Response

The District of Columbia received approval from the federal Centers for Medicare and Medicaid (CMS) in November 2019 to expand behavioral health services for Medicaid beneficiaries under the District's Medicaid Section 1115 Behavioral Health Transformation Demonstration. The demonstration which is expected to provide services for more than 80,000 District residents who are enrolled in Medicaid and have a behavioral health diagnosis started in January 2020.

This first-in-the-nation demonstration expands the array of evidence-based services to treat residents with a serious mental illness and/or substance use disorders and is part of the District's broader effort to address the opioid epidemic outlined in the District's Opioid Strategic Plan, Live.Long.DC. The demonstration will expand the range of services offered, improve data collection and transitions, and create a new focus on improving community service delivery for both mental health and Substance Use Disorder (SUD) services. The demonstration will complement the State Opioid Response grant and the recently-awarded SUPPORT Act planning grant to increase all Medicaid providers' capacity to diagnose, treat and provide SUD recovery services.

The demonstration will increase services available to District Medicaid beneficiaries by:

- expanding crisis stabilization and mobile outreach services and adding crisis psychiatric treatment,
- adding transition planning services for individuals leaving a hospital, IMD, or other facility,
- providing comprehensive recovery support services (RSS) for individuals with SUDs,
- adding coverage for psychologists and other licensed behavioral health provider services to independently treat individuals diagnosed with SMI/SED and/or SUD,
- adding psychosocial rehabilitative services to assist those with SMI in social networking, independent living, budgeting, self-care, and other skills that affect their ability to live in the community and secure and retain employment,
- providing behavioral health services to complement trauma informed care,
- providing prevocational work training and employment services, and
- eliminating of the $1 copayment for prescriptions for medication assisted treatment (MAT).

The table below includes services previously funded by local dollars included in the 1115 waiver that are now reimbursed by Medicaid.

| Service | Status Update |
|---|---|
| Supported Employment, Non-MHRS Vocational | Under the 1115 behavioral health demonstration, this services will be reimbursed by the Medicaid program as of January 1, 2020. |
| Residential Crisis Stabilization | Under the 1115 behavioral health demonstration, this service will reimbursed by the Medicaid program as of January 1, 2020. |
| Team Meeting | No alternate reimbursement mechanism available at this time. |
| Jail Diversion, Criminal Justice System | No alternate reimbursement mechanism available at this time. |
| No-Authorization Residential Crisis Stabilization | Under the 1115 behavioral health demonstration, this service will reimbursed by the Medicaid program as of January 1, 2020. |
| Transitional Service | No alternate reimbursement mechanism available at this time. |
| Choice Care Coordination | No alternate reimbursement mechanism available at this time.<br><br>See note below |
| FlexN Service | No alternate reimbursement mechanism available at this time. |
| Travel/Transportation | No alternate reimbursement mechanism available at this time. |
| MH Service, Discharge Treatment Planning Institution | Under the 1115 behavioral health demonstration, this service will reimbursed by the Medicaid program as of January 1, 2020. |
| MH Service, Continuity of Care Treatment Planning/ Institution | Under the 1115 behavioral health demonstration, this service will reimbursed by the Medicaid program as of January 1, 2020. |
| MH Service Discharge Treatment Planning Institution, Assertive Community Treatment | Under the 1115 behavioral health demonstration, this service will reimbursed by the Medicaid program as of January 1, 2020. |
| MH Service Discharge Treatment Planning Institution, Community Based Intervention | Under the 1115 behavioral health demonstration, this service will reimbursed by the Medicaid program as of January 1, 2020. |
| Community Psychiatric Supportive Treatment Program – Rehab/Day Services | No alternate reimbursement mechanism available at this time. |

*Q46. Provide an update on the status of establishing medical necessity criteria for mental health consumers.*

**DBH Response:**

With the approval of the 1115 Behavioral Health Transformation Demonstration waiver,  DBH is reviewing the new service provisions to determine any implications for the development of formal medical necessity criteria. DBH will engage the providers and partners before proposing new medical necessity criteria.

*Q47. DBH regulations provide that DBH conduct targeted compliance reviews of CSAs supported housing assessments and report the results to each CSA under review. DBH policies also require that DBH monitor certified providers to ensure compliance with DBH's housing procedures and programs, and that DBH utilize routine oversight and monitoring activities to determine whether CSAs are meeting their supported housing objectives. How does DBH conduct targeted compliance reviews and monitor certified providers to ensure compliance with its housing procedures and programs? What type of oversight and monitoring does DBH conduct to determine whether CSAs are meeting their supported housing objectives?*

**DBH Response**

DBH certified community-based providers (Core Service Agencies (CSA)) assess consumer housing level of care at consumer intake and periodically when engaging with the consumers and providing services as a part of the treatment planning process. DBH Licensure Division conducts annual compliance reviews of licensed Mental Health Community Residence Facilities.

DBH Housing staff formally meets monthly with CSA Housing Liaisons to review protocols for accessing the DBH array of housing, criteria for consumer eligibility for housing resources, and best practices in assisting consumers to manage their household affairs and to maintain their housing. DBH Housing staff provide technical assistance to CSAs to ensure that protocols are being followed.

Q48. *What percentage of Mental Health Community Residential Facilities (MHCRF), as a whole, are wheelchair accessible?*

**DBH Response**
Seven of the 93 licensed Mental Health Community Residential Facilities (MHCRF) have wheelchair accessibility. This represents eight percent of the total number and breaks down by facility type as follows: two of sixty-three SR level residences or 3 percent and four of twenty-eight (28) SRR level facilities or 14 percent. The one Intensive Residence CRF is wheelchair accessible.

*Q49. What percentage of Supported Independent Living (SIL) providers within the DBH system, as a whole, are wheelchair accessible?*

**DBH Response**

Of the forty-four SIL congregate residences, three or seven percent have wheelchair accessibility.

*Q50. What is the average wait time for consumers to access an accessible Mental Health Community Residential Facility (MHCRF)? What is the average wait time for Supported Independent Living providers (SIL)?*

**DBH Response**

In FY19, seven consumers were placed in MHCRF beds at locations with wheelchair accessibility within thirty-two (32) days.  However, there is little turnover in wheelchair accessible Mental Health Community Residential Facility (MHCRF), with some beds occupied for more than five years.

The average wait time to access an available Supported Independent Living (SIL) placement is less than two weeks.

Q51. *DBH does not currently have a process to prioritize applicants who need wheelchair accessible Mental Health Community Residential Facilities (MHCRF). Creating a process for accessible Mental Health Community Residential Facilities (MHCRF) is increasingly important as the DBH population ages and needs accessible housing. Will DBH update its application process to include whether applicants need an accessible room and any other reasonable accommodations? Will DBH develop a process to prioritize consumers who need accessible housing and create policies and procedures for providers to follow?*

**DBH Response**

DBH amended its CRF Application Package in FY18 to require that a Core Service Agency explicitly indicate the consumer's need for wheelchair accessibility, grab bars, and other accommodations.  Consumers who require wheelchair accessibility are prioritized for placement into available beds at CRFs with wheelchair accessibility. CRF providers and CSA staff will be provided with training and information regarding the prioritization process during joint meetings with CRF and CSA staff convened on a quarterly basis.  DBH reinforces with CRF providers that vacant accessible beds must be reserved for placement of consumers with a need for accessibility.   A written policy will be developed and finalized not later than March 31, 2020.

*Q52.  Of the total number of consumers that DBH serves, what is the number of consumers who are homeless?*

**DBH Response:**

An individual can self-identify as homeless or be categorized as homeless if they are without a stable living arrangement, are temporarily residing with family or friends, recently released from incarceration, residing in a shelter, or living on the street.

Using this definition, providers report on consumer living status to DBH. Of the 24,162 clients served in MHRS services, 4,299 (17.8%) were identified as experiencing homelessness by their MHRS providers.  Of the 6,447 clients served in FY19, 1,963 (30.4%) were identified as experiencing homelessness by their SUD providers.

*Q53.  In FY19, what array of services and support did DBH provide to homeless consumers? What were DBH's outcomes? How many DBH consumers in FY19, who were homeless, were placed in housing?*

**DBH Response**

Consumers who self-report as experiencing homelessness defined as living temporarily with family or friends, living in shelters or living on the streets receive the full array of behavioral health services including priority housing placement.   The 24 hour Community Response Team regularly engages through street outreach individuals experiencing homelessness to build relationships and encourage treatment. The CRT, provides on the spot psychiatric assessments, in person counseling and crisis support. It also assists with obtaining vital documents such as a birth certificate required to engage in services and provides transportation to appointments.  The team conducts specific outreach and education regarding opioids and other substance use disorder services and distributes life-saving naloxone.  During inclement weather or cold emergency alerts, the CRT supports the Department of Human Services in outreach and connection to emergency resources.

In FY19, thirteen consumers who identity as homeless were placed in DBH housing resources. In addition, other individuals experiencing homelessness who are receiving DBH services were housed through other resources including the coordinated entry process, specialty programs operating as part of the District's HUD funded Continuum of Care overseen by The Community Partnership for the Prevention of Homelessness (TCP) and the District's Interagency Council on Homelessness (DCICH).

Table 1 and Table 2 below show services provided to individuals who self-report identified as experiencing homelessness.  Please note that the numbers below do not refer to services provided to unique individuals since one individual likely received more than one service.

| Table 1. Mental Health Rehabilitation Service | Number of Consumers  Who Report Experiencing Homelessness |
|---|---|
| ACT | 618 |
| CBI | 3 |
| Community Support | 3523 |
| Counseling | 723 |
| Crisis Services | 451 |
| D&A | 1319 |
| Day Services | 175 |
| Health Homes | 213 |
| Medication Somatic | 1902 |
| Supported Employment | 106 |
| Transition Support Services | 178 |

| Table 2. Substance Use Disorder Service | Number of Clients Who Report Experiencing Homelessness |
|---|---|
| Urinalysis Collection- | 1551 |
| Counseling-Group Psycho-Educational- | 1535 |
| Counseling group- | 1487 |
| Diagnostic Assessment Comprehensive Adult- | 1449 |
| Counseling Individual On-Site, Behavioral Health Therapy- | 1429 |
| Case Management- | 1283 |
| Residential Treatment-Long Term Room & Board- | 1159 |
| Diagnostic Assessment, Brief, Modify Tx Plan- | 939 |
| Counseling-Group Psycho-Educational (HIV)- | 934 |
| Clinical Care Coordination- | 889 |
| Medication Management Adult- | 887 |
| Behavioral Health Screening - Determine Eligibility- | 517 |
| Breathalyzer Collection- | 495 |
| Crisis Intervention- | 482 |
| Short-term MMIWM- | 446 |
| Medication Assisted Therapy, Administration | 217 |
| Case Management HIV- | 207 |
| PsychoSocial Rehabilitative Service, Education Services, Group | 181 |
| Training and Skills Development, Life Skills, Adult, Group | 156 |
| Recovery Support Evaluation Alcohol/drug Assessment | 131 |
| PsychoSocial Rehabilitative Service, Education Services, Individual | 108 |
| Medication Assisted Treatment, Methadone, Clinic or Take Home- | 80 |
| Prevention Education Service, Recovery Mentoring, Coaching | 77 |
| Case Management Recovery Support | 53 |
| Counseling, Family with Client- | 33 |
| Environmental Stability, Supported Housing, Individual | 31 |
| Substance Use Disorder Services NOS, Spiritual Support Group | 20 |
| Counseling Family without Client- | 17 |
| Counseling Individual Off-Site- | 14 |
| Residential Treatment Room & Board, Woman w/1 child- | 13 |
| Ongoing Assessment and Plan of Care- | 9 |
| Residential Treatment Room & Board, Woman w/4 children- | 4 |
| Residential Treatment Room & Board, Woman w/2 children- | 3 |
| PsychoSocial Rehabilitative Service, Recovery Social Activities, Group | 2 |

*Q54. How does DBH ensure quality of mental health services within its provider network? Does DBH interview consumers of Core Service Agencies while conducting satisfaction surveys?*

**DBH Response**

Quality of services is measured in numerous ways such as claims audits, medical reviews, and consumer interviews. These are practices used by the Centers for Medicare and Medicaid Services, National Committee on Quality Assurance, and the Joint Commission.

DBH utilizes these practices to ensure quality in our behavioral health provider network in addition to offering training and technical assistance.  DBH conducts consumer satisfaction surveys that consumers and clients of mental health and substance use disorder providers and individuals in care at Saint Elizabeths Hospital.  If there are significant adverse findings of consumer satisfaction that rise to the level of concern, DBH refers these to the DBH Ombudsman, the Accountability Administration, or both depending on the nature of the report.

DBH uses data produced by the annual claims audit to plan and hold specific training and clinical technical assistance to address identified challenges.  Over the past year, DBH provided quality and compliance trainings and provided technical assistance to providers (particularly to new providers) based on review of provider service documentation. DBH also provides ongoing technical assistance to new and existing providers to address clinical practice.

In addition, the DBH Training Institute supports quality service through classroom training and eLearning in a wide range of best-practice mental health and substance use areas targeting direct service practitioners, clinical supervisors/managers, consumers, and leaders of the provider network.  In FY 19, the Training Institute awarded over 3,900 training certificates to participants.

*Q55. Please provide an update on the High Fidelity Wraparound Program.*
- *What is the current capacity of wraparound?*
- *Since MBI was awarded the Care Management Entity (CME) contract in 2017 with a reduced capacity to serve 94 youth in the community, how many youth were served in FY19 and to date in FY20?*
- *We understand that there has been a decrease in the flexible funding available per youth ($1,000 per youth). Please explain the decrease in funding? Are there any short term or long term plans to increase available flexible funding? Will DBH take steps to change high fidelity wraparound from a locally-funded pilot program to a Medicaid-funded permanent MHRS service? If so, what steps have been taken to date?*

**DBH Response**

High Fidelity Wraparound is a care coordination service and is a collaborative team-based care planning process where the family and the team implement, track, and adapt an individualized Plan of Care (POC) to achieve positive outcomes in the home, school, and community.  High Fidelity Wraparound is beneficial for families with complex unmet needs, multisystem involved, at risk of out of home or residential placement, disruption in school setting and high utilization of acute care.  The current contract was awarded through the Office of Contracts and Procurement competitive process to MBI Health Services for $1.1 million dollars. High Fidelity Wraparound is currently funded with local dollars.  The capacity is 94 youth and the chart below shows the number of youth served.

|  | FY17 (9/1/17) | FY18 | FY19 | Total YTD |
|---|---|---|---|---|
| Referred (new entry) | 3 | 53 | 45 | 6 |
| Total Served | 3 | 50 | 63 | 52 |

According to MBI, in FY 19, progress has been noted with the children and youth engaged in HFW:  97 percent of children and youth engaged in HFW were diverted from PRTF; 97 percent did not receive new juvenile charges; 91 percent maintained school placement; 79 percent improved school attendance; 76 percent decreased detention and suspensions in school, and 82 percent showed academic achievement. Six percent absconded from living environment.

Flexible funding has been budgeted at $1,000.00 on average per youth to pay for non-traditional supports based on available funding.  Some youth may need more than the average while others may need far less. Additionally, the provider is expected to identify and maximize both private and public community-based resources to meet each family's basic needs such as shelter, food, clothing, and income maintenance.

DBH continues to explore utilization of Medicaid funding for High Fidelity Wraparound with the Department of Healthcare Finance as part of our system transformation and planning.

*Q56. Please provide an update on DBH's efforts to identify providers to provide Multisystemic Therapy (MST) and Functional Family Therapy (FFT) to youth to fill the gap, in part, created by the abrupt closures of Youth Villages in June 2017, the only MST provider in the District, and First Home Care, an FFT provider, in October 2017. Please describe the barriers to identifying providers, including whether caused by low Medicaid reimbursement rates, billing limitations, and/or burdensome reporting requirements, and what steps will DBH take to attempt to overcome those barrier(s).*

**DBH Response**

During FY 18, DBH worked closely with providers to identify potential Multisystemic Therapy (MST) providers resulting in the certification of two new MST providers, MBI and Life Changing Solutions, in FY 19.  MBI opened for referrals in the first quarter while  Life Changing Solutions began accepting referrals in the third quarter of the fiscal year.

 During FY 18, DBH also worked with its contracted expert on evidence-based programs and the disseminator of the Functional Family Therapy ( FFT) model revamped the Intent to Negotiate (ITN) application process. The ITN is an initial screening for potential providers to develop and submit a proposed team structure that aligns with fidelity and certification requirements, a financial structure to sustain training and startup costs, and an outreach plan to obtain referrals. The initial screening assists teams in implementing structures that will sustain the model within their agency and meet fidelity standards. DBH held informational sessions with current and potential MHRS providers to explain the ITN process and provide technical assistance. The ITN screening process equipped agencies to quickly meet the MHRS certification criteria.

As an outcome of the ITN process, Anchor Mental Health (Catholic Charities was certified as an FFT provider. DBH funded the initial training to assist with startup costs. However, in the last quarter of FY 19, Anchor reported that it would cease offering FFT because of low enrollment and a growing financial deficit.  To address the concern regarding FFT sustainability, DBH is revising the regulations. DBH continues to work with providers and its expert consultants to promote the services and address challenges to increased participation such as removing FFT from Community Based Intervention Services to eliminate prior authorization which has been identified as a barrier to access.

*Q57. For FY 18, FY 19, and FY20 to date, please list: a) the total number of psychiatric residential treatment facility (PRTF) and the total number of residential treatment center (RTC) admissions of a child and youth receiving MHRS (may include duplicate counts of those children or youth with multiple admissions during the Fiscal Year), b) the unduplicated number of children, and of youth, receiving MHRS and served in a PRTF or RTC.*

**DBH Response**

DBH has the responsibility and authority to determine medical necessity for all psychiatric residential treatment facility (PRTF) placements for Medicaid eligible children and youth and monitor their treatment.  We do not have the responsibility and authority for a residential treatment center (RTC).

As indicated in the chart below, 81 children and/or youth received treatment in a PRTF in FY18. Of the 81, 44 were new admissions.  Six of the 44 children and/or youth received services MHRS through DBH six months prior to admission. In FY19, 81 children and/or youth required treatment in a PRTF.  Of the 81, 43 were new admissions.  Of the new admissions, two received services through the DBH behavioral health network six months prior to treatment.

To date in FY20, 47 youth receive treatment in a PRTF.  Eleven of the 47 are new admissions. None of the 11 children and/or youth received MHRS six months prior to admission. Children and/or youth who are not involved in MHRS through DBH may have received services provided through their Managed Care Organization (MCO), Free Standing Mental Health Clinic (FSMHC) or private entity. DBH does not capture this data.

| Fiscal Year | Admission | Services six months prior to admission | Total PRTF |
|---|---|---|---|
| 2018 | 44 | 6 | 81 |
| 2019 | 43 | 2 | 81 |
| 2020 Q1 | 11 | 0 | 47 |

*Q58. What resources, and how many FTEs, are assigned to the Access Help Line? Will there be any changes during the remainder of FY20? How is DBH standardizing operating procedures, practices, manuals, or other business process and workflow systems for the Access Help Line? How will Access Help Line staff members be trained to carry out changes to their process, and if needed, to their roles and responsibilities? How can callers to the Access Help Line escalate concerns when they believe contact is not successfully connecting consumers or eligible District residents to needed services? If concerns are escalated, how does DBH define a timely response? How often escalated concerns are currently addressed in a timely manner?*

**DBH Response**

The Access Helpline is a 24-hour call service staffed by behavioral health professions who respond to crisis calls and dispatch crisis services if needed; enroll individuals in the DBH system of care; assists with consumer transfers between providers, and provides authorization for specialty services. The Access Helpline also includes a "Warm Line" and is certified in suicide prevention. Language interpretation services are available.

A total of 19 FTEs assigned to the Access Helpline are comprised of the Director and Deputy Director, five Counselors, four Care Coordinators, six Clinical Care Coordinators, and two administrative staff. The staff is properly resourced with standard office equipment as well as equipment to support continuity of operations offsite during emergencies. A big-screen monitor displays call activity in real-time so a supervisor can step in as needed to make staff changes.

Implementation of the 1115 Behavioral Health Transformation requires the establishment of new pre-authorization and re-authorization requirements for new services. Staff will be trained on these new requirements as well as any new processes associated with changes in the regulations. As recommended by the American Association of Suicidology, all staff have been retrained in best practices for assessment of suicide risk and are required to complete assigned online trainings.

Over the past year, a comprehensive review took place of all procedures, including call protocols, procedures for enrolling consumers, and entering benefit and service authorizations and reauthorizations for services in the electronic medical records for mental health and substance use disorder services. An operations manual is in development which will outline all internal procedures, including authorizations; appropriate handling of complaints, and data collection protocols.

Complaints or concerns are resolved as quickly possible but timely response is defined as within 24 hours or the next business day. A caller can escalate concerns immediately to a supervisor in charge (a clinical coordinator) or to the Director or Deputy Director who alternate on-call back-up responsibilities when neither is onsite. Concerns that remain unresolved are elevated to the Deputy Director of Adult Services who works with the team and the Chief Clinical Officer to seek satisfactory resolution. Some complaints are referred to the DBH Ombudsman, such as those regarding a DBH certified or contracted provider partner. Data on the time required to resolve escalated concerns is not collected.

*Q59. Please provide detailed information about proposed changes to the ARC. When consumers who are not enrolled in services arrive at a DBH certified community-based provider, what will the new enrollment process be? Will changes to the ARC mean SUD providers are now allowed to bill for initial assessment services? Does the budget reflect this additional expense for SUD providers?*

**DBH Response**

The Assessment and Referral Center (The ARC) is the DBH-operated same day service for assessment and referral to certified providers of substance use disorder (SUD) services. The ARC also conducts voluntary health screenings for HIV and Hepatitis C, and pregnancy tests. The ARC provides transportation to the withdrawal management (detox) program as well as residential service and DBH-certified methadone clinics as needed. The ARC also makes referrals to providers of all FDA-approved medication assisted treatment.  The ARC will refer individuals to medical care or call for emergency care when needed.

The mobile ARC travels to targeted locations throughout the District to conduct mental health and substance use screenings and enroll individuals in services. It also conducts health screenings and educate about substance use disorder services. The ARC collects data on the self-reported drugs of choice including K2 to support surveillance of drug usage in the District.

Data show that care-transitions that necessitate answering sensitive personal questions multiple times prior to entering treatment erode motivation and lead individuals already ambivalent about seeking treatment to walk away in frustration. In FY 19, to make it easier to access to SUD services, DBH began to certify community based providers to assess and enroll on site. The providers will assess the client and refer them to an appropriate level of care per the ASAM guidelines.  Seven providers now are certified with the goal of all of SUD providers providing assessment and referral services in FY20.

There is early indication that this approach is expanding access with a 3.7 percent increase in SUD intakes between July-Dec FY19 compared to the same time period in FY 18.

DBH is committed to working with its provider partners to provide technical assistance and to address any perceived unanticipated costs associated with new enrollment process.

*Q60.  District contracts are usually offered as a base year plus four option years. Has DBH considered aligning its provider certification process with the five year contract cycle? So long as other periodic reviews of critical information continue, what would be DBH's major concerns with extending the provider organization certification to match the period for which contracts normally last? Are there other steps DBH could reasonably take to reduce duplication of administrative activities and paperwork by sharing information between DBH certification and recertification efforts and OCP solicitations and post-award documentation?*

**DBH Response**

DBH has considered aligning the certification process with the five year contract cycle.  While we are not opposed to doing so, our current regulations do not allow for a five year certification period.  Currently, with the two year certification period, a provider has a built-in deadline to remediate all compliance issues before they are recertified.  For a five year certification period to occur, we would need to consider how a longer certification period would impact our ability to hold a provider accountable for quality and compliance issues that are more serious in nature.

DBH has aligned the certification process with the Request for Qualification (RFQ) process. Regulatory changes will allow prospective providers to become provisionally certified without incurring costs to hold a lease. Provisionally certified providers may respond to an RFQ.  While the provider would still need to submit two sets of documentation, the barrier of long term waiting periods before a Solicitation is open for a particular service has been removed.  DBH will work with OCP to best meet DBH's need to maintain an adequate supply of providers through a flexible procurement process.  DBH is reviewing our requirements to ensure only essential information that would be necessary for a qualification determination will be included as a part of the provider's submission.  We continue to look for more ways to make this process less burdensome on the providers while still holding them to a high standard that would translate to quality care received by District residents.

*Q61.  How many children (0-20) received a service through MHRS during FY19? How does this compare to the number who received a service in FY17 and FY18.*

**DBH Response**

In FY19, 3692 children and youth received a service through MHRS. The chart below represents the comparison of the number of children and youth who received a service in FY17 and FY18.

**Number of Children (0-20) Served in MHRS**

| FY | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| # Children Served between (0-20) | 5060 | 5512 | 4807 | 3821 | 3692 |

Q62. Please provide an updated list of all Evidence-Based Practices (EBP) and for each EBP please note:

- The name of each provider who offers it;
- Each provider's capacity;
- Each provider's current enrollment;
- Whether the EBP is Medicaid-reimbursable and if so, under what code or rate;
- Any quality assessment or outcome measure that have been put in place to assess the program; and
- Whether the EBP is trauma-informed.

**DBH Response:**

DBH currently offers eight Evidence-Based Programs or (EBPs) which are Child Parent Psychotherapy (CPP), Parent Child Interaction Therapy (PCIT), Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), Functional Family Therapy (FFT), Multi-Systemic Therapy (MST), Trauma Systems Therapy (TST), Transition Into Independence (TIP), Adolescent Community Reinforcement Approach (ACRA).

According to fidelity, each EBP has requirements regarding the number of cases per clinician. Each EBP provider varies in the number of staff currently assigned to each EBP program. The number of cases per clinician and the specific EBP impacts the capacity. In FY19, EBP providers have experienced turnover which has impacted their respective team's capacity.

DBH is partnering with current vendor, Evidence-Based Associates (EBA) to identify barriers to access to the different evidence based programs. EBA is also working on revising outreach plans with the providers to include targeted outreach strategies that will increase awareness and knowledge of the various EBPs within the District which will increase referrals to and engagement in the EBPs. DBH is also utilizing support from DC Social Emotional Early Childhood Development (DC SEED) grant to develop a sustainability plan for Early Childhood models (PCIT and CPP) to improve access and support providers in offering appropriate trainings and consultation by national purveyors and technical assistance such as establishing a learning collaborative to implement the models.

**Child Parent Psychotherapy (CPP)**

CPP has four providers: the DBH Parent and Early Childhood Enhancement Program (PIECE) which has a current capacity of 20 and current enrollment of 15; Mary's Center which has a current capacity of 11 and current enrollment of 12; Community Connections which has a current capacity of 8 and a current enrollment of 4, and Medstar Georgetown has a current capacity of 6 and a current enrollment of 3.  CPP is Medicaid-reimbursable and uses code H0004-HT. A CPP Consultant is assigned to each provider and conducts annual fidelity reviews to assess each provider's compliance with fidelity to the model. This model is trauma-informed.

**Parent Child Interaction Therapy (PCIT)**

PCIT has four providers: the DBH Parent and Early Childhood Enhancement (PIECE) Program which has a current capacity of 17 and current enrollment of 9; Mary's Center which has a current capacity of 21 and current enrollment of 17, Community Connections which has a

current capacity of 11 and a current enrollment of 4, and Medstar Georgetown has a current capacity of 16 and a current enrollment of 2. It should be noted Medstar Georgetown is a newer provider and has just completed training and recruitment at the end of FY19. PCIT is Medicaid-reimbursable and does not have a specifically assigned code. When implementing PCIT, providers utilize the Counseling code which is H0004. A PCIT Consultant is assigned to each provider and conducts annual fidelity reviews to assess each provider's compliance with fidelity to the model. This model is not trauma-informed.

**Trauma-Focused Cognitive Behavioral Therapy (TF-CBT)**

TF-CBT has five providers: Maryland Family Resource which has a current capacity of 35 and current enrollment of 19; Community Connections which has a current capacity of 14 and current enrollment of 3, Hillcrest Children and Family Center which has a current capacity of 15 and current enrollment of 8, Latin American Youth Center which has a current capacity of 14 and current enrollment of 7, and Life Enhancement Services which has a current capacity of 11 and current enrollment of 0. LES has experienced turnover in leadership and staff which impacted the TF-CBT Team. LES is in the process of hiring clinicians and training staff to rebuild the TF-CBT team.

TF-CBT is Medicaid-reimbursable and utilizes code H0004-ST. A TF-CBT Consultant is assigned to each provider and conducts annual fidelity reviews to assess each provider's compliance with fidelity to the model. This model is trauma-informed.

**Functional Family Therapy (FFT)**

FFT has two providers: Parent Adolescent Support Services (PASS) which has a current capacity of 36 and current enrollment of 37 and Hillcrest Child and Family Center which has a current capacity of 12 and current enrollment of 0. Hillcrest has informally notified DBH of the plan to close their FFT team once the current caseload of youth and their families have completed the program. Hillcrest closed their FFT program to any new intakes. FFT is Medicaid-reimbursable and utilizes the code H2033-HU. Each FFT provider is assigned a FFT consultant and fidelity is measured and reviewed three times per year to assess a provider's performance, fidelity, and implementation characteristics of each program. FFT is not trauma-informed. CFSA plans to support the expansion of Functional Family Therapy (FFT) utilizing the Community Based Child Abuse Prevention or (CBCAP) funding to provide intensive therapeutic interventions to families as a key service to prevent or reduce child abuse and neglect. DBH will use the funding to identify, train and monitor the fidelity of the model by a community mental health provider and track the utilization and success of the treatment modality.

**Multi-Systemic Therapy (MST)**

MST has two providers: MBI which has a current capacity of 12 and current enrollment of 9 and Life Changing Solutions which has a current capacity of 12 and current enrollment of 6. MST is Medicaid-reimbursable and utilizes code H2033. Each provider is assigned an MST Expert which completes a Program Implementation Review (PIR) every six months which outlines areas of strength in the program as well as areas in which improvement in implementation is needed. Each PIR follows an action plan to highlight goals and objectives for improvement. MST is not trauma-informed.

**Trauma Systems Therapy (TST)**

TST has two providers which are Maryland Family Resources which has a current capacity of 11 and current enrollment of 5 and Hillcrest Children and Family Center which has a current capacity of 12 and current enrollment of 9. TST is Medicaid-reimbursable and does not have a specifically assigned code. When implementing TST, providers utilize the Counseling code which is H0004. Each provider is assigned a TST consultant which completes fidelity reviews annually. TST is trauma-informed. The new 1115 Behavioral Health Transformation Demonstration waiver includes TST which will establish Chapter 34 regulations that reflect fidelity such as team structure. The implementation of the waiver regarding TST is anticipated to begin in March of 2020. An increased reimbursement rate will be established which will fiscally support current providers to hire sufficient staff to serve trauma impacted families.

**Transition Into Independence (TIP)**

TIP has five providers: PASS which has a current capacity of 90 and current enrollment of 65; Life Enhancement Services which has a current capacity of 33 and current enrollment of 0. LES has experienced turnover in leadership and staff which has impacted the TIP Team. LES is in the process of hiring and training staff to rebuild the TIP team; MBI which has a current capacity of 135 and current enrollment of 167; Community Connections which has current capacity of 150 and current enrollment of 97, Wayne's Place which has a current capacity of 29 and current enrollment of 30. TIP is Medicaid-reimbursable and does not have a specifically assigned code. When implementing TIP, providers utilize the Community Support code which is H0036. Each provider is assigned a TIP Consultant which completes fidelity reviews annually. TIP is not trauma-informed.

**Adolescent Community Reinforcement Approach (ACRA)**

ACRA has three providers: Federal City which has a current capacity of 70 and current enrollment of 1. Hillcrest which has a current capacity of 50 and a current enrollment of 5, and LAYC which has a current capacity of 20 and a current enrollment of 12. Both Federal City and Hillcrest have indicated difficulty with referrals and retaining the youth once enrolled in their programs. DBH through the DC CITY grant is working with all three of the providers on developing referral agreements with key stakeholders including DYRS, Court Social Services, CFSA, and schools. In addition DBH will be providing training on family engagement to all providers and DBH's Family Engagement Coordinator and Youth Coordinator will be working with all three agencies on providing supports to youth and families to access treatment. ACRA is Medicaid-reimbursable and utilizes code H2033-HA, HF. ACRA Fidelity is monitored by Chestnut Health Systems through coaching calls and session reviews. ACRA is not trauma-informed.

In FY19, DBH was among the stakeholders to assist CFSA in the development of Family First Prevention Plan. CFSA's Prevention plan was in response to the Family First Prevention Services Act (FFPSA) of 2018, which aims to provide federal funding for prevention services for children and families who are at risk of entering foster care. CFSA's prevention plan, submitted to the Administration for Children and Families in April 2019 was approved in October 2019. One of the key elements of the approved plan was the increase funds for evidence-based prevention activities/services. Of the evidence based prevention (EBP) services to support mental health and substance use disorders and in home parenting, DBH supports six of the

interventions.  The six EBP Intervention include Trauma Focused Cognitive Based Therapy (TF-CBT), Parent Child Interaction Therapy (PCIT), Functional Family Therapy (FFT), Multi-Systemic Therapy (MST), Adolescent Community Reinforcement Approach (A-CRA), and Transition to Independence (TIP).  CFSA launched Family First on October 1, 2019.  CFSA has since added another trauma model intervention to their service array, Child-Parent Psychotherapy (CPP), for which DBH also supports.

*Q63.  Please provide a description and an update on the Behavioral Court Diversion program including:*

- *A description of which youth are eligible to participate in the program;*
- *The process or protocol for selecting or referring youth to the program;*
- *The number of youth who participated in FY19 and to date in FY 20, the type of status offense they were alleged to have committed, the referral source (i.e., judge, probation officer, prosecutor, etc.) and the outcomes for youth in the program;*
- *The recidivism rate of the youth participants and an explanation of how recidivism rates are measured;*
- *Any costs associated with the program; and,*
- *The program's capacity and any expansion plan or barriers to expansion.*

**DBH Response:**

The Juvenile Behavioral Diversion Program (JBDP) is a mental health based solution or specialty court that provides intensive case management and mental health services to youth in the juvenile justice system with significant mental health concerns.  The JBDP has operated within the DC Superior Court Juvenile Division since January 2011.  This program connects and engages juveniles and their caregivers/families in appropriate community-based mental health services and supports and provides for a period of engagement during which the court monitors both the implementation of mental health services and the youth and families' participation in those services. Court-involved juvenile status offenders are given the option of voluntarily participating in mental health services rather than being prosecuted. The goals of the program are to: (1) increase the number of youth able to remain in the community with improved functioning in the home, school and community with appropriate mental health services and supports, (2) reduce the likelihood of the youth's further contact with the criminal justice system as a youth and later as an adult, and (3) to reduce crime in the community and protect public safety. This program is intended for children and youth who are often served within multiple systems who are at risk of re-offending without linkage to mental health services and other important supports. Participants are required to attend regular court status hearings to monitor progress and to participate in mental health services and other specified court conditions.  Youth generally participate in the program from three months to one year, depending on the pace of their overall progress towards individualized goals, as determined by the child and family's service team. The team is comprised of all individuals assisting in the youth's service plan (e.g. the youth/family/service providers/probation officer/defense counsel/Education Attorney/AAG and JBDP Judge).

**Eligibility Criteria:** This program serves juvenile offenders who are 18 years of age or younger at the time of the offense.  A juvenile offender can be referred by the initial hearing judge, the juvenile calendar judge, the Assistant Attorney General (AAG), the youth's defense attorney or a Court Social Services Probation Officer.  Eligibility is determined by a two-step process. The Office of the Attorney General (OAG) reserves the right to permit or decline allowing a youth to participate in the program.  This determination is made based on a variety of factors including: prior and current contacts with the court, the nature and circumstances surrounding the offense, mental health needs, and other relevant social factors.  Once a juvenile is deemed legally eligible and screened for a mental health diagnosis, a referral is made to the Suitability Committee for the

final eligibility determination.   The Suitability Committee, co-chaired by DBH and Court Social Services Division is composed of members from Court Social Services, the Child Guidance Clinic, and Community Services Agencies (CSAs) that are affiliated with the JBDP. In FY19, Latin American Youth Center, MBI and Hillcrest Children's Center were the CSA's that participated in the Suitability Committee.  These CSAs service the majority of the youth in the program and collectively offer the range of services most highly utilized by program participants. The Committee determines if the youth meets the basic clinical criteria, which includes the following: (1) the presence of a primary mental health diagnosis and; (2) that the youth is able to participate in community-based services at the time of entry into the program.  Multiple other factors that may impact a youth's ability to fully participate in the program, utilizing a biopsychosocial model of assessment, are also considered to determine final "suitability."

Following the review, the Committee renders recommendations for individualized services for each youth that are both comprehensive and holistic.  These recommendations are forwarded to all court officials involved in the youth's case, regardless of their outcome of eligibility for the program.  All youth enrolled in JBDP receive mental health services through the DBH provider network and are supervised by Court Social Services.

**Number of Youth Served.**  The data related to this program are collected for each calendar year. In calendar year 2019, 72 youth were involved in JBDP.  The number of youth served in this program decreased in calendar year 2019 since some of the youth previously served in this program received services through the HOPE Court launched during this period.

| Type of Offenses | *Number of Offenses Of all youth  enrolled in FY19 |
|---|---|
| Unlawful Entry and Assault (Threats, Simple Assault, Assault on Police) | 25 |
| Theft (Shoplifting, Theft II) | 10 |
| Robbery – UUV-Burglary | 18 |
| Destruction of Property/Fare Evasion | 5 |
| Runaway | 0 |
| Truancy | 3 |
| Sex Abuse | 1 |
| Possession of Weapon/Ammunition | 15 |
| Assault with Weapon | 10 |
| Possession of Controlled Substance | 3 |
| Total | 90 |

* Some youth have multiple charges.

The Court Social Services' Child Guidance Clinic is responsible for collecting and analyzing program data.  Recidivism is defined as "a plea or found involved" in a crime one year after

completion of the program. The data collected to date for the 2018 cohort indicates a recidivism rate of 25 percent which is far below the national average of 43 percent to 50 percent. Since the recidivism rate is calculated one year post graduation, this rate is not final because the entire cohort from 2018 has not reached one year post graduation. Data is not yet available for the 2019 cohort. Below is data since the program's inception in calendar year 2011.

**JBDP 2011-2018 Enrolled Recidivism Rates since the Program's Inception**

| Calendar Year | Total Number of Youth Enrolled | Total Reconvictions (youth can have multiple reconvictions) | Recidivism Rate (percentage) |
|---|---|---|---|
| 2018* | 56 | 14 | 25 |
| 2017 | 95 | 19 | 20 |
| 2016 | 61 | 9 | 14.5 |
| 2015 | 33 | 6 | 9 |
| 2014 | 54 | 12 | 24 |
| 2013 | 42 | 6 | 13 |
| 2012 | 62 | 19 | 30 |
| 2011 | 54 | 4 | 7 |

*post one year for graduated participants

The cost for the salary of a DBH FTE social worker which is $116,145.00.

The program capacity is 100 youth per year.

*Q64. Please provide an update on the Agency's early childhood mental health projects, including any studies or reports. For the Parent Child Infant Early Childhood Enhancement Program include a description of the services provided, the type of clinicians employed, their capacity, and the number of children served, and how the cases ended (e.g. successful completion, closure for lack of attendance, etc.) in FY19 and to date in FY20. For the Early Childhood Mental Health Consultation Project, list the child care centers, homes, and schools that are participating, the services they have received and provide any progress/outcome measure available. For the Behavioral Health Access Project, list the number of individual patients who participate in the Project, the number of pediatric primary care providers who have been using the Project, and any efforts made by DBH to engage other pediatric primary care providers in using the Project.*

**DBH Response**

The service array of behavioral health services and supports for young children and families reflects best practices and evidence-based programs proven to have good outcomes. A report published by the National Technical Assistance Center for Children's Behavioral Health (Horen, 2016) indicates that services for the early childhood population should include prevention, early intervention and treatment services.  The following programs and services provide support to young children and families:  Parent Child Infant Early Childhood Enhancement Program (PIECE) which provides early childhood mental health treatment services to young children and families; the DC Social Emotional and Early Development (DC SEED) project which is expanding early childhood-specific evidence-based treatment programs; Healthy Futures which implements Early Childhood Mental Health Consultation services within Child Development Centers across the District, and DC MAP which supports screening and mental health services in pediatric care settings.

**The Parent Infant Early Childhood Enhancement Program** (P.I.E.C.E.) is consistent with research which recognizes that early childhood intervention programs have the potential to alter cognitive, emotional and behavioral challenges in the lives of young children. The P.I.E.C.E. Program serves young children and their families from birth to seven years old. The goal of the PIECE Program is to intervene early with comprehensive services designed to prevent social emotional/behavioral challenges, reduce stressors with the parent child relationship and family from adversely affecting the developing child. The program provides family focused behavior management, individual and family therapy/counseling, art and play therapy, psychoeducational parenting group, developmental screenings, psychiatric/medication management, home/school visitation, and mental health services for prenatal and postpartum women. For Fiscal Years 18, 19 and 20, The PIECE Program continues to serve as an approved graduate level field placement site for the University of the District of Columbia, Howard University, and Catholic University.

 The P.I.E.C.E. Program utilizes two evidence based practices: Parent Child Psychotherapy (PCIT), which is a play therapy evidence-based practices that strengthens the relationship between parent/caregiver and the child and Child Parent Psychotherapy (CPP) which is a therapy for parents with infants, toddlers and preschoolers who have experienced trauma(s). The data for the two evidence based practices for FY 19 were for Parent Child Interaction (PCIT). (See Table 1 below)

| Table 1.  PIECE Evidence Based Practice Utilization | | | |
|---|---|---|---|
| Evidenced Based Practice | FY 18 | FY 19 | FY 20 YTD |
| # of children receiving CPP | 35 | 24 | 18 |
| # of children who received PCIT | 23 | 23 | 17 |

*For the fiscal year agreement with Evidence-Based Associates, PIECE was to serve 15 PCIT cases and 22 CPP Cases. The PIECE met and exceeded this agreement.

Several staff from the P.I.E.C.E. program are apprentice trainers and consultants to the District of Columbia DBH SOC SAMHSA expansion grant called DC SEED. The P.I.E.C.E. staff are participants on weekly conference calls to discuss implementation, data collection, clinician supervision and sustainability of the expansion grant, in addition their involvement in the training of staff from three CSAs (Foundations, Mary Center and Community Connections). The grant involves training of the three aforementioned CSAs in two evidence-based interventions, CPP and PCIT. P.I.E.C.E. staff include two child psychiatrists, a clinical psychologist, and 5 clinicians (LICSWs, LGSW, PHD and LPC) the caseload capacity is 140 clients. The psychiatrists serve children and adolescents for both the P.I.E.C.E. Program and the Urgent Care Clinic. The psychiatrists provide psychiatric evaluations. The five clinicians provide treatment services to children under the age of 7. (See attachment 2 Table 2).

| Table 2. PIECE Client Utilization | | | | | | |
|---|---|---|---|---|---|---|
| Fiscal Year | Capacity* | Total Continuous Cases | Total Served** | CFSA Involved | Successful Discharges | Administrative Discharges** |
| FY18 | 140 | 110 | 215 | 66 | 27 | 78 |
| FY19 | 140 | 108 | 205 | 54 | 22 | 75 |
| FY20 YTD | 140 | 100 | 129 | 34 | 7 | 22 |

*The current capacity for the PIECE program based upon the maximum number of continuous cases at one time on a monthly basis. This is determined by the caseload capacity of the available clinicians.
** The total number of clients served is calculated by the number of total continuous cases and discharges, both administrative and successful.
***Administrative discharges included cases that may have not presented since intake, lack of attendance, and changes in placements or moves.

**The Healthy Futures Program**
The Healthy Futures Program provides consultation services to child development centers and home childcare providers, as well as directly to children and families.  These services are provided by a mental health professional with the goals of building professional skills and capacity to promote social emotional development and prevent escalation of challenging behaviors. Decreasing, with the goal of eliminating, early childhood expulsion and increasing appropriate referrals for additional assessments and services are also goals of the program. Child

development centers and home providers serviced by Healthy Futures are located in every Ward with a concentration in Wards 4 and 8.

| Healthy Futures 61 Child Development Facilities | | |
|---|---|---|
| **Ward** | **Child Development Centers** | **Home Providers** |
| One | Barbara Chambers Children's Center<br>Bell Teen and Child Development Center<br>CentroNia<br>Christian Tabernacle I<br>Easter Seals<br>Jubilee Jumpstart<br>Martha's Table – Maycroft<br>Rosemount Center | |
| Two | Edward C. Mazique Parent Child Center | Ms. P's Unique Development |
| Three | CommuniKids<br>CommuniKids – Van Ness<br>CommuniKids – The Church | |
| Four | Bright Start Child Childcare & Preschool<br>Christian Tabernacle II<br>Gap Community Children Center<br>Goldies Child Development Center #1<br>Goldies Child Development Center #2<br>Ideal Child Care Development Center #1<br>Ideal Child Care Development Center #2<br>Love and Care CDC LLC<br>Spanish Education Development Center | Blooming Minds<br>God is Good Child Development Home<br>Infancia Feliz<br>Kings and Queens<br>Little Blessings, LLC<br>Renaissance Early Childhood Education |
| Five | Associates for Renewal in Education, Inc.<br>Home Away From Home<br>Kennedy Institute<br>Nation's Capital Child & Family Center | |
| Six | Board of Child Care<br>Bright Beginnings | |
| Seven | Community Educational Research Group<br>First Rock Baptist CDC<br>Saint Timothy Episcopal CDC | Amen Family<br>Bert Family Child Care<br>LTH Infants and Toddlers<br>Promoting Love and Wisdom |
| Eight | Big Mama's Children Center<br>Dawn to Dusk<br>Kids Are Us Learning Center I<br>Kids Are Us Learning Center II<br>Martha's Table - The Commons<br>Matthew's Memorial CDC<br>National Children's Center<br>Saint Phillip's Child Development Center<br>Southeast Children's Fund Child I<br>Southeast Children's Fund Child II<br>Sunshine Early Learning Center | Angel's Arena Child Care<br>Blessing<br>Bright Horizon<br>Kiddie Academy<br>Miriam's Growing Seeds<br>Our Children First<br>Point of Care<br>Tiny Tots |
| Total: 61 | 42 Child Development Centers | 19 Home Providers |

The utilization data for FY19 of the Early Childhood Mental Health Consultation Program shows 1,825 young children in 42 child development centers and 19 home providers had access to consultation.

| Table 2.  Early Childhood Mental Health Consultation Utilization Data | | |
|---|---|---|
| **Service Provided** | **FY 19** | **FY 20 YTD (Quarter 1: October – December 2019)** |
| # of children referred to Healthy Futures for child-specific services | 182 | 150 |
| # of children who received child-specific consultation | 205 | 101 |
| # of prevention/early intervention sessions | 2,566 | 707 |
| # of staff and parent presentations | 150 | 46 |
| # of classroom observations | 233 | 98 |
| # of parent consultations | 490 | 137 |
| # of teacher/staff consultations | 2,684 | 816 |
| # of consultations with Center Director | 1,167 | 303 |
| # of children referred for outside services | 32 | 16 |
| # of abuse/neglect reports | 5 | 5 |
| # of expulsions | 1 | 0 |
| # of children who had access to consultation (Approximate) | 1,825 | 1,990 |

In FY19, one child was expelled out of the 42 centers where the Healthy Futures Program was implemented. Child specific consultation data in FY19 showed 80% improvement in at least one area of concern (attachment, initiative, self-regulation, and/or protective factors.) Programmatic consultation data in FY19 showed each of the teaching teams that remained together for the entirety of the academic year improved in their overall social-emotional teaching skills.  Center directors' feedback has been overwhelmingly positive. 25% (15 total responses) of directors responded to the Healthy Futures Director Survey in FY19 with 100% of the directors surveyed stating that they are satisfied or very satisfied with the Healthy Futures Program. 100% of the directors surveyed also said they would recommend Healthy Futures to other directors.

**Behavioral Health Access**
DC MAP (Mental Health Access in Pediatrics
Since launching in 2015, DC MAP (Mental Health Access in Pediatrics; has had a significant impact on improving the mental health access for children in the District. The program offers

primary care providers (PCPs) real-time phone access (Monday-Friday, 9am-5pm) to a team of mental health professionals, including psychiatrists, psychologists, social workers, and care coordinators. In addition to answering mental health-related inquiries about specific children (e.g., questions about community resources that would be appropriate for the family, medication questions), the DC MAP team also provides education and technical assistance for PCPs about identifying and addressing mental health issues in primary care. Since DC MAP started in May 2015 through December 2019, DC MAP received almost 3000 (2986) consultation requests generated from primary care, regarding 2486 unique patients.

In the past 15 months—between the beginning of FY19 through the end of Q1 of FY20— PCPs have consulted DC MAP regarding 1037 unique patients. Over 75% of the consultation requests received are for children with DC Medicaid. The demand for care coordination services has continued to be high. The breakdown of the past 15 months (FY19 and FY20 Q1) is as follows: 89% were calling at least in part for resource/referral information/care coordination, 16% were routed to a DC MAP psychiatrist and 8% involved support from a DC MAP psychologist/social worker. PCP enrollment has steadily continued to increase over the past few years. As of December 2019 (end of FY20 Q1), 323 PCPs have enrolled in DC MAP and 392 PCPs have used the service. In addition to PCP enrollment, 30 primary care sites have formally enrolled in DC MAP. However DC MAP has a wider reach and has worked with PCPs from 56 different clinics in the DMV area. Please note that while enrollment is not required for first time PCPs, enrollment is strongly encouraged. Also to note is that practice enrollment is separate from PCP enrollment; however PCPs can enroll even if their practice is not enrolled.

The Department of Behavioral Health has supported DC MAP through funding and regular contact with a DBH Program Officer. The DC MAP team continually attempts to engage more providers in using the service. DC MAP outreach efforts include personalized emails, phone calls, and letters to practice directors, as well as in-person visits to these sites. During these outreach visits, the DC MAP team provides information about DC MAP; enrolls the practice and providers in the program; offers education in the form of case discussion or didactic teaching; and engages PCPs in in-person case consultation. Since 2015, clinicians have conducted over 170 site visits and 950+ practice contacts including phone and email. DC MAP clinicians are also available to provide technical assistance and support to PCPs in implementing mental health screening. Thus far, efforts have included discussing screening with practice sites during in person visits and meeting with local agencies, such as the DC Department of Healthcare Finance (DHCF), about ways to support practices. The DC MAP team has made expert recommendations around screening tools for use in primary care and has disseminated practice report cards with information about mental health screening rates and DC MAP utilization. DC MAP is excited to be partnering with the Pediatric Health Network, a clinically integrated network of over 1500 pediatricians in the DMV area to launch a Behavioral Health Project ECHO (planned launch in late spring 2020). The ECHO will focus on the assessment, treatment, and management of ADHD, anxiety, and depression which are the three mental health topics that PCPs express needing the most support for managing in primary care.

*Q.65 Please provide an update on the implementation of the DC SEED Grant.*

**DBH Response:**

The DC Social, Emotional and Early Development (DC SEED) initiative focuses on addressing the unmet behavioral health needs of young children, birth to 6 years-of-age, who are at high risk for or diagnosed with serious emotional disturbance (SED) and their families. Funds support the expansion and implementation of early childhood-specific, evidence-based programs proven effective with young children.

DC SEED began Year 4, the last year of the grant, in October 2019.All three DC SEED providers (i.e., Community Connections, Georgetown MedStar, and Mary's Center) expanded services to reach young children and their families. As a result of bringing on a new provider in FY19 (i.e. MedStar Georgetown replaced Foundations for Home and Community who closed on 8/31/18), DC SEED provided additional evidence based training in Child-Parent Psychotherapy (CPP), Parent-Child Interaction Therapy (PCIT) and Strengthening Families Coping Resources (SFCR). In addition to the clinicians trained during FY18 (i.e.,12 clinicians in CPP and 6 clinicians in PCIT), DC SEED trained 5 additional clinicians in CPP, 6 additional clinicians in PCIT, and 15 participants were trained in SFCR.

DC SEED clinicians provided services to 60 young children and families during FY19. Specifically, 28 young children and families received CPP services and 32 young children and families received PCIT services. Clinicians will begin implementing SFCR in January 2020. In addition to expanding the capacity of early childhood behavioral health treatment services, DC SEED provided additional support to young children, families and staff working in Child Development Centers (CDC).

The DC SEED Early Childhood Mental Health Consultant (ECMHC) continued to provide targeted outreach to Child Development Centers (CDCs) in the District. The consultant educated Center Directors about DC SEED as well as described the supports and services available through the grant. Specifically, the ECMHC provided over 134 on-site consultations (over 265 hours of consultation) at 14 different CDCs. In addition, the EMCHC provided 25 trainings to over 350 participants (i.e., Center Directors, teachers, teacher assistants, and caregivers) who worked with young children and families. The trainings covered the following topics: Social Emotional 101 Parent Training; Addressing Biting Behaviors; The Purple Period: Shaken Baby Syndrome and Post-Partum Depression; Social Emotional Foundations; Building a Solid Foundation; Promoting Nurturing and Responsive Relationships through Family Partnerships and Cultural Inclusion; Promoting Healthy Social-Emotional Development; and Self-Care.

During FY19, the DC SEED Family Engagement Coordinator (FEC) continued to collaborate with family leaders, Family Peer Specialists, members of Family Run Organizations and parents/caregivers of young children who received behavioral health services through the group called DC Families United. DC Families United was created by the FEC through DC SEED and is a family advocacy initiative addressing the need for increased family partnerships within the System of Care. The group believes in the inherent dignity and resiliency of families and that the system of care achieves best outcomes when it is authentically family – driven with families at

the center of decision making. DC Families United is working to implement a strategic approach toward supporting and training DC families in leadership and advocacy.

The DC Families United created a Collaborative Action Plan and rolled out the plan at the Children's Roundtable meeting.  The Collaborative Action Plan outlines specific goals (see attachment) which include: 1) increasing the number and effectiveness of DC family leaders with lived experience serving at the policy level to improve the system of care helping to identify and address systems' vulnerabilities, gaps and failures to improve service delivery and accountability creating systems change 2) improve the readiness, willingness and capacity of DC systems leaders to welcome and partner effectively with family leaders with lived experience to improve the systems of care and 3) ensure accurate relevant data collection that reflects family leaders', Family Peers' and Family Run Organizations' contributions to the system of care.

DC SEED supported many different early childhood trainings for families, Family Peer Specialists, clinicians and professionals working with young children and families.  Some of the trainings included DC:0-5 Diagnostic Classification of Mental Health and Developmental Disorders, Play Therapy Training, Early Childhood Series:  Understanding Infant and Early Childhood Mental Health, Your Journey Together (parent curriculum), Serving on Groups, and Early Childhood Development.  During FY19, the DC SEED team continued to revise and strengthen the DC SEED Strategic Financing Plan that leverages and builds upon ongoing collaboration with the DC Department of Healthcare Finance (DHCF) to support the sustainability of the array of existing and proposed clinical interventions and other supports for the target population and their families.

Through support of the Zero to Three Technical Assistance project, DC SEED team members created an Infant Early Childhood Mental Health (IECMH) Asset Map that displays services and supports across the continuum and includes prenatal, prevention, early intervention, treatment and recovery services.  In addition, the team created a spreadsheet of all early childhood programs and services with aligned Medicaid codes where applicable.  The spreadsheet also served the purpose of highlighting where there are not billable codes for IECMH services.  These efforts will be continued during FY20 to finalize the Sustainability Plan outlining the specific steps to sustain the services and supports of the DC SEED grant after the end of the grant.

*Q66. Please provide an update on the implementation of the DC Opioid Response (DCOR) Faith-Based Recovery Month Grant. Did the programs funded by this grant prove successful?*

**DBH Response:**

DBH received final reports from the 23 faith-based organizations that received grants to host community events in September (Recovery Month). The grantees provided awareness and education around opioids and opioid use disorder (OUD), treatment options (e.g., medication-assisted treatment), and The Good Samaritan Law. In addition, each grantee was required to provide a naloxone training. The below chart shows the number of individuals from each Ward who participated in the events.

| Ward | Number of Faith-Based Organizations | Unduplicated Participants |
|---|---|---|
| 1 | 1 | 578 |
| 4 | 2 | 450 |
| 5 | 6 | 262 |
| 6 | 5 | 711 |
| 7 | 3 | 798 |
| 8 | 8 | 1,311 |
| Total: | 23 | 4,110 |

A few highlights from the work include: a bilingual (Spanish) naloxone training, an OUD presentation at the 18th Jazz Preservation Festival, and opioid and recovery story-telling by jazz artist Doug Carn at America's Islamic Heritage Museum and Cultural Center.

The response from the faith community to our request for proposals in a very short window showed the well of untapped resources that we can harness to exponentially strengthen our opioid prevention work. We intend to expand this program in Year Two.

*Q67. Please provide an update on the "Now is the Time" Transitional Age Youth Grant. Please describe the status of the project, including the following information:*

*-Which community-based organizations participated in the grant in FY19?*
*-What services were provided under the grant in FY19? Are any of these services time-limited? -*
*-If so, which services and what are their time limits?*
*-To date, which community-based providers are certified to deliver transition age youth-specific services and supports?*
*-To date, how many Transition Aged Youth (TAY) have received services under the Now is the Time grant, broken down by service type and dates of service?*
*-How much of the grant funding was used in FY19 for direct services?*
*-Please provide any outcome evaluations or reports of the program from the past.*

**DBH Response**

The "Now Is The Time" Grant is the first of two federal grants awarded to the District to stimulate the implementation and scaling up of services to meet the unique needs of transition age youth.  Usually defined as 18-25, some funders and system planners broaden the definition to include individuals as young as 14 to as old as 29.  The goal is not to groom youth exiting child and youth services to better fit into the adult system of care, but instead to provide high quality, evidence based services in order to maximize independence, minimize functional deficits, and prevent chronicity and life-long involvement in the adult system.  The Now is the Time TAY Grant will end on March 29, 2020. A preliminary report from the independent evaluation team, Community Connections of New York (CCNY), shows a total of 392 unique Transition Aged Youth served through this grant. There were over 1500 referrals to MHRS services and there is evidence of overall well-being improvements for the transition-age youth. A final evaluation report will be available after the close of the grant.

In FY2019 certified community providers MBI Health Services, LLC and Community Connections participated in this grant.  These agencies provided behavioral health services (MHRS ACT and Community Support, and SUD services) to the TAY population via the Transition to Independence Process (TIP) model while also providing non-Medicaid reimbursable services such as supported employment, educational and vocational training and enrichment activities. Bradley and Associates is a community based contracted agency providing case management services to transition age young adults living in the Wayne Place Transitional Living Program. The Wayne Place Transitional Living Program is locally funded through an MOU between DBH and CFSA, and the contracted provider Bradley & Associates was also trained in the Transition to Independence (TIP) model. Grant funds were also used to fund time limited "Transition Specialists" to work with TAY for up to 6 months.

The Now Is the Time Healthy Transition (NITT: HT) grant provided a foundation for a TAY focused system of care in Wards 7 & 8 of the District. Through this grant, MBI and Community Connections addressed transitional needs through evidence-based practices and non-traditional supports and were identified as "TAY friendly" and. This effort resulted in the establishment of TAY divisions within other agencies and significantly reduced wait times.

The newest SAMHSA funded TAY grant (OurTime: Exploration) was awarded in April 2019 and will continue the efforts made through NITT: HT. While activities are focused on Wards 1 and Ward 6, grant funds will also serve youth and young adults across the District. Due to disproportionately higher incidences of mental health and substance use disorders (SUD), a special population of focus for the grant will be lesbian, gay, bi-sexual, transgender, and questioning (LGBTQ) youth.

The goals of the OurTime: Exploration grant include:
1. Increase the self-efficacy and meaningful participation in transition plans of young adults ages 16–25 who have mental health and/or co-occurring substance use disorders.
2. Improve and expand treatment recovery and support services and strengthen evidenced-based practices that address all life domains.
3. Increase community buy-in and ownership of TAY outcomes through establishment of OurTime: Exploration Transition Implementation Team and the continuation of the TAY Roundtable Takeover to increase community knowledge, support, and responsiveness to TAY.
4. Develop and implement community-wide education and messaging to reduce stigma about getting help for mental health and co-occurring SUD.

In FY2019, $729,878.85 of grant funding was allocated to community partners for TAY services.

**Transition Into Independence Process (TIP)** was developed for working with youth and young adults (14-29 years old) to: a) engage them in their own futures planning process; b) provide them with developmentally-appropriate, non-stigmatizing, culturally-competent, and appealing services and supports; and c) involve them and their families and other informal key players in a process that prepares and facilitates them in their movement toward greater self-sufficiency and successful achievement of their goals related to relevant transition domains (i.e., employment/career, educational opportunities, living situation, personal effectiveness/wellbeing, and community-life functioning).

The TIP system is operationalized through seven guidelines and their associated practices that drive the work with young people and provide the framework for the program and community system to support these functions. TIP has been in the District since 2013. Six providers have been certified to provide TIP in the District, specifically: Community Connections, Family Preservation Services, Life Enhancement Services (LES), MBI, and Parent and Adolescent Support Services (PASS) and Wayne's Place. For FY 19 (ending September 2019), 760 youth were served. In the first 2 months of FY 20, 394 youth were served with 368 youth of them continuing in services as of the end of November. Of 559 youth served in FY19 with verified dates of birth, 112 youth are ages 13-17 (21%) and 447 youth are ages 18-32 (80%). In FY 19, 122 of 273 total discharges (45%) were deemed successful. Barriers such as inconsistency of the meaning of "successful discharge" and changes in agency and program leadership at provider sites have diminished our ability to collect discharge data. DBH is currently actively working with contractors to conduct more site visits, fidelity reviews, getting more structured language around what is and is not considered a successful discharge.

Data from DC TIP outcome measures have indicated trends towards improved outcomes in many TIP Transition Domains - Community Life Functioning, Personal Effectiveness and Wellbeing and Housing, Employment and Education. Additionally, DC TIP agencies have currently developed 2 Certified TIP Site Based Trainers, 3 Certified Regional Fidelity Assessors, and MBI achieved TIP Site Accreditation, an accomplishment achieved by few TIP Sites across the country.  DC TIP agencies have developed creative strategies to intervene with their youth and young adults using music, job training, and activities designed to help a youth improve their sense of self-worth. The DBH affiliated agencies have also partnered with a range of other nonprofit organizations to improve the youths' ability to function in the community as well as to help shift the community's attitudes and perceptions toward the young people with behavioral health challenges.

FY2019 Activities are outlined below:

| Service | Q1<br>Oct 18-Dec 18 | Q2<br>Jan 19-Mar19 | Q3<br>Apr 19-Jun 19 | Q4<br>Jul 19-Sep 19 |
|---|---|---|---|---|
| TAY Supported Employment | 22 | 16 | 36 | 14 |
| Enrichment Activities | 33 | 26 | 32 | 42 |
| Educational/Vocational Training | 17 | 16 | 17 | 20 |
| Life Skills Enhancement Training and Support | 6 | 2 | 3 | 15 |
| Screening/Referrals | 105 | 84 | 232 | 2 |
| **Total** | **183** | **144** | **320** | **93** |

*Q68. Please provide an update on the Department's work with the DC Collaborative for Mental Health in Pediatric Primary Care.*

**DBH Response**

The Department of Behavioral Health is an active member on the DC Collaborative for Mental Health in Pediatric Primary ("DC Collaborative"). As a member, DBH provides feedback and input on initiatives led by the Collaborative, such as DC MAP and education and technical assistance for PCPs related to mental health screening and care. See below for a sample of efforts of the DC Collaborative over the past year:

- Updated The Child & Adolescent Mental Health Resource Guide. This guide aims to provide a comprehensive listing of community behavioral health resources for children and adolescents in the District of Columbia. The most recent update included the additional of a filterable function, which allows users to filter the document based on relevant criteria such as insurance, service type, and patient age. The addition of the filters made the document more intuitive and user friendly, resulting in a 300% increase in utilization since its release in September 2019. The DC Collaborative provides access to the guide through HealthCheck and will update the guide on a quarterly basis.
- Updated Perinatal Toolkit. This toolkit is intended to aid PCPs in screening for perinatal mood and anxiety disorders, such as postpartum depression, during well child visits in the first year postpartum. This guide can be found on dchealthcheck.net. Efforts are underway to develop an Autism Toolkit for primary care providers.
- Updated Mental Health Screening Tool Recommendations. A comprehensive literature review was completed to identify a range of possible mental health screening tools. Information was compiled about the tools, including the age ranges covered, domains assessed, administration issues (e.g., time to complete and score), costs, psychometric properties, reading level required to complete, and the languages in which the tool is available. Tools were reviewed by the DC Collaborative and DC MAP clinicians.
- Facilitated cross-sector collaborative care with events, including hosting networking events for primary care providers, mental health clinicians, and early childhood educators, piloting information-sharing feedback loops, and developing information-sharing guides and handouts.

**Number of Behavioral Health Screenings completed from FY19**

Developmental screening - 96110
Behavioral Health screening - 96127
Caretaker screening - 96161

*Q69. During FY19, what percentage of children discharged from a hospital were seen within the community within seven days? When children are not seen until after the 7-day deadline, what are the reasons? Provide numbers and percentages.*

**DBH Response**

DBH does not capture this data as the hospitals do not provide a summary or report of children discharged from acute care to DBH.

*Q70.    Please explain the work the Department is doing with CFSA to better serve the mental health needs of District foster children in Maryland.*

**DBH Response:**

In FY19, CFSA provided $100,000.00 to DBH through an Intra-District MOU to ensure children and youth placed in foster homes including Maryland are fully engaged and have easy access to behavioral health services and supports.  DBH contracted certified providers known as Choice Providers to provide services to the children, youth and their families.  The Choice Provider agencies are reimbursed for travel, outreach and engagement efforts, participation in CFSA's Review Evaluate and Direct (RED) Team and Family Team meetings, and non-reimbursable costs related to service delivery.  A robust array of mental health services and supports, including evidence-based practices, are available to youth placed in Maryland through the public behavioral health system.

DBH maintains the Certification Standards for Child Choice Providers which was established in FY15 and went into effect FY16.  In order to be a Child Choice Provider, DBH certified child-serving providers must meet at least three of the five standards below:

- 70% overall CSR System Performance score (most recent score prior to application)
- 80% Quality Score MHRS Provider Scorecard (the most recent prior to application)
- 80% compliance administration rate of the DBH approved standardized Assessment (CAFAS/PECFAS) instrument for enrolled child/youth consumers.
- 70% of enrolled consumers discharged from an acute care facility receive a post-discharge appointment within seven days, and 80% of consumers discharged from an acute care facility receive a post-discharge appointment within 30 days.
- 80% of Diagnostic and Assessment reports for all children are completed within 30 days of the initial interview.

In FY19, DBH's Child Choice Provider Network includes Maryland Family Resources and Community Connections. These providers were members of the original choice provider network who had demonstrated the capacity, competency and commitment to serving CFSA youth in Maryland.  CFSA's provider, National Center for Children and Families or NCCF, partnered with Maryland Family Resources to provide the district's youth placed in Maryland foster homes with their primary mental health services.  In FY19, 56 children who were placed in Maryland were enrolled with Maryland Family Resources.

*Q71. Please provide an update on the collaboration between DBH, DYRS, DHS, CFSA, OSSE, DCPS, and DC Public Charter Schools to implement CAFAS and PECFAS. In your response, please provide an update on the plan to develop the data warehouse that will allow for CAFAS/PECFAS results to be shared with all of a specific child/youth's providers.*

**DBH Response**

The Child and Adolescent Functional Assessment Scale (CAFAS) designed for youth 6-20 years old and the Pre-school and Early Childhood Functional Assessment Scale (PECFAS) designed for children three to five years old are instruments to identify and monitor the changes in a child or youth's functioning across life domains, over time. The CAFAS and PECFAS are not screening tools, rather they are clinical instruments that identify areas of impairment, support the integration of these concerns in treatment plan goals, and illustrates changes over time. These functional assessment scores also determine the appropriate level of care and the development of a plan of care. They also support and empower parent/caregiver engagement and promote cross agency collaboration and a holistic approach proven to achieve the best outcomes for children and their families.

Engaging youth and their families about the CAFAS and PECFAS and its cross system usefulness in planning the most appropriate care and support and monitoring progress is an ongoing focus of DBH. Informational sheets were developed and multiple community-based informational sessions were held. In response to feedback, DBH developed an informational video that explains the CAFAS and how it is used at each DC agency. The video is currently available on the DBH website.

The use of CAFAS and PECFAS is now embedded in the treatment protocols of the District's child serving agencies nearly three years after the end of a federal grant that supported its implementation. CAFAS and PECFAS instruments are used by all DBH child and youth providers, Child and Family Services Agency (CFSA), Department of Youth Rehabilitation Services (DYRS), and for youth participating in the Parent and Adolescent Support Services (PASS), the Teen Parent Assessment Program (TPAP) and in the Alternatives to Court Experience (ACE) diversion programs with the Department of Human Services (DHS). DBH providers are required to complete the CAFAS or PECFAS at admission, every 90 days, and at discharge. DBH uses the web-based Multi-Health Systems Functional Assessment Systems to allow child providers to complete the CAFAS and PECFAS assessments for record keeping and data analysis which are then manually placed in the DBH electronic record ICAMS.

At CFSA, the CAFAS and PECFAS are part of a battery of assessments that informs the development of the plan of care within their data management system (FACES). Additionally, CFSA has developed a dashboard for each child that includes the results of the trauma screen and the CAFAS. This dashboard quickly illustrates change over time for each child including what services are being provided during what time frames.  DYRS uses the CAFAS to inform the Team Decision-Making Meetings including the development of the case plan, matching youth to appropriate services and supports, and monitoring the youth's progress. DHS uses the CAFAS data to help determine initial service needs and to measure outcomes of their short term programs.

The Office of the State Superintendent of Education (OSSE) supported a pilot use of the CAFAS within DC Public School and DC Public Charter Schools. In 2017, DBH and OSSE jointly conducted rater training with DCPS Social Workers assigned to 23 schools with a Behavior and Education Support class. Also, DBH coordinated two train-the-trainer sessions with a particular emphasis on training staff members within the DC Public Schools and Public Charter Schools. These trainers are now available to train raters throughout the public school system, although OSSE, DCPS, and PCSB did not formally adopt the CAFAS tool.

Creating a data warehouse to implement across the various electronic medical records proved more challenging than originally envisioned and did not take place before the federal grant ended in 2017. Each agency that uses CAFAS and PECFAS continues to use its own data system and coordinates care across agencies through regular meetings and communications.

Q72 Attachment 1of 4 DC Public School Completions in FY19

| Count of Group | Column Labels | | | | |
| --- | --- | --- | --- | --- | --- |
| Row Labels | Director | Other | Principal | Teacher | Grand Total |
| At-Risk for Early Childhood Educators | | 3 | | 7 | 10 |
| At-Risk for Elementary School Educators (L) | 16 | 851 | 92 | 2587 | 3546 |
| At-Risk for High School Educators | 32 | 540 | 43 | 1148 | 1763 |
| At-Risk for Middle School Educators | 8 | 229 | 26 | 688 | 951 |
| Referral Process - District of Columbia | 48 | 1363 | 148 | 4104 | 5663 |
| Resilient Together: Coping with Loss at School | | 2 | | 11 | 13 |
| Step In, Speak Up! | 4 | 145 | 24 | 375 | 548 |
| Suicide Postvention - The Role of the School Community After a Suicide | 46 | 1348 | 149 | 4218 | 5761 |
| Grand Total | 154 | 4481 | 482 | 13138 | 18255 |

Q72 Attachment 2 of 4 DC Public School Completions in FY20 to date

| Count of Group<br><br>Row Labels | Column Labels<br><br>Director | Other | Principal | Teacher | (blank) | Grand Total |
|---|---|---|---|---|---|---|
| At-Risk for Early Childhood Educators | 10 | 141 | 2 | 244 | | 397 |
| At-Risk for Elementary School Educators (L) | 4 | 82 | 7 | 194 | | 287 |
| At-Risk for High School Educators | 9 | 111 | 8 | 135 | | 263 |
| At-Risk for Middle School Educators | 1 | 48 | 4 | 83 | | 136 |
| Referral Process - District of Columbia | 17 | 244 | 21 | 464 | | 746 |
| Resilient Together: Coping with Loss at School | 16 | 237 | 21 | 520 | | 794 |
| Step In, Speak Up! | | 17 | 3 | 39 | | 59 |
| (blank) | | | | | | |
| **Grand Total** | **57** | **880** | **66** | **1679** | | **2682** |

Q72 Attachment 3 of 4 DC Public Charter School Completions in FY19

| Count of Group | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | Director | Other | Principal | Teacher | (blank) | Grand Total |
| At-Risk for Early Childhood Educators | 1 | 21 | 1 | 49 | | 72 |
| At-Risk for Elementary School Educators (L) | 25 | 248 | 24 | 660 | | 957 |
| At-Risk for High School Educators | 27 | 155 | 12 | 294 | | 488 |
| At-Risk for Middle School Educators | 18 | 147 | 13 | 312 | | 490 |
| Referral Process - District of Columbia | 57 | 377 | 38 | 942 | | 1414 |
| Resilient Together: Coping with Loss at School | 5 | 36 | 6 | 101 | | 148 |
| Step In, Speak Up! | 7 | 45 | 3 | 101 | | 156 |
| Suicide Postvention - The Role of the School Community After a Suicide | 44 | 332 | 30 | 844 | | 1250 |
| (blank) | | | | | | |
| Grand Total | 184 | 1361 | 127 | 3303 | | 4975 |

Q72 Attachment 4 of 4 DC Public Charter School Completions in FY20 to date

| Count of Group | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | Director | Other | Principal | Teacher | (blank) | Grand Total |
| At-Risk for Early Childhood Educators | 8 | 91 | 2 | 144 | | 245 |
| At-Risk for Elementary School Educators (L) | 2 | 48 | 6 | 71 | | 127 |
| At-Risk for High School Educators | 8 | 81 | 2 | 58 | | 149 |
| At-Risk for Middle School Educators | 1 | 34 | 1 | 36 | | 72 |
| Referral Process - District of Columbia | 14 | 179 | 13 | 231 | | 437 |
| Resilient Together: Coping with Loss at School | 13 | 162 | 11 | 247 | | 433 |
| Step In, Speak Up! | | 14 | 2 | 26 | | 42 |
| (blank) | | | | | | |
| **Grand Total** | **46** | **609** | **37** | **813** | | **1505** |

*Q72.Please provide an update on the online behavioral health training program for all child development facilities and public schools that was launched in the first quarter of FY15. How many teachers and other personnel completed the online training in FY19 and FY20 to date?*

**DBH Response**

DBH continues to provide the online behavioral health training through the portal **http://www.supportdcyouth.com** All District public and public charter school teachers and principals must complete the following three DC Youth Behavioral Health Program courses once every two years to be compliant with this law:

1. *At-Risk* (at the appropriate grade level: At-Risk elementary, At-Risk middle, or At-Risk high school modules)- Duration - 60 minutes

   This simulation is designed to support recognizing when a student is exhibiting signs of psychological distress, and managing conversations with virtual students to connect them with appropriate services within the school. After completing the simulation, the participant will be better equipped to identify warning signs of psychological distress, manage conversations that help students build resilience, and make effective referrals to school support personnel.

2. *Referral Process* (Referral Module)- Duration - 8 minutes

   This simulation is designed to support existing referral protocols within the District of Columbia. It teaches participants about the school's protocol on referring a youth in distress, the early intervention team, and roles of the school social worker and the school-based mental health clinician. Links to local community-based resources and supports are also included.

3. *Suicide Postvention* (Resilient Together: Coping with Loss at School Module)- Duration - 40 minutes

   This simulation is designed to prepare schools for responding to a death in the school community. Teachers and administrators learn key elements of a crisis response plan, including postvention, and best practices for communicating with students and colleagues impacted by a loss in the school.

For those who are early childhood educators, child development center staff, and child development center administrators, there is *At-Risk for Early Childhood Educators* (Duration - 45 minutes). This simulation is for those administrators, staff, and educators who work with young children and builds understanding, knowledge, and skills in mental health and behavior management. Additionally, it is highly recommended for educators to take the *Step In Speak Out* course for challenges and concerns related to LGBTQ students. This is an additional module that is available within the portal.

 In FY19, 6,270 DC Public School (DCPS) teachers and other personnel completed the online training and 1,083 have completed the trainings in FY20 to date. For DC Public Charter Schools (DCPCS), 2,007 teachers and other personnel completed the training in FY19 and 593 have completed the training in FY20 to date. During FY20, DBH will collaborate with the Office of the State Superintendent of Education (OSSE) to increase the completion of the online trainings by Child Development Center Administrators, teachers and other personnel.  In FY19, there were no Child Development Center Administrators nor staff who completed the on-line training. And,

in FY20 to date, only 18 staff have completed the training. The attached documents provide information on the number of DC Public School and DC Public Charter School teachers and other personnel who have completed the online training in FY19 and FY20 to date.

Attachment 1 of 4.  DC Public School Completions in FY19
Attachment 2 of 4.  DC Public School Completions in FY20 to date
Attachment 3 of 4.  DC Public Charter School Completions in FY19
Attachment 4 of 4.  DC Public Charter School Completions in FY20 to date

# EXHIBIT F

*Q47. In FY20, how many children have been discharged from inpatient psychiatric hospitalization or psychiatric residential treatment facilities and received in-home and community-based mental health services? This figure should include CBI, intensive care coordination, and intensive case management services—within 30 days, 60 days, or 90 or more days of their discharge.  Please also explain how this data may reflect the impact of the COVID-19 pandemic.*

**DBH Response**

DBH monitors discharges from a Psychiatric Residential Treatment Facility (PRTF) to support care coordination.  During FY 20, there were 42 PRTF discharges. Of the 42 discharges, 20 children and/or youth were referred to CBI services.   Of those, 17 youth were seen within 30 days, another two within 60 days, and the last one within 90 days.

The remaining youth who were discharged were referred to other services including individual therapy, High Fidelity Wraparound, and community support according to their discharge treatment plan.

Regarding the number of children discharged from inpatient hospitalization, DBH receives notification only when the child is referred to CBI services.  In FY 20, seven referrals were made.  DBH is working with inpatient hospitals to receive notification of all admissions and discharges for children.

During the COVID-19 pandemic, providers have continued to provide services primarily through telehealth services.

# EXHIBIT G

*Q49. For FY 19, FY 20, and FY21 to date, please list: a) the total number of psychiatric residential treatment facility (PRTF) and the total number of residential treatment center (RTC) admissions of a child and youth receiving MHRS (may include duplicate counts of those children or youth with multiple admissions during the Fiscal Year), b) the unduplicated number of children, and of youth, receiving MHRS and served in a PRTF or RTC, and c) the behavioral health conditions being treated. Please also explain how this data may reflect the impact of the COVID-19 pandemic.*

**DBH Response**

In FY19, the total of children and youth that received treatment in a PRTF was 69, of whom 32 were new admissions.  Of the 32 new admissions, 30 received mental health services prior to admission.   In FY20, the total number of children and youth that required treatment in a PRTF was 97, of whom 36 were new admissions. Of the 36 new admissions, 31 received mental health services six months prior to admission.  In FY21 to date, the total number of children and youth who require treatment in a PRTF is 60, of whom eight were new admissions.  Seven of the eight new admissions received mental health services six months prior to admission.

The PRTF Review Committee chaired by DBH makes a determination about whether a referral for placement meets medical necessity criteria.  The referral package includes a range of behavioral health conditions specific to the child or youth, some of whom have more than one diagnosis.  The behavioral health conditions cover a wide range including Attention Deficit Disorder, combined and unspecified; Adjustment Disorder Unspecified; Autism Spectrum Disorder; Bipolar Disorder; Borderline Intellectual Functioning; Borderline Personality Disorder; Cannabis Use Disorder; Child Sexual Abuse; Conduct Disorder; Depressive Disorder with and without psychosis, recurrent, unspecified; Developmental disorder of speech and language, mathematics; Disruptive Mood Dysregulation Disorder; Encopresis; Enuresis; Impulse Control Disorder; Intellectual Disability; Intermittent Explosive Disorder; Post-Traumatic Stress Disorder; Oppositional Defiant Disorder; other problems related to primary support, education and literacy; Reactive Attachment Disorder; Schizo-affective Disorder; Unspecified Bipolar Disorder and Related Disorders, and Unspecified Mood Disorder.

Youth continue to be admitted to a PRTF during the pandemic. Each of the five referring agencies is responsible for identifying and arranging admission.  During the pandemic, most new admissions are taking longer because some PRTFs require mandatory COVID testing prior to admission or delay admissions to keep the right census level necessary to maintain social distancing, proper PPE or appropriate infection control procedures.  DBH is aware of delays in 27 of the 32 new admissions in FY 20 that averaged about four weeks.  While awaiting admission, youth receive the same level of treatment if hospitalized or at the DYRS Youth Service Center and youth in the community receive stepped up community-based services and other supports such as increased one/one mentorship to increase supervision and address behavioral health concerns.

# EXHIBIT H

*Q57. For FY 18, FY 19, and FY20 to date, please list: a) the total number of psychiatric residential treatment facility (PRTF) and the total number of residential treatment center (RTC) admissions of a child and youth receiving MHRS (may include duplicate counts of those children or youth with multiple admissions during the Fiscal Year), b) the unduplicated number of children, and of youth, receiving MHRS and served in a PRTF or RTC.*

**DBH Response**

DBH has the responsibility and authority to determine medical necessity for all  psychiatric residential treatment facility (PRTF) placements for Medicaid eligible children and youth and monitor their treatment.  We do not have the responsibility and authority for a residential treatment center (RTC).

As indicated in the chart below, 81 children and/or youth received treatment in a PRTF in FY18. Of the 81, 44 were new admissions. Six of the 44 children and/or youth received services MHRS through DBH six months prior to admission. In FY19, 81 children and/or youth required treatment in a PRTF.  Of the 81, 43 were new admissions.  Of the new admissions, two received services through the DBH behavioral health network six months prior to treatment.

To date in FY20, 47 youth receive treatment in a PRTF.  Eleven of the 47 are new admissions. None of the 11 children and/or youth received MHRS six months prior to admission. Children and/or youth who are not involved in MHRS through DBH may have received services provided through their Managed Care Organization (MCO), Free Standing Mental Health Clinic (FSMHC) or private entity. DBH does not capture this data.

| Fiscal Year | Admission | Services six months prior to admission | Total PRTF |
|---|---|---|---|
| 2018 | 44 | 6 | 81 |
| 2019 | 43 | 2 | 81 |
| 2020 Q1 | 11 | 0 | 47 |

# EXHIBIT I

*Q71. If DBH is aware that fewer children and youth are receiving services than before COVID-19, what steps, if any, is DBH taking to investigate this and what specific steps is DBH taking to ensure that every child and youth's needs are met?*

**DBH Response**

During the October 2019 through March 2020, the months before the pandemic, the number of children served was trending up—from 3,329 to 3,413 compared to the same time the year before. However, this trend stopped in April and the number of children served declined. During the pandemic months from April through September 2020, the number served was 3,193 compared to 3,371 in the same time period—a decrease of 220 or about six percent.

This corresponds to the decreases in the number of youth who received evidence-based practices during this same time period. In FY 20 Q1 and Q2 which was prior to the pandemic, Evidence Based Practice (EBP) providers served 932 youth. In FY 20 Q3 and Q4 during the pandemic, the number of youth served decreased to 771. However, the youth that were served showed increased engagement and availability for services. It appears that the models that could be adopted to telehealth saw more engagement. Some of the services were not as amenable to the telehealth platform such as the early childhood evidence based practices.

For Community Based Intervention (CBI), the number of youth served increased from 284 (prior to the pandemic) to 296 (during the pandemic). CBI providers have increased capacity by hiring and training new staff to meet the needs of families in the District. DBH is working with providers on strategies to engage families during the pandemic via telehealth and in person. DBH is also working with training model developers and purveyors of all of the evidence based practices to structure trainings and consultations around current cultural and public health climate. DBH is also implementing targeted outreach to community agencies to increase utilization of the trauma and early childhood models.

Data from the DHCF Medicaid dashboard indicate a high proportion of children did receive at least one telemedicine service. This data includes children and youth up to age 21 who had services paid by Fee for Service and MCOs and indicates at least 65 percent received a telemedicine service in FY20. The data also indicate that the place of service of school decreased by 77 percent between FY19 and FY20 from 1375 to 311 for the number of children and youth with encounters (claims) with that place of service of school was documented.

School-based services also saw decreases in the number of youth receiving treatment since the pandemic. All behavioral health services transitioned from in person services to telehealth services as schools transitioned to virtual learning platforms. At the beginning of the transition, the shift to telemedicine was challenging for some youth and families due to the following reasons: 1) lack of access to technology for virtual sessions 2) challenges establishing when, where and how clinicians would enter classrooms to integrate behavioral health services. It should be noted that DBH in partnership with DC Public and Charter School leadership has developed and are implementing strategies to address this issue 3) locating and connecting with the youth was sometimes challenging and 4) zoom fatigue. In an effort to increase the number of youth receiving behavioral health supports and to ensure that students who needed behavioral health supports were being linked to services, clinicians shifted and implemented new and

creative techniques. For example, clinicians actively reached out to teachers and school staff to collaborate with them regarding the delivery of behavioral health services, reviewed the referral process and encouraged teachers and school staff to refer students who may need additional support.  In addition, clinicians used social media outlets to reach and engage students, created on-demand behavioral health resources for youth to watch at their leisure and joined virtual classrooms to provide support to students when necessary and appropriate. Other clinicians have created virtual wellness rooms, where students can connect, express their feelings and be linked to additional resources if necessary. To address the Zoom fatigue, clinicians are using creative art and movement based activities that are engaging and sometimes have audio only sessions to reduce the amount of screen time.   In addition, DBH developed the Parental Support Program to assist parents in dealing with their own stressors and providing information about resources such as the Mental Health Hotline that they can access 24/7 to address any mental health concerns they have regarding themselves or their children.

# EXHIBIT J



Evidence-Based Associates
Families First / DC SEED Activity Dashboard
Results for the Time Period Oct-20 Through Sep-21

# EXHIBIT K

# Evidence-Based Associates
## Families First / DC SEED Activity Dashboard
### Results for the Time Period Oct-21 Through Sep-22

evidence-based associates

| Category Color Coding | | | |
|---|---|---|---|
| Optimal | Good | Fair | Poor |
| >94% | 85%-94% | 75%-84% | <75% |

| Primary Selection | Program | Combined | Model | FFT |
|---|---|---|---|---|
| | Provider | All FFT Providers | | |

**Time Frame:**
First Month to Include: Oct-21
Last Month to Include: Sep-22

| Comparative Selection | Program | Combined | Model | MST |
|---|---|---|---|---|
| | Provider | All MST Providers | | |

| Staffing | Capacity | Utilization | Outcomes | Youth Seen |
|---|---|---|---|---|
| 78% | 82% | 66% | 58% | 134 |

| Staffing | Capacity | Utilization | Outcomes | Youth Seen |
|---|---|---|---|---|
| 85% | 85% | 84% | 90% | 53 |

## Staffing

**All FFT Providers FFT Combined Staffing: Oct-21 through Sep-22**

Averages Between Oct-21 - Sep-22

| All FFT Providers FFT Combined | All MST Providers MST Combined |
|---|---|
| 78% (7.8/10) | 85% (3.4/4) |

All FFT Providers FFT Combined is 250% of All MST Providers MST Combined Staffing

**All MST Providers MST Staffing: Oct-21 through Sep-22**

| Staffing Data | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Ave. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 8/10 | 8/10 | 7/10 | 7/10 | 8/10 | 8/10 | 8/10 | 8/10 | 8/10 | 8/10 | 8/10 | 8/10 | 7.8/10 |

| Staffing Data | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Ave |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4/4 | 4/4 | 4/4 | 4/4 | 3/4 | 3/4 | 3/4 | 3/4 | 3/4 | 3/4 | 3/4 | 3/4 | 3.4/4 |

## Capacity

**All FFT Providers FFT Capacity: Oct-21 through Sep-22**

Averages Between Oct-21 - Sep-22

| All FFT Providers FFT | All MST Providers MST |
|---|---|
| 82% (47/57) | 85% (17.1/20) |

All FFT Providers FFT is 285% of All MST Providers MST Capacity

**All MST Providers MST Capacity: Oct-21 through Sep-22**

| Capacity Data | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Ave. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 48/57 | 48/57 | 48/57 | 42/57 | 42/57 | 48/57 | 48/57 | 48/57 | 48/57 | 48/57 | 48/57 | 48/57 | 47/57 |

| Capacity Data | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Ave. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 20/20 | 20/20 | 20/20 | 20/20 | 20/20 | 15/20 | 15/20 | 15/20 | 15/20 | 15/20 | 15/20 | 15/20 | 17.1/20 |

## Utilization

**All FFT Providers FFT Utilization: Oct-21 through Sep-22**

Averages Between Oct-21 - Sep-22

| All FFT Providers FFT | All MST Providers MST |
|---|---|
| 66% (31.1/47) | 84% (14.3/17.1) |

All FFT Providers FFT is 275% of All MST Providers MST Utilization

**All MST Providers MST Utilization: Oct-21 through Sep-22**

| Utilization Data | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Ave. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 33/48 | 32/48 | 32/48 | 32/42 | 33/42 | 25/48 | 29/48 | 23/48 | 27/48 | 37/48 | 40/48 | 41/48 | 31.1/47 |

| Utilization Data | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Ave. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 20/20 | 18/20 | 17/20 | 17/20 | 15/20 | 16/15 | 9/15 | 12/15 | 12/15 | 12/15 | 12/15 | 12/15 | 14.3/17.1 |

## Outcomes

**All FFT Providers FFT Outcomes: Oct-21 through Sep-22**

Averages Between Oct-21 - Sep-22

| All FFT Providers FFT | All MST Providers MST |
|---|---|
| 58% (4.8/8.3) | 90% (3.3/3.6) |

All FFT Providers FFT is 227% of All MST Providers MST Outcomes

**All MST Providers MST Outcomes: Oct-21 through Sep-22**

| Outcomes Data | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 7/13 | 4/6 | 5/6 | 10/15 | 4/7 | 3/11 | 2/9 | 3/6 | 5/9 | 3/5 | 4/9 | 4/9 | 57/99 |

| Outcomes Data | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 3/3 | 3/3 | 4/4 | 4/5 | 5/5 | 2/3 | 7/7 | 2/2 | 2/2 | 2/3 | 1/2 | 4/4 | 36/40 |

## Youth Seen

**All FFT Providers FFT Youth Seen: Oct-21 through Sep-22**

Totals Between Oct-21 - Sep-22

| All FFT Providers FFT | All MST Providers MST |
|---|---|
| 134 | 53 |

All FFT Providers FFT is 253% of All MST Providers MST Youth Seen

**All MST Providers MST Youth Seen: Oct-21 through Sep-22**

Carryover Cases / New Cases

| Dates | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Youth | 8 | 7 | 6 | 15 | 6 | 5 | 10 | 3 | 3 | 13 | 11 | 11 | 99 |
| Total Seen | 43 | 40 | 39 | 47 | 38 | 40 | 40 | 40 | 48 | 134 |

All FFT Providers FFT admitted 99 and served a total of 134

| Dates | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Youth | 3 | 1 | 4 | 5 | 4 | 3 | 7 | 2 | 2 | 1 | 2 | 2 | 36 |
| Total Seen | | | | | | | | | | | | | 53 |

All MST Providers MST admitted 36 and served a total of 53

LIMITED USE LICENSE - Permission to reproduce or utilize the dashboard, is granted to contract partners only within the terms and restrictions set forth by contract and is specifically deemed confidential information and restricted information. This permission (license) does not grant the right to reproduce these materials for resale, or for distribution other than for specific Evidence Based Associates, LLC, sanctioned training events, counseling sessions or contractual activities. The dashboard cannot be used as a tool on non-contracted projects without the express permission, in writing, and substantive alterations to the content of these materials for future use may only be made with the permission, in writing, of Evidence Based Associates, LLC. Upon completion of the contract, all training materials, copyrighted materials and the dashboard tool must be returned. Violations are subject to fines and penalties and all rights and remedies available by law.

# EXHIBIT L



### Evidence-Based Associates
Families First / DC SEED Activity Dashboard
Results for the Time Period Oct-22 Through May-23

# EXHIBIT M

# ChAMPS DBH Monthly Report
## February 2018

### Professional Development
On February 15th, ChAMPS staff attended a Crisis Intervention and Ethics training at the Child Welfare Consortium.

On February 20th, ChAMPS staff attended the Time Management training through Catholic Charities Children Services.

All employees continue to attend professional development trainings that are within their Catholic Charities Learning Plan and additional trainings outside of their learning plans.

### Outreach Efforts
On February 2nd, ChAMPS was represented at the DBH Children's Roundtable.

On February 26th ChAMPS was represented at the CFSA SOY meeting to discuss the use of ChAMPS services for resource parents.

### Community Deployments
There were no community deployments for the month of February.

### Critical Incidents
There were no critical incidents for this reporting period.

### Staffing Updates
There were no changes is staffing in the month of February.
The program currently has 6 vacancies, which influences the programs ability to respond to the community as requested.  The program's vacancies are in the following areas; 1 Clinical Manager, 3 full time Crisis Specialist and 2-part time Crisis Specialist.   Continuous efforts are being made to fully staff the program; we are in the process of seeking temporary workers.

### Program Overview
As in the past several couple of months, there has been an increase in calls received in by ChAMPS program.   In the month of February 2018, 178 calls were recorded, this is significantly greater than the 137 calls recorded in February of the previous year; there were 41 (30%) more calls this year.
Of the 178 calls recorded, 84(47%) resulted in deployments; 72(40%) of those calls resulted in interventions, while 12(7%) of total calls resulted in deployments with no interventions.  A large amount of calls recorded in February were clinical consultations; 50(22%).  It appears that the community is utilizing the ChAMPS program more for clinical consultations.   An increasing amount of calls received from school clinicians and MPD police officers are to consult regarding their own interventions.   There were 6(3%) information only calls and 38(21%) were calls cancelled by the caller for various reasons explained below.

- Caregiver intervened: 9
- Other professional intervened:6
- Child Deescalated: 8
- No Team Available: 13
- Other: 2

Programmatic trends regarding demographic information varied; as in most months, calls were related to a higher percentage of males 99(56%) and females 79(44%).   During this reporting period, the age range with the highest amount of calls were children ages 11-14yrs old 76(43%), followed by children ages 6-10yrs old 62(34%), then children ages 15-18yrs old 28(16%); There were 8(4%) calls regarding children who were under the age of 5yrs old and no calls for children who were between the ages of 18yrs and 21yrs., however, 4(2%) calls were received for persons over the ages of 21yrs.; these calls were redirected.

As in previous months, most of the consumers 108(61%) served lived at home with their biological parents; followed by extended families 39(22%) and then traditional foster homes 19(11%).

Some consumers served by ChAMPS are already involved in other systems.  Programmatic trends regarding client's mental health or community agency involvement as reported by the callers were recorded as: CFSA 29(16%), CSA 28(16%), CBI, CSS & DRYS totaling 4(2%), Unknown 48(27%) and none 58(32%)

**Program Highlights**

- There is a significant increase in the amount of calls being received by ChAMPS.  The program received 41(30%) more calls in February of 2018 (178) than it did in February of 2017(137).  Beginning in the month of September 2017, there was a total of 151 more calls that there was for the same period in 2017.

- With the increase in call volume, the program is often without a team available to deploy to the community.  During the month of February, there were 34 (26% of the total calls) calls in which the team was not able to respond to because ChAMPS was fully deployed.  This resulted in 13 cancelled calls, 13 clinical consultations and 8 delayed calls.

- During this reporting period, the average response time of crisis teams arriving at the deployment site was 38 minutes from the initial crisis call.

**Statistical Comparisons**
- During this month, there were 10(14%) FD12 written by ChAMPS; of the FD12 written, 3(4%) resulted in hospitalization, 5(7%) children were voluntarily hospitalized by a caregiver.  Additionally, 52(72%) placements were stabilized this month.
  *(see Figure 1).*

MJ-DEF-0000351

- In February of 2018, 29(16%) of the total calls received were affiliated with CFSA; of those calls 12(41%) were deployments and 2(7%) deployments that resulted in no interventions. Additionally, there were 11(38%) clinical consultations and 4(14%) cancelled calls. *(See figure 2)*

- Calls received during the month of February were from the following sources; Schools 100 (56%) and parents 42(24%). The remaining (crisis calls were received from other community agencies 16(8%), CFSA and foster parents 20(11%). *(see figure 3)*

- During the month of February, the crisis response type for the calls received were follows; suicidal ideations being the highest at 64(36%), then aggression toward others 53(30%), property destruction 5(3%) decompensating behaviors 18(10%), Self-injurious behaviors 8(5%), and family problems 3(2%). *(see Figure 4)*

### STATISTICAL COMPARISONS (February 2018)

*FD12 (Figure 1)*




**2018**  14%  7%

MJ-DEF-0000352

*CFSA Response (Figure 2)*

*Call Source (Figure 3)*





*Call Type (Figure 4)*

## February 2018 Call Volume Comparison



*Call volume (Figure 5)*

MJ-DEF-0000353

# EXHIBIT N

# ChAMPS DBH Monthly Report
## March 2018

**Professional Development**
All employees continue to attend professional development trainings that are within their Catholic Charities Learning Plan and additional trainings outside of their learning plans.

**Outreach Efforts**
On March 14th ChAMPS was represented at the Crisis Intervention Officers training to provide information about the program and to answer and questions that the officer had about how we can work together.

On March 23rd, ChAMPS staff attended the E. L. Haynes Public Charter School Resource Fair to share information about the program.  Approximately 150 persons were expected to attend this event.

**Community Deployments**
There were no community deployments for the month of February.

**Critical Incidents**
There were no critical incidents for this reporting period.

**Staffing Updates**
The program currently has 8 vacancies, which influences the programs ability to respond to the community as requested.  The program's vacancies are in the following areas; 1 Clinical Manager, 3 full time Crisis Specialist and 2-part time Crisis Specialist, 2 Peer Specialist. Continuous efforts are being made to fully staff the program; we are in the process of seeking temporary workers.

**Program Overview**
During the month of March 2018, 138 calls were recorded; of the 138 calls recorded, 78(58%) resulted in deployments; 71(51%) of those calls resulted in interventions, while 7(5%) resulted in deployments with no interventions.  Some of our calls resulted in clinical consultations; 28(20%).  Some calls were information only calls 4(3%) and 28(20%) were calls cancelled by the caller for various reasons explained below.

- Caregiver intervened: 6
- Other professional intervened:5
- Child Deescalated: 6
- No Team Available: 10
- Other: 1

MJ-DEF-0000284

Programmatic trends regarding demographic information looked the same as in previous months.   As it relates to gender, there were more calls related to males 87(63%) than females 49(36%) and 2(1%) were unknown.   This reporting period, the call volume was higher for children ages 6-10 years old; 66(48%), followed by children ages 11-14 years old; 42 (30%), then children ages 15-18 years old; 24(17%).  There was 1 call for persons ranging from ages 19-21 years old.

Most of the consumers served by ChAMPS in March 2018 lived at home with their biological parents; 77(56%).  Some consumers lived with extended family; 35(25%).  17(12%) consumers live in traditional foster care setting.

Some consumers served by ChAMPS are already involved in other systems.  Programmatic trends regarding client's mental health or community agency involvement as reported by the callers were recorded as: CFSA 20(14%), CSA 20(14%), CBI, CSS & DRYS totaling 6(4%), Unknown 34(23%) and none 44(30%)

**Program Highlights**

- During this reporting period, the average response time of crisis teams arriving at the deployment site was 35 minutes from the initial crisis call.

- With the increase in call volume, the program is often without a team available to deploy to the community.  During the month of March, there were 23(16% of the total calls) calls in which a team was not able to respond to because the program was fully deployed; This resulted in 10 cancelled calls, 4 clinical consultations and 8 delayed calls and 1 Deployment with no Intervention.

**Statistical Comparisons**
- During the March 2018 reporting period, there were 5(7%) FD12 written by ChAMPS; of the FD12 written, 3(4%) resulted in hospitalization, 8(11%) children were voluntarly hospitalized by a caregiver.  Additionally, 52(73%) placements were stabilized this month.
  *(see Figure 1).*

- The total calls received that were affiliated with CFSA was 20 (14% of our total calls); of those calls 7(35%) resulted in deployments and 2(10%) resulted in deployment with no intervention.  Additionally, there were 4(20%) clinical consultations and 5(25%) cancelled calls.  *(See figure 2)*

- Calls received during the month of March were from the following sources; Schools 77(56%) and parents 35(25%).  The remaining crisis calls were received from other community agencies; 10(7%), CFSA and foster parents 12(8%).
  *(see figure 3)*

MJ-DEF-0000285

- The crisis response type for the calls received in March 2018 were follows; suicidal ideations being the highest at 51(37%), then aggression toward others 36(26%), property destruction 9(6%) decompensating behaviors 13(9%), Self-injurious behaviors 7(5%), and family problems 4(3%).
  *(see Figure 4)*

### STATISTICAL COMPARISONS (March 2018)

**March 2018 FD12 Comparisons**



*FD12 (Figure 1)*

MJ-DEF-0000286

**March 2018 CFSA Comparisons**



*CFSA Response (Figure 2)*

**March 2018 Call Source Comparisons**



*Call Source (Figure 3)*

MJ-DEF-0000287



*Call Type (Figure 4)*

MJ-DEF-0000288

# EXHIBIT O

# ChAMPS DBH Monthly Report
November 2018

## Professional Development

On November 9th four (4) ChAMPS staff successfully completed the Department of Behavioral Health Officer Agent training.

All employees continue to attend professional development trainings that are within their Catholic Charities learning plans and additional trainings outside of their learning plans.

## Outreach Efforts/Community Presence

On November 2nd, ChAMPS was represented at the Department of Behavioral Health Children's Roundtable meeting.

On November 6th, the ChAMPS team completed an Outreach at McKinley Middle School for a Parent Resource Fair.

On November 14th, the ChAMPS team completed an Outreach at Oyster Elementary School.

## Community Deployments

There was no community deployment during this reporting period.

## Critical Incidents

There were no reported critical incidents during this reporting period.

## Staffing Updates

During this reporting period, one new full-time crisis specialist joined the ChAMPS team.  There are currently two (2) vacancies for the full-time crisis specialist position and three (3) vacancies for the part time crisis specialist position.  One offer was made and accepted for the Youth Peer Specialist position.

## Program Overview

During the November 2018 reporting period, the program received 176 calls.  All calls in November 2018 were direct, and none came from the Access Helpline.  In comparison to November 2017 (148 calls), the program received 28 more calls this year; this is a **19%** increase in calls.

Of the calls received, 84 (48%) were deployable calls; 74 (42%) resulted in deployments with interventions, 10 (6%) were deployments with no interventions, 36 (20%) of the total calls resulted in clinical consultations, 14 (8%) of the total calls were information only calls and 42 (24%) of calls were cancelled by the callers.  Of the calls cancelled by the callers, 24 calls were

MJ-DEF-0000230

cancelled because no teams were available to respond at the time of the call and when a team was available, assistance was no longer needed.  Other calls were cancelled for the following reasons:

      Caregiver intervened: 6
      Child deescalate: 5
      Child not available: 2
      Other professionals intervened: 5

Gender demographic of the consumers served during this reporting period was as follows; 106 (60%) were males and 66 (38%) were females. As in previous months, more of the calls received were regarding male consumers than female consumers.

During this reporting period, consumers ages 11-14 years old were the most served; 62 (35%), consumers ages 6-10 years old accounted for 51 (29%) of the total calls, followed by consumers ages 15-18 years who accounted for 44 (25%) of the total calls.  The program served 11 (6%) child under the age of 5 years old and 1 person over the age of 21 years.

As in most months, most of the consumers served by ChAMPS live at home with their biological parents; 118 (67%). Many other consumers lived with their extended families 25 (14%) and 16 (9%) lived in out-of-home settings including foster care and group care placements.  1 (<1%) of consumers served were homeless.

Information is often collected about the consumers' system involvement; some consumers served by ChAMPS were already involved in other District of Columbia Government systems. System involvement, as reported by the caller was recorded as such; CFSA 15 (8%), CSA 20 (11%), CBI, Court Social Services & DYRS totaling 4(2%), Unknown (as reported by caller) 67 (37%) and no system involvement 42 (23%).

During the month of November 2018 there were 74 deployments with interventions; of the deployments with interventions, 16 (22%) of the consumers were linked to ongoing services during the deployment, 0 (0%) were relinked, 17 (23%) were already linked and planned to continue with services and 41 (55%) were not linked at the initial deployment.  For the consumers who were unable to be linked to services during the initial deployment, attempts are being made to link these consumers to services before case closure.  It should be noted that the caregiver's availability or ability to respond during the intervention, is often a barrier to linkage to services during the initial deployment.

60 (81%) of the deployment with interventions involved consumers who had active Medicaid.  7 (9%) of the consumers served had private insurance and 7 (9%) were uninsured or information about their insurance was unknown.

**Program Highlights**
Our call volume continues to increase. The program received 176 calls during this reporting period compared to 148 calls in November of 2017.  There was a 19% increase in calls in November 2018 compared to this month last year.

The average response time from deployment to call was 32 minutes.

Aggression and Suicidal Ideation continues to be the highest call response type.  Aggression accounted for 40 (23%) of the total calls for November 2018 and suicidal ideation accounted for 64 (36%).

**Statistical Comparisons**
- In comparison to November of 2017, 28 more calls were received this month in 2018.   November 2017 the total calls were 148, while October 2018 the program received 176 calls.
  *(See Figure 1)*

- During the November 2018 reporting period, there were 12 (16%) FD12 written by ChAMPS; 6 (8%) of the consumers were voluntarily hospitalized by a caregiver. Additionally, 56 (76%) placements were preserved this month.
  *(see Figure 2)*

- The total calls received that were affiliated with CFSA was 15(8%) of our total calls; of those calls 5(33%) resulted in deployments and 3(20%) resulted in deployment with no intervention.  Additionally, there were 2(1%) clinical consultations, 4(27%) cancelled calls and no information only calls.   *(See figure 3)*

- Calls received during the month of November 2018 were from the following sources; Schools 97(55%), 46(24%) were from parents and extended families.  The remaining crisis calls were received from other community agencies 24(14%), CFSA and foster parents 8(4%).
  *(see figure 4)*

- The crisis response type for the calls received in November 2018 were as follows; Suicidal Ideation being the highest at 64(36%), followed by aggression at 40(23%), property destruction 4(2%) decompensating behaviors 18(10%), Self-injurious behaviors 7(4%), and family problems 8(4%).
  *(see Figure 5)*

MJ-DEF-0000232

### **_STATISTICAL COMPARISONS (November 2018)_**



*Call volume (figure 1)*

MJ-DEF-0000233



*FD12 (Figure 2)*



*CFSA Response (Figure 3)*

MJ-DEF-0000234



*Call Source (Figure 4)*

MJ-DEF-0000235



*Call Type (Figure 5)*

MJ-DEF-0000236

# EXHIBIT P

# ChAMPS DBH Monthly Report
April 2019

**Professional Development**
All employees continue to attend professional development trainings that are within their Catholic Charities learning plans and additional trainings outside of their learning plans.

Staff continue to renew professional licenses and acquire Continuing Education Units.  All ChAMPS Social Workers (LICSW and LGSW) are preparing for license renewal in July 2019.

**Outreach Efforts/Community Presence**
On April 4th, ChAMPS manager, Chris Villalobos, attended a committee planning meeting at the National Youth Academy.

**Community Deployments**
There was no community deployment during this reporting period.

**Critical Incidents**
There were no reported critical incidents during this period.

**Staffing Updates**
During this reporting period, one full time and two part time employees resigned.  There continues to be active recruitment and interviewing efforts to fill all vacant positions.  An offer was made and accepted, for one full time position.  The new crisis specialist is scheduled to begin on May 20th, pending a successful background check.  There are currently four (4) vacancies for the full-time crisis specialist position, five (5) vacancies for the part time crisis specialist position and one for the Youth Peer Specialist position.

**Program Overview**

During the April 2019 reporting period, the program received 207 calls.  All calls were direct to the ChAMPS main line, except one (1) call was from the Access Helpline.  In comparison to April 2018 (165 calls), the program received 55 more calls in April 2019 (207 calls). This is a 25% increase in calls.

Of the calls received, 106 (51%) were deployable calls; 92 (44%) resulted in deployments with interventions, 9 (14%) were deployments with no interventions, 43 (21%) of the total calls resulted in clinical consultations, 12 (6%) of the total calls were information only calls and 46 (22%) of calls were cancelled by the callers.  Of the calls cancelled by the callers, many calls were cancelled because no teams were available to respond at the time of the call, and when a

team was available, assistance was no longer needed for reasons including: caregiver intervened, child de-escalated, child no longer available, and other professionals intervened.

Gender demographic of the consumers served during this reporting period was as follows; 110 (53%) were males and 86 (41%) were females. As in previous months, more of the calls received were regarding male consumers than female consumers. 11 (5%) calls were received with the gender unknown.

During this reporting period, consumers ages 6-10 years old were the most served with 79 clients (38%). This age group was followed by consumers 11-14 years old equating to 60 clients (28%). Consumers ages 15-18 accounted for 49 (23%) of the total calls. The program received 6 calls regarding a child under the age of 5 years old and 0 calls for an adolescent 19-21 years old. There were 13 calls where the client's age was unknown by the caller. These were nondeployable calls resulting in clinical consultation or information only and age of the youth was not identified.

As in most months, most of the consumers served by ChAMPS live at home with their biological parents; 164 (79%). Some other consumers lived with their extended families 10 (4%) and 29 (14%) lived in out-of-home settings including foster care (traditional and therapeutic) and group care placements (CFSA and other).  2 (1%) of consumers served resided with adopted parents.

Information is often collected about the consumers' system involvement; some consumers served by ChAMPS were already involved in other District of Columbia Government systems. System involvement, as reported by the caller was recorded as such; CFSA 30(15%), CSA 49 (24%), CBI 4 (2%) & DYRS 4 (2%), Unknown (as reported by caller) 61 (30%), no system involvement 24 (11%) and other service provider 35 (16%).

During the month of April 2019 there were 92 deployments with interventions; of the deployments with interventions, 49 (53%) of the consumers were already active, re-linked, or linked by ChAMPS to a Core Service Agency (CSA). 17 clients (18%) were receiving mental health services through another service provider and 26 (29%) were not linked during the initial deployment. For the consumers who were unable to be linked to services during the initial deployment, attempts are being made to link these consumers to services before case closure. It should be noted that the caregiver's availability or ability to respond during the intervention, is often a barrier to linkage to services during the initial deployment. Other barriers include refusal of services, private insurance and difficulty connecting to a provider.

74 (80%) of the deployment with interventions involved consumers who had active Medicaid. 11 (12%) of the consumers served had private insurance and 7 (8%) were uninsured or information about their insurance was unknown.

**Program Highlights**

Our call volume increased significantly this month. The program received 207 calls during this reporting period compared to 165 calls in April of 2018.  There was an 25% increase in calls in April compared to last year.

The average response time from deployment to call was **30 minutes**.

Aggression and Suicidal Ideation continues to be the highest call response type.  Aggression accounted for 56 (27%) of the total calls for April 2019 and suicidal ideation accounted for 64 (30%). Decompensation/ Increase in Psychiatric Symptoms accounted for 13 (6%) of the calls. Runaway accounted for 7 (3.5%) of the total calls and self- injurious behaviors accounted for 6 (3%). Homicidal ideation accounted for 9 (4.5%) of the total calls. Other reasons for calls included: depression, family problems, substance use and property destruction combined to equal 54 (26%).

**Statistical Comparisons**

- In comparison to April of 2018 there were 42 more calls received this month in 2019. April 2018 the total calls were 165, while April 2019 the program received 207 calls. *(See Figure 1)*

- During the April 2019 reporting period, there were 15 (16%) FD12 written by ChAMPS; 12 (13%) of the consumers were voluntarily hospitalized by a caregiver. Additionally, 65 (71%) placements were preserved this month. *(see Figure 2)*

- The total calls received that were affiliated with CFSA was 30 (33%) of our total calls. Of those calls (45%) resulted in deployments and 14 (7%) resulted in deployment with no intervention.  Additionally, there were 43 (21%) clinical consultations, 46 (22%) cancelled calls and 12 (6%) information only calls.  *(See figure 3)*

- Calls received during the month of April 2019 were from the following sources; Schools 90 (44.5%), 66 (32%) were from parents and extended families.  The remaining crisis calls were received from other community agencies 23 (11%), CFSA and foster parents 23 (11%). *(see figure 4)*

MJ-DEF-0000311

## *STATISTICAL COMPARISONS (April 2019)*



*Call volume (Figure 1)*

MJ-DEF-0000312



*FD12 (Figure 2)*



*CFSA Response (Figure 3)*

MJ-DEF-0000313



*Call Source (Figure 4)*



| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Total Calls | 74 | 120 | 230 | 181 | 176 | 161 | 132 | 158 | 220 | 207 | | |
| ■ FY'19 Deployments | 31 | 58 | 87 | 79 | 84 | 74 | 67 | 84 | 120 | 106 | | |
| ▨ % of Total Calls resulting in Deployments | 42% | 48% | 38% | 44% | 48% | 46% | 51% | 53% | 55% | 51% | | |



Response to Call April 2018

- Deployment
- Deployment no intervention
- Call cancelled
- Clinical Consultation
- Information Only

41%
7%
22%
26%
4%



Crisis Type April 2018

- Aggression Towards Others
- Suicidal Ideation
- Self-injurious behavior
- Decompensation/Increased Psyc Symptoms
- Other

31%
8%
11%
6%
44%

MJ-DEF-0000315



**Crisis Type April 2019**

- Aggression Towards Others
- Suicidal Ideation
- Other
- Decompensation/Increased Psyc Symptoms
- Self-injurious behavior

MJ-DEF-0000316

# EXHIBIT Q

**ChAMPS DBH Monthly Report**
August 2019

**Professional Development**

All employees continue to attend professional development trainings that are within their Catholic Charities learning plans and additional trainings outside of their learning plans.

On August 9, 2019 three (3) ChAMPS staff successfully completed the Department of Behavioral Health Officer Agent training.

On August 2, 2019 all ChAMPS staff attended Mandated Reporter training.

Staff continue to renew professional licenses and complete Continuing Education Units (CEU's), including renewal of Maryland Social Work licensure (LCSW-C and LMSW) for those whose renewal is due in October 2019.

**Outreach Efforts/Community Presence**

The ChAMPS team completed numerous outreaches at DCPS/ DCPCS school and Core Service Agencies (CSA's) in August including:

8/1: LAYC

8/5: Meridian Public Charter School (PCS)

8/6: Wheatley Education Campus

8/7: Youth Build DC

8/7: Roosevelt STAY

8/7: McKinley Middle School

8/8: Turner Elementary

8/12: Columbia Heights Education Campus

8/13: Rocketship Rise Academy

8/14: Phelps High School

MJ-DEF-0000257

8/15: Inner City CSA

8/16: Paul PCS

8/16: LAYC Housing Department

8/19: Friendship Tech Prep

8/22: Bridges PCS

8/23: Inner City CSA

8/23: Redskins Back to School Fair

8/27: Maury Elementary

8/28: Ballou High School

8/28: Life Enhancements

8/29: School Without Walls

8/29: Whittier Education Campus

8/30: MBI

**Community Deployments**

There were no community deployments during this reporting period.

**Critical Incidents**

There were 7 MUI's completed and submitted in August 2019.

**Staffing Updates**

During the month of August 2019, there were two (2) new staff who started in the Crisis Specialist position. There was one (1) Crisis Specialist who left the program.  There was an interview for another Crisis Specialist position during this reporting period and offer accepted for hire; projected start date is September 2019.  One (1) MSW Intern joined the ChAMPS team. The Sr. Program Manager position became vacant in August 2019.  Interviews were conducted and a new Sr. Program Manager was hired; start date was September 1, 2019.  There continues to be active recruitment and interviewing in efforts to fill all vacant positions.  There are currently two (2) remaining vacancies for the full-time Crisis Specialist position, which are

overhire positions, and six (6) vacancies for the part-time Crisis Specialist position. Additionally, there is one (1) vacancy for the Peer Specialist (youth).

**Program Overview**

During the August 2019 reporting period, the program received 99 calls.  All calls in August 2019 were direct.  In comparison to August 2018 (107 calls), the program received 8 less calls in August 2019 (99 calls). This is an **8%** decrease in calls.

Of the calls received, 48 (48%) were deployable calls; 39 (39%) resulted in deployments with interventions, 9 (9%) were deployments with no interventions, 15 (15%) of the total calls resulted in clinical consultations, 16 (16%) of the total calls were information only calls and 20 (20%) of calls were cancelled by the callers.  Of the calls cancelled by the callers, some calls were cancelled because no teams were available to respond at the time of the call.  Other reasons included caregiver intervention, child de-escalating, child no longer available, and other professionals intervening.

Gender demographic of the consumers served during this reporting period was as follows; 50 (50%) were males and 40 (40%) were females. As in previous months, more of the calls received were regarding male consumers than female consumers. 9 (9%) of the calls were received with the gender unknown.

During this reporting period, consumers ages 11-14 years old were the most served with 37 clients (37%). This age group was followed by consumers 15-18 years old equating to 26 clients (26%). Consumers ages 6-10 accounted for 14 (14%) of the total calls. The program received 2 calls regarding children 5 years old and under, and 5 calls for adolescents 19-21 years old. There were 15 calls where the client's age was unknown by the caller. These were nondeployable calls resulting in clinical consultation or information only and age of the youth was not identified.

As in most months, most of the consumers served by ChAMPS live at home with their biological parents; 76 (76%). Some other consumers lived with their extended families- 5 (5%), while 12 (12%) lived in out-of-home settings including foster care (traditional and therapeutic) and group care placements (CFSA and other).  4 (4%) of consumers served resided with adopted parents.

Information is often collected about the consumers' system involvement; some consumers served by ChAMPS were already involved in other District of Columbia Government systems. System involvement, as reported by the caller was recorded as such; CFSA 15 (15%), CSA 19 (19%), CBI 0 (0%) & DYRS 1 (1%), Unknown (as reported by caller) 32 (32%) and no system involvement 17 (17%).

During the month of August 2019 there were 39 deployments with interventions; of the deployments with interventions, 19 (19%) of the consumers were already active, re-linked, or linked by ChAMPS to a Core Service Agency (CSA). 9 clients (9%) were receiving mental health services through another service provider and 11 (11%) were not linked during the initial

MJ-DEF-0000259

deployment. For the consumers who were unable to be linked to services during the initial deployment, attempts are being made to link these consumers to services before case closure. It should be noted that the caregiver's availability or ability to respond during the intervention, is often a barrier to linkage to services during the initial deployment. Other barriers include refusal of services, private insurance and difficulty connecting to a provider.

34 (34%) of the deployment with interventions involved consumers who had active Medicaid. 3 (3%) of the consumers served had private insurance and 2 (2%) were uninsured or information about their insurance was unknown.

## Program Highlights

Our call volume decreased slightly in August 2019 as compared to August 2018, with 99 calls during this reporting period compared to 107 calls in August of 2018. There was an 8% decrease in calls in February 2019 compared to this month last year. Reasons for possible decrease in calls include school closure for summer vacation, during which time the program receives a significant decrease in overall call volume.

The average response time from deployment to call was **35 minutes**.

Decompensation/Increased Psychiatric Symptoms was the highest call response type for the reporting period at 23 (23%). Suicidal Ideation accounted for 19 (19%) of the total calls for August 2019 and Aggression accounted for 18 (18%). Family Problems accounted for 10 (10%) of the calls. Runaway accounted for 8 (8%) of the total calls and Self-Injurious Behaviors accounted for 4 (4%). Homicidal Ideation accounted for 3 (3%) of the total calls. Other reasons for calls included: depression, medical/medication non-compliance, substance abuse, and other concerns (combined to equal 14%).

## Statistical Comparisons
- In comparison to August of 2018 there were 8 less calls received this month in 2019. August 2018 the total calls were 107, while August 2019 the program received 99 calls.
  *(See Figure 1)*

- During the August 2019 reporting period, regarding deployment with intervention, there were 10 (25%) FD-12s written by ChAMPS; 1 FD-12 written by police (2%); and 5 (13%) of the consumers were voluntarily hospitalized by a caregiver. Additionally, 20 (51%) placements were preserved this month.
  *(see Figure 2)*

- The total calls received that were affiliated with CFSA was 15 (15%) of our total calls. Of those calls 10 (66%) resulted in deployments and 2 (13%) resulted in deployment

with no intervention.  Additionally, there was 1 (6%) clinical consultation, 0 (0%) cancelled calls and 2 (13%) information only calls.   *(See figure 3)*

- Calls received during the month of August 2019 were from the following sources; Parents/Extended Family- 41 (41%), Schools- 22 (22%), and Police-11 (11%).  The remaining crisis calls were received from other community agencies- 20 (20%), CFSA and foster parents 5 (5%).
  *(see figure 4)*

## STATISTICAL COMPARISONS (August 2019)



*Call volume (Figure 1)*

MJ-DEF-0000261



*FD12 (Figure 2)*



*CFSA Response (Figure 3)*

MJ-DEF-0000262



*Call Source (Figure 4)*

MJ-DEF-0000263



### FY'19 Total Calls vs Deployments

|  | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Calls | 74 | 120 | 230 | 181 | 176 | 161 | 132 | 158 | 220 | 207 | 211 | 100 |
| FY'19 Deployments | 31 | 58 | 87 | 79 | 84 | 74 | 67 | 84 | 120 | 106 | 105 | 51 |
| % of Total Calls resulting in Deployments | 42% | 48% | 38% | 44% | 48% | 46% | 51% | 53% | 55% | 51% | 50% | 51% |



### FY'20 Total Calls vs Deployments

|  | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Calls | 73 | 99 |  |  |  |  |  |  |  |  |  |  |
| FY'20 Deployments | 43 | 48 |  |  |  |  |  |  |  |  |  |  |
| % of Total Calls resulting in Deployments | 59% | 48% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

MJ-DEF-0000264





MJ-DEF-0000265





MJ-DEF-0000266

# EXHIBIT R

| FY2018 CHAMPS Service Statistics | Jul | Aug | Sept | 1st Quarter | 2nd Quarter | 3rd Quarter | 4th Quarter | YTD |
|---|---|---|---|---|---|---|---|---|
| **Referral Information** | | | | | | | | |
| Calls Received from AHL | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Calls Received Directly | 69 | 107 | 206 | 421 | 467 | 411 | 382 | 1681 |
| **Total Calls** | **69** | **107** | **206** | **421** | **467** | **412** | **382** | **1682** |
| **Response to Call** | | | | | | | | |
| Deployments | 29 | 52 | 78 | 179 | 216 | 195 | 159 | 749 |
| Deployments - No Intervention | 2 | 7 | 9 | 18 | 26 | 26 | 18 | 88 |
| Cancelled Calls | 11 | 20 | 66 | 106 | 92 | 86 | 97 | 381 |
| Clinical Consultations | 17 | 24 | 40 | 95 | 117 | 87 | 81 | 380 |
| Information Only | 10 | 4 | 13 | 16 | 16 | 18 | 27 | 77 |
| **Total Deployments** | **31** | **59** | **87** | **197** | **242** | **221** | **177** | **837** |
| **Total Calls Not Deployable** | **38** | **48** | **119** | **217** | **225** | **191** | **205** | **838** |
| **Total Calls** | **69** | **107** | **206** | **414** | **467** | **412** | **382** | **1675** |
| **General Statistics** | | | | | | | | |
| Unduplicated Number of Children by Month (New Cases) | 29 | 66 | 108 | 207 | 248 | 199 | 203 | 857 |
| Average Response Time From Deployment to Call | 0:36 | 0:34 | 0:31 | 0:33 | 0:36 | 0:34 | 0:33 | 0:34 |
| Special Community Deployments | 7 | 0 | | 0 | 0 | 2 | 7 | 9 |
| **Call Source** | | | | | | | | |
| CFSA | 3 | 9 | 5 | 1 | 0 | 1 | 17 | 19 |
| Court Social Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CSA | 1 | 0 | 1 | 5 | 13 | 11 | 2 | 31 |
| DBH | 1 | 0 | 0 | 84 | 108 | 131 | 1 | 324 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DYRS | 1 | 1 | 2 | 252 | 266 | 187 | 4 | 709 |
| Extended Family | 0 | 0 | 9 | 40 | 21 | 29 | 9 | 99 |
| Foster Parents | 6 | 4 | 3 | 6 | 7 | 3 | 13 | 29 |
| Other Community | 16 | 20 | 14 | 4 | 21 | 14 | 50 | 89 |
| Parents | 31 | 33 | 44 | 10 | 17 | 18 | 108 | 153 |
| Police | 2 | 5 | 4 | 2 | 2 | 0 | 11 | 15 |
| School | 8 | 35 | 124 | 0 | 2 | 1 | 167 | 170 |
| Youth / Self | 0 | 0 | 0 | 17 | 10 | 19 | 0 | 46 |
| **Total Calls** | 69 | 107 | 206 | 421 | 467 | 414 | 382 | 1684 |
| **Residential Status** | | | | | | | | |
| Biological Parents | 36 | 60 | 126 | 296 | 280 | 245 | 222 | 1043 |
| Extended Family | 8 | 14 | 54 | 55 | 109 | 78 | 76 | 318 |
| Therapeutic Foster Care | 3 | 1 | 3 | 6 | 8 | 10 | 7 | 31 |
| Traditional Foster Care | 12 | 16 | 10 | 28 | 46 | 31 | 38 | 143 |
| Homeless | 1 | 0 | 0 | 0 | 2 | 0 | 1 | 3 |
| Group Care (not CFSA) | 1 | 4 | 6 | 7 | 3 | 9 | 11 | 30 |
| Group Care (CFSA) | 3 | 1 | 2 | 6 | 1 | 1 | 6 | 14 |
| Adopted | 2 | 0 | 2 | 14 | 5 | 13 | 4 | 36 |
| Other | 2 | 1 | 0 | 0 | 3 | 3 | 3 | 9 |
| Unknown | 1 | 10 | 3 | 9 | 10 | 22 | 14 | 55 |
| **Total Calls** | 69 | 107 | 206 | 421 | 467 | 412 | 382 | 1682 |
| **Hospitalizations** | | | | | | | | |
| FD-12 Written by Champs | 4 | 12 | 10 | 30 | 31 | 25 | 26 | 112 |
| FD-12 Written by Police | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| FD-12 Written by Other Provider | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 |
| Voluntary Hospitalization | 5 | 7 | 8 | 9 | 23 | 16 | 20 | 68 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total Cases Resulting in Hospitalization | 2 | 0 | 11 | 15 | 8 | 12 | 13 | 48 |
| Placements Preserved | 19 | 32 | 57 | 130 | 149 | 146 | 108 | 533 |
| **CSA Utilization** | | | | | | | | |
| Initial Link | 5 | 14 | 20 | 47 | 56 | 52 | 39 | 194 |
| Re-Link | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 3 |
| No link | 12 | 25 | 32 | 91 | 114 | 78 | 69 | 352 |
| Continued Use | 12 | 13 | 26 | 25 | 44 | 65 | 51 | 185 |
| **Total Deployments** | 29 | 52 | 78 | 164 | 216 | 195 | 159 | 734 |
| **System Involvement** | | | | | | | | |
| CFSA | 17 | 20 | 19 | 49 | 72 | 61 | 56 | 238 |
| DYRS | 2 | 2 | 4 | 6 | 6 | 10 | 8 | 30 |
| Court Social Services | 0 | 0 | 0 | 1 | 3 | 3 | 0 | 7 |
| CSA | 18 | 15 | 31 | 85 | 73 | 76 | 64 | 298 |
| CBI | 1 | 0 | 2 | 7 | 10 | 1 | 3 | 21 |
| Other | 9 | 20 | 21 | 81 | 70 | 68 | 50 | 269 |
| Unknown | 21 | 45 | 114 | 126 | 133 | 143 | 180 | 582 |
| None | 10 | 19 | 29 | 102 | 140 | 89 | 58 | 389 |
| **Total Usage** | 78 | 121 | 220 | 457 | 507 | 451 | 419 | 1834 |
| **Insurance Information** | | | | | | | | |
| Active Medicaid | 26 | 49 | 70 | 139 | 188 | 164 | 145 | 636 |
| Private Insurance | 1 | 2 | 5 | 23 | 15 | 23 | 8 | 69 |
| Uninsured | 0 | 1 | 0 | 4 | 2 | 0 | 1 | 7 |
| No Insurance Provided | 0 | 0 | 2 | 1 | 5 | 3 | 2 | 11 |
| Unknown Insurance Status | 2 | 0 | 1 | 11 | 6 | 5 | 3 | 25 |
| **Total Deployments** | 29 | 52 | 78 | 178 | 216 | 195 | 159 | 748 |

| Demographics | | | | | | | |
|---|---|---|---|---|---|---|---|
| Ages 5 and under | 6 | 9 | 4 | 11 | 17 | 26 | 19 | 73 |
| Ages 6 -10 | 14 | 35 | 77 | 169 | 184 | 144 | 126 | 623 |
| Ages 11 -14 | 26 | 45 | 70 | 136 | 175 | 150 | 141 | 602 |
| Ages 15 -18 | 22 | 17 | 53 | 94 | 85 | 85 | 92 | 356 |
| Ages 19 - 21 | 0 | 1 | 2 | 5 | 1 | 5 | 3 | 14 |
| Over 21 | 0 | 0 | 0 | 6 | 5 | 0 | 0 | 11 |
| Unknown Age | 1 | 0 | 0 | 0 | 0 | 2 | 1 | 3 |
| Total Calls | 69 | 107 | 206 | 421 | 467 | 412 | 382 | 1682 |
| Gender | | | | | | | |
| Male | 28 | 45 | 121 | 233 | 274 | 209 | 194 | 910 |
| Female | 36 | 56 | 81 | 186 | 191 | 187 | 173 | 737 |
| Transgender | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Unknown Gender | 5 | 6 | 4 | 2 | 2 | 16 | 15 | 35 |
| Total Calls | 69 | 107 | 206 | 421 | 467 | 412 | 382 | 1682 |
| Ethnicity | | | | | | | |
| African-American | 37 | 40 | 79 | 265 | 220 | 207 | 156 | 848 |
| African | 0 | 0 | 3 | 6 | 12 | 13 | 3 | 34 |
| Caucasian | 0 | 0 | 1 | 17 | 2 | 5 | 1 | 25 |
| Latino/Hispanic | 1 | 3 | 6 | 26 | 19 | 11 | 10 | 66 |
| Asian/Pacific Islander | 0 | 0 | 0 | 5 | 0 | 1 | 0 | 6 |
| Other | 1 | 5 | 2 | 9 | 14 | 9 | 8 | 40 |
| Unknown Ethnicity | 30 | 59 | 115 | 93 | 200 | 166 | 204 | 663 |
| Total Calls | 69 | 107 | 206 | 421 | 467 | 412 | 382 | 1682 |
| CFSA Service Statistics | | | | | | | |
| Clinical Consultations | 1 | 1 | 2 | 15 | 11 | 17 | 4 | 47 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Deployments | 8 | 9 | 7 | 8 | 22 | 11 | 24 | 65 |
| Deployments - No Intervention | 2 | 1 | 1 | 20 | 29 | 23 | 4 | 76 |
| Cancelled Calls | 2 | 6 | 9 | 4 | 7 | 7 | 17 | 35 |
| Information Only | 4 | 2 | 0 | 2 | 3 | 3 | 6 | 14 |
| **Total CFSA Calls** | **17** | **19** | **19** | **49** | **72** | **61** | **55** | **237** |
| **Crisis Response Type** | | | | | | | | |
| Aggression Toward Others | 11 | 28 | 59 | 159 | 136 | 123 | 98 | 516 |
| Decompensation / Increased Psychiatric Symptoms | 6 | 10 | 17 | 22 | 37 | 25 | 33 | 117 |
| Depression | 0 | 1 | 1 | 4 | 5 | 3 | 2 | 14 |
| Family Problems | 10 | 6 | 10 | 13 | 10 | 17 | 26 | 66 |
| Homicidal Ideation | 1 | 4 | 2 | 22 | 7 | 14 | 7 | 50 |
| Medical | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 1 |
| Medication Non-Compliance | 0 | 0 | 0 | 6 | 2 | 7 | 0 | 15 |
| Other | 5 | 7 | 19 | 17 | 35 | 27 | 31 | 110 |
| Out of Medications | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 2 |
| Property Destruction | 2 | 2 | 4 | 7 | 19 | 20 | 8 | 54 |
| Runaway | 5 | 5 | 15 | 13 | 13 | 23 | 25 | 74 |
| Self-Injurious Behaviors | 4 | 7 | 11 | 16 | 25 | 13 | 22 | 76 |
| Substance Abuse | 5 | 1 | 0 | 1 | 1 | 2 | 6 | 10 |
| Suicidal Ideation | 20 | 36 | 68 | 141 | 175 | 137 | 124 | 577 |
| **Total Calls** | **69** | **107** | **206** | **421** | **467** | **412** | **382** | **1682** |

| Statistics | July | Aug | Sept |
|---|---|---|---|
| Percentage of Total Calls Deployed = | 44.93% | 55.14% | 42.23% |
| Percentage of Total Calls w/ CFSA Affiliation = | 24.64% | 18.69% | 9.22% |
| Percentage of Deployments Resulting in Hospitalization = | 65.52% | 61.54% | 14.10% |
| Percentage of Total Calls Initiated by Parents = | 4.35% | 8.41% | 2.43% |
| Percentage of Total Calls Initiated by Schools = | 11.59% | 32.71% | 0.00% |
| Percentage of Total Calls Regarding Children Ages 6-10 = | 20.29% | 32.71% | 37.38% |
| Percentage of Total Calls Regarding Children Ages 11-14 = | 37.68% | 42.06% | 33.98% |
| Percentage of Total Calls Regarding Children Ages 15-18 = | 31.88% | 15.89% | 25.73% |
| Percentage of Total Calls Regarding Suicide = | 28.99% | 33.64% | 28.64% |
| Percentage of Total Calls Regarding Aggression = | 15.94% | 26.17% | 0.49% |
| Percentage of Total Calls for Females = | 52.17% | 52.34% | 39.32% |
| Percentage of Total Calls for Males = | 40.58% | 42.06% | 58.74% |

# EXHIBIT S

**COUNCIL OF THE DISTRICT OF COLUMBIA
COMMITTEE ON HEALTH
CHAIRMAN VINCENT C. GRAY
COUNCILMEMBER, WARD 7**



**Department of Behavioral Health
Oversight Questions**

1.  Please provide a current organizational chart for DBH. Please provide information to the activity level. In addition, please identify the number of full-time equivalents (FTEs) at each organizational level and the employee responsible for the management of each program and activity. If applicable, please provide a narrative explanation of any organizational changes made during FY20 and to date in FY21.

2.  Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY20 and to date in FY21. In addition, please describe any variance between the amount budgeted and actually spent for FY20 and to date in FY21:
    a.  At the agency level, please provide information broken out by source of funds and by Comptroller Source Group and Comptroller Object;
    b.  At the program level, please provide the information broken out by source of funds and by Comptroller Source Group and Comptroller Object; and,
    c.  At the activity level, please provide the information broken out by source of funds and by Comptroller Source Group.

3.  Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY20 and to date in FY21.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.

4.  Please provide a complete accounting of all reprogramings received by or transferred from DBH in FY20 and to date in FY21.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.

5.  Please provide a complete accounting of all of DBH's Special Purpose Revenue Funds for FY20 and to date in FY21. Please include the following:
    a.  Revenue source and code;
    b.  Source of the revenue for each special purpose revenue fund (*i.e. license fee, civil fine*);
    c.  Total amount of funds generated by each source or program in FY20 and to date in FY21;
    d.  DBH activity that the revenue in each special purpose revenue source fund supports; and,

    e.  The FY20 and to date FY21 expenditure of funds, including purpose of
       expenditure.

6.  Please provide copies of any investigations, reviews or program/fiscal audits completed
    on programs and activities within DBH during FY20 and to date in FY21. This includes
    any reports of the DC Auditor, the Office of the Inspector General, or the Office of
    Accountability. In addition, please provide a narrative explanation of steps taken to
    address any issues raised by the program/fiscal audits. Please include the following:

7.  Did DBH meet the objectives set forth in the performance plan for FY20? Please provide
    a narrative description of what actions DBH undertook to meet the key performance
    indicators.  For any performance indicators that were not met, if any, please provide a
    narrative description for why they were not met and any remedial actions taken.  In
    addition, please provide a narrative description of the performance objectives for FY21
    and what actions DBH has undertaken to meet them to date.

8.  Please provide DBH's capital budgets for FY20 and FY21, including amount budgeted
    and actual dollars spent. In addition, please provide an update on all capital projects
    undertaken in FY20 and FY21. In your response, please include information regarding
    the iCAMS project or its successor.

9.  Please provide a list of all FTE positions detailed <u>to</u> DBH, broken down by program and
    activity for FY20 and to date in FY21.  In addition, please provide which agency the
    detailee originated from and how long they were detailed to DBH.

10.  Please provide a list of all FTE positions detailed <u>from</u> DBH to another agency in FY20
    and to date in FY21.  In addition, please provide which agency the employee was
    detailed to and for how long.

11.  Please provide the following information for all grants awarded to DBH during FY20
    and to date in FY21, broken down by DBH program and activity:
       a.  Grant Number/Title;
       b.  Approved Budget Authority;
       c.  Funding source;
       d.  Expenditures (including encumbrances and pre-encumbrances);
       e.  Purpose of the grant;
       f.  Grant deliverables;
       g.  Grant outcomes, including grantee performance;
       h.  Any corrective actions taken or technical assistance provided;
       i.  DBH program and activity supported by the grant; and,
       j.  DBH employee responsible for grant deliverables.

12.  Please provide a complete accounting of all grant lapses including a detailed statement
    as to why the lapse occurred and any corrective action taken by DBH.  Please provide
    accounting of any grant carryover from FY18 to FY19 or FY20 to FY21 and a detailed
    explanation as to why it occurred.

13. Please provide the following information for all Human Care Agreements (HCA) and task orders issued during FY20 and to date in FY21, broken out by DBH program and activity:
    a. Vendor name;
    b. Services provided;
    c. Funding source;
    d. HCA amount;
    e. Task order amount;
    f. Actual expenditures;
    g. Status of performance; and,
    h. DBH employee responsible for monitoring the HCA and task order.

14. Please provide a list and narrative description of any DBH partnerships with District agencies, if any, in FY20 and to date in FY21 to address employment for DBH consumers.  In addition, please provide the number of individuals served, the types of employment placements available, and the employee/s responsible for coordinating the partnership.

    a. Please provide an update on the MOU with the Department of Human Services Economic Security Administration to provide Supported Employment services to individuals with serious mental illness who receive Temporary Assistance for Needy Families (TANF). How many individuals participated in this program in FY20? To date in FY21?

15. Please provide a description of all housing programs administered by DBH. For each, please provide the following information:
    a. Name of the program and services provided;
    b. Number of individuals served in FY20 and to date in FY21;
    c. Capacity of the program;
    d. Performance measures and associated outcomes for each program;
    e. The name and title of the DBH employee responsible for administering the program;
    f. The average wait time for a consumer to access housing through the program;
    g. The number of individuals on waiting lists for the program; and,
    h. Of those individuals on the wait list, whether any are homeless or in other housing programs.

16. Please provide an update on the work of the children mobile crisis teams. What services are provided? How many individuals were served in FY20? To date in FY21? Please be sure to specifically speak to the work of the Children and Adolescent Mobile Psychiatric Service (ChAMPS), as well as any related services.
    a. What is the process in determining what calls are deployable and non-deployable?
    b. What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY20 and FY21 to date.

  c. How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?
  d. Please describe the extent to which these services and responses to (a) through (d) were impacted by the COVID-19 pandemic.

17. How long does it take for families or children who are enrolled in DBH either by calling the Access Helpline or by walking into a community provider office seeking mental health services to receive the treatment they need?  Please provide the following information for FY19, FY20, and FY21, to date:
  a. How many days, on average, between when a family or child calls the Access Helpline and when they are referred to a Core Service Agency?
  b. How many days, on average, between when a family or child is enrolled and their intake appointment with a Core Service Agency?
  c. How many days, on average, between when a family or child is enrolled and when they receive a diagnostic needs assessment?
  d. How many days, on average, between when a family or child is enrolled and when they receive their first service as part of a treatment plan?

18. Please explain the work the Department has been doing to address gun violence in the community and treat children/youth exposed to violence in their communities or at homes.  Please explain how this work has been affected by the COVID-19 pandemic.

19. Please explain the work the Department has been doing with the Child and Family Services Agency on trauma-informed care. Please explain how this work has been affected by the COVID-19 pandemic.

20. Please explain the work the Department is doing with Child and Family Services Agency to better serve the mental health needs of foster children in the District. How long does it take for a child who has been identified as needing mental health services before they are connected to those services? During FY20, what percentage of children were screened within 30 days of entering or re-entering care? Has there been a decrease in time to linkage to first services from FY19 to FY20? If available, please provide any documentation that shows children are receiving more timely services. What efforts have been made to improve more timely services?  Please explain how this work and the data provided in response to the questions above may have been impacted by the COVID-19 pandemic.

21. Please describe what substance abuse services are offered to children and youth and the process for obtaining these services. Are there any plans for FY21 to expand the types of services offered to children and youth? How many children and youth have received services through the Adolescent Community Reinforcement Approach (A-CRA) in FY20 and FY21 to date?
  a. Please explain how this work and the data provided in response to the questions above may have been impacted by the COVID-19 pandemic.

22.    Please explain the work the Department is doing with the Department of Health Care Finance to plan for the transition of fee for service individuals to MCOs in Fiscal Year 2022. How will this transition improve care coordination?

23.    Please provide an update on the Department's School Mental Health Program including a list of all schools that participate. For each school, please also include:
    a.  The number of student who met with a clinician;
    b.  The number of students who were referred to care;
    c.  The most common diagnosis;
    d.  The referral source (i.e. walk-in, teacher);
    e.  The number of students participating in prevention programs;
    f.  Whether the current programs are meeting the existing need for services, and if not, what is being done to meet the total need;
    g.  What prevention programs and services were offered through the SMHP in FY20 and FY21 to date;
    h.  Any plans to expand the program and barriers to expansion; and
    i.  The number of FTEs serving in each school.
    j.  Please explain how this program and the data provided in response to (a) through (i) above may have been impacted by the COVID-19 pandemic and the transition to distance learning.

24.    Please provide an update on the status of implementation of the public health model for school-based mental health.  Please include the following information for Cohort 1, Cohort 2, and Cohort 3:
    a.  List all schools in each cohort
    b.  Number of schools matched with a CBO, and identify which CBO has been matched with which schools
    c.  Number of schools where a CBO clinician has been hired and is working in the schools and identify which schools
    d.  Number of schools where a CBO clinician has been hired, but is not yet working in the school, and identify which schools and provide the reason why the CBO clinician is not yet working in the school
    e.  Number of schools where the CBO clinician has not yet been hired, and identify which schools and provide the reason why the CBO clinician has not yet been hired
    f.  Please describe any obstacles or barriers to having CBO clinicians working in schools at the start of the school year
    g.  Please explain how this program and the data provided in response to (a) through (g) above may have been impacted by the COVID-19 pandemic and the transition to distance learning.

25.    Please provide a description of plans implement the public health model for school-based mental health for the remaining traditional and charter public schools.  Please include the following information
    a.  How many schools will be included in future cohort(s), and identify which schools would be in each cohort

    b. Timeline for implementation, including funding CBO grants, completing CBO matching process, and hiring CBO clinicians

    c. Anticipated obstacles or barriers to having CBO clinicians working in all future cohort schools at the start of the school year (Fall 2021), and plans to mitigate/remove these barriers

    d. Please explain how this plan takes into account the COVID-19 pandemic and the transition to distance learning.

26. Please provide an update on the status of completion of the School Strengthening Tool and Work Plan for all schools in Cohorts 1, 2 and 3. Please include the following information:

    a. How many schools in each cohort have completed the School Strengthening Tool and identify which schools

    b. How many schools in each cohort have completed the Work Plan and identify which schools

    c. For each school that has not completed the School Strengthening Tool, please provide the reason why this has not been done

    d. For each school that has not completed the Work Plan, please provide the reason why this has not been done

    e. How many schools in each cohort have identified an individual to serve as the School Behavioral Health Coordinator and identify which schools

    f. For each school that has not identified an individual to serve as the School Behavioral Health Coordinator, please provide the reason why this has not been done

    g. Please explain how this work and responses to (a) through (g) above may have been impacted by the COVID-19 pandemic and the transition to distance learning.

27. Please provide an update on the extent to which CBO and DBH clinicians have been able to bill their services to Medicaid, private insurance, or other sources of funds outside of local dollars. Please also discuss plans to bill additional services in the future. Please explain how this information may have been impacted by the COVID-19 pandemic and the transition to distance learning.

28. Please provide description and status update on the Memorandum of Understanding between DBH, DCPS, and OSSE providing for 1 full-time staff person at DCPS and 1 full-time staff person at OSSE to support the implementation of School-Based Mental Health. Please include the following information:

    1. A copy of the MOU and any other relevant interagency agreements

    2. Job descriptions for the two positions

    3. Plans for funding and supporting these two positions next year, and in the future

29. Please provide an update on the status of the community of practice for school-based mental health. Please include the following information

    a. An overview of the current organization structure, and plans for the future

b. List of events, trainings, or other convenings with brief summaries of the purpose of each event, target audience, planned number of participants, and actual number of participants in FY19, FY20, and FY21 to date

c. List of planned events, training, regular meetings, or other convenings with brief summaries of the purpose of each event, target audience, and planned number of participants in FY19, FY20, and FY21 to date

d. Estimated timeline for fully establishing the community of practice

e. Plans for assessing the effectiveness and utilization rate for the community of practice

f. Please explain how the community of practice and responses to (a) through (e) above have been impacted by the COVID-19 pandemic.

30. Please provide an update on the status of implementing and completing an assessment or evaluation of the effectiveness of the public health model for school-based mental health.  Please include the following information:
   a. Timeline for implementation and completion
   b. Description of planned assessment or evaluation tools
   c. If using an outside contractor, please identify which
   d. Please explain how the assessment or evaluation and responses to (a) through (c) above have been impacted by the COVID-19 pandemic, if at all.

31. Please provide the results of the midyear and last year's end of the year surveys that were distributed to school administrators to measure the satisfaction of services provided by SMHP clinicians. In your response, please indicate any actions taken to address concern raised in previous surveys regarding the need to have additional of full-time SMHP clinicians in schools.
   - Will similar surveys be administered to measure satisfaction of services provided by CBO clinicians through the school based mental health expansion program? If not, why not?

32. Please provide information about any work DBH is doing with DHCF and DC's education agencies to resolve concerns about payments for the educational part of PRTF placements, for youth with and without Individualized Education Plans (IEPs) from the school.  Please provide any MOAs or MOUs related to this subject.

33. Please provide the list of services available as part of the Mental Health Rehabilitation Services (MHRS) system. Specifically, please provide a description of each service and indicate whether or not it is available as part of the Medicaid MHRS program, the non-MHRS program, or both.  In addition, please provide the FY20 and current reimbursement rates for each service.

34. Please provide the monthly MHRS utilization data for FY20 and to date in FY21. Specifically, please include the following:
   a. A breakdown of Medicaid MHRS vs. non-Medicaid MHRS;
   b. For Medicaid MHRS, please provide a breakdown by managed care vs. fee-for-service (and include a breakdown by specific managed care organization);

    c.  For non-Medicaid MHRS enrollees, please indicate whether the individual had coverage via the DC Healthcare Alliance or was uninsured.

35. Please provide the name of all certified MHRS providers. For each provider, please provide the following information for FY19, FY20 and to date in FY21:
    a. Whether or not the provider utilizes the Medicaid MHRS program, the locally-funded MHRS program, or both;

36. Please provide an update on the implementation of the Live.Long.DC Strategic Plan including some of the positive results. Describe any new strategies to combat the increase in opioid overdoses related deaths.

37. Please provide an update on the DBH services to consumers under the custody of the Department of Corrections, including services provided in the READY Center.

38. Are there any services provided through Core Service Agencies or other mental health providers that are not currently reimbursed by Medicaid, and please indicate whether these services will be reimbursed under DC's approved 1115 waiver or could be reimbursed under a 1915(i) state plan option, a waiver, or a demonstration project.

39. DBH regulations provide that DBH conduct targeted compliance reviews of CSAs supported housing assessments and report the results to each CSA under review. DBH policies also require that DBH monitor certified providers to ensure compliance with DBH's housing procedures and programs, and that DBH utilize routine oversight and monitoring activities to determine whether CSAs are meeting their supported housing objectives. How does DBH conduct targeted compliance reviews and monitor certified providers to ensure compliance with its housing procedures and programs? What type of oversight and monitoring does DBH conduct to determine whether CSAs are meeting their supported housing objectives?

40. What percentage of Mental Health Community Residential Facilities (MHCRF), as a whole, are wheelchair accessible?

41. What percentage of Supported Independent Living (SIL) providers within the DBH system, as a whole, are wheelchair accessible?

42. DBH does not currently have a process to prioritize applicants who need wheelchair accessible Mental Health Community Residential Facilities (MHCRF). Creating a process for accessible Mental Health Community Residential Facilities (MHCRF) is increasingly important as the DBH population ages and needs accessible housing. Will DBH update its application process to include whether applicants need an accessible room and any other reasonable accommodations? Will DBH develop a process to prioritize consumers who need accessible housing and create policies and procedures for providers to follow?

43.   Of the total number of consumers that DBH serves, what is the number of consumers who are homeless?

44.   In FY20, what array of services and support did DBH provide to homeless consumers? What were DBH's outcomes? How many DBH consumers in FY20, who were homeless, were placed in housing?

45.   How does DBH ensure quality of mental health services within its provider network? Does DBH interview consumers of Core Service Agencies while conducting satisfaction surveys?

46.   Please provide an update on the High Fidelity Wraparound program, to include the following information:
   a.   What is the current capacity of wraparound?
   b.   Description of services currently being provided
   c.   Description of how individuals can access these services
   d.   How many individuals were serviced in FY20 and to date in FY21?
   e.   Since MBI was awarded the Care Management Entity (CME) contract in 2017 with a reduced capacity to serve 94 youth in the community, how many youth were served in FY20 and to date in FY21?
   f.   We understand that there has been a decrease in the flexible funding available per youth ($1,000 per youth). Please explain the decrease in funding? Are there any short term or long term plans to increase available flexible funding?
   g.   Will DBH take steps to change high fidelity wraparound from a locally-funded pilot program to a Medicaid-funded permanent MHRS service? If so, what steps have been taken to date?
   h.   How many children were diverted from PRTF placements?  Please provide a breakdown for the school and community-based programs.
   i.   Any outcome evaluations or reports of the program from the past two years
   j.   Please explain how the High Fidelity Wraparound program and responses to (a) through (i) above have been impacted by the COVID-19 pandemic.

47.   In FY20, how many children have been discharged from inpatient psychiatric hospitalization or psychiatric residential treatment facilities and received in-home and community-based mental health services?  This figure should include CBI, intensive care coordination, and intensive case management services—within 30 days, 60 days, or 90 or more days of their discharge.  Please also explain how this data may reflect the impact of the COVID-19 pandemic.

48.   Please provide an update on DBH's efforts to identify providers to provide Multisystemic Therapy (MST) and Functional Family Therapy (FFT).  Please describe the barriers to identifying providers, including whether caused by low Medicaid reimbursement rates, billing limitations, and/or burdensome reporting requirements, and what steps will DBH take to attempt to overcome those barrier(s).

49. For FY 19, FY 20, and FY21 to date, please list: a) the total number of psychiatric residential treatment facility (PRTF) and the total number of residential treatment center (RTC) admissions of a child and youth receiving MHRS (may include duplicate counts of those children or youth with multiple admissions during the Fiscal Year), b) the unduplicated number of children, and of youth, receiving MHRS and served in a PRTF or RTC, and c) the behavioral health conditions being treated. Please also explain how this data may reflect the impact of the COVID-19 pandemic.

50. Please provide detailed information about proposed changes to the ARC. When consumers who are not enrolled in services arrive at a DBH certified community-based provider, what will the new enrollment process be? Will changes to the ARC mean SUD providers are now allowed to bill for initial assessment services? Does the budget reflect this additional expense for SUD providers?

51. District contracts are usually offered as a base year plus four option years. Has DBH considered aligning its provider certification process with the five year contract cycle? So long as other periodic reviews of critical information continue, what would be DBH's major concerns with extending the provider organization certification to match the period for which contracts normally last? Are there other steps DBH could reasonably take to reduce duplication of administrative activities and paperwork by sharing information between DBH certification and recertification efforts and OCP solicitations and post-award documentation?

52. Please provide an updated list of all Evidence-Based Practices (EBP) and for each EBP please note:
    a. The name of each provider who offers it;
    b. Each provider's capacity;
    c. Each provider's current enrollment;
    d. Whether the EBP is Medicaid-reimbursable and if so, under what code or rate;
    e. Any quality assessment or outcome measure that have been put in place to assess the program; and
    f. Whether the EBP is trauma-informed.

53. Please provide a description and an update on the Behavioral Court Diversion program including:
    a. A description of which youth are eligible to participate in the program;
    b. The process or protocol of selecting or referring youth to the program;
    c. The number of youth who participated in FY20 and to date in FY21, the type of status offense they were alleged to have committed, the referral source (i.e., judge, probation officer, prosecutor, etc.) and the outcomes for youth in the program;
    d. The number of youth currently receiving CBI services through the Juvenile Behavioral Diversion Program

    e. The number of youth currently receiving CBI services through the Family Court Social Services Division

    f. The average and median wait time for a first appointment with a psychiatrist after referral from the Juvenile Behavioral Diversion Program and the Family Court Social Services Division

    g. The recidivism rate of the youth participants and an explanation of how recidivism rates are measured;

    h. Any costs associated with the program; and

    i. The program's capacity and any expansion plan or barriers to expansion.

    j. Please explain how the Behavioral Court Diversion program and responses to (a) through (i) above have been impacted by the COVID-19 pandemic.

54. Please provide an update on the Agency's early childhood mental health projects, including any studies or reports.

    a. For the Parent Child Infant Early Childhood Enhancement Program include a description of the services provided, the type of clinicians employed, their capacity, and the number of children served, and how the cases ended (e.g. successful completion, closure for lack of attendance, etc.) in FY20 and to date in FY21.

    b. For the Early Childhood Mental Health Consultation Project, list the child care centers, homes, and schools that are participating, the services they have received and provide any progress/outcome measure available.

    c. For the Behavioral Health Access Project, list the number of individual patients who participate in the Project, the number of pediatric primary care providers who have been using the Project, and any efforts made by DBH to engage other pediatric primary care providers in using the Project.

    d. Please provide an update on the DC MAP grant/contract.

    e. Please explain how DBH's early childhood mental health projects and responses to (a) through (e) above have been impacted by the COVID-19 pandemic.

55. Please provide an update on the implementation of the DC SEED Grant.

    a. Please also explain the impact of the COVID-19 pandemic on the implementation of the DC SEED grant.

    b. Please describe any plans or steps taken to sustain the services and supports related to this grant, once the grant period has ended.

56. Please provide an update on the implementation of the DC Opioid Response (DCOR) Faith-Based Recovery Month Grant. Did the programs funded by this grant prove successful?

57. Please provide an update on the "Now is the Time" Transitional Age Youth Grant. Please describe the status of the project, including the following information:

    a. Which community-based organizations participated in the grant in FY20?

    b. What services were provided under the grant in FY20? Are any of these services time-limited? If so, which services and what are their time limits?

    c.  To date, which community-based providers are certified to deliver transition age youth-specific services and supports?

    d.  To date, how many Transition Aged Youth (TAY) have received services under the Now is the Time grant, broken down by service type and dates of service?

    e.  How much of the grant funding was used in FY20 for direct services?

    f.  Please provide any outcome evaluations or reports of the program from the past.

    g.  Please explain how the "Now is the Time" Transitional Age Youth Grant and responses to (a) through (f) above have been impacted by the COVID-19 pandemic.

58.   During FY20, what percentage of children discharged from a hospital were seen within the community within seven days? When children are not seen until after the 7-day deadline, what are the reasons? Provide numbers and percentages.

59.   Please provide an update on the online behavioral health training program for all child development facilities and public schools that was launched in the first quarter of FY15. How many teachers and other personnel completed the online training in FY20 and FY21 to date?

60.   Please provide a list and narrative description of new or expanded services, activities, and/or programs offered by DBH to specifically address the increased stress and potential rise in behavioral health issues among DC's population during the COVID-19 pandemic. For each service, activity or program, please provide the number of individuals served, including a breakdown by age, race, gender, ethnicity, and ward.

61.   How does DBH plan to implement the National Suicide Hotline Designation Act of 2020, which creates a new 9-8-8 universal telephone number for the purpose of suicide prevention and mental health crisis response?

    a.  To what extent has DBH engaged the Office of Unified Communications or other public safety cluster agencies following the law's passage?

62.   Describe how DBH is working with providers especially substance use disorder providers to facilitate better coordination between Levels of Care and settings.

63.   Please provide an update on implementation of the District's approved Behavioral Health Transformation Demonstration program?

64.   What specific steps has DBH taken to ensure consumers living in DBH supported housing have been protected from contracting COVID?

65.   What specific steps has DBH taken to ensure DBH Providers have continued to meet the mental health needs of its consumers during the COVID emergency?

66. What specific steps is DBH taking now to ensure consumers have access to information about the COVID vaccine and are able to access vaccination cites to receive the vaccine?

67. How many grievances were filed against DBH providers and DBH during FY20? How many external reviews were filed in FY20? How many external reviews found in favor of the consumer? How many of those external review determinations in favor of the consumer were approved by the DBH Director?

68. Please describe the specific efforts DBH has taken to ensure CSAs provide services in accordance with CDC guidelines and consistent with the District's public health emergency because of the COVID-19 pandemic.

69. Did DBH take any measures to remove individuals from residential facilities because of the COVID-19 pandemic, which has taken the lives of thousands of individuals in congregate care facilities across the United States this year? If so, what specific measures did DBH take? How many individuals have been removed from residential placements because of the COVID-19 pandemic? For each such individual, where did that individual receive services after removal from the residential placement?

70. Did any guidelines, policies, or procedures change during FY20 for determining whether a child or youth under the age of 21 who is enrolled in your Medicaid program and has a diagnosis of "severe emotional disturbance" should receive CBI, ACT, HFW, TFC, and RS during FY 2020? If so, how?

71. If DBH is aware that fewer children and youth are receiving services than before COVID-19, what steps, if any, is DBH taking to investigate this and what specific steps is DBH taking to ensure that every child and youth's needs are met?

**Department of Behavioral Health Organizational Chart**

January 2021

**Barbara J. Bazron, Ph.D.**
Director

**Wilbur Giles**
Office of Contracts & Procurement

**Joyce Jeter**
Agency Fiscal Officer

**Michael Neff**
Chief Operating Officer
- Melvin Barry — Claims & Billing
- Anthony Baffour — Fiscal Services
- Imran Chaudry — Information Technology
- Facilities Management
- Renee Evans-Jackman — Grants Management
- Sabriana Clark — Records Management

**Mark Chastang**
Saint Elizabeths CEO

**Matt Caspari**
General Counsel
Office of the General Counsel

**Marsha Lillie-Blanton**
Senior Policy Advisor
- **Jelani Murrain** — Director, Policy, Planning, & Evaluation
  - Estelle Richardson — BH Block Grant Program
  - Laura Heaven — Data & Performance Measurement
  - David Shapiro — Training Institute
  - Trina Dutta — Strategic Management & Policy

**Nancy Black**
Interim Chief Clinical Officer
- Mishka Terplan — Deputy Clinical Officer
- Shannon Goodhue — Disaster Behavioral Health and Support Services

**Phyllis Jones**
Chief of Staff
- Patricia Thompson — Office of Ombudsman
- Frankie Wheeler — Human Resources
- Erica Cunningham — Communications
- Alvin Hinkle — Consumer & Family Affairs
- Davida Crocket — Legislative Affairs
- Community Engagement

**Richard Bebout**
Senior Deputy Director
- Integrated Care Team
- Chad Tillbrook — Forensic Services
- Morgan Medlock — Comprehensive Psych. Emerg. Program (CPEP)

**Atiya Jackson**
Deputy Director Accountability
- Madonna Green — Program Integrity
- Sheila Kelly — Licensure
- Christine Phillips — Certification
- Craig Stewart — Incident Management & Investigations

**Jean Moise**
Deputy Director
Adult/Transitional Youth Services
- JaVon Oliver — Behavioral Health Services (SUD)
- Alvin Hinkle — Residential Support & Continuity of Services
- Brandi Gladden — Housing Support Services
- Nancy Black — Government Operated Services (35 K Street Clinic)
- Anthony Hall — Community Response Team
- Sharon Hunt — State Opioid Response Program
- Venida Hamilton — Provider Relations
- Adina Madden — Assessment & Referral Center
- Johari Eligan — Access Helpline
- Terri Spencer — Behavioral Health Services (MHRS)
- Randall Raybon — Specialty Services
- Eugene Wooden — ACT/Co-located Services

**Barbara Paulson**
Deputy Director
Child/Adolescent/Family Services
- Patrina Anderson — Division Director
- Crisis Services
- Court Assessment
- Co-located Services
- Specialty Service
- Meghan Sullivan — Division Director
- School-Based BH Services
- Early Childhood Services
- Behavioral Health Services (MH/SUD)
- Eric Chapman — SUD Prevention, Intervention, & Treatment
- Amina Smith — Evidence-Based Practices
- Shermain Bowden — Government Operated Services (Howard Road)

DBH — DEPARTMENT OF BEHAVIORAL HEALTH

*Q1. Please provide a current organizational chart for DBH. Please provide information to the activity level. In addition, please identify the number of full time equivalents (FTEs) at each organizational level and the employee responsible for the management of each program and activity. If applicable, please provide a narrative explanation of any organizational changes made during FY19 and to date in FY20.*

**DBH Response**

Please see Attached FY 20 Organizational Chart.

To centralize all relevant services and programs for greater visibility and accountability, the Community Services and Clinical Services Administrations were reconfigured to include an Adult Division and Children/Youth Services Division.  The Forensic Services, Integrated Care Team, and the Comprehensive Psychiatric Emergency Program (CPEP) now report to the Senior Deputy Director.

Question 2: Please provide the following information for DBH, including the amount budgeted and actually spent for FY20 and to date in FY21. In addition please describe any variance between the amount budgeted and actually spent for FY20 and to date in FY21:

| | | | | | Fiscal Year | Values | | | | |
| | | | | | 2020 | | | 2021 | | |
| Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|
| 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 99,273,328.11 | 100,253,764.05 | (980,435.94) | 99,508,639.70 | 28,395,001.94 | 71,113,637.76 |
| | | | 0012 | REGULAR PAY - OTHER | 5,960,310.62 | 5,430,720.19 | 529,590.43 | 5,414,691.95 | 1,978,493.22 | 3,436,198.73 |
| | | | 0013 | ADDITIONAL GROSS PAY | 3,995,046.99 | 6,425,473.48 | (2,430,426.49) | 3,995,046.99 | 1,771,264.27 | 2,223,782.72 |
| | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 28,328,106.84 | 26,376,732.13 | 1,951,374.71 | 27,851,198.45 | 7,524,089.54 | 20,327,108.91 |
| | | | 0015 | OVERTIME PAY | 1,476,154.73 | 5,630,751.33 | (4,154,596.60) | 1,476,154.73 | 1,904,928.83 | (428,774.10) |
| | | PS Total | | | 139,032,947.29 | 144,117,441.18 | (5,084,493.89) | 138,245,731.82 | 41,573,777.80 | 96,671,954.02 |
| | | NPS | 0020 | SUPPLIES AND MATERIALS | 5,713,646.69 | 5,156,767.08 | 556,879.61 | 5,721,495.62 | 587,360.48 | 2,677,249.45 |
| | | | 0030 | ENERGY, COMM. AND BLDG RENTALS | 1,561,225.82 | 1,496,184.46 | 65,041.36 | 1,889,393.55 | 76,672.75 | (116,602.00) |
| | | | 0031 | TELECOMMUNICATIONS | 704,391.15 | 711,568.09 | (7,176.94) | 715,172.53 | 39,545.23 | 381,714.35 |
| | | | 0032 | RENTALS - LAND AND STRUCTURES | 6,628,949.00 | 6,429,607.02 | 199,341.98 | 6,963,803.80 | 1,586,053.91 | - |
| | | | 0034 | SECURITY SERVICES | 2,880,580.00 | 2,878,413.45 | 2,166.55 | 4,993,070.70 | 786,485.40 | - |
| | | | 0035 | OCCUPANCY FIXED COSTS | 697,246.00 | 679,867.56 | 17,378.44 | 884,973.92 | 12,798.70 | (500,000.00) |
| | | | 0040 | OTHER SERVICES AND CHARGES | 12,683,388.65 | 11,222,258.92 | 1,461,129.73 | 13,149,036.38 | 1,916,269.26 | 978,893.58 |
| | | | 0041 | CONTRACTUAL SERVICES - OTHER | 31,438,758.67 | 28,439,780.84 | 2,998,977.83 | 28,555,692.77 | 5,839,954.26 | 2,049,163.83 |
| | | | 0050 | SUBSIDIES AND TRANSFERS | 72,003,117.42 | 72,077,201.41 | (74,083.99) | 73,104,997.91 | 13,337,861.29 | 35,045,686.78 |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 175,050.00 | 55,910.02 | 119,139.98 | 175,050.00 | 1,238.87 | 158,971.00 |
| | | NPS Total | | | 134,486,353.40 | 129,147,558.85 | 5,338,794.55 | 136,152,687.18 | 24,184,240.15 | 40,675,076.99 |
| 0100 Total | | | | | 273,519,300.69 | 273,265,000.03 | 254,300.66 | 274,398,419.00 | 65,758,017.95 | 137,347,031.01 |
| 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 5,025,441.23 | 5,885,407.64 | (859,966.41) | 6,449,694.21 | 1,549,242.69 | 4,900,451.52 |
| | | | 0012 | REGULAR PAY - OTHER | 1,054,194.65 | 451,805.32 | 602,389.33 | 1,446,999.85 | 149,824.81 | 1,297,175.04 |
| | | | 0013 | ADDITIONAL GROSS PAY | - | 158,235.90 | (158,235.90) | - | 33,031.04 | (33,031.04) |
| | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 1,564,803.96 | 1,492,994.67 | 71,809.29 | 2,124,420.47 | 411,688.71 | 1,712,731.76 |
| | | | 0015 | OVERTIME PAY | - | 224,742.95 | (224,742.95) | - | 32,445.29 | (32,445.29) |
| | | PS Total | | | 7,644,439.84 | 8,213,186.48 | (568,746.64) | 10,021,114.53 | 2,176,232.54 | 7,844,881.99 |
| | | NPS | 0020 | SUPPLIES AND MATERIALS | 609,933.39 | 464,371.07 | 145,562.32 | 750,598.07 | 56,206.82 | 396,982.52 |
| | | | 0031 | TELECOMMUNICATIONS | - | - | - | - | - | (4,980.42) |
| | | | 0040 | OTHER SERVICES AND CHARGES | 8,078,606.12 | 8,099,789.12 | (21,183.00) | 20,012,509.52 | 610,496.83 | 6,644,915.82 |
| | | | 0041 | CONTRACTUAL SERVICES - OTHER | 2,234,028.32 | 2,190,785.37 | 43,242.95 | 9,980,756.01 | 42,649.84 | 9,559,618.14 |
| | | | 0050 | SUBSIDIES AND TRANSFERS | 9,148,280.77 | 8,503,545.58 | 644,735.19 | 19,407,751.53 | 1,713,961.15 | 10,588,808.39 |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 120,825.65 | 90,427.37 | 30,398.28 | 63,853.82 | - | 53,853.82 |
| | | NPS Total | | | 20,191,674.25 | 19,348,918.51 | 842,755.74 | 50,215,468.95 | 2,423,314.64 | 27,239,198.27 |
| 0200 Total | | | | | 27,836,114.09 | 27,562,104.99 | 274,009.10 | 60,236,583.48 | 4,599,547.18 | 35,084,080.26 |
| 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 448,167.59 | 447,927.88 | 239.71 | 594,417.28 | 134,359.10 | 460,058.18 |
| | | | 0013 | ADDITIONAL GROSS PAY | - | 6,600.71 | (6,600.71) | - | - | - |
| | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 99,911.73 | 99,557.27 | 354.46 | 159,898.25 | 29,860.84 | 130,037.41 |
| | | | 0015 | OVERTIME PAY | - | 6,429.28 | (6,429.28) | - | 1,700.42 | (1,700.42) |
| | | PS Total | | | 548,079.32 | 560,515.14 | (12,435.82) | 754,315.53 | 165,920.36 | 588,395.17 |
| | | NPS | 0020 | SUPPLIES AND MATERIALS | 5,000.00 | 2,412.15 | 2,587.85 | 5,000.00 | 2,089.97 | 5,000.00 |
| | | | 0040 | OTHER SERVICES AND CHARGES | 1,973,854.36 | 1,973,854.36 | - | 2,086,327.70 | 998,299.68 | 186,739.86 |
| | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | 6,782.05 | (6,782.05) | - | 449.95 | - |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 119,063.44 | 102,433.42 | 16,630.02 | 145,771.17 | 1,000,839.60 | 40,771.17 |
| | | NPS Total | | | 2,097,917.80 | 2,085,481.98 | 12,435.82 | 2,237,098.87 | 1,000,839.60 | 232,511.03 |
| 0250 Total | | | | | 2,645,997.12 | 2,645,997.12 | - | 2,991,414.40 | 1,166,759.96 | 820,906.20 |
| 0400 | PRIVATE GRANT FUND | NPS | 0020 | SUPPLIES AND MATERIALS | 25,425.12 | 25,425.12 | - | 40,000.00 | 1,389.26 | 40,000.00 |
| | | | 0040 | OTHER SERVICES AND CHARGES | 204,039.74 | 204,039.74 | - | 346,290.44 | 55,231.10 | 133,897.44 |
| | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | 10,531.75 | (10,531.75) | - | - | - |
| | | | 0050 | SUBSIDIES AND TRANSFERS | - | - | - | 20,000.00 | - | 20,000.00 |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 32,406.79 | 21,875.04 | 10,531.75 | 127,603.53 | - | 42,392.58 |
| | | NPS Total | | | 261,871.65 | 261,871.65 | (0.00) | 533,893.97 | 56,620.36 | 236,290.02 |
| 0400 Total | | | | | 261,871.65 | 261,871.65 | (0.00) | 533,893.97 | 56,620.36 | 236,290.02 |
| 0450 | PRIVATE DONATIONS | NPS | 0020 | SUPPLIES AND MATERIALS | 12,000.00 | 18,044.55 | (6,044.55) | 12,000.00 | 668.22 | 12,000.00 |
| | | | 0040 | OTHER SERVICES AND CHARGES | 135,463.55 | 26,650.99 | 108,812.56 | 135,463.55 | - | 135,463.55 |
| | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | 4,822.00 | (4,822.00) | - | - | - |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 13,689.19 | 4,661.65 | 9,027.54 | 13,689.19 | - | 13,689.19 |
| | | NPS Total | | | 161,152.74 | 54,179.19 | 106,973.55 | 161,152.74 | 668.22 | 161,152.74 |
| 0450 Total | | | | | 161,152.74 | 54,179.19 | 106,973.55 | 161,152.74 | 668.22 | 161,152.74 |
| 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,389,238.93 | 1,263,260.14 | 125,978.79 | 1,639,573.78 | 428,770.73 | 1,210,803.05 |
| | | | 0013 | ADDITIONAL GROSS PAY | - | 177,053.26 | (177,053.26) | - | 55,780.94 | (55,780.94) |
| | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 379,942.93 | 334,181.19 | 45,761.74 | 441,045.37 | 118,882.44 | 322,162.93 |
| | | | 0015 | OVERTIME PAY | 44,701.15 | 87,248.89 | (42,547.74) | 44,701.15 | 48,699.17 | (3,998.02) |
| | | PS Total | | | 1,813,883.01 | 1,861,743.48 | (47,860.47) | 2,125,320.30 | 652,133.28 | 1,473,187.02 |
| | | NPS | 0020 | SUPPLIES AND MATERIALS | - | (0.00) | 0.00 | - | 697.57 | - |
| | | | 0040 | OTHER SERVICES AND CHARGES | 501,599.75 | 450,634.77 | 50,964.98 | 525,000.00 | - | 125,000.00 |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | - | 3,104.51 | (3,104.51) | - | - | - |
| | | NPS Total | | | 501,599.75 | 453,739.28 | 47,860.47 | 525,000.00 | 697.57 | 125,000.00 |
| 0600 Total | | | | | 2,315,482.76 | 2,315,482.76 | 0.00 | 2,650,320.30 | 652,830.85 | 1,598,187.02 |
| Grand Total | | | | | 306,739,919.05 | 306,104,635.74 | 635,283.31 | 340,971,783.89 | 72,234,444.52 | 175,247,647.25 |

Question 2:  Please provide the following information for DBH, including the amount budgeted and actually spent for FY20 and to date in FY21.  In addition please describe any variance between the amount budgeted and actually spend for FY20 and to date in FY21:

| | | | | | Fiscal Year | Values | | | | |
| | | | | | 2020 | | | 2021 | | |
| Approp  Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |

Local Underspending:  $254,300 is related to undersping for the Gambling Initiative and other contractual services
Federal Underspending:  $274.009 related to undrspending in contractual services
Private Donations:  Original estimates exceeded actual collections

*Q2. Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY20 and to date in FY21. In addition, please describe any variance between the amount budgeted and actually spent for FY20 and to date in FY21:*

   *a. At the agency level, please provide information broken out by source of funds and by Comptroller Source Group and Comptroller Object;*

   *b. At the program level, please provide the information broken out by source of funds and by Comptroller Source Group and Comptroller Object; and,*

   *c. At the activity level, please provide the information broken out by source of funds and by Comptroller Source Group.*

**DBH Response**

Please see Attachment 1 of 1. Budget Reports

Question 3: Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY 20 and to date in FY 21. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.

| PROGRAM/PCA  FY 2020 | Source of Funds | Org Code | Prg Code | Intra-District Amount | Partner Agency | Comments/Description |
|---|---|---|---|---|---|---|
| **Transmitted Funds (Buyer)** | | | | | | |
| Accountability (4900); Office of Accountability (4905) | Local | 4900 | 4905 | $ 20,000.00 | Department of Health | Bedbug Inspections. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 425,595.00 | Department of Human Services | Opioid Response Team. |
| Community Services (6900); Prevention and Early Intervention (6912) | Local | 6900 | 6912 | $ 300,000.00 | Department of Health | To focus on Increasing access to MAT, reducing unment treatment needs and reducing opioid overdose related deaths in DC through the provision of prevention, treatment, and RSS to individuals with OUD. |
| Community Services (6900); Prevention and Early Intervention (6912) | Local | 6900 | 6912 | $ 88,685.46 | Office of the State Superintendent of Education | Annual salary and benefits of a School Behavioral Health Outreach Manager. |
| Various | Local | Various | Various | $ 76,584.00 | Deputy Mayor for Health and Human Services | Employement Screening. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 1,373,318.33 | Department of Health | To focus on Increasing access to MAT, reducing unment treatment needs and reducing opioid overdose related deaths in DC through the provision of prevention, treatment, and RSS to individuals with OUD. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 750,000.00 | Department of Health Care Finance | Pilot programs to utlize telehealth to increase access to MAT purposes of treating opiod use disorder. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 668,533.00 | Metropolitan Police Department | Naloxone Kits. |
| Community Services (6900); Prevention and Early Intervention (6912) | Local | 6900 | 6912 | $ 120,340.60 | DCPS | Expansion Outreach Manager. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 902,592.00 | Department of Corrections | Provide an orderly, safe, and secure and humane environment for the confinement of pretrial detainees and sentenced inmates, while providing meaningful opportunities for community reintegration. |
| Community Services (6900); Behavioral Health Rehab Local Match (6980) | Local | 6900 | 6980 | $ 26,339,837.53 | Department of Health Care Finance | Funding to expand, improve, and continue access to community-based rehabilitative mental health services, implementing certification standards to ensure quality provision of mental health services covered by the District of Columbia State Plan for Medical Assistance. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 68,559.76 | Office of the State Superintendent of Education | Implement and provide drug prevention education in high, middle, and elementary schools. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 2,401,021.87 | Department of Health | To focus on increasing access to MAT, reducing unment treatment needs and reducing opioid overdose related deaths in DC through the provision of prevention, treatment, and RSS to individuals with OUD. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 20,000.00 | Deputy Mayor for Health and Human Services | Maternal and infant health summit. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 182,275.40 | Department of Forensic Sciences | Alinity C analyzer equipment. |
| Community Services (6900); Behavioral Health Rehab Local Match (6980) | Local | 6900 | 6980 | $ 38,034.87 | Department of Health Care Finance | Funding to expand, improve, and coordinate access to community-based substance abuse services for youth under 21 on the Youth Substance Abuse Treatment (YSATS) ( ASTEP). |
| Various | Local | Various | Various | $ 654,771.35 | Department of Health Care Finance | Adult Substance Abuse Rehabilitative Services (ASARS) benefit for enrollees in the District of Columbia. Medicaid program and operational procedures to carry out those duties, rights, and responsibilities. |
| Behavioral Health Authority (1800); Consumer and Family Affairs (1820) | Local | 1800 | 1820 | $ 26,590.71 | Office of Unified Communications | 800MHZ Radio Communications and Maintenance Services and Support. |
| Agency Management (1000); Training and Employee Development (1015) | Local | 1000 | 1015 | $ 412.50 | Office of Disablity Services | Sign Language Interperation. |
| St Elizabeth Hospital (3800); Off of Clinical & Medical Services-St. Elizabeth Hospital  (3810) | Local | 3800 | 3810 | $ 4,618.44 | Office of the Chief Financial Officer | Armored Car Services. |
| Clinical Services Division (5800); Assessment and Referral Center (ARC) (5890) | Intra-District | 5800 | 5890 | $ 77,126.30 | Child & Family Services Agency | Year-end closing. |
| Community Services (6900); Behavioral Health Rehab Local Match (6980) | Local | 6900 | 6980 | $ 595,586.27 | Department of Health Care Finance | DBH shall implement the Medicaid benefit to deliver 1115 Medicaid Waiver Services. |
| Community Services (6900); Behavioral Health Rehab Local Match (6980) | Local | 6900 | 6980 | $ 254,384.14 | Department of Health Care Finance | Integrate mental and physical health care services for Medicaid beneficiaries with severe mental illness through Health Homes model and implement Health Home certification standards to ensure quality provision of Health Home services. |
| | **Total** | | | **$ 35,388,867.53** | | |

*Question 3: Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY 20 and to date in FY 21. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

| PROGRAM/PCA  FY 2020 | Source of Funds | Org Code | Prg Code | Intra-District Amount | Partner Agency | Comments/Description | Advance: Yes/No |
|---|---|---|---|---|---|---|---|
| **Received Funds (Seller)** | | | | | | | |
| Community Services (6900); Implementation of Drug Treatment Choice (6960) | Intra-District | 6900 | 6960 | $ 284,600.00 | Department of Human Services - Economic Security Administration | Reimbursable MOU- Provides the necessary substance abuse treatment & prevention services that are not provided or reimbursed through Medicaid. | No |
| Clinical Services Division (5800); Assessment and Referral Center (ARC) (5890) | Intra-District | 5800 | 5890 | $ 100,000.00 | Child & Family Services Agency | DBH shall identify a Contract Monitor within DBH to monitor the contract that staffs the ARC. | Yes |
| Community Services (6900); Behavioral Health Rehab (6970); Behavioral Health Rehab Local Match (6980) | Intra-District | 6900 | 6970;6980 | $ 4,300,000.00 | Department of Health Care Finance | DBH will provide MHRS Day Treatment Services to individuals formerly enrolled in the Fee-for-Service Day Treatment Program. | No |
| Community Services (6900); Linkage and Assessment (6930) | Intra-District | 6900 | 6930 | $ 60,000.00 | Child & Family Services Agency | DBH will manage contracts with the Choice Providers (doctors, psychologists, & mental health coordinators for children entering foster care and those within the Child & Family Services Agency. | No |
| Community Services (6900); Housing Development (6940) | Intra-District | 6900 | 6940 | $ 480,395.31 | Department of Human Services - Economic Security Administration | Collaboration & Coordination of resources, services, & expertise to better assist TANF customers who need to address & overcome mental health related barriers & to assist in customers re-engaging in work activities. | No |
| Community Services (6900); Prevention and Early Intervention (6912) | Intra-District | 6900 | 6912 | $ 760,000.00 | Office of the State Superintendent of Education | Pre-K Enhancement and Expansion Program to improve outcomes for young children. | No |
| Community Services (6900); Linkage and Assessment (6930) | Intra-District | 6900 | 6930 | $ 113,101.21 | Department of Employment Services | Identify and hire a qualified practitioner with the appropriate licensure and experience to serve as the on-site qualified practitioner for TEPD participants. | No |
| Community Services (6900); Linkage and Assessment-Co-Located (6932) | Intra-District | 6900 | 6932 | $ 220,000.00 | Deputy Mayor for Planning and Economic Development | Co-Location of two DBH Staff. Behavioral health clinicians hired to provide services to families and individuals in need of assistance overcoming health and personal barriers to improve their lives and social standing. | Yes |
| Community Services (6900); Prevention and Early Intervention (6912) | Intra-District | 6900 | 6912 | $ 516,452.00 | Office of the State Superintendent of Education | Project AWARE - Project Advancing Wellness and Resilience Education. | Yes |
| Community Services (6900); Specialty Care Community Based Services (6921) | Intra-District | 6900 | 6921 | $ 59,700.00 | Child & Family Services Agency | Functional family therapy for families that have children with behavioral or emotional problems. | Yes |
| System Transformation (5900); Information Systems Innovation & Data Analytics (ISIDA) | Intra-District | 5900 | 5910 | $ 465,650.00 | Department of Health Care Finance | DBH will provide upgrades to the current DATA/ WITS system of record for SUD providers and consultation and subject matter expertise on the design, development, and implementation. | Yes |
| Various | Intra-District | Various | Various | $ 8,412,725.81 | Department of Health Care Finance (Medicaid FY20) | Medicaid Claims for Saint Elizabeth Hospital and Behavioral Health Services & Support. | No |
| Clinical Services Division (5800); Office of the Chief Clinical Officer | Intra-District | 5800 | 5810 | $ 350,507.00 | Homeland Security and Emergency Management | Crisis Counseling - Immediate Services Program. | Yes |
| | **Total** | | | **$ 16,123,131.33** | | | |

*Question 3: Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY 20 and to date in FY 21. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

| PROGRAM/PCA  FY 2021 | Source of Funds | Org Code | Prg Code | Intra-District Amount | Partner Agency | Comments/Description |
|---|---|---|---|---|---|---|
| **Transmitted Funds (Buyer)** | | | | | | |
| Community Services (6900); Prevention and Early Intervention (6912) | Local | 6900 | 6912 | $ 141,041.23 | District of Columbia Public Schools | Employ a Expansion Outreach Manager to expand school-based behavioral health services. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 627,803.00 | Department of Health | To focus on Increasing access to MAT, reducing unmet treatment needs and reducing opioid overdose related deaths in DC through the provision of prevention, treatment, and RSS to individuals with OUD. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 188,000.00 | Department of For-Hire Vehicles | OUD transportation "My Rides" program MOU with DFHV and DBH. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 5,240,567.00 | Department of Health | To maintain an inventory of buprenorphine medication, enhance behavioral health issues, implement opioid overdose crisis, expand naloxone distribution, and provide training. |
| Community Services (6900); Specialty Care - New Initiatives (6922) | Grant | 6900 | 6922 | $ 107,866.00 | Office of the State Superintendent of Education | Opioid prevention education program. |
| Community Services (6900); Behavioral Health Rehab Local Match (6980) | Local | 6900 | 6980 | $ 338,599.26 | Department of Health Care Finance | Adult Substance Abuse Rehabilitative Services (ASARS) benefit for enrollees in the District of Columbia. Medicaid program and operational procedures to carry out those duties, rights, and responsibilities. |
| Community Services (6900); Behavioral Health Rehab (6970) | Local | 6900 | 6970 | $ 1,221,795.00 | Department of Health Care Finance | Health Homes model and implement Health Home certification standards to ensure quality provision of Health Home services covered by the District of Columbia State Plan. |
| Community Services (6900); Behavioral Health Rehab (6970);Behavioral Health Rehab Local Match (6980) | Local | 6900 | 6970;6980 | $ 29,844,252.71 | Department of Health Care Finance | Funding to expand, improve, and continue access to community-based rehabilitative mental health services, implementing certification standards to ensure quality provision of mental health services covered by the District of Columbia State Plan for Medical Assistance. |
| Community Services (6900); Behavioral Health Rehab Local Match (6980) | Local | 6900 | 6980 | $ 8,909.57 | Department of Health Care Finance | Funding to expand, improve, and coordinate access to community-based substance abuse services for youth under 21 on the Youth Substance Abuse Treatment (YSATS) ( ASTEP). |
| | **Total** | | | **$ 37,718,833.77** | | |

*Question 3: Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY 20 and to date in FY 21. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

| PROGRAM/PCA  FY 2021 | Source of Funds | Org Code | Prg Code | Intra-District Amount | Partner Agency | Comments/Description | Advance: Yes/No |
|---|---|---|---|---|---|---|---|
| **Received Funds (Seller)** | | | | | | | |
| Clinical Services Division (5800); Assessment and Referral Center (ARC) | Intra-District | 5800 | 5890 | $        108,000.00 | Child & Family Services Agency | DBH shall identify a Contract Monitor within DBH to monitor the contract that staffs the ARC. | Yes |
| Community Services (6900); Behavioral Health Rehab (6970); Behavioral Health Rehab Local Match (6980) | Intra-District | 6900 | 6970;6980 | $     4,300,000.00 | Department of Health Care Finance | DBH will provide MHRS Day Treatment Services to individuals formerly enrolled in the Fee-for-Service Day Treatment Program. | No |
| Community Services (6900); Linkage and Assessment (6930) | Intra-District | 6900 | 6930 | $        100,000.00 | Child & Family Services Agency | DBH will manage contracts with the Choice Providers (doctors, psychologists, & mental health coordinators for children entering foster care and those within the Child & Family Services Agency. | No |
| Community Services (6900); Housing Development (6940) | Intra-District | 6900 | 6940 | $        560,000.00 | Department of Human Services - Economic Security Administration | Collaboration & Coordination of resources, services, & expertise to better assist TANF customers who need to address & overcome mental health related barriers & to assist in customers re-engaging in work activities. | No |
| Community Services (6900); Prevention and Early Intervention- Early Childhood (6911) | Intra-District | 6900 | 6911 | $        831,007.00 | Office of the State Superintendent of Education | Pre-K Enhancement and Expansion Program to improve outcomes for young children. | Yes |
| Community Services (6900); Linkage and Assessment (6930) | Intra-District | 6900 | 6930 | $        127,000.00 | Department of Employment Services | Identify and hire a qualified practitioner with the appropriate licensure and experience to serve as the on-site qualified practitioner for TEPD participants. | No |
| Community Services (6900); Prevention and Early Intervention (6912) | Intra-District | 6900 | 6912 | $        517,344.00 | Office of the State Superintendent of Education | Project AWARE - Project Advancing Wellness and Resilience Education. | Yes |
| Various | Intra-District | Various | Various | $     8,972,342.96 | Department of Health Care Finance (Medicaid FY21) | Medicaid Claims for Saint Elizabeth Hospital and Behavioral Health Services & Support. | No |
| | **Total** | | | $   15,515,693.96 | | | |

*Q3. Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY20 and to date in FY21.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

**DBH Response**

Please see Attachment 1 of 1. Intra-District report

Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY20 and to date in FY21. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.

### Reprogramming's for FY 2020

| FY2020 Source of Funding | Amount | (Program/PCA) | (Program/PCA) | Purpose |
|---|---|---|---|---|
| Federal (8200) | $3,957,871.14 | Community Services (6900); Office of Community Services (6905), Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To safeguard that the DC Opioid Grant successfully completes the expectations and deliverables indicated in the federal grant award. |
| Federal (8200) | $5,495,502.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To safeguard that the DC Opioid Grant successfully completes the expectations and deliverables indicated in the federal grant award to the supplemental correct index. |
| Federal (8200) | $90,000.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To support ongoing operational costs and ongoing needs within behavioral health services. |
| Federal (8200) | $215,867.04 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To properly align the budget with the projected expenditures for the remainder of the fiscal year. |
| Federal (8200) | $120,000.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To align the budget with the projected expenditures for patient services within the accurate funding stream. |
| Federal (8200) | $100,000.00 | Community Services (6900); Prevention Substance Use Disorder (6913) | Community Services (6900); Prevention Substance Use Disorder (6913) | To align the budget with program's planned allocations for the correct comptroller source group that supports professional services and fees. |
| Federal (8200) | $115,000.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To ensure the budget is aligned with the program's planned allocations. |
| Federal (8200) | $44,199.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To support ongoing costs and ongoing needs within the information Specialty Care - New Initiatives Division. |
| Federal (8200) | $448,250.00 | Systems Transformation (5900); Strategic Management & Policy (5920) | Systems Transformation (5900); Strategic Management & Policy (5920) | To align the budget with program's planned allocations for the Mental Health Block Grant. |
| Intra-District (0758) | $76,777.64 | Community Services (6900); Prevention & Early Intervention Early Childhood (6912) | Community Services (6900); Prevention & Early Intervention Early Childhood (6912) | To align the budget with the contractual funded through the Intra-District specific to the Memorandum of Understanding (MOU) requirements. |

Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY20 and to date in FY21.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.

## Reprogramming's for FY 2020

| FY2020 Source of Funding | Amount | From(Program/PCA) | To (Program/PCA) | Purpose |
|---|---|---|---|---|
| Federal (8200) | $3,341,171.85 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To support ongoing costs and ongoing needs within the information Specialty Care - New Initiatives Division. |
| Federal (8200) | $60,000.00 | Community Services (6900); Office of Community Services (6905), Specialty Care - Community Based Services (6921) | Community Services (6900); Office of Community Services (6905), Specialty Care - Community Based Services (6921) | To align the budget with program's planned allocations for contructual services. |
| Federal (8200) | $700.00 | Systems Transformation (5900); Strategic Management & Policy (5920) | Systems Transformation (5900); Strategic Management & Policy (5920) | To align the budget with program's planned allocations for the Mental Health Block Grant. |
| Federal (8200) | $148,475.58 | Agency Management (1000); Financial Management (1050); Community Services (6900); Office of Community Services (6905),  Prevention Substance Use Disorder (6913) | Community Services (6900); Specialty Care (6920) | To realign the fiscal year 2020 budget to the appropriate cost centers to support needed  services and agreements. |
| Federal (8200) | $31,000.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To properly align the budget with the projected expenditures for the remainder of the fiscal year. |
| Intra-District (0765) | $25,000.00 | Community Services (6900); Prevention & Early Intervention Early Childhood (6912) | Community Services (6900); Prevention & Early Intervention Early Childhood (6912) | To align the budget with the contractual funded through the Intra-District specific to the Memorandum of Understanding (MOU) requirements. |
| Federal (8200) | $100,000.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To ensure the budget is aligned with the program's planned allocations. |
| Federal (8200) | $22,400.00 | DBH Financial Operations (100F); DBH Budget Operations (110F) | DBH Financial Operations (100F); DBH Budget Operations (110F); Behavioral Health Authority (1800); Office of the Director (1810); Systems Transformation (5900); Office of System Transformation (5905) | To safeguard that the DC Opioid Grant successfully completes the expectations and deliverables indicated in the federal grant award. |
| Federal (8200) | $26,379.34 | DBH Financial Operations (100F); DBH Budget Operations (110F) | DBH Financial Operations (100F); DBH Budget Operations (110F); Systems Transformation (5900); Office of System Transformation (5905) | To support ongoing operational costs and ongoing needs within behavioral health services. |
| Federal (8200) | $6,000.00 | DBH Financial Operations (100F); DBH Budget Operations (110F) | DBH Financial Operations (100F); DBH Budget Operations (110F); Behavioral Health Authority (1800); Office of the Director (1810) | To safeguard that the DC City Grant successfully completes the expectations and deliverables indicated in the federal grant award. |

Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY20 and to date in FY21.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.

## Reprogramming's for FY 2020

| FY2020 Source of Funding | Amount | From(Program/PCA) | To (Program/PCA) | Purpose |
|---|---|---|---|---|
| Federal (8200) | $7,000.00 | DBH Financial Operations (100F); DBH Budget Operations (110F) | DBH Financial Operations (100F); DBH Budget Operations (110F); Systems Transformation (5900); Office of System Transformation (5905) | To align the budget with program's planned allocations for the Our Time Exploration Grant. |
| Federal (8200) | $155,300.90 | Systems Transformation (5900); Strategic Management  & Policy (5920) | Systems Transformation (5900); Strategic Management & Policy (5920) | To properly align the budget with the projected expenditures for the remainder of the fiscal year. |
| Local (0100) | $4,676,868.41 | Community Services (6900); Prevention & Early Intervention - Early Childhood (6911), Prevention & Early Intervention Early Childhood (6912) | Community Services (6900); Prevention & Early Intervention -Early Childhood (6911), Prevention & Early | To realign the fiscal year 2020 budget to the appropriate cost centers to support needed  services and agreements in Prevention & Early Intervention. |
|  |  |  |  |  |

**Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY20 and to date in FY21. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.**

### Reprogramming's for FY 2021 to date.

| FY2021 Source of Funding | Amount | From(Program/PCA) | To (Program/PCA) | Purpose |
|---|---|---|---|---|
| Private Donations (8450) | $12,000.00 | St Elizabeth's Hospital (3800) Fiscal & Support Services (3820) | St Elizabeth's Hospital (3800) Fiscal & Support Services (3820) | To support ongoing operational costs and ongoing needs within behavioral health services. |
| Federal (8200) | $75,000.00 | Systems Transformation (5900); Strategic Management & Policy (5920) | Systems Transformation (5900); Strategic Management & Policy (5920) | To align the budget with program's planned allocations for the Mental Health Block Grant. |
| Federal (8200) | $6,574,690.84 | Community Services (6900); Specialty Care - New Initiatives (6922); DBH Financial Operations (100F); DBH Budget Operations (110F) | Community Services (6900); Specialty Care - New Initiatives (6922); DBH Financial Operations (100F); DBH Budget Operations | To safeguard that the DC Opioid Grant successfully completes the expectations and deliverables indicated in the federal grant award. |
| Federal (8200) | $86,000.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To ensure the budget is aligned with the program's planned allocations. |
| Federal (8200) | $122,931.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920); DBH Financial Operations (100F); DBH Budget Operations (110F); Agency Management (1000); Information Technology (1040) | To properly align the budget with the projected expenditures for the remainder of the fiscal year. |
| | | | | |

Q4. Please provide a complete accounting of all reprogramings received by or transferred from DBH in FY20 and to date in FY21.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.

**DBH Response**

Please Attachment 1 of 1. Reprogramming Report

**Question #5 - SPECIAL PURPOSE REVENUE**

Provide a complete accounting of all DBH's Special Purpose Revenue Funds for FY20 and to date FY21.

Agency Name (Code): Department of Behavioral Health (RM0)

| REVENUE SOURCE NAME | CODE | SOURCE OF FUNDING | Program/ Activity | PROGRAM DESCRIPTION | FY 2020 GENERATED FUNDS | FY 2020 EXPENDITURES | FY 2021 BUDGET | FY 2021 COLLECTIONS TO DATE | FY 2021 EXPENDITURES/TO DATE |
|---|---|---|---|---|---|---|---|---|---|
| Federal Beneficiary Reimbursement 0610 | D.C. Code 44-908/ D.C. Code 1-204.24d | Reimbursement | St. Elizabeths Hospital/Various Activities | Forensic Patients legally incarcerated by the court system. Funds are used to reimburse the District for services provided to patients in care. | 1,813,883 | 1,758,236 | 2,078,647 | 237,608 | 635,744 |
| Federal Beneficiary Reimbursement 0610 | D.C. Code 44-908/ D.C. Code 1-204.24d | Reimbursement | System Transformation/Information Systems | IT Staff support Forensic Patients legally incarcerated by the court system. | 0 | 55,647 | 0 | 0 | (2,723) |
| Federal Beneficiary Reimbursement 0610 | D.C. Code 44-908/ D.C. Code 1-204.24d | Reimbursement | Information Technology | IT Staff support. | 0 | 0 | 46,673 | 0 | 19,112 |
| Self Pay & 3rd Party Reimbursement 0640 | 7-1131.04./DC Code 2-586/DC Code 24-501 | Reimbursement | St. Elizabeths Hospital/Various Activities | Self Pay & 3rd Party Reimbursement. | | 118,094 | 100,000 | 0 | 0 |
| Self Pay & 3rd Party Reimbursement 0640 | 7-1131.04./DC Code 2-586/DC Code 24-501 | Reimbursement | Community Services/Prevention and Early Intervention | Self Pay & 3rd Party Reimbursement. | 500,000 | 381,906 | 400,000 | 51,907 | 0 |
| DBH Enterprise Fund Establishment 0641 | D.C Code 1-325.281 | Reimbursement | System Transformation/Training Institute | Collection of fees charged for training and Continuing Education Units | 1,600 | 1,600 | 25,000 | 0 | 0 |
| | | | | **TOTAL** | **2,315,483** | **2,315,483** | **2,650,320** | **289,515** | **652,133** |

*Q5. Please provide a complete accounting of all of DBH's Special Purpose Revenue Funds for FY20 and to date in FY21. Please include the following:*

    *a.  Revenue source and code;*

    *b.  Source of the revenue for each special purpose revenue fund (i.e. license fee, civil fine);*

    *c.  Total amount of funds generated by each source or program in FY20 and to date in FY21;*

    *d.  DBH activity that the revenue in each special purpose revenue source fund supports; and,*

    *e.  The FY20 and to date FY21 expenditure of funds, including purpose of expenditure.*

**DBH Response**

Please see Attachment 1 of 1. Special Purpose Revenue Report

| PROVIDER | DATE RECEIVED | COMPLAINT TYPE | REFFERAL SOURCE | TYPE OF REPORT | SUMMARY NATURE OF COMPLAINT OR ALLEGATIONS | CONCLUSIONS | RECOMMENDATIONS/ OUTCOMES | DATE COMPLETE |
|---|---|---|---|---|---|---|---|---|
| Abundant Grace | 8.25.2020 | MUI | provider | n/a | Provider internal QI activity returned false claims submitted by six staff | substantiated | Provider placed on Suspended Referrals and submitted Corrective Action Plan (CAP) | 8.31.2020 |
| Abundant Grace | 8.25.2020 | MUI | provider | n/a | Provider internal QI activity returned false claims submitted by six staff | substantiated | Provider placed on Suspended Referrals and submitted Corrective Action Plan (CAP) | 8.31.2020 |
| Amazing Love | 3.31.2020 | MUI | | Memo | | n/a | | 6.18.2020 |
| Anchor Mental Health | 10.28.2019 | MUI | CSA | Investigation | Sexual Assault | Inconclusive | NEW SOP in line with Chapter 38, retrain on DBH 480.1 & Chapter 38 | 8.27.2020 |
| CPEP | 1.21.2020 | MUI | Employee | Investigation | Employee Misconduct | Substantiated | Within 30 days, CPEP should retrain staff on DBH's & District policies regarding secondary employment. | 2.25.2020 |
| DBH | 3.24.2020 | MUI | DBH | Investigation | Exploitation | Substantiated | Submit proof no longer beneficiary, retrain on policies 482.1 & DC Code 22-933.01, review case load to ensure no other victims, report to DC Board of Licensure, forward to supervisor for appropriate actions | 8.5.2020 |
| Dedicated | 1.19.2021 | Complaint | DBH | Investigation | Consumers reported to DBH staff that they were induced to enroll with provder and recruit others | TBD | Refer for Suspended Referrals and require CAP pending | in process |
| Dedicated | 1.19.2021 | Complaint | DBH | Investigation | Consumers reported to DBH staff that they were induced to enroll with provder and recruit others | TBD | Refer for Suspended Referrals and require CAP pending | in process |
| District | 1.4.2021 | complaint | DBH | n/a | Provider staff allegedly offering indudement for enrollment to consumers | TBD | Refer for Suspended Referrals and require CAP pending | in process |
| District | 1.4.2021 | complaint | DBH | n/a | Provider staff allegedly offering indudement for enrollment to consumers | TBD | Refer for Suspended Referrals and require CAP pending | in process |
| Family Preservation | 8.01.2020 | complaint | DBH | Investigation | RN allegedly documenting false claims | substantiated | Provider submitted CAP, recieved TA, onging monitoring | in process |
| Family Preservation | 8.01.2020 | complaint | DBH | Investigation | RN allegedly documenting false claims | substantiated | Provider submitted CAP, recieved TA, onging | in process |
| Federal City | 11.14.2020 | Anonymous | Consumer | Memo | other | n/a | n/a | 12.24.2020 |
| Inner City Families Services | 2.10.2020 | MUI | CSA | Memo | Other | n/a | n/a | 8.8.2020 |
| Innovative Life Solutuins | 11.14.2019 | MUI/E-mail | CRF/ULS | Investigation | Physical Abuse | Substantiated | Retrain on DBH policy 480.1 & 630.2 & Chapter 38, | 6.3.2020 |
| Kahak | 8.24.2020 | MUI | other provider | Investigation | staff witnessed allegedly offering inducement for enrollment to potential consumers | substantiated | Provider placed on Suspended Referrals and submitted | 9.9.2020 |
| Kahak | 8.24.2020 | MUI | other provider | Investigation | staff witnessed allegedly offering inducement for enrollment to potential consumers | substantiated | Provider placed on Suspended Referrals and submitted | 9.9.2020 |

# *Everything is Scattered...*
# The Intersection of Substance Use Disorders and Incarcerations in the District

**August 25, 2020**     A report for ODCA from the Council for Court Excellence





Office of the District of Columbia Auditor

**Kathleen Patterson, District of Columbia Auditor**

**www.dcauditor.org**

# *Everything is Scattered...* The Intersection of Substance Use Disorders and Incarcerations in the District

This report, written for ODCA by the Council for Court Excellence, is a first-ever analysis of substance use disorder (SUD) services and incarceration data from D.C. agencies. It highlights the District's successes and challenges in addressing the treatment needs of people who are involved in the criminal justice system. The report includes recommendations for policy and practice change, with the goal of better health and reduced incarceration for D.C. residents.

## ODCA recommends that the District:

**1** Make D.C.'s pre-arrest diversion pathways more robust to keep people with SUDs out of jail.

**2** Develop jail entry procedures to identify more people with SUDs.

**3** Expand SUD treatment in the D.C. Jail.

**4** Ensure more people get quickly connected to community-based treatment when leaving the jail.

**5** Legally share information about SUD clients between agencies.

**6** Set public benchmarks for improved outcomes for this client population and hold the relevant agencies accountable.

**7** Continue to improve communications with clients, providers, and the public.

**11%** 

Residents of D.C. who have a SUD.

**25** 

Individuals in 3.5 years who had SUD care before, during, and after their incarceration.

**95%** 

Incarceration episodes we analyzed that involved a Black person, compared to the 46% of District residents who are Black.

**40%**  

Percentage of the records we evaluated that indicated that an incarcerated individual had a SUD.



Office of the District of Columbia Auditor



**Scan this code to read the report at www.dcauditor.org**


Office of the District of Columbia Auditor

August 24, 2020

The Hon. Muriel E. Bowser
Mayor of the District of Columbia
The John A. Wilson Building
1350 Pennsylvania Avenue N.W.
Washington, DC  20004

The Hon. Phil Mendelson, Chairman
Council of the District of Columbia
The John A. Wilson Building
1350 Pennsylvania Avenue N.W.
Washington DC  20004

Dear Mayor Bowser and Chairman Mendelson:

I am pleased to present this report, ***Everything is Scattered:* The Intersection of Substance Use and Justice-Involvement in the District**, prepared by the Council for Court Excellence (CCE) for the Office of the D.C. Auditor (ODCA), providing a comprehensive review of the District's provision of substance use disorder services (SUDS) to persons involved in the criminal justice system in our community. It represents a first-ever analysis of what the data collected and maintained by District agencies on SUD services can tell us, and highlights both the successes and the long-term challenges in addressing the persistent needs. We include a series of recommendations for policy and practice change, all with the goal of better health and reduced incarceration.

We are pleased to include here a comprehensive and detailed response to the draft report. The Bowser Administration concurs with a majority of our recommendations and provides further description of reforms underway including actions taken after the time period covered in the report such as expansion of the pre-arrest diversion program and adding new leadership exper-tise at DBH. We particularly appreciate the ongoing commitment to improving cross-agency collaboration and the reminder that building systems to securely share data can be a costly endeavor. The cover letter signed by Deputy Mayors Wayne Turnage and Kevin Donahue notes that the report "affirms that work remains to connect individuals through the system in the com-munity, interactions with the justice system, and by assessments and engagements by our service providers."

This report is the third public-private partnership between the D.C. Auditor and CCE, a non-profit, non-partisan civic organization that has focused on justice in the Washington metropolitan area for nearly four decades. I am particularly pleased to partner with CCE because their methodology brings together a wide range of representatives in the legal, business, and social services commu-nity of Washington, D.C.,  who give of their own time on a pro-bono basis to produce research and recommendations that assist policymakers in serving the District's residents.

This report builds on our last engagement with CCE published in 2018, **Improving Mental Health Services and Outcomes for All: D.C.'s Department of Behavioral Health and the Justice System.**

That initiative put a spotlight on the critical need for diversion programs in place of incarceration for those with behavioral health disorders and the similarly critical need to connect individuals being released from incarceration to needed community behavioral health services.

We are publishing a companion report, **Lessons From the Life and Death of Alice Carter,** that provides a case study of Alice Carter, a transgender District woman who received SUD services and experienced time incarcerated. Her story is told by Street Sense Media and is largely based on District government documents and social agency staff interviews, providing a very human picture of the policies and practices in place and the challenges in carefully serving those who suffer from substance abuse.

I am pleased that the CCE work helps highlight significant achievements by both DBH and the District's Department of Corrections while also focusing on the long road ahead to improving cross-agency collaborations including the need to better identify a larger proportion of those who would could greatly benefit from treatment while in custody. We look forward to next steps in sharing the findings and recommendations with members of the D.C. Council and the public.

Finally, I want to extend ODCA's appreciation to senior members of the Bowser Administration, and in particular DBH Director Barbara Bazron, DOC Director Quincy Booth, Deputy Mayor for Health and Human Services Wayne Turnage, General Counsel Betsy Cavendish and Deputy General Counsel Karuna Seshasai, as well as members of the Administration's information tech-nology team who worked to provide access to health and public safety data including Mario Field, Data Curation Program Manager, Office of the Chief Technology Officer.  My thanks as well to our CCE partners for another productive partnership and for this comprehensive report.

Sincerely yours,

Kathleen Patterson
Auditor of the District of Columbia

AUGUST 25, 2020

# *Everything is Scattered…*
# The Intersection of Substance Use Disorders and Incarcerations in the District

**A report by the Council for Court Excellence**
**for the Office of the District of Columbia Auditor**



# Contents

**Note from the Chair** ..................................................................................................................1

**Executive Summary** .................................................................................................................3

**Introduction** ..............................................................................................................................9

    Objective and Scope ............................................................................................................9

    Methodology ......................................................................................................................10

    Substance Use Disorders and Justice Involvement........................................................11

    D.C.'s Behavioral Health System and Population Overview..........................................13

    D.C.'s Criminal Justice System and Population Overview.............................................16

**Inter-Agency Data Analysis**..................................................................................................19

    Limitations of the Dataset.................................................................................................20

    Terms Used..........................................................................................................................21

    Data Findings: Racial Demographics ..............................................................................22

    Data Findings: Continuity of SUD Care Before, During, and After Incarceration Episodes .......22

    Data Findings: Time until Care Connection Following Release from Custody ...........28

    Data Findings: Relationships between Care During an Incarceration Episode
    and Additional Justice Involvement ................................................................................30

    Data Findings: Deaths, Justice Involvement, and Care ................................................33

    Data Findings: Deaths, Justice Involvement, and Assessments...................................34

**Finding 1:**  An enhanced Pre-Arrest Diversion program in the District would provide
opportunities for substantial improvement in outcomes for people with substance
use Disorders who are at risk of justice involvement.........................................................38

**Finding 2:**  DOC is failing to identify all individuals with substance use disorders who
may benefit from treatment while in custody or connection to care during reentry. ............48

**Finding 3:**  DOC is a leader in the delivery of Medication-Assisted Treatment in a correctional
setting, but needs to improve the availability of other types of substance use disorder services,
reentry planning, and Medicaid reconnection support for people leaving custody. ...............60

**Finding 4:** DBH requires people seeking substance use disorder services to be assessed in-person at an intake location with limited availability; there are delays between referrals and care; and DBH does not follow up to ensure people connect to treatment.................................78

**Finding 5:** The District and federal governments do not adequately share, utilize, or analyze information about D.C.'s justice-involved substance use disorder client population across agencies................................................................................................................................92

**Finding 6:** DBH does not have clear strategic priorities, goals, and benchmarks that guide its delivery of substance use disorder services in the District generally, or for justice-involved individuals in particular, and it has not consistently used the same benchmarks annually to evaluate performance. ...............................................................................................................105

**Finding 7:** DBH has not established adequate communication channels with critical substance use disorder stakeholders, including providers and members of the public....................116

**Conclusion** ...................................................................................................................................128

**Appendix A:** Index of Figures...................................................................................................130

**Appendix B:** Data Sharing Agreement ...................................................................................132

**Appendix C:** Quantitative Methods.........................................................................................159

**Appendix D:** Glossary of Terms...............................................................................................165

**Members of the Audit Team** ...................................................................................................169

# Note from the Chair

The Council for Court Excellence (CCE) is pleased to share this audit examining the District's challenges and successes in providing substance use disorder (SUD) services to low-income adults who are eligible for publicly funded health care and are justice-involved in the District. While an important undertaking, a review of these issues is inherently difficult and limited given both the complex mix of local and federal actors included within D.C.'s criminal justice system, and the many different agencies and health care providers involved in the identification of individuals needing SUD services and the referral to, provision, and tracking of SUD services. Despite (or perhaps because of) this large and varied group of stakeholders, no single entity in the District has yet succeeded in ensuring the inter-agency collaboration necessary to assess the full scope of justice-involved individuals needing SUD services or to facilitate system-wide data-sharing and program evaluation. Nevertheless, an examination of the services and programs provided by Department of Behavioral Health (DBH) and the Department of Corrections (DOC) can help us understand what the District does well—in some cases serving as a national leader—and what the District could do better to serve this uniquely vulnerable population.

Our report is based on a tremendous amount of research and data analysis conducted over the past year and a half that explored the ways in which DBH and DOC interacted with SUD consumers and the effectiveness of these interactions. The research included more than 100 interviews with DBH and DOC administrators, SUD clients, community behavioral health providers, community stakeholders and advocates, attorneys and judges, academic experts, and current and former senior officials from other behavioral health agencies around the country.  In addition, the research included a SUD practitioner survey, a review of SUD and other behavioral health practices in other jurisdictions, analysis of D.C. statutes and regulations, and a thorough review of DBH and DOC internal documents and data. Finally, this audit is unique because it analyzed an inter-agency, person-level dataset of behavioral health medical claims, arrest records, incarceration records, and overdose deaths. This is the first time that such a dataset has been assembled and used in the District of Columbia to analyze the interrelationship of SUD services, justice-system involvements, and deaths. The audit expands the universe of what is now knowable about SUD clients and their involvement with the justice system, and we hope that the dataset will live on and be used by the District to improve SUD treatment outcomes and reduce justice involvement.

We found that, during a period of significant change, DBH and DOC accomplished much to enhance and expand their provision of SUD services, progress for which they can be justly proud. For instance, DBH is moving from a centralized model for SUD assessments and referrals to care to a "no-wrong-door" model that is considered best practice nationwide. DOC offers state-of-the-art Medication-Assisted Treatment (MAT) to opioid users in its custody. At the same time, however, many areas need improvement.

In particular, DBH and DOC are not yet ensuring continuity of care with respect to the delivery of services to SUD clients before and after incarcerations. In addition, both agencies, as well as other District actors, need to improve inter-agency cooperation, communication, planning, and information sharing to identify the clients who need care or are at risk of being arrested. We recommend that DOC improve the way that it gathers information about its clients' SUD status and that DOC deliver SUD services to all individuals in its custody with SUDs, not just those who need detoxification services or receive MAT for opioid dependencies. DBH should improve the way that it sets, and measures its achievement of goals, and it should continue to build on recent successes in its communication with stakeholders. We also recommend that DBH work with other relevant agencies to expand and improve its pre-arrest diversion services to fulfill the Neighborhood Engagement Achieves Results (NEAR) Act's goal of using public health approaches to prevent violence and reduce incarceration. We hope that this report will provide impetus toward such further improvement.

As chair of the Audit Steering Committee, I wish to express our sincere appreciation to Deputy Mayor for Health and Human Services Wayne Turnage, DOC Director Quincy Booth, DBH Director Barbara Bazron, and their staff members who participated in this process. Finally, I thank the Audit's Steering Committee members and the CCE staff. Their extensive combined efforts in conducting interviews and research, analyzing the data obtained, and their thoughtful drafting and editing of the material have assured the quality of this report.

Sincerely,

Michael D. Hays
Audit Steering Committee Chair
CCE Board Director

# Executive Summary

Throughout the nation, substance use disorders (SUD) have profoundly destructive and far-reaching effects on individuals, families, and communities. The physical, emotional, and economic costs of addiction and dependency, and the associated burdens on the public health and criminal justice systems, are enormous. The District of Columbia is a participant in the pain. According to federal government estimates, more than one in 10 D.C. adults have a SUD.  In 2017 alone, the number of lethal overdoses approached 300. Compounding the problem, individuals struggling with addiction and dependency frequently have encounters with and become entangled in the criminal justice system. Many become caught up in the debilitating cycle of repeated trips through the revolving door of arrest, judicial proceedings, incarceration, release, and re-arrest.

Breaking free from that cycle is difficult. Nevertheless, it can be done with appropriate treatment services. In the District of Columbia, three agencies play critical roles in providing and supporting such care: the Department of Behavioral Health (DBH), which is responsible for SUD services in the community; the Department of Corrections (DOC), which has that responsibility in the jails; and the Department of Health Care Finance (DHCF), which is the District's state Medicaid agency and the source of much of the funding for SUD services in the community. In light of the importance of those roles, the Office of the District of Columbia Auditor (ODCA) engaged the Council for Court Excellence (CCE) to review, and make recommendations for improving, the agencies' policies, systems, and procedures for providing SUD services for the District's justice-involved population.

To carry out the ODCA contract, the CCE audit team conducted numerous interviews of current and former DBH and DOC administrators, community and government stakeholders, D.C. Superior Court judges, and practitioners. CCE also interviewed individuals currently receiving community-based SUD services in the District, and it used on-line surveys to get additional information about providers' experiences when serving clients with SUDs or interacting with behavioral-health and criminal-justice agencies. The audit team educated itself about best practices by conducting an extensive literature review and interviewing behavioral-health and substance-use administrators and practitioners and other experts in the field. The CCE audit team reviewed the statutory, regulatory, and caselaw bases for the provision of SUD services in the District and analyzed DBH's and DOC's organizational histories and legal structures to gain an understanding of their relevant policies, practices, and objectives. In response to questions and document requests from CCE, DBH and DOC produced numerous internal and inter-agency documents and other useful information.

In addition to combing through publicly available data about SUD services for justice-involved people in the District, the CCE audit team compiled and analyzed a first-of-its-kind dataset consisting of information supplied by DBH, DOC, DHCF, the Metropolitan Police Department (MPD), and the Office of the Chief Medical Examiner (OCME). This unique dataset reveals a number of patterns and relationships among arrests, SUD services in the community and in the jail, and overdose deaths during the Audit Period (Jan. 1, 2015 through Sept. 30, 2018).

CCE found that, during the Audit Period, DBH and DOC accomplished some significant achievements and launched some promising initiatives to enhance and expand the provision of SUD services. These include DOC's implementation of leading-edge Medication-Assisted Treatment in the jails and DBH's improved communications with community providers and members of the public and its recent shift away from a single point of intake to a "no-wrong-door approach" to accessing SUD services. We commend the agencies for those actions.

At the same time, CCE's review revealed several areas where improvements are needed, and CCE makes several corresponding recommendations. Some recommendations call for specific actions by either DBH or DOC. Other recommendations require coordinated actions by multiple governmental agencies. And some necessitate greater communication and cooperation between DBH and community providers. None of the recommendations, however, are likely to succeed unless government and community leaders make a sustained commitment to achieving steady progress over the long term and to cultivating a healthy culture of collaboration, cooperation, and communication by and among relevant public and private agencies and organizations.

The following summarizes the data-matching analysis conducted as part of this audit and CCE's key findings and recommendations. These topics are discussed in greater detail in the body of this report.

## INTER-AGENCY DATA ANALYSIS

The CCE audit team matched various anonymized datasets for the Audit Period—arrests (MPD), claims for SUD services (DHCF and DBH), incarceration and SUD identification (DOC), and overdose fatalities (OCME)—to follow the contacts of justice-involved adults through the stages of assessment and treatment in the community, arrest, incarceration, and release back into the community. This exercise suggests some interesting, and in some cases startling, observations. For example, during the Audit Period:

- Only a tiny fraction (just over 1%) of the incarcerations associated with a SUD in the 4,602 cases analyzed by CCE received SUD services before, during, and after incarceration, suggesting that virtually no one receives the benefit of complete continuity of care, which is important to effective treatment and reduced recidivism.

- It took an average of 33 days after release from DOC to connect an individual to SUD services.

- DBH had no contact with approximately 77% of the cases in which an individual died of an overdose.

As explained in the report, these observations are made using limited data and should be scrutinized further before drawing any definitive conclusions. Nevertheless, the analysis does show the promising potential of assembling and analyzing data collected by the relevant agencies to develop a complete picture of the patterns of interaction that people with SUDs have with behavioral health, correctional, and related agencies in the District. This type of analysis should help identify the system intercepts having the greatest need for attention and improvement.

## SUMMARY OF FINDINGS AND RECOMMENDATIONS

**Pre-Arrest Diversion**

*"Sooner begun is sooner done."* –Patrick Rothfuss, Writer of Epic Fiction

Many jurisdictions around the country, including the District, use drug courts and other post-booking programs to divert people with mental illness and/or SUDs away from the criminal justice system and into treatment and related services. Another effective point of diversion occurs even earlier—before arrest and entanglement in the criminal justice system. SUDs are progressive—the earlier treatment starts, the better the chances of long-term recovery. In addition, avoiding a criminal record enhances the prospects of ultimately finding housing and employment, and treatment in the community costs taxpayers less than judicial proceedings and incarceration.

In April 2018, MPD, DBH, and the Department of Human Services announced a pilot pre-arrest diversion program. The program was restricted to two police service areas and was operational only during limited hours and days of the week. A relatively small number of police officers completed training, and even fewer actively participated in the pilot program. Approximately 80 individuals with mental illness or co-occurring mental illness and SUDs were enrolled in the program, most of whom received individualized service plans within 72 hours and some of whom received housing assistance. In October 2019, the pilot was merged into DBH's new mobile, multi-disciplinary, 24-hour crisis response team. CCE did not review that new arrangement because it started after the conclusion of the Audit Period.

Pre-arrest diversion is a best practice and has yielded positive outcomes in other jurisdictions. CCE recommends that it be continued, strengthened, and expanded in the District. In the body of this report, CCE makes recommendations for improving the District's pre-arrest diversion efforts, including proposals for increasing community-based organizations' and providers' involvement and trust in the program. In addition, a key to successful pre-arrest diversion is having sufficient numbers of properly trained police officers. MPD buy-in is thus vital, and CCE makes recommendations for improvements in that regard.

**More Accurate SUD Detection Within DOC**

*"Fast is fine, but accuracy is everything."* –Wyatt Earp, Frontiersman, Deputy U.S. Marshal

CCE's data-matching analysis suggests that, during the Audit Period, DOC failed to identify a substantial number of people in its custody who had SUDs. Of the 4,602 "incarceration episodes" analyzed by CCE, only about 333 (or slightly more than 7%) were identified by DOC as having a SUD. On its face, that percentage is suspect—it is lower than the 11.55% SUD rate in the District's general adult population, according to the federal government's 2018 National Survey on Drug Use and Health. CCE's analysis suggests that DOC should have detected many more SUD cases. For example, of 772 DOC residents who had received SUD care in the 90 days before their incarceration, DOC identified only 63 as having a SUD. It seems likely that many of the other 709 had a SUD that went undetected by DOC. As a result of this undercounting, many people who would have benefited from SUD services did not receive them, and opportunities were missed to connect people in need with SUD services and to support continuity of care between correctional and community settings.

In the body of this report, CCE recommends that DOC adopt protocols and policies requiring the use of a best-practices screening tool and other instruments and techniques to improve the accuracy rate of SUD identification.

### Expand SUD Services and Improve Reentry Planning at DOC

*"We know what we are but know not what we may be."* –Ophelia in Hamlet, William Shakespeare, Playwright

To its credit, DOC is among the nation's leading correctional facilities in providing Medication-Assisted Treatment (MAT) in the jail, but it needs to do a better job with respect to expanding the availability of other types of SUD services and planning for released residents' reentry into the community. In the body of this report, CCE makes recommendations for additional therapeutic programming, "brief interventions" suited to short stays at the jail, and ways to strengthen reentry planning and post-release connections to SUD services.

### Improving Access to SUD Care

*"Be an opener of doors."* –Ralph Waldo Emerson, Essayist, Transcendentalist

During the Audit Period, DBH's single point of intake for SUD services assessment, combined with the substantial delay between assessment and connection to care, created serious barriers to accessing and receiving treatment and contributed to higher rates of arrest and incarceration. Recently, however, DBH has been taking steps to lower those barriers. It is moving toward a "no-wrong-door" decentralized model that increases the number of points of entry into SUD services. In 2019, after the conclusion of the Audit Period, DBH certified six additional intake centers and is now considering additional expansions of the number of intake points. In the body of this report, CCE makes recommendations for further improvements, including a proposal that the D.C. Council fund a pilot program requiring at least one SUD service provider to be open 24/7 for assessment and care. CCE also makes recommendations for shortening the lag time between assessment and treatment.

### Priorities, Benchmarks, and Strategic Planning

*"If you don't know where you are going, you'll end up someplace else."* –Yogi Berra, Baseball Legend

It is a fundamental principle of effective management that an organization should engage, on an ongoing basis, in disciplined and thoughtful long-term strategic planning, including the setting of priorities and benchmarks. Engaging in such planning helps to get everyone within the organization to work together toward common goals, provides a guide for day-to-day decisions and a rational framework for allocating resources, and enables management to assess progress toward the organization's goals and evaluate whether a course correction is needed in response to changing circumstances.

For DBH, strategic planning has been a struggle. Although it has prepared single-year performance reports and started an unfinished strategic planning effort nearly four years ago, DBH has not adopted a multi-year, agency-wide strategic plan to guide its medium to long-term decision-making. The absence of a clear set of agreed-upon goals, priorities, and benchmarks has hampered DBH's ability to assess the effectiveness of its programs and policy changes and may have delayed its responses to developments in the opioid crisis. Moreover, several administrators expressed concern about the agency's overall lack of strategic vision, describing management as functioning solely in a reactive mode.

CCE recommends that, considering DBH's planning struggles, the D.C. Council enact legislation requiring the agency to develop and complete, on a timely basis, a multi-year, agency-wide strategic plan. In the body of this report, CCE also makes several related recommendations, including that DBH supplement its "Live. Long. DC. Washington, DC's Strategic Plan to Reduce Opioid Use, Misuse, and Related Deaths" to cover services and care for all SUDs, not just opioids.

### Sharing of SUD Information Among Relevant District and Federal Agencies

*"Information is like compost; it does no good unless you spread it around."* –Eliot Coleman, Organic Farmer, Researcher, Writer

Notwithstanding its limitations, CCE's data-matching exercise shows the potential ways in which interagency sharing of data can reveal important information about the functioning of the behavioral health and criminal justice systems with respect to justice-involved people with SUDs. In the body of this report, we elaborate on the various ways in which such information sharing, including the real-time sharing of authorized SUD information by the agencies and community-based providers, could improve outcomes—for example, by de-escalating law enforcement encounters, promoting interventions to prevent harm to at-risk individuals, or facilitating prompt connections to care.

In the District, information sharing among behavioral health and criminal justice agencies about justice-involved people with SUDs is extremely circumscribed. This situation leaves each agency with only limited and fragmented information, thereby depriving it of a full picture of the individuals it is trying to serve. The lack of common information across agency lines also inhibits interagency collaboration, a prerequisite to developing coherent, integrated solutions to the complex issues presented by the population at issue. In addition, the current inability to match data from multiple agencies to individuals impairs the ability of the agencies, governmental officials, researchers, and others to assess the effectiveness of the SUD services and programs being offered to those in need. For example, the District cannot evaluate how its Opioid Strategic Plan is functioning without cross-agency information sharing and the ability to discern causal relationships among the different datasets. Moreover, the federal government's involvement in the prosecution, adjudication, and incarceration of D.C. Code offenders adds a layer of complexity to effective information sharing.

In the body of this report, CCE makes various recommendations for facilitating information sharing among behavioral health and criminal justice agencies, including the outlines of an interagency agreement and potential protocols and consents for addressing privacy and ethical concerns. CCE

also suggests that the Criminal Justice Coordinating Council may be able to play a constructive role in facilitating the sharing of information among the relevant District and federal agencies.

## Communications with SUD Providers and the Public

*"The biggest problem with communication is the illusion that it has taken place."*
–George Bernard Shaw, Playwright

Based on interviews and online surveys, CCE found that, during much of the Audit Period, individuals with SUDs, professionals in the field, and community-based SUD providers had many complaints about the quality of DBH's communications. In many cases, these perceived communication deficiencies led to misunderstandings, negative feelings, and distrust. A number of providers also complained about the lack of adequate advance notice of DBH policy changes. This situation was exacerbated by high turnover at DBH, which resulted in communications disruptions and mixed messages. The good news is that, during the late stages of the Audit Period, those that had dealings with DBH reported a marked improvement. DBH has made significant progress in upgrading its communications with providers and the public and has developed some high-quality models for enhancing its future communications.

In the body of this report, CCE makes recommendations for ways in which DBH can build on its recent communications improvements. The recommendations include regular meetings with providers at which they, not DBH, set most of the agenda; informational sessions with the public; and improvements in the ways in which DBH dispenses information to the public. In addition, CCE proposes improvements in the procedures by which members of the public can complain about provider misconduct.

# Introduction

## OBJECTIVE AND SCOPE

The objectives of this audit were to examine and evaluate the ways in which three District agencies–the Department of Behavioral Health (DBH), the Department of Corrections (DOC), and the Department of Healthcare Finance (DHCF)–directly provided or supported the provision of substance use disorder services to justice-involved people in the District of Columbia.

To produce a series of findings and recommendations in the areas related to criminal justice and behavioral health outcomes, including possible legislative, regulatory, policy, and practice changes, we sought to answer several fundamental questions.

- How are SUD services provided in the District, particularly to individuals eligible for publicly funded health care and those who are arrested and incarcerated in D.C.?

- What are the barriers or challenges faced by individuals seeking care for a SUD and are those barriers different for individuals who have been incarcerated?

- Is relevant information shared among the local and federal agencies that interact with these vulnerable individuals, and if so, how?

- What are promising or best practices for providing SUD services to justice-involved clients?

The Council for Court Excellence (CCE) conducted this audit between November 2018 and February 2020. The period of review, called the "Audit Period" throughout this report, covered January 1, 2015, through September 30, 2018. The scope of CCE's review was limited to evaluating how effectively DBH, DOC, and, to a limited extent, DHCF (hereinafter referred to collectively as the "engaged agencies") interact to provide SUD services to D.C.'s justice-involved population. Much of the audit pertains to the intersections of these agencies where justice-involved SUD clients are served. We also reviewed facets of the agencies that serve a broader population but have a distinct impact on justice-involved SUD clients. We focused on District agencies, so federal agencies involved in D.C.'s behavioral or criminal justice systems were not engaged in the audit.

In addition to analyzing publicly available datasets related to the District's behavioral health and criminal justice systems, the CCE audit team developed a first-of-its-kind person-level dataset that it used to observe how individuals interacted with D.C.'s SUD and justice systems. To offer a meaningful evaluation of the intersection of these systems, it was critical to understand who was assessed for SUD care, who received SUD care, who was arrested and incarcerated, whether an individual received SUD care while incarcerated, whether those who died of overdoses received SUD care or had been incarcerated, and how those groups intersected. CCE compiled the dataset based on information supplied by the three agencies the Auditor formally engaged as well as the MPD and the Office of the Chief Medical Examiner (OCME).

Throughout this report, CCE uses the term "justice-involved" to refer to individuals who were arrested or held in connection with the alleged commission of a crime or who either are currently or were previously incarcerated. In keeping with DBH's conventions, CCE refers to individuals who are receiving SUD services as "clients" and refers to individuals who are receiving mental health services as "consumers." Consistent with DOC's conventions, CCE refers to individuals who are incarcerated as "residents" of a jail facility except when discussing their treatment, in which case they are referred to as "patients" or "clients." For a glossary of terms used in this report, see Appendix D.

The first chapter of the report, this **Introduction**, gives a high-level overview of the audit and the District's behavioral health and criminal justice systems and populations. The second chapter, **Inter-Agency Data Analysis**, explains the dataset given to CCE, describes how that dataset was analyzed, and presents findings from that data analysis. The third chapter, **Findings and Recommendations**, details the seven main findings and recommendations of the audit. The first four findings are organized roughly by system intercept, beginning at the point of arrest, moving to the identification of individuals in DOC custody who have SUDs, then DOC's available SUD treatments and its reentry planning in conjunction with DBH, and then DBH's assessments, referrals, and connections to care for justice-involved people. The last three findings are related to higher-level agency operations: data sharing, use, and analysis, strategic planning, and communications. Finally, we provide a brief conclusion with potential next steps for the District.

## METHODOLOGY

This audit's focus was on justice-involved adults who were eligible for publicly funded SUD services in D.C. To assess how publicly-funded SUD services in D.C. are provided to adults in the community and in DOC, CCE's research and analysis combined information from myriad sources about the behavioral health and criminal justice systems in the District of Columbia and gauged the opinions and perceptions of SUD clients, SUD providers, governmental staff, other stakeholders, and experts in and outside of the District.

CCE formed a five-member Steering Committee that was supported by several behavioral health expert advisors, CCE staff, and two research fellows. The Steering Committee helped to guide and conduct legal, quantitative, and qualitative research; ensure an independent evaluation of the facts identified in the data-collection phase; and create reasonable and implementable recommendations based on D.C.'s unique traits, the information collected, and best practices. Steering Committee members led methodology-based working groups that had responsibility for different types of information-collection. The four methodologies were:

**Qualitative Data Collection**. The qualitative working group was chiefly responsible for overseeing more than 80 interviews with current and former DBH and DOC administrators, community and government stakeholders, D.C. Superior Court judges, and practitioners. CCE also interviewed 26 individuals who were receiving community-based SUD services in D.C. They provided explicit, informed consent before being interviewed and received $25 gift cards after completing their interviews. All participation in the interviews, including by government staff, was voluntary and anonymous. Information from those interviews is included as supporting evidence throughout this

report.[1] At several points in 2019, CCE sought to interview individuals with SUDs who were in DOC custody, but ultimately did not obtain access to the interviews.

In addition to interviews, CCE distributed an online survey to members of the D.C. Behavioral Health Association to solicit anonymous responses to questions related to the experience of serving clients with SUDs and interacting with justice and behavioral health agencies in D.C. In total, 21 providers responded to the survey. Throughout this report the survey results are used to improve the quality and detail of the audit team's findings, but they are not used as statistical data or for causal inference. Survey results bolster findings that were identified first through interviews or research, describe subjective experiences of providers, and highlight areas for further analysis.

Best Practice Information Collection. The best practice working group was chiefly responsible for identifying and learning about best practices in other jurisdictions based on extensive literature reviews and interviews of behavioral-health and substance-use system administrators and health care services practitioners. The other functional working groups relied on information and background data developed through this exercise to inform their analysis.

**Legal Framework Analysis.** The legal working group was responsible for evaluating the statutory and regulatory bases for the provision of SUD services in the District of Columbia, as well as relevant case law. CCE analyzed the organizational histories and legal structures of DBH and DOC to understand their policies, practices, and objectives as they related to serving individuals who have SUDs. DBH and DOC provided responses to dozens of questions and document requests to further inform CCE's review; these included descriptive organizational documents, relevant contracts and inter-agency agreements, and qualitative data on program performance outcomes.

**Quantitative Data Collection.** This effort had two components. First, CCE staff and research fellows evaluated publicly available data related to the provision of SUD services to justice-involved clients in the District and the quantitative data included in the agencies' responses to information requests. Second, ODCA and CCE worked with the Executive Office of the Mayor, representatives from the engaged agencies, MPD, OCME, and the Office of the Chief Technology Officer (OCTO), to create a novel dataset that matched behavioral health and justice information for individuals during the Audit Period. This dataset—the first of its kind in D.C.—gave CCE and ODCA a unique view of justice-involved SUD clients in the District. Details of how CCE analyzed this dataset can be found in Appendix C: Quantitative Methodology.

## SUBSTANCE USE DISORDERS AND JUSTICE INVOLVEMENT

According to the Diagnostic and Statistical Manual of Mental Disorders (DSM-V), which provides the standard classifications of *mental disorders* used by *mental* health professionals in the United States, the term substance use disorder (SUD) describes "a problematic pattern of using alcohol or another substance that results in impairment in daily life or noticeable distress." More specifically, a SUD is "a cluster of cognitive, behavioral, and physiological symptoms indicating that the

---

1    All notes taken during interviews conducted for the audit were redacted to preserve anonymity and are on file with CCE.

individual continues using the substance despite significant substance-related problems."[2] The DSM-V describes 10 separate classes of drugs relevant to SUDs: alcohol, caffeine, cannabis, hallucinogens, inhalants, opioids, sedatives, hypnotics, stimulants, and tobacco.

The 2018 National Survey on Drug Use and Health indicates that 7.6% of Americans age 18 and older met the DSM-IV diagnostic criteria for a SUD.[3] The same survey estimated that 11.55% of D.C. residents aged 18 or older had a SUD in 2018.[4] The Substance Abuse and Mental Health Services Administration (SAMHSA) claims that, "[b]y 2020, mental and substance use disorders will surpass all physical diseases as a major cause of disability worldwide.[5] In the U.S., drug overdoses are already a leading cause of death among individuals under the age of 50.6 Among individuals aged 24-35, opioids were involved in one in five deaths nationally.[7] In D.C., there was a 178% increase in fatal overdoses due to opioid use from 2014 to 2016; the peak occurred in 2017, with 279 overdoses.[8] Nationally, illicit drugs, prescription opioids, and alcohol abuse are associated with economic and health costs that are estimated to be around $572 billion dollars annually.[9] This constitutes a major public health crisis.

While SUDs are a significant issue for all Americans, they have a particularly strong connection to our criminal justice system. Substance use contributes to rates of incarceration, taxpayer and other "hidden" costs, disease, and death among people who are justice-involved. In the most comprehensive study of drug use among arrestees in the U.S., 68% of arrestees nationally tested positive for at least one illicit substance at the time of arrest.[10] Following arrests, among the people who are subsequently jailed or imprisoned, illicit drugs are implicated in 75.9% of incarcerations, and

---

2    American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013). The DSM-V updated the definitions of a SUD from the manual's prior edition, also commonly referred to by its acronym, the DSM-IV.

3    Substance Abuse and Mental Health Services Administration ("SAMHSA"), *Key Substance Use and Mental Health Indicators in the United States: Results from the 2018 National Survey on Drug Use and Health* (2019), https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHNationalFindingsReport2018/NSDUHNationalFindingsReport2018.pdf.

4    SAMHSA, NSDUH State Estimates, accessed Mar. 5, 2020, https://pdas.samhsa.gov/saes/state; *see also SAMHSA, Section 5 PE Tables—Results from the 2018 National Survey on Drug Use and Health: Detailed Tables, Sections 1 - 3, SAMHSA, CBHSQ,* accessed Mar. 11, 2020, https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHDetailedTabs2018R2/NSDUHDetTabsSect5pe2018.htm.

5    SAMHSA, SAMHSA: *Prevention of Substance Abuse and Mental Illness* (last updated Feb. 3, 2020), https://www.samhsa.gov/prevention.

6    Karin Mack et al., Center for Disease Control and Prevention, *Illicit Drug Use, Illicit Drug Disorders, and Drug Overdose Deaths in Metropolitan and Nonmetropolitan Areas - United States* (2017), https://www.cdc.gov/mmwr/volumes/66/ss/ss6619a1.htm?s_cid=ss6619a1_w.

7    Tara Gomes et al., *The Burden of Opioid-Related Mortality in the United States,* 1 JAMA Network 2 (2018).

8    D.C. Department of Behavioral Health, *Washington, DC's Strategic Plan to Reduce Opioid Use, Misuse, and Related Deaths* (Mar. 2019), https://livelong.dc.gov/sites/default/files/u23/LIVE.%20LONG.%20DC-%20Washington%20DC%27s%20Opioid%20Strategic%20Plan-%20March%20Revision.pdf.

9    National Institute on Drug Abuse, *Trends & Statistics* (2017), https://www.drugabuse.gov/related-topics/trends-statistics.

10   Dana Hunt et al., Office of National Drug Control Policy, *ADAM II 2013 Annual Report* (2013), https://www.abtassociates.com/sites/default/files/migrated_files/91485e0a-8774-442e-8ca1-5ec85ff5fb9a.pdf.

alcohol alone is implicated in 56.6% of incarcerations nationally.[11] A 2017 U.S. Bureau of Justice Statistics (BJS) report found that 58% of people incarcerated in state prisons and 63% of people detained in jails met the criteria for a SUD diagnosis.[12]

Put together, the data tell us that the majority of people who are charged with or convicted of a crime in America have a diagnosed SUD or have recently consumed an illicit or impairing substance at the time of their arrest. This compounds the impacts of this public health crisis, further burdening public resources, degrading community safety, and leading to collateral consequences that can make recovery even more difficult. At the same time, an encounter or involvement with the criminal justice system can present the opportunity to connect with and help an individual who may be struggling to get SUD treatment and other needed supports. Many in the District of Columbia are working hard to provide this care and connection to services, but more collaboration, commitment, information, and resources are needed to address the complex crisis of addiction and criminal justice involvement.

## D.C.'S BEHAVIORAL HEALTH SYSTEM AND POPULATION OVERVIEW

There are two local agencies central to the provision of community-based behavioral health care in D.C.: DBH, which oversees the city's public mental health and SUD services, and DHCF, which is D.C.'s state Medicaid agency.

DHCF, formerly the Medical Assistance Administration under the D.C. Department of Health (DOH), administers D.C.'s Medicaid program and the D.C. Healthcare Alliance, which serves low-income residents not eligible for federally-supported programs. Medicaid serves as a significant source of funding for DBH and community-service providers in the District. Federal Medicaid regulations give states the flexibility to determine the scope of services that can be offered and the populations eligible to receive them. DHCF determines what behavioral health care services are covered by Medicaid and Alliance and sets reimbursement rates for the services provided.

DBH was established in 2013 when the District merged the Department of Mental Health (DMH), an independent District agency, with the Addiction Prevention & Recovery Administration (APRA), which had been operating within DOH. DBH provides prevention, intervention, and treatment services for people with mental health and/or SUDs in D.C. DBH also provides emergency psychiatric care and community-based long- and short-term outpatient and residential services, and it operates Saint Elizabeths Hospital, D.C.'s inpatient psychiatric hospital. The number of adult SUD clients served by DBH decreased every year during the Audit Period from a high of 6,908 SUD clients in FY2015.[13] In FY2018, DBH reported serving 4,977 adult SUD services clients and 19,855 adult mental health services consumers.

---

11    The National Center on Addiction and Substance Abuse at Columbia University, *Behind Bars II: Substance Abuse and America's Prison Population* (2010).

12    Jennifer Bronson et al., Bureau of Justice Statistics, *Drug Use, Dependence, and Abuse Among State Prisoners and Jail Inmates, 2007-2009* (2017), https://www.bjs.gov/content/pub/pdf/dudaspji0709.pdf.

13    D.C. Department of Behavioral Health, *Reports: Mental Health and Substance Use Report on Expenditures and Services (MHEASURES)*, accessed March 12, 2020, https://dbh.dc.gov/page/reports-01 (years 2015 through 2018).

In 2017 the District's Health Systems Plan described D.C.'s behavioral health system as an "expansive and fragmented private system of care made up of hundreds of individual and small group practices."[14] These include mental health service providers, SUD service providers, and general healthcare providers that offer behavioral health services.

At the end of the Audit Period, DBH had 30 SUD providers certified to operate in the District, down from 40 certified SUD providers at the beginning of the Audit Period. Some SUD providers operate out of a single facility, while others have several. According to the National Survey of Substance Abuse Treatment Services, the number of SUD treatment facilities in the District also declined, from 34 to 24, between 2016 and 2018.[15]

DBH contracts with some, but not all, of the SUD providers it certifies. In FY2018, DBH had 23 contracts for SUD services with 20 certified SUD providers.[16] The contracted providers offer, on DBH's behalf, a continuum of SUD services, including prevention, treatment, and recovery support. Preventive services include educational and outreach efforts to children and youth in the District. Treatment services include outpatient, intensive outpatient, residential, detoxification and stabilization, and Medication Assisted Treatment (MAT). Recovery Support Services (RSS) are wrap-around services such as care coordination, peer mentoring, and a range of other social supports that aim to improve the recovery process. Not every provider offers all of these services, and some providers offer only specialized or targeted SUD care.[17]

Even though the number of certified SUD providers has declined, evidence suggests that the number of individuals with SUDs in the District increased over the course of the Audit Period. Specifically, the National Survey on Drug Use and Health estimated that 10.59% of adult D.C. residents between 2015 and 2016 had a SUD, while between 2017 and 2018, 13.01% of adult D.C. residents had a SUD.[18] This means that between 2015 and 2016, there were 58,000 adult D.C. residents who had a SUD, while between 2017 and 2018, there were 73,000 adult D.C. residents who had a SUD.[19]

---

14    D.C. Department of Health, District of Columbia: Health Systems Plan 2017, p. 80 (2017), https://dchealth.dc.gov/sites/default/files/dc/sites/doh/publication/attachments/DC%20Health%20Systems%20Plan%202017_0.pdf.

15    SAMHSA, *2016 State Profile - District of Columbia* - N-SSATS, p. 46 (2016), https://wwwdasis.samhsa.gov/dasis2/nssats/n2016_st_profiles.pdf; SAMHSA, 2018 State Profile - District of Columbia - N-SSATS, p. 37 (2018).

16    DBH Correspondence on Feb. 13, 2020.

17    In addition to dedicated SUD providers, SUD services in D.C. are also provided in Acute Care Hospitals and in the two psychiatric hospitals, St. Elizabeths and the Psychiatric Institute of Washington (PIW). Of D.C.'s hospitals, only Providence, which closed April 30, 2019, and PIW offered detoxification. Acute Care Hospitals, Federally Qualified Health Centers, and primary care physicians can all provide SUD services part of their routine care, but are not under DBH's authority.

18    *SAMHSA, NSDUH State Estimates*, accessed Mar. 5, 2020, https://pdas.samhsa.gov/saes/state; see also SAMHSA, 2017-2018 State Level Estimates, accessed Mar. 13, 2020, http://www.samhsa.gov/data/sites/default/files/reports/rpt23235/2k18SAEExcelTabs/NSDUHsaePercents2018.pdf.

19    *SAMHSA, 2017-2018 National Surveys on Drug Use and Health: Model-Based Estimated Totals* (in Thousands) (50 States and the District of Columbia) (2019), https://www.samhsa.gov/data/sites/default/files/reports/rpt23259/NSDUHsaeTotals2018/NSDUHsaeTotals2018.pdf.

The number of adults in the District who needed but did not receive SUD care also increased during the Audit Period. In D.C., between 2015 and 2018, there were between 55,000 and 64,000 adults who needed but did not receive treatment at a specialty facility for a SUD.[20] From 2015 to 2018 there were between 16,000 and 24,000 adults in D.C. who needed but did not receive treatment for illicit drug use.[21] For context, there were 27,000 adults in D.C. from 2017 to 2018 who had an illicit drug use disorder in the past year.[22] In short, during the Audit Period, and at the same time as the opioid crisis peaked, the number of adults in D.C. with a SUD increased, and the number of individuals needing but not receiving treatment also increased.

Simultaneously, the number of people receiving care from DBH decreased. As seen in Figure 1 below, between 2015 and 2018, the number of SUD clients served, the "Existing" and "New" client categories in the chart below, decreased by 28%. While it is beyond this audit's scope to determine why SUD services in D.C. decreased, it is notable that DBH served fewer SUD clients, fewer providers offered SUD services, and fewer facilities delivered SUD services.

---

20    *See id; see also SAMHSA, 2015-2016* National Surveys on Drug Use and Health: Model-Based Estimated Totals (in Thousands) (50 States and the District of Columbia) (2017), https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHsaeTotal2016/NSDUHsaeTotals2016.pdf.

21    *Id.*; SAMHSA, *2017-2018 National Surveys on Drug Use and Health: Model-Based Estimated Totals (in Thousands) (50 States and the District of Columbia)* (2019), https://www.samhsa.gov/data/sites/default/files/reports/rpt23259/NSDUHsaeTotals2018/NSDUHsaeTotals2018.pdf.

22    SAMHSA, *2016-2017 NSDUH State Estimates of Substance Use And Mental Disorders* (2018), http://www.samhsa.gov/data/report/2016-2017-nsduh-state-estimates-substance-use-and-mental-disorders.

**Figure 1: DBH Adult SUD Clients Assessed and Served**



*Source: D.C. Department of Behavioral Health, 2018 Mental Health and Substance Use Report on Expenditures and Services (2019), p.23*

## D.C.'S CRIMINAL JUSTICE SYSTEM AND POPULATION OVERVIEW

Like most places in the U.S., there are two separate criminal justice systems at work in D.C. The first is federal, where the U.S. Attorney's Office for the District of Columbia (USAO-DC) prosecutes people charged with violating federal laws in U.S. District Court.  If convicted, these people could be sentenced to serve time in the federal Bureau of Prisons (BOP). If released to the community, they are supervised by U.S. Probation and Pretrial Services. This is the same system that anyone in the country is subject to if charged with or convicted of violating federal law.

In most cases, however, individuals in the District who are charged with a crime will face prosecution under D.C.'s local laws. People convicted under D.C. law are commonly referred to as "D.C. Code offenders." This second system is D.C.'s equivalent of a state system, but because of D.C.'s unique position as a federal District, D.C. Code offenders follow a complex chain of custody and supervision that bounces back and forth between local and federal agencies.

MPD, a locally funded agency, is the primary law enforcement agency in the District. During the Audit Period, MPD made 225,180 arrests, 213,517 of which were of adults.[23] In addition to MPD, however, nearly 30 independent law enforcement agencies operate in the District, the most active of which include the D.C. Housing Authority's Office of Public Safety, Metro Transit Police Department, U.S. Secret Service, U.S. Park Police, and the U.S. Capitol Police.

The USAO-DC, a federal office within the U.S. Department of Justice (DOJ) which has both federal and local jurisdiction, prosecutes most D.C. Code charges. The D.C. Office of the Attorney General (OAG), a local agency, prosecutes juveniles and some misdemeanor crimes. In 2019, there were 4,949 convictions for D.C. Code offenses in the D.C. Superior Court, excluding an additional 1,723 convictions for traffic offenses.[24]

Generally, after being arrested for an alleged violation of D.C. law and arraigned in D.C. Superior Court, a federally funded and controlled court with local jurisdiction, an individual is either conditionally released under the supervision of the Pretrial Services Agency for the District of Columbia (PSA), is a federal agency with local jurisdiction, or detained by the DOC, a local agency, at either the Central Detention Facility (CDF or D.C. Jail) or the Correctional Treatment Facility (CTF). CTF houses all women and some men deemed to be special populations, including people with acute health needs, people participating in a Residential Substance Abuse Treatment (RSAT) unit, and the new Young Men Emerging unit. People can also be confined at a halfway house facility while awaiting trial, particularly if they are participating in a work-release program, although pre-trial halfway house confinement is infrequent.

During the Audit Period, 22,373 individuals were incarcerated at DOC facilities a total of 40,112 times.[25] From 2015 to 2018, DOC incarcerated between 1,500 and 2,000 people daily.[26] Approximately 60% of individuals released from DOC are released back into the community. Many incarcerations in DOC are short: 34.7% of stays are for one week or less.

If an individual is sentenced to probation or time served with community supervision for a D.C. Code offense, they are supervised by the Court Services and Offender Supervision Agency (CSOSA). CSOSA is another federal agency with local jurisdiction over D.C. Code offenders who are on probation, parole or supervised release. An individual convicted of a misdemeanor and sentenced to less than a year of incarceration will remain either in the CDF or CTF. Finally, someone convicted of a D.C. Code felony and sentenced to a period of incarceration of a year or longer will be sent to one of more than 100 BOP facilities scattered around the country.

Upon release from custody, an individual will serve any remaining parole or supervised-release sentence under the supervision of CSOSA staff. An individual under CSOSA supervision accused

---

23    CCE Analysis of Inter-Agency Data.

24    D.C. Superior Court, *District of Columbia Courts 2019 Statistical Summary* (2019), https://www.dccourts.gov/sites/default/files/2019_Statistical_Summary.pdf.

25    *Id.*

26    D.C. Department of Corrections, *DOC Population Statistics* (December 31, 2019), https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/DOC%20Population%20Statistics_Dec31_2019_01_24_2020.pdf.

of violating the terms of parole or supervision will face a revocation hearing before the U.S. Parole Commission (USPC), which is a federal agency. Those awaiting a hearing before the USPC are frequently held in the custody of the DOC. When the USPC decides to revoke parole or supervised release, the individual will typically be returned to the custody of the BOP.

The total reach of the District's criminal justice system is vast. On any given day in 2017, one in every 22 adults in D.C. was actively involved in the local criminal justice system.[27] Over the past ten years, one in seven adults in D.C. had a publicly available criminal record, and one in 14 had a criminal conviction.[28]

---

27  Council for Court Excellence, *Beyond Second Chances, Returning Citizens' Re-Entry Struggles and Successes in the District of Columbia,* p.1 (2016), http://www.courtexcellence.org/uploads/File/BSC-FINAL-web.pdf.

28  Marina Duane et al., Urban Institute, *Criminal Background Checks and Access to Jobs, A Case Study of Washington, D.C.* (2017), https://www.urban.org/sites/default/files/publication/91456/2001377-criminal-background-checks-and-access-to-jobs_2.pdf.

# Inter–Agency Data Analysis

As part of this audit, CCE matched and analyzed four years' worth of behavioral health, criminal justice, and fatality data from five different D.C. agencies. The following provides a snapshot of the relationship between SUD services in the community, MPD arrests, incarcerations at DOC, and overdose deaths between January 1, 2015, and September 30, 2018 ("the Audit Period").29

Specifically, the de-identified, person-level data used to perform this evaluation included:

- SUD claims data generated by DHCF for Medicaid funded services and DBH for local-dollar funded services.

- DOC incarceration and SUD identification data.

- MPD arrest data.

- OCME overdose fatality data.

In compliance with all health and personal information privacy protections required by law and the July 19, 2019, Data Sharing Agreement[30] entered into by these agencies, ODCA, CCE, the Office of the Chief Technology Officer (OCTO), and the Deputy Mayor for Health and Human Services (DMHHS), we matched these person-level datasets together using the unique identifiers included in each. We then used the matched datasets to identify and evaluate relationships between D.C. justice involvement, as measured by record of encounters with MPD and DOC, and SUD services, as measured by record of service claims generated by DHCF and DBH in the delivered datasets, as well as any overdose deaths that occurred in the District during the Audit Period.

This preliminary analysis offers an illuminating and troubling first look into the intersection between SUD care and criminal justice involvement in the District. However, it is simply that—a first impression based on an imperfect and incomplete data set. While this audit identifies important new facts about the provision of SUD services to justice-involved individuals in the District, it makes an even more valuable contribution by suggesting the examinations and conclusions that might be possible with a more comprehensive inter-agency data sharing agreement and protocols. In short, our analyses point to the imperative need for the District to: 1) establish and implement ongoing behavioral health and criminal justice data sharing between local and federal partners; and 2) iden-tify a single entity that will be responsible for managing this dataset, addressing data problems and solutions, conducting rigorous analyses, and regularly publishing information gleaned from the data.

---

29    For a more detailed explanation of the datasets used in this analysis, see Appendix C: Quantitative Meth-ods.

30    *See* Appendix B: Data Sharing Agreement.

## LIMITATIONS OF THE DATASET

Before describing the most interesting findings from the inter-agency matched data analysis, it is important to note several distinct limitations of the information presented below:

- First, this data does not include any federal agencies or any jurisdictions other than D.C. that may have had relevant contact with District residents during the Audit Period. It therefore does not represent the full universe of justice involvement or received SUD services for District residents during the Audit Period. We do not know whether the universe of data we analyze is representative of the broader data about justice involvement and SUD services, and we do not attempt to extrapolate that information. While we were able to remove individuals who were released to a non-DOC custodial setting by only considering cases in which an individual was "released to community,"[31] not all individuals who were in the DOC and MPD datasets are D.C. residents, and we cannot know where an individual who is released to the community will reside after they leave DOC.

- Second, there is no universal identifier for individuals in different D.C. or federal datasets. Therefore, matching the data between agencies required the creation of unique identifiers for each individual in the data provided by the agencies, and then merging the different datasets using these unique identifiers to be able to track one person's information between different agencies. For reasons described in greater detail in the Quantitative Methods appendix, this necessary process further narrowed the data considered in the audit team's analysis.

- Third, the audit team performed this analysis with considerable time constraints. From the time of first request on December 19, 2018, it took more than eleven months for CCE to receive a final version of the agencies' data that was usable for evaluation. The final version of the data was not delivered until November 21, 2019, leaving only three months to clean, test, and analyze the data provided for publication.

- Finally, the analysis presented in this audit was limited in scope of time, including data for the Audit Period only. Thus, January 1, 2015, and September 30, 2018, served as artificial start and stop points, or "censors." With a few exceptions, one cannot know from the datasets received what happened before or after the censor dates.[32] A person may have received SUD care or had justice involvement just outside of those censors, but since we could not confirm that, we could not fairly make assumptions about those people in our analysis. To address this issue, we analyzed the data through "Incarceration Episodes," and added additional buffers of time around the edges of the censors. This further limited the data that we analyzed and any findings described in this report.

---

31   *See* Appendix C: Quantitative Methods.

32   DOC data contained some records for incarcerations that started before the Audit Period began but were in progress during the Audit Period. DOC also delivered a "SUD Ever" variable that measured whether an individual ever had a SUD while in DOC custody.

## TERMS USED

**Incarceration Episode.** For the purposes of this report, an Incarceration Episode is the period of time beginning with an MPD arrest that most closely preceded a person's DOC incarceration, and ending with the release date for that particular incarceration. Our data analysis did not track individual people and group together their different arrests or incarcerations, but instead looks at the distinct times any person came in and out of DOC custody during the Audit Period.

**Look Forward.** The Look Forward period is the 90 days following an Incarceration Episode, helping us to understand what happened to a person in the days immediately after their release from DOC custody in terms of SUD assessment, care, or death.

**Look Back.** The Look Back period is the 90 days prior to an Incarceration Episode, helping us to understand what happened to a person in the days immediately preceding their arrest or DOC incarceration in terms of SUD assessment or care.

**Look Around.** The Look Around period encompasses both the Look Forward and the Look Back periods, counting the 90 days on each side of an Incarceration Episode.

**Active SUD.** The Active SUD flag is the term used in the DOC data to indicate whether an individual had a current SUD diagnosis while incarcerated and is also the only  proxy for whether that individual was receiving any SUD treatment during a particular incarceration based on the data held by DOC during the incarceration.

**SUD Ever.** The SUD Ever flag is the term used in the DOC data to indicate whether an individual has ever had a SUD diagnosis while in DOC custody, either during the current incarceration or any prior incarcerations.

**Justice Involvement.** Justice Involvement (or JI) following an Incarceration Episode is limited to either a new MPD arrest or a new DOC incarceration.

**Care.** A person is determined to have received care in the community if they have a SUD service claim record generated by DHCF or DBH or a record of a DBH assessment for care during the relevant period. In almost all analyses, care is not differentiated by the types of actual treatment provided.

**Continuous Care.** Continuous Care is the term used when an Incarceration Episode shows Care in the Look Back, an Active SUD flag, and Care in the Look Forward. Here, the Active SUD flag during an incarceration is used as a proxy for an individual receiving SUD treatment in DOC during that Incarceration Episode.

**Assessment.** A person is determined to have received an assessment for SUD Care if there is a claim generated by DBH for an initial assessment for SUD services during the relevant period.

## DATA FINDINGS: RACIAL DEMOGRAPHICS

Most of the analyses run in this report rely on a narrowed dataset of 4,602 Incarceration Episodes, as described in greater detail in Appendix C: Quantitative Methods. Of those 4,602 Incarceration Episodes, 4,406 involved someone identified by the DOC as Black, 82 involved someone identified as Hispanic, and 100 involved someone identified as white. In other words, over 95% of the Incarceration Episodes that we analyzed involved a Black person. Similarly, nearly all of the 26 justice-involved SUD clients interviewed for this report were Black. At the same time, only 46% of District residents are Black, according to the most recent U.S. Census data.

Therefore, we make two observations about race and this report. First, because nearly all of the individuals we considered in this report were of the same race, and the small sub-group size of the non-Black individuals, we could not analyze racial differences between Incarceration Episodes. Second, because nearly all of the individuals we consider in this dataset are Black, the findings of the report speak directly to the Black experience at the intersection of the District's public behavioral health and criminal justice systems.

## DATA FINDINGS: CONTINUITY OF SUD CARE BEFORE, DURING, AND AFTER INCARCERATION EPISODES

A significant portion of our analysis is related to the continuity of care. Relevant literature identifies behavioral health care continuity as important for protecting individuals' health and public health care investments.[33] First, the period immediately following an individual's release from custody is especially dangerous, with increased risk of death from overdose, suicide, and cardiovascular disease. Second, the recidivism-reduction and public health effects of correctional health programs can be undermined if treatment is not continued in the community, leading to re-incarceration and higher justice system costs. Third, poorly managed chronic conditions, including SUDs, can result in avoidable and costly emergency room visits and hospitalizations. Treatment for a SUD received while incarcerated has delivered better and more durable results when followed up by treatment in the community.

After restricting the merged dataset based on the rules described above and removing clear data errors, we were left with 4,602 distinct Incarceration Episodes during the Audit Period. To be clear, not all Incarceration Episodes necessarily involved a person with a SUD—the Incarceration Episode is counted irrespective of whether that individual had an Active SUD or SUD Ever flag in DOC or was identified in the DHCF or DBH datasets.

The first questions asked were related to care continuity; in short, did people who received care before an Incarceration Episode continue to receive care after the Incarceration Episode? We observed a pattern of discontinuous care in the community before and after Incarceration Episodes,

---

33    See, e.g., The Pew Charitable Trusts, *Prison Health Care: Costs and Quality* (2017), https://www.pewtrusts.org/-/media/assets/2017/10/sfh_prison_health_care_costs_and_quality_final.pdf.

the under-identification of individuals with SUDs in DOC, and limited post-release care among those known to DOC to have SUDs. Of the 4,602 Incarceration Episodes, only 7.24% had an Active SUD flag while incarcerated. In 1,653 (35.92%) of the 4,602 Incarceration Episodes, the person who was incarcerated received care at some point in the Look Back period, the Look Forward period, or both periods. Figure 2 and Figure 3 provide breakdowns of the number of Incarcerations Episodes that were followed or preceded by care.

### Figure 2: Care Received Before and After Incarceration Episode

| Care Received | n[34] |
|---|---|
| No Care in Look Around | 2949 |
| Care in Look Forward Only | 881 |
| Care in Look Back Only | 546 |
| Care in Both Look Forward and Back | 226 |

*Source: Matched District Data*

### Figure 3: Care Before and After Incarceration Episode



| Look back total | Look back | Look back and look forward | Look forward | Look forward total |
|---|---|---|---|---|
| **772** | **546** | **226** | **881** | **1107** |

*Source: Matched District Data*

This data shows that Incarceration Episodes (i) may affect both SUD care discontinuity (or the disruption of care being received in the community in the Look Back) and the initiation of care (or

---

34   Throughout the charts in this report, "n" refers to the count or "number" of the unit of analysis being described. In this chart it refers to the count of "Incarceration Episodes."

the starting of care in the Look Forward), but (ii) rarely presents a continuous stream of care that preceded and followed an incarceration in the District. Of the 1,107 Incarceration Episodes that were associated with care in the Look Forward, only 226 (20.42%) had also received care in the Look Back. Similarly, of the 772 Incarceration Episodes for which care was received at some point in the Look Back only 226 (29.27%) also received care in the look forward.

Very few people had continuous care before, during, and after an Incarceration Episode. Of the 1,653 total Incarceration Episodes in which care was received at some point in the Look Around, only 13.67% had continuous care both before and after the incarceration. It is impossible to deter-mine, based on this data, whether individuals did not receive continuous care because they did not need such care during all of those intervals (perhaps because the care they did receive was suffi-cient to address their active symptoms, or the need did not arise until post-incarceration, or they moved into or out of D.C.), or if they did need continuous care but were not effectively connected. In any case, the District should further explore this finding, as it is not plausible that in 70.73% of incar-cerations in which the incarcerated individuals needed SUD care before incarceration (in the Look Back), they did not also need care after release (in the Look Forward). Similarly, it is unlikely that for the 79.58% of incarcerations in which the incarcerated individual needed community-based SUD care in D.C. in the Look Forward that those individuals did not need some care in the Look Back.

Additional data sharing and further research could also help reveal whether individuals were receiving related services from other agencies (such as the Fire and Emergency Medical Services Department or the Department of Human Services), which would help the District better under-stand whether an individual is in need of care but not receiving it, or is simply not in need of care.

We also analyzed the relevance of a DOC Active SUD flag on whether there was continuity of care in the community. The DOC Active SUD flag serves as a proxy for whether DOC knew an individual needed care and may have delivered SUD services to those individuals. The Active SUD flag allows us some insight into how care delivery to individuals changed when DOC knew that those individ-uals had SUDs. As can be calculated from the information in Figure 4, of the 1,653 cases in which care was received in the Look Back, Look Forward, or both periods, only 142 Incarceration Episodes, or 8.59%, had an Active SUD flag during the incarceration.

**Figure 4: Care Received before and after Incarceration Episode by SUD Flag**

| Care Received | SUD Flag | n |
|---|---|---|
| No Care in Look Around | No Active SUD Flag | 2758 |
| | Active SUD Flag | 191 |
| Care in Look Forward Only | No Active SUD Flag | 802 |
| | Active SUD Flag | 79 |
| Care in Look Back Only | No Active SUD Flag | 508 |
| | Active SUD Flag | 38 |
| Care in Both Look Forward and Back | No Active SUD Flag | 201 |
| | Active SUD Flag | 25 |

*Source: Matched District Data*

Of course, not all cases of care receipt before or after an Incarceration Episode are automatically indicative of a SUD during incarceration, but it is not plausible that 91.4% of those cases either abated before the incarceration began or started after the incarceration ended, especially since the Look Back and Look Forward periods were specifically-designed to be short in duration surrounding an incarceration. Even using a conservative interpretation of SUD prevalence in DOC, where one assumes that only those incarcerations with care in both the Look Back and Look Forward reflect an individual that had an Active SUD during their Incarceration Episode, we find that DOC correctly detected only 11.1% of those cases. However, even that 11.1% may be an *over*estimation of DOC's actual SUD detection rate, as DBH and DHCF data is not comprehensive, either; there are many other sources of data that could identify individuals who received SUD services, but are not included in our definition of "care."

Next, we consider only the 772 cases in which an individual received care in the Look Back period, before the Incarceration Episode began. This group reflects the cases where DBH, DHCF, or specific SUD providers could have potentially shared information with DOC about whether or not an incarcerated individual had received SUD services in the 90 days prior to the incarceration. As is shown in Figure 5, only 8.16% of those Incarceration Episodes had an Active SUD flag.

Figure 5: Incarceration Episodes with Care in the Look Back by Active SUD Flag



*Source: Matched District Data*

Conversely, DOC's Active SUD flag also did not have a strong relationship to receipt of care in the Look Forward period, suggesting that DOC identification of (and potential treatment for) a SUD during an Incarceration Episode did not necessarily facilitate care continuation after release. As is shown in Figure 6, of the 333 cases in which an Incarceration Episode had an Active SUD flag, only 31.23% received care in the Look Forward period. Looking at the data from another angle, of the 1,107 cases in which an individual did receive care in the Look Forward period, only 9.39% had an Active SUD flag while they were incarcerated at DOC. In this sense, DOC's Active SUD flags were poor predictors of future SUD care connectivity.

On a positive note, there is some indication that the presence of an Active SUD flag did support better connection to care post-incarceration than did the absence of an Active SUD flag. Of the 333 cases in which an incarceration had an Active SUD flag, 31.23% received care in the Look Forward period, while of the 4,269 cases where there was no Active SUD flag only 19.37% of those cases received care in the Look Forward. Stated another way, the odds of an incarceration with an Active SUD flag being followed by care were 1.8 times higher than the odds of an incarceration without

an Active SUD flag being followed by care.[35] While more examination is needed, this suggests that increasing SUD detections in DOC could help to increase the rate of SUD care connectivity upon release.

**Figure 6: Active SUD Flags by Care in Look Forward**



*Source: Matched District Data*

When attempting to synthesize all of these variables together and understand how often people had indications (limited as they may be) of consistency of care before, during, and after an Incarceration Episode, the results are stark.

In summary, of the 1,844 Incarceration Episodes in which an individual received care in the Look Back or Look Forward periods *or* had an Active SUD flag (the universe of all individuals likely to have a SUD in this dataset), only 25 total Incarceration Episodes, or *1.3%* of cases received SUD care in all three stages: before, during, and after incarceration. As noted above, not all of these

---

35    Considering only those cases in which an Incarceration Episode had care before or after an incarceration (excluding the 2,797 cases in which there was no delivery of care in the Look Back or Look Forward), the odds ratio was 1.68.

1,844 Incarceration Episodes definitively reflect an individual who needed care at all three stages. However, in light of the short length of the established censors—only 90 days in either direction—and the short length of average stays in DOC custody, it is significant that so few cases reflect seamless receipt of SUD care.

As discussed in the Introduction, the most recent national data shows that the majority of adults in D.C. who had SUDs during the Audit Period needed, but did not receive, treatment. Given that there is significant unmet treatment need here, and an individual with an unmet treatment need would not show anywhere in our dataset as having a SUD, the dearth of individuals receiving continuous care before, during and after incarceration is even more stark. When considering all 4,602 Incarceration Episodes, only 0.5% of all incarcerations—or one in 200—were preceded by care, followed by care, and had an Active SUD flag during the incarceration, as shown in Figure 7.

### Figure 7: Continuous and Discontinuous Care



*Source: Matched District Care*

## DATA FINDINGS: TIME UNTIL CARE CONNECTION FOLLOWING RELEASE FROM CUSTODY

We also utilized the Incarceration Episodes data to look at the length of time between release from DOC custody and the onset of care in the Look Forward period. This information told us whether individuals who received care before and during incarcerations got care faster after release relative to those who only received care after incarceration. We considered whether Incarceration Episodes that had care in the Look Back period got care faster in the Look Forward period, and found that they did. Figure 8 shows that Incarcerations Episodes that received care in both periods received care in the Look Forward 11.5 days faster, on average, than individuals who received care only in the Look Forward. This suggests that SUD care prior to incarcerations may help to facilitate timelier care-initiation after release.

**Figure 8: Release to Care Duration by Look Forward and Look Back**

| Care Received | Median | n |
|---|---|---|
| Look Forward only | 28 | 881 |
| Look Forward and Back | 16.5 | 226 |

*Source: Matched District Data*

We also evaluated whether the presence of an Active SUD flag in DOC facilitated faster care-connectivity in the Look Forward period than those who did not have an Active SUD flag. As Figure 9 shows, those with an Active SUD flag were not connected to care faster than those without an Active SUD flag; in fact, they were connected half a day slower on average over the entire Audit Period. This is a troubling "null" observation because it may suggest that DOC's reentry processes for individuals known to have a SUD do not improve the speed with which care connectivity occurs after release.

**Figure 9: Release to Care Duration by Active SUD Flag**

| Care Received | Median | n |
|---|---|---|
| Active SUD Flag | 26.5 | 4269 |
| No Active SUD Flag | 26 | 333 |

*Source: Matched District Data*

We then calculated the mean and median intervals of time from release from DOC custody to the first receipt of care for each year during the Audit Period (referred to as the "release-to-care interval"). As Figure 10 shows, while the release-to-care interval shrank from 2015 to 2016, it did not meaningfully change from 2016 to 2018. This data also shows that, on average, individuals took 33 days from the end of an Incarceration Episode, their release from DOC, to get connected to care. Unfortunately, we are not able to evaluate the reasons for the changes over time using the data available, but do note later in the report that DOC added several different Medication Assisted Treatment options during the Audit Period and had unique protocols for reentry planning related to those treatments that may have affected the release to care intervals for the individuals receiving those specific services.

We also sought to evaluate whether the presence of an Active SUD flag in an Incarceration Episode facilitated faster care-connectivity in the Look Forward period compared to Incarceration Episodes that did not have Active SUD flags. Interestingly, we found that Incarceration Episodes with Active SUD flags had far more *variable* release-to-care intervals over time than Incarceration Episodes without an Active SUD flag, but where the individual nevertheless sought treatment in the Look Forward period. See Figure 10 below.

For those with an Active SUD flag, the median release-to-care interval was 55 days in 2015. That interval dropped to 42.5 in 2016 and 14 in 2017, and then rebounded to 28.5 in 2018. In contrast,

those without Active SUD flags had relatively consistent release-to-care intervals from 2016 to 2018 of around 24 days. This is clearly an area that is ripe for further analysis and consideration by the District to understand the nuances of why these intervals varied so significantly, what, if any programmatic changes may have contributed to lengthy intervals, and how to potentially shrink the intervals in the future.

Figure 10: Average Release to Care Duration by Year and Active SUD Flag Status



*Source: Matched District Data*

## DATA FINDINGS: RELATIONSHIPS BETWEEN CARE DURING AN INCARCERATION EPISODE AND ADDITIONAL JUSTICE INVOLVEMENT

Bringing together the previous analysis with an evaluation of Active SUD flags, we also consider the interactions between care, the presence of Active SUD flags during the Incarceration Episode, and new "justice involvement" (either an MPD arrest or DOC incarceration) in the 90 days after the Incarceration Episode. We considered these factors to learn more about the way that care continuity may affect the experiences of individuals in the Look Forward.

Individuals who received care in the Look Forward were associated with less additional justice involvement during that same period, compared to individuals for whom care was not received in the Look Forward. The odds of new justice involvement after an Incarceration Episode for those who received care in the Look Forward was 36.3% lower than were the odds of those who did not receive care in the Look Forward.[36] Figure 11 shows the relationship between receipt of SUD Care in the Look Forward, Active SUD Flags, and justice involvement for all cases in which an individual received care in the Look Back. It shows that, independent of whether an individual had an Active SUD flag, if an individual received care in the Look Forward after an Incarceration Episode, that Look Forward was associated with less new justice involvement compared to Incarceration Episodes in which a person did not receive care in the Look Forward.

### Figure 11: Arrests and Care in Incarceration Episode Look Forward

| Active SUD Flag | SUD Care | Justice Involvement | n |
|---|---|---|---|
| No Active SUD Flag | No SUD Care | No JI | 286 |
| | | JI | 222 |
| | SUD Care | No JI | 127 |
| | | JI | 74 |
| Active SUD Flag | No SUD Care | No JI | 17 |
| | | JI | 21 |
| | SUD Care | No JI | 17 |
| | | JI | 8 |

*Note: This table shows those who received care and justice involvement in the Look Forward, only among those who also received care in the Look Back.*

*Source: Matched District Data*

We then considered those who had Continuous Care, or in other words, those who had care in the Look Back and Look Forward and who additionally had an Active SUD flag. In general, Incarceration Episodes associated with Continuous Care were also associated with less justice involvement in the Look Forward than Incarceration Episodes that were not associated with Continuous Care. We determined this by examining how breaks in care continuity impacted the protective effect of care in the Look Forward on new justice involvement.

While the odds ratio of justice involvement among those who had care in the Look Forward was 0.75:1 (relative to those who did not have care in the Look Forward), the odds ratio of those who had

---

36    Care in the Look Back alone had an odds ratio of 1.07. Active SUD flag alone had an odds ratio of 1.09, where "care in the Look Back" and "Active SUD flag" are considered the "treatment" and "justice involvement" is considered the outcome. Given the small sizes of the effects, we did not explore these relationships further.

Continuous Care was 0.38:1 (relative to those who did not have care in the Look Forward).[37] This is illustrated in Figure 12.

### Figure 12: Odds of Justice Involvement for Incarceration Episodes with Care in Look Forward



*Source: Matched District Data*

This suggests both that receiving care in the Look Forward has a protective effect on justice involvement, *and* that the protective effect of receiving care in the Look Forward is moderated by the presence of an Active SUD flag and the presence of care in the Look Back. Those who had Continuous Care had 62% lower odds of justice involvement in the Look Forward than those who did not receive care in the Look Forward. Whether or not the individual had an Active SUD flag in DOC moderated the effect of care in the Look Forward on the odds of new justice involvement: the odds of new justice involvement in the Look Forward were 25% lower among Incarceration Episodes with care in the Look Forward but no Active SUD flag compared to Incarceration Episodes

---

37    We also calculated the effect of care in the Look Forward on justice involvement for cases that did not have care in the Look Back. When there was *neither* an Active SUD flag *nor* care in the Look Back, the odds ratio for care in the Look Forward was .61, whereas when there *was* an Active SUD flag (but still no care in the Look Back), the odds ratio for care in the Look Forward was .58. In other words, we only observe Active SUD flags to moderate the effect of care in the Look Forward when the incarceration was also associated with care in the Look Back.

without care in the Look Forward. This stands in contrast to Incarceration Episodes that received care in the Look Forward and had Active SUD flags, for which the odds were 62% lower.

## DATA FINDINGS: DEATHS, JUSTICE INVOLVEMENT, AND CARE

As noted above, our dataset included information about drug-related fatalities in the District. Of individuals who suffered a lethal overdose during the Audit Period, 15.07% had a DOC incarceration, and 22.65% received SUD care at some point during the Audit Period. Figure 13 shows that DBH and DOC had contact during the Audit Period with 31.41% of the individuals who died in the District due to overdoses. With further data analysis and case studies of the identified individuals, DBH and DOC could potentially offer better-targeted overdose prevention strategies to individuals who are at risk and who are already in the populations they serve. While these two agencies alone cannot carry the responsibility of predicting and preventing opioid overdoses, these known relationships represent a significant opportunity for the District to improve the way that it connects SUD and other support services to at-risk individuals.

Looked at another way, however, this data also suggests that DBH is not identifying and connecting to care individuals in the District who use drugs and might benefit from additional outreach and support. Specifically, based on our analysis of the District's data, DBH did not have any contact during the audit period with 77.35% of cases in which an individual died of an overdose.

Considering only the subset of deaths that were identifiable in the DBH or DHCF data, 97 people (or 8.75%) were incarcerated at some point during the Audit Period but did not receive any SUD services in the Audit Period. There were 251 people (22.64%) who received some kind of SUD services in the Audit Period but still died. In particular, the 97 individuals who were incarcerated, received no care, and died is a group worth significant examination and case study by the District, as they may represent the most urgent opportunity for targeted outreach and additional supports to improve care connectivity to its known, justice-involved residents with SUDs who may be at risk for overdose.

**Figure 13: Deaths by Incarceration and Care in Audit Period**

| Incarceration | Care | n | % |
|---|---|---|---|
| No Incarceration | No Care | 760 | 68.59% |
| | Care | 181 | 16.34% |
| Incarceration | No Care | 97 | 8.75% |
| | Care | 70 | 6.32% |

*Source: Matched District Data*

In Figure 14, we show the number of individuals who received care in the months preceding a fatal overdose. As reflected therein, 92.32% of individuals who died of an overdose during the Audit Period received no SUD care in the three (3) months preceding their deaths. This further supports the observation that the District may be able to prevent lethal SUD overdoses by improving the way that it connects clients to care.

**Figure 14: Care in Fatality Look Back**

| Care | n | % |
|---|---|---|
| No Care | 1023 | 92.32 |
| Care | 85 | 7.67 |

*Source: Matched District Data*

## DATA FINDINGS: DEATHS, JUSTICE INVOLVEMENT, AND ASSESSMENTS

We also considered the universe of DBH assessments in the Audit Period and the relationship between assessments, SUD care, new justice involvement, and lethal overdoses. Assessments are evaluated using 90-day Look Forwards. When we say an assessment was "followed" by an event we mean that event occurred in the 90-day period after the assessment occurred, or during the "Assess Look Forward." These are defined using Department of Behavioral Health "Assess" data. The Assess data contains information about Assessments that DBH conducted at the Assessment and Referral Center (ARC) during the Audit Period. This data is comprised of 12,259 assessments and 8,234 individuals. After removing duplicated Assessments, Assessments that violated our censors, and or were clearly erroneous, we were left with a dataset consisting of 8,601 assessments and their associated Look Forwards.  Unlike in other parts of this report, "care" in an Assessment Look Forward does not include additional Assessments that were performed within that 90-day period.

As discussed in detail in Finding 4, during the Audit Period, individuals seeking SUD care were required to receive an assessment prior to beginning therapy or treatment. We treat Assessment Episodes as the beginning of a discrete period of time in which an individual may have received

SUD services (as reflected as a billed claim for SUD service in DBH or DHCF data). Assessment Episodes allow us to look at periods of SUD care from some fixed start point, and therefore allows us to consider the relationship between receipt of SUD care after an assessment, Justice Involvement, and deaths.

Of the 8,601 total assessments evaluated in the Audit Period: 4,906 (57.04%) were followed by the receipt of a SUD service; 713 (8.29%) were followed by new justice involvement; and 123 (1.45%) were followed by a lethal overdose. Figure 15 below shows a breakdown of how these different factors—care, justice involvement, or death—overlap. Of those 123 assessments in which there was a lethal overdose in the Look Forward, 59 had received no SUD care in the associated Look Forward, and 64 had received SUD care in the Look Forward. Of the cases in which an individual received SUD care after an assessment, 1.3% had an overdose. In contrast, of the 3,695 individuals who did not receive SUD services in the 90 days after an assessment, 1.5% had an overdose. Although seemingly small differences, the human impact is clearly high; and when looked at in terms of odds, we found that the odds of death after assessments that did not lead to SUD care in the Look Forward were 18.55% higher than the odds of death after an assessment when the assessment was followed by Care.

**Figure 15: SUD Care, Deaths, and Justice Involvement in Assessment Look Forward**

| SUD Care | Deaths | Justice Involvement | n |
|---|---|---|---|
| No Care | No Deaths | No JI | 3291 |
| | | JI | 345 |
| | Deaths | No JI | 55 |
| | | JI | 4 |
| Care | No Deaths | No JI | 4487 |
| | | JI | 355 |
| | Deaths | No JI | 55 |
| | | JI | 9 |

*Note: Values are measures of whether an event occurred in an Assessment Look Forward.*

*Source: Matched District Data*

We also considered the relationship between assessments that did and did not result in care, and new justice involvement. Of the 3,695 assessments that did not result in care, 349 (9.45%) resulted in justice involvement. In contrast, of the 4,907 assessments for which the assessment resulted in a connection to care only 364 assessments (7.4%) were also associated with new justice involvement during the Look Forward period. An assessment that was associated with SUD care was 0.76 times less likely to have a new justice involvement than an assessment that did not result in SUD care.

We recognized the possibility that the new justice involvements prevented some individuals who

were assessed and given a referral for SUD services from receiving those services in the community during the Assessment Look Forward. To address this, we also looked at the subset of cases in which there was an arrest but no incarceration. We found that 7.36% of assessments that did not result in care in the Assessment Look Forward were followed by an arrest but no incarceration, while only 6.16% of assessments that did result in care were followed by an arrest. Using these more conservative assumptions, absence of care in the assessment Look Forward is still associated with 16.4% more new justice involvements in D.C.

There were only 13 cases in which an assessment was followed by both new justice involvement and a lethal overdose. Figure 16 shows the odds ratios for justice involvements and deaths in assessment Look Forwards based on whether or not the assessed individual received care. Relative to the odds of someone who did not receive care in the assessment Look Forward, individuals who did receive care were both less likely to have justice involvements and less likely to have died.

**Figure 16: Likelihood of Adverse Outcomes by Care Received After Assessment**



*Source: Matched District Data*

Finally, we considered features of assessments that occurred in Incarceration Episode Look Forward and Look Back periods. Of the 1107 individuals who received care in the Look Forward, 295 of those individuals received an assessment during the Incarceration Episode Look Forward. Figure 17 shows

a troubling null association between assessments and arrest: there was no relationship between whether or not an assessment was followed by care and whether there was an arrest within the Incarceration Episode Look Forward. Roughly 25% of those who did and did not receive care after an assessment were arrested at some point during the Incarceration Episode Look Forward.

### Figure 17: Arrests and Care in Look Forward

| SUD Care in Look Forward | Arrest in Look Forward | n |
|---|---|---|
| SUD Care | No Arrest | 151 |
| | Arrest | 49 |
| Care | No Arrest | 71 |
| | Arrest | 24 |

*Note: This table only shows the 295 assessments that occurred after an incarceration episode.*
*Source: Matched District Data*

We explored this relationship further based on the referred level of care. We found that for those referred to Outpatient Care, Intensive Outpatient Care, and Withdrawal Management, the above relationship only marginally changed. However, those who were referred to and received Residential Care were more likely to have arrests than those who were referred to but did not receive Residential Care. Roughly 40% of those who were referred to and received Residential Care were arrested, whereas roughly 30% of those referred to Residential Care who did not receive care were arrested. Figure 18 shows this relationship.

### Figure 18: Arrests and Care in Look Forward among Referrals to Residential Treatment

| SUD Care in Look Forward | Arrest in Look Forward | n |
|---|---|---|
| SUD Care | No Arrest | 32 |
| | Arrest | 14 |
| Care | No Arrest | 20 |
| | Arrest | 13 |

*Source: Matched District Data*

The null relationship between care connectivity among individuals with assessments and arrests indicates that DBH can do a better job providing additional support to those receiving Residential Care after incarcerations. The *increase* in arrests among those who receive Residential Care in contrast to those who were referred to but did not receive residential care is particularly notable and deserves further exploration by DBH.

## FINDING 1:

**An enhanced Pre–Arrest Diversion program in the District would provide opportunities for substantial improvement in outcomes for people with substance use disorders who are at risk of justice involvement.**

### RELATED RECOMMENDATIONS:

1. The District should continue to offer pre-arrest diversion (PAD), building on the successes of the PAD pilot.

2. DBH and other PAD administrators should ensure that external stakeholders directly advise the program, consistent with best practices. The program should be transparent, creating a process for providing and responding to external feedback.

3. DBH, MPD, and other PAD administrators should work to increase police officer participation in and support of PAD by providing ongoing opportunities for feedback; updating policies based on officer feedback; and implementing pre-arrest referrals so that officers can divert someone from arrest without handcuffing them or bringing them to a police station.

4. PAD administrators should collaborate with community stakeholders to establish and publish a clear set of programmatic goals for PAD. Those goals should include measures of success for both improved health outcomes and reduced justice involvement.

5. PAD administrators should implement procedures to correct the PAD pilot's data collection and reporting shortcomings, including publishing information to help evaluate program efficacy and implementing data sharing procedures, consistent with best practices.

### COMMENTARY:

**Overview of the District's Pre-Arrest Diversion Pilot**

In 2016, the District enacted the Neighborhood Engagement Achieves Results Amendment Act of 2016 (NEAR Act). That Act required, among other things, that MPD establish a "Community Crime Prevention Team Program," to be operated jointly by MPD, DBH, and the Department of Human Services (DHS).[38] Under the statute, the program's goal is to "immediately identify individuals in need of assistance and connect those who may be impacted by homelessness, mental illness, or substance abuse, with available services."[39]

As a first step toward fulfilling this mandate, the District launched a pre-arrest diversion (PAD) pilot

---

38    D.C. Code § 5-132.31(a)-(b).

39    *Id.*

in April 2018.[40] PAD is a type of diversion program that occurs before an individual's arrest and is designed to break the cycle of justice involvement that may be caused by underlying behavioral health problems.[41] PAD programs can take different forms, but usually involve offering individuals connection to treatment programs in lieu of arrest or other criminal sanction. They may also involve active outreach to individuals who are either at high risk of contact with law enforcement or who have had high levels of past justice involvement.[42] While PAD programs take different forms, they are generally recognized as resulting in positive outcomes for participants, including a greater degree of treatment initiation and fewer future justice interactions.[43]

Increasingly, PAD programs are viewed as a best practice.[44] Several jurisdictions, including Maryland, Massachusetts, and King County, Wash. have implemented various PAD programs with significant positive effects.[45] King County's Law Enforcement Assisted Diversion (LEAD) program was one of the first PAD programs and was designed to include a robust program evaluation. It proved to be cost-effective, saving more in justice system costs driven by typical recidivism rates than were incurred in case management and social service costs, and has become a model program.[46] An evaluation of the LEAD program indicated that participants recidivated 60% less than counterparts

40   Executive Office of the Mayor, District of Columbia. *Pre-Arrest Diversion: Connecting Police Community Contacts with District Services - Overview of the 2018 Pilot Period* (Apr. 23, 2019), http://lims.dccouncil.us/Download/42362/RC23-0058-Introduction.pdf.

41   Kathleen Hartford et al., *Pre-Arrest Diversion of People with Mental Illness: Literature Review and International Survey, 24(6) Behav. Sci. & L.*, 845 (2006), https://doi.org/10.1002/bsl.738.

42   Barry Goetz & Roger E. Mitchell, *Pre-Arrest/Booking Drug Control Strategies: Diversion to Treatment, Harm Reduction and Police Involvement*, 33(3) Contemporary Drug Problems 473 (2018), https://doi.org/10.1177/009145090603300307.

43   Greg Frost, Safety and Justice Challenge, *Pre-arrest Diversion—An Effective Model Ready For Widespread Adoption* (2016), http://www.safetyandjusticechallenge.org/2016/07/pre-arrest-diversion-effective-model-ready-widespread-adoption.

44   This section considers only "pre-arrest" diversion programs, although there are also diversion programs that occur "pre-booking" and "pre-trial." The former of which do not currently exist in the District of Columbia but have been implemented in jurisdictions such as New York City and Bexar County. The latter of which does exist in the District of Columbia through its specialty courts, including the District of Columbia Superior Court Drug Court and the District of Columbia Superior Court Mental Health Community Court.

45   Davida Schiff et al., *A Police-Led Addiction Treatment Referral Program in Massachusetts*," 375 New Eng. J. Med. 25 (2016), https://www.fels.upenn.edu/sites/default/files/NE%20Journal%20of%20Medicine-Gloucester%20Police%20Angel%20Program.pdf; Arlington Massachusetts Police Department, *Arlington Police Department Implements New Addiction Protocols* (2015), https://www.arlingtonma.gov/Home/Components/News/News/3078/494?arch=1; Johns Hopkins Bloomberg School of Public Health, *Criminal Justice Diversion Programs: Policy Recommendations for Maryland* (2015), https://www.jhsph.edu/research/centers-and-institutes/institute-for-health-and-social-policy/award-programs/lipitz-award/past-awardees/_documents/Criminal-Justice-Diversion.pdf; Center for Health and Justice, *STEER Deflection Model: Pre-Booking Diversion Option for Law Enforcement* (2016), http://www2.centerforhealthandjustice.org/content/project/steer-deflection-model-pre-booking-diversion-option-law-enforcement.

46   Susan E. Collins et al., *Seattle's Law Enforcement Assisted Diversion (LEAD): Program Effects on Recidivism Outcomes*, 64 Evaluation and Program Planning 49 (2017), https://doi.org/10.1016/j.evalprogplan.2017.05.008.

in a control group, who were arrested during a randomized no-LEAD shift.[47] In the 18 months after LEAD participation, clients were 46% more likely to be in training, employed, or retired; 89% more likely to be permanently housed, and 33% more likely to have a legitimate income source.[48]

Recognizing that many MPD arrests each year involved individuals who were diagnosed with a mental illness, diagnosed with a SUD, or tested positive for illicit substances, the District's PAD pilot focused on connecting individuals struggling with mental illness and/or SUDs to treatment and social services.[49] The PAD pilot utilized community outreach and peer support to connect individuals to services prior to arrest, with the goal of diverting low-level, would-be offenders away from arrest and incarceration and into appropriate treatment and social supports.[50] The pilot was limited to two target Police Service Areas, and PAD services were only available during limited hours and days of the week.[51]

For an individual to be eligible for D.C.'s PAD pilot, they must have exhibited indications of a mental health condition or a SUD, been 18 years of age or older, and been subject to arrest for one or more of the approved non-violent misdemeanor charges (i.e., disorderly conduct, liquor law violations, narcotics, prostitution, theft, trafficking/receiving stolen property, and unlawful entry).[52] An individual who was not capable of conducting a coherent interview, could not be identified, attempted to flee, attempted to cause harm to another person or property, or who had outstanding warrants, was not eligible for the PAD pilot.[53] Finally, the individual was required to voluntarily choose to participate in PAD.

There were two entry points to D.C.'s PAD pilot. The first was through a pre-arrest referral.[54] When a PAD-trained MPD officer encountered an individual who was engaged in behavior that could be charged as one of the qualifying crimes and appeared to meet the PAD's enrollment eligibility criteria, the officer was required to first confirm that the potential enrollee did not have any disqualifying warrants. The officer then was required to describe to the potential enrollee the services available through the voluntary program and to explain that arrest could be avoided by agreeing to enroll. If the potential enrollee expressed an interest in participating, the officer called PAD social workers from DBH, and the officer would handcuff and transport the enrollee to an intake location, either the First District or Fifth District precincts. There, a PAD social worker would complete the enrollment, at which point the potential enrollee would become a program participant.[55]

---

47   Susan E. Collins et al., *LEAD Program Evaluation: Criminal Justice and Legal System Utilization and Associated Costs* (2015), https://docs.wixstatic.com/ugd/6f124f_2f66ef4935c04d37a11b04d1998f61e2.pdf.

48   *Supra*, n. 46.

49   *Supra*, n. 40.

50   *Id.*

51   D.C. Metropolitan Police Department, *Pre-Arrest Diversion Pilot Program*, G.O. 502.04 (IV)(C) (effective Apr. 24, 2018), https://go.mpdconline.com/GO/GO_502_04.pdf.

52   *Id.* at Attachment A.

53   *Id.*

54   *Id.* at IV(A).

55   *Id.*

The second PAD pilot entry point was through a social contact referral, or social referral.[56] Social referrals were made when there was no active behavior justifying a criminal charge, but the person was known to MPD because of a history of arrests or previous interactions with an officer in the community. The person still would have to meet the other eligibility requirements of the program, but could enter the program without being handcuffed and taken to one of the intake sites. Instead, an MPD officer would make a referral to the PAD social workers or a PAD social worker would make direct contact with the individual to facilitate enrollment.[57]

Once an enrollee was accepted into the program, staff would provide "services based on a plan tailored to the participant's individual needs."[58] Such services could include ongoing assessments of the participant's "vulnerability and service needs," outreach and referrals to relevant community providers, and other supports. Successful participants would graduate from the PAD pilot program after 180 days.

Between April and December 2018, the PAD pilot program was staffed by both existing MPD officers and DHS staff and new primary programmatic staff DBH hired through a $970,000 allocation in the FY2018 budget. These specialized programmatic staff included a program director, four licensed clinical social workers, and four certified peer specialists.[59] The PAD pilot trained 69 MPD officers who offered pre-arrest and social referrals near Gallery Place and Starburst Plaza, the two locations the pilot targeted.[60]

When the pilot period concluded in September 2018, there were 50 PAD participants, and all had individualized service plans developed within 72 hours of enrollment.[61] Through the end of 2018, the program had 82 enrolled participants. Some 95% of the clients served had been diagnosed with a Severe Mental Illness (SMI), and 46% had a co-occurring SUD and SMI.[62] Some 95% had unstable housing at the time of enrollment, and 26 of the participants (about one-third of those with unstable housing) had received, or were approved to receive, some form of housing assistance.[63] The pilot showed promising initial outcomes, and DC should continue a PAD program.

Beginning in October 2019, the PAD program merged into DBH's new mobile, multi-disciplinary, 24-hour response team. This team is designed to "provide crisis services to District residents that are

---

56    *Id.* at IV(B).

57    *Id.*

58    D.C. Department of Human Services, *District of Columbia Pre-Arrest Diversion Pilot Program: Pilot Program Update* (2018), https://dhs.dc.gov/sites/default/files/dc/sites/dhs/page_content/attachments/DC%20Pre-Arrest%20Divers%20Pilot%20Program_Updated%20v3.pdf.

59    *Supra*, n. 40.

60    *Id.*

61    Office of the Deputy Chief Administrator & Deputy Mayor for Public Safety and Justice, *Deputy Mayor for Public Safety and Justice Performance Oversight Responses* (2019) (see response to 40(f); the other 35 participants were in FY19).

62    *Supra*, n. 40.

63    *Id.*

experiencing a wide range of behavioral health distresses."[64] CCE did not examine the crisis team because it was created after the conclusion of the Audit Period. MPD's General Order authorizing the PAD pilot and laying out procedures for officers is still in place.[65]

### Limited Engagement of Community-Based Organizations and SUD Providers in PAD Pilot

During the initial PAD pilot development in 2018, external organizations and community stakeholders were invited to listening sessions hosted by the government regarding the program and invited to give feedback. However, as the PAD pilot was implemented, no non-governmental community partners were involved as collaborators in the planning, functioning, or evaluation of the program. In jurisdictions with successful PAD programs, external stakeholders are involved in advising and/or managing the program. For instance, administrators of the LEAD program in King County, Wash.,, on which D.C.'s PAD pilot is based, noted that, "part of the secret sauce is that LEAD is run by a civil society group, and chose not to become city employees to ensure the viability of the program… there is an intentional power-sharing structure, because it contains police and prosecutorial discretion, those [non-governmental community leaders] are needed to maintain credibility" among community members.[66] Indeed, the LEAD National Support Bureau notes explains:

> LEAD is a voluntary agreement among independent decision-makers to collaborate, and therefore must work for all stakeholders. LEAD cannot work without the dedicated efforts of independent agencies and, sometimes, multiple jurisdictions. The program can only proceed as far as the key participants can achieve agreement at any given time. In addition to law enforcement, service providers, community groups, prosecutors, elected officials and others, persons with relevant lived experience (e.g. drug use, sex work, homelessness, poverty) are essential stakeholders who should be meaningfully involved partners.[67]

Experts who conduct national trainings for PAD programs note that, "nationally, the jurisdictions that have struggled the most are the ones where the government is sitting in the project management position."[68] External management and oversight allows PAD programs to effectively learn about community needs, build trust between law enforcement and members of the community who are historically distrustful of law enforcement, and build relationships between diverse stakeholders, including healthcare providers, prosecutors, and the judiciary.[69]

---

64    Government of the District of Columbia, *FY 2020 Approved Budget and Financial Plan: Volume 4, Agency Budget Chapters - Part III* (submitted July 25, 2019), https://cfo.dc.gov/sites/default/files/dc/sites/ocfo/publication/attachments/DC_2020_OCFO_Budget_Vol_4.pdf.

65    *Supra*, n. 51, at IV.

66    CCE Interview with LEAD Program Staff.

67    LEAD National Support Bureau, *Essential Principles for Successful LEAD Implementation* (updated Jan. 2017), https://56ec6537-6189-4c37-a275-02c6ee23efe0.filesusr.com/ugd/6f124f_552d331f637f436189a38d-14f9b823ad.pdf

68    *Supra*, n. 66.

69    *Id.*

These problems have arisen in the District, where governmental management of D.C.'s PAD pilot and a perceived lack of transparency undermined the trust of community-based organizations, SUD providers, and their clients. For instance, the D.C. Deputy Mayor for Public Safety and Justice reported that:

> PAD's focus is to connect and utilize existing service delivery networks as resources. The PAD team has met with providers and stakeholders on an ongoing basis to develop workflows that support consumer choice while promoting effective service utilization. Providers and stakeholders have also been invited to participate in planning sessions, observe and comment on officer trainings, and meet with the PAD planning group to offer feedback.[70]

However, community members involved in advocacy concerning people with SUDs and the PAD pilot noted that they did not believe that their feedback had been adequately considered or adopted, and that they had no impact on shaping the PAD pilot's design or efficacy. One community member explained: "I'd like to see meaningful community engagement and an iterative process to best meet the needs of the target population. I haven't seen the PAD team engage with many community providers."[71]

Moreover, providers' lack of knowledge about the PAD pilot's processes and outcomes led to an unwillingness among some SUD providers to engage with the program. For example, one provider who serves clients who are frequently justice-involved said that they would not refer their clients to PAD because they did not know enough about what would happen to their clients if they participated. Several providers attributed their lack of comfort with the program to the absence of clear information on the implications of participation from governmental leaders.[72] Another common concern was that enrollees were being handcuffed and transported to police stations after agreeing to participate in the PAD pilot, scaring them by making the process feel like an arrest. The community organizations and advocates who raised these concerns did not believe that the agencies were interested in revising the PAD pilot protocols to address barriers to participation.

To address these issues, the MPD General Order and DBH policy should be amended to make D.C.'s program more closely resemble LEAD's best practice model. D.C.'s program should require that, in addition to MPD, DBH, and DHS, one or more community-based partners be engaged as part of the program administration and evaluation.

Additionally, to move the program beyond the pilot phase, the D.C. Council must ensure sufficient funding for all PAD partners to train and engage sufficient staff to participate in the program. While the precise need for PAD in D.C. is not currently known, continued inter-agency data-sharing and analysis, as discussed in Finding 5, could facilitate a reasonably accurate estimate of individuals who may be eligible for PAD and who might benefit from enhanced connections to behavioral health services.

---

70   *Supra*, n. 61.

71   Email Correspondence with Community Organizer.

72   CCE Provider Interview.

PAD partner agencies should work with interested community-based organizations, SUD provid-ers, and directly impacted individuals to: debrief on lessons-learned from the PAD pilot, consider changes to enhance participation of both potential enrollees and law enforcement officers, and establish agreed-upon benchmark goals, as well as a set of data points to collect, for use in quar-terly evaluations of the program's performance.  This data and any evaluations should be made public on a quarterly basis. Additionally, the partner agencies should establish periodic standing meetings to discuss progress toward achievement of the program's goals, resource needs, and any challenges faced as well as to receive and respond to stakeholder and public feedback.

### Low MPD "Buy-In" of PAD

The PAD pilot also suffered from insufficient buy-in from MPD officers. Of the more than 3,800 sworn MPD officers in February 2018, 69 received PAD training and only 25 MPD officers, less than 1% of the force, actively referred one or more potential arrestees to the program or acted as "hub" officers during the PAD pilot.[73] One DBH administrator estimated that for PAD to function effi-ciently across the city, approximately 10%-20% of MPD officers would need to participate.[74]

Generally, low MPD officer buy-in was attributed to a lack of interest in participating in trainings, the perception that SUD treatment was not effective, and the perception that diversion was not a good use of officer time.[75] Unless agency leaders and program staff devote additional resources to educating more officers about the benefits of PAD and addressing any concerns about administra-tive burdens, this limited participation will be a barrier to  the program's growth and, ultimately, its ability to serve as a vital tool to divert individuals with SUDs away from the criminal justice system and into treatment, reducing recidivism and the costs associated with unnecessary incarceration.[76]

Building buy-in from rank-and-file officers is a challenge in every jurisdiction. In interviews with LEAD trainers in King County, they explained that the problem could be addressed through tar-geted efforts by department leadership, particularly ongoing dialogue and training. The LEAD pro-gram established carefully managed focus groups with officers to convey information about the diversion program as it developed and to elicit feedback.[77] Based on our evaluation and interviews, we understand that targeted focus groups with officers—including those who have been trained and those who express disinterest in being trained—have not been conducted by the PAD pilot program agencies in the District.

The District should collect feedback from officers regarding their perceptions of and experiences with PAD in order to address their concerns in future iterations of the program. The District should also work with trainers and experts from other jurisdictions who have implemented full-scale and functional PAD or LEAD programs to help D.C. develop engagement strategies and design revised training resources for agency leadership, staff, and officers.

---

73    *Supra*, n. 40.

74    CCE Interview with DBH Administrator.

75    *Id.*

76    *Id.*

77    *Supra*, n. 66.

**Goal Setting, Data Collection, and Information Sharing for PAD**

Lessons learned from the D.C. PAD pilot offer the opportunity for the District to join a handful of other jurisdictions in implementing a best-in-class diversion program. Together, the partner agencies must develop a clear and transparent set of program goals and measurements to ensure PAD's future efficacy in D.C.

First, although DBH and DHS published summary data regarding the number of clients who received PAD services, and the types of services received, the PAD pilot did not collect or report sufficient information necessary to evaluate the program's efficacy and functions. In no publicly available document regarding the pilot did the District specify goals of the PAD pilot or describe how any goals should be measured. Measurements of individual PAD participants' success were reported, but the impact of the pilot as a whole was not. At of the end of the PAD pilot evaluation period, the District could not answer the following questions posed by the PAD working group:

- The number of individuals arrested for PAD eligible offenses during the pilot period.

- The number of individuals offered PAD during the pilot period, and, of those, how many declined to participate and how many were determined to be ineligible.

- The number of MPD officers who made PAD referrals.

- The number of social referrals that occurred in lieu of arrest.

- The estimated cost-savings of diversions compared to processing through the standard criminal justice system.[78]

Second, the D.C. PAD pilot suffered from low information sharing that was anomalous relative to other jurisdictions. In King County, community information sharing is written into the LEAD protocol.[79] For example, that protocol stipulates: "At least monthly, LEAD project management staff conduct a staffing meeting that includes community advisory representatives, [and city and state law enforcement agencies]. LEAD partners will use the staffing meetings to share information about... referral criteria, program capacity and compliance with the protocol; and to focus the attention of LEAD program staff and [the Seattle Police Department] in particular areas viewed with concern by community representatives."[80] Information on program alternatives, non-participating but eligible encounters, and client outcomes are each measured, allowing for robust program evaluation and monitoring.[81]

In Albany, N.Y. , which implemented a LEAD program in 2016, information sharing underpins the program's success. Albany LEAD started as a memorandum of understanding between city agencies, business improvement districts, law enforcement, and justice-system oversight groups;

---

78    DC LEAD Working Group Meeting Notes.

79    LEAD King County, *Law Enforcement Assisted Diversion (LEAD) Referral and Diversion Protocol* (Nov. 2018).

80    Catherine Lester, City of Seattle, *Statement of Legislative Intent (SLI) 87-1-A-2 Response: Adjustment to 2016 Contracts with The Law Enforcement Assisted Diversion (LEAD) and Multi-Disciplinary Team (MDT) Programs* (June 24, 2016), http://clerk.seattle.gov/~CFS/CF_319829.pdf.

81    *Id.*

a series of health care providers signed on later. A justice-system oversight group hosts regular public meetings to share information about program operations and to listen to public concerns with other signatories present. [82] A "Data and Evaluation Committee" that included community and governmental stakeholders determined what diversion data to collect and how to measure the data required for ongoing outcome evaluations. [83] After collecting the data with evaluators, the committee returns its findings to all signatories to provide recent information about program outcomes. These findings are also presented to the public and to business and government stakeholders. Early successes evidenced in Albany were attributed chiefly to LEAD signatories' "inter-agency communication and planning to ensure that checks and balances are in place to assist the client." [84]

Third, procedures for D.C.'s PAD pilot prompted misreporting that appears to underrepresent the number of "pre-arrest referral" diversions offered through the program. CCE learned, through interviews, that pre-arrest referrals are likely underreported because the city tracked the number of individuals referred to PAD in lieu of arrest through a count of Form 1004s—the Pre-Arrest Diversion Pilot Program Referral Form that MPD officers were required to complete when an individual was offered and accepted diversion through a pre-arrest referral. [85] However, the number of Form 1004s generated likely does not reflect the true number of individuals diverted.

MPD policy requires that officers offering diversion in lieu of arrest handcuff and transport the individual to a booking station, where they are enrolled in PAD by a social worker. [86] At that point, the officer must fill out the Form 1004, which some officers were disinclined to do. Some officers participating in the pilot would instead contact PAD programmatic staffers directly, then report the diversions as "social referrals," both to avoid taking custody of the person and to avoid the paperwork. [87] Other officers funneled diversions through "hub" officers, who were more comfortable with the PAD process, after initial contact with a potential diversion participant. [88] Administrators reported that there were 25 active PAD officers, although only a handful actually signed Form 1004s. [89] MPD also chose not to track any offers of PAD participation declined by arrestees. [90] These practices combined to undercount both the number of "pre-arrest referrals" made and the number of officers who were making them.

Whether a diversion is attributed to a pre-arrest referral or a social referral is an important distinction. Community members interpreted the absence of "true" diversions—those attributed to

---

82    Katal Center for Health Equity and Justice, *Albany LEAD First-Year Report* (Apr. 5, 2017), https://d3n8a8pro7vhmx.cloudfront.net/katal/pages/1743/attachments/original/1517565036/2017_Albany_LEAD_First_Year_Report.pdf?1517565036.

83    *Id.* at 6.

84    *Id.* at 7.

85    *Supra*, n. 51; CCE Interview with DBH administrator.

86    *Supra*, n. 56.

87    CCE Interview with DBH administrator.

88    *Id.*

89    *Id.*

90    Office of the Deputy Chief Administrator & Deputy Mayor for Public Safety and Justice, *Deputy Mayor for Public Safety and Justice Performance Oversight Responses* (Feb. 7, 2019).

pre-arrest referrals made in lieu of arrest—as an indication that the PAD pilot functioned as only a social-service referral program, another version of homeless outreach, but not as an actual diversion from a path leading to further justice involvement. The low number of officers completing the Form 1004s compounded these concerns.[91] Overall, the inaccuracy of the measures used to reflect the PAD pilot, combined with the low-level of external engagement, created a perception among District stakeholders that the program was not a good-faith effort to implement "true" PAD in D.C.

---

91   *Supra*, n. 78.

### FINDING 2:

## DOC is failing to identify all individuals with substance use disorders who may benefit from treatment while in custody or connection to care during reentry.

---

### RELATED RECOMMENDATIONS:

1. DOC should use a best practice screening protocol for SUDs at intake, and revise its internal policy (PS 6000.1H) to require such screening.

2. In addition to self-reporting by residents, DOC should use collateral information to supplement SUD screenings to identify individuals with Active SUDs in its custody. Specifically, DOC should refer a resident for a full SUD assessment, regardless of the outcome of their intake screening, if they:

   a. Have any history in DOC's own medical records of a SUD diagnosis or treatment from a prior period of custody; or
   b. Have a positive drug test or are found guilty of a substance-related disciplinary violation while in DOC custody, which requires revision of DOC Program Statements 6050.2G and 5300.1H.

3. DOC should establish a protocol to request informed consent from all residents at intake to allow their community-based SUD providers and DBH to share SUD information with DOC, and to allow DOC to share information and communicate with DBH and their community-based SUD providers.

4. DBH and DHCF should provide DOC's medical provider limited access to SUD records and claims databases, through an MOU, for the purposes of accessing the SUD histories of patients in DOC custody who provide informed consent.

### COMMENTARY:

The D.C. Code provides that "[t]he Mayor shall contract for delivery of health care for inmates in the custody of the Department of Corrections...including primary care, specialty care, emergency care, and hospital care, and for connecting inmates with a health center in the community for continued care after the inmates are released from the custody of the Department of Corrections."[92] DOC contracted with Unity Healthcare ("Unity") to serve as its Health Care Vendor during the Audit Period and continues to have an active contract with Unity through April 14, 2020, with an option to

---

92    D.C. Code § 24–140.

extend the base contract through 2024.[93] Unity is responsible for the day-to-day delivery of health care, including SUD services like MAT and detoxification, for DOC's entire resident population.[94] Despite many areas of effective provision of care, the data CCE analyzed and stakeholder experiences make clear that DOC has been unable to comprehensively or consistently identify all residents in its custody who have a SUD. This reflects an important missed opportunity to connect residents who could benefit from SUD treatment to care, and to support the continuity of care between correctional and community settings.

### Overview of Intake Screenings at DOC

Any individual entering DOC custody is screened by a "qualified health care professional or health/mental-health trained personnel," regardless of the reason for their detention or their expected length of stay.[95] During the Audit Period, the intake screener at DOC's Inmate Reception Center (IRC) was either a physician, nurse practitioner, or physician assistant employed by Unity.[96] The intake screening includes questions about: the "use of alcohol and other drugs (legal and illegal), including type(s) of drugs used, mode of use, amounts used, frequency used, date or time of last use, and history of any problems that may have occurred after ceasing use; drug withdrawal symptoms; and history of treatment."[97] If indicated by the screening, the patient is referred for a more comprehensive assessment by a Unity mental health clinician. This assessment asks for details about the patient's "substance use history and assesses [their] acute symptomatology," including risk of self-harm and withdrawal.[98]

Unity's evaluation of whether a patient has a SUD is based almost exclusively on the patient's participation in the evaluation and willingness to self-report; Unity does not generally review a patient's DOC records, DBH's SUD treatment database (DataWITS), or other agency-provided information during the intake process to determine whether the patient has a SUD history or an "Active SUD."[99] The limited exception is if the assessor looks for records in Centricity, Unity's Electronic Medical Record (EMR), and finds a medical history of SUD diagnosis or treatment at Unity during a prior DOC incarceration or at one of its community-based clinics.[100]

---

93   *See* §§ 13 and 14 of Contract No. CW37196, Comprehensive Medical, Mental Health, Pharmacy and Dental Services for Department of Corrections (Oct. 1, 2015), and Contract No. CW37196 (Oct. 1, 2017); *see also* Contract Extension, Contract No. CW68868 (Apr. 15, 2019), http://app.ocp.dc.gov/Award_attachments/CW68868-Base%20Period-Contract%20Award-CW68868%20Award%20File%20Redacted.pdf (the "Unity Contracts").

94   D.C. Department of Corrections, Program Manual No. 6000.1I at p. 2, ¶¶ 3(a)-(d) (effective June 20, 2017), https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/PM%206000.1I%20Medical%20Management%2006-20-2017.pdf.

95   *Id.*

96   DOC Correspondence on Nov. 1, 2019.

97   D.C. Department of Corrections, Program Manual No. 6000.1H, at ¶¶ 1(c), 6-8 (effective Aug. 26, 2013), https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/PM%206000.1H%20Medical%20Managment.pdf.

98   *Supra*, n. 96.

99   CCE Administrator Interviews; *supra*, n. 5.

100  *Supra*, n. 96; *see also* CCE DOC Administrator Interviews; CCE SUD Provider Interviews.

If the intake screening does not identify a SUD, DOC reports that a resident in its custody can still be connected to SUD care, "through the vigilance of staff and medical providers," who identify residents suffering the effects of withdrawal, or if medically indicated during the course of care for other health concerns. DOC reports that residents in its custody can also request medical care for substance use concerns at any time.[101]

### Reported SUD Prevalence in DOC

DOC collects SUD data exclusively through patient records in Centricity. Patient records in Centricity include a code of the SUD diagnosis plus the diagnosis' onset and end dates. When DOC extracts data for analysis, the information is flagged with two indicators based on the presence and timing of the diagnosis: (i) if a patient has ever had a SUD diagnosis in their record, they receive a "SUD Ever" indicator; and (ii) if a SUD diagnosis onset date is during a patient's current period of incarceration, they receive an "Active SUD" indicator.[102]

DOC's reported rates of identified SUDs among people in its custody during the Audit Period are summarized in Figure 19 below. In 2015, 58.8% of individuals in custody that year had some historical SUD diagnoses recorded in Centricity, while 8.4% had Active SUD flags because SUD diagnoses were made during their current period of incarceration. By 2018, 50.1% of individuals in custody that year had a SUD diagnosis history recorded in Centricity, while only 6% received Active SUD flags. From 2015 to 2018, DOC's data shows a 27% decrease in the number of individuals incarcerated who "ever" had a SUD, and a 39% decrease in the number of individuals with an Active SUD diagnosis. The majority of the decrease in individuals who had ever had a SUD diagnosis occurred between 2017 and 2018, while the declines in the number of individuals who had an Active SUD diagnosis took place over a longer period between 2016 and 2018.

#### Figure 19: Persons with SUD Information in DOC

| Year | Total Distinct Persons | No SUD Diagnoses Ever | SUD Diagnoses Ever | Active SUD Diagnoses | Opioid Diagnoses Ever |
|------|------|------|------|------|------|
| 2015 | 8920 | 3671 | 5249 | 453 | 515 |
| 2016 | 9412 | 4058 | 5354 | 746 | 523 |
| 2017 | 9831 | 4583 | 5248 | 631 | 576 |
| 2018 | 7688 | 3840 | 3848 | 462 | 464 |

*Source: DOC Correspondence with CCE, Response 2*

---

101   *Supra*, n. 96, at Response 6.

102   *Supra*, n. 96, at Responses 1 and 2(e).

DOC's own interpretation of its data during the Audit Period indicated "only 2-9% of EMR records indicated substance use disorder diagnoses in the EMR."[103] This is consistent with the results of a 2017 custodial population study commissioned for the Criminal Justice Coordinating Council in which the authors reported a 5% rate of Active SUD diagnosis among residents in DOC custody in FY2015.[104]

However, DOC administrators and medical providers acknowledged that the current screening protocols likely capture only a small percentage of the total number of individuals in DOC with SUDs.[105] DOC has even gathered supplementary information indicating that SUD levels among its residents are much higher than identified. In correspondence with CCE, DOC reported that in a recent survey of the individuals released from custody who received reentry services through DOC's Resources to Empower and Develop You (READY) Center, "approximately 40% of respondents anticipated that substance use would be a barrier to [their] reentry.[106]

**Alternative Data About Substance Use Prevalence**

There are several sources of data that suggest that DOC has undercounted individuals in its custody with a SUD, including the first-impression data analysis that CCE conducted using inter-agency matched data. As noted above, the DOC screenings to identify a SUD largely involve patient self-reporting. Aside from limited Unity medical record access, the information about which clients have SUDs is collected based on the disclosures of the person entering custody. DOC recognized that its method of collecting SUD information likely resulted in a significant undercount,[107] but it did not modify its intake screening process to improve the quality of its data during the Audit Period.

First, in the general U.S. population, approximately 7.6% of Americans age 18 and older met the DSM-IV diagnostic criteria for a SUD in 2018.[108] The same survey estimated that 11.55% of D.C. residents aged 18 or older had a SUD.[109]

Second, narrowing to those with justice involvement, people who are arrested are more likely to test positive for one or more substances and to have SUDs than non-arrestees. In the most comprehensive national study of drug use among arrestees, the Arrestee Drug Abuse Monitoring Program

---

103   *Supra*, n. 96.

104   Moss Group, *District of Columbia Custodial Population Study: Seeking Alignment between Evidence Based Practices and Jail Based Reentry Services*, p. 2 (2017), https://cjcc.dc.gov/sites/default/files/dc/sites/cjcc/page_content/attachments/DC%20Custodial%20Population%20Study%2009.2017.pdf.

105   CCE Provider Interviews; CCE Administrator Interviews.

106   *Supra*, n. 96.

107   *Supra*, n. 96.

108   SAMHSA, *Key Substance Use and Mental Health Indicators in the United States: Results from the 2018 National Survey on Drug Use and Health*. Rockville, MD: August 2019. https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHNationalFindingsReport2018/NSDUHNationalFindingsReport2018.pdf.

109   SAMHSA, *NSDUH State Estimates*, accessed Mar. 5, 2020, https://pdas.samhsa.gov/saes/state; see also SAMHSA, *Section 5 PE Tables—Results from the 2018 National Survey on Drug Use and Health: Detailed Tables, Sections 1 - 3, SAMHSA, CBHSQ*, accessed Mar. 11, 2020, https://www.samhsa.gov/data/sites/default/files/cbhsq-reports/NSDUHDetailedTabs2018R2/NSDUHDetTabsSect5pe2018.htm.

(ADAM) II, 68% of arrestees nationally tested positive for at least one illicit substance at the time of arrest.[110] The majority of ADAM II positive tests were for marijuana.[111] Another study estimated that 45.5% of arrestees nationwide had alcohol dependence or abuse in the past year.[112] Locally, the Pretrial Services Agency for the District of Columbia (PSA) found in 2018 that between 25%-30% of individuals arrested in a given month tested positive for an active metabolite of either amphet-amines, cocaine, opiates (non-heroin), PCP, heroin, or synthetic cannabinoids. PSA did not test for alcohol or marijuana.[113]

Third, in a recent systemic review of the literature on the relationship between alcohol use disor-ders, drug use disorders, and corrections internationally, 18%-30% of men and 10%-24% of women in prison had an alcohol use disorder, and 10%-48% of men and 30%-60% of women had a drug use disorder.[114] In the U.S., the Bureau of Justice Statistics estimates that more than half of people incarcerated in state prisons and two-thirds of people serving sentences in jails met the criteria for substance dependence or abuse.[115]

It is important to note that an incident of substance use near the time of an arrest does not nec-essarily mean that a person has a SUD, nor does the absence of a positive drug test mean the person does not have a SUD. Prison and jail SUD rates are also not directly comparable because of differences between pre-trial and sentenced populations. Nevertheless, the fact that rates of positive drug tests of arrestees in D.C. and national rates of substance use corresponding to arrests and incarceration significantly exceed the identified rates of SUDs in DOC supports DOC's and this audit's conclusion that it significantly under-identifies individuals with SUDs in its custody.

Fourth, CCE's interagency data analysis also found significant evidence to suggest that DOC under-identifies residents with Active SUDs, visualized in Figures 20 and 21 below. Of the 4,602 Incarceration Episodes analyzed during the Audit Period, 1,653 had community-based SUD care in D.C. either before, after, or both before and after the incarceration. Of those 1,653 cases, only 142, or 8.5%, had an Active SUD at DOC during their incarceration, meaning that more than 90% of the people in DOC custody who had community-based SUD treatment in D.C. within 90 days of their incarceration were not identified by DOC as having an Active SUD.

---

110   *Supra*, n. 10.

111   *Id.*

112   Pamela K. Lattimore et al., CBHSQ Data Review, *Arrestee Substance Use: Comparison of Estimates from the National Survey on Drug Use and Health and the Arrestee Drug Abuse Monitoring Program* (2014), https://www.ncbi.nlm.nih.gov/books/NBK390289.

113   Leslie Cooper, Pretrial Services Agency for the District of Columbia, *December 2018 Drug Test Statistics* (2019), https://www.psa.gov/sites/default/files/PSA%20Drug%20Stats%20Report%20December%202018.pdf (data for D.C. only).

114   Jack Tsai & G. Xian, *Utilization of Addiction Treatment among U.S. Adults with History of Incarceration and Substance Use Disorders*, 14. Addiction Science & Clinical Practice 1, 9 (2019), https://doi.org/10.1186/s13722-019-0138-4; see also The National Center on Addiction and Substance Abuse at Columbia Universi-ty, *Behind Bars II: Substance Abuse and America's Prison Population*, p. 14 (2010).

115   *Supra*, n. 12.

Figure 20: Incarceration Episodes by Active SUD Flag and Care in Community



*Source: Matched District Data*

Taking a more conservative approach and assuming that only those people who received SUD care *both* before and after an incarceration reflect those actively in need of SUD care, DOC correctly detected 11.1% of cases. However, this is likely an overestimation of DOC's true overall SUD detection rate, as the matched dataset we had did not include several relevant data sources that may have identified additional individuals that were unknown to DBH and DHCF, but nevertheless had SUDs and were ultimately incarcerated in DOC. In other words, there likely are more individuals, even beyond those known to DBH but not DOC, who had SUDs while they were in custody and could have benefitted from treatment.

Figure 21: Care received before and after Incarceration Episode by SUD Flag

| Care Received | SUD Flag | n |
|---|---|---|
| No Care in Look Around | No Active SUD Flag | 2758 |
| | Active SUD Flag | 191 |
| Care in Look Forward Only | No Active SUD Flag | 802 |
| | Active SUD Flag | 79 |
| Care in Look Back Only | No Active SUD Flag | 508 |
| | Active SUD Flag | 38 |
| Care in Both Look Forward and Back | No Active SUD Flag | 201 |
| | Active SUD Flag | 25 |

*Source: Matched District Data*

Put together, this data suggests that DOC systematically and significantly undercounted the number of individuals in its custody with SUDs during the Audit Period, and, therefore, also was under-delivering SUD services to individuals who might have benefited from them.

**Screening Protocols to Improve SUD Identification in DOC**

As CCE's analysis shows, DOC did not detect the vast majority of individuals who consumed SUD services in the District in the months before and after their incarceration. In light of this data, DOC and Unity should re-examine their clinical methods of screening and assessing for SUDs and explore and test alternative diagnostic instruments and processes that might increase accurate identification of SUDs.

Relying on self-reporting at intake as the primary source of information is problematic because patients entering DOC's custody have often recently undergone the often long and stressful process of arrest, booking, and arraignment, and may not believe that disclosing a SUD is necessary or will benefit them. Medical providers in DOC explained that, "intake screening is a poor place to capture this information. Individuals at intake are stressed, they may have slept little over the past several days, and may just not want to talk to you." [116] As a consequence, "we have piss-poor data about SUDs... we are not capturing anywhere close to the amount of SUDs in DOC." [117]

SUD clients also reported skepticism about the efficacy of the DOC screening protocols. Several reported that they did not go into detail about the nature of their SUDs during intake screenings because they believed that DOC already knew about their issues since they had been in and out of jail for years. Others felt that nothing happened when they did disclose their SUD to DOC, and so they were less likely, when re-incarcerated, to raise it again or to seek any kind of treatment when they were re-incarcerated. [118] To counter some of these limitations of self-reporting, DOC could both improve and supplement the information it receives during intake screenings.

DOC's current screening protocols include asking a series of questions about an individual's past substance use and draws on a list of mandatory questions enumerated under the American Correctional Association (ACA) Standards' Performance-Based Detention Standards for "Health Screens." [119] The ACA standard sets the floor for SUD screenings for accreditation purposes, but does not represent best practice. SUD screening instruments are questionnaires developed by researchers for clinical use and are designed to ascertain the risk, presence, and severity of SUDs. Differences in approach are considered rigorously in SAMHSA's *Screening and Assessment of Co-Occurring Disorders in the Justice System* monograph. [120] Some jurisdictions are even successfully exploring the use of computer-administered SUD screenings to combat conditions that inhibit accurate

---

116    CCE Administrator Interview.

117    *Id.*

118    CCE Client Interviews.

119    U.S. Department of Justice, *Federal Performance-Based Detention Standards* (revised Feb. 2011), https://www.justice.gov/archive/ofdt/fpbds02232011.pdf.

120    SAMHSA, *Screening and Assessment of Co-Occurring Disorders in the Justice System* (revised Jun. 2019), https://store.samhsa.gov/product/Screening-and-Assessment-of-Co-Occurring-Disorders-in-the-Justice-System/PEP19-SCREEN-CODJS.

self-reporting.[121] Currently, DOC policy does not call for the explicit use of a best practice screening tool. DOC should work with Unity to test alternative SUD screening tools and identify instruments or protocols that could enhance DOC's identification rate. Following that clinical evaluation, DOC should amend its internal policy 6000.1H to require the delivery and implementation of a best practice SUD screening tool.

### Using Collateral Information to Improve SUD Identification in DOC

Given patients' potential reluctance to answer questions about their history of substance use during a correctional intake, DOC should also use collateral information to help decide whether to refer a patient for a full SUD assessment. One source of such information is patients' Unity health records. Patients with a SUD diagnosis anywhere in their Unity health records should be referred for a full assessment, regardless of what they self-report during the intake screening.

In the case of those who are quickly released from custody, however, it is impractical to expect them to undergo full assessments. Figure 22 below shows that, during the Audit Period, 20.3% of people were released from DOC custody in three or fewer days, and 35.2% in seven or fewer days. DOC should automatically review medical histories in Centricity for the 64.8% of residents who are in custody longer than a week and refer any resident with a recorded SUD diagnosis for a full SUD assessment. For those likely to be in custody for a short period of time or for an unknown duration, DOC should use the best practice "Screening, Brief Intervention, and Referral to Treatment" (SBIRT) model, discussed at greater length in Finding 3, to quickly rank individuals at intake who are at risk of having or may have a SUD and give them a brief intervention or a referral to later treatment— either in DOC custody or in the community.[122]

---

121   Nancy Wolff & J. Shi, *Screening for Substance Use Disorder among Incarcerated Men with the Alcohol, Smoking, Substance Involvement Screening Test (ASSIST): A Comparative Analysis of Computer-administered and Interviewer-administered Modalities*, 53 J. Subst. Abuse Treat. 22 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4414742/.

122   See, e.g., SAMHSA, *Screening, Brief Intervention, And Referral To Treatment (SBIRT) In Behavioral Healthcare* (2011), https://www.samhsa.gov/sites/default/files/sbirtwhitepaper_0.pdf.



Figure 22: Length of Incarceration at DOC Throughout Audit Period

*Source: Matched District Data*

These procedures should significantly raise the rate of identification of patients with SUDs at DOC. As shown below in Figures 23 and 24, CCE found that DOC's SUD Ever flag, created from patients' SUD diagnosis histories, did a significantly better job capturing the universe of people who had received SUD services during the 90-day period before or after an Incarceration Episode than the screening and assessment procedure DOC currently uses. Of the 1,653 individuals who received care in the community at some point before or after an Incarceration Episode, 1,237 individuals (74.8%) had a SUD Ever flag at DOC; in contrast, only 142 (or 8.59%) of those 1,653 individuals had an Active SUD flag.[123]

---

123  Please note the SUD Ever Flag does a poor job discriminating between individuals who do or do not receive care in the Look Around. 71.93% of all Incarceration Episodes analyzed in this Audit Period had an SUD Ever Flag, but 62.63% of SUD Ever Flags were held by individuals who did not receive SUD services in the Look Around.



Figure 23: Incarceration Episodes that Received Care in Look Around by Type of SUD Flag

*Source: Matched District Data*

Figure 24: Care Received Before and After Incarceration Episode by SUD Flag

| Care Received | SUD Flag | n |
|---|---|---|
| No Care in Look Around | No Active SUD Flag | 2758 |
| | Active SUD Flag | 191 |
| Care in Look Forward Only | No Active SUD Flag | 802 |
| | Active SUD Flag | 79 |
| Care in Look Back Only | No Active SUD Flag | 508 |
| | Active SUD Flag | 38 |
| Care in Both Look Forward and Back | No Active SUD Flag | 201 |
| | Active SUD Flag | 25 |

*Source: Matched District Data*

A second source of collateral information is the record of the resident's disciplinary incidents. Residents housed at the Central Detention Facility (CDF) for more than 30 days are subject to

randomized drug testing.[124] A resident who tests positive for an illicit substance, is supposed to receive "appropriate disciplinary action" and "may be offered the opportunity to participate in a substance abuse counseling, education or treatment program."[125] However, DOC explained that, in practice, individuals who tested positive during the Audit Period only received a disciplinary report (DR) "and were not sent to Unity for SUD assessment."[126] In addition to testing positive, if a resident were found to possess, control, use, make, or be under the influence of an "illegal drug, marijuana, a controlled substance, or a narcotic [not prescribed by a physician]," that behavior would also be written up in a DR, and the resident could face an investigation, hearing, and sanction.[127] Similarly, "individuals found to possess illicit substance contraband were given a DR and were not assessed for [a] SUD."[128]

These drug tests and possession of contraband infractions are both missed opportunities for DOC to identify additional residents who may have a SUD that was not identified at the intake screening, or who would benefit from an increase in care. DOC should amend its internal Policy Statements 6050.2G and 5300.1H to require that residents who either test positive for an illicit substance or are found guilty of a disciplinary violation related to an illicit substance are referred to Unity for SUD assessments.[129]

### Increasing SUD Identification and Care Coordination Through Information Sharing

The inability of medical staff to rely on existing, contemporaneous health records when making screening decisions impedes efforts to accurately track patients' diagnoses and deliver high-quality SUD services in correctional settings.[130] As noted above, people who are undergoing the stressful process of arrest and incarceration are a poor place to report accurate information about their SUD status or to seek treatment. The District can mitigate that problem by facilitating DOC's consistent and immediate access to client-level SUD information generated by medical records or claims.

If Unity, acting as DOC's medical provider, had access to specific patient information in DBH, DHCF, and PSA databases, it could use recent drug test results, SUD diagnoses, level of care assignments, and recent care history to better identify DOC residents in need of SUD care and ensure that appropriate care is delivered. As our data analysis shows, this information sharing could immediately result in the more accurate identification, during intake, of individuals with SUDs in DOC custody.

---

124    D.C. Department of Corrections, Policy and Procedure No. 6050.2(f), 2(a) (Jan. 17, 2017), https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/PP%206050.2G%20Drug%20Testing%20of%20Inmates%2001-17-2017.pdf

125    *Id.* at 16(a).

126    *Supra*, n. 96, at Question 7.

127    D.C. Department of Corrections, Program Manual No. 5300.1H (Apr. 21, 2017), https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/PM%205300.1H%20Inmate%20Disciplinary%20and%20Administrative%20Housing%20Hearing%20Procedures%2006-28-17.pdf.

128    *Supra*, n. 96, at Question 8.

129    This is not currently occurring. *See supra*, n. 96, at Response 7.

130    *See* Justice and Health Connect, *Background*, accessed Mar. 13, 2020, http://www.jhconnect.org/background.

To facilitate this client-level SUD information sharing, it is critical that individuals in DOC custody provide specific and informed consent to share their SUD records with DOC. While other agencies and SUD providers may also be involved in efforts to educate SUD clients about the benefits of sharing certain limited SUD information with other behavioral health and criminal justice entities, DOC should ensure that it has a procedure that will maximize its ability to obtain informed consent from individuals in its custody.

Specifically, DOC should establish a protocol to request and record informed consent from all residents at intake to allow their community-based SUD providers, DBH, DHCF, and PSA to share SUD records with DOC, and to allow DOC to share SUD information and communicate with DBH and the residents' community-based SUD providers. The forms used to record consent must be compliant with federal and local law and should be consistent with the forms used by other providers and agencies to ensure appropriate use.

With such consent protocols in place, DBH and DHCF should then work with DOC to establish a Memorandum of Use that will grant DOC's medical provider limited, but ongoing access to their SUD records and claims databases for the purposes of accessing the SUD histories of patients in DOC custody who have active consent on record.

There are additional benefits to DOC's having better information about individuals with SUDs in its custody. By more accurately identifying residents with SUDs, not only will DOC be better poised to provide appropriate treatment and reentry planning, as will be discussed in Finding 3, but DOC also will have information to better scale its SUD treatment programs, make more targeted requests for grants or District funds, and tailor its future medical provider contracts to reflect patient needs. Furthermore, the District must transform the way it shares population-level information about SUD clients between community-based providers and local and federal agencies if it wants to increase the successful provision of care in the jail and the community more generally. A range of recommendations to improve inter-agency information sharing and program evaluation practices surrounding SUD records and justice-involved individuals, inside the boundaries of federal and local law, are made as part of Finding 5 of this report.

**FINDING 3**

## DOC is a leader in the delivery of medication–assisted treatment in a correctional setting, but needs to improve the availability of other types of substance use disorder services, reentry planning, and Medicaid reconnection support for people leaving custody.

---

### RELATED RECOMMENDATIONS:

1. DOC should offer group and individual therapeutic programming, in addition to existing chemical dependency care, that will address the interest in and need for SUD treatment for DOC residents that Residential Substance Abuse Treatment (RSAT) cannot fulfill in light of its capacity limitations, eligibility criteria, and abstinence requirement.

2. DOC should make "brief interventions," practices that clinicians can undertake in short periods of time and that are designed to motivate residents at risk of substance abuse to change their behavior, available to all individuals with SUDs in DOC custody, regardless of the length of their stay.

3. DOC should determine the minimum length of incarceration needed for it to provide effective treatment—beyond medication-assisted treatment (MAT) and detoxification—at the appropriate level of care to individuals in its custody who have an Active SUD.

4. DOC and DBH should prioritize reentry planning and data collection for people with Active SUD flags. This should include the facilitation of connections between SUD providers in DOC to community-based SUD providers, and tracking systems that will allow DOC and DBH to evaluate connection to care rates.

5. DOC should use the Uniform Consent Form with residents with Active SUD flags so that:
   a. If a resident has a community-based SUD provider, DOC can inform that provider when its client has been taken into custody and when the client is scheduled for release.
   b. The provider can share information with DOC about the SUD client's level and type of care.

6. DOC and DHCF should establish annual goals and relevant procedures to ensure that all eligible individuals leaving DOC have Medicaid coverage initiated or reinstated within 48 hours of their release from custody.

## COMMENTARY:

### Overview of SUD Services in DOC

The D.C. Code provides that "[t]he Mayor shall contract for delivery of health care for inmates in the custody of the Department of Corrections at the D.C. Jail and Correctional Treatment Facility… including primary care, specialty care, emergency care, and hospital care, and for connecting inmates with a health center in the community for continued care after the inmates are released from the custody of the Department of Corrections."[131] As noted above, DOC contracted with Unity to serve as its Health Care Vendor, with an option to extend its contract through 2024.[132] Unity is responsible for the day-to-day delivery of health care, including SUD services, to the DOC correctional population.[133]

As noted in the previous finding, data suggests that DOC is failing to identify all of the individuals in its custody with active SUDs. That problem is compounded by the barriers to care posed by a limited range of SUD services available to DOC residents. During the Audit Period, DOC offered the following SUD-specific services: medication-assisted treatment (MAT) or detoxification services for clients with chemical dependencies, through Unity; the Residential Substance Abuse Treatment (RSAT) program for a select group of eligible participants; and the opportunity to "partake in NA [Narcotics Anonymous] or AA [Alcoholics Anonymous] programming, even though that has a re-entry/abstinence-based perspective."[134] DOC reported that, during the Audit Period, "there was no SUD curriculum used with residents, which is typical for most jails," but that people in DOC custody "may have also had exposure to Ministry of Hope SUD-focused psycho-educational materials."[135]

**Detoxification and MAT**. Under its contract with DOC, Unity has the responsibility to develop the "medical detoxification policy for drug and alcohol addicted inmates."[136] Patients undergoing acute withdrawal receive appropriate assessments and treatment to address withdrawal symptoms.[137] Detoxification may occur "at a DOC facility, a D.C. Detoxification Center or an off-site inpatient service facility."[138] Detoxification "is a set of interventions aimed at managing acute intoxication and

---

131    D.C. Code § 24–1401 (2010) (Chapter 14, Delivery of Health Care to Inmates).

132    *See* §§ 13 and 14 of Contract No. CW37196, Comprehensive Medical, Mental Health, Pharmacy and Dental Services for Department of Corrections (Oct. 1, 2015), and Contract No. CW37196 (Oct. 1, 2017); *see also* Contract Extension, Contract No. CW68868 (Apr. 15, 2019), http://app.ocp.dc.gov/Award_attachments/ CW68868-Base%20Period-Contract%20Award-CW68868%20Award%20File%20Redacted.pdf. Also, see *supra*, n. 93.

133    *Supra*, n. 94, at p. 2, ¶¶ 3(a)-(d).

134    DOC Correspondence on Nov. 1, 2019.

135    *Id.* DOC also stated that in 2020 a new curriculum was expected be used for SUD reentry planning services, but CCE has not confirmed its roll out.

136    There are slight differences in the language of H.13.12 the 2015 Unity Contract, as compared to the corresponding sections of the 2017 Unity Contract. *See* 2017 Unity Contract at C.5.13.1 ("Contractor shall develop and provide medical detoxification policy for drug and alcohol addicted inmates. Contractor shall include description of medical detoxification policy in its Operations Manual.") and C.5.13.2 ("Contractor shall coordinate its services with the DOC residential Substance Abuse Treatment (RSAT) program…").

137    *Supra*, n. 134.

138    *Supra*, n. 97, at pp. 28-29, ¶ 13(a).

withdrawal. It denotes a clearing of toxins from the body of the patient who is acutely intoxicated and/or dependent on substances of abuse."[139] During the Audit Period, Unity's detoxification policy included the use of MAT. MAT is the use of medications, in combination with counseling and behavioral therapies, for the treatment of SUDs.[140] MAT is consistently heralded as a key best practice in the treatment of individuals with SUDs, particularly opioid use disorder. MAT has been found to reduce criminal activity, arrests, probation revocations, and re-incarcerations.[141] MAT is associated with reduced patient odds of relapse and reduced medical costs.[142]

The use of MAT services puts DOC in good company.[143] Despite the growing attention to the opioid crisis, "few prisons and jails provide evidence-based substance use disorder treatments."[144] The National Commission on Correctional Health Care's "Jail-Based MAT: Promising Practices, Guidelines and Resources" notes that best practices among MAT providers include many of the features that are present in DOC's MAT program, including a wide variety of choice in treatment options, appropriate detoxification protocols, and reentry supports.[145]

Within DOC, MAT includes the continuation of methadone and Suboxone prescriptions that individuals were receiving in the community and the initiation of Suboxone.[146] These services meet the National Commission on Correctional Health Care (NCCHC) standards for opioid treatment programs in correctional facilities,[147] for which DOC has received an NCCHC accreditation.[148] Additionally, DOC's use of the triple-MAT model (initiating methadone and Suboxone, as well as delivering Narcan upon release) is comparable to the program in Rhode Island, which is broadly considered to have the best correctional MAT protocols in the country.[149] A study comparing the

---

139   SAMHSA, *Detoxification and Substance Abuse Treatment: A Treatment Improvement Protocol*, https://store.samhsa.gov/system/files/sma15-4131.pdf.

140   SAMHSA, *MAT Overview*, accessed Mar. 11, 2020, https://www.integration.samhsa.gov/clinical-practice/mat/mat-overview.

141   SAMHSA, *Medication-Assisted Treatment (MAT) in the Criminal Justice System: Brief Guidance to the States* (Mar. 2019), https://store.samhsa.gov/system/files/pep19-matbriefcjs_0.pdf.; see also *supra*, n. 1.

142   Naoko A. Ronquest et al., *Relationship Between Buprenorphine Adherence and Relapse, Healthcare Utilization and Costs in Privately and Publicly Insured Patients with Opioid Use Disorder*, 9 Substance Abuse and Rehabilitation (2018), https://doi.org/10.2147/SAR.S150253. p. 59.

143   *Supra*, n. 139.

144   Warren J. Ferguson et al., *Advancing the Implementation and Sustainment of Medication Assisted Treatment for Opioid Use Disorders in Prisons and Jails*, 7 Health & Justice 1, 19 (2019), https://doi.org/10.1186/s40352-019-0100-2 (citing Amy Nunn et al., *Methadone and Buprenorphine Prescribing and Referral Practices in US Prison Systems: Results from a Nationwide Survey*, 105 Drug and Alcohol Dependence 1, 83 (2009)).

145   National Commission on Correctional Healthcare, *Jail-Based MAT: Promising Practices, Guidelines and Resources* (2018), https://www.ncchc.org/jail-based-mat.

146   DOC Correspondence on Feb. 15, 2019, Attachment entitled *DOC MAT Trends and Plans 2016-2019* (FINAL).pptx.

147   D.C. Department of Mental Health, Notice of Final Rulemaking, 62 D.C. Reg. 12056 (Sep. 4, 2015) (Pub. L. No. 37, 62).

148   *Supra*, n. 146, Attachment entitled *OTP re-certifications (2019_2016_2013)_DBH OTP certification (2014-2017) and 2019 DBH approval to initiate Methadone.pdf.*

149   *Supra*, n. 140.

six-month period before implementation of the Rhode Island MAT program to the same period a year later found a 61% decrease in post-incarceration deaths. That decrease contributed to an overall 12% reduction in overdose deaths in the state's general population in the post-implementation period.[150]

Additionally, over the course of the Audit Period, DOC's provision of best-practice MAT services increased significantly, consistent with its plans to increase the delivery of MAT services.[151] The expansion of DOC's MAT services has continued after the end of the Audit Period to include the initiation of methadone and the delivery of Vivitrol injections to patients discharged from the facility.[152]

### Figure 25: Trends in DOC MAT Treatment 2015–2018

| Year | Methadone prescription | Suboxone Prescription |
| --- | --- | --- |
| 2015 | 64 | 43 |
| 2016 | 72 | 42 |
| 2017 | 78 | 58 |
| 2018 | 51 | 73 |

*Source: DOC Correspondence on Nov. 1, 2019.*

As is shown in Figure 25, during the Audit Period, DOC increased the number of individuals who received Suboxone from 43 in 2015 to 73 in 2018, while the number of individuals provided methadone decreased somewhat from 64 in 2015 to 51 in 2018.[153] DOC has expanded its MAT services by initiating Suboxone in DOC facilities in 2018, initiating methadone in 2019, and beginning the delivery of Narcan kits to patients upon discharge.[154]

**Residential Substance Abuse Treatment.** DOC also provides SUD services through the RSAT program, a therapeutic program within the Central Treatment Facility (CTF) that provides "treatment, education and/or counseling to individual inmates, needs assessments, activities, treatment plans, planning and linkages" to a select group of participants.[155] The RSAT program mission is "to provide comprehensive diversified treatment interventions and support service linkages, upon release, to

---

150   Traci Green et al., *Postincarceration Fatal Overdoses After Implementing Medications for Addiction Treatment in a Statewide Correctional System,* 75 JAMA Psychiatry 4, 405 (2018); *see also At Rikers Island, a Legacy of Medication-Assisted Opioid Treatment (2016),* http://pew.org/27ISkFh.

151   DOC Correspondence on Nov. 1, 2019.

152   *Id.*

153   *Supra,* n. 151, at Question 14.

154   *Supra,* n. 146.

155   *Supra,* n. 94, at p. 30, ¶ 14(c).

participants with substance use disorders, for the purpose of developing and enhancing the effective coping skills necessary to the recovery process and becoming productive members of their communities."[156]

The RSAT units can house a total of 75 men and 15 women at any one time, and DOC reports that the average stay in the program is 90 days.[157] During each Fiscal Year covered by the Audit Period, RSAT served between 104 and 115 residents, except for FY2018 when RSAT served only 65 residents at DOC.[158] Eight people were put on a waitlist for the program during FY2015, and none were wait-listed throughout the rest of the Audit Period.[159] Individuals in DOC custody are eligible for RSAT if there is a SUD diagnosis, evidence of substance use within the last 12 months, custody clearance by DOC, and the ability to participate in the RSAT program for a minimum of 30 days (in other words, release or transfer to different custody is not expected before participation in RSAT is completed).[160] Anyone who had already participated in the program in the last 12 months is disqualified from re-applying to RSAT.[161] Additionally, RSAT is an abstinence-only program, and any participant who has a positive drug screening is expelled from the program.[162]

In addition to the services described above that were available during the Audit Period, DOC has several new or expanded SUD programs planned. DOC reported:

> In FY2020 DOC will also develop a state-of-the-art SUD therapeutic housing unit for men and comprehensive mental health/SUD therapeutic housing unit for women, offering comprehensive mental health care as well as Medication Assisted Treatment (MAT) with Methadone, Suboxone, and Vivitrol. Residents on these units will also fortify medical treatment with comprehensive SUD curricula and Trauma Informed Curricula, which will be co-lead [sic] by officers and mental health clinicians. All DOC officers and Unity clinicians involved will have been trained by Trauma Informed Care (TIC) Subject Matter Experts.[163]

---

156   *Supra*, n. 151.

157   Government of the District of Columbia, Substance Abuse Treatment at DOC, accessed Mar. 2, 2020, https://doc.dc.gov/page/substance-abuse-treatment-doc.

158   DOC Correspondence on Feb. 26, 2020 (Note that "Between February-May 2019 there were no RSAT referrals from USPC pending their review of the program's outcomes for its clientele. Thereafter, RSAT started receiving referrals again from USPC between June-September 2019 for the RSAT program. During the review period, 53 USPC referred clients were instead moved to alternative community programs.").

159   DOC Correspondence on Feb. 14, 2020, Response 6a.

160   D.C. Department of Corrections, *Policy and Procedure*, 6050.3C (Mar. 31, 2017).

161   *Id.*

162   *Id.* at 6050.3C.13.b and 17.b.

163   *Supra*, n. 158.

DOC also plans to partner with community-based organizations to "provide clinical care on the TIC curricula, a 30-module unit combining psycho-education and mindfulness from a TIC perspective, so that residents can continue their stabilization with community-based partners well versed in TIC and DOC's evidence-based groundbreaking SUD work."[164]

**Reentry Planning**. DOC's policy is to provide continuity of care "from admission to transfer or discharge from the DOC facilities, including discharge planning and referral to community-based providers, when indicated" for all individuals in its custody.[165] In addition to its contractual duties to provide "medical detoxification," Unity is responsible for providing patients, before release from DOC custody, "referrals to substance abuse treatment and counseling programs, as appropriate."[166] All inmates must receive a "discharge treatment plan, and, if applicable, an initial appointment to an assigned health care center of their choice in the inmate's neighborhood, ideally with the same health care team that provided services while the inmate was in custody."[167]

For individuals in DOC custody with diagnosed mental health disorders, "the Mental Health Liaison from the D.C. Department of Behavioral Health (DBH) assigned to the DOC evaluates patients with mental health problems who are due to be released into the community."[168] The liaison then facilitates a connection between those patients and community-based care.[169] However, for clients with only SUDs (and who do not also have a co-occurring mental health diagnosis), DOC explained that reentry planning was provided only through their health care vendor contract, via Unity's "comprehensive discharge planning services."[170]

### Insufficient Services Available for Non-Chemical Dependency SUDs

As noted, DOC implements a well-regarded MAT program, offers detoxification, and serves up to 115 people annually in the RSAT program. It does not provide, however, any other SUD care to people in its custody. This effectively leaves anyone who has a SUD but who does not require detoxification (such as for opioid or alcohol withdrawal) or MAT, or who cannot qualify for RSAT, without any SUD treatment, even though a wide range of SUDs exist within the incarcerated population. If left untreated, these SUDs can have significant health and social impacts. This concern is borne out in DOC's SUD flag indicators. DOC reported that, during the Audit Period, only between 9.81% and 12.06% of individuals in DOC custody who had SUD Ever flags also had Opioid Ever flags,

---

164   *Id.*

165   *Supra*, n. 94, at p. 40, ¶ 40(d). It is noteworthy that this policy further states that "Discharge planning occurs of inmates in need of community follow up; those with acute or chronic medical/mental health/ dental concerns," completely omitting substance use needs as a basis for discharge planning. While there are other sub-provisions that provide for some SUD discharge planning, it is clearly not prioritized as the same level as these areas of care.

166   *See* Contract No. CW37196, Comprehensive Medical, Mental Health, Pharmacy and Dental Services for Department of Corrections (Oct. 1, 2015), at p. 45, C.5.12.10.

167   *Supra*, n. 94, at p. 40, ¶ 40(c).

168   *Id.* at p. 40, ¶ 40(d).

169   *Id.*

170   *Supra*, n. 134.

suggesting that MAT would have benefited a minority of DOC residents with SUDs.[171] At the same time, as Figure 26 shows, CCE found in its analysis of agency data that most individuals in DOC had some prior record of having a SUD. In Incarceration Episode's analyzed by DOC, 71.93% of individuals in DOC had a SUD Ever flag while only 9.08% had an Opioid Ever flag.[172]

### Figure 26: SUD Ever Flags and Opioid Ever Flags



Note: This graph shows the percentage of incarceration episodes with SUD Ever flags vs. Opioid Ever flags.

Source: Matched District Data

While D.C. law requires DOC to provide for the care of "all persons committed" to the jail,[173] DOC's own policies make clear that SUD services are primarily intended for chemical dependency. First, Chapter 4 of the DOC's Medical Management Policies details the "Procedures for Provision of a Continuum of Health Care Services" of the Health Care Vendor within DOC facilities. This section includes expectations for its full range of services and includes both a "mental health program" and "management of chemical dependency."[174] There is no reference to substance use services within the mental health sub-section and "Management of Chemical Dependency" contemplates only two options: detoxification (and related MAT care) and the RSAT program. While the sub-heading that describes the RSAT program uses the more general "Substance Abuse Programs," it does not in fact reference more than one potential additional program that might be available to individuals in DOC custody with SUDs that are not chemical dependencies.[175] The only other reference in Chapter 4 to substance use services is under "Health Education" where it requires that the offered health education program topics include "substance abuse."

---

171    Opioid Ever flags are indicators of whether an individual in DOC has ever had an opioid addiction. DOC Correspondence on Nov. 1, 2019.

172    CCE Analysis of Agency data.

173    D.C. Code § 24–211.02a (2012) (Processing and Release of Inmates from the Central Detention Facility), https://code.dccouncil.us/dc/council/code/sections/24-211.02a.html.

174    *Supra*, n. 94.

175    *Id.*

In its contracts with DOC during the Audit Period, Unity's obligations for providing SUD services were exclusively to "develop and provide medical detoxification policy for drug and alcohol addicted inmates."[176] Unlike its detailed expectations for the provision of mental health services,[177] DOC did not specifically require Unity to develop individual treatment plans, support visitation from SUD providers, or prescribe any other forms of care such as group or individual counseling for individuals with SUDs who were not otherwise in MAT or detoxification programs.

While the 2019 contract between DOC and Unity includes significant changes to expand the requirements and resources for behavioral health services, the contracts that were active during the Audit Period did not contemplate services for all individuals who had SUDs in DOC custody. Administrators emphasized that residents in DOC custody who did not need detoxification or MAT and who could not access RSAT received no SUD counseling during the Audit Period, regardless the level of care they had previously been receiving in the community. One member of the medical team reported that "generally, if you screen positive for SUD, you are not going to receive counseling through Unity, however the behavioral health unit also does individual and group counseling services."[178] DOC medical staff in charge of the behavioral health unit also confirmed there was no systematic delivery of SUD-specific counseling services in DOC, outside of the RSAT program.

One provider working inside DOC explained that group and individual counseling focused on substance use was, in fact, provided only to people who were actively receiving MAT care.[179] "[During the Audit period] the group was only for people who were on Methadone."[180] Providers and DOC noted that NA/AA meetings are also offered to individuals in DOC, but those are not offered specifically by [Unity].[181]

For example, one DOC-based provider explained that, for a person entering DOC with a chronic marijuana or PCP addiction, "I don't think they would receive any specific follow-up for that, I think it would go in their chart, and any provider that saw them for something else would note it, and those providers might provide motivational interviewing, but would not provide other care."[182] Another explained that, with regard to SUD counseling, "we didn't have any SUD counseling [or] treatment in our contract other than [Opioid Treatment Program] weaning. There wasn't a big push for SUD treatment in our contract."[183] For patients who come in with an alcohol or marijuana problem, "there is not an addiction counselor."[184]

---

176   *Supra*, n. 94, at C.5.13.

177   *See supra*, n. 94, at C.5.10.1.2.8, C.5.10.1.3.5, C.5.10.3.5.5, C.5.10.3.5.6, C.5.10.3.5.7, C.5.10.3.5.8.

178   CCE SUD Provider Interview.

179   *Id.*

180   *Id.*

181   DOC Correspondence on Nov. 1, 2019.

182   CCE SUD Provider Interview.

183   *Id.*

184   *Id.*

While DOC program statements require that individuals undergoing chemical dependency management receive "on-going substance abuse counseling and linkage to services internally and upon release,"[185] no comparable services are required for patients who have other types of SUDs. Most of the justice-involved SUD clients interviewed about their experience receiving SUD care in jail reported that they did not receive any SUD services while incarcerated at DOC.[186] A client with a marijuana addiction explained that he received no rehabilitation while he was in DOC, but was later connected to care by his supervision officer after he failed a urine screening.[187]

The diversity and volume of SUD care in DOC would benefit from offering regular group and individual counseling for individuals with SUDs, regardless of whether they have chemical dependencies. As a best practice, SAMHSA calls for criminal-justice agencies to provide "therapeutic programming (such as relapse prevention counseling, cognitive-behavioral therapy, etc.) in addition to MAT medications, either through in-house services or by partnering with community-based agencies."[188]

As a practical matter, DOC is unable to provide comprehensive and tailored SUD treatment to every individual who enters its custody because a significant majority are held for only a short period of time, often only a few days. As the graph below shows, 25% of incarcerations last for four or fewer days. Over the course of the full Audit Period, the median amount of time that individuals spent in DOC custody was 20 days, and 56.4% of incarcerations had a duration of stay under 30 days.[189] It is unrealistic to expect DOC to implement a comprehensive SUD treatment plan for each person who is in custody for such a brief period of time.

---

185   *Supra*, n. 94, at p. 30, ¶ 14(a) and p. 26, ¶ 5(a).

186   CCE Client Interviews.

187   *Id.*

188   *Supra*, n. 141 at, pp. 4, 7.

189   CCE Analysis of Inter-Agency Data.

Figure 27: DOC Stays by Length of Custody



*Source: District Matched Data*

Jails present many barriers to connecting SUD clients to care, both in the correctional setting and in the community. DOC should explore options for alternative offerings for residents who may leave the facility too quickly to engage in treatment or reentry planning but could still benefit from a brief intervention. One solution is to implement a Screening, Brief Intervention, and Referral to Treatment (SBIRT) screening to all people entering DOC custody. The SBIRT model is a "comprehensive, integrated, public health approach to the delivery of early intervention for individuals with risky alcohol and drug use, and the timely referral to more intensive substance abuse treatment for those who have substance abuse disorders."[190] The short timeframe of SBIRT is well-suited for jails, and its structure allows referral to further treatment at subsequent justice intercepts or in the community. For individuals whose score meets a particular threshold of need based on SBIRT or other intake assessment tools, and who are expected to be in custody for 72 hours or more, the jail can administer a more robust clinical screening to identify what level of care that individual should be receiving while incarcerated and connect the individual to appropriate treatment. For those with shorter stays, but who still show signs of a SUD, or who have some record of SUD diagnosis or treatment in their medical history, DOC can deliver brief interventions or other motivational

---

190   *Supra*, n. 122.

interviewing techniques appropriately tailored for correctional contexts.[191]

This is similar to a practice highlighted by SAMHSA in Hancock County, Ohio. In that program, individuals who score positively on a SUD assessment and who are anticipated to have a jail stay of less than 72 hours are quickly re-screened using SBIRT and, in the case of those with high scores, referred to more intensive, SUD-focused discharge planning, in addition to general programming.[192] In at least one study, the authors found that SBIRT screenings in a correctional context resulted in a "significant decrease in average number of arrests in the 12-month period after receiving the intervention compared to the 12-month prior period."[193]

While DOC and Unity should decide the exact extent of screenings and services based on their clinical and custodial population analyses, it is clear that DOC should change its policy and practice regarding SUD care to ensure that (i) brief interventions are offered to all individuals who have a non-chemical dependency SUD, even if they will be in DOC custody only for a very short period; and (ii) there is available and relevant SUD care, including counseling and other therapeutic programs, for all individuals with an Active SUD diagnosis who are expected to be in DOC custody for more than a few days. DOC should engage in an evaluation to determine the length of incarceration during which they can ensure the DOC's ability to provide relevant services to all individuals in DOC who are determined to have an Active SUD and evaluate whether their planned SUD services and capacity are adequate to address the needs of this population.

### Insufficiency of RSAT as Lone Residential Treatment Option

It is the policy of DOC "to provide substance use treatment programs for participants with substance use disorders, to include monitoring and testing." The RSAT program was contemplated as the sole "therapeutic community substance use treatment program for...DOC participants housed at...CTF."[194] The RSAT program, however, is too limited with respect to its bed space, general availability, and strict requirements for participation to serve all of the individuals in DOC who might benefit from SUD care. These factors, and others, make RSAT inadequate to serve as the sole option for SUD patients in DOC custody in need of services beyond MAT and detoxification.

First, the RSAT program is very limited in its availability. At any given time, RSAT can house only 75

---

191    For considerations in selecting an appropriate evidenced based SUD intervention, see John W. Finney & H. Hagedorn, *Introduction to a Special Section on Implementing Evidence-Based Interventions for Substance Use Disorders*, 25 Psych. of Addictive Behav. 2, 191-93 (2011), https://doi.org/10.1037/a0023949.  This article also supports brief motivational interviewing in a correctional context for SUD treatment initiation. *Id.*  For a feasibility study of SBIRT in jails see Mandy D. Owens & B. McCrady, *A Pilot Study of a Brief Motivational Intervention for Incarcerated Drinkers*, 68 Substance Abuse: Research and Treatment 1 (2016), https://doi.org/10.1016/j.jsat.2016.05.005.

192    *Supra*, n. 141 at, p. 13.

193    Jeffrey A. Cigrang et al., "Brief Motivational Interview–Based Intervention for Women in Jail with History of Drug Addiction and Sex-Trading," *Professional Psychology: Research and Practice* 51, no. 1 (2020): 25–33, https://doi.org/10.1037/pro0000273.

194    D.C. Department of Corrections, *Policy and Procedure*, 6050.3B (Nov. 17, 2015), https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/PP%206050.3B%20%20Residential%20Substance%20Abuse%20Treatment%20Program%2011-17-15.pdf.

men and 25 women total, inherently limiting the availability of the program, regardless of the prevalence of SUD diagnoses in the DOC population. Additionally, up to 14 of those beds may be taken up by "mentors" or "tutors" who have graduated from the program and who can stay in the RSAT unit for up to 90 days.[195] DOC reported that residents entering the program are either self-referred, referred by the United States Parole Commission (USPC), or referred by the court. For each of the years covered by the Audit Period, individuals referred by the USPC constituted between 64.6 and 75.9% of total of RSAT program participants; for the Audit Period as a whole, they averaged 71.9% of all RSAT program participants.[196] Between 2015 and 2018, only between 11 and 34 individuals participated in the RSAT program from self-requests.[197]

To participate, individuals must be able to stay in the RSAT unit for a minimum of 30 days.[198] However, as noted above, 56.4% of incarcerations had a duration of under 30 days, rendering more than half of the people in DOC custody ineligible to receive care through RSAT, regardless of whether they had a SUD.[199] Additionally, individuals may not know how long they are going to remain in custody, and the 30-day minimum requirement may deter some people from applying to participate in the program. Of the 803 individuals referred to RSAT from all sources (self-request to DOC staff, USPC, or court) during the Audit Period, only 398, or 49.56%, were considered eligible to participate. In 2015 and 2017, more than half of the residents who asked to participate in RSAT were rejected, and in 2018, 47.62% were rejected.[200] While the data provided by DOC does not break down the reasons for rejection by referral category, it is clear that interest in participating in a SUD treatment was greater than the program could accommodate or accept.

Even participants in RSAT have recommended changes to the program to allow them to get more care and additional programs. As part of one recent evaluation, RSAT participants reported getting "approximately five to ten hours of programming" each week, "resulting in a lot of idle time and a desire for much more intensive programming and treatment time."[201] Additionally, RSAT participants expressed frustration that they were "unable to link to or participate in other programs [like employment, housing, etc.] while housed within RSAT units."[202]

Finally, RSAT is an abstinence-only program and any participant who has a positive drug screening is expelled.203 Evidence has shown that abstinence-only requirements can be a barrier to care

---

195   *Id.* at 11.A .

196   DOC Correspondence on Mar. 3, 2020.

197   *Id.*

198   *Supra*, n. 190, at 19.a.2.

199   CCE Analysis of DOC Audit Data.

200   *Supra*, n. 192.

201   See Moss Group, District of Columbia Custodial Population Study: Seeking Alignment between Evidence Based Practices and Jail Based Reentry Services, p. 103 (2017), https://cjcc.dc.gov/sites/default/files/dc/sites/cjcc/page_content/attachments/DC%20Custodial%20Population%20Study%2009.2017.pdf.

202   *Id.*

203   *Supra*, n. 160 (DOC Policy and Procedure), at 6050.3C.

for patients attempting to begin SUD recovery.[204] In St. Paul, Minn., a nationally renowned abstinence-based SUD program reduced its drop-out rate from 25% to 5% by including MAT services in its programming.[205] Of the individuals who participated in DOC's RSAT during the Audit Period, 145 individuals failed to complete the full 120-day RSAT program, 129 of whom were dismissed from the program with the remaining 16 withdrawing voluntarily.[206] The data does not specify whether dismissals were abstinence-related or for other reasons; whatever the explanation, the result was that another group of individuals with SUDs did not have a therapeutic alternative inside DOC.

In light of RSAT's shortcoming as the sole source of residential and therapeutic programming, DOC should establish adequate alternative SUD care options for individuals who do not need chemical dependency care and for whom abstinence-based programming, or programming requiring long stays in DOC, are inappropriate or infeasible. As noted above, DOC has described plans to start new therapeutic SUD units for both men and women that incorporate comprehensive SUD and trauma-informed curricula. These programs, assuming they have flexible, low-barrier eligibility criteria, would be a welcome addition to the chemical dependency and RSAT options. Once piloted and confirmed to offer needed additional services, the full range of SUD programs should be funded and offered so that individuals receiving SUD care in the community can continue to receive the same level of care within DOC.

### Inadequate Reentry Planning and Connection to Care upon Release

One significant finding from our analysis of the District's interagency matched data is the extent to which DOC's knowledge of individuals' SUD status through Active SUD flags failed to correspond to meaningful connections to SUD care following release from DOC custody. In only 31.23% of Incarceration Episodes in which an individual had an Active SUD flag at DOC was the Incarceration Episode followed by the receipt of SUD care in the 90 days after the incarceration. Conversely, as the figure below shows, in the broader group of Incarceration Episodes where the individual received SUD care in the community in the 90 days after the incarceration, only 9.39% had an Active SUD flag during the incarceration itself.[207] These facts suggest that DOC's Active SUD flags are weakly associated with connection to care after incarceration. DOC needs to work with DBH to evaluate how to increase SUD detection and to facilitate better reentry planning for individuals in DOC who are identified as having a SUD.

---

204  William R. Miller & A. Page, Warm Turkey: Other Routes to Abstinence, 8 Journal of Substance Abuse Treatment 8, 227 (1991), https://doi.org/10.1016/0740-5472(91)90043-A.

205  Christine Vestal, The Pew Charitable Trusts, At Fabled Addiction Treatment Center, a New Approach (2016), http://pew.org/2aX80Av.

206  *Supra*, n. 159, at Response 5.

207  For more on the relationship between Active SUD Flags and care continuity, *see* Inter-Agency Data Analysis.

**Figure 28: Incarceration Episodes with Care by Active SUD Flag**



*Source: Matched District Data*

This data also suggests that during the Audit Period, DOC reentry protocols usually failed to maintain continuity of care, even though in some instances individuals who had not been receiving care before their arrest were connected to care following incarceration. While DOC is not solely responsible for the low level of care secured after release among the individuals with Active SUD flags in its custody, DOC does need to collaborate with other organizations, including DBH, DHCF, and community partners, to remedy this situation and institute new reentry protocols for individuals with SUDs.

The reentry planning protocols for individuals receiving MAT during the Audit Period were significantly more robust than for those with other SUDs, but still did not necessarily result in successful care connections provision after release. Specifically, Unity providers reported that patients receiving MAT care "would follow up with their medical or mental health providers in the jail."[208] They might also be referred to Methadone or Suboxone clinics, or to clinics that provide Vivitrol.[209] Those actively receiving MAT care from DOC when they were slated to be released from custody could schedule a follow-up appointment for services, including MAT at a community-based Unity site,

---

208   CCE SUD Provider Interviews.

209   DOC Correspondence on Feb. 15, 2019, Response 23.

without a new referral from a DBH Assessment and Referral site. Unity also could schedule MAT appointments at a community-based SUD provider of the patient's choice while the patient was still incarcerated. Patients who wish to continue receiving services from Unity in the community were referred to Unity's community-based MAT social workers.[210]

Unity staff explained that during the Audit Period, "there [was] no systematized process for doing release planning of clients."[211] At least one provider who participated in care delivery at the jail said that it was "under the impression that for non-MAT [SUD clients]...there [was] no current reentry planning... [and] that SUD was [n]ever something that was envisioned in the contract as the goal of discharge planning. It's not to say it never happens, but the focus was on the medical/physical health piece."[212]

Community-based behavioral healthcare providers also indicated that they perceived little reentry planning occurring in DOC. They also expressed frustration that they did not receive information from DOC or Unity personnel about the release dates of clients they had been treating before the period of incarceration. One provider described a client with severe disabilities being released in the middle of the night without notice to the provider, who had prepared transitional housing for the client.[213] Another put it bluntly, "there is no continuity of care, we don't know when [clients] are released." Other providers explained that they had some success learning from Unity about clients with opioid dependencies specifically.  The overwhelming consensus was that there is a substantial need for greater coordination between behavioral health and correctional agencies as clients leave custody. As one provider put it, "better alignment between Unity, DOC, and DBH needs to happen to assure continuity of care and to save lives."[214]

Clients reported similar experiences. "[A] lot of people have nothing when they get back, and they get discouraged," one man explained. He had been unemployed and in and out the justice system, including DOC, and had used illicit substances since he was 15.[215] "There needs to be a core some-where, where you can get help," he said, "everything is so scattered...go here for an ID, go here for mental health, the services are there but they aren't together." Multiple clients reported benefiting from mental health and psychiatric care in federal prison facilities, where staff encouraged them to seek help for their SUDs. This approach resulted in them being connected to care after returning to the District, and they noted that they did not receive similar connections during their stays at DOC.[216] Clients who received SUD services in the DOC reported receiving a packet of information from Unity with a list of health care resources, but little other information.[217]

One researcher summarizes what numerous studies have found: "continuity of behavioral health

---

210   *Id.* at Response 20.

211   *Supra*, n. 205.

212   CCE Administrator Interview.

213   CCE Survey Responses.

214   CCE Survey Responses.

215   CCE Client Interview.

216   CCE Client Interview.

217   CCE SUD Provider Interviews.

and addiction services during the transition between incarceration and community reentry is a crucial factor in determining reentry success."[218] Nevertheless, transition planning remains a generally under-developed area of service for people with behavioral health needs. The most common barriers to care include eligibility problems, loss of insurance during incarceration, and inability to meet service costs, while patients also have difficulties with transition planning, transportation issues, and getting appointments quickly enough after release.[219]

Noting that the hours, days and weeks following release are critical, SAMHSA's *Guidelines for Successful Transition of People with Mental or Substance Use Disorders from Jail and Prison* describes promising practices for improving the reentry planning and transition process, including advance planning to identify appropriate community-based interventions and prioritizing continuity of care by promoting direct linkages for post-release treatment and supervision agencies.[220]

The Hampden County Sheriff's Department, in Massachusetts, established a program called After Incarceration Support System (AISS). AISS uses individuals who were incarcerated previously and/or are in recovery from a SUD as peer mentors who meet with individuals pre-release and provide them with information about the range of services and treatment options available in the region.[221] The peer mentors then follow discharged individuals into the community, transporting them to appointments and encouraging compliance with treatment plans.[222]

In New York, there are "care managers" who work with the individuals with behavioral health needs slated for release to develop a community treatment plan. There, the care manager "meets the individual at the jail and transports him or her to...activate Medicaid coverage and....to treatment and services providers to minimize disruption in services."[223] Across the country, some jails and prison systems "establish affiliations directly with community-based agencies or Federally Qualified Health Centers (FQHCs) to create a pathway for continued [SUD] care."[224]

---

218   Audrey L. Begun et al., *Mental Health and Substance Abuse Service Engagement by Men and Women During Community Reentry Following Incarceration*, 43 Adm Policy Ment Health 2, 207-18 (2016), https://doi.org/10.1007/s10488-015-0632-2.  For the studies that this article addresses in this claim, see Jacques Baillargeon et al., *Addressing the Challenge of Community Reentry Among Released Inmates with Serious Mental Illness* (2010), 46 Am. J. of Comm. Psych. 46 (2010), https://doi.org/10.1007/s10464-010-9345-6 pp. 3-4;  see also Steven Belenko, *Assessing Released Inmates for Substance-Abuse-Related Service Needs*, 52 Crime & Delinquency 1, 94 (2016), https://doi.org/10.1177/0011128705281755; Brenda J. Bond & J. Gittell, *Cross-Agency Coordination of Offender Reentry: Testing Collaboration Outcomes*, 38 Journal of Criminal Justice 2, 118 (2010), https://doi.org/10.1016/j.jcrimjus.2010.02.003; Fred Osher et al., *A Best Practice Approach to Community Reentry From Jails for Inmates With Co-Occurring Disorders: The Apic Model*, 49 Crime & Delinquency 1, 79 (2003), https://doi.org/10.1177/0011128702239237.

219   Audrey L. Begun et al. *Mental Health and Substance Abuse Service Engagement by Men and Women During Community Reentry Following Incarceration*, 43 Adm. Policy Ment. Health. 2, 207 (2016).

220   SAMHSA, *Guidelines for Successful Transition of People with Mental or Substance Use Disorders from Jail and Prison: Implementation Guide* (2017), p. 7, https://store.samhsa.gov/system/files/sma16-4998.pdf.

221   Hampden County Sheriff's Department, *AISS HCSD Website Content*, accessed Mar. 12, 2020, http://hcsd-ma.org/wp-content/uploads/2015/09/Website-Content-for-AISS.pdf.

222   SAMHSA, *Guidelines for Successful Transition of People with Mental or Substance Use Disorders from Jail and Prison: Implementation Guide* (2017), p. 7, https://store.samhsa.gov/system/files/sma16-4998.pdf.

223   *Id*. at 16.

224   *Supra*, n. 141 at 4.

To address such issues, DOC and DBH should work together to link all DOC residents who have an Active SUD flag with community-based SUD providers before release through "in-reach" services, or services delivered by community-based SUD providers within a correctional setting. DOC should facilitate the SUD providers' ability to establish relationships, conduct assessments, and schedule appointments for individuals while they are still in custody.[225]

For those who were receiving care before incarceration and were happy with that care, DOC should establish a protocol to enable those individuals to reconnect with their community-based SUD providers and give the providers advance notice of when such individuals are expected to be released. One step to help facilitate this recommendation would be to work with the Criminal Justice Coordinating Council to complete the new "Uniform Consent Form for the Release of Protected Health Information" that has been in development since at least 2017 and ensure that it also encompasses substance use information, in addition to mental health information.[226]

DOC should explore the capacity of its new READY Center and/or develop pilot programs in partnership with other agencies to provide "warm hand-offs," or connections to care that are conducted in person by members of a care team—perhaps through peer mentors or care managers—who help individuals with SUDs in a more active way than simply providing a referral or information about available services upon release. DOC and DBH could collect data and evaluate the impacts on successful connection to care by providing transportation or other supports for individuals who need to get to the ARC or another DBH assessment location.

**Support for Medicaid Reinstatement upon Release**

The federal Center for Medicare and Medicaid Services (CMS) currently does not allow reimbursement for services provided to individuals who are incarcerated, except when those services are provided in a community-based hospital setting.[227] D.C. complies with this process by automatically suspending Medicaid coverage for all individuals incarcerated in DOC.[228] DOC also adopted a protocol for reconnecting people to Medicaid. Since 2017, when individuals are released from

---

225  For a discussion of the need for appropriate PHI releases as best practices, see supra, n. 10 at p. 7 *(MAT Treatment in the Criminal Justice System: Brief Guidance to the States)*.  For unified consent form progress in D.C., see Pretrial Services Agency for the District of Columbia, *Congressional Budget Justification and Performance Budget Request Year 2019* (Feb. 12, 2018) at p. 38, https://www.csosa.gov/wp-content/uploads/bsk-pdf-manager/2018/07/FY2019-PSA-CBJ-Performance-Budget-02122018-1.pdf  and D.C. Criminal Justice Coordinating Council, *An Evolving City, An Ever-Present to Public Safety and Justice* (2017), https://cjcc.dc.gov/sites/default/files/dc/sites/cjcc/page_content/attachments/2017%C2%A0-%20Criminal%20Justice%20Coordinating%20Council%20Annual%20Report.pdf.

226  D.C. Criminal Justice Coordinating Council, *Public Safety, Justice and Community—The Fabric of a Safer DC: Annual Report 2018 (2018)* at p. 21, https://cjcc.dc.gov/sites/default/files/dc/sites/cjcc/page_content/attachments/CJCC_Annual_Report_2018.pdf. See Finding 7 for more treatment of this issue.

227  Jane Wishner & Kamala Mallik-Kane, Urban Institute, *Information Sharing between Medicaid and Corrections Systems to Enroll the Justice-Involved: Arizona and Washington* (Jan. 2017),  http://www.urban.org/sites/default/files/publication/88046/info_sharing_2.pdf.

228  The Henry J. Kaiser Family Foundation, *States Reporting Corrections-Related Medicaid Enrollment Policies In Place for Prisons or Jails* (Oct. 2019), https://www.kff.org/medicaid/state-indicator/states-reporting-corrections-related-medicaid-enrollment-policies-in-place-for-prisons-or-jails.

DOC, Unity is supposed to ensure that all individuals who are Medicaid eligible have filled out the paperwork, which DOC subsequently delivers to a partner-agency that facilitates the enrollment. DHCF is supposed to check two weeks after discharge to ensure that Medicaid re-enrollment was completed.[229] However, in multiple interviews, SUD providers insisted that they had many clients leaving the DOC who had not been re-enrolled in Medicaid. One SUD provider estimated that, during the three months before the interview (December 2018 through February 2019), it knew of five patients who arrived at its office without being re-enrolled in Medicaid, and only two of them returned to the provider after being instructed to go first to the Medicaid re-enrollment office and then to ARC.[230]

DOC and DHCF should collaborate to study Medicaid re-enrollment times for individuals leaving DOC custody. Further, they should set a joint Key Performance Indicator (KPI) to ensure that all DOC clients who were enrolled in Medicaid before their incarceration have their Medicaid eligibility fully re-instated within 48 hours of release.

---

229   CCE Administrator Interview.
230   CCE SUD Provider Interview.

**FINDING 4:**

## DBH requires people seeking substance use disorder services to be assessed in-person at an intake location with limited availability; there are delays between referrals and care; and DBH does not follow up to ensure people connect to treatment.

### RELATED RECOMMENDATIONS:

1. DBH should increase access to its services by:
   a. Adopting the proposed revision to D.C.M.R Chapter 22-A to allow any SUD provider to conduct assessments and referrals;
   b. Amending D.C.M.R Chapter 22-A to remove the requirement that initial SUD assessments be conducted in person; and,
   c. Expanding days and hours of access for the initial assessments, ensuring that at least one SUD provider is open, 24 hours a day, 7 days a week to assess and accept clients into each level of care and to serve individuals in acute withdrawal.

2. DBH should track the time between referrals and care initiation in the new "no wrong door" system, and set goals to decrease any wait times, particularly for people with SUDs suffering withdrawal.

3. DBH should minimize the time between identification of a treatment need and initiation of care by:
   a. Significantly expanding Screening, Brief Intervention, and Referral to Treatment (SBIRT) referrals into broader community settings; and,
   b. Developing programs integrating behavioral health and primary care to foster close collaboration between care teams in a co-located setting.

### COMMENTARY:

**Overview of DBH Assessments and Referrals**

Research shows that referrals to behavioral health services have low treatment initiation rates. People who seek care for their SUD do not always start treatment right away.[231] While there are many reasons for the disconnect between the initial desire to get help and actually receiving care, clients and providers in D.C. reported two distinct challenges to accessing SUD care in the

---

231   Clayton Brown et al., *Predictors of Initiation and Engagement in Substance Abuse Treatment among Individuals with Co-Occurring Serious Mental Illness and Substance Use Disorders*, 36 Addictive Behaviors 5 (2011); see also CCE Client Interviews and CCE Provider Interviews.

community: (i) the limited options for getting assessed for care; and, (ii) the lag time between seeking and starting treatment.[232] Data from the National Survey on Drug Use and Health indicated that 10.67% of the District's population from 2016 to 2017 needed but did not receive specialty treatment for a SUD.[233] If a person is readily able to initiate treatment in the community they may avoid becoming justice-involved, thereby avoiding court-ordered treatment either in the community or in a correctional setting.

In CCE's analysis of District data, we found that when a person was assessed and needed but did not receive SUD care within 90 days, they were 24% more likely to be arrested or incarcerated within that 90-day period compared to assessments that did lead to care. Similarly, a person who was assessed and did not receive SUD care within 90 days was 18.55% more likely to die of an overdose within that same 90-day period as compared to assessments that did lead to care.[234] To minimize justice-involvement and deaths, D.C. must make the initiation of SUD care in the community as easy as possible.

For almost all individuals in D.C. who are insured by Medicaid, the path to access SUD services, either for the first time or after a meaningful lapse in their care, begins at a DBH-certified intake center.[235] There, a person undergoes an "initial assessment," designed to evaluate whether a person is in need of SUD treatment and, if so, to determine the appropriate Level of Care ("LOC"). After the assessment, the person will initiate a course of treatment with a referral to an appropriate SUD provider.[236] While we could not find a calculation of the exact proportion of D.C.'s justice-involved residents eligible for Medicaid, prior analyses indicate that nearly all people incarcerated at DOC

---

232   SUD Client Interviews.

233   SAMHSA, *2016-2017 NSDUH State-Specific Tables* (2019), https://www.samhsa.gov/data/report/2016-2017-nsduh-state-specific-tables.

234   For a more in depth analysis, please see the Inter-Agency Data Analysis.

235   There are some exceptions to this rule. If the payer for the services is not DBH (through local dollars) or the Department of Health Care Finance (through Medicaid), then a client is not required to undergo an initial assessment. However, even when another party (like PSA or D.C. Superior Court) is paying for care, they still frequently send their clients to a DBH-certified assessment center to receive level of care assignment and referral to treatment, even though the initial assessment is not strictly required. Additionally, some justice-involved individuals may be able to avoid the initial assessment process if they receive MAT services in DOC custody and then continue that treatment with a community-based DBH certified SUD provider after incarceration. Finally, individuals with private insurance or who pay for care out of pocket do not require an initial assessment or referral to begin receiving services. See DBH Administrator Interviews.

236   D.C. Mun. Regs. 22-A § 6336.7.

are likely eligible upon their release from custody.[237] Thus, the community-based points of entry to SUD services for most people who have a history (or are at risk) of justice-involvement are likely a DBH-certified intake center or a court order.

DBH regulations in place during the Audit Period require that clients "be referred for SUD services at the level of care determined by a Level 1-AR provider or other intake center authorized by the Department, unless the clients are only receiving Recovery Support Services."[238] During the Audit Period, DBH had only one certified intake center, the Assessment and Referral Center (ARC), a facility at 64 New York Avenue NE, in Ward 5, run directly by the agency. Until 2019, the ARC was the only community access-point into the public SUD service system in the District. All potential clients had to complete an initial assessment at the ARC by appointment or as a walk-in on weekdays from 6 AM to 7 PM.

An individual who completes the initial assessment at the ARC is then referred for an intake appointment by a DBH-certified SUD provider to ensure the appropriate level of care.[239] The referral itself involved DBH representatives communicating with the future care provider to schedule an intake appointment for the client, and sending a packet of information to the future care provider containing information confirming the assessed level of care.[240] If the referral was for either residential treatment or withdrawal management (detoxification), and the SUD provider was open and has available bed space, DBH provides transportation directly to the care-site and the patient leaves for care immediately.[241]

At the SUD provider intake appointment, the SUD provider is also required to perform a "comprehensive assessment" designed to determine an individual's treatment and recovery needs.[242] At this stage, a client is officially diagnosed, their level of care is confirmed, and a treatment plan

---

237   While the exact number of individuals who were Medicaid eligible and justice-involved in D.C. has not been calculated in any study CCE could identify, there are good reasons to believe that nearly all previously incarcerated D.C. residents who are not disqualified because of matters related to citizenship and a lack of social security numbers, are eligible. A Legislative Analyst Office report, *The 2013-2014 Budget: Obtaining Federal Funds for Inmate Medicaid Care—A Status Report*," found that in other jurisdictions 80% of incarcerated individuals were eligible for Medicaid (see Washington State and Colorado). They note that the remainder "were only ineligible because they are not lawfully residing in the United States or lack a valid social security number." These jurisdictions also had more restrictive Medicaid eligibility requirements (see www.healthinsurance.org for a comparison) and are therefore more likely to exclude an incarcerated individual on the basis of income. See also *Moss Group, District of Columbia Custodial Population Study: Seeking Alignment between Evidence Based Practices and Jail Based Reentry Services*, p. 66 (2017), https://cjcc.dc.gov/sites/default/files/dc/sites/cjcc/page_content/attachments/DC%20Custodial%20Population%20Study%2009.2017.pdf (noting that in 2017, while 47% of DOC male residents reported no income at all, "the other 53% reported that their primary source of income was generally from 3 sources—wages (31%); TANF or Public Assistance (29%) and Disability (29%)").

238   D.C. Mun. Regs. 22-A § 6301.4(b) (2015).

239   D.C. Mun. Regs. 22-A § 6336.7(a) (2015).

240   CCE Administrator and Provider Interviews.

241   D.C. Dept. of Behavioral Health, SUD Assessment and Referral Sites FAQ, accessed Mar. 11, 2020, https://dbh.dc.gov/sites/default/files/dc/sites/dmh/page_content/attachments/SUD%20ASSESSMENT%20AND%20REFERRAL%20SITES%20FAQ%208-1.pdf.

242   D.C. Mun. Regs. 22-A § 6336.8(a) (2015).

is developed and adopted by licensed professionals and the client.[243] This comprehensive assessment must be completed within seven calendar days of admission to a SUD provider.[244] "Ongoing assessments" are then performed regularly throughout an individual's course of treatment by the SUD provider to ensure that the diagnosis continues to be appropriate or is revised if warranted.[245]

### Accessing Assessments: "No Wrong Door"

The system of assessment and referral in place during the Audit Period was a "centralized" intake model with one single entry-point, the ARC, through which most individuals were required to pass to get access to care. For the last several years, stakeholders, including both DBH administrators and SUD service providers, have called explicitly for the "no wrong door" model to be embraced in D.C.[246] DBH is actively working to address this issue, but it remained a significant one during the Audit Period.

The single "right door" at the ARC created a geographic barrier to care for justice-involved individuals. Some 76% of people in DOC custody in 2018 resided in Wards 5, 7, and 8,[247] and many reported that transportation issues were barriers to effective reentry.[248] Providers also noted that long commutes made it hard for their clients to access SUD care.[249] For clients who are poor and justice-involved, transportation can be a particularly acute barrier to care initiation.[250]

Hitting a "wrong door" is a known barrier to securing SUD services. For example, if a Medicaid insured person was self-motivated to seek care and walked into a SUD provider in D.C., perhaps one recommended by a friend, or one located nearby in the neighborhood, the person was told that they must first go to the ARC for an initial assessment and referral, and that they then could return to the provider for care.[251] SUD clients interviewed by CCE regarded the ARC as an onerous bureaucratic hoop through which they had to jump before getting services.[252] All individuals receiving SUD services must also ultimately undergo an intake appointment with their chosen provider, which includes a comprehensive assessment at the point of service initiation.[253] This often

---

243  D.C. Mun. Regs. 22-A § 6336.8(c) (2015).

244  D.C. Mun. Regs. 22-A § 6336.8(d) (2015).

245  D.C. Mun. Regs. 22-A § 6336.9 (2015).

246  *Supra*, n. 241.

247  *District Task Force on Jails and Justice, Jails & Justice: A Framework for Change*, p. 16 (Oct. 2019), http://www.courtexcellence.org/uploads/publications/FrameworkForChange.pdf.

248  *Supra*, n. 232.

249  SUD Provider Interviews.

250  James B. Luther et al., *An Exploration of Community Reentry Needs and Services for Prisoners: A Focus on Care to Limit Return to High-Risk Behavior*, 25 AIDS Patient Care and STDs 8, 475 (2011), https://doi.org/10.1089/apc.2010.0372; see also Miriam Bohmert, *The Role of Transportation Disadvantage for Women on Community Supervision*, 43 Crim. Justice and Behav. 11, 1522 (2016), https://journals.sagepub.com/doi/abs/10.1177/0093854816654267.

251  *Supra*, n. 249; see also D.C. Mun. Regs. 22-A § 6336.7.

252  *Supra*, n. 232.

253  D.C. Mun. Regs. 22-A § 6336.8(a) (2015).

feels repetitive and wasteful to clients.[254] Providers interviewed during the Audit Period stated that the initial assessment could take place during the provider intake appointment.[255]

There is broad consensus among experts that initial assessments should be decentralized, and a "no wrong door" model embraced. "No wrong door" is the "principle… that the healthcare delivery system, and each provider within it, has a responsibility to address the range of client needs wherever and whenever a client presents for care."[256] SAMHSA has encouraged this approach for the last two decades as part of a series of patient-centered recommendations designed to improve the quality of care for SUD clients.[257] In fact, national best practices increasingly recognize that care coordination and integration can be improved by increasing the points of entry into the system and ensuring that service connectivity and delivery for a given domain of care (such as SUDs) are not siloed among one group of care providers. Research also suggests that referral points into the care delivery system should be widely distributed across care providers in the community, including primary care, acute care, and outpatient care.[258]

A 2015 study of women with behavioral health needs returning to the community from prison found that behavioral health clients viewed "jumping through hoops" as a barrier to care connectivity.[259] The participants indicated that, although they often intended to seek care, they sometimes did not follow through because of the number of steps required to access care. Similarly, providers interviewed by CCE for this audit emphasized that clients seeking services are often doing so during periods of high stress, and that delays in connection to services lead to the abandonment of service initiation.[260]

To begin addressing these limitations, DBH modified its regulations last year and certified six additional community-based SUD providers to conduct initial assessments of adults as of November 2019.[261] This exceeded the initial goal in the District's Opioid Strategic Plan to "expand DBH's Assessment and Referral (AR) sites to establish multiple points of entry and expedited access into

---

254 *Supra*, n. 232.

255 CCE Provider Interviews.

256 SAMHSA, *Substance Abuse Treatment For Persons With Co-Occurring Disorders A Treatment Improvement Protocol*, pp. 11-12 (2013), https://store.samhsa.gov/system/files/sma13-3992.pdf.

257 National Treatment Plan Initiative, *Changing the Conversation* (2000), https://atforum.com/documents/Natxplan%201.pdf.

258 Martha Gerrity, Milbank Memorial Fund: The Reforming States Group, *Evolving Models of Behavioral Health Integration: Evidence Update 2010-2015* (2016); Marcela Horvitz-Lennon et al., From Silos To Bridges: Meeting The General Health Care Needs Of Adults With Severe Mental Illnesses, 3 Health Affairs 25, 659-69 (2006), https://doi.org/10.1377/hlthaff.25.3.659; W. J. Doherty et al., *Five Levels of Primary Care/Behavioral Healthcare Collaboration*, 5 Behav. Healthcare Tomorrow 5, 25-27 (1996); A. Blount, *Integrated Primary Care: Organizing the Evidence*, 21 Families, Systems, & Health 2, 121-33 (2003).

259 Jennifer Johnson et al., *Provider Experiences with Prison Care and Aftercare for Women with Co-Occurring Mental Health and Substance Use Disorders: Treatment, Resource, and Systems Integration Challenges*, 42 J. Behav. Health Services and Research 4 (2015).

260 Provider Interviews.

261 Live.Long.DC, Government of the District of Columbia, *The District's Approach to Saving Lives from the Opioid Epidemic* (2019), https://livelong.dc.gov/sites/default/files/dc/sites/opioid/page_content/attachments/LLDC%20Accomplishments_website_November%202019.pdf.

the system of care for substance use disorder treatment services" by certifying "at least four sub-stance use disorder treatment providers as AR sites."[262] CCE did not collect information on the functioning of these new assessment sites because they were not certified during the Audit Period.

On February 28, 2020, DBH issued a rulemaking notice proposing that the "certification require-ment for intake and assessment as a level of care" be eliminated and that "all treatment provid-ers provide intake and assessment services."[263] Decentralizing assessment and referral services, and increasing the availability of entry points into the SUD system for individuals who access care through Medicaid is an important step forward to improve SUD care in the District.  This would also make it easier for people who are justice-involved—or at risk of justice involvement—to get connected to care quickly.

DBH's efforts to decentralize SUD intakes reflect a significant movement toward the "no wrong door" model, but some barriers persist. In particular, it remains notable that the procedures in place to initiate SUD care in D.C. pose more "wrong doors" than those to initiate mental health care. Although SUD initial assessments must be done in-person at limited locations, Medicaid-insured individuals seeking mental health treatment can call DBH's Access HelpLine, available 24 hours a day.[264] Staff at the Access HelpLine refer people directly to a community-based mental health services provider, called a Core Service Agency (CSA), for an intake assessment and care.[265] A centralized intake, like that at the ARC, is not required; the relevant regulation only requires that a qualified practitioner determine that a person is in need of mental health services to initiate care.[266] Multiple DBH administrators and community stakeholders expressed a desire for DBH to have a common set of standards for admitting SUD clients and mental health consumers into D.C.'s behavioral health system.[267]

DBH should not only adopt the proposed revision to D.C.M.R Chapter 22-A to allow assessments and referrals to be conducted by any SUD provider, but should go further and make its regulations for SUD assessments correspond with the assessment and referral requirements for mental health services. This change would increase the parity of SUD and mental health services by allowing referrals to come from any qualified practitioner, for instance at a community-based SUD provider, by phone from the DOC, or via Access HelpLine, instead of requiring an in-person visit to a desig-nated assessor.

---

262  *Id.*

263  *Notice of Fourth Emergency and Proposed Rulemaking, Certification Standards for Substance Use Disorder Treatment and Recovery Providers*, 67 D.C. Reg. 2252 (Feb. 28, 2020), https://www.dcregs.dc.gov/Common/DCMR/SectionList.aspx?SectionNumber=22-A6328.

264  D.C. Dept. of Behavioral Health, *Access HelpLine*, accessed Mar. 11, 2020, https://dbh.dc.gov/service/access-helpline.

265  *Id.*

266  D.C. Mun. Regs. § 22A 3403.1.

267  CCE Interviews with Administrators and Stakeholders.

### ARC Operational Barriers

In addition to being the sole site for assessments and referrals during the Audit Period, operational limitations at the ARC also increased the barriers to care for some clients. As noted above, there are many steps that an individual with a SUD must navigate in order to get care.  If any of those steps prove too difficult or too slow, it could result in the person abandoning their efforts to receive treatment in D.C. Specifically, once a person identified the need to go to the ARC, they must either get an appointment or try to be seen during walk-in hours. The process entails getting to the ARC during its limited hours of operation, often waiting for hours to be seen, getting assessed, and receiving a referral to a SUD provider. If those hurdles are cleared successfully, a client must still travel to the first appointment with the SUD provider and undergo another comprehensive assessment—all before receiving any treatment whatsoever.[268]

**Limited Dates and Hours of Operation.**  The ARC's first operational limitation is its dates and hours of operation, which impair the accessibility of its services. The ARC is closed on Saturdays and Sundays.[269] On weekdays, the ARC opens at 7 a.m. and closes at 6 p.m., but stops accepting walk-ins for initial intake assessments at 3:30 p.m. each day. Clients reported that, when the lobby was too full, ARC security sometimes turned them away before 3:30 p.m.[270]

These limited hours have had a significant impact on some individuals with untreated SUDs. For example, clients who arrive at the ARC on a Friday afternoon only to be told to return Monday morning are left to fend for themselves over the weekend as they struggle with their disorder. The three new intake assessment sites, which began operation in 2019, have slightly varied hours, but each also operates only on weekdays during the day and evenings and requires in-person meetings to complete the initial assessment process.[271]

To complicate matters further, the ARC's hours of operation have not been clearly communicated to the public or important justice system actors who direct individuals to treatment. SUD clients interviewed by CCE reported being told by case workers as well as PSA and CSOSA supervision officers to arrive at the ARC after walk-in hours are over, only to be turned away and told to come back the next day, wasting precious time and travel funds.[272] One client described being told by her supervision officer that she could go to the ARC as late as 5:30 p.m. to accommodate her work schedule, only to show up and be told walk-ins were no longer being accepted. When she came back later that week around 11 a.m., she waited for a few hours to be seen but then had to leave and thus had to make another appointment. Finally, several days after she first attempted to receive care, she was able to carve out enough time in her schedule to go to the ARC and receive an assessment and referral.[273]

---

268   *See* SUD Client Interviews, SUD Provider Interviews, and DOC Correspondence with CCE.

269   D.C. Dept. of Behavioral Health, *Substance Use Disorder Services,* accessed Mar. 11, 2020, https://dbh.dc.gov/page/aprat.

270   *Supra,* n. 232.

271   *Supra,* n. 269.

272   *Supra,* n. 232.

273   *Id.*

Even for clients who have accurate information, the limited hours of operation at assessment and referral sites can act as a barrier to clients who may have many stressors and complicated lives. For these individuals, maintaining an easily accessible point of entry into a system that has the flexibility they need is important. This is especially true for individuals leaving the criminal justice system who are more likely to experience high-stress lifestyles characterized by little structure.274 Traditional daytime operating hours may not serve these individuals well. One qualitative study of people returning from incarceration found that juggling irregular work hours was one of the most common causes of job loss among returning citizens.275 The authors noted that returning citizens often work jobs with shifting hours and little predictability, and that juggling competing obligations led to job loss among the individuals interviewed.

**Extended Wait Times.** The second operational limitation at the ARC is wait times once a person arrives. The ARC system required significant patience—and an open schedule—for people seeking SUD services, as it often consumed half a day to be seen and to complete an assessment. Between January and August 2019, the only time period for which CCE received DBH data, people (including both walk-ins and appointments) waited an average of 2.5 hours to be seen for their initial assessment after arriving at the ARC. Initial assessments took an average of 57 minutes to perform, totaling approximately three and a half hours of total time at the ARC per client. [276]

Clients' self-reported wait times at the ARC were consistent with the DBH data—an estimated average of four hours from arriving at the ARC to completing the initial assessment and receiving a referral for services.[277] CCE learned through interviews that these wait times present barriers both to potential clients' connection to care and to fulfilling their other obligations, especially for those who must find time to wait at the ARC around work shifts, medical appointments, or required appointments with their supervision officer.[278]

To address these barriers, DBH should ensure that at least one SUD provider is open, 24 hours a day, 7 days a week to assess and accept clients into each level of care. The D.C. Council should fund a pilot for such a program, and DBH should work with SUD providers to evaluate the utilization and efficacy of the services in order to determine how to make such a model financially and logistically feasible.

### Delays Between ARC Referral and Care Initiation

We also found evidence of meaningful gaps between individual assessments and referrals and the actual initiation of SUD care during the Audit Period. Significant wait times between a client's

---

274  Ingrid A. Binswanger et al., *Return to Drug Use and Overdose after Release from Prison: A Qualitative Study of Risk and Protective Factors*, 7 Addiction Science & Clinical Practice 1 (2012), https://doi.org/10.1186/1940-0640-7-3.

275  David J. Harding et al., *On the Outside: Prisoner Reentry and Reintegration*, Univ. of Chicago Press (2019).

276  *See* DBH Response to CCE Document Request (August 23, 2019).

277  CCE Client Interviews.

278  *Id.*

referral from the ARC and initial service from a SUD provider are yet another barrier to connecting vulnerable people to treatment.[279] Delays can contribute to attrition among people seeking services. While delays between referral and initial service for different levels of care were identified during this audit, CCE did not have access to the information required to determine the sources of delays, nor did DBH report on this topic in any of the strategic planning or evaluation materials that it produced. Therefore, CCE cannot point to the specific causes of long wait times, and encourages further study of this topic.

During the Audit Period, DBH reported that the average SUD clients in D.C. spent just over a week between receiving a referral to care from the ARC and getting their first instance of care, as is shown in Figure 29.[280] However, as is shown in the table below, there were considerable differences between the mean and median periods of time it took clients to be connected to care; the means were shorter than the medians and increased from 2015 to 2018. This skew may reflect differences in the amount of time it took clients to be connected to service for different levels of care, as detailed below.

The aggregate data about referral-to-service wait times reflects worsening conditions in D.C. over the Audit Period that may be a consequence of the increasing number of untreated SUDs and the decreasing number of SUD treatment facilities in the District, as was discussed in the Introduction. In FY2018, DBH clients waited longer to receive care than they did in 2017, 2016, and 2015.

### Figure 29: Annual ARC Intake Assessment Data

| Measure of Central Tendency | FY 2015 | FY2016 | FY 2017 | FY2018 |
|:---|:---:|:---:|:---:|:---:|
| Mean Days | 2.99 | 5.77 | 5.3 | 7.91 |
| Median Days | 4 | 6 | 6 | 14 |

*Source: Matched District Data*

In our analysis of the District's assessment and claims data, CCE observed meaningful differences in the lengths of time that individuals waited to be connected to different levels of SUD services. For example, as seen in Figures 30 and 31, median wait times were significantly longer for outpatient care and withdrawal management than for residential care. This is particularly troubling for withdrawal management, as client and SUD provider interviews both indicated that longer wait times for the receipt of withdrawal management services were associated with a return to substance use.[281]

---

279   CCE Correspondence with DOC Nov. 2, 2019.

280   CCE Analysis of DBH Response to CCE Document Request (Aug. 23, 2019).

281   SUD Client Interviews and SUD Provider Interviews.



Figure 30: ARC Referral-to-Care Interval by Level of Care Throughout Audit Period[282]

*Source: Matched District Data*

Figure 31: Between ARC Referral and First SUD Service

| Measure of Central Tendency | Outpatient | Intensive Outpatient | Residential | Withdrawal Management |
|---|---|---|---|---|
| Mean Days | 90.81 | 102.99 | 94.75 | 135 |
| Median Days | 12 | 13 | 1 | 7 |

*Source: Matched District Data*

Withdrawal management is an important example of why delays between referral and care can be harmful for patients. Withdrawal management or Medically Monitored Intensive Inpatient Withdrawal Management is sometimes referred to as detoxification and "refers to the medical and psychological care of patients who are experiencing withdrawal symptoms as a result of ceasing

---

282   CCE analysis of Inter-Agency Data. Note that because of the data censorship constraints noted in *Appendix C: Quantitative Methods*, we believe that these estimates are *not valid* estimates of the true mean and median values but are instead only useful for making comparisons between types of services.

or reducing their use of drugs."[283] In D.C., these services are for, "clients with sufficiently severe signs and symptoms of withdrawal from psychoactive substances such that medical monitoring and nursing care are necessary but hospitalization is not indicated."[284]

For opioids, "withdrawal syndrome usually begins…6 to 12 hours for short-acting opioids such as heroin and morphine, and 36 to 48 hours for long-acting opioids such as methadone…symptoms [can] reach peak intensity within two to four days, with most of the obvious physical withdrawal signs no longer observable after 7 to 14 days."[285] While withdrawal itself, "is rarely life-threatening…the combination of uncomfortable symptoms and intense craving makes completion of withdrawal treatment difficult for most people."[286] Initiation of withdrawal management services, therefore, are critically time-dependent, as they are intended to reduce symptoms that occur within the first 6-48 hours, and that peak within two to four days. D.C. clients who wait more than four days are not benefiting from the effects of withdrawal treatment, and are at increased risk of returning to substance use.[287]

As shown below in Figures 32 and 33, while the number of individuals in D.C. receiving withdrawal management care within 24 hours of referral increased in 2017 and 2018, until 2018 most DBH clients did not receive withdrawal management care within 72 hours of referral, a critical window for care. However, that changed in 2018, when 156 individuals received withdrawal management services within one day of referral, and 102 received withdrawal management services at least one day after referral.

### Figure 32: Number of Referrals to Withdrawal Management by Duration from Referral to First SUD Service

| Year | One Day or Fewer | More than one day |
|------|------------------|-------------------|
| 2015 | 6 | 412 |
| 2016 | 29 | 235 |
| 2017 | 78 | 224 |
| 2018 | 156 | 102 |

*Source: Matched District Data*

---

283  World Health Organization, *Clinical Guidelines for Withdrawal Management and Treatment of Drug Dependence in Closed Settings* (2009), http://www.ncbi.nlm.nih.gov/books/NBK310654 (WHO Guidelines Approved by the Guidelines Review Committee); D.C. Mun. Regs. 22-A § 6300.16(h) (described as "Medically Monitored Intensive Inpatient Withdrawal Management").

284  D.C. Mun. Regs. 22-A § 6334.1.

285  Linda Gowing et al., *Buprenorphine for Managing Opioid Withdrawal*, 2 Cochrane Database of Systematic Reviews (2017), https://doi.org/10.1002/14651858.CD002025.pub5.

286  *Id.*

287  *See id* (noting that individuals are at increased risk of returning to substance use during periods of withdrawal).

**Figure 33: Days from Referral to Care to Receipt of Withdrawal Treatment by Calendar Year**



*Source: Matched District Data*

This means the majority of DBH clients referred to withdrawal management services during the Audit Period did not receive access to those services prior to the average peak of withdrawal intensity, exposing clients to unnecessary suffering and increasing the risk that they return to substance use.[288] In 2015, only six of 418 clients referred to Withdrawal Management services received a SUD service within 24 hours. As the research shows, and as SUD providers explained, the periods of time in which clients are interested in receiving services can be short and fleeting.[289] Clients may be disposed to entering treatment for only very small window of time. This was corroborated by SUD clients who described the difficulties they had engaging services. Many described not feeling ready to receive treatment for many years, or having only fleeting desires to enter treatment during long periods of sustained substance use.[290]

This reality makes it even more important to minimize the "wrong doors," delays, and other barriers

---

288   The duration of withdrawal varies by substance use. For a treatment of alcohol withdrawal and duration.  *See* Maurizio A. Leone et al., *Gamma- hydroxybutyrate (GHB) for Treatment of Alcohol Withdrawal and Prevention of Relapses*, 2 Cochrane Database of Systematic Reviews (2010), https://doi.org/10.1002/14651858.CD006266.pub2 ("[Alcohol withdrawal syndrome] is a life-threatening condition.); *see also* A. Lautieri, American Addiction Centers, *Alcohol Withdrawal: Symptoms, Timeline & Detox Process*, https://americanaddictioncenters.org/withdrawal-timelines-treatments/alcohol.

289   SUD Client, Provider, and Agency Interviews.

290   SUD Client Interviews.

that people face when seeking SUD services in the District. While DBH's movement towards a "no wrong door" model will likely have significant positive impacts on the problem of delays between assessment and care initiation, it may not be able to solve all delays. For example, some individuals may seek assessments from SUD providers that are unable to offer the appropriate level of care, and will need to make referrals to another provider.

To address these issues, DBH should expand its use of SBIRT referrals in broader community settings to facilitate an increase in care initiation among the 10.67% of District residents who have SUD needs and who are not being connected to care by the District's current assessment and referral system.[291] Facilitating assessments and referrals for these individuals, and improving the flow of care generally, requires the wide adoption of a model appropriate for the diffuse contacts that individuals with SUDs have with health care and justice systems.

SBIRT is considered a best practice for connecting individuals who use alcohol and other drugs at risky levels, and who may not already have a SUD diagnosis or treatment plan.[292] SBIRT programs have been shown to facilitate connectivity to treatment. Further, SBIRT has been associated with significant cost-savings across the healthcare system by preventing the use of other public services, in particular the public safety and justice systems, as substitutes for behavioral health care. Estimates have shown that each dollar spent on SBIRT programs delivers four dollars in savings in local budgets.[293]

Since the conclusion of the Audit Period, DBH and DOH began a peer-based Rapid Peer Responder (RPR) program pursuant to the objectives of the Opioid Strategic Plan. This program enables peers to deliver SBIRT to in-need clients, offer harm-reduction services, and make connections to MAT.[294]

However, as SAMHSA notes, SBIRT programs are often rendered less effective by inadequate referral to treatment, which SAMHSA describes as a, "critical yet often overlooked component of the SBIRT process."[295] Effective and complete referral to treatment involves:

> "...establishing a clear method of follow-up with patients that have been identified as having a possible dependency on a substance or in need of specialized treatment. The referral to treatment process consists of assisting a patient with accessing specialized treatment, selecting treatment facilities, and helping navigate any barriers such as treatment cost or lack of transportation that could hinder treatment in

---

291  SAMHSA, 2016-2017 National Survey on Drug Use and Health: Model-Based Prevalence Estimates (50 States and the District of Columbia (2018), http://www.samhsa.gov/data/report/2016-2017-nsduh-state-estimates-substance-use-and-mental-disorders.

292  SAMHSA, Why SBIRT?, accessed Mar. 11, 2020, https://www.integration.samhsa.gov/clinical-practice/sbirt/SBIRT_Colorado_WhySBIRT.pdf.

293  *Id., see also* CASA Nat'l Advisory Commission on the Costs of Substance Abuse to Government, Nat'l Center on Addiction and Substance Use at Columbia Univ., *Shoveling up II: The Impact of Substance Abuse on Federal, State and Local Budgets* (2009), https://www.centeronaddiction.org/addiction-research/reports/shoveling-ii-impact-substance-abuse-federal-state-and-local-budgets.

294  *Supra*, n. 261.

295  SAMHSA, Referral to Treatment (2010), https://www.integration.samhsa.gov/clinical-practice/sbirt/referral-to-treatment.

a specialty setting. The manner in which a referral to further treatment is provided can have tremendous impact on whether the client will actually receive services with the referred provider."[296]

Models that have been successful in addressing poor client connectivity in behavioral health settings emphasize integrating behavioral health care in primary care settings, as recommended above.[297] Co-located and integrated care models show significant improvements in client care initiation after referral as compared to non-integrated programs.[298] In these models, behavioral health and primary care providers work together to design and implement patient care plans and deliver those care plans at a single-site with a closely coordinated team.[299] The models encourage the availability of same-day appointments for routine and urgent care, providing routine and urgent care outside regular business hours, providing alternative types of clinical encounters, tracking appointment availability, and monitoring no-show rates.[300] This can prevent care initiation drop-offs caused by delays from assessment to treatment, the need to identify additional transportation, or miscommunication between a fragmented care-team.[301]

This also aligns with recommendations made in the "DC Health Systems 2017 Plan," which found that "behavioral health integration in primary care and other settings" could help decrease fragmentation in the District health care system.[302] DBH should continue to study and consider these models as a means of reducing barriers to client care.

DBH should also coordinate with DOH to develop a plan to encourage the widespread adoption of SBIRT as part of the SUD assessment and referral process, as well as in primary care settings across the District. Finally coordination should be done to evaluate the RPR and other implementations of SBIRT in the District and beyond.

---

296   *Id.*

297   A. Auxier et al., Behavioral Health Referrals and Treatment Initiation Rates in Integrated Primary Care: A Collaborative Care Research Network Study, 2 Translational Behav. Med. 3, 337 (2012).

298   Mindy Klowden, SAMHSA, Best Practices for Sustaining Behavioral Health Integration Models in Health Centers Using Health Information Technology (2018), https://integration.samhsa.gov/about-us/Best_Practices_for_Sustaining_BH_Integration_Models_in_Health_Centers_using_HIT_slides_final.pdf.

299   *Id.*

300   *Id.*

301   *Id.*

302   Department of Health, District of Columbia, DC Health Systems Plan 2017, accessed Mar. 11, 2020, https://dchealth.dc.gov/sites/default/files/dc/sites/doh/publication/attachments/DC%20Health%20Systems%20Plan%202017_0.pdf.

## FINDING 5:

**The District and federal governments do not adequately share, utilize, or analyze information about D.C.'s justice–involved substance use disorder client population across agencies.**

---

## RELATED RECOMMENDATIONS:

1. DBH, DOC, and DHCF, in collaboration with the Criminal Justice Coordinating Council (CJCC), should finalize a "Uniform Consent Form for the Release of Protected Health Information" that includes specific, informed consent for release of SUD records.

2. DBH should establish a protocol for certified SUD providers to seek informed consent from SUD clients that would specifically allow for the lawful and appropriately-limited sharing of behavioral health information (BHI), including SUD information, between providers, DBH, DHCF, and DOC, in the case of a client's incarceration.

3. DOC, DBH, and DHCF should establish a protocol for the real-time sharing of clients' authorized SUD information—both electronically and through other forms of communication—between community-based SUD providers and the agencies as is appropriate and necessary to ensure care-continuity for people entering and leaving DOC custody.

4. D.C. should establish an inter-agency agreement to facilitate data sharing between all agencies that regularly come into contact with justice-involved SUD consumers. The agreement should create a process for agencies, on an ongoing and permanent basis, to combine their person-level data into a single, anonymized dataset that includes all variables relevant to a person's behavioral health needs and service consumption and justice involvement in the District of Columbia.

5. The Deputy Mayor for Health and Human Services (DMHHS) and the Deputy Mayor for Public Safety and Justice (DMPSJ) should collaborate to identify the appropriate entity, with adequate staffing and expertise, to manage this data sharing on an ongoing basis, to ensure compliance from all participating D.C. agencies, and to analyze the dataset.

6. The District should publish an annual report summarizing the inter-agency dataset analyzed about SUDs and justice system involvement, including any indicators of emerging barriers to care or significant population trends.

**COMMENTARY:**

**Overview of D.C. Agency SUD Data Collection, Sharing, and Publication**

Interagency behavioral health information (BHI) and criminal justice data sharing in D.C. is extremely limited. Currently, no single agency or office in the District has the responsibility or authority to collect, track, synthesize, and evaluate information about the intersections between substance use and our criminal justice system. Indeed, no D.C. agency could do those tasks alone; they require significant collaboration and a sustained focus. Because of our unique jurisdictional status, many of the relevant criminal justice agencies are federal and are not under the authority of the Mayor or D.C. Council, adding a layer of complexity to the partnerships required.

To date, no entity has successfully established a comprehensive, continuous interagency data sharing and evaluation scheme for behavioral health and criminal justice information. Unfortunately, this leaves D.C. policymakers, agency staff, SUD providers, and the public with fractional and fragmented SUD and justice involvement data. Such data, if appropriately collected, shared, and analyzed, could significantly deepen the District's understanding of this complex issue and improve its ability to serve this vulnerable population.

**Sharing Data with Other Agencies.** During the Audit Period, DBH did not "receive any information about behavioral health outcomes, including SUD treatment, from any other District of federal agency," did not "provide any information about SUD treatment outcomes" to any local or federal criminal justice agency, and did not participate in regional health information exchanges for data sharing.[303] In 2017, DBH signed a limited agreement with the Office of the Deputy Mayor of Public Safety and Justice (DPMSJ) that facilitated the annual matching of DBH data to MPD and D.C. Superior Court data to identify "whether individuals who have been arrested and individuals who have been victims of a crime have had prior contact with DBH."[304] Taking the court and police data provided by DMPSJ, DBH is supposed to "determine whether an individual identified...received services from DBH at any point in time." In December 2017, DMPSJ used DBH's analysis to complete statutorily required reporting on crime trends, and reported the number of individuals arrested on a felony charge who had received substance abuse treatment in either CY2015 or 2016.[305] This data-matching agreement does not include all relevant agencies that have behavioral health data, nor all relevant criminal justice data sources. Nor does the agreement require any specific breakdowns for SUDs or other types of behavioral health services.

DOC did not cite any interagency data-sharing agreements during the Audit Period, but did point to a FY2019 agreement between DOC and DBH regarding the provision of Vivitrol and Nalaxone,

---

303   DBH Correspondence on Aug. 23, 2019, Requests 14, 15, 18.

304   D.C. Department of Behavioral Health & Office of the Deputy Mayor for Public Safety and Justice, *Data Use Agreement* (Nov. 8, 2017).

305   Office of the Deputy Mayor for Public Safety and Justice, District of Columbia, *A Report on Felony Crime in the District of Columbia for 2016* (Dec. 2017), https://github.com/thelabdc/NEAR-Act-Public. For NEAR Act requirements, see D.C. Law 21-356, 63 D.C. Reg. 4659 (Neighborhood Engagement Achieves Results Amendment Act of 2016) (Apr. 1, 2016).

which included a requirement that DOC will "provide DBH with client-level data and participate in an evaluation of each initiative."[306]

DBH does report behavioral health data to SAMHSA. DBH explained that it "sends SAMHSA automated Treatment Episode Data Set (TEDS) and National Outcome Measure reports from DATA WITS."[307] The anonymized data SAMSHA collects from participating agencies like DBH allows for the evaluation of national trends in admission and discharge patterns by jurisdiction, service type, and time, but does not track individual clients through treatment. While the data can be used for retrospective studies of the efficacy of SUD services, they are inadequate for use in evaluating SUD services at a local level in a timely way. No administrators at DBH, DOC, or any of the SUD providers interviewed, report using TEDS and NOM data for SUD outcomes evaluation.

Thus, DBH relies primarily on its own agency and provider data to maintain clients' individual records, track service utilization trends and outcomes, and perform evaluations of SUD service provision. DBH uses two electronic health records (EHR) systems for its billing and claims processing, DATA WITS and iCAMS.[308] DATA Wits tracks service claims related to SUDs and iCAMS tracks claims related to mental health disorders.309 These EHRs contain information about individuals and their claims generated by DBH,  as well as by the community-based SUD and mental health care providers with which DBH contracts. In addition to billing and claims, these EHRs are used for clinical communication, as medical records for individual clients, and as "a source of data for clinical, health services, and outcomes for mental health and substance use services."310

DBH administrators consistently reported that the DATA WITS claims and billings data collected during the Audit Period was also used to track "service utilization" or the number of individuals receiving different types of SUD services over time.[311] DOC relies primarily on Centricity—the internal EHR system maintained by Unity, its healthcare contractor—to collect and analyze its SUD related data.

**Publishing Information about SUDs**. DBH, DOC, and other D.C. entities have published a variety of reports about the populations of people in the District who have SUDs or those who are involved with our justice system, but there have been virtually no studies analyzing data about both of those groups together. For example, DBH publishes its Mental Health and Substance Use Report on Expenditures and Services (MHEASURES) on an annual or biannual basis. This "is a comprehensive overview of the usage of community based mental health and substance use disorder

---

306  D.C. Department of Corrections, FY-19 *Memorandum of Understanding between District of Columbia Department of Behavioral Health and DOC* (Jan. 29, 2019).

307  DBH Correspondence on Aug. 23, 2019, Request 14; see also id. at Request 15.

308  DBH Correspondence on Aug. 23, 2019, Request 19 (regarding the number of systems). For services that DBH provides itself, it may not need to generate payment claims (it would not need to reimburse itself for services it provides). In these cases, services directly provided by DBH would not be captured in the same iCAMS and Wits data systems that are used to track and store other health records.

309  CCE DBH Administrator Interviews.

310  D.C. Department of Behavioral Health, Policy 115.6, at § 6 (Responsibilities and Procedures) (2016); see also CCE DBH Administrator Interviews.

311  CCE DBH Administrator Interview.

services."[312] Additionally, in FY2018, DBH released a Community Service Review of Adult Substance Use Treatment Services Summary Report.[313] This was a "case-based review" of 31 adult clients who received care from 16 different DBH-certified providers to gauge the quality of the SUD services delivered by particular providers.[314] In 2017, DBH also released the results of its annual Behavioral Health Satisfaction Survey that, for the first time, included specific questions about client satisfaction with SUD services.[315]

During the Audit Period, DOC published information regarding its SUD services through its "Program Effectiveness Rates for Reentry and RSAT programs" Key Performance Indicator (KPI). Starting in 2016, DOC began reporting the number of RSAT participants as a KPI.[316] Starting in 2017, DOC began reporting the "effectiveness" of RSAT, which was retained in its 2018 KPI and defined as the "reduction in 12-month reincarceration rate compared to that for DOC inmates." [317] DOC also publishes quarterly population statistics, but these reports do not include information about SUD prevalence in DOC.[318] The most detailed information about people in DOC custody known to have a SUD and the services offered was reported in the custodial population study published by the Moss Group in 2017 for the Criminal Justice Coordinating Council (CJCC).[319] The study included an estimate of the rate of SUDs in the population of people incarcerated in D.C., as well as a survey of individuals in DOC who had at some point received a DBH assessment.[320]

The CJCC is an independent agency designed to identify issues and their solutions, propose actions, and facilitate cooperation to improve public safety and criminal justice services in D.C.[321] It published three reports during the Audit Period related to behavioral health information sharing in the District. Two of the reports were part of CJCC's, "Research in Brief" series published in 2016. One provided a high-level overview of "super-utilizers" of health care and the justice system in the District, who are people with complex and unaddressed behavioral health, physical health, and

---

312  *Reports*, D.C. Department of Behavioral Health, https://dbh.dc.gov/page/reports-01.

313  DBH Correspondence on Jan. 16, 2019, Response 1.

314  D.C. Department of Behavioral Health, *FY18 Community Services Review of Adult Substance Use Treatment Services Summary Report* (2018).

315  D.C. Department of Behavioral Health, *Behavioral Health Satisfaction Survey* (2017), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/BHSS_Annual%20Report_FY17_20180221_REQ1011%20%28002%29%20-%20FINAL.pdf.

316  D.C. Department of Behavioral Health, *FY 2016 Performance Accountability Report* (2016), https://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DBH_FY16PAR.pdf.

317  Office of the City Administrator, District of Columbia, *DC Department of Corrections FY2017 (2017)* ("[E]ffectiveness" is not defined in the KPI for 2017, but in the 2018 KPI is defined as the "percent reduction in 12-month reincarceration rate compared to that for DOC inmates").

318  *See, e.g.*, D.C. Department of Corrections, DOC Population Statistics (Dec. 31, 2019), https://doc.dc.gov/sites/default/files/dc/sites/doc/publication/attachments/DOC%20Population%20Statistics_Dec31_2019_01_24_2020.pdf.

319  F. Shawn & M. Flower, The Moss Group, *District of Columbia Custodial Population Study: Seeking Alignment between Evidence Based Practices and Jail Based Reentry Services* (2017), https://www.jrsa.org/pubs/reports/jrsa-dc-custodial-pop-study-9-2017.pdf.

320  *Id*.

321  Criminal Justice Coordinating Council, *About CJCC*, accessed Mar. 12, 2020, https://cjcc.dc.gov/page/about-cjcc.

social needs.[322] The other was a high-level overview of synthetic cannabinoids and their known use in the District.[323]

CJCC also published the comprehensive "Mental Health Information Sharing in the District of Columbia Criminal Justice System" report in 2015.[324] The report details a wide variety of opportunities for improved mental health information sharing between mental health providers and the correctional system.[325] The report concludes that because of Health Insurance Portability and Accountability Act (HIPAA) exceptions for information provided to a custodial agency for treatment purposes, DOC could automatically receive vital BHI from DBH through a secure, shared database. However, CJCC reported that the federal requirements of 42 CFR Part 2 establish a higher level of protection for SUD information, and would require releases to be signed by clients for any sharing of their SUD diagnosis or treatment information. Similar releases would also have to be signed for DOC to share SUD information with justice partners or DBH and its certified SUD providers.

### Fragmentation of D.C. Behavioral Health Data

A 2018 study of D.C. and federal agency data by the Vera Institute of Justice (Vera) found that BHI is distributed across several health and justice agencies in the District and is highly fragmented.[326] Vera's study looked at administrative data from MPD, PSA, DOC, CSOSA, DBH, and DHCF. In addition to successfully demonstrating that these diverse agencies' data could be shared, anonymized, and matched, Vera's analysis found that 57% of people arrested by MPD in October 2012 had mental health or substance use data on record with at least one of these health or justice agencies at the time of their arrest. Further, 47% of that data was held by either health or justice agencies, but not by both types of agencies, reflecting significant data fragmentation.

For the period examined—between 2006 and 2014—Vera found that DBH held BHI for just 28% of individuals who were arrested in October 2012, while DHCF held BHI for only 13% of individuals at the time of arrest. Only 2.26% of the cohort had information shared by both DBH and DHCF at arrest. Just over half of the cohort's BHI was held by non-health agencies. Despite not being a local or health agency, federal CSOSA, not DBH or DHCF, held a plurality of behavioral health data for justice-involved behavioral health clients in the District. Specifically, Vera found that CSOSA held BHI for 85% of the people in the October 2012 arrest cohort with whom it had contact.[327]

In conducting this audit and analyzing agency data, CCE's findings are consistent with Vera's

---

322    District of Columbia Statistical Analysis Center, *Brief: Super-Utilizers in the District of Columbia* (2016).

323    District of Columbia Statistical Analysis Center, *Brief: New Psychoactive Substances* (2016).

324    Criminal Justice Coordinating Council, *Mental Health Information Sharing in the District of Columbia Criminal Justice System* (2015), https://cjcc.dc.gov/sites/default/files/dc/sites/cjcc/publication/attachments/CJCC%20Mental%20Health%20Final%20Report%20081315.pdf.

325    *Id.*

326    Marilyn Sinkewicz et al., Vera Institute of Justice, *Sharing Behavioral Health Information Across Justice and Health Systems* (2018), https://www.vera.org/downloads/publications/Sharing-Behavioral-Health-Information-across-Justice-and-Health-Systems-Full-Report.pdf.

327    *Id.*

conclusion about siloed data, albeit based on different information and analytical designs. While we did not have access to CSOSA or PSA data as part of this audit's matched dataset, we found that the majority of information that DBH and DOC held about the SUD care and status of individuals in period of transition into and out of correctional settings was not held by the other agency. Of the 11,534 individuals for whom DOC had any SUD data in its record system at *any* time before that individual's incarceration (the "SUD Ever" flag), only 28.71% of those individuals also generated a SUD record in either the DBH or DHCF data received by CCE during the Audit Period. Because there were not agreements or protocols for the relevant D.C. and federal agencies to share behavioral health information about clients with each other during the Audit Period, the majority of the information these agencies had about overlapping clients or people in custody remained siloed and unshared.

### Sharing Justice-Involved Individuals' SUD Information in Real Time

For people with SUDs who are justice-involved, interventions at different intercepts—at the time of arrest when diversion is being considered, at the time of incarceration when DOC is evaluating a person's SUD needs, or at the time of reentering the community when DBH tries to reconnect a person to community-based care, among others—could be better targeted if these agencies had better data about the individual people and their behavioral health and justice-involvement histories. The combination of behavioral health and justice information, when appropriately shared, can create opportunities to better identify individuals at higher risk of negative outcomes like arrests, relapse, or service disruption, and can help ensure those people are targeted for outreach by relevant stakeholders.

To reach clients before a behavioral health crisis, D.C. needs to engage in real-time (or as close to real-time as is practicable) data sharing between agencies to identify opportunities for just-in-time adaptive interventions (JITAIs).[328] JITAIs are an "intervention design aiming to provide just-in-time support, by adapting to the dynamics of an individual's internal state and context."[329] Studies have shown that JITAIs have been successful at mitigating alcohol use[330] and increasing symptom management for people with mental illness,[331] even when the implementing agencies had access only to scarce behavioral health data. These types of policies can leverage individualized information about behavioral health clients to deliver tailored interventions to clients at critical times and reduce the likelihood of the deterioration of a person's behavioral health.

D.C. does have one example of inter-agency, real-time behavioral and health data sharing that

---

328   Inbal Nahum-Shani et al., *Just-in-Time Adaptive Interventions (JITAIs) in Mobile Health: Key Components and Design Principles for Ongoing Health Behavior Support*, 52 Annals of Behavioral Medicine, A Publication of the Society of Behavioral Medicine 6, 446 (2018), https://doi.org/10.1007/s12160-016-9830-8.

329   *Id.*

330   David H. Gustafson et al., *A Smartphone Application to Support Recovery from Alcoholism: A Randomized Clinical Trial*, 71 JAMA Psychiatry 5, 566 (2014), https://doi.org/10.1001/jamapsychiatry.2013.4642.

331   Dror Ben-Zeev et al., *Development and Usability Testing of FOCUS: A Smartphone System for Self-Management of Schizophrenia*, 36 Psychiatric Rehabilitation Journal 4, 289 (2013), https://doi.org/10.1037/prj0000019.

appears to improve connections to SUD services, although the details about how any SUD client information was shared are sparse. In 2015, D.C. launched a Screening, Brief Intervention, and Referral to Treatment (SBIRT) pilot that was implemented through a collaboration between DBH and D.C. Fire & Emergency Medical Services (FEMS).[332] As described in earlier Finding 3, SBIRT is a SUD-specific, targeted method of delivering interventions to connect clients to care when they are most in need of, and may be most willing to seek help.[333] As part of this pilot, DBH was able to identify opioid "super-users" using FEMS data on the administration of Naloxone during a 911 EMS response. These individuals were then targeted for SBIRT in the immediate aftermath of their overdose. Some 54% of those contacted for SBIRT agreed to treatment planning, and 21% agreed to be transported immediately to treatment intake.[334] While there is not a comparison to a control group of individuals who did not receive SBIRT following an overdose, that pilot supports the potential of cross-agency data-matching between DBH and other health and justice partners.

Based on the data collected and matched as part of this audit, CCE's limited analysis suggests that incarceration-related disruptions to SUD care delivery are associated with adverse health and justice outcomes. As discussed in Finding 2, in only 9.39% of Incarceration Episodes in which the person received SUD care in the Look Forward, did that individual have an Active SUD flag during their most recent incarceration.

Then, when looking at the cases in which community-based care was received either in the Look Forward or the Look Back period, only 8.59% had an Active SUD flag during those incarcerations. In other words, as is shown in Figure 34, between 90.61% and 91.41% of incarcerations that could have—and perhaps should have—been flagged as "Active SUD" cases because of the proximity to care received in the community, were not identified by DOC.

---

332   Rafael Sa'adah & Jessica Bress, *Final Analysis of SBIRT Pilot Program.*

333   CCE Stakeholder Interview.

334   Rafael Sa'adah, MWCOG Regional Opioid and Substance Abuse Summit, *Holistic Response to the Opioid Epidemic: The District of Columbia Experience* (May 9, 2017).

**Figure 34: Incarceration Episodes with Care in Look Forward by Active SUD Flag**



*Source: Matched District Data*

Additionally, this suggests that individuals DOC identifies as having active SUD service needs are not receiving care from DBH providers upon release. These findings demonstrate significant information fragmentation and gaps in both agencies' data sets regarding SUD diagnoses, leaving each agency respectively hindered in its ability to provide timely and relevant care to the full universe of individuals who might benefit from treatment or other supports.

To improve the District's capacity to identify and serve individuals who need SUD care and other interventions, D.C. should establish targeted agency protocols for obtaining client consent and, when provided, sharing of BHI among agencies that can facilitate just-in-time interventions, or at the very least help better identify people with SUDs and their histories of care. This protocol should, at minimum, include DOC and DBH, but may also ultimately include other federal or local partners that have BHI and that support justice-involved individuals with SUDs, like FEMS or PSA.

In addition to the recommendation made in Finding 2 for DOC to obtain consent from individuals in its custody, DBH should establish a practice among its certified SUD providers to seek consent from SUD clients that would specifically allow for the sharing of BHI between providers, DBH, and DOC, in the case of an incarceration. Furthermore, these agencies should allow for the sharing of SUD health information and the real-time communication between community-based SUD

providers, DBH, and DOC care providers, as is appropriate to ensure more robust care-continuity for people entering and leaving DOC custody.

This recommendation is not made without recognition that there are significant ethical considerations, as well as legal protections and restrictions, related to disclosing or sharing individuals' BHI generally, and substance use information specifically. In D.C., the Data-Sharing and Information Coordination Amendment Act of 2010 controls the use and disclosure of information relating to the health of or provision of health care to an individual, by a D.C. government agency or its service providers.[335] This law explicitly allows interagency sharing of a person's health information in order to coordinate their treatment, services, or support, among other purposes. At the federal level, HIPAA and 42 CFR Part 2 place limits on the disclosure of a person's health information, including when consent is required to share information, who is allowed to access the information, and how it is stored and transmitted. Part 2 specifically protects peoples' "identity, diagnosis, prognosis, or treatment" records related to substance use, and is more restrictive than HIPAA, requiring patient consent for almost all disclosures, including between different SUD providers and agencies.[336] The purposes of these regulations are to protect confidentiality, promote access to treatment, support the doctor-patient relationship, and reduce stigma.[337]

However, these laws are not categorical bars to interagency SUD data sharing. In developing this protocol, the District can ensure compliance with all federal and local laws and appropriately tailor the information shared, by creating a process to obtain written, informed consent from individuals with SUDs who receive care at a community-based SUD provider or from DBH, or who receive care inside DOC. Across the country, "agencies have developed single or multi-party consent forms to enable communication between stakeholders coordinating care and services, while respecting the autonomy and privacy of the patient."[338] It is allowable under Part 2 for patients to specifically designate entities that can make disclosures or to provide a "general designation" like "my treating providers" or "all programs in which the patient has been enrolled as an alcohol or drug abuse patient" in their consent, offering the flexibility of one consent form facilitating communications between DOC, DBH, and individual care providers in the community.[339] However, the forms will still need to be explicit in the amount and kind of SUD treatment information that may be disclosed and the duration of the consent.

DBH and DOC should work closely with SUD providers, advocates, and individuals with SUDs to: develop the consent form and the information provided to individuals whose consent is

---

335   D.C. Code § 7-241, et. seq.

336   42 C.F.R. § 2.1(a).

337   See Justice and Health Connect, *Module 3: Legal and Ethical Regulations*, accessed Mar. 12, 2020, http://www.jhconnect.org/toolkit#module-3-map-legal-and-ethical-regulations.

338   See Justice and Health Connect, *The Legal Landscape of Justice and Health Information Sharing*, accessed Mar. 12, 2020,  http://www.jhconnect.org/wp-content/uploads/2013/06/Legal-Issue-Paper-Final.pdf.

339   See, e.g., SAMHSA, *Substance Abuse Confidentiality Regulations*, accessed Mar. 12, 2020, https://www.samhsa.gov/about-us/who-we-are/laws-regulations/confidentiality-regulations-faqs.

requested;[340] determine the appropriate, and least-coercive, circumstances under which individuals are asked to give consent; and decide how to implement patient decisions to revoke any consent. The agencies and SUD providers should establish different opportunities, outside moments of crisis, acute stress, or incapacitation, for clients to provide informed consent for information about their SUD diagnosis and treatment history to be shared with DOC or DBH. Additionally, they should explore including the option for people to "opt out" of sharing their health records with particular agencies, as a way to protect privacy rights and promote autonomy.[341]

Most importantly, DBH, DOC, and these stakeholders must develop a protocol for how they will actually share authorized information, both electronically and interpersonally, on an ongoing basis. While participation in the D.C. Health Information Exchange by all SUD providers, as contemplated by DBH-proposed regulations in 2020, could meaningfully improve real-time information sharing that is possible between the DOC-contracted SUD provider and other providers who serve justice-involved individuals before and after periods of incarceration, there are more decisions to be made about what triggers a contact, who holds primary responsibility at each entity to communicate, and when those communications must be made.

With this type of ongoing information sharing, DOC and DBH could work together to deliver more timely interventions, ensure the delivery of continuous SUD care before, during, and after incarcerations, and ultimately help disrupt the harmful cycle of substance use and justice-involvement for many vulnerable people.

### Inter-Agency SUD and Justice Data Matching and Analysis

The District's current inability to match data collected across agencies to individual clients makes it difficult for each agency to track the efficacy of its own SUD programs or for the DMHHS, the D.C. Council, the CJCC, researchers, or the public to evaluate these systems more broadly. The District needs to understand whether the delivery of a specific type of service to a specific group of clients generates improvements for those clients according to one or more established, pre-existing measures. Lack of capacity to do these analyses ultimately puts the District's programmatic investments at risk.

D.C. justice and health agencies must rely on each other—as well as other federal and community partners—if they want to have a more robust understanding of the impacts of their services on the people who interact with them simultaneously and sequentially. For example, a DOC administrator explained that, "Unity [the medical contractor in DOC] can make recommendations that people follow-up for their chronic problems [in the community]... but [Unity] doesn't know why people

---

340   It may be most efficient for these agencies and community stakeholders to work with the Criminal Justice Coordinating Council (CJCC) to finalize the "Uniform Consent Form for the Release of Protected Health Information" that remains in development and ensure that the form is explicitly compliant with Part 2 requirements. See Criminal Justice Coordinating Council for the District of Columbia, *Public Safety, Justice and Community –The Fabric of a Safer DC: Annual Report 2018* (2018), at 21, https://cjcc.dc.gov/sites/default/files/dc/sites/cjcc/page_content/attachments/CJCC_Annual_Report_2018.pdf.

341   See Justice and Health Connect, *Background*, accessed Mar. 12, 2020, http://www.jhconnect.org/background.

don't show up if DBH doesn't track if there are follow-ups or connectivity. We need for there to be a way for the liaisons to transmit that information back to DOC."[342]

Interagency BHI sharing is an emerging best practice, and many jurisdictions have proven that statutory and ethical privacy barriers can be overcome using well-designed and implemented data-sharing protocols.[343] Studies using interagency matched data have shown a relationship between the receipt of behavioral health outpatient services and arrests,[344] and a relationship between mental health service provision and a variety of justice outcomes such as arrest and lengths of incarceration.[345] D.C. is currently not able to conduct ongoing analyses like this on any behavioral health and justice system interactions.

Further, DOC cannot currently evaluate the medium- or long-term efficacy of its SUD services and reentry planning provided in the jail if it does not know whether clients are successfully connected to treatment or have adverse SUD-related health events after release from its custody. These are outcomes that can currently be tracked only by DBH, DHCF, and OCME, as DOC does not have access to the information necessary to observe whether a referral made from DOC is followed through on in the community.[346] Similarly, DBH cannot evaluate the impacts of its SUD services on different judicial outcomes such as police contacts, arrests, convictions, or incarcerations, as that data is not shared with DBH.

Additionally, the District cannot effectively identify or understand relationships between the rate of lethal drug overdoses by District residents and the provision or lack of SUD services or justice involvement. Finally, the District cannot evaluate the efficacy of many of the important and innovative strategies outlined in the Opioid Strategic Plan without cross-agency information sharing and the ability to decipher correlations, causations, and other relationships between different data points. Without robust and ongoing inter-agency data-matching, these analyses are not possible.

Using the novel inter-agency data set analyzed as part of this audit, CCE was able, for the first time, to identify significant disruptions in the continuity of publicly funded SUD care before and after incarceration in D.C. This analysis shows that while DOC incarcerations appear to have a positive effect on initiating SUD care delivery for some individuals, they also contribute to the disruption of community-based care for almost as many other individuals.[347] These findings, and others noted in the Inter-Agency Data Analysis, would not have been possible without the data match done as

---

342   DOC Administrator Interview.

343   John Petrila & H. Fader-Towe, The Council of State Governments, *Information Sharing in Criminal Justice - Mental Health Collaborations: Working with HIPAA and Other Privacy Laws* (2010), https://bja.ojp.gov/sites/g/files/xyckuh186/files/Publications/CSG_CJMH_Info_Sharing.pdf.

344   A. R. Gilbert et al., *Reductions in arrest under assisted outpatient treatment in New York*, 61 Psychiatric Services 10, 996 (2010); see also R. A. Van Dorn et al., *Effects of outpatient treatment on risk of arrest of adults with serious mental illness and associated costs*, 64 Psychiatric Services 9, 856 (2013).

345   Robert Constantine et al., *Characteristics and Experiences of Adults with a Serious Mental Illness Who Were Involved in the Criminal Justice System*, 61 Psychiatric Services 5, 451 (2013), https://doi.org/10.1176/ps.2010.61.5.451.

346   CCE DOC Administrator Interview; see also DBH Correspondence.

347   *See* CCE Analysis of Inter-Agency Data.

part of this audit. While the audit team's analysis was of time-limited data from a small set of local agencies and does not point to definitive conclusions, it does demonstrate that a concerted and ongoing evaluation of these care disruptions will be necessary to identify relevant predictors and, ultimately, to repair breaking points in the cycle of community-based SUD treatment in D.C.

D.C. should develop and execute an inter-agency agreement designed to facilitate data sharing among all agencies that regularly come into contact with justice-involved SUD consumers in the District. Ideally, this agreement should include both local and federal agencies, including: MPD, DOC, DBH, DHCF, FEMS, BOP, PSA and CSOSA.[348] The agreement should create a process for the agencies, on an ongoing and permanent basis, to combine their person-level data into a single, anonymized dataset that includes all variables relevant to a person's SUD status, health service consumption, and justice involvement in the District of Columbia. The data should be analyzed to detect emerging trends that are associated with continuity of care provision, justice outcomes such as arrests and incarcerations, and negative health outcomes such as unintended hospitalizations, use of FEMS services, overdoses, and deaths.

As noted above, this recommendation is made in recognition of the relevant legal restrictions related to disclosing or sharing individuals' BHI. While federal regulations significantly restrict disclosure of private information as it pertains to SUD patient records,[349] 42 CFR Part 2 permits non-consent disclosure to an entity performing an audit or evaluation on behalf of a federal, state, or local agency that is authorized by law to regulate the activities of the Part 2 program or another lawful holder.[350] The evaluating entity must provide written assurance that it will remove and destroy records with BHI after its evaluation is complete in a manner consistent with the law.[351]

Likewise, 45 CFR Part 46 generally prohibits the disclosure of any records containing personally identifiable information or any other indicators that could potentially link data to a particular individual. However, this regulation provides an exception for information that is used to "study, evaluate, improve, or otherwise examine public benefit or service programs" and is subject to the approval of department heads (a requirement that would be taken care of by establishing an agreement to which those departments are a party).[352] Additionally, Vera's research in 2018 and this audit's data matching exercise demonstrate that such information sharing protocols are possible in the District.

Finally, there needs to be clear leadership to ensure implementation of the data sharing agreement by each agency; identify the appropriate entity or entities to conduct the related analyses; solicit independent review of the analytical methods used; and publish relevant findings to the

---

348  The list could, of course, be even broader and should likely include the D.C. and federal courts, and agencies like the D.C. Department of Human Services, and could even include agencies serving youth, if it were to truly capture various social determinants of health.

349  42 C.F.R. Part 2.

350  42 C.F.R. § 2.53.

351  *Id.*; 42 C.F.R. § 2.16.

352  *See* 45 C.F.R. § 46-104(d)(5).  For more on the topic of data-sharing, see Appendix: Federal Data-Sharing Memo.

public. The DMHHS and the DPMSJ should collaborate to identify the specific entity that has adequate staffing and expertise to manage this data-sharing on an ongoing basis, ensure initial compliance from all relevant D.C. agencies that needs to participate, and analyze the resulting dataset.

In the District of Columbia, the "Substance Abuse Treatment and Mental Health Services Integration Task Force" (SATMHSIT) established by the CJCC conceivably could perform some of the necessary functions to support this project. SATMHSIT was formed in 2006 to support "interagency collaboration to improve the treatment options for criminal justice-involved individuals with mental health issues, substance abuse problems, or co-occurring disorders."[353] To date, SATMHSIT has not been called upon by the District to support ongoing data sharing agreements or conduct evaluations of interagency SUD data. However, all of the relevant federal agencies are members of CJCC, including the Directors of PSA, BOP, CSOSA, and other potential data partners.[354] CJCC does have statisticians, data analysts, and policy analysts on its staff that could likely conduct the necessary analyses. Another option for the District would be to use OCTO and "The Lab," a team of data scientists within the Office of the City Administrator, to collect and analyze the data.

The entity identified to perform this task, following the initial matching process, should then be empowered to perform ongoing analyses of the emerging trends and existing gaps in the District's system of care delivery at least annually, if not more frequently. This body could make recommendations, as warranted, for improving the existing data sharing protocol, identifying justice-system intercepts ripe for diversion, improving care-continuity, and more. This body should also be responsible for publishing an annual report that would contain information pertaining to the interaction between SUDs and the justice system, including any indicators of emerging barriers to care or significant population trends. This report should not be limited only to opioids but should contain information for all SUDs.

---

353    *Supra*, n. 22, at 1.

354    Criminal Justice Coordinating Council, CJCC Members, accessed Mar. 12, 2020, https://cjcc.dc.gov/page/cjcc-members.

## FINDING 6:

**DBH does not have clear strategic priorities, goals, and benchmarks that guide its delivery of substance use disorder services in the District generally, or for justice-involved individuals in particular, and it has not consistently used the same benchmarks annually to evaluate performance.**

### RELATED RECOMMENDATIONS:

1. DBH should produce a multi-year, agency-wide strategic plan addressing the findings identified in this audit and other reports. DBH's Strategic Management and Policy Division should develop these plans and oversee their implementation and progress. This should be done in coordination with DBH's Data and Performance Management Branch, which should develop performance goals against which DBH and the D.C. Council could measure progress.

2. DBH should supplement the goals articulated in the Opioid Strategic Plan to establish a relevant plan for all SUD service delivery and care outcomes.

3. The Office of the City Administrator should work with DBH to develop and incorporate into DBH's annual Performance Accountability Report (PAR) performance metrics that effectively capture and measure DBH's provision of SUD services and its work with justice-involved consumers. The City Administrator should require DBH to evaluate Key Performance Indicators (KPI) over at least three years consistently. If a new KPI goal or measurement is required by a shift in strategy or funding, the reasoning behind the change should also be fully explained by DBH.

4. DBH should revise D.C. Mun. Regs. 22-A § 2204.1(a) to make SUD-only clients who do not receive care at a Core Services Agency (CSA) eligible for DBH's Home First subsidy.

5. DBH should revise D.C. Mun. Regs. 22-A § 2207.1 to add individuals returning from incarceration as a priority population for supported housing subsidies.

6. DBH should also update Policies 511.1 and 511.2 to reflect the agency merger and explicitly make SUD-only clients eligible for housing services.

7. In its annual PAR to the Office of the City Administrator, DBH should fully explain the reasons for any significant shortfalls in the achievement of its goals.

## COMMENTARY:

### Overview of DBH's Planning Processes

DBH has not had an active, agency-wide, multi-year strategic plan since its creation via the merger of the Department of Mental Health (DMH) and the Addiction Prevention & Recovery Administration (APRA) in 2013, despite the general best practice for governmental agencies to have such plans,[355] and the statutory expectations that DBH produce annual plans.[356] DBH does work with the Office of the City Administrator (OCA) to produce its required annual Fiscal Year Performance Plan (FY Plan) with Key Performance Indicators (KPIs) at the beginning of each Fiscal Year.[357] Then, at the end of the Fiscal Year, it submits a Performance Accountability Report (PAR) to OCA.[358] The PAR contains information about the agency's success in implementing its KPIs and other elements of its FY Plan, and an account of other organizational highlights from the previous year.[359] The KPIs include information about DBH's performance related to certain key metrics, and if the agency failed to meet those metrics, explanations for why that occurred.

Aside from these required single-year annual documents, DBH was not functioning under an agency-wide strategic plan during the Audit Period. Instead, DBH identified two alternative sources of multi-year agency planning it was developing during the Audit Period.

First, the agency pointed to D.C.'s inter-agency opioid-related strategic plan called "Live. Long. DC. Washington, DC's Strategic Plan to Reduce Opioid Use, Misuse, and Related Deaths," (Opioid Strategic Plan), published in December 2018.[360] Development of the Opioid Strategic Plan began in October 2017 when an Opioid Stakeholder Summit was convened to discuss the emerging crisis.[361] The Opioid Strategic Plan was revised in March 2019 and includes goals, strategies, completion dates, action steps, lead actors, measures of success, and funding targets for proposed goals.[362] Monthly progress updates on the plan were published through the District's Live.Long.DC. website through December 2019.[363]

Second, DBH began what was slated to be an 18-month strategic planning process in 2016 that

---

355  See Frances Berry, *Innovation in Public Management: The Adoption of State Strategic Planning*, 54 Public Admin. Review 4, 322 (1995); see also Theodore Poister & G. Streib, *Strategic Management in the Public Sector: Concepts, Models, and Processes*, 22 Strategic Management in the Public Sector 3, 308 (1999).

356  CCE Administrator Interviews; see also D.C. Code § 7-1141.06(2).

357  D.C. Code § 7-1141.06(2).

358  For a description of performance plans and reports, see Office of the City Administrator, District of Columbia, *Performance Plans and Reports: Health and Human Services*," accessed Mar. 5, 2020, https://oca.dc.gov/node/160702.

359  *Id.* (specifically, the sections on *Performance Plans and Performance Accountability Reports*).

360  *Supra*, n. 8.

361  *Id.*

362  *Id.*

363  Live.Long. DC, D.C. Department of Behavioral Health, https://livelong.dc.gov (button labeled *Read the Strategic Plan*).

was intended to produce a three-year agency-wide strategic plan.[364] DBH selected "Results-Based Accountability" (RBA) as the model for its strategic planning process. RBA is a proprietary process developed by a private consultant for public institutions and agencies to identify problems, develop strategic plans, and track outcomes.[365] For DBH, the goal of RBA was to develop a series of outcomes associated with each of the agency's different functional units and for the network of care providers.[366] The RBA process began in 2016 as DBH worked to integrate former DMH and APRA units.  As one DBH administrator explained, the agency tried to build a common culture and resolve frustrations expressed by SUD and Mental Health Rehabilitative Services (MHRS) providers.[367] DBH conducted extensive interviews with "consumers, clients and their families, advocates, behavioral health practitioners, community-based service providers, government leaders, and other community members."[368] As of February 2020, DBH had not yet completed its RBA process and did not have an active agency-wide strategic plan to guide its medium- and long-term priorities.

**Impacts of Not Having a Multi-Year Strategic Plan**

In over 20 interviews, no DBH administrator could point to a single document or set of documents that served as guidance to the staff about the agency's long-term goals or performance measures during the Audit Period.  Further, many expressed concern that there was a lack of strategic vision at DBH.[369] Despite the RBA process being underway, some administrators considered DBH leaders to be generally reactive, rather than embracing any strategic vision during the Audit Period. One administrator explained that DBH "functioned around a lot of requests—from the Auditor, from the Mayor, from Council."[370] Several DBH administrators reported that the result of the RBA will reflect the agency's strategic plan, but DBH administrators indicated that the plan was still a work in progress and was not ready for external review, citing fears that circulation of an incomplete document would compromise its later successful rollout to the provider network.[371]

DBH should prioritize completing and publishing its RBA and creating a sustainable process to update its agency-wide strategic plan every three years. Strategic planning is a critical part of agency function because it helps to coordinate all of an agency's resources in an "omnidirectional alignment."[372] Surveys of state agencies indicate that strategic plans are widely used across state

---

364   DBH Correspondence with CCE Aug. 23, 2019, Request 10.

365   Mark Friedman, FSI Publishing, Trying Hard Is Not Good Enough (2005).

366   CCE DBH Administrator Interview.

367   CCE DBH Administrator Interview.

368   DBH Correspondence with CCE Aug. 23, 2019, Request 11.

369   CCE DBH Administrator Interview.

370   CCE DBH Administrator Interview.

371   CCE DBH Administrator Interview.

372   Theodore Poister, *The Future of Strategic Planning: Linking Strategic Management and Performance*, 70 Public Administration Review 1, 246 (2010).

agencies and local governments.[373] Strategic planning should be ongoing rather than episodic, and allows organizations to set goals, measure critical external trends, and develop plans to react to those trends.[374] Two particular problems have resulted from DBH's lack of multi-year goals or metrics during the Audit Period.

First, DBH does not have a framework in place for evaluating the ways in which the implementation of new practices, policies, and regulations affect patient outcomes. One administrator explained: "When we change a policy, we don't collect information about the impact."[375] The absence of consistent measures makes it impossible to evaluate whether DBH policy changes have been effective.

Second, DBH may have missed significant problems or trends relevant to the provision of and demand for SUD services in D.C., and consequently failed to respond to the problems in a timely manner. For example, as part of a SAMHSA grant, DBH issued its Opioid State Targeted Response (STR) Needs Assessment in July 2017.[376] That report identified a range of unanswered questions regarding DBH's provision of SUD services during the height of the opioid crisis, and highlighted several areas ripe for future analysis. For the STR, DBH analyzed a 2015 study of 2012 data and learned that D.C.'s Opioid Treatment Program (OTP) facilities, clinics that provide MAT services, had likely been operating at maximum capacity since 2012, before the onset of the opioid crisis. DBH wrote that "the District may lack the capacity to serve additional clients at the current OTPs," and that it would "seek to better assess the ability of…OTPs…to provide comprehensive, coordinated care—which DBH believes is an area of concern."[377] Despite the recognition of this issue in the 2017 STR Needs Assessment, DBH did not include evaluating or increasing OTP capacity as a KPI or strategic initiative in its FY2018 or FY2019 Plan.

The District's Opioid Strategic Plan did include a generalized goal to "Conduct a comprehensive assessment of the availability of treatment services slots/beds…in Washington, DC for adequacy, and develop a plan for building capacity as may be required."[378] DBH was listed as the lead agency for this goal, with a target completion date of September 30, 2019, but as of February 2020, no capacity evaluations have been published. OTP capacity is also not included in DBH's annual MHEASURES. Those reports, provide a summary of key agency measures related to service cost, utilization, and access to the public behavioral health system, but do not publish target goals or provide any other context for the data.[379]

These facts offer a troubling example of an important issue that was identified as the opioid crisis

---

373   Theodore Poister & G. Streib, *Elements of Strategic Planning and Management in Municipal Government: Status after Two Decades*, 65 Public Administration Review 1, 45 (2005), https://doi.org/10.1111/j.1540-6210.2005.00429.x.

374   *Supra*, n. 372.

375   CCE Administrator Interview.

376   D.C. Department of Behavioral Health, *District of Columbia Opioid STR Needs Assessment* (July 31, 2017).

377   *Id*.

378   See supra, n. 8,at p. 16 (Goal 5.1).

379   D.C. Department of Behavioral Health, Reports: *Mental Health and Substance Use Report on Expenditures and Services*, accessed Mar. 12, 2020, https://dbh.dc.gov/page/reports-01.

was growing, deserved further study and, possibly, a policy response. But the issue did not become a specific target or goal in any DBH plan produced by DBH during the Audit Period. By failing to incorporate the issue of OTP capacity into DBH's internal goals and metrics for program evaluation, it likely hindered the District's ability to answer vital questions in 2016 and 2017, when overdoses were increasing in D.C.

To address these issues, the D.C. Council should require DBH to produce multi-year, agency-wide strategic plans addressing findings identified in this and other reports. In addition, on a more granular level, it should ensure that DBH produces and publishes annual plans, as D.C. Code § 7-1141.06(2) mandates, including information detailing progress in carrying out those plans. Further, the Executive Office of the Mayor should work with DBH to develop short- and long-term goals for improving the Department's operations as they relate to SUD services, establish plans for achieving these goals, and devote sufficient resources to ensuring that those goals are met. DBH's Strategic Management and Policy Division should be tasked with developing these plans and over-seeing their implementation and progress. This should be done in coordination with DBH's Data and Performance Management Branch, which should develop performance goals against which DBH and the D.C. Council can measure progress. These goals should include a plan to ensure that network capacity is sufficient for service demand. The goal setting and strategic planning process should include a structure through which DBH can incorporate new information that it receives about the behavioral health needs and challenges of District residents into the existing plan on a regular basis. As is more fully addressed below, DBH should supplement the goals articulated in the Opioid Strategic Plan to establish a relevant plan for all SUD service delivery and care outcomes.

### Looking Beyond Opioids at All SUD Service Needs

The Opioid Strategic Plan is an example of a clear, detailed strategic plan that, if implemented fully, could make a meaningful difference in the District's opioid crisis. It identifies key stakeholders, targets, completion dates, lead agencies, and funding sources. Several of the goals are specifically related to the intersection of the justice and behavioral health system, many of which are con-sistent with the findings and recommendations in this audit.[380] However, there are two import-ant omissions in the Opioid Strategic Plan that DBH should seek to address in its own individual agency strategic planning before seeking to use it as the basis for an agency-wide, multi-year stra-tegic planning initiative.

First, while the opioid epidemic is an exigent public health crisis, SUDs are a broader universe deserving of strategic attention. In fact, the overwhelming majority of District residents who have a SUD do not have an opioid use disorder (OUD). In 2016 and 2017, 11.5% of adult residents in D.C. had a SUD, but only .39% of adult residents reported having used heroin in the past year. Of the 10.67% of D.C. adult residents who reported needing but not receiving treatment for substance use, 8.5% reported needing but not receiving treatment for alcohol use.381

---

380   *Supra*, n. 360, at 19-20.

381   SAMHSA, 2016-2017 NSDUH *State-Specific Tables* (2019), https://wwwsamhsa.gov/data/re-port/2016-2017-nsduh-state-specific-tables.

Second, the Opioid Strategic Plan does not contain any specific measures to evaluate progress toward achieving its listed health and justice outcomes. DBH should supplement the Opioid Strategic Plan by setting clear, measurable outcomes related to client health. For example, DBH could set goals such as:

- Correctly identifying 90% of individuals who were actively receiving SUD services in community settings in the 30 days prior to their incarceration as having an Active SUD.

- Reducing the arrest rate of individuals with SUDs by 10% from the previous year.

- Reducing the rate of lethal overdoses that occur within 90 days of leaving jail by 15% from the previous year.

The goals that DBH adopts should reflect the full spectrum of SUDs, not just OUD, and should measure client level improvements of both health and justice involvement outcomes. The goals should be developed in conjunction with stakeholders to ensure they are aligned with the client populations needs and that there is buy-in among SUD providers and other District agencies to achieve them.

### SUD Client Access to DBH's Specialized Housing Programs

The overwhelming consensus of the SUD consumers that CCE interviewed during this audit emphasized the challenges that homelessness, poor family relationships, low-education, and adverse childhood experiences had on their pathways to treatment initiation and recovery. In recognition of these important social factors that affect behavioral health, DBH has several specialized housing programs for the consumers and clients it serves.

In FY2018, DBH provided housing or housing support to 2,282 people. This included 892 individuals served through Home First vouchers, which are housing vouchers provided to DBH consumers that cover the difference between 30% of a client's income and the cost of rent in the home of their choice.[382] Unfortunately, however, this significant part of DBH's housing is only accessible to its mental health consumers.

DBH regulations require that a person who wishes to apply for a Home First subsidy must be a consumer receiving care from "a CSA or other DMH-certified provider."[383] As previously noted, a Core Services Agency (CSA) is a specific designation for mental health providers that serve as clinical homes to their consumers[384] Clients who are only associated with SUD providers and who do not receive services at a CSA are rendered ineligible under current DBH regulations from accessing DBH Home First support. Additionally, DBH prioritizes consumers who are transitioning from Saint Elizabeths to the community, chronically homeless, or are moving to a less-restrictive environment for supportive housing. In contract, DBH does not prioritize consumers or clients who are returning

---

382  Council of the District of Columbia Committee on Health, *Department of Behavioral Health FY 18-19 Performance Oversight Questions* (2019), https://dccouncil.us/wp-content/uploads/2019/04/dbh.pdf.

383  D.C. Mun. Regs. 22-A § 2204.1(a) (2013).

384  See D.C. Mun. Regs. 22-A § 3411 (2011).

to D.C. from incarceration or otherwise justice-involved.[385] Finally, both DBH's policy on Access to Housing and its policy on Providing Housing and Services to Homeless Consumers were issued in 2005, before the DMH-APRA merger. They, contemplate housing services only for consumers diagnosed with Serious Mental Illness or Serious Emotional Disturbance, not clients exclusively diagnosed with a SUD.[386]

One of the most common narratives SUD clients shared during interviews was that incarceration, homelessness, and substance use formed a vicious cycle that consumed many years of their lives. For these people, homelessness led to more substance use, which resulted in petty crime, which in turn led to arrests and incarceration. Incarcerations further destabilized SUD clients. Many used PCP or cocaine instead of opioids, and therefore received no services of any kind for their SUDs in jail, nor were they connected to services upon release.[387] Indeed, the need for housing support is particularly acute for individuals who have SUDs and are justice involved. In 2015, 90 days into their reentry, more than a quarter of people returning from incarceration under CSOSA's supervision in D.C. lacked stable housing.[388] In the 2019 Point in Time (PIT) District-wide survey of people experiencing homelessness, 25% of individuals reported having "a problem with drugs." The majority of people experiencing homelessness in D.C. (57%) said they had previously been incarcerated, and of those, 55% said that incarceration had caused their current episode of homelessness. A smaller proportion, 31%, said they had been treated at a residential rehabilitation facility, and of those, 61% said they entered homelessness after leaving the residential program.[389]

Access to housing is strongly associated with positive outcomes among individuals with SUDs and improves the efficacy of treatment.[390] One study demonstrated that supportive housing like that offered by DBH can reduce reported SUD symptoms by 50% relative to intensive case management alone.[391] Additionally, Housing First programs have proven successful for maintaining cli-

---

385  See D.C. Mun. Regs. 22-A § 2207.1 (2013).

386  D.C. Department of Mental Health, DMH Policy 511.1 (June 10, 2005), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/TL73.pdf; DMH Policy 511.2 (June 10, 2005), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/TL74.pdf.

387  CCE Client Interviews (multiple); see also Finding 3.

388  Council for Court Excellence, *Beyond Second Chances, Returning Citizens' Re-Entry Struggles and Successes in the District of Columbia* (Dec. 2016), http://www.courtexcellence.org/uploads/File/BSC-FINAL-web.pdf.

389  Interagency Council on Homelessness, *2019 Point in Time Plus Survey, Part One Initial Findings* (May 2019), http://www.community-partnership.org/LiteratureRetrieve.aspx?ID=141162.

390  For example, for the effect of residential treatment, see John M. Majer et al., *Abstinence Self-Efficacy and Substance Use at 2 Years: The Moderating Effects of Residential Treatment Conditions*, 34 Alcoholism Treatment Quarterly 4, 386 (2016), https://doi.org/10.1080/07347324.2016.1217708; for the effect of housing on treatment initiation see Deborah Padgett et al., *Housing First Services for People Who Are Homeless With Co-Occurring Serious Mental Illness and Substance Abuse*, 16 *Research on Social Work Practice* 1, 74 (2006); for the effect of housing first models on homelessness and hospitalization among a cohort with mental illness and SUD needs, see Gulcur et al., *Housing, Hospitalization, and Cost Outcomes for Homeless Individuals with Psychiatric Disabilities Participating in Continuum of Care and Housing First Programmes*, 13 Journal of Community & Applied Social Psychology 2, 171 (2003).

391  G. Hall et al., Taylor & Francis Online, *Housing Versus Treatment First for Supportive Housing Participants with Substance Use Disorders: A Comparison of Housing and Public Service Use Outcomes* (2018), https://www.tandfonline.com/action/showCitFormats?doi=10.1080%2F08897077.2018.1449049.

ents in housing, regardless of whether SUD clients are abstinent or acutely using substances.[392] Unfortunately, with the D.C. Housing Authority waiting list remaining closed to new applicants for subsidized housing support for more than seven years, low-income or homeless individuals with SUDs are without any generalized or targeted resources to support their housing needs.

In interviews with CCE, DBH administrators characterized the agency's regulations that prevent SUD clients from qualifying for supportive housing vouchers as something that they intended to fix eventually but had not been prioritized.[393] Moreover, in 2018, DBH introduced a KPI to measure the "number of housing subsidies to individuals who are mentally ill and homeless," but did not introduce a goal to change its relevant regulations or to increase the number of SUD clients who had access to housing programs within DBH.[394]

To address this disparity and align with its stated goals of enhancing parity between mental health and SUD clients, DBH should evaluate how individuals who receive SUD services can be included in its specialized housing programs that are currently available to mental health and co-occurring disorder consumers. DBH should modify its regulations to add people returning from incarceration as a priority population and to make clients with SUD-only diagnoses and who receive care from non-CSA providers eligible for Home First vouchers and other relevant housing supports. This modification would also allow for funding from the District or other sources to be targeted to SUD clients' housing needs in the future. DBH should also update Policies 511.1 and 511.2 to reflect the agency merger and include SUD-only clients.

### Inconsistent KPIs Related to SUDs

Of all the potential sources for DBH agency-wide goal-setting and evaluation metrics related to SUDs, only KPIs existed throughout the entire four-year Audit Period. Unfortunately, however, the relevant KPIs that DBH established during the Audit Period to evaluate SUD service provision were limited in number, and, more important, changed meaningfully from year to year in ways that prevent consistent evaluation. Indeed, as detailed below, DBH's constant changes to the KPIs frustrates oversight.

CCE analyzed every KPI related to SUD services and found that, between 2015 and 2018, DBH failed to have even a single SUD-related KPI that did not qualitatively change at least once. As one example, in FY2015, DBH set the KPI goal of having 60% of adults that receive SUD services complete their course of treatment. The agency did not reach that goal, as only 46.97% of adults completed treatment.[395] Then, in FY2016, this KPI was revised as the "percent of adults that successfully complete DBH substance use disorder treatment," and only 35.7% of the 60% target was

---

392  K. Urbanoski et al., *Effects of Comorbid Substance Use Disorders on Outcomes in a Housing First Intervention for Homeless People With Mental Illness*, 113 Addiction 1, 137 (2017), https://doi.org/10.1111/add.13928.

393  CCE DBH Administrator Interview.

394  See D.C. Department of Behavioral Health, *FY 2018 Performance Accountability Report* (2018), https://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DBH_FY18PAR.pdf.

395  D.C. Department of Behavioral Health, FY 2015 *Performance Accountability Report* (2015), https://oca.dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DBH_FY15PAR.pdf.

met.[396] The effect of this linguistic change is unknown. However, DBH noted in its FY2016 PAR that the decreased discharge and completion rates of a particular program may skew results and be a barrier to achieving this goal, noting that the agency might "rethink the programs associated with this KPI."[397]

Then, in FY2017, DBH eliminated the KPI regarding the total number of adults successfully completing treatment. Instead, it broke out two different KPIs: successful completion of "residential level of substance use disorder treatment" and "intensive outpatient substance use disorder treatment." Under these new KPIs, DBH met its 60% target for residential treatment, with a 62.3% completion rate.[398] However, for intensive outpatient treatment, DBH changed the target to 41.2% and reached only 28.8% completion for that metric.[399] Combined back together, these figures show that 46% of adults in residential and outpatient completed their course of treatment in FY2017, comparable to the combined rate in FY2015. In FY2018 without any stated rationale, all KPIs related to successful adult completion of SUD treatment were removed.[400]

There was a similar inconsistency with DBH's Planned Prevention Services KPIs during the Audit Period. In FY2015 and FY2016 DBH had two Planned Prevention Services KPIs with separate outreach goals for youth and adults. The targets in FY2016 were to reach 10,047 adults and 11,350 youth. It met the target for adults (12,977 adults reached), but badly missed the target for youth (6,803 youth reached).[401] In FY2017, DBH based its Planned Prevention Services KPI targets on the prior year's actual results, with a goal to reach 5% more in each category, but then missed both goals by wide margins: only 4,069 adults and 5,167 youth were reached.[402]

Then, in FY2018, DBH removed the two distinct Planned Prevention Services KPIs and replaced them with a combined target to "achieve a five percent increase in the number of individuals (adults and youth) reached through planned prevention strategies over [the] FY2017 number." That year, DBH set a target of 19,289 total individuals—both adults and youth—reached through Planned Prevention Services outreach, which was a 6% increase over the combined targets set in FY2017, and a 109% increase over the number of individuals actually reached in FY2017.[403] In its FY2018 PAR, DBH reported meeting this new goal, reaching 20,639 people; however it offered no data to

---

396   D.C. Department of Behavioral Health, *FY 2016 Performance Accountability Report* (2016), https://oca. dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DBH_FY16PAR.pdf.

397   *Id*. at 12.

398   Technically the goal was related to the percent of adults who successfully completed residential SUD treatment on a quarterly basis, and only 56.1% of individuals completed residential treatment in Q3. D.C. Department of Behavioral Health, *FY 2017 Performance Accountability Report* (2017), https://oca.dc.gov/ sites/default/files/dc/sites/oca/publication/attachments/DBH_FY17PAR.pdf.

399   *Id*.

400   D.C. Department of Behavioral Health, *FY 2018 Performance Accountability Report* (2018),   https://oca. dc.gov/sites/default/files/dc/sites/oca/publication/attachments/DBH_FY18PAR.pdf.

401   *Supra*, n. 397.

402   *Supra*, n. 399.

403   *Id*.

suggest whether the success was continuing to primarily reach adults, or if the gains were also with youth.[404]

Because DBH's KPIs and targets related to SUDs were not consistent throughout the Audit Period, DBH cannot be effectively evaluated on whether it is consistently succeeding or failing at any of its performance metrics over periods of time longer than one or two years. Even small positional shifts in short periods of time can make it difficult for the OCA, D.C. Council, and the public to track agency priorities and related progress, and difficult for agency staff to know what goals they are working to achieve.

DBH's lack of consistency in setting its KPIs and its PAR reporting reflect the agency's insufficient focus on developing detailed goals and metrics for success. These metrics must be detailed, consistent, and clearly explained over time to provide a clear picture of where the agency is excelling and where improvements should be targeted. DBH should identify short-term and long-term goals and metrics for improving care in a way that is public and transparent. Clear long-term goals can help build trust with the community, and will help external stakeholders hold DBH accountable and DBH to hold itself accountable.

To address these concerns, the D.C. Office of Performance Management (OPM) should develop and incorporate into DBH's annual PAR performance metrics that effectively capture and measure DBH's provision of SUD services and its work with justice-involved consumers. When DBH adopts a measure as part of its KPIs or other strategic planning, it should continue to evaluate outcomes on that specific measure for at least three years (the period of a strategic plan), and preferably five years, regardless of whether it identifies an updated or more appropriate measure, as long as outcome reporting for that measure is still possible. DBH should adopt this internal policy to prevent changing measures that inhibit its ability to track its progress on a given outcome from year-to-year.

### Errors and Inaccuracies in KPI Reporting

In addition to inconsistent KPIs and targets, when DBH reports on its progress on SUD-related goals, it has in the past failed to adequately and accurately address why the results were so dramatically different from the goal. The following incidents provide examples of this problem.

First, in its FY2017 PAR, DBH inaccurately asserts that it reached 97% of its target for "adults reached through planned prevention services," when the data cited reflects that only 33% of the target had been reached.[405] While such errors (typographical or not) are troublesome, it is more noteworthy that DBH goes on to suggest in its explanation that the agency has no control over its success on this metric because the number of prevention services it provides are simply a function of the number of requests the agency receives for materials and the people who attend its events.[406] If

---

404  *Id.*

405  The stated target goal was 13,626 "number of adults reached through planned prevention services" annually and the number reached annually was 4,069.

406  *Supra*, n. 399.

KPIs are to serve as a source of DBH strategic planning, the agency should also be setting goals that measure its actions (such as its various outreach activities), the outcomes they produce, and the ultimate impact on clients.

Second, DBH also offered an incomplete and inconsistent explanation for the 97.2% decrease in Recovery Support Services (RSS) from FY2016 - FY2017, one of its most significant KPI and service delivery changes during the Audit Period.[407] RSS include recovery coaching and mentoring, life-skill support, education support services, transportation, supported employment and housing, and other services that contribute to keeping people engaged in maintaining sobriety after completing treatment.[408]

In FY2016, DBH reported delivery of RSS to 5,115 clients, far exceeding the target of 2,500, but still a 17.4% decrease from the 6,192 individuals who received those services the previous year. In the FY2016 PAR, DBH cited as one of its agency accomplishments that it had revised its regulations so all SUD providers could be certified to bill Medicaid for SUD services, which would "allow a diversion of local funds to increase non-Medicaid-eligible services such as the Recovery Support Services, previously funded by a now-expired grant."[409] Then, in FY2017, DBH set an increased goal to deliver RSS to 3,000 people, but ultimately delivered RSS to only *167 people*, a 97.2% decrease from FY2016.[410]

This significant reduction in SUD RSS occurred at the peak of the opioid crisis, the same year during which the number of fatal overdoses in D.C. spiked to 279, more than three times the number of people who died from an opioid overdose in the first year of the crisis.[411] DBH's explanation in the FY2017 PAR for this severe drop was that, "DBH received an Access to Recovery (ATR) Grant from SAMHSA that ended during FY17. Estimates were set based on ATR requirements and once grant funding ended previous targets were not sustainable which explains the reduction in RSS clients receiving treatments."[412] Nowhere in its explanation does it reference the plan, articulated only a year before, to divert local funds to "increase" services like RSS. The dramatic FY2017 drop in RSS—services that were in high demand in the District—show that DBH did not successfully plan for or effectuate the diversion of local funds to ensure continuity of RSS availability after the grant expired.

DBH should fully explain any significant goal shortfalls in its annual PARs. Also, as noted above, KPIs should remain consistent over time; however, when a new goal or measurement is required by a shift in strategy or funding, the reason for the change should also be fully explained in any new KPI.

---

407   *Id.; see also supra*, n. 397.

408   D.C. Department of Behavioral Health, Recovery Support Services, accessed Mar. 12, 2020, https://dbh.dc.gov/service/recovery-support-services.

409   *See supra*, n. 396 (FY 16 Performance Accountability Report).

410   *See supra*, n. 399 (FY 17 Performance Accountability Report).

411   *Supra*, n. 360.

412   *Supra*, n. 399 (FY 17 Performance Accountability Report).

## FINDING 7:

## DBH has not established adequate communication channels with critical substance use disorder stakeholders, including providers and members of the public.

### RELATED RECOMMENDATIONS:

1. DBH should use its Results Based Accountability (RBA) process as a model for designing ongoing engagement with SUD stakeholders, including community-based organizations, justice system actors, and SUD clients and their loved ones.

2. DBH should host a regular Provider Meeting at which SUD providers set the agenda.

3. DBH should establish a protocol, based on their robust process prior to revising the agency's Chapter 63 regulations in 2019, for soliciting and addressing SUD provider feedback on future changes to agency regulations, policies, and practices that will significantly impact SUD providers or their clients.

4. DBH should issue a policy establishing clear procedures for organizations, or people who are not themselves SUD clients, to alert DBH of alleged violations of client rights at DBH certified SUD providers.

5. DBH should amend its regulations, D.C. Mun. Regs. 22-A §3 and § 6319, to align with DBH Policy 515.3, Consumer Rights (August 15, 2017), formally merging the grievance procedures for mental health consumers and SUD clients.

6. DBH should maintain its public list of SUD providers and update it as SUD providers are certified and decertified.

7. DBH should improve its website to increase usability for SUD clients, SUD providers, individuals involved in the justice system, and the public.

8. DBH should train all outward facing staff on connecting the public to its resources.

### COMMENTARY:

**Contextualizing DBH's Communications Practices**

During the Audit Period—which coincided with the peak of the opioid crisis—members of the public, including individuals with SUDs and professionals working in the field, struggled to find information about the SUD services available in D.C. Additionally, over the Audit Period, DBH's communication challenges extended to its working relationships with the network of community-based SUD providers. In fact, SUD providers expressed general dissatisfaction with the way DBH

communicated with them during large parts of the Audit Period. SUD providers struggled to work effectively with DBH through emerging opioid and synthetic drug crises to improve the services targeted to affected populations.

The information gathered during the audit suggested that these difficulties stemmed from low trust between SUD providers and DBH, and a culture at DBH that did not prioritize external communication and collaboration. DBH has only one policy statement, originally issued in 2003 by the Department of Mental Health (DMH), governing "procedures for the release of information to the public, publications by staff members, and employees' testimony before legislative committees."[413] During the Audit Period, no other policies were in place setting the standards for communication with SUD providers or other D.C. agencies.

Two features of the observations discussed in this finding are notable. First, they rely heavily on the perceptions and attitudes of the SUD providers and agency administrators whom CCE interviewed and surveyed during the Audit Period, and include feedback received from interviews with SUD clients. Almost all SUD providers that responded to the Provider Survey or whom the audit team interviewed responded that they were not satisfied with the way that DBH communicated with its SUD provider network. For the most part, instead of attempting to evaluate the "quality" of outgoing communications from DBH, the focus here is on the way that the recipients perceived these communications and the effect those perceptions had on SUD providers, agencies, and the clients they served.

Second, a consistent theme was that while the perceptions of DBH communications were very negative at times, they improved in the latter part of the Audit Period. The RBA process for some, and the end of Dr. Royster's tenure as DBH Director for others, marked turning points for the better in SUD providers' relationship with DBH. The following findings and recommendations should be viewed within this context.

### Challenges with DBH Provider Meetings

DBH hosts Provider Meetings several times a month that are designed to be the main forum for in-person communication between DBH and its SUD provider network. DBH administrators of varying levels of responsibility convene these meetings, depending on the topic.[414] DBH reported that, during the Audit Period, there were four classes of SUD Provider Meetings: (1) combined mental health and SUD provider Chief Executive Officer meetings, planned and facilitated by the Director of DBH and DBH's Director of Network Development; (2) SUD and MAT Provider meetings, planned and facilitated by DBH's Network Development Supervisor; (3) SUD iCAMS and DATA Wits user trainings, planned and facilitated by DBH's Information Technology Department; and (4) Recovery

---

413   Department of Mental Health, *Transmittal Letter re: DMH Policy 640.1* (Dec. 13, 2003), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/TL37.pdf.

414   See DBH, *August 2018 Provider Meeting Calendar* (Aug. 2018), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/Provider%20Calendar%20for%20DBH%20WEBSITE%20August%202018.pdf.

Support Services and ACRA/ASTEP meetings, planned and facilitated by DBH's SUD program staff.[415] However, in 2017, "due to changes in leadership, 'Recovery Support Services' [meetings] were terminated and then reinstated." DBH explained that "[t]opics listed on the agendas were identified as areas required [sic] discussion by the provider network, DBH staff, and/or the DBH Director two to three weeks prior to the scheduled meeting."[416]

Several SUD providers singled out these meetings as a source of dysfunction, explaining that the issues they considered most pressing, like the decentralization of the ARC and changes in the certifications, were rarely included on Provider Meeting agendas during the Audit Period.[417] When SUD providers asked about those issues during meetings, DBH representatives seemed unprepared to give answers.[418] According to one provider, many questions went unasked because, "for folks that are new to the network … they don't feel comfortable speaking up." This SUD provider explained that this fear was tied to the idea that speaking out against DBH policies or practices could have consequences.[419] CCE did not find evidence that there was retaliation against SUD providers for speaking out during Provider Meetings. However, this anecdote reflects issues commonly reported to CCE: that SUD providers struggled to identify the appropriate individuals to reach out to with critical issues, or felt that they were not comfortable elevating the issues that they had with DBH.[420]

DBH administrators interviewed acknowledged this perception and noted the existence of "animus and distrust toward providers" at the beginning of the Audit Period, under the Royster administration.[421] One DBH administrator explained that they believed that while DBH does "a good job of the big stuff, the news campaigns and press support, we need to work on communicating with the middle, the churches and support groups and actual agencies that provide community supports to [clients]."[422]

These feelings were also acute among community-based organizations that provided job training, harm reduction, housing, and reentry services; although these organizations were not DBH certified or contracted SUD providers, they frequently shared clients with those SUD providers. In interviews, these organizations frequently reported not knowing the appropriate channels through which to voice their concerns and felt that DBH ignored or was uninterested in their feedback.[423]

To address SUD providers' concerns, DBH should host regular Provider Meetings at which all or most of the agenda would be set by SUD providers. DBH should solicit topics from SUD providers in advance of the meeting, synthesize those topics into common thematic areas, and facilitate the

---

415   DBH correspondence with CCE Feb. 13, 2020, response 10a.

416   DBH correspondence with CCE Feb. 13, 2020, response 10b.

417   CCE SUD Provider Interviews.

418   CCE SUD Provider Interview.

419   CCE SUD Provider Interview.

420   CCE SUD Provider Interview; CCE Survey Responses.

421   CCE DBH Administrator Interviews.

422   CCE SUD Provider Interview.

423   CCE Stakeholder Interviews.

discussion of those topics during the meeting. Empowering SUD providers to take a collaborative role in leading discussions with DBH support may reduce SUD providers' feelings of isolation or disengagement.

Additionally, to facilitate better communication with stakeholders that are not DBH certified or contracted SUD providers, including community based organizations, justice system actors, and SUD clients and their loved ones, DBH should also host regular listening and informational sessions specially designed for these additional, but important stakeholders. These should be modeled after DBH's successful RBA community engagement sessions, covered in Section 4, below.

### Improved Procedures for Provider Grievance Reporting

While Provider Meetings discouraged SUD providers from effectively communicating their questions and concerns to DBH, breeding distrust, the SUD grievance reporting policies and practices inhibited client and provider reporting of SUD provider misconduct. This stood in contrast to the grievance reporting policies and practices in place to report provider misconduct and wrongdoing among MHRS providers in several ways.

First, the culture of mistrust between SUD providers and DBH discouraged the *ad hoc* reporting of grievances. Multiple small SUD providers expressed the suspicion that the ARC might not send clients their way if they upset DBH by bringing attention to an issue that would result in additional scrutiny being applied to DBH's practices.[424] Although CCE found no evidence that any client referrals were made on the basis of anything other than client need and preferences, the perception of preferential treatment influenced SUD provider behavior. One SUD provider described the consequences of this mistrust through an anecdote about their willingness to turn to DBH with reports of wrongdoing:

> "If [a client] lodge[s] an official complaint [they] could be retaliated against, you don't want [providers] to come back and attack their clients... I can think of lots of times contractors misbehaved or took actions that seemed wrong and I felt that I couldn't reach out to DBH or lodge a complaint... There's a sense that you don't want to rock the boat or make a fuss.
>
> We had a couple of clients who came to us saying that their Suboxone was stolen or taken from them by staff at a DBH funded program, the program wouldn't answer their calls and eventually we went there in person. We sent a physician to the provider who said, "I prescribed this, they should have this medication," and the boss there said, "Well I'm in charge here, so what I say goes," and we felt that we couldn't tell DBH that, we didn't feel we had recourse to do anything about it, and were worried about whether there would be consequences for causing trouble."[425]

---

424   CCE SUD Provider Interviews.

425   CCE SUD Provider Interview.

There is no formal system for people who are not themselves SUD clients to file a grievance against a SUD provider with DBH. Outside of the mandatory reporting of abuse or neglect of children, elders, and vulnerable adults,[426] SUD providers are not required to report violations of client rights by the hands of organizations other than their own. Some stakeholders explained to CCE that, instead, they would informally report *ad hoc* issues observed among SUD providers to DBH senior leadership.[427] Others indicated that they were unwilling to report issues informally because of a culture of suspicion surrounding DBH.[428] DBH should establish formal procedures for SUD providers, other community-based organizations, as well as for friends and family of SUD clients to report violations of client rights witnessed at DBH-certified SUD providers.

Second, the absence of formal grievance policies for SUD clients during part of the Audit Period prevented people from navigating the grievance reporting process directly. While DBH had a formal agency process for mental health clients to file grievances with DBH against MHRS providers, and are protected from retaliation,[429] similar regulations do not exist for SUD clients. Instead, the regulations governing SUD providers only require them to establish an internal grievance process, report the allegation of an incident and the outcome of any investigation to DBH, and cooperate with any "inquiries related to client rights" instigated by DBH staff.[430] These regulations also prohibit retaliation.

In August 2017, DBH issued a new policy on consumer rights, applicable to all DBH licensed, certified, and/or contracted SUD and mental health community-based providers.[431] This new policy brings SUD client grievance procedures in line with those for MHRS consumers by requiring all providers to broadly distribute information on clients rights, requiring all providers to establish formal and informal internal grievance processes, and allowing all consumers, including SUD clients, to file their grievance directly with DBH. DBH should modify its regulations to align with this new policy, merging the old DMH and APRA grievance regulations into a single, equitable system.

### Communications About Agency Policy and Operational Changes

When asked, "What are the specific changes that you would like to see regarding DBH's communication with the provider network?" SUD providers most frequently responded that they wanted

---

426   D.C. Department of Behavioral Health, *Transmittal Letter re: DMH Policy 630.3* (June 24, 2014), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/630.3%20TL-256.PDF; *D.C. Department of Behavioral Health, Transmittal Letter re: DMH Policy 630.2* (Mar. 28, 2014), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/630.2%20TL-245.PDF.

427   CCE Stakeholder Interview.

428   CCE Stakeholder Interview.

429   D.C. Department of Behavioral Health, *Notice of Final Rulemaking*, 50 D.C. Reg. 8480 (Oct. 10, 2003); D.C. Mun. Regs. 22A § 305. https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/DCR8480.pdf.

430   D.C. Mun. Regs. 22A § 6319.

431   D.C. Department of Behavioral Health, *Transmittal Letter re: Policy 515.3* (Aug. 15, 2017), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/515.3%20%20TL-310_0.PDF.

DBH to make clear communications "well in advance of any policy or operational changes."[432] This was a top concern during the search for a new DBH Director in 2018. The D.C. Behavioral Health Association, a membership association representing many of the District's SUD providers, wrote a letter to Mayor Bowser recommending that the new Director should focus on "collaborative, iterative, and transparent decision-making."[433] SUD providers sought quicker and clearer communications about major issues that DBH identified or changes DBH intended to implement that would affect their functioning or their clients' health outcomes.

For instance, one SUD provider explained that in 2016, DBH "notified providers that there were problems with local dollars due to billing issues and that there would be no incremental extensions as local funds ran out." This information was conveyed after many SUD providers had already performed services that should have been reimbursable, so some had to cover the costs from their own operating budgets. Several SUD providers reported the belief that this fiscal strain led to some SUD providers being "forced to close their doors."[434] While DBH has not fully investigated the potential causal link between the local dollar issues and SUD provider closures (nor has there been an independent financial audit), a handful of SUD providers that closed in 2016 and 2017 testified before the D.C. Council that payment issues caused them to discontinue services or even to go out of business.[435]

In another example, DBH's failure to adequately respond to SUD provider questions regarding policy clarification had near-lethal consequences:

> "The Narcan thing is another place where DBH is just being fuzzy...there are some caveats about the use of Narcan. A citizen is protected by the Good Samaritan laws in the District, but a professional is not. That raises a question for us as a provider about whether we should use Narcan in some contexts. For us to administer Narcan, DBH needs to tell us explicitly, 'we've got your back.' ...I had written [a DBH contact] and said 'DHS is telling us to do this, where are you guys at with this?', but they won't write us back...Recently, we had a guy who overdosed in the office. Fortunately, the EMT came and gave him three doses of Narcan and he revived. That was a close call. We did not deliver Narcan earlier because we are hesitant to have Narcan around when there are questions that we have asked DBH about the specific support of the use of Narcan in a population that has traumatic brain injuries or an undiagnosed seizure disorder and who may be receiving medical medications that are contraindicated with Narcan. Because we haven't resolved that risk, we are hesitant to move forward until DBH helps us resolve this risk analysis."[436]

432   CCE Survey Responses.

433   DC Behavioral Health Association, *Department of Behavioral Health Director Search* (2018), https://www.dcbehavioralhealth.org/public-policy.

434   CCE Survey Responses.

435   Office of the District of Columbia Auditor, *Improving Mental Health Services and Outcomes for All: The D.C. Department of Behavioral Health and the Justice System* (Feb. 26, 2018), http://www.courtexcellence.org/uploads/publications/ODCA_Report_Audit_of_DBH_2.pdf.

436   CCE SUD Provider Interview.

The quoted SUD provider indicated that it had still not received a communication indicating an official agency position on this issue more than five months after making the request. Some SUD providers suspected there was disagreement between DBH's programmatic administrators, who supported the practice of delivering Narcan, and DBH's accountability administrators, who are responsible for regulating the SUD provider's delivery of health care services as a DBH certified entity. But, without clarifying communication from DBH or a discussion at Provider Meetings, there was no way to obtain needed guidance on this important and nuanced SUD service issue.

Similarly, from 2016 to 2017, SUD providers described receiving unclear information about how and when they could seek certification for different types of SUD services. In some cases, this delayed SUD providers from receiving certifications for over a year, ultimately constraining the availability of SUD services in the District.[437] In 2016, DBH issued a request for proposals (RFP) for SUD providers to prescribe methadone. Some SUD providers described not knowing how or whether to apply for this RFP because, as they explained, methadone is traditionally dispensed, not prescribed. DBH recalled the RFP, and then re-issued it several months later, correctly characterizing methadone as being dispensed and not prescribed.[438] This resulted in DBH-certified SUD providers being unable to expand their provision of methadone services to clients during the time that the RFP was recalled. The delay came at an inopportune time, as there were 233 deaths from opioid overdoses in D.C. in 2016, with another 281 following in 2017.[439]

Beyond improving communications about policy and practice decisions at DBH, SUD providers also want to be involved earlier in DBH's policy-making process, rather than being informed of changes after they had already been decided. Even when SUD providers were invited to provide feedback on proposed changes, they did not always receive indications from DBH that their feedback was seriously considered.[440] "DBH has offered more opportunities for feedback, but the providers do not know how their feedback is being interpreted and who is involved in reviewing it, are their [sic] any misconceptions or follow-up information needed concerning the feedback, is it going somewhere or not."[441] At least one SUD provider cited examples of offering feedback on proposed changes to D.C.'s Medicaid State Plan Amendment and never receiving an indication from DBH about whether and how the feedback was used.

During the Audit Period, DBH had two Interim Directors and three Directors.[442] A common complaint among SUD providers was that staff turnover exacerbated DBH's difficulties communicating with the provider network. They explained that "it leaves us with [DBH staff contacts] who do not understand previous commitments and challenges....We are left with unresolved issues when we

---

437  CCE SUD Provider Interview.

438  CCE SUD Provider Interview.

439  Leak, Chirkarlo, *Opioid-Related Fatal Overdoses: January 1, 2014 to October 28, 2019.*" D.C. Office of the Chief Medical Examiner, Jan. 22, 2018.

440  *Id.*

441  CCE Survey Responses.

442  DBH Correspondence with CCE Feb. 13 ,2020, request 10e.

had almost reached a conclusion."[443] Frequent staff turnover disrupted the flow of communication between agency personnel and community members. It is hard to gauge the exact consequence of this disruption; however, many SUD providers expressed frustration and disillusionment with DBH as a change-maker, and partially attributed those feelings to their inability to bring complaints, questions, and concerns to DBH representatives who were appropriately knowledgeable to address their issues.[444]

### Positive Communication Approaches as Models for Future Engagement

In CCE's Provider Survey, several indicated that DBH's communications did change for the better over the course of the Audit Period. SUD providers reported positive participation in a variety of fora with DBH in 2017, including RBA sessions and meetings, as part of a strategic planning process that is covered more in depth in Finding 6.[445] In describing how external entities were involved in the RBA, DBH explained that it had:

> "[L]ed an 18-month comprehensive, collaborative community engagement and planning process to develop a three-year strategic plan. DBH brought together consumers, clients and their families, advocates, behavioral health practitioners, community-based service providers, government leaders, and other community members. Throughout the process, hundreds of stakeholders and partners were invited to participate in 15 community engagement sessions and several online follow-up surveys."[446]

Multiple SUD providers described this RBA process as an example of productive communication from DBH.[447] They felt that it was structured in a way that enabled DBH to listen to SUD provider complaints and concerns.[448] Most SUD providers said that they noticed an improvement in their relationships with DBH during the RBA process, but indicated the day-to-day relationships between the providers and DBH are still developing.[449] Because of the success of this approach, CCE recommends that DBH use the RBA process as a model for continued engagement with SUD stakeholders.

DBH also received praise for the transparency and clarity with which it designed and initially approached its process for revising the agency's Chapter 63 regulations, "Certification Standards for Substance Use Disorder Treatment and Recovery Providers."[450] In 2018, DBH put out a request for SUD providers to comment on and propose revisions to the existing regulations. DBH then

---

443   CCE Survey Responses.

444   CCE SUD Provider Interviews; CCE Survey Responses.

445   CCE Provider Survey.

446   DBH Correspondence with CCE Aug. 23, 2019, response 11.

447   CCE Survey Responses.

448   CCE SUD Provider Interviews; CCE Survey Responses.

449   CCE SUD Provider Interview.

450   D.C. Mun. Regs. 22-A § 63.

published a table that listed each suggestion it had received, stated whether DBH accepted the SUD provider proposed change, described whether that change would be enacted through regulation, policy, or process, and, explained the agency's reasoning for its decision.[451]

DBH also proposed some of its own regulatory changes on which it solicited feedback from SUD providers. In September 2018, DBH held a "Stakeholder Question and Answer Session" to update SUD providers on the process and explained that the proposed revisions would be run through DBH's Office of General Counsel, the Mayor's Office of Policy and Legislative Affairs, the Office of the Deputy Mayor for Health and Human Services, and the Office of the Attorney General. Then, the proposed regulations would be published in the D.C. Register, and a formal 30-day public comment period would commence.[452] Through these efforts, DBH provided a straightforward and transparent process for SUD providers to be heard and their view considered.

However, this process was pushed off-track when compliance with a Section 1115 Behavioral Health Transformation Demonstration Program through the federal Centers for Medicare and Medicaid Services, designed largely "as a response to the crisis unfolding in the District relating to opioid use and abuse," required DBH to update its regulations immediately. Between April 2019 and February 2020, DBH issued a series of four emergency rulemakings.[453] SUD providers told CCE they did not feel that DBH clearly informed them of this change in plans, and expressed confusion about why they never received formal notice of the proposed rulemaking.[454] After a period of very clear communication, some SUD providers felt the agency was returning to a pattern of routinely excluding them from the process of formulating rules and policies.

The evidence collected during this audit suggests that DBH generally made significant progress in improving its communication with SUD providers, and it now has high-quality models on which to base future efforts. DBH should continue what has proven effective: RBA-style engagement sessions, clear, transparent processes for providing early feedback on proposed regulatory changes, and, a formal notice and comment period prior to regulation changes as required by the Administrative Procedure Act. This protocol should also be extended to changes in policy and practice that will have a significant impact on SUD providers and their clients. This protocol is particularly important for clarifying decisions where interpretations have varied between DBH's own administrative units. For SUD provider informational requests that are urgent—either because of significant cost or risk of harm to patients or because of a potential emerging public health crisis—DBH should establish a protocol to provide rapid responses regarding such policies to SUD providers.

---

451   DBH, *Chapter 63 Proposals from Providers and DBH Responses.*

452   DBH, *Update on Revisions to Chapter 63: Stakeholder Question and Answer Session* (Sept. 18, 2018).

453   Notice of Fourth Emergency and Proposed Rulemaking, *Certification Standards for Substance Use Disorder Treatment and Recovery Providers*, 67 D.C. Reg. 2252 (Feb. 28, 2020), https://www.dcregs.dc.gov/Common/DCMR/SectionList.aspx?SectionNumber=22-A6328.

454   CCE SUD Provider Interview; CCE Survey Responses.

**Agency Communications With and Information For the Public**

DBH's provision of information for the general public, including people who may have been seek-ing SUD services, was also inadequate during the Audit Period. According to many clients, when they decided to seek care it was difficult for them to learn about available SUD services in the District. A common frustration articulated by clients, SUD providers, and administrators at other D.C. and federal agencies who interact with individuals with SUDs, was the absence of a public, accurate, and complete list of SUD providers in the District. In fact, a complete list of DBH-certified or contracted SUD providers was never available to the public during the Audit Period. The only SUD providers that DBH listed online were those who also provided mental health services, and they were listed only in that capacity, as a CSA.

To confirm there was no comprehensive online list of SUD providers, CCE analyzed web captures on WayBack Machine, a public archive of historical and inactive webpages. In the months leading up to and immediately after the APRA/DMH merger in October 2013, both agencies' public listings of providers were available.[455] A list of SUD providers was maintained on the APRA website and a list of mental health providers was listed on the DMH website. As of September 5, 2015, the first "capture" on WayBack during the Audit Period showed that both lists were still online.[456] By that point, however, DMH's list of MHRS providers had become the list of providers posted by DBH on its new website. While some of the mental health providers, often known as CSAs, also provide SUD services, this was not indicated anywhere on the page, and SUD providers were not specifically identified anywhere on DBH's site.[457] Unfortunately, the APRA list of SUD providers was still tech-nically a live page, but it was only accessible by directly typing in the exact URL to the old APRA webpage or, theoretically, if someone happened to know to go to the former agency's website. There was no way to navigate to the list of SUD providers from the DBH website.

The absence of an accurate list of SUD providers created two problems during the Audit Period. First, some clients and providers attempted to access a complete list of SUD providers but were unable to do so. Second, other clients and providers looked at the DBH website and interpreted the list of providers available there, labeled "Community Service Providers," as a list of all providers of behavioral health services in the community, thus creating confusion for those clients and pro-viders about whether additional SUD providers existed in the District.

To confirm the challenges that providers and clients faced when attempting to access a list of SUD services, CCE called and emailed DBH using publicly-available contact information between February and May of 2019, in a series of attempts to access a complete list of DBH-certified or con-tracted SUD providers like any member of the public might. Audit team members called the ARC,

---

455  For the SUD Provider List, see https://web.archive.org/web/20140823072546/http://dbh.dc.gov/node/236132.  For the Mental Health provider list, see https://web.archive.org/web/20140822182607/http://dbh.dc.gov/page/list-community-based-service-providers.

456  *List of Community-Based Service Providers*, accessed Mar. 11, 2020, https://dbh.dc.gov/page/list-commu-nity-based-service-providers; List of Adult Substance Abuse Treatment Services (Sept. 5, 2015), https://web.archive.org/web/20150905201848/http://dbh.dc.gov/node/197082.

457  This was the case for the list during the instances of time it was visible on WayBack Machine.

using the phone number provided on DBH's website, requesting a comprehensive list of services and identifying themselves as D.C. residents who wanted to learn more about the SUD services that were available in the District.[458] While several ARC staff members tried to be responsive, a full list was never provided. In some communications, a DBH staff member provided the names of a few SUD providers but never a complete list. After follow-up requests, DBH staff eventually either stopped responding to communications or explained that they had already provided all of the SUD provider information that they had.[459]

Multiple SUD providers and other D.C. agencies described the absence of a comprehensive list of SUD providers as a barrier to care for their clients. One MAT provider noted that even though it was DBH-certified, it was not listed anywhere online as a SUD provider. Another observed that during the Audit Period, the Psychiatric Institute of Washington, the only free-standing psychiatric care facility in D.C. open throughout the duration of the Audit Period, was not listed on DBH's list of community-based providers.[460] Others noted that the absence of an accurate and complete list meant that they did not know all of the providers in the community, thus making it difficult to refer clients to additional resources.[461]

Several clients whom CCE interviewed reported relying on word-of-mouth referrals from other clients for information on how to get SUD care.[462] In many cases, such referrals were sufficient to get clients connected to treatment, but in others it was not.[463] One privately insured SUD client described going to the ARC to get help after receiving an order from PSA to get treatment, but was turned away because they had private health insurance. DBH staff did not offer any other resources to them. Not sure what to do, this client tried to research programs online, but was unsuccessful. It took several weeks for them to finally enroll in a service.[464]

Many clients described struggling with substance use for years without learning about or being connected to SUD services. The first time they made such a connection occurred when they came into contact with the justice system. Many of the individuals interviewed by CCE had no awareness of the services available in the community until a court mandated their participation in a program.[465]

SUD providers explained that the periods of time in which clients are interested in receiving services

---

458  *Memoranda of SUD Provider Request.*

459  *Id.*

460  *About The Psychiatric Institute of Washington,* accessed Mar. 10, 2020, https://psychinstitute.com/about-us/.

461  CCE SUD Provider Interviews; CCE Administrator Interviews.

462  CCE Client Interviews.

463  CCE interviewed clients who were currently receiving SUD services and who had some justice involvement. This inclusion criterion necessarily excludes individuals who are not receiving SUD services. Those individuals may have been more likely to not know about available services than individuals who had been successfully connected to care.

464  CCE Client Interviews.

465  CCE Client Interviews.

can be fleeting.[466] Because clients may be disposed to enter treatment for only a very small window of time, it is crucial that they have the information they need to access services in that moment. SUD clients corroborated this view and described the difficulties they had engaging services. Many described not feeling ready to receive treatment for many years or having only occasional desires to enter treatment during long periods of sustained substance use.[467]

In August 2019, after the conclusion of the Audit Period, DBH posted a list of SUD providers on its website, including a description of the services provided and contact information.[468] While this reflects progress, the list of SUD providers remains a difficult page to find on DBH's website and is not given co-equal visibility with the list of mental health service providers. Currently, mental health providers are easily found from DBH's homepage under the "Services" or "Adults" menus as "Community Based Service Providers." Furthermore, the "Community Based Service Providers" designation may foster confusion because it does not immediately suggest that it excludes SUD-only providers. A list of SUD providers cannot be accessed from any part of the site's main navigation. Instead, one must navigate from the "services" drop-down menus to "Substance Use Disorder Services," and then to a text-based link called "Substance Use Disorder Provider Listings."

To address these issues, DBH should ensure that its comprehensive lists of mental health and SUD providers are available in one easily accessible place and that they clearly describe the services offered at each SUD provider. DBH should also update these lists regularly to ensure accuracy. More generally, DBH should improve its website to be more consumer-focused and user-friendly, helping to guide a person with a SUD, and/or their loved ones, through the steps required to connect to care, determine their eligibility for DBH services, and find SUD providers available in the District. Additionally, DBH should create specific content on its site dedicated to providing information for individuals involved in the justice system, explaining in particular how that justice involvement might uniquely affect their connection to behavioral health services. Overall, improvements in the clarity, simplicity, and organization of information about SUDs and SUD services on DBH's website could help support and supplement the educational goals and strategies described in the Opioid Strategic Plan to "[i]ncrease the targeted advertisement of treatment and recovery programs throughout Washington, DC."[469]

Finally, DBH should provide regular training for all of its staff members who are public facing to ensure that they can identify all important DBH materials and information and are well-equipped to point people to relevant resources.

---

466  CCE SUD Provider Interview.

467  CCE SUD Provider Interview.

468  D.C. Department of Behavioral Health, *List of Substance Use Disorder Providers* (Aug. 1, 2019), https://dbh.dc.gov/node/1417206.

469  *Supra*, n. 8 (Washington, DC's Strategic Plan to Reduce Opioid Use, Misuse, and Related Deaths).

# Conclusion

---

The findings and recommendations in this report offer a path forward to further improve the delivery of SUD services to justice-involved residents of the District of Columbia. However, they should not be viewed as completing the needed analysis, but rather as part of an ongoing effort to improve the services that many in this underserved community desperately need to move beyond the cycle of drug use and incarceration that is so damaging to them and our community.

In particular, as noted in the report, the data analysis conducted is a starting point that, if developed further, could offer valuable insights into further improvements in the District's delivery of services. The District should preserve and expand this dataset to conduct further analysis, and ideally construct a system that could be updated in real time. The potential benefits of data sharing across the various government agencies are real and significant. While data sharing presents some unique challenges, data-sharing and analysis can be accomplished without running afoul of HIPPA or 42 CFR Part 2. We are making our data-sharing agreement public to offer a template for such further efforts.

Two data analysis projects recommend themselves as offering particularly valuable information First, with further data analysis and case studies of the identified individuals, DBH and DOC could potentially offer better targeted overdose prevention strategies to individuals who are at risk and who are already in the populations they serve. Second, the ninety-seven individuals who were incarcerated, received no care, and died, is a group worth significant examination and case study by the District, as they may represent the most urgent opportunity for targeted outreach and additional supports to improve care connectivity to its known, justice-involved residents with SUDs who may be at risk for overdose.

Our audit was necessarily limited in certain ways that, if further examined, offer additional opportunities for improvement. We were unable to evaluate the quality of care due to data and other constraints. Quality of care is a very important topic that needs to be evaluated in future studies. Further, this audit examined only those aspects of the criminal justice system that are under local control.  However, D.C.'s criminal legal system also includes federal agencies, including PSA, the USAO-DC, local and federal trial courts, BOP, and CSOSA. These entities also have an important role to play in improving the delivery of SUD treatment to justice-involved residents. The current data collected and reports prepared are insufficient. There needs to be serious work with these entities to share data, measure and track outcomes, and provide policies that improve accountability and transparency.

While the above future steps are important, this report also offered some concrete and immediate operational changes that can readily be accomplished and that offer a road to further improvements in the delivery of services. The D.C. Government should pursue more opportunities for diversion from the justice system, provide better diagnosis and treatment for those with SUDs, and

provide continuity of treatment across justice intercepts. To accomplish these goals, there must be a close partnership between the D.C. government and its federal partner agencies.

Finally, our review of those jurisdictions where improvements in SUD treatment have been particularly noteworthy indicates that meaningful progress requires a focus on developing comprehensive, integrated systems, not just individual programs. Achieving this goal requires not only a shared vision within the community, but also an entity or agency responsible and accountable for coordination and collaboration among, and joint planning by, the relevant behavioral health and criminal justice agencies and service providers.

# Appendix A

## INDEX OF FIGURES

Figure 1: DBH Adult SUD Clients Assessed and Served .................................................................18

Figure 2: Care Received Before and After Incarceration Episode ...............................................25

Figure 3: Care Before and After Incarceration Episode ................................................................25

Figure 4: Care Received before and after Incarceration Episode by SUD Flag ........................27

Figure 5: Incarceration Episodes with Care in the Look Back by Active SUD Flag .................28

Figure 6: Active SUD Flags by Care in Look Forward ...................................................................29

Figure 7: Continuous and Discontinuous Care ..............................................................................30

Figure 8: Release to Care Duration by Look Forward and Look Back ........................................31

Figure 9: Release to Care Duration by Active SUD Flag ...............................................................31

Figure 10: Average Release to Care Duration by Year and Active SUD Flag Status ...............32

Figure 11: Arrests and Care in Incarceration Episode Look Forward ........................................33

Figure 12: Odds of Justice Involvement for Incarceration Episodes with Care in Look Forward ........34

Figure 13: Deaths by Incarceration and Care in Audit Period ....................................................36

Figure 14: Care in Fatality Look Back ..............................................................................................36

Figure 15: SUD Care, Deaths, and Justice Involvement in Assessment Look Forward ...........37

Figure 16: Likelihood of Adverse Outcomes by Care Received After Assessment ..................38

Figure 17: Arrests and Care in Look Forward .................................................................................39

Figure 18: Arrests and Care in Look Forward among Referrals to Residential Treatment ...........39

Figure 19: Persons with SUD Information in DOC .........................................................................52

Figure 20: Incarceration Episodes by Active SUD Flag and Care in Community ....................55

Figure 21: Care received before and after Incarceration Episode by SUD Flag ........................55

Figure 22: Length of Incarceration at DOC throughout Audit Period .......................................58

Figure 23: Incarceration Episodes that Received Care in Look Around by Type of SUD Flag..............59

Figure 24: Care received before and after Incarceration Episode by SUD Flag..............................59

Figure 25: Trends in DOC MAT Treatment 2016-2019 ...............................................................65

Figure 26: SUD Ever Flags and Opioid Ever Flags.....................................................................68

Figure 27: DOC Stays by Length of Custody................................................................................71

Figure 28: Incarceration Episodes with Care by Active SUD Flag................................................75

Figure 29: Annual ARC Intake Assessment Data .......................................................................88

Figure 30: ARC Referral to Care Interval by Level of Care throughout the Audit Period ..................89

Figure 31: Between ARC Referral and First SUD Service ............................................................89

Figure 32: Number of Referrals to Withdrawal Management by Duration
from Referral to First SUD Service..........................................................................................90

Figure 33: Days from Referral to Care to Receipt of Withdrawal Treatment by Calendar Year ...........91

Figure 34: Incarceration Episodes with Care in Look Forward by Active SUD Flag ......................101

Figure 35: Identifiers and Data by Agency ...............................................................................155

Figure 36: Agency Data by Observation and Identified Individual..............................................155

Figure 37: "Our" Identifier and Alternative Identifier.................................................................156

# Appendix B

DATA SHARING AGREEMENT

**DATA USE AGREEMENT**

**AMONG THE OFFICE OF THE DEPUTY MAYOR FOR HEALTH AND HUMAN SERVICES, DEPARTMENT OF BEHAVIORAL HEALTH, THE DEPARTMENT OF CORRECTIONS, DEPARTMENT OF HEALTH CARE FINANCE, THE METROPOLITAN POLICE DEPARTMENT, THE OFFICE OF THE CHIEF MEDICAL EXAMINER, OFFICE OF THE CHIEF TECHNOLOGY OFFICER, AND THE OFFICE OF THE DISTRICT OF COLUMBIA AUDITOR AND THE COUNCIL FOR COURT EXCELLENCE**

This DATA USE AGREEMENT ("Agreement") is entered into between the following agencies in the District of Columbia ("District"): the Office of the Deputy Mayor for Health and Human Services ("DMHHS"), Department of Behavioral Health ("DBH"), the Department of Corrections ("DOC"), the Department of Health Care Finance ("DHCF"), the Metropolitan Police Department ("MPD"), the Office of the Chief Medical Examiner ("OCME"), and the Office of the Chief Technology Officer ("OCTO") (collectively referred to as "the Agencies"), the Office of the District of Columbia Auditor ("ODCA"), and the Council for Court Excellence ("CCE"). Each of DMHHS, DBH, DHCF, DOC, MPD, OCME, OCTO ODCA, and CCE are referred to herein together as the "Parties" and individually as a "Party." This Agreement will be effective upon execution by the date of the last signatory ("Effective Date").

I.    **THE PARTIES**

   A.  DMHHS supports the District Mayor in coordinating a comprehensive system of benefits, goods and services across multiple agencies to ensure that children, youth and adults, with and without disabilities, can lead healthy, meaningful and productive lives.

   B.  DBH provides prevention, intervention, and treatments services and supports for children, youth, and adults with mental and/or substance use disorders including emergency psychiatric care and community-based outpatient and residential services. DBH serves eligible adults, children, youth, and their families through a network of community-based providers and unique government delivered services and operates Saint Elizabeth's Hospital, the District's public inpatient psychiatric facility.

   C.  DOC's mission is to ensure public safety for citizens of the District by providing an orderly, safe, secure and humane environment for the confinement of pretrial detainees and sentenced inmates, while providing meaningful opportunities for community reintegration.

   D.  The DHCF, formerly the Medical Assistance Administration under the Department of Health, is the District of Columbia's state Medicaid agency. DHCF works to improve health outcomes by providing access to comprehensive, cost-effective and quality healthcare services for residents of the District of Columbia.

   E.  MPD is the primary law enforcement agency for the District. Founded in 1861, the MPD of today is on the forefront of technological crime fighting advances, from highly

1

developed advances in evidence analysis to state-of the-art-information technology. These modern techniques are combined with a contemporary community policing philosophy, referred to as Customized Community Policing. Community policing bonds the police and residents in a working partnership designed to organize and mobilize residents, merchants and professionals to improve the quality of life for all who live, work, and visit the nation's capital.

F.   OCME investigates all deaths in the District that occur as the result of violence or injury, as well as those that occur unexpectedly, without medical attention, in custody or pose a threat to public health. OCME provides forensic services to government agencies, health-care providers and citizens in the District to ensure that justice is served and to improve the health and safety of the public.

G.   OCTO is the District's central technology organization. It develops, implements, and maintains the District's technology infrastructure, including but not limited to developing and implementing major enterprise applications, establishing and overseeing technology policies and standards, providing technology services and support to District agencies, and developing technology solutions for improving services to businesses, residents, and visitors to the District. OCTO provides the information technology (IT) infrastructure support to agencies throughout District government.

H.   ODCA's mission is to support the Council of the District by making sound recommendations that improve the effectiveness, efficiency, and accountability of the District government. ODCA conducts performance audits, non-audit reviews, and revenue certifications.

I.   CCE is a not-for-profit, nonpartisan civic organization. Its mission is to enhance the justice system in the District of Columbia to serve the public equitably. CCE identifies and proposes solutions by collaborating with diverse stakeholders to conduct research, advance policy, educate the public, and increase civic engagement. CCE is a contractor engaged by ODCA in order to assist it in meeting the purposes set out in this Agreement.

II.   **PURPOSE OF THE AGREEMENT**

**WHEREAS,** ODCA is conducting a programmatic audit of the District's system of Substance Use Disorder ("SUD") services to Justice-Involved Individuals pursuant to D.C. Official Code § 1-204.55 & § 1-301.44 (c) ("SUD Audit"). The SUD Audit will be used to determine how justice-involved individuals access SUD services in District before, during, and after points of contact with the justice system; how providers of SUD services interact with District government agencies to coordinate the provision of care to justice-involved individuals with SUDs; what are the most salient barriers to access to SUD services among justice-involved individuals, and how can they be lowered; what are social,

economic, and health characteristics of District's justice-involved population with SUDs; and whether District has sufficient capacity to meet their health needs;

**WHEREAS,** ODCA has contracted with CCE as its third-party contractor to assist ODCA in collecting, reviewing and analyzing Data for purposes of the SUD Audit;

**WHEREAS,** ODCA has requested the assistance of the Agencies in producing datasets to allow for ODCA to perform the SUD Audit;

**WHEREAS,** the Agencies have agreed to assist ODCA as requested to fulfill the purposes of the SUD Audit. Only DBH, DHCF, and DOC have been formally engaged by ODCA for the SUD Audit;

**WHEREAS,** in order for ODCA to complete the SUD Audit, the Agencies agree to share Data with each other and with ODCA and CCE, pursuant to the terms and conditions of this Agreement;

**WHEREAS,** the purpose of this Agreement is to govern the sharing of Data between the Parties, protect the privacy and provide for the security of the Data disclosed to each Receiving Party, and to establish standards for its use in connection with the SUD Audit;

**NOW, THEREFORE,** in consideration of and reliance upon the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

III.  **DEFINITIONS**

As used in this Agreement, the following terms have the following meanings:

A.  "Data" means all information that is collected and disclosed by a Party or its Representatives to another Party in connection with the SUD Audit, whether disclosed or accessed in written, electronic or other form or media, including without limitation the datasets described in Appendix A to this Agreement.

B.  "Data Custodian" means the individual responsible for compiling Data on behalf of a Disclosing Party as described in Section X.

C.  "Disclosing Party" means the Party disclosing Data hereunder to a Receiving Party.

D.  "De-Identify" or "De-Identified" means information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual.

E.  "Final Data" means the De-Identified Data that Agencies disclose to ODCA and CCE for purposes of the SUD Audit.

3

F. "Justice-Involved Individual" means individual(s) who are either currently or previously incarcerated, or who are arrested or held in connection to the alleged commission of a crime.

G. "Personally Identifiable Information" or "PII" information that can be used to identify a specific individual (such as a name, address, social security number, driver's license number, taxpayer identification number, email address, telephone number, financial records, educational records, health records, criminal records, or biometric information and indirect identifiers, such as an individual's date of birth, place of birth, or mother's maiden name) or information for which there is a reasonable basis to believe that the information can be used to identify an individual in combination with other reasonably available information.

H. "Protected Health Information" or "PHI" shall have the same meaning as defined in the Health Insurance Portability and Accountability Act of 1996, approved August 21, 1996 (Pub. L. No. 104-191; 42 U.S.C. §§ 1320d, *et seq.*), and its corresponding regulations located at 45 C.F.R. 160, 162, and 164 (collectively referred to as "HIPAA").

I. "Representatives" means any Data Custodian, employee, officer, director, manager (including any consultants, accountants, and counsel) or any third-party provider of a Disclosing Party or Receiving Party.

## IV. ELECTRONIC DATA TO BE SHARED

A. In order for ODCA to perform the SUD Audit, it is necessary for the Agencies to disclose to ODCA and CCE the Final Data. The Final Data shall be prepared as set forth in this Section IV.

B. Within one month, or otherwise agreed upon by the Agencies and CCE, after the Effective Date of this Agreement, the District Parties will concurrently compile Data containing the information identified in Appendix A and provide that Final Data electronically to CCE.

C. Final Data will be compiled by each District Party, specifically MPD, DBH, DOC, DHCF, and OCME, utilizing the services of employees from OCTO to De-Identify each Disclosing Party's Data. OCTO will use a unique identifier where PII is contained in the Data received from the Disclosing Parties so as to De-Identify the Data compiled from District Parties in a manner where a unique identifier may be matched across Final Data sets from each District Party to represent the same individual's name. De-Identification will remove PII and/or any Data or combination of Data listed in Appendix A for which there is a reasonable basis to believe that the information could be used to identify an individual (such variables may include an individual's name, date of birth, court case title, social security number, and police department identification number).

4

D. An employee from OCTO will provide CCE with an explanation of the methodology of its De-Identification process and an explanation of any potential rate of error or information relevant to matching across unique identifiers.

E. ODCA and CCE are not responsible for De-Identifying the Data. In the event ODCA or CCE becomes aware that the Final Data is not De-Identified, ODCA and CCE shall promptly notify DMHHS.

F. The Original Data, and all Data to be shared under this Section IV, shall be compiled in .xlsx, .csv, or .dat, or similar format as agreed by the Parties. Further, the Disclosing Parties shall ensure that the transfer of Data as described in this Section IV is in accordance with the security requirements set forth in Appendix B.

## V. REPRESENTATIONS

A. Each Disclosing Party represents and warrants that it has all the authorizations, rights, and permissions necessary to provide Data to the Receiving Parties, and to use and permit the Receiving Parties to use the Data for the purposes contemplated herein.

B. Each Disclosing Party further represents and warrants that any Data it discloses in accordance with Section IV above and for purposes of the SUD Audit are complete and accurate to the best of its knowledge.

C. ODCA and CCE represent and warrant that the requested Data is the minimum necessary to achieve the purposes of the SUD Audit.

## VI. AUTHORIZED USES OF DATA

A. During the Term, the Disclosing Party hereby grants to the Receiving Party a right to use the Data solely in connection with the SUD Audit and as set forth herein. All Data of the Disclosing Party is and shall remain the property of the Disclosing Party.

B. Any portion of the Data or its content merged into or used in conjunction with other material will continue to be the property of the Disclosing Party and subject to the terms and conditions of this Agreement.

C. Each Receiving Party shall use the Data or Final Data, as the case may be, solely for the purposes permitted by Agreement or required by applicable law.

D. Each Receiving Party shall not copy or alter, or modify Data received from a Disclosing Party, and shall not remove, overprint, deface, or change any notice of confidentiality, legends or other notices of ownership from any originals or copies of Data it receives from a Disclosing Party.

E. ODCA and CCE will not identify, attempt to re-identify Final Data. ODCA and CCE will not aid any other Party in re-identification efforts. Likewise, ODCA and CCE will not alter or modify Final Data so it can access PII.

5

**VII.    PROTECTION OF DATA**

A.  The Receiving Party shall take all reasonable measures to protect the Data from any accidental, unauthorized, or unlawful destruction, loss, alteration, or disclosure of, or access to Data ("Security Incident") or the possession of persons other than those authorized hereunder to have any such Data, which measures shall include (i) employing industry-standard security and encryption protocols to securely transfer and store the Data, as described in Appendix B and (ii) taking the same degree of care that Receiving Party utilizes to protect its own information of a similar nature, but in no event less than a commercially reasonable degree of care.

B.  In the event a Party becomes aware of a Security Incident, the discovering Party shall notify the other Parties in writing within two (2) business days. The discovering Party agrees to cooperate fully in the investigation of each Security Incident. Such notification shall include the following information (to the extent known):

   1.  The nature of the unauthorized use, access, or disclosure;

   2.  The Data used, accessed, or disclosed; and

   3.  The actions taken by the discovering Party to mitigate any impact of the Security Incident.

C.  To the extent that a Security Incident is determined to be the result of a Party's breach of this Agreement, the breaching Party agrees to cooperate fully in the investigation of each Security Incident, is responsible for making reasonable efforts to eliminate or mitigate the impact of any Security Incident, and taking corrective action to prevent future similar Security Incidents from occurring. The owner of the Data that is the subject of the Security Breach shall be responsible for any notifications to affected individuals or other persons or authorities as required under applicable law.

**VIII.    AUTHORIZED DISCLOSURES OF DATA**

A.  The Data of each Disclosing Party is confidential and sensitive in nature and shall be used by Receiving Party solely in connection with the Agreement. The Receiving Party shall hold Disclosing Party's Data in confidence at all times, and, except as set forth in this Agreement, shall not use or disclose Disclosing Party's Data without the prior written consent of Disclosing Party, which consent may be withheld in Disclosing Party's sole and absolute discretion.

B.  The Parties shall disclose or provide Data or Final Data, as the case may be, only to Authorized Users as described below and as is necessary for the Authorized Users to carry out his or her work in the purposes of this Agreement.

C.  Authorized Users of the Agencies include their Representatives and the Representatives of the District whose services the Agencies determine are necessary to fulfill the purposes of this Agreement.

6

D. Authorized Users of ODCA include its Representatives whose services ODCA determines are necessary to fulfill the purposes of this Agreement and CCE. If ODCA or CCE determine that any additional subcontractors, agents, or other partners are necessary to fulfill the purposes of this Agreement, ODCA shall itself or shall authorize CCE to provide notice to the Agencies within two (2) business days of that determination. The Agencies must consent to the disclosure of Data to an additional subcontractor, agent or other party before ODCA or CCE may disclose any Data such third party.

E. The Parties agree that within the Party's organization, access to Data covered by the Agreement shall be limited to the minimum amount of Data and minimum number of Authorized Users necessary to achieve the purpose. Any Authorized User of a Receiving Party given access to any Data of a Disclosing Party must have a legitimate "need to know" basis for access.

F. Before a Party's Authorized User may receive or be provided access to Data, the Authorized User must execute and provide to the Data Custodian of the relevant Party a Data Confidentiality Agreement (in the form provided in Appendix C).

G. Nothing in this Agreement shall prohibit the Parties from disclosing any Data if the Parties are legally required to do so by law or by a judicial or governmental order or in a judicial or governmental proceeding. In the event of such disclosure, the Disclosing Party shall, where permissible:

   1. Notify the other Parties of the requirement to make the disclosure within two (2) business days after it becomes aware of such requirement; and

   2. Cooperate with the other Party or Parties if that Party elects or Parties elect to contest the requirement to make the disclosure or to seek a protective order, or any other course designated by the Party or Parties.

## IX.    PUBLICATION OF RESULTS OF DATA ANALYSIS

A. Notwithstanding Section VIII of this Agreement, ODCA or CCE on behalf of ODCA may publish and present the results and conclusions of its analyses based on the Final Data ("Final Report") under this Agreement to individuals and entities outside of ODCA provided however, that the publication or presentation of the Final Report shall not include:

   1. PII or information that would lead to the identification of a Justice-Involved Individual; or

   2. Data a Disclosing Party has determined is protected from disclosure by law, including state and federal Freedom of Information Act ("FOIA"), regulation, or contract and that is either highly sensitive or is restricted by law, by regulation, or by contract from disclosure to other public bodies.

7

B. ODCA or CCE on behalf of ODCA shall provide a draft of the Final Report to the Agencies for the Agencies to review at least ten (10) business days before publishing the results or conclusions of ODCA's analyses that include Final Data under this Agreement. The purpose of the Agencies review pursuant to this Section is only to ensure conformity with paragraph A of this Section.

C. ODCA, or CCE on behalf of ODCA shall provide a draft of the Final Report to the Agencies for review of its content. ODCA will provide the Agencies at least thirty (30) days to meet and confer about the content of draft Final Report and respond, in writing, no fewer than ten (10) days after any such meeting. ODCA or CCE shall have the right to publish or present the Final Report if the Agencies do not respond within forty (40) days of providing the Agencies the draft Final Report.

## X.  DATA CUSTODIANS

A. The Data Custodians are responsible for compiling the Data identified in Appendix A and working with OCTO to transfer Final Data to CCE.

B. Once Data is compiled by a Data Custodian pursuant to Section IV of this Agreement, he or she is responsible for:

1. Providing the Data to Authorized Users and ensuring that such Authorized Users receive access to the Data only in conformity with this Agreement (including by ensuring that a signed Data Confidentiality Agreement is signed before the Data Custodian provides access to the Data to an authorized user);

2. Maintaining a record of all Data requested and received; and

3. Ensuring that the Data is disposed in accordance with Section XI of this Agreement.

C. Before any Data is shared by the Parties, each Data Custodian shall execute and deliver to the contacts for DMHHS a signed copy of his or her Data Confidentiality Agreement in the form set forth in Appendix C.

D. As of the Effective Date of this Agreement, the following individuals have been designated as the Data Custodians:

1. DBH designates Laura Heaven, LICSW, Chief, Data and Performance Management, DC Department of Behavioral Health, laura.heaven@dc.gov.

2. DOC designates Reena Chakraborty, PhD, Chief of Strategic Planning and Analysis D.C. Department of Corrections, reena.chakraborty@dc.gov.

3. DHCF designates Dr. LaRah Payne, Information & Privacy Officer, D.C. Department of Health Care Finance, larah.payne@dc.gov.

8

    4.  MPD designates Marty Afhami, Enterprise Data Officer, Information Technology Bureau, MPD, marty.afkhami@dc.gov.

    5.  OCME designates Dr. Chikarlo Leak, Forensic Epidemiologist, Office of the Chief Medical Examiner, chikarlo.leak@dc.gov.

## XI.  DISPOSITION OF DATA

A.  Each Party shall return or delete, unless otherwise and independently authorized to retain Data or Final Data (or any copies thereof), as the case may be, from all places where it is stored and in any medium, without retaining a copy thereof (including expunging copies from any computer or other device). Each Party shall provide verification, in writing, to the other Parties of the manner and date of deletion within thirty (30) days after the later of the following occurrences:

    1.  ODCA, or CCE on its behalf, issues a Final Report based on the Final Data;

    2.  Upon termination of this Agreement pursuant to Section XII.C; or

    3.  As otherwise required by state or federal law.

B.  By mutual agreement, the Parties may, for good cause shown, extend the Agreement for ninety (90) days beyond the Term (as defined below). Such extension must be in writing, executed by the Parties' signatories listed in Section XIV of this Agreement.

C.  ODCA and CCE may not maintain data sets developed from the Final Data beyond the Term and must dispose of any additional datasets as set forth in Section XI.A above.

D.  Notwithstanding the other requirements of Section VII and this Section XI, OCME may disclose Data to the Opioid Fatality Review Committee, established by Mayor's Order 2019-024, dated May 2, 2019.

## XII.  TERM & TERMINATION; REMEDY; NON-WAIVER

A.  The Term of this Agreement will commence on the Effective Date and will continue until the publication of the Final Report (the "Term").

B.  Any failure by any Party, or its Representatives to comply with the terms or conditions of this Agreement may constitute a default under this Agreement.

C.  In the event of a default, a Party shall provide written notice to the other Party's Data Custodian promptly, and in any case within forty-eight (48) hours, of becoming aware of a default and a courtesy copy of the written notice to all other Parties in the Agreement. The written notice shall include a description of the alleged default along with a demand to cure by a reasonable date. If the defaulting Party does not cure or remedy the default within thirty (30) calendar days of the receiving the notice, that

failure to cure shall be considered a breach of the Agreement, under which a Party may terminate its participation in this Agreement and request immediate destruction of its Data by all Parties. If the breach is cured in the specified period, the defaulting Party shall notify all other Parties by written notice.

D. No delay or omission of a Party to exercise any right, power, or remedy accruing upon the happening of a default shall impair any such right, power, or remedy, or shall be construed to be a waiver of, or acquiescence to, any such default.

## XIII. COMPLIANCE WITH THE LAW

A. The Parties will perform under this Agreement in compliance with all requirements of all applicable laws, rules and regulations, which are, in part, included below, as well as all professional standards applicable to such data-sharing and disclosure. The Parties shall cooperate with each other to facilitate compliance with these laws, regulations and standards.

B. To the extent applicable, CCE and its Representatives shall comply with:

   1. The District of Columbia Personnel Manual as if its personnel were employees of the District and bound by the District's ethics laws. This includes the provisions of the District Personnel Manual, Part I, Section 1800.3.

   2. The Data-Sharing and Information Coordination Amendment Act of 2010, effective December 4, 2010 (D.C. Law 18-273; D.C. Official Code § 7-242) ("Data Sharing Act") and its accompanying regulations at 29 DCMR §§ 3000–3099.

   3. The Freedom of Information Act of 1976, effective March 25, 1977 (D.C. Law 1-96; D.C. Official Code § 2-531 et seq.)

   4. The Federal Policy for the Protection of Human Subjects and the District of Columbia Department of Corrections Policy and Procedure Number 1311.11, issued September 10, 2018 on Research Activity.

   5. The Substance Abuse Confidentiality Regulations, specifically 42 CFR § 2, which applies to all records relating to "the identity, diagnosis, prognosis, or treatment of any patient in a substance abuse program that is conducted, regulated, or directly or indirectly assisted by any department or agency of the United States."

   6. All applicable data protection and privacy laws.

C. To the extent the Parties use or disclose PHI in connection with this Agreement, the Parties agree not to use or disclose such PHI other than as permitted or required by

10

HIPAA; provided however the Parties agree and understand the disclosure of PHI is permitted pursuant to 45 C.F.R. § 164.512(e).

## XIV. PARTIES' SIGNATORIES

A. The following individuals are the Parties' signatories and legal representatives under this Agreement:

**DMHHS**

[For Notices Only]
Amelia Whitman
Policy Director
Office of the Deputy Mayor for Health and Human Services
1350 Pennsylvania Avenue NW, Suite 223
Washington, DC 20004
Amelia.whitman@dc.gov
202-807-0348

Michael Grier
Policy Advisor
Office of the Deputy Mayor for Health and Human Services
1350 Pennsylvania Avenue NW, Suite 223
Washington, DC 20004
Michael.grier@dc.gov
202-727-2320

[As a signatory]
Wayne Turnage
Deputy Mayor
Office of the Deputy Mayor for Health and Human Services
1350 Pennsylvania Avenue NW, Suite 223
Washington, DC 20004

**DBH**
Barbara J. Bazron, Ph.D.
Acting Director
DC Department of Behavioral Health
64 New York Avenue, N.E.
Washington, D.C. 20002

**DHCF**
Wayne Turnage
Director
D.C. Department of Health Care Finance
441 4th Street NW, 900S

11

Washington, DC 20001

**DOC**
Quincy L. Booth
Director
D.C. Department of Corrections
2000 14th Street NW
Washington, DC 20009

**OCME**
Dr. R Mitchell Jr. MD
Chief Medical Examiner
Office of the Chief Medical Examiner
401 E Street SW, Suite 6080
Washington, DC 20024

**MPD**
Chief Peter Newsham
Chief of Police
Metropolitan Police Department
300 Indiana Avenue NW
Washington, DC 20001

**OCTO**
Lindsey V. Parker
Chief Technology Officer
Office of the Chief Technology Officer
200 I Street SE
Washington, DC 20003

**CCE**
Misty Thomas
Executive Director
Council for Court Excellence
1111 14th Street NW, Suite 500
Washington, DC 20005

**ODCA**
Kathleen Patterson
D.C. Auditor
Office of the D.C. Auditor
717 14th Street NW, 9th Floor
Washington, DC 20005

12

All writings and notices delivered under this Agreement shall be provided to the Parties' aforementioned signatories by electronic mail and also may be copied and provided by mail or by hand.

## XV.  SURVIVAL

Sections IV, VI, VII, VIII, IX, XIX and XXI shall survive beyond the Term.

## XVI.  MODIFICATIONS

The terms and conditions of this Agreement may be modified only upon the agreement of the Parties. A modification must be in writing and signed by the duly authorized signatories of each Party.

## XVII.  COUNTERPARTS

This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall be taken together and deemed to be one instrument.

## XVIII. NO JOINT VENTURE OR THIRD-PARTY BENEFICIARIES

Nothing contained in this Agreement shall be deemed or construed by the Parties or by any third party to create the relationship of partnership, joint venture or any association between the Parties.

## XIX.  LIABILITY

Each Party shall be responsible for any liability arising from its own conduct and retain immunity and all defenses available to it pursuant to law.

## XX.  NOTICE OF CLAIMS

Each Party shall promptly inform the other Party of any information related to the provision of services under this Agreement which could reasonably lead to a claim, demand or liability of or against the other Party or the District by any third party.

## XXI.  SEVERABILITY

This Agreement shall be deemed severable and any provision of this Agreement that violates any law, statute, rule, or regulation of the District of Columbia or the United States, or is otherwise invalid or unenforceable, shall be deemed to be severed and shall not affect the enforceability of any other provision thereof.

## XXII.  HEADINGS/COUNTERPARTS

The headings in this Agreement are for purposes of reference only and shall not limit or define the meaning of any provision hereof. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same document.

## XXIII. JOINTLY DRAFTED AND ENTIRE AGREEMENT

This Agreement shall be deemed to have been drafted by all Parties and, in the event of a dispute, shall not be construed against any Party on that basis. This Agreement contains the entire understanding of the Parties with respect to the matters contained herein, and supersedes any and all other agreements between the parties relating to the matters contained herein. No oral or written statements not specifically incorporated or referenced herein shall be of any force or effect.

The Parties, by the signatures of the authorized representatives below, hereby acknowledge and agree to the terms and conditions of this Agreement.

[signatures on the following page]

**IN WITNESS WHEREOF,** this Agreement has been executed by the Parties as of the dates set forth below.

By: Wayne Turnage
Title: Deputy Mayor for Health and Human Services, Office of the Deputy Mayor for Health and Human Services
Date:

By: Dr. R. Mitchell, Jr. MD
Title: Chief Medical Examiner, Office of the Chief Medical Examiner
Date:

By: Barbara J. Bazron, PhD.
Title: Acting Director, Department of Behavioral Health
Date:

By: Chief Peter Newsham
Title: Chief of Police, Metropolitan Police Department
Date:

By: Wayne Turnage
Title: Director, D.C. Department of Health Care Finance
Date:

By: Lindsey V. Parker
Title: Chief Technology Officer, Office of the Chief Technology Officer
Date:

By: Quincy L. Booth
Title: Director, D.C. Department of Corrections
Date: 7/19/19

By: Misty Thomas
Title: Executive Director, Council for Court Excellence
Date: 6/17/19

By: Kathleen Patterson
Title: D.C. Auditor, Office of the D.C. Auditor
Date: 6/17/19

15

**IN WITNESS WHEREOF,** this Agreement has been executed by the Parties as of the dates set forth below.

By: Wayne Turnage
Title: Deputy Mayor for Health and Human Services, Office of the Deputy Mayor for Health and Human Services
Date:

By: Dr. R. Mitchell, Jr. MD
Title: Chief Medical Examiner, Office of the Chief Medical Examiner
Date:

By: Barbara J. Bazron, PhD.
Title: Acting Director, Department of Behavioral Health
Date:

By: Chief Peter Newsham
Title: Chief of Police, Metropolitan Police Department
Date:

By: Wayne Turnage
Title: Director, D.C. Department of Health Care Finance
Date:

By: Lindsey V. Parker
Title: Chief Technology Officer, Office of the Chief Technology Officer
Date: 6/18/2019

By: Quincy L. Booth
Title: Director, D.C. Department of Corrections
Date:

By: Misty Thomas
Title: Executive Director, Council for Court Excellence
Date: 6/17/19

By: Kathleen Patterson
Title: D.C. Auditor, Office of the D.C. Auditor
Date: 6/17/19

15A

**IN WITNESS WHEREOF,** this Agreement has been executed by the Parties as of the dates set forth below.


By: Wayne Turnage
Title: Deputy Mayor for Health and Human Services, Office of the Deputy Mayor for Health and Human Services
Date:

By: Dr. R. Mitchell, Jr. MD
Title: Chief Medical Examiner, Office of the Chief Medical Examiner
Date: 6/20/2019


By: Barbara J. Bazron, PhD.
Title: Acting Director, Department of Behavioral Health
Date:

By: Chief Peter Newsham
Title: Chief of Police, Metropolitan Police Department
Date:


By: Wayne Turnage
Title: Director, D.C. Department of Health Care Finance
Date:

By: Lindsey V. Parker
Title: Chief Technology Officer, Office of the Chief Technology Officer
Date:


By: Quincy L. Booth
Title: Director, D.C. Department of Corrections
Date:

By: Misty Thomas
Title: Executive Director, Council for Court Excellence
Date: 6/17/19


By: Kathleen Patterson
Title: D.C. Auditor, Office of the D.C. Auditor
Date: 6/17/19

**IN WITNESS WHEREOF,** this Agreement has been executed by the Parties as of the dates set forth below.

By: Wayne Turnage
Title: Deputy Mayor for Health and Human Services, Office of the Deputy Mayor for Health and Human Services
Date:

By: Dr. R. Mitchell, Jr. MD
Title: Chief Medical Examiner, Office of the Chief Medical Examiner
Date:

By: Barbara J. Bazron, PhD.
Title: Acting Director, Department of Behavioral Health
Date:

By: Chief Peter Newsham
Title: Chief of Police, Metropolitan Police Department
Date:     6/21/2019

By: Wayne Turnage
Title: Director, D.C. Department of Health Care Finance
Date:

By: Lindsey V. Parker
Title: Chief Technology Officer, Office of the Chief Technology Officer
Date:

By: Quincy L. Booth
Title: Director, D.C. Department of Corrections
Date:

By: Misty Thomas
Title: Executive Director, Council for Court Excellence
Date: 6/17/19

By: Kathleen Patterson
Title: D.C. Auditor, Office of the D.C. Auditor
Date:     6/17/19

**IN WITNESS WHEREOF,** this Agreement has been executed by the Parties as of the dates set forth below.

By: Wayne Turnage
Title: Deputy Mayor for Health and Human Services, Office of the Deputy Mayor for Health and Human Services
Date:

By: Dr. R. Mitchell, Jr. MD
Title: Chief Medical Examiner, Office of the Chief Medical Examiner
Date:

By: Barbara J. Bazron, PhD.
Title: Acting Director, Department of Behavioral Health
Date:

By: Chief Peter Newsham
Title: Chief of Police, Metropolitan Police Department
Date:

By: Wayne Turnage
Title: Director, D.C. Department of Health Care Finance
Date:

By: Lindsey V. Parker
Title: Chief Technology Officer, Office of the Chief Technology Officer
Date:

By: Quincy L. Booth
Title: Director, D.C. Department of Corrections
Date:

By: Misty Thomas
Title: Executive Director, Council for Court Excellence
Date: 6/17/19

By: Kathleen Patterson
Title: D.C. Auditor, Office of the D.C. Auditor
Date: 6/17/19

15 D

**IN WITNESS WHEREOF,** this Agreement has been executed by the Parties as of the dates set forth below.


By: Wayne Turnage
Title: Deputy Mayor for Health and Human Services, Office of the Deputy Mayor for Health and Human Services
Date:

By: Dr. R. Mitchell, Jr. MD
Title: Chief Medical Examiner, Office of the Chief Medical Examiner
Date:


By: Barbara J. Bazron, PhD.
Title: Acting Director, Department of Behavioral Health
Date:

By: Chief Peter Newsham
Title: Chief of Police, Metropolitan Police Department
Date:


By: Wayne Turnage
Title: Director, D.C. Department of Health Care Finance
Date:

By: Lindsey V. Parker
Title: Chief Technology Officer, Office of the Chief Technology Officer
Date:


By: Quincy L. Booth
Title: Director, D.C. Department of Corrections
Date:

By: Misty Thomas
Title: Executive Director, Council for Court Excellence
Date:


By: Kathleen Patterson
Title: D.C. Auditor, Office of the D.C. Auditor
Date:

## APPENDIX A

1. **Dataset name: MPD Full Data**

   **Data description**

   MPD will provide a person-level dataset containing data about arrests made between January 2015-September 2018. The dataset shall contain the following for each Justice-Involved Individual:

   a) if an arrest occurred
   b) the date of each arrest
   c) Police Service Area of arrest
   d) the offense for which individuals were arrested

   The following demographic information will be provided about each individual in the dataset, if available:

   a) Year of birth
   b) Race
   c) Ethnicity

2. **Dataset name: DOC Full Data**

   **Data description**

   DOC will provide a person-level dataset containing data about all individuals incarcerated between January 2015-September 2018 for all Justice-Involved Individuals in the "Original Data". The dataset that DOC will provide will contain the following data for each individual:

   a) The date(s) at which an incarceration began
   b) The date(s) at which the individual was released
   c) Whether the individual received a SUD-diagnosis during intake
   d) Whether the individual received treatment for a SUD while incarcerated and the date(s) during which each of the following services were provided, if applicable;
   e) What services were provided to the individual including;
   f) Enrollment in the Residential Substance Abuse Treatment (RSAT) program;
   g) Clinical Care Coordination;
      a. Case Management;
      b. Crisis Intervention;
      c. Substance Use Disorder Counseling, including the following;
   h) Individual Counseling;
   i) Group Counseling;
   j) Group Counseling - Psycho-education; and
   k) Family Counseling; and
      a. Medication Management;
      b. Medication Assisted Treatment; and

16

     c.  Recovery Support Service

The following demographic information will be provided about each individual in the dataset:

    a) Zip code of home address
    b) Native language, if not English
    c) Education level
    d) Income level

3. **Dataset name: DBH Full Data**

   **Data description**

DBH will provide a person-level dataset containing data about the SUD-related service(s) provided by DBH itself and community providers with its clients. These records will be at the individual level and will include demographic information about each Justice-Involved Individual, as well as data on the nature of the SUD-related service(s) they received during the Audit Period, which is January 2015 through September 2018. SUD-related Services refers to the following:

    a) Assessment/Diagnostic and Treatment Planning Services; including an indication of whether a referral was made, and the level of service for which the referral was made
    b) Clinical Care Coordination;
    c) Case Management;
    d) Crisis Intervention;
    e) Substance Use Disorder Counseling, including the following;
        i.    Individual Counseling;
        ii.   Group Counseling;
        iii.  Group Counseling - Psycho-education; and
        iv.  Family Counseling;
    f) Drug Screening, as follows;
        i.    Toxicology Sample Collection; and
        ii.   Breathalyzer Testing;
    g) Medication Management;
    h) Medication Assisted Treatment; and
    i) Recovery Support Services.

4. **Dataset name: OCME Full Data**

OCME will provide the following information for each individual, when available, in the dataset from January 2015 –September 2018:

    a) Cause of Death; and
    b) Manner of Death.

5. **Dataset name: DHCF Full Data**

   **Data description**

DHCF will provide a person-level dataset containing data about the SUD-related service(s) provided to all Justice-involved Individuals. The dataset that DHCF will provide will contain data about the following SUD related services for each individual:

a) Assessment/Diagnostic and Treatment Planning Services; including an indication of whether a referral was made, and the level of service for which the referral was made
b) Clinical Care Coordination;
c) Case Management;
d) Crisis Intervention;
e) Substance Use Disorder Counseling, including the following;
    i.    Individual Counseling;
    ii.    Group Counseling;
    iii.    Group Counseling - Psycho-education; and
    iv.    Family Counseling;
f) Drug Screening, as follows;
    i.    Toxicology Sample Collection; and
    ii.    Breathalyzer Testing;
g) Medication Management;
h) Medication Assisted Treatment; and
i) Recovery Support Services

18

**Appendix B**

**Security Requirements**

---

## Security Controls for the Transfer of Data

- Disclosing Parties must transmit Data employing industry-standard security and encryption protocols to securely transfer Data, and in all cases no less than the same protocols as it employs to protect and transfer its own data. Disclosing Parties shall not provide Data to Receiving Parties in an unencrypted format or through an insecure means.

- The Disclosing Party may provide Data via an encrypted flash drive or an approved secure, encrypted upload facility. When provided via a secure encrypted upload facility, the Receiving Party shall download any Data or Final Data, when available, only to a secure computer or server with strong password protection. In the case that the Data or Final Data is available for download using a secure website with an assigned user name and password, the login information shall not be shared with anyone not authorized by the Receiving Party to receive the Data or Final Data.

- If Data is transferred via flash drive, the Data will be deleted immediately from the flash drive after the transfer is complete and the deletion will be confirmed by ensuring that the Data does not appear in the trash or recycle bin of the flash drive.

- The Receiving Party shall ensure that any computers hosting, transmitting or storing the Data or Final have the latest security patches and are running virus protection software, in accordance with industry standards.

- The Receiving Party shall avoid storing any Data or Final on a laptop or other portable devices. If the Data or Final Data is stored on portable devices, the Receiving Party shall ensure that the Data or Final Data and device are encrypted, in accordance with industry standards. If Data or Final Data is stored on an immobile computer, the Receiving Party shall ensure that the computer is locked when the computer is unattended, and is password protected and the password is not visible, accessible, or shared with any unauthorized individuals.

## General Security Controls for the Agencies

- All Data collection and analysis by the Agencies must be conducted on District-issued devices.

- All District-issued computers on which Data analysis is conducted must:

    o Run Windows 10 to facilitate encryption;

- o  Use full disk encryption (using Check Point endpoint security);

- o  Be password-protected issuing appropriate password protection and controls; and

- o  Have the computer screen set to automatically lock and require a password to re-open after 5 minutes or less of inactivity

- When using a Wi-Fi connection (other than the secure Wi-Fi connection operated by the District government), all Authorized Users shall comply with the following guidelines:
  - o  The Authorized Users shall not use an unsecured public Wi-Fi connection unless such use is absolutely necessary (for example, a hotel only provides unsecured Wi-Fi connection and it is necessary for the user to perform work while at the hotel);

  - o  The Authorized Users shall immediately connect to the DC VPN (regardless of whether the Wi-Fi connection is secure or unsecure);

  - o  The Authorized Users shall avoid accessing or analyzing Data when connected to a public Wi-Fi connection, even if the Authorized Users is connected to the DC VPN and even if the Wi-Fi connection is secured; and

  - o  The user shall ensure that the user's home network uses WPA2 authentication

## General Security Controls for CCE

If analysis is conducted by Council for Court Excellence ("CCE") staff, CCE shall also comply with all relevant elements of the General Security Controls above for any of its computers that access or analyze the Data. Upon request, CCE should be prepared to demonstrate to District staff its relevant security protocols, as applicable to its own network.

**Appendix C**

---

### Data Confidentiality Agreement

Pursuant to the Data Use Agreement between the District and the Office of the District of Columbia Auditor ("ODCA") and the Council for Court Excellence ("CCE") ("Agreement") regarding the sharing of records, I understand that I will be given access to data that may include confidential or sensitive information such as personally identifiable information and medical information ("Data"). As an authorized user of such data, I make the following affirmations.

I understand that it is my responsibility to know the security protections in place and necessary to protect the Data. I have carefully read and completely understand the data security guidelines outlines in Appendix B. I understand that I must, and affirm that I will, comply with all data security requirements specified in Appendix B. I have carefully read, understand, and will comply with the terms and conditions of the Agreement, including the restrictions on the use and disclosure of the Data provided to ODCA and CCE pursuant to the Agreement.

I will not disclose, and will take all necessary and reasonable precautions to prevent others from disclosing, any Data provided pursuant to the Agreement, and the security protections in place and necessary to protect the Data.

I will not use, and will take all necessary and reasonable precautions to prevent others from using, the Data provided pursuant to the Agreement for any purpose not authorized by the Agreement. I will not use, and will take all necessary and reasonable precautions to prevent others from using, the Data provided pursuant to the Agreement to contact any person in the data for any purpose unless such contact is authorized by the Agreement.

I understand that my disclosure of Data in violation of the Agreement, or my failure to abide by this Agreement or Appendix C, may subject me to disciplinary action, up to and including termination of employment.

I agree to report the violation or potential violation of any term of this Agreement or the Agreement to the Data Custodian without unreasonable delay.

I acknowledge and affirm that I am personally responsible for compliance with the terms of this Data Confidentiality Agreement.

Signature_____

Printed Name_____

Date_____

21

# Appendix C

---

## QUANTITATIVE METHODS

To perform this audit, the Office of the D.C. Auditor (ODCA) requested that the Department of Behavioral Health (DBH), Department of Corrections (DOC), Department of Healthcare Finance (DHCF), and the Department of Health (DOH) produce datasets that the Council for Court Excellence (CCE) could match together to evaluate the relationship between substance use disorder (SUD) services and justice involvement, among individuals in the District of Columbia, between January 1, 2015 and September 30, 2018 (the "Audit Period"). After discussions with representatives from the Executive Office of the Mayor and the Deputy Mayor for Health and Human Services, it was determined that DOH would not provide data and, instead, the Metropolitan Police Department (MPD) and Office of the Chief Medical Examiner (OCME) would contribute data to the dataset, even though they were not initially agencies engaged in this audit. DHCF was never intended to be subject to programmatic evaluation, but instead was party to this audit only for the purposes of data sharing. The following describes the methodology CCE used to analyze the data provided by these agencies.

## DESCRIPTION OF THE DATA

On November 21, 2019, CCE received final person-level datasets from the above agencies that provided information about the individuals who had been in various forms of contact with each agency during the Audit Period. As part of each different dataset, each agency produced a number of individual "identifiers" as well as substantive data that could be used for analysis. To protect the individual peoples' identities, the identifiers were reported to CCE as a 32-character "hash." Each hash was deterministically created from the original identifying content held only by the agency, such that each name, date of birth, and any other agency identifier was represented by one distinct hash. The creation of those hashes was performed identically for data from each agency. Agency identifiers were pre-processed by the Office of the Chief Technology Officer (OCTO) to account for differences in spacing and capitalization conventions.

Once delivered to CCE, the audit team created a unique identifier (UID) for each distinct person in the dataset, using a combination of hashes of first names, last names, and dates of birth. Social Security Numbers (SSNs) were not used for identifying matches because there was missing data and a hashing error in the data as it was delivered to CCE which prevented the use of SSNs as a common identifier between DHCF and other agencies. For reasons discussed in greater detail below, Metropolitan Police Department's unique personal Identification Numbers (PDIDs), were used to match MPD data to DOC data, and UIDs were not used to match MPD data to other data-sets. Therefore, this limited the ability to match MPD data to the behavioral health data sources in this dataset, leaving only arrests that were associated with DOC incarcerations to be considered in our analysis. Figures 35 and 36 outline the data delivered to CCE from each agency.

Figure 35: Identifiers and Data by Agency

| Agency | Identifiers | Data |
|--------|-------------|------|
| MPD | Names, birthdate, PDID, SSN | Demographics, arrest date |
| DOC | Names, birthdate, PDID, DCDC, SSN, USM | Incarceration start and end date, SUD flags |
| DBH | Names, birthdate | Assess and referral data, care episode data |
| DHCF | Names, birthdate, Medicaid ID | Care episode data |
| OCME | Names, birthdate | Mortality data and dates |

*Source: Matched District Data*

Figure 36: Agency Data by Observation and Identified Individual[470]

| Agencies | Observations | ID'd individuals |
|----------|-------------|------------------|
| MPD | 225,180 | 68,026 |
| DOC | 40,122 | 23,283 |
| DBH (Assess) | 12,259 | 8.234 |
| DBH (Claims) | 567,248 | 12,901 |
| DHCF | 941,499 | 25,414 |
| OCME | 1,140 | 1,140 |

*Source: Matched District Data*

## DATA-MATCHING AND QUALITY CHECKS

As noted above, the data that CCE received contained a number of identifiers, however, those identifiers were encrypted in such a way that only a direct match of hashes between a first name, last name, or date of birth could be used to correctly identify a particular person and/or their specific justice involvement or SUD care. As discussed below, we found that a combination of first name, last name, and date of birth resulted in a dataset that closely resembled unique internal identifiers used by the agency to track individuals. Figure 37, below, shows counts of individuals between CCE's UID and our best available agency identifier.

---

470  The count of *Id*entified Individuals for each agency is the total of UIDs developed from that agency's data, except for MPD. MPD's count of *Id*entified Individuals is the total number of unique PDIDs.

Figure 37: "Our" Identifier and Alternative Identifier

| Agencies | Our Identifier | Best Alternative Identifier |
|----------|----------------|------------------------------|
| MPD | 91,800 | 68,026 (PDID) |
| DOC | 22,283 | 23,373 |
| DBH (Assess) | 12,259 | NA |
| DBH (Claims) | 12,901 | NA |
| DHCF | 25,414 | 25,455 (Medicaid ID) |
| OCME | 1,140 | NA |

*Source: Matched District Data*

CCE was able to identify roughly 100 more individuals in DOC with our UID than we could with DOC's own internal identifier (DCDC), representing a known error rate of approximately .04% in the DOC data. Using a similar comparison, we identified an error rate of .02% in the DHCF data. However our identifier has a roughly 25.9% error rate in the MPD data. We had no metric for analyzing the error rates in the OCME, DBHA, or DBH data, as they did not contain internal agency identifiers against which we could make our comparisons.

The MPD data posed a challenge because there were a significant number of missing PDIDs (their agency internal identifier), and CCE found that our UID was less reliable when matching to DOC data than the PDID was, even when accounting for the missing PDIDs. As a consequence, we chose to use PDIDs instead of UIDs to match MPD to DOC data, and then used the associated UIDs in the DOC dataset as a means of bridging the MPD observations to other datasets.

## ASSUMPTIONS AND CREATION OF "EPISODES"

In light of the limitations on tracking individual people consistently through the different agency data, CCE chose to evaluate relationships by "episode," rather than by individual persons identified in the datasets, for all of our analyses. In particular, we established "Incarceration Episodes," "Assessment Episodes," and "Fatality Episodes." Developing these "Episodes" allowed us to anchor and conduct our analyses around distinct events that occurred wholly within the Audit Period, rather than around an individual person who may or may not have been incarcerated multiple times before, during, and after the Audit Period, or who may or may not have received care multiple times before, during and after the Audit Period. This allowed us to increase the precision of the claims that we made about our analyses. As we performed these analyses, we also chose to limit the data we evaluated to control for events that happened outside of the Audit Period, or that were not reflected in our dataset, as best we could.

For the purposes of this report, an Incarceration Episode is the period of time beginning with the MPD arrest that most closely preceded an incarceration through the release date for that incarceration. An Assessment Episode is an assessment for SUD services at the Assessment and Referral Center (ARC), and a Fatality Episode is an accidental drug overdose in which the individual died, as measured by OCME.

For some Incarceration Episodes, we could not identify a MPD arrest in the dataset that we reasonably believed correlated with a specific DOC incarceration; this could be because there was an arrest initiated by a law enforcement agency other than MPD, or because the arrest occurred more than 365 days prior to the incarceration, the bound we set in defining what was the likely arrest link to a particular incarceration. When this occurred, we dropped the arrest, and defined the Incarceration Episode as the period from the beginning of the DOC incarceration to the end of that incarceration. Additionally, as noted above, if the incarceration had an intake date or release date after that did not fall between January 1, 2015, and September 30, 2018, that Incarceration Episode was removed from our analysis.

Once we identified the Episodes we then created "Look Forward" and "Look Back" periods to facilitate our analysis of what happened to individuals immediately preceding and following an Episode. These bounds were set to attempt to approximate activity that could be reasonably considered "close in time" to major life incidents, like an arrest, an incarceration, or a decision to get assessed and seek SUD care. For Assessments we only created Look Forward periods, and for deaths we only created Look Back periods.

We defined the "Look Forward" period as the 90 days after an Episode and the "Look Back" period as the 90 days before an Episode. We used these windows to evaluate whether an individual had received SUD care paid for by either DBH or DHCF in a finite period before or after their release from incarceration, whether that individual was assessed by DBH, whether that individual was arrested by MPD during that period of time, and whether that individual died during that period of time. The "Look Around" period encompasses both the Look Forward and the Look Back period, 90 days on each side of an event. Any Incarceration Episode for which any part of the Look Around period was outside of January 1, 2015, or September 30, 2018, was dropped completely from our data analyses, as we determined that we could not get a consistent picture of what happened during these Episodes or fairly compare them to the Episodes that occurred completely within the Audit Period.

"Care" was defined in this analysis as any SUD service claim record generated by DHCF or DBH or a record of a DBH assessment for care, as was provided in the datasets delivered by the agencies to CCE. The universe of care that we consider is constrained to the data delivered to the audit team by the agencies. If an individual received privately funded care, or care from a non-D.C. public health agency, CCE received no data on that care and it is not reflected in our analysis. Moreover, with few exceptions, we do not distinguish between types of SUD care in the analyses reported and instead focus on whether care occurred or did not. While a more detailed analysis of how patterns of incarceration varied by type of care received at various intercepts before or after justice-involvement would have been revealing, it was not feasible given our time constraints.

## IMPOSED CENSORS BASED ON TIME INTERVALS

As noted above, we completely excluded any Incarceration, Assessment, or Fatality Episodes that violated the "left" censor (January 1, 2015) or "right" censor (September 30, 2018) in the dataset. For example, if an incarceration occurred such that the individual first entered DOC custody within 90 days of January 1, 2015, or September 30, 2018, we excluded those Incarceration Episodes from our

analysis. Similarly, any deaths that occurred within 90 days of January 1, 2015 and any Assessments that occurred within 90 days of September 30, 2018, were excluded. This decision, while limiting of the amount of data that we could analyze, ensured our ability to create more consistent observational units overall. Failing to exclude cases that violated the censors would have risked identifying cases around incarceration as "no care" cases, when in fact they were "care" cases, but the care was delivered before or after the time censor.

The downside of the decision to create data censors was some information loss from within the Audit Period dataset. For the 30 day Look Around, only 4% of the relevant data was excluded. However, imposing the 90 day Look Around resulted in 12.3% of the relevant data being excluded. For 365 day Look Around, 730 days were excluded, or 50% of the Audit Period. For nearly all evaluations reported in this report, we set our Look Around periods at 90 days. To test the appropriateness and stringency of our chosen censors, we repeated our analysis of the relationship between care in the Look Forward and care in the Look Back with both 30 and 365 day Look Arounds, and found that these changes did not meaningfully impact the data results or our interpretation of events. The broader academic literature used various lengths of time post-incarceration to evaluate behavioral health outcomes. 90 days is a commonly used window for these types of outcomes.[471]

## IMPOSED CENSORS BASED ON DOC RELEASE TYPE

Individuals in DOC were not always released to the community, many were released to the custody of other jurisdictions (like Maryland and Virginia) or other authorities (like the federal Bureau of Prisons, the U.S. Marshal's Service or the MPD Fugitive Unit). Because we have no data on SUD services provided by other jurisdictions' correctional institutions, these cases were also categorically removed from our data analysis of Episodes. We subset our Episodes down to only those who were identified in DOC's records as being "released to community." This shrunk the number of incarcerations we considered from 40,112 to 21,194. Unfortunately, the data we were provided did not indicate an address or place of residency of an individual "released to community." We were, however, comfortable assuming D.C. residency of those who received SUD care funded through D.C. Medicaid or DBH's local dollars, and who were part of the DBH and DCHF data. We have no way of knowing, with the data available to us, whether a person received SUD care in another jurisdiction.

We considered retaining two limit cases that we thought might have relevance to our analysis: there were 2,709 incarcerations that were identified as released to "treatment program" and 689 incarcerations identified as release to "St. Elizabeths Hospital." To test the effect of excluding these cases on our results, we re-ran our analyses related to Incarceration Episodes and care in the Look Around, as well as Active SUD flags while including the release to treatment program and release to St. Elizabeths Hospital cases. We found that excluding these cases slightly *decreased* the percentage of individuals receiving care before and after incarcerations. We believe that this may be

---

471   Kinlock, Timothy W., Michael S. Gordon, Robert P. Schwartz, and Kevin E. O'Grady. "A Study of Methadone Maintenance For Male Prisoners: 3-Month Postrelease Outcomes." *Criminal Justice and Behavior* 35, no. 1 (2008): 34–47. https://doi.org/10.1177/0093854807309111.

the case because these individuals are being released to court-funded SUD services that are not captured within our dataset. Without any further information with which to consider these cases, and with a suspicion that they may be receiving SUD services that are not captured in our dataset, we chose to exclude all non-"release to community" cases, narrowing the universe that we consider to only those who are released to community.

## POPULATION VS. SAMPLE DATA

Philosophically, we treated the data presented in this report not as a sample of a broader universe of data, but as *the* universe of data itself. We made this choice for two reasons. First, our goal in this audit is to evaluate the provision of SUD services to justice-involved clients by certain D.C. agencies during a particular period of time. We are neither trying to generalize our results to years outside the Audit Period, nor to jurisdictions other than D.C., nor as data reflecting trends. Albeit imperfect, the inter-agency matched dataset is population data, not a sample data set for research. Tests of statistical significance are not considered appropriate with population data, because they are uninterpretable.[472] Our data findings, therefore, should be considered a look at the relationship between the District's SUD service system and justice system *at a particular point in time*, and not as a general exploration of the District's SUD service system and justice system today.

---

472  Allen Rubin, "Significance Testing with Population Data," *Social Service Review* 59, no. 3 (Sept. 1, 1985): 518–20. A test of statistical significance is a test of the likelihood that a relationship observed between two variables in a sample exists between the population parameters the sampled variables represent. When looking at the parameters themselves, this is a meaningless test.

# Appendix D

---

## GLOSSARY OF TERMS

| Acronym | Name |
|---|---|
| **AA** | Alcoholics Anonymous |
| **APRA** | The Addiction Prevention & Recovery Administration |
| **AR** | Assessment and Referral |
| **ARC** | Assessment and Referral Center |
| **ATR** | Access to Recovery |
| **AUD** | Alcohol-Use Disorder |
| **BHI** | Behavioral Health Information |
| **BOP** | U.S. Bureau of Prisons |
| **CCE** | Council for Court Excellence |
| **CDF** | Central Detention Facility or "DC Jail" |
| **CJCC** | Criminal Justice Coordinating Council |
| **CMS** | Center for Medicare and Medicaid Services |
| **CSA** | Core Services Agency |
| **CSOSA** | Court Services and Offender Supervision Agency |
| **CTF** | Correction Treatment Facility |
| **DCMR** | D.C. Municipal Regulations |
| **DBH** | D.C. Department of Behavioral Health |
| **DBHA** | Department of Behavioral Health Assessment (data) |
| **DHCF** | D.C. Department of Health Care Finance |
| **DHS** | D.C. Department of Human Services |
| **DMH** | D.C. Department of Mental Health |
| **DMHHS** | D.C. Deputy Mayor for Health and Human Services |
| **DMPSJ** | D.C. Deputy Mayor for Public Safety and Justice |
| **DOC** | D.C. Department of Corrections |

## GLOSSARY, CONTINUED:

| | |
|---|---|
| **DOH** | D.C. Department of Health |
| **DOJ** | U.S. Department of Justice |
| **DR** | Disciplinary Report |
| **DUD** | Drug-Use Disorder |
| **EHR** | Electronic Health Record |
| **EMR** | Electronic Medical Record |
| **EOM** | Executive Office of the Mayor |
| **FEMS** | Fire & Emergency Medical Services |
| **FQHC** | Federally Qualified Health Centers |
| **FY** | Fiscal Year |
| **HIPAA** | Health Insurance Portability and Accountability Act |
| **IRC** | Inmate Reception Center |
| **JITAI** | just-in-time adaptive interventions |
| **KPI** | Key performance Indicator |
| **LEAD** | Law  Enforcement  Assisted Diversion |
| **LOC** | Level of Care |
| **MAT** | Medication-Assisted  Treatment |
| **MH** | Mental Health |
| **MHRS** | Mental Health Rehabilitation Services |
| **MOU** | Memorandum of Understanding |
| **MPD** | Metropolitan Police Department |
| **MUD** | marijuana use disorders |
| **NA** | Narcotics Anonymous |
| **NCCHC** | National Commission on Correctional Health Care |
| **NEAR Act** | Neighborhood Engagement Achieves Results Act |
| **OAG** | D.C. Office of the Attorney General |
| **OCA** | D.C. Office of the City Administrator |
| **OCME** | D.C. Office of the Chief Medical Examiner |

## GLOSSARY, CONTINUED:

| | |
|---|---|
| **OCTO** | D.C. Office of the Chief Technology Officer |
| **ODCA** | Office of the District of Columbia Auditor |
| **OTP** | Opioid Treatment Program |
| **OUD** | Opioid Use Disorder |
| **PAD** | Pre-Arrest Diversion |
| **PAR** | Performance Accountability Report |
| **PCP** | Phencyclidine |
| **PDID** | Police Department Identification Numbers |
| **PIT** | Point-in-Time Count |
| **PSA** | Pretrial Services Agency for the District of Columbia |
| **RBA** | Results-Based Accountability |
| **READY Center** | Resources to Empower and Develop You Center |
| **RFP** | Request for Proposal |
| **RPR** | Rapid Peer Responder |
| **RSAT** | Residential Substance Abuse Treatment Program |
| **RSS** | Recovery Support Services |
| **SAMHSA** | Substance Abuse and Mental Health Services Administration |
| **SATMHSIT** | Substance Abuse Treatment and Mental Health Services Integration Task Force |
| **SBIRT** | Screening, Brief Intervention, And Referral to Treatment |
| **SMI** | Severe Mental Illness |
| **SSN** | Social Security Numbers |
| **STR** | State Targeted Response |
| **SUD** | Substance Use Disorder |
| **TED** | Treatment-Episode Data |
| **TIC** | Trauma Informed Care |
| **UID** | Unique identification number created using a combination of first name, last name, and date of birth |

## GLOSSARY, CONTINUED:

| | |
|---|---|
| **USAO** | U.S. Attorney's Office for the District of Columbia |
| **USPC** | U.S. Parole Commission |

# Members of the Audit Team

---

### AUDIT STEERING COMMITTEE CHAIR

**Michael D. Hays, Esq.** CCE Civic Board Director

### AUDIT STEERING COMMITTEE MEMBERS

**Kevin A. Chambers, Esq**., Latham & Watkins, CCE Board Director

**Fritz Mulhauser, Esq**., CCE Civic Board Director

**James P. Tuite, Esq**., CCE Civic Board Director

**Joanne L. Zimolzak, Esq**., Dykema, CCE Board Director

### CCE STAFF

**Misty C. Thomas, Esq**., Executive Director

**Emily N. Tatro, Esq**., Deputy Director

**Casey M. Anderson**, Development Manager/Policy Analyst

**Adam J. Bernbaum**, Policy Analyst

**Faith J. Hudson,** Operations Associate

**Tracy B. Nutall, Esq.,** Policy Counsel

### ACKNOWLEDGEMENTS

**Adam Bernbaum** was the primary researcher and author of this report, with contributions from **Emily Tatro** and **Misty Thomas**. CCE thanks **Casey Anderson** and **Matthew Campbell** for their contributions to this report, and **Amy Bellanca**, General Counsel for ODCA, for supervising the audit. Many CCE interns also helped, including **Olivia Avery**, **Paola Bayron**, **Isaiah Beaton**, **Alleyah Caesar, Alexis Christensen, Kerri Corcoran, Grace Cutting, Kimberley Davis, Thelma Aguilar Gutierrez, Faith Hudson, Sondos Issa, Michael Logsdon, Sophia Pandelidis, Brittny Pham, Miriam Raffel-Smith, Basmah Raja, Pranay Somayajula, Aliya Sternstein**, and **Jarod Wade**.

CCE would also like to thank **Jennifer Everett** and **Levent Herguner**, of the law firm Jones Day, for representing CCE pro bono during the drafting and finalization of the Data Use Agreement. Additionally, we thank **Nils Franco** for his major contributions to the scrubbing, merging, and analysis of agency data.

CCE is especially grateful to the people with substance use disorders (SUD), SUD providers, community stakeholders, and government agencies who provided valuable feedback for this report. In particular, we would like to recognize the following D.C. administrators and agency staff who spent a significant amount of time on this audit, including **Michael Grier** at the Deputy Mayor of Health and Human Services Office, **Mario Field** at the Office of the Chief Technology Officer,

**Reena Chakraborty** and **Gitana Stewart-Ponder** at the Department of Corrections, **Matthew Caspari**, **Laura Heaven**, and **Mia Olsen** at the Department of Behavioral Health, and staff from the Executive Office of the Mayor, in particular Deputy General Counsel **Karuna Seshasai**, who worked us to facilitate the Data Sharing Agreement.

# About ODCA

The mission of the Office of the District of Columbia Auditor (ODCA) is to support the Council of the District of Columbia by making sound recommendations that improve the effectiveness, efficiency, and accountability of the District government.

To fulfill our mission, we conduct performance audits, non-audit reviews, and revenue certifications. The residents of the District of Columbia are one of our primary customers and we strive to keep the residents of the District of Columbia informed on how their government is operating and how their tax money is being spent.

**Office of the District of Columbia Auditor**
**717 14th Street N.W.**
**Suite 900**
**Washington, DC  20005**

**Call us:**    202-727-3600
**Email us:**   odca.mail@dc.gov
**Tweet us:**   https://twitter.com/ODCA_DC
**Visit us:**   www.dcauditor.org



Founded in 1982, the Council for Court Excellence (CCE) is a nonprofit, nonpartisan civic organization that envisions a justice system in the District of Columbia that equitably serves its people and continues to be a model for creating strong and more prosperous communities. CCE identifies and proposes solutions by collaborating with diverse stakeholders to conduct research, advance policy, educate the public, and increase civic engagement.



Information presented here is the intellectual property of the Office of the District of Columbia Auditor and is copyright protected. We invite the sharing of this report, but ask that you credit ODCA with authorship when any information, findings, or recommendations are used. Thank you.



*Q6. Please provide copies of any investigations, reviews or program/fiscal audits completed on programs and activities within DBH during FY20 and to date in FY21. This includes any reports of the DC Auditor, the Office of the Inspector General, or the Office of Accountability. In addition, please provide a narrative explanation of steps taken to address any issues raised by the program/fiscal audits. Please include the following:*

**DBH Response**

In FY20, the Center for Court Excellence conducted a study for the DC Auditor entitled "Everything is Scattered…The Intersection of Substance Use Disorders and Incarcerations in the District", by creating and analyzing a person-level data set that matched data across five health and justice agencies—DBH, the Department of Corrections, the Department of Health Care Finance, the Office of the Chief Medical Officer, and the Metropolitan Police Department. The report was released on August 25, 2020.  No investigations, reports or reviews were conducted by the Office of the Inspector General in FY20 or FY21 to date.

**OFFICE OF ACCOUNTABILITY**

**Claims Audits**

The Accountability Administration conducts audits of paid claims for each fiscal year for every certified provider.  The auditing process is retrospective and generally crosses fiscal years. Audits are conducted annually for all Mental Health Rehabilitation Services (MHRS), Adult Substance Abuse Rehabilitative Services (ASARS), and Health Homes providers on a sample universe which includes all paid claims.  All annual audit samples are random, statistically valid, and generated using RAT-STATS, a tool developed for this purpose by the Federal government. In addition, focused audits are conducted for a variety of reasons and the sample universe may be tailored to the reason for the audit.  Focused audit samples may be generated using methods appropriate to the purpose of the audit. The corrective action plan section below explains what happens in response to audits and reviews by the Accountability Administration.

In FY20 and to date in FY21, the following audits and audit activities were conducted:
- 37 audits of FY19 MHRS claims
- 40 focused audits of FY20 MHRS telemedicine claims
- 15 focused audits of FY19 and FY20 MHRS new provider claims
- 0 audits of FY19 Substance Use Disorder claims
- 6 audits of FY19 Health Homes claims

For FY19 audits, every Claims Review Committee included provider participation. The Claims Review Committee reviews and evaluates failed claims about which the provider and DBH disagree. Below is the current recoupment amount for Medicaid and Local funds.

Current Value on FY19 MHRS (annual) recoupment to date:

| | |
|---|---|
| Medicaid | $76, 982.12 |
| Local | $ 5, 366.71 |
| Total | $82, 348.83 |

Annual FY20 audits are scheduled to begin in April 2021.  New Provider audits will be conducted on a rolling basis. All providers with an FY19 fail rate of 40 percent or greater will be audited. Preliminary audit results are scheduled to be completed by the end of September 2021.

**Corrective Action Plans**
The Accountability Administration requires a provider to submit a Corrective Action Plan (CAP) for compliance and quality deficiencies identified during the Claim Audit or during other routine monitoring. A Statement of Deficiencies (SOD) also is issued for failure to comply with DBH certification regulations.  An SOD also can be issued to an operator of a Mental Health Community Residence Facility (MHCRF) for failure to comply with licensure regulations.  Each provider is assigned a staff person who monitors any CAP or SOD.  In addition, the Accountability Administration provides training on compliance planning and proper claiming.  This training is developed and modified to address specific issues identified during Claim Audits. Information from audits and other reviews is used to inform the overall technical assistance plan for providers, which includes the technical assistance provided by program staff.

**Investigations**
The list of investigatory reports is attached. Investigatory reports may include recommendations for policy changes, training, corrective action plans, or disciplinary action when allegations are substantiated.

Please see Attachment 1 of 2. DC Auditor Report and Attachment 2 of 2. DBH Investigations.

FY 20 Oversight Question 7, Attachment 1 of 2:  FY20 Performance Plan Key Performance Indicator Status

| Measure | FY20 Total Target | FY20 Performance | KPI Status | Explanation for Performance |
|---|---|---|---|---|
| 1. Percent of certified peers employed | 80% | 79% | Nearly Met | Did not meet target because peers were not certified in FY20 due to COVID.  DBH established virtual peer training and certification in FY 21. |
| 2. Percent of consumers surveyed in the Behavioral Health Satisfaction Survey who were satisfied with the person-centered planning process | 80% | 77% | Nearly Met | Data is comparable to previous fiscal years. DBH is working in partnership with providers and other stakeholders to strengthen the delivery of person-centered services. |
| 3. Percent of Mental Health Rehabilitative Services (MHRS) consumers who were discharged from a psychiatric hospital and had a follow-up service within 30 days | 70% | 45% | Not Met | DBH continued to provide technical assistance to hospitals on contract obligations for reporting timely discharge information and aftercare plan. DBH has been conducting virtual meetings with Provider Relations and stakeholders on continuity of care Guidelines for clients admitted at a hospital. DBH continues to maintain active communication and engagement with hospital direct care staff and hospital leadership at our contracted hospitals.  All active treatment planning and aftercare planning is done virtually or via telephone. DBH and DHCF recently launched a transition planning benefit |

1

| | | | | |
|---|---|---|---|---|
| | | | | that will allow providers to bill for this service. It is anticipated that this will improve performance on this KPI. |
| 4. Percent of children newly-enrolled in Mental Health Rehabilitative Services (MHRS) who had their first service within 30 days of enrollment | 75% | 74% | Nearly Met | This target was nearly met (74%) due to improved performance during the pandemic as a result of increased availability of telehealth services. Traditionally, scheduling/keeping in-person appointments have been a challenge for caregivers. |
| 5. Percent of adults newly-enrolled in mental health rehabilitative services (MHRS) services who had their first service within 30 days of enrollment | 80% | 82% | Target Met | Target Met |
| 6. Percent of consumers who completed competency restoration program who were found competent | 90% | 62% | Not Met | The Competency Restoration KPI is a composite of inpatient and outpatient scores. When assessing agency performance, DBH reviews inpatient and outpatient performance separately, as the restoration services provided to the defendants are significantly disparate. During the first two quarters of the fiscal year the outpatient restoration program received 62 cases with a performance score of 12% restored, while the inpatient restoration program received 138 cases with a performance score of 81% restored; combined performance for Q2 was |

| | | | | |
|---|---|---|---|---|
| | | | | 59%. To improve outpatient restoration performance, the program identified strategies to increase engagement with court stakeholders and reduce client no-shows, one of the most significant barriers to participation. However, due to COVID-19 impacts such as closure of the DC Courts for several months, both programs observed a significant drop in cases. In Q4 only 8 competency restoration cases were received. |
| 7. Percent of school-based behavioral health partnership schools with a school-based behavioral health clinician | 80% | 82% | Target Met | Target Met |
| 8. Percent of Individuals from Saint Elizabeths Hospital readmitted within 30 days | 2% | 1% | Target met | Target Met |
| 9. Percent of SUD withdrawal management clients who stepped down to a lower level of care | 75% | 45% | Not met | There has been improvement in performance on this measure since DBH assigned a staff person to monitor admissions and discharges from this level of care and actively facilitates connections to lower levels of care.  DBH will continue this level of monitoring and facilitation in FY21.  DBH has also initiated a performance review process with providers to identify strategies for improving results on this measure. |
| 10. Percent of SUD residential clients who | 50% | 30% | Not Met | DBH Senior Deputy Director presented the |

| | | | | |
|---|---|---|---|---|
| stepped down to a lower level of care | | | | system level data for this KPI at a series of provider meetings to communicate the need to improve discharge planning and facilitating step-downs to lower levels of care. DBH is scheduling individual provider meetings to ensure providers have the necessary resources to provide this service. |
| 11. Percent of methadone clients who were served in two consecutive quarters | 95% | 87% | Nearly Met | Performance on this measure has been close to target during 2020. DBH has been working with providers to reinforce the expectation of outreach to clients not coming regularly for methadone doses. DBH has started sending client level data to the 3 OTP to show them who has not been served in the last quarter (not in the numerator of this measure) so they can begin outreach. This outreach will continue in FY21. |
| 12. Percent of children receiving MH services whose acuity was initially high who had significant improvement in functioning on their most recent functional assessment | 80% | 59% | Not Met | DBH regularly shared data and provided training to providers. In FY21, DBH will provide targeted technical assistance to ensure CAFAS compliance data is a standing agenda item in monthly provider meetings. COVID significantly impacted performance in Q3 (50.4%); aggressive intervention efforts counteracted COVID's impact on performance in Q4 (61.1%). |

| | | | | |
|---|---|---|---|---|
| 13. Percent of consumers who remained in the CRF placement for at least 90 days from move-in date, with no psychiatric hospitalizations, incarcerations, crisis bed placements, or involuntary discharges. | 90% | 86% | Nearly Met | DBH made significant improvements on this KPI, meeting the target for the last 3 quarters. Conducting phone conferences with a consumer's CRF and CSA key staff at 7 days, 30 days, 60 days and 90 days after the consumer moves into the CRF, to address challenges experienced by the consumer during the transition period has proven effective (Q1: 71%, Q4: 91%); DBH will continue to conduct the phone conferences throughout FY21. |
| 14. Percent of vendors not selling tobacco to minors | 90% | Not available | Not Available | Due to health and safety concerns related to the COVID-19 pandemic, collection of data (which occurs in-person at vendor locations) did not occur in FY20 |

FY 20 Oversight Question 7, Attachment 2 of 2:  FY21 Performance Plan Key Performance Indicator Status

| Measure | Frequency | FY21 Target | Q1 Performance | Explanation of Unmet Target |
|---|---|---|---|---|
| 1.  Percent individuals referred through the emergency department medication assisted treatment programs who went to treatment. | Quarterly | 50% | 78% | Target met |
| 2.  Percentage of SUD clients who re-entered services within 90 days | Quarterly | 25% (lower is better) | 8% | Target met |
| 3.  Percent of consumers who completed competency restoration program who were found competent | Quarterly | 75% | 67% | During the first quarter of FY21, the inpatient competency restoration program received 3 cases; 2 of the 3 cases were restored to competency. This represents a significant decline in the number of cases from what is typically observed. For example, prior to the COVID-19 pandemic, the inpatient competency restoration program received 72 cases during the first quarter of FY20. The limited number of cases during this timeframe is the reason DBH failed to meet the quarterly target. |
| 4.  Percent of patients satisfied with Facility/Environment | Annual | 80% | NA | Annual Measure |
| 5.  Percent of unique patients restrained at least once | Quarterly | 8.4% (lower is better) | 10% | Efforts at St Elizabeths hospital to reduce the frequency of restraints have focused on strengthening data apparatuses which inform clinical decisions and interventions. This includes greater utilization of data dashboards (which document incident trends), units/areas of the hospital with higher incidents of restraints, |

| | | | | |
|---|---|---|---|---|
| | | | | identification of individuals in care with higher incidents of restraints, and times of the day/shifts with higher incidents of restraints. This data is reviewed during Assaults Committee Meetings by multi-disciplinary team members with the goal of augmenting established continuous quality improvement efforts (e.g. employee training, clinical teaming, and care management). |
| 6. Percent of unique patients secluded at least once | Quarterly | 4.4% (lower is better) | 5% | Efforts at St Elizabeths hospital to reduce the frequency of seclusions have focused on strengthening data apparatuses which inform clinical decisions and interventions. This includes greater utilization of data dashboards (which document incident trends) units/areas of the hospital with higher incidents of seclusions, identification of individuals in care with higher incidents of seclusions, and times of the day/shifts with higher incidents of seclusions. This data is reviewed during Assaults Committee Meetings by multi-disciplinary team members with the goal of augmenting established continuous quality improvement efforts (e.g. employee training, clinical teaming, and care management). |
| 7. Percent of consumers who remained in the Community Residential Facility (CRF) placement for at least 90 days from move-in date, with no | Quarterly | 90% | 91% | Target met |

| | | | | |
|---|---|---|---|---|
| psychiatric hospitalizations, incarcerations, crisis bed placements, or involuntary discharges | | | | |
| 8. Percent of children receiving mental health services whose acuity was initially high who had significant improvement in functioning on their most recent functional assessment | Quarterly | 80% | 69% | Despite ongoing challenges related to the coronavirus pandemic, CAFAS KPI performance increased 8% in Q1. This was due to the aggressive intervention efforts of the Children, Adolescent and Family Services Administration (CAFS) and its partners. Monthly compliance and performance data was tracked by the CAFAS Performance Improvement Workgroup and shared with CBI and other child/youth service providers. CAFS is working with CFSA to monitor and address data quality issues that prevent the inclusion of CFSA's CAFAS data. In FY21, DBH will track and analyze improvement and service data for high acuity youth as well as assess and address the impact of the coronavirus pandemic on CAFAS compliance and performance. |
| 9. Percent of adults newly enrolled in Mental Health Rehabilitative Services (MHRS) services who had their first service within 30 days of enrollment | Quarterly | 85% | 87% | Target met |
| 10. Percent of children newly enrolled in Mental Health Rehabilitative Services (MHRS) services who had their first service | Quarterly | 85% | 86% | Target met |

3

| | | | | |
|---|---|---|---|---|
| within 30 days of enrollment | | | | |
| 11. Percent of MAT clients who were served in two consecutive quarters | Quarterly | 90% | 92% | |
| 12. Percentage of consumers/clients satisfied with Access | Annual | 80% | NA | Annual Measure |
| 13. Percent of individuals from Saint Elizabeths Hospital readmitted within 90 days | Quarterly | 2.4% (lower is better) | 0% | Target met |
| 14. Percent of consumers surveyed in the Behavioral Health Satisfaction Survey who were satisfied with the person-centered planning process | Annual | 80% | NA | Annual Measure |
| 15. Percent certified peers employed during the quarter | Quarterly | 80% | Waiting on Data | Data N/A |
| 16. Percent of school-based behavioral health partnership schools with a school based behavioral health clinician | Semi-Annual | 80% | NA | NA |
| 17. Percent of vendors not selling tobacco to minors | Annual | 90% | NA | Annual Measure |
| 18. Percent of substance use disorder (SUD) withdrawal management clients who stepped down to a lower level of care | Quarterly | 20% | 54% | Target Met |
| 19. Percent of mental health rehabilitative | Quarterly | 50% | 54% | DBH is taking a multi-prong approach to improving |

4

| | | | | |
|---|---|---|---|---|
| services (MHRS) consumers who were discharged from a psychiatric hospital and had a follow-up service within 30 days | | | | performance on this KPI that includes the following: Improve data quality and accuracy by obtaining DHCF hospitalization data versus the existing process that consists of matching multiple data points against recorded discharges in DBH's electronic medical record; Validation of the DHCF data sets until there is reliability regarding the completeness of the data sets; Establish regular meetings with outpatient providers to identify barriers to performance (e.g. CRISP technological barriers to hospital notification, communication and/or workflow breakdowns with the contracted hospitals and providers ); Identify both high and low performing providers to determine patterns in group performance;  Analysis of DBH workflows within the Access Help Line's FD12/hospitalizations authorization process;  Analysis of DBH workflows within Integrated Care Division that provides short-term monitoring of involuntary hospitalizations. |
| 20. Percent of substance use disorder (SUD) residential treatment clients who stepped down to a lower level of care | Quarterly | 50% | 32% | DBH Adult Services staff began sending client-level data to providers and meeting with Residential Treatment providers as a group on November 18, 2020, and will continue to do this monthly to address performance expectations. In FY20, Network Development reviewed provider census data with individual providers during monthly meetings to encourage providers to disenroll in a |

| | | | | |
|---|---|---|---|---|
| | | | | timely manner so DBH has more accurate data on this metric.  DBH Network Development – provider monthly will continue in FY21. |
| 21. Percentage of consumers/clients who were homeless at admission who had housing at discharge | Annual | 50% | NA | Annual Measure |

*Q7. Did DBH meet the objectives set forth in the performance plan for FY20? Please provide a narrative description of what actions DBH undertook to meet the key performance indicators. For any performance indicators that were not met, if any, please provide a narrative description for why they were not met and any remedial actions taken. In addition, please provide a narrative description of the performance objectives for FY21 and what actions DBH has undertaken to meet them to date.*

**DBH Response**

Please see Attachment 1 of 2. FY 20 Performance Plan KPI Report and Attachment 2 of 2. FY 21 KPI Report.

**Capital LTD Activity and FY2021 - 2026 Planned Allotments - All Capital Funds (excl Intra-District funds) - Question 8**
*(Project/Fund Detail with Lifetime Balances Only)*
*Source: SOAR/BFA*
**(Report Date: Feb.3.2021)**
**RM0-DEPARTMENT OF BEHAVIORAL HEALTH**

| Project No | Project Title | Implementing Agency | Approp Fund | Agy Fund | Lifetime Budget | LTD Allotments | Expenditures through FY 2017 | Allotments in FY 2018 | Expenditures in FY 2018 | Allotments in FY 2019 | Expenditures in FY 2019 | Allotments in FY 2020 | Expenditures in FY 2020 | LTD Expenditure | Unspent Allotments | Encumbrances | Pre Encumbrances | ID Advances | LifeTime Balance | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | FY 2026 | 6-yr Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DB202C | THERMAL DOCKING STATION SYSTEM | RM0 | 0300 | 0300 | 500,000 | 500,000 | 0 | 0 | 0 | 0 | 0 | 500,000 | 0 | 0 | 500,000 | 0 | 0 | 0 | 500,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DB203C | | | | 0304 | 1,255,000 | 1,255,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,255,000 | 0 | 0 | 0 | 1,255,000 | 1,255,000 | 0 | 0 | 0 | 0 | 0 | 1,255,000 |
| DB203C | INTERCOM SYSTEM | RM0 | 0300 | 0300 | 300,000 | 300,000 | 0 | 0 | 0 | 0 | 0 | 300,000 | 0 | 0 | 300,000 | 0 | 0 | 0 | 300,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | 0304 | 355,000 | 355,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 355,000 | 0 | 0 | 0 | 355,000 | 355,000 | 0 | 0 | 0 | 0 | 0 | 355,000 |
| HX703C | DBH FACILITIES SMALL CAPITAL IMPROVEMENT | RM0 | 0300 | 0300 | 2,758,767 | 2,758,767 | 1,244,090 | 750,094 | 283,431 | 0 | 333,942 | 0 | 0 | 1,861,463 | 897,304 | 5,900 | 337,977 | 53,427 | 500,000 | 500,000 | 0 | 0 | 0 | 0 | 0 | 500,000 |
| HX805C | VEHICLE ACQUISITION-DBH | KT0 | 0300 | 0304 | 360,000 | 360,000 | 0 | 360,000 | 0 | 0 | 329,839 | 0 | 0 | 329,839 | 30,161 | 0 | 0 | 0 | 30,161 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HX990C | FACILITY UPGRADES | RM0 | 0300 | 0300 | 4,185,000 | 4,185,000 | 0 | 0 | 0 | 835,000 | 0 | 350,000 | 0 | 0 | 4,185,000 | 0 | 0 | 509,982 | 3,675,018 | 3,000,000 | 0 | 0 | 0 | 0 | 0 | 3,000,000 |
| HX992C | ST. ELIZABETHS HOSPITAL EHR CAP IMPROVEMENT | RM0 | 0300 | 0300 | 2,600,000 | 2,600,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,600,000 | 0 | 0 | 0 | 2,600,000 | 2,600,000 | 0 | 0 | 0 | 0 | 0 | 2,600,000 |
| HX993C | PHARMACY MEDICINE DISPENSING UPGRADE (PY | RM0 | 0300 | 0300 | 1,038,000 | 1,038,000 | 0 | 0 | 0 | 0 | 0 | 1,038,000 | 63,760 | 63,760 | 974,240 | 0 | 824,628 | 0 | 149,612 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HX997C | FLOORING REPLACEMENT | RM0 | 0300 | 0300 | 1,085,000 | 1,085,000 | 0 | 0 | 0 | 1,085,000 | 0 | 0 | 0 | 0 | 1,085,000 | 0 | 0 | 0 | 1,085,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| HX998C | HVAC MODERNIZATION AT SAINT ELIZABETHS HOSPITAL | RM0 | 0300 | 0300 | 1,825,000 | 1,825,000 | 0 | 0 | 0 | 500,000 | 0 | 1,325,000 | 0 | 0 | 1,825,000 | 0 | 0 | 491,801 | 1,333,199 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Grand Total** | | | | | **16,261,767** | **16,261,767** | **1,244,090** | **1,110,094** | **283,431** | **2,420,000** | **663,781** | **3,513,000** | **63,760** | **2,255,062** | **14,006,705** | **5,900** | **1,162,605** | **1,055,210** | **11,782,990** | **7,710,000** | **0** | **0** | **0** | **0** | **0** | **7,710,000** |

*Q8. Please provide DBH's capital budgets for FY20 and FY21, including amount budgeted and actual dollars spent. In addition, please provide an update on all capital projects undertaken in FY20 and FY21. In your response, please include information regarding the iCAMS project or its successor.*

**DBH Response**

Please see Attachment 1 of 1. Capital Budget Report

*Q9.    Please provide a list of all FTE positions detailed to DBH, broken down by program and activity for FY20 and to date in FY21.  In addition, please provide which agency the detailed originated from and how long they were detailed to DBH.*

**DBH Response**

The employees listed below were detailed to DBH by the Office of Risk Management for a modified duty status as a result of a worked related injury.

| PROGRAM CODE | ACTIVITY CODE | EMPLOYEE | AGENCY | START DATE | END DATE |
|---|---|---|---|---|---|
| 3800 | 3850 | Edward Walston | DOC | 8/18/2020 | 10/9/2020 |
| 3800 | 3850 | Kehinde Oni | DOC | 11/8/2019 | 12/2/2019 |
| 3800 | 3850 | Nicole Fisher | DOC | 2/18/2020 | 3/13/2020 |
| 3800 | 3850 | Aaron Taylor | DYRS | 3/2/2020 | 3/13/2020 |
| 3800 | 3850 | Carrie Felton | DYRS | 12/9/2019 | 2/6/2020 |
| 3800 | 3850 | Donneatrice Brown | DYRS | 1/21/2020 | 2/16/2020 |
| 3800 | 3850 | Evans Chambers | DYRS | 1/13/2020 | 3/13/2020 |
| 3800 | 3850 | Hiram Brewton II | DYRS | 3/3/2020 | 3/13/2020 |
| 3800 | 3850 | James Brown | DYRS | 11/12/2019 | 12/30/2019 |
| 3800 | 3850 | Jermall Morgan | DYRS | 1/21/2020 | 7/10/2020 |
| 3800 | 3850 | Kenneth Thomas | DYRS | 1/21/2020 | 2/16/2020 |
| 3800 | 3850 | Kiana Huff | DYRS | 12/7/2020 | 1/15/2021 |
| 3800 | 3850 | Legonn Haskins | DYRS | 11/13/2019 | 12/11/2019 |
| 3800 | 3850 | Shawnae Goldstein | DYRS | 12/21/2020 | 1/17/2021 |
| 3800 | 3850 | Larone Newman | FEMS | 10/7/2019 | 5/1/2020 |

*Q10.    Please provide a list of all FTE positions detailed <u>from</u> DBH to another agency in FY20 and to date in FY21.  In addition, please provide which agency the employee was detailed to and for how long.*

**DBH Response**

To perform critical duties during the public emergency and the public health emergency, the DBH employees listed below were detailed to the Board of Elections to support nonpartisan Election Day activities, the Department of Employment Services to support unemployment claims processing, and to the Department of Human Services for administrative support.

| Employee Name | Title | Agency | Start Date | End Date |
|---|---|---|---|---|
| Alvin Hinkle | Dir., Consumer Affairs | BOE | 10/29/2020 | 10/29/2020 |
| Darryl Ware | Comm. Outreach Spec. | BOE | 10/29/2020 | 10/29/2020 |
| Deborah Evans | Comm. Support Worker | BOE | 10/31/2020 | 11/3/2020 |
| George Gibbs | Motor Vehicle Operator | BOE | 10/27/2020 | 11/4/2020 |
| Leasa Robertson | Program Support Assist. | BOE | 10/31/2020 | 11/3/2020 |
| Leon Barnes | Motor Vehicle Operator | BOE | 10/29/2020 | 10/29/2020 |
| Marvin Drummond | Clerical Support Assist | BOE | 10/29/2020 | 10/29/2020 |
| Valerie McBride | Motor Vehicle Operator | BOE | 10/27/2020 | 11/4/2020 |
|  |  |  |  |  |
| Jacqueline Worsley | Administrative Spec | DOES | 4/14/2020 | 11/13/2020 |
| Johnetta Saunders | Social Worker | DOES | 4/9/2020 | 7/31/2020 |
| Toni Bell | Mental Health Spec | DOES | 4/9/2020 | 2/3/2021 |
| Tonia Gore | Recovery Advocate | DOES | 4/13/2020 | 5/28/2020 |
|  |  |  |  |  |
| Gilliam Richardson | Staff Assistant | DHS | 5/15/2020 | 8/13/2020 |
| JoAnn Spencer | Administrative Officer | DHS | 5/15/2020 | 12/30/2020 |

| Question 11: | Please provide the following information for all grants awarded to DBH during FY20 and to date in FY21, broken down by DBH program and activity: | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Grant Number/Title | FY 2020 Revised Budget | Funding Source | FY 2020 Expenditures | FY 2021 Revised Budget | Funding Source | FY 2021 Expenditures (inc. encumbrances & pre-encumbrances, intra-district) | Purpose of Grant | Grant Deliverables | Grant Outcomes/ Grantee Performance | Corrective Actions/TA Provided | DBH Program & Activity Supported By Grant | DBH Employee Responsible for Grant Deliverables |
| 6H79SM061903/Positive Transitions Youth - Young Adult/(81PTYA) | $46,757.59 | SAMHSA | $46,757.59 | $0.00 | SAMHSA | $0.00 | Design and implement a youth-focused system of care with Core Support Agencies providing transition age youth-specific care planning, wraparound, evidence-based practices and recovery supports. | Provide transition aged youth with a system of care | Provide transition aged youth with a system of care | None | Community Services Division, Specialty Care - 6922 | Terri Spencer |
| 5U79SP020706/ DC Strategic State and Tribal Initiative/ (81SPSF) | $0.00 | SAMHSA | $0.00 | $0.00 | SAMHSA | $0.00 | Strategic Prevention Framework, Partnerships for Success Initiative (SPF-PFS) will support 8 high-need wards in reducing underage drinking and marijuana use among persons ages 12-25 through; Plan Development, Community Prevention Network Enhancement, Community Capacity for Change, Community Changes, and Ward Infrastructure. | Identified evidence-based preventive intervention strategies in the community, evaluation of SPF-PFS activities, District of Columbia Epidemiological Outcomes Workgroups (DCEOW), "There is a Reason" ads, flyers, etc. bringing awareness to underage drinking and marijuana use campaign | Identified evidence-based preventive intervention strategies in the community, evaluation of SPF-PFS activities,District of Columbia Epidemiological Outcomes Workgroups (DCEOW), "There is a Reason" ads, flyers, etc. bringing awareness to underage drinking and marijuana use campaign | None | Community Services, Office of Prevention Services - 6913 | Eric Chapman |
| 2B08TI010008/ Substance Abuse and Prevention and Treatment/ (92APBG/SUD Block Grant) | $1,311,024.04 | SAMHSA | $1,311,024.04 | $0.00 | SAMHSA | $0.00 | The Substance Abuse and Prevention and Treatment (SAPT) block grant is used for the purpose of planning, carrying out, and evaluating activities to prevent and treat substance abuse and for related activities as authorized by the statute. | Substance abuse prevention, treatment, and recovery support services | Substance abuse prevention, treatment, and recovery support services | None | Multiple Activities - (6913 - Prevention and Substance Use Disorder,6920 - Specialty Care) | Estelle Richardson |
| 2B08TI010008/ Substance Abuse and Prevention and Treatment/ (02APBG SUD Block Grant) | $5,167,153.28 | SAMHSA | $5,167,153.28 | $1,801,019.72 | SAMHSA | $532,383.64 | The Substance Abuse and Prevention and Treatment (SAPT) block grant is used for the purpose of planning, carrying out, and evaluating activities to prevent and treat substance abuse and for related activities as authorized by the statute. | Substance abuse prevention, treatment, and recovery support services | Substance abuse prevention, treatment, and recovery support services | None | Multiple Activities - (6913 - Prevention and Substance Use Disorder,6920 - Specialty Care) | Estelle Richardson |
| 1B08TI083489-01/ Substance Abuse and Prevention and Treatment/ (12APBG SUD Block Grant) | | SAMHSA | | $6,120,335.37 | SAMHSA | $1,689,576.07 | The Substance Abuse and Prevention and Treatment (SAPT) block grant is used for the purpose of planning, carrying out, and evaluating activities to prevent and treat substance abuse and for related activities as authorized by the statute. | Substance abuse prevention, treatment, and recovery support services | Substance abuse prevention, treatment, and recovery support services | None | Multiple Activities (6921 - Specialty Care - Community Based Services,6922 - Specialty Care - New Initiatives,6940 - Housing Development,1030 - Property Management,1050 - Financial Managment,1089 - Health Information Managment,1088 - Claims Administration, 1820 - Consumer and Family Affairs,1889 - Legislative and Public Affairs,4940 - Program Integrity, 5870 - Access | Estelle Richardson |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3B09SM010008/ State Mental Health Block Grant/ (92MHBG) | $798,463.03 | SAMHSA | $798,463.03 | $0.00 | SAMHSA | $0.00 | Funding is used to develop and support community mental health services such as; DBH Strategic Plan, building a cadre of Peer Support Providers, recruiting and supporting child providers, as well as informing mental health professionals and community members about first episode psychosis. | Mental Health Services | Mental Health Services | None | System Transformation, Strategic Management and Policy - 5920 | Estelle Richardson |
| 3B09SM010008/ State Mental Health Block Grant/ (02MHBG) | $548,001.00 | SAMHSA | $548,001.00 | $500,000.00 | SAMHSA | $491,576.67 | Funding is used to develop and support community mental health services such as; Peer Services, continued support for Clubhouse infrastructure, DBH Strategic Planning and Results Based Accountability efforts. | Mental Health Services | Mental Health Services | None | System Transformation, Strategic Management and Policy - 5920 | Estelle Richardson |
| / State Mental Health Block Grant/ (12MHBG) | $0.00 | SAMHSA | $0.00 | $1,000,000.00 | SAMHSA | $418,834.80 | Funding is used to develop and support community mental health services such as; Peer Services, continued support for Clubhouse infrastructure, DBH Strategic Planning and Results Based Accountability efforts. | Mental Health Services | Mental Health Services | None | System Transformation, Strategic Management and Policy - 5920 | Estelle Richardson |
| 2X06SM016009/ Projects for Assistance in Transition from Homelessness/(01MHPH) | $278,499.83 | SAMHSA | $278,499.83 | $0.00 | SAMHSA | $0.00 | Provides services to people with serious mental illness, including those with co-occurring substance use disorders, who are experiencing homelessness or are at imminent risk of becoming homeless. | Assistance in housing homeless individuals | Assistance in housing homeless individuals | None | Clinical Services Division, Homeless Outreach / Mobile Crisis - 5842 | Anthony Hall |
| 6X06SM083689-01M001/ Projects for Assistance in Transition from Homelessness/(11MHPH) | $0.00 | SAMHSA | $0.00 | $309,379.65 | SAMHSA | $70,870.59 | Provides services to people with serious mental illness, including those with co-occurring substance use disorders, who are experiencing homelessness or are at imminent risk of becoming homeless. | Assistance in housing homeless individuals | Assistance in housing homeless individuals | None | Clinical Services Division, Homeless Outreach / Mobile Crisis - 5842 | Anthony Hall |
| 5H79SM063426/ District of Columbia Social, Emotional and Early Development (DC SEED) Project (91SEED) | $1,074,332.11 | SAMHSA | $1,074,332.11 | $375,000.00 | SAMHSA | $325,025.45 | Implement a 4-year System of Care (SOC) to address the highly specific, largely unmet needs of infants and young children (birth-6) residing in DC who are at high imminent risk for and diagnosed with Serious Emotional Disturbance (SED). | Early Childhood System of Care | Early Childhood System of Care | None | Community Services, Specialty Care - 6922 | Meghan Sullivan |
| 5H79TI080229/DC Opioid Targeted Strategy (DOTS) Project (81DOTS) | $0.00 | SAMHSA | $0.00 | $0.00 | SAMHSA | $0.00 | Activities will address all individuals in the District with at or risk for Opioid Use Disorders (OUDs), but will specifically target middle-aged heroin-using African American males. | Engage in strategic planning focused on District-wide OUD needs; Decrease the incidence of OUD through prevention; Increase access to OUD treatment and improve care coordination for medication-assisted treatment (MAT) clients; Expand recovery support services (RSS) for individuals with OUD; and Enhance recruitment and engagement for individuals with OUDs. | Engage in strategic planning focused on District-wide OUD needs; Decrease the incidence of OUD through prevention; Increase access to OUD treatment and improve care coordination for medication-assisted treatment (MAT) clients; Expand recovery support services (RSS) for individuals with OUD; and Enhance recruitment and engagement for individuals with OUDs. | None | Community Services, Specialty Care - 6920 | Petrina Williams |
| 1H79TI081707-01/District of Columbia Opioid Response (DCOR) (91DCOR) | $14,806,443.53 | SAMHSA | $14,806,443.53 | $15,685,682.00 | SAMHSA | $7,963,377.57 | Initiative will focus on increasing access to medication assisted treatment (MAT), reducing unmet treatment needs, and reducing opioid overdose related deaths in DC through the provision of prevention, treatment, and recovery support services (RSS) to individuals with opioid use disorder (OUD). | Implement a multi-pronged approach aimed at enhancing its ability to divert potential opioid abuse, effectively treating individuals with OUD and supporting them and their families throughout and into recovery. | Implement a multi-pronged approach aimed at enhancing its ability to divert potential opioid abuse, effectively treating individuals with OUD and supporting them and their families throughout and into recovery. | Yes | Community Services, Specialty Care - 6922, Legal Services - 1888 | Sharon Hunt |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5H7TI081707-02/District of Columbia Opioid Response (DCOR) (01DCOR) | $0.00 | SAMHSA | $0.00 | $1,000,000.00 | SAMHSA | $381,584.00 | Initiative will focus on increasing access to medication assisted treatment (MAT), reducing unmet treatment needs, and reducing opioid overdose related deaths in DC through the provision of prevention, treatment, and recovery support services (RSS) to individuals with opioid use disorder (OUD). | Implement a multi-pronged approach aimed at enhancing its ability to divert potential opioid abuse, effectively treating individuals with OUD and supporting them and their families throughout and into recovery. | Implement a multi-pronged approach aimed at enhancing its ability to divert potential opioid abuse, effectively treating individuals with OUD and supporting them and their families throughout and into recovery. | Yes | Community Services, Specialty Care - 6922 | Sharon Hunt |
| 1H79TI081212-01/District of Columbia Changing and Improving Treatment for our Youth (91CITY) | $235,867.99 | SAMHSA | $235,867.99 | $0.00 | SAMHSA | $0.00 | Enhance DBH services for youth (ages 12-18) and transition age youth (ages 18-25) to provide a comprehensive, family-centered, trauma-informed, evidence-based, coordinated system of care from early intervention through recovery. Provide tobacco use counseling and interventions as a standard of practice. Increase access for youth/TAY and their families to co-occurring substance use disorder/mental health services. Develop and implement education and messaging on making healthy choices regarding substance use and emotional wellness. | Provide other supports such as tobacco, vaping use counseling and intervention and cessation. Reduce the stigma associated with youth entering substance abuse treatment. Expand the reach of substance abuse treatment services for children and youth by establishing partnerships with other District agencies such DC Health, DYRS, CFSA, and DOES. | Provide other supports such as tobacco, vaping use counseling and intervention and cessation. Reduce the stigma associated with youth entering substance abuse treatment. Expand the reach of substance abuse treatment services for children and youth by establishing partnerships with other District agencies such DC Health, DYRS, CFSA, and DOES. | None | Community Services, Specialty Care - 6920 | Eric Chapman |
| 5H79TI081212-03/District of Columbia Changing and Improving Treatment for our Youth (01CITY) | $0.00 | SAMHSA | $0.00 | $541,350.00 | SAMHSA | $135,783.75 | Enhance DBH services for youth (ages 12-18) and transition age youth (ages 18-25) to provide a comprehensive, family-centered, trauma-informed, evidence-based, coordinated system of care from early intervention through recovery. Provide tobacco use counseling and interventions as a standard of practice. Increase access for youth/TAY and their families to co-occurring substance use disorder/mental health services. Develop and implement education and messaging on making healthy choices regarding substance use and emotional wellness. | Provide other supports such as tobacco, vaping use counseling and intervention and cessation. Reduce the stigma associated with youth entering substance abuse treatment. Expand the reach of substance abuse treatment services for children and youth by establishing partnerships with other District agencies such DC Health, DYRS, CFSA, and DOES. | Provide other supports such as tobacco, vaping use counseling and intervention and cessation. Reduce the stigma associated with youth entering substance abuse treatment. Expand the reach of substance abuse treatment services for children and youth by establishing partnerships with other District agencies such DC Health, DYRS, CFSA, and DOES. | None | Community Services, Specialty Care Community Based-Services - 6920 | Eric Chapman |
| 1H79SM081976-01/OurTime: Exploration (91EXPL) | $156,547.00 | SAMHSA | $156,547.00 | $0.00 | SAMHSA | $0.00 | Focus on wards 1 and 6 to increase the self-efficacy and meaningful participation in transition plans of young adults ages 16-25 who have mental health and/or co-occurring substance use disorders. Improve and expand treatment recovery and support support services and strengthen evidenced-based practices that address all life domains. | Increase the number of unduplicated youth receiving direct treatment services and/or recovery support. Increase community buy-in and ownership of TAY outcomes and increase community knowledge, support, and responsiveness to TAY. | Increase the number of unduplicated youth receiving direct treatment services and/or recovery support. Increase community buy-in and ownership of TAY outcomes and increase community knowledge, support, and responsiveness to TAY. | None | Community Services, Specialty Care - 6922 | Leslie-Ann Byum |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 5H79SM081976-02/OurTime: Exploration (01EXPL) | $154,568.75 | SAMHSA | $154,568.75 | $845,431.25 | SAMHSA | $461,283.54 | Focus on wards 1 and 6 to increase the self-efficacy and meaningful participation in transition plans of young adults ages 16-25 who have mental health and/or co-occurring substance use disorders. Improve and expand treatment recovery and support support services and strengthen evidenced-based practices that address all life domains. | Increase the number of unduplicated youth receiving direct treatment services and/or recovery support. Increase community buy-in and ownership of TAY outcomes and increase community knowledge, support, and responsiveness to TAY. | Increase the number of unduplicated youth receiving direct treatment services and/or recovery support. Increase community buy-in and ownership of TAY outcomes and increase community knowledge, support, and responsiveness to TAY. | None | Community Services, Specialty Care - 6922 | Leslie-Ann Byum |
| 1H79TI083311/District of Columbia Opioid Response 2 (11SORO) | $0.00 | SAMHSA | $0.00 | $23,821,155.00 | SAMHSA | $8,099,144.20 | Focus on increasing access to medication-assisted treatment (MAT), reducing unmet treatment needs, and reducing opioid overdose-related deaths through the provision of prevention, treatment, and recovery support services (RSS) to individuals with opioid use disorder (OUD). Expanded services and supports will also be provided to individuals with stimulant use disorders (STUD) | Ensure timely access to high-quality substance use disorder treatment and a recovery oriented system of care; educate District residents and key stakeholders on the risk of opioid use disorders and stimulant addiction and effective prevention and treatment strategies; increase access to harm reduction services in the District of Columbia; facilitate collaboration between justice and public health agencies to address the needs of individuals who come in contact with the criminal justice system; and prepare for program sustainability through evaluation, planning, and performance monitoring. | Ensure timely access to high-quality substance use disorder treatment and a recovery oriented system of care; educate District residents and key stakeholders on the risk of opioid use disorders and stimulant addiction and effective prevention and treatment strategies; increase access to harm reduction services in the District of Columbia; facilitate collaboration between justice and public health agencies to address the needs of individuals who come in contact with the criminal justice system; and prepare for program sustainability through evaluation, planning, and performance monitoring. | None | Community Services, Specialty Care - 6922 | Julie Wiegandt |
| Crisis Counseling Assistance and Training Program (1H07SM083759) (11CATP) | $0.00 | SAMHSA | $0.00 | $3,470,758.00 | SAMHSA & FEMA | $2,640,099.57 | The Crisis Counseling Program is co-supported by SAMHSA and FEMA. It provides funds for crisis mental health services and support as well as mental health focused public service messaging. | Outreach to the broader community impacted by COVID as well as specific outreach to targeted highly-impacted groups including: grieving families, families with children on the spectrum, pregnant women, returning citizens, essential workers, teens, with school age children, justice involved youth, and the deaf community. | Outreach to the broader community impacted by COVID as well as specific outreach to targeted highly-impacted groups including: grieving families, families with children on the spectrum, pregnant women, returning citizens, essential workers, teens, families with school age children, justice involved youth, and the deaf community. | None | Clinical Services, Office of the Chief Clinical Officer - 5810 | Shannon Goodhue |
| Promoting Resiliency and Recovery (1H79FG000258) (01COVD) | $468,091.90 | SAMHSA | $468,091.90 | $1,200,000.00 | SAMHSA | $975,000.00 | To address mental health and substance use disorders during COVID-19. Services are available to health care practitioners and individuals with less serious mental health conditions who are impacted by COVID-19. | To promote community resilience during the COVID-19 public health emergency. To improve timely access to emergency mental health services for individuals with serious mental illness (SMI) or a co-occurring mental health and substance use disorder (SUD). | To promote community resilience during the COVID-19 public health emergency. To improve timely access to emergency mental health services for individuals with serious mental illness (SMI) or a co-occurring mental health and substance use disorder (SUD). | None | Clinical Services, Office of the Chief Clinical Officer - 5810 | Jocelyn Route |
| | $25,045,750.05 | $0.00 | $25,045,750.05 | $27,332,766.74 | $0.00 | $12,009,012.54 | | | | | |

*Q11. Please provide the following information for all grants awarded to DBH during FY20 and to date in FY21, broken down by DBH program and activity:*

      *a.  Grant Number/Title;*
      *b.  Approved Budget Authority;*
      *c.  Funding source;*
      *d.  Expenditures (including encumbrances and pre-encumbrances);*
      *e.  Purpose of the grant;*
      *f.  Grant deliverables;*
      *g.  Grant outcomes, including grantee performance;*
      *h.  Any corrective actions taken or technical assistance provided;*
      *i.  DBH program and activity supported by the grant; and,*
      *j.  DBH employee responsible for grant deliverables.*

**DBH Response**

Please see Attachment 1 of 1. Grant Report.

Q. 12 Please provide a complete accounting of all grant lapses including a detailed statement as to why the lapse occurred and any corrective action taken by DBH.  Please provide accounting of any grant carryover from FY18 to FY19 or FY20 to FY21 and a detailed explanation as to why it occurred.

Department of Behavioral Health, FY 20 - FY 21 Grant Lapse Report

| Grant Name | Grant Number | Grant Phase | Grant Begin Date | Grant End Date | Total Grant Award Amount | Total Obligations | Grant Lapse | Comments |
|---|---|---|---|---|---|---|---|---|
| DC Strategic & Tribal Initiative | 81SPSF | 18 | 9/30/2018 | 7/31/2020 | $2,215,161.00 | $1,807,116.53 | $408,044.47 | Grant Lapse - As a result of the COVID-19 pandemic, there was underspending in Contractual and Sub Grants due to the series of large, in-person youth engagement activities being cancelled (based on CDC and DC government recommendations).  The grant was in a no cost extension which ended in July 2020. The no cost extension only allowed for the activities that were underway (e.g., planned) resulting in the inability to reallocate funds. Grant expired. |
| PATH Grant | 01MHPH | 20 | 9/30/2019 | 9/29/2020 | $300,000.00 | $278,499.83 | $21,500.17 | Grant Lapse - Due to the COVID-19 pandemic, there was less than anticipated spending in Supplies. Items needed to be procured were backordered or not available. Funds will be encumbered towards supply and training purchases in accordance with guidance from our health care experts. This will allow the team to resume distribution of resources at a higher rate. |
| Positive Transitions Youth | 81PTYA | 18 | 9/30/2018 | 3/29/2020 | $1,608,539.00 | $1,240,458.57 | $368,080.43 | Grant Lapse - Due to less than anticipated spending in Sub Grants and Professional Services. Grant expired. |
| DOTS | 81DOTS | 18 | 5/1/2018 | 4/30/2020 | $2,622,580.00 | $1,330,515.91 | $1,292,064.09 | Grant Lapse - As a result of guidance provided by SAMHSA for a no cost extension request, DBH underestimated the amount of funding allowed. In addition, the approval provided limited time to establish budget authority and execute activities/deliverables. Grant expired. |
| Our Time: Exploration | 91EXPL | 19 | 3/31/2019 | 3/30/2020 | $1,000,000.00 | $174,643.69 | $825,356.31 | Grant Lapse – Due to less than anticipated spending in Contractual and Professional Services. Due to COVID-19 pandemic, there was a delay in awarding 5 contracts budgeted under this grant. Additionally, COVID-19 has created the need to pivot, change and adjust the way services will be delivered to transitional age youth. This required some changes requiring approvals which impacted contracts causing delays. A meeting is forthcoming with grant staff, OCP and SAMHSA to strategize upcoming year 3 funding to avoid delays experienced in years 1 and 2. |
| District of Columbia Opioid Response | 91DCOR | 19 | 9/30/2019 | 9/29/2020 | $31,141,696.25 | $14,806,443.53 | $16,335,252.72 | Grant Lapse – Due to funds being placed on terms and conditions as a result of an audit, Contractual and Sub Grants were underspent due to continuing grants, MOUs and contracts initially being partially funded. New grant awards were unable to be awarded until the end of the fiscal year when additional funding was released. At this time the remaining funding for Continuing awards were issued. Professional Services was underspent due to the project director (PD) leaving at the end of FY 19 and not re-hiring another PD due to the approaching end of the grant. Audit concerns have been addressed. The grant is in a no cost extension, expiring 9/29/21. |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| DC-CITY: Changing and Improving Treatment for our Youth | 91CITY | 19 | 9/30/2019 | 9/29/2020 | $541,350.00 | $235,867.99 | $305,482.01 | Grant Lapse – Due to delayed SAMHSA approval of a budget modification to add 3 Adolescent Substance Use Treatment Expansion Programs (ASTEP), funding was not available in FY20 resulting in underspending in Sub Grants. A carryover request to utilize funding in FY21 was submitted in Dec. 2020 to support non-billable activities of the ASTEP providers. DBH is awaiting approval. |
| Social, Emotional and Early Development | 91SEED | 19 | 9/30/2019 | 9/29/2020 | $1,506,570.00 | $1,074,332.11 | $432,237.89 | Grant Lapse - As a result of the COVID-19 pandemic, there was underspending in Contractual and Sub Grants due to large activities being canceled (based on CDC and DC government recommendations) and providers having to adjusts services and supports to telemedicine. There was an underspending in Personnel due to extended medical leave being taken as leave without pay. The grant was approved for a No Cost Extension in FY 21 and is anticipated that all funds will be spent. |
| Mental Health Block Grant | 92MHBG | 19 | 10/1/2018 | 9/30/2020 | $1,740,150.00 | $1,342,150.05 | $397,999.95 | Grant Lapse - As a result of the COVID-19 pandemic, there was underspending in Contractual as supplemental grant funds for technical assistance and training could not be prioritized. The pandemic required emergency response for behavioral health treatments and support services. Supplemental grant fund criteria did not allow these funds to be spent on services, only training and/or technical assistance. |
| Substance Abuse Prevention | 92APBG | 19 | 10/1/2018 | 9/30/2020 | $7,297,693.00 | $6,998,619.53 | $299,073.47 | Grant Lapse - As a result of the COVID-19 pandemic, there was underspending in Contractual as supplemental grant funds for technical assistance and training could not be prioritized. The pandemic required emergency response for behavioral health treatments and support services. Supplemental grant fund criteria did not allow these funds to be spent on services, only training and/or technical assistance. |
| **TOTAL** | | | | | **$49,973,739.25** | **$29,288,647.74** | **$20,685,091.51** | |

Q12. Please provide a complete accounting of all grant lapses including a detailed statement as to why the lapse occurred and any corrective action taken by DBH.  Please provide accounting of any grant carryover from FY18 to FY19 or FY20 to FY21 and a detailed explanation as to why it occurred.

**DBH Response**

Please see Attachment 1 of 1. Grant Lapse Report

| FY2020 MHRS Local Fee-for-Service Claims | Purchase Order (PO) Number | HCA POP End Date | FY2020 HCA Amount & PO Allocation | Local Fee for Service Expenditures | PO Balance | Status % |
|---|---|---|---|---|---|---|
| **Dates of Service: 10/1/2019 thru 9/30/2020** | | | | **6970** | | |
| Absolute Healthcare Resources | PO613031 | 3/31/2020 | 20,000.00 | 19,984.18 | 15.82 | **100%** |
| | | | | | | |
| Abundant Grace Health Services | PO612392 | 1/31/2020 | 39,999.00 | 39,805.42 | 193.58 | **100%** |
| Abundant Grace Health Services | PO622715 | 9/30/2020 | 30,000.00 | 24,559.84 | 5,440.16 | **82%** |
| | | | | | | |
| Affordable Home Healthcare LLC | PO622481 | 9/30/2020 | 10,000.00 | 9,907.42 | 92.58 | **99%** |
| | | | | | | |
| Amazing Love Health Services | PO617821 | 3/31/2020 | 500,000.00 | 499,978.91 | 21.09 | **100%** |
| Amazing Love Health Services | PO623473 | 9/30/2020 | 200,000.00 | 199,995.86 | 4.14 | **100%** |
| | | | | | | |
| Anchor Mental Health Association, Inc | PO612386 | 9/30/2020 | 1,100,000.00 | 1,099,982.65 | 17.35 | **100%** |
| Better Morning | PO613541 | 9/30/2020 | 70,000.00 | 69,472.22 | 527.78 | **99%** |
| | | | | | | |
| City Care Health Services | PO615872 | 3/30/2020 | 150,000.00 | 149,980.28 | 19.72 | **99.9%** |
| City Care Health Services | PO623472 | 9/30/2020 | 130,000.00 | 126,442.77 | 3,557.23 | **97%** |
| | | | | | | |
| Community Connections, Inc. | PO612438 | 3/28/2020 | 750,000.00 | 647,120.26 | 102,879.74 | **86%** |
| Community Wellness Ventures | PO615363 | 6/30/2020 | 200,000.00 | 193,792.48 | 6,207.52 | **97%** |
| Deaf - REACH, Specialty Services | PO612396 | 9/30/2020 | 50,000.00 | 27,803.20 | 22,196.80 | **56%** |
| | | | | | | |
| Dedicated Health Care | PO619163 | 9/30/2020 | 160,000.00 | 69,014.40 | 90,985.60 | **43%** |
| Dedicated Health Care | PO622610 | 9/30/2020 | 60,000.00 | 49,996.10 | 10,003.90 | **83%** |
| | | | | | | |
| District Health Care Services | PO612387 | 6/30/2020 | 85,000.00 | 84,259.78 | 740.22 | **99%** |
| Family Preservation | PO618335 | 9/30/2020 | 444,000.00 | 438,965.11 | 5,034.89 | **99%** |
| Family Solutions of Ohio | PO613539 | 7/31/2020 | 20,000.00 | 8,449.81 | 11,550.19 | **42%** |
| Family Wellness Center | PO612397 | 9/30/2020 | 50,000.00 | 36,456.68 | 13,543.32 | **73%** |
| Goshen Healthcare Management | PO612362 | 6/30/2020 | 20,000.00 | 19,976.48 | 23.52 | **100%** |
| Global Resources & Supports | PO612797 | 4/30/2020 | 10,000.00 | - | 10,000.00 | **0%** |
| Hillcrest Children's Center | PO612360 | 9/30/2020 | 420,000.00 | 412,204.67 | 7,795.33 | **98%** |
| Holy Health Care Services | PO613053 | 4/30/2020 | 39,145.00 | 14,291.05 | 24,853.95 | **37%** |
| Inner City Family Services | PO612359 | 9/30/2020 | 120,000.00 | 118,148.72 | 1,851.28 | **98%** |
| Integrated Health Resouces | PO617514 | 2/29/2020 | 1.00 | - | 1.00 | **0%** |
| Kahak | PO612358 | 9/30/2020 | 20,000.00 | 18,885.63 | 1,114.37 | **94%** |
| | | | | | | |
| Kinara Health & Home Care Services | PO616493 | 9/30/2020 | 100,000.00 | 99,997.52 | 2.48 | **100.0%** |
| Kinara Health & Home Care Services | PO617633 | 9/30/2020 | 81,000.00 | 49,314.58 | 31,685.42 | **61%** |
| | | | | | | |
| Latin America Youth Ctr (LAYC) | PO612035 | 9/30/2020 | 55,000.00 | 16,497.46 | 38,502.54 | **30%** |
| Life Care | PO615838 | 6/30/2020 | 100,000.00 | 80,004.82 | 19,995.18 | **80%** |
| Life Changing Solutions | PO613047 | 3/31/2020 | 5,000.00 | | 5,000.00 | **0%** |
| | | | | | | |
| Life Enhancement Services (LES) | PO611570 | 11/30/2019 | 23,339.38 | 21,658.92 | 1,680.46 | **93%** |
| Life Enhancement Services (LES) | PO618305 | 11/30/2020 | 100,000.00 | 94,185.05 | 5,814.95 | **94%** |
| | | | | | | |
| Life Stride, Inc | PO613049 | 9/30/2020 | 140,000.00 | 139,992.72 | 7.28 | **100%** |
| Maryland Family Resources (MD/DC) | | | | | | |
| Mary s Center Maternal Child Care, Inc. | PO615866 | 9/30/2020 | 230,000.00 | 229,996.24 | 3.76 | **100%** |
| | | | | | | |
| MBI Health Services | PO612127 | 9/5/2020 | 980,000.00 | 978,905.40 | 1,094.60 | **99%** |
| MBI Health Services | PO625453 | 9/30/2020 | 900,000.00 | 899,996.11 | 3.89 | **100%** |
| MBI Health Services | PO630119 | 9/30/2020 | 101,000.00 | 100,999.69 | 0.31 | **100%** |
| | | | | | | |
| McClendon Center, Specialty Services | PO612192 | 9/30/2020 | 275,000.00 | 274,449.36 | 550.64 | **100%** |
| | | | | | | |
| Neighbors Consejo | PO613051 | 11/30/2019 | 70,288.11 | 45,583.92 | 24,704.19 | **65%** |
| Neighbors Consejo | PO617820 | 9/30/2020 | 155,007.70 | 154,163.13 | 844.57 | **99%** |

FY 20 Oversight Question 13. Attachment 1 of 2. FY 20 HCA Report

| FY2020 MHRS Local Fee-for-Service Claims | Purchase Order (PO) Number | HCA POP End Date | FY2020 HCA Amount & PO Allocation | Local Fee for Service Expenditures | PO Balance | Status % |
|---|---|---|---|---|---|---|
| New Hope Heath Services | PO612390 | 2/28/2020 | 19,695.19 | 19,695.19 | 0.00 | 100% |
| New Hope Heath Services | PO623662 | 9/30/2020 | 168,381.83 | 168,359.07 | 22.76 | 100% |
| | | | | | | |
| New Living | PO612092 | 9/30/2020 | 30,000.00 | 15,025.37 | 14,974.63 | 50% |
| NYA Health Services | PO612761 | 9/16/2020 | 10,000.00 | 9,926.84 | 73.16 | 99% |
| ONE CARE DC | PO613054 | 7/31/2020 | 50,000.00 | 38,556.53 | 11,443.47 | 77% |
| | | | | | | |
| Outreach Solutions | PO613052 | 9/30/2020 | 10,000.00 | 8,625.36 | 1,374.64 | 86% |
| Outreach Solutions | PO623107 | 9/30/2020 | 15,000.00 | 15,000.00 | 0.00 | 100% |
| | | | | | | |
| P&G Behavioral Heatlh | PO619433 | 9/30/2020 | 70,000.00 | 69,680.95 | 319.05 | 100% |
| Pathways to Housing D.C., MHRS Services | PO612796 | 9/30/2020 | 580,000.00 | 362,562.82 | 217,437.18 | 63% |
| | | | | | | |
| Prestige Healthcare Resources | PO613544 | 3/31/2020 | 70,000.00 | 64,762.52 | 5,237.48 | 93% |
| Prestige Healthcare Resources | PO623661 | 9/30/2020 | 410,000.00 | 365,778.01 | 44,221.99 | 89% |
| | | | | | | |
| Preventive Measures | PO615706 | 9/30/2020 | 210,000.00 | 209,198.85 | 801.15 | 100% |
| PRS-DC Recovery Academy | PO615705 | 9/30/2020 | - | - | 0.00 | 0% |
| PSI, III | PO613632 | 9/30/2020 | 160,000.00 | 145,438.25 | 14,561.75 | 91% |
| Psychiatric Center Chartered (PCC) | PO613050 | 9/30/2020 | 200,000.00 | 197,223.63 | 2,776.37 | 99% |
| RAP, Inc. | PO617904 | 3/31/2020 | 5,000.00 | - | 5,000.00 | 0% |
| Restoration Community Alliance | | | | | | |
| | | | | | | |
| Spring Leaf Solutions | PO615837 | 2/29/2020 | 20,000.00 | 19,951.02 | 48.98 | 99.8% |
| Spring Leaf Solutions | PO623136 | 9/30/2020 | 75,000.00 | 56,914.27 | 18,085.73 | 76% |
| | | | | | | |
| Umbrella Therapeutic Services | PO611407 | 4/30/2020 | 300,000.00 | 299,995.23 | 4.77 | 100% |
| Umbrella Therapeutic Services | PO628184 | 9/30/2020 | 160,000.00 | 84,145.07 | 75,854.93 | 53% |
| | | | | | | |
| Universal Healthcare Management | PO619196 | 9/30/2020 | 5,000.00 | 4,770.89 | 229.11 | 95% |
| Volunteers of America Chesapeake | PO611696 | 9/30/2020 | 200,000.00 | 156,285.19 | 43,714.81 | 78% |
| Wellness Healthcare | PO611358 | 9/30/2020 | 135,000.00 | 8,920.79 | 126,079.21 | 7% |
| Wellness Healthcare (the ARK of DC) | | | | | 0.00 | 0% |
| Woodley House, Inc. | PO611432 | 9/30/2020 | 25,000.00 | 10,671.26 | 14,328.74 | 43% |
| | | | | | | |
| | | | | | | |
| Total Amount | | | 10,941,857.21 | 9,896,705.95 | 1,045,151.26 | 90.4% |

| FY2021 to date MHRS Local Fee-for-Service Claims | Purchase Order (PO) Number | HCA POP End Date | FY2021 HCA Amount & PO Allocation | Local Fee for Service Expenditures | PO Balance | Status % |
|---|---|---|---|---|---|---|
| **Dates of Service (Q1): 10/1/2020 thru 12/31/2020** | | | | **6970** | | |
| Absolute Healthcare Resources | PO636202 | 3/31/2020 | 10,000.00 | 9,929.97 | 70.03 | **99%** |
| Abundant Grace Health Services | PO638115 | 1/29/2021 | 50,000.00 | - | 50,000.00 | **0%** |
| | | | | | 0.00 | |
| Amazing Love Health Services | Po638514 | 3/31/2021 | 500,000.00 | 202,078.27 | 297,921.73 | **40%** |
| Anchor Mental Health Association, Inc | PO637351 | 12/31/2020 | 700,000.00 | 25,620.84 | 674,379.16 | **4%** |
| Better Morning | PO637073 | 9/30/2021 | 65,000.00 | 28,212.40 | 36,787.60 | **43%** |
| City Care Health Services | PO637318 | 3/30/2021 | 100,000.00 | 71,063.80 | 28,936.20 | **71%** |
| Community Connections, Inc. | PO637640 | 9/30/2021 | 950,000.00 | 94,390.95 | 855,609.05 | **10%** |
| Community Wellness Ventures | PO636852 | 6/30/2021 | 170,000.00 | 5,747.44 | 164,252.56 | **3%** |
| Deaf - REACH, Specialty Services | PO636209 | 9/30/2021 | 50,000.00 | - | 50,000.00 | **0%** |
| Dedicated Care Health Services | PO636210 | 9/30/2021 | 160,000.00 | - | 160,000.00 | **0%** |
| District Health Care Services | PO637074 | 6/30/2021 | 80,000.00 | 79,995.37 | 4.63 | **100%** |
| Family Preservation | PO637637 | 9/30/2021 | 400,000.00 | 40,958.12 | 359,041.88 | **10%** |
| Family Solutions of Ohio | PO634898 | 7/31/2021 | 15,000.00 | - | 15,000.00 | **0%** |
| Family Wellness Center | PO636207 | 9/30/2021 | 40,000.00 | - | 40,000.00 | **0%** |
| Goshen Healthcare Management | PO636204 | 6/30/2021 | 25,000.00 | - | 25,000.00 | **0%** |
| Global Resources & Supports | PO636243 | 4/30/2021 | 7,000.00 | - | 7,000.00 | **0%** |
| Hillcrest Children's Center | PO637638 | 9/30/2021 | 400,000.00 | 67,533.02 | 332,466.98 | **17%** |
| Holy Health Care Services | PO636203 | 4/30/2021 | 15,000.00 | - | 15,000.00 | **0%** |
| Inner City Family Services | PO637633 | 9/30/2021 | 110,000.00 | 21,650.05 | 88,349.95 | **20%** |
| Kahak | PO635211 | 1/31/2021 | 28,000.00 | 14,275.45 | 13,724.55 | **51%** |
| Kinara Health & Home Care Services | PO634241 | 9/30/2021 | 200,000.00 | 63,488.07 | 136,511.93 | **31.7%** |
| Latin America Youth Ctr (LAYC) | PO636206 | 9/30/2021 | 30,000.00 | 5,569.93 | 24,430.07 | **19%** |
| Life Care | PO636957 | 6/30/2021 | 80,000.00 | - | 80,000.00 | **0%** |
| Life Enhancement Services (LES) | PO635212 | 11/30/2020 | 15,000.00 | 12,898.22 | 2,101.78 | **86%** |
| Life Enhancement Services (LES) | PO636234 | 9/30/2021 | 85,000.00 | 9,271.14 | 75,728.86 | |
| Life Stride, Inc | PO632316 | 9/30/2021 | 120,000.00 | 45,760.83 | 74,239.17 | **38%** |
| Maryland Family Resources (MD/DC) | PO634632 | 9/30/2021 | 5,000.00 | - | 5,000.00 | **0%** |
| Mary s Center Maternal Child Care, Inc. | PO637357 | 9/30/2021 | 220,000.00 | 48,709.22 | 171,290.78 | **22%** |
| MBI Health Services | PO637355 | 9/5/2021 | 950,000.00 | 949,980.92 | 19.08 | **100%** |
| | | | | | 0.00 | |
| McClendon Center, Specialty Services | PO638528 | 9/30/2021 | 250,000.00 | 72,672.35 | 177,327.65 | **29%** |
| Neighbors Consejo | PO636208 | 11/30/2020 | 40,000.00 | - | 40,000.00 | **0%** |
| Neighbors Consejo | PO636233 | 9/30/2021 | 170,000.00 | - | 170,000.00 | |
| New Hope Heath Services | PO636956 | 2/28/2021 | 40,000.00 | 39,194.55 | 805.45 | **98%** |

FY 20 Oversight Question 13. Attachment 2 of 2. FY 21 HCA Report

| FY2021 to date MHRS Local Fee-for-Service Claims | Purchase Order (PO) Number | HCA POP End Date | FY2021 HCA Amount & PO Allocation | Local Fee for Service Expenditures | PO Balance | Status % |
|---|---|---|---|---|---|---|
| New Hope Heath Services | PO637322 | 9/30/2021 | 160,000.00 | - | 160,000.00 | 0% |
| | | | | | | |
| New Living | PO636205 | 9/30/2021 | 25,000.00 | - | 25,000.00 | 0% |
| NYA Health Services | PO637660 | 9/30/2021 | 50,000.00 | | 50,000.00 | 0% |
| ONE CARE DC | PO637661 | 7/31/2021 | 40,000.00 | | 40,000.00 | 0% |
| | | | | | | |
| Outreach Solutions | PO636134 | 9/30/2021 | 10,000.00 | - | 10,000.00 | 0% |
| | | | | | | |
| P&G Behavioral Heatlh | PO637317 | 9/30/2021 | 60,000.00 | 5,849.07 | 54,150.93 | 10% |
| Pathways to Housing D.C., MHRS Services | PO637658 | | 500,000.00 | 47,465.65 | 452,534.35 | 9% |
| | | | | | | |
| Prestige Healthcare Resources | PO637354 | 3/31/2021 | 225,000.00 | 187,643.44 | 37,356.56 | 83% |
| | | | | | | |
| Preventive Measures | PO637641 | | 200,000.00 | 91,187.83 | 108,812.17 | 46% |
| PSI, III | PO636211 | 9/30/2021 | 160,000.00 | 38,519.22 | 121,480.78 | 24% |
| Psychiatric Center Chartered (PCC) | PO637353 | 9/30/2021 | 200,000.00 | 36,973.33 | 163,026.67 | 18% |
| | | | | | | |
| Restoration Community Alliance | PO633242 | 9/30/2021 | 10,000.00 | - | 10,000.00 | 0% |
| | | | | | | |
| Spring Leaf Solutions | PO637352 | 2/28/2021 | 30,000.00 | 11,300.40 | 18,699.60 | 37.7% |
| | | | | | | |
| Umbrella Therapeutic Services | PO635185 | 4/30/2021 | 300,000.00 | 105,918.46 | 194,081.54 | 35% |
| | | | | . | | |
| Volunteers of America Chesapeake | PO637319 | 9/30/2021 | 200,000.00 | - | 200,000.00 | 0% |
| Wellness Healthcare | PO633544 | 3/31/2021 | 20,000.00 | - | 20,000.00 | 0% |
| Wellness Healthcare (the ARK of DC) | PO633545 | 9/30/2021 | 10,000.00 | 9,883.16 | 116.84 | 99% |
| Woodley House, Inc. | PO636136 | 9/30/2021 | 15,000.00 | - | 15,000.00 | 0% |
| | | | | | | |
| | | | | | | |
| Total Amount | | | 8,295,000.00 | 2,443,741.47 | 5,851,258.53 | 29.5% |

*Q13.* *Please provide the following information for all Human Care Agreements (HCA) and task orders issued during FY20 and to date in FY21, broken out by DBH program and activity:*

    *a.* *Vendor name;*
    *b.* *Services provided;*
    *c.* *Funding source;*
    *d.* *HCA amount;*
    *e.* *Task order amount;*
    *f.* *Actual expenditures;*
    *g.* *Status of performance; and,*
    *h.* *DBH employee responsible for monitoring the HCA and task order.*

**DBH Response**

Please see:
Attachment 1 of 2.  FY20 HCA by DBH MHRS Program
Attachment 2 of 2.  FY21 HCA by DBH MHRS Program

*Q14. Please provide a list and narrative description of any DBH partnerships with District agencies, if any, in FY20 and to date in FY21 to address employment for DBH consumers. In addition, please provide the number of individuals served, the types of employment placements available, and the employee/s responsible for coordinating the partnership.*

**DBH Response**

DBH has partnerships with the following District agencies to help residents with behavioral health challenges obtain and keep employment with ongoing support.

**Department of Disabilities Services (DDS) Rehabilitation Services Administration (RSA)**
The partnership with RSA supports nine DBH certified Evidence-Based Supported Employment programs in FY20 and seven programs to date in FY21. The pay for performance funding model from RSA covers job development, job placement and job stabilization for shared consumers. DBH and RSA expanded Evidence-Based Supported Employment services to individuals with substance use disorders in FY21 as part of the 1115 Behavioral Health Transformation Demonstration using the same payment structure for consumers of mental health services.

Supported Employment programs served a total of 676 consumers in FY20 and 481 to date in FY21. Through the funding agreement between DBH and RSA, 315 consumers have received job placement and retention services in FY 20 and 131 consumers have received these services in FY 21 to date.

DBH Supported Employment providers received technical assistance through the Visionary Opportunities to Increase Competitive Employment (VOICE) initiative in FY20. DDS and DBH were jointly awarded 300 hours of technical assistance to help increase capacity to serve individuals with Substance Use Disorders with developing best practices that align with Individual Placement and Support (IPS).

**Department of Employment Services (DOES)**
DBH partners with the Department of Employment Services (DOES) to provide onsite screening and referrals. This partnerships support behavioral health wellness and positions participants to have a comprehensive and well-rounded experience leading to economic stability. During FY20, the DBH onsite clinician screened and referred 288 residents.

**Office of the Deputy Mayor for Planning and Economic Development (DMPED) New Communities Initiatives**
During FY20, the Office of the Deputy Mayor for Planning and Economic Development (DMPED) New Communities Initiatives (NCI) provided funding to support residents living in the following four NCI: Barry Farm, Park Morton, Lincoln Heights/Richardson Dwelling, and Northwest One. DBH provides two onsite mental health clinical specialists to provide behavioral health screening, assessments, and linkage to supports and services. During FY20, the Mental Health Clinical Specialists have conducted brief solution focused sessions with 142 participants; conducted nine behavioral health assessments and seven enrollments, and provided care coordination for seven residents. They also provided 130 consultations to the case managers and partners working directly with clients impacted by unaddressed behavioral health needs. The

MHCS also provided workshops with 46 participants who live in New Community Initiative neighborhoods.

In FY21 to date, the Mental Health Clinical Specialists provided brief solution focused sessions with 90 participants; conducted two behavioral health assessment and two enrollments, and provided care coordination for six residents.   Workshops included 29 residents of New Community Initiative neighborhoods.

a.  *Please provide an update on the MOU with the Department of Human Services Economic Security Administration to provide Supported Employment services to individuals with serious mental illness who receive Temporary Assistance for Needy Families (TANF). How many individuals participated in this program in FY20? To date in FY21?*

**DBH Response**

DBH continues its partnership with the Department of Human Services (DHS), Economic Security Administration (ESA) to better assist TANF customers who may face behavioral health challenges.  In FY20, two hundred and seventeen (217) individuals were screened and referred to providers for ongoing behavioral health services. In FY21 to date, 41 individuals have been screened and referred for ongoing behavioral services.   Since the start of the public health emergency in March, assessments, linkage and enrollment and support have been provided via telehealth.

Supported Employment programs helped individuals obtain the following types of competitive employment placements in FY20 and to date in FY21.

- Freight Associate
- Dietary Aide
- Home Health Aide
- Day Care Provider
- Custodian
- Store Clerk
- Bus Detailer
- Fulfillment Associate
- Investigator
- Delivery Driver
- Retail Associate
- CDL Driver
- Warehouse Associate
- Intern
- Cake Decorator
- Sales Associate
- Deli Clerk
- Program Associate
- Carpet Assistant

- Security Officer
- Uber Driver
- Mail Carrier
- Concierge
- Sorter
- Floor Associate
- Housekeeper
- Masonry Laborer
- Barista
- Fruit Cutter
- Tutor
- Concrete Finisher
- Detailer
- Cabinet Maker
- School Teacher
- HR Assistant
- Certified Medical Technician
- Seafood Clerk

The following is a sample list of the private and public sector agencies that have hired individuals in the program:

- Alexandria Public Schools
- City of Takoma Park
- Coalition for The Homeless
- Ingleside at Rock Creek
- Wonders Extended Day Care
- Home Depot
- Hogan Transportation
- Georgetown Home Care
- Blue Tee Construction Company
- Beltway Cleaning Services
- Dollar General
- Hearts & Homes for Youth
- Amazon
- District Photo
- Randstad
- Stanley Steamer
- Magnolia Bakery
- Hallmark

- GAP
- Walgreens
- Speedy Greens
- N Street Village
- Urban Alliance
- Trader Joes
- Solar Solutions
- Fort Myer Construction
- Hertz Rental Car
- Sport & Health Tyson
- Bed, Bath & Beyond
- National Stadium
- Charleston Grove
- Handy Pro Cleaner dc
- Bowling Air Force Base
- FedEx
- USPS

District Government Agencies
- DC Department of Health
- DC Water & Sewer Authority
- DOES
- Library of Congress

Federal Agencies
- US National Intelligence Agency
- US Social Security Office
- Census Bureau
- FEMA

Employee/s responsible for coordinating the partnership: Melody Crutchfield

*Q15. Please provide a description of all housing programs administered by DBH. For each, please provide the following information:*

      *a. Name of the program and services provided;*
      *b. Number of individuals served in FY20 and to date in FY21;*
      *c. Capacity of the program;*
      *d. Performance measures and associated outcomes for each program;*
      *e. The name and title of the DBH employee responsible for administering the program;*
      *f. The average wait time for a consumer to access housing through the program;*
      *g. The number of individuals on waiting lists for the program; and,*
      *h. Of those individuals on the wait list, whether any are homeless or in other housing programs.*

**DBH Response**

*Name of the program and services provided;*

**Home First Housing Voucher Program**
The locally funded Home First Program provides housing rental vouchers for individuals and families who live in the apartment or home of their choice and sign their own rental leases. Consumers pay thirty percent (30%) of their household income to the landlord toward their rent, while the Home First Program subsidizes the balance of the rental amount.

**DC Local Rent Supplement Program (LRSP)**
The LRSP is administered by the D.C. Housing Authority (DCHA) The program follows the eligibility requirements, rules and regulations of DCHA's federally-funded voucher program. DBH makes referrals for initial occupancy and backfill of vacancies for LRSP vouchers attached to newly-renovated or developed units funded with DBH capital dollars for 25 years. The LRSP vouchers are attached to single-room occupancy (SRO) units and to apartments.

**Supported Independent Living Program (SIL)**
The Supported Independent Living (SIL) Program supports an independent home setting with services and supports to assist consumers in transitioning to a less restrictive level of care. Training in life skill activities, home management, community services, along with supports that are provided through a comprehensive continuum of care on an individual, flexible recovery-driven basis are provided based upon individual needs. Weekly home visits and monitoring are conducted by community support workers to ensure that the individual receiving service is able to maintain community tenure and move to more independent living.

**Licensed Mental Health Community Residential Facilities (MHCRFs):**
- **Intensive Rehabilitative Residence (IRR)**

An intensive level of care for individuals enrolled in the DBH behavioral health system who have medical issues that put them at risk of needing nursing home care if they do not receive physical health care nursing supports with the appropriate mental health rehabilitation services.

- **Supportive Rehabilitative Residence (SRR)**

SRR CRFs provide twenty-four hour, structured housing support for consumers with severe and persistent mental illness who need an intense level of support to live within the community. The specific services offered include: 24-hour awake supervision; assisting the consumer to obtain medical care; providing training and support to assist consumers in mastering activities of daily living; maintaining a medication intake log to ensure that residents take their medications as prescribed; provision of 1:1 support to manage behaviors or perform functional living skills; transportation to doctor's appointments; assistance with money management; and participation in treatment planning, implementation, and follow-up.

- **Supportive Residence (SR)**

SR CRFs provide on-site supervision when residents are in the facility; medication monitoring; maintenance of a medication log to ensure that medication is taken as prescribed; assistance with activities of daily living; arrangement of transportation; monitoring behaviors to ensure consumer safety; and participation in treatment planning, implementation, and follow-up.

*Number of Individuals Served in FY20 and to-date in FY21 and Capacity of the program*

**DBH Response**

In FY20, a total of 2,167 people received DBH housing and a total of 1,988 received housing in the first quarter of FY21Q1.

| Program | FY20 Capacity | Consumers Served FY20 | FY21 Capacity | Consumers Served FY21 Q1 |
|---|---|---|---|---|
| **Federal Funding** | | | | |
| Federal – DBH Shelter Plus Care* | 20 | 20* | 0* | 20 |
| **Local Funding** | | | | |
| **LRSP Vouchers** | | | | |
| DBH Capital-Funded Housing (LRSP Vouchers) | 196 | 198 | 196 | 196 |
| **Supported Housing** | | | | |
| Home First (Vouchers) | 850 | 899 | 800 | 851 |
| Supported Independent Living (SIL) | 375 | 375 | 375 | 331 |
| **Mental Health Community Residential Facilities (MHCRFs)** | | | | |
| Intensive Residence (IR) | 10 | 13 | 8 | 8 |
| Supportive Rehabilitative Residence (SRR) | 188 | 195 | 188 | 170 |
| Supportive Residence (SR) | 435 | 459 | 421 | 412 |
| Transitional Supportive Residence (TSR)** | 6 | 8 | 0 | 0 |
| **Total** | **2,060** | **2,167** | **1,988** | **1,988** |

***Shelter Plus Care** – DBH grant ended November 30, 2019 (FY20-1Q); consumers transferred to DBH voucher program.*
****Transitional Supportive Residence (TSR) CRF** – CRF Operator Voluntary Closure in July 2020*

*Performance measures and associated outcomes for each program*

**DBH Response**
Please see below outcomes on DBH Housing Performance Measures for Home First Subsidy Recipients

| Quality Domain | Performance Measure | Outcome |
|---|---|---|
| Housing Tenure/Stability | 75% of consumers will maintain community tenure in independent housing for 12 months or longer | 94% of consumers maintained community tenure through September 30, 2020 |
| Housing Occupancy | DBH will maintain an 80% or greater occupancy rate within its subsidized housing program | 100% occupancy rate |
| Availability of Housing Services/Supports | 80% of consumers in subsidized housing will enroll with a CSA to receive mental health services and supports | 98% of consumers are enrolled with a CSA |

*Name and title of the DBH employee responsible for administering the program*

**DBH Response**
Brandi Gladden, Director – Housing Development Division, is the DBH employee responsible for administering the DBH housing programs.

*The average wait time for a consumer to access housing through the program*

**DBH Response**
All rental housing vouchers have been awarded. The average time between referral and placement for a capital housing voucher, a SRO or a MHCRF is four to six weeks.

*The number of individuals on waiting lists for the program*

**DBH Response**
DBH requires certified providers to assess housing needs at the time of intake for consumers to indicate if they want to be considered for housing resources when they become available. Individuals who request a rental housing voucher self-report whether they are homeless, living on the streets, in a shelter, living temporarily with families or friends or living place to place. They also can report if they are rent burdened, at risk of eviction, or living in substandard housing. This information is entered into the consumer's electronic medical record. This process has been commonly referred to as a "waiting list" but it is actually a self-report of housing needs. When a rental housing voucher becomes available, DBH notifies providers and works with them to determine eligibility of current consumers. Since interest far exceeds available vouchers,

consumers experiencing homelessness by living on the streets or in a shelter are prioritized. This process does not apply to supported residences where placement is determined by level of need.

*Of those individuals on the wait list, whether any are homeless or in other housing programs*

**DBH Response**

As indicated above, at the time of intake, individuals self-report their living situation. Individuals who request a rental housing voucher often seek support from other available housing programs.

*Q16. Please provide an update on the work of the children mobile crisis teams. What services are provided? How many individuals were served in FY20? To date in FY21? Please be sure to specifically speak to the work of the Children and Adolescent Mobile Psychiatric Service (ChAMPS), as well as any related services.*

a.      *What is the process in determining what calls are deployable and non-deployable?*

b.      *What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY20 and FY21 to date.*

c.      *How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?*

d.      *Please describe the extent to which these services and responses to (a) through (d) were impacted by the COVID-19 pandemic.*

**DBH Response**

The Department of Behavioral Health contracts through the Office of Contracts and Procurement for emergency mobile psychiatric services for children and youth. The contract was awarded to Anchor Mental Health and the program is called Children and Adolescent Mobile Psychiatric Service (ChAMPS).   The 24 hour program helps children and youth between six to 17 years old manage extreme emotional behavior and supports families so that the behavior does not result in the child leaving the home or psychiatric hospitalization.   ChAMPS services include screening for mental health and substance use needs, crisis stabilization, involuntary crisis stabilization and referral to appropriate resources, including longer-term mental health or substance use services. Services are provided in the community, schools, or in homes for District residents and children in the care and custody of DC Child and Family Services Agency living in Maryland.

After emergency crisis intervention services, ChAMPS follows up with families within 24 hours to check on the child's well-being and provides support for up to 30 days post-intervention.  The team links children and families to a behavioral health provider for ongoing support. For children already enrolled with a provider, the team communicates the child's status and recommendations based on the intervention.   ChAMPS also offers Family Peer Specialist services to support families in the steps necessary for the stabilization of their child and to help promote a culture that recognizes, understands, and respects the family's views and preferences.

In FY 20, ChAMPS received 1,634 calls and deployed teams 806 times to support children in crisis, serving 710 unique children.  ChAMPS also provided 459 clinical consultation services.  In FY 21 Q1, ChAMPS received 301 calls and deployed teams 139 times to support children/youth in crisis, serving 114 unique children.  There have been 193 clinical consultation services.

a. Each call that is routed into ChAMPS is received by a Licensed Clinical Manager who is trained and equipped to make a clinical determination on how to manage crisis calls.   All calls involving children and youth in psychiatric crisis are deployable calls which results in an onsite response by a clinical team.  ChAMPS also responds to requests from families for immediate support related to concerns such as family functioning, oppositional defiance, and emotional dysregulation. A non-deployable call could be a request for a clinical consultation only, when a

caregiver declines an assessment, or for information about program services or community resources

b. In FY20, the average deployment time was 39 minutes. The longest response time was 2 hours, 39 minutes due to a delay in security clearance on a military base. The shortest time was one minute. In FY21 to date, the average deployment time was 49 minutes. The longest response time was 2 hours, 5 minutes during the snow storm the week of February 1, 2021. The shortest time was 20 minutes. The goal is to arrive to all deployments within one hour or less.

c. ChAMPS has seven crisis teams available for deployment on a week day and one crisis team on the weekend. Teams are deployed in pairs. Staff are scheduled in a staggered manner in order to maximize coverage and the number of crisis teams available. In addition, the program has three Clinical Managers who can be deployed if call volumes exceed normal level. Calls are triaged according to imminent risk and prioritized by the level of danger a child poses to self/others.  Other considerations are the availability of a mental health clinician, MPD or a Crisis Intervention Officer at the deployment site. The Clinical Manager maintains contact with the caller as needed until the crisis team is at the scene of the crisis.

d. During the pandemic months of FY 20, the number of calls decreased compared to the pre-pandemic months.  In the pre-pandemic months of October 2019 through March 2020, there were 1,066 calls that resulted in 541 deployments.  During the pandemic months of April through September, the number dropped in half to 568 calls that resulted in 265 deployments.

DBH is looking at the data closely to determine reasons for the significant drop in calls for crisis services. Public schools were the primary source of calls pre-pandemic and the distance learning environment may might not generate the same behavior by the child or youth or provide an opportunity to observe such behavior.  As more schools return to onsite learning, DBH will monitor whether calls return to the pre-pandemic levels or even increase.

With distance learning, parents or caregivers are now the source of calls and some may be reluctant to admit a non-family member into their homes. ChAMPS also reports that some parents expressed concerns about their child going to a hospital emergency department because they fear an increased risk of exposure to COVID-19.

DBH is also examining the date to assess whether there is evidence of more intense needs that result in more frequent calls for the same children, an increased proportion of deployments that lead to hospitalizations, or less engagement with enrolled providers.

The pandemic also has affected ChAMPS average response time with an increase from an average of 39 minutes to 49 minutes.  Logistics are more time consuming as the teams are teleworking and deploy to crisis calls from their homes rather than one work location.  In addition, the teams report it takes more time to park at deployment sites given limited spaces with more people at home due to the pandemic. The teams utilize personal protective equipment while working with consumers and families and will provide it to families if needed.

*Q17. How long does it take for families or children who are enrolled in DBH either by calling the Access Helpline or by walking into a community provider office seeking mental health services to receive the treatment they need?  Please provide the following information for FY19, FY20, and FY21, to date:*

*a. How many days, on average, between when a family or child calls the Access Helpline and when they are referred to a Core Service Agency?*

*b. How many days, on average, between when a family or child is enrolled and their intake appointment with a Core Service Agency?*

*c. How many days, on average, between when a family or child is enrolled and when they receive a diagnostic needs assessment?*

*d. How many days, on average, between when a family or child is enrolled and when they receive their first service as part of a treatment plan?*

**DBH Response**

DBH currently has data for the time between when a family or child's enrollment takes place to intake appointment and the time from enrollment to when a family or child receives a diagnostic assessment.  Callers to the Access Helpline are referred to a provider during the call. The chart below shows the data for b. and c. It should be noted in FY21 year to date there has been a significant decrease in the time from intake to enrollment and from enrollment to Diagnostic Assessment. Providers have reported that since the use of telehealth it has become easier to connect with parents and children for intake interviews. Flexibility around scheduling from home as well as eliminating the need for transportation to appointments has helped to greatly reduce the number of days for appointments.

**Average Number of Days from enrollment to Intake Appointment**

| FY | 2019 | 2020 | 2021 YTD |
|---|---|---|---|
| **Avg days** | 25 | 24 | 8 |

**Average Number of Days from enrollment to Diagnostic Assessment**

| FY | 2019 | 2020 | 2021 YTD |
|---|---|---|---|
| **Avg days** | 22 | 22 | 6 |

*Q18. Please explain the work the Department has been doing to address gun violence in the community and treat children/youth exposed to violence in their communities or at homes. Please explain how this work has been affected by the COVID-19 pandemic.*

**DBH Response**

Outlined separately below are DBH's efforts to address the impact of traumatic violence first for children, then for adults, followed by current work DBH is doing under the auspices of the Gun Violence Prevention Emergency Operations Center (GVP EOC). DBH offers Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), Trauma Systems Therapy (TST) and Child-Parent Psychotherapy (CPP) which are models of therapy that are offered to children who have experienced trauma. TF-CBT is a psychotherapy model for youth ages 3-18 years old designed to help children, youth, and their parents overcome the negative effects of traumatic life events and address feelings. TST is a psychotherapy model for youth ages 6-20 years old which aims to stabilize the child's environment while simultaneously enhancing their ability to regulate emotions and behaviors. CPP is a psychotherapy model for children ages 0-6 years old and their parents that helps restore normal developmental functioning in the wake of violence and trauma by focusing on safety, affect regulation, improving the child-caregiver relationship, normalization of trauma related response, and joint construction of a trauma narrative.

Prior to the pandemic, 128 youth were served in these models with services delivered in the community and in families' homes as well as in clinical settings. As a result of the pandemic, the number of youth being served fell slightly to 114 youth and their families who receive services via telehealth. Despite the slight decrease, telehealth generally has had a positive impact allowing providers to reach some families who were previously difficult to reach. Furthermore, providers are consistently reporting fewer "no-shows" because telehealth reduces the total time commitment and the burden of travel. For those families not served well by telehealth, the team is actively working to re-establish capacity for in-person services while mitigating COVID risk.

DBH is actively working with the Executive Office of the Mayor (EOM) and representatives from Department of Employment Services (DOES) to explore DBH's role in addressing gun violence as part of DOES's Project Empowerment Program. This program utilizes the Trauma Recovery Empowerment Model (TREM), a structured, evidence-based group intervention designed for individuals who have survived trauma and have substance use disorders and/or mental health conditions and incorporates psycho-educational strategies and cognitive behavioral therapy (CBT) techniques to improve increase adaptive coping and reduce the functional impacts behavioral health symptoms.

DBH's school-based behavioral health providers have implemented a variety of approaches including "peace assemblies" and facilitating healthy conflict management within schools. Providers have implemented art programs to provide an outlet for youth who have experienced gun violence. In addition, gun violence prevention programs have been implemented in after-school and in-school programming. During COVID-19, programming has transitioned to virtual platforms.

With individual adults and the broader community, DBH seeks to address the impact of gun violence primarily using three distinct strategies.  First, DBH worked with DHCF to secure enhanced funding for two trauma-focused interventions through the 1115 Behavioral Health Transformation Waiver.  Specifically, the Trauma Recovery & Empowerment Model (TREM for women and MTREM for men) plus Trauma Systems Therapy (TST) are now reimbursed at a higher rate to reflect the level of training, sophistication, and supervision involved in delivering these evidence based practices.  The goal in pursuing these enhancements was to incentivize more providers to be certified and to provide the best practices related to trauma support and intervention strategies.  Gun violence is just one of the many forms of traumatic violence to which many in our community including a higher percentage of those with behavioral health disorders have been exposed, often through their lifetimes.  Trauma severely impacts trust and one's ability to seek and accept care both to address the specific impact of trauma and the ways trauma complicates the expression and management of nearly all other behavioral health conditions.

Secondly, DBH's Community Response Team (CRT) is frequently asked by faith leaders and other community members to support communities dealing with the loss of one or more of their members.  CRT staff provide immediate support to individuals at memorial events in the community and provide printed information about behavioral health resources available through DBH or its many provider partners located in every ward in the District.

Thirdly, DBH has recently joined forces with many other District agencies to form the Gun Violence Prevention Emergency Operations Center through the Building Blocks DC initiative to be led by Linda Harllee Harper.  This initiative adopts a public health approach to gun violence prevention and targets the individuals and neighborhood at highest risk of being adversely effected by gun violence.  Though the center is very early in the planning and development stages, DBH proposed to contribute in at least three specific ways.  (1) DBH will provide Mental Health 101 training to frontline workers from the MOCRS or ONSE offices along with communication and de-escalation skills and information about navigating the city's robust array of behavioral health services.  (2) Because we know that we will frequently need collectively to address other tangible needs—like housing and employment supports—and that this initiative will need to build trust in the identified high-risk neighborhoods, DBH will identify community organizations already well ensconced in those neighborhoods to conduct ongoing outreach and engagement activities in non-clinical settings to address stigma and to promote basic behavioral health literacy, and (3) DBH will develop a preferred provider network to offer rapid intake and "red carpet" access to needed mental health and substance use disorder services so individuals and families can immediately access those service when they are ready for them.

*Q19. Please explain the work the Department has been doing with the Child and Family Services Agency on trauma-informed care. Please explain how this work has been affected by the COVID-19 pandemic.*

**DBH Response**

DBH and Child and Family Services Agency (CFSA) have worked very closely to expand trauma-informed care within the District since FY12 with support from federal grants to both agencies. As a result of this partnership, several key initiatives have enhanced access to trauma informed care:

Implementation and sustainability of the Well-Being Pathway. The Well-Being Pathway is designed for the first 30 days of children entering care and focuses on screening and assessments at time of removal in order to identify and enroll children in an array of services in a timely and coordinated fashion.  The Mental Health Clinic within CFSA goal is to assess and begin therapy (for those that need it) within 60 days of removal (as early as possible).

Modification of the Child Stress Disorder Checklist (CSDC) trauma screen instrument to meet the changing needs of the District children and youth as well as the inclusion of eight screening questions to assess risk for commercial and sexual exploitation of children, and Addition of Trauma Focused- Cognitive Behavioral Therapy (TF-CBT) and Child Parent Psychotherapy (CPP), both trauma models, to MHRS as Medicaid-reimbursable services. DBH also continues to offer Trauma Systems Therapy (TST).

DBH worked with CFSA on the development of the Family First Prevention Services Plan. One of the key elements of the approved plan was the increase of federal funds for evidence-based prevention activities and services. DBH supports six of the evidence-based prevention (EBP) services to support mental health and substance use disorders and in-home parenting. They are:
- Trauma Focused Cognitive Behavioral Therapy (TF-CBT)
- Parent Child Interaction Therapy (PCIT)
- Functional Family Therapy (FFT)
- Multi-Systemic Therapy (MST)
- Adolescent Community Reinforcement Approach (A-CRA), and
- Transition to Independence (TIP).

In FY20, the following referrals for the six EBPs were completed in the Community Portal, the section established in CFSA's database to track and monitor Family First Prevention Services Act (FFPSA) activities.

| Service | FY 20 Total Referrals |
|---|---|
| Trauma Focused Cognitive Behavior Therapy | 36 |
| Parent Child Interaction Therapy | 8 |
| Functional Family Therapy | 34 |
| Multi-Systemic Therapy | 8 |
| Adolescent Community Reinforcement Approach | 7 |
| Transition to Independence | 6 |

DBH has one co-located staff at CFSA to assist with linkage and trouble shooting and to support referrals for Evidence-based intervention services from CFSA social workers, private agencies, and staff at the Collaboratives. The Collaboratives are community organizations located within each ward of DC where CFSA has staff who assist with the monitoring of youth who are placed in their family's homes under protective supervision. DBH has supported the work through the Success Centers which were developed under the Family First Prevention Services Act (Families First). The Family First Prevention Services Act was enacted by the federal government to increase the availability of evidence-based services with the goal to prevent foster care entry by serving families in their community. DBH has provided support to include training on behavioral health services to the staff at each of the 10 Success Centers and by identifying community resources that will support the work at each of the sites in community.

In FY 20 and Q1 FY 21, DBH and CFSA have continued to collaborate in the provision of trauma informed care for youth. The new 1115 Behavioral Health Transformation Demonstration waiver includes Trauma-Informed Behavioral Health Services which will further support the work with trauma impacted families. Through an intra-district transfer, CFSA supported the expansion of Functional Family Therapy (FFT) which is an evidenced-based practice that targets families with children between the ages of 11-18 with behavioral or emotional problems such as conduct disorder, violent acting out, and substance abuse disorders. During FY20, the funding was utilized to certify an additional FFT provider which increased the capacity to serve families by 70 percent.

Services have continued during the pandemic in-person and by telehealth. Referrals from CFSA to behavioral health evidence-based programs have remained steady in the first quarter of FY21. DBH continues to collaborate with CFSA to address the needs of children and families both in-home and in out-of-home care.

# EXHIBIT T

**COUNCIL OF THE DISTRICT OF COLUMBIA
COMMITTEE ON HEALTH
CHAIRMAN VINCENT C. GRAY
COUNCILMEMBER, WARD 7**



**Department of Behavioral Health
FY 21 Pre-Hearing Performance Oversight Questions**

1. Please provide a current organizational chart for DBH. Please provide information to the activity level. In1/24/2022 addition, please identify the number of full-time equivalents (FTEs) at each organizational level and the employee responsible for the management of each program and activity. If applicable, please provide a narrative explanation of any organizational changes made during FY21 and to date in FY22.

2. Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY21 and to date in FY22. In addition, please describe any variance between the amount budgeted and actually spent for FY21 and to date in FY22:
   a. At the agency level, please provide information broken out by source of funds and by Comptroller Source Group and Comptroller Object;
   b. At the program level, please provide the information broken out by source of funds and by Comptroller Source Group and Comptroller Object; and,
   c. At the activity level, please provide the information broken out by source of funds and by Comptroller Source Group.

3. Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY21 and to date in FY22.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.

4. Please provide a complete accounting of all reprogramings received by or transferred from DBH in FY21 and to date in FY22.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.

5. Please provide a complete accounting of all of DBH's Special Purpose Revenue Funds for FY21 and to date in FY22. Please include the following:
   a. Revenue source and code;
   b. Source of the revenue for each special purpose revenue fund (*i.e. license fee, civil fine*);
   c. Total amount of funds generated by each source or program in FY21 and to date in FY22;
   d. DBH activity that the revenue in each special purpose revenue source fund supports; and,

e.  The FY21 and to date FY22 expenditure of funds, including purpose of expenditure.

6.  Please provide copies of any investigations, reviews or program/fiscal audits completed on programs and activities within DBH during FY21 and to date in FY22. This includes any reports of the DC Auditor, the Office of the Inspector General, or the Office of Accountability. In addition, please provide a narrative explanation of steps taken to address any issues raised by the program/fiscal audits. Please include the following:

7.  Did DBH meet the objectives set forth in the performance plan for FY21? Please provide a narrative description of what actions DBH undertook to meet the key performance indicators.  For any performance indicators that were not met, if any, please provide a narrative description for why they were not met and any remedial actions taken.  In addition, please provide a narrative description of the performance objectives for FY22 and what actions DBH has undertaken to meet them to date.

8.  Please provide DBH's capital budgets for FY21 and FY22, including amount budgeted and actual dollars spent. In addition, please provide an update on all capital projects undertaken in FY21 and FY22. In your response, please include information regarding the iCAMS project or its successor.

9.  Please provide a list of all FTE positions detailed <u>to</u> DBH, broken down by program and activity for FY21 and to date in FY22.  In addition, please provide which agency the detailee originated from and how long they were detailed to DBH.

10. Please provide a list of all FTE positions detailed <u>from</u> DBH to another agency in FY21 and to date in FY22.  In addition, please provide which agency the employee was detailed to and for how long.

11. Please provide the following information for all grants awarded to DBH during FY21 and to date in FY22, broken down by DBH program and activity:
    a.  Grant Number/Title;
    b.  Approved Budget Authority;
    c.  Funding source;
    d.  Expenditures (including encumbrances and pre-encumbrances);
    e.  Purpose of the grant;
    f.  Grant deliverables;
    g.  Grant outcomes, including grantee performance;
    h.  Any corrective actions taken or technical assistance provided;
    i.  DBH program and activity supported by the grant; and,
    j.  DBH employee responsible for grant deliverables.

12. Please provide a complete accounting of all grant lapses including a detailed statement as to why the lapse occurred and any corrective action taken by DBH. Please provide accounting of any grant carryover from FY19 to FY20 or FY21 to FY22 and a detailed explanation as to why it occurred.

13. Please provide a list and narrative description of any DBH partnerships with District agencies, if any, in FY21 and to date in FY22 to address employment for DBH consumers. In addition, please provide the number of individuals served, the types of employment placements available, and the employee/s responsible for coordinating the partnership.

    a. Please provide an update on the MOU with the Department of Human Services Economic Security Administration to provide Supported Employment services to individuals with serious mental illness who receive Temporary Assistance for Needy Families (TANF). How many individuals participated in this program in FY21? To date in FY22?

14. Please provide a description of all housing programs administered by DBH. For each, please provide the following information:
    a. Name of the program and services provided;
    b. Number of individuals served in FY21 and to date in FY22;
    c. Capacity of the program;
    d. Performance measures and associated outcomes for each program;
    e. The name and title of the DBH employee responsible for administering the program;
    f. The average wait time for a consumer to access housing through the program;
    g. The number of individuals on waiting lists for the program; and,
    h. Of those individuals on the wait list, whether any are homeless or in other housing programs.

15. Please provide an update on the work of the children mobile crisis teams. What services are provided? How many individuals were served in FY21? To date in FY22? Please be sure to specifically speak to the work of the Children and Adolescent Mobile Psychiatric Service (ChAMPS), as well as any related services.
    a. What is the process in determining what calls are deployable and non-deployable?
    b. What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY21 and FY22 to date.
    c. How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?
    d. Please describe the extent to which these services and responses to (a) through (d) were impacted by the COVID-19 pandemic.

16. How long does it take for families or children who are enrolled in DBH either by calling the Access Helpline or by walking into a community provider office seeking mental

Department of Behavioral Health
FY21-22 Performance Oversight Questions

health services to receive the treatment they need?  Please provide the following
information for FY20, FY21, and FY22, to date:

a. How many days, on average, between when a family or child calls the Access
Helpline and when they are referred to a Core Service Agency?
b. How many days, on average, between when a family or child is enrolled and their
intake appointment with a Core Service Agency?
c. How many days, on average, between when a family or child is enrolled and
when they receive a diagnostic needs assessment?
d. How many days, on average, between when a family or child is enrolled and
when they receive their first service as part of a treatment plan?

17. Please explain the work the Department has been doing to address gun violence in the
community and treat children/youth exposed to violence in their communities or at
homes.  Please explain how this work has been affected by the COVID-19 pandemic.

18. Please explain the work the Department has been doing with the Child and Family
Services Agency on trauma-informed care. Please explain how this work has been
affected by the COVID-19 pandemic.

19. Please explain the work the Department is doing with Child and Family Services
Agency to better serve the mental health needs of foster children in the District. How
long does it take for a child who has been identified as needing mental health services
before they are connected to those services? During FY21, what percentage of children
were screened within 30 days of entering or re-entering care? Has there been a decrease
in time to linkage to first services from FY20 to FY21? If available, please provide any
documentation that shows children are receiving more timely services. What efforts
have been made to improve more timely services?  Please explain how this work and the
data provided in response to the questions above may have been impacted by the
COVID-19 pandemic.

20. Please describe what substance abuse services are offered to children and youth and the
process for obtaining these services. Are there any plans for FY22 to expand the types of
services offered to children and youth? How many children and youth have received
services through the Adolescent Community Reinforcement Approach (A-CRA) in
FY21 and FY22 to date?
a. Please explain how this work and the data provided in response to the
questions above may have been impacted by the COVID-19 pandemic.

21. Please explain the work the Department has done with the Department of Health Care
Finance for the transition of fee for service individuals to MCOs in Fiscal Year 2022.
How has this transition improve care coordination?

22. Please provide an update on the Department's School Mental Health Program including
a list of all schools that participate. For each school, please also include:
a. The number of student who met with a clinician;

    b.  The number of students who were referred to care;

    c.  The most common diagnosis;

    d.  The referral source (i.e. walk-in, teacher);

    e.  The number of students participating in prevention programs;

    f.  Whether the current programs are meeting the existing need for services, and if not, what is being done to meet the total need;

    g.  What prevention programs and services were offered through the SMHP in FY21 and FY22 to date;

    h.  Any plans to expand the program and barriers to expansion; and

    i.  The number of FTEs serving in each school.

    j.  Please explain how this program and the data provided in response to (a) through (i) above may have been impacted by the COVID-19 pandemic and the transition to distance learning.

23.    Please provide an update on the status of implementation of the public health model for school-based mental health.  Please include the following information for Cohort 1, Cohort 2, and Cohort 3:

    a.  List all schools in each cohort

    b.  Number of schools matched with a CBO, and identify which CBO has been matched with which schools

    c.  Number of schools where a CBO clinician has been hired and is working in the schools and identify which schools

    d.  Number of schools where a CBO clinician has been hired, but is not yet working in the school, and identify which schools and provide the reason why the CBO clinician is not yet working in the school

    e.  Number of schools where the CBO clinician has not yet been hired, and identify which schools and provide the reason why the CBO clinician has not yet been hired

    f.  Please describe any obstacles or barriers to having CBO clinicians working in schools at the start of the school year

    g.  Please explain how this program and the data provided in response to (a) through (g) above may have been impacted by the COVID-19 pandemic and the transition to distance learning.

24.    Please provide an update on the extent to which CBO and DBH clinicians have been able to bill their services to Medicaid, private insurance, or other sources of funds outside of local dollars.  Please also discuss plans to bill additional services in the future. Please explain how this information may have been impacted by the COVID-19 pandemic and the transition to distance learning.

25.    Please provide an update on the status of the community of practice for school-based mental health.  Please include the following information

    a.  An overview of the current organization structure, and plans for the future

    b. List of events, trainings, or other convenings with brief summaries of the purpose of each event, target audience, planned number of participants, and actual number of participants in FY20, FY21, and FY22 to date

    c. List of planned events, training, regular meetings, or other convenings with brief summaries of the purpose of each event, target audience, and planned number of participants in FY20, FY21, and FY22 to date

    d. Estimated timeline for fully establishing the community of practice

    e. Plans for assessing the effectiveness and utilization rate for the community of practice

    f. Please explain how the community of practice and responses to (a) through (e) above have been impacted by the COVID-19 pandemic.

26. Please provide information about any work DBH has done with DHCF and DC's education agencies to resolve concerns about payments for the educational part of PRTF placements, for youth with and without Individualized Education Plans (IEPs) from the school.  Please provide any MOAs or MOUs related to this subject.

27. Please provide the list of services currently available as part of the Mental Health Rehabilitation Services (MHRS) system. Specifically, please provide a description of each service and indicate whether or not it is available as part of the Medicaid MHRS program, the non-MHRS program, or both.  In addition, please provide the FY21 and current reimbursement rates for each service.

28. Please provide the monthly MHRS utilization data for FY21 and to date in FY22. Specifically, please include the following:

    a. A breakdown of Medicaid MHRS vs. non-Medicaid MHRS;

    b. For Medicaid MHRS, please provide a breakdown by managed care vs. fee-for-service (and include a breakdown by specific managed care organization);

    c. For non-Medicaid MHRS enrollees, please indicate whether the individual had coverage via the DC Healthcare Alliance or was uninsured.

29. Please provide the name of all certified MHRS providers. For each provider, please provide the following information for FY20, FY21 and to date in FY22:

    a. Whether or not the provider utilizes the Medicaid MHRS program, the locally-funded MHRS program, or both;

30. Please provide an update on the implementation of the Live.Long.DC Strategic Plan including some of the positive results. Describe any new strategies to combat the increase in opioid overdoes related deaths.

31. Please provide an update on the DBH services to consumers under the custody of the Department of Corrections, including services provided in the READY Center.

32. Are there any services provided through Core Service Agencies or other mental health providers that are not currently reimbursed by Medicaid, and please indicate whether these

services will be reimbursed under DC's approved 1115 waiver or could be reimbursed under a 1915(i) state plan option, a waiver, or a demonstration project.

33. DBH regulations provide that DBH conduct targeted compliance reviews of CSAs supported housing assessments and report the results to each CSA under review. DBH policies also require that DBH monitor certified providers to ensure compliance with DBH's housing procedures and programs, and that DBH utilize routine oversight and monitoring activities to determine whether CSAs are meeting their supported housing objectives. How does DBH conduct targeted compliance reviews and monitor certified providers to ensure compliance with its housing procedures and programs? What type of oversight and monitoring does DBH conduct to determine whether CSAs are meeting their supported housing objectives?

34. What percentage of Mental Health Community Residential Facilities (MHCRF), as a whole, are wheelchair accessible?

35. What percentage of Supported Independent Living (SIL) providers within the DBH system, as a whole, are wheelchair accessible?

36. Last fiscal year, DBH did not have a process to prioritize applicants who need wheelchair accessible Mental Health Community Residential Facilities (MHCRF). Creating a process for accessible Mental Health Community Residential Facilities (MHCRF) became increasingly important as the DBH population is aging and needs accessible housing. Has DBH updated its application process to include whether applicants need an accessible room and any other reasonable accommodations? Has DBH developed a process to prioritize consumers who need accessible housing and create policies and procedures for providers to follow?

37. Of the total number of consumers that DBH serves, what is the number of consumers who are homeless?

38. In FY21, what array of services and support did DBH provide to homeless consumers? What were DBH's outcomes? How many DBH consumers in FY21, who were homeless, were placed in housing?

39. How does DBH ensure quality of mental health services within its provider network? Does DBH interview consumers of Core Service Agencies while conducting satisfaction surveys?

40. Please provide an update on the High Fidelity Wraparound program, to include the following information:
    a. What is the current capacity of wraparound?
    b. Description of services currently being provided
    c. Description of how individuals can access these services

    d.  How many individuals were serviced in FY21 and to date in FY22?

    e.  Since MBI was awarded the Care Management Entity (CME) contract in 2017 with a reduced capacity to serve 94 youth in the community, how many youth were served in FY21 and to date in FY22?

    f.  Are there any short term or long term plans to increase available flexible funding available per youth?

    g.  Will DBH take steps to change high fidelity wraparound from a locally-funded pilot program to a Medicaid-funded permanent MHRS service? If so, what steps have been taken to date?

    h.  How many children were diverted from PRTF placements?  Please provide a breakdown for the school and community-based programs.

    i.  Any outcome evaluations or reports of the program from the past two years

    j.  Please explain how the High Fidelity Wraparound program and responses to (a) through (i) above have been impacted by the COVID-19 pandemic.

41.  In FY21, how many children have been discharged from inpatient psychiatric hospitalization or psychiatric residential treatment facilities and received in-home and community-based mental health services?  This figure should include CBI, intensive care coordination, and intensive case management services—within 30 days, 60 days, or 90 or more days of their discharge.  Please also explain how this data may reflect the impact of the COVID-19 pandemic.

42.  For FY 20, FY 21, and FY22 to date, please list: a) the total number of psychiatric residential treatment facility (PRTF) and the total number of residential treatment center (RTC) admissions of a child and youth receiving MHRS (may include duplicate counts of those children or youth with multiple admissions during the Fiscal Year), b) the unduplicated number of children, and of youth, receiving MHRS and served in a PRTF or RTC, and c) the behavioral health conditions being treated. Please also explain how this data may reflect the impact of the COVID-19 pandemic.

43.  Please provide an updated list of all Evidence-Based Practices (EBP) and for each EBP please note:

    a.  The name of each provider who offers it;

    b.  Each provider's capacity;

    c.  Each provider's current enrollment;

    d.  Whether the EBP is Medicaid-reimbursable and if so, under what code or rate;

    e.  Any quality assessment or outcome measure that have been put in place to assess the program; and

    f.  Whether the EBP is trauma-informed.

44.  Please provide a description and an update on the Behavioral Court Diversion program including:

    a.  A description of which youth are eligible to participate in the program;

    b.  The process or protocol of selecting or referring youth to the program;

    c. The number of youth who participated in FY21 and to date in FY22, the type of status offense they were alleged to have committed, the referral source (i.e., judge, probation officer, prosecutor, etc.) and the outcomes for youth in the program;

    d. The number of youth currently receiving CBI services through the Juvenile Behavioral Diversion Program

    e. The number of youth currently receiving CBI services through the Family Court Social Services Division

    f. The average and median wait time for a first appointment with a psychiatrist after referral from the Juvenile Behavioral Diversion Program and the Family Court Social Services Division

    g. The recidivism rate of the youth participants and an explanation of how recidivism rates are measured;

    h. Any costs associated with the program; and

    i. The program's capacity and any expansion plan or barriers to expansion.

    j. Please explain how the Behavioral Court Diversion program and responses to (a) through (i) above have been impacted by the COVID-19 pandemic.

45. Please provide an update on the Agency's early childhood mental health projects, including any studies or reports.

    a. For the Parent Child Infant Early Childhood Enhancement Program include a description of the services provided, the type of clinicians employed, their capacity, and the number of children served, and how the cases ended (e.g. successful completion, closure for lack of attendance, etc.) in FY21 and to date in FY22.

    b. For the Early Childhood Mental Health Consultation Project, list the child care centers, homes, and schools that are participating, the services they have received and provide any progress/outcome measure available.

    c. Please provide an update on the DC MAP contract.

    d. Please explain how DBH's early childhood mental health projects and responses to (a) through (d e) above have been impacted by the COVID-19 pandemic.

46. Please provide an update on the implementation of the DC SEED Grant.

    a. Please also explain the impact of the COVID-19 pandemic on the implementation of the DC SEED grant.

    b. Please describe any plans or steps taken to sustain the services and supports related to this grant, once the grant period has ended.

47. Please provide an update on the online behavioral health training program for all child development facilities and public schools that was launched in the first quarter of FY15. How many teachers and other personnel completed the online training in FY21 and FY22 to date?

48. How did DBH implement the National Suicide Hotline Designation Act of 2020, which created a new 9-8-8 universal telephone number for the purpose of suicide prevention and mental health crisis response?
    a. To what extent has DBH engaged the Office of Unified Communications or other public safety cluster agencies following the law's passage?

49. Describe how DBH is working with providers especially substance use disorder providers to facilitate better coordination between Levels of Care and settings.

50. What specific steps has DBH taken to ensure consumers living in DBH supported housing have been protected from contracting COVID?

51. What specific steps has DBH taken to ensure DBH Providers have continued to meet the mental health needs of its consumers during the COVID emergency?

52. What specific steps is DBH taking now to ensure consumers have access to information about the COVID vaccine and are able to access vaccination cites to receive the vaccine?

53. How many grievances were filed against DBH providers and DBH during FY21?  How many external reviews were filed in FY21?  How many external reviews found in favor of the consumer?  How many of those external review determinations in favor of the consumer were approved by the DBH Director?

54. Did DBH take any measures to remove individuals from residential facilities because of the COVID-19 pandemic, which has taken the lives of thousands of individuals in congregate care facilities across the United States this year?  If so, what specific measures did DBH take?  How many individuals have been removed from residential placements because of the COVID-19 pandemic?  For each such individual, where did that individual receive services after removal from the residential placement?

55. Did any guidelines, policies, or procedures change during FY21 for determining whether a child or youth under the age of 21 who is enrolled in your Medicaid program and has a diagnosis of "severe emotional disturbance" should receive CBI, ACT, HFW, TFC, and RS during FY 2021?  If so, how?

56. DBH acknowledged that fewer children and youth are receiving services than before COVID-19; what steps, if any, has DBH taken to investigate this and what specific steps has DBH taken to ensure that every child and youth's needs are met?

**Department of Behavioral Health (RM0)**
**Organizational Chart**



Wilbur Giles — Office of Contracts & Procurement

**Barbara J. Bazron, Ph.D.**
Director

Joyce Jeter — Agency Fiscal Officer

**Michael Neff** — Chief Operating Officer
- Claims & Billing
- Fiscal Services
- Information Technology
- Facilities Management
- Grants Management
- Records Management

**Mark Chastang** — Saint Elizabeths CEO

**Matt Caspari** — General Counsel Office of the General Counsel

**Jelani Murrain** — Director Policy, Planning, & Evaluation
- BH Block Grant Program
- Training Institute
- Data & Performance Measurement
- Strategic Management & Policy

**Nancy Black** — Interim Chief Clinical Officer
- Deputy Clinical Officer
- Disaster Behavioral Health and Support Services

**Phyllis Jones** — Chief of Staff
- Legislative Affairs
- Human Resources
- Communications and Public Engagement
- Consumer & Family Affairs
- Office of Ombudsman

**Richard Bebout** — Chief of Crisis Services
- Deputy Chief of Crisis Services
- Comprehensive Psych. Emerg. Program (CPEP)
- Community Response Team
- Access Helpline
- Crisis Residences
- 911 Call Diversion
- Building Blocks

**Senior Deputy Director**

**Atiya Jackson** — Deputy Director Accountability
- Program Integrity
- Licensure
- Certification
- Incident Management & Investigations

**Jean Moise** — Deputy Director Adult/Transitional Youth Services
- Behavioral Health Services (SUD)
- Government Operated Services (35 K Street Clinic)
- Behavioral Health Services (MHRS)
- Residential Support & Continuity of Services
- State Opioid Response Program
- Specialty Services
- Housing Support Services
- Integrated Care
- ACT/Co-located Services
- Assessment & Referral Center
- Provider Relations

**Chad Tillbrook** — Forensic Services

**Barbara Paulson** — Deputy Director Child/Adolescent/Family Services
- Division Director
  - Crisis Services
  - Court Assessment
  - Co-located Services
  - Specialty Service
- Division Director
  - School-Based BH Services
  - Early Childhood Services
  - Behavioral Health Services (MH/SUD)
- SUD Prevention, Intervention, & Treatment
- Evidence-Based Practices
- Government Operated Services (Howard Road)

DBH

*Q1. Please provide a current organizational chart for DBH. Please provide information to the activity level. In addition, please identify the number of full time equivalents (FTEs) at each organizational level and the employee responsible for the management of each program and activity. If applicable, please provide a narrative explanation of any organizational changes made during FY21 and to date in FY22.*

**DBH Response:**

During FY22, in order to support more focused management, stronger integration and coordination, and greater visibility, all crisis services were separated from the Adult Services Division. Crisis Services include the Comprehensive Emergency Psychiatric Program (CPEP); the Community Response Team (CRT); Access Helpline (clinical functions); crisis residences; the 911 mental health-related call diversion initiative; and, our participation in the Building Blocks DC (BBDC) initiative.  Crisis Services is headed by Dr. Richard Bebout, formerly DBH Senior Deputy Director.

See Attachment Organizational Chart.

Question 2:  Please provide the following budget information for DBH, including the amount budgeted and actually spend FY 21 and to date in FY 22.
In addition please describe any variance between the amount budgeted and actually spent for FY 21 and to date in FY 22.
a. At the agency level, please provide information by source of funds and by Comptroller Source Group and Comptroller Object;
b. At the program level, please provide the information broken out by source of funds and by Comptroller Object; and
c. At the activity level, please provide the information broken out by source of funds and by Comptroller Source Group

**AGENCY LEVEL**

| Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | FY 2021 Sum of Budget | FY 2021 Sum of Actuals | FY 2021 Sum of Variance | FY 2022 Sum of Budget | FY 2022 Sum of Actuals | FY 2022 Sum of Variance | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | ########### | 98,134,566.88 | 3,277,992.85 | ########### | 22,667,660.53 | 78,075,433.95 | |
| | | | 0012 | REGULAR PAY - OTHER | 5,414,691.95 | 6,742,913.44 | (1,328,221.49) | 6,017,665.21 | 1,395,707.81 | 4,621,957.40 | |
| | | | 0013 | ADDITIONAL GROSS PAY | 5,656,404.99 | 5,655,967.51 | (1,660,920.52) | 3,995,046.99 | 1,439,521.61 | 2,555,525.38 | |
| | | | 0014 | FRINGE BENEFITS - CURR PERSON | 28,363,354.75 | 23,468,605.46 | 2,894,749.29 | 28,716,440.79 | 5,581,467.04 | 23,134,973.75 | |
| | | | 0015 | OVERTIME PAY | 1,476,154.73 | 6,744,781.95 | (5,268,627.22) | 1,476,154.73 | 1,567,254.10 | (91,099.37) | |
| | | PS Total | | | ########### | ########### | ########### | (2,085,027.09) | ########### | 32,651,611.09 | 108,296,791.11 |
| | | NPS | 0020 | SUPPLIES AND MATERIALS | 5,460,646.12 | 4,580,666.95 | 879,979.17 | 5,768,645.92 | 791,352.98 | 2,619,289.09 | |
| | | | 0030 | ENERGY, COMM. AND BLDG RENTA | 1,889,393.55 | 1,314,286.26 | 575,107.29 | 1,447,742.79 | | 6,115.93 | |
| | | | 0031 | TELECOMMUNICATIONS | 715,172.53 | 800,607.60 | (85,435.07) | 760,916.22 | 69,136.06 | (56,280.00) | |
| | | | 0032 | RENTALS - LAND AND STRUCTURE | 6,963,803.80 | 6,520,068.98 | 443,734.82 | 7,412,085.89 | | | |
| | | | 0034 | SECURITY SERVICES | 4,993,070.70 | 4,934,558.79 | 58,511.91 | 5,013,033.47 | | | |
| | | | 0035 | OCCUPANCY FIXED COSTS | 884,973.92 | 592,555.47 | 292,418.45 | 418,404.65 | | | |
| | | | 0040 | OTHER SERVICES AND CHARGES | 10,153,073.62 | 8,979,223.77 | 1,173,849.85 | 14,916,439.89 | 1,025,368.41 | 4,297,650.37 | |
| | | | 0041 | CONTRACTUAL SERVICES - OTHER | 28,185,059.29 | 29,009,984.66 | (844,612.87) | 27,723,146.77 | 4,121,935.46 | 3,368,044.71 | |
| | | | 0050 | SUBSIDIES AND TRANSFERS | 62,571,032.68 | 61,555,036.60 | 1,016,016.08 | 86,936,971.51 | 13,572,480.09 | 37,052,840.09 | |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 178,050.00 | 130,205.59 | 47,844.41 | 175,050.00 | | 111,075.80 | The FY 2021 variance is primarily related to underspending for fixed costs and professional service contracts. |
| | | NPS Total | | | ########### | ########### | 3,557,414.04 | ########### | 19,580,273.00 | 49,598,733.99 | |
| **0100 Total** | **LOCAL FUND** | | | | ########### | ########### | **1,472,386.95** | ########### | **52,231,884.09** | **157,695,527.10** | |
| 0110 | LOCAL FUND | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | 200,000.00 | | 200,000.00 | 200,000.00 | | 200,000.00 | |
| | | NPS Total | | | 200,000.00 | - | 200,000.00 | 200,000.00 | | 200,000.00 | |
| **0110 Total** | **LOCAL FUND** | | | | **200,000.00** | **-** | **200,000.00** | **200,000.00** | | **200,000.00** | The underspending of funds is related to Gambling Treatment and Intervention funds |
| 0150 | ARPA | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 6,938,135.00 | | 6,938,135.00 | |
| | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 602,651.00 | | 602,651.00 | |
| | | PS Total | | | | | | 7,540,786.00 | | 7,540,786.00 | |
| | | NPS | 0040 | OTHER SERVICES AND CHARGES | 1,088,345.72 | 1,088,345.72 | | 536,000.00 | | 536,000.00 | |
| | | | 0050 | SUBSIDIES AND TRANSFERS | 2,004,655.00 | 2,004,655.00 | | | | | |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | | | | 2,144,000.00 | | 2,144,000.00 | |
| | | NPS Total | | | 3,093,000.72 | 3,093,000.72 | | 2,680,000.00 | | 2,680,000.00 | |
| **0150 Total** | **ARPA** | | | | **3,093,000.72** | **3,093,000.72** | **-** | **10,220,786.00** | | **10,220,786.00** | |
| 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 5,473,299.42 | 5,424,847.57 | 48,451.85 | 7,256,110.01 | 1,262,894.64 | 5,993,215.37 | |
| | | | 0012 | REGULAR PAY - OTHER | 793,435.15 | 732,856.45 | 60,578.70 | 594,346.73 | 212,309.07 | 382,037.66 | |
| | | | 0013 | ADDITIONAL GROSS PAY | | 161,736.00 | (161,736.00) | | 37,974.63 | (37,974.63) | |
| | | | 0014 | FRINGE BENEFITS - CURR PERSON | 1,564,764.33 | 1,471,856.00 | 92,908.33 | 2,041,425.15 | 331,020.71 | 1,710,404.44 | |
| | | | 0015 | OVERTIME PAY | | 168,679.08 | (168,679.08) | | 49,487.07 | (49,487.07) | |
| | | PS Total | | | 7,831,498.90 | 7,959,975.10 | (128,476.20) | 9,891,881.89 | 1,893,686.12 | 7,998,195.77 | |
| | | NPS | 0020 | SUPPLIES AND MATERIALS | 236,681.95 | 513,538.99 | (276,857.04) | 3,203,171.90 | 1,435.00 | 2,869,447.90 | |
| | | | 0031 | TELECOMMUNICATIONS | 4,980.42 | 4,980.42 | | | | | |
| | | | 0040 | OTHER SERVICES AND CHARGES | 15,123,970.30 | 14,483,053.32 | 640,916.98 | 15,125,609.15 | 166,875.57 | 9,724,130.94 | |
| | | | 0041 | CONTRACTUAL SERVICES - OTHER | 4,482,433.85 | 4,470,119.18 | 12,314.67 | 8,884,266.93 | 72,757.56 | 8,576,214.93 | |
| | | | 0050 | SUBSIDIES AND TRANSFERS | 14,127,121.84 | 14,386,585.57 | (259,463.73) | 10,711,671.35 | 89,371.37 | 5,125,126.39 | |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 103,465.14 | 91,899.82 | 11,565.32 | 63,833.82 | | 38,453.82 | |
| | | NPS Total | | | 34,078,653.50 | 33,950,177.30 | 128,476.20 | 37,988,573.15 | 310,439.50 | 26,331,375.98 | |
| **0200 Total** | **FEDERAL GRANT FUND** | | | | **41,910,152.40** | **41,910,152.40** | **(0.00)** | **47,880,455.04** | **2,204,125.62** | **34,329,571.75** | |
| 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 382,819.06 | 389,075.99 | (6,257.93) | 487,109.59 | 79,351.92 | 407,757.67 | |
| | | | 0013 | ADDITIONAL GROSS PAY | | 17,772.89 | (17,772.89) | | | | |
| | | | 0014 | FRINGE BENEFITS - CURR PERSON | 99,226.14 | 84,872.75 | 14,353.39 | 133,468.02 | 16,283.83 | 117,184.19 | |
| | | | 0015 | OVERTIME PAY | | 5,706.51 | (5,706.51) | | 192.75 | (192.75) | |
| | | PS Total | | | 482,044.20 | 497,428.14 | (15,383.94) | 620,577.61 | 95,828.50 | 524,749.11 | |
| | | NPS | 0020 | SUPPLIES AND MATERIALS | 5,000.00 | 12,741.85 | (7,741.85) | 5,000.00 | | | |
| | | | 0040 | OTHER SERVICES AND CHARGES | 1,633,130.36 | 1,603,041.95 | 30,088.41 | 2,066,327.70 | 672,954.26 | 81,573.82 | |
| | | | 0041 | CONTRACTUAL SERVICES - OTHER | | 8,191.68 | (8,191.68) | | | | |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 145,771.17 | 144,542.11 | 1,229.06 | 145,771.17 | | 45,705.25 | |
| | | NPS Total | | | 1,783,901.53 | 1,768,517.59 | 15,383.94 | 2,237,098.87 | 672,954.26 | 127,279.07 | |
| **0250 Total** | **FEDERAL MEDICAID PAYMENTS** | | | | **2,265,945.73** | **2,265,945.73** | **(0.00)** | **2,857,676.48** | **768,782.76** | **652,028.18** | |
| 0400 | PRIVATE GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | 59,313.54 | (59,313.54) | | | | |
| | | | 0012 | REGULAR PAY - OTHER | 59,313.54 | | 59,313.54 | | | | |
| | | | 0014 | FRINGE BENEFITS - CURR PERSON | 15,955.34 | 15,955.34 | | | | | |
| | | PS Total | | | 75,268.88 | 75,268.88 | | | | | |
| | | NPS | 0020 | SUPPLIES AND MATERIALS | 2,379.11 | 2,379.11 | | 60,000.00 | | 53,000.00 | |
| | | | 0040 | OTHER SERVICES AND CHARGES | 186,578.15 | 59,853.15 | 126,725.00 | 366,290.44 | 11,123.36 | 237,966.44 | |
| | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 20,000.00 | | 20,000.00 | |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 56,976.83 | 56,976.83 | | 40,000.00 | | 35,000.00 | |
| | | NPS Total | | | 245,934.09 | 119,209.09 | 126,725.00 | 486,290.44 | 11,123.36 | 345,966.44 | |
| **0400 Total** | **PRIVATE GRANT FUND** | | | | **321,202.97** | **194,477.97** | **126,725.00** | **486,290.44** | **11,123.36** | **345,966.44** | |
| 0450 | PRIVATE DONATIONS | NPS | 0020 | SUPPLIES AND MATERIALS | 6,956.31 | 6,956.31 | (0.00) | 12,000.00 | | | |
| | | | 0040 | OTHER SERVICES AND CHARGES | 614.37 | 614.37 | 0.00 | 135,463.55 | 30.36 | 125,433.19 | |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | | | | 13,689.19 | | 13,689.19 | |
| | | NPS Total | | | 7,570.68 | 7,570.68 | (0.00) | 161,152.74 | 30.36 | 139,122.38 | |
| **0450 Total** | **PRIVATE DONATIONS** | | | | **7,570.68** | **7,570.68** | **(0.00)** | **161,152.74** | **30.36** | **139,122.38** | |
| 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,639,573.78 | 1,370,239.80 | 269,333.98 | 1,648,556.39 | 321,982.29 | 1,326,574.10 | |
| | | | 0012 | REGULAR PAY - OTHER | | | | | 10,660.15 | (10,660.15) | |
| | | | 0013 | ADDITIONAL GROSS PAY | | 147,272.63 | (147,272.63) | | 43,318.77 | (43,318.77) | |
| | | | 0014 | FRINGE BENEFITS - CURR PERSON | 441,045.37 | 407,891.76 | 33,153.61 | 451,704.45 | 92,347.71 | 359,356.74 | |
| | | | 0015 | OVERTIME PAY | 44,701.15 | 153,049.68 | (108,348.53) | 44,701.15 | 48,671.83 | (3,970.68) | |
| | | PS Total | | | 2,125,320.30 | 2,078,453.87 | 46,866.43 | 2,144,961.99 | 516,980.75 | 1,627,981.24 | |
| | | NPS | 0020 | SUPPLIES AND MATERIALS | | | | | | | |
| | | | 0040 | OTHER SERVICES AND CHARGES | 522,000.00 | 521,733.80 | 266.20 | 542,000.00 | 50,000.00 | 492,000.00 | |
| | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 3,000.00 | | 3,000.00 | | | | |
| | | NPS Total | | | 525,000.00 | 521,733.80 | 3,266.20 | 542,000.00 | 50,000.00 | 492,000.00 | |
| **0600 Total** | **SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total** | | | | **2,650,320.30** | **2,600,187.67** | **50,132.63** | **2,686,961.99** | **566,980.75** | **2,119,981.24** | |
| 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 5,533,740.40 | 5,191,422.33 | 342,318.07 | 6,253,284.03 | 1,188,313.98 | 5,064,970.05 | |
| | | | 0012 | REGULAR PAY - OTHER | 1,223,732.34 | 1,219,017.61 | 4,714.73 | 291,796.00 | 309,827.39 | (18,031.39) | |
| | | | 0013 | ADDITIONAL GROSS PAY | | 404,944.52 | (404,944.52) | | 124,718.15 | (124,718.15) | |
| | | | 0014 | FRINGE BENEFITS - CURR PERSON | 1,607,520.64 | 1,416,410.23 | 191,110.41 | 1,770,794.65 | 301,604.54 | 1,469,190.11 | |
| | | | 0015 | OVERTIME PAY | | 263,455.36 | (263,455.36) | | 166,622.16 | (166,622.16) | |
| | | PS Total | | | 8,364,993.38 | 8,495,250.05 | (130,256.67) | 8,315,874.68 | 2,091,086.22 | 6,224,788.46 | |
| | | NPS | 0020 | SUPPLIES AND MATERIALS | 100,000.00 | 99,998.82 | 1.18 | | | | |
| | | | 0040 | OTHER SERVICES AND CHARGES | 5,657,611.85 | 4,526,536.03 | 1,131,275.82 | 427,602.76 | 63,236.00 | 120,750.76 | |
| | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 396,081.95 | | 396,081.95 | |
| | | | 0050 | SUBSIDIES AND TRANSFERS | 5,657,654.14 | 5,657,654.14 | | 4,300,000.00 | | 4,300,000.00 | |
| | | NPS Total | | | 11,415,665.99 | 10,284,388.99 | 1,131,277.00 | 5,123,684.71 | 63,236.00 | 4,816,832.71 | |
| | | | | | 19,780,659.37 | 18,779,639.04 | 1,001,020.33 | 13,439,559.39 | 2,154,322.22 | 11,041,621.17 | |
| **0700 Total** | **OPERATING INTRA-DISTRICT FUNDS Total** | | | | **19,780,659.37** | **18,779,639.04** | **1,001,020.33** | **13,439,559.39** | **2,154,322.22** | **11,041,621.17** | The remaining funds for FY 2021 are related to delays in contractual services |
| **Grand Total** | | | | | ########### | ########### | **2,850,264.91** | ########### | **57,937,249.16** | **216,744,604.26** | |

PROGRAM LEVEL

| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | 2021 Sum of Budget | 2021 Sum of Actuals | 2021 Sum of Variance | 2022 Sum of Budget | 2022 Sum of Actuals | 2022 Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Fiscal Year Values | | | 2022 | | |
| 100F | AGENCY FINANCIAL OPERATIONS (BUDGET) | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,628,870.99 | 1,428,417.64 | 200,453.35 | 1,248,400.24 | 354,468.73 | 893,931.51 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 110,042.90 | (110,042.90) | 157,443.71 | 26,539.72 | 130,903.99 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | - | - | - | 21,757.08 | (21,757.08) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 438,166.30 | 288,120.09 | 150,046.21 | 430,824.44 | 69,330.10 | 361,494.34 |
| | | | | | 0015 | OVERTIME PAY | - | 364.73 | (364.73) | - | (95.97) | 95.97 |
| | | | | PS Total | | | 2,067,037.29 | 1,826,945.36 | 240,091.93 | 1,836,668.39 | 471,999.66 | 1,364,668.73 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 7,500.00 | - | 7,500.00 | 7,500.00 | - | 2,500.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 25,000.00 | 22,077.45 | 2,922.55 | 25,000.00 | 455.19 | 16,544.81 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 100,000.00 | 69,762.00 | 30,238.00 | 100,000.00 | - | 100,000.00 |
| | | | | NPS Total | | | 132,500.00 | 91,839.45 | 40,660.55 | 132,500.00 | 455.19 | 119,044.81 |
| | | | LOCAL FUND Total | | | | 2,199,537.29 | 1,918,784.81 | 280,752.48 | 1,969,168.39 | 472,454.85 | 1,483,713.54 |
| | | 0100 Total | | | | | 2,199,537.29 | 1,918,784.81 | 280,752.48 | 1,969,168.39 | 472,454.85 | 1,483,713.54 |
| | | 0200 | FEDERAL GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 66,622.58 | 56,584.42 | 10,038.16 | 196,409.00 | - | 196,409.00 |
| | | | | NPS Total | | | 66,622.58 | 56,584.42 | 10,038.16 | 196,409.00 | - | 196,409.00 |
| | | | FEDERAL GRANT FUND Total | | | | 66,622.58 | 56,584.42 | 10,038.16 | 196,409.00 | - | 196,409.00 |
| | | 0200 Total | | | | | 66,622.58 | 56,584.42 | 10,038.16 | 196,409.00 | - | 196,409.00 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | NPS | 0040 | OTHER SERVICES AND CHARGES | 64,408.41 | 34,320.00 | 30,088.41 | 85,000.00 | - | 49,308.00 |
| | | | | NPS Total | | | 64,408.41 | 34,320.00 | 30,088.41 | 85,000.00 | - | 49,308.00 |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | 64,408.41 | 34,320.00 | 30,088.41 | 85,000.00 | - | 49,308.00 |
| | | 0250 Total | | | | | 64,408.41 | 34,320.00 | 30,088.41 | 85,000.00 | - | 49,308.00 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | - | - | - | - | | |
| | | | | NPS Total | | | - | - | - | - | | |
| | | | PRIVATE GRANT FUND Total | | | | - | - | - | - | | |
| | | 0400 Total | | | | | - | - | - | - | | |
| | AGENCY FINANCIAL OPERATIONS (BUDGET) Total | | | | | | 2,330,568.28 | 2,009,689.23 | 320,879.05 | 2,250,577.39 | 472,454.85 | 1,729,430.54 |
| 100F Total | | | | | | | 2,330,568.28 | 2,009,689.23 | 320,879.05 | 2,250,577.39 | 472,454.85 | 1,729,430.54 |
| 1800 | MENTAL HEALTH AUTHORITY (BUDGET) | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 9,452,174.01 | 9,568,427.22 | (116,253.21) | 9,558,767.55 | 2,273,649.92 | 7,285,057.63 |
| | | | | | 0012 | REGULAR PAY - OTHER | 763,982.51 | 553,131.21 | 210,851.30 | 448,422.21 | 105,957.06 | 342,465.15 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 148,672.59 | (148,672.59) | - | 50,136.93 | (50,136.93) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 2,753,896.32 | 2,078,505.42 | 675,390.90 | 2,741,953.59 | 457,282.84 | 2,284,670.75 |
| | | | | | 0015 | OVERTIME PAY | - | 94,972.31 | (94,972.31) | - | 21,606.81 | (21,606.81) |
| | | | | PS Total | | | 12,970,052.84 | 12,443,708.75 | 526,344.09 | 12,749,083.35 | 2,908,633.56 | 9,840,449.79 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 151,283.68 | 76,489.26 | 74,794.42 | 151,283.68 | 10,489.32 | 44,044.99 |
| | | | | | 0030 | ENERGY, COMM. AND BLDG RENTA | 166,092.91 | 166,092.91 | - | 197,692.85 | - | - |
| | | | | | 0031 | TELECOMMUNICATIONS | 715,172.53 | 794,362.92 | (79,190.39) | 760,916.22 | 69,136.06 | (56,280.00) |
| | | | | | 0032 | RENTALS - LAND AND STRUCTURES | 6,963,803.90 | 6,520,068.98 | 443,734.82 | 7,412,085.89 | - | - |
| | | | | | 0034 | SECURITY SERVICES | 3,052,786.84 | 3,034,000.79 | 18,385.57 | 3,167,887.65 | - | - |
| | | | | | 0035 | OCCUPANCY FIXED COSTS | 247,743.71 | 247,743.71 | - | 264,953.83 | - | - |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 2,632,005.74 | 1,848,574.82 | 783,430.92 | 2,620,045.03 | 318,382.21 | 536,586.34 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | - | - | 112,730.00 | - | 112,730.00 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 100,000.00 | 73,633.99 | 26,366.01 | 100,000.00 | - | 46,075.80 |
| | | | | NPS Total | | | 14,028,889.21 | 12,760,967.38 | 1,267,521.35 | 14,787,595.15 | 398,007.59 | 683,157.13 |
| | | | LOCAL FUND Total | | | | 26,998,942.05 | 25,204,676.13 | 1,793,865.44 | 27,536,678.50 | 3,306,641.15 | 10,523,606.92 |
| | | 0100 Total | | | | | 26,998,942.05 | 25,204,676.13 | 1,793,865.44 | 27,536,678.50 | 3,306,641.15 | 10,523,606.92 |
| | | 0150 | ARPA | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 536,000.00 | - | 536,000.00 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | | | | 2,144,000.00 | - | 2,144,000.00 |
| | | | | NPS Total | | | | | | 2,680,000.00 | - | 2,680,000.00 |
| | | | ARPA Total | | | | | | | 2,680,000.00 | - | 2,680,000.00 |
| | | 0150 Total | | | | | | | | 2,680,000.00 | - | 2,680,000.00 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,195,392.73 | 1,203,395.51 | (8,002.78) | 1,216,263.67 | 282,173.12 | 934,090.55 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 13,418.69 | (13,418.69) | - | (121.36) | 121.36 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 273,225.11 | 276,523.64 | (3,298.53) | 333,256.25 | 61,493.33 | 271,762.92 |
| | | | | | 0015 | OVERTIME PAY | - | 1,336.85 | (1,336.85) | - | 222.12 | (222.12) |
| | | | | PS Total | | | 1,468,617.84 | 1,494,674.69 | (26,056.85) | 1,549,519.92 | 343,767.21 | 1,205,752.71 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 68,356.50 | 21,957.00 | 46,399.50 | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 30,000.51 | 29,546.14 | 454.37 | | | |
| | | | | NPS Total | | | 98,357.01 | 51,503.14 | 46,853.87 | | | |
| | | | FEDERAL GRANT FUND Total | | | | 1,566,974.85 | 1,546,177.83 | 20,797.02 | 1,549,519.92 | 343,767.21 | 1,205,752.71 |
| | | 0200 Total | | | | | 1,566,974.85 | 1,546,177.83 | 20,797.02 | 1,549,519.92 | 343,767.21 | 1,205,752.71 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 223,418.02 | 230,423.31 | (7,005.29) | 222,994.01 | 54,647.78 | 168,346.23 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 52,808.85 | 50,932.21 | 1,876.64 | 61,100.35 | 11,480.68 | 49,619.67 |
| | | | | PS Total | | | 276,226.87 | 281,355.52 | (5,128.65) | 284,094.36 | 66,128.46 | 217,965.90 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 5,000.00 | 12,741.85 | (7,741.85) | 5,000.00 | - | - |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 1,568,721.95 | 1,568,721.95 | - | 2,001,327.70 | 672,954.26 | 32,265.82 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | 8,191.68 | (8,191.68) | - | - | - |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 145,771.17 | 144,542.11 | 1,229.06 | 145,771.17 | - | 45,705.25 |
| | | | | NPS Total | | | 1,719,493.12 | 1,734,197.59 | (14,704.47) | 2,152,098.87 | 672,954.26 | 77,971.07 |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | 1,995,719.99 | 2,015,553.11 | (19,833.12) | 2,436,193.23 | 739,082.72 | 295,936.97 |
| | | 0250 Total | | | | | 1,995,719.99 | 2,015,553.11 | (19,833.12) | 2,436,193.23 | 739,082.72 | 295,936.97 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | PS | 0011 | REGULAR PAY - CONT FULL TIME | 36,779.67 | 38,713.73 | (1,934.06) | 37,547.00 | 9,515.13 | 28,031.87 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 13,803.68 | (13,803.68) | - | 2,946.51 | (2,946.51) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 9,893.73 | 6,176.96 | 3,716.77 | 10,287.38 | 1,506.92 | 8,780.96 |
| | | | | | 0015 | OVERTIME PAY | - | - | - | - | 371.92 | (371.92) |

PROGRAM LEVEL

| | | | | | | | Fiscal Year | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2021 | | | 2022 | | |
| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | | PS Total | | | 46,673.40 | 58,694.37 | (12,020.97) | 47,834.88 | 14,340.48 | 33,494.40 |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 46,673.40 | 58,694.37 | (12,020.97) | 47,834.88 | 14,340.48 | 33,494.40 |
| | | 0600 Total | | | | | 46,673.40 | 58,694.37 | (12,020.97) | 47,834.88 | 14,340.48 | 33,494.40 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 15,797.15 | - | 15,797.15 | | | |
| | | | | | 0012 | REGULAR PAY - OTHER | | 17,332.91 | (17,332.91) | - | 3,448.53 | (3,448.53) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 4,249.43 | 168.87 | 4,080.56 | - | 274.22 | (274.22) |
| | | | | PS Total | | | 20,046.58 | 17,501.78 | 2,544.80 | - | 3,722.75 | (3,722.75) |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 20,046.58 | 17,501.78 | 2,544.80 | - | 3,722.75 | (3,722.75) |
| | | 0700 Total | | | | | 20,046.58 | 17,501.78 | 2,544.80 | | 3,722.75 | (3,722.75) |
| | MENTAL HEALTH AUTHORITY (BUDGET) | Total | | | | | 30,628,356.87 | 28,842,603.22 | 1,785,353.17 | 34,250,226.53 | 4,407,554.31 | 14,735,068.25 |
| 1800 Total | | | | | | | 30,628,356.87 | 28,842,603.22 | 1,785,353.17 | 34,250,226.53 | 4,407,554.31 | 14,735,068.25 |
| 3000 | SAINT ELIZABETHS HOSPITAL (BUDGET) | 0450 | PRIVATE DONATIONS | NPS | 0020 | SUPPLIES AND MATERIALS | - | - | | | | |
| | | | | NPS Total | | | - | - | | | | |
| | | | PRIVATE DONATIONS Total | | | | - | - | | | | |
| | | 0450 Total | | | | | - | - | | | | |
| | SAINT ELIZABETHS HOSPITAL (BUDGET) | Total | | | | | - | - | | | | |
| 3000 Total | | | | | | | - | - | | | | |
| 3800 | SAINT ELIZABETHS HOSPITAL | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 59,213,647.20 | 58,492,564.85 | 721,082.35 | 58,433,651.81 | 13,640,369.38 | 44,793,282.43 |
| | | | | | 0012 | REGULAR PAY - OTHER | 3,777,655.42 | 4,718,457.33 | (940,801.91) | 4,540,202.36 | 953,262.74 | 3,586,939.62 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 3,995,046.99 | 4,481,767.50 | (486,720.51) | 3,995,046.99 | 1,198,317.40 | 2,796,729.59 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 16,607,507.70 | 16,692,652.03 | (85,144.33) | 17,206,593.24 | 3,623,153.58 | 13,583,439.66 |
| | | | | | 0015 | OVERTIME PAY | 1,476,154.73 | 5,842,622.60 | (4,366,467.87) | 1,476,154.73 | 1,310,569.65 | 165,585.08 |
| | | | | PS Total | | | 85,070,012.04 | 90,228,064.31 | (5,158,052.27) | 85,651,649.13 | 20,725,672.75 | 64,925,976.38 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 3,937,324.86 | 3,596,369.22 | 340,955.64 | 4,237,324.66 | 673,314.83 | 2,294,282.78 |
| | | | | | 0030 | ENERGY, COMM. AND BLDG RENTA | 1,723,300.64 | 1,148,193.35 | 575,107.29 | 1,250,049.94 | - | 6,115.93 |
| | | | | | 0031 | SECURITY SERVICES | 1,940,283.86 | 1,900,558.00 | 40,126.34 | 1,845,145.82 | - | |
| | | | | | 0035 | OCCUPANCY FIXED COSTS | 637,230.21 | 344,811.76 | 292,418.45 | 153,450.82 | - | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 2,468,923.70 | 2,235,093.50 | 233,830.20 | 4,019,742.94 | 78,820.55 | 1,281,745.02 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 1,286,128.00 | 1,123,665.09 | 162,462.91 | 1,536,128.00 | 282,988.00 | 397,286.83 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 1,786,959.60 | 771,807.17 | 1,015,152.43 | 1,786,959.60 | 132,617.76 | 615,000.50 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 21,050.00 | 7,158.31 | 13,891.69 | 21,050.00 | - | 11,000.00 |
| | | | | NPS Total | | | 13,801,200.87 | 11,127,656.40 | 2,673,944.95 | 14,849,851.78 | 1,167,741.14 | 4,605,431.00 |
| | | | LOCAL FUND Total | | | | 98,871,212.91 | ############ | (2,484,107.32) | ############ | 21,893,413.89 | 69,531,407.44 |
| | | 0100 Total | | | | | 98,871,212.91 | ############ | (2,484,107.32) | ############ | 21,893,413.89 | 69,531,407.44 |
| | | 0150 | ARPA | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 6,938,135.00 | - | 6,938,135.00 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 602,651.00 | - | 602,651.00 |
| | | | | PS Total | | | | | | 7,540,786.00 | - | 7,540,786.00 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 288,345.72 | 288,345.72 | - | | | |
| | | | | NPS Total | | | 288,345.72 | 288,345.72 | - | | | |
| | | | ARPA Total | | | | 288,345.72 | 288,345.72 | - | 7,540,786.00 | - | 7,540,786.00 |
| | | 0150 Total | | | | | 288,345.72 | 288,345.72 | - | 7,540,786.00 | - | 7,540,786.00 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,246,611.27 | 1,131,946.13 | 114,665.14 | 1,207,790.78 | 276,625.42 | 931,165.36 |
| | | | | | 0012 | REGULAR PAY - OTHER | 65,822.75 | 123,894.88 | (58,072.13) | 124,975.51 | 29,252.48 | 95,723.03 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | 80,231.35 | (80,231.35) | - | 19,091.47 | (19,091.47) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 353,044.74 | 327,126.43 | 25,918.31 | 365,177.96 | 73,967.09 | 291,210.87 |
| | | | | | 0015 | OVERTIME PAY | - | 122,690.34 | (122,690.34) | - | 30,965.26 | (30,965.26) |
| | | | | PS Total | | | 1,665,478.76 | 1,785,889.13 | (120,410.37) | 1,697,944.25 | 429,901.72 | 1,268,042.53 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 535,531.90 | 495,647.45 | 39,884.45 | 585,531.90 | 1,435.00 | 251,807.90 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 422,067.47 | 347,229.75 | 74,837.72 | 431,887.15 | 925.00 | 146,217.34 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 189,720.86 | 196,265.94 | (6,545.08) | 319,720.86 | - | 319,720.86 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 63,853.82 | 53,645.10 | 10,208.72 | 63,853.82 | - | 38,453.82 |
| | | | | NPS Total | | | 1,211,174.05 | 1,092,788.24 | 118,385.81 | 1,400,993.73 | 2,360.00 | 756,199.92 |
| | | | FEDERAL GRANT FUND Total | | | | 2,876,652.81 | 2,878,677.37 | (2,024.56) | 3,098,937.98 | 432,261.72 | 2,024,242.45 |
| | | 0200 Total | | | | | 2,876,652.81 | 2,878,677.37 | (2,024.56) | 3,098,937.98 | 432,261.72 | 2,024,242.45 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0020 | SUPPLIES AND MATERIALS | 2,379.11 | 2,379.11 | - | 40,000.00 | - | 33,000.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 60,514.15 | 60,514.15 | (0.00) | 175,000.00 | 11,798.36 | 75,701.00 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 56,976.83 | 56,976.83 | - | 40,000.00 | - | 35,000.00 |
| | | | | NPS Total | | | 119,870.09 | 119,870.09 | (0.00) | 255,000.00 | 11,798.36 | 143,701.00 |
| | | | PRIVATE GRANT FUND Total | | | | 119,870.09 | 119,870.09 | (0.00) | 255,000.00 | 11,798.36 | 143,701.00 |
| | | 0400 Total | | | | | 119,870.09 | 119,870.09 | (0.00) | 255,000.00 | 11,798.36 | 143,701.00 |
| | | 0450 | PRIVATE DONATIONS | NPS | 0020 | SUPPLIES AND MATERIALS | 6,956.31 | 6,956.31 | 0.00 | 12,000.00 | - | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 614.37 | 614.37 | 0.00 | 135,463.55 | 30.36 | 125,433.19 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | | | | 13,689.19 | - | 13,689.19 |
| | | | | NPS Total | | | 7,570.68 | 7,570.68 | (0.00) | 161,152.74 | 30.36 | 139,122.38 |
| | | | PRIVATE DONATIONS Total | | | | 7,570.68 | 7,570.68 | (0.00) | 161,152.74 | 30.36 | 139,122.38 |
| | | 0450 Total | | | | | 7,570.68 | 7,570.68 | (0.00) | 161,152.74 | 30.36 | 139,122.38 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,602,794.11 | 1,333,329.91 | 269,464.20 | 1,611,009.39 | 312,467.16 | 1,298,542.23 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | 10,660.15 | - | (10,660.15) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | 134,100.29 | (134,100.29) | - | 40,372.26 | (40,372.26) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 431,151.64 | 402,002.27 | 29,149.37 | 441,416.57 | 90,840.79 | 350,575.78 |
| | | | | | 0015 | OVERTIME PAY | 44,701.15 | 153,049.68 | (108,348.53) | 44,701.15 | 48,299.91 | (3,598.76) |
| | | | | PS Total | | | 2,078,646.90 | 2,022,482.15 | 56,164.75 | 2,097,127.11 | 502,640.27 | 1,594,486.84 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | - | - | | - | | |

PROGRAM LEVEL

| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Fiscal Year Values 2021 Sum of Budget | Sum of Actuals | Sum of Variance | 2022 Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 69,947.37 | 116,813.80 | (46,866.43) | 100,000.00 | - | 100,000.00 |
| | | | | NPS Total | | | 69,947.37 | 116,813.80 | (46,866.43) | 100,000.00 | - | 100,000.00 |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 2,148,594.27 | 2,139,295.95 | 9,298.32 | 2,197,127.11 | 502,640.27 | 1,694,486.84 |
| | | 0600 Total | | | | | 2,148,594.27 | 2,139,295.95 | 9,298.32 | 2,197,127.11 | 502,640.27 | 1,694,486.84 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 634,830.14 | 596,790.29 | 38,039.85 | 689,666.49 | 157,597.33 | 532,069.16 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 1,614.76 | (1,614.76) | - | (1,710.11) | 1,710.11 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 47,803.39 | (47,803.39) | - | 17,105.29 | (17,105.29) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 186,681.89 | 159,389.38 | 27,292.51 | 188,968.62 | 42,967.61 | 146,001.01 |
| | | | | | 0015 | OVERTIME PAY | - | 110,283.50 | (110,283.50) | - | 26,032.88 | (26,032.88) |
| | | | | PS Total | | | 821,512.03 | 915,881.32 | (94,369.29) | 878,635.11 | 241,993.00 | 636,642.11 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 100,000.00 | 99,998.82 | 1.18 | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 2,472,407.04 | 1,766,537.75 | 705,869.29 | 380,467.04 | 43,236.00 | 93,615.04 |
| | | | | NPS Total | | | 2,572,407.04 | 1,866,536.57 | 705,870.47 | 380,467.04 | 43,236.00 | 93,615.04 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 3,393,919.07 | 2,782,417.89 | 611,501.18 | 1,259,102.15 | 285,229.00 | 730,257.15 |
| | | 0700 Total | | | | | 3,393,919.07 | 2,782,417.89 | 611,501.18 | 1,259,102.15 | 285,229.00 | 730,257.15 |
| | SAINT ELIZABETHS HOSPITAL        Total | | | | | | ########### | ########### | (1,865,332.38) | ########### | 23,125,373.60 | 81,804,003.26 |
| 3800 Total | | | | | | | ########### | ########### | (1,865,332.38) | ########### | 23,125,373.60 | 81,804,003.26 |
| 4800 | MENTAL HEALTH SERVICES AND SUPPORTS | 0100 | LOCAL FUND | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | - | (42.66) | 42.66 | | | |
| | | | | NPS Total | | | - | (42.66) | 42.66 | | | |
| | | | LOCAL FUND Total | | | | - | (42.66) | 42.66 | | | |
| | | 0100 Total | | | | | - | (42.66) | 42.66 | | | |
| | MENTAL HEALTH SERVICES AND SUPPORTS Total | | | | | | - | (42.66) | 42.66 | | | |
| 4800 Total | | | | | | | - | (42.66) | 42.66 | | | |
| 4900 | ACCOUNTABILITY | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 2,717,850.03 | 2,803,611.51 | (85,761.48) | 2,692,495.33 | 703,379.51 | 1,989,115.82 |
| | | | | | 0012 | REGULAR PAY - OTHER | 9,278.46 | | 9,278.46 | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 632.32 | (632.32) | - | 22.13 | (22.13) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 733,728.92 | 609,233.65 | 124,495.27 | 737,743.74 | 147,432.84 | 590,310.90 |
| | | | | | 0015 | OVERTIME PAY | - | 1,632.71 | (1,632.71) | - | 60.30 | (60.30) |
| | | | | PS Total | | | 3,460,857.41 | 3,415,110.19 | 45,747.22 | 3,430,239.07 | 850,894.78 | 2,579,344.29 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 69,105.81 | 34,441.83 | 34,663.98 | 69,105.81 | - | 48,610.81 |
| | | | | NPS Total | | | 69,105.81 | 34,441.83 | 34,663.98 | 69,105.81 | - | 48,610.81 |
| | | | LOCAL FUND Total | | | | 3,529,963.22 | 3,449,552.02 | 80,411.20 | 3,499,344.88 | 850,894.78 | 2,627,955.10 |
| | | 0100 Total | | | | | 3,529,963.22 | 3,449,552.02 | 80,411.20 | 3,499,344.88 | 850,894.78 | 2,627,955.10 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 94,858.00 | 94,110.64 | 747.36 | 99,815.13 | 24,704.14 | 75,110.99 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 25,516.80 | 17,406.76 | 8,110.04 | 27,349.35 | 4,803.15 | 22,546.20 |
| | | | | | 0015 | OVERTIME PAY | - | 5,706.51 | (5,706.51) | - | 192.75 | (192.75) |
| | | | | PS Total | | | 120,374.80 | 117,223.91 | 3,150.89 | 127,164.48 | 29,700.04 | 97,464.44 |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | 120,374.80 | 117,223.91 | 3,150.89 | 127,164.48 | 29,700.04 | 97,464.44 |
| | | 0250 Total | | | | | 120,374.80 | 117,223.91 | 3,150.89 | 127,164.48 | 29,700.04 | 97,464.44 |
| | ACCOUNTABILITY        Total | | | | | | 3,650,338.02 | 3,566,775.93 | 83,562.09 | 3,626,509.36 | 880,594.82 | 2,725,419.54 |
| 4900 Total | | | | | | | 3,650,338.02 | 3,566,775.93 | 83,562.09 | 3,626,509.36 | 880,594.82 | 2,725,419.54 |
| 5800 | CLINICAL SERVICES DIVISION | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 13,367,257.15 | 12,630,241.19 | 737,015.96 | 7,452,937.24 | 1,298,266.83 | 6,154,670.41 |
| | | | | | 0012 | REGULAR PAY - OTHER | 195,104.82 | 1,157,080.31 | (961,975.49) | 206,455.14 | 110,999.11 | 95,456.03 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 887,071.22 | (887,071.22) | - | 89,478.07 | (89,478.07) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 3,660,129.41 | 2,806,897.25 | 853,232.16 | 2,143,388.77 | 268,314.99 | 1,875,073.78 |
| | | | | | 0015 | OVERTIME PAY | - | 801,916.59 | (801,916.59) | - | 128,283.05 | (128,283.05) |
| | | | | PS Total | | | 17,222,491.38 | 18,283,206.56 | (1,060,715.18) | 9,802,781.15 | 1,895,342.05 | 7,907,439.10 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 1,356,010.58 | 892,167.26 | 463,843.32 | 1,176,011.35 | 107,455.66 | 83,555.26 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 1,486,414.97 | 1,053,226.14 | 433,188.83 | 3,193,353.27 | 25,474.48 | 578,811.27 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 5,895,286.40 | 5,073,652.01 | 801,946.89 | 4,127,244.00 | 654,091.44 | 205,850.27 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 1,124,584.09 | 995,033.08 | 129,551.01 | 824,584.09 | 766.18 | 612,638.11 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 3,000.00 | 175.80 | 2,824.20 | | | |
| | | | | NPS Total | | | 9,865,296.04 | 8,014,254.29 | 1,831,354.25 | 9,321,192.71 | 787,787.76 | 1,520,855.71 |
| | | | LOCAL FUND Total | | | | 27,087,787.42 | 26,297,460.85 | 770,639.07 | 19,123,973.86 | 2,683,129.81 | 9,428,294.81 |
| | | 0100 Total | | | | | 27,087,787.42 | 26,297,460.85 | 770,639.07 | 19,123,973.86 | 2,683,129.81 | 9,428,294.81 |
| | | 0150 | ARPA | NPS | 0040 | OTHER SERVICES AND CHARGES | 800,000.00 | 800,000.00 | - | | | |
| | | | | NPS Total | | | 800,000.00 | 800,000.00 | - | | | |
| | | | ARPA Total | | | | 800,000.00 | 800,000.00 | - | | | |
| | | 0150 Total | | | | | 800,000.00 | 800,000.00 | - | | | |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,851,269.63 | 1,775,329.37 | 75,940.26 | 1,716,083.32 | 349,521.64 | 1,366,561.68 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 897.09 | (897.09) | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 47,060.26 | (47,060.26) | - | 905.88 | (905.88) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 459,430.70 | 445,056.48 | 14,374.22 | 470,206.83 | 76,550.56 | 393,656.27 |
| | | | | | 0015 | OVERTIME PAY | - | 38,134.07 | (38,134.07) | - | 2,297.38 | (2,297.38) |
| | | | | PS Total | | | 2,310,700.33 | 2,306,477.27 | 4,223.06 | 2,186,290.15 | 429,275.46 | 1,757,014.69 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 21,996.00 | 6,996.00 | 15,000.00 | | | |
| | | | | | 0031 | TELECOMMUNICATIONS | 4,980.42 | 4,980.42 | - | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 1,034,864.32 | 1,001,155.32 | 33,709.00 | 2,000.00 | - | 2,000.00 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 95,610.03 | 82,393.65 | 13,216.38 | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 2,572,124.16 | 2,572,124.16 | - | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 3,735,594.67 | 6,019.74 | 6,019.74 | | | |
| | | | | NPS Total | | | 3,735,594.67 | 3,673,669.29 | 61,925.38 | 2,000.00 | - | 2,000.00 |
| | | | FEDERAL GRANT FUND Total | | | | 6,046,295.00 | 5,980,146.56 | 66,148.44 | 2,188,290.15 | 429,275.46 | 1,759,014.69 |

PROGRAM LEVEL

| | | | | | | | Fiscal Year | Values | | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2021 | | | | | |
| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actual | Sum of Variance | Sum of Budget | Sum of Actual | Sum of Variance |
| | | 0200 Total | | | | | 6,046,295.00 | 5,980,146.56 | 66,148.44 | 2,188,290.15 | 429,275.46 | 1,759,014.69 |
| | | 0400 | PRIVATE GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | 59,313.54 | (59,313.54) | | | |
| | | | | | 0012 | REGULAR PAY - OTHER | 59,313.54 | | 59,313.54 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 15,955.34 | 15,955.34 | - | | | |
| | | | | PS Total | | | 75,268.88 | 75,268.88 | | | | |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | | 20,000.00 | - | 20,000.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | - | (126,725.00) | 126,725.00 | 20,000.00 | (31,875.00) | 51,875.00 |
| | | | | NPS Total | | | | (126,725.00) | 126,725.00 | 40,000.00 | (31,875.00) | 71,875.00 |
| | | | PRIVATE GRANT FUND Total | | | | 75,268.88 | (51,456.12) | 126,725.00 | 40,000.00 | (31,875.00) | 71,875.00 |
| | | 0400 Total | | | | | 75,268.88 | (51,456.12) | 126,725.00 | 40,000.00 | (31,875.00) | 71,875.00 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | NPS | 0040 | OTHER SERVICES AND CHARGES | 27,052.63 | - | 27,052.63 | 417,000.00 | 50,000.00 | 367,000.00 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 3,000.00 | | 3,000.00 | | | |
| | | | | NPS Total | | | 30,052.63 | - | 30,052.63 | 417,000.00 | 50,000.00 | 367,000.00 |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 30,052.63 | - | 30,052.63 | 417,000.00 | 50,000.00 | 367,000.00 |
| | | 0600 Total | | | | | 30,052.63 | - | 30,052.63 | 417,000.00 | 50,000.00 | 367,000.00 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 3,696,995.55 | 3,515,340.20 | 181,655.35 | 2,820,916.39 | 340,601.90 | 2,480,314.49 |
| | | | | | 0012 | REGULAR PAY - OTHER | 167,060.32 | 130,501.38 | 36,558.94 | | 9,654.67 | (9,654.67) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | 329,966.82 | (329,966.82) | | 96,929.54 | (96,929.54) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 881,157.80 | 810,687.18 | 70,470.62 | 772,931.10 | 81,999.34 | 690,931.76 |
| | | | | | 0015 | OVERTIME PAY | | 153,098.01 | (153,098.01) | | 138,617.40 | (138,617.40) |
| | | | | PS Total | | | 4,745,213.67 | 4,939,593.59 | (194,379.92) | 3,593,847.49 | 667,802.85 | 2,926,044.64 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 1,443,710.00 | 1,255,273.52 | 188,436.48 | | | |
| | | | | NPS Total | | | 1,443,710.00 | 1,255,273.52 | 188,436.48 | | | |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 6,188,923.67 | 6,194,867.11 | (5,943.44) | 3,593,847.49 | 667,802.85 | 2,926,044.64 |
| | | 0700 Total | | | | | 6,188,923.67 | 6,194,867.11 | (5,943.44) | 3,593,847.49 | 667,802.85 | 2,926,044.64 |
| | CLINICAL SERVICES DIVISION | Total | | | | | 40,228,327.60 | 39,221,018.40 | 987,621.70 | 25,363,111.50 | 3,798,333.12 | 14,552,229.14 |
| 5800 Total | | | | | | | 40,228,327.60 | 39,221,018.40 | 987,621.70 | 25,363,111.50 | 3,798,333.12 | 14,552,229.14 |
| 5900 | SYSTEM TRANSFORMATION | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 3,671,037.48 | 3,406,803.50 | 264,233.98 | - | (172,820.58) | 172,820.58 |
| | | | | | 0012 | REGULAR PAY - OTHER | | (4,576.78) | 4,576.78 | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | 98,824.91 | (98,824.91) | - | (41,774.10) | 41,774.10 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 987,509.09 | 713,378.13 | 274,130.96 | - | (38,106.60) | 38,106.60 |
| | | | | | 0015 | OVERTIME PAY | | 611.36 | (611.36) | - | (3,124.32) | 3,124.32 |
| | | | | PS Total | | | 4,658,546.57 | 4,215,041.12 | 443,505.45 | - | (255,825.60) | 255,825.60 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 5,000.00 | | 5,000.00 | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 143,910.15 | 119,297.68 | 24,612.47 | - | 69.24 | (69.24) |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | 1,677.76 | (1,677.76) | - | 430.22 | (430.22) |
| | | | | NPS Total | | | 148,910.15 | 120,975.44 | 27,934.71 | - | 499.46 | (499.46) |
| | | | LOCAL FUND Total | | | | 4,807,456.72 | 4,336,016.56 | 471,440.16 | - | (255,326.14) | 255,326.14 |
| | | 0100 Total | | | | | 4,807,456.72 | 4,336,016.56 | 471,440.16 | - | (255,326.14) | 255,326.14 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 69,564.30 | 64,498.57 | 5,065.73 | - | (3,758.08) | 3,758.08 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 14,055.94 | 12,934.09 | 1,121.85 | - | (742.58) | 742.58 |
| | | | | PS Total | | | 83,620.24 | 77,432.66 | 6,187.58 | - | (4,500.66) | 4,500.66 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 546,837.25 | 514,791.91 | 32,045.34 | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 674,763.80 | 674,763.80 | - | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 4,000.00 | 2,688.44 | 1,311.16 | | | |
| | | | | NPS Total | | | 1,225,601.05 | 1,192,244.55 | 33,356.50 | | | |
| | | | FEDERAL GRANT FUND Total | | | | 1,309,221.29 | 1,269,677.21 | 39,544.08 | - | (4,500.66) | 4,500.66 |
| | | 0200 Total | | | | | 1,309,221.29 | 1,269,677.21 | 39,544.08 | - | (4,500.66) | 4,500.66 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 64,542.04 | 64,542.04 | - | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | 17,772.89 | (17,772.89) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 20,900.49 | 17,197.11 | 3,703.38 | | | |
| | | | | PS Total | | | 85,442.53 | 99,512.04 | (14,069.51) | | | |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | 85,442.53 | 99,512.04 | (14,069.51) | | | |
| | | 0250 Total | | | | | 85,442.53 | 99,512.04 | (14,069.51) | | | |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 103,948.00 | 103,948.00 | - | | | |
| | | | | NPS Total | | | 103,948.00 | 103,948.00 | - | | | |
| | | | PRIVATE GRANT FUND Total | | | | 103,948.00 | 103,948.00 | - | | | |
| | | 0400 Total | | | | | 103,948.00 | 103,948.00 | - | | | |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | (1,803.84) | 1,803.84 | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | (631.34) | 631.34 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (287.47) | 287.47 | | | |
| | | | | PS Total | | | - | (2,722.65) | 2,722.65 | | | |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 25,000.00 | 4,920.00 | 20,080.00 | | | |
| | | | | NPS Total | | | 25,000.00 | 4,920.00 | 20,080.00 | | | |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 25,000.00 | 2,197.35 | 22,802.65 | | | |
| | | 0600 Total | | | | | 25,000.00 | 2,197.35 | 22,802.65 | | | |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 131,518.57 | 126,699.64 | 4,818.93 | - | (7,108.41) | 7,108.41 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 35,378.49 | 24,437.76 | 10,940.73 | - | (1,357.57) | 1,357.57 |
| | | | | PS Total | | | 166,897.06 | 151,137.40 | 15,759.66 | - | (8,465.98) | 8,465.98 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | | | |
| | | | | NPS Total | | | | | | | | |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 166,897.06 | 151,137.40 | 15,759.66 | - | (8,465.98) | 8,465.98 |
| | | 0700 Total | | | | | 166,897.06 | 151,137.40 | 15,759.66 | - | (8,465.98) | 8,465.98 |

PROGRAM LEVEL

| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Fiscal Year Values 2021 Sum of Budget | Sum of Actuals | Sum of Variance | 2022 Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SYSTEM TRANSFORMATION | Total | | | | | 6,497,965.60 | 5,962,488.56 | 535,477.04 | - | (268,292.78) | 268,292.78 |
| **5900 Total** | | | | | | | 6,497,965.60 | 5,962,488.56 | 535,477.04 | - | (268,292.78) | 268,292.78 |
| 6500 | ADULT/TRANSITIONAL YOUTH SERVICES | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 8,743,598.26 | 1,981,951.66 | 6,761,646.60 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | 172,329.67 | 115,286.32 | 57,043.35 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 86,689.10 | (86,689.10) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 2,079,312.42 | 503,887.91 | 1,575,424.51 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 107,025.51 | (107,025.51) |
| | | | | PS Total | | | | | | 10,995,240.35 | 2,794,840.50 | 8,200,399.85 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 4,044,946.06 | 440,417.47 | 1,381,336.58 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 20,341,044.77 | 3,147,458.06 | 4,118,057.54 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 41,885,785.21 | 9,079,283.12 | 11,995,175.85 |
| | | | | NPS Total | | | | | | 66,271,776.04 | 12,667,158.65 | 17,094,569.97 |
| | | | **LOCAL FUND Total** | | | | | | | **77,267,016.39** | **15,461,999.15** | **25,294,969.82** |
| | | 0100 Total | | | | | | | | 77,267,016.39 | 15,461,999.15 | 25,294,969.82 |
| | | 0110 | LOCAL FUND | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 200,000.00 | - | 200,000.00 |
| | | | | NPS Total | | | | | | 200,000.00 | - | 200,000.00 |
| | | | **LOCAL FUND Total** | | | | | | | **200,000.00** | **-** | **200,000.00** |
| | | 0110 Total | | | | | | | | 200,000.00 | - | 200,000.00 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 2,815,156.50 | 370,056.55 | 2,445,099.95 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | 469,371.22 | 132,112.09 | 337,259.13 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 13,976.38 | (13,976.38) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 790,360.60 | 114,449.07 | 675,911.53 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 15,979.29 | (15,979.29) |
| | | | | PS Total | | | | | | 4,074,888.32 | 646,573.38 | 3,428,314.94 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | | 127,238.00 | - | 127,238.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | | | | 11,146,488.00 | 42,799.07 | 6,327,076.74 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 6,591,692.07 | 72,757.56 | 6,283,640.07 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 8,536,386.35 | 89,371.37 | 3,601,685.39 |
| | | | | NPS Total | | | | | | 26,401,804.42 | 204,928.00 | 16,339,640.20 |
| | | | **FEDERAL GRANT FUND Total** | | | | | | | **30,476,692.74** | **851,501.38** | **19,767,955.14** |
| | | 0200 Total | | | | | | | | 30,476,692.74 | 851,501.38 | 19,767,955.14 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 23,982.00 | 11,400.00 | 5,082.00 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 20,000.00 | | 20,000.00 |
| | | | | NPS Total | | | | | | 43,982.00 | 11,400.00 | 25,082.00 |
| | | | **PRIVATE GRANT FUND Total** | | | | | | | **43,982.00** | **11,400.00** | **25,082.00** |
| | | 0400 Total | | | | | | | | 43,982.00 | 11,400.00 | 25,082.00 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 1,839,582.22 | 509,901.93 | 1,329,680.29 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | 198,471.00 | 77,753.48 | 120,717.52 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 6,692.66 | (6,692.66) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 535,869.26 | 90,530.74 | 445,338.52 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 1,907.09 | (1,907.09) |
| | | | | PS Total | | | | | | 2,573,922.48 | 686,785.90 | 1,887,136.58 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 47,135.72 | 20,000.00 | 27,135.72 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 4,300,000.00 | | 4,300,000.00 |
| | | | | NPS Total | | | | | | 4,347,135.72 | 20,000.00 | 4,327,135.72 |
| | | | **OPERATING INTRA-DISTRICT FUNDS Total** | | | | | | | **6,921,058.20** | **706,785.90** | **6,214,272.30** |
| | | 0700 Total | | | | | | | | 6,921,058.20 | 706,785.90 | 6,214,272.30 |
| | **ADULT/TRANSITIONAL YOUTH SERVICES Total** | | | | | | | | | ########### | 17,031,686.43 | 51,502,279.26 |
| **6500 Total** | | | | | | | | | | ########### | 17,031,686.43 | 51,502,279.26 |
| 6600 | CHILD/ADOLESCENT/FAMILY SERVICES | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 9,690,909.12 | 2,313,954.39 | 7,376,954.73 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | 492,812.12 | 85,006.00 | 407,806.12 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 4,102.69 | (4,102.69) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 2,707,216.01 | 503,028.18 | 2,204,187.83 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 1,044.63 | (1,044.63) |
| | | | | PS Total | | | | | | 12,890,937.25 | 2,907,135.89 | 9,983,801.36 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | | 191,526.23 | - | 189,999.23 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | | | | 800,336.63 | 117,464.00 | 339,815.63 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 1,506,000.00 | 37,397.96 | 434,120.07 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 42,439,642.61 | 4,359,382.81 | 24,190,455.05 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | | | | 54,000.00 | | 54,000.00 |
| | | | | NPS Total | | | | | | 44,991,505.47 | 4,514,244.77 | 25,208,389.98 |
| | | | **LOCAL FUND Total** | | | | | | | | **57,882,442.72** | **7,421,380.66** | **35,192,191.34** |
| | | 0100 Total | | | | | | | | | 57,882,442.72 | 7,421,380.66 | 35,192,191.34 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 231,219.02 | 20,533.47 | 210,685.55 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | - | 12,262.04 | (12,262.04) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 4,444.10 | (4,444.10) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 63,354.01 | 9,591.85 | 53,762.16 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 23.02 | (23.02) |
| | | | | PS Total | | | | | | 294,573.03 | 46,854.48 | 247,718.55 |
| | | | **FEDERAL GRANT FUND Total** | | | | | | | | **294,573.03** | **46,854.48** | **247,718.55** |
| | | 0200 Total | | | | | | | | | 294,573.03 | 46,854.48 | 247,718.55 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 893,767.74 | 213,860.88 | 679,906.86 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | 93,325.00 | 28,579.05 | 64,745.95 |

PROGRAM LEVEL

| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | 2021 Sum of Budget | Sum of Actuals | Sum of Variance | 2022 Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | | 474.78 | (474.78) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 270,463.44 | 56,246.24 | 214,217.20 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 64.79 | (64.79) |
| | | | | PS Total | | | | | | 1,257,556.18 | 299,225.74 | 958,330.44 |
| | | | | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 396,081.95 | - | 396,081.95 |
| | | | | NPS Total | | | | | | 396,081.95 | - | 396,081.95 |
| | | | | 0700 Total | | | | | | 1,653,638.13 | 299,225.74 | 1,354,412.39 |
| | CHILD/ADOLESCENT/FAMILY SERVICES | | OPERATING INTRA-DISTRICT FUNDS Total | Total | | | | | | 1,653,638.13 | 299,225.74 | 1,354,412.39 |
| 6600 Total | | | | | | | | | | 59,830,653.88 | 7,767,460.88 | 36,794,222.28 |
| | | | | | | | | | | 59,830,653.88 | 7,767,460.88 | 36,794,222.28 |
| 6700 | POLICY, PLANNING, & EVALUATION ADMIN | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 2,922,394.93 | 757,607.94 | 2,164,786.99 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | - | 7,552.00 | (7,552.00) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 30,792.31 | (30,792.31) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 669,408.58 | 159,907.89 | 509,500.69 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 2,302.20 | (2,302.20) |
| | | | | PS Total | | | | | | 3,591,803.51 | 958,162.34 | 2,633,641.17 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | | 5,000.00 | - | 5,000.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | | | | 143,910.15 | - | 136,610.15 |
| | | | | NPS Total | | | | | | 148,910.15 | - | 141,610.15 |
| | | | LOCAL FUND Total | | | | | | | 3,740,713.66 | 958,162.34 | 2,775,251.32 |
| | | 0100 Total | | | | | | | | 3,740,713.66 | 958,162.34 | 2,775,251.32 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 69,596.72 | 21,444.52 | 48,152.20 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 19,069.50 | 4,090.78 | 14,978.72 |
| | | | | PS Total | | | | | | 88,666.22 | 25,535.30 | 63,130.92 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | | 2,490,402.00 | - | 2,490,402.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | | | | 3,348,825.00 | 103,151.50 | 3,052,427.86 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 1,972,854.00 | - | 1,972,854.00 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 2,175,285.00 | - | 1,521,443.00 |
| | | | | NPS Total | | | | | | 9,987,366.00 | 103,151.50 | 9,037,126.86 |
| | | | FEDERAL GRANT FUND Total | | | | | | | 10,076,032.22 | 128,686.80 | 9,100,257.78 |
| | | 0200 Total | | | | | | | | 10,076,032.22 | 128,686.80 | 9,100,257.78 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 164,300.45 | - | 164,300.45 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 45,018.32 | - | 45,018.32 |
| | | | | PS Total | | | | | | 209,318.77 | - | 209,318.77 |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | | | | 209,318.77 | - | 209,318.77 |
| | | 0250 Total | | | | | | | | 209,318.77 | - | 209,318.77 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 147,308.44 | 19,800.00 | 105,308.44 |
| | | | | NPS Total | | | | | | 147,308.44 | 19,800.00 | 105,308.44 |
| | | | PRIVATE GRANT FUND Total | | | | | | | 147,308.44 | 19,800.00 | 105,308.44 |
| | | 0400 Total | | | | | | | | 147,308.44 | 19,800.00 | 105,308.44 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 25,000.00 | - | 25,000.00 |
| | | | | NPS Total | | | | | | 25,000.00 | - | 25,000.00 |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | | | | 25,000.00 | - | 25,000.00 |
| | | 0600 Total | | | | | | | | 25,000.00 | - | 25,000.00 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 9,351.19 | 2,880.78 | 6,470.41 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 2,562.23 | 376.36 | 2,185.87 |
| | | | | PS Total | | | | | | 11,913.42 | 3,257.14 | 8,656.28 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | 11,913.42 | 3,257.14 | 8,656.28 |
| | | 0700 Total | | | | | | | | 11,913.42 | 3,257.14 | 8,656.28 |
| | POLICY, PLANNING, & EVALUATION ADMIN | | | Total | | | | | | 14,210,286.51 | 1,109,906.28 | 12,223,792.99 |
| 6700 Total | | | | | | | | | | 14,210,286.51 | 1,109,906.28 | 12,223,792.99 |
| 6900 | COMMUNITY SERVICES | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 11,361,722.87 | 9,800,053.40 | 1,561,669.47 | - | (478,719.68) | 478,719.68 |
| | | | | | 0012 | REGULAR PAY - OTHER | 668,670.74 | 213,612.73 | 455,058.01 | - | (8,895.14) | 8,895.14 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 38,998.97 | (38,998.97) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 3,182,417.01 | 2,279,432.20 | 902,984.81 | - | (112,378.00) | 112,378.00 |
| | | | | | 0015 | OVERTIME PAY | - | 2,661.65 | (2,661.65) | - | (417.76) | 417.76 |
| | | | | PS Total | | | 15,212,810.62 | 12,334,758.95 | 2,878,051.67 | - | (600,410.58) | 600,410.58 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 11,527.00 | 23,641.21 | (12,114.21) | - | 93.17 | (93.17) |
| | | | | | 0031 | TELECOMMUNICATIONS | - | 6,244.68 | (6,244.68) | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 3,327,713.25 | 3,666,512.35 | (338,799.10) | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 20,903,644.89 | 22,742,948.22 | (1,839,303.33) | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 59,659,508.99 | 59,786,518.59 | (127,009.60) | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 54,000.00 | 49,237.49 | 4,762.51 | | | |
| | | | | NPS Total | | | 83,956,394.13 | 86,275,102.54 | (2,318,708.41) | - | 93.17 | (93.17) |
| | | | LOCAL FUND Total | | | | 99,169,204.75 | 98,609,861.49 | 559,343.26 | - | (600,317.41) | 600,317.41 |
| | | 0100 Total | | | | | 99,169,204.75 | 98,609,861.49 | 559,343.26 | - | (600,317.41) | 600,317.41 |
| | | 0110 | LOCAL FUND | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | 200,000.00 | - | 200,000.00 | | | |
| | | | | NPS Total | | | 200,000.00 | - | 200,000.00 | | | |
| | | | LOCAL FUND Total | | | | 200,000.00 | - | 200,000.00 | | | |
| | | 0110 Total | | | | | 200,000.00 | - | 200,000.00 | | | |
| | | 0150 | ARPA | NPS | 0050 | SUBSIDIES AND TRANSFERS | 2,004,655.00 | 2,004,655.00 | - | | | |
| | | | | NPS Total | | | 2,004,655.00 | 2,004,655.00 | - | | | |
| | | | ARPA Total | | | | 2,004,655.00 | 2,004,655.00 | - | | | |

PROGRAM LEVEL

| | | | | | | | Fiscal Year | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2021 | | | 2022 | | |
| Org Code 3 | Org Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | 0150 Total | | | | | 2,004,655.00 | 2,004,655.00 | - | | | |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,110,461.49 | 1,249,677.99 | (139,216.50) | - | (53,702.00) | 53,702.00 |
| | | | | | 0012 | REGULAR PAY - OTHER | 727,612.40 | 608,064.48 | 119,547.92 | - | 38,682.46 | (38,682.46) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 21,025.70 | (21,025.70) | - | (321.84) | 321.84 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 465,007.84 | 420,946.88 | 44,060.96 | - | (8,379.39) | 8,379.39 |
| | | | | | 0015 | OVERTIME PAY | - | 6,517.82 | (6,517.82) | | | |
| | | | | PS Total | | | 2,303,081.73 | 2,306,232.87 | (3,151.14) | - | (23,720.77) | 23,720.77 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | (320,845.95) | 10,895.54 | (331,741.49) | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 12,985,222.18 | 12,541,334.92 | 443,887.26 | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 4,197,102.96 | 4,191,459.59 | 5,643.37 | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 10,880,233.88 | 11,139,697.61 | (259,463.73) | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | - | (408.93) | (408.93) | | | |
| | | | | NPS Total | | | 27,741,304.14 | 27,883,387.66 | (142,083.52) | | | |
| | | | FEDERAL GRANT FUND Total | | | | 30,044,385.87 | 30,189,620.53 | (145,234.66) | - | (23,720.77) | 23,720.77 |
| | | 0200 Total | | | | | 30,044,385.87 | 30,189,620.53 | (145,234.66) | - | (23,720.77) | 23,720.77 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 22,116.00 | 22,116.00 | - | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | - | - | - | | | |
| | | | | NPS Total | | | 22,116.00 | 22,116.00 | - | | | |
| | | | PRIVATE GRANT FUND Total | | | | 22,116.00 | 22,116.00 | - | | | |
| | | 0400 Total | | | | | 22,116.00 | 22,116.00 | - | | | |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | NPS | 0040 | OTHER SERVICES AND CHARGES | 400,000.00 | 400,000.00 | - | | | |
| | | | | NPS Total | | | 400,000.00 | 400,000.00 | - | | | |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 400,000.00 | 400,000.00 | - | | | |
| | | 0600 Total | | | | | 400,000.00 | 400,000.00 | - | | | |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,054,598.99 | 952,592.20 | 102,006.79 | - | (29,420.43) | 29,420.43 |
| | | | | | 0012 | REGULAR PAY - OTHER | 1,056,672.02 | 1,069,568.56 | (12,896.54) | - | 192,101.77 | (192,101.77) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 27,174.31 | (27,174.31) | - | 3,515.88 | (3,515.88) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 500,053.03 | 421,727.04 | 78,325.99 | - | 30,567.60 | (30,567.60) |
| | | | | | 0015 | OVERTIME PAY | - | 73.85 | (73.85) | | | |
| | | | | PS Total | | | 2,611,324.04 | 2,471,135.96 | 140,188.08 | - | 196,764.82 | (196,764.82) |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 1,741,694.81 | 1,504,724.76 | 236,970.05 | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | - | - | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 5,657,854.14 | 5,657,854.14 | - | | | |
| | | | | NPS Total | | | 7,399,548.95 | 7,162,578.90 | 236,970.05 | | | |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 10,010,872.99 | 9,633,714.86 | 377,158.13 | - | 196,764.82 | (196,764.82) |
| | | 0700 Total | | | | | 10,010,872.99 | 9,633,714.86 | 377,158.13 | - | 196,764.82 | (196,764.82) |
| | COMMUNITY SERVICES | Total | | | | | ########### | ########### | 991,266.73 | - | (427,273.36) | 427,273.36 |
| 6900 Total | | | | | | | ########### | ########### | 991,266.73 | - | (427,273.36) | 427,273.36 |
| 9950 | AUDIT ADJUSTMENT | | 0200 | FEDERAL GRANT FUND | PS | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (10,731.52) | 10,731.52 | | | |
| | | | | PS Total | | | - | (10,731.52) | 10,731.52 | | | |
| | | | FEDERAL GRANT FUND Total | | | | - | (10,731.52) | 10,731.52 | | | |
| | | 0200 Total | | | | | - | (10,731.52) | 10,731.52 | | | |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (663.33) | 663.33 | | | |
| | | | | PS Total | | | - | (663.33) | 663.33 | | | |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | - | (663.33) | 663.33 | | | |
| | | 0250 Total | | | | | - | (663.33) | 663.33 | | | |
| | AUDIT ADJUSTMENT | Total | | | | | - | (11,394.85) | 11,394.85 | | | |
| 9950 Total | | | | | | | - | (11,394.85) | 11,394.85 | | | |
| (blank) | (blank) | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | 4,447.57 | (4,447.57) | - | (4,447.57) | 4,447.57 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 4,834.26 | (4,834.26) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | 386.69 | (386.69) | - | (386.69) | 386.69 |
| | | | | PS Total | | | - | (0.00) | 0.00 | - | (4,834.26) | 4,834.26 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | - | - | - | - | 44,285.27 | (22,341.00) |
| | | | | NPS Total | | | | | | - | 44,285.27 | (22,341.00) |
| | | | LOCAL FUND Total | | | | - | (0.00) | 0.00 | - | 39,451.01 | (17,506.74) |
| | | 0100 Total | | | | | - | (0.00) | 0.00 | - | 39,451.01 | (17,506.74) |
| | (blank) Total | | | | | | - | (0.00) | 0.00 | - | 39,451.01 | (17,506.74) |
| (blank) Total | | | | | | | - | (0.00) | 0.00 | - | 39,451.01 | (17,506.74) |
| Grand Total | | | | | | | ########### | ########### | 2,850,264.91 | ########### | 57,937,249.16 | 216,744,604.26 |

ACTIVITY
LEVEL

| | | | | | | | Fiscal Year | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2021 | | | 2022 | | |
| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| 1010 | PERSONNEL | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,558,949.80 | 1,490,603.26 | 68,346.54 | 1,436,755.04 | 329,616.83 | 1,107,138.21 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 11,918.70 | (11,918.70) | - | 13,403.59 | (13,403.59) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 419,357.29 | 290,820.27 | 128,537.02 | 393,670.67 | 59,550.34 | 334,120.53 |
| | | | | | 0015 | OVERTIME PAY | - | 808.56 | (808.56) | - | 16.17 | (16.17) |
| | | | | PS Total | | | 1,978,307.09 | 1,794,150.79 | 184,156.30 | 1,830,425.91 | 402,586.93 | 1,427,838.98 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 24,000.00 | - | 24,000.00 | 24,000.00 | - | 24,000.00 |
| | | | | NPS Total | | | 24,000.00 | - | 24,000.00 | 24,000.00 | - | 24,000.00 |
| | | | LOCAL FUND Total | | | | 2,002,307.09 | 1,794,150.79 | 208,156.30 | 1,854,425.91 | 402,586.93 | 1,427,838.98 |
| | | 0100 Total | | | | | 2,002,307.09 | 1,794,150.79 | 208,156.30 | 1,854,425.91 | 402,586.93 | 1,427,838.98 |
| | PERSONNEL | Total | | | | | 2,002,307.09 | 1,794,150.79 | 208,156.30 | 1,854,425.91 | 402,586.93 | 1,427,838.98 |
| 1010 Total | | | | | | | 2,002,307.09 | 1,794,150.79 | 208,156.30 | 1,854,425.91 | 402,586.93 | 1,427,838.98 |
| 1015 | TRAINING AND EMPLOYEE DEVELOPMENT | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 201,351.55 | 216,991.43 | (15,639.88) | 203,795.27 | 50,506.96 | 153,288.31 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 52,295.06 | 34,804.27 | 17,490.79 | 55,839.90 | 8,094.87 | 47,745.03 |
| | | | | PS Total | | | 253,646.61 | 251,795.70 | 1,850.91 | 259,635.17 | 58,601.83 | 201,033.34 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 10,429.69 | 3,080.49 | 7,349.20 | 10,429.69 | - | 10,429.69 |
| | | | | NPS Total | | | 10,429.69 | 3,080.49 | 7,349.20 | 10,429.69 | | |
| | | | LOCAL FUND Total | | | | 264,076.30 | 254,876.19 | 9,200.11 | 270,064.86 | 58,601.83 | 201,033.34 |
| | | 0100 Total | | | | | 264,076.30 | 254,876.19 | 9,200.11 | 270,064.86 | 58,601.83 | 201,033.34 |
| | TRAINING AND EMPLOYEE DEVELOPMENT | Total | | | | | 264,076.30 | 254,876.19 | 9,200.11 | 270,064.86 | 58,601.83 | 201,033.34 |
| 1015 Total | | | | | | | 264,076.30 | 254,876.19 | 9,200.11 | 270,064.86 | 58,601.83 | 201,033.34 |
| 1017 | LABOR RELATIONS | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 369,139.41 | 398,412.86 | (29,273.45) | 370,193.47 | 87,899.13 | 282,294.34 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | - | - | - | 16,672.73 | (16,672.73) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 99,298.50 | 43,288.19 | 56,010.31 | 101,433.02 | 9,412.68 | 92,020.34 |
| | | | | PS Total | | | 468,437.91 | 441,701.05 | 26,736.86 | 471,626.49 | 113,984.54 | 357,641.95 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | - | 1,870.00 | (1,870.00) | - | - | - |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 26,000.00 | 26,000.00 | - | 26,000.00 | - | - |
| | | | | NPS Total | | | 26,000.00 | 27,870.00 | (1,870.00) | 26,000.00 | - | - |
| | | | LOCAL FUND Total | | | | 494,437.91 | 469,571.05 | 24,866.86 | 497,626.49 | 113,984.54 | 357,641.95 |
| | | 0100 Total | | | | | 494,437.91 | 469,571.05 | 24,866.86 | 497,626.49 | 113,984.54 | 357,641.95 |
| | LABOR RELATIONS | Total | | | | | 494,437.91 | 469,571.05 | 24,866.86 | 497,626.49 | 113,984.54 | 357,641.95 |
| 1017 Total | | | | | | | 494,437.91 | 469,571.05 | 24,866.86 | 497,626.49 | 113,984.54 | 357,641.95 |
| 1030 | PROPERTY MANAGEMENT | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 150,866.58 | 166,927.07 | (16,060.49) | 153,161.85 | 40,906.02 | 112,255.83 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 40,583.12 | 51,349.76 | (10,766.64) | 41,966.34 | 11,844.50 | 30,121.84 |
| | | | | PS Total | | | 191,449.70 | 218,276.83 | (26,827.13) | 195,128.19 | 52,750.52 | 142,377.67 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 137,283.68 | 70,251.33 | 67,032.35 | 137,283.68 | 10,489.32 | 31,074.99 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 608,634.49 | 326,300.81 | 282,333.68 | 628,634.49 | 111,373.46 | (157,051.19) |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 25,000.00 | 15,498.70 | 9,501.30 | 25,000.00 | - | 630.03 |
| | | | | NPS Total | | | 770,918.17 | 412,050.84 | 358,867.33 | 790,918.17 | 121,862.78 | (125,346.17) |
| | | | LOCAL FUND Total | | | | 962,367.87 | 630,327.67 | 332,040.20 | 986,046.36 | 174,613.30 | 17,031.50 |
| | | 0100 Total | | | | | 962,367.87 | 630,327.67 | 332,040.20 | 986,046.36 | 174,613.30 | 17,031.50 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 54,201.00 | 54,594.66 | (393.66) | 54,201.00 | 13,778.10 | 40,422.90 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 14,580.07 | 14,791.45 | (211.38) | 14,851.07 | 3,423.83 | 11,427.24 |
| | | | | PS Total | | | 68,781.07 | 69,386.11 | (605.04) | 69,052.07 | 17,201.93 | 51,850.14 |
| | | | FEDERAL GRANT FUND Total | | | | 68,781.07 | 69,386.11 | (605.04) | 69,052.07 | 17,201.93 | 51,850.14 |
| | | 0200 Total | | | | | 68,781.07 | 69,386.11 | (605.04) | 69,052.07 | 17,201.93 | 51,850.14 |
| | PROPERTY MANAGEMENT | Total | | | | | 1,031,148.94 | 699,713.78 | 331,435.16 | 1,055,098.43 | 191,815.23 | 68,881.64 |
| 1030 Total | | | | | | | 1,031,148.94 | 699,713.78 | 331,435.16 | 1,055,098.43 | 191,815.23 | 68,881.64 |
| 1040 | INFORMATION TECHNOLOGY | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 2,355,178.60 | 2,141,215.42 | 213,962.58 | 2,002,615.98 | 516,174.90 | 1,486,441.08 |
| | | | | | 0012 | REGULAR PAY - OTHER | 87,926.30 | 162,579.16 | (74,652.86) | 89,084.27 | 33,529.68 | 55,554.59 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 52,962.39 | (52,962.39) | - | 10,975.52 | (10,975.52) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 657,196.07 | 533,778.97 | 123,417.10 | 573,125.88 | 121,150.26 | 451,975.62 |
| | | | | | 0015 | OVERTIME PAY | - | 89,872.60 | (89,872.60) | - | 21,384.79 | (21,384.79) |
| | | | | PS Total | | | 3,100,300.37 | 2,980,408.54 | 119,891.83 | 2,664,826.13 | 703,215.15 | 1,961,610.98 |
| | | | LOCAL FUND Total | | | | 3,100,300.37 | 2,980,408.54 | 119,891.83 | 2,664,826.13 | 703,215.15 | 1,961,610.98 |
| | | 0100 Total | | | | | 3,100,300.37 | 2,980,408.54 | 119,891.83 | 2,664,826.13 | 703,215.15 | 1,961,610.98 |
| | | 0150 | ARPA | NPS | 0040 | OTHER SERVICES AND CHARGES | - | - | - | 536,000.00 | - | 536,000.00 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | - | - | - | 2,144,000.00 | - | 2,144,000.00 |
| | | | | NPS Total | | | - | - | - | 2,680,000.00 | - | 2,680,000.00 |
| | | | ARPA Total | | | | - | - | - | 2,680,000.00 | - | 2,680,000.00 |
| | | 0150 Total | | | | | - | - | - | 2,680,000.00 | - | 2,680,000.00 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 115,245.17 | 121,679.93 | (6,434.76) | 116,145.00 | 29,502.58 | 86,642.42 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 23,573.06 | 23,573.06 | 0.00 | 31,823.73 | 5,369.16 | 26,454.57 |
| | | | | PS Total | | | 138,818.23 | 145,252.99 | (6,434.76) | 147,968.73 | 34,871.74 | 113,096.99 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 10,000.00 | - | 10,000.00 | - | - | - |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 30,000.51 | 29,546.14 | 454.37 | - | - | - |
| | | | | NPS Total | | | 40,000.51 | 29,546.14 | 10,454.37 | - | - | - |
| | | | FEDERAL GRANT FUND Total | | | | 178,818.74 | 174,799.13 | 4,019.61 | 147,968.73 | 34,871.74 | 113,096.99 |
| | | 0200 Total | | | | | 178,818.74 | 174,799.13 | 4,019.61 | 147,968.73 | 34,871.74 | 113,096.99 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 127,883.01 | 134,888.30 | (7,005.29) | 127,883.01 | 30,473.97 | 97,409.04 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | (2,975.25) | 32,523.89 | (35,499.14) | 35,039.94 | 7,045.49 | 27,994.45 |
| | | | | PS Total | | | 124,907.76 | 167,412.19 | (42,504.43) | 162,922.95 | 37,519.46 | 125,403.49 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 5,000.00 | 12,741.85 | (7,741.85) | 5,000.00 | - | - |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 1,568,721.95 | 1,568,721.95 | - | 2,001,327.70 | 672,954.26 | 32,265.82 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | 8,191.68 | (8,191.68) | - | - | - |

ACTIVITY LEVEL

| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | 2021 Sum of Budget | 2021 Sum of Actual | 2021 Sum of Variance | 2022 Sum of Budget | 2022 Sum of Actual | 2022 Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 145,771.17 | 144,542.11 | 1,229.06 | 145,771.17 | - | 45,705.25 |
| | | | | NPS Total | | | 1,719,493.12 | 1,734,197.59 | (14,704.47) | 2,152,098.87 | 672,954.26 | 77,971.07 |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | 1,844,400.88 | 1,901,609.78 | (57,208.90) | 2,315,021.82 | 710,473.72 | 203,374.56 |
| | | 0250 Total | | | | | 1,844,400.88 | 1,901,609.78 | (57,208.90) | 2,315,021.82 | 710,473.72 | 203,374.56 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | PS | 0011 | REGULAR PAY - CONT FULL TIME | 36,779.67 | 38,713.73 | (1,934.06) | 37,547.00 | 9,515.13 | 28,031.87 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 13,803.68 | (13,803.68) | - | 2,946.51 | (2,946.51) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 9,893.73 | 6,176.96 | 3,716.77 | 10,287.88 | 1,506.92 | 8,780.96 |
| | | | | | 0015 | OVERTIME PAY | - | - | - | - | 371.92 | (371.92) |
| | | | | PS Total | | | 46,673.40 | 58,694.37 | (12,020.97) | 47,834.88 | 14,340.48 | 33,494.40 |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 46,673.40 | 58,694.37 | (12,020.97) | 47,834.88 | 14,340.48 | 33,494.40 |
| | | 0600 Total | | | | | 46,673.40 | 58,694.37 | (12,020.97) | 47,834.88 | 14,340.48 | 33,494.40 |
| | INFORMATION TECHNOLOGY Total | | | | | | 5,170,193.29 | 5,115,511.82 | 54,681.57 | 7,855,651.56 | 1,462,901.09 | 4,991,576.93 |
| 1040 Total | | | | | | | 5,170,193.29 | 5,115,511.82 | 54,681.57 | 7,855,651.56 | 1,462,901.09 | 4,991,576.93 |
| 1050 | FINANCIAL MANAGEMENT-AGENCY | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 946,003.44 | 852,741.84 | 93,261.60 | 940,093.05 | 223,204.97 | 716,888.08 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 24,920.44 | (24,920.44) | - | (225.35) | 225.35 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 254,474.91 | 178,814.33 | 75,660.58 | 257,585.51 | 43,350.93 | 214,234.58 |
| | | | | | 0015 | OVERTIME PAY | - | 770.97 | (770.97) | - | 18.87 | (18.87) |
| | | | | PS Total | | | 1,200,478.35 | 1,057,247.58 | 143,230.77 | 1,197,678.56 | 266,349.42 | 931,329.14 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | - | (368.88) | 368.88 | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 109,887.57 | 96,829.04 | 13,058.53 | 109,887.57 | - | 91,289.90 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | - | - | | | |
| | | | | NPS Total | | | 109,887.57 | 96,460.16 | 13,427.41 | 109,887.57 | - | 91,289.90 |
| | | | LOCAL FUND Total | | | | 1,310,365.92 | 1,153,707.74 | 156,658.18 | 1,307,566.13 | 266,349.42 | 1,022,619.04 |
| | | 0100 Total | | | | | 1,310,365.92 | 1,153,707.74 | 156,658.18 | 1,307,566.13 | 266,349.42 | 1,022,619.04 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 791,759.51 | 791,639.20 | 120.31 | 795,910.32 | 186,151.69 | 609,758.63 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 13,418.69 | (13,418.69) | - | (121.36) | 121.36 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 173,123.30 | 173,123.30 | (0.00) | 218,079.43 | 38,504.49 | 179,574.94 |
| | | | | | 0015 | OVERTIME PAY | - | 1,156.43 | (1,156.43) | - | 28.33 | (28.33) |
| | | | | PS Total | | | 964,882.81 | 979,337.62 | (14,454.81) | 1,013,989.75 | 224,563.15 | 789,426.60 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 25,000.00 | 21,957.00 | 3,043.00 | | | |
| | | | | NPS Total | | | 25,000.00 | 21,957.00 | 3,043.00 | | | |
| | | | FEDERAL GRANT FUND Total | | | | 989,882.81 | 1,001,294.62 | (11,411.81) | 1,013,989.75 | 224,563.15 | 789,426.60 |
| | | 0200 Total | | | | | 989,882.81 | 1,001,294.62 | (11,411.81) | 1,013,989.75 | 224,563.15 | 789,426.60 |
| | FINANCIAL MANAGEMENT-AGENCY Total | | | | | | 2,300,248.73 | 2,155,002.36 | 145,246.37 | 2,321,555.88 | 490,912.57 | 1,812,045.64 |
| 1050 Total | | | | | | | 2,300,248.73 | 2,155,002.36 | 145,246.37 | 2,321,555.88 | 490,912.57 | 1,812,045.64 |
| 1088 | CLAIMS ADMINISTRATION | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 408,229.50 | 448,263.92 | (40,034.42) | 416,550.94 | 107,188.53 | 309,362.41 |
| | | | | | 0012 | REGULAR PAY - OTHER | 96,375.75 | 108,813.84 | (12,438.09) | 99,272.79 | 26,350.28 | 72,922.51 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 137,103.29 | 121,986.86 | 15,116.43 | 141,335.70 | 28,218.54 | 113,117.16 |
| | | | | | 0015 | OVERTIME PAY | - | 457.90 | (457.90) | - | 16.03 | (16.03) |
| | | | | PS Total | | | 641,708.54 | 679,522.52 | (37,813.98) | 657,159.43 | 161,773.38 | 495,386.05 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 5,000.00 | 5,000.00 | - | 5,000.00 | - | 5,000.00 |
| | | | | NPS Total | | | 5,000.00 | 5,000.00 | - | 5,000.00 | - | 5,000.00 |
| | | | LOCAL FUND Total | | | | 646,708.54 | 684,522.52 | (37,813.98) | 662,159.43 | 161,773.38 | 495,386.05 |
| | | 0100 Total | | | | | 646,708.54 | 684,522.52 | (37,813.98) | 662,159.43 | 161,773.38 | 495,386.05 |
| | CLAIMS ADMINISTRATION Total | | | | | | 646,708.54 | 684,522.52 | (37,813.98) | 662,159.43 | 161,773.38 | 495,386.05 |
| 1088 Total | | | | | | | 646,708.54 | 684,522.52 | (37,813.98) | 662,159.43 | 161,773.38 | 495,386.05 |
| 1089 | HEALTH INFORMATION MANAGEMENT | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 545,907.30 | 593,582.09 | (47,674.79) | - | (31,066.29) | 31,066.29 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 2,789.52 | (2,789.52) | - | (216.19) | 216.19 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 146,849.05 | 142,100.43 | 4,748.62 | - | (7,598.08) | 7,598.08 |
| | | | | | 0015 | OVERTIME PAY | - | 326.58 | (326.58) | | | |
| | | | | PS Total | | | 692,756.35 | 738,798.62 | (46,042.27) | - | (38,880.56) | 38,880.56 |
| | | | LOCAL FUND Total | | | | 692,756.35 | 738,798.62 | (46,042.27) | - | (38,880.56) | 38,880.56 |
| | | 0100 Total | | | | | 692,756.35 | 738,798.62 | (46,042.27) | - | (38,880.56) | 38,880.56 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 57,917.72 | 58,339.80 | (422.08) | - | (3,144.50) | 3,144.50 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 15,579.87 | 14,975.91 | 603.96 | - | (778.85) | 778.85 |
| | | | | PS Total | | | 73,497.59 | 73,315.71 | 181.88 | - | (3,923.35) | 3,923.35 |
| | | | FEDERAL GRANT FUND Total | | | | 73,497.59 | 73,315.71 | 181.88 | - | (3,923.35) | 3,923.35 |
| | | 0200 Total | | | | | 73,497.59 | 73,315.71 | 181.88 | - | (3,923.35) | 3,923.35 |
| | HEALTH INFORMATION MANAGEMENT Total | | | | | | 766,253.94 | 812,114.33 | (45,860.39) | - | (42,803.91) | 42,803.91 |
| 1089 Total | | | | | | | 766,253.94 | 812,114.33 | (45,860.39) | - | (42,803.91) | 42,803.91 |
| 1091 | OFFICE OF ADMINISTRATION OPERATIONS | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 55,710.75 | 206,833.97 | (151,123.22) | 232,157.20 | 60,494.40 | 171,662.80 |
| | | | | | 0012 | REGULAR PAY - OTHER | 226,014.77 | 72,788.95 | 153,225.82 | 71,055.55 | 11,279.34 | 59,776.21 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 42,838.08 | (42,838.08) | - | 7,877.62 | (7,877.62) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 78,916.01 | 60,644.62 | 18,271.39 | 83,080.29 | 11,661.83 | 71,418.46 |
| | | | | PS Total | | | 360,641.53 | 383,105.62 | (22,464.09) | 386,293.04 | 91,313.19 | 294,979.85 |
| | | | | NPS | 0030 | ENERGY, COMM. AND BLDG RENTA | 166,092.91 | 166,092.91 | - | 197,692.85 | | |
| | | | | | 0031 | TELECOMMUNICATIONS | 715,172.53 | 794,362.92 | (79,190.39) | 760,916.22 | 69,136.06 | (56,280.00) |
| | | | | | 0032 | RENTALS - LAND AND STRUCTURES | 6,963,803.80 | 6,520,068.98 | 443,734.82 | 7,412,085.89 | - | - |
| | | | | | 0034 | SECURITY SERVICES | 3,052,786.84 | 3,034,000.79 | 18,385.57 | 3,167,887.65 | - | - |
| | | | | | 0035 | OCCUPANCY FIXED COSTS | 247,743.71 | 247,743.71 | - | 264,953.83 | - | - |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 891,218.89 | 853,239.82 | 37,979.07 | 875,437.18 | 152,318.95 | 191.66 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 75,000.00 | 58,135.29 | 16,864.71 | 75,000.00 | - | 45,445.77 |
| | | | | NPS Total | | | 12,111,818.68 | 11,673,644.42 | 437,773.78 | 12,753,973.62 | 221,455.01 | (10,642.57) |
| | | | LOCAL FUND Total | | | | 12,472,460.21 | 12,056,750.04 | 415,309.69 | 13,140,266.66 | 312,768.20 | 284,337.28 |

ACTIVITY LEVEL

| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | 2021 Sum of Budget | 2021 Sum of Actual | 2021 Sum of Variance | 2022 Sum of Budget | 2022 Sum of Actual | 2022 Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | OFFICE OF ADMINISTRATION OPERATIONS | Total | | | | | 12,472,460.21 | 12,056,750.04 | 415,309.69 | 13,140,266.66 | 312,768.20 | 284,337.28 |
| | | 0100 Total | | | | | 12,472,460.21 | 12,056,750.04 | 415,309.69 | 13,140,266.66 | 312,768.20 | 284,337.28 |
| 1091 Total | | | | | | | 12,472,460.21 | 12,056,750.04 | 415,309.69 | 13,140,266.66 | 312,768.20 | 284,337.28 |
| 1092 | RECORDS MANAGEMENT | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 551,363.71 | 174,112.93 | 377,250.78 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 1,000.50 | (1,000.50) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 151,073.67 | 40,948.69 | 110,124.98 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 11.43 | (11.43) |
| | | | | PS Total | | | | | | 702,437.38 | 216,073.55 | 486,363.83 |
| | | | LOCAL FUND Total | | | | | | | 702,437.38 | 216,073.55 | 486,363.83 |
| | | 0100 Total | | | | | | | | 702,437.38 | 216,073.55 | 486,363.83 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 58,207.00 | 17,934.50 | 40,272.50 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 15,948.72 | 4,234.29 | 11,714.43 |
| | | | | PS Total | | | | | | 74,155.72 | 22,168.79 | 51,986.93 |
| | | | FEDERAL GRANT FUND Total | | | | | | | 74,155.72 | 22,168.79 | 51,986.93 |
| | | 0200 Total | | | | | | | | 74,155.72 | 22,168.79 | 51,986.93 |
| | RECORDS MANAGEMENT | Total | | | | | | | | 776,593.10 | 238,242.34 | 538,350.76 |
| 1092 Total | | | | | | | | | | 776,593.10 | 238,242.34 | 538,350.76 |
| 110F | DBH BUDGET OPERATIONS | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 606,557.56 | 425,081.22 | 181,476.34 | 281,381.83 | 112,013.39 | 169,368.44 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 106,818.88 | (106,818.88) | 105,897.13 | 26,539.72 | 79,357.41 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 163,163.99 | 104,306.19 | 58,857.80 | 151,737.63 | 26,220.42 | 125,517.21 |
| | | | | PS Total | | | 769,721.55 | 636,206.29 | 133,515.26 | 539,016.59 | 164,773.53 | 374,243.06 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 7,500.00 | - | 7,500.00 | 7,500.00 | - | 2,500.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 25,000.00 | 22,077.45 | 2,922.55 | 25,000.00 | 455.19 | 16,544.81 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 100,000.00 | 69,762.00 | 30,238.00 | 100,000.00 | - | 100,000.00 |
| | | | | NPS Total | | | 132,500.00 | 91,839.45 | 40,660.55 | 132,500.00 | 455.19 | 119,044.81 |
| | | | LOCAL FUND Total | | | | 902,221.55 | 728,045.74 | 174,175.81 | 671,516.59 | 165,228.72 | 493,287.87 |
| | | 0100 Total | | | | | 902,221.55 | 728,045.74 | 174,175.81 | 671,516.59 | 165,228.72 | 493,287.87 |
| | | 0200 | FEDERAL GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 66,622.58 | 56,584.42 | 10,038.16 | 196,409.00 | - | 196,409.00 |
| | | | | NPS Total | | | 66,622.58 | 56,584.42 | 10,038.16 | 196,409.00 | - | 196,409.00 |
| | | | FEDERAL GRANT FUND Total | | | | 66,622.58 | 56,584.42 | 10,038.16 | 196,409.00 | - | 196,409.00 |
| | | 0200 Total | | | | | 66,622.58 | 56,584.42 | 10,038.16 | 196,409.00 | - | 196,409.00 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | NPS | 0040 | OTHER SERVICES AND CHARGES | 64,408.41 | 34,320.00 | 30,088.41 | 85,000.00 | - | 49,308.00 |
| | | | | NPS Total | | | 64,408.41 | 34,320.00 | 30,088.41 | 85,000.00 | - | 49,308.00 |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | 64,408.41 | 34,320.00 | 30,088.41 | 85,000.00 | - | 49,308.00 |
| | | 0250 Total | | | | | 64,408.41 | 34,320.00 | 30,088.41 | 85,000.00 | - | 49,308.00 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | - | - | - | | | |
| | | | | NPS Total | | | - | - | - | | | |
| | | | PRIVATE GRANT FUND Total | | | | - | - | - | | | |
| | | 0400 Total | | | | | - | - | - | | | |
| | DBH BUDGET OPERATIONS | Total | | | | | 1,033,252.54 | 818,950.16 | 214,302.38 | 952,925.59 | 165,228.72 | 739,004.87 |
| 110F Total | | | | | | | 1,033,252.54 | 818,950.16 | 214,302.38 | 952,925.59 | 165,228.72 | 739,004.87 |
| 120F | DBH ACCOUNTING OPERATIONS | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 747,889.43 | 718,422.04 | 29,467.39 | 691,985.01 | 172,314.49 | 519,670.52 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 3,224.02 | (3,224.02) | 51,546.58 | - | 51,546.58 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 21,757.08 | (21,757.08) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 201,182.25 | 145,284.18 | 55,898.07 | 203,727.66 | 33,841.17 | 169,886.49 |
| | | | | | 0015 | OVERTIME PAY | - | 364.73 | (364.73) | - | (95.97) | 95.97 |
| | | | | PS Total | | | 949,071.68 | 867,294.97 | 81,776.71 | 947,259.25 | 227,816.77 | 719,442.48 |
| | | | LOCAL FUND Total | | | | 949,071.68 | 867,294.97 | 81,776.71 | 947,259.25 | 227,816.77 | 719,442.48 |
| | | 0100 Total | | | | | 949,071.68 | 867,294.97 | 81,776.71 | 947,259.25 | 227,816.77 | 719,442.48 |
| | DBH ACCOUNTING OPERATIONS | Total | | | | | 949,071.68 | 867,294.97 | 81,776.71 | 947,259.25 | 227,816.77 | 719,442.48 |
| 120F Total | | | | | | | 949,071.68 | 867,294.97 | 81,776.71 | 947,259.25 | 227,816.77 | 719,442.48 |
| 130F | DBH FISCAL OFFICER | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 274,424.00 | 284,914.38 | (10,490.38) | 275,033.40 | 70,140.85 | 204,892.55 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 73,820.06 | 38,529.72 | 35,290.34 | 75,359.15 | 9,268.51 | 66,090.64 |
| | | | | PS Total | | | 348,244.06 | 323,444.10 | 24,799.96 | 350,392.55 | 79,409.36 | 270,983.19 |
| | | | LOCAL FUND Total | | | | 348,244.06 | 323,444.10 | 24,799.96 | 350,392.55 | 79,409.36 | 270,983.19 |
| | | 0100 Total | | | | | 348,244.06 | 323,444.10 | 24,799.96 | 350,392.55 | 79,409.36 | 270,983.19 |
| | DBH FISCAL OFFICER | Total | | | | | 348,244.06 | 323,444.10 | 24,799.96 | 350,392.55 | 79,409.36 | 270,983.19 |
| 130F Total | | | | | | | 348,244.06 | 323,444.10 | 24,799.96 | 350,392.55 | 79,409.36 | 270,983.19 |
| 1810 | OFC OF THE DIRECTOR/CHIEF EXEC OFFICER | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,108,398.97 | 1,158,504.50 | (50,105.53) | 1,321,191.63 | 284,320.05 | 1,036,871.58 |
| | | | | | 0012 | REGULAR PAY - OTHER | 126,215.00 | 138,199.78 | (11,984.78) | 119,904.28 | 16,836.72 | 103,067.56 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 638.93 | (638.93) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 332,111.16 | 211,019.74 | 121,091.42 | 394,860.28 | 46,690.09 | 348,170.19 |
| | | | | | 0015 | OVERTIME PAY | - | 2,539.16 | (2,539.16) | | | |
| | | | | PS Total | | | 1,566,725.13 | 1,510,263.18 | 56,461.95 | 1,835,956.19 | 348,485.79 | 1,487,470.40 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 254,868.99 | 190,715.58 | 64,153.41 | 254,868.99 | 30,077.92 | 93,423.85 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 112,730.00 | - | 112,730.00 |
| | | | | NPS Total | | | 254,868.99 | 190,715.58 | 64,153.41 | 367,598.99 | 30,077.92 | 206,153.85 |
| | | | LOCAL FUND Total | | | | 1,821,594.12 | 1,700,978.76 | 120,615.36 | 2,203,555.18 | 378,563.71 | 1,693,624.25 |
| | | 0100 Total | | | | | 1,821,594.12 | 1,700,978.76 | 120,615.36 | 2,203,555.18 | 378,563.71 | 1,693,624.25 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 56,318.20 | 56,318.20 | - | 71,540.95 | 7,386.55 | 64,154.40 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 14,994.27 | 14,994.27 | 0.00 | 19,602.22 | 2,644.78 | 16,957.44 |
| | | | | PS Total | | | 71,312.47 | 71,312.47 | 0.00 | 91,143.17 | 10,031.33 | 81,111.84 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 33,356.50 | - | 33,356.50 | | | |
| | | | | NPS Total | | | 33,356.50 | - | 33,356.50 | | | |

ACTIVITY LEVEL

| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Fiscal Year Values 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | FEDERAL GRANT FUND Total | | | | 104,668.97 | 71,312.47 | 33,356.50 | 91,143.17 | 10,031.33 | 81,111.84 |
| | | 0200 Fund | | | | | 104,668.97 | 71,312.47 | 33,356.50 | 91,143.17 | 10,031.33 | 81,111.84 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 15,797.15 | - | 15,797.15 | - | - | - |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 17,332.91 | (17,332.91) | - | 3,448.53 | (3,448.53) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 4,249.43 | 168.87 | 4,080.56 | - | 274.22 | (274.22) |
| | | | | PS Total | | | 20,046.58 | 17,501.78 | 2,544.80 | - | 3,722.75 | (3,722.75) |
| | | 0700 Fund | OPERATING INTRA-DISTRICT FUNDS Total | | | | 20,046.58 | 17,501.78 | 2,544.80 | - | 3,722.75 | (3,722.75) |
| | OFC OF THE DIRECTOR/ CHIEF EXEC OFFICER Total | | | | | | 1,946,309.67 | 1,789,793.01 | 156,516.66 | 2,294,698.35 | 392,317.79 | 1,771,013.34 |
| 1810 Total | | | | | | | 1,946,309.67 | 1,789,793.01 | 156,516.66 | 2,294,698.35 | 392,317.79 | 1,771,013.34 |
| 1820 | CONSUMER AND FAMILY AFFAIRS | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 686,746.62 | 639,828.43 | 46,918.19 | 682,052.74 | 155,037.92 | 527,014.82 |
| | | | | | 0012 | REGULAR PAY - OTHER | 65,750.69 | 70,749.48 | (4,998.79) | 69,105.32 | 16,467.79 | 52,637.53 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 6,380.09 | (6,380.09) | - | 9.58 | (9.58) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 203,324.16 | 176,664.86 | 26,659.30 | 205,817.31 | 37,956.39 | 167,860.92 |
| | | | | PS Total | | | 955,821.47 | 893,622.86 | 62,198.61 | 956,975.37 | 209,471.68 | 747,503.69 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 14,000.00 | 4,736.81 | 9,263.19 | 14,000.00 | - | 12,970.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 644,380.48 | 337,061.44 | 307,319.04 | 628,201.48 | 24,611.88 | 471,146.49 |
| | | | | NPS Total | | | 658,380.48 | 341,798.25 | 316,582.23 | 642,201.48 | 24,611.88 | 484,116.49 |
| | | 0100 Fund | LOCAL FUND Total | | | | 1,614,201.95 | 1,235,421.11 | 378,780.84 | 1,599,176.85 | 234,083.56 | 1,231,620.18 |
| | | | | | | | 1,614,201.95 | 1,235,421.11 | 378,780.84 | 1,599,176.85 | 234,083.56 | 1,231,620.18 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 66,542.00 | 67,025.14 | (483.14) | 66,542.00 | 16,917.00 | 49,625.00 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 17,007.48 | 16,007.14 | 1,000.34 | 18,232.51 | 3,771.92 | 14,460.59 |
| | | | | PS Total | | | 83,549.48 | 83,032.28 | 517.20 | 84,774.51 | 20,688.92 | 64,085.59 |
| | | 0200 Fund | FEDERAL GRANT FUND Total | | | | 83,549.48 | 83,032.28 | 517.20 | 84,774.51 | 20,688.92 | 64,085.59 |
| | | | | | | | 83,549.48 | 83,032.28 | 517.20 | 84,774.51 | 20,688.92 | 64,085.59 |
| | CONSUMER AND FAMILY AFFAIRS Total | | | | | | 1,697,751.43 | 1,318,453.39 | 379,298.04 | 1,683,951.36 | 254,772.48 | 1,295,705.77 |
| 1820 Total | | | | | | | 1,697,751.43 | 1,318,453.39 | 379,298.04 | 1,683,951.36 | 254,772.48 | 1,295,705.77 |
| 1885 | OFFICE OF OMBUDSMAN | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 119,359.42 | 131,702.31 | (12,342.89) | 119,359.42 | 29,940.27 | 89,419.15 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 32,191.65 | 31,540.38 | 567.30 | 32,704.48 | 7,122.97 | 25,581.51 |
| | | | | PS Total | | | 151,467.10 | 163,242.69 | (11,775.59) | 152,063.90 | 37,063.24 | 115,000.66 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 15,000.00 | - | 15,000.00 | 15,000.00 | - | 15,000.00 |
| | | | | NPS Total | | | 15,000.00 | - | 15,000.00 | 15,000.00 | - | 15,000.00 |
| | | 0100 Fund | LOCAL FUND Total | | | | 166,467.10 | 163,242.69 | 3,224.41 | 167,063.90 | 37,063.24 | 130,000.66 |
| | | | | | | | 166,467.10 | 163,242.69 | 3,224.41 | 167,063.90 | 37,063.24 | 130,000.66 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 95,535.01 | 95,535.01 | - | 95,111.00 | 24,173.81 | 70,937.19 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 55,784.10 | 18,408.32 | 37,375.78 | 26,060.41 | 4,435.19 | 21,625.22 |
| | | | | PS Total | | | 151,319.11 | 113,943.33 | 37,375.78 | 121,171.41 | 28,609.00 | 92,562.41 |
| | | 0250 Fund | FEDERAL MEDICAID PAYMENTS Total | | | | 151,319.11 | 113,943.33 | 37,375.78 | 121,171.41 | 28,609.00 | 92,562.41 |
| | | | | | | | 151,319.11 | 113,943.33 | 37,375.78 | 121,171.41 | 28,609.00 | 92,562.41 |
| | OFFICE OF OMBUDSMAN Total | | | | | | 317,786.21 | 277,186.02 | 40,600.19 | 288,235.31 | 65,672.24 | 222,563.07 |
| 1885 Total | | | | | | | 317,786.21 | 277,186.02 | 40,600.19 | 288,235.31 | 65,672.24 | 222,563.07 |
| 1888 | LEGAL SERVICES | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 663,431.07 | 788,121.39 | (124,690.32) | 673,325.39 | 183,672.60 | 489,652.79 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 178,462.95 | 111,468.84 | 66,994.11 | 184,491.17 | 22,407.79 | 162,083.38 |
| | | | | PS Total | | | 841,894.02 | 899,590.23 | (57,696.21) | 857,816.56 | 206,080.39 | 651,736.17 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 42,585.63 | 10,347.64 | 32,237.99 | 42,585.63 | - | 22,585.63 |
| | | | | NPS Total | | | 42,585.63 | 10,347.64 | 32,237.99 | 42,585.63 | - | 22,585.63 |
| | | 0100 Fund | LOCAL FUND Total | | | | 884,479.65 | 909,937.87 | (25,458.22) | 900,402.19 | 206,080.39 | 674,321.80 |
| | | | | | | | 884,479.65 | 909,937.87 | (25,458.22) | 900,402.19 | 206,080.39 | 674,321.80 |
| | LEGAL SERVICES Total | | | | | | 884,479.65 | 909,937.87 | (25,458.22) | 900,402.19 | 206,080.39 | 674,321.80 |
| 1888 Total | | | | | | | 884,479.65 | 909,937.87 | (25,458.22) | 900,402.19 | 206,080.39 | 674,321.80 |
| 1889 | LEGISLATIVE AND PUBLIC AFFAIRS | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 282,901.60 | 334,698.73 | (51,797.13) | 456,091.86 | 61,640.70 | 394,451.16 |
| | | | | | 0012 | REGULAR PAY - OTHER | 161,700.00 | - | 161,700.00 | - | 1,493.25 | (1,493.25) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 6,863.37 | (6,863.37) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 121,817.07 | 90,223.90 | 31,593.17 | 124,969.17 | 16,471.04 | 108,498.13 |
| | | | | | 0015 | OVERTIME PAY | - | 196.54 | (196.54) | - | 159.52 | (159.52) |
| | | | | PS Total | | | 566,418.67 | 431,982.54 | 134,436.13 | 581,061.03 | 79,764.51 | 501,296.52 |
| | | 0100 Fund | LOCAL FUND Total | | | | 566,418.67 | 431,982.54 | 134,436.13 | 581,061.03 | 79,764.51 | 501,296.52 |
| | | | | | | | 566,418.67 | 431,982.54 | 134,436.13 | 581,061.03 | 79,764.51 | 501,296.52 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 53,409.13 | 53,798.58 | (389.45) | 53,717.40 | 13,647.20 | 40,070.20 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 14,367.06 | 19,058.51 | (4,691.45) | 14,718.57 | 4,323.71 | 10,394.86 |
| | | | | | 0015 | OVERTIME PAY | - | 180.42 | (180.42) | - | 193.79 | (193.79) |
| | | | | PS Total | | | 67,776.19 | 73,037.51 | (5,261.32) | 68,435.97 | 18,164.70 | 50,271.27 |
| | | 0200 Fund | FEDERAL GRANT FUND Total | | | | 67,776.19 | 73,037.51 | (5,261.32) | 68,435.97 | 18,164.70 | 50,271.27 |
| | | | | | | | 67,776.19 | 73,037.51 | (5,261.32) | 68,435.97 | 18,164.70 | 50,271.27 |
| | LEGISLATIVE AND PUBLIC AFFAIRS Total | | | | | | 634,194.86 | 505,020.05 | 129,174.81 | 649,497.00 | 97,929.21 | 551,567.79 |
| 1889 Total | | | | | | | 634,194.86 | 505,020.05 | 129,174.81 | 649,497.00 | 97,929.21 | 551,567.79 |
| 3805 | OFFICE OF THE CHIEF EXECUTIVE | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 410,173.18 | 382,489.43 | 27,683.75 | 352,635.28 | 89,028.57 | 263,606.71 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 110,336.59 | 51,084.94 | 59,247.65 | 96,622.06 | 9,737.06 | 86,885.00 |
| | | | | PS Total | | | 520,509.77 | 433,578.37 | 86,931.40 | 449,257.34 | 98,765.63 | 350,491.71 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 0.20 | 1,290.34 | (1,290.14) | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 33,009.80 | 6,555.00 | 26,454.80 | 10,000.00 | - | - |
| | | | | NPS Total | | | 33,010.00 | 7,845.34 | 25,164.66 | 10,000.00 | - | - |
| | | 0100 Fund | LOCAL FUND Total | | | | 553,519.77 | 441,423.71 | 112,096.06 | 459,257.34 | 98,765.63 | 350,491.71 |
| | | | | | | | 553,519.77 | 441,423.71 | 112,096.06 | 459,257.34 | 98,765.63 | 350,491.71 |

ACTIVITY
LEVEL

| | | | | | | | Fiscal Year | Values | | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program Code 3 | Program Code 3 Title | | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | 0200 | FEDERAL GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 35,000.00 | 30,553.75 | 4,446.25 | 35,000.00 | - | 35,000.00 |
| | | | | | NPS Total | | | 35,000.00 | 30,553.75 | 4,446.25 | 35,000.00 | - | 35,000.00 |
| | | | | FEDERAL GRANT FUND Total | | | | 35,000.00 | 30,553.75 | 4,446.25 | 35,000.00 | - | 35,000.00 |
| | | | 0200 Total | | | | | 35,000.00 | 30,553.75 | 4,446.25 | 35,000.00 | - | 35,000.00 |
| | OFFICE OF THE CHIEF EXECUTIVE | Total | | | | | | 588,519.77 | 471,977.46 | 116,542.31 | 494,257.34 | 98,765.63 | 385,491.71 |
| 3805 Total | | | | | | | | 588,519.77 | 471,977.46 | 116,542.31 | 494,257.34 | 98,765.63 | 385,491.71 |
| 3810 | OFFICE OF CLINICAL AND MEDICAL SVS - SEH | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 9,243,615.87 | 9,901,217.60 | (657,601.73) | 9,622,990.90 | 2,267,681.86 | 7,355,309.04 |
| | | | | | | 0012 | REGULAR PAY - OTHER | 3,071,912.21 | 3,650,685.01 | (578,772.80) | 3,590,052.18 | 707,752.46 | 2,882,299.72 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | 926,047.22 | 428,878.64 | 497,168.58 | 926,047.22 | 107,560.73 | 818,486.49 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 3,312,608.22 | 2,574,389.72 | 738,218.50 | 3,653,223.53 | 499,109.42 | 3,154,114.11 |
| | | | | | | 0015 | OVERTIME PAY | 521,535.52 | 698,498.51 | (176,962.99) | 521,535.52 | 210,113.53 | 311,421.99 |
| | | | | | PS Total | | | 17,075,719.04 | 17,253,669.48 | (177,950.44) | 18,313,849.35 | 3,792,218.00 | 14,521,631.35 |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 2,433,589.33 | 2,283,330.87 | 150,258.46 | 2,683,589.33 | 490,707.20 | 2,046,617.22 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 528,739.80 | 325,330.64 | 203,409.16 | 528,739.80 | 9,858.63 | 12,996.10 |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 623,585.00 | 546,417.41 | 77,167.59 | 623,585.00 | 63,838.00 | 208,965.00 |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | 1,370,900.00 | 510,430.94 | 860,469.06 | 1,370,900.00 | 132,617.76 | 198,940.90 |
| | | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 5,000.00 | | 5,000.00 | 5,000.00 | | 5,000.00 |
| | | | | | NPS Total | | | 4,961,814.13 | 3,665,509.86 | 1,296,304.27 | 5,211,814.13 | 697,021.59 | 2,472,519.22 |
| | | | | LOCAL FUND Total | | | | 22,037,533.17 | 20,919,179.34 | 1,118,353.83 | 23,525,663.48 | 4,489,239.59 | 16,994,150.57 |
| | | | 0100 Total | | | | | 22,037,533.17 | 20,919,179.34 | 1,118,353.83 | 23,525,663.48 | 4,489,239.59 | 16,994,150.57 |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 394,115.76 | 396,276.17 | (2,160.41) | 394,515.65 | 97,537.44 | 296,978.21 |
| | | | | | | 0012 | REGULAR PAY - OTHER | 65,822.75 | 65,280.08 | 542.67 | 65,822.75 | 14,285.81 | 51,536.94 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 1,007.82 | (1,007.82) | - | 116.10 | (116.10) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 123,723.46 | 115,172.64 | 8,550.82 | 126,132.71 | 26,814.18 | 99,318.53 |
| | | | | | | 0015 | OVERTIME PAY | - | 2,083.99 | (2,083.99) | - | 884.72 | (884.72) |
| | | | | | PS Total | | | 583,661.97 | 579,820.70 | 3,841.27 | 586,471.11 | 139,638.25 | 446,832.86 |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 92,060.36 | 89,889.12 | 2,171.24 | 142,060.36 | - | 68,200.36 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 18,693.52 | 3,675.22 | 15,018.30 | 18,693.52 | - | 4,693.52 |
| | | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 13,352.52 | 5,298.00 | 8,054.52 | 13,352.52 | - | 3,952.52 |
| | | | | | NPS Total | | | 124,106.40 | 98,862.34 | 25,244.06 | 174,106.40 | - | 76,846.40 |
| | | | | FEDERAL GRANT FUND Total | | | | 707,768.37 | 678,683.04 | 29,085.33 | 760,577.51 | 139,638.25 | 523,679.26 |
| | | | 0200 Total | | | | | 707,768.37 | 678,683.04 | 29,085.33 | 760,577.51 | 139,638.25 | 523,679.26 |
| | | | 0400 | PRIVATE GRANT FUND | NPS | 0020 | SUPPLIES AND MATERIALS | 2,379.11 | 2,379.11 | - | 40,000.00 | - | 35,000.00 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 60,514.15 | 60,514.15 | (0.00) | 175,000.00 | 11,798.36 | 75,701.00 |
| | | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | - | - | - | 40,000.00 | - | 35,000.00 |
| | | | | | NPS Total | | | 62,893.26 | 62,893.26 | (0.00) | 255,000.00 | 11,798.36 | 143,701.00 |
| | | | | PRIVATE GRANT FUND Total | | | | 62,893.26 | 62,893.26 | (0.00) | 255,000.00 | 11,798.36 | 143,701.00 |
| | | | 0400 Total | | | | | 62,893.26 | 62,893.26 | (0.00) | 255,000.00 | 11,798.36 | 143,701.00 |
| | | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | PS | 0011 | REGULAR PAY - CONT FULL TIME | 104,917.75 | 62,705.60 | 42,212.15 | 104,917.75 | 16,690.87 | 88,226.88 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 3,481.00 | (3,481.00) | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 28,222.88 | 16,756.84 | 11,466.04 | 28,747.46 | 3,899.35 | 24,848.11 |
| | | | | | PS Total | | | 133,140.63 | 82,943.45 | 50,197.18 | 133,665.21 | 20,590.22 | 113,074.99 |
| | | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 133,140.63 | 82,943.45 | 50,197.18 | 133,665.21 | 20,590.22 | 113,074.99 |
| | | | 0600 Total | | | | | 133,140.63 | 82,943.45 | 50,197.18 | 133,665.21 | 20,590.22 | 113,074.99 |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 85,633.00 | 81,989.96 | 3,643.04 | 85,633.00 | 21,771.79 | 63,861.21 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 23,035.28 | 19,724.99 | 3,310.29 | 23,463.44 | 4,875.22 | 18,588.22 |
| | | | | | | 0015 | OVERTIME PAY | - | 307.67 | (307.67) | - | 10.77 | (10.77) |
| | | | | | PS Total | | | 108,668.28 | 102,022.62 | 6,645.66 | 109,096.44 | 26,657.78 | 82,438.66 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 235,026.80 | 111,387.91 | 123,638.89 | 225,026.80 | 26,152.00 | 19,742.80 |
| | | | | | NPS Total | | | 235,026.80 | 111,387.91 | 123,638.89 | 225,026.80 | 26,152.00 | 19,742.80 |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 343,695.08 | 213,410.53 | 130,284.55 | 334,123.24 | 52,809.78 | 102,181.46 |
| | | | 0700 Total | | | | | 343,695.08 | 213,410.53 | 130,284.55 | 334,123.24 | 52,809.78 | 102,181.46 |
| | OFFICE OF CLINICAL AND MEDICAL SVS - SEH | Total | | | | | | 23,285,020.51 | 21,957,109.62 | 1,327,920.89 | 25,009,029.44 | 4,714,076.20 | 17,876,787.28 |
| 3810 Total | | | | | | | | 23,285,020.51 | 21,957,109.62 | 1,327,920.89 | 25,009,029.44 | 4,714,076.20 | 17,876,787.28 |
| 3815 | ENGINEERING AND MAINTENANCE - SEH | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,470,246.45 | 1,420,703.06 | 49,543.39 | 1,413,904.26 | 315,695.96 | 1,098,208.32 |
| | | | | | | 0012 | REGULAR PAY - OTHER | 59,205.90 | 32,870.43 | 26,335.47 | 59,722.03 | - | 59,722.03 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | 49,435.41 | 43,290.47 | 6,144.94 | 49,435.41 | 23,877.83 | 25,557.58 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 411,422.71 | 358,989.51 | 52,433.20 | 403,773.61 | 72,669.06 | 331,104.55 |
| | | | | | | 0015 | OVERTIME PAY | 29,454.07 | 134,986.82 | (105,532.75) | 29,454.07 | 21,346.92 | 8,107.15 |
| | | | | | PS Total | | | 2,019,764.54 | 1,990,840.29 | 28,924.25 | 1,956,289.40 | 433,589.77 | 1,522,699.63 |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | - | - | - | - | 89.53 | (89.53) |
| | | | | | | 0030 | ENERGY, COMM. AND BLDG RENTA | 1,718,749.06 | 1,144,221.36 | 574,527.70 | 1,239,776.45 | - | - |
| | | | | | | 0035 | OCCUPANCY FIXED COSTS | 637,230.21 | 344,811.76 | 292,418.45 | 153,450.82 | - | - |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 751,791.89 | 684,301.67 | 67,490.22 | 751,791.89 | 6,793.99 | 6,669.15 |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | 7,900.00 | (7,900.00) | 250,000.00 | - | 72,385.96 |
| | | | | | NPS Total | | | 3,107,771.16 | 2,181,234.79 | 926,536.37 | 2,395,019.16 | 6,883.52 | 78,965.58 |
| | | | | LOCAL FUND Total | | | | 5,127,535.70 | 4,172,075.08 | 955,460.62 | 4,351,308.56 | 440,473.29 | 1,601,665.21 |
| | | | 0100 Total | | | | | 5,127,535.70 | 4,172,075.08 | 955,460.62 | 4,351,308.56 | 440,473.29 | 1,601,665.21 |
| | | | 0200 | FEDERAL GRANT FUND | NPS | 0020 | SUPPLIES AND MATERIALS | 68,126.62 | 92,645.89 | (24,519.27) | 68,126.62 | 1,435.00 | 6,762.62 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 94,917.81 | 102,866.90 | (7,949.09) | 94,917.81 | 925.00 | - |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | 785.08 | (785.08) | - | - | - |
| | | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 24,716.55 | 37,397.10 | (12,680.55) | 24,716.55 | - | 8,716.55 |
| | | | | | NPS Total | | | 187,760.98 | 233,694.97 | (45,933.99) | 187,760.98 | 2,360.00 | 15,479.17 |
| | | | | FEDERAL GRANT FUND Total | | | | 187,760.98 | 233,694.97 | (45,933.99) | 187,760.98 | 2,360.00 | 15,479.17 |

ACTIVITY LEVEL

| Program Code 3 | Program Code 3 Title | | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Fiscal Year 2021 | | | Values 2022 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | 0200 Total | | | | | 187,760.98 | 233,694.97 | (45,933.99) | 187,760.98 | 2,360.00 | 15,479.17 |
| | | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | NPS | 0020 | SUPPLIES AND MATERIALS | - | - | - | - | - | - |
| | | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | NPS Total | | | - | - | - | - | - | - |
| | | | 0600 Total | | | | | - | - | - | - | - | - |
| | ENGINEERING AND MAINTENANCE - SEH | Total | | | | | | 5,315,296.68 | 4,405,770.05 | 909,526.63 | 4,539,069.54 | 442,833.29 | 1,617,144.38 |
| 3815 Total | | | | | | | | 5,315,296.68 | 4,405,770.05 | 909,526.63 | 4,539,069.54 | 442,833.29 | 1,617,144.38 |
| 3820 | FISCAL AND SUPPORT SERVICES - SEH | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 82,406.21 | 61,863.33 | 20,542.88 | 83,705.50 | 17,914.20 | 65,791.30 |
| | | | | | | 0012 | REGULAR PAY - OTHER | 27,648.32 | 55,747.86 | (28,099.54) | 28,301.74 | 17,127.52 | 11,174.22 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 29,604.67 | 22,646.54 | 6,958.13 | 30,689.99 | 6,499.33 | 24,190.66 |
| | | | | | PS Total | | | 139,659.20 | 140,257.73 | (598.53) | 142,697.23 | 41,541.05 | 101,156.18 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 91,389.08 | 62,449.08 | 28,940.00 | 66,389.08 | - | 9,695.88 |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | 216,059.60 | 101,526.66 | 114,532.94 | 216,059.60 | - | 216,059.60 |
| | | | | | NPS Total | | | 307,448.68 | 163,975.74 | 143,472.94 | 282,448.68 | - | 225,755.48 |
| | | | | LOCAL FUND Total | | | | 447,107.88 | 304,233.47 | 142,874.41 | 425,145.91 | 41,541.05 | 326,911.66 |
| | | | 0100 Total | | | | | 447,107.88 | 304,233.47 | 142,874.41 | 425,145.91 | 41,541.05 | 326,911.66 |
| | | | 0450 | PRIVATE DONATIONS | NPS | 0020 | SUPPLIES AND MATERIALS | 6,956.31 | 6,956.31 | (0.00) | 12,000.00 | - | - |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 614.37 | 614.37 | 0.00 | 135,463.55 | 30.36 | 125,433.19 |
| | | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | - | - | - | 13,689.19 | - | 13,689.19 |
| | | | | | NPS Total | | | 7,570.68 | 7,570.68 | (0.00) | 161,152.74 | 30.36 | 139,122.38 |
| | | | | PRIVATE DONATIONS Total | | | | 7,570.68 | 7,570.68 | (0.00) | 161,152.74 | 30.36 | 139,122.38 |
| | | | 0450 Total | | | | | 7,570.68 | 7,570.68 | (0.00) | 161,152.74 | 30.36 | 139,122.38 |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | 3.20 | (3.20) | - | 57.60 | (57.60) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | 4,071.12 | (4,071.12) | - | 1,271.86 | (1,271.86) |
| | | | | | PS Total | | | - | 4,074.32 | (4,074.32) | - | 1,329.46 | (1,329.46) |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 144,932.51 | 129,257.51 | 15,675.00 | 144,932.51 | 16,568.00 | 73,364.51 |
| | | | | | NPS Total | | | 144,932.51 | 129,257.51 | 15,675.00 | 144,932.51 | 16,568.00 | 73,364.51 |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 144,932.51 | 133,331.83 | 11,600.68 | 144,932.51 | 17,897.46 | 72,035.05 |
| | | | 0700 Total | | | | | 144,932.51 | 133,331.83 | 11,600.68 | 144,932.51 | 17,897.46 | 72,035.05 |
| | FISCAL AND SUPPORT SERVICES - SEH | Total | | | | | | 599,611.07 | 445,135.98 | 154,475.09 | 731,231.16 | 59,468.87 | 538,069.09 |
| 3820 Total | | | | | | | | 599,611.07 | 445,135.98 | 154,475.09 | 731,231.16 | 59,468.87 | 538,069.09 |
| 3828 | QUALITY AND DATA MANAGEMENT | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,088,106.98 | 1,185,605.52 | (97,498.54) | 1,112,342.55 | 287,090.87 | 825,251.68 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 292,700.79 | 313,706.14 | (21,005.35) | 304,781.87 | 71,766.28 | 233,015.59 |
| | | | | | PS Total | | | 1,380,807.77 | 1,499,311.66 | (118,503.89) | 1,417,124.42 | 358,857.15 | 1,058,267.27 |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 5,000.00 | 3,288.26 | 1,711.74 | 5,000.00 | - | 907.93 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 70,039.07 | 58,224.48 | 11,814.59 | 70,039.07 | - | 27,921.07 |
| | | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 2,500.00 | 2,238.30 | 261.70 | 2,500.00 | - | - |
| | | | | | NPS Total | | | 77,539.07 | 63,751.04 | 13,788.03 | 77,539.07 | - | 28,829.00 |
| | | | | LOCAL FUND Total | | | | 1,458,346.84 | 1,563,062.70 | (104,715.86) | 1,494,663.49 | 358,857.15 | 1,087,096.27 |
| | | | 0100 Total | | | | | 1,458,346.84 | 1,563,062.70 | (104,715.86) | 1,494,663.49 | 358,857.15 | 1,087,096.27 |
| | QUALITY AND DATA MANAGEMENT | Total | | | | | | 1,458,346.84 | 1,563,062.70 | (104,715.86) | 1,494,663.49 | 358,857.15 | 1,087,096.27 |
| 3828 Total | | | | | | | | 1,458,346.84 | 1,563,062.70 | (104,715.86) | 1,494,663.49 | 358,857.15 | 1,087,096.27 |
| 3830 | HOUSEKEEPING - SEH | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,758,345.47 | 1,715,163.82 | 43,181.65 | 1,754,941.13 | 400,615.72 | 1,154,325.41 |
| | | | | | | 0012 | REGULAR PAY - OTHER | 206,859.93 | 265,971.90 | (59,111.97) | 188,787.37 | 61,955.89 | 126,831.48 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | 129,767.79 | 105,185.96 | 24,581.83 | 129,767.79 | 51,275.89 | 78,491.90 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 528,640.25 | 515,081.28 | 13,558.97 | 532,581.61 | 113,880.30 | 418,701.31 |
| | | | | | | 0015 | OVERTIME PAY | 22,581.45 | 48,593.67 | (26,012.22) | 22,581.45 | 15,531.81 | 7,049.64 |
| | | | | | PS Total | | | 2,646,194.89 | 2,649,996.63 | (3,801.74) | 2,628,659.35 | 643,259.61 | 1,985,399.74 |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 134,777.75 | 134,777.15 | 0.60 | 184,777.75 | 50,252.30 | 18,800.00 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | (4,663.41) | 10,126.63 | (14,790.06) | 391,546.57 | - | 32,946.57 |
| | | | | | NPS Total | | | 130,114.32 | 144,903.78 | (14,789.46) | 576,324.32 | 50,252.30 | 51,746.57 |
| | | | | LOCAL FUND Total | | | | 2,776,309.21 | 2,794,900.41 | (18,591.20) | 3,204,983.67 | 693,511.91 | 2,037,146.31 |
| | | | 0100 Total | | | | | 2,776,309.21 | 2,794,900.41 | (18,591.20) | 3,204,983.67 | 693,511.91 | 2,037,146.31 |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 137,544.12 | 139,715.66 | (2,171.54) | 147,176.47 | 31,121.31 | 116,055.16 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 12,154.01 | (12,154.01) | - | 927.51 | (927.51) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 36,999.37 | 31,042.52 | 5,956.85 | 40,326.36 | 6,355.13 | 33,971.23 |
| | | | | | | 0015 | OVERTIME PAY | - | 850.79 | (850.79) | - | 591.05 | (591.05) |
| | | | | | PS Total | | | 174,543.49 | 183,762.98 | (9,219.49) | 187,502.83 | 38,995.00 | 148,507.83 |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 16,705.04 | - | 16,705.04 | 16,705.04 | - | 16,705.04 |
| | | | | | NPS Total | | | 16,705.04 | - | 16,705.04 | 16,705.04 | - | 16,705.04 |
| | | | | FEDERAL GRANT FUND Total | | | | 191,248.53 | 183,762.98 | 7,485.55 | 204,207.87 | 38,995.00 | 165,212.87 |
| | | | 0200 Total | | | | | 191,248.53 | 183,762.98 | 7,485.55 | 204,207.87 | 38,995.00 | 165,212.87 |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | NPS | 0020 | SUPPLIES AND MATERIALS | 100,000.00 | 90,998.82 | 1.18 | | | |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 242,480.00 | 194,499.12 | 47,980.88 | | | |
| | | | | | NPS Total | | | 342,480.00 | 294,497.94 | 47,982.06 | | | |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 342,480.00 | 294,497.94 | 47,982.06 | | | |
| | | | 0700 Total | | | | | 342,480.00 | 294,497.94 | 47,982.06 | | | |
| | HOUSEKEEPING - SEH | Total | | | | | | 3,310,037.74 | 3,273,161.33 | 36,876.41 | 3,409,191.54 | 732,506.91 | 2,202,359.18 |
| 3830 Total | | | | | | | | 3,310,037.74 | 3,273,161.33 | 36,876.41 | 3,409,191.54 | 732,506.91 | 2,202,359.18 |
| 3835 | MATERIALS MANAGEMENT - SEH | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 504,901.00 | 504,764.46 | 136.54 | 513,938.44 | 118,996.41 | 394,942.03 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 21,627.74 | (21,627.74) | 21,627.74 | 324.47 | 21,303.27 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 135,818.36 | 118,824.06 | 16,994.30 | 140,819.14 | 26,442.40 | 114,376.74 |
| | | | | | | 0015 | OVERTIME PAY | 17,672.40 | 7,921.50 | 9,750.94 | 17,672.40 | 4,136.05 | 13,536.39 |
| | | | | | PS Total | | | 680,019.54 | 631,510.02 | 48,509.52 | 694,057.76 | 149,899.33 | 544,158.43 |

ACTIVITY
LEVEL

| | | | | | | | | Fiscal Year | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2021 | | | 2022 | | |
| Program Code 3 | Program Code 3 Title | | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actual | Sum of Variance | Sum of Budget | Sum of Actual | Sum of Variance |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 512,390.73 | 473,712.56 | 38,678.17 | 512,390.73 | 132,265.80 | 134,023.44 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 317,577.52 | 222,554.97 | 95,022.55 | 317,577.52 | 9,608.01 | 60,847.02 |
| | | | | | NPS Total | | | 829,968.25 | 696,267.53 | 133,700.72 | 829,968.25 | 141,873.81 | 194,870.46 |
| | | | | LOCAL FUND Total | | | | 1,509,987.79 | 1,327,777.55 | 182,210.24 | 1,524,026.01 | 291,773.14 | 739,028.89 |
| | | | 0100 Total | | | | | 1,509,987.79 | 1,327,777.55 | 182,210.24 | 1,524,026.01 | 291,773.14 | 739,028.89 |
| | | | 0200 | FEDERAL GRANT FUND | NPS | 0020 | SUPPLIES AND MATERIALS | 94,593.39 | 53,401.88 | 41,191.51 | 94,593.39 | - | 94,593.39 |
| | | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 16,705.04 | 10,950.00 | 5,755.04 | 16,705.04 | - | 16,705.04 |
| | | | | | NPS Total | | | 111,298.43 | 64,351.88 | 46,946.55 | 111,298.43 | - | 111,298.43 |
| | | | | FEDERAL GRANT FUND Total | | | | 111,298.43 | 64,351.88 | 46,946.55 | 111,298.43 | - | 111,298.43 |
| | | | 0200 Total | | | | | 111,298.43 | 64,351.88 | 46,946.55 | 111,298.43 | - | 111,298.43 |
| | MATERIALS MANAGEMENT - SEH | Total | | | | | | 1,621,286.22 | 1,392,129.43 | 229,156.79 | 1,635,324.44 | 291,773.14 | 850,327.32 |
| 3835 Total | | | | | | | | 1,621,286.22 | 1,392,129.43 | 229,156.79 | 1,635,324.44 | 291,773.14 | 850,327.32 |
| 3845 | NURSING - SEH | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 32,143,736.22 | 31,093,161.50 | 1,050,574.72 | 31,842,823.60 | 7,247,327.60 | 24,595,496.00 |
| | | | | | | 0012 | REGULAR PAY - OTHER | 35,375.15 | 71,462.67 | (36,087.52) | 135,445.50 | 22,081.67 | 111,363.83 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | 2,218,564.29 | 3,548,404.64 | (1,329,840.35) | 2,218,564.29 | 921,902.56 | 1,296,661.73 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 8,319,295.04 | 9,619,082.59 | (1,299,787.55) | 8,578,728.72 | 2,108,793.81 | 6,469,934.91 |
| | | | | | | 0015 | OVERTIME PAY | 812,477.17 | 4,492,059.00 | (3,679,581.83) | 812,477.17 | 925,776.45 | (113,299.28) |
| | | | | | PS Total | | | 43,529,447.87 | 48,824,170.40 | (5,294,722.53) | 43,586,039.28 | 11,225,882.09 | 32,360,157.19 |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 45,824.84 | 31,266.89 | 14,557.95 | 45,824.84 | - | 25,824.84 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 40,000.00 | 244,804.87 | (204,804.87) | 1,144,000.00 | 1,426.24 | 732,060.90 |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | 200,000.00 | 159,849.57 | 40,150.43 | 200,000.00 | - | 200,000.00 |
| | | | | | NPS Total | | | 285,824.84 | 435,921.33 | (150,096.49) | 1,389,824.84 | 1,426.24 | 957,885.74 |
| | | | | LOCAL FUND Total | | | | 43,815,272.71 | 49,260,091.73 | (5,444,819.02) | 44,975,864.12 | 11,227,308.33 | 33,318,042.93 |
| | | | 0100 Total | | | | | 43,815,272.71 | 49,260,091.73 | (5,444,819.02) | 44,975,864.12 | 11,227,308.33 | 33,318,042.93 |
| | | | 0150 | ARPA | NPS | 0040 | OTHER SERVICES AND CHARGES | 288,345.72 | 288,345.72 | - | | | |
| | | | | | NPS Total | | | 288,345.72 | 288,345.72 | - | | | |
| | | | | ARPA Total | | | | 288,345.72 | 288,345.72 | - | | | |
| | | | 0150 Total | | | | | 288,345.72 | 288,345.72 | - | | | |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 172,894.50 | 118,296.55 | 54,597.95 | 174,300.69 | 25,700.99 | 148,599.70 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 14,823.00 | (14,823.00) | - | 3,298.81 | (3,298.81) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 46,508.62 | 41,389.83 | 5,118.79 | 47,758.38 | 7,172.52 | 40,585.86 |
| | | | | | | 0015 | OVERTIME PAY | - | 5,039.21 | (5,039.21) | - | 4,449.67 | (4,449.67) |
| | | | | | PS Total | | | 219,403.12 | 179,548.59 | 39,854.53 | 222,059.07 | 40,621.99 | 181,437.08 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 29,692.68 | 3,290.00 | 26,402.68 | 29,692.68 | - | 29,692.68 |
| | | | | | NPS Total | | | 29,692.68 | 3,290.00 | 26,402.68 | 29,692.68 | - | 29,692.68 |
| | | | | FEDERAL GRANT FUND Total | | | | 249,095.80 | 182,838.59 | 66,257.21 | 251,751.75 | 40,621.99 | 211,129.76 |
| | | | 0200 Total | | | | | 249,095.80 | 182,838.59 | 66,257.21 | 251,751.75 | 40,621.99 | 211,129.76 |
| | | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,450,453.95 | 1,222,857.12 | 227,596.83 | 1,458,536.14 | 283,689.44 | 1,174,846.70 |
| | | | | | | 0012 | REGULAR PAY - OTHER | - | - | - | - | 10,660.15 | (10,660.15) |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 130,527.83 | (130,527.83) | - | 40,369.06 | (40,369.06) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 390,172.13 | 367,988.01 | 22,184.12 | 399,638.90 | 83,014.47 | 316,624.43 |
| | | | | | | 0015 | OVERTIME PAY | 41,701.15 | 153,049.68 | (111,348.53) | 41,701.15 | 48,299.91 | (6,598.76) |
| | | | | | PS Total | | | 1,882,327.23 | 1,874,422.64 | 7,904.59 | 1,899,876.19 | 466,033.03 | 1,433,843.16 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 69,947.37 | 116,813.80 | (46,866.43) | 100,000.00 | - | 100,000.00 |
| | | | | | NPS Total | | | 69,947.37 | 116,813.80 | (46,866.43) | 100,000.00 | - | 100,000.00 |
| | | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 1,952,274.60 | 1,991,236.44 | (38,961.84) | 1,999,876.19 | 466,033.03 | 1,533,843.16 |
| | | | 0600 Total | | | | | 1,952,274.60 | 1,991,236.44 | (38,961.84) | 1,999,876.19 | 466,033.03 | 1,533,843.16 |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 343,735.30 | 340,141.54 | 3,593.76 | 392,985.67 | 91,787.95 | 301,197.72 |
| | | | | | | 0012 | REGULAR PAY - OTHER | - | 634.52 | (634.52) | - | 41.95 | (41.95) |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 43,183.83 | (43,183.83) | - | 13,838.26 | (13,838.26) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 108,377.38 | 84,338.94 | 24,038.44 | 107,678.08 | 23,827.01 | 83,851.07 |
| | | | | | | 0015 | OVERTIME PAY | - | 94,487.57 | (94,487.57) | - | 17,537.33 | (17,537.33) |
| | | | | | PS Total | | | 452,112.68 | 561,517.36 | (109,404.68) | 500,663.75 | 147,032.50 | 353,631.25 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 1,622,507.13 | 1,308,383.21 | 314,124.52 | 10,507.73 | 516.00 | 507.73 |
| | | | | | NPS Total | | | 1,622,507.13 | 1,308,383.21 | 314,124.52 | 10,507.73 | 516.00 | 507.73 |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 2,074,620.41 | 1,869,900.57 | 204,719.84 | 511,171.48 | 147,548.50 | 354,138.98 |
| | | | 0700 Total | | | | | 2,074,620.41 | 1,869,900.57 | 204,719.84 | 511,171.48 | 147,548.50 | 354,138.98 |
| | NURSING - SEH | Total | | | | | | 48,379,609.24 | 53,592,413.05 | (5,212,803.81) | 47,738,663.54 | 11,881,511.85 | 35,417,154.83 |
| 3845 Total | | | | | | | | 48,379,609.24 | 53,592,413.05 | (5,212,803.81) | 47,738,663.54 | 11,881,511.85 | 35,417,154.83 |
| 3850 | NUTRITIONAL SERVICES SEH | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,543,140.73 | 1,188,327.49 | 354,813.24 | 1,299,405.16 | 252,202.24 | 1,047,202.92 |
| | | | | | | 0012 | REGULAR PAY - OTHER | - | 193,041.72 | (193,041.72) | 170,940.14 | 56,971.29 | 113,968.85 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | 121,425.33 | 123,760.40 | (2,335.05) | 121,425.35 | 28,643.81 | 92,781.54 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 415,104.87 | 385,308.40 | 29,796.47 | 402,874.62 | 82,789.74 | 320,084.88 |
| | | | | | | 0015 | OVERTIME PAY | 3,927.21 | 133,264.96 | (129,337.75) | 3,927.21 | 33,431.21 | (29,504.00) |
| | | | | | PS Total | | | 2,083,598.16 | 2,023,702.97 | 59,895.19 | 1,998,572.48 | 454,038.29 | 1,544,534.19 |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 721,424.43 | 634,717.84 | 86,706.59 | 721,424.43 | - | - |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 322,038.56 | 358,231.12 | (36,192.56) | 420,657.60 | - | 295,657.60 |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 162,543.00 | 162,542.92 | 0.08 | 162,543.00 | - | 108,835.87 |
| | | | | | NPS Total | | | 1,206,005.99 | 1,155,491.88 | 50,514.11 | 1,304,625.03 | - | 404,493.47 |
| | | | | LOCAL FUND Total | | | | 3,289,604.15 | 3,179,194.85 | 110,409.30 | 3,303,197.51 | 454,038.29 | 1,949,027.66 |
| | | | 0100 Total | | | | | 3,289,604.15 | 3,179,194.85 | 110,409.30 | 3,303,197.51 | 454,038.29 | 1,949,027.66 |
| | | | 0200 | FEDERAL GRANT FUND | NPS | 0020 | SUPPLIES AND MATERIALS | 239,852.96 | 259,658.72 | (19,805.76) | 239,852.96 | - | 49,852.96 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 5,341.00 | 4,303.29 | 1,037.72 | 5,341.00 | - | 5,341.00 |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 189,720.86 | 195,480.86 | (5,760.00) | 319,720.86 | - | 319,720.86 |

ACTIVITY
LEVEL

| | | | | | | | Fiscal Year | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2021 | | | 2022 | | |
| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 9,079.71 | - | 9,079.71 | 9,079.71 | - | 9,079.71 |
| | | | | NPS Total | | | 443,994.54 | 459,442.87 | (15,448.33) | 573,994.54 | - | 383,994.54 |
| | | | FEDERAL GRANT FUND Total | | | | 443,994.54 | 459,442.87 | (15,448.33) | 573,994.54 | - | 383,994.54 |
| | | 0200 Total | | | | | 443,994.54 | 459,442.87 | (15,448.33) | 573,994.54 | - | 383,994.54 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | NPS | 0020 | SUPPLIES AND MATERIALS | - | - | - | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | - | - | - | | | |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | - | - | - | | | |
| | | 0600 Total | | | | | - | - | - | | | |
| | NUTRITIONAL SERVICES SEH | Total | | | | | 3,733,598.69 | 3,638,637.72 | 94,960.97 | 3,877,192.05 | 454,038.29 | 2,333,022.20 |
| 3850 Total | | | | | | | 3,733,598.69 | 3,638,637.72 | 94,960.97 | 3,877,192.05 | 454,038.29 | 2,333,022.20 |
| 3860 | SECURITY AND SAFETY - SEH | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,295,520.36 | 1,452,107.04 | (156,586.68) | 1,316,873.89 | 360,050.20 | 956,823.69 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 3,204.96 | (3,204.96) | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 55,615.34 | 132,670.23 | (77,054.89) | 55,615.34 | 35,204.42 | 20,410.92 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 348,494.99 | 400,501.95 | (52,006.96) | 360,823.43 | 94,749.93 | 266,073.50 |
| | | | | | 0015 | OVERTIME PAY | 29,454.07 | 252,760.68 | (223,306.61) | 29,454.07 | 80,017.90 | (50,563.83) |
| | | | | PS Total | | | 1,729,084.76 | 2,241,244.86 | (512,160.10) | 1,762,766.73 | 570,022.45 | 1,192,744.28 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 14,500.00 | 14,417.73 | 82.27 | 14,500.00 | - | 14,500.00 |
| | | | | | 0034 | SECURITY SERVICES | 1,940,283.86 | 1,900,558.00 | 40,126.34 | 1,845,145.82 | | |
| | | | | NPS Total | | | 1,954,783.86 | 1,914,975.73 | 40,208.61 | 1,859,645.82 | - | 14,500.00 |
| | | | LOCAL FUND Total | | | | 3,683,868.62 | 4,156,220.59 | (471,951.49) | 3,622,412.55 | 570,022.45 | 1,207,244.28 |
| | | 0100 Total | | | | | 3,683,868.62 | 4,156,220.59 | (471,951.49) | 3,622,412.55 | 570,022.45 | 1,207,244.28 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 431,604.89 | 366,831.49 | 64,773.40 | 378,852.13 | 94,457.64 | 284,394.49 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 58,614.80 | (58,614.80) | 59,152.76 | 14,966.67 | 44,186.09 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 52,246.52 | (52,246.52) | - | 14,749.05 | (14,749.05) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 116,101.70 | 117,512.52 | (1,410.82) | 120,013.35 | 28,899.78 | 91,113.57 |
| | | | | | 0015 | OVERTIME PAY | - | 114,716.35 | (114,716.35) | - | 25,039.82 | (25,039.82) |
| | | | | PS Total | | | 547,706.59 | 709,921.68 | (162,215.09) | 558,018.24 | 178,112.96 | 379,905.28 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 10,841.00 | - | 10,841.00 | 10,841.00 | - | 10,841.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 13,664.97 | 9,980.00 | 3,684.97 | 13,664.97 | - | 13,664.97 |
| | | | | NPS Total | | | 24,505.98 | 9,980.00 | 14,525.98 | 24,505.98 | - | 24,505.98 |
| | | | FEDERAL GRANT FUND Total | | | | 572,212.57 | 719,901.68 | (147,689.11) | 582,524.22 | 178,112.96 | 404,411.26 |
| | | 0200 Total | | | | | 572,212.57 | 719,901.68 | (147,689.11) | 582,524.22 | 178,112.96 | 404,411.26 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 124,946.64 | 95,871.36 | 29,075.28 | 128,160.00 | 23,947.72 | 104,212.28 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 2,249.28 | (2,249.28) | - | (1,752.96) | 1,752.06 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 4,619.56 | (4,619.56) | - | 3,267.03 | (3,267.03) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 33,610.64 | 36,638.16 | (3,027.52) | 35,115.84 | 9,475.07 | 25,640.77 |
| | | | | | 0015 | OVERTIME PAY | - | 15,488.26 | (15,488.26) | - | 8,484.78 | (8,484.78) |
| | | | | PS Total | | | 158,557.28 | 154,866.62 | 3,690.66 | 163,275.84 | 43,422.54 | 119,853.30 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 227,460.00 | 23,010.00 | 204,450.00 | | | |
| | | | | NPS Total | | | 227,460.00 | 23,010.00 | 204,450.00 | | | |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 386,017.28 | 177,876.62 | 208,140.66 | 163,275.84 | 43,422.54 | 119,853.30 |
| | | 0700 Total | | | | | 386,017.28 | 177,876.62 | 208,140.66 | 163,275.84 | 43,422.54 | 119,853.30 |
| | SECURITY AND SAFETY - SEH | Total | | | | | 4,642,098.47 | 5,053,998.89 | (411,499.94) | 4,368,212.61 | 791,557.95 | 1,731,508.84 |
| 3860 Total | | | | | | | 4,642,098.47 | 5,053,998.89 | (411,499.94) | 4,368,212.61 | 791,557.95 | 1,731,508.84 |
| 3865 | TRANSPORTATION AND GROUNDS - SEH | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 299,491.30 | 266,858.08 | 32,633.22 | 246,522.45 | 65,564.22 | 180,958.23 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 41,239.38 | 14,213.10 | 27,026.28 | 41,239.38 | 4,158.93 | 37,080.45 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 80,563.17 | 51,044.55 | 29,518.62 | 115,496.51 | 12,331.18 | 103,165.33 |
| | | | | | 0015 | OVERTIME PAY | 30,435.85 | 56,056.26 | (25,620.41) | 30,435.85 | 14,011.76 | 16,424.09 |
| | | | | PS Total | | | 451,729.70 | 388,171.99 | 63,557.71 | 433,694.19 | 96,066.09 | 337,628.10 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 1,280.00 | - | 1,280.00 | 1,280.00 | - | 1,280.00 |
| | | | | | 0030 | ENERGY, COMM. AND BLDG RENTA | 4,551.58 | 3,971.99 | 579.59 | 10,273.49 | | 6,115.93 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 139,033.99 | 112,412.74 | 26,621.25 | 139,033.99 | 41,647.68 | 26,636.31 |
| | | | | NPS Total | | | 144,865.57 | 116,384.73 | 28,480.84 | 150,587.48 | 41,647.68 | 34,032.24 |
| | | | LOCAL FUND Total | | | | 596,595.27 | 504,556.72 | 92,038.55 | 584,281.67 | 137,713.77 | 371,660.34 |
| | | 0100 Total | | | | | 596,595.27 | 504,556.72 | 92,038.55 | 584,281.67 | 137,713.77 | 371,660.34 |
| | | 0150 | ARPA | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 6,938,135.00 | - | 6,938,135.00 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 602,651.00 | - | 602,651.00 |
| | | | | PS Total | | | | | | 7,540,786.00 | - | 7,540,786.00 |
| | | | ARPA Total | | | | | | | 7,540,786.00 | - | 7,540,786.00 |
| | | 0150 Total | | | | | | | | 7,540,786.00 | - | 7,540,786.00 |
| | | 0200 | FEDERAL GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 194,519.60 | 192,560.59 | 1,959.01 | 194,519.60 | - | 31,119.60 |
| | | | | NPS Total | | | 194,519.60 | 192,560.59 | 1,959.01 | 194,519.60 | - | 31,119.60 |
| | | | FEDERAL GRANT FUND Total | | | | 194,519.60 | 192,560.59 | 1,959.01 | 194,519.60 | - | 31,119.60 |
| | | 0200 Total | | | | | 194,519.60 | 192,560.59 | 1,959.01 | 194,519.60 | - | 31,119.60 |
| | TRANSPORTATION AND GROUNDS - SEH | Total | | | | | 791,114.87 | 697,117.31 | 93,997.56 | 8,319,587.27 | 137,713.77 | 7,943,565.94 |
| 3865 Total | | | | | | | 791,114.87 | 697,117.31 | 93,997.56 | 8,319,587.27 | 137,713.77 | 7,943,565.94 |
| 3870 | OFF OF THE CHIEF OF STAFF - SEH | 0100 | LOCAL FUND | PS | 0013 | ADDITIONAL GROSS PAY | 77,243.09 | - | 77,243.09 | 77,243.09 | | 77,243.09 |
| | | | | PS Total | | | 77,243.09 | - | 77,243.09 | 77,243.09 | | 77,243.09 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 6,118.70 | - | 6,118.70 | 6,118.70 | | |
| | | | | NPS Total | | | 6,118.70 | - | 6,118.70 | 6,118.70 | | |
| | | | LOCAL FUND Total | | | | 83,361.79 | - | 83,361.79 | 83,361.79 | | 77,243.09 |
| | | 0100 Total | | | | | 83,361.79 | - | 83,361.79 | 83,361.79 | | 77,243.09 |
| | | 0200 | FEDERAL GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 26,705.04 | - | 26,705.04 | 26,705.04 | | 26,705.04 |

ACTIVITY LEVEL

| | | | | | | | Fiscal Year | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2021 | | | 2022 | | |
| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | | NPS Total | | | 26,705.04 | - | 26,705.04 | 26,705.04 | - | 26,705.04 |
| | | | FEDERAL GRANT FUND Total | | | | 26,705.04 | - | 26,705.04 | 26,705.04 | - | 26,705.04 |
| | | 0200 Total | | | | | 26,705.04 | - | 26,705.04 | 26,705.04 | - | 26,705.04 |
| | OFF OF THE CHIEF OF STAFF - SEH | Total | | | | | 110,066.83 | - | 110,066.83 | 110,066.83 | - | 103,948.13 |
| 3870 Total | | | | | | | 110,066.83 | - | 110,066.83 | 110,066.83 | - | 103,948.13 |
| 3875 | OFF OF THE CHIEF OPERATING OFFICER - SEH | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 715,966.65 | 670,966.58 | 45,000.07 | 728,004.99 | 567,743.03 | 160,261.96 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 59,631.42 | 12,805.25 | 46,826.17 | 59,631.42 | 6.22 | 59,625.20 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 192,595.02 | 173,043.97 | 19,551.05 | 199,473.35 | 41,633.42 | 157,839.93 |
| | | | | | 0015 | OVERTIME PAY | - | 10,914.33 | (10,914.33) | - | 5,437.80 | (5,437.80) |
| | | | | PS Total | | | 968,193.09 | 867,730.13 | 100,462.96 | 987,109.76 | 207,339.40 | 779,770.36 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 53,354.26 | 49,712.00 | 3,642.26 | 53,354.26 | - | 53,354.26 |
| | | | | NPS Total | | | 53,354.26 | 49,712.00 | 3,642.26 | 53,354.26 | - | 53,354.26 |
| | | | LOCAL FUND Total | | | | 1,021,547.35 | 917,442.13 | 104,105.22 | 1,040,464.02 | 207,339.40 | 833,124.62 |
| | | 0100 Total | | | | | 1,021,547.35 | 917,442.13 | 104,105.22 | 1,040,464.02 | 207,339.40 | 833,124.62 |
| | OFF OF THE CHIEF OPERATING OFFICER - SEH | Total | | | | | 1,021,547.35 | 917,442.13 | 104,105.22 | 1,040,464.02 | 207,339.40 | 833,124.62 |
| 3875 Total | | | | | | | 1,021,547.35 | 917,442.13 | 104,105.22 | 1,040,464.02 | 207,339.40 | 833,124.62 |
| 3880 | OFFICE OF CHIEF CLINICAL OFFICER-SEH | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 8,657,096.78 | 8,649,336.94 | 8,659.84 | 8,145,563.64 | 2,057,979.57 | 6,087,624.07 |
| | | | | | 0012 | REGULAR PAY - OTHER | 376,653.91 | 445,472.78 | (68,818.87) | 368,953.40 | 87,373.91 | 281,579.49 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | 294,449.96 | 72,558.81 | 221,891.15 | 294,449.96 | 25,362.54 | 269,087.42 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 2,430,323.02 | 2,108,944.38 | 321,378.64 | 2,386,704.80 | 482,751.65 | 1,903,953.15 |
| | | | | | 0015 | OVERTIME PAY | 8,616.95 | 7,566.87 | 1,050.08 | 8,616.95 | 766.22 | 7,850.73 |
| | | | | PS Total | | | 11,768,040.62 | 11,283,879.78 | 484,160.84 | 11,204,288.75 | 2,654,193.89 | 8,550,094.86 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 62,418.88 | 19,567.58 | 42,851.30 | 62,418.88 | - | 52,418.88 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 126,613.16 | 100,390.30 | 26,222.86 | 126,613.16 | 9,486.00 | 22,960.16 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 500,000.00 | 406,804.76 | 93,195.24 | 500,000.00 | 219,150.00 | 7,100.00 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 13,550.00 | 4,920.01 | 8,629.99 | 13,550.00 | - | 6,000.00 |
| | | | | NPS Total | | | 702,582.04 | 531,682.65 | 170,899.39 | 702,582.04 | 228,636.00 | 88,479.04 |
| | | | LOCAL FUND Total | | | | 12,470,622.66 | 11,815,562.43 | 655,060.23 | 11,906,870.79 | 2,882,829.89 | 8,638,573.90 |
| | | 0100 Total | | | | | 12,470,622.66 | 11,815,562.43 | 655,060.23 | 11,906,870.79 | 2,882,829.89 | 8,638,573.90 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 110,452.00 | 110,826.26 | (374.26) | 112,945.84 | 27,808.04 | 85,137.80 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 29,711.59 | 22,008.92 | 7,702.67 | 30,947.16 | 4,725.48 | 26,221.68 |
| | | | | PS Total | | | 140,163.59 | 132,835.18 | 7,328.41 | 143,893.00 | 32,533.52 | 111,359.48 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 13,352.52 | 51.84 | 13,300.68 | 13,352.52 | - | 4,852.52 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 3,532.84 | - | 3,532.84 | 13,352.52 | - | 0.52 |
| | | | | NPS Total | | | 16,885.36 | 51.84 | 16,833.52 | 26,705.04 | - | 4,853.04 |
| | | | FEDERAL GRANT FUND Total | | | | 157,048.95 | 132,887.02 | 24,161.93 | 170,598.04 | 32,533.52 | 116,212.52 |
| | | 0200 Total | | | | | 157,048.95 | 132,887.02 | 24,161.93 | 170,598.04 | 32,533.52 | 116,212.52 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 56,976.83 | 56,976.83 | - | - | | |
| | | | | NPS Total | | | 56,976.83 | 56,976.83 | - | | | |
| | | | PRIVATE GRANT FUND Total | | | | 56,976.83 | 56,976.83 | - | | | |
| | | 0400 Total | | | | | 56,976.83 | 56,976.83 | - | | | |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | PS | 0011 | REGULAR PAY - CONT FULL TIME | 47,422.41 | 47,767.19 | (344.78) | 47,555.50 | 12,086.85 | 35,468.65 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 91.45 | (91.45) | - | 3.20 | (3.20) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 12,756.63 | 17,257.42 | (4,500.79) | 13,030.21 | 3,926.97 | 9,103.24 |
| | | | | | 0015 | OVERTIME PAY | 3,000.00 | - | 3,000.00 | 3,000.00 | - | 3,000.00 |
| | | | | PS Total | | | 63,179.04 | 65,116.06 | (1,937.02) | 63,585.71 | 16,017.02 | 47,568.69 |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 63,179.04 | 65,116.06 | (1,937.02) | 63,585.71 | 16,017.02 | 47,568.69 |
| | | 0600 Total | | | | | 63,179.04 | 65,116.06 | (1,937.02) | 63,585.71 | 16,017.02 | 47,568.69 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 80,515.20 | 78,784.23 | 1,730.97 | 82,887.82 | 20,032.27 | 62,855.55 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 21,658.59 | 14,616.17 | 7,042.42 | 22,711.26 | 3,518.45 | 19,192.81 |
| | | | | PS Total | | | 102,173.79 | 93,400.40 | 8,773.39 | 105,599.08 | 23,550.72 | 82,048.36 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 102,173.79 | 93,400.40 | 8,773.39 | 105,599.08 | 23,550.72 | 82,048.36 |
| | | 0700 Total | | | | | 102,173.79 | 93,400.40 | 8,773.39 | 105,599.08 | 23,550.72 | 82,048.36 |
| | OFFICE OF CHIEF CLINICAL OFFICER-SEH | Total | | | | | 12,850,001.27 | 12,163,942.74 | 686,058.53 | 12,246,653.62 | 2,954,931.15 | 8,884,403.47 |
| 3880 Total | | | | | | | 12,850,001.27 | 12,163,942.74 | 686,058.53 | 12,246,653.62 | 2,954,931.15 | 8,884,403.47 |
| 4830 | ADULT SERVICES - FORENSIC - BHSS | 0100 | LOCAL FUND | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | - | (42.66) | 42.66 | | | |
| | | | | NPS Total | | | - | (42.66) | 42.66 | | | |
| | | | LOCAL FUND Total | | | | - | (42.66) | 42.66 | | | |
| | | 0100 Total | | | | | - | (42.66) | 42.66 | | | |
| | ADULT SERVICES - FORENSIC - BHSS | Total | | | | | - | (42.66) | 42.66 | | | |
| 4830 Total | | | | | | | - | (42.66) | 42.66 | | | |
| 4905 | OFFICE OF ACCOUNTABILITY | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | 165,215.52 | (165,215.52) | - | 39,088.71 | (39,088.71) |
| | | | | | 0012 | REGULAR PAY - OTHER | 9,278.46 | - | 9,278.46 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 2,627.27 | 31,766.15 | (29,138.88) | - | 7,294.05 | (7,294.05) |
| | | | | PS Total | | | 11,905.73 | 196,981.67 | (185,075.94) | - | 46,382.76 | (46,382.76) |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 36,605.81 | 23,716.64 | 12,889.17 | 36,605.81 | - | 16,110.81 |
| | | | | NPS Total | | | 36,605.81 | 23,716.64 | 12,889.17 | 36,605.81 | - | 16,110.81 |
| | | | LOCAL FUND Total | | | | 48,511.54 | 220,698.31 | (172,186.77) | 36,605.81 | 46,382.76 | (30,271.95) |
| | | 0100 Total | | | | | 48,511.54 | 220,698.31 | (172,186.77) | 36,605.81 | 46,382.76 | (30,271.95) |
| | OFFICE OF ACCOUNTABILITY | Total | | | | | 48,511.54 | 220,698.31 | (172,186.77) | 36,605.81 | 46,382.76 | (30,271.95) |
| 4905 Total | | | | | | | 48,511.54 | 220,698.31 | (172,186.77) | 36,605.81 | 46,382.76 | (30,271.95) |
| 4910 | INVESTIGATIONS | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 407,044.22 | 344,234.57 | 62,809.65 | 409,199.12 | 80,144.14 | 329,054.98 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 315.68 | (315.68) | - | 11.04 | (11.04) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 109,494.89 | 50,563.69 | 58,931.20 | 112,120.56 | 11,759.51 | 100,361.05 |

ACTIVITY LEVEL

| | | | | | | | Fiscal Year | Values | | | 2022 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2021 | | | | | |
| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | | | 0015 | OVERTIME PAY | - | (90.19) | 90.19 | | | |
| | | | LOCAL FUND Total | PS Total | | | 516,539.11 | 395,023.75 | 121,515.36 | 521,319.68 | 91,914.69 | 429,404.99 |
| | | 0100 Total | | | | | 516,539.11 | 395,023.75 | 121,515.36 | 521,319.68 | 91,914.69 | 429,404.99 |
| | | | | | | | 516,539.11 | 395,023.75 | 121,515.36 | 521,319.68 | 91,914.69 | 429,404.99 |
| | INVESTIGATIONS | Total | | | | | 516,539.11 | 395,023.75 | 121,515.36 | 521,319.68 | 91,914.69 | 429,404.99 |
| 4910 Total | | | | | | | 516,539.11 | 395,023.75 | 121,515.36 | 521,319.68 | 91,914.69 | 429,404.99 |
| 4920 | LICENSURE | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 433,293.26 | 472,117.32 | (38,824.06) | 439,364.10 | 114,612.80 | 324,751.30 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 116,555.88 | 120,038.28 | (3,482.40) | 120,385.78 | 27,586.47 | 92,799.31 |
| | | | | PS Total | | | 549,849.14 | 592,155.60 | (42,306.46) | 559,749.88 | 142,199.27 | 417,550.61 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 25,000.00 | - | 25,000.00 | 25,000.00 | | 25,000.00 |
| | | | | NPS Total | | | 25,000.00 | - | 25,000.00 | 25,000.00 | | 25,000.00 |
| | | | LOCAL FUND Total | | | | 574,849.14 | 592,155.60 | (17,306.46) | 584,749.88 | 142,199.27 | 442,550.61 |
| | | 0100 Total | | | | | 574,849.14 | 592,155.60 | (17,306.46) | 584,749.88 | 142,199.27 | 442,550.61 |
| | LICENSURE | Total | | | | | 574,849.14 | 592,155.60 | (17,306.46) | 584,749.88 | 142,199.27 | 442,550.61 |
| 4920 Total | | | | | | | 574,849.14 | 592,155.60 | (17,306.46) | 584,749.88 | 142,199.27 | 442,550.61 |
| 4930 | CERTIFICATION | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 829,014.63 | 908,088.51 | (79,073.88) | 838,177.73 | 221,298.97 | 616,878.76 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 223,004.93 | 191,243.11 | 31,761.82 | 229,660.71 | 45,465.30 | 184,195.41 |
| | | | | | 0015 | OVERTIME PAY | - | 535.50 | (535.50) | - | 18.74 | (18.74) |
| | | | | PS Total | | | 1,052,019.56 | 1,099,867.12 | (47,847.56) | 1,067,838.44 | 266,783.01 | 801,055.43 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 7,500.00 | - | 7,500.00 | 7,500.00 | | 7,500.00 |
| | | | | NPS Total | | | 7,500.00 | - | 7,500.00 | 7,500.00 | | 7,500.00 |
| | | | LOCAL FUND Total | | | | 1,059,519.56 | 1,099,867.12 | (40,347.56) | 1,075,338.44 | 266,783.01 | 808,555.43 |
| | | 0100 Total | | | | | 1,059,519.56 | 1,099,867.12 | (40,347.56) | 1,075,338.44 | 266,783.01 | 808,555.43 |
| | CERTIFICATION | Total | | | | | 1,059,519.56 | 1,099,867.12 | (40,347.56) | 1,075,338.44 | 266,783.01 | 808,555.43 |
| 4930 Total | | | | | | | 1,059,519.56 | 1,099,867.12 | (40,347.56) | 1,075,338.44 | 266,783.01 | 808,555.43 |
| 4940 | PROGRAM INTEGRITY | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,048,497.92 | 913,955.59 | 134,542.33 | 1,005,754.38 | 248,234.89 | 757,519.49 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 316.64 | (316.64) | - | 11.09 | (11.09) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 282,045.95 | 215,622.42 | 66,423.53 | 275,576.69 | 55,327.51 | 220,249.18 |
| | | | | | 0015 | OVERTIME PAY | - | 1,187.40 | (1,187.40) | - | 41.56 | (41.56) |
| | | | | PS Total | | | 1,330,543.87 | 1,131,082.05 | 199,461.82 | 1,281,331.07 | 303,615.05 | 977,716.02 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | - | 10,725.19 | (10,725.19) | | | |
| | | | | NPS Total | | | - | 10,725.19 | (10,725.19) | | | |
| | | | LOCAL FUND Total | | | | 1,330,543.87 | 1,141,807.24 | 188,736.63 | 1,281,331.07 | 303,615.05 | 977,716.02 |
| | | 0100 Total | | | | | 1,330,543.87 | 1,141,807.24 | 188,736.63 | 1,281,331.07 | 303,615.05 | 977,716.02 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 94,858.00 | 94,110.64 | 747.36 | 99,815.13 | 24,704.14 | 75,110.99 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 25,516.80 | 17,406.76 | 8,110.04 | 27,349.35 | 4,803.15 | 22,546.20 |
| | | | | | 0015 | OVERTIME PAY | - | 5,706.51 | (5,706.51) | - | 192.75 | (192.75) |
| | | | | PS Total | | | 120,374.80 | 117,223.91 | 3,150.89 | 127,164.48 | 29,700.04 | 97,464.44 |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | 120,374.80 | 117,223.91 | 3,150.89 | 127,164.48 | 29,700.04 | 97,464.44 |
| | | 0250 Total | | | | | 120,374.80 | 117,223.91 | 3,150.89 | 127,164.48 | 29,700.04 | 97,464.44 |
| | PROGRAM INTEGRITY | Total | | | | | 1,450,918.67 | 1,259,031.15 | 191,887.52 | 1,408,495.55 | 333,315.09 | 1,075,180.46 |
| 4940 Total | | | | | | | 1,450,918.67 | 1,259,031.15 | 191,887.52 | 1,408,495.55 | 333,315.09 | 1,075,180.46 |
| 5810 | OFFICE OF THE CHIEF CLINICAL OFFICER | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 2,153,324.13 | 1,534,987.83 | 618,336.30 | 1,998,007.20 | 348,232.31 | 1,649,774.89 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 331,888.98 | (331,888.98) | 124,099.36 | 75,133.87 | 48,965.49 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 69,008.40 | (69,008.40) | - | 18,523.91 | (18,523.91) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 579,244.22 | 394,698.63 | 184,545.59 | 581,457.21 | 87,707.85 | 493,749.36 |
| | | | | | 0015 | OVERTIME PAY | - | 157,361.90 | (157,361.90) | - | 24,611.35 | (24,611.35) |
| | | | | PS Total | | | 2,732,568.35 | 2,487,945.74 | 244,622.61 | 2,703,563.77 | 554,209.29 | 2,149,354.48 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | - | 352.30 | (352.30) | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 558,943.19 | 545,191.19 | 13,752.00 | 513,544.00 | - | 50,057.00 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 1,998,836.17 | 1,891,392.69 | 107,443.48 | 2,467,252.24 | 632,539.99 | 173,582.42 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 824,584.09 | 786,447.93 | 38,136.16 | 824,584.09 | - | 653,405.09 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | - | 175.80 | (175.80) | | | |
| | | | | NPS Total | | | 3,382,363.45 | 3,223,559.91 | 158,803.54 | 3,805,380.33 | 632,539.99 | 877,044.51 |
| | | | LOCAL FUND Total | | | | 6,114,931.80 | 5,711,505.65 | 403,426.15 | 6,508,944.10 | 1,186,749.28 | 3,026,398.99 |
| | | 0100 Total | | | | | 6,114,931.80 | 5,711,505.65 | 403,426.15 | 6,508,944.10 | 1,186,749.28 | 3,026,398.99 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0012 | REGULAR PAY - OTHER | - | - | - | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | - | - | | | |
| | | | | PS Total | | | - | - | - | | | |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 6,996.00 | - | 6,996.00 | - | | |
| | | | | | 0031 | TELECOMMUNICATIONS | 4,980.42 | - | 4,980.42 | - | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 1,032,864.32 | 1,001,155.32 | 31,709.00 | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 82,393.65 | 82,393.65 | - | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 2,572,124.16 | 2,572,124.16 | - | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 6,019.74 | 6,019.74 | - | | | |
| | | | | NPS Total | | | 3,705,378.29 | 3,673,669.29 | 31,709.00 | | | |
| | | | FEDERAL GRANT FUND Total | | | | 3,705,378.29 | 3,673,669.29 | 31,709.00 | | | |
| | | 0200 Total | | | | | 3,705,378.29 | 3,673,669.29 | 31,709.00 | | | |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | NPS | 0040 | OTHER SERVICES AND CHARGES | 101,520.00 | 49,362.50 | 52,157.50 | | | |
| | | | | NPS Total | | | 101,520.00 | 49,362.50 | 52,157.50 | | | |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 101,520.00 | 49,362.50 | 52,157.50 | | | |
| | | 0700 Total | | | | | 101,520.00 | 49,362.50 | 52,157.50 | | | |
| | OFFICE OF THE CHIEF CLINICAL OFFICER | Total | | | | | 9,921,830.09 | 9,434,537.44 | 487,292.65 | 6,508,944.10 | 1,186,749.28 | 3,026,398.99 |
| 5810 Total | | | | | | | 9,921,830.09 | 9,434,537.44 | 487,292.65 | 6,508,944.10 | 1,186,749.28 | 3,026,398.99 |

ACTIVITY
LEVEL

| | | | | | | | | | Fiscal Year | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | 2021 | | | 2022 | | |
| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | | | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| 5830 | BEHAVIORAL HEALTH SERVICES | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY – CONT FULL TIME | | | 307,159.50 | 319,663.87 | (12,504.37) | 324,351.56 | 55,544.06 | 268,807.50 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | - | 19,726.47 | (19,726.47) | - | 5.95 | (5.95) |
| | | | | | 0014 | FRINGE BENEFITS – CURR PERSONN | | | 82,625.90 | 73,858.87 | 8,767.03 | 88,872.33 | 13,999.29 | 74,873.04 |
| | | | | | 0015 | OVERTIME PAY | | | - | - | - | - | 12,112.50 | (12,112.50) |
| | | | | PS Total | | | | | 389,785.40 | 413,249.21 | (23,463.81) | 413,223.89 | 81,661.80 | 331,562.09 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | 7,000.00 | 16,028.60 | (9,028.60) | 7,000.00 | - | 7,000.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | | | 41,671.00 | 33,535.34 | 8,135.66 | - | (3,731.62) | 3,731.62 |
| | | | | | 0041 | CONTRACTUAL SERVICES – OTHER | | | - | (8,829.46) | 8,829.46 | | | |
| | | | | NPS Total | | | | | 48,671.00 | 40,734.48 | 7,936.52 | 7,000.00 | (3,731.62) | 10,731.62 |
| | | | LOCAL FUND Total | | | | | | 438,456.40 | 453,983.69 | (15,527.29) | 420,223.89 | 77,930.18 | 342,293.71 |
| | | 0100 Total | | | | | | | 438,456.40 | 453,983.69 | (15,527.29) | 420,223.89 | 77,930.18 | 342,293.71 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY – CONT FULL TIME | | | 151,446.11 | 103,029.18 | 48,416.93 | 151,498.38 | 28,511.93 | 122,986.45 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | - | 12,229.03 | (12,229.03) | | | |
| | | | | | 0014 | FRINGE BENEFITS – CURR PERSONN | | | 40,739.00 | 19,025.88 | 21,713.12 | 41,510.56 | 4,495.84 | 37,014.72 |
| | | | | | 0015 | OVERTIME PAY | | | - | - | - | | | |
| | | | | PS Total | | | | | 192,185.11 | 134,284.09 | 57,901.02 | 193,008.94 | 33,007.77 | 160,001.17 |
| | | 0700 Total | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | 192,185.11 | 134,284.09 | 57,901.02 | 193,008.94 | 33,007.77 | 160,001.17 |
| | | | | | | | | | 192,185.11 | 134,284.09 | 57,901.02 | 193,008.94 | 33,007.77 | 160,001.17 |
| | BEHAVIORAL HEALTH SERVICES | Total | | | | | | | 630,641.51 | 588,267.78 | 42,373.73 | 613,232.83 | 110,937.95 | 502,294.88 |
| 5830 Total | | | | | | | | | 630,641.51 | 588,267.78 | 42,373.73 | 613,232.83 | 110,937.95 | 502,294.88 |
| 5831 | BEHAVIORAL HEALTH SERVICES - ADULT | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | 1,242,428.56 | 1,725,141.34 | (482,712.78) | - | (30,602.61) | 30,602.61 |
| | | | | | 0012 | REGULAR PAY – OTHER | | | - | 12,018.34 | (12,018.34) | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | - | 24,898.65 | (24,898.65) | | | |
| | | | | | 0014 | FRINGE BENEFITS – CURR PERSONN | | | 334,213.30 | 318,965.77 | 15,247.53 | - | (11,106.55) | 11,106.55 |
| | | | | | 0015 | OVERTIME PAY | | | - | 4,776.90 | (4,776.90) | | | |
| | | | | PS Total | | | | | 1,576,641.86 | 2,085,801.00 | (509,159.14) | - | (41,709.16) | 41,709.16 |
| | | | LOCAL FUND Total | | | | | | 1,576,641.86 | 2,085,801.00 | (509,159.14) | - | (41,709.16) | 41,709.16 |
| | | 0100 Total | | | | | | | 1,576,641.86 | 2,085,801.00 | (509,159.14) | - | (41,709.16) | 41,709.16 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | 998,951.79 | 998,951.79 | - | - | (40,822.75) | 40,822.75 |
| | | | | | 0012 | REGULAR PAY – OTHER | | | 105,963.08 | 57,805.63 | 48,157.45 | - | (3,031.15) | 3,031.15 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | - | 6,805.60 | (6,805.60) | | | |
| | | | | | 0014 | FRINGE BENEFITS – CURR PERSONN | | | 184,008.95 | 184,008.95 | - | - | (6,214.82) | 6,214.82 |
| | | | | PS Total | | | | | 1,288,923.82 | 1,247,571.97 | 41,351.85 | - | (50,068.72) | 50,068.72 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | 1,288,923.82 | 1,247,571.97 | 41,351.85 | - | (50,068.72) | 50,068.72 |
| | | 0700 Total | | | | | | | 1,288,923.82 | 1,247,571.97 | 41,351.85 | - | (50,068.72) | 50,068.72 |
| | BEHAVIORAL HEALTH SERVICES - ADULT | Total | | | | | | | 2,865,565.68 | 3,333,372.97 | (467,807.29) | - | (91,777.88) | 91,777.88 |
| 5831 Total | | | | | | | | | 2,865,565.68 | 3,333,372.97 | (467,807.29) | - | (91,777.88) | 91,777.88 |
| 5832 | BEHAVIORAL HEALTH SERVICES - CHILD | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | 1,434,956.34 | 1,088,285.65 | 346,670.69 | - | 50,488.88 | (50,488.88) |
| | | | | | 0012 | REGULAR PAY – OTHER | | | 195,104.82 | 155,511.82 | 39,593.00 | - | (6,862.37) | 6,862.37 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | - | 10,031.38 | (10,031.38) | | | |
| | | | | | 0014 | FRINGE BENEFITS – CURR PERSONN | | | 420,971.58 | 215,209.27 | 205,762.31 | - | 8,865.23 | (8,865.23) |
| | | | | | 0015 | OVERTIME PAY | | | - | 1,639.93 | (1,639.93) | | | |
| | | | | PS Total | | | | | 2,051,032.74 | 1,470,678.05 | 580,354.69 | - | 52,491.74 | (52,491.74) |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | 179,999.23 | - | 179,999.23 | | | |
| | | | | NPS Total | | | | | 179,999.23 | - | 179,999.23 | | | |
| | | | LOCAL FUND Total | | | | | | 2,231,031.97 | 1,470,678.05 | 760,353.92 | - | 52,491.74 | (52,491.74) |
| | | 0100 Total | | | | | | | 2,231,031.97 | 1,470,678.05 | 760,353.92 | - | 52,491.74 | (52,491.74) |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | 280,206.28 | 280,604.80 | (398.52) | - | (15,634.46) | 15,634.46 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | | | 75,375.48 | 77,098.01 | (1,722.53) | - | (4,232.22) | 4,232.22 |
| | | | | | 0015 | OVERTIME PAY | | | - | 352.08 | (352.08) | | | |
| | | | | PS Total | | | | | 355,581.76 | 358,054.89 | (2,473.13) | - | (19,866.68) | 19,866.68 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | 355,581.76 | 358,054.89 | (2,473.13) | - | (19,866.68) | 19,866.68 |
| | | 0700 Total | | | | | | | 355,581.76 | 358,054.89 | (2,473.13) | - | (19,866.68) | 19,866.68 |
| | BEHAVIORAL HEALTH SERVICES - CHILD | Total | | | | | | | 2,586,613.73 | 1,828,732.94 | 757,880.79 | - | 32,625.06 | (32,625.06) |
| 5832 Total | | | | | | | | | 2,586,613.73 | 1,828,732.94 | 757,880.79 | - | 32,625.06 | (32,625.06) |
| 5836 | BEHAVIORAL HEALTH SERVICES - PHARMACY | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | - | 10,103.28 | (10,103.28) | | | |
| | | | | PS Total | | | | | - | 10,103.28 | (10,103.28) | | | |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | 910,039.00 | 676,529.59 | 233,509.41 | 910,039.00 | 79,469.15 | 25,139.00 |
| | | | | NPS Total | | | | | 910,039.00 | 676,529.59 | 233,509.41 | 910,039.00 | 79,469.15 | 25,139.00 |
| | | | LOCAL FUND Total | | | | | | 910,039.00 | 686,632.87 | 223,406.13 | 910,039.00 | 79,469.15 | 25,139.00 |
| | | 0100 Total | | | | | | | 910,039.00 | 686,632.87 | 223,406.13 | 910,039.00 | 79,469.15 | 25,139.00 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | 394,048.00 | 315,126.18 | 78,921.82 | 410,367.71 | 80,951.50 | 329,416.21 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | | | 105,998.91 | 78,631.56 | 27,367.35 | 112,440.76 | 18,861.45 | 93,579.31 |
| | | | | PS Total | | | | | 500,046.91 | 393,757.74 | 106,289.17 | 522,808.47 | 99,812.95 | 422,995.52 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | 500,046.91 | 393,757.74 | 106,289.17 | 522,808.47 | 99,812.95 | 422,995.52 |
| | | 0700 Total | | | | | | | 500,046.91 | 393,757.74 | 106,289.17 | 522,808.47 | 99,812.95 | 422,995.52 |
| | BEHAVIORAL HEALTH SERVICES - PHARMACY | Total | | | | | | | 1,410,085.91 | 1,080,390.61 | 329,695.30 | 1,432,847.47 | 179,282.10 | 448,134.52 |
| 5836 Total | | | | | | | | | 1,410,085.91 | 1,080,390.61 | 329,695.30 | 1,432,847.47 | 179,282.10 | 448,134.52 |
| 5840 | COMPREHENSIVE PSYCH EMER PROG-CPEP | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | 684,581.22 | 787,490.16 | (102,908.94) | 2,683,918.92 | 483,330.80 | 2,200,588.12 |
| | | | | | 0012 | REGULAR PAY – OTHER | | | - | 45,195.84 | (45,195.84) | - | 15,051.66 | (15,051.66) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | - | 18,427.15 | (18,427.15) | - | 82,161.10 | (82,161.10) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | | | 184,152.33 | 122,906.23 | 61,246.10 | 735,393.81 | 106,966.82 | 628,426.99 |
| | | | | | 0015 | OVERTIME PAY | | | - | 45,622.22 | (45,622.22) | - | 92,268.34 | (92,268.34) |
| | | | | PS Total | | | | | 868,733.55 | 1,019,641.60 | (150,908.05) | 3,419,312.73 | 779,778.72 | 2,639,534.01 |

ACTIVITY
LEVEL

| | | | | | | | Fiscal Year | Values | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program Code 3 | Program Code 3 Title | Approp | Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 57,835.35 | 34,388.94 | 23,446.41 | 57,835.35 | 27,930.42 | 5,335.35 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 197,994.55 | 94,359.36 | 103,635.19 | 2,301,961.67 | 29,206.10 | 419,031.39 |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | (1,008.83) | 1,008.83 | | | |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | - | | - | | 766.18 | (766.18) |
| | | | | | NPS Total | | | 255,829.90 | 127,739.47 | 128,090.43 | 2,359,797.02 | 57,902.70 | 423,600.56 |
| | | | | LOCAL FUND Total | | | | 1,124,563.45 | 1,147,381.07 | (22,817.62) | 5,779,109.75 | 837,681.42 | 3,063,134.57 |
| | | | 0100 | LOCAL FUND | | | | 1,124,563.45 | 1,147,381.07 | (22,817.62) | 5,779,109.75 | 837,681.42 | 3,063,134.57 |
| | | | 0150 | ARPA | NPS | 0040 | OTHER SERVICES AND CHARGES | 800,000.00 | 800,000.00 | - | | | |
| | | | | | NPS Total | | | 800,000.00 | 800,000.00 | - | | | |
| | | | 0150 Total | | | | | 800,000.00 | 800,000.00 | - | | | |
| | | | | ARPA Total | | | | 800,000.00 | 800,000.00 | - | | | |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 93,776.00 | 53,570.79 | 40,205.21 | 2,224,774.96 | 369,645.24 | 1,855,129.72 |
| | | | | | | 0012 | REGULAR PAY - OTHER | - | | - | | 13,178.41 | (13,178.41) |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 7,168.45 | (7,168.45) | - | 104,058.06 | (104,058.06) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 25,225.74 | 12,995.58 | 12,230.16 | 609,588.34 | 85,450.74 | 524,137.60 |
| | | | | | | 0015 | OVERTIME PAY | - | | - | - | 152,750.03 | (152,750.03) |
| | | | | | PS Total | | | 119,001.74 | 73,734.82 | 45,266.92 | 2,834,363.30 | 725,082.48 | 2,109,280.82 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 1,342,190.00 | 1,205,911.02 | 136,278.98 | | | |
| | | | | | NPS Total | | | 1,342,190.00 | 1,205,911.02 | 136,278.98 | | | |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 1,461,191.74 | 1,279,645.84 | 181,545.90 | 2,834,363.30 | 725,082.48 | 2,109,280.82 |
| | | | 0700 Total | | | | | 1,461,191.74 | 1,279,645.84 | 181,545.90 | 2,834,363.30 | 725,082.48 | 2,109,280.82 |
| | COMPREHENSIVE PSYCH EMER PROG-CPEP | Total | | | | | | 3,385,755.19 | 3,227,026.91 | 158,728.28 | 8,613,473.05 | 1,562,763.90 | 5,172,415.39 |
| 5840 Total | | | | | | | | 3,385,755.19 | 3,227,026.91 | 158,728.28 | 8,613,473.05 | 1,562,763.90 | 5,172,415.39 |
| 5841 | PSYCHIATRIC EMERGENCY SERVICES - CPEP | 0100 | | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 2,330,447.82 | 2,460,812.66 | (130,364.84) | - | (69,715.81) | 69,715.81 |
| | | | | | | 0012 | REGULAR PAY - OTHER | - | 45,919.77 | (45,919.77) | - | (2,555.64) | 2,555.64 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 386,996.25 | (386,996.25) | - | (4,553.41) | 4,553.41 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 626,890.46 | 502,714.45 | 124,176.01 | - | (17,379.99) | 17,379.99 |
| | | | | | | 0015 | OVERTIME PAY | - | 179,061.66 | (179,061.66) | - | (8,034.49) | 8,034.49 |
| | | | | | PS Total | | | 2,957,338.28 | 3,575,504.79 | (618,166.51) | - | (102,239.34) | 102,239.34 |
| | | | | LOCAL FUND Total | | | | 2,957,338.28 | 3,575,504.79 | (618,166.51) | - | (102,239.34) | 102,239.34 |
| | | | 0100 Total | | | | | 2,957,338.28 | 3,575,504.79 | (618,166.51) | - | (102,239.34) | 102,239.34 |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,594,204.96 | 1,594,204.96 | - | - | (82,868.69) | 82,868.69 |
| | | | | | | 0012 | REGULAR PAY - OTHER | - | 11,598.51 | (11,598.51) | - | (2,555.64) | 2,555.64 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 284,255.32 | (284,255.32) | - | (6,302.07) | 6,302.07 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 393,610.56 | 393,610.56 | 0.00 | - | (16,847.50) | 16,847.50 |
| | | | | | | 0015 | OVERTIME PAY | - | 142,118.36 | (142,118.36) | - | (13,519.16) | 13,519.16 |
| | | | | | PS Total | | | 1,987,815.52 | 2,425,787.71 | (437,972.19) | - | (122,093.06) | 122,093.06 |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 1,987,815.52 | 2,425,787.71 | (437,972.19) | - | (122,093.06) | 122,093.06 |
| | | | 0700 Total | | | | | 1,987,815.52 | 2,425,787.71 | (437,972.19) | - | (122,093.06) | 122,093.06 |
| | PSYCHIATRIC EMERGENCY SERVICES - CPEP | Total | | | | | | 4,945,153.80 | 6,001,292.50 | (1,056,138.70) | - | (224,332.40) | 224,332.40 |
| 5841 Total | | | | | | | | 4,945,153.80 | 6,001,292.50 | (1,056,138.70) | - | (224,332.40) | 224,332.40 |
| 5842 | HOMELESS OUTREACH / MOBILE CRISIS - CPEP | 0100 | | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,616,621.82 | 1,290,811.93 | 325,809.89 | - | (63,042.69) | 63,042.69 |
| | | | | | | 0012 | REGULAR PAY - OTHER | - | 437,460.95 | (437,460.95) | - | (20,207.18) | 20,207.18 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 160,011.79 | (160,011.79) | - | (4,044.40) | 4,044.40 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 434,871.28 | 417,841.58 | 17,029.70 | - | (22,166.37) | 22,166.37 |
| | | | | | | 0015 | OVERTIME PAY | - | 247,896.42 | (247,896.42) | - | (10,862.35) | 10,862.35 |
| | | | | | PS Total | | | 2,051,493.10 | 2,554,022.67 | (502,529.57) | - | (120,322.99) | 120,322.99 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 280,987.66 | 54,995.53 | 225,992.13 | | | |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 2,236,458.47 | 2,190,524.17 | 45,934.30 | | | |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | 300,000.00 | 208,585.15 | 91,414.85 | | | |
| | | | | | NPS Total | | | 2,817,446.13 | 2,454,104.85 | 363,341.28 | | | |
| | | | | LOCAL FUND Total | | | | 4,868,939.23 | 5,008,127.52 | (139,188.29) | - | (120,322.99) | 120,322.99 |
| | | | 0100 Total | | | | | 4,868,939.23 | 5,008,127.52 | (139,188.29) | - | (120,322.99) | 120,322.99 |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 146,588.63 | 146,588.63 | - | - | (7,978.20) | 7,978.20 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 12,583.75 | (12,583.75) | - | (501.34) | 501.34 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 39,043.27 | 28,416.32 | 10,626.95 | - | (1,494.97) | 1,494.97 |
| | | | | | | 0015 | OVERTIME PAY | - | 28,259.58 | (28,259.58) | - | (1,246.01) | 1,246.01 |
| | | | | | PS Total | | | 185,631.90 | 215,848.28 | (30,216.38) | - | (11,220.52) | 11,220.52 |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 15,000.00 | - | 15,000.00 | | | |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 2,000.00 | - | 2,000.00 | 2,000.00 | - | 2,000.00 |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 13,216.38 | - | 13,216.38 | | | |
| | | | | | NPS Total | | | 30,216.38 | - | 30,216.38 | 2,000.00 | - | 2,000.00 |
| | | | | FEDERAL GRANT FUND Total | | | | 215,848.28 | 215,848.28 | (0.00) | 2,000.00 | (11,220.52) | 13,220.52 |
| | | | 0200 Total | | | | | 215,848.28 | 215,848.28 | (0.00) | 2,000.00 | (11,220.52) | 13,220.52 |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 184,362.41 | 169,852.50 | 14,509.91 | - | (9,631.88) | 9,631.88 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 19,508.42 | (19,508.42) | - | (826.45) | 826.45 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 49,593.49 | 38,710.97 | 10,882.52 | - | (2,139.01) | 2,139.01 |
| | | | | | | 0015 | OVERTIME PAY | - | 10,627.57 | (10,627.57) | - | (613.78) | 613.78 |
| | | | | | PS Total | | | 233,955.90 | 238,699.46 | (4,743.56) | - | (13,211.12) | 13,211.12 |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 233,955.90 | 238,699.46 | (4,743.56) | - | (13,211.12) | 13,211.12 |
| | | | 0700 Total | | | | | 233,955.90 | 238,699.46 | (4,743.56) | - | (13,211.12) | 13,211.12 |
| | HOMELESS OUTREACH / MOBILE CRISIS - CPEP | Total | | | | | | 5,318,743.41 | 5,462,675.26 | (143,931.85) | 2,000.00 | (144,754.63) | 146,754.63 |
| 5842 Total | | | | | | | | 5,318,743.41 | 5,462,675.26 | (143,931.85) | 2,000.00 | (144,754.63) | 146,754.63 |
| 5870 | ACCESS HELPLINE | 0100 | | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,149,290.36 | 1,196,115.45 | (46,825.09) | - | (61,045.18) | 61,045.18 |

ACTIVITY LEVEL

| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Fiscal Year 2021 Sum of Budget | Sum of Actuals | Sum of Variance | 2022 Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0013 | ADDITIONAL GROSS PAY | | 109,851.17 | (109,851.17) | - | (18,268.47) | 18,268.47 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 309,159.11 | 312,589.91 | (3,430.80) | - | (16,370.67) | 16,370.67 |
| | | | | | 0015 | OVERTIME PAY | - | 64,178.56 | (64,178.56) | - | (5,304.46) | 5,304.46 |
| | | | | PS Total | | | 1,458,449.47 | 1,682,735.09 | (224,285.62) | - | (100,988.78) | 100,988.78 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 108,154.41 | 85,174.19 | 22,980.22 | | | |
| | | | | NPS Total | | | 108,154.41 | 85,174.19 | 22,980.22 | | | |
| | | | LOCAL FUND Total | | | | 1,566,603.88 | 1,767,909.28 | (201,305.40) | - | (100,988.78) | 100,988.78 |
| | | 0100 Total | | | | | 1,566,603.88 | 1,767,909.28 | (201,305.40) | - | (100,988.78) | 100,988.78 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 149,259.38 | 147,226.99 | 2,032.39 | - | (3,242.52) | 3,242.52 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 13,568.16 | (13,568.16) | - | (2,329.69) | 2,329.69 |
| | | | | | 0014 | FRINGE PAY - CURR PERSONN | 40,150.77 | 54,618.35 | (14,467.58) | - | (1,552.35) | 1,552.35 |
| | | | | | 0015 | OVERTIME PAY | - | 2,780.12 | (2,780.12) | | | |
| | | | | PS Total | | | 189,410.15 | 218,193.62 | (28,783.47) | - | (7,124.56) | 7,124.56 |
| | | | FEDERAL GRANT FUND Total | | | | 189,410.15 | 218,193.62 | (28,783.47) | - | (7,124.56) | 7,124.56 |
| | | 0200 Total | | | | | 189,410.15 | 218,193.62 | (28,783.47) | - | (7,124.56) | 7,124.56 |
| | | 0400 | PRIVATE GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | 59,313.54 | (59,313.54) | | | |
| | | | | | 0012 | REGULAR PAY - OTHER | 59,313.54 | - | 59,313.54 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 15,955.34 | 15,955.34 | - | | | |
| | | | | PS Total | | | 75,268.88 | 75,268.88 | - | | | |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | - | - | - | | | |
| | | | | NPS Total | | | - | - | - | | | |
| | | | PRIVATE GRANT FUND Total | | | | 75,268.88 | 75,268.88 | - | | | |
| | | 0400 Total | | | | | 75,268.88 | 75,268.88 | - | | | |
| | ACCESS HELPLINE | Total | | | | | 1,831,282.91 | 2,061,371.78 | (230,088.87) | - | (108,113.34) | 108,113.34 |
| 5870 Total | | | | | | | 1,831,282.91 | 2,061,371.78 | (230,088.87) | - | (108,113.34) | 108,113.34 |
| 5880 | FORENSICS | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 2,423,326.36 | 2,186,495.78 | 236,832.58 | 2,151,218.81 | 501,986.92 | 1,649,231.89 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 128,350.62 | (128,350.62) | 82,355.78 | 50,438.77 | 31,917.01 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 88,119.96 | (88,119.96) | - | 15,652.24 | (15,652.24) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 681,244.20 | 440,890.66 | 240,353.54 | 656,714.67 | 102,516.35 | 554,198.32 |
| | | | | | 0015 | OVERTIME PAY | - | 101,379.00 | (101,379.00) | - | 23,490.67 | (23,490.67) |
| | | | | PS Total | | | 3,104,572.56 | 2,945,236.02 | 159,336.54 | 2,890,289.26 | 694,084.95 | 2,196,204.31 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 201,137.00 | 164,867.83 | 36,269.17 | 201,137.00 | 56.09 | 46,080.91 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 298,664.16 | 239,970.53 | 58,693.63 | 301,664.16 | - | 54,347.82 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 1,659,991.76 | 1,001,573.44 | 638,730.82 | 1,659,991.76 | 21,551.45 | 32,267.85 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 3,000.00 | - | 3,000.00 | | | |
| | | | | NPS Total | | | 2,162,792.92 | 1,406,411.80 | 736,693.62 | 2,162,792.92 | 21,607.54 | 132,696.58 |
| | | | LOCAL FUND Total | | | | 5,267,365.48 | 4,351,647.82 | 896,030.16 | 5,053,082.18 | 715,692.49 | 2,328,900.89 |
| | | 0100 Total | | | | | 5,267,365.48 | 4,351,647.82 | 896,030.16 | 5,053,082.18 | 715,692.49 | 2,328,900.89 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0020 | SUPPLIES AND MATERIALS | - | - | - | 20,000.00 | | 20,000.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | - | (126,725.00) | 126,725.00 | 20,000.00 | (31,875.00) | 51,875.00 |
| | | | | NPS Total | | | - | (126,725.00) | 126,725.00 | 40,000.00 | (31,875.00) | 71,875.00 |
| | | | PRIVATE GRANT FUND Total | | | | - | (126,725.00) | 126,725.00 | 40,000.00 | (31,875.00) | 71,875.00 |
| | | 0400 Total | | | | | - | (126,725.00) | 126,725.00 | 40,000.00 | (31,875.00) | 71,875.00 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | NPS | 0040 | OTHER SERVICES AND CHARGES | 27,052.63 | - | 27,052.63 | 17,000.00 | - | 17,000.00 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 3,000.00 | - | 3,000.00 | | | |
| | | | | NPS Total | | | 30,052.63 | - | 30,052.63 | 17,000.00 | - | 17,000.00 |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 30,052.63 | - | 30,052.63 | 17,000.00 | - | 17,000.00 |
| | | 0600 Total | | | | | 30,052.63 | - | 30,052.63 | 17,000.00 | - | 17,000.00 |
| | FORENSICS | Total | | | | | 5,297,418.11 | 4,224,922.82 | 1,052,807.79 | 5,110,082.18 | 683,817.49 | 2,417,775.89 |
| 5880 Total | | | | | | | 5,297,418.11 | 4,224,922.82 | 1,052,807.79 | 5,110,082.18 | 683,817.49 | 2,417,775.89 |
| 5883 | DISASTER BEHAVIORAL HEALTH & SUPPORT SVC | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 295,440.75 | 84,647.25 | 210,793.50 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 1.15 | (1.15) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 80,950.75 | 15,651.63 | 65,299.12 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 1.49 | (1.49) |
| | | | | PS Total | | | | | | 376,391.50 | 100,301.52 | 276,089.98 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 76,183.44 | - | 51,643.44 |
| | | | | NPS Total | | | | | | 76,183.44 | - | 51,643.44 |
| | | | LOCAL FUND Total | | | | | | | 452,574.94 | 100,301.52 | 327,733.42 |
| | | 0100 Total | | | | | | | | 452,574.94 | 100,301.52 | 327,733.42 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 400,000.00 | 50,000.00 | 350,000.00 |
| | | | | NPS Total | | | | | | 400,000.00 | 50,000.00 | 350,000.00 |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | | | | 400,000.00 | 50,000.00 | 350,000.00 |
| | | 0600 Total | | | | | | | | 400,000.00 | 50,000.00 | 350,000.00 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 34,275.34 | 9,992.55 | 24,282.79 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 9,391.44 | 2,261.81 | 7,129.63 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 0.31 | (0.31) |
| | | | | PS Total | | | | | | 43,666.78 | 12,254.67 | 31,412.11 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | 43,666.78 | 12,254.67 | 31,412.11 |
| | | 0700 Total | | | | | | | | 43,666.78 | 12,254.67 | 31,412.11 |
| | DISASTER BEHAVIORAL HEALTH & SUPPORT SVC | Total | | | | | | | | 896,241.72 | 162,556.19 | 709,145.53 |
| 5883 Total | | | | | | | | | | 896,241.72 | 162,556.19 | 709,145.53 |
| 5890 | ASSESSMENT AND REFERRAL CENTER (ARC) | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 25,119.04 | 30,333.24 | (5,214.20) | - | (1,557.00) | 1,557.10 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 733.99 | (733.99) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 6,757.03 | 7,221.88 | (464.85) | - | (368.60) | 368.60 |

ACTIVITY
LEVEL

| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Fiscal Year 2021 Sum of Budget | Sum of Actuals | Sum of Variance | 2022 Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | PS Total | | | 31,876.07 | 38,289.11 | (6,413.04) | - | (1,925.70) | 1,925.70 |
| | | | LOCAL FUND Total | | | | **31,876.07** | **38,289.11** | **(6,413.04)** | **-** | **(1,925.70)** | **1,925.70** |
| | | 0100 Total | | | | | 31,876.07 | 38,289.11 | (6,413.04) | - | (1,925.70) | 1,925.70 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,555,421.62 | 1,481,513.75 | 73,907.87 | 1,716,083.32 | 360,742.36 | 1,355,340.96 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 897.09 | (897.09) | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 20,908.35 | (20,908.35) | - | 3,736.91 | (3,736.91) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 380,236.66 | 362,021.81 | 18,214.85 | 470,206.83 | 79,597.88 | 390,608.95 |
| | | | | | 0015 | OVERTIME PAY | - | 7,094.37 | (7,094.37) | - | 3,543.39 | (3,543.39) |
| | | | | PS Total | | | 1,935,658.28 | 1,872,435.37 | 63,222.91 | 2,186,290.15 | 447,620.54 | 1,738,669.61 |
| | | | FEDERAL GRANT FUND Total | | | | **1,935,658.28** | **1,872,435.37** | **63,222.91** | **2,186,290.15** | **447,620.54** | **1,738,669.61** |
| | | 0200 Total | | | | | 1,935,658.28 | 1,872,435.37 | 63,222.91 | 2,186,290.15 | 447,620.54 | 1,738,669.61 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | - | - | - | 458.46 | (458.46) |
| | | | | | 0012 | REGULAR PAY - OTHER | 61,097.24 | 61,097.24 | - | - | 2,063.05 | (2,063.05) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 6,605.67 | 6,605.67 | 0.00 | - | 363.05 | (363.05) |
| | | | | PS Total | | | 67,702.91 | 67,702.91 | 0.00 | - | 2,884.56 | (2,884.56) |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | **67,702.91** | **67,702.91** | **0.00** | **-** | **2,884.56** | **(2,884.56)** |
| | | 0700 Total | | | | | 67,702.91 | 67,702.91 | 0.00 | - | 2,884.56 | (2,884.56) |
| | ASSESSMENT AND REFERRAL CENTER (ARC) | Total | | | | | 2,035,237.26 | 1,978,427.39 | 56,809.87 | 2,186,290.15 | 448,579.40 | 1,737,710.75 |
| 5890 Total | | | | | | | **2,035,237.26** | **1,978,427.39** | **56,809.87** | **2,186,290.15** | **448,579.40** | **1,737,710.75** |
| 5905 | OFFICE OF SYSTEM TRANSFORMATION | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 512,242.75 | 511,532.75 | 710.00 | - | (18,411.94) | 18,411.94 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 77,155.62 | (77,155.62) | - | (41,774.10) | 41,774.10 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 137,793.30 | 108,864.38 | 28,928.92 | - | (5,337.67) | 5,337.67 |
| | | | | PS Total | | | 650,036.05 | 697,552.75 | (47,516.70) | - | (65,523.71) | 65,523.71 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 12,151.69 | - | 12,151.69 | | | |
| | | | | NPS Total | | | 12,151.69 | - | 12,151.69 | | | |
| | | | LOCAL FUND Total | | | | **662,187.74** | **697,552.75** | **(35,365.01)** | **-** | **(65,523.71)** | **65,523.71** |
| | | 0100 Total | | | | | 662,187.74 | 697,552.75 | (35,365.01) | - | (65,523.71) | 65,523.71 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 64,542.04 | 64,542.04 | - | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 17,772.89 | (17,772.89) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 20,900.49 | 20,900.49 | 0.00 | | | |
| | | | | PS Total | | | 85,442.53 | 103,215.42 | (17,772.89) | | | |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | **85,442.53** | **103,215.42** | **(17,772.89)** | | | |
| | | 0250 Total | | | | | 85,442.53 | 103,215.42 | (17,772.89) | | | |
| | OFFICE OF SYSTEM TRANSFORMATION | Total | | | | | 747,630.27 | 800,768.17 | (53,137.90) | - | (65,523.71) | 65,523.71 |
| 5905 Total | | | | | | | **747,630.27** | **800,768.17** | **(53,137.90)** | **-** | **(65,523.71)** | **65,523.71** |
| 5910 | INFO SYSTEMS INNOVATION/DATA ANALYTICS | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | (3,824.31) | 3,824.31 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (792.10) | 792.10 | | | |
| | | | | PS Total | | | - | (4,616.41) | 4,616.41 | | | |
| | | | LOCAL FUND Total | | | | **-** | **(4,616.41)** | **4,616.41** | | | |
| | | 0100 Total | | | | | - | (4,616.41) | 4,616.41 | | | |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | - | - | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (3,703.38) | 3,703.38 | | | |
| | | | | PS Total | | | - | (3,703.38) | 3,703.38 | | | |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | **-** | **(3,703.38)** | **3,703.38** | | | |
| | | 0250 Total | | | | | - | (3,703.38) | 3,703.38 | | | |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | NPS | 0040 | OTHER SERVICES AND CHARGES | - | - | - | | | |
| | | | | NPS Total | | | - | - | - | | | |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | **-** | **-** | **-** | | | |
| | | 0700 Total | | | | | - | - | - | | | |
| | INFO SYSTEMS INNOVATION/DATA ANALYTICS | Total | | | | | - | (8,319.79) | 8,319.79 | | | |
| 5910 Total | | | | | | | **-** | **(8,319.79)** | **8,319.79** | | | |
| 5911 | ISIDA - DATA/PERFORMANCE MGMT | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,579,197.64 | 1,553,472.30 | 25,725.34 | - | (77,558.43) | 77,558.43 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 424,804.18 | 326,818.78 | 97,985.40 | - | (17,710.83) | 17,710.83 |
| | | | | | 0015 | OVERTIME PAY | - | 3,107.07 | (3,107.07) | - | (2,613.30) | 2,613.30 |
| | | | | PS Total | | | 2,004,001.82 | 1,883,398.15 | 120,603.67 | - | (97,882.56) | 97,882.56 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | - | 13,800.00 | (13,800.00) | | | |
| | | | | NPS Total | | | - | 13,800.00 | (13,800.00) | | | |
| | | | LOCAL FUND Total | | | | **2,004,001.82** | **1,897,198.15** | **106,803.67** | **-** | **(97,882.56)** | **97,882.56** |
| | | 0100 Total | | | | | 2,004,001.82 | 1,897,198.15 | 106,803.67 | - | (97,882.56) | 97,882.56 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 69,564.30 | 70,091.57 | (527.27) | - | (3,758.08) | 3,758.08 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 14,055.94 | 14,055.94 | 0.00 | - | (742.58) | 742.58 |
| | | | | PS Total | | | 83,620.24 | 84,147.51 | (527.27) | - | (4,500.66) | 4,500.66 |
| | | | FEDERAL GRANT FUND Total | | | | **83,620.24** | **84,147.51** | **(527.27)** | **-** | **(4,500.66)** | **4,500.66** |
| | | 0200 Total | | | | | 83,620.24 | 84,147.51 | (527.27) | - | (4,500.66) | 4,500.66 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 103,948.00 | 103,948.00 | - | | | |
| | | | | NPS Total | | | 103,948.00 | 103,948.00 | - | | | |
| | | | PRIVATE GRANT FUND Total | | | | **103,948.00** | **103,948.00** | **-** | | | |
| | | 0400 Total | | | | | 103,948.00 | 103,948.00 | - | | | |
| | ISIDA - DATA/PERFORMANCE MGMT | Total | | | | | 2,191,570.06 | 2,085,293.66 | 106,276.40 | - | (102,383.22) | 102,383.22 |
| 5911 Total | | | | | | | **2,191,570.06** | **2,085,293.66** | **106,276.40** | **-** | **(102,383.22)** | **102,383.22** |
| 5912 | ISIDA - INFORMATION SYSTEMS | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | (56,631.38) | 56,631.38 | | | |
| | | | | | 0012 | REGULAR PAY - OTHER | - | (4,576.78) | 4,576.78 | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | (2,047.99) | 2,047.99 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (13,724.56) | 13,724.56 | | | |

ACTIVITY
LEVEL

| | | | | | | | Fiscal Year 2021 | | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actual | Sum of Variance | Sum of Budget | Sum of Actual | Sum of Variance |
| | | | | | 0015 | OVERTIME PAY | - | (4,634.01) | 4,634.01 | | | |
| | | | | PS Total | | | - | (81,614.72) | 81,614.72 | | | |
| | | 0100 Total | | | | | - | (81,614.72) | 81,614.72 | | | |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | (5,593.00) | 5,593.00 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (1,121.85) | 1,121.85 | | | |
| | | | | PS Total | | | - | (6,714.85) | 6,714.85 | | | |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 33,356.50 | - | 33,356.50 | | | |
| | | | | NPS Total | | | 33,356.50 | - | 33,356.50 | | | |
| | | | FEDERAL GRANT FUND Total | | | | 33,356.50 | (6,714.85) | 40,071.35 | | | |
| | | 0200 Total | | | | | 33,356.50 | (6,714.85) | 40,071.35 | | | |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | (1,803.84) | 1,803.84 | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | (631.34) | 631.34 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (287.47) | 287.47 | | | |
| | | | | PS Total | | | - | (2,722.65) | 2,722.65 | | | |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | - | (2,722.65) | 2,722.65 | | | |
| | | 0600 Total | | | | | - | (2,722.65) | 2,722.65 | | | |
| 5912 Total | ISIDA - INFORMATION SYSTEMS        Total | | | | | | 33,356.50 | (91,052.22) | 124,408.72 | | | |
| | | | | | | | 33,356.50 | (91,052.22) | 124,408.72 | | | |
| 5913 | ISIDA - TECHNOLOGY INFRASTRUCTURE | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | (33,204.23) | 33,204.23 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (8,106.24) | 8,106.24 | | | |
| | | | | PS Total | | | - | (41,310.47) | 41,310.47 | | | |
| | | 0100 Total | | | | | - | (41,310.47) | 41,310.47 | | | |
| | | | LOCAL FUND Total | | | | - | (41,310.47) | 41,310.47 | | | |
| 5913 Total | ISIDA - TECHNOLOGY INFRASTRUCTURE        Total | | | | | | - | (41,310.47) | 41,310.47 | | | |
| 5920 | STRATEGIC MGMT AND POLICY | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 322,766.52 | 191,014.42 | 131,752.10 | - | (12,501.18) | 12,501.18 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 86,824.20 | 32,086.80 | 54,737.40 | - | (1,988.02) | 1,988.02 |
| | | | | PS Total | | | 409,590.72 | 223,101.22 | 186,489.50 | - | (14,489.20) | 14,489.20 |
| | | 0100 Total | | | | | 409,590.72 | 223,101.22 | 186,489.50 | - | (14,489.20) | 14,489.20 |
| | | | LOCAL FUND Total | | | | 409,590.72 | 223,101.22 | 186,489.50 | - | (14,489.20) | 14,489.20 |
| | | 0200 | FEDERAL GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 513,480.75 | 514,791.91 | (1,311.16) | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 674,763.80 | 674,763.80 | - | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 4,000.00 | 2,688.84 | 1,311.16 | | | |
| | | | | NPS Total | | | 1,192,244.55 | 1,192,244.55 | 0.00 | | | |
| | | | FEDERAL GRANT FUND Total | | | | 1,192,244.55 | 1,192,244.55 | 0.00 | | | |
| | | 0200 Total | | | | | 1,192,244.55 | 1,192,244.55 | 0.00 | | | |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | - | - | - | | | |
| | | | | NPS Total | | | - | - | - | | | |
| | | | PRIVATE GRANT FUND Total | | | | - | - | - | | | |
| | | 0400 Total | | | | | - | - | - | | | |
| | | | STRATEGIC MGMT AND POLICY        Total | | | | 1,601,835.27 | 1,415,345.77 | 186,489.50 | - | (14,489.20) | 14,489.20 |
| 5920 Total | | | | | | | 1,601,835.27 | 1,415,345.77 | 186,489.50 | - | (14,489.20) | 14,489.20 |
| 5930 | NETWORK DEVELOPMENT | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 787,339.38 | 764,834.00 | 22,505.38 | - | (38,467.31) | 38,467.31 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 14,149.56 | (14,149.56) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 211,794.28 | 159,339.97 | 52,454.31 | - | (7,951.57) | 7,951.57 |
| | | | | | 0015 | OVERTIME PAY | - | 1,627.28 | (1,627.28) | | | |
| | | | | PS Total | | | 999,133.66 | 939,950.81 | 59,182.85 | - | (46,418.88) | 46,418.88 |
| | | | LOCAL FUND Total | | | | 999,133.66 | 939,950.81 | 59,182.85 | - | (46,418.88) | 46,418.88 |
| | | 0100 Total | | | | | 999,133.66 | 939,950.81 | 59,182.85 | - | (46,418.88) | 46,418.88 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | - | - | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | - | - | | | |
| | | | | PS Total | | | - | - | - | | | |
| | | | FEDERAL GRANT FUND Total | | | | - | - | - | | | |
| | | 0200 Total | | | | | - | - | - | | | |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 122,227.00 | 117,071.34 | 5,155.66 | - | (6,603.24) | 6,603.24 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 32,879.06 | 23,180.20 | 9,698.86 | - | (1,291.34) | 1,291.34 |
| | | | | PS Total | | | 155,106.06 | 140,251.54 | 14,854.52 | - | (7,894.58) | 7,894.58 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 155,106.06 | 140,251.54 | 14,854.52 | - | (7,894.58) | 7,894.58 |
| | | 0700 Total | | | | | 155,106.06 | 140,251.54 | 14,854.52 | - | (7,894.58) | 7,894.58 |
| | | | NETWORK DEVELOPMENT        Total | | | | 1,154,239.72 | 1,080,202.35 | 74,037.37 | - | (54,313.46) | 54,313.46 |
| 5930 Total | | | | | | | 1,154,239.72 | 1,080,202.35 | 74,037.37 | - | (54,313.46) | 54,313.46 |
| 5940 | TRAINING INSTITUTE | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 469,491.19 | 479,609.95 | (10,118.76) | - | (25,881.72) | 25,881.72 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 9,567.72 | (9,567.72) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 126,293.13 | 108,891.10 | 17,402.03 | - | (5,118.51) | 5,118.51 |
| | | | | | 0015 | OVERTIME PAY | - | 511.02 | (511.02) | - | (511.02) | 511.02 |
| | | | | PS Total | | | 595,784.32 | 598,579.79 | (2,795.47) | - | (31,511.25) | 31,511.25 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 5,000.00 | - | 5,000.00 | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 131,758.46 | 105,497.68 | 26,260.78 | - | 69.24 | (69.24) |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | - | 1,677.76 | (1,677.76) | - | 430.22 | (430.22) |
| | | | | NPS Total | | | 136,758.46 | 107,175.44 | 29,583.02 | - | 499.46 | (499.46) |
| | | | LOCAL FUND Total | | | | 732,542.78 | 705,755.23 | 26,787.55 | - | (31,011.79) | 31,011.79 |
| | | 0100 Total | | | | | 732,542.78 | 705,755.23 | 26,787.55 | - | (31,011.79) | 31,011.79 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | NPS | 0040 | OTHER SERVICES AND CHARGES | 25,000.00 | 4,920.00 | 20,080.00 | | | |

ACTIVITY LEVEL

| Program Code 3 | Program Code 3 Title | | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Fiscal Year 2021 Sum of Budget | Sum of Actuals | Sum of Variance | 2022 Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | NPS Total | | | 25,000.00 | 4,920.00 | 20,080.00 | | | |
| | | | 0600 Total | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 25,000.00 | 4,920.00 | 20,080.00 | | | |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 9,291.57 | 9,628.30 | (336.73) | - | (505.17) | 505.17 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 2,499.43 | 1,257.56 | 1,241.87 | - | (66.23) | 66.23 |
| | | | | | PS Total | | | 11,791.00 | 10,885.86 | 905.14 | - | (571.40) | 571.40 |
| | | | 0700 Total | OPERATING INTRA-DISTRICT FUNDS Total | | | | 11,791.00 | 10,885.86 | 905.14 | - | (571.40) | 571.40 |
| | TRAINING INSTITUTE | Total | | | | | | 11,791.00 | 10,885.86 | 905.14 | - | (571.40) | 571.40 |
| 5940 Total | | | | | | | | 769,333.78 | 721,561.09 | 47,772.69 | - | (31,583.19) | 31,583.19 |
| 6501 | ADULT/TRANSITIONAL YOUTH SERVICES ADMIN | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | - | 35,418.86 | (35,418.86) |
| | | | | | | 0012 | REGULAR PAY - OTHER | | | | - | 1,984.27 | (1,984.27) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | - | 6,670.22 | (6,670.22) |
| | | | | | | 0015 | OVERTIME PAY | | | | - | 183.52 | (183.52) |
| | | | | | PS Total | | | | | | - | 44,256.87 | (44,256.87) |
| | | | 0200 Total | FEDERAL GRANT FUND Total | | | | | | | - | 44,256.87 | (44,256.87) |
| | ADULT/TRANSITIONAL YOUTH SERVICES ADMIN | Total | | | | | | | | | - | 44,256.87 | (44,256.87) |
| 6501 Total | | | | | | | | | | | - | 44,256.87 | (44,256.87) |
| 6502 | BEHAVIORAL HEALTH SERVICES MHSUD | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,634,882.70 | 390,150.18 | 1,244,732.52 | | | |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 298.82 | (298.82) | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 399,485.21 | 86,082.53 | 313,402.68 | | | |
| | | | | | | 0015 | OVERTIME PAY | - | 122.06 | (122.06) | | | |
| | | | | | PS Total | | | 2,034,367.91 | 476,653.59 | 1,557,714.32 | | | |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 551,477.00 | 83,941.57 | 135,431.43 | | | |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | - | 237.78 | (237.78) | | | |
| | | | | | NPS Total | | | 551,477.00 | 84,179.35 | 135,193.65 | | | |
| | | | 0100 Total | LOCAL FUND Total | | | | 2,585,844.91 | 560,832.94 | 1,692,907.97 | | | |
| | | | | | | | | 2,585,844.91 | 560,832.94 | 1,692,907.97 | | | |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 822,012.88 | 146,058.59 | 675,954.29 | | | |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 1,350.74 | (1,350.74) | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 225,231.54 | 35,645.25 | 189,586.29 | | | |
| | | | | | PS Total | | | 1,047,244.42 | 183,054.58 | 864,189.84 | | | |
| | | | | | NPS | 0050 | SUBSIDIES AND TRANSFERS | 600,000.00 | 89,371.37 | - | | | |
| | | | | | NPS Total | | | 600,000.00 | 89,371.37 | | | | |
| | | | | | | | | 1,647,244.42 | 272,425.95 | 864,189.84 | | | |
| | | | 0200 Total | FEDERAL GRANT FUND Total | | | | 1,647,244.42 | 272,425.95 | 864,189.84 | | | |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,251,081.00 | 338,120.25 | 912,960.75 | | | |
| | | | | | | 0012 | REGULAR PAY - OTHER | 116,145.00 | 15,634.85 | 100,510.15 | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 374,619.92 | 43,447.39 | 331,172.53 | | | |
| | | | | | PS Total | | | 1,741,845.92 | 397,202.49 | 1,344,643.43 | | | |
| | | | | | | | | 1,741,845.92 | 397,202.49 | 1,344,643.43 | | | |
| | | | 0700 Total | OPERATING INTRA-DISTRICT FUNDS Total | | | | 1,741,845.92 | 397,202.49 | 1,344,643.43 | | | |
| | BEHAVIORAL HEALTH SERVICES MHSUD | Total | | | | | | 5,974,935.25 | 1,230,461.38 | 3,901,741.24 | | | |
| 6502 Total | | | | | | | | 5,974,935.25 | 1,230,461.38 | 3,901,741.24 | | | |
| 6504 | PROVIDER RELATIONS | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 795,069.84 | 216,681.50 | 578,388.34 | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 217,849.14 | 42,709.10 | 175,140.04 | | | |
| | | | | | | 0015 | OVERTIME PAY | - | 31.43 | (31.43) | | | |
| | | | | | PS Total | | | 1,012,918.98 | 259,422.03 | 753,496.95 | | | |
| | | | 0100 Total | LOCAL FUND Total | | | | 1,012,918.98 | 259,422.03 | 753,496.95 | | | |
| | | | | | | | | 1,012,918.98 | 259,422.03 | 753,496.95 | | | |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 177,184.00 | - | 177,184.00 | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 48,548.41 | - | 48,548.41 | | | |
| | | | | | PS Total | | | 225,732.41 | - | 225,732.41 | | | |
| | | | 0200 Total | FEDERAL GRANT FUND Total | | | | 225,732.41 | - | 225,732.41 | | | |
| | | | | | | | | 225,732.41 | - | 225,732.41 | | | |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 122,227.00 | 37,682.41 | 84,544.59 | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 33,490.20 | 6,970.78 | 26,519.42 | | | |
| | | | | | PS Total | | | 155,717.20 | 44,653.19 | 111,064.01 | | | |
| | | | 0700 Total | OPERATING INTRA-DISTRICT FUNDS Total | | | | 155,717.20 | 44,653.19 | 111,064.01 | | | |
| | PROVIDER RELATIONS | Total | | | | | | 155,717.20 | 44,653.19 | 111,064.01 | | | |
| | | | | | | | | 1,394,368.59 | 304,075.22 | 1,090,293.37 | | | |
| 6504 Total | | | | | | | | 1,394,368.59 | 304,075.22 | 1,090,293.37 | | | |
| 6505 | CO-LOCATED SERVICES | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 375,280.28 | 119,255.12 | 256,025.16 | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 102,826.80 | 33,897.27 | 68,929.53 | | | |
| | | | | | PS Total | | | 478,107.08 | 153,152.39 | 324,954.69 | | | |
| | | | 0100 Total | LOCAL FUND Total | | | | 478,107.08 | 153,152.39 | 324,954.69 | | | |
| | CO-LOCATED SERVICES | Total | | | | | | 478,107.08 | 153,152.39 | 324,954.69 | | | |
| 6505 Total | | | | | | | | 478,107.08 | 153,152.39 | 324,954.69 | | | |
| 6506 | RESIDENTIAL SUPPORT & CONTINUITY OF SVCS | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 318,125.24 | 86,999.49 | 231,125.75 | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 87,166.31 | 24,586.35 | 62,579.96 | | | |
| | | | | | PS Total | | | 405,291.55 | 111,585.84 | 293,705.71 | | | |
| | | | | | LOCAL FUND Total | | | 405,291.55 | 111,585.84 | 293,705.71 | | | |

ACTIVITY
LEVEL

| | | | | | | | | Fiscal Year | Values | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2021 | 2022 | |
| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actual | Sum of Variance | Sum of Budget | Sum of Actual | Sum of Variance |

| | | | | | | | Sum of Budget | Sum of Actual | Sum of Variance | Sum of Budget | Sum of Actual | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0100 Total | | | | | | | | 405,291.55 | 111,585.84 | 293,705.71 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0050 | SUBSIDIES AND TRANSFERS | | | | 20,000.00 | - | 20,000.00 |
| | | | | NPS Total | | | | | | 20,000.00 | - | 20,000.00 |
| | | | PRIVATE GRANT FUND Total | | | | | | | **20,000.00** | **-** | **20,000.00** |
| | | 0400 Total | | | | | | | | 20,000.00 | | 20,000.00 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 116,661.67 | 35,806.20 | 80,855.47 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 31,965.30 | 6,198.53 | 25,766.77 |
| | | | | PS Total | | | | | | 148,626.97 | 42,004.73 | 106,622.24 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | **148,626.97** | **42,004.73** | **106,622.24** |
| | | 0700 Total | | | | | | | | 148,626.97 | 42,004.73 | 106,622.24 |
| | RESIDENTIAL SUPPORT & CONTINUITY OF SVCS | Total | | | | | | | | 573,918.52 | 153,590.57 | 420,327.95 |
| **6506 Total** | | | | | | | | | | **573,918.52** | **153,590.57** | **420,327.95** |
| **6507** | **HOUSING SUPPORT SERVICES** | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 221,446.46 | 69,543.78 | 151,902.68 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 60,676.33 | 21,456.42 | 39,219.91 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 7.58 | (7.58) |
| | | | | PS Total | | | | | | 282,122.79 | 91,007.78 | 191,115.01 |
| | | | | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 18,244,586.30 | 2,864,020.53 | 3,393,666.95 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 11,517,602.58 | 5,800,000.00 | - |
| | | | | NPS Total | | | | | | 29,762,188.88 | 8,664,020.53 | 3,393,666.95 |
| | | | LOCAL FUND Total | | | | | | | **30,044,311.67** | **8,755,028.31** | **3,584,781.96** |
| | | 0100 Total | | | | | | | | 30,044,311.67 | 8,755,028.31 | 3,584,781.96 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 38,302.57 | 11,499.66 | 26,802.91 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 10,494.90 | 2,488.43 | 8,006.47 |
| | | | | PS Total | | | | | | 48,797.47 | 13,988.09 | 34,809.38 |
| | | | FEDERAL GRANT FUND Total | | | | | | | **48,797.47** | **13,988.09** | **34,809.38** |
| | | 0200 Total | | | | | | | | 48,797.47 | 13,988.09 | 34,809.38 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | - | 16,480.28 | (16,480.28) |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | - | 48,837.11 | (48,837.11) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 138.83 | (138.83) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | - | 12,950.24 | (12,950.24) |
| | | | | | 0015 | OVERTIME PAY | | | | - | 396.41 | (396.41) |
| | | | | PS Total | | | | | | - | 78,802.87 | (78,802.87) |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | **-** | **78,802.87** | **(78,802.87)** |
| | | 0700 Total | | | | | | | | - | 78,802.87 | (78,802.87) |
| | HOUSING SUPPORT SERVICES | Total | | | | | | | | 30,093,109.14 | 8,847,819.27 | 3,540,788.47 |
| **6507 Total** | | | | | | | | | | **30,093,109.14** | **8,847,819.27** | **3,540,788.47** |
| **6508** | **COMMUNITY RESPONSE TEAM** | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 1,187,334.35 | 378,545.53 | 808,788.82 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | 172,329.67 | 115,286.32 | 57,043.35 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 42,844.20 | (42,844.20) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 372,547.97 | 126,541.87 | 246,006.10 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 76,017.00 | (76,017.00) |
| | | | | PS Total | | | | | | 1,732,211.99 | 739,234.92 | 992,977.07 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 280,987.66 | 45,543.51 | - |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 1,736,458.47 | 283,437.53 | 364,390.59 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 300,000.00 | - | 300,000.00 |
| | | | | NPS Total | | | | | | 2,317,446.13 | 328,981.04 | 664,390.59 |
| | | | LOCAL FUND Total | | | | | | | **4,049,658.12** | **1,068,215.96** | **1,657,367.66** |
| | | 0100 Total | | | | | | | | 4,049,658.12 | 1,068,215.96 | 1,657,367.66 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 214,539.19 | 28,896.10 | 185,643.09 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | - | 16,350.67 | (16,350.67) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 4,022.77 | (4,022.77) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 58,783.74 | 12,028.31 | 46,755.43 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 8,195.58 | (8,195.58) |
| | | | | PS Total | | | | | | 273,322.93 | 69,493.43 | 203,829.50 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | | 15,000.00 | - | 15,000.00 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 9,677.07 | - | 9,677.07 |
| | | | | NPS Total | | | | | | 24,677.07 | - | 24,677.07 |
| | | | FEDERAL GRANT FUND Total | | | | | | | **298,000.00** | **69,493.43** | **228,506.57** |
| | | 0200 Total | | | | | | | | 298,000.00 | 69,493.43 | 228,506.57 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 179,314.18 | 54,925.65 | 124,388.53 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 6,553.83 | (6,553.83) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 49,132.09 | 11,745.07 | 37,387.02 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 1,510.68 | (1,510.68) |
| | | | | PS Total | | | | | | 228,446.27 | 74,735.23 | 153,711.04 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | **228,446.27** | **74,735.23** | **153,711.04** |
| | | 0700 Total | | | | | | | | 228,446.27 | 74,735.23 | 153,711.04 |
| | COMMUNITY RESPONSE TEAM | Total | | | | | | | | 4,576,104.39 | 1,212,444.62 | 2,039,585.27 |
| **6508 Total** | | | | | | | | | | **4,576,104.39** | **1,212,444.62** | **2,039,585.27** |
| **6509** | **STATE OPIOID RESPONSE PROGRAM** | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 1,172,488.62 | 325,352.63 | 847,135.99 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 281,510.20 | 70,613.22 | 210,896.98 |
| | | | | PS Total | | | | | | 1,453,998.82 | 395,965.85 | 1,058,032.97 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 2,247,628.57 | 291,332.25 | 436,795.04 |
| | | | | NPS Total | | | | | | 2,247,628.57 | 291,332.25 | 436,795.04 |
| | | | LOCAL FUND Total | | | | | | | **3,701,627.39** | **687,298.10** | **1,494,828.01** |

ACTIVITY
LEVEL

| | | | | | | | | Fiscal Year | Values | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2021 | | 2022 | |
| Program Code 3 | Program Code 3 Title | | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actual | Sum of Varianc | Sum of Budget | Sum of Actual | Sum of Varianc |

| | | | | | | | | Sum of Budget | Sum of Actual | Sum of Varianc | Sum of Budget | Sum of Actual | Sum of Varianc |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 0100 Total | | | | | | | | 3,701,627.39 | 687,298.10 | 1,494,828.01 |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 1,314,012.32 | 112,624.68 | 1,201,387.64 |
| | | | | | | 0012 | REGULAR PAY - OTHER | | | | 469,371.22 | 103,334.75 | 366,036.47 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 379,047.08 | 44,987.35 | 334,059.73 |
| | | | | | | 0015 | OVERTIME PAY | | | | - | 173.92 | (173.92) |
| | | | | | PS Total | | | | | | 2,162,430.62 | 261,120.70 | 1,901,309.92 |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | | 112,238.00 | - | 112,238.00 |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | | | | 11,017,141.00 | 42,799.07 | 6,197,729.74 |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 6,582,015.00 | 72,757.56 | 6,273,963.00 |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 6,980,491.00 | - | 3,064,790.04 |
| | | | | | NPS Total | | | | | | 24,691,885.00 | 115,556.63 | 15,648,720.78 |
| | | | | FEDERAL GRANT FUND Total | | | | | | | 26,854,315.62 | 376,677.33 | 17,550,030.70 |
| | | | 0200 Total | | | | | | | | 26,854,315.62 | 376,677.33 | 17,550,030.70 |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 170,298.37 | 26,887.14 | 143,411.23 |
| | | | | | | 0012 | REGULAR PAY - OTHER | | | | 82,326.00 | 13,281.52 | 69,044.48 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 46,661.75 | 9,218.73 | 37,443.02 |
| | | | | | PS Total | | | | | | 299,286.12 | 49,387.39 | 249,898.73 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 47,135.72 | 20,000.00 | 27,135.72 |
| | | | | | NPS Total | | | | | | 47,135.72 | 20,000.00 | 27,135.72 |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | 346,421.84 | 69,387.39 | 277,034.45 |
| | | | 0700 Total | | | | | | | | 346,421.84 | 69,387.39 | 277,034.45 |
| | STATE OPIOID RESPONSE PROGRAM | Total | | | | | | | | | 30,902,264.85 | 1,133,362.82 | 19,321,893.16 |
| 6509 Total | | | | | | | | | | | 30,902,264.85 | 1,133,362.82 | 19,321,893.16 |
| 6510 | ASSESSMENT & REFERRAL CENTER | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 25,119.04 | 8,864.85 | 16,254.19 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 6,882.62 | 2,006.73 | 4,875.89 |
| | | | | | PS Total | | | | | | 32,001.66 | 10,871.58 | 21,130.08 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 760,550.00 | - | 760,550.00 |
| | | | | | NPS Total | | | | | | 760,550.00 | - | 760,550.00 |
| | | | | LOCAL FUND Total | | | | | | | 792,551.66 | 10,871.58 | 781,680.08 |
| | | | 0100 Total | | | | | | | | 792,551.66 | 10,871.58 | 781,680.08 |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 32,316.90 | 10,834.70 | 21,482.20 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 8,854.83 | 2,452.77 | 6,402.06 |
| | | | | | PS Total | | | | | | 41,171.73 | 13,287.47 | 27,884.26 |
| | | | | FEDERAL GRANT FUND Total | | | | | | | 41,171.73 | 13,287.47 | 27,884.26 |
| | | | 0200 Total | | | | | | | | 41,171.73 | 13,287.47 | 27,884.26 |
| | ASSESSMENT & REFERRAL CENTER | Total | | | | | | | | | 833,723.39 | 24,159.05 | 809,564.34 |
| 6510 Total | | | | | | | | | | | 833,723.39 | 24,159.05 | 809,564.34 |
| 6511 | ACCESS HELPLINE | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 1,160,359.69 | 351,550.36 | 808,809.33 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 39,946.13 | (39,946.13) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 317,938.60 | 89,234.15 | 228,704.45 |
| | | | | | | 0015 | OVERTIME PAY | | | | - | 30,847.44 | (30,847.44) |
| | | | | | PS Total | | | | | | 1,478,298.29 | 511,578.08 | 966,720.21 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 108,154.41 | 19,600.14 | 11,411.69 |
| | | | | | NPS Total | | | | | | 108,154.41 | 19,600.14 | 11,411.69 |
| | | | | LOCAL FUND Total | | | | | | | 1,586,452.70 | 531,178.22 | 978,131.90 |
| | | | 0100 Total | | | | | | | | 1,586,452.70 | 531,178.22 | 978,131.90 |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 151,823.29 | 21,155.88 | 130,667.41 |
| | | | | | | 0012 | REGULAR PAY - OTHER | | | | - | 10,442.40 | (10,442.40) |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 5,002.91 | (5,002.91) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 41,599.59 | 9,438.36 | 32,161.23 |
| | | | | | | 0015 | OVERTIME PAY | | | | - | 7,426.27 | (7,426.27) |
| | | | | | PS Total | | | | | | 193,422.88 | 53,465.82 | 139,957.06 |
| | | | | FEDERAL GRANT FUND Total | | | | | | | 193,422.88 | 53,465.82 | 139,957.06 |
| | | | 0200 Total | | | | | | | | 193,422.88 | 53,465.82 | 139,957.06 |
| | ACCESS HELPLINE | Total | | | | | | | | | 1,779,875.58 | 584,644.04 | 1,118,088.96 |
| 6511 Total | | | | | | | | | | | 1,779,875.58 | 584,644.04 | 1,118,088.96 |
| 6512 | SPECIALTY SERVICES | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 1,853,492.04 | 35,008.22 | 1,818,483.82 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 3,599.95 | (3,599.95) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 232,429.24 | 6,760.27 | 225,668.97 |
| | | | | | PS Total | | | | | | 2,085,921.28 | 45,368.44 | 2,040,552.84 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 70,000.00 | - | 11,000.00 |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 717,663.24 | 56,837.00 | 297,663.24 |
| | | | | | NPS Total | | | | | | 787,663.24 | 56,837.00 | 308,663.24 |
| | | | | LOCAL FUND Total | | | | | | | 2,873,584.52 | 102,205.44 | 2,349,216.08 |
| | | | 0100 Total | | | | | | | | 2,873,584.52 | 102,205.44 | 2,349,216.08 |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 64,965.35 | 3,568.08 | 61,397.27 |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 3,599.96 | (3,599.96) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 17,800.51 | 738.38 | 17,062.13 |
| | | | | | PS Total | | | | | | 82,765.86 | 7,906.42 | 74,859.44 |
| | | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 129,347.00 | - | 129,347.00 |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 955,895.35 | - | 536,895.35 |
| | | | | | NPS Total | | | | | | 1,085,242.35 | - | 666,242.35 |
| | | | | FEDERAL GRANT FUND Total | | | | | | | 1,168,008.21 | 7,906.42 | 741,101.79 |
| | | | 0200 Total | | | | | | | | 1,168,008.21 | 7,906.42 | 741,101.79 |

ACTIVITY LEVEL

| | | | | | | | | Fiscal Year | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2021 | | | 2022 | | |
| Program Code 3 | Program Code 3 Title | Total | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | SPECIALTY SERVICES | Total | | | | | | | | | 4,041,592.73 | 110,111.86 | 3,090,317.87 |
| 6512 Total | | | | | | | | | | | 4,041,592.73 | 110,111.86 | 3,090,317.87 |
| 6513 | SUBSTANCE USE DISORDER TREATMENT SVCS | | 0100 | LOCAL FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 26,148.42 | | 26,148.42 |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 11,037,435.58 | 1,439,835.89 | 2,658,620.58 |
| | | | | | NPS Total | | | | | | 11,063,584.00 | 1,439,835.89 | 2,684,769.00 |
| | | | | LOCAL FUND Total | | | | | | | 11,063,584.00 | 1,439,835.89 | 2,684,769.00 |
| | | | 0100 Total | | | | | | | | 11,063,584.00 | 1,439,835.89 | 2,684,769.00 |
| | | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 23,982.00 | 11,400.00 | 5,082.00 |
| | | | | | NPS Total | | | | | | 23,982.00 | 11,400.00 | 5,082.00 |
| | | | | PRIVATE GRANT FUND Total | | | | | | | 23,982.00 | 11,400.00 | 5,082.00 |
| | | | 0400 Total | | | | | | | | 23,982.00 | 11,400.00 | 5,082.00 |
| | SUBSTANCE USE DISORDER TREATMENT SVCS | Total | | | | | | | | | 11,087,566.00 | 1,451,235.89 | 2,689,851.00 |
| 6513 Total | | | | | | | | | | | 11,087,566.00 | 1,451,235.89 | 2,689,851.00 |
| 6514 | MHRS LOCAL ONLY | | 0100 | LOCAL FUND | NPS | 0050 | SUBSIDIES AND TRANSFERS | | | | 10,000,954.81 | 1,782,372.45 | 27,000.81 |
| | | | | | NPS Total | | | | | | 10,000,954.81 | 1,782,372.45 | 27,000.81 |
| | | | | LOCAL FUND Total | | | | | | | 10,000,954.81 | 1,782,372.45 | 27,000.81 |
| | | | 0100 Total | | | | | | | | 10,000,954.81 | 1,782,372.45 | 27,000.81 |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | NPS | 0050 | SUBSIDIES AND TRANSFERS | | | | 1,312,000.00 | - | 1,312,000.00 |
| | | | | | NPS Total | | | | | | 1,312,000.00 | - | 1,312,000.00 |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | 1,312,000.00 | - | 1,312,000.00 |
| | | | 0700 Total | | | | | | | | 1,312,000.00 | - | 1,312,000.00 |
| | MHRS LOCAL ONLY | Total | | | | | | | | | 11,312,954.81 | 1,782,372.45 | 1,339,000.81 |
| 6514 Total | | | | | | | | | | | 11,312,954.81 | 1,782,372.45 | 1,339,000.81 |
| 6515 | BEHAVIORAL HEALTH REHAB. - LOCAL MATCH | | 0100 | LOCAL FUND | NPS | 0050 | SUBSIDIES AND TRANSFERS | | | | 8,312,129.00 | - | 8,312,129.00 |
| | | | | | NPS Total | | | | | | 8,312,129.00 | - | 8,312,129.00 |
| | | | | LOCAL FUND Total | | | | | | | 8,312,129.00 | - | 8,312,129.00 |
| | | | 0100 Total | | | | | | | | 8,312,129.00 | - | 8,312,129.00 |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | NPS | 0050 | SUBSIDIES AND TRANSFERS | | | | 2,988,000.00 | - | 2,988,000.00 |
| | | | | | NPS Total | | | | | | 2,988,000.00 | - | 2,988,000.00 |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | 2,988,000.00 | - | 2,988,000.00 |
| | | | 0700 Total | | | | | | | | 2,988,000.00 | - | 2,988,000.00 |
| | BEHAVIORAL HEALTH REHAB. - LOCAL MATCH | Total | | | | | | | | | 11,300,129.00 | - | 11,300,129.00 |
| 6515 Total | | | | | | | | | | | 11,300,129.00 | - | 11,300,129.00 |
| 6516 | GAMBLING ADDICTION TREATMENT & RESEARCH | | 0110 | LOCAL FUND | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 200,000.00 | - | 200,000.00 |
| | | | | | NPS Total | | | | | | 200,000.00 | - | 200,000.00 |
| | | | | LOCAL FUND Total | | | | | | | 200,000.00 | - | 200,000.00 |
| | | | 0110 Total | | | | | | | | 200,000.00 | - | 200,000.00 |
| | GAMBLING ADDICTION TREATMENT & RESEARCH | Total | | | | | | | | | 200,000.00 | - | 200,000.00 |
| 6516 Total | | | | | | | | | | | 200,000.00 | - | 200,000.00 |
| 6517 | IMPLEM. OF DRUG TREATMENT CHOICE | | 0100 | LOCAL FUND | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 360,000.00 | - | 360,000.00 |
| | | | | | NPS Total | | | | | | 360,000.00 | - | 360,000.00 |
| | | | | LOCAL FUND Total | | | | | | | 360,000.00 | - | 360,000.00 |
| | | | 0100 Total | | | | | | | | 360,000.00 | - | 360,000.00 |
| | IMPLEM. OF DRUG TREATMENT CHOICE | Total | | | | | | | | | 360,000.00 | - | 360,000.00 |
| 6517 Total | | | | | | | | | | | 360,000.00 | - | 360,000.00 |
| 6601 | CHILD/ADOLESCENT/FAMILY SERVICES ADMIN | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 714,950.79 | 261,477.25 | 453,473.54 | | | |
| | | | | | | 0012 | REGULAR PAY - OTHER | 141,550.00 | 343.84 | 141,206.16 | | | |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | | 377.02 | (377.02) | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 234,681.23 | 50,834.48 | 183,846.75 | | | |
| | | | | | PS Total | | | 1,091,182.02 | 313,032.59 | 778,149.43 | | | |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 10,000.00 | | 10,000.00 | | | |
| | | | | | | 0040 | OTHER SERVICES AND CHARGES | 603,836.63 | 117,464.00 | 330,241.63 | | | |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 100,000.00 | | 100,000.00 | | | |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | 50,000.00 | (41,974.99) | 91,974.99 | | | |
| | | | | | NPS Total | | | 763,836.63 | 75,489.01 | 532,216.62 | | | |
| | | | | LOCAL FUND Total | | | | 1,855,018.65 | 388,521.60 | 1,310,366.05 | | | |
| | | | 0100 Total | | | | | 1,855,018.65 | 388,521.60 | 1,310,366.05 | | | |
| | | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 71,624.15 | 20,533.47 | 51,090.68 | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 19,625.02 | 4,729.90 | 14,895.12 | | | |
| | | | | | PS Total | | | 91,249.17 | 25,263.37 | 65,985.80 | | | |
| | | | | FEDERAL GRANT FUND Total | | | | 91,249.17 | 25,263.37 | 65,985.80 | | | |
| | | | 0200 Total | | | | | 91,249.17 | 25,263.37 | 65,985.80 | | | |
| | CHILD/ADOLESCENT/FAMILY SERVICES ADMIN | Total | | | | | | 1,946,267.82 | 413,784.97 | 1,376,351.85 | | | |
| 6601 Total | | | | | | | | 1,946,267.82 | 413,784.97 | 1,376,351.85 | | | |
| 6610 | BEHAVIORAL HEALTH SERVICES MHSUD | | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,069,629.63 | 163,127.10 | 906,502.53 | | | |
| | | | | | | 0012 | REGULAR PAY - OTHER | 122,613.17 | 35,396.44 | 87,216.73 | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | 324,730.34 | 34,191.23 | 290,539.11 | | | |
| | | | | | | 0015 | OVERTIME PAY | | 12.31 | (12.31) | | | |
| | | | | | PS Total | | | 1,516,973.14 | 232,727.08 | 1,284,246.06 | | | |
| | | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 179,999.23 | - | 179,999.23 | | | |
| | | | | | NPS Total | | | 179,999.23 | | 179,999.23 | | | |
| | | | | LOCAL FUND Total | | | | 1,696,972.37 | 232,727.08 | 1,464,245.29 | | | |
| | | | 0100 Total | | | | | 1,696,972.37 | 232,727.08 | 1,464,245.29 | | | |
| | | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 294,394.96 | 85,713.37 | 208,681.59 | | | |

ACTIVITY LEVEL

| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | 2021 Sum of Budget | 2021 Sum of Actuals | 2021 Sum of Variance | 2022 Sum of Budget | 2022 Sum of Actuals | 2022 Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 80,664.23 | 22,472.37 | 58,191.86 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 12.31 | (12.31) |
| | | | | PS Total | | | | | | 375,059.19 | 108,198.05 | 266,861.14 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | 375,059.19 | 108,198.05 | 266,861.14 |
| | BEHAVIORAL HEALTH SERVICES MHSUD | Total | | | | | | | | 375,059.19 | 108,198.05 | 266,861.14 |
| | | | | | | | | | | 2,072,031.56 | 340,925.13 | 1,731,106.43 |
| 6610 Total | | | | | | | | | | 2,072,031.56 | 340,925.13 | 1,731,106.43 |
| 6615 | SUD PREVENTION & TREATMENT | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | - | 22,174.58 | (22,174.58) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | - | 3,826.49 | (3,826.49) |
| | | | | PS Total | | | | | | - | 26,001.07 | (26,001.07) |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 196,500.00 | - | 9,574.00 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 20,256,488.61 | - | 20,256,488.61 |
| | | | | NPS Total | | | | | | 20,452,988.61 | - | 20,266,062.61 |
| | | | LOCAL FUND Total | | | | | | | 20,452,988.61 | 26,001.07 | 20,240,061.54 |
| | | 0100 Total | | | | | | | | 20,452,988.61 | 26,001.07 | 20,240,061.54 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 159,594.87 | - | 159,594.87 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | - | 12,262.04 | (12,262.04) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 4,444.10 | (4,444.10) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 43,728.99 | 4,861.95 | 38,867.04 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 23.02 | (23.02) |
| | | | | PS Total | | | | | | 203,323.86 | 21,591.11 | 181,732.75 |
| | | | FEDERAL GRANT FUND Total | | | | | | | 203,323.86 | 21,591.11 | 181,732.75 |
| | | 0200 Total | | | | | | | | 203,323.86 | 21,591.11 | 181,732.75 |
| | SUD PREVENTION & TREATMENT | Total | | | | | | | | 20,656,312.47 | 47,592.18 | 20,421,794.29 |
| 6615 Total | | | | | | | | | | 20,656,312.47 | 47,592.18 | 20,421,794.29 |
| 6620 | SCHOOL BASED BEHAVIORAL HEALTH SERVICES | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 5,362,332.75 | 1,224,135.16 | 4,138,197.59 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | 228,648.95 | 49,265.72 | 179,383.23 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 3,724.60 | (3,724.60) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 1,450,749.58 | 274,281.46 | 1,176,468.12 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 1,028.99 | (1,028.99) |
| | | | | PS Total | | | | | | 7,041,731.28 | 1,552,435.93 | 5,489,295.35 |
| | | | | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 1,025,000.00 | 37,397.96 | 265,105.36 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 20,327,547.00 | 4,401,357.80 | 3,425,857.45 |
| | | | | NPS Total | | | | | | 21,352,547.00 | 4,438,755.76 | 3,690,962.81 |
| | | | LOCAL FUND Total | | | | | | | 28,394,278.28 | 5,991,191.69 | 9,180,258.16 |
| | | 0100 Total | | | | | | | | 28,394,278.28 | 5,991,191.69 | 9,180,258.16 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 549,996.79 | 117,670.56 | 432,326.23 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | 93,325.00 | 28,579.05 | 64,745.95 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 474.78 | (474.78) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 176,270.18 | 30,391.77 | 145,878.41 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 51.79 | (51.79) |
| | | | | PS Total | | | | | | 819,591.97 | 177,167.95 | 642,424.02 |
| | | | | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 396,081.95 | - | 396,081.95 |
| | | | | NPS Total | | | | | | 396,081.95 | - | 396,081.95 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | 1,215,673.92 | 177,167.95 | 1,038,505.97 |
| | | 0700 Total | | | | | | | | 1,215,673.92 | 177,167.95 | 1,038,505.97 |
| | SCHOOL BASED BEHAVIORAL HEALTH SERVICES | Total | | | | | | | | 29,609,952.20 | 6,168,359.64 | 10,218,764.13 |
| 6620 Total | | | | | | | | | | 29,609,952.20 | 6,168,359.64 | 10,218,764.13 |
| 6625 | CRISIS SERVICES | 0100 | LOCAL FUND | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 300,000.00 | - | 3,014.71 |
| | | | | NPS Total | | | | | | 300,000.00 | - | 3,014.71 |
| | | | LOCAL FUND Total | | | | | | | 300,000.00 | - | 3,014.71 |
| | | 0100 Total | | | | | | | | 300,000.00 | - | 3,014.71 |
| | CRISIS SERVICES | Total | | | | | | | | 300,000.00 | - | 3,014.71 |
| 6625 Total | | | | | | | | | | 300,000.00 | - | 3,014.71 |
| 6630 | COURT ASSESSMENT | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 400,365.93 | 110,567.01 | 289,798.92 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 109,700.27 | 27,477.12 | 82,223.15 |
| | | | | PS Total | | | | | | 510,066.20 | 138,044.13 | 372,022.07 |
| | | | LOCAL FUND Total | | | | | | | 510,066.20 | 138,044.13 | 372,022.07 |
| | | 0100 Total | | | | | | | | 510,066.20 | 138,044.13 | 372,022.07 |
| | COURT ASSESSMENT | Total | | | | | | | | 510,066.20 | 138,044.13 | 372,022.07 |
| 6630 Total | | | | | | | | | | 510,066.20 | 138,044.13 | 372,022.07 |
| 6635 | EARLY CHILDHOOD SERVICES | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 1,686,111.92 | 413,133.15 | 1,272,978.77 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 1.07 | (1.07) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 461,994.63 | 88,140.62 | 373,854.01 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 3.33 | (3.33) |
| | | | | PS Total | | | | | | 2,148,106.55 | 501,278.17 | 1,646,828.38 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | | 1,527.00 | - | 1,527.00 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 81,000.00 | - | 66,000.00 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 1,805,607.00 | - | 416,134.00 |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | | | | 54,000.00 | - | 54,000.00 |
| | | | | NPS Total | | | | | | 1,942,134.00 | - | 536,134.00 |
| | | | LOCAL FUND Total | | | | | | | 4,090,240.55 | 501,278.17 | 2,182,962.38 |
| | | 0100 Total | | | | | | | | 4,090,240.55 | 501,278.17 | 2,182,962.38 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 49,375.99 | 10,476.95 | 38,899.04 |

ACTIVITY LEVEL

| | | | | | | | Fiscal Year | Values | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2021 | | 2022 | | |
| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 13,529.03 | 3,382.10 | 10,146.93 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 0.69 | (0.69) |
| | | | | PS Total | | | | | | 62,905.02 | 13,859.74 | 49,045.28 |
| | | | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 62,905.02 | 13,859.74 | 49,045.28 |
| | | 0700 Total | | | | | | | | 62,905.02 | 13,859.74 | 49,045.28 |
| | EARLY CHILDHOOD SERVICES | Total | | | | | | | | 4,153,145.57 | 515,137.91 | 2,232,007.66 |
| 6635 Total | | | | | | | | | | 4,153,145.57 | 515,137.91 | 2,232,007.66 |
| 6640 | SPECIALTY SERVICES | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 457,518.10 | 119,340.14 | 338,177.96 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 125,359.96 | 24,276.78 | 101,083.18 |
| | | | | PS Total | | | | | | 582,878.06 | 143,616.92 | 439,261.14 |
| | | | LOCAL FUND Total | | | | | | | 582,878.06 | 143,616.92 | 439,261.14 |
| | | 0100 Total | | | | | | | | 582,878.06 | 143,616.92 | 439,261.14 |
| | SPECIALTY SERVICES | Total | | | | | | | | 582,878.06 | 143,616.92 | 439,261.14 |
| 6640 Total | | | | | | | | | | 582,878.06 | 143,616.92 | 439,261.14 |
| 6702 | STRATEGIC PLANNING & POLICY | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 693,817.84 | 171,248.16 | 522,569.68 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | - | 30,792.31 | (30,792.31) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 190,106.09 | 35,960.30 | 154,145.79 |
| | | | | PS Total | | | | | | 883,923.93 | 238,000.77 | 645,923.16 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 12,151.69 | - | 12,151.69 |
| | | | | NPS Total | | | | | | 12,151.69 | - | 12,151.69 |
| | | | LOCAL FUND Total | | | | | | | 896,075.62 | 238,000.77 | 658,074.85 |
| | | 0100 Total | | | | | | | | 896,075.62 | 238,000.77 | 658,074.85 |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 164,300.45 | - | 164,300.45 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 45,018.32 | - | 45,018.32 |
| | | | | PS Total | | | | | | 209,318.77 | - | 209,318.77 |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | | | | 209,318.77 | - | 209,318.77 |
| | | 0250 Total | | | | | | | | 209,318.77 | - | 209,318.77 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 9,945.80 | - | 9,945.80 |
| | | | | NPS Total | | | | | | 9,945.80 | - | 9,945.80 |
| | | | PRIVATE GRANT FUND Total | | | | | | | 9,945.80 | - | 9,945.80 |
| | | 0400 Total | | | | | | | | 9,945.80 | - | 9,945.80 |
| | STRATEGIC PLANNING & POLICY | Total | | | | | | | | 1,115,340.19 | 238,000.77 | 877,339.42 |
| 6702 Total | | | | | | | | | | 1,115,340.19 | 238,000.77 | 877,339.42 |
| 6703 | TRAINING INSTITUTE | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 2,140,874.09 | 586,359.78 | 1,554,514.31 |
| | | | | | 0012 | REGULAR PAY - OTHER | | | | - | 7,552.00 | (7,552.00) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 455,271.87 | 123,947.59 | 331,324.28 |
| | | | | | 0015 | OVERTIME PAY | | | | - | 2,302.20 | (2,302.20) |
| | | | | PS Total | | | | | | 2,596,145.96 | 720,161.57 | 1,875,984.39 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | | | | 5,000.00 | - | 5,000.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | | | | 131,758.46 | - | 124,458.46 |
| | | | | NPS Total | | | | | | 136,758.46 | - | 129,458.46 |
| | | | LOCAL FUND Total | | | | | | | 2,732,904.42 | 720,161.57 | 2,005,442.85 |
| | | 0100 Total | | | | | | | | 2,732,904.42 | 720,161.57 | 2,005,442.85 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 69,596.72 | 21,444.52 | 48,152.20 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 19,069.50 | 4,090.78 | 14,978.72 |
| | | | | PS Total | | | | | | 88,666.22 | 25,535.30 | 63,130.92 |
| | | | FEDERAL GRANT FUND Total | | | | | | | 88,666.22 | 25,535.30 | 63,130.92 |
| | | 0200 Total | | | | | | | | 88,666.22 | 25,535.30 | 63,130.92 |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 137,362.64 | 19,800.00 | 95,362.64 |
| | | | | NPS Total | | | | | | 137,362.64 | 19,800.00 | 95,362.64 |
| | | | PRIVATE GRANT FUND Total | | | | | | | 137,362.64 | 19,800.00 | 95,362.64 |
| | | 0400 Total | | | | | | | | 137,362.64 | 19,800.00 | 95,362.64 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | NPS | 0040 | OTHER SERVICES AND CHARGES | | | | 25,000.00 | - | 25,000.00 |
| | | | | NPS Total | | | | | | 25,000.00 | - | 25,000.00 |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | | | | 25,000.00 | - | 25,000.00 |
| | | 0600 Total | | | | | | | | 25,000.00 | - | 25,000.00 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 9,351.19 | 2,880.78 | 6,470.41 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 2,562.23 | 376.36 | 2,185.87 |
| | | | | PS Total | | | | | | 11,913.42 | 3,257.14 | 8,656.28 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | | | 11,913.42 | 3,257.14 | 8,656.28 |
| | | 0700 Total | | | | | | | | 11,913.42 | 3,257.14 | 8,656.28 |
| | TRAINING INSTITUTE | Total | | | | | | | | 2,995,846.70 | 768,754.01 | 2,197,592.69 |
| 6703 Total | | | | | | | | | | 2,995,846.70 | 768,754.01 | 2,197,592.69 |
| 6704 | BEHAVIORAL HEALTH BLOCK GRANT PROGRAM | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | | | 87,703.00 | - | 87,703.00 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONNEL | | | | 24,030.62 | - | 24,030.62 |
| | | | | PS Total | | | | | | 111,733.62 | - | 111,733.62 |
| | | | LOCAL FUND Total | | | | | | | 111,733.62 | - | 111,733.62 |
| | | 0100 Total | | | | | | | | 111,733.62 | - | 111,733.62 |
| | | 0200 | FEDERAL GRANT FUND | NPS | 0020 | SUPPLIES AND MATERIALS | | | | 2,490,402.00 | - | 2,490,402.00 |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | | | | 3,348,825.00 | 103,151.50 | 3,052,427.86 |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | | | 1,972,854.00 | - | 1,972,854.00 |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | | | 2,175,285.00 | - | 1,521,443.00 |
| | | | | NPS Total | | | | | | 9,987,366.00 | 103,151.50 | 9,037,126.86 |
| | | | FEDERAL GRANT FUND Total | | | | | | | 9,987,366.00 | 103,151.50 | 9,037,126.86 |

ACTIVITY
LEVEL

| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Fiscal Year 2021 Sum of Budget | Values Sum of Actual | Sum of Variance | 2022 Sum of Budget | Sum of Actual | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0200 Fund | Total | | | | | | | 9,987,366.00 | 103,151.50 | 9,037,126.86 |
| | BEHAVIORAL HEALTH BLOCK GRANT PROGRAM | | Total | | | | | | | 10,099,099.62 | 103,151.50 | 9,148,860.48 |
| 6704 Total | | | | | | | | | | 10,099,099.62 | 103,151.50 | 9,148,860.48 |
| 6901 | COMMUNITY SERVICES ADMINISTRATION | 0100 | LOCAL FUND | NPS | 0020 | SUPPLIES AND MATERIALS | | | | - | 93.17 | (93.17) |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 80,000.00 | 57,656.59 | 22,343.41 | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 100,000.00 | 100,000.00 | - | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 50,000.00 | 50,404.70 | (404.70) | | | |
| | | | | NPS Total | | | 230,000.00 | 208,061.29 | 21,938.71 | - | 93.17 | (93.17) |
| | | 0100 Total | LOCAL FUND Total | | | | 230,000.00 | 208,061.29 | 21,938.71 | - | 93.17 | (93.17) |
| | COMMUNITY SERVICES ADMINISTRATION | | Total | | | | 230,000.00 | 208,061.29 | 21,938.71 | - | 93.17 | (93.17) |
| 6901 Total | | | | | | | 230,000.00 | 208,061.29 | 21,938.71 | - | 93.17 | (93.17) |
| 6905 | OFFICE OF COMMUNITY SERVICES | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 465,056.24 | 777,061.06 | (312,004.82) | - | (42,811.13) | 42,811.13 |
| | | | | | 0012 | REGULAR PAY - OTHER | 314,589.66 | 21,285.78 | 293,303.88 | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 662.05 | (662.05) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 212,078.50 | 164,491.95 | 47,586.55 | - | (8,771.73) | 8,771.73 |
| | | | | PS Total | | | 991,724.40 | 963,500.84 | 28,223.56 | - | (51,582.86) | 51,582.86 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 10,000.00 | 23,641.21 | (13,641.21) | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 1,006,821.90 | 1,006,318.76 | 503.14 | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | 9,756.30 | (9,756.30) | | | |
| | | | | NPS Total | | | 1,016,821.90 | 1,039,716.27 | (22,894.37) | | | |
| | | 0100 Total | LOCAL FUND Total | | | | 2,008,546.30 | 2,003,217.11 | 5,329.19 | - | (51,582.86) | 51,582.86 |
| | | | | | | | 2,008,546.30 | 2,003,217.11 | 5,329.19 | - | (51,582.86) | 51,582.86 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 54,564.77 | 54,564.77 | - | - | (3,813.29) | 3,813.29 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 14,780.37 | 14,780.37 | 0.00 | - | (895.81) | 895.81 |
| | | | | PS Total | | | 69,345.14 | 69,345.14 | 0.00 | - | (4,709.10) | 4,709.10 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 255,724.54 | 255,724.54 | - | | | |
| | | | | NPS Total | | | 255,724.54 | 255,724.54 | - | | | |
| | | | FEDERAL GRANT FUND Total | | | | 325,069.68 | 325,069.68 | 0.00 | - | (4,709.10) | 4,709.10 |
| | | 0200 Total | | | | | 325,069.68 | 325,069.68 | 0.00 | - | (4,709.10) | 4,709.10 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | NPS | 0040 | OTHER SERVICES AND CHARGES | 10,080.00 | 10,080.00 | - | | | |
| | | | | NPS Total | | | 10,080.00 | 10,080.00 | - | | | |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 10,080.00 | 10,080.00 | - | | | |
| | | 0700 Total | | | | | 10,080.00 | 10,080.00 | - | | | |
| | OFFICE OF COMMUNITY SERVICES | | Total | | | | 2,343,695.98 | 2,338,366.79 | 5,329.19 | - | (56,291.96) | 56,291.96 |
| 6905 Total | | | | | | | 2,343,695.98 | 2,338,366.79 | 5,329.19 | - | (56,291.96) | 56,291.96 |
| 6910 | PREVENTION AND EARLY INTERVENTION | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 272,697.34 | 269,804.34 | 2,893.00 | - | (15,376.32) | 15,376.32 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 57.55 | (57.55) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 73,355.59 | 51,657.25 | 21,698.34 | - | (2,903.52) | 2,903.52 |
| | | | | | 0015 | OVERTIME PAY | - | 74.84 | (74.84) | | | |
| | | | | PS Total | | | 346,052.93 | 321,593.98 | 24,458.95 | - | (18,279.84) | 18,279.84 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 102,331.86 | 94,807.86 | 7,524.00 | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | - | 1,658.56 | (1,658.56) | | | |
| | | | | NPS Total | | | 102,331.86 | 96,466.44 | 5,865.42 | | | |
| | | 0100 Total | LOCAL FUND Total | | | | 448,384.79 | 418,060.42 | 30,324.37 | - | (18,279.84) | 18,279.84 |
| | | | | | | | 448,384.79 | 418,060.42 | 30,324.37 | - | (18,279.84) | 18,279.84 |
| | | 0600 | SPECIAL PURPOSE REVENUE FUNDS (O TYPE | NPS | 0040 | OTHER SERVICES AND CHARGES | 400,000.00 | 400,000.00 | - | | | |
| | | | | NPS Total | | | 400,000.00 | 400,000.00 | - | | | |
| | | | SPECIAL PURPOSE REVENUE FUNDS (O TYPE) Total | | | | 400,000.00 | 400,000.00 | - | | | |
| | | 0600 Total | | | | | 400,000.00 | 400,000.00 | - | | | |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 34,275.34 | 32,763.07 | 1,512.27 | - | (1,824.79) | 1,824.79 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 9,220.06 | 7,702.74 | 1,517.32 | - | (424.27) | 424.27 |
| | | | | | 0015 | OVERTIME PAY | - | 15.33 | (15.33) | | | |
| | | | | PS Total | | | 43,495.40 | 40,481.14 | 3,014.26 | - | (2,249.06) | 2,249.06 |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 43,495.40 | 40,481.14 | 3,014.26 | - | (2,249.06) | 2,249.06 |
| | | 0700 Total | | | | | 43,495.40 | 40,481.14 | 3,014.26 | - | (2,249.06) | 2,249.06 |
| | PREVENTION AND EARLY INTERVENTION | | Total | | | | 891,880.19 | 858,541.56 | 33,338.63 | - | (20,528.90) | 20,528.90 |
| 6910 Total | | | | | | | 891,880.19 | 858,541.56 | 33,338.63 | - | (20,528.90) | 20,528.90 |
| 6911 | PREVENTION/EARLY INTERVEN-EARLY CHILDHOOD | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 1,876,927.99 | 1,117,489.37 | 759,438.62 | - | (71,841.60) | 71,841.60 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 19,661.04 | (19,661.04) | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 53.68 | (53.68) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 504,893.57 | 246,360.35 | 258,533.22 | - | (15,980.95) | 15,980.95 |
| | | | | PS Total | | | 2,381,821.56 | 1,383,564.44 | 998,257.12 | - | (87,822.55) | 87,822.55 |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | 1,527.00 | - | 1,527.00 | | | |
| | | | | | 0031 | TELECOMMUNICATIONS | - | 6,244.68 | (6,244.68) | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | - | 200,092.96 | (200,092.96) | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 81,000.00 | 75,813.66 | 5,186.34 | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | - | 2,813.58 | (2,813.58) | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | 54,000.00 | 49,237.49 | 4,762.51 | | | |
| | | | | NPS Total | | | 136,527.00 | 334,202.37 | (197,675.37) | | | |
| | | 0100 Total | LOCAL FUND Total | | | | 2,518,348.56 | 1,717,766.81 | 800,581.75 | - | (87,822.55) | 87,822.55 |
| | | | | | | | 2,518,348.56 | 1,717,766.81 | 800,581.75 | - | (87,822.55) | 87,822.55 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 47,054.30 | 72,327.10 | (25,272.80) | - | 549.78 | (549.78) |
| | | | | | 0012 | REGULAR PAY - OTHER | 531,919.66 | 497,068.83 | 34,850.83 | - | 126,321.18 | (126,321.18) |

ACTIVITY LEVEL

| | | | | | | | | Fiscal Year | Values | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2021 | | | 2022 | |
| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | | | | - | 3,515.88 | (3,515.88) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | | 110,866.17 | 110,834.63 | 31.54 | - | 24,472.26 | (24,472.26) |
| | | | | PS Total | | | | 689,840.13 | 680,230.56 | 9,609.57 | - | 154,859.10 | (154,859.10) |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS Total | | | | | 689,840.13 | 680,230.56 | 9,609.57 | - | 154,859.10 | (154,859.10) |
| | | | 0700 Total | | | | | 689,840.13 | 680,230.56 | 9,609.57 | - | 154,859.10 | (154,859.10) |
| | PREVENTION/EARLY INTERVEN-EARLY CHILDHOOD | | Total | | | | | 3,208,188.69 | 2,397,997.37 | 810,191.32 | - | 67,036.55 | (67,036.55) |
| 6911 Total | | | | | | | | 3,208,188.69 | 2,397,997.37 | 810,191.32 | - | 67,036.55 | (67,036.55) |
| 6912 | PREVENTION/EARLY INTERVEN-SCH MENT HLTH | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | 5,615,385.00 | 4,407,799.27 | 1,207,585.73 | - | (170,201.06) | 170,201.06 |
| | | | | | 0012 | REGULAR PAY - OTHER | | 256,182.08 | 156,281.51 | 99,900.57 | - | (8,895.14) | 8,895.14 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | - | 40,319.59 | (40,319.59) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | | 1,523,339.18 | 1,061,497.86 | 461,841.32 | - | (41,180.39) | 41,180.39 |
| | | | | | 0015 | OVERTIME PAY | | - | 2,370.19 | (2,370.19) | - | (417.76) | 417.76 |
| | | | | PS Total | | | | 7,394,906.26 | 5,668,268.42 | 1,726,637.84 | - | (220,694.35) | 220,694.35 |
| | | | | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | | 2,049,220.59 | 1,627,268.89 | 421,951.70 | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | 10,905,914.98 | 10,964,578.42 | (58,663.44) | | | |
| | | | | NPS Total | | | | 12,955,135.57 | 12,591,847.31 | 363,288.26 | | | |
| | | | LOCAL FUND Total | | | | | 20,350,041.83 | 18,260,115.73 | 2,089,926.10 | - | (220,694.35) | 220,694.35 |
| | | 0100 Total | | | | | | 20,350,041.83 | 18,260,115.73 | 2,089,926.10 | - | (220,694.35) | 220,694.35 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | | 560,433.10 | 491,294.43 | 69,138.67 | - | (24,757.94) | 24,757.94 |
| | | | | | 0012 | REGULAR PAY - OTHER | | 96,136.00 | 96,571.05 | (435.05) | - | (5,118.30) | 5,118.30 |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | - | 5,476.68 | (5,476.68) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | | 166,420.27 | 126,398.16 | 40,022.11 | - | (6,091.27) | 6,091.27 |
| | | | | | 0015 | OVERTIME PAY | | - | 58.52 | (58.52) | | | |
| | | | | PS Total | | | | 822,989.37 | 719,798.84 | 103,190.53 | - | (35,967.51) | 35,967.51 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | 307,450.09 | 307,015.04 | 435.05 | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | 1,357,854.14 | 1,357,854.14 | - | | | |
| | | | | NPS Total | | | | 1,665,304.23 | 1,664,869.18 | 435.05 | | | |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | | 2,488,293.60 | 2,384,668.02 | 103,625.58 | - | (35,967.51) | 35,967.51 |
| | | 0700 Total | | | | | | 2,488,293.60 | 2,384,668.02 | 103,625.58 | - | (35,967.51) | 35,967.51 |
| | PREVENTION/EARLY INTERVEN-SCH MENT HLTH | | Total | | | | | 22,838,335.43 | 20,644,783.75 | 2,193,551.68 | - | (256,661.86) | 256,661.86 |
| 6912 Total | | | | | | | | 22,838,335.43 | 20,644,783.75 | 2,193,551.68 | - | (256,661.86) | 256,661.86 |
| 6913 | PREVENTION SUBSTANCE USE DISORDER | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | 222,925.63 | 243,495.43 | (20,569.80) | - | (12,359.90) | 12,359.90 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | | 59,967.00 | 43,571.50 | 16,395.50 | - | (2,319.52) | 2,319.52 |
| | | | | PS Total | | | | 282,892.63 | 287,066.93 | (4,174.30) | - | (14,679.42) | 14,679.42 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | 70,877.00 | 70,877.00 | - | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | | - | 11,742.00 | (11,742.00) | | | |
| | | | | NPS Total | | | | 70,877.00 | 82,619.00 | (11,742.00) | | | |
| | | | LOCAL FUND Total | | | | | 353,769.63 | 369,685.93 | (15,916.30) | - | (14,679.42) | 14,679.42 |
| | | 0100 Total | | | | | | 353,769.63 | 369,685.93 | (15,916.30) | - | (14,679.42) | 14,679.42 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | 542,414.92 | 515,155.92 | 27,259.00 | - | (25,254.19) | 25,254.19 |
| | | | | | 0012 | REGULAR PAY - OTHER | | - | - | - | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | | - | 9,994.86 | (9,994.86) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | | 146,034.71 | 139,432.35 | 6,602.36 | - | (6,676.41) | 6,676.41 |
| | | | | | 0015 | OVERTIME PAY | | - | 693.53 | (693.53) | | | |
| | | | | PS Total | | | | 688,449.63 | 665,276.66 | 23,172.97 | - | (31,930.60) | 31,930.60 |
| | | | | NPS | 0050 | SUBSIDIES AND TRANSFERS | | 735,716.39 | 735,716.39 | - | | | |
| | | | | NPS Total | | | | 735,716.39 | 735,716.39 | - | | | |
| | | | FEDERAL GRANT FUND Total | | | | | 1,424,166.02 | 1,400,993.05 | 23,172.97 | - | (31,930.60) | 31,930.60 |
| | | 0200 Total | | | | | | 1,424,166.02 | 1,400,993.05 | 23,172.97 | - | (31,930.60) | 31,930.60 |
| | PREVENTION SUBSTANCE USE DISORDER | | Total | | | | | 1,777,935.65 | 1,770,678.98 | 7,256.67 | - | (46,610.02) | 46,610.02 |
| 6913 Total | | | | | | | | 1,777,935.65 | 1,770,678.98 | 7,256.67 | - | (46,610.02) | 46,610.02 |
| 6914 | GAMBLING TREATMENT AND INTERVENTION | 0110 | LOCAL FUND | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | | 200,000.00 | - | 200,000.00 | | | |
| | | | | NPS Total | | | | 200,000.00 | - | 200,000.00 | | | |
| | | | LOCAL FUND Total | | | | | 200,000.00 | - | 200,000.00 | | | |
| | | 0110 Total | | | | | | 200,000.00 | - | 200,000.00 | | | |
| | GAMBLING TREATMENT AND INTERVENTION | | Total | | | | | 200,000.00 | - | 200,000.00 | | | |
| 6914 Total | | | | | | | | 200,000.00 | - | 200,000.00 | | | |
| 6920 | SPECIALTY CARE | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | 164,167.51 | 221,278.65 | (57,111.14) | - | (12,695.12) | 12,695.12 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | | 44,160.86 | 40,931.32 | 3,229.54 | - | (2,557.72) | 2,557.72 |
| | | | | PS Total | | | | 208,328.37 | 262,209.97 | (53,881.60) | - | (15,252.84) | 15,252.84 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | 70,000.00 | 33,138.41 | 36,861.59 | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | | 764,339.51 | 570,184.87 | 194,154.64 | | | |
| | | | | NPS Total | | | | 834,339.51 | 603,323.28 | 231,016.23 | | | |
| | | | LOCAL FUND Total | | | | | 1,042,667.88 | 865,533.25 | 177,134.63 | - | (15,252.84) | 15,252.84 |
| | | 0100 Total | | | | | | 1,042,667.88 | 865,533.25 | 177,134.63 | - | (15,252.84) | 15,252.84 |
| | | 0150 | ARPA | NPS | 0050 | SUBSIDIES AND TRANSFERS | | 2,004,655.00 | 2,004,655.00 | - | | | |
| | | | | NPS Total | | | | 2,004,655.00 | 2,004,655.00 | - | | | |
| | | | ARPA Total | | | | | 2,004,655.00 | 2,004,655.00 | - | | | |
| | | 0150 Total | | | | | | 2,004,655.00 | 2,004,655.00 | - | | | |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | | 110,683.35 | 103,893.45 | 6,789.90 | - | (6,953.63) | 6,953.63 |
| | | | | | 0012 | REGULAR PAY - OTHER | | - | 2,731.14 | (2,731.14) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | | 29,773.82 | 18,405.62 | 11,368.20 | - | (1,435.16) | 1,435.16 |
| | | | | PS Total | | | | 140,457.17 | 119,567.93 | 20,889.24 | - | (8,388.79) | 8,388.79 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | | 146,452.50 | 116,000.00 | 30,452.50 | | | |

ACTIVITY
LEVEL

| | | | | | | | Fiscal Year | Values | | 2022 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | 2021 Sum of Budget | Sum of Actual | Sum of Variance | Sum of Budget | Sum of Actual | Sum of Variance |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 1,140,252.82 | 1,140,252.82 | - | | | |
| | | | | NPS Total | | | 1,286,700.32 | 1,256,252.82 | 30,452.50 | | | |
| | | 0200 | FEDERAL GRANT FUND Total | | | | 1,427,162.49 | 1,375,820.75 | 51,341.74 | - | (8,388.79) | 8,388.79 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | NPS | 0040 | OTHER SERVICES AND CHARGES | 1,379,829.00 | 1,143,294.00 | 236,535.00 | - | (8,388.79) | 8,388.79 |
| | | | | NPS Total | | | 1,379,829.00 | 1,143,294.00 | 236,535.00 | | | |
| | | 0700 Total | OPERATING INTRA-DISTRICT FUNDS Total | | | | 1,379,829.00 | 1,143,294.00 | 236,535.00 | | | |
| | | | | | | | 1,379,829.00 | 1,143,294.00 | 236,535.00 | | | |
| | SPECIALTY CARE | Total | | | | | 5,854,314.37 | 5,389,303.00 | 465,011.37 | - | (23,641.63) | 23,641.63 |
| 6920 Total | | | | | | | 5,854,314.37 | 5,389,303.00 | 465,011.37 | - | (23,641.63) | 23,641.63 |
| 6921 | SPECIALTY CARE - COMMUNITY-BASED SERVICE | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 555,743.69 | 644,875.96 | (89,132.27) | - | (37,722.01) | 37,722.01 |
| | | | | | 0012 | REGULAR PAY - OTHER | 97,899.00 | | 97,899.00 | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | (403.41) | 403.41 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 175,829.89 | 143,555.86 | 32,274.03 | - | (9,228.60) | 9,228.60 |
| | | | | PS Total | | | 829,472.58 | 788,028.41 | 41,444.17 | - | (46,950.61) | 46,950.61 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 747,116.48 | 795,866.82 | (48,750.34) | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | - | 59.49 | (59.49) | | | |
| | | | | NPS Total | | | 747,116.48 | 795,926.31 | (48,809.83) | | | |
| | | | LOCAL FUND Total | | | | 1,576,589.06 | 1,583,954.72 | (7,365.66) | - | (46,950.61) | 46,950.61 |
| | | 0100 Total | | | | | 1,576,589.06 | 1,583,954.72 | (7,365.66) | - | (46,950.61) | 46,950.61 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 273,313.25 | 273,313.25 | - | - | (15,000.05) | 15,000.05 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 86,194.90 | 86,194.90 | (0.00) | - | (4,677.01) | 4,677.01 |
| | | | | | 0015 | OVERTIME PAY | - | 4,758.10 | (4,758.10) | | | |
| | | | | PS Total | | | 359,508.15 | 364,266.25 | (4,758.10) | - | (19,677.06) | 19,677.06 |
| | | | FEDERAL GRANT FUND Total | | | | 359,508.15 | 364,266.25 | (4,758.10) | - | (19,677.06) | 19,677.06 |
| | | 0200 Total | | | | | 359,508.15 | 364,266.25 | (4,758.10) | - | (19,677.06) | 19,677.06 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 85,408.46 | 81,840.76 | 3,567.70 | - | (4,723.79) | 4,723.79 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 22,974.88 | 17,538.26 | 5,436.62 | - | (1,009.19) | 1,009.19 |
| | | | | PS Total | | | 108,383.34 | 99,379.02 | 9,004.32 | - | (5,732.98) | 5,732.98 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 44,335.72 | 44,335.72 | - | | | |
| | | | | NPS Total | | | 44,335.72 | 44,335.72 | - | | | |
| | | 0700 Total | OPERATING INTRA-DISTRICT FUNDS Total | | | | 152,719.06 | 143,714.74 | 9,004.32 | - | (5,732.98) | 5,732.98 |
| | | | | | | | 152,719.06 | 143,714.74 | 9,004.32 | - | (5,732.98) | 5,732.98 |
| | SPECIALTY CARE - COMMUNITY-BASED SERVICE | Total | | | | | 2,088,816.27 | 2,091,935.71 | (3,119.44) | - | (72,360.65) | 72,360.65 |
| 6921 Total | | | | | | | 2,088,816.27 | 2,091,935.71 | (3,119.44) | - | (72,360.65) | 72,360.65 |
| 6922 | SPECIALTY CARE - NEW INITIATIVES | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 102,450.91 | 64,872.91 | 37,578.00 | - | (7,826.29) | 7,826.29 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 8,236.64 | (8,236.64) | | | |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | (1,690.49) | 1,690.49 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 27,559.29 | 6,242.73 | 21,316.56 | - | (917.95) | 917.95 |
| | | | | PS Total | | | 130,010.20 | 77,661.79 | 52,348.41 | - | (8,744.24) | 8,744.24 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | - | (740.00) | 740.00 | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | 2,501,861.00 | (2,501,861.00) | | | |
| | | | | NPS Total | | | - | 2,501,121.00 | (2,501,121.00) | | | |
| | | | LOCAL FUND Total | | | | 130,010.20 | 2,578,782.79 | (2,448,772.59) | - | (8,744.24) | 8,744.24 |
| | | 0100 Total | | | | | 130,010.20 | 2,578,782.79 | (2,448,772.59) | - | (8,744.24) | 8,744.24 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 113,806.13 | 287,071.53 | (173,265.40) | - | (2,680.84) | 2,680.84 |
| | | | | | 0012 | REGULAR PAY - OTHER | 727,612.40 | 610,795.62 | 116,816.78 | - | (38,682.46) | (38,682.46) |
| | | | | | 0013 | ADDITIONAL GROSS PAY | - | 11,030.84 | (11,030.84) | - | (321.84) | 321.84 |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 184,546.30 | 158,455.90 | 26,090.40 | - | (321.84) | 321.84 |
| | | | | | 0015 | OVERTIME PAY | - | 1,066.19 | (1,066.19) | | | |
| | | | | PS Total | | | 1,025,964.83 | 1,068,420.08 | (42,455.25) | - | 40,984.78 | (40,984.78) |
| | | | | NPS | 0020 | SUPPLIES AND MATERIALS | (320,845.95) | 10,895.54 | (331,741.49) | | | |
| | | | | | 0040 | OTHER SERVICES AND CHARGES | 12,583,045.14 | 12,169,610.10 | 413,434.76 | | | |
| | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | 4,197,102.96 | 4,191,459.59 | 5,643.37 | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 9,004,264.67 | 9,263,728.40 | (259,463.73) | | | |
| | | | | | 0070 | EQUIPMENT & EQUIPMENT RENTAL | (408.93) | - | (408.93) | | | |
| | | | | NPS Total | | | 25,463,157.89 | 25,635,693.91 | (172,536.02) | | | |
| | | | FEDERAL GRANT FUND Total | | | | 26,489,122.72 | 26,704,113.99 | (214,991.27) | - | 40,984.78 | (40,984.78) |
| | | 0200 Total | | | | | 26,489,122.72 | 26,704,113.99 | (214,991.27) | - | 40,984.78 | (40,984.78) |
| | SPECIALTY CARE - NEW INITIATIVES | Total | | | | | 26,619,132.92 | 29,282,896.78 | (2,663,763.86) | - | 32,240.54 | (32,240.54) |
| 6922 Total | | | | | | | 26,619,132.92 | 29,282,896.78 | (2,663,763.86) | - | 32,240.54 | (32,240.54) |
| 6930 | LINKAGE AND ASSESSMENT | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 239,063.25 | 254,983.58 | (15,920.33) | - | (13,694.33) | 13,694.33 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 2,661.12 | (2,661.12) | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 64,308.01 | 54,032.17 | 10,275.84 | - | (2,874.22) | 2,874.22 |
| | | | | PS Total | | | 303,371.26 | 311,676.87 | (8,305.61) | - | (16,568.55) | 16,568.55 |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | 1,250,566.01 | 1,432,206.41 | (181,640.40) | | | |
| | | | | NPS Total | | | 1,250,566.01 | 1,432,206.41 | (181,640.40) | | | |
| | | | LOCAL FUND Total | | | | 1,553,937.27 | 1,743,883.28 | (189,946.01) | - | (16,568.55) | 16,568.55 |
| | | 0100 Total | | | | | 1,553,937.27 | 1,743,883.28 | (189,946.01) | - | (16,568.55) | 16,568.55 |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 33,166.79 | - | 33,166.79 | | | |
| | | | | | 0012 | REGULAR PAY - OTHER | - | 33,166.79 | (33,166.79) | - | 6,320.59 | (6,320.59) |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 9,771.80 | 9,771.80 | (0.00) | - | 1,844.13 | (1,844.13) |
| | | | | PS Total | | | 42,938.59 | 42,938.59 | (0.00) | - | 8,164.72 | (8,164.72) |
| | | | | NPS | 0040 | OTHER SERVICES AND CHARGES | - | - | - | | | |

ACTIVITY
LEVEL

| | | | | | | | | Fiscal Year | Values | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 2021 | | | 2022 | |
| Program Code 3 | Program Code 3 Title | Approp | Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Sum of Budget | Sum of Actuals | Sum of Variance | Sum of Budget | Sum of Actuals | Sum of Variance |
| | | | | | | 0041 | CONTRACTUAL SERVICES - OTHER | - | - | - | | | |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | - | - | - | | | |
| | | | | | NPS Total | | | - | - | - | | | |
| | | | 0700 Total | | | | OPERATING INTRA-DISTRICT FUNDS Total | 42,938.59 | 42,938.59 | (0.00) | - | 8,164.72 | (8,164.72) |
| | | | | | | | | 42,938.59 | 42,938.59 | (0.00) | - | 8,164.72 | (8,164.72) |
| | LINKAGE AND ASSESSMENT | Total | | | | | | 1,596,875.86 | 1,786,821.87 | (189,946.01) | - | (8,403.83) | 8,403.83 |
| 6930 Total | | | | | | | | 1,596,875.86 | 1,786,821.87 | (189,946.01) | - | (8,403.83) | 8,403.83 |
| 6931 | LINKAGE AND ASSESSMENT/ASSESSMENT CENTER | 0100 | | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 396,121.14 | 401,269.93 | (5,148.79) | - | (19,700.79) | 19,700.79 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 106,556.58 | 97,024.55 | 9,532.03 | - | (5,107.58) | 5,107.58 |
| | | | | | PS Total | | | 502,677.72 | 498,294.48 | 4,383.24 | - | (24,808.37) | 24,808.37 |
| | | | | LOCAL FUND Total | | | | 502,677.72 | 498,294.48 | 4,383.24 | - | (24,808.37) | 24,808.37 |
| | | | 0100 Total | | | | | 502,677.72 | 498,294.48 | 4,383.24 | - | (24,808.37) | 24,808.37 |
| | LINKAGE AND ASSESSMENT/ASSESSMENT CENTER | Total | | | | | | 502,677.72 | 498,294.48 | 4,383.24 | - | (24,808.37) | 24,808.37 |
| 6931 Total | | | | | | | | 502,677.72 | 498,294.48 | 4,383.24 | - | (24,808.37) | 24,808.37 |
| 6932 | LINKAGE AND ASSESSMENT/CO-LOCATED PRGMS | 0100 | | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 460,137.65 | 491,119.68 | (30,982.03) | - | (26,223.91) | 26,223.91 |
| | | | | | | 0012 | REGULAR PAY - OTHER | - | 5,486.64 | (5,486.64) | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 123,777.03 | 140,740.87 | (16,963.84) | - | (7,360.46) | 7,360.46 |
| | | | | | PS Total | | | 583,914.68 | 637,347.19 | (53,432.51) | - | (33,584.37) | 33,584.37 |
| | | | | LOCAL FUND Total | | | | 583,914.68 | 637,347.19 | (53,432.51) | - | (33,584.37) | 33,584.37 |
| | | | 0100 Total | | | | | 583,914.68 | 637,347.19 | (53,432.51) | - | (33,584.37) | 33,584.37 |
| | | 0700 | | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | 53,120.59 | (53,120.59) | | | |
| | | | | | | 0012 | REGULAR PAY - OTHER | 165,440.00 | 115,378.32 | 50,061.68 | - | 43,082.41 | (43,082.41) |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 30,849.20 | 27,790.29 | 3,058.91 | - | 6,883.60 | (6,883.60) |
| | | | | | PS Total | | | 196,289.20 | 196,289.20 | 0.00 | - | 49,966.01 | (49,966.01) |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 196,289.20 | 196,289.20 | 0.00 | - | 49,966.01 | (49,966.01) |
| | | | 0700 Total | | | | | 196,289.20 | 196,289.20 | 0.00 | - | 49,966.01 | (49,966.01) |
| | LINKAGE AND ASSESSMENT/CO-LOCATED PRGMS | Total | | | | | | 780,203.88 | 833,636.39 | (53,432.51) | - | 16,381.64 | (16,381.64) |
| 6932 Total | | | | | | | | 780,203.88 | 833,636.39 | (53,432.51) | - | 16,381.64 | (16,381.64) |
| 6933 | LINKAGE AND ASSESSMENT - PRTF | 0100 | | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 453,651.58 | 452,346.76 | 1,304.82 | - | (20,655.46) | 20,655.46 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 122,032.28 | 102,721.29 | 19,310.99 | - | (4,342.89) | 4,342.89 |
| | | | | | PS Total | | | 575,683.86 | 555,068.05 | 20,615.81 | - | (24,998.35) | 24,998.35 |
| | | | | LOCAL FUND Total | | | | 575,683.86 | 555,068.05 | 20,615.81 | - | (24,998.35) | 24,998.35 |
| | | | 0100 Total | | | | | 575,683.86 | 555,068.05 | 20,615.81 | - | (24,998.35) | 24,998.35 |
| | LINKAGE AND ASSESSMENT - PRTF | Total | | | | | | 575,683.86 | 555,068.05 | 20,615.81 | - | (24,998.35) | 24,998.35 |
| 6933 Total | | | | | | | | 575,683.86 | 555,068.05 | 20,615.81 | - | (24,998.35) | 24,998.35 |
| 6940 | HOUSING DEVELOPMENT | 0100 | | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 220,595.03 | 215,725.76 | 4,869.27 | - | (14,486.66) | 14,486.66 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 59,340.06 | 63,248.45 | (3,908.39) | - | (4,487.12) | 4,487.12 |
| | | | | | | 0015 | OVERTIME PAY | - | 216.62 | (216.62) | | | |
| | | | | | PS Total | | | 279,935.09 | 279,190.83 | 744.26 | - | (18,973.78) | 18,973.78 |
| | | | | | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | 18,673,424.30 | 18,416,506.37 | 256,917.93 | | | |
| | | | | | | 0050 | SUBSIDIES AND TRANSFERS | 8,844,602.58 | 8,800,000.00 | 44,602.58 | | | |
| | | | | | NPS Total | | | 27,518,026.88 | 27,216,506.37 | 301,520.51 | | | |
| | | | | LOCAL FUND Total | | | | 27,797,961.97 | 27,495,697.20 | 302,264.77 | - | (18,973.78) | 18,973.78 |
| | | | 0100 Total | | | | | 27,797,961.97 | 27,495,697.20 | 302,264.77 | - | (18,973.78) | 18,973.78 |
| | | 0200 | | FEDERAL GRANT FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 15,679.07 | 15,679.07 | - | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 3,677.74 | 3,677.74 | (0.00) | | | |
| | | | | | PS Total | | | 19,356.81 | 19,356.81 | (0.00) | | | |
| | | | | FEDERAL GRANT FUND Total | | | | 19,356.81 | 19,356.81 | (0.00) | | | |
| | | | 0200 Total | | | | | 19,356.81 | 19,356.81 | (0.00) | | | |
| | | 0700 | | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 178,116.00 | 110,000.62 | 68,115.38 | - | 7,610.92 | (7,610.92) |
| | | | | | | 0012 | REGULAR PAY - OTHER | 263,176.36 | 327,383.57 | (64,207.21) | - | 21,495.89 | (21,495.89) |
| | | | | | | 0013 | ADDITIONAL GROSS PAY | - | 21,697.63 | (21,697.63) | | | |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 118,707.64 | 100,918.18 | 17,789.46 | - | 6,047.35 | (6,047.35) |
| | | | | | | 0015 | OVERTIME PAY | - | - | - | | | |
| | | | | | PS Total | | | 560,000.00 | 560,000.00 | 0.00 | - | 35,154.16 | (35,154.16) |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 560,000.00 | 560,000.00 | 0.00 | - | 35,154.16 | (35,154.16) |
| | | | 0700 Total | | | | | 560,000.00 | 560,000.00 | 0.00 | - | 35,154.16 | (35,154.16) |
| | HOUSING DEVELOPMENT | Total | | | | | | 28,377,318.78 | 28,075,054.01 | 302,264.77 | - | 16,180.38 | (16,180.38) |
| 6940 Total | | | | | | | | 28,377,318.78 | 28,075,054.01 | 302,264.77 | - | 16,180.38 | (16,180.38) |
| 6950 | RESIDENTIAL SUPPORT SRVS/CARE CONTINUITY | 0100 | | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | 316,799.91 | 237,930.70 | 78,869.21 | - | (13,125.10) | 13,125.10 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 85,219.17 | 63,356.05 | 21,863.12 | - | (4,345.35) | 4,345.35 |
| | | | | | PS Total | | | 402,019.08 | 301,286.75 | 100,732.33 | - | (17,470.45) | 17,470.45 |
| | | | | | NPS | 0041 | CONTRACTUAL SERVICES - OTHER | - | - | - | | | |
| | | | | | NPS Total | | | - | - | - | | | |
| | | | | LOCAL FUND Total | | | | 402,019.08 | 301,286.75 | 100,732.33 | - | (17,470.45) | 17,470.45 |
| | | | 0100 Total | | | | | 402,019.08 | 301,286.75 | 100,732.33 | - | (17,470.45) | 17,470.45 |
| | | 0400 | | PRIVATE GRANT FUND | NPS | 0050 | SUBSIDIES AND TRANSFERS | - | - | - | | | |
| | | | | | NPS Total | | | - | - | - | | | |
| | | | | PRIVATE GRANT FUND Total | | | | - | - | - | | | |
| | | | 0400 Total | | | | | - | - | - | | | |
| | | 0700 | | OPERATING INTRA-DISTRICT FUNDS | PS | 0011 | REGULAR PAY - CONT FULL TIME | 116,145.00 | 111,245.63 | 4,899.37 | - | (6,274.61) | 6,274.61 |
| | | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | 31,243.01 | 20,772.98 | 10,470.03 | - | (1,155.01) | 1,155.01 |
| | | | | | PS Total | | | 147,388.01 | 132,018.61 | 15,369.40 | - | (7,429.62) | 7,429.62 |
| | | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 147,388.01 | 132,018.61 | 15,369.40 | - | (7,429.62) | 7,429.62 |

ACTIVITY LEVEL

| Program Code 3 | Program Code 3 Title | Approp Fund | Approp Fund Title | PS/NPS | Comp Source Group | Comp Source Group Title | Fiscal Year Values 2021 Sum of Budget | Sum of Actuals | Sum of Variance | 2022 Sum of Budget | Sum of Actuals | Sum of Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 0700 Total | | | | | 147,388.01 | 132,018.61 | 15,369.40 | - | (7,429.62) | 7,429.62 |
| | RESIDENTIAL SUPPORT SRVS/CARE CONTINUITY | Total | | | | | 549,407.09 | 433,305.36 | 116,101.73 | - | (24,900.07) | 24,900.07 |
| 6950 Total | | | | | | | 549,407.09 | 433,305.36 | 116,101.73 | - | (24,900.07) | 24,900.07 |
| 6960 | IMPLEMENTATION OF DRUG TREATMENT CHOICE | 0100 | LOCAL FUND | NPS | 0050 | SUBSIDIES AND TRANSFERS | 12,453,056.87 | 10,544,701.82 | 1,908,355.05 | | | |
| | | | | NPS Total | | | 12,453,056.87 | 10,544,701.82 | 1,908,355.05 | | | |
| | | | LOCAL FUND Total | | | | 12,453,056.87 | 10,544,701.82 | 1,908,355.05 | | | |
| | | 0100 Total | | | | | 12,453,056.87 | 10,544,701.82 | 1,908,355.05 | | | |
| | | 0400 | PRIVATE GRANT FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | 22,116.00 | 22,116.00 | - | | | |
| | | | | NPS Total | | | 22,116.00 | 22,116.00 | - | | | |
| | | | PRIVATE GRANT FUND Total | | | | 22,116.00 | 22,116.00 | - | | | |
| | | 0400 Total | | | | | 22,116.00 | 22,116.00 | - | | | |
| | IMPLEMENTATION OF DRUG TREATMENT CHOICE | Total | | | | | 12,475,172.87 | 10,566,817.82 | 1,908,355.05 | | | |
| 6960 Total | | | | | | | 12,475,172.87 | 10,566,817.82 | 1,908,355.05 | | | |
| 6970 | BEHAVIORAL HEALTH REHAB | 0100 | LOCAL FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | - | (23,712.46) | 23,712.46 | | | |
| | | | | | 0050 | SUBSIDIES AND TRANSFERS | 8,298,942.31 | 7,117,262.00 | 1,181,680.31 | | | |
| | | | | NPS Total | | | 8,298,942.31 | 7,093,549.54 | 1,205,392.77 | | | |
| | | | LOCAL FUND Total | | | | 8,298,942.31 | 7,093,549.54 | 1,205,392.77 | | | |
| | | 0100 Total | | | | | 8,298,942.31 | 7,093,549.54 | 1,205,392.77 | | | |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | NPS | 0050 | SUBSIDIES AND TRANSFERS | 1,312,000.00 | 2,988,000.00 | (1,676,000.00) | | | |
| | | | | NPS Total | | | 1,312,000.00 | 2,988,000.00 | (1,676,000.00) | | | |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 1,312,000.00 | 2,988,000.00 | (1,676,000.00) | | | |
| | | 0700 Total | | | | | 1,312,000.00 | 2,988,000.00 | (1,676,000.00) | | | |
| | BEHAVIORAL HEALTH REHAB | Total | | | | | 9,610,942.31 | 10,081,549.54 | (470,607.23) | | | |
| 6970 Total | | | | | | | 9,610,942.31 | 10,081,549.54 | (470,607.23) | | | |
| 6980 | BEHAVIORAL HEALTH REHAB- LOCAL MATCH | 0100 | LOCAL FUND | NPS | 0050 | SUBSIDIES AND TRANSFERS | 18,342,652.74 | 21,734,855.13 | (3,392,202.39) | | | |
| | | | | NPS Total | | | 18,342,652.74 | 21,734,855.13 | (3,392,202.39) | | | |
| | | | LOCAL FUND Total | | | | 18,342,652.74 | 21,734,855.13 | (3,392,202.39) | | | |
| | | 0100 Total | | | | | 18,342,652.74 | 21,734,855.13 | (3,392,202.39) | | | |
| | | 0700 | OPERATING INTRA-DISTRICT FUNDS | NPS | 0050 | SUBSIDIES AND TRANSFERS | 2,988,000.00 | 1,312,000.00 | 1,676,000.00 | | | |
| | | | | NPS Total | | | 2,988,000.00 | 1,312,000.00 | 1,676,000.00 | | | |
| | | | OPERATING INTRA-DISTRICT FUNDS Total | | | | 2,988,000.00 | 1,312,000.00 | 1,676,000.00 | | | |
| | | 0700 Total | | | | | 2,988,000.00 | 1,312,000.00 | 1,676,000.00 | | | |
| | BEHAVIORAL HEALTH REHAB- LOCAL MATCH | Total | | | | | 21,330,652.74 | 23,046,855.13 | (1,716,202.39) | | | |
| 6980 Total | | | | | | | 21,330,652.74 | 23,046,855.13 | (1,716,202.39) | | | |
| 9221 | DEPARTMENT OF MENTAL HEALTH - PCARD | 0100 | LOCAL FUND | NPS | 0040 | OTHER SERVICES AND CHARGES | - | - | - | - | 44,285.27 | (22,341.00) |
| | | | | NPS Total | | | - | - | - | - | 44,285.27 | (22,341.00) |
| | | | LOCAL FUND Total | | | | - | - | - | - | 44,285.27 | (22,341.00) |
| | | 0100 Total | | | | | - | - | - | - | 44,285.27 | (22,341.00) |
| | DEPARTMENT OF MENTAL HEALTH - PCARD | Total | | | | | - | - | - | - | 44,285.27 | (22,341.00) |
| 9221 Total | | | | | | | - | - | - | - | 44,285.27 | (22,341.00) |
| (blank) | (blank) | 0100 | LOCAL FUND | PS | 0011 | REGULAR PAY - CONT FULL TIME | - | 4,447.57 | (4,447.57) | - | (4,447.57) | 4,447.57 |
| | | | | | 0012 | REGULAR PAY - OTHER | - | (4,834.26) | 4,834.26 | | | |
| | | | | | 0014 | FRINGE BENEFITS - CURR PERSONN | - | 386.69 | (386.69) | - | (386.69) | 386.69 |
| | | | | PS Total | | | - | (0.00) | 0.00 | - | (4,834.26) | 4,834.26 |
| | | | LOCAL FUND Total | | | | - | (0.00) | 0.00 | - | (4,834.26) | 4,834.26 |
| | | 0100 Total | | | | | - | (0.00) | 0.00 | - | (4,834.26) | 4,834.26 |
| | | 0200 | FEDERAL GRANT FUND | PS | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (10,731.52) | 10,731.52 | | | |
| | | | | PS Total | | | - | (10,731.52) | 10,731.52 | | | |
| | | | FEDERAL GRANT FUND Total | | | | - | (10,731.52) | 10,731.52 | | | |
| | | 0200 Total | | | | | - | (10,731.52) | 10,731.52 | | | |
| | | 0250 | FEDERAL MEDICAID PAYMENTS | PS | 0014 | FRINGE BENEFITS - CURR PERSONN | - | (663.33) | 663.33 | | | |
| | | | | PS Total | | | - | (663.33) | 663.33 | | | |
| | | | FEDERAL MEDICAID PAYMENTS Total | | | | - | (663.33) | 663.33 | | | |
| | | 0250 Total | | | | | - | (663.33) | 663.33 | | | |
| | (blank) Total | | | | | | - | (11,394.85) | 11,394.85 | - | (4,834.26) | 4,834.26 |
| (blank) Total | | | | | | | - | (11,394.85) | 11,394.85 | - | (4,834.26) | 4,834.26 |
| Grand Total | | | | | | | ########## | ########## | 2,850,264.91 | ########## | 57,937,249.16 | 216,744,604.26 |

*Q2.  Please provide the following budget information for DBH, including the amount budgeted and actually spent for FY21 and to date in FY22. In addition, please describe any variance between the amount budgeted and actually spent for FY21 and to date in FY22:*

> *a.  At the agency level, please provide information broken out by source of funds and by Comptroller Source Group and Comptroller Object;*
>
> *b.  At the program level, please provide the information broken out by source of funds and by Comptroller Source Group and Comptroller Object; and,*
>
> *c.  At the activity level, please provide the information broken out by source of funds and by Comptroller Source Group.*

**DBH Response**

*Question 3: Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY 21 and to date in FY 22. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

| PROGRAM/PCA  FY 2021 | Source of Funds | Org Code | Prg Code | Intra-District Amount | Partner Agency | Comments/Description |
|---|---|---|---|---|---|---|
| **Transmitted Funds (Buyer)** | | | | | | |
| Behavioral Health Administration (1800), Office of Administrative Operations (1091); Saint Elizabeth's Hospital (3800), Security and Safety (3860) | Local | 1800/3800 | 1091/3860 | $ 139,677.62 | Department of General Services | Collaboration & coordination of resources, services, & expertise to better assist TANF customers who need to address and overcome mental health related barriers and assist customers engaging in work activities. |
| Saint Elizabeth's Hospital (3800); Office of Clinical and Medical Services (3810) | Local | 3800 | 3810 | $ 3,659.04 | Office of the Chief Financial Officer | Armored car service provider to transport district funds from collection points specified by the Buyer Agency to various financial institutions. |
| Behavioral Health Administration (1800); Personnel (1010), Training and Employee Development (1015), Labor Relations (1017), Legal Services (1088) | Local | 1800 | 1010/1015/ 1017/1088 | $ 93,548.02 | Department of Human Resources | DCHR to provide employment screening services. |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 311,532.00 | Department of Employment Services | FY21 Long Live DC Initiative |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 115,248.24 | Metropolitan Police Department | Naloxone Kit |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 153,495.00 | Fire and Emergency Medical Services | Annual subscriptions for each hospital to participate in the Health Data Exchange |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 2,232,289.00 | Department of Corrections | SOR2 for Healthcare |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 1,341,078.00 | Department of Corrections | SOR1 for Healthcare and Ready Center |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 171,853.28 | Office of Victim Services and Justice Grants | SAMSHA State Opioid Response |
| Community Services (6900); Prevention and Early Intervention-School Mental Health (6912) | Federal | 6900 | 6912 | $ 141,041.23 | District of Columbia Public Schools | Employ an Expansion Outreach Manager to expand school-based behavioral health services. |
| Community Services (6900); Office of Community Services (6905) | Local | 6900 | 6905 | $ 135,642.12 | Office of the State Superintendent | Annual salary and benefits of a School Behavioral Health Outreach Manager. |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 31,283.75 | Department of Parks and Recreation | Assist in promoting the Chuck Brown Day |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 627,803.00 | Department of Health | To increase the access to MAT |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 5,240,567.00 | Department of Health | To maintain an inventory of buprenorphine medication |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 3,691,431.00 | Department of Health | To maintain an inventory of buprenorphine medication |
| (HGO)-Oversight and Support(2100); Agency Oversight and Support(2010) | Local | 2100 | 2010 | $ 20,000.00 | Department of Human Services | Ensure that all eligible ICH members receive stipends. |
| Community Services (6900); Implementation of Drug Treatment Choice (6960) | Local | 6900 | 6960 | $ 338,599.26 | Department of Health Care Finance | ASARS benefit for enrollees in the District Medicaid Program |
| Community Services (6900); Behavioral Health Rehab (6980) | Local | 6900 | 6980 | $ 1,221,794.88 | Department of Health Care Finance | To integrate mental and physical health care services for Medicaid beneficiaries with severe mental illness through Health Home model. |
| Community Services (6900); Behavioral Health Rehab (6980) | Local | 6900 | 6980 | $ 29,844,252.71 | Department of Health Care Finance | To expand and improve access to community based rehab health services and implement certification standards. |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 700,965.00 | Department of Health Care Finance | To award three grants to support the development of pilot programs to utilize telehealth to increase access to MAT. |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 429,549.06 | Department of Human Services | On-going partnership to serve District Residents/collaboration under the D.C. Opioid Response Initiative. |
| Community Services (6900); Specialty Care-New Initiatives (6922) | Federal | 6900 | 6922 | $ 188,000.00 | Department of For-Hire Vehicles | OUD transportation "My rides" program MOU with DFHV and DBH. |
| CMHS Capital Project (8900) ;Facility Upgrades (8920) | Federal | 8900 | 8920 | $ 239,682.01 | Department of the Chief Technology Officer | Covers the professional service and equipment costs required to upgrade the network infrastructure at 821 Howard Road, SE-Option Year 1. |
| Behavioral Health Authority (1800); Office of Administrative Operations (1091) | Local | 1800 | 1091 | $ 26,590.71 | Office of Unified Communications | Office of Unified Communications/Radio Custom Support Services |
| | | | | | | |
| | | | | | | |
| | **Total** | | | $ 47,439,581.93 | | |

*Question 3: Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY 21 and to date in FY 22.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

| PROGRAM/PCA  FY 2021 | Source of Funds | Org Code | Prg Code | Intra-District Amount | Partner Agency | Comments/Description | Advance: Yes/No |
|---|---|---|---|---|---|---|---|
| **Received Funds (Seller)** | | | | | | | |
| Community Services (6900); Prevention and Early Intervention-Early Childhood (6911) | Intra-District | 6900 | 6911 | $ 831,007.00 | Office of the State Superintendent of Education | Pre-K Enhancement and Expansion program to improve outcomes for young children by providing high quality development services. | |
| Community Services (6900); Linkage & Assessment-Co-Located Programs (6932) | Intra-District | 6900 | 6932 | $ 220,000.00 | Deputy Mayor of Planning and Development | Co-location of two DBH staff (NCIBHS/21) | |
| Community Services (6900); Prevention and Early Intervention-School Mental Health (6912) | Intra-District | 6900 | 6912 | $ 517,344.00 | Office of the State Superintendent Education | Supporting implementation of Project DC Project AWARE | |
| Community Services (6900); Behavioral Health Rehab (6980) | Intra-District | 6900 | 6980 | $ 4,300,000.00 | Department of Health Care Finance | To provide MHRS Day Treatment Services | |
| Community Services (6900); Housing Development (6940) | Intra-District | 6900 | 6940 | $ 599,160.03 | Department of Human Services | Collaboration to assist TANF customers with mental health barriers. | |
| Behavioral Health Authority (1800); Office of Administrative Operations (1091) | Intra-District | 1800 | 1091 | $ 5,015,479.00 | Office of Finance & Resource Management | Coronavirus Relief Fund distributed by the United States Treasury Department. | |
| Clinical Services (5800); Assessment & Referral Center (5890) | Intra-District | 5800 | 5890 | $ 108,000.00 | Child and Family Services Administration | To identify a contract monitor within DBH to monitor the contract that staffs the ARC. | |
| Community Services (6900); Linkage & Assessment Center (6930) | Intra-District | 6900 | 6930 | $ 50,000.00 | Child and Family Services Administration | MOU with CFSA for Choice Providers. | |
| Clinical Services (5800); Office of the Chief Financial Officer (5810) | Intra-District | 5800 | 5810 | $ 615,179.29 | Child and Family Services Administration | To support care coordination and planning for Wayne Place Transitional housing facility. | |
| Community Services (6900); Specialty Care-Community Based Services (6921) | Intra-District | 6900 | 6921 | $ 47,135.72 | Child and Family Services Administration | To provide Functional Family Therapy for families that have children with behavioral or emotional problems. | |
| Community Services (6900); Linkage & Assessment | Intra-District | 6900 | 6930 | $ 111,226.55 | Department of Employment Services | Identify and hire a qualified practitioner with appropriate licensure to serve as the on-site practitioner for TEPD participants | |
| Community Services (6900); Prevention & Early Intervention-School Mental Health (6912) | Intra-District | 6900 | 6912 | $ 1,500,000.00 | Office of the State Superintendent of Education | Governor's Emergency Education Relief Fund (GEER) | |
| | **Total** | | | **$ 13,914,531.59** | | | |

*Question 3: Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY 21 and to date in FY 22. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

| PROGRAM/PCA    FY 2022 | Source of Funds | Org Code | Prg Code | Intra-District Amount | Partner Agency | Comments/Description |
|---|---|---|---|---|---|---|
| **Transmitted Funds (Buyer)** | | | | | | |
| St Elizabeth Hospital (3800); Off of Clinical & Medical Services- St. Elizabeth Hospital (3810) | Local | 3800 | 3810 | $ 3,659.24 | Office of the Chief Financial Officer | Dunbar armored car services will transport district funds. |
| Behavioral Health Authority (1800); Personnel (1010), Labor Relations (1017), Financial Management-Agency (1059), Claims Administration (1088), Office of Administration Operations (1091) | Local | 1800 | 1010, 1017, 1050, 1088, 1091 | $ 96,027.36 | Department of Human Resources | DCHR to provide employment screening. |
| Adult/Transitional Youth Services (6500); State Opioid Response Program (6509) | Federal | 6500 | 6509 | $ 4,141,411.00 | Department of Corrections | SOR SUD Units-Healthcare, Ready Center, and CCR Workforce Development. |
| Adult/Transitional Youth Services (6500); State Opioid Response Program (6509) | Federal | 6500 | 6509 | $ 47,135.72 | Child & Family Services Administration | MOU with CFSA for- Functional Family Therapy for families that have children with behavioral or emotional problems. |
| Adult/Transitional Youth Services (6500); State Opioid Response Program (6509) | Federal | 6500 | 6509 | $ 188,000.00 | Department of For-Hire Vehicles | OUD Transportation "My Rides" program |
| | | | | | | |
| | **Total** | | | **$ 4,476,233.32** | | |

*Question 3: Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY 21 and to date in FY 22.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

| PROGRAM/PCA   FY 2020 | Source of Funds | Org Code | Prg Code | Intra-District Amount | Partner Agency | Comments/Description | Advance: Yes/No |
|---|---|---|---|---|---|---|---|
| **Received Funds (Seller)** | | | | | | | |
| Adult/Transitional Youth Services (6500); State Opioid Response Program (6509) | Intra-District | 6500 | 6509 | $   222,453.10 | Department of Employment Services | Identify and hire 2 qualified practioners with the appropriate licensure and experience to service as the on-site qualified practioner for TEPD participants. | |
| Adult/Transitional Youth Services (6500); Co-located Services (6505) | Intra-District | 6500 | 6505 | $   220,000.00 | Deputy Mayor of Planning and Development | Co-location of two DBH staff (NCIBHS/21) | |
| Adult/Transitional Youth Services (6500); Housing Support Services (6507) | Intra-District | 6500 | 6507 | $   471,745.41 | Department of Human Services | Collaboration & coordination of resources, services, & expertise to better assist TANF customers who need to address & overcome mental health related barriers & to assist in customers engaging in work activities. | |
| Adult/Transitional Youth Services (6500); Assessment & Referral Center (6510) | Intra-District | 6500 | 6510 | $   108,000.00 | Child & Family Services Administration | To  identify a Contract Monitor within DBH to monitor the contract that staffs the ARC | |
| Child/Adolescent/Family Services (6600); School Based Behavioral Health Services (6620) | Intra-District | 6600 | 6620 | $   3,198,647.00 | Office of the State Superintendent | Funding for the Coronavirus Response and Relief Supplemental Appropriations | |
| Child/Adolescent/Family Services (6600); School Based Behavioral Health Services (6620) | Intra-District | 6600 | 6620 | $   521,978.00 | Office of the State Superintendent | District of Columbia Project Aware | |
| | | | | | | | |
| | Total | | | $   4,742,823.51 | | | |

*Q3. Please provide a complete accounting of all intra-district transfers received by or transferred from DBH during FY21 and to date in FY22.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the transfer affected.*

**DBH Response**

See Attachment. Intra-District transfers

Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY21 and to date in FY22. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.

**Reprogramming's for FY 2021**

| FY2021 Source of Funding | Amount | (Program/PCA) | (Program/PCA) | Purpose |
|---|---|---|---|---|
| Private Donations (8450) | $12,000.00 | St Elizabeth's Hospital (3800); Fiscal & Support Services (3820) | St Elizabeth's Hospital (3800) Fiscal & Support Services (3820) | To properly align the budget to the correct index and org code. |
| Federal (8200) | $75,000.00 | Systems Transformation (5900); Strategic Management & Policy (5920) | Systems Transformation (5900); Strategic Management & Policy (5920) | To align the budget with planned allocations per the Mental Health Block Grant application. |
| Federal (8200) | $6,574,690.84 | Community Services (6900); Specialty Care - New Initiatives (6922); DBH Financial Operations (100F); DBH Budget Operations (110F) | Community Services (6900); Specialty Care - New Initiatives (6922); DBH Financial Operations (100F); DBH Budget Operations (110F) | To align budget authority with the earmarks of the grant award's supplemental funding agreement. |
| Federal (8200) | $86,000.00 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To ensure the budget is aligned with the program's planned allocations. |
| Federal (8200) | $122,931.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920); DBH Financial Operations (100F); DBH Budget Operations (110F); Agency Management (1000); Information Technology (1040) | To properly realign funds with the projected expenditures for the remainder of the fiscal year. |
| Federal (8200) | $15,985.44 | Community Services (6900); Specialty Care - New Initiatives (6922) | Community Services (6900); Specialty Care - New Initiatives (6922) | To support ongoing personnel costs and needs within speciality care services. |
| Federal (8200) | $11,480.42 | Clinical Services Division (5800); Office of the Chief Clinical Officer (5810) | Clinical Services Division (5800); Office of the Chief Clinical Officer (5810) | To align the budget in accordance with the programs planned equipment expenditures. |
| Federal (8200) | $27,000.51 | DBH Financial Operations (100F); DBH Budget Operations (110F) | Agency Management (1000); Information Technology (1040) | To support ongoing costs and needs within the Agency Management Adminstration. |
| Federal (8200) | $3,000.00 | DBH Financial Operations (100F); DBH Budget Operations (110F) | Agency Management (1000); Information Technology (1040) | To ensure the budget is aligned with the program's planned expenditures. |
| Federal (8200) | $33,408.00 | Clinical Services Division (5800); Office of the Chief Clinical Officer (5810) | Clinical Services Division (5800); Office of the Chief Clinical Officer (5810) | To align the budget with the projected expenditures for needed medical supplies. |

Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY21 and to date in FY22. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.

### Reprogramming's for FY 2021

| FY2021 Source of Funding | Amount | From(Program/PCA) | To (Program/PCA) | Purpose |
|---|---|---|---|---|
| Federal (8200) | $4,000.00 | Systems Transformation (5900); Strategic Management & Policy (5920) | Systems Transformation (5900); Strategic Management & Policy (5920) | To align the budget with planned allocations per the Mental Health Block Grant application. |
| Federal (8200) | $82,396.65 | Clinical Services Division (5800); Office of the Chief Clinical Officer (5810) | Clinical Services Division (5800); Office of the Chief Clinical Officer (5810) | To align the budget with program's planned expenditures for the Crisis Counseling Assistance & Training Program. |
| Federal (8200) | $3,275,439.00 | Community Services (6900); Specialty Care - New Initiatives (6922); DBH Financial Operations (100F); DBH Budget Operations (110F) | Community Services (6900); Specialty Care - New Initiatives (6922); Agency Management (1000); Financial Management (1050) | To realign the fiscal year 2021 budget to the appropriate cost centers to support ongoing needs and support in the Specialty Care Division. |
| Federal (8200) | $4,000.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To support ongoing costs and needs within the Specialty Care Division. |
| Federal (8200) | $187,269.00 | Community Services (6900); Specialty Care (6920) | Community Services (6900); Specialty Care (6920) | To align the DC City Grant budget to meet the expectations and deliverables indicated in the federal grant award. |
| Intra-District (0763) | $1,700.00 | Community Services (6900); Linkage & Assessment (6930) | Community Services (6900); Linkage & Assessment (6930) | To support training required as outlined in the Memorandum of Understanding (MOU). |
| Local (0100) | $2,970,352.86 | Community Services (6900); Prevention & Early Intervention-Early Childhood (6911); Prevention & Early Intervention-School Mental Health (6912); Clinical Services Division (5800); Foresenics (5880) | Community Services (6900); Office of Community Services (6905), Prevention & Early Intervention-School Mental Health (6912), Implentation of Drug Treatment Choice (6960); Clinical Services Division (5800); Foresenics (5880) | To support expansion of school-based behavioral health services, and to purchase necessary equipment. |
|  |  |  |  |  |

Question 4. Please provide a complete accounting of all reprogramming's received by or transferred from DBH in FY21 and to date in FY22. For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.

**Reprogramming's for FY 2022 to date.**

| FY2022 Source of Funding | Amount | From(Program/PCA) | To (Program/PCA) | Purpose |
|---|---|---|---|---|
| Local (0100) | $24,840,909.36 | Adult/Transitional Youth Services (6500); Assessment and Referral Center (6510); Specialty Services (6512); Child/Adolescent/Family Services (6600),SUD Prevention & Treatment (6615), School Based Behavioral Health Services (6620), Early Childhood Services (6635) | Adult/Transitional Youth Services (6500); Specialty Services (6512), Substance Use Disorder Treatment Services (6513); Behavioral Health Rehab. - Local Match (6515); Child/Adolescent/Family Services (6600), Crisis Services (6625), Early Childhood Services (6635); Clinical Services Division (5800); Comprehensive Psych - CPEP (5840) | To align with the newly established programs for substance use disorder treatment services, Sobering and Stablization program, Healthy Futures Program, CPEP Expansion, and MPD Crisis Response Training. |
| ARPA (8157) | $1,148,001.00 | St Elizabeth's Hospital (3800); Transportation and Grounds (3865) | Adult/Transitional Youth Services (6500), Specialty Services (6512) | To align budget with the newly established programs for Specialty Care. |
| ARPA (8158) | $6,392,785.00 | St Elizabeth's Hospital (3800); Transportation and Grounds (3865) | Agency Management (1000); Property Management (1030), Information Technology (1040), Adult/Transitional Youth Services (6500),Community Response Team (6508), Access Helpline (6511); Child/Adolescent/Family Services (6600), Child/Adolescent/Family Services Administration (6601), School Based Behavioral Health Services (6620), Early Childhood Services (6635) | To align budget with the newly established programs for Healthy Futures Program, CPEP Expansion, School Based, Early Childhood Services, and MPD Crisis Response Training. |
| Federal (8200) | $400,000.00 | Adult/Transitional Youth Services (6500); State Opioid Response Program (6509) | Adult/Transitional Youth Services (6500); State Opioid Response Program (6509) | To align budget authority with the earmarks of the grant award's supplemental funding agreement. |
| Intra-District (0700) | $82,326.00 | Adult/Transitional Youth Services (6500); State Opioid Response Program (6509) | Adult/Transitional Youth Services (6500); State Opioid Response Program (6509) | To align budget authority with the earmarks of the grant award's supplemental funding agreement. |

*Q4.  Please provide a complete accounting of all reprogramings received by or transferred from DBH in FY21 and to date in FY22.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within DBH the reprogramming affected.*

**DBH Response**

See Attachment. Reprogrammings

**Question #5 - SPECIAL PURPOSE REVENUE**

Provide a complete accounting of all DBH's Special Purpose Revenue Funds for FY21 and to date FY22.

Agency Name (Code): Department of Behavioral Health (RM0)

| REVENUE SOURCE NAME | CODE | SOURCE OF FUNDING | Program/ Activity | PROGRAM DESCRIPTION | FY 2021 GENERATED FUNDS | FY 2021 EXPENDITURES | FY 2022 BUDGET | FY 2022 COLLECTIONS TO DATE | FY 2022 EXPENDITURES/TO DATE | Purpose of the expenditures |
|---|---|---|---|---|---|---|---|---|---|---|
| Federal Beneficiary Reimbursement 0610 | D.C. Code 44-908/ D.C. Code 1-204.24d | Reimbursement | St. Elizabeths Hospital/Various Activities | Forensic Patients legally incarcerated by the court system. Funds are used to reimburse the District for services provided to patients in care. | 2,442,495 | 2,069,349 | 2,097,127 | 172,619 | 502,640 | To support Personnel Services cost associated with patient care. |
| Federal Beneficiary Reimbursement 0610 | D.C. Code 44-908/ D.C. Code 1-204.24d | Reimbursement | System Transformation/Information Systems | IT Staff support Forensic Patients legally incarcerated by the court system. | 0 | 0 | 0 | 0 | 0 | |
| Federal Beneficiary Reimbursement 0610 | D.C. Code 44-908/ D.C. Code 1-204.24d | Reimbursement | Information Technology | IT Staff support. | 0 | 55,972 | 47,835 | 0 | 14,340 | To offset Personnel Services cost associated with IT functions. |
| Self Pay & 3rd Party Reimbursement 0640 | 7-1131.04./DC Code 2-586/DC Code 24-501 | Reimbursement | St. Elizabeths Hospital/Various Activities | Self Pay & 3rd Party Reimbursement. | | 69,947 | 100,000 | 0 | 0 | To offset Professional Services cost associated with patient care. |
| Self Pay & 3rd Party Reimbursement 0640 | 7-1131.04./DC Code 2-586/DC Code 24-501 | Reimbursement | Community Services/Prevention and Early Intervention | Self Pay & 3rd Party Reimbursement. | 469,947 | 400,000 | 400,000 | 42,453 | 50,000 | To offset Professional Services cost associated with patient care. |
| DBH Enterprise Fund Establishment 0641 | D.C Code 1-325.281 | Reimbursement | System Transformation/Training Institute | Collection of fees charged for training and Continuing Education Units | 7,661 | 4,920 | 25,000 | 0 | 0 | To offset Professional Services cost associated with DBH Training Institute. |
| | | | | **TOTAL** | **2,920,104** | **2,600,188** | **2,669,962** | **215,072** | **566,981** | |

*Q5.  Please provide a complete accounting of all of DBH's Special Purpose Revenue Funds for FY21 and to date in FY22. Please include the following:*

    *a.  Revenue source and code;*

    *b.  Source of the revenue for each special purpose revenue fund (i.e. license fee, civil fine);*

    *c.  Total amount of funds generated by each source or program in FY21 and to date in FY22;*

    *d.  DBH activity that the revenue in each special purpose revenue source fund supports; and,*

    *e.  The FY21 and to date FY22 expenditure of funds, including purpose of expenditure.*

**DBH Response**

See Attachment. Special Purpose Revenue

| PROVIDER | DATE RECEIVED | COMPLAINT TYPE | TYPE OF REPORT | SUMMARY NATURE OF COMPLAINT OR ALLEGATIONS | CONCLUSIONS | RECOMMENDATIONS/ OUTCOMES | DATE COMPLETE |
|---|---|---|---|---|---|---|---|
| Comprehensive Psychiatric Emergency Program (CPEP) | 9/9/21 | MUI | Major Investigation | Violation of Nurse Practice/Abuse and Neglect of Patient | Memo Completed | 1. Upon receipt of this report CPEP administrative staff should develop a standard operating procedures that ensures all CPEP staff are available for investigations conducted by the Accountability Administration  2. Copy of the investigative report should be forwarded CPEP Director, Morgan Medlock, and DBH Director of Certification, Christine Phillips | 9/30/21 |
| Innovative Life Solutions (ILS) | 05/12/21 | MUI | Major Investigation | Physical Assault | Inconclusive/Partially Substantiated | Within in 30 days of receiving this report ILS should retrain DSP, staff on DBH Policies 480.1 §5(b) Reporting Major Unusual Incidents (MUIs) and Unusual Incidents (UIs) timely and 482.1 Protecting Consumers from Abuse, Neglect or Exploitation. A copy of the training materials and sign-in sheet should be forwarded to the Accountability Administration.  2. Copy of the investigative report should be forwarded ILS Residential Director, Abul Sesay and DBH Director of Licensure, Sheila Kelly. | 09/10/21 |
| Sunshine Home Care Community Residential | 06/09/21 | MUI | Major Investigation | Physical Assault | Memo Completed | | |
| Kinara Health and Home Care Services | 12/21/20 | MUI | Major Investigation | Harrassment | Memo Completed | | 10/08/21 |
| Federal City Recovery | 11/13/20 | MUI | Major Investigation | Patient Abuse and Neglect | Memo Completed | | 08/18/21 |
| DBH Community Response Team (CRT) | 10/15/20 | MUI | Major Investigation | Abuse of Services | Unsubstantiated, Partially Substantiated | Within 30 days of receipt of this report, all CRT staff should be trained on Chapter 80 Rule Stabilization Providers, since it is now the policy for | 4/29/21 |
| MBI Health Services, LLC | 09/25/20 | MUI | Major Investigation | Sexual Harrassment | Memo Completed | | 08/18/21 |
| CPEP | 4/24/21 | MUI | Major Investigation | Patient Abuse | Substantiated | Referred to Human Resources | 7/21/21 |
| CPEP | 5/24/21 | MUI | Major Investigation | Patient Abuse/Vehicular Assault | Substantiated | Referred to Human Resources | 7/9/21 |
| CPEP | 5/30/21 | MUI | Major Investigation | Physical and Verbal Abuse | Substantiated | Referred to Human Resources | 8/12/21 |
| CPEP | 7/22/21 | MUI | Major Investigation | Patient Abuse | Substantiated | Referred to Human Resources | 10/4/21 |
| Saint Elizabeths Hospital | 8/31/21 | MUI | Major Investigation | Elopement (Neglect) | Substantiated | Referred to Human Resources | 11/23/21 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

*Q6. Please provide copies of any investigations, reviews or program/fiscal audits completed on programs and activities within DBH during FY21 and to date in FY22. This includes any reports of the DC Auditor, the Office of the Inspector General, or the Office of Accountability. In addition, please provide a narrative explanation of steps taken to address any issues raised by the program/fiscal audits. Please include the following:*

**DBH Response**

**OFFICE OF ACCOUNTABILITY**
**Claims Audits**
The Accountability Administration conducts audits of paid claims for each fiscal year for every certified provider.  The auditing process is retrospective and generally crosses fiscal years. Audits are conducted annually for all Mental Health Rehabilitation Services (MHRS), Adult Substance Abuse Rehabilitative Services (ASARS), and Health Homes providers on a sample universe which includes all paid claims.  All audit samples are random, statistically valid, and generated using RAT-STATS, a tool developed for this purpose by the Federal government.

In addition, focused audits are conducted for a variety of reasons and the sample universe may be tailored to the reason for the audit.  Focused audit samples may be generated using methods appropriate to the purpose of the audit. The corrective action plan section below explains what happens in response to audits and reviews by the Accountability Administration.

In FY21 and to date in FY22, the following audits and audit activities were conducted:

- 24 focused audits for FY21 MHRS claims
- 16 focused audits for FY21 SUD claims
- 12 annual audits for Supported Employment CY20 and CY21 claims
- 5 annual audits for Health Homes FY21 claims

Two trainings were provided to the provider network during FY21 (as well as a session for DBH staff) on the DBH claims audit process. During FY21, 30 Claims Review Committees (CRCs) held that reviewed 272 claims. Every CRC included provider participation. (The Claims Review Committee reviews and evaluates failed claims about which the provider and DBH disagree.)

Below lists the current recoupment amount for Medicaid and Local funds. Claims Review Committees are conducted on a rolling, as needed basis.

Current Value on FY19, FY20 and partial FY21 MHRS recoupment to date:

| | |
|---|---|
| Medicaid | $61,777.40 |
| Local | $627.56 |
| Total | $62,404.96 |

Appeals for FY21 Recoupments:
Two appeals have been submitted to date and will be submitted to the Director.

Audits for FY21 Free Standing Mental Health claims are scheduled for February 2022 and FY21 claims auditsare scheduled to begin in April 2022. All providers with an FY21 fail rate of 40% and greater will be audited. All substance use disorder (SUD) providers will be audited. Preliminary audit results are anticipated to be completed by the end of September 2022.

**Corrective Action Plans**

The Accountability Administration requires providers to submit Corrective Action Plans (CAPs) for compliance and quality deficiencies identified during claim audits or during other routine monitoring. Statements of Deficiencies (SOD) are issued to Mental Health Community Residence Facility (MHCRF) operators for failure to comply with licensure regulations. SODs are also issued for failure to comply with DBH certification regulations. Each provider is assigned a primary accountability staff persons who collaboratively monitor CAPs and SODs. Accountability is available to provide training on compliance planning and proper claiming. This training is developed and modified to address specific issues identified during Claim Audits. Information from audits and other reviews is also used to inform the overall technical assistance plan for providers which includes the technical assistance provided by DBH.

**Investigations**

Investigatory reports may include recommendations for policy changes, training, corrective action plans, or disciplinary action when allegations are substantiated. The list of investigatory reports is attached.

*Q7. Did DBH meet the objectives set forth in the performance plan for FY21? Please provide a narrative description of what actions DBH undertook to meet the key performance indicators.  For any performance indicators that were not met, if any, please provide a narrative description for why they were not met and any remedial actions taken.  In addition, please provide a narrative description of the performance objectives for FY22 and what actions DBH has undertaken to meet them to date.*

**DBH Response**

Please see Attachment 1 of 2. FY 21 Performance Plan KPI Report and Attachment 2 of 2.  FY 22 KPI Report.

**Capital LTD Activity and FY2022 - 2027 Planned Allotments - All Capital Funds (excl Int**

*(Project/Fund Detail with Lifetime Balances Only)*

Source: SOAR/BFA

**(Report Date: Jan 11, 2022)**

**RM0-DEPARTMENT OF BEHAVIORAL HEALTH**

| Project No | Project Title | Implementing Agency |
|---|---|---|
| DB202C | THERMAL DOCKING STATION SYSTEM | RM0 |
| DB203C | INTERCOM SYSTEM | RM0 |
| HX703C | DBH FACILITIES SMALL CAPITAL IMPROVEMENT | RM0 |
| HX805C | VEHICLE ACQUISITION-DBH | KT0 |
| HX990C | FACILITY UPGRADES | RM0 |
| HX992C | ST. ELIZABETHS HOSPITAL EHR CAP IMPROVME | RM0 |
| HX993C | PHARMACY MEDICINE DISPENSING UPGRADE (PY | RM0 |
| HX995C | ELECTRONIC HEALTH RECORD SYSTEMS REPLACE | RM0 |
| HX997C | FLOORING REPLACEMENT | RM0 |
| HX998C | HVAC MODERNIZATION AT SAINT ELIZABETHS H | RM0 |
| **Grand Total** | | |

**tra-District funds) - Question 8**

| Approp Fund | Agy Fund | Lifetime Budget | LTD Allotments |
|---|---|---:|---:|
| 0300 | 0300 | 500,000 | 500,000 |
| | 0304 | 1,255,000 | 1,255,000 |
| 0300 | 0300 | 300,000 | 300,000 |
| | 0304 | 355,000 | 355,000 |
| 0300 | 0300 | 2,758,767 | 2,758,767 |
| 0300 | 0304 | 360,000 | 360,000 |
| 0300 | 0300 | 9,255,383 | 8,105,383 |
| 0300 | 0300 | 2,600,000 | 2,600,000 |
| 0300 | 0300 | 1,038,000 | 1,038,000 |
| 0300 | 0300 | 500,000 | 500,000 |
| 0300 | 0300 | 1,085,000 | 1,085,000 |
| 0300 | 0300 | 1,825,000 | 1,825,000 |
| | | **21,832,150** | **20,682,150** |

| Expenditures through FY 2018 | Allotments  in FY 2019 | Expenditures in FY 2019 |
|---:|---:|---:|
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 1,527,521 | 0 | 333,942 |
| 0 | 0 | 329,839 |
| 0 | 835,000 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 0 | 1,085,000 | 0 |
| 0 | 500,000 | 0 |
| **1,527,521** | **2,420,000** | **663,781** |

| Allotments  in FY 2020 | Expenditures in FY 2020 | Allotments  in FY 2021 |
|---:|---:|---:|
| 500,000 | 0 | 0 |
| 0 | 0 | 1,255,000 |
| 300,000 | 0 | 0 |
| 0 | 0 | 355,000 |
| 0 | 0 | 500,000 |
| 0 | 0 | 0 |
| 350,000 | 0 | 3,000,000 |
| 0 | 0 | 2,600,000 |
| 1,038,000 | 63,760 | 0 |
| 0 | 0 | 0 |
| 0 | 0 | 0 |
| 1,325,000 | 0 | 0 |
| **3,513,000** | **63,760** | **7,710,000** |

| Expenditures in FY 2021 | LTD Expenditures | Unspent Allotments | Encumbrances |
|---:|---:|---:|---:|
| 0 | 0 | 500,000 | 0 |
| 0 | 0 | 1,255,000 | 0 |
| 0 | 0 | 300,000 | 0 |
| 0 | 0 | 355,000 | 0 |
| 0 | 1,861,463 | 897,304 | 5,900 |
| 0 | 329,839 | 30,161 | 0 |
| 195,676 | 195,676 | 7,909,707 | 0 |
| 357,556 | 357,556 | 2,242,444 | 729,404 |
| 0 | 63,760 | 974,240 | 0 |
| 0 | 0 | 500,000 | 0 |
| 0 | 0 | 1,085,000 | 0 |
| 0 | 0 | 1,825,000 | 0 |
| **553,232** | **2,808,294** | **17,873,856** | **735,304** |

| Pre Encumbrances | ID Advances | LifeTime Balance | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| 0 | 0 | 500,000 | 0 | 0 | 0 |
| 0 | 0 | 1,255,000 | 0 | 0 | 0 |
| 0 | 0 | 300,000 | 0 | 0 | 0 |
| 0 | 0 | 355,000 | 0 | 0 | 0 |
| 337,977 | 53,427 | 500,000 | 0 | 0 | 0 |
| 0 | 0 | 30,161 | 0 | 0 | 0 |
| 299,000 | 314,306 | 8,446,401 | 3,920,383 | 1,150,000 | 0 |
| 961,166 | 0 | 551,874 | 0 | 0 | 0 |
| 824,628 | 0 | 149,612 | 0 | 0 | 0 |
| 0 | 0 | 500,000 | 500,000 | 0 | 0 |
| 0 | 921,198 | 163,802 | 0 | 0 | 0 |
| 0 | 491,801 | 1,333,199 | 0 | 0 | 0 |
| **2,422,771** | **1,780,732** | **14,085,049** | **4,420,383** | **1,150,000** | **0** |

| FY 2025 | FY 2026 | FY 2027 | 6-yr Total |
|---|---|---|---|
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 5,070,383 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 500,000 |
| 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 |
| **0** | **0** | **0** | **5,570,383** |

*Q8. Please provide DBH's capital budgets for FY21 and FY22, including amount budgeted and actual dollars spent. In addition, please provide an update on all capital projects undertaken in FY21 and FY22. In your response, please include information regarding the iCAMS project or its successor.*

**DBH Response:**

DBH worked with the Department of Health Care Finance (DHCF) to submit a proposal to the Centers for Medicare and Medicaid (CMS) to obtain American Rescue Plan Act (ARPA) funding that will allow grants to DBH providers to purchase or upgrade their electronic health record (EHR) systems. The proposal to CMS was successful and DHCF, in partnership with DBH, is in the process of reviewing grant applications for a vendor to offer technical assistance for project implementation to providers and to manage the EHR grant process. DHCF hopes to have a vendor in place in early March to begin this process.

Once the vendor is in place, DBH providers can begin the process of purchasing and configuring an EHR with the support of the vendor. When providers demonstrate that they have successfully implemented an EHR, DBH will work with them to migrate off the iCAMS or DataWITS systems. In addition, DBH is in the final stages of a solicitation to hire a consultant that will assist DBH in developing data sets (encounter file) that providers will need to produce through their EHRs to submit to DBH monthly. Providers will be required to implement EHRs that can produce the data sets required by DBH. The receipt of monthly provider encounter files is critical for DBH to manage the District's behavioral health system as the State Authority.

See Attachment 1 of 1. Capital Budget Report

*Q9.     Please provide a list of all FTE positions detailed <u>to</u> DBH, broken down by program and activity for FY21 and to date in FY22.  In addition, please provide which agency the detailed originated from and how long they were detailed to DBH.*

**DBH Response**

During FY 21 and to date in FY 22, the FTE positions listed below were detailed to DBH by the DC Office of Risk Management for a modified duty status as a result of a work-related injury. Currently, two FTEs are detail to DBH.

| PROGRAM CODE | ACTIVITY CODE | EMPLOYEE | AGENCY | START DATE | END DATE | FISCAL YEAR |
|---|---|---|---|---|---|---|
| 3800 | 3850 | Youth Development Representative | DYRS | 12/21/2020 | 1/17/2021 | FY 21 |
| 6500 | 6502 | School bus driver | OSSE | 01/3/2021 | TBD | FY 21/22 |
| 3800 | 3850 | Youth Development Representative | DYRS | 8/10/2021 | 11/18/2021 | FY 21/22 |
| 3800 | 3850 | Youth Development | DYRS | 9/7/2021 | 12/20/2021 | FY 21 |
| 3800 | 3850 | Youth Development Representative | DYRS | 12/15/2021 | TBD | FY 21/22 |

*Q10.    Please provide a list of all FTE positions detailed <u>from</u> DBH to another agency in FY21 and to date in FY22.  In addition, please provide which agency the employee was detailed to and for how long.*

**DBH Response**

To perform critical duties during the public emergency and the public health emergency, the DBH employees listed below were detailed to the Board of Elections to support nonpartisan Election Day activities, the Department of Employment Services to support unemployment claims processing, and to the Department of Human Services for administrative support during FY 21.  No FTES were detailed to date in FY 22 and no employee is currently detailed.

| Employee Name | Title | Agency | Start Date | End Date |
|---|---|---|---|---|
| Alvin Hinkle | Dir., Consumer Affairs | BOE | 10/29/2020 | 10/29/2020 |
| Darryl Ware | Comm. Outreach Spec. | BOE | 10/29/2020 | 10/29/2020 |
| Deborah Evans | Comm. Support Worker | BOE | 10/31/2020 | 11/3/2020 |
| George Gibbs | Motor Vehicle Operator | BOE | 10/27/2020 | 11/4/2020 |
| Leasa Robertson | Program Support Assist. | BOE | 10/31/2020 | 11/3/2020 |
| Leon Barnes | Motor Vehicle Operator | BOE | 10/29/2020 | 10/29/2020 |
| Marvin Drummond | Clerical Support Assist | BOE | 10/29/2020 | 10/29/2020 |
| Valerie McBride | Motor Vehicle Operator | BOE | 10/27/2020 | 11/4/2020 |
|  |  |  |  |  |
| Jacqueline Worsley | Administrative Spec | DOES | 4/14/2020 | 11/13/2020 |
| Johnetta Saunders | Social Worker | DOES | 4/9/2020 | 7/31/2020 |
| Toni Bell | Mental Health Spec | DOES | 4/9/2020 | 2/3/2021 |
| Tonia Gore | Recovery Advocate | DOES | 4/13/2020 | 5/28/2020 |
|  |  |  |  |  |
| Gilliam Richardson | Staff Assistant | DHS | 5/15/2020 | 8/13/2020 |
| JoAnn Spencer | Administrative Officer | DHS | 5/15/2020 | 12/30/2020 |

*Q11. Please provide the following information for all grants awarded to DBH during FY21 and to date in FY22, broken down by DBH program and activity:*

      *a.  Grant Number/Title;*

      *b.  Approved Budget Authority;*

      *c.  Funding source;*

      *d.  Expenditures (including encumbrances and pre-encumbrances);*

      *e.  Purpose of the grant;*

      *f.  Grant deliverables;*

      *g.  Grant outcomes, including grantee performance;*

      *h.  Any corrective actions taken or technical assistance provided;*

      *i.  DBH program and activity supported by the grant; and,*

      *j.  DBH employee responsible for grant deliverables.*

**DBH Response**

Please see Attachment 1 of 1. Grant Report.

*Q12. Please provide a complete accounting of all grant lapses including a detailed statement as to why the lapse occurred and any corrective action taken by DBH. Please provide accounting of any grant carryover from FY19 to FY20 or FY21 to FY22 and a detailed explanation as to why it occurred.*

**DBH Response**

Please see Attachment 1 of 1. Grant Lapse Report

*Q13.   Please provide a list and narrative description of any DBH partnerships with District agencies, if any, in FY21 and to date in FY22 to address employment for DBH consumers.  In addition, please provide the number of individuals served, the types of employment placements available, and the employee/s responsible for coordinating the partnership.*

*a.   Please provide an update on the MOU with the Department of Human Services Economic Security Administration to provide Supported Employment services to individuals with serious mental illness who receive Temporary Assistance for Needy Families (TANF). How many individuals participated in this program in FY21? To date in FY22?*

**DBH Response**

The DBH evidence-based Supported Employment Program supports adult consumers with serious mental or substance use disorders for whom competitive employment has been interrupted or intermittent because of these challenges. Evidence-Based Supported Employment involves obtaining a part-time or full-time job in which a consumer receives supports in a competitive employment setting and in which the consumer earns at least minimum wage.  The program offers the following services: intake, assessment, job development, treatment team coordination, disclosure counseling, benefits counseling and follow-along supports for all participants enrolled in the program.  The Supported Employment program helps individuals obtain competitive employment placements in such areas as service industries, retail, health care, and local and federal government.

DBH has partnerships with the following District agencies to help residents with behavioral health challenges obtain and keep employment with ongoing support.

**Department of Disabilities Services (DDS) Rehabilitation Services Administration (RSA)**

The partnership with RSA supported seven DBH certified Evidence-Based Supported Employment programs in FY21 and six programs to date in FY22. The pay for performance funding model from RSA covers job development, job placement, and job stabilization for shared consumers.

DBH and RSA expanded Evidence-Based Supported Employment services to individuals with substance use disorders in FY21 as part of the 1115 Behavioral Health Transformation Demonstration using the same payment structure for consumers of mental health services.

Supported Employment programs served a total of 525 consumers in FY21 and 129 to date in FY22, 50 of whom (39%) were carry overs from FY21. During FY21, of the 525 consumers served through Supported Employment Programs 267 consumers have received job placement and retention services.  During FY22 to date, of the 129 consumers served, 81 consumers have received job placement and retention services.

During FY21, DBH Supported Employment providers moved from "in person" services to virtual services, and some adopted a hybrid model.  This allowed providers to maintain nearly all services and resulted in a minimal decrease in both the number of participants served (1.3% decrease from

FY20) and participants placed (0.8% decrease from FY20).  In FY21, one Supported Employment provider closed due to financial challenges during COVID-19.

The average earned hourly wage for participants in the program for FY21 was $15.81 and the average hourly wage to date in FY22 is $18.51.

**Department of Employment Services (DOES)**

DBH partners with the Department of Employment Services (DOES) to provide onsite behavioral health support, screening, and referral for DC residents who participate in DOES' Job Readiness Programs, specifically DC Career Connections and Project Empowerment.  This partnership supports behavioral health wellness and positions participants to have a comprehensive and well-rounded experience leading to long term employment success and economic stability.  During FY21, the DBH onsite clinician screened and referred 207 residents.  In FY22 to date, DBH has screened and referred 144 DC residents.

**Office of the Deputy Mayor for Planning and Economic Development (DMPED) - New Communities Initiatives**

DBH partners with the Office of the Deputy Mayor for Planning and Economic Development's (DMPED) New Communities Initiatives (NCI) to support the behavioral health needs of residents living in the following four NCI neighborhoods: Barry Farm, Park Morton, Lincoln Heights/Richardson Dwelling, and Northwest One. DBH provides two onsite mental health clinical specialists to provide behavioral health support, screenings, assessments, and linkage to supports and services to the four NCI's.  Each MHCS staff is dedicated to two NCI sites.

During FY21, the DBH mental health clinical specialists, co-located at the four NCI neighborhood designated sites provided behavioral health support to 40 residents including screening, referral, care coordination, and brief solution focused sessions.  They also provided 234 consultations to the case managers and partners working directly with residents impacted by unaddressed behavioral health needs.  The DBH staff also conducted 22 behavioral health subject matter workshops which yielded participation from 307 residents who live in New Community Initiative neighborhoods.

Community Engagement activities which are typically in person, were primarily provided virtually. Virtual activities included provision of virtual psycho-educational workshops on behavioral health subject matters to engage residents.

In FY22 to date, the DBH staff provided behavioral health support to 16 residents including screening, referral, care coordination, and brief solution focused sessions. The DBH staff provided 41 behavioral health consultations to case managers and partners working with residents of the NCI neighborhoods.  During FY22 to date, four workshops have been conducted serving 45 residents of New Community Initiative neighborhoods.

b. *Please provide an update on the MOU with the Department of Human Services Economic Security Administration to provide Supported Employment services to individuals with serious*

*mental illness who receive Temporary Assistance for Needy Families (TANF). How many individuals participated in this program in FY21? To date in FY22?*

DBH continues its partnership with the Department of Human Services (DHS), Economic Security Administration (ESA) to better assist TANF customers who may face behavioral health challenges. In FY21, services were delivered via telehealth to 191 TANF customers who were screened and referred to providers for ongoing behavioral health services. In FY22 to date, 37 individuals have been screened and referred for ongoing behavioral services.

*Q14.    Please provide a description of all housing programs administered by DBH. For each, please provide the following information:*
1. *Name of the program and services provided;*
2. *Number of individuals served in FY21 and to date in FY22;*
3. *Capacity of the program;*
4. *Performance measures and associated outcomes for each program;*
5. *The name and title of the DBH employee responsible for administering the program;*
6. *The average wait time for a consumer to access housing through the program;*
7. *The number of individuals on waiting lists for the program; and,*
8. *Of those individuals on the wait list, whether any are homeless or in other housing programs.*

**DBH Response**

**DC Local Rent Supplement Program (LRSP)**
The LRSP is administered by the D.C. Housing Authority (DCHA). The program follows the eligibility requirements and rules and regulations of DCHA's federally funded voucher program. DBH makes referrals for initial occupancy and backfill of vacancies for LRSP vouchers attached to newly renovated or developed units funded with DBH capital dollars for 25 years. The LRSP vouchers are attached to single-room occupancy (SRO) units and to apartments.

**Home First Housing Voucher Program**
The locally funded Home First Program provides housing rental vouchers for individuals and families who live in the apartment or home of their choice and sign their own rental leases. Consumers pay thirty percent (30%) of their household income to the landlord toward their rent and the Home First Program subsidizes the balance of the rental amount.

**Supported Residences (Licensed Mental Health Community Residential Facilities):**
- **Intensive Rehabilitative Residence (IRR)**
  An intensive level of care for individuals enrolled in the DBH behavioral health system who have medical issues that put them at risk of needing nursing home care if they do not receive physical health care nursing supports with the appropriate mental health rehabilitation services.

- **Supportive Rehabilitative Residence (SRR)**
  A SRR CRF provides 24-hour, structured housing support for consumers with severe and persistent mental illness who need an intense level of support to live within the community. The specific services offered include: 24-hour awake supervision; assisting the consumer to obtain medical care; providing training and support to assist consumers in mastering activities of daily living; maintaining a medication intake log to ensure that residents take their medications as prescribed; provision of one-to-one support to manage behaviors or perform functional living skills; transportation to doctor's appointments; assistance with money management; and participation in treatment planning, implementation, and follow-up.

- **Supportive Residence (SR)**

A SR CRF provides on-site supervision when residents are in the facility; medication monitoring; maintenance of a medication log to ensure that medication is taken as prescribed; assistance with activities of daily living; arrangement of transportation; monitoring behaviors to ensure consumer safety; and participation in treatment planning, implementation, and follow-up.

**Supported Independent Living Program**
In April 2021, DBH ended contracts to providers for the Supported Independent Living (SIL) Program. It is not a voucher program. The program was created to provide supportive services to consumers. However, services to support independent living are available through the Mental Health Rehabilitation Program (MHRS) and are Medicaid reimbursable. Savings from this program were reallocated in part to fund 20 new rental housing vouchers and 10 new placements in supported residences.

*Number of Individuals Served in FY21 and FY22-1Q* and *Capacity of the program*

**DBH Response**

In FY 22, the capacity of the supported housing program increased by 78 rental housing vouchers and 10 additional placements in supported residences. In FY21, a total of 1,703 people received either a rental or site-based voucher or lived in a supported residence. In addition, the Supported Independent Living Program served 352 people, most of whom also have rental or site-based vouchers. In the FY 22 Q1, a total of 1,583 people received either a site-based or rental voucher or lived in a supported residence.

| Supported Housing Program | FY21 Capacity | Consumers Served FY21 | FY22 Capacity | Consumers Served FY22 Q1 |
|---|---|---|---|---|
| **Site-based Vouchers** | | | | |
| DBH Capital-Funded Housing (LRSP Vouchers) | 196 | 198 | 210 | 196 |
| **Rental Vouchers** | | | | |
| Home First (Vouchers) | 800 | 851 | 878 | 813 |
| **Mental Health Community Residential Facilities (MHCRFs)** | | | | |
| Intensive Residence (IR) | 8 | 12 | 8 | 8 |
| Supportive Rehabilitative Residence (SRR) | 188 | 182 | 188 | 169 |
| Supportive Residence (SR) | 435 | 459 | 445 | 397 |
| **Total Supported Housing** | **1627** | **1703** | **1,729** | **1,583** |
| | | | | |
| Supported Independent Living (SIL) Program services | 375 | 352 | **0** | **0** |

*Performance measures and associated outcomes for each program*

**DBH Response**

DBH Housing Performance Measures /Outcomes for Consumers – FY21

| Quality Domain | Performance Measure | Outcome |
| --- | --- | --- |
| Housing Tenure/Stability | 75% of consumers will maintain community tenure in independent housing for 12 months or longer | 94% of consumers maintained community tenure through September 30, 2021 (FY21) |
| Housing Occupancy | DBH will maintain an 80% or greater occupancy rate within its subsidized housing program | 100% occupancy rate |
| Availability of Housing Services/Supports | 80% of consumers in subsidized housing will enroll with a Core Service Agency (CSA) to receive mental health services and supports | 85% of consumers are enrolled with a CSA |
| CRF Placement Stability | 90% of consumers who remained in the CRF placement for at least 90 days from move-in date, with no psychiatric hospitalizations, incarcerations, crisis bed placements, or involuntary discharges. | 91% of consumers in a CRF placement had no disruptions in placement 90 days from move-in date |

*Name and title of the DBH employee responsible for administering the program*

**DBH Response**

Brandi Gladden, Director – Housing Development Division, is the DBH employee responsible for administering the DBH housing programs.

*The average wait time for a consumer to access housing through the program*

**DBH Response**

The average time between referral and placement is four to six weeks.

*The number of individuals on waiting lists for the program*

**DBH Response**

DBH does not maintain a waiting list for housing.  DBH requires certified providers to assess housing needs at the time of intake and for consumers to indicate if they want to be considered for housing resources when they become available.  Individuals who request a rental housing voucher self-report whether they are homeless, living on the streets or in a shelter, living temporarily with families or friends, or living place to place. They also can report if they are rent burdened, at risk of eviction, or living in substandard housing. This information is entered into the consumer's electronic medical record. This process has been commonly referred to as a "waiting list" but it is a self-report of housing needs.  When a rental housing voucher becomes available, DBH notifies providers and works with them to determine eligibility of current consumers. Since interest far

exceeds available vouchers, consumers experiencing homelessness who are living on the streets or in a shelter are prioritized.  This process does not apply to supported residences where placement is determined by level of need.

*Of those individuals on the wait list, whether any are homeless or in other housing programs*

**DBH Response**

As indicated above, at the time of intake, individuals self-report their living situation. Individuals who request a rental housing voucher often seek support from other available housing programs as well.

*Q15. Please provide an update on the work of the children mobile crisis teams. What services are provided? How many individuals were served in FY21? To date in FY22? Please be sure to specifically speak to the work of the Children and Adolescent Mobile Psychiatric Service (ChAMPS), as well as any related services.*

*a.      What is the process in determining what calls are deployable and non-deployable?*
*b.      What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY21 and FY22 to date.*
*c.      How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?*
*d.      Please describe the extent to which these services and responses to (a) through (d) were impacted by the COVID-19 pandemic.*

**DBH Response**

The Department of Behavioral Health contracts through the Office of Contracts and Procurement for emergency mobile psychiatric services for children and youth. The current contractor is Anchor Mental Health, and the program is called Children and Adolescent Mobile Psychiatric Service (ChAMPS).  The ChAMPs program operates 24 hours a day, seven days per week and helps children and youth between six to 17 years of age manage extreme emotional behavior and supports families to wherever possible to prevent behavior from resulting in the child needing to leave the home or require a psychiatric hospitalization.  In the cases where a child or youth does require hospitalization, ChAMPs is able to facilitate the referral for both voluntary and involuntary hospitalization. ChAMPS services also include screening for mental health and substance use needs, crisis stabilization, referral to appropriate resources, including longer-term mental health or substance use services. ChAMPs also provides information dissemination, consultation to parents and service providers and outreach to the community regarding their services.

Services are provided in the community, schools, or in homes for District residents and children living in Maryland in the care and custody of the DC Child and Family Services Agency. After a family is involved with an emergency crisis intervention service, ChAMPS follows up with the family within 24 hours to check on the child's well-being and provides support for up to 30 days post-intervention.  The team links children and families to a behavioral health provider for ongoing support. For children already enrolled with a provider, the team communicates with the provider the child's status and recommendations based on the intervention.  ChAMPS also offers Family Peer Specialist services to support families in the steps necessary for the stabilization of their child to promote a culture that recognizes, understands, and respects the family's views and preferences.

*What is the process in determining what calls are deployable and non-deployable?*

Each call that is routed into ChAMPS is received by a Licensed Clinical Manager who is trained and equipped to make a clinical determination on how to manage crisis calls.  All calls involving children and youth in psychiatric crisis are deployable calls which results in an onsite response by a clinical team.  ChAMPS also provides telephone clinical consultation for families seeking support for concerns such as family functioning, oppositional defiance, and emotional dysregulation. Clinical consultation also takes place with providers.  A non-deployable call

includes requests for information about program services or resources only or when a caregiver declines an assessment.

*What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY21 and FY22 to date.*

In FY 21, Anchor reports the average deployment time was 50 minutes. The longest response time was 2 hours and 5 minutes due to inclement weather on 12/16/2020.  The shortest time was 6 minutes. In FY 22 to date, the average deployment time is 48 minutes. The longest response time was 1 hours, 38 minutes due to a parent providing the incorrect address during the initial call.  The shortest time was 5 minutes. The goal is to arrive to all deployments within one hour or less during the week and within 2 hours for overnight on call shifts and weekend on call shifts.

*How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?*

Anchor has six ChAMPS crisis teams available for deployment on the weekdays and one crisis team on the weekend with two new hires pending to begin in Q2 of FY22 which will increase team capacity. Teams are deployed in pairs. Staff are scheduled in a staggered manner to maximize coverage and the number of crisis teams available. Calls are triaged according to imminent risk and prioritized by the level of danger a child poses to self or to others. Additional considerations are the availability of a mental health clinician, MPD or a Crisis Intervention Officer at the deployment site if needed. The Clinical Manager maintains contact with the caller as needed until the crisis team is at the scene of the crisis.

*Please describe the extent to which these services and responses to (a) through (d) were impacted by the COVID-19 pandemic.*

**Utilization:**

| ChAMPS Utilization | FY 18 | FY19 | FY20 | FY21 | FY22 Q1 |
|---|---|---|---|---|---|
| Calls | 1,682 | 1880 | *1634 | 1237 | 329 |
| Telephone clinical consultations | 380 | 370 | 459 | 593 | 149 |
| Deployments | 837 | 938 | 806 | 457 | 117 |
| Unique Children/Youth Served | 857 | 873 | 710 | 416 | NA |

* March 2019 public health emergency

The data shows a significant decrease in calls during the pandemic.  DBH is working with Anchor to identify factors affecting the number of calls.   One change during the pandemic is that most calls were from parents while during the pre-pandemic months, the majority were from public schools.

**Staffing:** Due to the pandemic, hiring for licensed behavioral health practitioners has been a challenge, which has been a reported challenge nationwide. In addition to difficulty with hiring, the pandemic has also impacted the Anchor's staffing matrix for ChAMPS, as staff who tested positive or staff who had been placed in quarantine were unable to participate in the field for 10 days. All calls were answered and teams were deployed as needed. Due to these factors and with the opportunity to provide telehealth, ChAMPS established a contingency plan to continue to provide telehealth crisis intervention in the case of an extreme staff shortage

**Deployment time:** The contract requires deployment within one hour of the call. Anchor met this requirement in FY21. The shortest response time average for the month was 46 minutes compared to 39 minutes in FY 20. The longest response time was 57 minutes. Anchor reports that logistics were more time consuming as the teams were teleworking and were to deploy to crisis calls from their homes rather than one work location. In addition, the teams reported it took more time to park at deployment sites given limited spaces with more people at home due to the pandemic.

*Q16.  How long does it take for families or children who are enrolled in DBH either by calling the Access Helpline or by walking into a community provider office seeking mental health services to receive the treatment they need?  Please provide the following information for FY20, FY21, and FY22, to date:*

> *a.  How many days, on average, between when a family or child calls the Access Helpline and when they are referred to a Core Service Agency?*
>
> *b.  How many days, on average, between when a family or child is enrolled and their intake appointment with a Core Service Agency?*
>
> *c.  How many days, on average, between when a family or child is enrolled and when they receive a diagnostic needs assessment?*
>
> *d.  How many days, on average, between when a family or child is enrolled and when they receive their first service as part of a treatment plan?*

**DBH Response**

DBH collects data tracking a number of milestones for children and families seeking care:  from the time of a family or child's enrollment to the intake appointment, and then to when a family or child receives a diagnostic assessment.  Callers to the Access Helpline are referred to a provider during the call. The charts below summarize the data for these two milestones.

As referenced in Table A, in FY20, on average it took 24 days from when a family or child is enrolled and their intake appointment with a Core Service Agency. In FY21, the average remained the same - 24 days. In FY22 YTD, the average number fell to 5 days.  Consequently, DBH has been working closely with providers to develop more streamlined processes to complete intake appointments via virtual platforms as well as in person.

As referenced in Table B, in FY20, on average it took 22 days from when a family or child enrolls and their diagnostic assessment with a Core Service Agency (CSA). In FY21, the average number of days increased to 29 days. In FY22 YTD, the average decreased to five days.  DBH continues to work with providers to utilize flexible scheduling, streamlined processes and telehealth platforms to reduce the lag to intake as well as diagnostic appointment to ensure children and families are seen as soon as feasible.

**Table A. Average Number of Days from enrollment to Intake Appointment**

| FY | 2020 | 2021 | 2022 YTD |
|---|---|---|---|
| **Avg days** | 24 | 24 | 5 |

**Table B. Average Number of Days from enrollment to Diagnostic Assessment**

| FY | | 2020 | 2021 | 2022 YTD |
|---|---|---|---|---|
| **Avg days** | | 22 | 29 | 7 |

*Q17. Please explain the work the Department has been doing to address gun violence in the community and treat children/youth exposed to violence in their communities or at homes. Please explain how this work has been affected by the COVID-19 pandemic.*

**DBH Response**

DBH conducts a variety of individual and community-focused activities to address the prevention, early intervention and treatment of gun violence using a public health approach and its impact on children, adults, and families.

**Prevention**. DBH supported Wards 5/6 DC Substance Use Prevention Center (DCPC) conducted outreach and engagement in communities near the Southwest Waterfront which experienced a significant increase in gun violence. With community partners, the DCPC distributed information on marijuana, underage drinking, opioid misuse, and synthetics. Since in-person events have been reduced due to the pandemic, DCPC increased its social media presence through virtual platforms including Twitter, Instagram, and Facebook. Social media messaging for targeted populations included information on the legal and health risks associated with drug use and promoted positive alternatives to substance use and other destructive behaviors such as exercising and finding creative outlets for expression.

**Evidence-based Treatment**. DBH offers evidence-based treatment approaches through certified providers to address the impact of traumatic events such as gun violence. These services include Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), Trauma Systems Therapy (TST), and Child-Parent Psychotherapy (CPP). These therapy models have been proven to reduce symptoms and behavior disturbance for children who are victims of trauma. TF-CBT is a psychotherapy model for youth ages 3-18 years old designed to help children, youth, and their parents overcome the negative effects of traumatic life events and address feelings. TST is a psychotherapy model for youth ages 6-18 years old which aims to stabilize the child's environment while simultaneously enhancing their ability to regulate emotions and behaviors. CPP is a psychotherapy model for children ages 0-6 years old and their parents that helps restore normal developmental functioning in the wake of violence and trauma by focusing on safety, affect regulation, improving the child-caregiver relationship, normalization of trauma related response, and joint construction of a trauma narrative.

The number youth served using these evidence-based models decreased slightly from 168 in FY20 to 146 in FY21. Providers specializing in trauma-informed care have experienced staff turnover, reduced capacity, and program closures, which directly impacted the number of youth they could serve. In response, DBH's vendor, Evidence-Based Associates (EBA), has offered technical assistance to support the recruitment and retention of qualified staff needed to sustain their operations. DBH has also partnered with providers to conduct community presentations to increase the knowledge of services offered and increase access to needed supports and services.

**School-based services.** Clinicians in public schools provide prevention, early intervention, and treatment services related to violence prevention. Specifically, the clinicians implement classroom-based violence prevention activities through programs such as Too Good For Violence

(TGFV) and Kimochis.  TGFV is a school-based violence prevention and character education program designed to improve student behavior and minimize aggression. TGFV is designed to help students learn the skills they need to resolve conflict peacefully. Kimochis is a social-emotional curriculum that uses characters to teach young children about emotions and how to communicate their feelings with others.  During SY20-21, clinicians implemented TGFV in 16 classrooms and Kimochis in 47 classrooms.

In addition, school-based behavioral health clinicians included information regarding gun and community violence in trauma focused presentations and provided trauma informed clinical services to students with a variety of exposures to gun violence.  Some clinicians are trained in trauma specific modalities, including TTF-CBT and can implement this intervention to address traumatic symptoms due to exposure to violent crimes including gun violence.

The school-based crisis response team conducted 16 crisis responses in SY20-21 and six to date in SY21-22. The responses included services provided for deaths related to gun violence. Clinicians use a protocol-driven approach to engage school communities beginning with classroom presentations to outline known facts of the event in developmentally appropriate ways, to normalize feelings, to identify and reinforce adaptive coping skills, and to remind students of resources available to them.  Clinicians often also organize "pull-out rooms" and for students and staff seeking additional individual supports and, if indicated, linked youth and staff to additional behavioral health resources.

**Community Response Team (CRT)**. The CRT conducts outreach in communities at high risk of experiencing violence.  Also, the CRT frequently is asked by faith leaders, partners, and community members to intervene and provide support to communities dealing with loss and trauma related to gun violence. The CRT provide immediate support to individuals at memorial events in the community and provide information about behavioral health resources available through DBH and our provider network in every ward in the District.

**Building Blocks DC**.  DBH has partnered with other District agencies to support the Building Blocks DC Initiative under the direction of Linda Harllee Harper.  This cross-agency initiative adopts a public health approach to gun violence prevention and targets the individuals and neighborhoods at highest risk of being adversely affected by gun violence.  DBH is also targeting and working with key community providers and leaders in the target neighborhoods to conduct ongoing outreach and engagement activities in non-clinical settings to address stigma and to promote basic behavioral health literacy and coping.

*Q18. Please explain the work the Department has been doing with the Child and Family Services Agency on trauma-informed care. Please explain how this work has been affected by the COVID-19 pandemic.*

**DBH Response**

In FY21, DBH and the Child and Family Services Agency (CFSA) have continued to collaborate in the provision of trauma informed care for youth impacted by trauma. The 1115 Behavioral Health Transformation Demonstration waiver includes Trauma-Informed Behavioral Health Services which will further support the work with trauma impacted families. Trauma Systems Therapy was included in published rulemakings and a newly established rate was implemented , increasing by 26% from $28.81 to $36.18. CFSA supported the expansion of Functional Family Therapy (FFT) utilizing the Community Based Child Abuse Prevention (CBCAP) funding to provide intensive therapeutic interventions to families as a key service to prevent or reduce child abuse and neglect. FFT is an evidenced-based practice that targets families with children between the ages of 11-18 with behavioral or emotional problems such as conduct disorder, violent acting out, and substance abuse disorders. During FY21, the funding was utilized to sustain the certification of providers, Better Morning and PASS.

As a result of the COVID-19 pandemic, providers have continued to provide services through a hybrid model which included in-person and virtual platforms. Both FFT providers experienced staff turnover and hired additional staff to sustain capacity to continue serving families. In FY21, 139 youth were served in FFT, which was a decrease from FY20 where 162 youth were served. 100% of the providers complied with full fidelity standards.

DBH continues to have one co-located staff at CFSA to assist with linkage, trouble shooting and supports the receipt of referrals for DBH Evidence-Based Practices (EBP) services from CFSA social workers, private agencies' social workers, and collaborative staff.

In addition to Families First Prevention Services Act (FFPSA), DBH has supported the work through Families First DC by providing training on behavioral health services to the staff at each of the 10 Success Centers and identifying community resources that will support the work of each site in their respective community.

DBH is also partnering with CFSA in their roll out of the "Thriving Families, Safer Children" initiative, which implements a transformation from a child welfare model to a child and family well-being model. DBH staff are participating in the sub-committees, including the development of a Warmline, involvement of families with lived experience, and a data and evaluation component.

The partnership with CFSA has not been impacted during the pandemic. DBH and CFSA continue to collaborate regularly to address the needs of children and families in in-home and out-of-home care. Services provided through DBH have continued to be provided in person and/or telehealth. In FY21, 128 CFSA youth were enrolled with DBH services, which was a decrease from FY20 where 141 youth were enrolled in DBH services.

Virtual meetings have continued through Microsoft Teams and other platforms approved by the District. DBH's Child and Adolescent and Family Service staff meet quarterly with CFSA's managers to discuss any barriers or challenges within the programs. Through these quarterly meetings, DBH identified a training gap regarding trauma-informed care. In FY22, DBH is planning to incorporate a new training that includes Medical Doctors, Registered Nurses, Licensed Social Workers/Counselors, and medical residents that focuses on trauma-focused interviewing and planning. DBH's goal is to develop a coordinated approach to conceptualizing trauma and incorporating the trauma-informed approach in treatment and the community.

Q19. *Please explain the work the Department is doing with Child and Family Services Agency to better serve the mental health needs of foster children in the District. How long does it take for a child who has been identified as needing mental health services before they are connected to those services? During FY21, what percentage of children were screened within 30 days of entering or re-entering care? Has there been a decrease in time to linkage to first services from FY20 to FY21? If available, please provide any documentation that shows children are receiving more timely services. What efforts have been made to improve more timely services?  Please explain how this work and the data provided in response to the questions above may have been impacted by the COVID-19 pandemic.*

**DBH Response**

In its partnership with CFSA, DBH is better able to serve children involved in foster care by having one co-located staff at CFSA to assist with timely enrollment to a Core Service Agency (CSA) for behavioral health services. In FY21, 128 children and youth involved in foster care were referred for mental health assessments and treatment through the DBH co-located staff stationed in the clinical services unit within CFSA.  Most often children and youth are linked to a CSA the same day of receipt of the referral.  If not the same day, then it is done the next day.

In FY20, the trauma screening process with DBH co-located staff ended when CFSA launched their Mental Health Redesign, which included the onboarding of three mental health clinicians to administer mental health screenings and to provide direct therapeutic interventions.  In FY21, DBH had one co-located staff person at CFSA who was responsible for facilitating timely enrollment of children in behavioral health services within the DBH network.  The co-located staff person is not a clinician therefore she does not complete screenings and assessments. DBH does not have data from linkage (defined as when a youth is referred and subsequently enrolled with a DBHCSA) to the receipt of first service. . "First Service" is defined as when the first behavioral health service is delivered by a CSA after the youth is enrolled. CFSA youth continue to be enrolled with services in a timely manner.  In FY21, the amount of days between referral and enrollment remained consistent; within one day or less.

The Department of Behavioral Health continues to assess and enhance the current array of services to meet the mental health needs of the District's children and youth in foster care.  In addition to efforts to build capacity, DBH and CFSA developed a process for connecting children and families with CSAs soon after removal occurs. If a child is currently receiving services or recently enrolled with a mental health provider, the provider is notified of removal and invited to participate in a Review, Evaluate and Direct (RED) Family Team Meeting teaming processes which occurs within 72 hours of the removal. During the RED Team Meeting, details of the cases are discussed; providers begin engagement with family members and schedule appointments at a time most convenient for families which improves the timeliness of service initiation.  CFSA and DBH recognize that having providers engaged earlier in the process when children are entering care, will increase access to care in a timely manner. The DBH staff co-located in CFSA's clinical unit closely track this data which shows children are linked to a CSA within same day of request. In FY21, DBH and CFSA have continued to collaborate to better serve the mental health needs of foster children in the District. CFSA extended support for the expansion of Functional Family Therapy (FFT) utilizing the Community Based Child Abuse Prevention (CBCAP) funding to

provide intensive therapeutic interventions to families as a key service to prevent or reduce child abuse and neglect. FFT is an evidenced-based practice that targets families with children between the ages of 11-18 with behavioral or emotional problems such as conduct disorder, violent acting out, and substance abuse disorders. During FY 21, the funding was utilized to sustain the certification of both FFT providers. In FY21, 139 youth were served in FFT which was a decrease from FY20 where 169 youth were served. Because of COVID-19, providers have continued to provide a hybrid model which included in-person and through virtual platforms. Both providers hired additional staff increasing the capacity to serve families. All providers complied with full fidelity standards.

In FY21, 78 youth, including CFSA foster care youth, received Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), which remained the same from FY20 where 78 youth were served. TF-CBT is a psychotherapeutic intervention designed to help children ages 3-18, working with their parent or caregivers, overcome the negative effects of traumatic life events. Through CFSA's portal, which is CFSA's internal system where referrals for Evidence-Based Practices (EBPs) are submitted, 19 referrals were submitted for CFSA youth in FY21.

In FY21, 20 youth including CFSA foster care youth received Trauma Systems Therapy (TST) which was a slight decrease from FY20 where 23 youth were served. TST is a comprehensive, phase-based model for treating traumatic stress in children and adolescents ages 6-18 that adds to individually-based approaches by specifically addressing the child's social environment and/or system of care. Through CFSA's portal, eight referrals were submitted for CFSA youth in FY21.

In addition to its expanded work on trauma-informed care, DBH and CFSA continue to collaborate on other programs to address the needs of children and families in in-home and out-of-home care. DBH continues to have one co-located staff at CFSA to assist with linkage, trouble shooting and supports referrals for DBH Evidence-Based Practices services from CFSA social workers, private agency social workers and collaborative staff.

DBH also provides training on behavioral health services to the staff at the 10 Success Centers managed by CFSA. DBH is partnering with CFSA on the "Thriving Families, Safer Children" initiative to transform from a child welfare model to a child and family well-being model. The partnership with CFSA has not been impacted during the pandemic. DBH and CFSA continue to collaborate and address the needs of children in foster care.

.

*Q20. Please describe what substance abuse services are offered to children and youth and the process for obtaining these services. Are there any plans for FY22 to expand the types of services offered to children and youth? How many children and youth have received services through the Adolescent Community Reinforcement Approach (A-CRA) in FY21 and FY22 to date?*

> *a. Please explain how this work and the data provided in response to the questions above may have been impacted by the COVID-19 pandemic.*

**DBH Response**

Within the DBH the youth substance use disorder services are offered to children and youth through a network of three (3) DBH certified Adolescent Substance-use Treatment Expansion Program (ASTEP) providers. These ASTEP providers facilitate therapy sessions, implement evidence-based interventions, and support youth and families in navigating the substance use treatment system.  DBH is also a recipient of a five-year DC Changing and Improving Treatment for our Youth (CITY) grant from the Substance Abuse and Mental Health Administration (SAMHSA).  The DC CITY grant is focused on the expansion and enhancement of substance use treatment services available for adolescents and transitional aged youth.

The ASTEP providers receive referrals for adolescents and transitional age youth  in need of treatment services. For the DC CITY grant, from March 2021 when referral data collection began, through the end of FY21, there were 78 referrals made to the providers.  During the first quarter of FY22, there have been 72 referrals.  Referrals come primarily come from CFSA, DYRS, and CSS, and additional referrals coming from family/self and internally for provider organizations with multiple programs.  Once referred, the respective provider conducts outreach to schedule the individual for enrollment and assessment to initiate the delivery of treatment services.

Programs and services offered by the three ASTEP providers include the Adolescent Community Reinforcement Approach (A-CRA) and Recovery Support Services for educational support, life skills support, recovery coaching, and recovery social activities.  During FY22, plans to expand the types of services offered to children and youth include the providers receiving training in other evidence-based treatment practices such as Motivational Enhancement Therapy (MET) and Cognitive Behavioral Therapy (CBT).  As currently only two of the three providers offer A-CRA, the inclusion of MET and CBT will broaden the array of services available to children and youth in need.

According to claims data,  a total of 73 District youth received A-CRA services during FY21.  The DC-CITY grant saw a significant enrollment increase from FY20 to FY21 rising from 23 enrollees to 56. Because of how DC CITY grant enrollments are counted, this is an undercount of the total number of overall DC youth served over the period. DC CITY grant enrollees must be enrolled in the SAMHSA SPARS database system and have a completed GPRA to be counted as a grant enrollee. But, there are youth who do not have a completed GPRA in the SPARS system but are receiving services from an SUD provider.  While these efforts are specifically reflective of the DC CITY grant during FY21, as mentioned above, it should be noted that there was a significant increase in the number of individuals enrolling in treatment services among the three ASTEP

providers. It is DBH's goal that the ongoing support, evidence-based practice trainings, and resources slated for FY22 will continue to bring about greater utilization of the services available.

The provision of youth substance use disorder services has been impacted by the COVID-19 pandemic in several ways.  The first challenge was the shifting of services from in-person to telehealth that went into place at the start of the pandemic and transitioned into FY21.  While telehealth appointments created the opportunity to safely remain in contact, it did require that individuals possess and utilize the proper technology, and that they successfully logged on at the designated time. Another challenge resulting from COVID-19 during FY21 was the inability for the providers to safely conduct large scale outreach and engagement.  Through the support of DBH staff, providers did facilitate presentations and workshops for smaller gatherings of individuals at youth serving organizations, but these activities were unable to result in a significant increase of enrollments into substance use treatment.

*Q21.  Please explain the work the Department is doing with the Department of Health Care Finance to plan for the transition of fee for service individuals to MCOs in Fiscal Year 2022. How will this transition improve care coordination?*

**DBH Response**

DBH works closely with the Department of Health Care Finance (DHCF) to implement the transition to the managed care program.  Overall, DHCF and DBH envision a three-phase approach to Medicaid behavioral health transformation that will result in a whole-person, population-based, integrated Medicaid behavioral health system that is comprehensive, coordinated, high quality, culturally competent, and equitable.

Phase I of the District's Medicaid behavioral health transformation efforts was initiated in 2019 with DHCF and DBH's collaboration and joint development of the 1115 Behavioral Health Transformation Waiver. Additionally, DHCF continued its progress of developing a more coordinated Medicaid system of care by transitioning approximately 17,000 individuals ages 21 and older from fee-for-service (FFS) to the managed care program in October 2020.[1] During this first phase, MCOs are responsible for ensuring coordination among individuals' primary, acute, and behavioral health care needs. This model allows the District Medicaid program to shift away from a fragmented approach of providing care to individuals most in need of behavioral health services, to ensuring that the total health outcomes of an individual are coordinated.

In Phase II, DHCF plans to include behavioral health services as covered benefits in the District's managed care contracts as of October 1, 2023 (FY24) with the purpose of improving coordination and providing whole-person care. The transition date of FY24 was delayed by one year to ensure that the newly awarded managed care plans may be engaged in the development and implementation of the carve-in and be active partners with the agencies, providers, and other stakeholders to ensure its success.

The development and planning for the carve-in of services is on-going and will continue over the next twenty-two months in Phase II. The time will be divided to focus on planning /development and readiness:

**November 2021 –December 2022: Planning and Development**
Complete rate study; develop Medicaid state plans and corresponding DHCF and DBH regulations for new/revised services; on-going provider technical assistance; electronic health record/health information exchange initiative; managed care solicitation, readiness, and implementation; DHCF-DBH MOU development; and drafting of the behavioral health manual for managed care.

During this period, DBH conducted a provider readiness review survey that was developed using recommendations from the stakeholder advisory workgroup. The results of that survey are being analyzed to inform and direct additional technical assistance.

---

[1] District Medicaid beneficiaries currently not enrolled in MCOs are individuals dually eligible for Medicare and Medicaid, and individuals living in an institution or a nursing home, or enrolled in a Medicaid home and community-based waiver services program.

**January 1, 2023 –September 30, 2023: Formal Readiness Period**
Routine agency, provider, managed care plan collaboration; provider accreditation; provider and managed care plan contracting; claims system testing; data sharing; outreach and communication with beneficiaries

Phase III will focus on additional efforts to integrate physical and behavioral health for Medicaid beneficiaries in the District of Columbia. The transition scheduled to occur in FY24 will include carving-in many behavioral health benefits (including the Mental Health Rehabilitation Services and the Adult Substance Abuse Rehabilitation Services) into the MCO contracts.

Q22 Attachment 2 of 3

    g.  What prevention programs and services were offered through the SMHP in FY21 and FY22 to date

List of School Mental Health Program Prevention programs implemented in each school during FY20 (SY20-21) and FY22 (SY21-22) to date.

| School | Evidence Based Prevention Programming Implemented | Early Intervention Programming Implemented | Presentations |
|---|---|---|---|
| Aiton Elementary School | Kimochis Resilience Builders Connect with Kids | Social Skills | |
| Amidon Bowen ES | Good Touch Bad Touch The 3 Rs | | |
| Anacostia High School | | | Staff Self Care Anxiety Staff Grief Teen Summit |
| Beers Elementary School | Kimochis Bullying | Social Skills Boys Group Grief Group | Trauma Responsive Schools LEAP |
| Boone ES | Too Good For Drugs | 3-4 Grade Social Circles | Parent Self Care |
| Brookland MS | | Lunch Bunch Girls Group | Grief and Loss Managing Stress |
| Browne EC | Zones of Regulation Bully Prevention | Boys Groups | Mind Matters Conflict Resolution; Lessons on Gratitude; Coping Skills |
| Cardozo EC HS | SOS Love is Not Abuse Wellness Wednesday Live | Girls Group | Mind Matters |
| Cardozo EC MS | Parent Café SOS | | Teen Summit Mind Matters Suicide Prevention |
| Cedar Tree Public Charter School | Parent Café Kimochis Good Touch Bad Touch | Boys Group | |
| Center City- Capitol Hill PCS | Kimochis | | |
| Center City- PCS Congress | Too Good For Violence SOS Ask For Help Kimochis | Social Skills | Teen Summit |

| School | Evidence Based Prevention Programming Implemented | Early Intervention Programming Implemented | Presentations |
|---|---|---|---|
| Cesar Chavez Parkside Public Charter School | SOS | Lunch Bunch Too Good For Drugs | Teen Summit |
| CHEC  HS | Too Good For Drugs SOS Love Is Not Abuse | | Trauma Informed Response Social Justice Awareness |
| CHEC MS | SOS | | Pandemic Self Care IG Live – various topics Mental Health 101 |
| DCI PCS | | Girls Group | Teen Summit |
| Dorothy Height Elementary School | Ask For Help Emotional Regulation Bullying Prevention Mindfulness Kimochis | Lunch Bunch Girls Group Grief Group | Self Care; Mindfulness; Self-Esteem; Trauma Responsive School |
| EL Haynes PCS ES | Good Touch Bad Touch | | Mindfulness for Teachers Mental Health Awareness – Poster Contest; Post Traumatic Growth |
| Eagle PCS | Kimochis Healthy Boundaries | | |
| Friendship Blow Pierce PCS | Good Touch Bad Touch | Anger Management Mindfulness | Self Care; Teen Summit; Changes and Transition; Mental Health 101; Trauma and COVID 19; Stress Management |
| Friendship Southeast Academy | | | Self Care for Teacher; Understanding Depression and Anxiety |
| Friendship Technology PCS | SOS Wellness Wednesday Students | | Teen Summit |
| Garfield ES | Bud to Blossom SEL | Social Skills | |
| Hart MS | SOS Weekly Advisory- Multiple MH topics | | |

| School | Evidence Based Prevention Programming Implemented | Early Intervention Programming Implemented | Presentations |
|---|---|---|---|
| Inspired Teaching PCS | Ask For Help Botvins | | Self Care |
| Jefferson MS | Recognizing/Reducing Cyber Bullying Wellness Wednesday for Students SOS | | Understanding and Managing Stress Healthy Habits |
| Johnson MS | SOS | | |
| Kelly Miller MS | SOS Too Good For Drugs | | Substance Abuse and Mental Health Mind Matters |
| Ketchum Elementary School | Ask For Help Kimochis The 3 Rs | Lunch Bunch Social Skills | Coping Skills Mind Matters Trauma Responsive Schools: Emotional Management; Coping with Community Violence |
| Kramer MS | | Grief Group Social Skills Restorative Justice Circle | Mental Health 101 |
| LAMB Public Charter School | Kimochis | Social Skills | |
| Malcolm X Elementary School | Coping Cats Kimochis Mindfulness Too Good For Violence | Conflict Resolution Grief Group Girls Group | Monthly Parent Workshop |
| McKinley Tech High School | SOS | | |
| McKinley Tech Middle School | Parent Café Mindfulness | | Trauma Responsive Schools; Teen Summit |
| Miner ES | Kimochis | | Parent Town Hall |
| Moten Elementary School | Monthly School Website Bully Prevention Kimochis | Girls Group Mindfulness Social Skills Lunch Bunch | Mind Matters; Self Care; Emotional Regulation |
| Mundo Verde Public Charter School | Kimochis Ask for Help Bullying | Lunch Bunch | |

| School | Evidence Based Prevention Programming Implemented | Early Intervention Programming Implemented | Presentations |
|---|---|---|---|
| Patterson ES | Kimochis<br>Too Good for Violence | Grief Group | Mind Matters<br>Child Abuse<br>In-person Learning<br>Monthly Parent<br>Workshops |
| Paul PCS | | | Teen Summit<br>Self Care |
| Perry Street PCS | Mindfulness<br>Too Good For Drugs | Lunch Bunch | Parent Chat and<br>Chew;<br>Internet Safety |
| Richard Wright PCS | Mindfulness; Positive Outlets<br>Self Care Support Group for Students and Parents<br>Stress Management | Anger Management<br>Healthy Boundaries | |
| Ron Brown High School | Multiple Monthly 9-12 Grade Community Circles | | |
| Sela Public Charter School | Kimochis<br>Too Good For Violence | | Self Care |
| Simon Elementary School | Too Good For Drugs<br>Too Good For Violence<br>Harambe SEL<br>Second Step<br>Parent Cafe | Lunch Bunch | Trauma Informed<br>School; Stress<br>Management;<br>Anxiety and<br>COVID |
| Stanton Elementary School | Ask For Help<br>Kimochis<br>Good Touch Bad Touch | Lunch Bunch<br>Conflict Resolution<br>Girls Group | Managing Feeling<br>after 1/6/2021 |
| Stuart Hobson Middle School | SOS<br>Too Good For Violence<br>Good Touch Bad Touch<br>Panther Pride (Gay/Straight Alliance)<br>On-line Craft and Chat<br>Game On, Middle School<br>Transition; Bullying | Humane Rescue<br>Alliance<br>Lunch Bunch<br>RTI Support Group-<br>Homework Help<br>Puppy Yoga<br>Social Skills | Grief Presentation<br>to Staff<br>Staff Wellness<br>Publication<br>Mental Health<br>Awareness PSAs<br>Managing Feelings<br>after 1/6/2021 |
| Takoma Educational Campus | MH Awareness Whole School Activities<br>Cyberbullying<br>SEL Morning Meetings<br>Connect with Kids | | Staff Presentations<br>various topic |
| Neval Thomas ES | Kimochis<br>Too Good For Violence | | Emotional<br>Regulation |
| Thurgood Marshall PCS | SOS<br>9th and 12th Transition<br>Groups; Resilient Warriors | Girls Group | Teen Summit |

| School | Evidence Based Prevention Programming Implemented | Early Intervention Programming Implemented | Presentations |
|---|---|---|---|
| Truth PCS | | Understanding Emotions Grief and Loss Mental Health 101 | |
| Two Rivers Public Charter School | Healthy Boundaries | Emotional Regulation Social Skills Self Esteem Boys Group Girls Group | |
| Walker Jones EC | Mindfulness | Social Skills | |
| Wilson High School | Wellness Newsletter for Staff and Students | Mindfulness | Anxiety Dating Violence Mind Matters |
| Yu Ying PCS | Videos on Various Topics Jellybean Jamboree | | |
| DPR Summer Youth Employment | Love is Not Abuse Mental Health 101 Self Care Minfulness | | |



**DEPARTMENT OF BEHAVIORAL HEALTH**
**SCHOOL BASED BEHAVIORAL HEALTH PROGRAM**
SCHOOL LIST – SCHOOL YEAR 2021-2022

| | WARD | FTE | DCPS/ DCPCS | SCHOOL INFORMATION | GRADE LEVEL | PRINCIPAL | CLINICIAN |
|---|---|---|---|---|---|---|---|
| 1 | 7 | 1 | DCPS | **AITON ELEMENTARY SCHOOL** 533 48th Place, NE Washington, DC 20019 Main# 202-671-6060 Fax# 202-724-4630 | PS – 5th | Malaika Golden Malaika.golden@k12.dc.gov | Kelly Baker, LICSW Cell: 202-573-3493 Email: Kelly.baker1@dc.gov  Supervisor: Jackie Droddy, LICSW |
| 2 | 6 | 1 | DCPS | **AMIDON-BOWEN ELEMENTARY SCHOOL** 401 I Street, SW Washington, DC 20024 Main# 202-724-4867 Fax# 202-724-4868 | PK3-5th | TaMikka Sykes Tamikka.sykes@k12.dc.gov | Vacant |
| 3 | 8 | 1 | DCPS | **ANACOSTIA HIGH SCHOOL** 1601 16TH Street, SE Washington, DC 20020 Main# 202-698-2155 Fax# 202-698-2188 | 9TH-12th | William Haith William.haith@k12.dc.gov | Vacant |
| 4 | 8 | .5 | DCPS | **BALLOU SENIOR HIGH SCHOOL** 3401 4th Street, SE Washington, DC 20020 Main # 202-645-3400 Fax# 202-645-3397 | 9th- 12th | Willie Jackson Willie.jackson@k12.dc.gov | Vacant |
| 5 | 7 | .5 | DCPS | **BEERS ELEMENTARY SCHOOL** 3600 Alabama Ave, SE Washington, DC 20020 Main # 202-939-4800 Fax # 202-645-3225 | PK3-5th | Gwendolyn Payton Gwendolyn.payton@k12.dc.gov | Sharon Hardy, LICSW Cell:  202-821-5452 Email: Sharon.hardy@dc.gov  Supervisor: David Shrank, LICSW |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6 | 8 | 1 | DCPS | **BOONE ELEMENTARY SCHOOL**<br>2200 Minnesota Ave, SE<br>Washington, DC 20020<br>Main#:  202-671-6240<br>Fax #:  202-645-3292 | PK3-5th | Kimberly Douglas<br>Kimberly.douglas@k12.dc.gov | Corrie Clanton, LICSW<br>Cell: 202-253-3784<br>Email: corrie.clanton@dc.gov<br><br>Supervisor: Jackie Droddy, LICSW |
| 7 | 5 | 1 | DCPS | **BROOKLAND MIDDLE SCHOOL**<br>1150 Michigan Avenue<br>Washington, DC  20017<br>Main # 202-759-1999<br>Fax #:  202-724- 1530 | 6th-8th | Kerry Richardson<br>Kerry.richardson@k12.dc.gov | Natasha Carter, LICSW<br>Cell:  202-597-2894<br>Email:  Natasha.carter@dc.gov<br><br>Supervisor: Carrie Grundmayer, LICSW |
| 8 | 5 | .5 | DCPS | **BROWNE EDUCATIONAL CAMPUS**<br>850 26th Street, NE<br>Washington, DC 20002<br>Main# 202-671-6210<br>Fax # 202-724-1530 | PS-8th | Dwight Davis<br>Dwight.davis@k12.dc.gov | Belinda Davis, LICSW<br>Cell: 202-631-3458<br>Email: Belinda.davis@dc.gov<br><br>Supervisor: Luis Morales, LICSW |
| 9 | 1 | .5 | DCPS | **CARDOZO EDUCATIONAL CAMPUS-MIDDLE**<br>1200 Clifton Street, NW<br>Washington, DC 20009<br>Main # 202-673-7385<br>Fax # 202673-2232 | 6th- 8th | Arthur Mola<br>Arthur.Mola@k12.dc.gov | Miata Tucker Zaza, LICSW<br>Cell:  202-407-2164<br>Email:  Miatta.Tucker-Zaza@dc.gov<br><br>Supervisor: Luis Morales, LICSW |
| 10 | 1 | 1 | DCPS | **CARDOZO EDUCATIONAL CAMPUS-HIGH**<br>1200 Clifton Street, NW<br>Washington, DC 20009<br>Main # 202-673-7385<br>Fax # 202673-2232 | 9TH- 12TH | Arthur Mola<br>Arthur.Mola@k12.dc.gov | Amanda Harvey, LICSW<br>Cell: 202-439-6231<br>Email:  Amanda.Harvey2@dc.gov<br><br>Supervisor:  Carrie Grundmayer, LICSW |
| 11 | 1 | 1 | DCPS | **COLUMBIA HEIGHTS EDUCATIONAL CAMPUS – HIGH**<br>3101 16TH Street, NW<br>Washington, DC 20010<br>Main #:  202-939-7700<br>Fax #:  202-576-9174 | 9th- 12th | Maria Tukeva<br>Maria.tukeva@k12.dc.gov | Madeline Keefe, LICSW<br>Cell: 202-577-9403<br>Email: Madelyn.keefe@dc.gov<br><br>Supervisor: Luis Morales, LICSW |

Revised 1/11/2022

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12 | 1 | 1 | DCPS | COLUMBIA HEIGHTS EDUCATIONAL CAMPUS – MIDDLE<br>3101 16TH Street, NW<br>Washington, DC 20010<br>Main #:  202-939-6680<br>Fax #:  202-576-9158 | 6TH- 8TH | Maria Tukeva<br>Maria.tukeva@k12.dc.gov | Aaron Feinstein,LICSW<br>Cell:  202-597-2912<br>Office: 202-939-6686<br>Email: aaron.feinstein@dc.gov<br>Supervisor:  Luis Morales, LICSW |
| 13 | 4 | 1 | DCPS | DOROTHY HEIGHT ELEMENTARY SCHOOL<br>1300 Allison Street, NW<br>Washington, DC 20011<br>Main # 202-723-4100<br>Fax# 202-723-6867 | PK4-5th | Masi Peston<br>Masi.Preston@k12.dc.gov | Jennifer Murphy, LICSW<br>Cell: (202)568-0882<br>Email:  Jennifer.murphy3@dc.gov<br><br>Supervisor: David Shrank, LICSW |
| 14 | 8 | .5 | DCPS | GARFIELD ELEMENTARY SCHOOL<br>2435 Alabama Ave, SE<br>Washington, DC 20020<br>Main #:  202-671-6140<br>Fax #: 202-698-1614 | PK3-5th | Kennard Branch<br>Kennard.branch@k12.dc.gov | Vacant |
| 15 | 8 | 1 | DCPS | HART MIDDLE SCHOOL<br>601 Mississippi Ave, SE<br>Washington, DC 20032<br>Main #:  202-671-6426<br>Fax #:  202-645-3426 | 6th-8th | Charlette Butler-Strickland<br>Charlette.butler@k12.dc.gov | Vacant |
| 16 | 6 | 1 | DCPS | JEFFERSON MIDDLE SCHOOL<br>801 7th Street, SW<br>Washington, DC 20024<br>Main#:  202-729-3270<br>Fax #:  202-724-2459 | 6th- 8th | Greg Dohmann<br>Greg.dohmann@k12.dc.gov | Lakeasha Hart-Tribue, LICSW<br>Cell:  202-821-9386<br>Email: Lakeasha.hart2@dc.gov<br><br>Supervisor:  Carrie Grundmayer, LICSW |
| 17 | 8 | 1 | DCPS | JOHNSON MIDDLE SCHOOL<br>1400 Bruce Street, SE<br>Washington, DC 20020<br>Main #:  202-939-3140<br>Fax #:  202-645-5882 | 6th-8th | Dwan Jordon<br>Dwan.jordon@k12.dc.gov | Tiffany Hardy, LICSW<br>Cell:  202-379-8782<br>Email: Tiffany.hardy@dc.gov<br><br>Supervisor: Luis Morales, LICSW |

Revised 1/11/2022

| 18 | 7 | 1 | DCPS | **KELLY MILLER MIDDLE SCHOOL**<br>301 49TH STREET, NE<br>WASHINGTON, DC 20019<br>Main #:  202-388-6870<br>Fax #:  202-727-8330 | 6th-8th | Kortni Stafford<br>Kornti.stafford@k12.dc.gov | Vacant |
| 19 | 8 | 1 | DCPS | **KETCHAM ELEMENTARY SCHOOL**<br>1919 15TH Street, SE<br>Washington, DC 20020<br>Main #:  202-698-1122<br>Fax #:  202-698-1113 | PK3-5th | Maisha Riddlesprigger<br>Maisha.riddlesprigger@k12.dc.gov | JoEtta Thomas, LICSW<br>Cell:  202-441-7835<br>Email:  joetta.thomas@dc.gov<br><br>Supervisor: Carrie Grundmayer, LICSW |
| 20 | 3 | .5 | DCPS | **KEY ELEMENTARY**<br>5001 Dana Place, NW<br>Washington, DC 20016<br>Main# 202-729-3280<br>Fax# 202-282-0188 | PK4-5th | David Landeryou<br>David.landeryou@k12.dc.gov | Vacant |
| 21 | 8 | .5 | DCPS | **KING ELEMENTARY SCHOOL**<br>3200 6TH Street SE<br>Washington, DC 20032<br>Main# 202-939-4900<br>Fax# 202-645-7308 | PK3-5 | Angel Hunter<br>Angel.hunter@k12.dc.gov | Vacant |
| 22 | 8 | 1 | DCPS | **KRAMER MIDDLE SCHOOL**<br>1700 Q Street, SE<br>Washington, DC 20020<br>Main #:  202-939-3150<br>Fax 3:  202-698-1171 | 6th-8th | Katreena Shelby<br>Katreena.shelby@k12.dc.gov | Tiera Brown, LICSW<br>Cell: 202-748-1387<br>Email: Tiera.brown1@dc.gov<br><br>Supervisor: Carrie Grundmayer, LICSW |
| 23 | 8 | 1 | DCPS | **MALCOLM X ELEMENTARY SCHOOL**<br>1500 Mississippi Ave, SE<br>Washington, DC  20032<br>Main#: 202-645-3409<br>Fax #:  202-645-7219 | PK3- 5th | Zara Berry-Young<br>Zara.berry-young@k12.dc.gov | Janice Jackson, LICSW<br>Cell:  202-744-1849<br>Email:  Janice.jackson@dc.gov<br><br>Supervisor: Luis Morales, LICSW |

Revised 1/11/2022

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 24 | 5 | .5 | DCPS | **MCKINLEY TECHNOLOGY MIDDLE SCHOOL**<br>151 T Street, NE<br>Washington, DC 20002<br>Main #: 202-281-3950<br>Fax #: 202- 832-1293 | 6th-8th | Mary Louise Jones<br>Loiuse.jones@k12.dc.gov | Austin Quinn, LICSW<br>Cell: 202-763-3208<br>Email: Austin.quinn@dc.gov<br><br>Supervisor: Monica Hammock, LICSW |
| 25 | 5 | .5 | DCPS | **MCKINLEY TECHNOLOGY HIGH SCHOOL**<br>151 T Street, NE<br>Washington, DC 20002<br>Main #: 202-281-3950<br>Fax #: 202- 576-6279 | 9th-12th | Mary Louise Jones<br>Loiuse.jones@k12.dc.gov | Austin Quinn, LICSW<br>Cell: 202-763-3208<br>Email: Austin.quinn@dc.gov<br><br>Supervisor: Monica Hammock, LICSW |
| 26 | 6 | .5 | DCPS | **MINER ELEMENTARY SCHOOL**<br>601 15th Street, NE<br>Washington, DC 20002<br>Main#: 202-397-3960<br>Fax#: 202-724-4957 | PK3-5th | Katrel Angry<br>Katrel.angry@k12.dc.gov | Alyson St. Amand, LICSW<br>Cell: 202-740-0378<br>Email: Alyson.StAmand@dc.gov<br><br>Supervisor: Jackie Droddy, LICSW |
| 27 | 8 | 1 | DCPS | **MOTEN ELEMENTARY SCHOOL**<br>1565 Morris Road, SE<br>Washington, DC 20020<br>Main #: 202-698-1111<br>Fax 3: 202-698-1112 | PK3-5th | Akela Stanfield- Dogbe<br>Akela.dogbe@k12dc.gov | Karra Hancock, LICSW<br>Cell: 202-815-0125<br>Email: Karra.hancock4@dc.gov<br><br>Supervisor: Jackie Droddy, LICSW |
| 28 | 8 | 1 | DCPS | **PATTERSON ELEMENTARY SCHOOL**<br>4399 South Capitol Terrace, SW<br>Washington, DC 2032<br>Main#: 202-939-5280<br>Fax# : 202-645-3851 | PK3-5th | Victorie Thomas<br>Victorie.thomas@k12dc.gov | Bridget McGiffin<br>Cell: (202) 578-0569<br>Email: bridget.mcgiffin@dc.gov<br><br>Supervisor: Jackie Droddy, LICSW |
| 29 | 7 | 1 | DCPS | **RON BROWN COLLEGE PREP HIGH SCHOOL**<br>4800 Meade Street<br>Washington, DC 20019<br>Main# 202-729-4343<br>Fax# | 9-12th | Charles Hunt<br>Charles.hunt@k12.dc.gov | Pierre Thomas, LICSW<br>Pierre.thomas@dc.gov<br>Cell: 202-740-7819<br><br>Supervisor: Jackie Droddy, LICW |

Revised 1/11/2022

| 30 | 4 | 1 | DCPS | **ROOSEVELT HIGH SCHOOL**<br>4301 13th Street NW<br>Washington, DC 20011<br>Main # 202-576-6130<br>Fax # 202 – 671-3310 | 9TH-12TH | Justin Rolston<br>Justin.rolston@k12.dc.gov | Hope Beavers<br>Cell: (202-)740-2136<br>Email: hope.beavers@dc.gov<br><br>Supervisor: David Shrank |
| 31 | 8 | 1 | DCPS | **SIMON ELEMENTARY SCHOOL**<br>401 Mississippi Ave, SE<br>Washington, DC 20032<br>Main#: 202-645-3360<br>Fax #: 202-645-3359 | PK3-5th | Franchita Eborn<br>Franchita.eborn@k12.dc.gov | Tina Terrill, LICSW<br>Cell: 202-578-8650<br>Email: tina.terrill@dc.gov<br><br>Supervisor: David Shrank, LICSW |
| 32 | 8 | 1 | DCPS | **STANTON ELEMENTARY SCHOOL**<br>2710 Naylor Road, SE<br>Washington, DC 20020<br>Main #: 202-671-6180<br>Fax #: 202-645-3264 | PK3-5th | Harold McCray<br>harold.mccray@k12.dc.gov | Kim Stiven, LICSW<br>Cell: 202-498-8945<br>Email: kim.stiven1@dc.gov<br><br>Supervisor: Luis Morales, LICSW |
| 33 | 6 | 1 | DCPS | **STUART HOBSON MIDDLE SCHOOL**<br>410 E Street NE<br>Washington, DC 20002<br>Main#: 202-671-6010<br>Fax#: 202-698-4720 | 6th-8th | Eric Fraser<br>Eric.fraser@k12.dc.gov | Kimberly Harrington, LICSW<br>Cell: 202-557-6404<br>Email:<br>Kimberly.harrington@dc.gov<br><br>Supervisor: Carrie Grundmayer, LICSW |
| 34 | 4 | 1 | DCPS | **TAKOMA EDUCATIONAL CAMPUS**<br>7010 Piney Branch Road, NW<br>Washington, DC 20012<br>Main#: 202-671-6050<br>Fax#: 202-671-5305 | PK3-8th | Brandon Clayton<br>Brandon.clayton@k12.dc.gov | Vanessa Haywood, LICSW<br>Cell: 202-573-6585<br>Email: Vanessa.Haywood@dc.gov<br><br>Supervisor: Monica Hammock, LICSW |
| 35 | 7 | 1 | DCPS | **NEVEL THOMAS ELEMENTARY SCHOOL**<br>650 Anacostia Avenue, NE<br>Washington, DC  20019<br>Main#: 202-724-4593<br>Fax#: 202-724-5053 | PK3- 5th | Jaimee Trahan<br>Jaimee.trahan@k12.dc.gov | Vacant |

Revised 1/11/2022

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 36 | 8 | 1 | DCPS | **TURNER ELEMENTARY SCHOOL**<br>3264 Stanton Road, SE<br>Washington, DC 20020<br>Main #:  202-645-3470<br>Fax 3:  202-645-3467 | PK3-5th | Jessica Johnson<br>Jessica.Morris@k12.dc.gov | Vacant |
| 37 | 6 | .5 | DCPS | **WALKER-JONES EDUCATIONAL CAMPUS**<br>1125 New Jersey Avenue, NW<br>Washington, DC 20001<br>Main#:  202-939-5934<br>Fax#:  202-535-1307 | PK3-8th | Clinton Turner<br>Clinton.turner3@k12.dc.gov | Vacant |
| 38 | 5 | 1 | DCPS | **WHEATLEY EDUCATIONAL CAMPUS**<br>1299 Neal Street, NE<br>Washington, DC  20002<br>Main #:  202-939-5970<br>Fax #:  202-724-9090 | PK3-8th | Shenora Plenty<br>Shenora.plenty@k12.dc.gov | Vacant |
| 39 | 3 | 1 | DCPS | **WOODROW WILSON SENIOR HIGH SCHOOL**<br>3950 Chesapeake Street, NW<br>Washington, DC  20008<br>Main#:  202-282-0120<br>Fax #:  202-282-0077 | 9th-12th | Greg Bargeman<br>Greg.bargeman@k12.dc.gov | Perette Arrington, PsyD<br>Cell:  202-494-3157<br>Email:  Perette.arrington@dc.gov<br><br>Supervisor: Monica Hammock, LICSW |

Revised 1/11/2022

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 40 | 8 | .5 | DCPCS | **CENTER CITY PCS CONGRESS HEIGHTS**<br>220 Highview Place, SE<br>Washington, DC 20032<br>Main #:  202-562-7070<br>Fax #:  202-574-5829 | PK3-8th | Niya White<br>Nwhite@centercitypcs.org | Jasmine Tingling Clemmons, LICSW<br>Cell:  202-438-1810<br>Email: Jasmine.tingling-clemmons@dc.gov<br><br>Supervisor: Carrie Grundmayer, LICSW |
| 41 | 6 | .5 | DCPCS | **CENTER CITY PCS CAPITOL HILL**<br>1503 East Capitol Street, SE<br>Washington, DC  20003<br>Main #:  202-537-7556<br>Fax: 202-589- | PK3-8th | Ayesha Abdul-Rahim<br>aabdulrahim@centercitypcs.org | Jasmine Tingling Clemmons, LICSW<br>Cell:  202-438-1810<br>Email: Jasmine.tingling-clemmons@dc.gov<br><br>Supervisor: Carrie Grundmayer, LICSW |
| 42 | 6 | .5 | DCPCS | **CENTER CITY PCS SHAW**<br>711 N Street, NW<br>Washington, DC<br>Main# 202-234-1093<br>Fax# | PK4-8th | Aaron Dukes<br>adukes@centercitypcs.org | Vacant |
| 43 | 5 | .5 | DCPCS | **CENTER CITY PCS TRINIDAD**<br>1217 West Virginia Avenue, NE<br>Washington, DC<br>Main# 2020-397-1614<br>Fax# | PK4-8th | Brandy Tyson<br>btyson@centercitypcs.org | Vacant |
| 44 | 8 | .5 | DCPCS | **CEDAR TREE PCS**<br>701 Howard Rd, SE<br>Washington, DC 20020<br>Main#:  202-800-8655<br>Fax #:  202-610-2845 | PK3-K | Celenease Edison<br>cedison@cedartree-dc.org | Sharon Hardy, LICSW<br>Cell:  202-821-5452<br>Email:<br>Sharon.hardy@dc.gov<br><br>Supervisor: David Shrank, LICSW |

Revised 1/11/2022

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 45 | 7 | 1 | DCPCS | **CESAR CHAVEZ PCS PARKSIDE MIDDLE**<br>3701 Hayes Street, NE<br>Washington, DC 20019<br>Main#:  202-398-2230<br>Fax #:  202-398-1966 | 6th-8th | Kourtney Miller<br>Kourtney.miller@chavezschools.org | Vacant |
| 46 | 1 | 1 | DCPCS | **DC INTERNATIONAL SCHOOL**<br>1400 Main Drive, NW<br>Washington, DC 20012<br>Main#:  202-808-9033<br>Fax #: | 6th-12th | Maya Stewart<br>maya,stewart@dcinernationalschool.org | Christiane Brady, LICSW<br>Cell:  202-748-3988<br>Email:  Christiane.brady@dc.gov<br><br>Supervisor: Monica Hammock, LICSW |
| 47 | 6 | .5 | DCPCS | **EAGLE ACADEMY PCS**<br>1017 New Jersey Ave, SE<br>Washington, DC 20003<br>Main#:  202-459-6825<br>Fax#:  202-476-6796 | PK3-2nd | Royston Lyttle<br>rlyttle@eagleacademypcs.org | Vacant |
| 48 | 8 | 1 | DCPCS | **EAGLE ACADEMY PCS**<br>3400  Wheeler RD SE<br>Washington, DC 20032<br>Main#:  202-544-2646<br>Fax:  202-544-0187 | PK3-3rd | Sharmel Robinson<br>Sharmel.Robinson@eagleacademypcs.org | Oron Gan, PsyD<br>Cell: 202-365-5133<br>Email:  oron.gan@dc.gov<br><br>Supervisor: David Shrank, LICSW |
| 49 | 4 | 1 | DCPCS | **EL HAYNES PCS**<br>4501 Kansas Ave, NW<br>Washington, DC 20011<br>Main#:  202-706-5828<br>Fax #:  202-667-8811 | PK3-4th | Brittney Wagner Friel<br>bwagnerfriel@elhaynes.org | Danielle Goldberg, LICSW<br>Cell: 202-236-4622<br>Email:  Danielle.goldberg@dc.gov<br><br>Supervisor: Jackie Droddy, LICSW |

Revised 1/11/2022

| 50 | 7 | 1 | DCPCS | **FRIENDSHIP BLOW PIERCE**<br>725 19th Street, NE<br>Washington, DC 20002<br>Main#: 202-572-1070<br>Fax#: 202-399-6157 | PK3-8th | Gregory Spears<br>gspears@friendshipschools.org | Taiwan Lovelace, PhD<br>Cell: 202-834-2636<br>Email: Taiwan.lovelace@dc.gov<br><br>Supervisor: Carrie Grundmayer, LICSW |
| 51 | 7 | .5 | DCPCS | **FRIENDSHIP SOUTHEAST ACADEMY MIDDLE**<br>645 Milwaukee Pl., SE<br>Washington, DC 20032<br>Main#: (202) 562-1980<br>Fax#: (202) 986-9240 | 7th-8th | David Lawery<br>dlawery@friendshipschools.org | Sharryl Jackson, LICSW<br>Cell: 202-834-6327<br>Email: Sharryl.Jackson@dc.gov<br><br>Supervisor: Monica Hammock, LICSW |
| 52 | 7 | .5 | DCPCS | **FRIENDSHIP TECHNOLOGY PREP HS**<br>2705 Martin Luther Avenue SE<br>Washington, DC 20032<br>Main#: (202) 552-5700<br>Fax#: (202) 986-9240 | 9th-12th | Kun Ye Booth<br>kbooth@friendshipschools.org | Sharryl Jackson, LICSW<br>Cell: 202-834-6327<br>Email: Sharryl.Jackson@dc.gov<br><br>Supervisor: Monica Hammock, LICSW |
| 53 | 5 | .5 | DCPCS | **INSPIRED TEACHING DEMONSTRATION PCS**<br>200 Douglas Street, NE<br>Washington, DC 20002<br>Main#: 202-248-6825<br>Fax#: 202-248-6939 | PK3-8th | Shannon Kane, EdD<br>skane@inspiredteachingschool.org<br><br>Seth Biderman<br>sbiderman@inspiredteachingschool.org | Emily Kahan, LICSW<br>Cell: 202-480-6765<br>Email: Emily.kahan@dc.gov<br><br>Supervisor: Monica Hammock, LICSW |
| 54 | 5 | .5 | DCPCS | **LATIN AMERICAN MONTESSORI BILINGUAL**<br>5000 14th Street, NW<br>Washington, DC 20011<br>Main#: 202-726-6200<br>Fax# | PK3- 5 | Michelle Mangan<br>michelle@lambpcs.org | Alyson St. Amand, LICSW<br>Cell: 202-740-0378<br>Email: Alyson.StAmand@dc.gov<br><br>Supervisor: Jackie Droddy, LICSW |

Revised 1/11/2022

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 55 | 5 | .5 | DCPCS | **MUNDO VERDE PUBLIC CHARTER SCHOOL**<br>30 P Street NW<br>Washington, DC 20001<br>Main# 202-750-7060<br>Fax # 202-905-0002 | PreK-5th | Roynetta Douglas<br>rdouglas@mundoverdepcs.org | Miata Tucker Zaza, LICSW<br>Cell:  202-407-2164<br>Email:  Miatta.Tucker-Zaza@dc.gov<br><br>Supervisor: Luis Morales, LICSW |
| 56 | 4 | 1 | DCPCS | **PAUL PUBLIC CHARTER SCHOOL**<br>5800 8th Street, NW<br>Washington, DC 20011<br>Main# 202-291-7499<br>Fax# 202-291-7495 | 6th-12 | Guye Turner<br>gturner@paulcharter.org<br><br>Shendrina Walker<br>swalker@paulcharter.org | Brian Wheeler, LICSW<br>Cell: 202-841-0401<br>Email: Brian.Wheeler2@dc.gov<br><br>Supervisor: David Shrank, LICSW |
| 57 | 5 | 1 | DCPCS | **PERRY STREET PREP PUBLIC CHARTER SCHOOL**<br>1800 Perry Street, NE<br>Washington, DC 20018<br>Main# 202-529-4400<br>Fax # 202-526-2214 | PK-8th | Rachel Crouch<br>Rachel.crouch@pspdc.org | Doree Smith, LICSW<br>Cell: 202-527-2051<br>Email:  doree.powell2@dc.gov<br><br>Supervisor:  David Shrank, LICSW |
| 58 | 6 | 1 | DCPCS | **RICHARD WRIGHT PCS**<br>770 M Street, SE<br>Washington, DC 20001<br>Main#:  202-388-1011<br>Fax #:  202-388-5197 | 8th-12th | Marco Clark<br>Marco.clark@richardwrightpcs.org | Shara Cyrus, LICSW<br>Cell: 202-763-9131<br>Email: Shara.Cyrus@dc.gov<br><br>Supervisor: Carrie Grundmayer, LICSW |
| 59 | 4 | .5 | DCPCS | **SELA PCS**<br>6015-17 Chillum Place, NE<br>Washington, DC 20011<br>Main#:  202-670-7352<br>Fax#:  202-722-2968 | PK4-4th | Joshua Bork<br>jbork@selapcs.org | Emily Kahan, LICSW<br>Cell: 202-480-6765<br>Email: Emily.kahan@dc.gov<br><br><br>Supervisor: Monica Hammock, LICSW |

Revised 1/11/2022

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 60 | 7 | .5 | DCPCS | **ELSIE WHITLOW STOKES**<br>5600 South Capitol Street,<br>Washington, DC<br>Main: 202-975-2100 | PK3-2 | Karim Ewing Boyd<br>KarimE@ewstokes.org | Vacant |
| 61 | 8 | 1 | DCPCS | **THURGOOD MARSHALL HIGH SCHOOL**<br>2427 Martin Luther King Jr Ave, SE<br>Washington, DC  20020<br>Main#:  202-569-6862<br>Fax #:  202-563-6946 | 9th-12th | Raymond Weeden<br>rweeden@tmapchs.org | Joyce Ericson, LICSW<br>Cell: 202-669-4116<br>Email: joyce.ericson@dc.gov<br><br>Supervisor: Jackie Droddy, LICSW |
| 62 | 6 | 1 | DCPCS | **TWO RIVERS PCS – 4TH STREET**<br>1227 4th Street NE<br>Washington, DC 20002<br>Main# 202-546-4477<br>Fax# 202-546-0869 | Pk3-8TH | Caroline Mwendwa-Baker<br>cbaker@tworiverspcs.org | Vacant |
| 63 | 5 | .5 | DCPCS | **TWO RIVERS PCS**<br>820 26th Street, NE<br>Washington, DC 20002<br>Main# 202-388-1360<br>Fax# | PK3-3rd | Chelsie Jones<br>cjones@tworiverspcs.org | Belinda Davis, LICSW<br>Cell: 202-631-3458<br>Email: Belinda.davis@dc.gov<br><br>Supervisor: Luis Morales, LICSW |
| 64 | 4 | 1 | DCPCS | **WASHINGTON Yu-Ying**<br>220 Taylor Street, NE<br>Washington, DC 20017<br>Main #:  202-635-1950<br>Fax#: 202-635-1960 | PK3-5th | Maquita Alexander<br>maquita@washingtonyuying.org | William McNulty, LICSW<br>Cell:  202-295-7036<br>Email: William.mcnulty@dc.gov<br><br>Supervisor: Monica Hammock, LICSW |

# School Mental Health Managers

Erica Barnes, Branch Chief        202-299-5847 (O)        202-295-7037 (C)        Erica.barnes@dc.gov

Jacqueline Droddy, Supervisor     202-673-7127 (O)        202-222-8785 (C)        Jacqueline.droddy@dc.gov

Monica Hammock, Supervisor        202-299-5296 (O)        202-380-7400 (c)        monica.hammock@dc.gov

Luis Morales, Supervisor          202-299-5703 (O)        202-494-8489 (c)        luis.morales3@dc.gov

Carrie Grundmayer, Supervisor     202-299-5702 (O)        202-494-0664 (c)        carrie.gundmayer@dc.gov

David Shrank, Supervisor                                  202-281-6821 (c)        david.shrank@dc.gov


J"Wan Griffin, Primary Project    202-299-5446 (O)        202-446-4128            jwan.griffin@dc.gov

Revised 1/11/2022

Q. 22 Attachment 1 of 3

Q22. Please provide an update on the Department's School Mental Health Program including a list of all schools that participate. For each school, please also include:

  a.  The number of student who met with a clinician;
  b.  The number of students who were referred to care;
  c.  The most common diagnosis;
  d.  The referral source (i.e. walk-in, teacher);
  e.  The number of students participating in prevention programs;

| | SY | |
|---|---|---|
| | **2020-2021** | |
| The number of students who met with a clinician | 960 | |
| The number of students who were referred to care | 372 | |
| Most Common Diagnosis | Adjustment Disorder | |
| | Major Depressive Disorder | |
| | ADHD/Anxiety | |
| Referral Source | Primary Project | 0% |
| | School | 74% |
| | Parents | 14% |
| | Student-Self Referrals | 5% |
| | Other | 6% |
| The number of students participating in prevention programs | 11,336 | |

*Q22. Please provide an update on the Department's School Mental Health Program including a list of all schools that participate. For each school, please also include:*

    *a.  The number of student who met with a clinician;*
    *b.  The number of students who were referred to care;*
    *c.  The most common diagnosis;*
    *d.  The referral source (i.e. walk-in, teacher);*
    *e.  The number of students participating in prevention programs;*
    *f.  Whether the current programs are meeting the existing need for services, and if not, what is being done to meet the total need;*
    *g.  What prevention programs and services were offered through the SMHP in FY21 and FY22 to date;*
    *h.  Any plans to expand the program and barriers to expansion; and*
    *i.  The number of FTEs serving in each school.*
    *j.  Please explain how this program and the data provided in response to (a) through (i) above may have been impacted by the COVID-19 pandemic and the transition to distance learning.*

**DBH Response**

The DBH School Based Behavioral Health Program consists of 39 clinicians servicing 46 District schools. Please see Attachment 1 which includes data that describes the following information: a) the number of students who met with a clinician, b) the number of students who were referred to care, c) the most common diagnosis, d) the referral source, and e) the number of students participating in prevention programs. See Attachment 2 for g) prevention programs and services offered in SMHP during FY21 and FY22 to date. See Attachment 3 for i) the SBHP School List with the number of FTEs that serve each school.

f.   Through the District's Expansion of School-based Behavioral Health services, each of the 251 DC Public and DC Public Charter Schools will receive a full-time licensed behavioral health clinician to provide prevention, early intervention, and treatment services. In addition, 46 of the DC Public and Public Charter Schools also have a DBH-hired clinician providing behavioral health services and supports.

h.   The DBH staffed SBBHP has no plans on expanding at this time.

i.   During SY20-21, DBH clinicians and youth all adapted to work within the on-line learning environment. Specifically, clinicians used technology to reach the students in their familiar platforms and continued to provide prevention, early intervention, and treatment services. Some examples of the programs that were implemented by the SBBHP clinicians were: *Too Good for Violence*, *Too Good for Drugs*, *Kimochis*, *Signs of Suicide*, and *Love is Not Abuse*, and *Zones of Regulation*. Many of the clinicians also created videos of programs and of themselves reading books so students and families could review the material when it was convenient for them. Additionally, clinicians used Instagram Live and other social media platforms to discuss various mental health topics (e.g., common mental health issues, coping strategies, behavioral health resources). DBH clinicians offered virtual office hours for students and parents to check in or consult with a mental health professional. DBH clinicians

continually assessed the mental health needs of the student and families in their school communities and made shifts to programming and services as needed.

During SY20-21, the DBH SBBHP clinicians continued to provide services to students on all three tiers; however, there was a decrease in Tier 3 services. Specifically, the DBH SBBHP data from SY20-21 revealed a 76% decrease from SY19-20 in the number of students receiving Tier 3 services (i.e., walk-in services and treatment services). There are multiple reasons that attribute to this decrease. One of the important benefits of school-based services is having clinicians available if and when students need someone to talk to. Students could essentially walk-in and receive support from the clinician. During virtual learning, many clinicians provided virtual office hours, where students were encouraged to reach out to clinicians; however, students at home were less likely to walk-in and discuss struggles with clinicians. In addition, some students did not participate in virtual learning, were disengaged, or did not turn their cameras on during class. As a result, it was likely harder for teachers and school staff to identify and refer students who were struggling and could benefit from behavioral health resources. Fewer identified students led to fewer students receiving treatment services. The number of students receiving Tier 1 and Tier 2 services remained consistent across SY19-20 and SY20-21.

During SY21-22, the DBH SBBHP clinicians returned to providing all in person behavioral health services at the schools and the data suggests that more students are being referred and are accessing Tier 3 services. Between August and December 2021, 370 students were referred to DBH SBBHP clinicians for treatment services. The number of referrals during the first five months of SY21-22 is consistent with the number of referrals (373) clinicians received for the entire SY20-21.

In addition to an increase in referrals, there has been an increase in the number of students who met with a clinician thus far in SY21-22. This year between August and December 2021, 885 students met with a clinician as compared to 960 students in SY 20-21 across the entire school year. The increase in behavioral health services may be related to students returning to school in-person five days a week and having more access to in-person behavioral health services. The DBH clinicians are continuing to work with students, parents, and school staff to ensure they are aware of the school behavioral health resources and understand how to access services when and if needed.

*Q23. Please provide an update on the status of implementation of the public health model for school-based mental health. Please include the following information for Cohort 1, Cohort 2, and Cohort 3:*

> a. *List all schools in each cohort*
> b. *Number of schools matched with a CBO, and identify which CBO has been matched with which schools*
> c. *Number of schools where a CBO clinician has been hired and is working in the schools and identify which schools*
> d. *Number of schools where a CBO clinician has been hired, but is not yet working in the school, and identify which schools and provide the reason why the CBO clinician is not yet working in the school*
> e. *Number of schools where the CBO clinician has not yet been hired, and identify which schools and provide the reason why the CBO clinician has not yet been hired*
> f. *Please describe any obstacles or barriers to having CBO clinicians working in schools at the start of the school year*
> g. *Please explain how this program and the data provided in response to (a) through (g) above may have been impacted by the COVID-19 pandemic and the transition to distance learning.*

**DBH Response**

A total of 251 DC public and DC Public Charter schools comprise Cohort 1, Cohort 2, Cohort 3, and Cohort 4 of the School Behavioral Health Expansion. The Attachment 1 provides information on a) list of schools in each Cohort. As of January 12, 2022, of the 251 schools, 155 or 62% have a CBO or DBH provider working in the school. There are 36 schools in Cohort 4, the newest Cohort and 2 schools in previous Cohorts that do not have a match with a provider for partnership for the full array of prevention, early intervention, and treatment services.
The information requested by individual Cohort (i.e., item b, c, d, and e) is included in Attachments 2-5. The attachments provide more specific information by cohort regarding hiring.

f. The CBO leaders note a range of obstacles and barriers to having CBO clinicians working in schools at the start of the school year. It is reported that retention, recruitment and hiring have been difficult. Clinicians are resigning due to personal life choices and applicants are declining job offers due to competitive salaries and opportunities to work remotely. In one reported case, termination of clinician occurred due to vaccination status. Additionally, some candidates have reported hesitancy providing in-person services during the pandemic. DBH continues to collaborate with partners to support the steps required for licensure and background check screening of prospective CBO hires. Additionally in order to support the retention of clinicians who report at times feeling depleted, disillusioned, and disenfranchised, DBH, DCPS, and the Community of Practice (CoP) partnered to develop opportunities specifically for clinicians to create space for self-care activities to promote clinician wellness.

The larger issue of an overall staffing shortage in the industry continues to be noted by CBOs as a barrier to recruitment and hiring of clinicians for the field of school-based behavioral health. The setting of serving an alternative school that includes adult students has been challenging to

find candidates willing to consider placement in that school setting.  DBH and OSSE continue to partner with the Workforce Development committee members that include CBO representation to address issues of retention, recruitment, and expanding the graduate school to work pipeline in school-based behavioral health.

g. Although the COVID-19 pandemic and transition to distance and hybrid learning continues to require creative innovation with rapport building and joining the school community, the CBOs have continued to try and address the needs. In the face of COVID-19 and the Omicron surge, the CBOs report various successful strategies and collaborations that their organization and their school-based clinicians have engaged in to reach the students and their families. For example, staff developed plans with students that show how to connect if a staff or student is quarantined and used telehealth services when needed.  In addition, clinicians provided frequent check-in calls to families, offered crisis management during the school day, held in-person and virtual office hours, encouraged self-referrals, and collaborated with school staff and administrators to ensure services and supports were being provided to students and families.

Q23. Attachment 1 of 5. School List in Each Cohort
Q23. Attachment 2 of 5. Information for Cohort 1
Q23. Attachment 3 of 5. Information for Cohort 2
Q.23.Attachment 4 of 5. Information for Cohort 3
Q.23.Attachment 5 of 5. Information for Cohort 4

Q.23.Attachment 1 of 5. School List in Each Cohort

---

**Cohort 1 Schools that include Adult populations include:**

Luke C. Moore HS (9-12/Adult, ages 16-22, City-wide Opportunity Academy) River Terrace Education Campus (3rd- Adult, citywide Special Education campus)

**Cohort 1 Schools that closed are:**

Democracy Prep

Washington Metropolitan High School National Collegiate Preparatory PCHS

Cesar Chavez Parkside MS

---

**Cohort 1**

1. Aiton ES
2. Anacostia
3. Ballou HS
   *(Project Aware Phase 1)*
4. Cardozo EC
   *(Project AWARE Phase 2)*
5. Cesar Chavez PCS for Public PolicyParkside HS
6. Coolidge HS
7. CW Harris ES
8. Dunbar HS
9. Eastern HS
10. Eliot Hine MS
11. Friendship PCS Blow Pierce Middle School
    *(Project AWARE Phase 2)*
12. Friendship PCS Collegiate Academy
    *(Project Aware Phase 1)*
13. Garfield ES
14. Hart MS
15. Hendley ES
    *(Project Aware Phase 1)*
16. Houston ES
    *(Project AWARE Phase 2)*

17. IDEA PCS
18. Ingenuity Prep PCS
19. Jefferson Middle School Academy
20. Johnson John Hayden MS
    *(Project AWARE Phase 2)*
21. Kelly Miller MS
22. Ketcham ES
23. Kimball ES
24. King M L ES
25. Kingsman Academy PCS
26. KIPP DC AIM Academy PCS
    *(Project AWARE Phase 2)*
27. KIPP DC College Preparatory Academy PCS
    *(Project AWARE Phase 2)*
28. KIPP DC: Somerset Preparatory Academy PCS
    *(Project AWARE Phase 2)*
29. Kramer MS
    *(Project AWARE Phase 2)*
30. Luke C. Moore Alternative HS
    *(Project Aware Phase 1)*
31. Malcolm X ES at Green
32. Maya Angelou PCS - High School
33. Monument Academy PCS

34. Moten ES
35. Patterson ES
36. River Terrace EC
37. Rocketship Rise PCS
38. Roosevelt HS
39. Savoy ES
40. SEED PCS of Washington DC
41. Smothers
42. Stanton ES
43. Sousa MS
44. St. Coletta Special Education PCS
45. The Children's Guild PCS
46. Turner ES
47. Walker Jones EC
48. Woodson HD HS

**Cohort 2 Schools that closed are:**
Achievement Prep MS - Whaler

## Cohort 2

1. Achievement Preparatory Academy ES - Whaler
2. Amidon-Bowen Elementary School
3. Bancroft Elementary School @ Sharpe
4. Barnard
5. Beers ES
6. Boone Elementary School
7. Bridges PCS
8. Brightwood Education Campus
9. Brookland Middle School
10. Browne Education Campus *(Project AWARE Phase 2)*
11. Bruce-Monroe Elementary School @ Parkview
12. Burrville Elementary School
13. Capital City PCS - High School
14. Cedar Tree Academy PCS
15. Columbia Heights Education Campus
16. DC Bilingual PCS
17. DC Prep PCS - Benning MS
18. DC PrepPCS Benning ES
19. DC Scholars PCS
20. Deal Middle School
21. District of Columbia International School MS/HS
22. Dorothy I. Height Elementary School
23. Drew Elementary School
24. E.L. Haynes PCS - High School
25. Eagle Academy PCS - Congress Heights
26. Friendship PCS - Armstrong ES *(Project AWARE Phase 2)*
27. Friendship PCS: Southeast Academy ES *(Project Aware Phase 1)*
28. Friendship Southeast Academy MS *(Project Aware Phase 1)*
29. H.D. Cooke Elementary School
30. Harriet Tubman
31. Hope Community PCS - Tolson
32. J.O. Wilson Elementary School
33. KIPP DC: Lead Academy
34. KIPP DC: Northeast Academy PCS
35. KIPP DC: Promise PCS *(Project AWARE Phase 1)*
36. KIPP DC: Quest Academy PCS *(Project Aware Phase 1)*
37. KIPP DC: Spring Academy PCS
38. KIPP: Heights Academy PC *(Project AWARE Phase 2)*
39. Langdon ES
40. Langley Elementary School
41. LaSalle-Backus Education Campus *(Project Aware Phase 1)*
42. Leckie Education Campus
43. Marie Reed Elementary School
44. Mary McLeod Bethune Day Academy PCS
45. McKinley Tech High School
46. McKinley Tech Middle School
47. Meridian Elementary PCS
48. Miner Elementary
49. Nalle Elementary School
50. Paul HS PCS
51. Perry Street Prep PCS
52. Plummer ES
53. Powell
54. Raymond Education Campus
55. Richard Wright PCS for Journalism & Media Arts
56. Simon Elementary School
57. Stuart Hobson Middle School (Cap. Hill)
58. Takoma Education Campus
59. Thomas Elementary School
60. Thurgood Marshall Academy HS
61. Truesdell
62. Two Rivers Elementary PCS - 4th Street
63. Tyler Elementary School
64. Wheatley *(Project AWARE Phase 2)*
65. Whittier Education Campus
66. Woodrow Wilson High School

**Cohort 3 Schools that closed are:**
Hope Community PCS - Lamond

| Cohort 3 | | |
|---|---|---|
| 1. Briya PCS<br>2. Burroughs Elementary School<br>3. Capital City PCS - Lower School<br>4. Capital City PCS - Middle School<br>5. Center City PCS - Capitol Hill<br>   *(Principal desired to not receive resources last school year)*<br>6. Cleveland Elementary School<br>7. Creative Minds International PCS<br>8. DC Prep PCS Anacostia Elementary School<br>9. DC Prep PCS- Edgewood Elementary School<br>10. DC Prep PCS - Edgewood Middle School<br>11. Duke Ellington School of the Arts<br>12. Early Childhood Academy PCS<br>13. E.L. Haynes PCS - Elementary School<br>14. E.L. Haynes PCS- Middle School<br>15. Excel Academy<br>16. Friendship PCS- Blow Pierce Elementary School<br>   *(Project AWARE Phase 2)*<br>17. Friendship PCS - Chamberlain Elementary School<br>   *(Project AWARE Phase 2)*<br>18. Friendship PCS - Chamberlain Middle School<br>   *(Project AWARE Phase 2)*<br>19. Friendship PCS- Technology Preparatory High School<br>   *(Project AWARE Phase 1)*<br>20. Garrison Elementary School | 21. Hardy Middle School<br>22. Howard University Middle School of Mathematics and Science PCS<br>23. Inspired Teaching Demonstration PCS<br>24. KIPP DC - Arts and Technology Academy PCS<br>   *(Project AWARE Phase 1)*<br>25. KIPP DC - Connect Academy PCS<br>26. KIPP DC- Discover Academy PCS *(Project AWARE Phase 2)*<br>27. KIPP DC - Grow Academy PCS<br>28. KIPP DC – KEY Academy PCS<br>   *(Project AWARE Phase 1)*<br>29. KIPP DC- Valor Academy PCS<br>   *(Project AWARE Phase 1)*<br>30. KIPP DC - WILL Academy PCS<br>31. MacFarland Middle School<br>32. Mundo Verde Bilingual PCS J.F. Cook Campus<br>33. Noyes Elementary School<br>34. Oyster-Adams Bilingual School<br>35. Paul PCS - Middle School<br>36. Payne Elementary School<br>37. Phelps Architecture, Construction and Engineering High School<br>38. Randle Highlands Elementary School<br>39. Rocketship DC PCS- Legacy Prep<br>40. Ron Brown College Preparatory High School | 41. School Without Walls @ Francis-Stevens<br>42. Seaton<br>43. Thomson Elementary School<br>44. Washington Global PCS<br>45. Washington Leadership Academy PCS<br>46. West Education Campus |

**Cohort 4 Schools that include Adult populations include: Academy of Hope Adult PCS**
Ballou STAY
Maya Angelou Academy at the DC Jail
Maya Angelou Academy at New Beginnings (formerly Oak Hill)
Maya Angelou PCS - Young Adult Learning Center Roosevelt STAY
YouthBuild DC PCS

## Cohort 4

1. Academy of Hope Adult PCS
2. AppleTree Early Learning Center PCS - Columbia Heights
3. AppleTree Early Learning Center PCS - Douglas Knoll
4. AppleTree Early Learning Center PCS - Lincoln Park
5. AppleTree Early Learning Center PCS - Oklahoma Avenue
6. AppleTree Early Learning Center PCS - Parklands at THEARC
7. AppleTree Early Learning Center PCS - Southwest
8. Ballou STAY
9. Bard High School Early College DC
10. BASIS DC PCS
11. Benjamin Banneker HS
12. Breakthrough Montessori PCS
13. Brent ES
14. Bunker Hill ES
15. Capital Village PCS
16. Capitol Hill Montessori EC
17. Carlos Rosario International PCS
18. Center City PCS - Brightwood
19. Center City PCS - Congress Heights
20. Center City PCS - Petworth
21. Center City PCS - Shaw
22. Center City PCS - Trinidad
23. Community College Preparatory Academy PCS
24. DC Prep PCS - Anacostia Middle School
25. Digital Pioneers Academy PCS - Capitol Hill
26. Digital Pioneers Academy PCS - Johennin
27. Eagle Academy PCS - Capitol Riverfront
28. Eaton ES
29. Elsie Whitlow Stokes Community Freedom PCS - Brookland
30. Elsie Whitlow Stokes Community Freedom PCS - East End
31. Friendship PCS - Armstrong Middle
32. Friendship PCS - Ideal Elementary
33. Friendship PCS - Ideal Middle
34. Friendship PCS - Online Academy
35. Friendship PCS - Woodridge International Elementary
36. Friendship PCS - Woodridge International Middle
37. Girls Global Academy PCS
38. Global Citizens PCS
39. Goodwill Excel Center PCS
40. Harmony DC PCS - School of Excellence
41. Hearst ES
42. Hyde-Addison ES
43. I Dream PCS
44. Ida B Wells Middle School
45. Janney ES
46. Key ES
47. KIPP DC - Honor Academy PCS
48. KIPP DC - Inspire Academy PCS
49. KIPP DC - LEAP Academy PCS
50. KIPP DC - Pride Academy PCS
51. Lafayette ES
52. Latin American Montessori Bilingual PCS
53. LAYC Career Academy PCS
54. LEARN DC PCS
55. Lee Montessori PCS - Brookland
56. Lee Montessori PCS - East End
57. Ludlow-Taylor ES
58. Mann ES
59. Maury ES
60. Maya Angelou Academy at the DC Jail
61. Maya Angelou Academy at New Beginnings (formerly Oak Hill)
62. Maya Angelou PCS - Young Adult Learning Center
63. Maya Angelou Academy @ Youth Services Center
64. Military Road Early Learning Center
65. Mundo Verde Bilingual PCS - Calle Ocho
66. Murch ES
67. Peabody ES
68. Rocketship PCS - Infinity Community Prep
69. Roosevelt STAY
70. Roots PCS
71. Ross ES
72. School Without Walls HS
73. School-Within-School @ Goding

| Cohort 4 (Continued) | | |
|---|---|---|
| 74. Sela PCS<br>75. Shepherd ES<br>76. Shining Stars Montessori Academy PCS<br>77. Social Justice PCS<br>78. Statesmen College Preparatory Academy for Boys PCS<br>79. Stevens Early Learning Center<br>80. Stoddert ES<br>81. The Family Place PCS<br>82. The Next Step/El Proximo Paso PCS<br>83. The Sojourner Truth School PCS<br>84. Two Rivers PCS - Young Elementary School<br>85. Two Rivers PCS - Young Middle School<br>86. Van Ness ES<br>87. Washington Latin PCS - Middle School<br>88. Washington Latin PCS - Upper School<br>89. Washington Yu Ying PCS<br>90. Watkins ES<br>91. YouthBuild DC PCS | | |

| Cohort 1 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired But Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired But Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| Aiton ES | VOA | x | | | x | | Cesar Chavez Parkside MS | Hillcrest | School Closed | | | |
| Anacostia HS | LAYC | x | | | | | Ceser Chavez Parkside HS | Hillcrest | x | | | |
| Ballou HS (Project Aware Phase 1) | LAYC | x | | | | | Friendship PCS Blow Pierce Middle School | SMILE | | | x | x |
| C.W. Harris ES | MBI | x | | | | | Friendship PCS Collegiate Academy (Project Aware Phase 1) | SMILE | x | | | |
| Cardozo EC | LAYC | x | | | x | | IDEA PCS | SMILE | x | | | |
| Coolidge HS | MC | | | x | | | Ingenuity Prep PCS | CC | | | x | |
| Dunbar HS | Hillcrest | x | | | | | Kingsman Academy PCS | Hillcrest | | | | |
| Eastern HS | OCU | | | x | | | KIPP DC AIM Academy PCS | CC | x | | | |
| Eliot Hine MS | CC | x | | | | | KIPP DC College Preparatory Academy PCS | MC | x | | | |
| Garfield ES | CC | x | | | | | KIPP DC: Somerset Preparatory Academy PCS | CC | x | | | |
| Hart MS | Hillcrest | x | | | | | Maya Angelou HS PCS | Howard | | | x | |
| Hendley ES (Project Aware Phase 1) | CC | x | | | | | Monument Academy PCS | Not Matched yet with new CBO | | | | |
| Houston ES | MBI | x | | | | | National Collegiate Preparatory PCHS | Not Participating | School Closed | | | |
| Jefferson Middle School Academy | CC | x | | | x | | Rocketship RISE PCS | Hillcrest | | | x | |
| Johnson John Hayden MS | Hillcrest | x | | | x | | SEED PCS of Washington DC | OCU | | | x | |
| Kelly Miller MS | MBI | x | | | x | | St. Coletta Special Education | DBH CS | | | | |
| Ketcham ES | COH | x | | | x | | The Children's Guild PCS | DBH CS | | | | |
| Kimball ES | Hillcrest | | Clearance process | | | | TOTAL  15 | | 7 | | 5 | 1 |

| Cohort 1 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired But Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired But Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| King M L ES | MBI | x | | | | | | | | | | |
| Kramer MS | LAYC | x | | | x | | | | | | | |
| Luke C. Moore Alternative HS (Project Aware Phase 1) | Maryland Family Resource | x | | | | | | | | | | |
| Malcolm X ES at Green | MBI | x | | | x | | | | | | | |
| Moten ES | COH | x | | | x | | | | | | | |
| Patterson ES | CC | x | | | x | | | | | | | |
| River Terrace EC | DBH CS | | | | | | | | | | | |
| Roosevelt HS | OCU | | | x | x | | | | | | | |
| Savoy ES | MBI | | Pending DCPS Clearance | | | | | | | | | |
| Smothers ES | Hillcrest | x | | | | | | | | | | |
| Sousa MS | SMILE | x | | | | | | | | | | |
| Stanton ES | MBI | x | | | x | | | | | | | |
| Turner ES | Hillcrest | x | | | | | | | | | | |
| Walker Jones EC | CC | x | | | | | | | | | | |
| Washington Metropolitan HS (Project Aware Phase 1) | Howerd | | School Closed | x | | | | | | | | |

| Cohort 1 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired But Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired But Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| Woodson H D HS | Hillcrest | x | | | | | | | | | | |
| TOTAL 33 | | 27 | 2 | 3 | 11 | | | | | | | |

* Resignation

DBH Clinical Specialist
Project AWARE

| Cohort 2 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| Amidon-Bowen ES | Hillcrest | | Clearance process | | | KIPP DC: Lead Academy | CC | x | | | |
| Ann Beers ES | CC | | | x | x | Achievement Prep. ES - Whaler | April May | x | | | |
| Bancroft Elementary School @ Sharpe | MC | x | | | | Achievement Prep. MS - Whaler | | | School Closed | | |
| Barnard | MC | x | | | | Bridges PCS | MC | x | | | |
| Boone ES | SMILE | x | | | x | Capital City PCS - High School | MC | | | x | |
| Brightwood Ec | LAYC | x | | | | Cedar Tree Academy PCS | SMILE | x | | | x |
| Brookland MS | Howard | x | | | x | DC Bilingual PCS | MC | x | | | |
| Browne EC | OCU | | | X | x | DC International MS/HS | MC | x | | | x |
| Bruce-Monroe ES@ Parkview | MC | x | | | | DC Prep PCS - Benning ES | April May | x | | | |
| Burrville ES | Hillcrest | x | | | | DC Prep PCS - Benning MS | AprilMay | x | | | |
| Columbia Heights EC | MC | x | | | x | DC Scholars PCS | DBH Clinical Specialist | | | | |
| Deal MS | OCU | x | | | | E.L. Haynes PCS - HS | MC | x | | | |
| Dorothy I. Height ES | AprilMAy | x | | | x | Eagle Academy PCS- Congress Heights | Hillcrest | x | | | x |
| Drew ES | MBI | x | | | | Friendship PCS - Armstrong ES | SMILE | x | | | |
| H.D. Cooke ES | Mary's Center | | | x | | Friendship PCS: Southeast ES (Project Aware Phase 1) | SMILE | x | | | |
| Harriett Tubman ES | MC | | | x | | Friendship PCS: Southeast MS (Project Aware Phase 1) | SMILE | | | x | x |
| J.O. Wilson ES | Hillcrest | x | | | | Hope Community PCS - Tolson | MBI | | | x | |

| Cohort 2 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| Langdon ES | Hillcrest | | | x | | KIPP DC: Northeast Academy PCS | MC | x | | | |
| Langley ES | MBI | | Clearance Process | | | KIPP DC: Promise Academy (Project Aware Phase 1) | MC | x | | | |
| LaSalle-Backus EC (Project Aware Phase 1) | Hillcrest | x | | | | KIPP DC: Quest Academy PCS (Project Aware Phase 1) | CC | x | | | |
| Leckie EC | Paving The Way | x | | | | KIPP DC: Spring Academy PCS | MC | x | | | |
| Marie Reed ES | COH | x | | | | KIPP: Heights Academy PCS | DBH Clinical Specialist | | | | |
| McKinley Tech HS | Howard | x | | | x | Mary McLeod Bethune Day Academy PCS | OCU | x | | | |
| McKinley Tech MS | Howard | | | X | x | Meridian PCS | Hillcrest | x | | | |
| Miner ES | MBI | x | | | x | Paul HS PCS | LAYC | | | x | x |
| Nalle ES | CC | x | | | | Perry Street Prep PCS | OCU | x | | | x |
| Plummer ES | MBI | x | | | | Richard Wright PCS for Journalism & Media Arts | OCU | x | | | x |
| Powell ES | MC | x | | | | Thurgood Marshall Academy HS | OCU | x | | | x |

| Cohort 2 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| Raymond EC | Hillcrest | | | x | | | Two Rivers Elementary PCS -4th Street | DBH CS | | | | |
| Simon ES | CC | x | | | x | | TOTAL 28 | | 21 | | 4 | 8 |
| Stuart Hobson MS (Cap. Hill) | OCU | | | x | x | | | | | | | |
| Takoma EC | OCU | x | | | x | | | | | | | |
| Thomas ES | Hillcrest | x | | | | | | | | | | |
| Truesdell EC | MC | x | | | | | | | | | | |
| Tyler ES | DBH CS | | | | | | | | | | | |
| Wheatley | OCU | x | | | | | | | | | | |
| Whittier EC | OCU | x | | | | | | | | | | |
| Woodrow Wilson HS | LAYC | x | | | x | | | | | | | |
| Total  38 | | 27 | 2 | 8 | 13 | | | | | | | |

| Cohort 2 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |

| Cohort 2 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |

| Cohort 3 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| Burroughs Elementary School | AprilMay | x | | | | Briya PCS | Mary's Center | x | | | |
| Cleveland Elementary School | Mary's Center | x | | | | Capital City PCS - School | Mary's Center | x | | | |
| Duke Ellington School of the Arts | Maryland Family Resource | x | | | | Capital City PCS - Middle School | Mary's Center | x | | | |
| Excel | Paving the Way | x | | | | Center City PCS - Capitol Hill | Desires to | not | participate | | x |
| Garrison Elementary School | Hillcrest | x | | | | Creative Minds International PCS | AprilMay | | | x | |
| Hardy Middle School | Hillcrest | x | | | | DC Prep PCS- Anacostia Elementary School | AprilMay | x | | | |
| MacFarland Middle School | Mary's Center | x | | | | DC Prep PCS- Edgewood Elementary School | AprilMay | x | | | |
| Noyes Elementary School | Hillcrest | x | | | | DC Prep PCS- Edgewood MS School | AprilMay | x | | | |
| Oyster-Adams Bilingual School | Paving the Way | | | | | E.L. Haynes PCS - Elementary School | | | DBH Clinical Specialist | | x |
| Payne Elementary School | Maryland Family Resource | x | | | | E.L. Haynes PCS- Middle School | Mary's Center | x | | | |
| Phelps Architecture, Construction and Engineering High School | Hillcrest | | | x | | Early Childhood Academy PCS | MBI | x | | | |
| Randle Highlands Elementary School | Paving the Way | x | Clearance Process | | | Friendship PCS - Chamberlain Middle School (Project AWARE) | SMILE | x | | | |

| Cohort 3 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| Ron Brown College Preparatory High School | Maryland Family Resource | x | | | x | Friendship PCS- Blow Pierce Elementary School | SMILE | x | | | x |
| School Without Walls @ Francis-Stevens | Maryland Family Resource | x | | | | Friendship PCS- Chamberlain Elementary School (Project AWARE | SMILE | x | | | |
| Seaton | Hillcrest | x | | | | Friendship PCS- Technology Preparatory High School | SMILE | x | | | x |
| Thomson Elementary School | Maryland Family Resource | x | | | | Hope Community PCS – Lamond | | SCHOOL | IS | CLOSED | |
| West Education Campus | Hillcrest | x | | | | Howard University Middle School of Mathematics and Science PCS | Not Matched yet with new CBO | | | X | |
| TOTAL 17 | | 15 | 1 | 1 | 1 | Inspired Teaching Demonstration PCS | AprilMay | x | | x | x |
| | | | | | | KIPP DC - Arts and Technology Academy PCS | | | DBH Clinical Specialist | | |
| | | | | | | KIPP DC - Connect Academy PCS | | | DBH Clinical Specialist | | |
| | | | | | | KIPP DC - Grow Academy PCS | | | DBH Clinical Specialist | | |
| | | | | | | KIPP DC - WILL Academy PCS | Catholic Charities | x | | | |

| Cohort 3 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| | | | | | | KIPP DC – KEY Academy PCS | Mary's Center | x | | | |
| | | | | | | KIPP DC- Discover Academy PCS | | | DBH Clinical Specialist | | |
| | | | | | | KIPP DC- Valor Academy PCS | Catholic Charities | x | | | |
| | | | | | | Mundo Verde Bilingual PCS - J.F. Cook | AprilMay | x | | | x |
| | | | | | | Paul PCS - Middle School | LAYC | x | | | x |
| | | | | | | Rocketship DC PCS- Legacy Prep | Catholic Charities | x | | | |
| | | | | | | Washington Global PCS | LAYC | x | | | |
| | | | | | | Washington Leadership Academy PCS | SMILE | x | | | |
| | | | | | | TOTAL 29 | | 21 | 5 | 3 | 7 |

| Cohort 3 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |

| Cohort 3 School/Provider Status - As of 1.11.2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |

| Cohort 4 School/Provider Status - 1.11.22 | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| Ballou STAY | MFR | | | x | | Academy of Hope Adult PCS | Catholic Charities | | | x | |
| Bard High School Early College DC | OCU | | | x | | AppleTree Early Learning Center PCS - Columbia Heights | Not Matched | | | x | |
| Benjamin Banneker HS | Hillcrest | | | x | | AppleTree Early Learning Center PCS - Douglas Knoll | Not Matched | | | x | |
| Brent ES | MBI | | Pending DCPS clearance | | | AppleTree Early Learning Center PCS - Lincoln Park | Not Matched | | | x | |
| Bunker Hill ES | Hillcrest | x | | | | AppleTree Early Learning Center PCS - Oklahoma Avenue | Not Matched | | | x | |
| Capitol Hill Montessori EC | Not Matched | | | x | | AppleTree Early Learning Center PCS - Parklands at THEARC | Not Matched | | | x | |
| Eaton ES | Catholic Charities | | | x | | AppleTree Early Learning Center PCS - Southwest | Not Matched | | | x | |
| Hearst ES | MBI | | | x | | BASIS DC PCS | Hillcrest | x | | | |
| Hyde-Addison ES | PTW | | | x | | Breakthrough Montessori PCS | Not Matched | | | x | |
| Ida B Wells Middle School | LAYC | | | x | | Capital Village PCS | PTW | x | | | |
| Janney ES | DBH Clinical Specialist | | | | | Carlos Rosario International PCS | Not Matched | | | x | |
| Key ES | MBI | | Pending DCPS Clearance | | | Center City PCS - Brightwood | Not Matched | | | x | |
| Lafayette ES | MBI | x | Pending DCPS Clearance | | | Center City PCS - Congress Heights | Not Matched | | | x | x |
| Ludlow-Taylor ES | MFR | x | | | | Center City PCS - Petworth | Not Matched | | | x | |

| Cohort 4 School/Provider Status - 1.11.22 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| Mann ES | AprilMay | | | x | | Center City PCS - Shaw | MBI | | | x | |
| Maury ES | PTW | | | x | | Center City PCS - Trinidad | Not Matched | | | x | |
| Military Road Early Learning Center | Not Matched | | | x | | Community College Preparatory Academy PCS | Hillcrest | x | | | |
| Murch ES | Hillcrest | | | x | | DC Prep PCS - Anacostia Middle School | AprilMay | | | x | |
| Peabody ES | Catholic Charities | | | x | | Digital Pioneers Academy PCS - Capitol Hill | Not Matched | | | x | |
| Roosevelt STAY | OCU | | | x | | Digital Pioneers Academy PCS - Johenning | Not Matched | | | x | |
| Ross ES | DBH Clinical Specialist | | | | | Eagle Academy PCS - Capitol Riverfront | Not Matched | | | x | |
| School Without Walls HS | PTW | | | x | | Elsie Whitlow Stokes Community Freedom PCS - Brookland | MBI | x | | | |
| School-Within-School @ Goding | MFR | x | | | | Elsie Whitlow Stokes Community Freedom PCS - East End | MBI | | | x | |
| Shepherd ES | PTW | | | x | | Friendship PCS - Armstrong Middle | SMILE | | | x | |
| Stevens Early Learning Center | Not Matched | | | x | | Friendship PCS - Ideal Elementary | SMILE | | | x | |
| Stoddert ES | Catholic Charities | | | x | | Friendship PCS - Ideal Middle | SMILE | | | x | |
| Van Ness ES | MBI | | | x | | Friendship PCS - Online Academy | SMILE | | | x | |
| Watkins ES | Catholic Charities | x | | x | | Friendship PCS - Woodridge International | SMILE | | | x | |

| Cohort 4 School/Provider Status - 1.11.22 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **DCPS School** | **CBO** | **CBO Clinician in School** | **CBO Clinician Hired-Not in School Reason** | **CBO Clinician Not Hired** | **DBH Clinician Placed at School** | **Charter School** | **CBO** | **CBO Clinician in School** | **CBO Clinician Hired-Not in School Reason** | **CBO Clinician Not Hired** | **DBH Clinician Placed at School** |
| **TOTAL 28** | | 5 | 3 | 20 | | **Friendship PCS - Woodridge International Middle** | SMILE | | | x | |
| | | | | | | **Girls Global Academy PCS** | PTW | x | | | |
| | | | | | | **Global Citizens PCS** | Not matched | | | x | |
| | | | | | | **Goodwill Excel Center PCS** | Not matched | | | x | |
| | | | | | | **Harmony DC PCS - School of Excellence** | OCU | | | x | |
| | | | | | | **I Dream PCS** | PTW | x | | | |
| | | | | | | **KIPP DC - Honor Academy PCS** | Catholic Charities | | | x | |
| | | | | | | **KIPP DC - Inspire Academy PCS** | Catholic Charities | | | x | |
| | | | | | | **KIPP DC - LEAP Academy PCS** | DBH Clinical Specialist | | | | |
| | | | | | | **KIPP DC - Pride Academy PCS** | DBH Clinical Specialist | | | | |
| | | | | | | **Latin American Montessori Bilingual PCS** | Catholic Charities | | | x | x |
| | | | | | | **LAYC Career Academy PCS** | Not Matched | | | x | |

| Cohort 4 School/Provider Status - 1.11.22 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| | | | | | | LEARN DC PCS | Not Matched | | | x | |
| | | | | | | Lee Montessori PCS - Brookland | Not Matched | | | x | |
| | | | | | | Lee Montessori PCS - East End | Not Matched | | | x | |
| | | | | | | Maya Angelou Academy at the DC Jail | Not Matched | | | x | |
| | | | | | | Maya Angelou Young Adult Learning Center | Not Matched | | | x | |
| | | | | | | Mundo Verde Bilingual PCS - Calle Ocho | AprilMay | | | x | |
| | | | | | | Rocketship PCS - Infinity Community Prep | Not Matched | | | x | |
| | | | | | | Roots PCS | Not Matched | | | x | |
| | | | | | | Sela PCS | AprilMay | | | x | x |
| | | | | | | Shining Stars Montessori Academy PCS | Not Matched | | | x | |
| | | | | | | Social Justice PCS | PTW | x | | | |
| | | | | | | Statesmen College Preparatory Academy for Boys PCS | PTW | | | x | |

| Cohort 4 School/Provider Status - 1.11.22 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **DCPS School** | **CBO** | **CBO Clinician in School** | **CBO Clinician Hired-Not in School Reason** | **CBO Clinician Not Hired** | **DBH Clinician Placed at School** | | **Charter School** | **CBO** | **CBO Clinician in School** | **CBO Clinician Hired-Not in School Reason** | **CBO Clinician Not Hired** | **DBH Clinician Placed at School** |
| | | | | | | | The Family Place PCS | Not Matched | | | x | |
| | | | | | | | The Next Step/El Proximo Paso PCS | OCU | | | x | |
| | | | | | | | The Sojourner Truth School PCS | Not Matched | | | x | |
| | | | | | | | Two Rivers PCS - Young Elementary School | Not Matched | | | x | x |
| | | | | | | | Two Rivers PCS - Young Middle School | Not Matched | | | x | x |
| | | | | | | | Washington Latin PCS - Middle School | Paving thr Way | | | x | |
| | | | | | | | Washington Latin PCS - Upper School | Paving the Way | | | x | |
| | | | | | | | Washington Yu Ying PCS | Catholic Charities | | | x | x |
| | | | | | | | Youthbuild | LAYC | | | x | |
| | | | | | | | **Total  61** | | **7** | | **52** | **6** |

| **DYRS** | **CBO** | **CBO Clinician in School** | **CBO Clinician Hired-Not in School Reason** | **CBO Clinician Not Hired** |
|---|---|---|---|---|

| Cohort 4 School/Provider Status - 1.11.22 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |
| | | | | | | | Maya Angelou Academy at Youth Services Center | Not Matched | | | x | |
| | | | | | | | Maya Angelou Academy at New Beginnings | Not Matched | | | x | |
| | | | | | | | Total 2 | | | | 2 | |

| Cohort 4 School/Provider Status - 1.11.22 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| DCPS School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School | | Charter School | CBO | CBO Clinician in School | CBO Clinician Hired-Not in School Reason | CBO Clinician Not Hired | DBH Clinician Placed at School |

*Q24. Please provide an update on the extent to which CBO and DBH clinicians have been able to bill their services to Medicaid, private insurance, or other sources of funds outside of local dollars.  Please also discuss plans to bill additional services in the future.*

*Please explain how this information may have been impacted by the COVID-19 pandemic and the transition to distance learning.*

**DBH Response**

The Community Based Organizations (CBOs) who are providing services through the school-based behavioral health expansion initiative have contracts with the Managed Care Organizations (MCOs) and the CBO clinicians are billing for the treatment services. While the CBO clinicians have the ability to bill for treatment services, CBOs report that the amount of billing decreased about 50 percent due to the pandemic. Low numbers of referrals and low caseloads during virtual school made billing for Tier 3 services challenging for the CBOs.

From FY22 CBO survey responses, the reported average monthly billing ranged from $3,399.41 to 61,225.24.  The amount billed varied based on the caseload size and the number of school-based clinicians at each CBO.  Of the 13 CBOs, only five noted actively billing private insurances.

A few CBOs are also currently in the process of applying to be paneled with private insurances.

DBH's SBBHP clinicians currently bill treatment services for all Medicaid clients. DBH ensures Medicaid insurance is linked in the medical records system for timely billing. DBH school-based clinicians also work with families who have lapsed insurance and assist them in whatever process is necessary to get them re-connected to Medicaid. Currently, the DBH SBBHP is not billing private insurance clients as they are not paneled with any of the companies. On rare occasions single case agreements have been negotiated with private insurance companies. During FY21, claims were submitted to MCOs for services and DBH received $606,973.

In FY22, DBH will obtain the National Provider Number (NPI) of both the biller and the individuals rendering the services within the SBBHP which will allow DCHF to pull accurate billing data for DBH and CBOs. DBH will then be able to use the data to inform programmatic decisions.

*Q25. Please provide an update on the status of the community of practice for school-based mental health.  Please include the following information*

      *a.  An overview of the current organization structure, and plans for the future*

      *b.  List of events, trainings, or other convenings with brief summaries of the purpose of each event, target audience, planned number of participants, and actual number of participants in FY20, FY21, and FY22 to date*

      *c.  List of planned events, training, regular meetings, or other convenings with brief summaries of the purpose of each event, target audience, and planned number of participants in FY20, FY21, and FY22 to date*

      *d.  Estimated timeline for fully establishing the community of practice*

      *e.  Plans for assessing the effectiveness and utilization rate for the community of practice*

      *f.  Please explain how the community of practice and responses to (a) through (e) above have been impacted by the COVID-19 pandemic.*

**DBH Response**

a. The DC Community of Practice (DC CoP) convenes School Behavioral Health Coordinators (SBHCs), Community Based Organization (CBO) and Department of Behavioral Health (DBH) clinicians, and other interested members to share their expertise, tools, research, and resources for improving student and family behavioral health and well-being. Monthly meetings provide space where members interact, build shared knowledge, and problem-solve. The Core Team includes: DBH, CRP, Incorporated, DC Public Charter School Board, OSSE, DCPS and George Washington University, Milken Institute School of Public Health, Center for Health and Health Care in Schools.

The Core Team and Coordinating Council on School Behavioral Health members support the DC CoP at the strategic level and decide how to address systemic challenges, disseminate resources and communicate key messages to essential partners in the most efficient ways to support the delivery of high quality school-based behavioral health services and supports. At the practice level, existing DBH and OSSE trainings are promoted through the DC CoP and foundational trainings are provided to increase participants' knowledge and enhance competency in delivering school-based behavioral health practices. DBH Clinical Specialists and Project AWARE staff, who are also members and leaders within the DC COP, provide technical assistance and consultation to the SBHCs. The technical assistance and consultation are provided to support the capacity and role of the SBHCs in facilitating their school-based teams in linking research and policy to practice and transferring DC CoP learning to the school level. The DC CoP Practice Groups (PGs) provide opportunities for DC CoP members to focus on specific aspects of the work and develop tools and resources to help spread the learning across the School-based Behavioral Health network. The current PGs provide opportunities for DC CoP members to enhance abilities in the School-based Behavioral Health domains (Crisis Response and Intervention; Family and Youth Engagement; Positive School Climate and Social and Emotional Learning Implementation; and Trauma-informed Practices in Schools). Learning activities are used during breakout sessions and as part of follow-up skill-building chats to gather ideas, apply new skills, practice strategies and share challenges and successes that can inform the ongoing work of school-based teams that are led by DC CoP members.

b. and c.  The attachment provides FY20, FY21, and FY22 to date information on b) implemented and c) planned events, trainings, meetings, and information informed by what is of the interest of the DC CoP members at the current point and time.

d. In September 2019, the DC CoP was formed. At present, the DC CoP is not fully established and is progressing through different stages/phases of learning and engagement. The DC CoP has moved from *Potential* and *Coalescing* to the *Maturing* and *Stewardship* stages of CoP development, with members taking charge of practice, forming an identity within the practicing community, and contributing to the learning agenda. DC CoP members see the value in shared work, as well as building relationships and trust. They are contributing to the DC CoP events and ongoing activities by sharing their practice, co-developing resources and taking on leadership roles, which promotes efficiencies because the core leaders and planning team members can focus on continuing to build the expanding infrastructure (e.g., supporting school teams in applying evidence-based practices learned through the DC CoP; embedding protocols into existing structures and building habits that will help sustain positive changes). The *Stewardship Phase* of growth is demonstrated through the growing number of workgroup leaders supporting the DC CoP efforts around staff wellness and suicide prevention, which were two areas leveraged by DC CoP members as requiring strategies and resources.

The DC CoP has convened monthly virtual meetings to build knowledge and skills, support implementation of best practices in School-based behavioral health and solve problems that have occurred within the implementation of the work. DC CoP members are invited to help shape monthly CoP meetings and offer the School Behavioral Health content and practices in relation to their specific school-community needs, context, and role. This flexibility and responsiveness to member needs have been crucial elements to providing supports during the ongoing pandemic. When members participate in the DC CoP social learning spaces, there is a chain of events that connects what they do together to the effect on the School-based behavioral health expansion and overall community wellness. The ideas, partnerships, engagement strategies and tools are carried back to the school-based teams and local wards through actions – big and small – that result in practice changes.

An existing challenge within the DC CoP is increasing the size of the core group of DC CoP members who consistently attend DC CoP meetings. Although there are members of the DC CoP who are returning to DC CoP sessions, there are still others joining for the first time. This presents the challenge and opportunity of orienting new members while keeping existing members engaged. In response to member input, the DC CoP organizers continue to apply for Continuous Education Units (CEUs) through the DC Board of Social Work as a way to further incentivize DC CoP involvement. Additional opportunities for CEUs through additional Professional Boards will be pursued. And, the aim is to have at least two members of each of the 251 schools in the expansion engaged and actively participating (and taking a leadership role) in the DC CoP.

e. Child Trends, the SBBH program evaluator is assessing the effectiveness of the DC CoP and the service utilization rate. The DC CoP contractor meets monthly with Child Trends and through this collaboration, a process has been refined for collecting feedback from the DC CoP to assess effectiveness, utilization, and improved school-based behavioral health practice. The

meeting feedback form includes a standard set of questions that monitor changes over time and inform the DC CoP planning. The current focus is on identifying patterns and trends as well as collecting and tracking how participants are using the information and learning from the DC CoP activities. The patterns and trends are related to the areas and topics for which the DC CoP members are interested in increasing knowledge and strategies for intervention, gathering related information, and sharing resources with partners. Examples of salient issues include:

- Increased suicidal ideation of students
- Burnout among clinicians and teachers
- Need for teacher wellness programming and whole school approaches to wellness
- Increased violence in schools
- Low family and youth engagement in School Behavioral Health

f. All engagement continues to be conducted virtually. Several resources were developed through the cross-agency, cross-sector collaboration supported by the DC CoP and disseminated to clinicians within the School-based Behavioral Health network despite the challenges posed by the global pandemic. The co-created resources included: "Integrating School Mental Health Staff and Partners: Administrative Tips for DCPS School Re-opening; Integrating School Mental Health Staff and Partners"; "Administrative Tips for Charter School Re-opening"; "How can School Behavioral Health Coordinators Promote Teaming and Advocacy with School Leadership, Educators, and Families in a Virtual Environment?"; "Learning Journey Stories on such topics as virtual offices as effective ways to connect with students, families, and school staff"; and "Convening a CoP meeting that focused on Suicide in Schools: Prevention and Intervention During COVID-19".

Q25. Attachment. CoP Event Meetings

Q. 25. Attachment. CoP Event Meetings

**List of DC CoP Meetings, Chats, and Trainings, FY20 (October 1, 2019 – September 30, 2020)**

A total of 20 DC CoP meetings, chats, and trainings were held between September 30, 2019 and May 27, 2020. These included DC CoP monthly meetings (including the CoP launch meeting (n=8), CoP Chats in response to COVID-19 (n=7), Skill-Building Sessions (n=2), trainings on "Multi-Tiered Systems of Supports: Best Practices for Implementation" (n=2), and dedicated PG meetings (n=2)).

| Title (Date) | Description | Target Audience | Planned Participants | Registrants | Actual Participants |
|---|---|---|---|---|---|
| **Monthly CoP meetings (n=8)** | | | | | |
| **DC CoP Launch Meeting** (September 30, 2019) | In-person monthly CoP meeting to celebrate the launch of the DC CoP, provide an overview of the Expansion and CoP, and to define partnership and collaboration in small groups. | DC CoP members and partners | 200 | 124 | 111 |
| **Building the DC CoP: Organization and Planning** (November 20, 2019) | In-person monthly CoP meeting to develop a shared vision for the DC CoP and for PGs to initially convene around current practices in DC and barriers and challenges to implementation. | DC CoP members | 100 | 70 | 51 |
| **Building Partnerships – Getting Buy-in and Shifting Mindsets** (December 18, 2019) | Virtual monthly CoP meeting to explore assumptions around the implementation of school mental health and to shift mindsets and gain buy-in from key decision-makers and stakeholders. | DC CoP members | 60 | 56 | 31 |
| **Trauma-informed Practices in Schools – Using Consultancy Protocol to Address Problems of** | In-person monthly CoP meeting to introduce and use the consultancy protocol to address problems of practice related to the implementation of trauma-informed approaches in schools. Hosted in partnership with the | DC CoP members | 100 | 72 | 69 |

| | | | | | |
|---|---|---|---|---|---|
| **Practice** (January 22, 2020) | Trauma-informed Practices in Schools PG. | | | | |
| **Families as Partners: Engaging Families in School Behavioral Health** (February 26, 2020) | In-person monthly CoP meeting to demonstrate the Fishbowl Activity to model important conversations that can deepen understanding of what it means to partner with families. Hosted in partnership with the Family and Youth Engagement PG. | DC CoP members | 100 | 71 | 53 |
| **Social and Emotional Learning: Beyond the School Walls** (April 22, 2020) | Monthly virtual CoP meeting to share social and emotional learning strategies during distance learning and to practice the use of restorative justice circles virtually. Hosted in partnership with the Positive School Climate and Social Emotional Learning Implementation PG, DCPS, and SchoolTalk. | DC CoP members | 120 | 106 | 113 |
| **COVID-19 as a Grief Experience for Ourselves and Our Students** (May 20, 2020) | Virtual monthly CoP meeting on grief and loss strategies and resources for supporting students, families, staff and ourselves. Hosted in partnership with the Crisis Response and Intervention PG and the Wendt Center for Loss and Healing, OSSE, and Building Capacity, Inc. | DC CoP members | 120 | 101 | 136 |

| CoP Chats (n=7) | | | | | |
|---|---|---|---|---|---|
| **CoP Chat: COVID-19 Discussion I** (March 19, 2020) | Virtual chat to create a space for problem-solving conversations, resource-sharing, and the exchange of strategies on how best to support students, parents, school staff, and clinicians during COVID-19. Hosted in partnership with DBH. | CBO Administrators and Clinicians | 22 | No registration required. | 21 |
| **CoP Chat: COVID-19 Discussion II** (March 25, 2020) | Virtual chat to create a space for problem-solving conversations, resource-sharing, and the exchange of strategies to deepen the discussion on how best to support students, parents, school staff, and clinicians during COVID-19. | DC CoP members | 75 | 87 | 112 |
| **CoP Chat: Telemental Health 101 in Schools** (April 1, 2020) | Virtual chat to create a space for problem-solving conversations, resource-sharing, and the exchange of strategies on best practices for telemental health in schools. Hosted in partnership with the National Center for School Mental Health and the Central East Mental Health Technology Transfer Center. | DC CoP members | 120 | 134 | 178 |
| **CoP Chat: Promoting Wellness** (April 8, 2020) | Virtual chat to create a space for problem-solving conversations, resource-sharing, and the exchange of strategies around self-care and wellness promotion. Hosted in partnership with Pure Edge, Inc. | DC CoP members | 75 | 61 | 68 |

| | | | | | |
|---|---|---|---|---|---|
| **CoP Chat: Tele-Play Therapy During COVID-19** (April 15, 2020) | Virtual chat to create a space for problem-solving conversations, resource-sharing, and the exchange of strategies around tele-play therapy through the Zoom platform. Hosted in partnership with Mary's Center. | DC CoP members | 75 | 129 | 132 |
| **CoP Chat: A High Functioning Wellness Team** (April 29, 2020) | Virtual chat to create a space for problem-solving conversations, resource-sharing, and the exchange of strategies on wellness teams. Hosted in partnership with Powell ES, Roosevelt HS, Sousa MS, Cedar Tree Academy, Mary's Center, One Common Unity, and SMILE Therapy Services. | DC CoP members | 75 | 131 | 111 |
| **CoP Chat: The Ecology of Wellness** (May 13, 2020) | Virtual chat to create a space for problem-solving conversations, resource-sharing, and the exchange of strategies on individual-, school-, and organization-level wellness promotion. Hosted in partnership with Mary's Center and Garrison ES. | DC CoP members | 75 | 66 | 111 |
| **Trainings and Skill-Building Sessions (n=4)** | | | | | |
| **Multi-Tiered Systems of Supports: Best Practices for Implementation** (October 11, 2019) | In-person training on the selection, implementation, and organization of interventions within a multi-tiered system of supports, with a focus on prevention and early intervention evidence-based programs and practices. Hosted in partnership | SBHCs and clinicians, with a primary focus on CBO clinicians | 30 | N/A | 12 |

| | | | | | |
|---|---|---|---|---|---|
| | with the DBH Clinical Specialists. | | | | |
| **Multi-Tiered Systems of Supports: Best Practices for Implementation** (November 12, 2019) | In-person training on the selection, implementation, and organization of interventions within a multi-tiered system of supports, with a focus on prevention and early intervention evidence-based programs and practices. | SBHCs and clinicians, with a primary focus on Project AWARE schools | 30 | 25 | 14 |
| **Skill-Building Session: Consultancy Protocol I** (February 5, 2020) | Virtual chat to create a space for problem-solving conversations, resource-sharing, and the exchange of strategies on how best to implement the Consultancy Protocol. | DC CoP members | 20 | No registration required for Skill-Building Sessions. | 4 |
| **Skill-Building Session: Consultancy Protocol II** (March 4, 2020) | Virtual chat to create a space for problem-solving conversations, resource-sharing, and the exchange of strategies on how best to implement the Consultancy Protocol. Participants chose to use this time to discuss challenges with teaming. | DC CoP members | 20 | No registration required for Skill-Building Sessions. | 5 |
| **Dedicated Practice Group Meetings (n=2)** | | | | | |
| **Practice Group Meetings** (May 6, 2020) | Virtual meeting for PGs to convene. | DC CoP members | 20 | 30 | 30 |
| **Practice Group Meetings** (May 27, 2020) | Virtual meeting for PGs to convene for reflection and planning and to celebrate the accomplishments of the DC CoP. | DC CoP members | 75 | 62 | 70 |

**List of DC CoP Meetings, Chats, and Trainings, FY21 (October 1, 2020 – September 30, 2021)**

A total of 70 DC CoP meetings, chats, webinars and trainings were held in FY21. These events included DC CoP monthly meetings (n=9), Skill-building Chats (n=7), a webinar on the Youth Risk Behavior Survey (YRBS) data (n=1), a training on MTSS (n=1), an online training on teaming (n=1), trainings on grief and loss (n=11), dedicated PGs sessions (n= 14), and Working Group meetings (n=26). A detailed list of DC CoP meetings, chats, and trainings are listed below. A timeline of DC CoP events is posted on the May 2021 meeting Padlet, a collaborative online worksite that archives key learning and resources throughout the year.

| Title (Date) | Description | Target Audience | Planned Participants | Registrants | Actual Participants |
|---|---|---|---|---|---|
| **Monthly CoP meetings (n=9)** | | | | | |
| **Starting the New Year with Building Relationships: Creating a Safe and Welcoming School Environment Beyond the School Walls** (September 30, 2020) | Virtual monthly CoP meeting to learn the key elements of a safe and welcoming school environment and why building relationships is critical for feeling connected during distance learning. | DC CoP members | 120 | 131 | 124 |
| **Grief, Loss, and Trauma: Promoting Community Resilience and Wellness** (October 21, 2020) | Virtual monthly CoP meeting to learn about a problem-solving strategy that you or your school team can use to work with students and families experiencing trauma. | DC CoP members | 120 | 120 | 133 |
| **Partnering With Families: Building Trust and Addressing Implicit Bias Around Family Engagement in** | Virtual monthly CoP meeting to explore evidence-based and promising strategies that promote meaningful engagement of families; Examine the implicit bias around family engagement; learn about national and local resources on family engagement; | DC CoP members | 120 | 116 | 97 |

| | | | | | |
|---|---|---|---|---|---|
| **School Behavioral Health** (November 18, 2020) | and showcase a successful family engagement strategy to model important conversations that can deepen understanding about what it means to partner with families (e.g., Parent café) | | | | |
| **The Power of Community: Celebrating Our Strengths and Resiliency** (December 9, 2020) | Virtual monthly CoP meeting to understand COVID-19's impact on student well-being and resilience in DC; share evidence-based practices and other resources that can be applied by school teams to promote well-being and resilience; practice an engagement strategy, Celebration Circle, that can be used to build resilience. | DC CoP members | 120 | 98 | 78 |
| **Promoting a Positive School Climate: Envisioning Tier 1 for Our New Context** (January 13, 2021) | Virtual monthly CoP meeting to introduce key elements of promoting a positive school environment; practice an engagement strategy that can be used to promote social emotional skills; share evidence-based practices and other resources that can be applied by school teams to promote positive school climate and social emotional learning; and explore how the social emotional learning (SEL) and positive school climate practices can be modified to adapt to the current COVID-19 school environment. | DC CoP members | 120 | 98 | 112 |

| | | | | | |
|---|---|---|---|---|---|
| **Promoting Student Access to School Behavioral Health Supports by Building Strong Crisis Response Teams** (February 17, 2021) | Virtual monthly CoP meeting to learn strategies to help build effective crisis response teams in their schools, share national and local resources on crisis response and intervention, and explore how practices can be modified to adapt to the current COVID-19 school environment. | DC CoP members | 120 | 137 | 117 |
| **Checking Your Blind Spots: Ethics and Multiculturalism** (March 31, 2021) | Virtual monthly CoP meeting to share best practices, frameworks and strategies that can be applied by school teams to increase insight about personal biases, values and behaviors that impact one's understandings of self and others as racial-cultural beings. Learn about national and local resources on multiculturalism and discuss ways to model cultural sensitivity when working with students, families, and schools. Explore/apply ethical decision-making model through a multicultural lens. Practice an engagement strategy that can be used to promote multicultural sensitivity within an ethical framework when working with students and families. | DC CoP members | 120 | 111 | 113 |

| | | | | | |
|---|---|---|---|---|---|
| **Preventing Youth Suicide: Best Practices Using a Multi-tiered Intervention Model** (April 21, 2021) | Virtual monthly CoP meeting to share national and local data trends on suicide ideation and attempts. Share evidence-based practices, frameworks, and strategies that can be applied by school teams to increase awareness about suicide prevention, assessment, and intervention. Learn about national and local resources on suicide prevention. Practice an engagement strategy that can be used to build awareness around suicide prevention when working with students and families. | DC CoP members | 120 | 105 | 100 |
| **Celebrating Our Learnings: A Review of School Strengthening Work Plans** (May 19, 2021) | Virtual monthly CoP meeting to share lessons learned and implementation strategies from the School Strengthening Work Plans. Celebrate our DC Community of Practice learnings to inspire next steps. Plan next year's DC CoP activities and next steps. | DC CoP members | 120 | 72 | 60 |
| **CoP Chats (n=8)** | | | | | |
| **CoP Chat** (October 7, 2020) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting; practice team building strategies, such as the Community Building Self-Guided Circles; and share the relationship-building challenges and successes with colleagues. | DC CoP members | 10 | 16 | 15 |

| | | | | | |
|---|---|---|---|---|---|
| **CoP Chat** (October 28, 2020) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting; practice team building strategies, such as the Community Building Self-Guided Circles; and share the relationship-building challenges and successes with colleagues. | DC CoP members | 8 | 16 | 8 |
| **CoP Chat** (November 23, 2020) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting; explore family engagement strategies (e.g., Parent Café); and share the implementation challenges and successes related to family engagement in schools with colleagues. | DC CoP members | 20 | 12 | 10 |
| **CoP Chat** (December 16, 2020) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting; explore engagement strategies (e.g., Celebration Circle); and share your implementation challenges and successes related to promoting wellness and resilience in schools with colleagues. | DC CoP members | 20 | 8 | 9 |
| **CoP Chat** (January 27, 2021) | Virtual chat to create a space to further discussions of tier 1 supports during the DC CoP meeting & share challenges/successes related to building a positive school climate. | DC CoP members | 20 | 16 | 12 |

| | | | | | |
|---|---|---|---|---|---|
| **CoP Chat** (March 3, 2021) | Virtual Chat to create a space to further discuss the promotion of student access to behavioral health supports by building string crisis response teams. | DC CoP members | 20 | N/A | 12 |
| **CoP Chat** (April 7, 2021) | Virtual Chat to create a space to further discuss implicit bias and how to best use the cultural formulation interview. | DC CoP members | 20 | N/A | 11 |
| **CoP Chat** (June 2, 2021) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting; practice team building strategies, such as the Community Building Self-Guided Circles; and share the relationship-building challenges and successes with colleagues. | DC CoP members | 20 | 13 | 7 |
| **Trainings (n=14)** | | | | | |
| **Teaming in School Mental Health: 2020-2021 School Year Considerations** (August 11, 2020) | This was an online learning event to address culturally responsive best practices and strategies in teaming, including adaptations for the upcoming school year during COVID-19. National best practice resources that support high quality teaming were shared and there were opportunities to discuss innovations, challenges, and successes occurring within DC. | DC CoP members | 120 | 139 | 122 |

| | | | | | |
|---|---|---|---|---|---|
| **Building Multi-tiered Systems of Support: DC School Behavioral Health Model** (September 29, 2020) | This was a workshop presentation for the School Social Work Association of DC's 2020 DC School Mental Health Conference. | DC School Social Workers | N/A | N/A | 15 |
| **DC's Youth Risk Behavior Survey (YRBS) Webinar** (November 5, 2020) | The purpose of the webinar was to present trends and patterns from the 2019 YRBS data that clarify the behavioral health needs of DC youth; help to understand how the 2019 YRBS data can be accessed and used to inform intervention planning; and identify strategies for effective data use and for moving "from outputs to outcomes" in our school behavioral health practice. | DC School Behavioral Health Coordinators and Clinicians from middle- and high-schools | 100 | 32 | 19 |
| **Grief & Loss Training Series: Part 1A** (March 23, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1A focused on helping children heal in a new era of grief. | DC CoP members | N/A | 57 | 45 |
| **Grief & Loss Training Series: Part 1A** (March 30, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1A | DC CoP members | N/A | 56 | 41 |

| | focused on helping children heal in a new era of grief. | | | | |
|---|---|---|---|---|---|
| **Grief & Loss Training Series: Part 1A** (April 2, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1A focused on helping children heal in a new era of grief. | DC CoP members | N/A | 57 | 49 |
| **Grief & Loss Training Series: Part 1B** (April 6, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1B focused on creating spaces for healing with elementary-aged children. | DC CoP members | N/A | 31 | 26 |
| **Grief & Loss Training Series: Part 1B** (April 20, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1B focused on creating spaces for healing with elementary-aged children. | DC CoP members | N/A | 44 | 33 |

| | | | | | |
|---|---|---|---|---|---|
| **Grief & Loss Training Series: Part 1B** (April 30, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1B focused on creating spaces for healing with elementary-aged children. | DC CoP members | N/A | 12 | 11 |
| **Grief & Loss Training Series: Part 1C** (May 7, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1C focused on creating spaces for healing with middle- and high-school adolescents. | DC CoP members | N/A | 31 | 31 |
| **Grief & Loss Training Series: Part 1C** (May 11, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1C focused on creating spaces for healing with middle- and high-school adolescents. | DC CoP members | N/A | 55 | 55 |

| | | | | | |
|---|---|---|---|---|---|
| **Grief & Loss Training Series: Part 1A** (June 8, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1A focused on helping children heal in a new era of grief. | DC CoP members | N/A | 51 | 33 |
| **Grief & Loss Training Series: Part 1B** (June 9, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1B focused on creating spaces for healing with elementary-aged children. | DC CoP members | N/A | 44 | 27 |
| **Grief & Loss Training Series: Part 1C** (June 9, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered a foundational training on grief, loss, and trauma among children and youth to members of our DC Community of Practice. Part 1C focused on creating spaces for healing with middle- and high-school adolescents. | DC CoP members | N/A | 52 | 31 |
| **Dedicated Practice Group Meetings (n=16)** | | | | | |
| **Crisis Response and Intervention** (January 25, 2021) | Virtual meeting for the practice group to plan for the February CoP meeting and how current crisis scenarios throughout | DC CoP members | 15 | 16 | 13 |

| | schools and CBOs can be provided with triage-based solutions. | | | | |
|---|---|---|---|---|---|
| **School-based Clinical Supervision and Leadership** (January 27, 2021) | Virtual meeting for the practice group to discuss strengths-based supervision, share resources, and engage in a role-play activity to practice the skills. | DC CoP members | N/A | 10 | 10 |
| **Positive School Climate and Social Emotional Learning Implementation** (January 27, 2021) | Virtual meeting for the practice group to further discussion from the CoP meeting on tier 1 supports and share challenges and successes related to building a positive school climate. | DC CoP members | 20 | 16 | 12 |
| **Trauma-Informed School Practices** (January 28, 2021) | Virtual meeting for the practice group to explore, share, and discuss tier 1 trauma-informed practices and resources as well as engage in case consultation. | DC CoP members | 20 | 4 | 4 |
| **Family and Youth Engagement** (February 2, 2021) | Virtual meeting for the practice group to focus on addressing behavioral health stigma and implicit bias, as well as sharing resources and working together to problem-solve challenges. | DC CoP members | N/A | N/A | 6 |
| **School-based Clinical Supervision and Leadership** (February 25, 2021) | Virtual meeting for the practice group to discuss how best to restructure the group to support the needs of the CoP community. | DC CoP members | N/A | N/A | 8 |
| **Trauma-Informed School Practices** (February 25, 2021) | Virtual meeting for the practice group to explore the intersection of vicarious trauma and crisis response, as well as share strategies to help mitigate such trauma. | DC CoP members | N/A | N/A | 7 |

| | | | | | |
|---|---|---|---|---|---|
| **Crisis Response and Intervention** (March 3, 2021) | Virtual meeting for the practice group to continue the learnings from the CoP meeting around student access to behavioral health supports by building strong crisis response teams. | DC CoP members | N/A | N/A | 12 |
| **Positive School Climate and Social Emotional Learning Implementation** (March 9, 2021) | Virtual meeting for the practice group to explore building relationships, routines, and resilience practices. Participants also had the opportunity to engage in mindfulness practices. | DC CoP members | N/A | N/A | 6 |
| **Family and Youth Engagement** (March 16, 2021) | Virtual meeting for the practice group to address behavioral health stigma and implicit bias, as well as share resources and problem-solve around problems. | DC CoP members | N/A | N/A | 8 |
| **Trauma-Informed School Practices** (April 8, 2021) | Virtual meeting for the practice group to share and discuss collaboration and advocacy for trauma-responsive practices with key stakeholders as well as engage in case-consultation. | DC CoP members | N/A | N/A | 4 |
| **Crisis Response and Intervention** (April 12, 2021) | Virtual meeting for the practice group to discuss how to handle crisis around families. | DC CoP members | N/A | N/A | 5 |
| **Family and Youth Engagement** (April 27, 2021) | Virtual meeting for the practice group to use the consultancy protocol in a collaborative learning space for practitioners, school coordinators, families and other stakeholders to solve challenges in family engagement in school behavioral health. | DC CoP members | N/A | N/A | 9 |

| | | | | | |
|---|---|---|---|---|---|
| **Crisis Response and Intervention** (May 10, 2021) | Virtual meeting for the practice group to allow participants to ask questions about current practices around crisis response & intervention. | DC CoP members | N/A | N/A | 4 |
| **Positive School Climate and Social Emotional Learning Implementation** (May 18, 2021) | Virtual meeting for the practice group to reflect on the school year and discuss topics of interest for next year. | DC CoP members | N/A | N/A | 5 |
| **Family and Youth Engagement** (May 5, 2021) | Virtual meeting for the practice group to focus on the Consultancy Protocol as a challenge-solving exercise. Participants explored the process and key elements of the protocol. | DC CoP members | N/A | N/A | 12 |
| **Working Group Meetings (n=26)** | | | | | |
| **Teacher Wellness** (June 23, 2020) | The purpose of this working group session was to identify the best strategies to get administration buy-in and build a wellness team from scratch. | DC CoP members | N/A | N/A | 12 |
| **Connecting with Students and Responding to Behavior** (June 30, 2020) | The purpose of this working group session was to explore the environment in order to identify the underlying assumptions of common practices and figure out what will be different for SY20-21 from multiple perspectives. | School leaders and partners in school behavioral health, restorative justice, and related fields. | 30 | 41 | 41 |

| | | | | | |
|---|---|---|---|---|---|
| **Connecting with Students and Responding to Behavior** (July 14, 2020) | The purpose of this working group session was to create a vision for how students will feel safe and supported in a new school environment. | School leaders and partners in school behavioral health, restorative justice, and related fields. | 30 | 29 | 29 |
| **Teacher Wellness** (July 21, 2020) | The purpose of this working group session was to discuss personal wellness journeys and the 11:11 wellness community. | DC CoP members | N/A | N/A | 8 |
| **Connecting with Students and Responding to Behavior** (July 28, 2020) | The purpose of this working group session was to identify policies, practices, and procedures that support the new vision. | School leaders and partners in school behavioral health, restorative justice, and related fields. | 30 | 26 | 26 |
| **Teacher Wellness** (August 11, 2020) | The purpose of this working group session was to identify challenges and concerns with the start of the school year in a distanced-learning format. | DC CoP members | N/A | N/A | 7 |
| **Teacher Wellness** (October 13, 2020) | The purpose of this working group session was to highlight strategies that have been successful in the distanced-learning format. | DC CoP members | N/A | N/A | 8 |

| | | | | | |
|---|---|---|---|---|---|
| **Kognito** (October 29, 2020) | This was a short-term working group. The purpose of this session was to revisit and extend the learning from Kognito simulation trainings to the DC school community. | DC CoP members | N/A | N/A | 13 |
| **Teacher Wellness** (November 10, 2020) | The purpose of this working group session was to present concrete strategies related to teacher wellness including how to make a Bitmoji classroom. | DC CoP members | N/A | N/A | 8 |
| **Kognito** (November 19, 2020) | This was a short-term working group. The purpose of this session was to discuss what to put into a FAQs document about the Kognito simulation trainings. | DC CoP members | N/A | N/A | 13 |
| **Teacher Wellness** (December 1, 2020) | The purpose of this working group session was to summarize what did and did not go well during the fall semester in the midst of the Pandemic. | DC CoP members | N/A | N/A | 12 |
| **Kognito** (December 21, 2020) | This was a short-term working group. The purpose of this session was to have a final review of the FAQs document and how to best disseminate it. | DC CoP members | N/A | N/A | 13 |
| **Mental Health + Primary Care** (January 15, 2021) | In the first meeting, facilitators led a discussion about general themes of these two practices and what best people/organizations to involve in the working group | DC CoP members | N/A | N/A | 11 |
| **Teacher Wellness** (January 26, 2021) | The purpose of this working group session was to discuss burnout and demoralization as it relates to teacher wellness. | DC CoP members | N/A | N/A | 9 |

| | | | | | |
|---|---|---|---|---|---|
| **Suicide Prevention** (February 5, 2021) | In the first meeting, everyone introduced themselves and discussed themes and areas of opportunity in DC around suicide prevention, intervention, and post-vention. | DC CoP members | N/A | N/A | 18 |
| **Teacher Wellness** (February 9, 2021) | The purpose of this working group session was to discuss how to create virtual SEL and learning opportunities for teachers, parents, and students. | DC CoP members | N/A | N/A | 10 |
| **Mental Health + Primary Care** (March 4, 2021) | The purpose of this working group session was to discuss systemic problems of practice as well as take time for individuals to discuss what work was currently being done to make things more efficient. | DC CoP members | N/A | N/A | 16 |
| **Suicide Prevention** (March 5. 2021) | The purpose of this working group session was to continue the discussion around the landscape in DC for suicide prevention, intervention, and post-vention. | DC CoP members | N/A | N/A | 19 |
| **Teacher Wellness** (March 9, 2021) | The purpose of this working group session was to discuss self-care strategies. | DC CoP members | N/A | N/A | 10 |
| **Mental Health + Primary Care** (April 6, 2021) | The purpose of this working group session was to continue the discussion around systemic problems of practice as well as make time for individuals to discuss what work was currently being done in this area. | DC CoP members | N/A | N/A | 15 |

| | | | | | |
|---|---|---|---|---|---|
| **Suicide Prevention** (April 9, 2021) | The purpose of this working group session was to discuss developments in suicide prevention, intervention, and post-vention resources that the DC community can benefit from. | DC CoP members | N/A | N/A | 19 |
| **Teacher Wellness** (April 13, 2021) | The purpose of this working group session was to discuss cognitive self-care, PERMA, and the art of saying no. | DC CoP members | N/A | N/A | 7 |
| **Suicide Prevention** (May 7, 2021) | The purpose of this working group session was to discuss systemic problems of practice in DC around suicide prevention, intervention, and post-vention. | DC CoP members | N/A | N/A | 18 |
| **Teacher Wellness** (May 11, 2021) | The purpose of this working group session was to discuss mindfulness strategies to support wellness work. | DC CoP members | N/A | N/A | 7 |
| **Suicide Prevention** (June 4, 2021) | The purpose of this working group session was to define the goals of the working group for the next school year. | DC CoP members | N/A | N/A | 12 |
| **Teacher Wellness** (June 8, 2021) | The purpose of this working group session was to learn about Teacher Within program. | DC CoP members | N/A | N/A | 11 |

**List of DC CoP Meetings, Chats, and Trainings, FY22 (October 1, 2021 – January 11, 2022)**
A total of 26 DC CoP meetings, chats, webinars and trainings were held in FY22 to date. These events included DC CoP monthly meetings (n=4), Skill-building Chats (n=3), trainings (n=5), dedicated PGs sessions (n= 8), and Working Group meetings (n=6). A detailed list of DC CoP meetings, chats, and trainings are listed below.

| Title (Date) | Description | Target Audience | Planned Participants | Registrants | Actual Participants |
|---|---|---|---|---|---|
| **Monthly CoP meetings (n=4)** | | | | | |
| **Building a Culture of Compassion & Creating Supportive and Safe School Environments** (September 22, 2021) | Virtual monthly CoP meeting to learn the key elements of safe school environments and build strategies to integrate them into SSWPs, and share best practices related to self-care and wellness. | DC CoP Members | 120 | 77 | 57 |
| **Working Together for Successful School Strengthening Work Plans (SSWP)** (October 20, 2021) | Virtual monthly CoP meeting to share the Strengthening School Behavioral Health Survey results related to school behavioral health (SBH) services and supports in school, grow knowledge of evidence-based practices for SBH and best practices for team building. Introduce the habits of collaboration and practice an engagement strategy (Trust Still: A Self-Reflection Tool) to build trust among team members and strengthen school teams. Understand how text-based coaching can be used as a new access point for behavioral health supports (Tier 2). | DC CoP Members | 120 | 117 | 80 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Addressing Youth Suicide in DC: Prevention to Post-vention** (November 17, 2021) | Virtual monthly CoP meeting to share evidence-based practices, frameworks, and strategies that can be applied by school teams to increase awareness about suicide prevention, assessment, intervention, and post-vention. Explore current available trainings and resources available in DC, share lessons learned from MindWise/Yellow Ribbon in DC schools, and practice an engagement strategy that can be used to increase communication and awareness around suicide prevention with different audiences. | DC CoP Members | 120 | 108 | 77 |
| **Using Restorative Practices to Build a Positive School Culture for Justice, Equity, Diversity, and Inclusion (JEDI)** (December 15, 2021) | Virtual monthly CoP meeting to learn JEDI and explore ways to balance policies or practice that undermine JEDI, understand restorative practices through Tier 1, model restorative practices approach to facilitate conversations around JEDI, and explore the intersection of practices at Tier 1 to promote school climate and culture conducive to student learning and teaching excellence. | DC CoP Members | 120 | 64 | 51 |

| CoP Chats (n=3) | | | | | |
|---|---|---|---|---|---|
| **CoP Chat** (October 6, 2021) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting; integrate key elements of safe school environments and resilience building strategies into SSWP to meet school goals | DC CoP Members | 20 | 13 | 9 |
| **CoP Chat** (November 3, 2021) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting; Explore the habits of collaboration and engagement strategies that build strong teams (e.g., Trust Still: A Self-Reflection Tool) | DC CoP Members | 20 | 21 | 11 |
| **CoP Chat** (December 1, 2021) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting; Share implementation challenges and successes related to SOS/Yellow Ribbon Programming; Explore the communication strategies for different audiences. | DC CoP Members | 20 | 16 | 11 |
| Trainings (n=5) | | | | | |
| **Family Engagement Training** | The purpose of this training is to understand effective family | DC CoP members | N/A | N/A | N/A |

| | | | | | |
|---|---|---|---|---|---|
| (July 21, 2021) | engagement practices, different types of partnerships in family engagement, and the unconscious biases that impede family engagement and clinical work. Participants will learn effective strategies and skill building for family engagement. | | | | |
| **Mapping Comprehensive School Behavioral Health Interventions Using an MTSS Framework** (July 21, 2021) | The purpose of the training is to learn best practices for the implementation of school behavioral health supports within a multi-tiered system of supports (MTSS) framework, and ideas for selecting, developing, and adapting programs and practices within their action plans. | DC CoP members | 30 | 34 | 20 |
| **Mapping Comprehensive School Behavioral Health Interventions Using an MTSS Framework** (July 22, 2021) | The purpose of the training is to learn best practices for the implementation of school behavioral health supports within a multi-tiered system of supports (MTSS) framework, and ideas for selecting, developing, and adapting programs and practices within their action plans. | DC CoP members | 30 | 18 | 14 |
| **Grief Group Training Series: Part 1** (November 18, 2021) **Part 2** (December 2, 2021) | The Center for Health and Health Care in Schools, in partnership with the Wendt Center for Loss and Healing, offered training on grief groups to members of our DC Community of Practice. | DC CoP members | 30 | 31 | 22 |

| | | | | | |
|---|---|---|---|---|---|
| **Mapping Comprehensive School Behavioral Health Interventions Using an MTSS Framework** (December 9, 2021) | The purpose of the training is to learn best practices for the implementation of school behavioral health supports within a multi-tiered system of supports (MTSS) framework, and ideas for selecting, developing, and adapting programs and practices within their action plans. | DC CoP members | 30 | 14 | 8 |
| **Dedicated Practice Group Meetings (n=8)** | | | | | |
| **Family and Youth Engagement** (October 12, 2021) | Virtual meeting for the practice group to discuss advocacy surrounding school behavioral health. | DC CoP Members | N/A | N/A | 9 |
| **Crisis Response and Intervention/Suicide Prevention** (October 25, 2021) | Virtual Meeting for the practice group to discuss how to talk about suicide with different audiences. | DC CoP members | N/A | N/A | 12 |
| **Positive School Climate and SEL Implementation** (October 27, 2021) | Virtual meeting for practice group to discuss the role of restorative circles in promoting JEDI and building positive school culture. | DC CoP Members | N/A | N/A | 9 |
| **Positive School Climate and SEL Implementation** (November 10, 2021) | Virtual meeting for practice group to discuss concepts of inequality vs. equality vs. equity vs. justice. | DC CoP Members | N/A | N/A | 8 |
| **Crisis Response and Intervention/Suicide Prevention** (November 15, 2021) | Virtual Meeting for the practice group to plan the CoP meeting focused on suicide prevention. | DC CoP members | N/A | N/A | 11 |

| | | | | | |
|---|---|---|---|---|---|
| **Crisis Response and Intervention/Suicide Prevention** (December 1, 2021) | Virtual Meeting for the practice group to discuss how to talk about suicide with a different audience and implementation challenges of suicide prevention programming. | DC CoP Members | N/A | N/A | 12 |
| **Family and Youth Engagement** (December 7, 2021) | Virtual meeting for the practice group to discuss creating greater alliances between caregivers, school staff, and SBH staff (ie. CBOs, school clinicians) to increase feelings of mutual support and understanding. | DC CoP Members | N/A | N/A | 7 |
| **Trauma-Informed Practices in Schools** (December 16, 2021) | Virtual meeting for the practice group to discuss grief response and support by age groups. | DC CoP Members | N/A | N/A | 16 |
| **Working Group Meetings (n=6)** | | | | | |
| **Teacher Wellness** (September 14, 2021) | The purpose of this working group session was to introduce new resources, welcome new members, and highlight the topics for the upcoming year. | DC CoP Members | N/A | N/A | 8 |
| **Teacher Wellness** (October 12, 2021) | The purpose of this working group session was to share insights on the transition to being in person and discuss the Structural Supports to Promote Teacher Well-being Brief. | DC CoP Members | N/A | N/A | 10 |

| | | | | | |
|---|---|---|---|---|---|
| **Teacher Wellness** (November 9, 2021) | The purpose of this working group session was to further learn and discuss the Structural Supports to Promote Teacher Well-being Brief with Dr. Olga Acosta Price. | DC CoP Members | N/A | N/A | 12 |
| **Primary Care Mental Health** (November 19, 2021) | The purpose of this working group session was to update on each group's progress, present findings from SBHCs and SDOH, clarify communication flow between providers and nurses, and explore strategies prioritizing aims for the coming year. | DC CoP Members | N/A | N/A | 26 |
| **Teacher Wellness** (December 14, 2021) | The purpose of this working group session was to gain insight on how the Structural Supports to Promote Teacher Well-being Brief was utilized in Briya Public Charter School, presented by Johanna Ulseth. | DC CoP Members | N/A | N/A | 12 |
| **Teacher Wellness** (January 11, 2022) | The purpose of this working group session is to collaborate on the creation of a resource on educators' wellness. | DC CoP Members | N/A | N/A | 9 |

**C. List of planned events, training, regular meetings, or other convenings with brief summaries of the purpose of each event, target audience, and planned number of participants in FY22 to date**

| Title (Date) | Description | Target Audience | Planned Participants | Registrants | Actual Participants |
|---|---|---|---|---|---|
| **Monthly CoP meetings (n=5)** | | | | | |
| **Whole School Approaches to Educators Wellness** (January 19, 2022) | Virtual monthly CoP meeting to learn frameworks to assist in the application of approaches to wellness, learn about OSSE's Whole School Approach to Educator Wellness, learn how to start a wellness program in school or community, and identify strategies for individuals and organizations to promote wellness in schools. | DC CoP Members | 120 | N/A | N/A |
| **Levels of Family Engagement: Building Trusting Relationships between Clinicians, School Staff and Parents** (February 16, 2022) | Virtual monthly CoP meeting to share evidence-based practices that promote authentic partnerships with families, connect family engagement practice to the SSWP process, share family engagement tools and strategies use within SBH, and showcase school teams' journeys as they have enhanced their family engagement practices and strategies. | DC CoP Members | 120 | N/A | N/A |
| **Provider Wellness** (March 23, 2022) | Virtual monthly CoP meeting to explore stress warning signs and stress management techniques; practice different self-care strategies (e.g., Mindfulness Meditation, Yoga, Movement, Nutrition) and learn how to | DC CoP Members | 120 | N/A | N/A |

| | develop an everyday self-care routine. | | | | |
|---|---|---|---|---|---|
| **LGBTQIA & Clinical Competencies** (April 20, 2022) | Virtual monthly CoP meeting to identify challenges facing LGBTQ+ youth; discuss how schools and mental health providers can collaborate and leverage the resilience of LGBTQ+ youth to promote safety and well-being; identify resources to support schools in promoting the safety and well-being of LGBTQ+ youth. | DC CoP Members | 120 | N/A | N/A |
| **Celebrating Our Learnings** (May 25, 2022) | Celebrate our DC Community of Practice learnings to inspire next steps. Plan next year's DC CoP activities and next steps. | DC CoP Members | 120 | N/A | N/A |
| **CoP Chats (n=5)** | | | | | |
| **CoP Chat** (February 2, 2022) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting related to educator wellness | DC CoP Members | 20 | N/A | N/A |
| **CoP Chat** (March 2, 2022) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting related to family engagement | DC CoP Members | 20 | N/A | N/A |
| **CoP Chat** (April 6, 2022) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP | DC CoP Members | 20 | N/A | N/A |

| | | | | | |
|---|---|---|---|---|---|
| | meeting related to providers wellness | | | | |
| **CoP Chat** (May 4, 2022) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting related to LGBTQ & Clinical competences | DC CoP Members | 20 | N/A | N/A |
| **CoP Chat** (June 8, 2022) | Virtual Chat to create a space to support the next steps in applying information and new ideas generated from the CoP meeting related to value of the CoP, learning needs and engagement strategies | DC CoP Members | 20 | N/A | N/A |
| **Trainings (n=1)** | | | | | |
| **Mapping Comprehensive School Behavioral Health Interventions Using an MTSS Framework** (Spring, Summer 2022) | The purpose of the training is to learn best practices for the implementation of school behavioral health supports within a multi-tiered system of supports (MTSS) framework, and ideas for selecting, developing, and adapting programs and practices within their action plans. | DC CoP members | N/A | N/A | N/A |
| **Dedicated Practice Group & Workgroup Meetings (n=21)** | | | | | |
| **Family and Youth Engagement** (January 18, 2022) (March, 2022) (April, 2022) (May, 2022) | Virtual meeting for the practice group to share the best practices on family engagement. | DC CoP Members | N/A | N/A | N/A |

| | | | | | |
|---|---|---|---|---|---|
| **Crisis Response and Intervention/Suicide Prevention** (January 24, 2022) (February 28, 2022) (March, 2022) (April, 2022) (May, 2022) | Virtual meeting for the practice group to share the best practices and implementation challenges and successes related to crisis response and intervention, including suicide prevention. | DC CoP Members | N/A | N/A | N/A |
| **Trauma-Informed Practices in Schools** (February 2022) (March 2022) (April, 2022) (May 2022) | Virtual meeting for the practice group to share the implementation challenges and successes of trauma-informed practice. | DC CoP Members | N/A | N/A | N/A |
| **Positive School Climate and SEL Implementation** (February 8, 2022) (March 2022) (April, 2022) (May 2022) | Virtual meeting for the practice group to share the implementation challenges and successes of building a positive school culture and implementing SEL practices. | DC CoP Members | N/A | N/A | N/A |
| **Teacher Wellness** (February 8, 2022) (March 8, 2022) (April 12, 2022) (May 10, 2022) | Virtual meeting for the practice group to build capacity and share resources on educators' wellness. | DC CoP Members | N/A | N/A | N/A |

*Q26. Please provide information about any work DBH has done with DHCF and DC's education agencies to resolve concerns about payments for the educational part of PRTF placements, for youth with and without Individualized Education Plans (IEPs) from the school. Please provide any MOAs or MOUs related to this subject.*

**DBH Response**

DBH leads regular monthly meetings of the PRTF Interagency Collaboration Committee which is working to resolve concerns about payments.  This Committee is comprised of DBH and all referring government agencies (CFSA, DYRS, CSS, DCPS, and OSSE), the Managed Care Organizations, DC Department of Disability Services, and the Department of Health Care Finance.

OSSE currently has MOUs with CFSA and DYRS to pay for the educational component of "committed" youth enrolled with their agencies who require placement in a PRTF and are reviewed and approved for placement by the PRTF Review Committee.  However, there is no policy in effect that governs whether or how payment for educational services will be paid for "non-committed" youth or youth in general education without an IEP who have no other agency involvement other than needing mental health services.

DBH and OSSE are currently working through the PRTF Interagency Collaboration Committee to develop a standardized process regarding the referral process for these youth and how the educational component of these placements will be financially supported.  These deliberations are currently underway.  It is anticipated that a resolution and formal agreement will be executed by the end of FY22.

| MHRS | Code | Modifier | Medicaid | Medicaid Authority | Rate |
|---|---|---|---|---|---|
| **Diagnostic / Assessment, 3 hrs** | T1023 | HE | Y | MHRS | $ 259.28 |
| **Brief Diagnostic / Assessment** | H0002 | | Y | MHRS | $ 86.43 |
| **Medication Training/Support Treatment Group** | H0034 | HQ | Y | MHRS | $ 12.58 |
| **Medication Training/Support Treatment Individual** | H0034 | | Y | MHRS | $ 50.26 |
| **Community Support - Group** | H0036 | HQ | Y | MHRS | $ 6.07 |
| **Community Support - Individual** | H0036 | | Y | MHRS | $ 24.27 |
| **Community Support - Collateral** | H0036 | UK | Y | MHRS | $ 24.27 |
| **Community Support - Family w/out consumer** | H0036 | HS | Y | MHRS | $ 24.27 |
| **Community Support - Family w/consumer** | H0036 | HR | Y | MHRS | $ 24.27 |
| **Community Support - CRF** | H0036 | U1 | Y | MHRS | $ 24.27 |
| **Community Support - Physician Team Member** | H0036 | AM | Y | MHRS | $ 24.27 |
| **Community Support - Self-help/Peer Support** | H0038 | | Y | MHRS | $ 24.27 |
| **Community Support - Self-help/Peer Support Group** | H0038 | HQ | Y | MHRS | $ 6.07 |
| **Community Support - Self-help/Peer Support Family** | H0038 | HS | Y | MHRS | $ 6.07 |
| **Community Support - Self-help/Peer Support Family Group** | H0038 | HS, HQ | Y | MHRS | $ 6.07 |
| **Crisis/Emergency** | H2011 | | Y | MHRS | $ 59.18 |
| **IDT - Intensive Day Treatment** | H2012 | | Y | MHRS | $ 164.61 |
| **Rehabilitation/Day Services** | H0025 | | Y | MHRS | $ 116.90 |
| **CBI Level II/III** | H2022 | | Y | MHRS | $ 51.96 |
| **MST - CBI Multi-Systemic Treatment** | H2033 | | Y | MHRS | $ 51.96 |
| **FFT** | H2033 | HU | Y | MHRS | $ 51.96 |
| **ACT - Individual** | H0039 | | Y | MHRS | $ 37.15 |

| MHRS | Code | Modifier | Medicaid | Medicaid Authority | Rate |
|---|---|---|---|---|---|
| ACT - Group | H0039 | HQ | Y | MHRS | $ 9.30 |
| Counseling - Group | H0004 | HQ | Y | MHRS | $ 7.21 |
| Counseling On-Site Individual | H0004 | | Y | MHRS | $ 28.81 |
| Counseling On-Site Family w/out consumer | H0004 | HS | Y | MHRS | $ 28.81 |
| Counseling On-Site Family w/consumer | H0004 | HR | Y | MHRS | $ 28.81 |
| Counseling Off-Site - Individual | H0004 | HETN | Y | MHRS | $ 36.18 |
| CPP | H0004 | HT | Y | MHRS | $ 36.18 |
| TF-CBT | H0004 | ST | Y | MHRS | $ 36.18 |
| TREM | H0004 | ST, UB | Y | Waiver | $ 10.00 |
| TST | H0004 | ST, UA | Y | Waiver | $ 36.18 |
| Supported Employment (therapeutic) | H2023 | | Y | MHRS | $ 24.27 |
| Supported Employment (vocational) | H2025 | | Y | Waiver | $ 18.61 |
| Clubhouse | H2031 | | Y | Waiver | $ 95.00 |
| SE for CABHI Clients | H2025 | HH | N | N/A | $ 18.61 |
| Team Meeting | DMH20 | | N | N/A | $ 15.00 |
| Transitional Service | DMH26 | | N | N/A | $ 25.00 |
| Choice Care Coordination | H0006 | HU | N | N/A | $ 21.97 |
| FlexN Service | FLEXN | | N | N/A | 1¢ / Unit |
| Transportation | DBH-MILN | | N | N/A | GSA Per Diem Schedule |
| MH Service – Discharge Planning, non-CBI/ACT | H0032 | | N | N/A | $ 21.97 |
| MH Service – COC Treatment Planning – Inst | H0032 | HK | N | N/A | $ 21.97 |
| MH Discharge Planning - ACT | H0046 | HT | N | N/A | $ 38.04 |

| MHRS | Code | Modifier | Medicaid | Medicaid Authority | Rate |
|---|---|---|---|---|---|
| **MH Discharge Planning - ACT** | H0046 | HT, HA | N | N/A | $ 35.74 |
| **Comm Psych Supportive (Day Rehab while in hospital)** | H0037 | | N | N/A | $ 116.90 |
| **Health Homes** | S0281 | | Y | N/A | $ 125.75 |

| Deaf Rate w/Add'l Modifier HK | Unit | TeleMedicine w/GT Modifier & POS 02 |
|---|---|---|
| $ 345.63 | Per Service | Y |
| | | |
| $ 115.21 | Per Service | Y |
| | | |
| $ 18.25 | 15 min | N |
| | | |
| $ 60.28 | 15 min | Y |
| | | |
| $ 8.98 | 15 min | Y |
| | | |
| $ 29.66 | 15 min | Y |
| | | |
| $ 29.66 | 15 min | Y |
| | | |
| $ 29.66 | 15 min | Y |
| | | |
| $ 29.66 | 15 min | Y |
| | | |
| $ 29.66 | 15 min | N |
| | | |
| $ 29.66 | 15 min | Y |
| | | |
| $ 29.66 | 15 min | N |
| | | |
| $ 8.98 | 15 min | N |
| | | |
| $ 29.66 | 15 min | N |
| | | |
| $ 8.98 | 15 min | N |
| | | |
| $ 49.85 | 15 min | Y |
| | | |
| $ 222.22 | Per Diem | N |
| | | |
| $ 166.12 | Per Diem | Y |
| | | |
| $ 48.25 | 15 min | Y |
| | | |
| $ 77.52 | 15 min | Y |
| | | |
| $ 77.52 | 15 min | N |
| | | |
| $ 51.35 | 15 min | Y |
| | | |

| Deaf Rate w/Add'l Modifier HK | | Unit | TeleMedicine w/GT Modifier & POS 02 |
|---|---|---|---|
| $ | 15.54 | 15 min | Y |
| | | | |
| $ | 10.80 | 15 min | Y |
| | | | |
| $ | 35.67 | 15 min | Y |
| | | | |
| $ | 35.67 | 15 min | Y |
| | | | |
| $ | 35.67 | 15 min | N |
| | | | |
| | | 15 min | N |
| | | | |
| $ | 48.25 | 15 min | N |
| | | | |
| $ | 48.25 | 15 min | Y |
| | | | |
| $ | 13.50 | 15 min | N |
| | | | |
| $ | 48.84 | 15 min | N |
| | | | |
| $ | 25.12 | 15 min | Y |
| | | | |
| $ | 25.12 | 15 min | Y |
| | | | |
| | | Per Diem | N |
| | | | |
| None | | 15 min | N |
| | | | |
| None | | 15 min | N |
| | | | |
| None | | Per occurrence | N |
| | | | |
| None | | 15 min | N |
| | | | |
| None | | | N |
| | | | |
| None | | | N |
| | | | |
| None | | 15 min | N |
| | | | |
| None | | 15 min | N |
| | | | |
| None | | 15 min | N |

380CBE62B32C1D4E333C275E.xlsx    Page 6

| Deaf Rate w/Add'l Modifier HK | Unit | TeleMedicine w/GT Modifier & POS 02 |
|---|---|---|
| | | |
| None | 15 min | N |
| | | |
| None | Per diem | N |
| | | |
| None | Per Month | N |
| | | |

*Q27.    Please provide the list of services available as part of the Mental Health Rehabilitation Services (MHRS) system. Specifically, please provide a description of each service and indicate whether or not it is available as part of the Medicaid MHRS program, the non-MHRS program, or both.  In addition, please provide the FY21 and current reimbursement rates for each service.*

**DBH Response**

Please see Attachment 1 of 1. MHRS, Medicaid Indicator, Rates.

### FY2021

| MHRS Monthly | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medicaid Approved/Paid | 17,056,595.74 | 13,495,772.31 | 17,121,111.23 | 16,389,580.68 | 16,038,199.66 | 18,352,126.43 | 16,774,787.01 | 15,799,883.52 | 17,373,108.70 | 17,671,665.25 | 17,897,096.41 | 18,009,318.25 | 201,979,245.19 |
| Medicaid FFP | 13,394,544.63 | 10,598,230.00 | 13,445,208.65 | 12,870,737.71 | 12,594,798.19 | 14,411,924.89 | 13,173,240.24 | 12,407,648.53 | 13,643,102.26 | 13,877,558.72 | 14,054,589.81 | 14,142,717.62 | 158,614,301.25 |
| Local Match | 3,662,051.11 | 2,897,542.31 | 3,675,902.58 | 3,518,842.97 | 3,443,401.47 | 3,940,201.54 | 3,601,546.77 | 3,392,234.99 | 3,730,006.44 | 3,794,106.53 | 3,842,506.60 | 3,866,600.63 | 43,364,943.94 |
| Local Approved | 1,099,370.32 | 1,017,348.78 | 1,043,323.12 | 1,008,740.95 | 929,976.20 | 1,024,535.81 | 943,310.09 | 922,042.78 | 953,433.34 | 962,812.17 | 929,021.13 | 792,158.82 | 11,626,073.51 |
| **Total** (Medicaid + Local) | **18,155,966.06** | **14,513,121.09** | **18,164,434.35** | **17,398,321.63** | **16,968,175.86** | **19,376,662.24** | **17,718,097.10** | **16,721,926.30** | **18,326,542.04** | **18,634,477.42** | **18,826,117.54** | **18,801,477.07** | **213,605,318.70** |

| *TOTALS SUMMARY:* | Oct-20 | Nov-20 | Dec-20 | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 18,155,966.06 | 14,513,121.09 | 18,164,434.35 | 17,398,321.63 | 16,968,175.86 | 19,376,662.24 | 17,718,097.10 | 16,721,926.30 | 18,326,542.04 | 18,634,477.42 | 18,826,117.54 | 18,801,477.07 | **213,605,318.70** |



### FY2022 to date

| MHRS Monthly | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Annual to Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medicaid Approved | 19,327,689.91 | 18,325,242.59 | 14,240,500.60 | | | | | | | | | | 51,893,633.10 |
| Medicaid FFP | 15,178,191.95 | 14,390,813.01 | 11,183,065.12 | | | | | | | | | | 40,752,070.07 |
| Local Match | 4,149,697.96 | 3,934,429.58 | 3,057,435.48 | | | | | | | | | | 11,141,563.03 |
| Local Approved | 1,190,839.76 | 1,116,506.04 | 838,528.06 | | | | | | | | | | 3,145,873.86 |
| **Total** (Medicaid + Local) | **20,518,729.67** | **19,441,748.63** | **15,079,028.66** | - | - | - | - | - | - | - | - | - | **55,039,506.96** |

| *TOTALS SUMMARY:* | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Annual to Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 20,518,729.67 | 19,441,748.63 | 15,079,028.66 | - | - | - | - | - | - | - | - | - | **55,039,506.96** |



*Q28.   Please provide the monthly MHRS utilization data for FY21 and to date in FY22.*
*Specifically, please include the following:*
    *a.   A breakdown of Medicaid MHRS vs. non-Medicaid MHRS;*
    *b.   For Medicaid MHRS, please provide a breakdown by managed care vs. fee-for-*
      *service (and include a breakdown by specific managed care organization);*
    *c.   For non-Medicaid MHRS enrollees, please indicate whether the individual had*
      *coverage via the DC Healthcare Alliance or was uninsured.*

**DBH Response:**

Please see Attachment 1 of 1.  MHRS Monthly Utilization for FY21 and FY22 to date

| Provider | Billed Medicaid & Local FY/20 | Billed Medicaid & Local FY/21 | Billed Medicaid & Local FY/22 | Billed Medicaid Only FY/21 & FY/22 | Billed Local Only in FY/21 | Billed Local Only in FY/22 |
|---|---|---|---|---|---|---|
| Absolute Healthcare | X | X | X | | | |
| Abundant Grace | X | X | X | | | |
| Affordable Healthcare LLC | X | X | X | | | |
| All Walks of Life | N/A | N/A | N/A | X | | |
| Amazing Love | X | X | N/A | | | |
| Anchor mental Health | X | X | X | | | |
| Better Morning | X | X | X | | | |
| Capital Club House | N/A | x | X | | | |
| City Care Health Services | X | X | X | | | |
| Community Connections | X | X | X | | | |
| Community Wellness Ventures | X | X | X | | | |
| Deaf Reach | X | X | X | | | |
| Dedicated Health Care | X | X | X | | | |
| Doors of Hope | N/A | N/A | N/A | X | | |
| District Health Care Services | X | X | X | | | |
| Family Preservation | X | X | X | | | |
| Family solutions of Ohio | X | X | X | | | |
| Family Wellness Center | X | X | X | | | |
| Goshen Healthcare Management | X | X | X | | | |
| Global Resources & Supports | X | N/A | N/A | | | |
| Hillcrest Children's Center | X | X | X | | | |
| Holy Health Care Services | X | X | N/A | | | |
| Inner City Family Services | X | X | X | | | |
| Kahak | N/A | X | X | | | |
| Kinara Health & Home Care Services | X | X | X | | | |
| Latin American Youth Ctr | X | X | X | | | |
| Life Care | X | X | X | | | |
| Life Changing Solutions | N/A | X | X | | | |
| Life Enhancement Servioces | X | X | X | | | |
| Life Stride | X | X | X | | | |
| Maryland Family Resources | X | X | X | | | |
| Mary's Center Maternal Child Care, Inc. | X | X | X | | | |
| MBI Health Services | X | X | X | | | |
| McClendon Center Specialty Services | X | X | X | | | |
| Neighbors Conseijo | X | X | X | | | |
| New Hope Health Services | X | X | X | | | |
| New Living | X | X | X | | | |
| NYA Health Services | X | X | X | | | |
| One Care DC | X | X | X | | | |
| Outreach Solutions | X | X | X | | | |
| P & G Behavioral Health | X | X | X | | | |
| Pathways to Housing DC | X | X | X | | | |
| Prestiege Healthcare Resources | X | X | X | | | |
| Preventive Measures | X | X | X | | | |
| PSI III | X | X | X | | | |
| Psychiatric Center Chartered | X | X | X | | | |
| Restoration Community Alliance | N/A | N/A | X | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Spring Leaf Solutions | X | X | X | | | |
| Umbrella Therapeutic Services | X | X | X | | | |
| Volunteers of America Chesapeake | X | X | X | | | |
| Wellness Healthcare Clinics | X | X | X | | | |
| Wellness Healthcare (The ARK of DC) | X | X | X | | | |
| Woodley House | X | X | X | | | |

*Q29.    Please provide the name of all certified MHRS providers. For each provider, please
provide the following information for FY20, FY21 and to date in FY22:*
*a.    Whether or not the provider utilizes the Medicaid MHRS program, the locally
funded MHRS program, or both;*

**DBH Response**

Please see Attachment 1 of 1.  Funding Source FY20 FY21 FY22

*Q30 Please provide an update on the implementation of the Live.Long.DC Strategic Plan including some of the positive results. Describe any new strategies to combat the increase in opioid overdose related deaths.*

**DBH Response**

Since LIVE.LONG.DC. (LLDC) was published in December 2018, much work has been done to meet the Plan goals. In 2020, an acknowledgement of the impacts of fentanyl on the rising death rate and the impacts of COVID-19 shifted the focus of the LLDC vision. The seven Opioid Strategy Groups (OSGs) convened in July 2020 to gather input and ideas from stakeholders on new LLDC strategies to inform the 2021 Plan revision (LLDC 2.0). The draft Plan was posted for public comment in March 2021 and released on August 31, 2021, International Overdose Awareness Day.

The original Plan had seven goals, each with a set of related strategies. The Appendix in LLDC 2.0 provides the detailed status of each of the 50 strategies and their connection to LLDC 2.0. In summary, 10 strategies were fully completed, 18 were completed but are expanding in LLDC 2.0, 13 were completed and are ongoing, 5 were partially completed, 3 were not started, and 1 will not be implemented.

LLDC 2.0 builds on effective strategies from the original plan. It also adopts new strategies based on lessons learned and our evolving understanding of the best way to combat the opioid epidemic using a person-centered approach through an equity and culturally competent lens. The modified plan includes: 1) a greater focus on saving lives from opioid overdoses by increasing harm reduction activities; 2) developing the peer workforce and a stronger integration of peers with lived experience within organizations, which has proven to be effective in encouraging individuals to get into and stay in treatment; 3) better coordination of treatment and supports to sustain recovery tailored to individual needs, including better coordination of treatment with the criminal justice system; and, 4) engagement with vulnerable populations including pregnant and parenting individuals, youth and young adults, and residents of skilled nursing facilities. LLDC 2.0 is implementing a targeted approach at the community level using data to address the needs at hotspots, which includes the deployment of a mobile unit to meet individuals where they live/socialize. LLDC 2.0 consists of six Opioid Strategy Areas (listed below) with each area guided by Opioid Strategy Groups (OSGs) responsible for overseeing strategies related to that area of focus. There are a total of 49 strategies with 13 new strategies, which are discussed below.

The following represent some of our key successes in FY21 in helping us move closer to reaching our goals of reducing opioid use, misuse, and related deaths:

***Regulation, Data, and Continuous Quality Improvement***
- The Opioid Fatality Review Board, composed of 15 individuals from more than 10 agencies/organizations including peers, continues to examine the cases of opioid decedents, review existing data, and make recommendations. Agencies have responded to recommendations that are intended to move the LLDC agenda forward.
- Implemented an Overdose Detection Mapping Application Program (ODMAP) to create an overdose tracking and response system that uses data to inform decision

making. To build upon that, in FY21, DBH began receiving non-fatal overdose data from FEMS in relatively real time, which enables the deployment of outreach workers to the scene of an overdose.

- Shared findings from the Department of Forensic Sciences (DFS) testing program with a broader audience, including the public, to improve understanding of drug use trends by various target populations.

### *Prevention and Education*

- In FY21, the four Prevention Centers worked with local youth to promote the youth-based opioid prevention campaign, More Harmful than You Think (MHTYT), through social media and they helped organize the 11th Annual Breaking the Silence on Youth Violence Anti-Violence Youth Summit, where they held opioid overdose preventions sessions and promoted the MHTYT campaign.
- Twenty-three faith-based organizations (FBOs) continued activities that expanded outreach, opioid education, and naloxone training throughout the District. A total of nine FBOs became established as partners to distribute naloxone onsite to the community. Eight faith-based organizations (seven returning, one new) received FY22 grants. They have an expanded scope to also partner with community-based organizations to serve as a hub of treatment, recovery, and harm reduction support in their communities.

### *Harm Reduction*
**Expanded Access to Naloxone**

- In FY21, there were 56,810 naloxone units distributed by DC Health and its partners. This is a 78% increase from FY20. The number of community-based organizations distributing naloxone increased from approximately 40 to 85.
- In FY21, FEMS distributed 357 naloxone kits to bystanders at an overdose scene, while MPD officers and sergeants administered naloxone 570 times.
- There are now 43 walk-in locations in all eight wards to pick up naloxone.
- Promotion of the "Text to Live" program continued. This initiative allows District residents to use their phones to receive an interactive map of naloxone distribution sites and a series of follow-up messages encouraging naloxone use and information about accessing treatment. In June 2021, naloxone delivery became available through Text to Live.
- Individuals can now receive naloxone through the mail. ·
- The "Be Ready" campaign continues to be marketed across the District, including at 150 retail locations displaying posters. Through the end of September, 75 electronic ads were placed in the Metro stations, and a mobile truck ad that traveled through and parks in areas with high rates of overdoses was deployed.
- Efforts have also focused on working with a dozen local DC influencers to post videos about naloxone on their social media accounts; in just over 5 weeks of this effort, 105,000 individuals saw these videos, and more than 14,000 took action, including likes, shares, and comments.

### *Outreach Expansion*

- DC Health's Specialized Street Outreach teams (HIPS and Family Medical Counseling Services) engaged 4,255 individuals and linked 122 individuals experiencing OUD to medication for opioid use disorder (MOUD).
- The DC Health Rapid Peer Responders (RPRs) made 9,018 client contacts and dispersed 9,528 Narcan kits, completed 28 overdose reversals, and provided linkages to 182 other social and drug user health services, including syringe exchange and MOUD.
- From October 1, 2020 to March 31, 2021, the three DBH DCOR outreach teams conducted 6,293 face-to-face outreach engagements with individuals experiencing homelessness, of which 308 referrals were made to other services. This included 208 referrals to peer support services or 61 referrals to supported employment.
- From February 1, 2021 to December 31, 2021, the DBH Community Response Team (CRT) reported receiving 6,548 referrals from individuals in mental health and/or substance use disorder (SUD) crisis, while intervening on 4,172 occasions. Furthermore, the CRT conducted 19,355 post-interventions.
- The DHS H.O.U.S.E. team uses the Housing First model to help the most at-risk, vulnerable District residents with OUD to navigate housing services and resources. In FY21, the H.O.U.S.E. team conducted 5,614 engagements with individuals experiencing homelessness and completed 116 new Service Prioritization Decision Assistance Tools (SPDATs) for homeless individuals (who did not already have a completed SPDAT) so that they could be eligible for housing supports.

### Treatment

- The Emergency Department Medication- Assisted Treatment (ED MAT) induction program was operational in six hospitals in FY21. There was a total of 194,180 screenings to assess patients for risky substance use, with 38,693 positive results. Of the 8,862 patients who had a brief intervention with a peer recovery coach, 2,108 were referred to treatment, with 1,078 completing at least the first full visit.
- In FY21, there were 1,527 individuals seen through the ED MAT program with suspected opioid overdoses, of which 535 were referred to the Overdose Survivor's Outreach Program (OSOP). Peer recovery coaches had 884 successful engagements with individuals enrolled in OSOP. Of those engagements, 12% were referrals to treatment and 40% were referrals to support services. Of the 108 individuals that were referred to treatment, 92% were linked to treatment (i.e., attended and completed the first session at the treatment provider).
- Buprenorphine continued to be available from six of the District's Federally Qualified Health Centers (FQHCs), a community health clinic, and the Howard University Hospital health clinic. In FY21, 447 individuals had MOUD initiated.
- In FY21, there were 62 new enrollees for the Buprenorphine Drug Assistance Plan (BupDAP), a benefit for the uninsured or underinsured.
- The "MyRides" initiative was implemented, which provides District residents on-demand roundtrip rides to opioid treatment and recovery support.

### Recovery

- Oxford House admitted 166 new individuals with OUD and/or stimulant use disorders (STUD) into their recovery homes. They also provided 146 of these individuals with training in opioid overdose prevention, including how to administer naloxone.

- From October 1 to December 31, 2020, the peer-operated centers (POCs) served 3,977 individuals and conducted 272 group sessions led by a peer support worker. This initiative was continued under SOR 2 through a competitive bid process. Three of the four providers continued with this work and a new provider was added. Between January 1 and September 29, 2021, the POCs served 820 individuals, which also includes individuals with STUD and their family members. They made 197 referrals to behavioral health services for these individuals and dispensed 4,281 units of naloxone and provided naloxone training to 467 individuals. The POCs have been a lifeline to many residents during the pandemic; some have become food distribution centers and are providing other support.

### Interdiction and Criminal Justice

- The Department of Corrections hired caseworkers and re-entry peer specialists to provide release planning and peer support to 400 returning citizens with the goal to get individuals with OUD into treatment and follow up with them for a designated period of time.
- The women's SUD treatment unit at the jail opened in August 2021. The men's unit will be opening by the Spring. Despite the delayed opening of the units, clinical services continued to be provided to individuals in the general population. From January 1 to September 29, 2021, 1,731 inmates received buprenorphine with an average of 192 per month; 431 inmates received methadone; and 1 inmate received Vivitrol. Also, during this period, 301 individuals were given two naloxone kits each upon release.

### Update on Nine New Strategies in LLDC 2.0:

*Ensure coordination across stakeholders, wards, and jurisdictional/regional areas to connect consumers, review data, and inform progress.*
Stakeholders are meeting bi-monthly in Ward-level engagement meetings to collaborate and plan activities.

*Create a 24/7 harm reduction drop in center that provides comprehensive services and engage individuals in conversations about treatment and recovery.*
The implementation of the District of Columbia Stabilization and Sobering Center (DCSSC) is led by DBH in partnership with FEMS, Department of Health Care Finance (DHCF), Metropolitan Police Department (MPD), and DC Health. The team is currently reviewing vendor proposals to operate the DCSSC, which is planned to open in the summer of 2022. The DCSSC will operate 24 hours a day, seven days a week offering immediate connections to treatment, including MOUD initiation, and support.

*Employ peers to engage with patients on DC hospital inpatient units and conduct post-discharge outreach.*
Peer services in hospitals have been combined into one program to allow for the same peer to be engaged with an individual as he/she navigates through the hospital and 90 days post discharge. As of September 2021, three hospitals have implemented the unified program on inpatient units with quality improvement activities and data validation ongoing.

*Establish a community of practice (CoP) for providers working with individuals with opioid use disorders.*

In FY21, a survey was conducted with providers to learn what technical assistance they needed. This information is being used to develop the CoP and it is scheduled to be fully implemented by early 2022.

*Implement mobile van to provide behavioral screenings, assessments and referrals, and services and supports.*
The DBH van was deployed in January 2021 and continues to visit hotspots Monday through Friday.  DBH staff are providing the needed support to get individuals initiated on MOUD.

*Develop and implement a comprehensive care coordination/care management system to care for and follow clients with SUD/OUD.*
Seven comprehensive care management grants were awarded in FY21. Through this initiative, sub-grantees are required to enroll clients who meet eligibility criteria (e.g., evidence of treatment involvement, history of non-fatal overdose, housing instability, co-occurring physical health conditions, etc.) and then monitor each client's progress starting/staying engaged with treatment services and re-engaging them if necessary.

*Implement the use of universal screening measures for pregnant women and individuals with children and provide training to OB/GYNs, nurses, and individuals who interact with them.*
Two grants were awarded through a competitive bid process to address the needs of pregnant and parenting individuals with OUD. The first grant explored SUD/OUD screening practices in the District for pregnant and parenting individuals and the vendor created a screening and resources toolkit specific to the District. The second vendor conducted an intense outreach program to reach pregnant and parenting individuals, including fathers, in areas with large overdose rates and connected them to treatment when applicable. DBH hosted the 2nd annual training of the *Clinical Guidance for Treating Pregnant and Parenting Women with Opioid Use Disorder and Their Infants*, on September 28 and 29.

*Create skilled nursing and long-term care facilities training program.*
 "Skilled Nursing Facilities Roadmap" is an online accredited training module recently developed, which will be available for all providers to access for free.

*Establish a Peer University to provide comprehensive training, education, and workforce opportunities for peers that will help them be eligible for national certification.*
In process of being implemented, in partnership with Consumer and Family Affairs (CFA).

*Q31.  Please provide an update on the DBH services to consumers under the custody of the Department of Corrections, including services provided in the READY Center?*

**DBH Response**

Though the READY Center has been closed since early March 2020 due to the pandemic, DBH has sustained its work supporting individuals with behavioral health needs in the custody of the Department of Corrections (DOC).  The Forensic Services Division continues to link individuals to behavioral health services, track the contact of returning citizens with DBH community-based providers monthly, and report ongoing performance data to relevant partners including DOC.

To further assist consumers in custody, Forensic Services staff provide DOC and Unity Health Care, its contracted healthcare provider in the DC Jail, with pertinent mental health information on individuals while they remain in custody.  Forensic Services staff cross-reference electronic medical records to identify whether new admittees have received mental health services locally and, if so, their diagnosis, treatment provider, and when last seen. These efforts expedite the identification of individuals that need help and promote the continuity of care and delivery of mental health services while incarcerated.

Until DOC resumes full in-person operations at the READY Center, DBH is working with Unity Health Care's discharge planning team at DOC to maximize follow-up in the community after individuals with known behavioral health challenges are released.  In-reach is being added at the Inmate Reception Center (IRC) through which all individuals are processed prior to release.

Until the DBH team is able to resume outreach to all individuals temporarily housed at DOC, DBH and Unity are prioritizing three distinct groups: (1) individuals who are linked to a DBH certified Core Service Agency (CSA) upon admission; (2) individuals not previously connected to a CSA but whose psychiatric symptoms are sufficiently acute that they are admitted to one of the acute behavioral health units during their time at the DC Jail, and (3) those who are participating in Medication Assisted Treatment (MAT) while at the jail.

The Women's Wellness Unit at the Correctional Treatment Facility of the DC Jail opened in August 2021.  The unit houses women with complex behavioral health needs including those being treated with MAT or Medications for Opioid Use Disorder (MOUD). DBH provides technical assistance and funding through the federal State Opioid Response program.  It is the first such unit of its kind and, beyond dosing, allows for intensive psychoeducation and relapse prevention skill building. DOC plans to open a men's unit in FY22.  The program also offers education and peer navigation services for women and men throughout the DOC facilities and is not limited to those housed on the specialty units.

Unity is consistently proactive about arranging immediate community follow-up for MAT participants, has expanded its distribution of naloxone upon release, and now can provide greater prescription coverage for MAT upon release so individuals have up to a week to be connected or re-connected to a provider in the community. To promote continuity of care, funding was identified through the federal State Opioid Response grant and a technology transfer grant from the National

Association of State Mental Health Program Directors to incentivize individuals to keep mental health appointments upon release from DOC custody.

Prior to the pandemic, The READY Center was operating and performing functions as designed. The Center was fully staffed, programmatic objectives were codified in the form of standard operating procedures (SOPs), which included regular communication to strengthen partnerships with relevant agencies including the Department of Human Services, Department of Employment Services, and the Department of Motor Vehicles. The Center staff also expanded the number of data points and metrics captured at each client encounter and for three months after their release from DOC. These efforts have allowed DBH's Forensic Services Division to sustain most of its READY Center functions despite the COVID-related closure.

*Q32.    Are there any services provided through Core Service Agencies or other mental health providers that are not currently reimbursed by Medicaid, and please indicate whether these services will be reimbursed under DC's approved 1115 waiver or could be reimbursed under a 1915(i) state plan option, a waiver, or a demonstration project.*

**DBH Response**

Please see attached list of eleven services that currently are not reimbursed by Medicaid, the 1115 waiver, or under a 1915i State Plan option.

Please see Attachment 1 of 1.  List of MHRS Service Not Reimbursed by Medicaid

| MHRS Non-Medicaid Reimbursable Services | Code | Modifier | Medicaid | Medicaid Authority | Rate |
|---|---|---|---|---|---|
| SE for CABHI Clients | H2025 | HH | N | N/A | $ 18.61 |
| Team Meeting | DMH20 | | N | N/A | $ 15.00 |
| Transitional Service | DMH26 | | N | N/A | $ 25.00 |
| Choice Care Coordination | H0006 | HU | N | N/A | $ 21.97 |
| FlexN Service | FLEXN | | N | N/A | 1¢ / Unit |
| Transportation | DBH-MILN | | N | N/A | GSA Per Diem Schedule |
| MH Service – Discharge Planning, non-CBI/ACT | H0032 | | N | N/A | $ 21.97 |
| MH Service – COC Treatment Planning – Inst | H0032 | HK | N | N/A | $ 21.97 |
| MH Discharge Planning - ACT | H0046 | HT | N | N/A | $ 38.04 |
| MH Discharge Planning - ACT | H0046 | HT, HA | N | N/A | $ 35.74 |
| Comm Psych Supportive (Day Rehab while in hospital) | H0037 | | N | N/A | $ 116.90 |

| Deaf Rate w/Add'l Modifier HK | Unit | TeleMedicine w/GT Modifier & POS 02 |
|---|---|---|
| None | 15 min | N |
| None | 15 min | N |
| None | Per occurrence | N |
| None | 15 min | N |
| None | | N |
| None | | N |
| None | 15 min | N |
| None | 15 min | N |
| None | 15 min | N |
| None | 15 min | N |
| None | Per diem | N |

Q33. *DBH regulations provide that DBH conduct targeted compliance reviews of CSAs supported housing assessments and report the results to each CSA under review. DBH policies also require that DBH monitor certified providers to ensure compliance with DBH's housing procedures and programs, and that DBH utilize routine oversight and monitoring activities to determine whether CSAs are meeting their supported housing objectives. How does DBH conduct targeted compliance reviews and monitor certified providers to ensure compliance with its housing procedures and programs? What type of oversight and monitoring does DBH conduct to determine whether CSAs are meeting their supported housing objectives?*

**DBH Response**

DBH certifies a Core Service Agency (CSA) which is responsible for assessing an individual's housing level of care needs at intake and thereafter while engaging with the consumer and providing services.

DBH Housing staff meet bi-monthly with CSA Housing Liaison staff from all CSAs to review their protocols for accessing DBH's array of housing and other services, their criteria for consumer eligibility for housing resources, and recommend best practices to assist consumers in managing their household affairs and to maintain their housing. DBH Housing staff are committed to providing technical assistance to CSAs to ensure that appropriate protocols are being followed. The DBH Ombudsman, Provider Network Division, and the Accountability Administration are engaged as necessary to address situations where a CSA is not in compliance with DBH housing support protocols and policies.

Q34.  *What percentage of Mental Health Community Residential Facilities (MHCRF), as a whole, are wheelchair accessible?*

**DBH Response**

The Americans with Disabilities Act requires that a minimum of five percent of supported residences must be wheelchair accessible. In FY21, DBH exceeded this requirement with eight percent or seven of the 93 currently licensed Mental Health Community Residential Facilities (MHCRFs) with wheelchair accessibility.

Q35.  *What percentage of Supported Independent Living (SIL) providers within the DBH system, as a whole, are wheelchair accessible?*

**DBH Response**

Supported Independent Living (SIL) is a service provided to help consumers live more independently.  It is not housing and the homes of consumers who receive this service are not licensed by DBH. Please note dedicated funding for this service ended in FY 21. Providers are expected to continue to provide individualized services to support independent living that are Medicaid reimbursable.

Q36. *DBH does not currently have a process to prioritize applicants who need wheelchair accessible Mental Health Residential Facilities (MHCRF). Creating a process for accessible Mental Health Community Residential Facilities (MHCRF) is increasingly important as the DBH population ages and needs accessible housing. Will DBH update its application process to include whether applicants need an accessible room and any other reasonable accommodations? Will DBH develop a process to prioritize consumers who need accessible housing and create policies and procedures for providers to follow?*

**DBH Response**

In FY 20, DBH updated the *Mental Health Community Residential Facilities (MHCRF)* Application Package to explicitly indicate the consumer's need for wheelchair accessibility, grab bars, and other accommodations.  DBH regularly tracks consumer accessibility needs as indicated in the MHCRF Application Package. Consumers who require wheelchair accessibility are prioritized for placement into available beds with wheelchair accessibility. DBH regularly provides training to operators and CSA staff regarding published protocols and policies, as well as information regarding the wheelchair prioritization process.

DBH regularly reinforces to operators with vacant accessible beds of the priority for placement of consumers with a need for accessibility.

*Q37. Of the total number of consumers that DBH serves, what is the number of consumers who are homeless?*

**DBH Response**

An individual may self-identify as homeless if they are without a stable living arrangement, are temporarily residing with family or friends, residing in a shelter, or living on the street. According to our electronic records, of the 35,837 consumers who received Mental Health services in FY 21, 6819 or 19 percent self-reported their living situation as "homeless" at the time of intake.  Of the 4,985 clients receiving SUD services in FY21, 1086 or 22 percent self-reported their living situation as "homeless" at the time of intake.   DBH is working with providers to update this information regularly.

*Q 38. In FY21, what array of services and support did DBH provide to homeless consumers? What were DBH's outcomes? How many DBH consumers in FY21, who were homeless, were placed in housing?*

**DBH Response**

Consumers who self-report as experiencing homelessness—defined as living temporarily with family or friends, living in shelters or living on the streets—receive the full array of behavioral health services as well as priority housing placement.   The 24-hour Community Response Team (CRT) regularly engages through street outreach individuals experiencing homelessness to build relationships and encourage treatment. The CRT provides on the spot psychiatric assessments, in person counseling and crisis support.  The team also assists with obtaining vital documents such as a birth certificate required to engage in services and provides transportation to appointments. In addition, the team conducts outreach and education regarding opioids and other substance use disorder services and distributes life-saving naloxone.  During inclement weather or cold emergency alerts, the CRT supports the Department of Human Services (DHS) in outreach and connection to emergency resources.

DBH sees stable housing as a primary factor in overall recovery.  DBH-certified providers are required to assess for housing needs, include housing needs on treatment plans, make referrals, and take steps as appropriate to address the housing needs of their consumers.

In FY21, eight consumers who identified as homeless were placed in DBH-allocated permanent housing resources.  In addition, other individuals experiencing homelessness who are receiving DBH services were housed through other resources including the coordinated entry process, specialty programs operating as part of the District's HUD funded Continuum of Care overseen by The Community Partnership for the Prevention of Homelessness (TCP) and the District's Interagency Council on Homelessness (DCICH).

At the outset of the pandemic, the DHS launched the Pandemic Emergency Program for Medically Vulnerable Residents (PEPV) residence hotels to offer housing to immuno-compromised individuals experiencing homelessness who are at a higher risk for severe illness should they contract the Covid virus. DBH has worked closely with DHS and other community partners to ensure that those who are housing insecure and in need of behavioral health services are linked with community mental health providers for ongoing care and support. DBH ensures that those connections have been made and are secure before the individual transitions from the PEPV site.  To ensure this happens, we hold weekly meetings with the CSAs to develop exit plans focused on community re-integration from the PEPV site back to the community.

*Q39. How does DBH ensure quality of mental health services within its provider network? Does DBH interview consumers of Core Service Agencies while conducting satisfaction surveys?*

**DBH Response**

Quality of services is measured in numerous ways such as claims audits, medical reviews, fidelity reviews, and consumer interviews. These are practices used by the Centers for Medicare and Medicaid Services, National Committee on Quality Assurance, and the Joint Commission.

DBH contracts with model developers and purveyors to complete annual fidelity reviews to assess each provider's adherence to the model. The Intensive Home and Community-Based Services (IHCBS) model assesses each provider's adherence to components of the IHCBS model (Community Based Intervention- CBI Level II and III) such as intensity of service, crisis response and availability, safety planning and team composition. DBH also reviews Evidence-Based Practice (EBP) outcomes on a monthly basis to assess the impact of services on youth served. Outcomes are measured as the number of successful discharges out of the total number of discharges which results in a percentage of successful outcomes. Each model utilizes an assessment tool that rates behaviors and symptoms in the beginning of treatment and end of treatment. Results of the fidelity reviews and outcomes are shared with DBH and the providers. DBH uses results to inform areas such policy, training development, and technical assistance plans.

DBH also uses fidelity reviews of Evidence Based Practices for Supported Employment and Assertive Community Treatment (ACT). Currently ACT teams are being trained in a new delivery model with quality reviews scheduled for each provider this year.  Supported Employment providers are evaluated annually for fidelity.  DBH utilizes these practices to ensure quality in our behavioral health provider network in addition to offering training and technical assistance.

DBH conducts consumer satisfaction surveys that consumers and clients of mental health and substance use disorder providers and individuals in care at Saint Elizabeths Hospital.  If there are significant adverse findings of consumer satisfaction that rise to the level of concern, DBH refers these to the DBH Ombudsman, the Accountability Administration, or both depending on the nature of the report.  This information is also used to improve service delivery at the systems level.

DBH uses data produced by the annual claims audit to plan and hold specific training and clinical technical assistance to address identified challenges.  DBH provides quality and compliance trainings and provided technical assistance to providers (particularly to new providers) based on review of provider service documentation. DBH also provides ongoing technical assistance to new and existing providers to address clinical practice. The DBH Training Institute examines audit trends to find areas where providers are not performing well and develops training to address these areas.

In addition, the DBH Training Institute supports quality service through classroom training and eLearning in a wide range of best-practice mental health and substance use areas targeting direct

service practitioners, clinical supervisors/managers, consumers, and leaders of the provider network.  In FY 21, the Training Institute awarded 3,932 training certificates to participants, a 33% increase over FY 20, for a wide variety of courses.

*Q40. Please provide an update on the High Fidelity Wraparound program, to include the following information:*

      *a. What is the current capacity of wraparound?*

      *b. Description of services currently being provided*

      *c. Description of how individuals can access these services*

      *d. How many individuals were serviced in FY21 and to date in FY22?*

      *e. Since MBI was awarded the Care Management Entity (CME) contract in 2017 with a reduced capacity to serve 94 youth in the community, how many youth were served in FY21 and to date in FY22?*

      *f. Are there any short term or long term plans to increase available flexible funding available per youth?*

      *g. Will DBH take steps to change high fidelity wraparound from a locally-funded pilot program to a Medicaid-funded permanent MHRS service? If so, what steps have been taken to date?*

      *h. How many children were diverted from PRTF placements? Please provide a breakdown for the school and community-based programs.*

      *i. Any outcome evaluations or reports of the program from the past two years*

      *j. Please explain how the High Fidelity Wraparound program and responses to (a) through (i) above have been impacted by the COVID-19 pandemic.*

**DBH Response**

a. The capacity for High Fidelity Wraparound in FY21 and in FY22 at any given time is 85 youth. MBI provided High Fidelity Wraparound to 94 youth in FY21 and 50 youth in FY22 Q1.

b. High Fidelity Wraparound is a strength-based, evidence- informed process, led by a facilitator in which representatives of multiple systems come together with a child, youth, and their family to create a highly individualized plan to address the complex emotional needs of a child or youth. The individualized plan of care is designed to prevent out-of-home placement and juvenile involvement with the courts. The plan of care is monitored by the Wraparound Coordinator several times per week to ensure that the family is receiving the required services including the incorporation of informal and natural support for the family. The average length of stay of youth and families enrolled in wraparound in FY21 was 10 months.

c. Children and youth are referred by a DBH-certified provider, the Juvenile Behavioral Diversion Program (JBDP), the Office of the Attorney General (OAG), Here Opportunities Prepare You for Excellence (HOPE) Court or the child or youth's family. A referral can be made through the program's website, wraparound.cftm@dc.gov. Referrals can also be made by contacting MBI or DBH directly to initiate the referral process. Once a referral is received, DBH's Wraparound Committee reviews the case presentation. Children and youth who are involved in multiple systems and are at-risk of out-of-home placement are accepted into the program. Children who meet the criteria for wraparound support are connected with DBH's contracted service provider, MBI. MBI is required to contact the family within 24 hours to begin the wraparound process.

d. and e. MBI provided High Fidelity Wraparound to 94 youth in FY21 and 50 youth in FY22 Q1.

f. Flexible funding is allocated to provide non-reimbursable services required to stabilize the family.  These services may include but are not limited to academic tutoring, mentoring, behavior modification programming, recreational activities or connection to specialty behavioral health services not covered by Medicaid such as dialectical behavioral therapy. The average amount available for these nontraditional supports is $1,000.00 per family.  Some youth may need more than the average while others may need far less.  In addition, MBI is expected to identify and maximize both private and public community-based resources to meet each family's basic needs such as shelter, food, clothing, and income maintenance. There are no plans to increase the current flex spending amount per youth involved in program.

g. DBH is exploring the utilization of Medicaid funding for High-Fidelity Wraparound with the Department of Healthcare Finance as part of our behavioral health system transformation efforts. DBH and DHCF will be reviewing other State Intensive Care Coordination rates and billing structures. DBH has advocated that High Fidelity Wraparound be part of the Medicaid State Plan as a reimbursable service. DBH also worked with DHCF to prioritize High Fidelity Wraparound in the first phase of the rate study which is currently being conducted by a vendor through the Department of Health Care Finance.

h. Ninety-eight percent of children and youth enrolled in Wraparound remained in their homes and community.  Currently there is not a Wraparound program available in schools, however in FY21, DBH in collaboration with OSSE using ESSER-II funding created an MOU to support the expansion of High-Fidelity Wraparound for six schools to begin in FY22. DBH is currently working with DCPS, and OSSE to identify the six schools. It has been determined that there will be three Middle Schools and three High Schools selected for the program based upon school level data that assesses risk of out of school or home placement.  The specific schools to be involved in the program have not been determined by OSSE and DCPS.  The selection of schools is anticipated to be finalized by the end of January 2022.   It is projected that School Wraparound will be initiated in the third quarter of FY22.

The areas to be considered to assess risk includes suspensions, truancy, and office referral data in addition to IEP data.

i. The outcomes for children and youth while they were enrolled in High-Fidelity Wraparound were reported by MBI for FY21 were as follows:
- Ninety-four percent of youth did not receive any additional juvenile charges;
- Eighty-five percent of youth stayed in their school placement;
- Sixty-four percent of youth showed an improvement in school attendance; and
- Sixty-four percent of youth showed a decreased in detention and school suspensions.

j. Enrollment continued to remain steady in FY21. Youth and families continued receive services and were fully engaged in this effort throughout the pandemic.   In-person services have continued to be provided throughout the pandemic in addition to virtual services. MBI offered flexible services to families by allowing for consumer choice as to the service delivery method of either in person or telehealth. Families chose which method best served their family.

*Q41. In FY21, how many children have been discharged from inpatient psychiatric hospitalization or psychiatric residential treatment facilities and received in-home and community-based mental health services?  This figure should include CBI, intensive care coordination, and intensive case management services—within 30 days, 60 days, or 90 or more days of their discharge.  Please also explain how this data may reflect the impact of the COVID-19 pandemic.*

**DBH Response**

In FY 21, based on Department of Health Care Finance data, there were 138 youth discharged from a community hospital inpatient psychiatric hospitalization.  Of the youth discharged, 49 were referred to CBI which includes intensive care coordination and intensive case management. Of that number, 36 youth were seen within 30 days, two youth within 60 days, and 11 youth in 90 days or more.   The other 89 youth received services including therapy, substance use disorder treatment services, and wrap-around services.

In FY 21, 40 youth were discharged from a Psychiatric Residential Treatment Facility (PRTF). Out of the 40 youth discharged, 22 youth were referred to CBI. Of that number, 16 youth received CBI with 30 days, one youth was seen within 60 days, and five youth in 90 or more days. The other 18 youth discharged from a PRTF received community support, therapy, medication management, and Assertive Community Treatment (ACT). Once youth are discharged, DBH continues to monitor the youth's transition and assess the need for additional behavioral health services.

During the pandemic, providers have implemented the hybrid model for services that can be delivered by telehealth which is preferred by some families because of safety concerns. CBI providers also continue to provide onsite crisis services to the families when needed. DBH continued to provide support to CBI providers with training and consultation around implementing safety strategies and how to engage families and sustain safety of providers in the community and in family's homes throughout the past year.

*Q42. For FY 20, FY 21, and FY22 to date, please list: a) the total number of psychiatric residential treatment facility (PRTF) and the total number of residential treatment center (RTC) admissions of a child and youth receiving MHRS (may include duplicate counts of those children or youth with multiple admissions during the Fiscal Year), b) the unduplicated number of children, and of youth, receiving MHRS and served in a PRTF or RTC, and c) the behavioral health conditions being treated. Please also explain how this data may reflect the impact of the COVID-19 pandemic.*

**DBH Response**

**a.** DBH maintains data for youth who are admitted to a Psychiatric Residential Treatment Facilities (PRTF).  Residential Treatment Facilities (RTCs) are more aligned with the Juvenile Justice System During FY 21, 30 youth were admitted to a PRTF for treatment and 19 (63%) of those admitted had received a mental health service six months prior to admission. Through the 1st Quarter of FY 22 there have been 4 youth admitted to PRTFs for treatment and 1 of those admitted had received a mental health service six months prior to admission. In comparison, in FY 20, 37 youth were admitted to a PRTF for treatment and 26 (70%) of those admitted had received a mental health service six months prior to their admission. There was a small decrease in the number of PRTF admissions in FY21.

**b.** During FY 20, 43 youth were discharged from PRTFs and 37 (86%) received MHRS services post discharge. In FY 21, 40 youth were discharged from PRTFs and 30 (75%) received MHRS services. To date, through the 1st Quarter of FY 22, there have been 9 discharges and 5 (56%) of those discharge have received a MHRS service.

**c.**  A wide range of behavioral health conditions are being treated and they include but are not limited to the following: Attention Deficit Disorder, combined and unspecified; Adjustment Disorder Unspecified; Autism Spectrum Disorder; Bipolar Disorder; Borderline Intellectual Functioning; Borderline Personality Disorder; Cannabis Use Disorder; Child Sexual Abuse; Conduct Disorder; Depressive Disorder with and without psychosis, recurrent, unspecified; Developmental disorder of speech and language, mathematics; Disruptive Mood Dysregulation Disorder; Encopresis; Enuresis; Impulse Control Disorder; Intellectual Disability; Intermittent Explosive Disorder; Post-Traumatic Stress Disorder; Oppositional Defiant Disorder; other problems related to primary support, education and literacy; Reactive Attachment Disorder; Schizo-affective Disorder; Unspecified Bipolar Disorder and Related Disorders, and Unspecified Mood Disorder.

It is difficult to determine the exact cause as to why the numbers of post-discharge MHRS services decreased from FY 20 to FY 21 by 11%. It is plausible that the pandemic had an influence on youth receiving services. In FY 20 when COVID-19 cases began appearing, there was an effort to make adaptations to the way in which services were delivered. Virtual platforms allowed for the provision of telehealth services. In addition, youth were more available for treatment as they were less likely to venture outside their homes. Enrollment was also simplified for parents as they did not have to physically go into an agency. Youth were not as engaged in outside activities and there were fewer competing activities because many activities were shut

down for a substantial period of time. Youth who needed treatment were more available to utilize treatment services.

However, in the 2nd quarter of FY 21 the COVID -19 vaccines became available and the rates of infection also had declined. Restrictions were lifted and youth and their families became more engaged in activities outside the home. Youth also returned to full-time in person school in the latter part of FY21.

Attachment A- Q 43

| Child Parent Psychotherapy | | | | | |
|---|---|---|---|---|---|
| **Provider** | **Current Capacity** | **Current Enrollment** | **Medicaid-Reimbursable (Y/N)** | **Medicaid Code** | **Trauma-Informed (Y/N)** |
| DBH Parent, Infant, and Early Childhood Enhancement (PIECE) Program | 8 | 20 (Current enrollment exceeds the model's designed | Y | H0004-HT | Y |
| Mary's Center | 9 | 4 | Y | H0004-HT | Y |
| **Parent Child Interaction Therapy (PCIT)** | | | | | |
| DBH Parent, Infant, and Early Childhood Enhancement (PIECE) Program | 5 | 5 | Y | H0004 (Providers utilize the counseling code) | Y |
| Mary's Center | 11 | 14 | Y | H0004 (Providers utilize the counseling code) | Y |
| **Trauma-Focused Cognitive Behavioral Therapy (TF-CBT)** | | | | | |
| Maryland Family Resource | 11 | 12 | Y | H0004-ST | Y |
| Hillcrest Children and Family Center | 18 | 9 | Y | H0004-ST | Y |
| Latin American Youth Center | 23 | 9 | Y | H0004-ST | Y |
| Community Connections | 9 | 1 | Y | H0004-ST | Y |
| **Functional Family Therapy** | | | | | |
| Parent Adolescent Support Services (PASS) | 30 | 27 | Y | H2033-HU | Y |
| Hillcrest Children and Family Center | 18 | 8 | Y | H2033-HU | Y |
| **Multi-Systemic Therapy (MST)** | | | | | |
| MBI | 20 | 17 | Y | H2033 | N |
| **Trauma Systems Therapy (TST)** | | | | | |
| Maryland Family Resource | 8 | 4 | Y | H0004-ST | Y |
| Hillcrest Children and Family Center | 24 | 6 | Y | H0004-ST | Y |
| **Transition Into Independence (TIP)** | | | | | |
| Life Enhancement Services | 42 | 23 | Y | H0036 (Providers utilize the Community Support Code) | N |
| MBI | 110 | 120 | Y | H0036 (Providers utilize the Community Support Code) | N |
| Community Connections | 84 | 61 | Y | H0036 (Providers utilize the Community Support Code) | N |
| Wayne's Place | 18 | 19 | Y | H0036 (Providers utilize the Community Support Code) | N |
| **Adolescent Community Reinforcement Approach (ACRA)** | | | | | |
| Federal City | 12 | 3 | Y | H2033-HA,HF | N |
| Latin American Youth Center | 18 | 12 | Y | H2033-HA,HF | N |

*Q43.Please provide an updated list of all Evidence-Based Practices (EBP) and for each EBP please note:*

> *a.The name of each provider who offers it;*
> *b.Each provider's capacity;*
> *c.Each provider's current enrollment;*
> *d.Whether the EBP is Medicaid-reimbursable and if so, under what code or rate;*
> *e.Any quality assessment or outcome measure that have been put in place to assess the program; and*
> *f. Whether the EBP is trauma-informed.*

**DBH Response:**

DBH currently offers eight evidenced-based programs (EBPs) which are Child Parent Psychotherapy (CPP), Parent Child Interaction Therapy (PCIT), Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), Functional Family Therapy (FFT), Multi-Systemic Therapy (MST), Trauma Systems Therapy (TST), Transition Into Independence (TIP) and Adolescent Community Reinforcement Approach (ACRA). In FY 21 the number of youth served in all of the eight EBPs decreased from 1166 in FY 20 to 925 in FY 21.  However, the utilization rate increased from 75% to 80%. In FY 21, although less youth were served, the youth in the various EBPs more consistently received the services and were more engaged in treatment. To address the challenges related to COVID, providers transitioned to the telehealth model. This allowed barriers around transportation costs and access to be eliminated and allowed families to be served while at home. Providers were able to increase sessions as a result. Providers also experienced staff turnover. In FY21, there was 50% turnover which was an increase of 6% compared to a 44% turnover in FY20. In addition, as the impact of DC SEED (Social and Emotional Early Childhood Development) SAMHA Grant ending in FY21 Q2, two of the providers closed their CPP and PCIT programs. As a response to this concern, DBH has been working to provide trainings and support to increase the network's capacity for early childhood services. To increase training capacity and cultural competency for early childhood models, both early childhood provider agencies are in the process of training regional trainers to establish local trainings and decrease costs. DBH's vendor, Evidence-Based Associates (EBA), the national subject matter expert on Evidence-Based Practices, has provided human resources support to assist with recruiting qualified staff.

Attachment A provides an updated list of all EBP providers and responses to a-d and f.

e. EBA provides fidelity monitoring which is completed annually by an assigned consultant to measure each providers' compliance with national model standards.

**Child Parent Psychotherapy (CPP)**
In FY21, 100% of CPP providers were within fidelity standards. In FY 21 Q2, at the conclusion of the DC SEED grant, two programs closed which decreased the capacity. In addition, both agencies experienced staff turnover as an outcome of the COVID-19 pandemic. Even though the capacity decreased by 50%, the utilization increased by 15% from 76% in FY20 to 91% in FY21. The number of youth served decreased from 67 in FY 20 to 48 in FY21.
Please see Attachment A for responses to a-d, and f.

**Parent Child Interaction Therapy (PCIT)**

In FY21, 100% of the PCIT providers were within fidelity standards. In FY 21, at the conclusion of the DC SEED grant, two programs closed which decreased the capacity. In addition, both agencies experienced staff turnover as an outcome of the COVID-19 pandemic. The number of youth served decreased from 87 in FY 20 to 56 in FY21. The number of successful discharges increased by 3% in FY 21 from 47% in FY20 to 50% in FY21. Please see Attachment A for responses to a-d, and f.

**Trauma-Focused Cognitive-Behavioral Therapy (TF-CBT)**

In FY 21, 75% of the providers were within fidelity standards. Utilization increased by 12% from 37% in FY20 to 49% in FY21. In FY21, the number of successful discharges increased by 8% from 63% to 71%. The number of youth served in FY20 remained the same in FY21.The impact of COVID-19 pandemic has decreased the number of referrals for each provider. Providers have had limited access to referral sources. In FY21, DBH held community presentations to increase community knowledge of trauma services and increase access. Please see Attachment A for responses to a-d, and f.

**Functional Family Therapy (FFT)**

In FY 21, 100% of the providers were within fidelity standards. Because of staff turnover, the number of youth served in FY20 decreased by 28% from 162 FY20 and 118 in FY21.DBH sustained Memorandum of Understanding (MOU) with CFSA which provided funding for hiring additional staff and leadership for both providers. Please see Attachment A for responses to a-d, and f.

**Multi-System Therapy (MST)**

In FY 21, 100% of the providers were within fidelity standards. In FY21 Q1, because of the impact of COVID-19, Life Changing Solutions closed which decreased the capacity by 50%. In FY21 Q4, MBI hired additional staff which increased the capacity by 100%. The number of youth served increased from 36 in FY20 to 40 in FY21. Please see Attachment A for responses to a-d, and f.

**Trauma Systems Therapy (TST)**

During FY21, because of the impact of COVID-19, both agencies experienced turnover in leadership and staff. This turnover decreased agencies' capacity. Utilization decreased by 28% from 71% in FY20 to 43% in FY21. In addition, providers' challenges with staff retention and access to treatment have been the contributing factors to low utilization. The impact of COVID-19 pandemic has decreased the number of referrals for each provider. Providers have had limited access to referral sources. Providers have worked to improve the initial screening process to implement TST approved screening tools and assessments which increases each agency's ability to screen for cases that meet criteria. DBH held community presentations to increase community knowledge of trauma services and increase access. Please see Attachment A for responses to a-d, and f.

**Transition into Independence (TIP)**
100% of the TIP providers are complying with full model fidelity standards. The number of youth served decreased from 703 in FY20 to 558 in FY21. TIP experienced 77% turnover which impacted the capacity. Utilization increased from 84% in FY20 to 91% in FY21. Please see Attachment A for responses to a-d, and f.

**Adolescent Community Reinforcement Approach (ACRA)**
During FY21, a total of 73 District youth received A-CRA services across two (2) of DBH's certified Adolescent Substance-use Treatment Expansion Program (ASTEP) providers. DBH used funding from its DC's Changing and Improving Treatment for our Youth (DC CITY) grant to expand the reach of substance use treatment services. The DC CITY grant is aimed at enhancing DBH services for youth (ages 12-18) and transition-age youth (ages 18-25) in order to provide a comprehensive, family centered, trauma-informed, evidence-based, coordinated system of care from early intervention through recovery. DBH has led the development of strategies and provided guidance to the three (3) ASTEP providers to increase program enrollment and connect youth to supports such as ACRA as an available service for youth in need of Substance Use Disorder (SUD) Treatment.

*Q44. Please provide a description and an update on the Behavioral Court Diversion program including:*

*a. A description of which youth are eligible to participate in the program;*

*b. The process or protocol of selecting or referring youth to the program;*

*c. The number of youth who participated in FY21 and to date in FY22, the type of status offense they were alleged to have committed, the referral source (i.e., judge, probation officer, prosecutor, etc.) and the outcomes for youth in the program;*

*d. The number of youth currently receiving CBI services through the Juvenile Behavioral Diversion Program*

*e. The number of youth currently receiving CBI services through the Family Court Social Services Division*

*f. The average and median wait time for a first appointment with a psychiatrist after referral from the Juvenile Behavioral Diversion Program and the Family Court Social Services Division*

*g. The recidivism rate of the youth participants and an explanation of how recidivism rates are measured;*

*h. Any costs associated with the program; and*

*i. The program's capacity and any expansion plan or barriers to expansion.*

*j. Please explain how the Behavioral Court Diversion program and responses to (a) through (i) above have been impacted by the COVID-19 pandemic.*

**DBH Response**

The Juvenile Behavioral Diversion Program (JBDP) is a voluntary, mental health based solution or specialty court that provides intensive case management and mental health services to youth in the juvenile justice system with significant mental health concerns. The JBDP has operated within the DC Superior Court Juvenile Division since January 2011. This program connects and engages juveniles and their caregivers/families in appropriate community-based mental health services and supports and provides for a period of engagement during which time the court monitors both the implementation of mental health services and the youth and families' participation in those services. Court-involved juvenile status offenders are given the option of voluntarily participating in mental health services rather than being prosecuted. If successful, participants are able to have their cases dismissed or shortened lengths of probation.

The goals of the program are to: (1) increase the number of youth able to remain in the community with improved functioning in the home, school and community with appropriate mental health services and supports, (2) reduce the likelihood of the youth's further contact with the criminal justice system as a youth and later as an adult, and (3) to reduce crime in the community and protect public safety. This program is intended for children and youth who are often served within multiple systems who are at risk of re-offending without linkage to mental health services and other important supports. Participants are required to attend regular court status hearings to monitor progress and to participate in mental health services and other specified court conditions. Youth generally participate in the program from three months to one year, depending on the pace of their overall progress towards individualized goals, as determined by the "team," i.e. all individuals assisting in the youth's service plan (e.g. the

youth/family/service providers/probation officer/defense counsel/Education Attorney/AAG and JBDP Judge).

a. The Juvenile Behavioral Diversion Program (JBDP) serves juvenile offenders who are 18 years of age or younger at the time of the instant offense. All court-involved youth receive mental health screening at the time of initial intake, following arrest. Youth are administered the Connor's Comprehensive Behavior Rating Scale (CBRS) which measures social, emotional, behavioral and academic problems in children and adolescents ages 8 to 18 years. Additionally, youth are administered the Sex Trafficking Assessment Review (STAR) to determine a child or adolescent's risk of sexual exploitation in the community. These screenings are used to initially identify youth who may be appropriate for either the JBDP or Here Opportunities Prepare You for Excellence (HOPE) Court for youth at-risk or involved in the commercial and sexual exploitation of children (CSEC).

Determining eligibility for the JBDP is a two-step process. The Office of the Attorney General (OAG) reserves the right to permit or deny a youth to participate in the program on a case by case basis as an initial step in determining a youth's overall eligibility for the program. The OAG makes its determination of "legal eligibility" based on a variety of factors including: prior and current contacts with the court, nature and circumstances surrounding the offense, mental health needs, and other relevant social factors. The second step in determining eligibility is a referral to the "Suitability Committee" of the JBDP. There, the Committee determines if the youth meets basic, clinical criteria, i.e. (1) the presence of a primary mental health diagnosis and (2) that the youth is able to participate in community-based services at the time of entry into the program. The Committee then takes into consideration multiple, additional factors that may impact a youth's ability to fully participate in the program, utilizing a biopsychosocial model of assessment, to determine final, clinical "suitability."

The Suitability Committee transitioned to meeting virtually via Microsoft Teams in April 2020 due to the pandemic. The transition was smooth and has not hindered the Committee's work in any way or caused disruption to the workflow.

b. A juvenile offender can be referred by the initial hearing judge, the juvenile calendar judge, the Assistant Attorney General (AAG), the youth's defense attorney or a Court Social Services Probation Officer. Once a juvenile is deemed legally eligible, a referral is made to the Suitability Committee whereupon clinical eligibility is determined. The Suitability Committee, co- chaired by a DBH and a Court Social Services Division (CSSD) representative, is otherwise comprised of members from CSSD, the Child Guidance Clinic (CGC), and the DBH "preferred providers," i.e. those Community Services Agencies (CSAs) that are affiliated with the JBDP. These CSAs provide services to the majority of the youth in the program and collectively offer the range of services most highly utilized by program participants, including trauma-focused services. Following the clinical review, the Committee establishes recommendations for individualized services for each youth that are both comprehensive and holistic. These recommendations are forwarded to all court officials involved in the youth's case, regardless of their outcome of eligibility for the program. The Committee's recommendations are able to be implemented outside of the JBDP, should a youth decline to enter the program or voluntarily op-out at a later time. All youth enrolled in JBDP receive mental health services through the DBH provider

network (or outside DBH's network, as needed) and are supervised by specialized probation officers (trained in the mental health System of Care of DC) of Court Social Services Division (CSSD).

c. The number of youth who participated in the JBDP program in FY21 is 53.  The number of youth participating in JBDP thus far in FY22 is 18.  Though referrals can be prompted by multiple court or community sources, i.e. judges, probation officers, defense atttorneys, etc., it is the OAG that ultimately becomes the main referral source, as all referrals must first be found legally eligible by the OAG.  Once legal eligibility is established, a referral is sent by OAG to the Child Guidance Clinic of CSSD, where the clinical referral packet is compiled for review for the Suitability Committee.

Below is a chart that details enrollment and case resolutions (Graduated/Dismissed/Certified Back to original judge/calendar) for youth since the program's inception in CY2011.

JBDP Enrollment Stats
2011-November 2021

| Year | Graduated | Certified Back to original calendar | Charge Dismissed | Active | Pend | Transferred to HOPE | Total Enrolled |
|------|-----------|-------------------------------------|------------------|--------|------|---------------------|----------------|
| 2011 | 30 | 24 | -- | 0 | 0 | -- | 54 |
| 2012 | 37 | 25 | -- | 0 | 0 | -- | 62 |
| 2013 | 26 | 13 | 3 | 0 | 0 | -- | 42 |
| 2014 | 35 | 16 | 3 | 0 | 0 | -- | 54 |
| 2015 | 30 | 9 | 4 | 0 | 0 | -- | 43 |
| 2016 | 45 | 13 | 2 | 0 | 0 | 1 | 61 |
| 2017 | 40 | 32 | 15 | 0 | 0 | 8 | 95 |
| 2018 | 26 | 19 | 10 | 1 | 0 | 0 | 56 |
| 2019 | 23 | 15 | 7 | 0 | 0 | 1 | 46 |
| 2020 | 15 | 7 | 7 | 1 | 0 | 0 | 30 |
| 2021 | 0 | 0 | 0 | 25 | 7 | 0 | 32 |
| Totals | 307 | 173 | 51 | 27 | 7 | | 597 |

The chart below details the types of offenses committed by youth in FY21.

| Type of Offenses | Number of Offenses Of all youth enrolled in FY21 |
|---|---|
| Unlawful Entry and Assault (Threats, Simple Assault, Assault on Police, Disorderly Conduct) | 27 |
| Theft (Shoplifting, Theft II) | 9 |
| Robbery – UUV-Burglary-No Permit | 13 |
| Destruction of Property/Fare Evasion | 7 |
| Runaway | 0 |
| Truancy | 0 |
| Sex Abuse | 1 |
| Possession of Weapon/Ammunition | 11 |
| Assault with Weapon | 2 |
| Possession of Controlled Substance | 3 |
| **Total Offenses** | **73*** |

*Youth may have multiple offenses

d. Of the 53 youth that were involved in JBDP in FY21, 32 are receiving or have received Community-Based Intervention (CBI) services, i.e., CBI I (Multisystemic Therapy (MST), CBI II and III, and CBI IV (Functional Family Therapy (FFT)) for a total percentage of 62%.  Of the 7 youth enrolled in JBDP in FY22 thus far, 5 are receiving or have received CBI services for a total percentage of 71%.   These data points indicate that a very high percentage of youth participants of the JBDP meet criteria for the most intensive, community-based services that DBH offers, further indicating that JBDP youth participants are among the highest-risk youth (and families) served by DBH through this one program. Although CBI was not provided to all youth involved in JBDP, participants receive services from an array that are offered through the Mental Health and Rehabilitation System (MHRS) through DBH, e.g. community support, individual and family-based therapies, evidence-based practices (Trauma-Focused CBT, Trauma Systems Therapy, High Fidelity Wraparound, Transition to Independence Process (TIP) and Transition Age Youth (TAY) services), and substance use services.  Each youth enters the program with a preliminary, individualized plan for services and treatment created by the Suitability Committee following a comprehensive review of the case.  The plan is then implemented once the youth enters the program and is adjusted per the needs of the youth and family as they progress through the program.  Recommendations for services while in JBDP are based on clinical determinants, services already in place, willingness to engage in intensive services and service criteria.

e. DBH does not have access to the universe of youth involved with Family Court Social Services Division. Therefore, we are unable to provide the number of youth receiving CBI services through Court Social Services Division.

f. The average and median wait time for a first appointment with a psychiatrist is within a two week period from the time of referral for medication management, per the protocols established with preferred providers of the program.  However, advocacy is made on a case by case basis by

the DBH Program Coordinator to assist program participants in securing earlier appointments with the youth's CSA or through DBH's Howard Road, in the event of an urgent need.

g. Court Social Services' Child Guidance Clinic (CGC) is responsible for collecting and analyzing the majority of the JBDP data. Recidivism is defined as "a plea or found involved" in a crime up to one year after completion of the program. The data collected to date for the CY2020 cohort indicates a recidivism rate of 16%, far below the national average of 43% to 50%. Recidivism rates are calculated one year post-graduation. Since youth enter and exit the JBDP on a rolling basis, data cannot be analyzed until the entire cohort for the year has reached one year post-graduation. Therefore, the rate of recidivism for the CY2021 cohort is not yet available as not all participants have reached the one year post-graduation mark.

Below is the recidivism data for the JBDP since the program's inception in calendar year 2011.

**JBDP 2011-2019 Recidivism Rates since the Program's Inception**

| Calendar Year | Total Number of Youth Enrolled | Total Reconvictions (youth can have multiple reconvictions) | Recidivism Rates |
|---|---|---|---|
| 2020* | 25 | 4 | 16% |
| 2019* | 47 | 17 | 36% |
| 2018 | 56 | 17 | 30% |
| 2017 | 95 | 19 | 20% |
| 2016 | 61 | 9 | 14.5% |
| 2015 | 33 | 6 | 18% |
| 2014 | 54 | 12 | 22% |
| 2013 | 42 | 6 | 14% |
| 2012 | 62 | 19 | 30% |

*excludes info for youth who exited the program < 12 months

h. The cost to the Department is the salary for one FTE social worker which is $123,360.00.

i. The program capacity is 100 youth per year however the number of youth served in JBDP has decreased from previous years due to the pandemic and the existence of HOPE Court which is another specialty court for juveniles at risk or engaged in commercial, sexual exploitation requiring behavioral health services. At this time, there is no plan for expansion as the current program has excess capacity and the pandemic continues to have an impact on the referral process (lower numbers) and service delivery.

j. In FY2021, the pandemic continued to have a significant impact on the number of youth engaged in the program. It has continued to cause delays in the preparation of referrals for review, i.e. by causing delays in the completion of comprehensive Psychoeducational/Psychological/Psychiatric Evaluations needed to determine clinical eligibility. These evaluations are now being conducted both in-person (with pandemic safety

measures observed) and virtually by appropriate and qualified practitioners.  Nonetheless, delays related to completion of these extensive evaluations continue to occur because the pandemic safety measures observed require fewer staff on-site to conduct interviews and evaluations having to be completed over multiple days to avoid long periods of being indoors in proximity to others.  Further, broken consumer appointments by those uncomfortable with being in proximity to others, and other scheduling complications continue to occur.  In other instances where evaluations are being conducted virtually, situations continue to occur where youth may require multiple days to complete the evaluations due to discomfort/difficulty in utilizing a virtual format.  Subsequently, these types of delays in completion of evaluations have likely caused secondary effects, e.g., alternative options to the specialty courts/programs being sought by defense attorneys on behalf of respondents, in effort to expedite the resolution of their clients' cases and reduce the length of time youth spend in the criminal justice system. These types of trends have likely reduced the number of referrals to the JBDP overall.  Additionally, ongoing efforts of the OAG to move the system towards a more restorative justice model may be influencing the number of cases being diverted from prosecution prior to entry into the system (as with programs such as ACE Diversion), or determining a higher number of cases that are ultimately "no papered," would cause an overall decrease in referrals overall, but would also impact the JBDP.

*Q45. Please provide an update on the Agency's early childhood mental health projects, including any studies or reports.*

      a. *For the Parent Child Infant Early Childhood Enhancement Program include a description of the services provided, the type of clinicians employed, their capacity, and the number of children served, and how the cases ended (e.g. successful completion, closure for lack of attendance, etc.) in FY21 and to date in FY22.*

      b. *For the Early Childhood Mental Health Consultation Project, list the child care centers, homes, and schools that are participating, the services they have received and provide any progress/outcome measure available.*

      c. *Please provide an update on the DC MAP contract.*

      d. *Please explain how DBH's early childhood mental health projects and responses to (a) through (d e) above have been impacted by the COVID-19 pandemic.*

**DBH Response**

*For the Parent Child Infant Early Childhood Enhancement Program include a description of the services provided, the type of clinicians employed, their capacity, and the number of children served, and how the cases ended (e.g. successful completion, closure for lack of attendance, etc.) in FY21 and to date in FY22.*

The Parent Infant Early Childhood Enhancement Program (PIECE) was founded on research which recognizes early childhood intervention programs have the potential to alter cognitive, emotional, and behavioral challenges in the lives of young children. The PIECE Program serves young children and their families from birth to seven years old. The goal of the PIECE Program is to intervene early with comprehensive services designed to prevent social emotional and behavioral challenges, reduce stressors within the parent/child relationship which can adversely affect the developing child. The program provides family focused behavior management, individual and family therapy/counseling, art and play therapy, psychoeducational parenting group, developmental screenings, psychiatric/medication management, home/school visitation, and mental health services for prenatal and postpartum women.

The PIECE Program utilizes two evidence-based practices:
Parent Child Interaction Therapy (PCIT) and Child Parent Psychotherapy (CPP). Parent Child Interaction Therapy (PCIT) is an interactive live parent-coaching program that teaches caregivers skills and techniques to improve their child's disruptive behavior. In PCIT caregivers are coached in specific skills by the therapist through an earpiece while the therapist observes the caregiver and child playing together in a separate room.

Child Parent Psychotherapy (CPP) is a therapy for parents with infants, toddlers and preschoolers who have experienced trauma(s). The use of on-line stories, art making via white board virtual adaptations, and other telehealth applications has allowed for some success in offering the CPP virtually.

PIECE Program staff include a clinical psychologist, and four clinicians (two LICSWs, one LGSW, and one PhD/LPC/LMFT) with a caseload capacity of 135 clients. Two child

psychiatrists serve children and adolescents for both the PIECE Program and the Urgent Care Clinic. The psychiatrists' caseloads vary based upon the number of collaborative cases with the PIECE clinicians and urgent care referrals.

See Table 1 below which illustrates the utilization of PCIT and CPP across years.
See Table 2 for data regarding client utilization.

| Table 1.  PIECE Evidence Based Practice Utilization | | | |
|---|---|---|---|
| **Evidenced Based Practice** | **FY 20** | **FY 21** | **FY 22 YTD** |
| Children receiving CPP | 34 | 16 | 19 |
| Children who received PCIT | 23 | 10 | 3 |

| Table 2. Overall Client Utilization | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Fiscal Year | Total Served | CFSA Involved | Successful Discharges | Administrative Discharges* | Individual Sessions | Family Sessions | Treatment Plans | Total Services |
| FY 20 | 211 | 48 | 22 | 75 | 509 | 1,401 | 193 | 2,103 |
| FY 21 | 279 | 48 | 23 | 39 | 566 | 1,783 | 177 | 2,526 |
| FY 22 YTD | 131 | 51 | 5 | 12 | 130 | 399 | 44 | 573 |

*Administrative discharges included cases that may have not presented since intake, lack of attendance, changes in placements or moves.


*For the Early Childhood Mental Health Consultation Project, list the child care centers, homes, and schools that are participating, the services they have received and provide any progress/outcome measure available.*

Healthy Futures consultants provided services in 69 child development centers and 18 home providers for a total of 87 facilities in FY 21.  See Attachment 1 for the list of Healthy Futures child development facilities.  The Healthy Futures Program provides consultation services to child development centers and home childcare providers, as well as directly to children and families.  These services are provided by a mental health professional with the goals of building professional skills and capacity to promote social emotional development and prevent escalation of challenging behaviors. Reducing early childhood expulsion and increasing appropriate referrals for additional assessments and services are also goals of the program.

Healthy Futures continued its expansion efforts in FY21.  Healthy Futures hired seven of the 11 early childhood consultants and two supervisors to the support the expansion of services. Healthy Futures has continued the expansion of services in FY22 and will be hiring an additional three early childhood consultants. When fully staffed Healthy Futures will have a total of 23 early childhood consultants with a capacity of 138 Child Development facilities. To date, the Healthy Futures program has increased services to 29 additional facilities. In addition, Healthy

Futures is currently finalizing agreements with 17 additional CDCs. See Attachment 2 for the list of the FY22 Expansion CDCs.

During the pandemic it has been challenging to reach Center Directors to discuss the program and to obtain signed MOAs as many centers have closed intermittently due to COVID-19 concerns.  Continued efforts to contact CDCs are being made through collaboration with OSSE's Quality Rating and Improvement System (QRIS) team.  Healthy Futures actively engaged with the CDCs to provide either in-person or virtual early childhood mental health consultation. The total capacity of children in the CDCs Healthy Futures served was 5,484 children ages birth to 5 during FY21 (see Attachment 3 for utilization data).

While at times it was challenging to provide consultation services during the pandemic due to frequent center closures, the early childhood clinical specialists worked with child development centers and homes virtually and in person to maintain services.  Healthy Futures actively engaged with the CDCs to provide either in person or virtual early childhood mental health consultation. The total capacity of children in the CDCs Healthy Futures served was 5,484 children ages birth to 5 during FY21 (see Attachment 3 for utilization data).

Although it was more difficult to engage with families during the pandemic, the Healthy Futures clinical specialists provided 56 parent workshops focusing on self-care and understanding children's behaviors due to the disruption of routines and lack of social-emotional learning. There were also 316 parent consultations held; some of which were via phone calls or virtual in-home calls. There were 88 children referred to Healthy Futures and 73 of those children's families signed consent to allow individual observations and interventions.

The Devereux Early Childhood Assessment (DECA) was completed for children who received child-specific consultation services. Teachers and parents of children who were referred for child-specific consultation services completed DECAs at the beginning of consultation and again three to four months later. The DECA uses a strengths-based approach to assess children's social-emotional functioning. Of the 88 children who were referred, 69 received an initial DECA and 21 received a post-DECA. The lower number of post- DECAs is attributed to disruptions to availability due to the pandemic (e.g., teacher turnover, children not attending center due to the pandemic).  Of those children with follow-up DECAs, all showed improvement in at least one area of concern (attachment, initiative, and self-regulation).

In addition to providing support to parents, Healthy Futures consultants provided consultation services to Center Directors.  Director consultations remained robust at 1,338 as directors were interested in learning how to cope with stress for themselves and their staff and to understand the behaviors they were observing with the children. Many of the 247 staff workshops focused on self-care and understanding behaviors.

Healthy Futures continues to educate early childhood directors in the positive impact of working with children that exhibit challenging behaviors and not expelling these children. This reflects the impact of consultation at increasing the confidence and capacity of teachers and directors to handle difficult child behaviors. Healthy Futures works with CDC staff to develop policies, skills and resources that help minimize expulsion as an option for children with challenging

behaviors.  In FY21, there were two expulsions of the approximate 5,484 children served from child development centers where the Healthy Futures Program was implemented; no children have been expelled from a child development center in FY22 to date.

Healthy Futures has continued its collaboration with the Office of the State Superintendent Office's (OSSE) Quality Improvement Network (QIN) and Pre-K Enhancement program (PKEEP). Through this collaboration with OSSE and the QIN Hubs (UPO and Easter Seals) the Healthy Futures consultants have been able to provide self-care and trauma informed practices workshops to the participating child development centers and homes.

During FY22, DBH will pilot treatment services for young children and families in child development centers.  Clinicians will be trained in early childhood evidence-based treatments and the program has the capacity to service up to 75 young children and families.  Services will be provided based upon need in eight identified child development centers in areas of the District most impacted by the COVID-19 pandemic. DBH collaborated with OSSE to identify the eight centers and DBH is planning to launch the pilot in Quarter 3 of FY22. (see Attachment 4 for the list of centers)

*Please provide an update on the DC MAP contract.*

After a competitive procurement process through the Office of Contract and Procurement, Paving the Way Multi Service Institute was awarded the contract to deliver DC MAP services. DC MAP services are unchanged.

DC MAP offers primary pediatric care providers (PPCPs) phone access (Monday-Friday, 9am-5pm) to a team of mental health professionals, including psychiatrists, psychologists, social workers, and care coordinators. In addition to answering mental health-related inquiries about specific children (e.g., questions about community resources that would be appropriate for the family, medication questions), the DC MAP team also provides education and technical assistance for PPCPs to identify and address mental health issues in primary care.

Paving the Way began providing DCMAP services November 22, 2021.  During November and December 2021, DC MAP received 81 consultation requests.  DC MAP received consultations from 19 unique pediatric primary care practices.  There were a total of seven psychiatric consultations and DC MAP clinicians were involved in three cases regarding safety concerns.

When the contract was awarded, 331 PPCPs were enrolled in DC MAP. Since then, Paving the Way has enrolled 40 PPCPs (some of whom were new enrollees). Since September 2020, enrollment is required to utilize DC MAP services to streamline response to consultations. The DC MAP outreach efforts to enroll providers include personalized emails, phone calls, letters, and visits to practice staff.

Paving the Way continues collaborations with other MAP programs and with local community partnerships as one of the requirements for the HRSA grant. Paving the Way participates in the DC Collaborative for Integration of Mental Health in Pediatric Primary Care.  In addition, the DC MAP leadership team met with MCOs to introduce the DC MAP program and formulate strategies to engage and outreach to PCPs within the network.

Paving the Way has an agreement with Concert Health to conduct trainings on topics specific to pediatric primary care providers and produce a PPCP telehealth manual.

The DC MAP program will add telehealth services in FY22 with federal grant funding received by DC Health. Paving the Way has begun surveying the current PPCP sites to learn about their current utilization of DC MAP telehealth and any obstacles to using telehealth.

Telehealth trainings for DC MAP will be a large component of PPCP sites. This telehealth model is expected to improve diagnostic accuracy, improve, and expedite treatment planning, and improve patient engagement with the treatment plan. The addition of the telehealth expansion is expected to improve the accuracy and efficiency of treatment to enhance PPC-DCMAP collaborations

*Please explain how DBH's early childhood mental health projects and responses to (a) through (d e) above have been impacted by the COVID-19 pandemic.*

While services were impacted by the COVID-19 pandemic, all programs continued to provide services and supports.

**Impact on the PIECE program:** Staff from the PIECE Program offer a full complement of mental health services while managing the challenges of the COVID-19 pandemic. The PIECE program services are delivered through telehealth including audio only or in person depending on the preferences of the family. Utilization of services increased in FY 21 as virtual therapy made it easier for families with several children to maintain access, especially with at home learning, limited public transportation, and fears of transmission of the virus.

During FY 21, the PIECE Program increased family therapy sessions from 1401 sessions in FY20 to 1783 in FY 22, a 32 percent increase and individual sessions from 509 in FY 20 to 566 in FY21 an 11 percent increase. At the same time, adaptation of PCIT to virtual therapy has been challenging since mobile phones are used to coach, appropriate toys may not be available, and environmental interference.

**Impact on Healthy Futures**. During the COVID-19 pandemic some child development centers closed, either temporarily or permanently, and others restricted access to outside visitors. All o our Home provider partners restricted outside visitors. Healthy Futures, along with the Quality Improvement Network (QIN) program offered laptops to the providers so virtual observations and meetings could continue to take place. There was a shift in the presentations given to center staff and families to focus on self-care and trauma informed care. Work was performed in person when possible.

As noted, it was challenging to provide consultation services during the pandemic due to frequent Center closures. Eight CDCs closed that were on target for Healthy Futures expansion. It also was more difficult to engage with families during the pandemic.

During the COVID-19 pandemic Healthy Futures recorded readings of early childhood books and created weekly support newsletters on topics such as self-regulation, resiliency, and

emotional safety that have been made available to families and centers. Healthy Futures focused its work for the centers and homes on understanding trauma, mindfulness activities for parents, children, and teachers, and weekly parent and teacher support groups. Healthy Futures provided activities for children such as reading Tucker Turtle, a story that teaches self-regulation skills, and Baby Doll Circle Time, from the Conscious Discipline program, which enhances the child/caregiver relationship and develops empathy. Many of these interventions and activities were also offered in Spanish and, when needed, the language line was accessed to communicate with families.

**Impact on DC MAP**. During the FY21, DC MAP services reported an increase in the number of consultations to 1,480 up from 957 in FY 20.

See Attachment 1 of 4 Healthy Futures FY21 Child Development Facilities
See Attachment 2 of 4 Health Futures FY22 Expansion Child Development Centers
See Attachment 3 of 4 Utilization Data
See Attachment 4 of 4 Healthy Futures Program Treatment Child Development Centers

Q45. Attachment 1 of 4

| Healthy Futures FY21 Child Development Facilities | | |
|---|---|---|
| **Ward** | **Child Development Centers** | **Home Providers** |
| 1 | Barbara Chambers Children's Center<br>Barbara Chambers Children Center #3<br>Bell Teen and CDC<br>CentroNia<br>Christian Tabernacle I<br>Easter Seals<br>Jubilee Jumpstart<br>Martha's Table – Maycroft<br>Rosemount Center | Our Children First |
| 2 | Edward C. Mazique Parent Child Center<br>Kiddie Academy of DC West End | Ms. P's Unique Development |
| 3 | CommuniKids- Tenley<br>CommuniKids – Van Ness<br>CommuniKids – The Church<br>CommuniKids- UDC | |
| 4 | Blandi's<br>Bright Start Child Childcare & Preschool<br>CentroNia @ Upshur Street<br>Children's Hut<br>Christian Tabernacle II<br>Gap Community Children Center<br>Goldie's I<br>Goldie's II<br>Ideal Child Care Development Center #1<br>Ideal Child Care Development Center #2<br>Kids Are People Too II<br>Love and Care CDC LLC<br>Loving Care Day Nursery, Inc.<br>Spanish Education Development Center<br>2 New Heights CDC | Blooming Minds<br>God is Good Child Development Home<br>Infancia Feliz<br>Little Blessings, LLC<br>Renaissance Early Childhood Education |
| 5 | Associates for Renewal in Education, Inc.<br>Happy Faces Early Learning Academy<br>Home Away From Home<br>Kennedy Institute | |

Q45. Attachment 1 of 4

| | | |
|---|---|---|
| | Loving Care | |
| 6 | Barbara Chambers Children Center #2<br>Board of Child Care<br>Bright Beginnings | |
| 7 | Community Educational Research Group<br>Educare of Washington, DC<br>First Rock Baptist CDC<br>House of Ruth/Kids Space<br>Kids Are People Too V<br>Kids Are Us II<br>Saint Timothy Episcopal CDC<br>UPO @ Paradise Early Childhood Center | Amen Family<br>Bert Family Child Care<br>Bright Horizon<br>LTH Infants and Toddlers<br>Promoting Love and Wisdom |
| 8 | Baby Einstein CDC<br>Big Mama's Children Center<br>Dawn to Dusk<br>Dawn to Dusk Child Dev. Center II<br>Emergent Prep<br>Home Away From Home, Too<br>Kiddies Kollege<br>Kids Are Us Learning Center I<br>Kids Are Us Learning Center II<br>Kids Are People Too III<br>Martha's Table - The Commons<br>National Children's Center<br>Paramount CDC<br>Saint Phillip's Child Development Center<br>Southeast Children's Fund Child I<br>Southeast Children's Fund Child II<br>Sunshine Early Learning Center<br>The Learning Curve CDC<br>UPO @ Anacostia High School<br>UPO @ Ballou High School<br>UPO @ Frederick Douglass<br>UPO @ Atlantic Garden Early<br>UPO @ Eagle Academy Public Charter School | Angel's Arena Child Care<br>Blessing<br>Kiddie Academy<br>Miriam's Growing Seeds<br>Point of Care<br>Tiny Tots |
| Total: 87 | 69 Child Development Centers | 18 Home Providers |

Q45 Attachment 2 of 4

<table>
<tr><th colspan="3">Healthy Futures FY22 Expansion Child Development Centers</th></tr>
<tr><th>Ward</th><th>Child Development Centers</th><th>Address</th></tr>
<tr><td>8</td><td>1. Kids Come First</td><td>1720 Minnesota AVE, SE       20020</td></tr>
<tr><td></td><td>2. Vee's Early Education Center</td><td>2130 Minnesota AVE, SE       20020</td></tr>
<tr><td></td><td>3. Little Apple Child Center-Wendy Weekes</td><td>908 Southern AVE, SE         20032</td></tr>
<tr><td></td><td>4. Community Educational Research Group, Inc.</td><td>2503 Good Hope RD, SE        20020</td></tr>
<tr><td></td><td>5. Kids Are People, Too CDC IV</td><td>2279 Savannah St, SE         20020</td></tr>
<tr><td></td><td>6. Kids Are People, Too III</td><td>2275 Savannah ST, SE         20020</td></tr>
<tr><td></td><td>7. New Creation CDC</td><td>1839 Alabama AVE, SE         20020</td></tr>
<tr><td></td><td>8. Bethel Christian Fellowship Early CDC</td><td>2220 Martin Luther King AVE, SE 20020</td></tr>
<tr><td></td><td>9. Tucker's Day Care Center II</td><td>3219 9th PL, SE              20032</td></tr>
<tr><td></td><td>10. Little Angels Child Care Center</td><td>2214 Naylor RD, SE           20032</td></tr>
<tr><td></td><td>11. Jewel's New Beginning Learning Center II</td><td>3927 - 3935 South Capitol ST, SW 20032</td></tr>
<tr><td></td><td>12. Jewel's New Beginning Learning Center, LLC</td><td>4309 3rd ST, SE              20032</td></tr>
<tr><td></td><td>13. KD's Klubhouse</td><td>1310 Ridge Pl, SE            20032</td></tr>
<tr><td></td><td>14. Rehoboth Baptist Church Day Care</td><td>621 Alabama AVE, SE          20032</td></tr>
<tr><td></td><td>15. Tucker's Day Care Center I</td><td>3215 11th PL, SE             20032</td></tr>
<tr><td></td><td>16. Sukarno Glory CDC</td><td>2323 Pennsylvania AVE, SE    20020</td></tr>
<tr><td></td><td>17. Baby Einstein CDC</td><td>1225 Good Hope RD, SE        20020</td></tr>
<tr><td></td><td>18. Creative Korner Early Learning Center</td><td>3223 23rd ST, SE             20020</td></tr>
<tr><td></td><td>19. Kids Come First Unit 4</td><td>1310 Ridge PL, SE,           20020</td></tr>
<tr><td>7</td><td>20. Community Educational Research Group</td><td>1105 50th ST, NE             20019</td></tr>
<tr><td></td><td>21. Lia's Rainbow</td><td>4428 Ord ST, NE              20019</td></tr>
<tr><td></td><td>22. Little Samaritan CDC</td><td>5100 E ST, SE                20019</td></tr>
<tr><td></td><td>23. Manley Science and Technology Center</td><td>4628 H ST, SE                20019</td></tr>
<tr><td></td><td>24. Shining Star 2 Early Learning Center</td><td>5325 East Capitol ST, SE     20019</td></tr>
<tr><td></td><td>25. Assembly of The Saints CDC</td><td>4605 Kane PL, NE             20019</td></tr>
<tr><td></td><td>26. Growth Spurts Child Learning Center @ Stoneridge</td><td>320 Anacostia RD, SE         20019</td></tr>
<tr><td></td><td>27. Rainbow Child Learning Center, Inc.</td><td>505 57th ST, NE              20019</td></tr>
<tr><td></td><td>28. Shining Star Early Learning Center</td><td>5307 East Capitol ST, SE     20019</td></tr>
<tr><td></td><td>29. Agape Woodland Tiger Children</td><td>3200 S ST, SE 20020</td></tr>
</table>

Q45 Attachment 2 of 4

|   |   |   |   |
|---|---|---|---|
|   | Academy Agape Cabbage Patch #3 |   |   |
|   | 30. Lena Sears CDC | 3456 Pennsylvania AVE, SE 20020 |   |
|   | 31. The Happy Kids Learning Center | 3233 Pennsylvania AVE, SE 20020 |   |
|   | 32. Sukarno Glory CDC | 2323 Pennsylvania AVE, SE 20020 |   |
|   | 33. KU Kids Deanwood, LLC | 1350 49th ST, NE | 20019 |
| 4 | 34. Spanish Education Development Center | 4110 Kansas AVE, NW | 20011 |
|   | 35. ABC Child Development Center | 32 Grant Circle, NW | 20011 |
|   | 36. Adventureland Day Nursery # 1 | 4015 Kansas AVE, NW | 20011 |
|   | 37. Adventureland Day Nursery II | 1109 Buchanan ST, NW | 20011 |
|   | 38. Bridges Academy, Inc. | 6119 Georgia AVE, NW | 20011 |
|   | 39. Bridges Babies | 6127 Georgia AVE, NW | 20011 |
|   | 40. Bright Start Childcare & Preschool | 5416 Georgia AVE, NW | 20011 |
|   | 41. Chantelle's Quality Child Care Center | 4221 7TH ST, NW | 20011 |
|   | 42. David's Stars Child Development Center  - Brains in Development | 4813 Georgia AVE, NW | 20011 |
|   | 43. Growing Seeds CDC | 3800 14th ST, NW | 20011 |
|   | 44. Lynn Carol's Academy Of Early Learning | 5506 3rd ST, NW | 20011 |
|   | 45. Mana Bilingual CDC | 604 Kennedy ST, NW | 20011 |
|   | 46. Mana Bilingual CDC 2 | 5511 Colorado AVE, NW | 20011 |
|   | 47. Meriam Academy, LLC | 704 Kennedy ST, NW | 20011 |
|   | 48. Newlen Early Childhood School Readiness Center | 405 Riggs RD, NE | 20011 |
|   | 49. Quickie Becky Child Care Development Center | 6135 Georgia AVE, NW | 20011 |
|   | 50. Estrellitas Montessori School | 5331 Colorado AVE, NW | 20011 |
|   | 51. UPO @ Roosevelt High School | 4301 13th ST, NW | 20011 |
| 6 | 52. Barbara Chambers Children Center #2 | 1734 7th ST, NW | 20001 |
|   | 53. Springfield Baptist Church "Kingdom Kids" CDC | 508 P ST, NW | 20001 |
|   | 54. Early Learner Academy | 474 Ridge ST, NW | 20001 |
|   | 55. Shiloh Child Development Center | 1507 9th ST, NW | 20001 |
|   | 56. Full Gospel Tabernacle Church | 632 11th ST, NE | 20002 |
|   | 57. Growth Spurts Child Learning Center @ D Street | 1802 D ST, NE | 20002 |

Q45 Attachment 2 of 4

| | | | |
|---|---|---|---|
| | 58. Kids Come First - Unit 2 | 200 K ST, NW | 20001 |
| | 59. Kids Come First - Unit 5 | 200 K ST, NW | 20001 |
| | 60. Toddlers On The Hill | 1000 5th ST, SE | 20003 |
| | 61. Edward C. Mazique @ Tyler House | 1200 North Capitol ST, NW | 20009 |
| | 62. Fabulous Kids Early Learning Child Care Center | 1505 1st ST, SW | 20024 |
| | 63. Growth Spurts Child Learning Center @ Bethel | 60 I ST, SW | 20024 |
| | 64. IDA Little Scholars Academy | 1546 5th ST, NW | 20001 |
| | 65. UPO @ Azeeze Bates | 444 16th ST, NE | 20002 |
| 1 | 66. UPO @ Marie Reed Elementary School | 2195 Champlain ST, NW | 20009 |
| | 67. Easter Seals Serving DC/MD/VA, Inc. | 2800 13th ST, NW | 20009 |
| | 68. Woodbridge Day Care Center III | | |
| | 69. Woodbridge Day Care Center IV | 424 Irving ST, NW | 20010 |
| | 70. CentroNia @ Cardozo High School | 629 Columbia RD, NW | 20001 |
| | 71. David's Stars Child Development Center | 1200 Clifton ST, NW | 20009 |
| | 72. Edward C. Mazique Parent Child Center | 2711 Ontario RD, NW | 20009 |
| | 73. Semillitas Child Development Center | 2000 14th ST, NW | 20009 |
| | 74. The Clark Inn of Samaritan Inns, Inc. | 2100 New Hampshire AVE, NW 20009 | |
| | | 1422 Harvard ST, NW | 20009 |
| 5 | 75. Growth Spurts Child Learning Center @ Judah | 1715 Rhode Island AVE, NE 20018 | |

Q45. Attachment 3 of 4

| Services Provided | FY 21 | FY 22 YTD (Quarter 1: October – December 2021) |
|---|---|---|
| # of children referred to Healthy Futures for child-specific services | 88 | 35 |
| # of children who received child-specific consultation | 73 | 35 |
| # of prevention/early intervention sessions | 94 | 66 |
| # of staff and parent presentations | 247 Staff<br>56  Parent | 16 Staff<br>8 Parent |
| # of classroom observations | 75 In Person<br>51 Virtual | 67 In Person<br>5 Virtual |
| # of parent consultations | 316 | 69 |
| # of teacher/staff consultations | 602 | 242 |
| # of consultations with Center Director | 1338 | 240 |
| # of children referred for outside services | 3 | 0 |
| # of abuse/neglect reports | 3 | 3 |
| # of expulsions | 2 | 0 |
| # of children who had access to consultation | 5484 | Still collecting data |

**Q45.  Attachment 4 of 4**

*Healthy Futures Program Treatment Child Development Centers*

| | Ward | **Name of Center**<br><br>**Type**<br><br>**Number of Children** | **Address** | **Director Name and Contact Information** |
|---|---|---|---|---|
| 1 | 8 | Sunshine | 4224 6th St. SE<br>20032 | Ms. Bell<br><br>t.bell@sunshinedc.org<br><br>(202) 561-8706 |
| 2 | 8 | National Children's Center | 3400 Martin Luther King Junior Avenue SE<br>20032 | Keesha Blythe<br><br>tbeeks@nccinc.org<br><br>(202) 561-7280 |
| 3 | 8 | Martha's Table | 2375 Elvans RD, SE ,<br>20020 | Yasmin Shaffi<br><br>yshaffi@marthastable.org<br><br>(202) 328-6608 |
| 4 | 8 | Bright Beginnings | 3640 Martin Luther King Jr Ave SE,<br>20032 | Angela Hamilton<br><br>ahamilton@bbidc.org<br><br>(202) 842-9090 |
| 5 | 7 | Educare of Washington, DC | 640 Anacostia AVE NE,<br>20019 | Jamal Berry<br><br>jberry@educaredc.org<br><br>(202) 727-5604 |
| 6 | 6 | Board of Child Care | 308 15th Street SE,<br>20003 | Kyrstina Johnson<br><br>kjohnson@boardofchildcare.org<br><br>(202) 291-3330 |
| 7 | 2 | Edward C. Mazique Parent Child Center, Inc. @ the Ruth E. Rucker Bld. | 1719 13th ST NW,<br>20009 | Ms. Lettie Williams<br><br>lmwilliams@ecmpcc.org<br><br>202-462-3375 |
| 8 | 1 | Rosemount | 2000 Rosemount Ave NW<br>20010 | Cornett Roberts-Njoku<br><br>croberts-njoku@rosemount.com<br><br>202-265-9885 |

*Q46. Please provide an update on the implementation of the DC SEED Grant.*
  *a. Please also explain the impact of the COVID-19 pandemic on the implementation of the DC SEED grant.*
  *b. Please describe any plans or steps taken to sustain the services and supports related to this grant, once the grant period has ended.*

**DBH Response**

DBH was awarded the DC Seed (Social Emotional and Early Development) grant in FY 17. The four-year grant ended on March 31, 2021 The objective of the grant was to implement and sustain infrastructure and system-building activities and supports necessary to create a comprehensive early childhood system of care. The grant supported the implementation of services and supports to young children (0-6 years old) and their families with three providers, Community Connections, Mary's Center and MedStar Georgetown. Over the course of the grant DC SEED supported the training of two evidence-based practices. Fifteen clinicians were trained in Parent Child Interaction Therapy (PCIT) and 24 clinicians were trained in Child Parent Psychotherapy (CPP). Three DC SEED providers supported 43 children and families with PCIT and 62 children and families with CPP. For children for whom pre and post assessments were available, the data indicated improved social emotional skills and reduced challenging behavior from before to after treatment.

In addition to treatment services, DC SEED provided Early Childhood Mental Health Consultation services. The Early Childhood Mental Health Consultant provided classroom/programmatic and child-specific consultation services to young children, families, and early childhood professionals in Child Development Centers across the District of Columbia. One highly skilled consultant, over the course of the grant, outreached to 116 child development centers in the District and provided consultation services to 21 centers. The consultant developed 17 trainings and provided staff and caregivers with 76 training sessions, including in person and virtual trainings during COVID-19. In terms of child-specific consultation, the consultant provided 123 consultation sessions (in person and virtual).

To assure family engagement in the development, implementation, and evaluation of the early childhood system of care, the DC SEED established DC Families United which created and implemented a Collaborative Action Plan (CAP) which outlined specific goals and objectives to increase family voice within the early childhood system of care. The goals of the group included: 1) increase the number and effectiveness of DC family leaders with lived experience services at the policy level to improve the system of care 2) improve the readiness, willingness and capacity of DC systems leaders to partner with family leaders to improve the system of care, and 3) ensure accurate relevant data collection that reflects family leaders' contributions to the system of care.

a. During the pandemic, all three DC SEED providers pivoted and continued to provide quality services to their clients through telemedicine. DC SEED hosted 27 virtual workshops for families and caregivers focusing on Self-Care, Prenatal Care for Women, and Early Childhood topics. In addition, nine virtual sensory workshops were conducted for young children and families. During these workshops parents learned about the importance of sensory activities and

the children engaged in a range of age-appropriate activities. During the pandemic, the Family Engagement Coordinator organized Tuesdays Together a weekly virtual parent support group that allowed parents and other caregivers to stay socially connected during a time of social distancing. Conversation topics were based on the protective factors using the Parent Café model's questions to guide the conversation.

b. After a No Cost Extension period, the DC SEED grant ended on March 31, 2021.  Early childhood treatment services continue to be provided through one of the DC SEED providers and at the DBH operated Parent Infant Early Childhood Enhancement (PIECE) program.  Young children and their families continue to receive evidence-based services.  Early Childhood Mental Health Consultation services are being sustained through the Healthy Futures Program.  Healthy Futures continues to expand into additional centers, many of which the DC SEED Early Childhood Mental Health Consultant supported during the grant.

In FY 22, DBH will pilot treatment services for young children and families in eight child development centers in areas of the District most impacted by the COVID-19 pandemic either through disproportionate cases or death rates. Each center will serve up to 75 young children and their families. Two participants from DC Families United will be leaders in the initiative to continue its work towards ensuring that family voice is included.

Q47. Attachment 1 of 3. DC Public Charter School Completions FY21

| Count of Group | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | Director | Other | Principal | Teacher | (blank) | Grand Total |
| At-Risk for Early Childhood Educators | 22 | 344 | 23 | 736 | | 1125 |
| At-Risk for Elementary School Educators (L) | 32 | 302 | 20 | 741 | | 1095 |
| At-Risk for High School Educators | 37 | 325 | 11 | 453 | | 826 |
| At-Risk for Middle School Educators | 33 | 205 | 12 | 526 | | 776 |
| Referral Process - District of Columbia | 102 | 1001 | 70 | 2344 | | 3517 |
| Resilient Together: Coping with Loss at School | 92 | 881 | 58 | 2054 | | 3085 |
| Step In, Speak Up! | 12 | 88 | 2 | 137 | | 239 |
| (blank) | | | | | | |
| Grand Total | 330 | 3146 | 196 | 6991 | | 10663 |

DC Public Charter School Completions FY22 to date

| Count of Group | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | Director | Other | Principal | Teacher | (blank) | Grand Total |
| At-Risk for Early Childhood Educators | 1 | 42 | | 44 | | 87 |
| At-Risk for Elementary School Educators (L) | 2 | 40 | 5 | 81 | | 128 |
| At-Risk for High School Educators | 3 | 28 | | 21 | | 52 |
| At-Risk for Middle School Educators | | 10 | | 11 | | 21 |
| Referral Process - District of Columbia | 5 | 64 | 5 | 106 | | 180 |
| Resilient Together: Coping with Loss at School | 4 | 67 | 5 | 103 | | 179 |
| Step In, Speak Up! | | 5 | | 5 | | 10 |
| (blank) | | | | | | |
| Grand Total | 15 | 256 | 15 | 371 | | 657 |

Q47. Attachment 2 of 3. DC Public School Completions FY21

| Count of Group | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | Director | Other | Principal | Teacher | (blank) | Grand Total |
| At-Risk for Early Childhood Educators | 12 | 434 | 24 | 1126 | | 1596 |
| At-Risk for Elementary School Educators (L) | 10 | 545 | 66 | 1884 | | 2505 |
| At-Risk for High School Educators | 32 | 311 | 34 | 947 | | 1324 |
| At-Risk for Middle School Educators | 6 | 216 | 27 | 797 | | 1046 |
| Referral Process - District of Columbia | 41 | 1207 | 139 | 4298 | | 5685 |
| Resilient Together: Coping with Loss at School | 39 | 1138 | 133 | 4125 | | 5435 |
| Step In, Speak Up! | 3 | 76 | 6 | 221 | | 306 |
| (blank) | | | | | | |
| **Grand Total** | **143** | **3927** | **429** | **13398** | | **17897** |

DC Public School Completions FY22 to date

| Count of Group | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | Director | Other | Principal | Teacher | (blank) | Grand Total |
| At-Risk for Early Childhood Educators | 10 | 9 | | 26 | | 45 |
| At-Risk for Elementary School Educators (L) | | 3 | | 1 | | 4 |
| At-Risk for High School Educators | | 23 | 2 | 32 | | 57 |
| At-Risk for Middle School Educators | | 3 | | 10 | | 13 |
| Referral Process - District of Columbia | | 29 | 2 | 36 | | 67 |
| Resilient Together: Coping with Loss at School | | 27 | 2 | 34 | | 63 |
| Step In, Speak Up! | | 1 | | 2 | | 3 |
| (blank) | | | | | | |
| **Grand Total** | **10** | **95** | **6** | **141** | | **252** |

Q47. Attachment 3 of 3. DC Child Development Center Completions FY21

| Count of Group | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | Director | Other | Principal | Teacher | (blank) | Grand Total |
| At-Risk for Early Childhood Educators | 30 | 34 | 1 | 202 | | 267 |
| At-Risk for Elementary School Educators (L) | | 5 | 1 | 13 | | 19 |
| At-Risk for High School Educators | | 1 | | 7 | | 8 |
| At-Risk for Middle School Educators | 1 | 1 | | 7 | | 9 |
| Referral Process - District of Columbia | | 13 | 2 | 35 | | 50 |
| Resilient Together: Coping with Loss at School | | 11 | | 33 | | 45 |
| Step In, Speak Up! | | | | 2 | | 2 |
| (blank) | | | | | | |
| Grand Total | 31 | 65 | 5 | 299 | | 400 |

DC Child Development Center Completions FY22 to date

| Count of Group | Column Labels | | | | | |
|---|---|---|---|---|---|---|
| Row Labels | Director | Other | Principal | Teacher | (blank) | Grand Total |
| At-Risk for Early Childhood Educators | 22 | 20 | | 215 | | 257 |
| At-Risk for Elementary School Educators (L) | | | | 1 | | 1 |
| At-Risk for High School Educators | | | | 2 | | 2 |
| At-Risk for Middle School Educators | | | | | | |
| Referral Process - District of Columbia | | | | | | |
| Resilient Together: Coping with Loss at School | | | | | | |
| Step In, Speak Up! | | | | | | |
| (blank) | | | | | | |
| Grand Total | 22 | 20 | | 218 | | 260 |

*Q47. Please provide an update on the online behavioral health training program for all child development facilities and public schools that was launched in the first quarter of FY15. How many teachers and other personnel completed the online training in FY21 and FY22 to date?*

**DBH Response**

The Department of Behavioral Health (DBH) continues to provide the online behavioral health training through the portal: http://www.supportdcyouth.com and a reset of the compliance cycle was implemented in 2020 in response to the public health emergency. All DC administrators and teachers are required to complete the mandated training modules on the same two-year cycle.

All District public and public charter school teachers and principals must complete three DC Youth Behavioral Health Program courses once every two years to be compliant with the legislative mandate. Additionally, it is highly recommended for educators to take the *Step In Speak Out* course for challenges and concerns related to LGBTQ students. This is an additional module that is available within the portal. Early childhood educators, child development center staff, and child development center administrators, must complete *At-Risk for Early Childhood Educators.* This simulation is for those administrators, staff, and educators who work with young children and builds understanding, knowledge, and skills in mental health and behavior management. The Division of Early Learning within the Office of the State Superintendent of Education (OSSE) has the completion of the *At-Risk for Early Childhood Educators* module as part of the yearly health and safety requirements, and all educators must complete their health and safety requirements by September 30, each year.

In FY21, 10,663 DC Public Charter Schools (DCPCS) teachers and other personnel completed the online training and 657 have completed the trainings in FY22 to date. For DC Public Schools (DCPS), 17,897 teachers and other personnel completed the training in FY21 and 252 have completed the training in FY22 to date.

In FY21, there were 400 DC Child Development Center Administrators and staff who completed the on-line training. And, in FY22 to date, 260 Administrators and staff have completed the training. The attached documents provide information on the number of DC Public Charter School, DC Public School, and DC Child Development Center teachers and other personnel who have completed the online training in FY21 and FY22 to date.

Q47. Attachment 1 of 3. DC Public Charter School Completions FY21 and FY22 to date
Q47. Attachment 2 of 3. DC Public School Completions FY21 and FY22 to date
Q47. Attachment 3 of 3. DC Child Development Center Completions FY21 and FY22 to date

*Q48.  How did DBH implement the National Suicide Hotline Designation Act of 2020, which creates a new 9-8-8 universal telephone number for the purpose of suicide prevention and mental health crisis response?  To what extent has DBH engaged the Office of Unified Communications or other public safety cluster agencies following the law's passage?*

**DBH Response**

DBH was awarded a grant on January 20, 2021 to support the implementation of the new 9-8-8 suicide prevention lifeline. Grant funding was made available to all states, territories, and the District of Columbia to support readiness.  Key legislative and planning grant requirements included:  transitioning to full utilization of 9-8-8 by July 16, 2022, as required nationwide; developing a clear roadmap to address key coordination, capacity, funding, and communication strategies that are foundational to the launching of 9-8-8; and assuring that all jurisdictions meet or exceed a minimum in-state answer rate of 80% for 9-8-8 calls.  Calls not answered in-state rollover to the next available call center in the lifeline network.  The District already exceeds this standard.

The DBH Access HelpLine is the District's only National Suicide Prevention Lifeline (NSPL) member center. As the 9-8-8 grant lead, the DBH driving planning and implementation efforts. DBH has engaged numerous stakeholders as 9-8-8 coalition members, including: representatives from the adult and child mobile crisis programs (CRT and ChAMPS respectively); law enforcement; community mental health providers; peer-based organizations; and family members who have experienced the attempted or completed suicide loss of a family member. The group, which serves as an advisory board to support the planning process for the implementation of 9-8-8, formed workgroups to address requirements of the grant.  The participants are listed in the table below.

The following represent the key building blocks on which the DBH is building out its 9-8-8 capacity for DC residents:

- Community Response Team (CRT) – The DBH's CRT is a 24-7 multidisciplinary direct service, crisis response team that expands our community-based direct service efforts and includes homeless outreach, mobile crisis, and pre-arrest diversion functions.
- Comprehensive Psychiatric Emergency Program (CPEP) - DBH's CPEP is a twenty-four hour/seven day a week operation that provides emergency psychiatric services and extended observation beds for individuals 18 years of age and older.  CPEP provides an alternative to hospital emergency rooms and inpatient psychiatric beds for those in acute distress and crisis.
- Crisis Beds – Through contracts DBH offers two short-term psychiatric stabilization programs, operated by SOME and Woodley House, and one Substance Use Disorder Crisis Program operated by Regional Addiction Prevention Inc. (RAP).
- Metropolitan Police Department(MPD)/Crisis Intervention Officer/Office of Unified Communications – When callers are assessed to be at imminent risk of suicide or harming themselves or others, the Access Help Line (AHL) routes the caller to 9-1-1, operated by the DC Office of Unified Communications

(OUC) to dispatch an ambulance or MPD.  When law enforcement is needed, AHL requests that a Crisis Intervention Officer (CIO) respond to the scene. CIOs are officers who receive mental health training from the DBH in crisis management and de-escalation. Having these specially trained officers respond to individuals experiencing a mental health crisis enhances the clinical response and reduces the risk potential exacerbating the crisis.

*To what extent has DBH engaged the Office of Unified Communications or other public safety cluster agencies following the law's passage?*

DBH works closely with OUC, as well as MPD and the Fire and Emergency Medical Services Department (FEMS).  OUC participated actively in monthly meetings of the 9-8-8 Planning Grant Coalition and will continue to be a key partner moving forward.

### 9-8-8 Planning Grant Coalition Membership

Johari Eligan, Access HelpLine Director, served as the designated lead for the planning grant.  In addition to the lead, the funders required grantees to establish of an advisory coalition that included specified categories of representatives which are denoted by an asterisk in the table below:

| Category | Organization | Name |
|---|---|---|
| Individuals with lived experience of suicide thoughts, attempts and/or loss* | Wanda Alston Foundation | Williams, Celendra |
| A representative from one or more Lifeline crisis centers receiving stipends through the grant* | DBH Access Line/Care Coordination | Minges, Melanie |
| State suicide prevention coordinator* | DBH Linkage & Assessment Service Division | Williams, Lanada |
| Mobile crisis service providers* | Community Response Team    Catholic Charities – ChAMPS | Bebout, Dr. Richard    Thomas, Ethlynne |
| Providers of crisis respite/ stabilization services* | Jordan House/SOME | Nightingale, Susan |
| Peer support service providers* | Depression and Bipolar Support Alliance | Scharf, Eric |
| State/local mental health and suicide prevention advocacy groups* | DC National Alliance on Mental Illness | Harris, Jean |
| Other District Government Partners | DC Office of Unified Communications (OUC) | Jackson, Trayshelle |
| | Office of the State of Superintendent of Education | Price, Claudia |

| | | |
|---|---|---|
| Other Community Partners | Washington Hospital Center | Colvin, Chandra<br>Gostel, Keith<br>Gentry, Larry |
| | Psychiatric Institute of Washington | Bolden, Bonita |
| | District of Columbia Behavioral Health Association | LeVota, Mark |
| | GWU Prevention & Community Health | Craw, Kaila |
| | GWU Prevention & Community Health | Lee, Jonathan |
| | GWU Prevention & Community Health | Price, Olga Acosta |
| | Education Development Center | Loudermilk, Amy |
| | American Foundation for Suicide Prevention | Steinberg, Deborah |
| Other DBH Staff | Comprehensive Psychiatric Emergency Program (CPEP) | Ward, Jonathan |
| | DBH Chief Information Officer | Chaudhry, Imran |
| | DBH New Initiatives Branch | Byam, Leslie-Ann |
| | DBH Data & Performance Manage Branch | Heaven, Laura |
| | DBH Director's Office | Moise, Jean |
| | DBH Prevention/Early Intervention Division | Barnes, Erica<br>Sullivan, Meghan |
| | DBH Provider Relations | Hamilton, Venida Y. |
| | DBH Integrated Care Division | Griffin, Chris<br>Queen, Robin |

*Q49. Describe how DBH is working with providers especially substance use disorder providers to facilitate better coordination between Levels of Care and settings.*

**DBH Response:**

DBH actively and continuously engages both Mental Health and Substance Use Disorder (SUD) providers to coordinate care between levels of care and across the care continuum. Our team hosts a bi-weekly meeting with the providers to provide technical assistance and assist them with data entry into our Electronic Health Record (EHR) to ensure better care coordination. A primary focus of this meeting addresses care coordination challenges which providers experience, as well as offering recommendations and strategies to better engage and retain clients in care. In this meeting, our team shares the service delivery system's monthly and quarterly outcome data related to our Key Performance Indicators (KPIs), which track how efficiently and effectively the provider system functions in meeting the needs of consumers, reviews individual provider's outcomes, and how providers can improve their performance.

In addition to these meetings, the SUD team works with the Managed Care Organizations (MCOs) to promote and incorporate their care coordination strategies and practices across the network. Per contract, the MCOs are required to facilitate Comprehensive Case Management (CCM) and coordinate care for their enrollees receiving behavioral health services. CCM and care coordination services work directly with clients in care to provide support services as they transition through the continuum. These supportive services include: transportation to appointments, peer supports, and assistance with medications to address cravings and ongoing withdrawal due to substance use.

DBH's SUD team also works regularly with DHCF, the MCOs, and Comagine Health (a utilization management vendor) to build a new authorization process. This recently implemented care management process redefines how people with a SUD enter care and transition through the various levels of SUD treatment. Over the past two years, DBH, DHCF, and Comagine Health has trained over 100 clinicians and certified addictions counselors (CACs) on this new clinical assessment protocol and person-centered practices. This new care management protocol is designed to place individuals with an SUD at the appropriate level of care and direct treatment planning based on medical necessity criteria and national best practices. This tool allows clinicians to not only assess an individual's substance use need, but it also allows clinicians to assess and appropriately manage mental health and other medical needs that an individual may be experiencing.

In addition to this new authorization / care management process, DBH has been diligently working with the residential treatment provider network to increase their care coordination and step-down rate (when an individual steps down to a lower level of service). Our target goal is to ensure that 50% of individuals are connected to continuing care when they leave the residential treatment programs. We experienced challenges regarding our clinical step-down rate during the earlier part of 2021 due to the impact of COVID on the SUD delivery system. Our overall step down rate was 42% in the early part of 2021, but we are now approaching our target due to efforts mentioned above implemented over the past six months.

Lastly, DBH is collaborating with DHCF to re-design our delivery to focus on further integrating care and aligning benefits across the delivery system.  We have added a care coordination and transition planning benefit to better facilitate transitions and continuity of care within the behavioral health system. DBH has initiated a Data Decision Workgroup in conjunction with providers and other stakeholders to improve Key Performance Indicators related to step-downs and transitions within our current system of care.



**District of Columbia**
**Department of Behavioral Health**

**Bulletin ID: 125**

**Bulletin Title: Guidance to Operators of Community-based Residences and Facilities to Comply with Mayor's Order 2020-063**

On March 11, 2020, Mayor Muriel Bowser issued Mayor's Orders 2020-45 and 2020-46, which declared a public emergency and a public health emergency in the District of Columbia in response to the novel coronavirus (COVID-19) pandemic. In meeting the challenges and issues that have developed for vulnerable populations, the Mayor issued Mayor's Order 2020-063 (Mayor's Order), dated April 15, 2020, which establishes requirements for community-based residences to ensure the safety of residents and employees. These requirements apply to residential providers that are licensed, certified and/or contracted by the Department of Behavioral Health (DBH). There are currently 96 Mental Health Community Residence Facilities (MHCRF) licensed by DBH pursuant to 22-A DCMR § 3800, 27 Substance Use Disorder (SUD) residential facilities certified by DBH pursuant to 22-A DCMR § 6300 and two DBH-contracted crisis bed facilities.

DBH is providing guidance to residential providers that outlines the requirements to comply with the Mayor's Order.[1] Furthermore, Bulletin ID 125 shall serve as a DBH emergency policy that applies to all DBH-licensed MHCRF providers, DBH-certified SUD residential providers, and DBH-contracted crisis bed facilities. This bulletin shall be effective immediately.

**Exclusion and Screening Protocols**

Residential providers must create and implement an exclusion and screening process, including the following:

1. Residential providers must exclude all non-essential visitors and non-essential personnel from entering the facility. Only employees necessary to meet the facility's operational requirements and the following essential visitors shall be permitted to enter the facility:
   a. Hospice care workers;
   b. Emergency personnel;
   c. Lawyers or legal guardians approved for in-person visits with a client;
   d. Licensed, certified or registered healthcare professionals, including an allied health professional from whom services cannot safely and effectively be provided via telehealth;

---

[1]The full text of the Mayor's Order can be found at:
https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/publication/attachments/MayorsOrder2020.063.pdf

    e.  Individuals present for youth or emergency hearings held at a District government facility;

    f.  Compassionate care visits for end of life care for an individual who does not have COVID-19, and

    g.  Regulators, auditors, or court-appointed investigators.

2. Residential providers must maintain a daily log of employees and essential visitors who enter and exit the facility, including the time and date of entry and the purpose of the visit.

3. Residential providers must check the body temperature of each employee and essential visitor entering the facility. Anyone registering a temperature of 100.4 degrees Fahrenheit or above shall be prohibited from entering the facility.

4. Residential providers must screen each employee and essential visitor who enters the facility by asking the following questions:
   1. Do you currently have any COVID-19 symptoms?
   2. Have you been in contact with anyone recently diagnosed with COVID-19?

**Anyone who answers "yes" to either question must be prohibited from entering the facility**.
*Please note that emergency personnel are exempt from the screening questions.*

**Social Distancing Protocols**

Residential providers must ensure that residents, employees and essential visitors adhere to social distancing guidelines, including not shaking hands or engaging in any other unnecessary physical contact. Further, residential providers must cancel all group activities, except those required to address a medical need. Residential providers must ensure social distancing at mealtime by restricting all seating in communal dining areas, and allowing residents to pick up grab and go meals. If this is not feasible, the residential provider must ensure proper social distancing by spacing the residents at least six feet apart in communal dining areas or staggering mealtimes.

Residential providers must ensure social distancing in shared bedrooms by providing at least six feet of space between beds and having residents sleep head to toe.

To accommodate social distancing and proper visitor practices, residential providers must encourage and facilitate videoconference or telephone visits with residents for non-essential visitors. Additionally, residential providers must provide secure and private videoconference or telephonic communication platforms for telemedicine, lawyers and legal guardians.

Residential providers must provide all employees with a printed copy of guidance highlighting the requirements for hand washing and social distancing. If possible, employee workstations should be spaced at least six feet apart.

**Personal Hygiene, Personal Protective Equipment (PPE) and Cleaning Protocols**

Consistent hand hygiene is essential to reduce the spread of the coronavirus. Residents, employees and essential visitors must wash their hands for at least twenty seconds or disinfect their hands



with an alcohol based hand sanitizer frequently throughout the day, including immediately upon entering the facility.  To facilitate appropriate handwashing practices, residential providers must provide hand sanitizing products throughout the facility, including at the entry and exit.  DC Health has developed posters on personal hygiene that the residential provider should display throughout the facility.[2]

To further facilitate employee hand hygiene, residential providers must ensure that all employees have consistent access to:
   a. Running water and soap;
   b. Tissues and lined trash receptacles that are frequently emptied;
   c. Store-bought alcohol-based hand sanitizer (containing at least sixty percent alcohol), and
   d. Disinfectant sprays or wipes.

Residential providers must follow DC Health guidance on masks and coverings for residents, staff and essential visitors.[3]  Specifically, residential providers must provide face masks or coverings for all employees who provide direct individual care and for any employees who handle food or are involved in food preparation.  If the residential provider is unable to obtain face masks, it should request masks from the Local Strategic Medical Supply.  Residential providers must also provide cloth face coverings for residents.  However, gloves, gowns, and face shields should be reserved for aerosolized procedures like nebulizer treatments and CPAP treatments.  Residential providers should post DC Health guidance on masks and facial coverings throughout the facility.[4]

Residential providers must ensure that facilities are regularly cleaned and disinfected.  High-touch surfaces and shared equipment (i.e. doorknobs, handrails, etc.) must be disinfected throughout the day.  Residential providers shall clean and disinfect the facility pursuant to guidelines established by the Center for Disease Control (CDC).[5]

Residential providers must inform all employees in writing that they should not come to work if sick and of applicable paid leave provisions, if any.

---

[2]Please visit https://coronavirus.dc.gov/page/translated-materials-0 to access the posters in multiple languages.

[3]For more information, please visit:
https://coronavirus.dc.gov/sites/default/files/dc/sites/coronavirus/page_content/images/DCHealth_Guidance_for_Essential_Non-Healthcare_Workers_on_How_to_Stay_Safe_In_The_Workplace.pdf

[4] A DC Health poster about face masks in multiple languages can be accessed at:
https://coronavirus.dc.gov/page/translated-materials-0

[5] Please visit https://coronovaris.dc.gov for cleaning guidelines.



**Protocols for Suspected COVID-19 Cases**

Any employee who observes a resident displaying symptoms consistent with COVID-19 shall immediately notify their supervisor.  Symptoms include the following:[6]
   a. Cough;
   b. Shortness of breath or difficulty breathing; or
   c. At least two of the following symptoms:
      i. Fever;
      ii. Chills;
      iii. Repeated shaking with chills;
      iv. Muscle pain;
      v. Headache;
      vi. Sore throat; or
      vii. New loss of taste or smell.

If a resident is experiencing symptoms consistent with COVID-19, the residential provider must contact the resident's primary care physician, or 911 if the resident is experiencing a health emergency.  The residential provider must follow the guidance of the resident's primary care physician and DC Health regarding COVID-19 testing.  To schedule COVID-19 testing for an employee or to assist a resident, please contact the Testing Triage Center at (855) 363-03333.  For Medicaid beneficiaries in need of transportation for testing, or transportation for medical appointments please contact the MTM reservation line at 1-866-796-0601. You may also email CO-DC@mtm-inc.net for any questions or concerns regarding MTM transportation.

A residential provider must follow DC Health quarantine and/or isolation guidance for suspected COVID-19 cases.[7]  Further, a residential provider who suspects that an employee or resident may be COVID-19 positive must clean and disinfect the facility in accordance with CDC guidelines, as discussed above.

**Protocols for Confirmed COVID-19 Cases**

When a resident or employee tests positive for COVID-19, the residential provider shall institute quarantine and/or isolation measures in accordance with DC Health guidance.  Residential providers should consult DC Health for the latest quarantine guidelines.  However, at a minimum, a residential provider must ensure that the facility maintains separate quarantine units for (1) newly admitted individuals, who should be quarantined for fourteen days if feasible; and (2) individuals known or suspected to be COVID-19 positive.  These groups should be kept separate from each other and the rest of the facility.  If possible, the residential provider should designate a cohort of staff to care for COVID-19 positive residents.  Further, the residential provider must ensure that the facility is cleaned and disinfected pursuant to CDC guidelines, as discussed above.

---

[6] For a current list of symptoms, please visit https://coronavirus.dc.gov.
[7] For current quarantine guidance, please visit https://coronavirus.dc.gov.



Any resident who shared a common area with a COVID-19 positive resident or employee should be screened through:

    a. A temperature check;

    b. A questionnaire regarding COVID-19 symptoms, and

    c. A COVID-19 test as soon as practicable.

Residential providers must report all confirmed COVID-19 cases among facility residents and employees as follows:

    a. Upon receipt of a positive COVID-19 test result for a resident or employee, the residential provider must notify the Core Service Agency (if applicable) of all residents in the facility. Absent a valid release of information, the residential provider shall not release any protected health information (PHI) under the Health Insurance Portability and Accountability Act (HIPAA), and shall only advise that someone in the facility tested positive for COVID-19.

    b. The residential provider shall notify DBH and DC Health when anyone in the facility tests positive for COVID-19, including submitting Major Unusual Report to DBH pursuant DBH Policy 480.1A.

Residential providers must permit any resident who left the facility for care at a community hospital for COVID-19 or any other approved reason to return to the facility.

Residential providers should be prepared to house residents with COVID 19. They should be able to appropriately isolate a resident with COVID from other non-infected residents. They should also be able to effectively quarantine a new resident away from other residents if there is a concern they were exposed to someone with COVID 19. If a resident is returning with a COVID-19 diagnosis they do have to remain in isolation until they are cleared using the two negative tests method.

**Continuity of Operations Plan**

Every facility must have an updated Continuity of Operations Plan (COOP) to provide for continued resident care if a large number of staff become sick or if the facility is evacuated. The COOP must also identify alternative locations within each facility or alternative licensed or certified facilities where quarantine and isolation functions can be carried out, where applicable and possible. Residential providers must provide updated COOPs to the Accountability Administration by 5:00 pm on May 15, 2020 for approval. For technical assistance, please contact Shannon Goodhue, Director, Disaster Behavioral Health and Support Collaborations.

**Enforcement**

DBH will enforce these provisions through frequent compliance checks and other mechanisms conducted by the Accountability Administration. Failure to comply with any provision of this bulletin shall result in the issuance of DBH sanctions against the facility. Please note that the



Mayor's Order states that knowing violations of the Order may subject the individual or entity to civil, criminal, and administrative penalties authorized by law. Individuals should call 311 to report any suspected violations of any Mayor's Order related to the COVID-19 public health emergency.

**Resources**

For more information about COVID-19, including a list of symptoms, testing centers and the District's response, please visit https://coronavirus.dc.gov/.

For a list of COVID-19 DC Health Guidance Documents, please visit https://dchealth.dc.gov/page/health-notices.

For questions about this bulletin, please contact Atiya Jackson, Deputy Director, Accountability Administration, at Atiya.Jackson@dc.gov.

**Barbara J. Bazron, Ph.D.**
**Director, DBH**

_Barbara J Bazron_ 05/13/2020

**(Signature)**                    **(Date)**



*Q50. What specific steps has DBH taken to ensure consumers living in DBH supported housing have been protected from contracting COVID?*

**DBH Response**

DBH issued Bulletin ID 125 on May 13, 2020 to provide guidance to operators of community-based residences and facilities to comply with Mayor's Order 2020-063 which establishes requirements for community-based residences to ensure the safety of residents and employees during the public health emergency. Bulletin ID 125 applies to all DBH-licensed Mental Health Community Residence Facilities (MHCRF) providers, DBH-certified Substance Use Disorder residential providers, and DBH-contracted crisis bed facilities. The Bulletin established protocols for social distancing, use of personal hygiene and Personal Protective Equipment (PPE), and suspected and confirmed COVID-19 cases.  Every residence is required to submit an updated Continuity of Operations Plan (COOP) to provide for continued resident care if a large number of staff become sick or if the facility is evacuated. The Bulletin is attached.

To protect residents of community-based residences, the Bulletin provides that operators should be prepared to house residents with a positive COVID -19 test result per DC Health guidance and must permit any resident who left the facility for care for COVID-19 to return home.  The DBH Residential Services and Support Team along with the Accountability Administration hosted virtual meetings to ensure residential providers delivered services in accordance with guidelines from DC Health and the Centers for Disease Control. As provided in the Bulletin, the DBH will enforce these provisions through frequent compliance checks and other mechanisms conducted by the Accountability Administration.

To help sustain operations, DBH distributed PPE, cleaning supplies and hard to get infrared thermometers to all operators of MHCRFs. DBH also distributed 706 COVID-19 rapid test kits to MHCRFs in response to the omicron variant.  DBH continues to partner closely with DC Health when positive cases are reported in congregate care settings. Additionally, DBH assists providers with navigating the placement at that need to be placed in Isolation and Quarantine (ISAQ) sites operated by the Department of Human Services.

Vaccination is one of the best tools we have against COVID-19. DBH partnered with DC Health to offer vaccinations on site at our MHCRFs across the District. To date, 89% of MHCRF residents are fully vaccinated and 20% have received a booster. Plans are underway to offer additional booster shots via DC Health.

DBH meets virtually each week with providers and partners. The meetings are used to share guidance from the Mayor and the DC Health and to address challenges within the provider network.

All provider bulletins and guidance from DC Health on universal precautions and PPE to reduce the spread of COVID-19 are posted on our website.

*Q51. What specific steps has DBH taken to ensure DBH Providers have continued to meet the mental health needs of its consumers during the COVID emergency?*

**DBH Response**

As the COVID pandemic extended into a third year, DBH remains focused on maintaining continuity of services and supports, enhancing and expanding services to meet the needs of all District residents, and providing clear direction based on DC Health guidance to providers for quality service delivery in the new environment.

Since the beginning of the pandemic, the DBH Director has hosted weekly virtual meetings with the provider network to review guidance from DC Health, share information about effective management of the pandemic, to encourage consistent self-care, facilitate problem-solving and to promote vaccinations.  To support providers to maintain operations, DBH:

- Distributed PPE and cleaning supplies to all providers and operators of supported residences.
- Provided hard to find infrared thermometers to all supported residences to ensure safety of consumers within their residences.
- Worked with DC Health to include behavioral health providers in the centralized purchasing program, and
- Continued certifications and licenses that had expired early in the pandemic to ensure continuity of care.

DBH worked closely with providers to take advantage of more flexible regulations such as relaxed telehealth requirements to maximize treatment availability and remove barriers to access. In FY 21, people receiving mental health services by telehealth jumped to 31,541 from 22,410 in FY 20.  Among individuals receiving treatment for substance use disorders, the number served through telehealth was 2,057 up from 1,543 in FY20.   The percentage of people who receive mental health services by telehealth is higher in part because about one-third of individuals who receive substance use disorder services are treated in residential or withdrawal management settings which occur in person.  Lack of access to devices and internet service also suppressed telehealth utilization.  DBH intends to buy devices and Internet access for those who need it as well as set up 10 telehealth stations at high-volume, low-barrier sites.

In FY20, DBH and DHCF successfully applied for a 20% rate increase for SUD services. However, residential SUD services which became available through the 1115 Waiver were excluded by federal regulators.  In response, DBH sought and received approval to distribute more than $2 million in ARPA funding to residential SUD providers based on a formula that reflected reduce revenues experienced in FY21 secondary to the PHE and reduced bed capacity necessitated by COVID mitigation guidelines.

DBH also worked closely with the Department of Healthcare Finance (DHCF) to secure other enhanced Medicaid reimbursement rates.  Early in the pandemic modifications were approved to allow the District's only certified Clubhouse to continue to deliver services and secure

reimbursement so this critical service would continue to be available to consumers.

DBH secured federal grants to increase staffing within our 24/7 Access HelpLine to respond to COVID-19 related mental health calls and to support the mental health of providers who deliver vital public health services while coping with their own COVID-19 related trauma and loss.

DBH has continued to partner with the Department of Human Services (DHS) to maintain 24/7 onsite behavioral health support at quarantine sites for residents experiencing homelessness who test positive for COVID-19, as well as for medically vulnerable individuals most at risk to contract the virus due to underlying health conditions.

DBH has provided guidance consistent with federal guidelines to modify medication assisted treatment practices that allow for additional take-home doses and curbside dosing. To support residential substance use disorder providers, DBH provides testing for residents seeking substance use disorder services at the ARC and established quarantine beds for residents to reduce the risk of transmission.

To ensure quality standards were not compromised during the pandemic, DBH's clinical programs and provider relations teams provided ongoing technical assistance regarding effective management of clinical operations given CDC restrictions and guidance. The Accountability Administration also provided ongoing oversight through audits and targeted monitoring based on changes in utilization to ensure compliance with regulations and quality of care standards.

To minimize the extent to which services for children and families were adversely affected by the COVID pandemic, DBH employed several strategies outlined below.

- Within the School-Based Behavioral Health (SBBH) Program Expansion, DBH provided additional supports and services to ensure clinicians had the necessary tools and resources to continue to meet the needs of students, families, and staff during the COVID emergency.  In November and December 2021, the DC School Behavioral Health Community of Practice (DC CoP) hosted a capacity-building virtual learning opportunity focused on best practices for the implementation of school behavioral health supports within a multi-tiered system of supports (MTSS) framework. Clinicians discussed ways to implement services across all three tiers taking in account the COVID emergency.
- During the pandemic, clinicians incorporated specific COVID related needs, services, and supports when completing the School Strengthening Tool, Work plan, and Engagement Plan. In addition to the virtual training sessions, resources and materials were made available for DBH Providers.  The DC CoP created a webpage which includes infographics, tip sheets, and resources to help clinicians navigate services within the pandemic. DBH also disseminated a weekly virtual newsletter called "Expansion Express" which provided links and resources related to the work.  In addition, the newsletter highlighted programs implementing innovative culturally responsive work during the COVID emergency.
- DBH also recognized the importance of the addressing clinicians' behavioral health and wellbeing. In December 2021, DBH, DCPS and the CoP partnered to develop opportunities specifically for clinicians to create a space for wellness and self-care

activities. Clinicians were invited to different events and activities held across two days to focus on self-care for themselves. Ensuring clinicians feel supported during this challenging time is essential.

- Due to the pandemic's continued impact on Multi-Systemic Therapy (MST), DBH continued to provide financial support for trainings and consultation to sustain existing teams and hire additional therapists. In the last quarter of FY21, MBI hired additional staff and increased their capacity by 100%. Funding was also utilized to sustain the certification of both Functional Family Therapy (FFT) providers. Consequently, providers were able to hire additional staff, increasing their capacity to serve families.

- To support providers who were negatively impacted by staff turnover, DBH engaged Evidence-Based Associates (EBA), a long serving technical assistance provider, to assist the network to recruit qualified staff. DBH also provided trainings and support to increase the network's capacity for early childhood services. DBH has also provided funding for Case Western Reserve University, the training and consultation entity for Intensive Home and Community Based Services, to consult with and facilitate the CBI Supervisory Collaborative which provides supervisors with crisis interventions and tools to engage families throughout the pandemic.

DBH-operated programs continued to provide in person services. These include onsite, same-day access to psychiatric care for children and youth at our Howard Road clinic as well as adults at the urgent care clinic operated at 35 K Street NE. DBH's outpatient pharmacy serves the uninsured, court-committed outpatient consumers, and provides emergency support for consumers enrolled with community providers. Emergency psychiatric care is available at CPEP as well as outreach and crisis stabilization services provided by the Community Response Team (CRT).

Saint Elizabeths Hospital continues to admit and quarantine small cohorts of individuals based on DC Health guidance and employs a robust infection control program that includes mandatory weekly testing of all employees and regular testing of individuals in care.

*Q52. What specific steps is DBH taking now to ensure consumers have access to information about the COVID vaccine and are able to access vaccination cites to receive the vaccine?*

**DBH Response**

Vaccination is one of the best tools we have against COVID-19. DBH partnered with DC Health to offer vaccinations on site at our MHCRFs across the District. To date, 89 percent of residents living in mental health community residence facilities are fully vaccinated and 20 percent have received a booster. Plans are underway to offer additional booster shots via DC Health.

DBH Consumer and Family Affairs (CFA) shares information about the vaccine through its networks. CFA also participated in two vaccination events to provide onsite support.  In partnership with the four peer-led centers, four consumer education forums were held in April 2021 when vaccines became widely available.  A second round of forums will be held in February 2022.

DBH has provided specific guidance to behavioral health providers on how to engage consumers about the vaccine and educate them using the resources available at vaccinate.dc.gov.  In addition, the Mayor's situational updates on the COVID-19 vaccinations schedule and how to schedule an appointment and transportation are shared during the weekly provider meeting.

*Q53. How many grievances were filed against DBH providers and DBH during FY21? How many external reviews were filed in FY21? How many external reviews found in favor of the consumer? How many of those external review determinations in favor of the consumer were approved by the DBH Director?*

**DBH Response**

During FY 21, DBH received a total of 75 grievances, of which 50 were filed against Saint Elizabeths Hospital and 25 against certified community providers. Two external reviews were recommended in favor of the consumer and both were approved by the DBH Director.

*Q54. Did DBH take any measures to remove individuals from residential facilities because of the COVID-19 pandemic, which has taken the lives of thousands of individuals in congregate care facilities across the United States this year? If so, what specific measures did DBH take? How many individuals have been removed from residential placements because of the COVID-19 pandemic? For each such individual, where did that individual receive services after removal from the residential placement?*

**DBH Response**

DBH issued Bulletin 125 on May 13, 2020 to provide guidelines to operators of supported residences based on guidance from DC Health. According to Bulletin 125, "residential providers should be prepared to house residents with COVID 19. They should be able to appropriately isolate a resident with COVID from other non-infected residents. They should also be able to effectively quarantine a new resident away from other residents if there is a concern they were exposed to someone with COVID 19."

Because many mental health community residence facilities and residential substance use disorder treatment facilities do not have private rooms, residents were able to be safely quarantine or isolate at Isolation and Quarantine Sites (ISAQ) or Pandemic Emergency Program for Vulnerable Individuals (PEP-V) sites operated by the Department of Human Services.

In FY 21, seven MHCRF residents were quarantined safely at an ISAQ site. These residents continued to receive services through their provider via telemedicine. Additionally, a DBH contracted provider delivered mental health services onsite.

As provided in Bulletin 125, operators of community-based residences must permit any resident who left their home for care for COVID-19 to return. No resident lost housing in a supported residence because of a positive test or exposure to COVID-19.

*Q55. Did any guidelines, policies, or procedures change during FY21 for determining whether a child or youth under the age of 21 who is enrolled in your Medicaid program and has a diagnosis of "severe emotional disturbance" should receive CBI, ACT, HFW, TFC, and RS during FY 2021? If so, how?*

**DBH Response:**
In FY 20, DBH updated the Chapter 34 regulations to include youth ages 0-6 for Community-Based Intervention (CBI) Level II and III which expanded the population served to include the early childhood population. There were no other changes in guidelines, policies, or procedures in FY21.

*Q56. DBH acknowledged that fewer children and youth are receiving services than before COVID-19; what steps, if any, has DBH taken to investigate this and what specific steps has DBH taken to ensure that every child and youth's needs are met?*

**DBH Response**

While DBH saw decreases in the number of children and youth receiving some of its services, there were other service types that did show an increase in FY21. The table below indicates that in FY21, 3,904 children received Mental Health Rehabilitation Services (MHRS) services. This was a reduction from FY20 of 248 children receiving MHRS services. This data was reported within the DBH MHEASURE report and reflects MHRS services limited to procedure codes on a service list considered to be within the DBH universe. The data also includes Free Standing Mental Health clinics (FSMH) and crisis services. Two examples of provider types not included in the MHEASURES report are Federally Qualified Health Centers (FQHCs) and other licensed practitioners (OLP) such as Independent social workers and psychologists that deliver behavioral health care.  According to DHCF data with regards to FQHCs, behavioral health services among beneficiaries ages 0-17 in Medicaid and the Immigrant Children's Program, DHCF paid claims for approximately 1,800 beneficiaries in FY20 and 2,200 in FY21, an increase of more than 20%.  It is important to note that children and youth in the District of Columbia are receiving services in multiple locations and by a variety of providers. FQHCs and OLPs are seeing increases in the number of children and youth seen for behavioral health services. In addition, the DC MAP program which provides consultation services to Pediatricians and Primary Care Practitioners also saw a 12 percent increase in the number of consultations in FY21.  CBI and SUD services for youth also had increases in the number of children and youth served in FY 21 in comparison to FY20.

| Consumers Receiving Mental Health Services by Fiscal Year | | | | | | |
|---|---|---|---|---|---|---|
| Type | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 |
| Children (0-17) | 6,597 | 4,687 | 4,373 | 4,318 | 4,152 | 3,904 |

The number of children and youth served in Evidenced based programs did decrease from 1166 in FY 20 to 925 in FY 21. However, utilization increased from 75% to 80%. Despite the decreases in youth seen within EBPs, the youth that were served utilized the service and were engaged in treatment. As an impact of COVID, providers transitioned to the telehealth model. Families were more engaged as this eliminated transportation costs and challenges and allowed families to receive services in their natural environment. Providers were able to increase sessions as a result. Providers also experienced staff turnover. In FY20, there was 44% turnover which increased to 50% turnover which was an increase of 6%. In addition, as the impact of DC SEED (Social and Emotional Early Childhood Development) SAMHSA Grant ending in FY21 Q2, two of the early childhood providers closed their Child Parent Psychotherapy (CPP) and Parent Child Interaction Therapy (PCIT) programs.

In response to the areas that experienced decreases. For the early childhood population, DBH has been working to provide trainings and support to increase the network's capacity for early childhood services. In order to increase training capacity, a grant was approved to train one of the

provider agency's staff from Howard Road, as a regional trainer which will increase the capacity for local trainings and decrease costs. DBH's vendor, Evidence-Based Associates (EBA), the national subject matter expert on Evidence-Based Practices, has also provided Human Resources support to assist providers with recruiting qualified staff.

DBH has also investigated the barriers to access such as administrative challenges, community knowledge, and racial equity and inclusion regarding all of the evidence- based programs. DBH has partnered with national model experts to complete a deeper analysis of the demographic landscape of the families served. In addition, DBH is assessing whether models are making the proper adaptations and structuring trainings and technical assistance that align with the needs of the population in the District of Columbia. To increase referrals, DBH is also developing a comprehensive outreach plan that target communities in need of services.

The number of children and youth served in Intensive Home and Community-Based Services (CBI) did increase by 9% from 518 served in FY20 to 568 served in FY21. DBH has continued to provide funding for Case Western Reserve University, the training and consultation entity for Intensive Home and Community Based Services model, to continue ongoing consultation and facilitating the CBI Supervisory Collaborative which provided supervisors with crisis interventions and tools to engage families through the pandemic. As a result of fidelity reviews, DBH continues to investigate areas of need across providers and develop a training and technical assistance plan to ensure providers are delivering quality services to the District's most vulnerable families.

Due to the COVID-19 pandemic Child Development Centers (CDC's) have experienced a shortage of teachers and children. Some CDC's have had to close while others closed classrooms due to low enrollment. Center directors have had to work in classrooms and, in some cases, cook the children's meals.  This has resulted in and increase stress on Child Development Center Directors. The Healthy Futures program has provided support to these CDC directors. There was an increase in director consultation with 1,338 taking place in FY21. Directors have sought consultation in understanding how disruption in routines and continuity of education impacts children's social-emotional and how the consultants can further support the children, families and teachers during any closures and re-openings as well as providing direct ongoing support to the Directors.

In CDC's where relationships between the Healthy Futures clinical specialist and center staff have established relationships, efforts to engage families were mostly successful. Healthy Futures presented 56 family workshops and engaged in 316 family consultations. Some of these consultations were virtual meetings that took place in the family's home.
Technology has become a major theme in providing services.
Some Child Development Centers and home providers lacked computers or tablets that would allow the consultants to enter the classrooms virtually to provide early intervention and prevention activities. Consultants have been able to virtually visit some centers and homes and have offered circle time activities, book readings and mindfulness techniques to both teachers and children virtually and in-person. The same technology issue has emerged in direct work with families. Many families lack computer or internet access and much of the consultation service has been through phone contact with families. The focus of these

consultations has been helping families manage their anxiety and helping them understand any changes in their children's behavior and best responses to these behaviors.

During the COVID-19 pandemic Healthy Futures recorded readings of early childhood books and created weekly support newsletters on topics such as self-regulation, resiliency, and emotional safety that have been made available to families and centers. Healthy Futures focused its work for the centers and homes on understanding trauma, mindfulness activities for parents, children, and teachers, and weekly parent and teacher support groups. Healthy Futures was able provide activities for children such as reading Tucker Turtle, a story that teaches self-regulation skills, and Baby Doll Circle Time, from the Conscious Discipline program, which enhances the child/caregiver relationship and develops empathy. Many of these interventions and activities were also offered in Spanish and, when needed, the language line was accessed to communicate with families.

During SY20-21, School Based Behavioral Health clinicians provided treatment services to students both virtually and in person when schools were open. In order to insure that all children needing services received services during SY21-22, SBBHP clinicians actively reached out students, staff and families during the first week in school.  SBBHP clinicians worked with other school staff to ensure a smooth transition back into class by reinforcing daily routines and consistency with daily transitions.  The School Mental Health team at each school teamed to complete the School Strengthening Tool, Workplan and Engagement Plan and clearly outlined the prevention, early intervention, and treatment services that would be implemented during SY21-22.  Several clinicians engaged parents and families through innovative activities (e.g., cooking class) and received parent feedback exploring ideas for supports and services to be included in the Workplan.  In addition, clinicians introduced themselves and behavioral health services to students, families, and staff, clinicians implement presentations in classrooms, at meetings, and during Back-to-School events.  These specific activities and supports appear to be supporting an increase in the number of referrals for treatment services.  Between August and December 2021, 370 students were referred to DBH SBHP clinicians for treatment services.  The number of referrals is consistent with the number of referrals (373) clinicians receiving for the entire SY20-21.

In FY21 there was an increase in the substance use disorder treatment services for adolescents and transitional aged youth. See table below.  DBH has continued working with its three (3) Adolescent Substance-use Treatment Expansion Program (ASTEP) providers to increase the number of children and youth enrolling in treatment services.  Though there has been an underutilization of services which existed prior to COVID-19, it is acknowledged that the pandemic contributed to enrollment challenges.  The challenges could be attributed to the lack of ancillary actions required to ensure that individuals know about the services available, and more importantly, how to access those services.

**Consumers Receiving SUD Services by Fiscal Year**

| Type | FY16 | | FY17 | FY18 | FY19 | FY20 | FY21 |
|---|---|---|---|---|---|---|---|
| Adolescents (20 and Under) | 367 | | 283 | 209 | 72 | 24 | 73 |

Beginning in FY21, DBH through the DC CITY grant provided funding to the ASTEP providers to support non-Medicaid billable activities such as outreach and engagement, case management, and follow-up for individuals disconnected from services. These services are critical to helping individuals navigate throughout the treatment process, and making sure that once connected, they remain enrolled until successfully discharging from the program.  In FY22 the providers will also receive training in other evidence-based treatment practices such as Motivational Enhancement Therapy (MET) and Cognitive Behavioral Therapy (CBT) to expand the array of treatment services available to adolescents, transitional age youth, and families.

# EXHIBIT U

*Department of Behavioral Health*
*FY 2022*
*Performance Oversight Questions*

**DC Council Committee on Health**
**Councilmember Christina Henderson, Chair**
**Fiscal Year 2022 Performance Oversight Pre-Hearing Questions**
**Department of Behavioral Health**

**Organization and Performance**

1. Please provide the current organizational chart for the agency, with information to the activity level. In addition, please identify the number of full-time equivalents (FTEs) at each organizational level and the employee responsible for the management of each program and activity. If applicable, please provide a narrative explanation of any organizational changes made during FY 2022 and FY 2023, to date.

**DBH Response**

In FY 22,  Disaster Behavioral Health and Support Services was transferred from the Chief Clinical Officer to the newly established position of Chief, Crisis Services to consolidate all crisis services activities and programs.

See Attachment. FY 23 Organizational Chart.

2. Please describe the agency's procedures for investigating allegations of sexual harassment or misconduct committed by or against its employees. List and describe any allegations received by the agency in FY 2022 and FY 2023, to date, and whether those allegations were resolved.

**DBH Response**

Mayor Muriel Bowser issued a Mayor's Order on sexual harassment on December 18, 2017, that addresses the definition of sexual harassment, reporting procedures, and the various protections provided to employees who are the subject of a sexual harassment complaint.  It also included mandatory training for all employees. The Department of Behavioral Health (DBH) is committed to providing a workplace that is free from sexual harassment and takes the necessary steps to ensure that such matters are promptly investigated and addressed as outlined in Mayoral Order 2017.33.

The Equal Employment Manager for a District agency serves as the Sexual Harassment Officer (SHO) and is the primary point of contact for questions or concerns regarding sexual harassment.

Employees who know of incidents of sexual harassment, as well as behavior that may create an intimidating, hostile or offensive work environment, or who are victims of sexual harassment or inappropriate conduct, should report the sexual harassment or inappropriate conduct to the SHO.

The SHO has responsibility for investigating or overseeing investigations of alleged sexual harassment in accordance with the Mayoral Order and guidance from the Office on Human Rights. Any allegation of sexual harassment also is reported to the Mayor's Office of Legal Counsel.

Per the Mayor's Order, DBH follows the procedures for investigating allegations of sexual harassment or misconduct committed by or against its employees upon receipt of a complaint:

1.  The SHO reviews and recommends immediate action whether to separate the parties involved, (such as temporary employee reassignments, temporary telework schedule, etc.) or whether to involve law enforcement, pending the investigation as warranted.

2.  The SHO determines the scope of investigation, speaks with all relevant parties, collects documents and records all information received to prepare a written report.

3.  The SHO conducts a meeting with the Complainant which could include a third-party witness or an individual to whom the allegation was reported.  More thorough interviews of these individuals occur as the investigation progresses.  The investigation includes verifying the allegations by conducting interviews (if possible, record all interviews) and gathering documents and other evidence. The SHO evaluates the evidence and prepares the written report of findings and recommendations for the Director including what the investigation entailed and what details or information were confirmed (or not confirmed) by the evidence. The final report is shared with General Counsel and findings and actions are shared with the Mayor's Office of Legal Counsel.

Below is a list of allegations of sexual harassment and misconduct cases received by DBH in FY 2022 and FY 2023 to date.

| Type of Case | Sexual Harassment | Fiscal Year | Outcome |
|---|---|---|---|
| Sexual Harassment | Sexual Orientation | FY 22 | Dismissed |
| Sexual Harassment | Unwelcome Advances | FY22 | Substantiated. Disciplinary action took place |
| Sexual Harassment | Inappropriate Behavior/Touch | FY 22 | Substantiated. Employee terminated |
| Sexual Harassment | Sexual Orientation | FY22 | Unsubstantiated |
| Sexual Harassment | Unwelcome Advances | FY22 | Unsubstantiated |
| Misconduct | Inappropriate/language | FY 22 | Substantiated. Employee resigned |
| Misconduct | Unprofessional Behavior | FY22 | Unsubstantiated |

| Sexual Harassment | Unwelcome advances | FY22/FY23 | Pending-investigation still in progress |
|---|---|---|---|

3. How many performance evaluations did the agency complete in FY 2022? How many performance improvement plans were issued in FY 2022? How many employees have submitted SMART Goals or other relevant workplans in FY 2023? For each question, provide the total number and the percentage of total employees.

**DBH Response**

For the FY 22 performance appraisal period October 1, 2022, through December 23, 2022, a total of 956 performance evaluations were completed. This represents 83 percent of the total workforce of 1,147 employees.  In FY 22, there were no performance improvement plans issued.  To date in FY 23, 976 performance plans have been completed. This represents 81 percent of the workforce of 1,203 employees.

4. Please provide the following budget information, in Microsoft Excel, for the agency, including the amount budgeted and spent for FY 2022 and FY 2023, to date. In addition, please describe any variance between the amount budgeted and spent.
   a. At the agency level, please provide information broken out by source of funds and by Comptroller Source Group and Comptroller Object;
   b. At the program level, please provide the information broken out by source of funds and by Comptroller Source Group and Comptroller Object; and
   c. At the activity level, please provide the information broken out by source of funds and by Comptroller Source Group.

   **DBH Response:**

   Please see Attachments:
   FY 22 Oversight Question 4 Attachment 1 of 3.  Agency Level
   FY 22 Oversight Question 4 Attachment 2 of 3. Program Level
   FY 22 Oversight Question 4 Attachment 3 of 3. Activity Level

5. Please provide a complete accounting of all intra-district transfers received by or transferred from the agency during FY 2022 and all interagency budget processes for FY 2023, to date, where the agency is a buyer and seller.  For each, please provide a narrative description as to the purpose of the intra-district transfer and interagency budget process,

and which programs, activities, and services within the agency the intra-district transfer and interagency budget process affected.

**DBH Response**

Please see Attachment 1 of 1. Intra-district transfers

6.  Please provide a complete accounting of all reprogrammings received by or transferred from the agency in FY 2022 and FY 2023, to date.  For each, please provide a narrative description as to the purpose of the transfer and which programs, activities, and services within the agency the reprogramming affected.

**DBH Response:**

Please see attached document titled, "FY22 Oversight Question 6 Attachment 1 of 1. Reprogramming".

7.  Please provide the following information for grants/sub-grants awarded to and by the agency in FY 2022 and FY 2023, to date, broken down by program and activity:

    a.  Grant Number/Title;
    b.  Approved Budget Authority;
    c.  Funding source;
    d.  Expenditures (including encumbrances and pre-encumbrances);
    e.  Purpose of the grant;
    f.  Organization or agency that received the grant;
    g.  Grant amount;
    h.  Grant deliverables;
    i.  Grant outcomes, including grantee/subgrantee performance;
    j.  Any corrective actions taken or technical assistance provided;
    k.  Agency program and activity supported by the grant; and
    l.  Agency employee responsible for grant deliverables.

**DBH Response**

Please FY22 Oversight Question 7. Attachment 1 of  2. FY22-23 Grants, and FY22 Oversight Question 7. Attachment 2 of 2. FY22 SubGrants

8.  Please provide the following information for all contracts, including modifications, active during FY 2022 and FY 2023, to date, broken down by program and activity:
    a.  Contract number;

     b.  Approved Budget Authority;
     c.  Funding source;
     d.  Expenditures (including encumbrances and pre-encumbrances);
     e.  Purpose of the contract;
     f.  Name of the vendor;
     g.  Original contract value;
     h.  Modified contract value (if applicable);
     i.  Whether it was competitively bid or sole sourced;
     j.  Final deliverables for completed contracts;
     k.  Any corrective actions taken or technical assistance provided; and
     l.  Agency employee(s) serving as Contract Administrator.

**DBH Response:**

Please see FY22 Oversight Question 8A Attachment 1 of 1.  Contracts

8. Please provide a list of all Department of General Services work orders submitted in FY 2022 and FY 2023, to date, for facilities operated by the agency. Please include the date the work order was submitted, whether the work order is completed or still open, and the date of completion (if completed).

**DBH Response:**

Please see Attachment 1 of 1. DGS

9.  Please provide a complete accounting of all DBH's Special Purpose Revenue Funds for FY 2022 and FY 2023, to date. Please include the following:
     a.  Revenue source and code;
     b.  Source of the revenue for each special purpose revenue fund (*i.e. license fee, civil fine*);
     c.  Total amount of funds generated by each source or program in FY 2022 and in FY 2023, to date;
     d.  DBH activity that the revenue in each special purpose revenue source fund supports; and
     e.  The FY 2022 and FY 2023, to date, expenditure of funds, including purpose of expenditure.

**DBH Response:**

Please see FY22 Oversight Question 9 Attachment 1 of 1. Special Purpose Revenue

10. Please provide copies of any investigations, reviews or program/fiscal audits completed on programs and activities within DBH during FY 2022 and FY 2023, to date. This includes any reports of the DC Auditor, the Office of the Inspector General, or the Office

of Accountability. In addition, please provide a narrative explanation of steps taken to address any issues raised by the program/fiscal audits. Please include a chart with the following:

    a.  Name of the provider;
    b.  Date complaint was received;
    c.  Type of complaint;
    d.  Referral source;
    e.  Type of report;
    f.  Summary or complaint or allegations;
    g.  Conclusion(s);
    h.  Recommended outcomes or actions; and
    i.  Date completed.

**DBH Response:**

**The Office of the Inspector General**
During FY 22, the Office of the Inspector General (OIG) did not complete any audits on DBH programs and activities.  The OIG began an audit of nine agencies' overtime usage that includes DBH that is continuing in FY 23.  According to the OIG, the objectives of this engagement are to assess: (1) overtime usage by District agencies; (2) adherence to District overtime policies; and (3) the effect overtime usage has on District operations.

**The DC Auditor**
During FY 22, the DC Auditor issued one report related to DBH: "NEAR Act Violence Prevention and Interruption Efforts: Opportunities to Strengthen New Program Models." Enacted by the Council in 2016, the Neighborhood Engagement Achieves Results (NEAR) Act was a comprehensive blueprint for a public health approach to criminal justice reform in the District. The ODCA reviewed the implantation and impacts of the NEAR Act to see if the law was implemented as intended and what impacts could be demonstrated from its first five years.  As it relates to DBH, the report made the following recommendation:

*Recommendation #12.* The Metropolitan Police Department should comply with the law by establishing the Community Crime Prevention Team program, in partnership with the Department of Behavioral Health and the Department of Human Services.

The response of the Office of the Deputy Mayor for Public Safety and Justice (DMPSJ) to the recommendation is copied below and can be found on pages 94-95.

*DMPSJ Response*: Disagree. ODCA's finding that MPD, DBH, and the Department of Human Services (DHS) failed to implement the provision on the Community Crime Prevention Team (CCPT) is contrary to Council action on that provision. As part of her FY 2018 Budget, Mayor Bowser proposed that Council accept the plans for the Pre-Arrest Diversion Pilot in lieu of the CCPT. DBH, with the support of MPD and DHS, presented the proposal to the Committee on the Judiciary and Public Safety staff. The Committee accepted the plan and chose to fund it. Per the

"Report and Recommendations of the Committee on the Judiciary and Public Safety on the Fiscal Year 2018 Budget for Agencies under Its Purview" (May 18, 2017, pp. 138-139): The budget provides $970,544 to launch a new arrest diversion program to support individuals in crisis due to problems associated with substance abuse, mental health, or homelessness.

As Chief Newsham noted during the Department's budget oversight hearing: "Comprehensive harm reduction strategies can help to move some of the issues from the law enforcement arena to the public health and services realm where they belong." The program is intended to satisfy the requirements of Section 105 of the NEAR Act – the Community Crime Prevention Team Program – although its structure is different. . . . It is the Executive's intention to develop intervention strategies by service agencies with expertise in these areas, and the Mayor's Errata Letter recommends transferring the funds to the Department of Behavioral Health ("DBH"). . . . The Committee supports the intent of this proposal . . . The Executive recommends ODCA mirror its recommendation #8 that Council should amend the NEAR Act to reflect what it has already agreed to as embodied in the Committee report and as accepted at oversight hearings. The recommendation would appropriately lodge responsibility for developing and reporting on behavioral health diversion programs with DBH rather than MPD.

In addition, the DMPSJ made the following comments:

Before responding to the audit's specific recommendations, we provide some general comments. Overall, the report went into great detail on a few of the NEAR Act provisions, such as the successful security camera rebate program, yet it glossed over other programs, like the MPD/Department of Behavioral Health (DBH) partnerships. DBH and MPD are actively working on several projects to best meet the needs of community members. These new efforts include the 911 Alternative Response Program, enhanced training for MPD members, a Sobering Center, and initial work on a "familiar faces" protocol. The agencies also will be reviewing various co-response and other models to see how they can best be used and tailored to the unique needs of District residents. DMPSJ is also involved in coordinating these efforts.

In the section entitled "The Metropolitan Police Department, the Department of Behavioral Health, and the Department of Human Services did not establish the Community Crime Prevention Team program required by the NEAR Act," the ODCA theorizes that DBH would have less input into training needs with MPD than it would have had under the original plan envisioned in the NEAR Act. However, this speculation is incorrect. DBH provides Crisis Intervention Officer (CIO) training to MPD and, in FY 2022, DBH began providing Mental Health First Aid for First Responders (MHFA). By the end of the 2023 training season, all MPD officers will have had either CIO or MHFA training. Both trainings are based on comprehensive national or international models. This year, MPD hired a Behavioral Health Partnerships Coordinator to continue to strengthen the department's work to serve individuals with behavioral health needs and the communities in which they live. The new MPD staff member previously worked for DBH and is a Licensed Professional Counselor. She has experience working with individuals diagnosed with severe and persistent mental illness or who are in need of immediate crisis intervention. Her research focus is on trauma and Post Traumatic Stress Disorder in underserved populations. That said, the majority of the work to develop programs to support

individuals with behavioral health needs will continue to rest with DBH, which has the most expertise in this area. For example, DBH conducted the research and determined the Law Enforcement Assisted Diversion (LEAD) model recommended in a 2017 Committee on the Judiciary and Public Safety report would not be appropriate for the District.

In addition to the work that MPD and DBH have already done together, the Deputy Mayor for Public Safety and Justice (DMPSJ) is bringing together MPD, DBH, and the Fire and Emergency Medical Services Department (FEMS) to discuss a larger, more comprehensive approach to mental health preventative care in lieu of arrest or hospitalization at the point of crisis.

**The DBH Accountability Administration**
The DBH Accountability Administration conducts the following program/fiscal audits:

- Claims Audits

The Accountability Administration conducts audits of paid claims for each fiscal year for certified providers.  The auditing process is retrospective and generally crosses fiscal years. Audits are conducted annually for Mental Health Rehabilitation Services (MHRS), Adult Substance Abuse Rehabilitative Services (ASARS) and Free Standing Mental Health Clinics (FSMHC) providers on a sample universe which includes all paid claims.  All audit samples are random, statistically valid, and generated using RAT-STATS, a tool developed for this purpose by the Federal government. In addition, focused audits are conducted for a variety of reasons and the sample universe may be tailored to the reason for the audit.  Focused audit samples may be generated using methods appropriate to the purpose of the audit. The corrective action plan section below explains what happens in response to audits and reviews by the Accountability Administration.

In FY 22 and to date in FY 23, the following audits and audit activities were conducted:
- 33 focused and annual audits for FY 22 MHRS claims
- 20 focused audits for FY 21 and FY 22 SUD claims
- 8 annual audits for FY 21 Free Standing Mental Health claims
- 5 audits for FY 21 Supported Employment claims

Audits for FY 22 Supported Employment claims are scheduled for April 2023. Preliminary audit results are anticipated to be completed by the end of September 2022. Audits are continuing for FY 22 MHRS claims.

Providers have an opportunity to contest claims audit findings. A Claims Review Committee (CRC) that includes providers is set up to as needed to review and evaluate failed claims about which the provider and DBH disagree. During FY 22, six Claims Review Committees reviewed 77 claims.

Based on the audit findings, a provider may be required to repay the amount of the failed claims. Below is the recoupment amount for FY 21 and FY 22 to date Medicaid and local funds.

    Medicaid       $61,121.00

*Department of Behavioral Health*
*FY 2022*
*Performance Oversight Questions*

Local        $9,181.77
Total        $70,302.77

Appeals for FY22 Recoupments:
No appeals have been submitted to date.

- **Investigations**

Investigatory reports may include recommendations for policy changes, training, corrective action plans, or disciplinary action when allegations are substantiated. All corrective action plans are considered during the licensure and re-certification process.
See Attachment 1. Investigatory reports

The Accountability Administration requires providers to submit Corrective Action Plans (CAPs) for compliance and quality deficiencies identified during claim audits or during other routine monitoring. Statements of Deficiencies (SOD) are issued to Mental Health Community Residence Facility (MHCRF) operators for failure to comply with licensure regulations. SODs also are issued for failure to comply with DBH certification regulations. Each provider is assigned a primary Accountability Administration contact who collaboratively monitor CAPs and SODs. In addition, the Accountability Administration provides training on compliance planning and proper claiming. Information from audits and other reviews is used to inform the overall technical assistance plan for each provider.

11. Did DBH meet the objectives set forth in the performance plan for FY 2022? Please provide a narrative description of what actions DBH undertook to meet the key performance indicators. For any performance indicators that were not met please provide a narrative description for why they were not met, and any remedial actions taken. In addition, please provide a narrative description of the performance objectives for FY 2023 and what actions DBH has undertaken to meet them to date.

**DBH Response**

Please see Attachment 1 of 2. FY 22 Performance Plan KPI Report and Attachment 2 of 2. FY 23 KPI Report.

12. Please provide DBH's capital budgets for FY 2022 and FY 2023, including amount budgeted and actual dollars spent. In addition, please provide an update on all capital projects undertaken in FY 2022 and in FY 2023, to date.

**DBH Response:**

Please see attached document titled, "FY22 Oversight Question 12 Attachment 1 of 1. Capital Projects".

 Project updates:

Project HC990C.  The Facility Upgrade project at St Elizabeths Hospital. The Automatic Transfer Switch (ATS) for the kitchen electrical upgrade has been affected by supply chain delays. The vendor is expecting to receive the parts needed to complete the ATS build by early February. Subsequently, they are projecting the build to be complete by the end of February and ready to ship in early March; arriving at Saint Elizabeths by the middle to end of March. Additionally, a change order to update a breaker in the electrical cabinet to complete the connections is being issued.

 Project HX995C.  The Systems Transformation project is divided into four components: Integrated Technology Engine (ITE), iCAMS reconfiguration, grants management system, and credentialing/certification database.

The ITE project is in its second year (Phase 2).  DBH works closely with vendor, IdeaCrew, to design and implement a data repository to enable DBH to use client level data to manage Whole Person Care/population health in support of the agency's system transformation goals. DBH is working with DHCF, ESA, MPD, OUC, CRISP DC as well as other governmental agencies to receive a rich data to monitor and shape a District behavioral health model.  The ITE will interface with DBH's eHRs, grants management system, and certification database.  Phase 2 of the project is scheduled to be completed by mid-summer.

ICAMS reconfiguration project has finished the scope of work and requirements.  The vendor, QualiFacts, will begin to work with the Office of Contracting and Procurement to finalize a contract.  The project will support the system of care at the DBH practice management system/electric health record.  The project is scheduled to be completed in late summer.

Currently, grants are managed using a SharePoint site.  The grants management system project currently underway will the utilize a SalesForce database to build a comprehensive grants management system.  The project will be implemented in conjunction with OCTO.  The project is scheduled to be completed by September 30, 2023.

DBH through the same arrangement with OCTO will utilize a SalesForce database to implement a credentialing/certification database.  The database will be the repository for documents and data used to certify behavioral health providers in the District.  In addition, the database will house documents to credential DBH employees as MCO and other health care payer providers.

Project HX999C.  The server replacement and database hub configuration is being developed in consultation with OCTO.  DBH is exploring all feasible options including site based and cloud-based models with vendors.

13. For each Mayoral Board, Commission, or Council overseen by DBH, please provide an updated list of members, including when their terms started and end, and their contact information. Please indicate any vacant positions.

**DBH Response**

The Department of Behavioral Health (DBH) does not oversee any Mayoral Board, Commission or Council.

14. Please provide an update on the upgrade of the provider electronic health record (EHD) systems including the selection of the vendor that will offer technical assistance to providers and the consultant that will assist DBH in developing the data sets (encounter file) that providers will produce monthly through their EHRs.

**DBH Response:**

DBH collaborated with the Department of Health Care Finance (DHCF) Home and Community Based Services (HCBS) Digital Health Technical Assistance (TA) Grant Program to develop the scope of work for behavioral health providers to receive technical assistance and funding to procure an electronic health record (EHR).  The HCBS TA program will incentivize DBH-contracted providers to meet milestones for adopting and implementing a Certified Electronic Health Record Technology (CEHRT) system and connecting to the DC Health Information Exchange (DC HIE) by September 30, 2023.

Currently, 67 eligible behavioral health providers are participating in the HCBS TA grant program. The program provides tailored TA and training to HCBS providers including assessing provider readiness to select and adopt a new Health IT system; support system implementation and ensure connectivity to and use of the DC HIE. The HCBS Digital Health TA Team under the direction of DHCF is led by DC Primary Care Association (DCPCA). DC PCA has partnered with Clinovations, Zane Networks and CRISP DC to support behavioral health providers.

DBH selected IdeaCrew to support the development of the Behavioral Health Supplemental Data (BHSD) extract. BHSD is client level information on clients receiving behavioral health services. DBH along with IdeaCrew has produced a companion guide that serves as instruction and validation rules to assist providers in the successful submission of a monthly extract to DBH. BHSD extract from DBH contracted providers together with DHCF claims data will allow DBH to meet federal funding reporting requirements and state reporting needs.  BHSD extract will provide necessary data to

DBH to support the transition to Whole Person Care (WPC) service delivery, outcome-based care and population behavioral health.

15. Please provide a list of all FTE positions detailed **to** DBH, broken down by program and activity for FY 2022 and FY 2023, to date. Include a narrative on specific role the detailed staff took at DBH during their detail. In addition, please provide which agency the detailee originated from and how long they were detailed to DBH.

   **DBH Response**

   There were no FTE positions detailed to DBH in FY 22 and to date in FY 23.

16. Please provide a list of all FTE positions detailed **from** DBH to another agency in FY 2022 and in FY 2023, to date.  In addition, please provide which agency the employee was detailed to, what work they took on, and for how long.

   **DBH Response**

   There are no FTE positions detailed from DBH to another agency in FY 22 and to date in FY 23.

17. Please provide the following information for grants (regardless of source) awarded to DBH during FY 2022 and FY 2023, to date, broken down by DBH program and activity:
   a. Grant Number/Title;
   b. Approved Budget Authority;
   c. Funding source;
   d. Expenditures (including encumbrances and pre-encumbrances);
   e. Purpose of the grant;
   f. Grant deliverables;
   g. Grant outcomes, including grantee performance;
   h. Any corrective actions taken or technical assistance provided;
   i. DBH program and activity supported by the grant;
   j. Organizations or agencies that received the grants; and
   k. DBH employee responsible for grant deliverables.

   **DBH Response**

   Please see  FY22 Oversight Question 17.  Attachment 1 of 1. FY22-23 Grants Awarded

18. Please provide a complete accounting of all grant lapses including a detailed statement as to why the lapse occurred and any corrective action taken by DBH.  Please provide

accounting of any grant carryover from FY 2020 to FY 2021 or FY 2022 to FY 2023 and a detailed explanation as to why it occurred.

    a.  Please provide an update on the District of Columbia Opioid Response grant where there was a grant lapse due to underspending in Contractual and Sub grants.

**DBH Response**

Please see FY22 Oversight Hearing Question 18.  Attachment 1 of 1.  Grant Lapse Report

**Providers, Core Service Agencies (CSAs), & Agency Partnerships**

19. Please provide a comprehensive list, in Microsoft Excel, of all DBH providers and Core Service Agencies (CSAs) that serve children, youth, and adults. Include the following information:

    a.  Name of provider;
    b.  Location(s) (including ward) where services are provided;
    c.  Types of services (indicate whether virtual, in-person, or hybrid);
    d.  Populations served (ages, LGBTQ+, seniors, justice involved, experiencing homelessness, newly arrived migrants, returning citizens, etc.); and
    e.  How many consumers were served in FY 2021, FY 2022, and in FY 2023, to
    f.  date.

**DBH Response**

See Attachment 1 of 3 FY 22 DBH Certified Providers
Attachment 2 of 3 Certified Agencies by Ward
Attachment 3 of 3 Consumers Served

20. Please provide any updates on how DBH ensures the quality of behavioral health services within its provider network.

**DBH Response**

Quality of services is measured in numerous ways such as claims audits, medical reviews, fidelity reviews, and consumer interviews. These are practices used by the Centers for Medicare and Medicaid Services, National Committee on Quality Assurance, and the Joint Commission.

To measure the quality of the children and youth services provider network, DBH utilizes several methods to measure quality of services. DBH contracts with model developers and

purveyors to complete annual fidelity reviews to assess each provider's adherence to Evidence- Based Practice models. Community-Based Intervention or (CBI), DBH's most intensive outpatient service, utilizes a third-party consultant, the Center for Innovative Practices at Case Western Reserve University, to assess fidelity by reviewing each agency's compliance with model components including: intensity of service, crisis response and availability, safety planning, and team composition. DBH also reviews all Evidence-Based Practice (EBP) outcomes for child and youth evidence- based programs on a monthly basis to assess the impact of services on the youth served. The outcome measurement utilized is the number of successful discharges. Each model also utilizes an assessment tool that rates behaviors and symptoms in the beginning of treatment and end of treatment.

In addition, DBH utilizes the Child & Adolescent Functional Assessment Scale (CAFAS) and the Pre-school & Early Childhood Functional Assessment Scale (PECFAS) to determine level of care and track functioning throughout treatment. CAFAS was also identified as the Key Performance Indicator (KPI) to measure the performance of cases.  DBH contracts with the developer to provide system access for completion of the tool for all DBH-Certified child and youth behavioral health providers and School-Based Behavioral Health (SBBH) providers. Providers may access an individualized report to guide treatment planning. DBH analyzes reports to monitor provider performance as well as how children and youth are improving over their course of treatment.

Results of the fidelity reviews and system performance on the CAFAS/PECFAS outcomes are shared with DBH and the providers. DBH uses the results to inform areas such as policy, training, and technical assistance plans.

DBH also uses fidelity reviews of Evidence Based Practices for Supported Employment and Assertive Community Treatment (ACT). Supported Employment providers are evaluated annually for fidelity to the model.  DBH utilizes these practices to ensure quality in our behavioral health provider network in addition to offering training and technical assistance.

DBH also conducts consumer satisfaction surveys of consumers receiving mental health and substance use services from community providers, as well as individuals in care at Saint Elizabeths Hospital.  If there are significant adverse findings of consumer satisfaction that rise to the level of concern, DBH refers these to the DBH Ombudsman, the Accountability Administration, or both depending on the nature of the report.  This information is also used to improve service delivery at the systems level.

DBH uses data produced by the annual claims audit to plan and hold specific training and clinical technical assistance to address identified challenges.  DBH provides quality and compliance trainings and provided technical assistance to providers (particularly to new providers) based on review of provider service documentation. DBH also provides ongoing technical assistance to new and existing providers to address clinical practice.

The DBH Training Institute examines trends to find areas where providers are not performing well and develops training to address these areas.  In addition, the DBH Training

Institute supports quality service through classroom training and eLearning in a wide range of best-practice mental health and substance use areas targeting direct service practitioners, clinical supervisors/managers, consumers, and leaders of the provider network.

21. Please share the specific steps DBH continues to take to ensure consumers living in DBH supported housing have been protected from contracting COVID?

**DBH Response**

The Accountability Administration Division of Licensure expanded its COVID-19 mitigation efforts by continuing vaccine booster efforts, partnering with The Project First Line Task Force and utilizing grant funds to decrease the spread of COVID-19 in our Mental Health Community Residence Facilities (MHCRF).

DBH partnered with DC Health's Project First Line Task Force in January 2022 to provide training materials, job aids/infographics, and other resources to MHCRF operators to help prevent the spread of COVID-19. This partnership provided the opportunity for our Licensing Inspectors to receive training required to become a Project First Line facilitator. As facilitators, our Licensing Inspector present training materials and resources to MHCRF staff and operators during quarterly trainings. DC Health continues to provide updated materials and information weekly to the Licensure Team in efforts the reduce the spread of COVID-19 within our MHCRF community.

DBH was awarded $125,000 from the Mental Health Block Grant (MHBG) Supplemental Funding for COVID Mitigation for use during the FY22 fiscal year. These grant funds were used to provide Personal Protective Equipment, rapid COVID testing, technical assistance on implementing rapid COVID test, and training on how to develop onsite testing confidentiality policies. DBH distributed COVID mitigation supplies to ninety-three (93) MHCRFs. COVID mitigation supplies were also provided to five (5) residential substance use disorder treatment programs.

In addition to the PPE supplies and test kits the Department was able to provide two (2) virtual trainings. The trainings focused on instructing staff on how to safely assist MHCRF residents with self-administering At-Home COVID-19 Testing.

The Division of Licensure continues to work collaboratively with the owners, operator and staff members of the MHCRFs. Next to education, vaccination remains one of best tools we have against COVID-19. Building on the progress of FY21, DBH Licensure Division partnered with Ascension Health of the Providence Health System to provide in-home booster shots to an additional 123 MHCRF residents. At the conclusion of our efforts 71% of residents who received the initial vaccine in FY21, were fully vaccinated and boosted by May of 2022. In comparison to a year prior when 20% of the residents who received their first vaccine had also received their booster shot.

22. How many grievances were filed against DBH providers and DBH during FY 2022 and FY 2023, to date? How many external reviews were filed in FY 2022 and in FY 2023, to date? How many external reviews found in favor of the consumer? How many of those external review determinations in favor of the consumer were approved by the DBH Director?

**DBH Response**

During FY 22, DBH received a total of 52 grievances, of which 32 were filed against DBH and 20 against certified community providers. Two external reviews were held, of which one was found in favor of the consumer and approved by the DBH Director.

During FY 23 to date, DBH received a total of 18 grievances, of which 15 were filed against DBH and three against certified community providers. One external review has been requested.

23. Please provide a list and narrative description of any DBH partnerships with District agencies in FY 2022 and FY 2023, to date, to address employment for DBH consumers. Please include the following:
    a. The number of individuals served, the types of employment placements available, and the employee(s) responsible for coordinating the partnership;
    b. The number of participants who entered post-secondary or occupation training program, apprenticeships, or District employment programs; and
    a. For DBH's partnership with Rehabilitation Services Administration (RSA) please provide the names of any organizations or agencies providing services through the Evidence-Based Support Employment program for FY 2022 and FY 2023, to date. Include a breakdown of how many participants were hired and where they were employed. Indicate whether any of the placements were in subsidized or temporary positions.

**DBH Response**

The Evidence-Based Supported Employment program serves adult consumers with a serious mental illness or substance use disorder for whom competitive employment has been interrupted or intermittent as a result of significant mental health or substance use challenges.
Evidence-Based Supported Employment strives to help enrollees obtain part-time or full-time employment. The consumer receives supports in a competitive employment setting that pays at least the minimum wage. The program offers intake, assessment, job development, treatment team coordination, disclosure counseling, benefits counseling and follow-along supports for all participants enrolled in the program.

*Department of Behavioral Health*
*FY 2022*
*Performance Oversight Questions*

DBH provides this program in partnership with Department of Disabilities Services (DDS), and Rehabilitation Services Administration (RSA) through a memorandum of understanding (MOU).  As stipulated in the MOU, RSA provides funding to six DBH-certified Evidence-Based Supported Employment programs using a "pay for performance" methodology.  Providers receive payment for meeting specified milestones for the following services: job development, job placement, and job stabilization for shared consumers.

    a. *The number of individuals served, the types of employment placements available, and the employee(s) responsible for coordinating the partnership;*

DBH's Supported Employment programs served a total of 381 consumers in FY 22 and 41 to date in FY 23. In FY 22, 199 consumers received job placement and retention services, while 18 consumers received job placement services to date in FY23.

    Employees responsible for coordinating the partnership:
    Melody Crutchfield - DBH Supported Employment Program Manager
    Catherine Pitts - DBH Supported Employment Program Analyst

    b. *The number of participants who entered post-secondary or occupation training program, apprenticeships, or District employment programs:*

Although the goal of DBH's Supported Employment programs is rapid placement into competitive employment, we also placed individuals in training and education programs. Please see Table 1 for the number of individuals placed in training and education programs in FY 2022 and FY 2023.

| Table 1. Support Employment: Training and Education | | |
|---|---|---|
| | **FY22** | **To Date FY23** |
| Participants Entered Post-Secondary Education Programs | 16 | 1 |
| Occupational Training Programs | 2 | 0 |
| Participated in Apprenticeships | 0 | 0 |
| Entered District Employment Programs | 0 | 0 |

    c. *For DBH's partnership with Rehabilitation Services Administration (RSA) please provide the names of any organizations or agencies providing services through the Evidence-Based Support Employment program for FY 2022 and FY 2023, to date. Include a breakdown of how many participants were hired and where they were employed. Indicate whether any of the placements were in subsidized or temporary positions.*

The partnership with RSA supports six DBH certified Supported Employment programs. Please see Table 2 for the number of consumers placed by each of the Supported Employment providers.

| Table 2. DBH Evidence-Based Support Employment FY 22 | | |
|---|---|---|
| Name of Agency | Number of Placements | Subsidized or Temporary |
| Anchor | 61 | 0 |
| Community Connections  (CC) | 13 | 0 |
| MBI | 25 | 0 |
| PCC | 44 | 0 |
| PSI | 15 | 0 |
| Hillcrest | 41 | 0 |

| DBH Evidence-Based Support Employment FY 23 | | |
|---|---|---|
| Name of Agency | Number of Placements | Subsidized or Temporary |
| Anchor | 4 | 0 |
| Community Connections  (CC) | 0 | 0 |
| MBI | 4 | 0 |
| PCC | 3 | 0 |
| PSI | 2 | 0 |
| Hillcrest | 5 | 0 |

Please see Attachment 1 of 1. Placements Report which lists the number and types of placements made by each agency during FY 22 and FY 23.

DBH has partnerships with the following District agencies to help residents with behavioral health challenges obtain and keep employment with ongoing support.

**Department of Employment Services (DOES)**
DBH partners with the Department of Employment Services (DOES) to provide onsite behavioral health support, screening and referral for DC residents who participate in DOES' Job Readiness Programs, specifically DC Career Connections and Project Empowerment.  This partnership promotes behavioral health wellness and prepares participants to have a comprehensive and well-rounded experience leading to long term employment success and economic stability.   During FY22, there were two (2) DBH onsite clinicians who screened and referred 591 residents to behavioral health resources and services.  In FY23 to date, DBH has screened and referred 240 DC residents.

**Office of the Deputy Mayor for Planning and Economic Development (DMPED) New Communities Initiatives**

DBH partners with the Office of the Deputy Mayor for Planning and Economic Development (DMPED) New Communities Initiatives (NCI) to support the behavioral

health needs of residents living in the following four NCI neighborhoods: Barry Farm, Park Morton, Lincoln Heights/Richardson Dwelling, and Northwest One. DBH provides two onsite Mental Health Clinical Specialists (MHCS) to provide behavioral health support, screenings/assessments, and linkage to supports and services.

During FY22, the two DBH Mental Health Clinical Specialists were co-located at the four NCI Neighborhood designated sites and provided behavioral health support to 54 residents via screening, referral, care coordination and solution focused sessions. They also provided 137 consultations to the case managers and partners working directly with residents impacted by unaddressed behavioral health needs. The MHCS also conducted 14 behavioral health workshops which yielded a total participation of 237 residents who live in NCI neighborhoods.

In FY23 to date, the Mental Health Clinical Specialists have provided behavioral health support to 18 residents via screening, referral care coordination and brief solution focused sessions. The DBH MHCS provided 11 behavioral health consultations to case managers and partners working with residents of the NCI neighborhoods. During FY23 to date, four workshops have been conducted serving 18 residents of NCI neighborhoods.

The employee responsible for coordinating the partnerships with the Department of Employment Services (DOES), and Office of the Deputy Mayor for Planning and Economic Development (DMPED) is Kim Ray

24. Please provide an update on the MOU with the Department of Human Services Economic Security Administration to provide Supported Employment services to individuals with serious mental illness who receive Temporary Assistance for Needy Families (TANF). How many individuals participated in this program in FY 2022 and in FY 2023, to date?

**DBH Response**

DBH continues its partnership with the Department of Human Services (DHS), Economic Security Administration (ESA) to better assist TANF customers who may face behavioral health challenges. In FY 22, three hundred and sixty-one (361) TANF customers were screened and referred to providers for ongoing behavioral health services. In FY23 to date, one hundred and eleven (111) individuals have been screened and referred for ongoing behavioral services.

25. Please provide the list of services currently available as part of the Mental Health Rehabilitation Services (MHRS) system. Specifically, please provide a description of

each service and indicate whether it is available as part of the Medicaid MHRS program, the non-MHRS program, or both.  In addition, please provide the FY 2022 and FY 2023 reimbursement rates for each service.

**DBH Response:**

Please FY22 Oversight Question 25 Attachment 1 of 1. MHRS Funding Medicaid Local Both
In the attachment, if a service is paid by Medicaid and local funds, there is a "Y" (Yes) in the column for "Medicaid".  If a service is paid by local funds only, there is a "N" (No) in the column for "Medicaid".

26. Please provide the monthly MHRS utilization data for FY 2022 and to FY 2023, to date. Please include:
    a. A breakdown of Medicaid MHRS vs. non-Medicaid MHRS;
    b. For Medicaid MHRS, provide a breakdown by managed care vs. fee-for-service (and include a breakdown by specific managed care organization); and
    c. For non-Medicaid MHRS enrollees, indicate whether the individual had coverage via the DC Healthcare Alliance or was uninsured.

    **DBH Response**

    Please FY22 Oversight Question 26 Attachment 1 of 1.  MHRS Utilization FY22_FY23

    DBH currently is not able to link the insurer information (MCO, Alliance) to an individual client.  With the implementation of the Integrated Technology Engine (ITE), DBH will be able to link Economic Security Administration (ESA) insurance coverage to individual clients.  DBH anticipates that this feature for the ITE will be available in late summer.

27. Please provide, for FY 2021, FY 2022, and FY 2023, to date, the name of all certified MHRS providers. For each provider, please indicate whether or not the provider utilizes the Medicaid MHRS program, the locally-funded MHRS program, or both.

    **DBH Response:**

    Please see Attachment 1 of 1.  Certified MHRS Providers by Funding Source FY21-FY22-FY23".

28. Are there any services provided through CSAs or other mental health providers that are not currently reimbursed by Medicaid? If so, please indicate whether these services will be

reimbursed under DC's approved 1115 waiver or could be reimbursed under a 1915(i) state plan option, a waiver, or a demonstration project.

**DBH Response:**

Please see document attached titled, "FY22 Oversight Question 28 Attachment 1 of 1. MHRS Services Not Reimbursable by Medicaid".

From this list, Transition Planning Services is included in the 1915i expansion of the State Plan Amendment. In addition, Transportation for medical appointments currently is a Medicaid benefit.

29. Please provide a description of all housing programs administered by DBH. For each, please provide the following information:
    a. Name of the program, services provided, and eligibility requirements;
    b. Number of individuals served in FY 2022 and FY 2023, to date;
    c. Capacity of the program;
    d. Performance measures and associated outcomes for each program;
    e. The name and title of the DBH employee responsible for administering the program;
    f. The average wait time for a consumer to access housing through the program;
    g. The number of individuals on waiting lists for the program; and
    h. Of those individuals on the wait list, whether any are experiencing homelessness or in other housing programs.

**DBH Response**

**DC Local Rent Supplement Program (LRSP)**
The LRSP is administered by the D.C. Housing Authority (DCHA). The program follows the eligibility requirements and rules and regulations of DCHA's federally funded voucher program. DBH makes referrals for initial occupancy and backfill of vacancies for LRSP vouchers attached to newly renovated or developed units funded with DBH capital dollars for 25 years. The LRSP vouchers are attached to single-room occupancy (SRO) units and to apartments.

**Home First Housing Voucher Program**
The locally funded Home First Program provides housing rental vouchers for individuals and families who live in the apartment or home of their choice and sign their own rental leases. Consumers pay thirty percent (30%) of their household income to the landlord toward their rent and the Home First Program subsidizes the balance of the rental amount.

**Supported Residences (Licensed Mental Health Community Residential Facilities)**

- Intensive Rehabilitative Residence (IRR)

An intensive level of care for individuals enrolled in the DBH behavioral health system who have medical issues that put them at risk of needing nursing home care if they do not receive physical health care nursing supports with the appropriate mental health rehabilitation services.

- Supportive Rehabilitative Residence (SRR)
  A SRR CRF provides 24-hour, structured housing support for consumers with severe and persistent mental illness who need an intense level of support to live within the community. The specific services offered include: 24-hour awake supervision; assisting the consumer to obtain medical care; providing training and support to assist consumers in mastering activities of daily living; maintaining a medication intake log to ensure that residents take their medications as prescribed; provision of one-to-one support to manage behaviors or perform functional living skills; transportation to doctor's appointments; assistance with money management; and participation in treatment planning, implementation, and follow-up.

- Supportive Residence (SR)
  A SR CRF provides on-site supervision when residents are in the facility; medication monitoring; maintenance of a medication log to ensure that medication is taken as prescribed; assistance with activities of daily living; arrangement of transportation; monitoring behaviors to ensure consumer safety; and participation in treatment planning, implementation, and follow-up.

*Number of Individuals Served in FY22 and FY23-1Q* and *Capacity of the program*
In FY 22, the capacity of the supported housing program increased by 78 rental housing vouchers and 10 placements in supported residences.

| Table 1. | Housing Capacity and Consumers Served | | | |
|---|---|---|---|---|
| Supported Housing Program | FY22 Capacity | Consumers Served FY22 | FY23 Capacity | Consumers Served FY23 Q1 |
| Site-based Vouchers | | | | |
| DBH Capital-Funded Housing (LRSP Vouchers) | 210 | 214 | 210 | 210 |
| Rental Vouchers | | | | |
| Home First (Vouchers) | 878 | 828 | 878 | 780 |
| Mental Health Community Residential Facilities (MHCRFs) | | | | |
| Intensive Residence (IR) | 8 | 8 | 8 | 8 |
| Supportive Rehabilitative Residence (SRR) | 188 | 191 | 204 | 183 |
| Supportive Residence (SR) | 445 | 424 | 429 | 376 |
| | | | | |

| | | | | |
|---|---|---|---|---|
| **Total Supported Housing** | 1,729 | 1,665 | 1,729 | 1,557 |

*Performance measures and associated outcomes for each program*

| Table 2. | Housing Program Performance Measures and Outcomes | |
|---|---|---|
| Quality Domain | Performance Measure | Outcome |
| Housing Tenure/Stability | 75% of consumers will maintain community tenure in independent housing for 12 months or longer | 92% in FY22 |
| Housing Occupancy | DBH will maintain an 80% or greater occupancy rate within its subsidized housing program | FY22 : 94% FY23-Q1: 92% |
| Availability of Housing Services/Supports | 80% of consumers in subsidized housing will enroll with a Core Service Agency to receive mental health services and supports | 83% enrollment |
| CRF Placement Stability | 90% of consumers who remained in the CRF placement for at least 90 days from move-in date, with no psychiatric hospitalizations, incarcerations, crisis bed placements, or involuntary discharges. | 86% |

*Name and title of the DBH employee responsible for administering the program*
Brandi Gladden, Director – Housing Development Division, is the DBH employee responsible for administering the DBH housing programs.

*The average wait time for a consumer to access housing through the program*
The average time between referral and placement is four to six weeks.

*The number of individuals on waiting lists for the program*
DBH does not maintain a waiting list for housing. DBH requires certified providers to assess housing needs at the time of intake and for consumers to indicate if they want to be considered for housing resources when they become available. Individuals who request a rental housing voucher self-report whether they are homeless, living on the streets or in a shelter, living temporarily with families or friends, or living place to place. They also can report if they are rent burdened, at risk of eviction, or living in substandard housing. This information is entered into the consumer's electronic medical record. This process has been commonly referred to as a "waiting list" but it is a self-report of housing needs. When a rental housing voucher becomes available, DBH notifies providers and works with them to determine eligibility of current consumers. Since interest far exceeds available vouchers, consumers experiencing homelessness who are living on the streets or in a shelter are prioritized. This process does not apply to supported residences where placement is determined by level of need.

*Of those individuals on the wait list, whether any are homeless or in other housing programs*

As indicated above, at the time of intake, individuals self-report their living situation. Individuals who request a rental housing voucher often seek support from other available housing programs as well.

30. DBH regulations provide that DBH conduct targeted compliance reviews of CSAs supported housing assessments and report the results to each CSA under review. DBH policies also require that DBH monitor certified providers to ensure compliance with DBH's housing procedures and programs, and that DBH utilize routine oversight and monitoring activities to determine whether CSAs are meeting their supported housing objectives. How does DBH conduct targeted compliance reviews and monitor certified providers to ensure compliance with its housing procedures and programs? What type of oversight and monitoring does DBH conduct to determine whether CSAs are meeting their supported housing objectives?

**DBH Response**

DBH monitors the performance of Core Service Agencies (CSAs) and operators through established protocols to ensure their compliance with Housing Program regulations and procedures. DBH Housing staff schedule regular, bi-monthly meetings with all CSA Housing Liaisons to review their protocols and their eligibility for available DBH housing resources.  In addition, DBH Housing staff are in constant communication via e-mail and phone calls with CSA Housing Liaisons and Community Support Workers (CSWs) to provide technical assistance, answer questions and reinforce housing protocols and policies.  When a consumer in housing is reported to be in crisis or experiencing behavioral challenges, DBH Housing staff immediately engage CSA Housing Liaisons to offer guidance and direction to ensure the consumer can successfully maintain their housing.  The DBH Ombudsman and the Accountability Administration are also engaged as necessary to address situations where a CSA is not in compliance with DBH housing protocols and policies.

31. Please provide any updates regarding wheelchair accessibility of Mental Health Community Residential Facilities (MHCRF) and Supported Independent Living (SIL) providers within the DBH system?

**DBH Response**

Seven of 92 licensed MHCRFs are wheelchair accessible.  DBH no longer contracts with Supported Independent Living (SIL) providers.  All providers are expected to provide functions that support independent living that are Medicaid reimbursable.

32. What is the average wait time for consumers to become a resident in an accessible MHCRF from the date of the application or request? What is the same average wait time for SIL?

**DBH Response**

An application for a MHCRF requires the completion of a Level of Care assessment to determine the most appropriate placement in supportive housing.  The assessment includes a determination of whether an MHCRF is required and available at the time. Typically this process can take 90+ days between the time the Level of Care assessment is completed and approved, and the consumer moves into an accessible MHCRF bed.

In FY 21, DBH ended contracts funded with local dollars to provide Supported Independent Living services with providers who operate congregate living settings as these supports are Medicaid reimbursable.  All DBH certified providers are expected to provide services to support consumers maintain independent living that are Medicaid reimbursable.

33. Of the total number of consumers that DBH serves, what is the number of consumers who are experiencing homelessness? Please provide the number and ages of those consumers under the age of 21. How is this data collected and compiled? How does DBH coordinate with housing and homeless service providers to serve these consumers and populations?

**DBH Response**

During intake, an individual is asked about their living situation. An individual may self-identify as "homeless" if they are living with family or friends, in a shelter, or living on the street. The numbers below are based on claims data. Please note that DBH identifies 18 years old as the age break between children/youth and adults receiving mental health services and 20 as the age break between children/youth and adults receiving substance use disorder services.

| FY 22 | Total Utilization | Self-identify as "homeless" | Under the age of 18 |
|---|---|---|---|
| Mental Health Services | 41,560 | 7,435 (18%) | 33 |
| Substance Use Disorder Services | 5,265 | 1,269 (24%) | 1 |

During FY 22, DBH was engaged in several initiatives with the Interagency Council on Homelessness (ICH), the Department of Human Services (DHS), and the Department of Health (DC Health) to coordinate our efforts in supporting individuals in the District who identified as not having a stable living arrangement.  DBH partnered with DHS to address the needs of people living in the encampments at 21st and E St, 25th and VA St, NOMA, and New Jersey and O St to assess consumers with behavioral health needs, connect them to care when appropriate, and to facilitate transitions into permanent housing.

DBH also partnered with the DC Health and ICH to provide services and care coordination within the District's PEP-V sites and shelters to support residents with behavioral health needs. Through our contracted vendor, MBI, DBH delivered on site behavioral health assessments to PEP-V consumers and provided necessary support.  In addition, DBH deployed our Intensive Care Coordination teams to engage PEP-V and shelter residents who were no longer connected to an on-going behavioral health provider to facilitate getting those individuals reconnected to care.

34. In FY 2022 and in FY 2023, to date, what array of services and support did DBH provide to homeless consumers? What were DBH's outcomes? How many DBH consumers in FY 2022 and FY2023, to date, who were homeless, were placed in housing?

**DBH Response**

DBH sees stable housing as a primary factor in overall recovery.  DBH-certified providers are required to assess for housing needs, include housing needs on treatment plans, make referrals, and take steps as appropriate to address the housing needs of their consumers.

Consumers who self-report as experiencing homelessness—defined as those without a stable living arrangement, living temporarily with family or friends, living in shelters or living on the streets—receive the full array of behavioral health services as well as priority housing placement.   DBH's 24-hour Community Response Team (CRT) regularly engages such individuals through street outreach to build relationships and encourage treatment. The CRT provides on the spot psychiatric assessments, in person counseling and crisis support.  The team also assists with obtaining vital documents such as a birth certificate required to engage in services and provides transportation to appointments.  In addition, the team conducts outreach and education regarding opioids and other substance use disorder services and distributes life-saving naloxone.  During inclement weather or cold emergency alerts, the CRT supports the Department of Human Services (DHS) in outreach and connection to emergency resources.

With respect to children and youth,  supports include the community and school-based prevention, early intervention, and treatment services. The school-based teams also partner with the Homeless Outreach Coordinators within the public schools whenever necessary to coordinate behavioral health services and supports.  DBH has also partnered with the Youth Economic Justice and Housing Coalition to discuss available behavioral health supports for youth and how to strengthen the partnership between DBH and homeless service providers.

Community Connections and MBI (DBH certified providers) partnered with District youth shelters to link individuals to behavioral health services and refer Transition Age Youth (TAY) to housing at DBH's Transitional Living Facility, Wayne Place. Wayne Place allots a minimum of four slots for young adults who are not able to locate housing at the Department of Human

Services (DHS) facilities because of space and the restriction of the environment. Additionally, the TAY team participates in meetings related to youth homelessness which includes the District's Interagency Council on Homelessness and Community Partnership.

During FY22, DBH provided the following *targeted services* and supports to consumers who are homeless:

- *Projects for Assistance in Transition from Homelessness (PATH)* - is a SAMHSA funded initiative designed to identify, engage, and support people who are experiencing homelessness and help them connect to behavioral health care and permanent housing. PATH targeted activities include: outreach, BH screening and diagnostic treatment, habilitation and rehabilitation, mental health and substance use treatment, referrals for primary care, job training, educational services, and housing.
- *Intensive Care Coordination (ICC)* – DBH's ICC Teams provide care coordination and case management services in PEP-V sites, encampments, and shelters with the goal of helping people select a CSA/provider and ensuring that meaningful connections to care are made before closing a case.
- *Assertive Community Treatment (ACT) services* – Through our provider network, DBH provides behavioral health and crisis services and supports to consumers who are experiencing homelessness including: diagnostic assessment, counseling, medication management, and community support. People who qualify for Assertive Community Treatment also receive this service irrespective of where they are in the community.

Outcomes during FY 22:
- In collaboration with DHS, 105 consumers previously in encampments on DHS' "By Name" lists received case management and 95 of these individuals were permanently housed.
- DBH's ICC Team engaged 404 consumers and a total of 44 were housed during that period of engagement.
- PATH and ICC engaged 264 consumers in PEP-V sites providing care coordination, case management and support.
- 48 consumers who identified as homeless were housed in DBH Community Residence Facilities.
- 15 consumers who identified as homeless were housed with a DBH housing subsidy.
- 17 youths obtained secure housing through the school based homeless program.

35. In FY 2022 and in FY 2023, to date, what range of services and support did DBH provide to consumers who identify as LGBTQ+? Please indicate what services are for children and youth.

**DBH Response**

DBH requires all our certified providers to offer services (within their scope of practice) to anyone seeking care or to appropriately refer such individuals to a qualified provider, whether an individual identifies as LGBTQ+ or not.  DBH repeatedly emphasizes this mandate in our monthly provider meetings to ensure that that those who identify as LGBTQ+ do not experience any barriers to accessing necessary care.  In addition, DBH has provided specialized grants focused on *Expanding Access and Retention in Care for Opioid and/or Stimulant Use Disorder Treatment* to Whitman Walker and HIPS targeting especially the LGBTQ population.

This initiative seeks to bring local providers together to: implement strategies that reduce barriers to accessing treatment for targeted individuals with Opioid Use Disorder or Stimulant Use Disorder; re-engage consumers who have unexpectedly or prematurely discontinued treatment; and support current consumers to promote retention, and whole-person care. By addressing the known barriers to care, this initiative seeks to reduce health disparities within this underserved community by improving access to needed behavioral health care services.

During FY22 and FY23 to date, DBH has especially focused on providing a range of services to children, youth and adults who identify as LGBTQ+. Our School Behavioral Health Program (SBHP) clinicians provide prevention, early intervention, and treatment services to children and youth in schools, some of whom identify as LGBTQ+. For example, an SBHP clinician facilitated a prevention group that focused on LGBTQ+ topics within her building.  In addition to providing services, DBH also supported training and professional development regarding the needs of this population.  In April 2022, the DC School Behavioral Health Community of Practice, through a contract with George Washington University, hosted a training titled "Supporting LGBTQ+ Youth and Clinical Competencies".  Behavioral health providers, DBH team members, team coordinators attended the session.  This training focused on the following areas:  1) identifying challenges facing LGBTQ+ youth, 2) means by which schools and clinicians can collaborate and leverage the resilience of the youth to promote safety and well-being, and 3) identifying resources to support schools in promoting the safety and well-being of LGBTQ+ youth.

Across various DBH social media pages and platforms targeting Transitional Aged Youth (such as Twitter, Instagram and Facebook), DBH has posted imagery and language promoting inclusion.  In June 2022, our Transitional Age Youth (TAY) social media pages highlighted gay pride month by showcasing both globally famous and local individuals who identify as LGBTQ+ who are successfully managing their behavioral health concerns and navigating adulthood. Additionally, our TAY social media pages promoted activities and trainings available throughout the city to LGBTQ+ youth and young adults.  In addition, TAY social media pages highlighted the work of "Supporting and Mentoring Youth Advocates and Leaders" (SMYAL), an organization committed to providing queer and trans youth ages 6-24 with safe spaces to express themselves, enhance their coping skills and build community. Many of DBH's behavioral health

providers partner with SMYAL to ensure clients receive the full continuum of services to support their mental health.

To strengthen services for those who identify as LGBTQ+, DBH plans to host a forum in the coming months to hear directly from consumers, family members, providers and community stakeholders on what additional services and trainings are needed to increase access, support and services to those who identify as LGBTQ+.

## Children and Youth Services (Non-School Based Behavioral Health)

36. Please provide an update on the work of the children mobile crisis teams. What services are provided? In what languages are Children and Adolescent Mobile Psychiatric Service (ChAMPS) services provided? How many individuals were served in FY 2022 and in FY 2023, to date? Please include the following:

    a. The process for determining what calls are deployable and non-deployable;
    b. The response time for deployable calls including the longest and shortest response times that occurred in FY 2022 and FY 2023, to date, as well as the average;
    c. The number of mobile crisis teams;
    d. How are calls triaged to ensure that a team is available upon request;
    e. The relationships and coordination between the 911 call-takers, Access Helpline, and ChAMPS teams; and
    f. The findings of any review or evaluation of these services.

### DBH Response

The Department of Behavioral Health contracts through the Office of Contracts and Procurement for emergency mobile psychiatric services for children and youth. The current contractor is Anchor Mental Health, and the program is called Children and Adolescent Mobile Psychiatric Service (ChAMPS). The ChAMPs program operates 24 hours a day, seven days per week and helps children and youth between six to 17 years of age manage extreme emotional behavior and supports families wherever possible to prevent behavior from resulting in the child needing to be removed from the home or a psychiatric hospitalization. In the cases where a child or youth does require hospitalization, ChAMPs facilitates the referral for both voluntary and involuntary hospitalizations. ChAMPS services also include screening for mental health and substance use needs, crisis stabilization, referral to appropriate resources, including longer-term mental health or substance use services. ChAMPs also provides information dissemination, consultation to parents and service providers and outreach to the community regarding their services.

Services are provided in the community, schools, or in homes for District residents and children living in Maryland in the care and custody of the DC Child and Family Services

Agency.  After a family is involved with an emergency crisis intervention service, ChAMPS follows up with them within 24 hours to check on the child's well-being and provides support for up to 30 days post-intervention.  The team links children and families to a behavioral health provider for ongoing support. For children already enrolled with a provider, the team communicates the child's status and recommendations based on the intervention.  ChAMPS also offers Family Peer Specialist services to support families in the stabilization of their child's behavior and to promote a culture that recognizes, understands, and respects the family's views and preferences.

 ChAMPS can provide services in the following languages with support of the Jeenie App: Akateko, Albanian, American Sign Language (ASL), Amharic, Arabic (Algerian Moroccan & Tunisian), Arabic (Egyptian or Sudanese), Arabic (Gulf), Arabic (Iraqi), Arabic (Levantine), Arabic (Modern Standard), Armenian, Bengali, Bosnian, Cape Verdean Creole, Chinese (Cantonese), Chinese (Mandarin), Dari (Persian), Farsi (Persian), French, Greek, Gujarati, Haitian Creole, Hebrew, Hindi, Hmong, Hungarian, Indonesian, Italian, Japanese, K'iche', Karen, Kinyarwanda, Korean, Lao (Laotian), Mam, Nebaj Ixil, Nepali, Oromo, Pashto, Polish, Portuguese, Portuguese (Brazil), Punjabi, Q'anjob'al / Kanjobal ,Q'eqchi, Romanian, Russian, Serbian, Somali, Spanish, Swahili, Sylheti, Tagalog (Filipi), Thai, Tigrinya, Turkish, and Vietnamese.  CHAMPS also has one Spanish speaking licensed clinician who can provide services and supports.

The table below shows the total number of calls to ChAMPs for FY22 and FY23 Quarter 1.

**Total Served:**

| Fiscal Year | Total Calls | Individual Number of Children and Youth Served |
|---|---|---|
| FY22 | 1555 | 607 |
| FY23 Q1 | 417 | 161 |

a. Each call that is routed into ChAMPS is received by a Licensed Clinical Manager who is trained and equipped to make a clinical determination on how to manage crisis calls. In making their clinical determination, the Licensed Clinical Manager considers the following:  whether there is an active mental health or behavioral crisis; the current safety concerns; whether or not there is a mental health clinician present; whether the client has an ongoing mental health provider; whether there are any current concerns that may require immediate medical attention; and whether the client is under the influence of any illegal substance.  All calls involving children and youth in psychiatric crisis are deployable calls which result in an onsite response by a clinical team.  ChAMPS also provides telephone clinical consultation to child serving agencies seeking support for concerns such as family conflict, oppositional defiant behavior, and emotional dysregulation of children and or youth.  A non-deployable call includes requests for information about program services or resources only or instances in which a caregiver

declines an on-site assessment. The table below shows the data with respect to response to calls:

| Service | FY22 | FY23 Quarter 1 |
|---|---|---|
| Deployments | 356 | 67 |
| Deployments – No intervention | 64 | 10 |
| Cancelled Calls | 141 | 30 |
| Clinical Consultations | 786 | 200 |
| Information Only | 208 | 109 |
| Total Deployments | 420 | 77 |
| Total Calls Not Deployable | 1135 | 339 |
| Total Calls | 1555 | 416 |

b. In FY 22, ChAMPS reported that the average deployment time was 44 minutes. The longest response time was 1 hours and 28 minutes.  The shortest time was under a minute due to crisis team already being on site for another crisis call.  In FY 23 to date, the average deployment time is 41 minutes. The longest response time was 1 hours, 21 minutes.  The shortest time was 9 minutes. The requirement is to arrive to all deployments within one hour or less during the week and within 2 hours for overnight on call shifts and weekend on call shifts.

c. Contractually, ChAMPS was required to have seven teams available in FY22 and FY23 Q1. However due to workforce challenges they were understaffed, often with the Clinical Manager completing deployments as well.  Currently, ChAMPS has four teams available.

d. ChAMPS teams are deployed in pairs. Staff are scheduled in a staggered manner to maximize coverage and the number of crisis teams available. Calls are triaged according to imminent risk and prioritized by the level of danger a child poses to self or to others. Additional considerations are the availability of a mental health clinician, and whether an MPD or a Crisis Intervention Officer is needed at the deployment site. The Clinical Manager maintains contact with the caller until the crisis team arrives at the scene.  There have been times when a ChAMPS crisis team has not been available due to other deployments or staffing issues however, an independent licensed social worker is always available via telephone to provide clinical consultations, recommendations, assist in connecting a client to ongoing mental health service, and contacting a service provider from the family's Care Service Agency (CSA).  Also, if there is an instance of eminent danger or safety concerns a Crisis Intervention Officer (CIO) officer can be deployed  to assist them immediately.

e. ChAMPS has a working relationship with 911, MPD, Access Helpline (AHL) and other District entities.  Most calls for Crisis Services are made directly to ChAMPS however in FY22, 9 calls were transferred from the AHL in FY22 and one in the first quarter of FY23.  ChAMPS often joins the parent or guardian on a call with AHL to link the youth and family to services.   ChAMPS does receive calls from MPD for support addressing psychiatric needs of children and youth.  In addition, when a child or youth is aggressive, ChAMPS will rely on MPD for support and transportation when FD-12 is required.  In addition, ChAMPS conducts information sessions about crisis services and advertises the program throughout the community, encouraging the public and private sector to use these services when needed.

f. ChAMPS conducts monthly surveys regarding the quality of care received by contacting the parents of child or youth after the case has been discharged.  ChAMPS created and uses a Likert Scale survey that asks if they were satisfied with the services provided, did they and/or child feel they were treated with dignity and respect and were the services received in a manner that demonstrated consideration for their beliefs, values, and cultural background.  Of the surveys received, 98% of the participants reported that they were satisfied with the services that were provided by ChAMPS.

37. For individuals served by ChAMPS, how many times did receipt of service result in psychiatric hospitalization in FY 2022 and in FY 2023, to date?  Of the individuals who were hospitalized, how many of those hospitalizations were involuntary (FD-12) and what agency, if any, had custody? Of the individuals who were hospitalized, how many had a diagnosis of "serious emotional disturbance" Please provide the same information for any other Youth Mobile Crisis provider.

**DBH Response**

The goal of emergency crisis support is to stabilize children and youth experiencing a behavioral health crisis and avoid inpatient hospitalization or placement disruptions in the case of children and youth in the care and custody of the child welfare system.  Of the 420 deployments in FY22, the clinician on the scene initiated an FD-12 process for involuntary treatment in 69 instances. Of that number, 23 children/youth required inpatient hospitalization.  In Q1 of FY23, of the 77 deployments, an FD-12 was initiated in 16 instances and of those, 11 children/youth required hospitalization.

ChAMPS is the only youth mobile crisis provider under contract with DBH.

38. During FY 2021, FY 2022, and FY 2023, to date, how many calls to ChAMPS were initiated by MDP?  How many calls were initiated by DCPS or a public charter school?  How many calls were initiated by family members?  How many calls were

initiated by the child or youth?  How many were initiated by others?  How do the totals from FY 2022 compare with FY 2021? Please provide the same information for any other Youth Mobile Crisis provider.

**DBH Response**

The chart below reflects calls received in FY21, FY22 and Quarter 1 of FY23 that were initiated by MPD, schools, family members, child/youth, and others.  The data reflect that schools and family remain the highest referral sources for mobile crisis services for children and youth.  The volume of family calls has remained consistent since the onset of the pandemic in March of 2020 while school calls have increased from FY21 as schools fully re-opened in FY21.

Table 1

| Fiscal Year | MPD | School | Family | Child/Youth | Other |
|---|---|---|---|---|---|
| FY 21 | 102 | 173 | 589 | 23 | 178 |
| FY 22 | 123 | 474 | 604 | 36 | 191 |
| FY 23 Q1 | 26 | 142 | 172 | 9 | 31 |

ChAMPS is the only youth mobile crisis provider contracted by DBH.

39. How long does it take for families or children who are enrolled in DBH either by calling the Access Helpline or by walking into a community provider office seeking mental health services to receive the treatment they need?  Please provide the following information for FY 2021, FY 2022, and FY 2023, to date:
   a. The number of days, on average, between when a family or child calls the Access Helpline and when they are referred to a Core Service Agency;
   b. The number days, on average, between when a family or child is enrolled and their intake appointment with a Core Service Agency;
   c. When is a child or family considered "enrolled" in services;
   d. The number of days, on average, between when a family or child is enrolled and when they receive a diagnostic needs assessment;
   e. The number of days, on average, between when a family or child is enrolled and when they receive their first service as part of a treatment plan; and

**DBH Response**

*Department of Behavioral Health*
*FY 2022*
*Performance Oversight Questions*

a. DBH's Access Helpline is one of the ways families and children are connected to services provided by the Department and its certified providers. Callers to the Access Helpline are referred to a provider during the call. DBH collects data to track the number of days from when a family or child is referred  and their intake appointment; and the number of days between when a family or child is enrolled and when they receive a diagnostic needs assessment.

b. In FY21, the average time between a referral to an intake appointment was 24 days. In FY 22, the average time was 23 days. DBH has continued to work closely with providers to streamline processes to complete intake appointments via virtual platforms as well as in person. In FY23 YTD the average number of days has decreased to10 days.

| Table 1. Average Number of Days from Referral to Intake Appointment (Enrollment) | | | |
|---|---|---|---|
| FY | 2021 | 2022 | 2023 Q1 |
| Avg days | 24 | 23 | 10 |

c. The AHL refers children and families to providers for services. A child or family is considered enrolled in services when an intake appointment is completed.

d. In FY21, the average time between an intake to a diagnostic assessment appointment is 29 days. In FY 22, the average number of days was 34 days. Several providers had staff turnover both on the leadership and clinician level which impacted capacity. To support providers, DBH has provided technical assistance to streamline their intake process. In addition, data has been shared with providers on an annual basis to guide protocols and procedures. In FY 23 YTD, the average time decreased to eight days. DBH will continue to work with providers to utilize flexible scheduling, streamlined processes and telehealth platforms to reduce the time period from referral to an intake appointment and from the intake appointment to the diagnostic assessment appointment.

| Table 2. Average Number of Days from Intake Appointment (Enrollment) to Diagnostic Assessment | | | |
|---|---|---|---|
| FY | 2021 | 2022 | 2023Q1 |
| Avg days | 29 | 34 | 8 |

e. DBH does not collect data on the number of days from enrollment/ intake appointment and the first service as part of a treatment plan based on the diagnostic assessment.

40. Please explain the work DBH is doing with Child and Family Services Agency to better serve the mental health needs of foster children and their families in the District. Please provide the following information for FY 2021, FY 2022, and FY 2023, to date:
    a. The number of children/youth in out-of-home placements DBH served;
    b. The number of children/youth in in-home care DBH served;
    c. The percentage of children/youth who were screened within 30 days of entering or re-entering care;
    d. The services DBH provides to parents and guardians whose children are being served through in-home or out-of-home care;
    e. The number parents and guardians that received services;
    f. The services DBH provides to resource providers; and
    g. The number of resource providers who received services from DBH.

**DBH Response**

In FY22, DBH and CFSA have continued to collaborate to better serve the mental health needs of foster children in the District. DBH continued to have a staff member co-located at CFSA to support the linkage, enrollment and follow up of behavioral health services to children, youth and families needing services.  CFSA continued support of the expansion of Functional Family Therapy (FFT) utilizing the Community Based Child Abuse Prevention (CBCAP) funding to provide intensive therapeutic interventions to families to prevent or reduce child abuse and neglect. FFT is an evidenced-based practice that targets families with children between the ages of 11-18 with behavioral or emotional problems such as conduct disorder, violent acting out, and substance use disorders.  CFSA funding was used to maintain the certification of FFT providers and supported continued training in the model.

 a. and b. The tables below show the numbers of CFSA youth in FY21, FY22, and FY23 Q1 in DBH services.

| FY21 | | |
|---|---|---|
| **Placement** | **DBH Services** | **CFSA Cases** |
| Foster Care | 355 | 502 |
| In-Home | 391 | 621 |
| **Total** | **746** | 1123 |

| FY22 | | |
|---|---|---|
| **Placement** | **DBH Services** | **CFSA Cases** |
| Foster Care | 267 | 508 |
| In-Home | 285 | 814 |

| **Total** | **552** | 1322 |
|-----------|---------|------|

| **FY23** | | |
|----------|------------|-----------|
| **Placement** | **DBH services** | **CFSA Cases** |
| **Foster Care** | 147 | 511 |
| **In-Home** | 79 | 632 |
| **Total** | 226 | 1143 |

c. DBH is no longer providing screening for children and youth who enter or re-enter care within CFSA.  This ended in FY20, when CFSA launched their Mental Health Redesign, which included the onboarding of three mental health clinicians to administer mental health screenings and to provide direct therapeutic interventions.

d, e, f, g. Services are provided to parents, guardians and resource parents of children and youth involved in the child welfare system, but this data is not aggregated in our database system.  The adults have access to services available in the DBH network to address their own needs in addition to psychoeducation and behavior management strategies that will support parenting and family dynamics.

41. Please provide an update on DBH's early childhood mental health projects, including any studies or reports. Please include a list of providers for these services.
    a. For the Parent Child Infant Early Childhood Enhancement Program, please include a description of the services provided, the type of clinicians employed, their capacity, and the number of children served, and how the cases ended (e.g. successful completion, closure for lack of attendance, etc.) in FY 2022 and in FY 2023, to date.
    b. For the Early Childhood Mental Health Consultation Project, Healthy Futures, list the childcare centers, homes, and schools that are participating, the services they have received and provide any progress/outcome measure available. Please provide updates on hiring for Healthy Futures. Please share any obstacles to expanding Healthy Futures to all subsidized child development centers and home providers. For FY 2021, FY 2022, and FY 2023, to date, please provide the amount budgeted and spent on Healthy futures, including a cost breakdown. Include a breakdown of the amount of local, federal, provide, and special revenue funding across all sites.
    c. Please provide an update on the DC MAP contract.

**DBH Response**

*a. For the Parent Child Infant Early Childhood Enhancement Program, please include a description of the services provided, the type of clinicians employed, their capacity, and the number of children served, and how the cases ended (e.g. successful completion, closure for lack of attendance, etc.) in FY 2022 and in FY 2023, to date.*

The Parent Infant Early Childhood Enhancement Program (PIECE) was established based on the findings from the 2007 Washington D.C. Early Childhood Mental Health White Paper, which identified the lack of existing mental health services in the District of Columbia for children under the age of five. The PIECE Program recognizes early childhood intervention programs have the potential to address cognitive, emotional and behavioral challenges in the lives of young children. The PIECE Program is certified by DBH to provide early intervention and treatment to young children and their families from birth to seven years old. The goal of the program is to intervene early with comprehensive services designed to prevent social emotional/behavioral challenges, reduce stressors within the parent-child relationship and family that might adversely affect the developing child. The program provides family focused behavior management, individual and family therapy/counseling, art and play therapy, developmental screenings, diagnostic assessments, psychiatric/medication management, home/school visitation, and mental health services for prenatal and postpartum women. The PIECE program continues to utilize a hybrid approach developed during the pandemic, which offers both virtual and in person clinic sessions.

The staff of the PIECE Program are trained and certified to provide several early childhood evidence-based practices for children and their families. The following is a list of these programs and a brief description of each of them.

**Parent Child Interaction Therapy (PCIT)** is a parent coaching program that teaches caregivers skills and techniques to improve their child's disruptive and non-compliant behavior. In PCIT caregivers are coached in specific skills by the therapist through an earpiece while the therapist observes the caregiver and child playing together in a separate room.

**PCIT with Toddlers (PCIT-T)** is an adaptation of PCIT, that combines attachment theory, play therapy, family systems, and cognitive-behavioral approaches with nurturing and sensitive caregiving. PCIT-T is an in-vivo coaching approach utilized with parents of children ages 12 months to three years to address disruptive behaviors and as a prevention model for caregivers experiencing stress.

**Child Parent Psychotherapy (CPP)** is a therapy for parents with infants, toddlers and preschoolers who have experienced trauma(s). CPP is also offered in a hybrid manner including the use of on-line stories art making via white board virtual adaptations and other telehealth applications in addition to in-person sessions.

**Attachment & Biobehavioral Catch-up (ABC)** is offered to parents and caregivers of babies who are between six and 24 months old. ABC strengthens the parent child

relationship while helping the child to learn to regulate behaviors and emotions. The ABC approach helps parents/caregivers identify and respond to their baby's signals. As a result, the parent's relationship with their child is supported to address stress and early challenges.

The PIECE Program has the capacity to provide services to 130 children and families. The staff include a clinical psychologist, and five clinicians. The credentials of the clinicians are as follows, 3 Licensed Independent Clinical Social Workers, 1 Licensed Graduate Social Worker, and 1 PhD with multiple credentials as a Licensed Professional Counselor, Licensed Marriage and Family Therapist, and is also a board-certified art therapist. In addition, two Board Certified Child Psychiatrists provide evaluation, and medication management services to children and adolescents for both the PIECE Program and the Urgent Care Clinic.

During FY 22 the PIECE Program provided services to 454 families. To date in FY 23, 1st Quarter the PIECE Program has provided services to 140 families. During FY 22 the program discharged 52 families, of which 25 were successful and 27 were unsuccessful due to a lack of attendance, referrals to CFSA's Office of Well-being and changes in jurisdiction. To date in FY 23, 1st quarter, the program has discharged 22 client families, of which 10 were successful and 12 were unsuccessful. A successful discharge is determined when the child and family has met their individualized treatment goals, as evidenced by pre/post assessments, and there is improvement in the social/emotional/behavioral symptoms reported at referral.


*b. For the Early Childhood Mental Health Consultation Project, Healthy Futures, list the childcare centers, homes, and schools that are participating, the services they have received and provide any progress/outcome measure available. Please provide updates on hiring for Healthy Futures. Please share any obstacles to expanding Healthy Futures to all subsidized child development centers and home providers. For FY 2021, FY 2022, and FY 2023, to date, please provide the amount budgeted and spent on Healthy futures, including a cost breakdown. Include a breakdown of the amount of local, federal, provide, and special revenue funding across all sites.*

The Healthy Futures program provides consultation services to Child Development Centers (CDCs) and home childcare providers as well as directly to children and families. These services are provided by a mental health professional.  The goals of the program are:  (1)  building professional skills and capacity of caregivers to promote social emotional development and prevent escalation of challenging behaviors (2) reducing the number of early childhood expulsions and (3) increasing appropriate referrals for additional assessments and services to support child and family functioning.  See Attachment 1 for the list of Healthy Futures child development facilities.

During FY 22, DBH continued to expand Healthy Futures.  Funding for FY 23 currently supports 26 early childhood clinical specialists, three supervisors, and a Program Manager. All

leadership positions are currently filled and 16 of the 26 early childhood clinical specialist positions are filled. DBH is recruiting for the remaining clinical specialists.

During FY 22 the Healthy Futures program provided services in 85 child development centers and 17 home providers for a total of 102 locations. When fully staffed, Healthy Futures will have a maximum capacity of 182 CDCs.

While most CDCs reopened in FY22, some centers continued to struggle to stay open consistently. Many centers have closed intermittently due to continued COVID-19 concerns. The early childhood clinical specialists worked with child development centers and homes virtually and in person to provide as many services as possible.

The early childhood mental health specialists served 7,571 children across 102 facilities. Healthy Futures specialists provided 65 parent workshops, 384 parent consultations and 1,354 director consultations. Centers referred 132 children to Healthy Futures for child-specific support and 116 of those children's families signed consent to allow individual observations and interventions. The Devereux Early Childhood Assessment (DECA) was completed for children who received child-specific consultation services. Of the 116 children whose family signed consent 116 received an initial DECA and 70 received a post DECA. Of those children with follow-up DECAs, all showed improvement in at least one area of concern (attachment, initiative, and self-regulation).

Healthy Futures continues to provide consultation and education to early childhood directors on the positive impact of working with children that exhibit challenging behaviors rather than expelling them from their programs. Through Healthy Futures, CDC staff developed policies, skills and resources that help minimize expulsion as an option for children with challenging behaviors. In FY 22, there were zero expulsions of the 7,571 children served from child development facilities where the Healthy Futures Program was implemented; no children have been expelled from a child development center in FY 23 to date. See Attachment 2 for additional utilization data.

Healthy Futures has continued its collaboration with the Office of the State Superintendent Office's (OSSE) Quality Improvement Network (QIN) and Pre-K Enhancement program (PKEEP). Through this collaboration with OSSE and the QIN Hubs (UPO and Easter Seals) the Healthy Futures consultants provide self-care and trauma informed practices workshops to the staff of the participating child development centers and homes.

During FY21, the Healthy Futures received $2,518,348 in local funds and $831,007 intra-district funds from the Office of State Superintendent of Education (OSSE). All the intra-district funds and most of the local funds were for personnel services. Of the local funds, $81,000 was budgeted for contracts, $54,000 for equipment, and $1,527 for supplies.

In FY22, DBH received $2,700,767 in local funds, $831,007 in intra-district funds, and $480,412 from the American Rescue Plan Act (ARPA). The ARPA funds were allocated for the Healthy Futures Treatment Pilot. In FY 22, all the intra-district funds and most of the local funds were

for personnel services.  Of the local funds, $171,000 was budgeted for contracts, $54,000 for equipment, and $1,527 for supplies.

In FY 23, DBH received $3,136,166 in local funds, $864,668 in intra-district funds, and $480,412 in ARPA funds.  Again, most of the local funds and all the intra-district funds were allocated for personnel services.  Of the remaining local funds, $171,000 was budgeted for contracts, $54,000 for equipment, and $1,527 for supplies.  Nearly $700,000 was placed in an incorrect category (i.e., non-personnel categories– maintenance of persons and subsidies) and must be reprogrammed into the personnel category.

| FY 21-FY 23 Healthy Futures Budget | | | |
|---|---|---|---|
| | FY 21 | FY 22 | FY 23 |
| Local Dollars - Personnel | $ 2,381,821 | $ 2,474,240 | $ 2,209,174 |
| Local Dollars - Non-Personnel | 136,527 | 226,527 | 926,992 |
| Intra-District - Personnel | 831,007 | 831,007 | 864,668 |
| ARPA - Personnel | 0 | 228,412 | 228,412 |
| ARPA Funds - Non-Personnel | 0 | 252,000 | 252,000 |
| Total | $ 3,349,355 | $ 4,082,186 | $ 4,481,246 |

  *c.  Please provide an update on the DC MAP contract.*

After a competitive procurement process through the Office of Contract and Procurement, Paving the Way Multi Service Institute was awarded the contract to deliver DC MAP services on October 14, 2021.  After a transition period, they began providing services in November 2021. DC MAP offers primary pediatric care providers (PPCPs) telephone consultation (Monday-Friday, 9am-5pm) from a team of mental health professionals, including psychiatrists, psychologists, social workers, and care coordinators. In addition to answering mental health-related inquiries about specific children (e.g., questions about community resources that would be appropriate for the family, medication questions), the DC MAP team also provides education and technical assistance for PPCPs to identify and address mental health issues in primary care.

DC Health is providing funding through its HRSA grant to support the DC MAP initiative.  This includes funding to expand training opportunities for PPCPs on the use of telehealth and cultural competency; to establish a regional consortium of telehealth practices that includes the Virginia Mental Health Access Program (VMAP) and the Maryland Behavioral Health Integration in Primary Care Program (BHIPP); to create new data entry fields in the software platform managed by DC MAP which will allow the  collection of information on every patient served and track connections to care and referrals; develop a referral system to school-based mental health for patients identified as needed behavioral health services and supports;  and develop

partnership and be a telehealth resource that addresses the needs of children, birth through five years of age with DC Health Help Me Grow.   To meet the requirements of DC Health's  HRSA grant, Paving the Way continues its collaborations with other MAP programs and with local community partnerships including the DC Collaborative for Integration of Mental Health in Pediatric Primary Care.

Another aspect of the HRSA grant is for grant recipients to provide training on behavioral health topics to pediatric primary care providers and to produce a PPCP telehealth manual.  Paving the Way is working in collaboration with Concert Health, as stipulated in their joint agreement, to provide this service.  In FY 23, Concert Health will also focus on the provision of technical assistance to local practices for integrating behavioral health into primary care and continued primary care provider education.  Paving the Way will pilot partnership and referral process to support School Based Health Centers capacity to meet the medical and behavioral needs of children and youth with identified behavioral health concerns.

In FY 22, 176 providers were enrolled in DCMAP and received a total of 271 consultations.  As of first quarter FY23, there are a total of 182 pediatric primary care providers enrolled in DC MAP.  The DC MAP Pediatric Primary Care Mental Health team continued to see an increase in the utilization of referrals and care coordination.  For the first quarter of FY23, there were183 consultation requests which is a 105% increase from first quarter FY22 which had a total of 81 consults.

See
Attachment 1 of 2. List of Healthy Futures Child Development Centers
Attachment 2 of 2. Healthy Futures Utilization Data

42. Please describe what substance abuse services are offered to children and youth, the process for obtaining these services, and detail how DBH partners with District schools (DCPS, charters, and private schools) to provide services and education to children and youth on the dangers and harm of substance abuse. Please describe how DBH uses data from the DC Youth Risk Behaviors and Academic  Achievement Report (YRBS) to inform the work and better serve District youth.  Please include:
   a. The total number of children and youth who received substance abuse services in FY 2022 and FY 2023, to date. Please breakdown by consumer age, consumer home ward, ward where services took place, how many were in-person/virtual/hybrid, and the types of services;
   b. The total number of agencies or organizations that provided substance abuse services to children and youth. Please provide (via Excel spreadsheet) a list of the agencies and organizations that provide substance abuse services to children and youth. Include their location, Ward, how many children and youth they served in FY 2022 and FY 2023, to date, the format of their services (virtual/in-person/hybrid), what services they provided, and contact information (staff contact, email address, phone number, and website);
   c. Where there are gaps and if there are plans in FY 2023 to fill these gaps or expand the types of substance abuse services offered to children and youth; and

    d.  The number children and youth who received services through the Adolescent Community Reinforcement Approach (A-CRA) in FY 2022 and FY 2023, to date.

**DBH Response**

The substance use services offered to children and youth within the District of Columbia include substance use disorder (SUD) prevention services, treatment, and recovery support services (RSS). SUD prevention services are delivered primarily through DBH's four (4) DC Prevention Centers (DCPCs) and the youth treatment and recovery support services are made available through DBH's two (2) Adolescent Substance use Treatment Expansion Program (ASTEP) providers. During FY2022, there were three (3) ASTEP providers. One provider, Federal City Recovery Services, terminated their youth treatment program on August 15, 2022. With the closing of its program, Federal City Recovery Services worked with the two (2) remaining ASTEP providers, Hillcrest Children and Family Center and Latin American Youth Center (LAYC) to ensure the seamless transition of youth enrolled in their program to other treatment services.

DBH has been able to provide sub-grants to both its prevention and youth treatment providers through the federal funding received from the Substance Abuse and Mental Health Services Administration (SAMHSA). The DC Prevention Centers focus specifically on educating residents about the dangers and harms of substance use in order to prevent and/or delay the onset of alcohol, tobacco, and other drug use. The ASTEP providers, through the Federal SAMHSA grant, DC Changing and Improving Treatment for our Youth (DC-CITY), offer non-Medicaid billable services such as outreach and engagement for youth referred to SUD treatment and Recovery Support Services (RSS).

The SUD prevention services provided by the four Prevention Centers include workshops and trainings on SAMHSA's Strategic Prevention Framework (SPF) – an approach for developing strategies aimed at addressing and preventing substance use among District youth, engaging and conducting outreach to residents through community events such as health fairs, and fostering the leadership skills of youth via the respective Youth Prevention Leadership Corps (YPLCs). The DCPCs have also worked to create formal partnerships with local middle and high schools within their wards to promote the prevention of substance use. The Centers have been able to work directly with the Community Based Organizations (CBOs) and School Based Clinicians to expand their efforts to include a focus of substance use prevention. This includes conducting presentations in classrooms and school assemblies on the harms and dangers of substance use, the adoption of curricula aimed at preventing drug use "Too Good for Drugs," and establishing school specific YPLC.

The two ASTEP providers, Hillcrest Children and Family Center and LAYC, provide both mental health and substance use services to youth within schools. Both providers have created a mechanism for making internal referrals to youth SUD treatment and recovery support services for those students who may be in need. In FY2022, school referrals made up 15% of the total

number of referrals made to the ASTEP providers for service. The ASTEP providers also receive referrals from individuals making self-referrals, agencies such as the DC Department of Youth Rehabilitation Services (DYRS) and the Child and Family Services Agency (CFSA), and from other youth serving entities. Once referrals are made, the ASTEP providers conduct outreach and engagement, assess the youth to determine the appropriate level of care, and then enroll youth into the services that can best address their substance use needs.

The Youth Risk Behavior Survey (YRBS) data which as compiled and analyzed by the Office of the State Superintendent for Education (OSSE) is critical to DBH's SUD efforts. One of the ways in which these data have been used is in the development and targeting of social marketing strategies. For example, one key data variable in the YRBS reports is the age of marijuana and alcohol use. In determining what content or graphics would resonate the most, DBH looks at the age of on-set as reported by middle school and high school students. The data is compared across years where the survey was administered to observe whether the age of first use is trending upwards or downward. This data was also used as a guide in purchasing the "Too Good for Drugs" curricula for the grade levels likely to have the greatest impact in preventing and/or delaying the on-set of drug use. In addition, the YRBS data presents a picture of substance use frequency, particularly past 30-day use. DBH uses this trend data to identify the substances that are most popular among youth, and then prioritizes these substances for the programs and social marketing strategies that are selected, developed, and/or implemented.

a. DBH has a full continuum of substance use services for youth which includes prevention, treatment, and recovery. Regarding prevention services rendered, *Table A* below shows that during FY2022, the DC Prevention Centers (DCPCs) served a total of 6,266 individuals aged 24 and younger through information dissemination, social marketing engagement, and Youth Prevention Leadership Corps (YPLC) activities. During the first quarter of FY2023, a total of 763 individuals have been served. Historically, broader reaching events have taken place in the spring and summer months, thus we anticipate that the number of children and youth reached will increase significantly during the third and fourth quarters of FY2023.

**Table A**

| Substance Use Prevention Services Offered to Children and Youth in FY2022 | | | |
|---|---|---|---|
| Number of Youth | Service Wards | Delivery Method | Types of Services |
| 6,266 | Wards 1&2 = 775 | Hybrid (combination of virtual and in person sessions) | Information dissemination, social marketing engagement, and YPLC activities |
| | Wards 3&4 = 1,357 | | |
| | Wards 5&6 = 3,257 | | |
| | Wards 7&8 = 877 | | |
| Substance Use Prevention Services Offered to Children and Youth in FY2023 | | | |
| Number of Youth | Service Wards | Delivery Method | Types of Services |
| 763 | Wards 1&2 = 60 | Hybrid (combination of | Information dissemination, social |
| | Wards 3&4 = 76 | | |
| | Wards 5&6 = 513 | | |

| | Wards 7&8 = 114 | virtual and in person sessions) | marketing engagement, and YPLC activities |
|---|---|---|---|

As it pertains to youth treatment and Recovery Support Services (RSS), DBH has experienced a steady increase in the number of youths enrolling into SUD treatment and RSS in FY22.  As noted in the table below (*Table B*), in FY2022, a total of 119 youth enrolled in services.  This is a significant increase compared to the 74 who were served in FY2021.  In the first quarter of FY2023, 31 additional youth enrolled in services.  A unique identifier is used to identify the youth who receive services from the ASTEP providers. Only the location of the agency that rendered the service is recorded.  As a result, the addresses for clients is not captured in this data. .  The wards corresponding with where the ASTEP providers physical buildings are located and the subsequent services that were rendered are included in the table. It should be noted that ASTEP providers see youth from all Wards , in schools and through telehealth applications.

*Table B*

| Substance Use Treatment and Recovery Support Services Offered to Children and Youth in FY2022 | | | | | |
|---|---|---|---|---|---|
| Number of Clients | Age | | Service Wards | Delivery Method | Types of Services |
| 119 | 11 y/o = 1 | 17 y/o = 23 | Wards 1, 2, and 8 (location of provider offices) | Hybrid (combination of virtual and in person sessions) | Individual Counseling, Group Counseling, A-CRA, RSS |
| | 12 y/o = 1 | 18 y/o = 19 | | | |
| | 13 y/o = 5 | 19 y/o = 14 | | | |
| | 14 y/o = 10 | 20 y/o = 8 | | | |
| | 15 y/o = 23 | 21 y/o = 4 | | | |
| | 16 y/o = 11 | | | | |
| Substance Use Treatment and Recovery Support Services Offered to Children and Youth in FY2023 | | | | | |
| Number of Clients | Age | | Service Wards | Delivery Method | Types of Services |
| 31 | 13 y/o = 6 | 18 y/o = 2 | Wards 1, 2, and 8 | Hybrid (combination of virtual and in person sessions) | Individual Counseling, Group Counseling, A-CRA, RSS MET/CBT |
| | 14 y/o = 7 | 19 y/o = 2 | | | |
| | 13 y/o = 4 | 20 y/o = 2 | | | |
| | 16 y/o = 2 | 21 y/o = 1 | | | |
| | 17 y/o = 4 | 22 y/o = 1 | | | |
| | | | | | |

b. To provide substance use disorder  (SUD) prevention, youth treatment, and recovery support services, DBH works with a number of partners.  This includes four DBH funded  Prevention Centers (DCPCs) which are strategically located throughout the District of Columbia and provide services to all eight (8) wards.  DBH provides supplemental funding to the Adolescent Substance use Treatment Expansion Program (ASTEP) providers to support SUD treatment and

recovery support services for youth. In FY2022, DBH had three (3) ASTEP providers. One (1) of the providers closed their youth program in August of 2022, and there are currently two (2) ASTEP providers serving youth through treatment and recovery support services in FY2023.

As requested, information for the organizations providing SUD services for children and youth is included in Attachment 1.

c. DBH through its work with youth, families and the community have identified some gaps within the continuum of substance use disorder services for youth. DBH will implement the following strategies to address identified gaps:

1. **Addressing Opioid Use Disorders:** As more youth are potentially at risk of experiencing Opioid Use Disorders, DBH has sought to expand the options available for youth requiring more intensive SUD treatment services. To that end, during FY2022, DBH began working with Dr. Sivabalaji Kaliamurthy who is an Attending Psychiatrist at Children's National Medical Center, specializing in treating youth with Opioid Use Disorders. In the establishing of this relationship, DBH and its ASTEP providers now have a local intensive outpatient option for youth struggling with opioids and needing support beyond the care that the ASTEP providers are providing. In addition, in FY2023 DBH began engaging a regional partner, the Fairfax County Community Services Board in Northern Virginia. This group is also focused on addressing Opioid Use Disorders among youth and identifying resources for treatment. DBH is working with them to explore and exchange ideas on how to best serve this population.

2. **Limited Evidence Based Interventions and Providers:** In an effort to respond to the diverse needs of youth requiring SUD treatment, DBH has sought to train the ASTEP providers in a variety of evidence-based interventions that have proven to be effective in reducing participants' dependence on drugs. There are currently a limited number of providers trained in and/or providing the Adolescent Community Reinforcement Approach (A-CRA) as a model for treating youth. In March of 2023, DBH is slated to facilitate an A-CRA training for providers to increase the number that are certified to deliver this evidence-based program. Certified staff will be able to train other staff within their organizations using a "train the trainer" model. This certification is critical as it will allow new staff to be trained quickly and will reduce training costs that otherwise would be paid to the national trainer of the program. Additionally, DBH provided training in Motivational Enhancement Therapy (MET)/ Cognitive Behavioral Therapy (CBT) for the ASTEP providers in August of 2022. As a part of its sustainability plan for the DC CITY grant, DBH will facilitate another MET/CBT training for ASTEP providers in FY2023 for new hires.

3. **Access to Treatment:** There are challenges which impact youth accessing SUD treatment. These challenges include whether youth know about the services that exist, how these services can be accessed, and the stigma associated with participating in youth SUD treatment. To address these challenges, non- reimbursable activities such as outreach and engagement are necessary. Through the five (5) year DC Changing and

Improving Treatment for our Youth (DC-CITY) grant that DBH received at the beginning of FY2019, the Agency has been able to provide sub-grants to the youth SUD treatment providers. As the DC CITY grant is focused on the expansion and enhancement of youth SUD treatment services, the ability to assist the ASTEP providers with conducting non-Medicaid billable activities such as outreach engagement has been invaluable to reaching more youth. More specifically, the numbers of youth enrolling in youth SUD treatment and RSS via the DC CITY grant after the providers received funding increased exponentially. The expanded access to treatment contributed to an uptick in enrollment. The table below (*Table C*) displays enrollment numbers the year prior to receiving funding for outreach and engagement (FY2019) in comparison to the years that follow where funding was allocated (FY2020, FY2021, and FY2022).

*Table C*



With the data showing a positive correlation between outreach and engagement activities and increased numbers of youth enrolling into SUD services, DBH has built into its sustainability plan, assisting the ASTEP providers with additional funding to support outreach and engagement staff once the grant expires.

d. In FY2022, a total of 17 individuals received services through the Adolescent Community Reinforcement Approach (A-CRA). While this number seems relatively low, it should be noted that A-CRA is only one of the services provided by the ASTEP providers. Additionally, during this period, there were only two (2) A-CRA trained staff across the three (3) provider organizations.
To date, in FY2023, no children or youth have received A-CRA services because there are currently a limited number of A-CRA providers. DBH is slated to offer an A-CRA training for current provider staff during March of 2023.

43. Please provide an update on DBH's pilot treatment services for the eight child development centers in the areas of the District most impacted by the COVID-19

pandemic. Please include the FY 2022 and FY 2023, to date, budget and expenditures and provide outcomes for the same period.

**DBH Response**

During FY 22, DBH began a treatment pilot for young children and families in child development centers.  Clinicians will be trained in early childhood evidence-based treatments and the program has the capacity to service up to 75 young children and families.  Services will be provided in eight child development centers in communities most impacted by the COVID-19 pandemic. DBH collaborated with OSSE to identify the eight centers. Because DBH is still recruiting two clinicians for the pilot, Healthy Futures clinicians already on staff have been assigned to begin providing treatment services in four centers in early 2023. Center directors now are identifying children who need support and working with the Healthy Futures clinicians to screen and connect with parents.

See Attachment 1 of 2. List of Child Development Centers.

During FY 22 and FY 23, DBH received $480,412 of American Rescue Plan Act (ARPA) funds to support the treatment pilot.   In FY 22, no PS funds were spent as DBH was unable to hire the early childhood treatment clinicians.  DBH spent $150,000 to train the clinicians assigned to the centers on Attachment Biobehavioral Therapy (ABC), an evidence-based program that supports young children and their families.  No supplies or equipment were purchased in FY22.  In FY 23 to date, an evaluation contract was awarded to Georgetown University to assess the implementation and the effectiveness of the treatment program. $85,000 supports the evaluation contract and $2,212 purchased equipment for the ABC program.  DBH continues to recruit two clinicians and will contract to provide additional early childhood training for the clinicians.  Supplies and equipment will be purchased to ensure clinicians have the necessary materials to implement services and supports.

See Attachment 2 of 2 for complete budget information.

44. Please provide an update on the online behavioral health training program for child development facilities and public schools that was launched in FY 2015. How many teachers and other personnel completed the online training in FY 2022 and FY 2023, to date?

**DBH Response**

The Department of Behavioral Health (DBH) continues to provide the online behavioral health training through the portal: http://www.supportdcyouth.com  and all DC administrators and teachers are required to complete the mandated training modules on the same two-year cycle.

All District public and public charter school teachers and principals must complete three DC Youth Behavioral Health Program courses once every two years to be compliant with the legislative mandate. Additionally, it is highly recommended for educators to take the *Step In Speak Out* course for challenges and concerns related to LGBTQ students. This is an additional module that is available within the portal. Early childhood educators, child development center staff, and child development center administrators, must complete *At-Risk for Early Childhood Educators.* This simulation is for those administrators, staff, and educators who work with young children and builds understanding, knowledge, and skills in mental health and behavior management. The Division of Early Learning within the Office of the State Superintendent of Education (OSSE) has the completion of the *At-Risk for Early Childhood Educators* module as part of the yearly health and safety requirements, and all educators must complete their health and safety requirements by September 30, each year.

In FY22, 2,954 DC Public Charter Schools (DCPCS) teachers and other personnel completed the online training and 9,151 have completed the trainings in FY23 to date. For DC Public Schools (DCPS), 614 teachers and other personnel completed the training in FY22 and 16,525 have completed the training in FY23 to date.

In FY22, there were 237 DC Child Development Center Administrators and staff who completed the on-line training. And, in FY23 to date, 361 Administrators and staff have completed the training. The attached documents provide information on the number of DC Public Charter School, DC Public School, and DC Child Development Center teachers and other personnel who have completed the online training in FY22 and FY23 to date.

Q44. Attachment 1 of 3. DC Public Charter School Completions FY22 and FY23 to date
Q44. Attachment 2 of 3. DC Public School Completions FY22 and FY23 to date
Q44. Attachment 3 of 3. DC Child Development Center Completions FY22 and FY23 to date

45. Please provide an update on the High-Fidelity Wraparound program. Please include the following:
   a. Current capacity;
   b. Description of services currently being provided;
   c. Description of how individuals can access these services;
   d. How many individuals were serviced in FY 2022 and FY 2023, to date;
   e. Since MBI was awarded the Care Management Entity (CME) contract in 2017 with a reduced capacity to serve 94 youth in the community, the number of youth who were served in FY 2022 and FY 2023, to date;
   f. Short-term or long-term plans to increase available flexible funding available per youth;
   g. An update on DBH's efforts to transition high fidelity wraparound from a locally-funded pilot program to a Medicaid-funded permanent MHRS service. Share any steps that have been taken to date;

    h.   The number of children who diverted from PRTF placements. Please provide a breakdown for the school and community-based programs; and

    i.   Any outcome evaluations or reports of the program from the past two years.

**DBH Response**

a. The current capacity for High Fidelity Wraparound in FY22 and in FY23 Q1 at any given time is 85 youth.

b. High Fidelity Wraparound is a strength-based, evidence- informed process, led by a Care Coordinator who is responsible for collaborating a team-based planning process where representatives of multiple systems come together with a child, youth, and their family to create a highly individualized plan to address the complex emotional needs of a child or youth.   The individualized plan of care is designed to prevent out-of-home placement and juvenile involvement with the courts.  The plan of care is monitored by the Wraparound Coordinator several times per week to ensure that the family is receiving the required services including the incorporation of informal and natural support for the family. The average length of stay of youth and families enrolled in wraparound in FY22 was 9.5 months.

c. Children and youth are referred by a DBH-certified provider, the Juvenile Behavioral Diversion Program (JBDP), the Office of the Attorney General (OAG), Here Opportunities Prepare You for Excellence (HOPE) Court or the child or youth's family.  A referral can be made through the program's website, wraparound.cftm@dc.gov.   Referrals can also be made by contacting MBI or DBH directly to initiate the referral process.  Once a referral is received, DBH's Wraparound Committee reviews the case presentation. Children and youth who are involved in multiple systems and are at-risk of out-of-home placement are accepted into the program.  Children who meet the criteria for wraparound support are connected to DBH's contracted service provider, MBI.  MBI is required to contact the family within 24 hours to begin the wraparound process.

d. and e. MBI provided High Fidelity Wraparound to 76 youth in FY22 and 52 youth in FY23 Q1.  The capacity of 85 was not met during FY22 due to incomplete referrals and families not willing to engage in Wraparound.

f. Flexible funding is allocated to provide non-reimbursable services required to stabilize the family.  These services may include but are not limited to academic tutoring, community mentorship, financial literacy, entrepreneurship internships, rental and utility assistance, behavior modification programming, recreational activities or connection to specialty behavioral health services not covered by Medicaid such as dialectical behavioral therapy. The average amount available for these nontraditional supports is $1,000.00 per family.  Some youth may need more than the average while others may need far less.  In addition, MBI is expected to identify and maximize both private and public community-based resources to meet each family's basic needs

such as shelter, food, clothing, and income maintenance. There are no plans to increase the current flex spending amount per youth involved in the program.

g. DBH explored the utilization of Medicaid funding for High-Fidelity Wraparound with the Department of Healthcare Finance as part of our behavioral health system transformation efforts. After review of other State Intensive Care Coordination rates and billing structures, DBH and DHCF have advocated that High Fidelity Wraparound be part of the Medicaid State Plan as a reimbursable service under the title of "Intensive Care Coordination (ICC). DBH and DHCF are finalizing regulations, rate, and billing codes for ICC to be a Medicaid billable service the second half of FY23 or the beginning of FY24.

h. One hundred percent of youth involved in Wraparound in FY22 were diverted from treatment in a PRTF. Currently there is not a Wraparound program available in schools, however funding through ESSER-II and Council has allowed for expansion of Wraparound in twelve schools. DBH, through the completion of the contract and procurement process, will contract with two vendors to provide High Fidelity Wraparound in the twelve identified schools and have secured training and coaching through the National Wraparound Implementation Center to support the initiative and fidelity of model. DBH anticipates that the school wraparound program will begin in Spring of 2023.

i. The outcomes for children and youth while they were enrolled in High-Fidelity Wraparound were reported by MBI for FY22 were as follows:
- Ninety-four percent of youth did not receive any additional juvenile charge.
- Eighty-five percent of youth maintained their living placement at time of referral.
- Seventy-one percent of youth showed an improvement in school attendance.
Sixty-eight percent of youth showed a decreased in detention and school suspensions.


**School Based Behavioral Health**

46. What type of assessments are in place for screening students? Does DBH use the Adverse Childhood Experiences assessment? How many students were assessed in FY 2021, FY 2022, and FY 2023, to date?

**DBH Response**

While DBH clinicians do not consistently use the Adverse Childhood Experiences assessment as a screener, DBH understands the importance of screening for events or circumstances that may be traumatic to students, and often uses screeners to guide treatment. School Based Behavioral Health (SBBH) clinicians use a wide range of screeners and assessments to gather information and data regarding student's strengths, weaknesses, and level of functioning. The specific screener or assessment tool is based on the need and the development age of the student. For example, young children who attend Child Development Centers are often assessed using the Ages and Stages

Questionnaire.  Healthy Futures consultants who provide early childhood mental health consultation services support the centers in administering the screener and help to link the children and families to appropriate services when necessary.  Children also are referred to the consultant for child-specific consultation services or to a behavioral health provider in the community.

Young students are also screened if they attend a school participating with Primary Project.  Primary Project is an evidence-based, early intervention and prevention program for young children in pre-Kindergarten/4 through third grade who have been identified with mild adjustment issues in the classroom. Through one-to-one, non-directive play sessions, the program reduces social, emotional and school adjustment difficulties to improve school-related competencies in task orientation, behavior control, assertiveness, and peer social skills. During SY 22-23 Primary Project services are being offered in 9 DC public and DC charter schools.  Four to six weeks after school starts, teachers assess the level of functioning and adjustment of each child in their classroom using the Teacher-Child Rating Scale-Short Form (TCRS-SF).  Based on the results of the screening, children with mild adjustments concerns are referred to Primary Project, and children with more significant concerns are referred to a behavioral health clinician in the school.  During FY 21, Primary Project was not implemented due to the COVID-19 pandemic and all students were learning virtually.  During FY 22, 826 students were screened and in FY 23 to date 1,220 students have been screened using the TCRS-SF.

All clinicians complete a diagnostic assessment (DA) for all students participating in treatment services.  When completing the DA clinicians gather information (i.e., presenting problem, developmental history, family history, history of abuse, social functioning, and trauma history etc.) from the student and parent/guardian.  In addition to the DA, clinicians sometimes complete additional screeners to gather information about a specific topic or concern.  For example, clinicians may use a specific screener to assess anxiety, depression, substance use, or attention difficulties.  The screener helps to provide additional information which aids in creating a comprehensive and effective treatment plan. In addition, clinicians use screeners for students participating in specific treatment programs (e.g., Bounce Back or Cognitive Behavioral Intervention for Trauma in Schools (CBITS) to assess appropriateness for the program.

47. Please provide an update on DBH's School Behavioral Health Program including a list of all schools that have DBH clinicians, CBO clinicians, or both. Please provide:
    a. How much clinician time has been spent on Tier 1, Tier 2, and Tier 3 services;
    b. How many and what percentage of schools have one or more CBO or DBH clinician currently in place;
    c. How many schools do not have an active DBH or CBO clinician;

    d.   How many schools have not been matched with a CBO (Please identify schools without a CBO clinician and provide the reason why one has not been hired);

    e.   How many schools in each cohort that have a School Behavioral Health Coordinator;

    f.   A list of all of the schools in each cohort;

    g.   How many schools in each cohort have completed the School Strengthening Tool;

    h.   How many schools in each cohort have completed the Work Plan;

    i.   What obstacles or barriers to completing the School Strengthening Tool and Work Plan and identifying the School Behavioral Health Coordinator; and how these documents can be accessed by members of school communities including whether this information can be found on the DBH website, MySchoolDC website, or other website.

**DBH Response**

Please see Attachment 1 of 7 which provides a list of all schools that have a DBH, CBO, or both a DBH and CBO provider.

a. In August 2022, the DBH School-Based Behavioral Health Program transitioned to a new data tracking system.  This data tracking system utilizes a QuickBase platform and is called the School Behavioral Health Program (SBHP) Activity Tracker App.  The SBHP Activity Tracker App allows us to track the amount of time clinicians spend on Tier 1 and Tier 2 services.  Prior to the current school year (SY2022-2023), we were not able to capture time spent.  See Attachment 2 of 7 for the number of hours spent on Tier 1 and Tier 2 services. We do not have the ability to track the number of hours clinicians spent on Tier 3 services.

b. Currently, 155 or 61% of the DC Public and Public Charter Schools are staffed with a CBO and/or DBH provider.

c. Currently, 98 Public and Public Charter schools do not have an active DBH or CBO provider. Two of these schools are not participating in the program as the leaders have determined they have sufficient resources to support the behavioral health needs of their students.  Of the remaining 96 schools, 71 schools have a partnership with a DBH clinician and are matched with a CBO and are recruiting for a clinician.

d. Twenty-one schools have not been matched with DBH and/or CBO and four schools are seeking new partnerships.  In addition, nine schools have a DBH clinician but have not been matched with a CBO clinician. Four schools are seeking new partnerships.

Please see Attachment 3 of 7. List of Schools Not Matched.

A total of 86 CBO matched schools are currently vacant. Of these 86 schools, 26 currently have a partnership with DBH.  While CBO partners are actively recruiting to staff these vacancies, workforce shortages and resignations have impacted the ability to hire and retain providers. At the beginning of the current school year (SY2022-2023) there has been an increase in hiring and strategies around workforce development are being explored to increase recruitment and retention.

Please see Attachment 4 of 7 for a list of CBO matched schools with a vacancy.

e. Currently there are 247 DC Public and Public Charter Schools that have an identified School Behavioral Health Coordinator. The number of schools by cohort is provided in Attachment 5 of 7.

f. Attachment 6 of 7 provides a list of schools in each cohort.

g. Modules from the School Health Index which comprise the School Strengthening Tool are no longer the prescribed sole data source for the school-centric assessment conducted annually by school behavioral health teams. This allows schools flexibility to identify and utilize existing school level data sources to complete the annual school-centric assessment and data-driven work plan. In completing the School Strengthening Work Plan, school behavioral health teams identify the data sources and metrics that are informing the work plan. Attachment 7 of 7 provides the number of schools in each cohort with completed annual school-centric assessments.  The denominator used reflects the total number of schools per cohort regardless of whether a CBO clinician is in place or not.

h. Attachment 7 of 7 provides the number of schools in each cohort with a completed work plan.  The denominator used reflects the total number of schools per cohort regardless of whether a CBO clinician is in place or not.

i. Obstacles and barriers to completing the School Strengthening Tool or school-centric assessment and work plan include the limited capacity of those professionals identified as School Behavioral Health Coordinators to manage often various assigned auxiliary roles. Additionally, the School Behavioral Health Coordinator is a role rather than a position. Given the workforce shortage, professionals with a behavioral health background, who are the recommended professionals to serve as School Behavioral Health Coordinators, are reported to already be stretched to fulfill various mandatory responsibilities within their job positions. Additionally, there is often a challenge to having protected time to conduct and participate in the teaming necessary to conduct the annual school-centric assessment and complete and periodically revisit the workplan goals and components throughout the school year. Relying on prescribed modules for the School Strengthening Tool was also noted as a barrier given the desire to have the opportunity to have options and flexibility to use relevant school level data that is already available for use by the school's behavioral health team.

Neither the school-centric assessments nor completed workplans are available on the DBH website, MySchoolDC, or other websites. DBH and its school partners recommend that the individual schools manage and engage the members of their school community on the assessment and workplan goals and how members of the school behavioral health team operationally support the school's priorities for the school year.

Q47. Attachment 1 of 7. List of Schools with DBH, CBO, or Both Providers
Q47. Attachment 2 of 7. Time Spent on Tiers of Services
Q47. Attachment 3 of 7. Schools Not Matched with a CBO
Q47. Attachment 4 of 7. CBO Matched Schools with Vacancy
Q47. Attachment 5 of 7. Schools with a SBHC by Cohort
Q47. Attachment 6 of 7. List of Schools by Cohort
Q47. Attachment 7 of 7. School-Centric Assessment/School Strengthening Tool and Workplan

48. <u>Individual School Breakdown:</u> For each school with a DBH or CBO clinician in place during FY 2021, FY 2022, and FY 2023, to date, please detail the services via an Excel spreadsheet that includes the following:
    a. The number of students who met with a clinician;
    b. The number of students who were referred to care;
    c. The student to clinician ratio for the school;
    d. The most common diagnosis;
    e. The referral source (walk-in, teacher, parent, etc.);
    f. The prevention programs and services that were offered in FY 2022 and FY 2023, to date;
    g. The number of students participating in prevention programs;
    h. Name and contact information for their clinician(s) and School Behavioral Health Coordinator;
    i. Relevant links for clinician websites, social media pages, or other materials;
    j. Plans to expand the prevention program and barriers to expansion; and
    k. A list of current programs that are meeting the existing need for services, and if not, what is being done to meet the total need.

**DBH Response**

a. The cost study mandated in the FY2023 Budget Support Act is currently underway. A rate study on school-based behavioral health services is being carried out by the Public Consulting Group (PCG). The PCG team has created a survey to directly collect information from all the Community Based Organization school providers. The survey will be used to better understand the current state of the overall services being provided, the reimbursement level for treatment services within the school-based behavioral health program and identify any challenges providers are facing with regards to providing all three tiers of the model. The study will ultimately determine if the current level of local funding and third- party reimbursement for treatment services covers the full cost of implementing the full model of services in each school.

The data collected from the providers will be analyzed to help DBH determine the true financial cost of the services provided within the school based behavioral health program.
A Comprehensive Cost Survey was sent to all CBOs to collect data on staffing, costs, and revenue. The data collection period runs from October 1, 2022, to December 31, 2022. The deadline for PCG responses is January 31, 2023. In addition, DBH contracted with Child Trends, an evaluation vendor to gather additional information needed to better understand the cost of implementing school behavioral health services.  All information will be included in a report that is expected to be completed for review by DBH by February 28, 2023.  Once completed the findings will be shared with Council, members of the Coordinating Council on School Behavioral Health, and at the DBH monthly provider meeting with the Department of Health Care Finance.

b.   DBH and the Community Based Organizations (CBOs) who are providing the services through the school based behavioral health expansion initiatives have contracts with the Managed Care Organizations (MCOs) and the clinicians are billing for treatment services.  Some CBOs have been successful with contracting with private insurances; however, barriers continue to exist.  Based on location of the services, some private insurers have refused to panel clinicians.  DBH is working to alleviate some of these barriers, by working with the District's Insurance Commissioner.  Currently, clinicians bill for treatment services for all Medicaid clients.  Prevention and early intervention services are not reimbursable in the current State Medicaid plan. The cost of these services is supported with funding from the DBH local budget allocation.

c.   The findings and recommendations from the cost study will help to inform any necessary shifts or revisions to the funding structure within the School Based Behavioral Health Program. DBH will incorporate these findings to determine the future financial model in collaboration with the Department of Health Care Finance and the provider community.

49. Please provide an update on the implementation of the SBBH funding model that includes the following:
   a. The status of the cost study mandated in the FY 2023 Budget Support Act, the timeline for publication, and how the findings will be shared;
   b. An update on the extent to which CBO and DBH clinicians have been able to bill their services to Medicaid, private insurance, or other sources of funds outside of local dollars.  Please also discuss plans to bill additional services in the future; and
   c. Plans for the financial model being re-evaluated or revised and the data DBH will use to make decisions.

**DBH Response**

The DC CoP advances the District's Comprehensive Expansion of School-based Behavioral Health Services by inviting School Behavioral Health Coordinators (SBHCs), Community Based Organization (CBO) and DC Department of Behavioral Health (DBH) clinicians, along with other members of the school-based teams, to participate in a peer learning environment aimed at building capacity to implement high-quality school-based behavioral health practices that supports a comprehensive school behavioral health system.

a. The following structural adjustments were made to the DC CoP based on emerging needs of community members and shifting funding priorities:

- Monthly CoP meetings now alternate between mornings and afternoons (e.g., January 3:00 - 5:00 pm; February 9:00 - 11:00 am) to accommodate different schedules of the CoP members.
- The Youth-Adult Partnerships Working Group grew out of youth engagement efforts. The Workgroup is focused on: amplifying the voice of students to address behavioral health and wellness issues that are most important to them; providing opportunities to work on shared messages and activities with adults; and building capacity of students to support their peers.
- A Primary Care and School Behavioral Health Collaboration Working Group was formed to explore ways the DC CoP can support better coordination between pediatric providers and school behavioral health teams to ensure continuity of care for children and families.
- New facilitators were recruited to support the Teacher Wellness Work group and Positive School Climate/Social and Emotional Learning Implementation Practice Group.
- The Crisis Response and Intervention Practice Group merged with the Suicide Prevention Working Group, which was formed last year in response to systemwide data showing the critical need to address suicide ideation and attempts, as part of their ongoing work.
- The School Leadership and Clinical Supervision Practice Group was dissolved in 2021. This group was integrated into DBH's bi-weekly supervisor's meeting.

The CoP plans for FY23 include:

1. Continue to reach new members through promoting CoP learning spaces and resources.
2. Continue to increase the number of school teams (2+ individuals working in the same school) who attend DC CoP events regularly.
3. Continue to promote the application of Tier 1, Tier 2, and Tier 3 practices within a multi-tiered system of supports (MTSS) framework to achieve the goals of the School Strengthening Work Plan (SSWP).
4. Expand foundational trainings (e.g., MTSS, grief and loss) and promote the practical applications of interventions.
5. Improve communication around services available and how to access them, especially for caregivers and youth. Continue to increase access to resources developed/shared through the CoP (e.g., increase use of padlet, including links to CoP resources in the CoP newsletter).
6. Continue providing Social Work and Psychology CEUs for the CoP meetings.
7. Collaborate with the CoP and Core Team Members to identify strategies for sustaining the effective components of the CoP in the future.

b. and c.  The attachment provides FY 2021, FY 2022, and FY 2023 to date information on b) implemented and c) planned events, trainings, meetings, and information informed by what is of the interest of the DC CoP members at the current point and time.

d. The timeline for fully establishing the processes and protocols needed to support the DC CoP is approximately 18 to 24 months. Although the Expansion does not define the term "fully established," the DC CoP uses five stages of a CoP (Wenger, McDermott, and Snyder, 2002) to measure community development. The DC CoP has consistently met the milestones each year and has advanced through four of the five stages of development since school year (SY) 2019-2020.  The DC CoP is currently in the Self-sustaining and Stewardship phase.  The CoP fully matured in terms of key leaders, structures, processes, and protocols; and many aspects of the community are now self-sustaining (e.g., practice groups), and outreach continues.  The DC CoP is working towards the last stage, Legacy, or Transformation, which is the phase where DC CoP members report applying what they have learned from the CoP meetings to improve SBH access and quality.

e. Child Trends has surveyed School Behavioral Health Coordinators (SBHCs) for the past two school years. As a part of that survey, they asked SBHCs to share their experiences with eight different types of resources: DC CoP; tip sheets and best practice guides; training related to the use of planning tools; training related to the use of data; other professional development (i.e., trainings, etc. provided outside of the DC CoP); technical assistance; CQI data provided by DBH and partners; support from community partners. They asked respondents to classify each resource using the following categories: (1) useful, (2) not useful, (3) have not used the resource, and (4) not familiar with the resource.

In 2021, when ranked by the percentage of respondents that classified resources as helpful, the top three resources were:

1. Other professional development (70.8%)
2. DC Community of Practice (68.8%)
3. Technical assistance (64.1%)

In 2022, when ranked by the percentage of respondents that classified resources as helpful, the top three resources were:

1. Other professional development (49.5%)
2. Tip sheets and best practice guides (47.6%)
3. DC Community of Practice (46.4%%)

Every resource in 2022 had a smaller proportion of respondents classifying it as helpful when compared to the previous year. Notably, the proportion of "have not used" responses for both other professional development and DC Community of Practice were much higher in 2022 compared to 2021 (30.1% vs 11.7% for other professional development and 33.7% vs 11.7% for the DC CoP). This trend was consistent across nearly all the resources Child Trends asked about in the survey.

Data from a separate survey of school staff (e.g., behavioral health clinicians) offers context for understanding the increase in the proportion of SBHCs that did not use resources. The proportion of staff responding they frequently or almost always felt exhausted (62% vs 48%) or stressed (54% vs 38%) was higher in 2022 compared to 2021. These data suggest that many staff were overwhelmed in SY 2022-2023 and may have had limited capacity to engage with available resources.

With respect to plans for evaluating the DC CoP, Child Trends plans to continue with the plan that has been in place for the past year:

1. Child Trends will continue to survey SBHC, clinicians, staff, families and students to learn more about the effectiveness of the DC CoP
2. Child Trends will continue to request that the DC CoP collect information through their pre-registration survey and evaluation survey on whether participants have applied skills/knowledge gained through participation in the DC CoP in their work.

DBH believes that the combination of data from SBHCs, clinicians, school staff, families and students (which will capture both participants and non-participants of the DC CoP) is likely the most efficient way to understand the role of the DC CoP in building the capacity of school teams to address the behavioral health needs of students, families, and staff and to measure the effectiveness of the Community of Practice.

Q50. Attachment 1 of 2. CoP Event Meetings Planned and Actual Participants
Q50. Attachment 2 of 2. CoP Event Meetings Planned Participants

50. Please provide an update on the status of the community of practice for school-based behavioral health. Please include the following information:
    a. Changes to the current organization structure and plans for the future;
    b. List of events, trainings, or other convenings with brief summaries of the purpose of each event, target audience, planned number of participants, and actual number of participants in FY 2021, FY 2022, and FY 2023 to date;
    c. List of planned events, training, regular meetings, or other convenings with brief summaries of the purpose of each event, target audience, and planned number of participants in FY 2021, FY 2022, and FY 2023, to date;
    d. Estimated timeline for fully establishing the community of practice; and
    e. Plans for assessing the effectiveness and utilization rate for the community of practice.

**Adult Substance Abuse Services**

51. Please provide a detailed narrative on DBH's work to promote access to a continuum of quality substance abuse prevention, treatment, and recovery support services. Please include the following:

a. An update on the implementation of DBH's outpatient methadone maintenance treatment programs and clinics. Please include a list of providers providing these services;

b. An update on the Prescription Drug Monitoring Program;

c. An update on the Safe Syringe Exchange program;

d. An update on DBH's Peer Support Specialist program and the Peer-Operated Centers; and

e. The number of Peer Support Specialist for FY 2021, FY 2022, and FY 2023, to date.

**DBH Response**

In partnership with its grantees and community partners, DBH continues to lead the effort to promote and enhance access to the full continuum of quality substance use prevention, treatment, and recovery support services in the District.  We utilize the following pathways / strategies to achieve these goals:

*Web based Resources*
A key component of our strategy to increase access to community services aggressive promotion of the DBH sponsored web site.  This site provides information about accessing prevention, treatment, and recovery support services. Prevention information and resources about the DC Prevention Centers can be accessed via https://dbh.dc.gov/node/109292; information about accessing treatment through the DBH Assessment and Referral Center and DBH-certified treatment provider network can be found at https://dbh.dc.gov/page/substance-use-disorder-services; youth specific treatment information is available at https://dbh.dc.gov/node/107042; and recovery resources are available at https://dbh.dc.gov/node/109902. DBH also partners with DC Health through its MyRecoveryDC initiative to provide updated, ward level information and resources, as well as access to individuals with lived experience for support. DBH also participates in the Network of Care, another web based resource which provides information about local behavioral health resources. Lastly, through Twitter and other web based platforms, DBH pushes daily messages about accessing services and supports, as well as highlighting the important work of community providers and partners.

*Social Marketing*
In FY22, DBH launched the *"Hope" Campaign* ("This Time It is Different"), which targets individuals who need to be engaged or re-engaged in treatment by promoting the District's treatment, recovery services and supports. As part of this campaign, by texting *"Ready"* to 888-811, an individual receives a list of treatment providers who are open and available at the particular time of the text. In addition, all DBH promotional materials list the number for the Access Helpline (24/7 Hotline, discussed below) staffed by behavioral clinicians who can address emergent issues at the time of the call or refer the individual to community providers for on-going care.

*Outreach and Community Engagement*
In FY 22, DBH hired a Public Engagement Director to coordinate outreach efforts and community engagement, leveraging both DBH resources as well as teams within community organizations.  These outreach teams provide support, training, distribute educational materials at community and pop-up events, and conduct community outreach in specified neighborhoods with the highest needs, engaging our most vulnerable citizens.

In the Spring of 2023, through the State Opioid Response (SOR) grant, DBH plans to launch an Opioid Ambassador's training, which will give community stakeholders an in depth overview of DBH's services and supports to enable them to spread the word throughout their communities regarding how those in need can best access services and supports.

*Access HelpLine*
Through the above pathways, we emphasize to community partners and those seeking care that our Access HelpLine at 1(888)7WE-HELP or 1-888-793-4357 is the most expedient and efficient means to connect to a DBH or certified, community behavioral health provider. This 24-hour, seven-day-a-week telephone hot line, staffed by licensed and trained, behavioral health professionals, serves as our Crisis and Triage hub: providing crisis management, counseling, information regarding community services, authorization for care and referrals to emergent services, as well as routine care in the community. The AccessHelpLine also receives calls from the "988" National Suicide Prevention Life Line emanating from the District.

   a.  In December 2022, the three community Opioid Treatment Programs (OTPs) (listed below) had 1,292 individuals enrolled. The majority of the individuals served were on Medicaid (718) and Medicare (319), while 126 were supported by local funds, and the remainder were self-pay (75) or commercial insurance (54). Since the COVID-19 public health emergency, the OTPs have been challenged by workforce shortages, which has forced them to limit or discontinue weekend hours. Fortunately, during this period, the Federal government has loosened regulations around take-home medication, which has allowed for increased take-home doses for all patients, including newly enrolled or "less stable" patients.

   During the public health emergency, the OTP clinics provided care through virtual means (including group therapy, one on one sessions, and educational forums).  Since many of these consumers have limited incomes and have no cell phones or computers, they have difficulty engaging in treatment via telehealth.  In response to this potential barrier to care, DBH plans to launch a Telehealth Expansion Initiative this year to provide at risk individuals not consistently engaged in outpatient care a smart phone in order to connect to their provider via telehealth and ensure their continued engagement in care.

   In addition, a number of community based Telehealth stations will also be distributed throughout the community to enhance access and connectivity to providers across a number of underserved communities.  At the same time, the OTP clinics are also working to increase in-person attendance through a number of incentives for consumers (through food, small perks, etc.) in order to increase in person attendance in spite of the lingering

effects of COVID.

The three current community based OTPs are listed below.  In addition, OTPs are also located at the DC Jail and the Veterans Administration:

> Behavioral Health Group (BHG)
> 1320 Good Hope Road SE
> Washington, DC 20020
>
> Medmark (Formerly Foundation for Contemporary Mental Health - Partners in Drug Abuse Rehabilitation and Counseling [PIDARC])
> 2112 F Street NW
> Suite 102
> Washington, DC 20037
>
> United Planning Organization (UPO)
> 1900 Massachusetts Avenue SE
> Bldg. 13
> Washington, DC 20003

b.  The DC Prescription Drug Monitoring Program (PDMP) was implemented in 2016 by DC Health. Since the program was launched, annual PDMP queries have increased from roughly 85,000 in 2016 to over 300,000 in 2021 (the DC Health 2022 report has not been released.)  In April 2019, the Opioid Overdose Treatment and Prevention Omnibus Act of 2018 became effective, which required that all practitioners authorized to prescribe or dispense in the District are registered with the DC PDMP. Most recently in March 2021, the Prescription Drug Monitoring Program Query and Omnibus Health Amendments Act of 2020 became effective, which required both prescribers and dispensers to query the PDMP prior to prescribing or dispensing an opioid or benzodiazepine medication for greater than a 7-day supply, and every 90 days thereafter during the course of treatment. The DC PDMP currently exchanges data with 27 jurisdictions through interstate interoperability agreements. Other services offered through the program include PDMP-EHR integration, quarterly 'Prescriber Reports,' and provider training sessions. DBH participates on the PDMP Advisory Committee, which meets several times each year to review data and implementation progress.

c.  The District currently has four sanctioned syringe service programs (SSPs). Bread For The City provides syringe services out of their NW and SE primary care clinics. The three mobile SSPs are operated by Family and Medical Counseling Services, Inc. (FMCS), HIPS, and Us Helping Us / People Into Living Inc. (UHUPIL). Prior to FY23, DBH provided SOR funding to DC Health's HIV/AIDS, Hepatitis, STD and TB Administration (HAHSTA) for mobile SSP operations at FMCS and HIPS. In FY22, HAHSTA reported that the four SSPs provided services to 12,583 clients and exchanged a total of 864,914 syringes.

In August 2022, DBH competed a $2.3 million annual grant to support mobile SSP services as one of our key SOR initiatives. FMCS, HIPS and UHUPIL successfully competed and were awarded a base grant in FY23 with four option years, contingent on continued funding. In addition, DBH is providing an additional $140,000.00 of local funding in FY23 for the purchase of syringes due to a Federal law prohibiting the purchase of syringes with Federal grant funds. The SSP grant will formally kick off on January 27, 2023. Required grant deliverables include: syringe exchange, naloxone and fentanyl test strip distribution, overdose prevention education, responding to overdose spikes / clusters, and facilitating access to medication for opioid use disorder for individuals experiencing access barriers to traditional office-based treatment settings. This grant will also support additional staff positions to expand weekend and evening hours.

d.  Due to the pandemic, the Peer Specialist Certification Training Program resumed in person training in July 22. The training program builds on the experience of people in recovery with training in foundational competencies required by anyone who provides peer support in behavioral health services. To date in FY 23, ten peers have been certified. DBH is also continuing to recertify peers who meet the requirements.

The DBH Peer Support Specialist Certification Training Program is currently accepting applications for three six week classes scheduled on the following dates:
- February 13-March 21
- March 27-April 27
- June 5-July 10

Also, in an effort to increase peers in the District of Columbia, the program is offering waiver testing for individuals who have a current certification from another state or jurisdiction and are in good standing.

There are currently four peer-operated centers (POCs).  During FY 22, POCs offered naloxone training, recovery plan support, and support groups on a variety of topics such as harm reduction and wellness. They connected people to services and resources to support individual recovery plans and personal needs, such as acquiring supplemental food sources.  POCs will continue this work in FY 23 by evaluating community needs and trends in order to tailor supports to meet real-time demands.

e.  The total number of Certified Peer Support Specialists was 141 for FY 21, 128 for FY 22, and 144 for FY 23 to date.

52. Please provide a narrative on DBH's strategy for addressing the District's opioid crisis including an update on the Lifelong DC strategic plan. Please include the following:
   a.  The number of DBH staff dedicated to opioid prevention and response;

b. An update on the Opioid Fatality Review board including a list of board members and participating organizations;

c. A list of locations (including ward) where the public can get Naloxone;

d. The number of Naloxone that was distributed in FY 2021, FY 2022, and FY 2023, to date. If possible, provide a list of the locations and the number of Naloxone that was distributed at each location;

e. The number of Naloxone trainings conducted in FY 2021, FY 2022, and FY 2023, to date;

f. A spreadsheet listing the 23 faith-based institutions detailing their work in FY 2021, FY 2022, and FY 2023, to date. Please include the types of services provided and the grant amounts each institution received;

g. The number of clinicians and other staff conducing assessments at the Assessment and Referral Center (ARC) in FY 2021, FY 2022 and FY 2023, to date;

h. How many assessments were done through the ARC in FY 2021, FY 2022, FY 2023, to date;

i. An overview of the assessment and referral process at the ARC; and

j. How many calls the Access Helpline received related to opioid addiction in FY 2021, FY 2022, in FY 2023, to date.

**DBH Response**

DBH certifies a network of community-based providers to render the following substance use disorder (SUD) treatment services which are based on the following levels of care established by the American Society of Addiction Medicine (ASAM):
Level 1 Outpatient, Level 2.1 Intensive Outpatient Program, Level 2.5 Day Treatment, Level 3.1 Clinically Managed Low-Intensity, Level 3.3 Clinically Managed High-Intensity, Level 3.5 Clinically Managed High Intensity Adult or Medium Intensity Youth, Level 3.7 Medically Monitored Intensive Inpatient Withdrawal Management.

DBH also provides a range of prevention and recovery services. Many adults with a substance use disorder (SUD) also have a co-occurring mental health disorder. DBH supports integrated care with screening, diagnosis and treatment for both mental and substance use disorders to treat the whole person for the best health outcomes.

SUD providers are located across the District **and** listed at: https://dbh.dc.gov/page/substance-use-disorder-services.

a. *The total number (via spreadsheet) of adults who received substance abuse services in FY 2022 and FY 2023, to date. Please provide breakdowns by consumer age, consumer home ward, ward where services took place, format (in-person/virtual/hybrid), and the types of services provided;*

Please see Attachment 1. SUD Services Provided.

> b. *Total number of agencies or organizations that provide substance abuse services to adults. Please provide (via spreadsheet) a list of all agencies and organizations that provide substance abuse services to children and youth. Include their location, Ward, how many children and youth they served in FY 2022 in FY 2023, to date, the format of their services (virtual/in-person/hybrid), what services they provided, and contact information (staff contact, email address, phone number, and website);*

There are 27 SUD adult DBH certified providers and  three providers who serve children/youth. Please see Attachment 2. SUD Services Provided and SUD Providers and Youth Data.

> c. *Plans in FY 2023 to expand the types of substance abuse services offered to adults;*

In FY 23, DBH plans to expand the types of SUD services and supports offered to adults in a number of areas: assessment and referral, early intervention services, residential treatment, recovery housing, and the expansion of medication for opioid use disorder programs.

In the spring of this year, DBH plans to open  the District's first Stabilization and Sobering Center (Sobering Center).  The Sobering Center will provide individuals under the influence of alcohol or drugs with person-centered care and a recovery-oriented alternative to law enforcement response or transfer to an emergency department. The DCSSC will include onsite services to screen and assess medical and behavioral health status and address immediate personal needs (i.e., food, bathrooms, shower, and laundry), transportation services, communication support, and other immediate supports. The DCSSC will also provide consumers with referrals to the appropriate ASAM level of care either on-site or in the community and offer care management and coordination directly or through community partners. DCSSC staff will assist with navigation, linkages and referrals to housing, transportation, social services, and other supports to address unmet social needs.   The Sobering Center will be open 24/7 and serve individuals 18 years or older.

During the coming year, DBH plans to fund the establishment of a community-based level 3.5 SUD treatment facility for youth, which would include transitional age youth, in a clinically managed, medium intensive residential program using Federal Substance Use Prevention, Treatment, and Recovery Services (SUPTRS) Block Grant funds. In addition, proposals were submitted to the Substance Abuse and Mental Health Services Administration (SAMHSA) to use SUPTRS funds to support expanded services at the Comprehensive Psychiatric Emergency Program (CPEP) and skilled/long-term care facilities. CPEP provides emergency psychiatric treatment services for individuals experiencing a mental health crisis, however at least 70% have a co-occurring SUD. The funding would support nurses and social workers to provide HIV Early Intervention services to individuals with SUD that are being treated in the CPEP Extended Observation Beds where withdrawal management and buprenorphine induction will be offered.

The majority of individuals experiencing fatal overdoses are older, African American males. To better target this population, DBH proposed to SAMHSA to use SUPTRS funds to create a pilot

SUD unit at long-term care/skilled nursing facility to allow for treatment of individuals traditionally unable to receive SUD treatment in this setting. In addition, SOR funding will support a consultant to conduct SUD training and technical assistance in at least 19 skilled nursing/long-term care facilities with the goal to encourage them to provide medication for opioid use disorder (MOUD) and other treatment in their facilities.

DBH also plans to award SOR grants in the near future to community providers to establish new recovery residences for individuals with stimulant use disorder/opioid use disorder (STUD/OUD). Through this grant, individuals with OUD/STUD will receive intensive care management while living in a safe and monitored recovery residence. Intensive care management includes an assessment of an individual's functional life skills (e.g., personal living skills, social skills, vocational skills and service procurement skills) in order to establish a long-term plan for ongoing recovery. Individuals will not be immediately asked to leave if they return to using; the staff will work with the resident to get back on their recovery path.

Through six new SOR Expanding Access and Retention in Care for Opioid and/or Stimulant Use Disorder Treatment grantees, DBH will implement strategies that reduce barriers to accessing treatment for prospective patients with STUD/OUD, re-engage clients who have unexpectedly or prematurely discontinued their treatment, support current patients to promote retention, and provide whole-person care. By addressing clients' connection to care, this grant initiative will seek to further reduce behavioral health disparities within underserved communities and improve access to behavioral health care services.

The SOR grant has also recently funded three syringe services programs. Two of these programs will be expanding their mobile MOUD programs. The Department of Corrections has requested additional SOR funding to expand their MOUD program by conducting a pilot using Sublocade, which is injectable long-acting buprenorphine. Lastly, the DBH SOR grant is funding four Fire and Emergency Medical Services (FEMS) outreach teams to connect in real-time to overdose survivors to refer them to MOUD and other services and supports and follow up with them as needed.

53. Please describe what substance abuse services are offered to adults and the process for obtaining these services. Please include:
    a. The total number (via spreadsheet) of adults who received substance abuse services in FY 2022 and FY 2023, to date. Please provide breakdowns by consumer age, consumer home ward, ward where services took place, format (in-person/virtual/hybrid), and the types of services provided;
    b. Total number of agencies or organizations that provide substance abuse services to adults. Please provide (via spreadsheet) a list of all agencies and organizations that provide substance abuse services to children and youth. Include their location, Ward, how many children and youth they served in FY 2022 in FY 2023, to date, the format of their services (virtual/in-person/hybrid), what services

they provided, and contact information (staff contact, email address, phone number, and website);

c. Plans in FY 2023 to expand the types of substance abuse services offered to adults;

d. *Types of services and interventions offered;*

**DBH Response:** Saint Elizabeths Hospital provides recovery-based and trauma-informed mental health treatment to District residents with severe mental illnesses. The following services are offered at Saint Elizabeths Hospital: Psychiatric Services, Psychology Services, Nursing Services, Social Work Services, Rehabilitation Services, Physical Therapy, Dental Services, Respiratory Therapy, General Medical Services, Laboratory Services, Pharmacy Services, Barber and Beautician Services, Chaplain Services, Volunteer Services, Consumer Advocacy, Positive Behavioral Support Services, Neurology and Neuropsychology Assessment and Treatment, Infection Control Services, Nutrition Services , Forensic Services, Facilities and Engineering Services, Housekeeping Services, Safety (Security) Services, Materials Management, Transportation Services, and Administrative Services.

e. *The types of mental health professionals providing services at the facility;*

**DBH Response:** Each treatment team includes a psychiatrist, psychologist, general medical officer, psychiatric nurse, social worker, clinical administrator, and behavioral health technicians who along with the individual in care are responsible for identifying treatment goals, objectives and interventions. Mental health services are also provided by rehabilitation therapists, creative arts therapists, chaplains, mental health counselors, licensed practical nurses, certified addictions counselors, positive behavioral support clinicians, and recovery advocates.

f. *Number of adult admissions;*

**DBH Response:**

| Fiscal Year (FY) | Admissions |
|---|---|
| **2021** | 180 |
| **2022** | 189 |
| **2023 (to date 1/18/23)** | 78 |

g. *Number of adult walk-ins;*

**DBH Response:** Saint Elizabeths Hospital does not admit adult-walk-ins. The pathways to admissions at Saint Elizabeths Hospital are through transfer from a community hospital (after up to 14 days stay), or through court order for psychiatric evaluation and/or treatment. The Hospital is a tertiary care (long-stay) facility.

h. *Number of children admissions;*

**DBH Response:** Saint Elizabeths is an adults only psychiatric hospital.

    *i.   Number of children walk-ins;*

**DBH Response:** Saint Elizabeths is an adults only psychiatric hospital.

    j.   *Number of FTEs (broken down by type);*

**DBH Response:** Saint Elizabeth Hospital FTEs by type as of January 18, 2023:

| FTEs By Type | Number | Percentage |
|---|---|---|
| Clinical | 560.95 | 76% |
| Non-Clinical | 173.00 | 24% |
| TOTAL | 733.95 | 100% |

    k.   *Number of open work orders; and*

**DBH Response:** Saint Elizabeths Hospital utilizes its own work order management system. In June 2022, the Hospital transitioned from its old work order system (SiteFM) to Total Maintenance System (TMS). There are 22 work orders open from FY 2022 due to supply chain delays for parts or awaiting preventative maintenance. Since the start of FY 2023, there are 300 open work orders to date (1/18/2023).

    l.   *Major facility upgrades and renovations (including plans for FY 2023).*

**DBH Response:** In FY 2021 – FY 2022, the Hospital completed the renovation and transformation of Therapeutic Learning Centers to livable spaces to provide additional COVID-19 quarantine/cohorting areas. Security upgrades included the installation of card readers on back doors (Hallways A, B, & C), and the installation of sounders and electronic sensors by every exit door. Campus lighting was also upgraded. In FY 2023, the following projects are planned:

- Emergency Power Electrical Upgrade (DGS)
- HVAC Modernization at SEH, Phase I & II (DGS)
- Flooring Upgrade (DGS)
- Thermal Docking Stations/Dinex System (DGS)
- Upgrade Security Surveillance System (DGS)
- Upgrade PA and Lighting Systems – included in Security System Upgrade (DGS)
- Nursing Station Enclosure 2TR (DGS)
- Automated Electronic Key Management System
- Installed Acoustical Ceiling Panels in Rooms
- Repair and Upgrade roadways, pathways, and courtyards
- Replace Doors on units 1C & 1D

**In-Patient Care**

54. Please provide an update on Saint Elizabeths Hospital operations including the following for FY 2021, FY 2022, and FY 2023, to date:
    a. Types of services and interventions offered;
    b. The types of mental health professionals providing services at the facility;
    c. Number of adult admissions;
    d. Number of adult walk-ins;
    e. Number of children admissions;
    f. Number of children walk-ins;
    g. Number of FTEs (broken down by type);
    h. Number of open work orders; and
    i. Major facility upgrades and renovations (including plans for FY 2023).

**DBH Response**

Immediately following this tragic incident, Saint Elizabeths Hospital strengthened its safety protocols including

- doubling the number of nursing staff who conduct evening and night safety checks at 30-minute intervals
- random searches and unannounced visits on the units by the nurse supervisors
- accounting for all utensils after meals and snacks to reduce the risk of their use for harm, and
- routine review of videotapes to make sure safety protocols are being followed

All staff have been retrained on the safety protocols. The Department of Behavioral Health is committed to providing a safe, healing environment at Saint Elizabeths and took appropriate personnel actions including terminations for staff who failed to follow safety protocols in place at the time of the tragic incident.

55. Please share any changes to hospital policies resulting from the tragic incident in March 2022 where a patient was murdered.

**DBH Response**

DBH has contractual agreements with United Medical Center (UMC), Psychiatric Institute of Washington (PIW) and Washington Hospital Center (WHC) to admit and treat patients admitted on an involuntary legal status.  These hospitals are required to notify DBH of all adult admissions and discharges. Admission and discharge notifications to DBH are made through the Chesapeake Regional Information System of Patients (CRISP). All three hospitals are required to participate in CRISP, the District's designated Health Information Exchange (HIE). In addition, DBH receives notification of admissions and discharges for any adult enrolled in a facility participating in CRISP.

DBH does not currently receive live notifications of children admissions and discharges from Psychiatric Institute of Washington or Children's National Hospital. DBH does receive non-live, aggregated data from both hospitals, however, which includes a monthly and weekly count of admissions and discharges after both hospitals have billed DHCF for services. DBH is actively working currently with Qualifacts, owner of the Credible system, to correct this situation in the future so we can have live notifications of hospital admissions and discharges of children concurrent with treatment.

56. Does DBH receive notification of all admissions and discharges for District residents (including children and youth) who receive inpatient behavioral health treatment at either the Psychiatric Institute of Washington (PIW) or Children's National Hospital? If not, what steps are being taken to receive these notifications?

**DBH Response**

DBH has an established discharge policy which provides the required procedures for providers for effective and safe discharges for children and youth. The child/youth's Core Service Agency or (CSA) and/or Community-Based Intervention (CBI) provider is required to participate in the development of an appropriate discharge plan with the individual's family and the hospital staff. Discharge planning must be documented to include the following:

- A face-to-face appointment between the CSA and/or CBI provider and the consumer within seven days of the child/youth's discharge from the facility to the community.
- A scheduled medication somatic appointment for each child/youth prescribed psychotropic medications with the CSA within 10 days of discharge.
- A Child Adolescent Functional Assessment Scale (CAFAS) should be administered to indicate level of acuity and appropriate service needs.
- Plans to have CBI authorized and in place within two days of discharge, if appropriate.

As a part of the discharge planning process, the CSA and/or the CBI Provider coordinates transportation services through the youth's managed care organization. Managed care organizations are required to provide transportation services to their enrollees.

DBH also has Continuity of Care Guidelines which specifically outline the roles and responsibilities of DBH certified providers to ensure engagement with an adult who has been admitted to an inpatient unit and begin discharge planning upon admission.  Providers are expected to engage within 48 hours of admission and within seven days thereafter while hospitalized, and within 30 days post-discharge. DBH monitors timeliness of services post-discharge from a psychiatric hospital for adults as a Key Performance Indicator (KPI).  In FY 22, the performance target was 60% and the actual performance was 54%. The actual performance is consistent with HEDIS reported performance for Medicaid/Medicare plans which ranges from 50.1% to 58.9%.

The, DBH's Integrated Care Division (ICD) within Adult Services administratively authorizes hospitalization for a person admitted in an involuntary legal status. ICD care managers work with the contracted community hospitals and the community provider to ensure discharge planning begins upon admission, that discharge plans are safe and appropriate, and that individuals have adequate transportation home.

57. What specific steps is DBH taking to ensure an effective and safe discharge for District residents (including children and youth)? Please include what type of transportation assistance is provided to discharged residents.

**DBH Response**

DBH conducts oversight of PIW both because of our role as the state authority for behavioral health and because of our contract with PIW to provide acute care services to adults who are admitted in an involuntary legal status for treatment. We recognize, however, that DC Health is the licensing authority for hospitals responsible for ensuring compliance with the law and health and safety standards and we work closely to coordinate our oversight and focus our monitoring activities as appropriate. In addition, our contract for involuntary acute care services requires that a hospital remain in good standing with its regulatory agencies.

During FY 22, when quality of care issues came to our attention, the DBH Accountability Administration conducted an unannounced site visit to review select clinical records, policies and operational practices to determine whether the hospital was complying with DBH's contractual requirements and DC Health policies.  Based on various issues brought to their attention around the same time, a separate site visit was conducted by DC Health to address their concerns regarding PIW's compliance with requirements pertaining to the patient health and safety requirements.

During its review, DBH focused on the care received by patients admitted under the contract for involuntary treatment and whether clinical and quality standards were being met during these admissions. The DC Health audit focused on whether their licensing requirements were being

followed. After the site visits, DC Health and DBH shared information/data regarding their findings. DBH met with PIW's clinical leadership and requested an corrective action plan to address the identified concerns regarding continuity of care, discharge planning, and record keeping errors. DC Health also required a separate corrective action plan from the hospital to address their concerns.

DBH met with PIW monthly to review their progress until satisfied that appropriate corrective actions had been taken. DBH then informed DC Health that the requirements of the DBH corrective action plan had been met and that PIW was adhering to the requirements of their contract.

58. How does DBH coordinate with DC Health to ensure that the Psychiatric Institute of Washington (PIW) is adhering to the protections provided in the Mental Health Consumers' Rights Protection Act, including incident reports, investigation, and other risk management requirements?

**DBH Response**

DBH continues to lead monthly meetings of the PRTF Interagency Collaboration Committee which is working to resolve concerns about payments. This Committee is comprised of DBH and all referring government agencies (CFSA, DYRS, CSS, DCPS, and OSSE), the Managed Care Organizations, DC Department of Disability Services, and the Department of Health Care Finance.

OSSE currently has MOUs with CFSA and DYRS to pay for the educational component of "committed" youth enrolled with their agencies who require placement in a PRTF and are reviewed and approved for placement by the PRTF Review Committee. However, there is no policy in effect that governs whether or how payment for educational services will be paid for "non-committed" youth or youth in general education without an IEP who have no other agency involvement other than needing mental health services. DBH, DHCF, and OSSE continue to explore viable processes and procedures through the PRTF Interagency Collaboration Committee to develop a standardized process regarding the referral process for these youth and how the educational component of these placements will be financially supported.

59. Please provide an update on the work of DBH, OSSE, and the Psychiatric Residential Facility (PRTF) Interagency Collaboration Committee regarding youth placed in PRTFs, with and without Individualized Education Plans (IEPs). How is the educational component of these placements financially supported? Please provide relevant documents (MOAs or MOUs) related to this subject.

**DBH Response**

In FY22, 449 (this does not reflect unique individuals) youth were discharged from a community hospital inpatient psychiatric hospitalization.  Of the youth discharged, 35 youth received CBI with 30 days, seven youth received CBI within 60 days, one received CBI within 61 days and eight were engaged in CBI within 90 days or more.   In addition to CBI, additional Mental Health Rehabilitative Services (MHRS) are available to youth based on recommendations of the discharge plan from hospital. Additional services include medicine management, therapy, community support, substance use services and/or group. Data show of the 449 youth discharged from inpatient treatment, 328 were involved in additional services 30 days upon discharge, 46 were involved 30 days or more, 20 were involved 60 days and more and 24 were in services 90 days or more.

In Quarter 1 of FY23, 102 (this does not reflect unique individuals) youth were discharged from a community hospital inpatient psychiatric hospitalization.  Of the youth discharged, 10 youth received CBI within 30 days, 2 youth received CBI within 60 days and zero beyond 61 days or more.  In addition to CBI, additional MHRS services are available to youth based on recommendations on discharge plan from hospital. Data reflect, of the 102 youth, 65 youth received additional MHRS 30 days or more and 2 youth 60 days or more.

In FY22, 31 youth were discharged from a Psychiatric Residential Treatment Facility (PRTF). Out of the 31youth discharged, 17 youth received CBI with 30 days and 2 youth were seen within 60 days. There were no youth who received CBI after 60 days. The other 12 youth discharged from a PRTF received community support, therapy, medication management, High Fidelity Wraparound and Assertive Community Treatment (ACT). Once youth are discharged, DBH continues to monitor the youth's transition and assess the need for additional behavioral health services.   One youth has been discharged from a PRTF in Quarter 1 of FY23.  Upon discharge, he was enrolled with a CSA and engaged in CBI within 60 days of discharge.

60. In FY 2022 and FY 2023, to date, how many children were discharged from inpatient psychiatric hospitalization or psychiatric residential treatment facilities and received in-home and community-based mental health services?  Please include CBI, intensive care coordination, and intensive case management services—within 30 days, 60 days, or 90 or more days of their discharge.

**DBH Response**

DBH conducts a variety of individual and community-focused activities to address the prevention, early intervention and treatment of trauma related to gun violence using a public health approach and its impact on children, adults, and families.  Broadly, much of the work DBH does directly and through certified partners serves to prevent and reduce violence including

anger management and anti-bullying for children and youth, treatment for substance use disorders and mood disorders, and evidence-based trauma treatment modalities.

This work crosses multiple administrations within DBH and Dr. Richard Bebout, Chief of Crisis Services, serves as the lead in our violence prevention and response efforts.  The Community Response Team (CRT)) is central to many of the activities in which DBH engages.  CRT sometimes collaborates with violence interrupters to assist an individual at risk of perpetrating or becoming a victim of gun violence to access needed behavioral health care, especially treatment for substance use disorders.  CRT also frequently is asked by faith leaders, stakeholders and community leaders to intervene and provide support to communities dealing with loss and trauma, in addition to crisis responses and ongoing outreach in communities at high risk of experiencing violence.  CRT team members provide immediate support to individuals at memorial events in the community and disseminate printed information about behavioral health resources available through DBH and its provider network in every ward in the District.

**Agency and Community Partnerships**. DBH's partnership with DMPSJ and public safety agencies including OUC, MPD, and FEMS are spotlighted at length in our response to Q64 which discusses enhanced crisis services and alternative 911 responses.  In addition, DBH has partnered with many other District agencies to support the Building Blocks DC Initiative under the direction of Linda Harllee Harper and has a number of individuals and families assigned to it within the People of Promise initiative.  These cross-agency initiatives adopt a public health approach to gun violence prevention and target the individuals and neighborhoods at highest risk of being adversely affected by gun violence.

DBH frequently collaborates with MOCRS and ONSE offices with a primary focus of providing detailed information about how to individuals they encounter can access the city's robust array of behavioral health services.  DBH is also targeting and working with key community providers and leaders in the target neighborhoods to conduct ongoing outreach and engagement activities in non-clinical settings to address stigma and to promote basic behavioral health literacy and coping. An example of this is the CRT's weekly participation in outreach to the Minnesota Avenue/Good Hope Road community.  This takes place Wednesdays from 1-5 pm and is spearheaded by DMPSJ in partnership with the MPD and FEMS.

**Prevention**.  Clinicians in public schools provide prevention, early intervention, and treatment services related to violence prevention.  Specifically, the clinicians implement classroom-based violence prevention activities through programs such as anti-bullying Too Good For Violence (TGFV) and Kimochis.  TGFV is a school-based violence prevention and character education program designed to improve student behavior and minimize aggression. TGFV is designed to help students learn the skills they need to resolve conflict peacefully. Kimochis is a social-emotional curriculum that uses characters to teach young children about emotions and how to communicate their feelings with others.

DBH also works through the four ward-based DC Substance Use Prevention Centers (DCPC) to conduct outreach and engagement in communities throughout the District that are experiencing gun violence.  With community partners, the prevention centers distribute information on

marijuana, underage drinking, opioid misuse, and synthetics.  In the last two years, the DCPCs have greatly increased their social media presence through virtual platforms including Twitter, Instagram, and Facebook.  Social media messaging for targeted populations includes information on the legal and health risks associated with drug use and promotes positive alternatives to substance use and other destructive behaviors such as exercising and finding creative outlets for expression.

**Services to youth and adult crime victims**.  DBH collaborates with the Office of Crime Victims to provide direct support and services to youth crime victims and their families.  Clinicians in the School Based Behavioral Health Program (SBBHP) support the victims and help to connect both youth and adults to services.   In addition, school-based behavioral health clinicians include information regarding gun and community violence in trauma-focused presentations and often provide trauma-informed clinical services to students exposed to gun violence in a variety of ways.  Some clinicians are trained in trauma-specific modalities, including TF-CBT and can implement this intervention to address traumatic symptoms due to exposure to violent crimes including gun violence.

DBH also makes available several evidence-based treatment approaches through certified providers to address the impact of traumatic events such as gun violence.  These services include Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), Trauma Systems Therapy (TST), and Child-Parent Psychotherapy (CPP).  These therapy models have been proven to reduce symptoms and behavioral disturbances for children who are victims of trauma. TF-CBT is a psychotherapy model for youth ages 3-18 years old designed to help children, youth, and their parents overcome the negative effects of traumatic life events and address feelings. TST is a psychotherapy model for youth ages 6-18 years old which aims to stabilize the child's environment while simultaneously enhancing their ability to regulate emotions and behaviors. CPP is a psychotherapy model for children ages 0-6 years old and their parents that helps restore normal developmental functioning in the wake of violence and trauma by focusing on safety, affect regulation, improving the child-caregiver relationship, normalization of trauma related response, and joint construction of a trauma narrative.

In the past year, DBH has responded to many requests for support from the community as well as sister District agencies impacted traumatic events.  For example, in June 2022, DBH provided a support to staff at a DC Health operated COVID Center who witnessed the shooting death of an individual in front of their door. In July, CRT and ChAMPS responded jointly to children and families who witnessed a fatal officer-involved shooting in Slocum Park.

**DBH supports to school communities**. Sometimes after a violent incident (e.g., death of a student or a teacher, drive by shooting) occurs additional supports and services are needed to support school communities.  For over 20 years, DBH has provided crisis response services to the District of Columbia Public Schools (DCPS) and District of Columbia Public Charter Schools (DCPCS).  DBH school-based behavioral health clinicians and supervisors are trained in a psycho-educational crisis model developed by William Steele.  This model explains the grief/trauma process and promotes healthy coping strategies in an attempt to prevent prolonged

grief disorder and Post Traumatic Stress Disorder (PTSD).  When requested to respond to a crisis, clinicians and supervisors use the model to help support students and staff.
All requests that come to DBH for school crisis are triaged through the Branch Chief or designee of the DBH SBBHP.  School leaders, members from other government agencies (e.g., Deputy Mayor's' Office, the Charter Board, OSSE Health and Wellness), and behavioral health clinicians at schools can reach out to the Branch Chief directly or her designee, and request support and a formal response.  The DBH crisis team responds mostly to crises at public charters schools, because DCPS has their own crisis teams and responds to crises in their buildings.  If needed, DCPS will reach out to DBH directly for additional support or when there are multiple crises.

Once a principal has invited DBH to provide a crisis response at their school, an assessment of need is provided by the Branch Chief or a Crisis Lead.  Based on the information gathered a plan is put in place and the number of clinicians needed is determined.  The crisis team can be deployed immediately or the next school day, whatever is most appropriate.  A typical crisis will start with classroom presentations being implemented in identified classrooms.  During the presentations, two clinicians provide accurate information, dispel rumors, identify common grief/trauma reactions, identify positive coping strategies, help each student identify coping strategies that have worked in the past, have each student identify an adult they can talk to, make sure the students are aware of the supports in the building and how they can be reach out to that person, provide additional resources and identify students that may need extra support.  Additional supports offered during a crisis response are individual staff and student sessions, group sessions with students or staff, morning meetings for staff to help with messaging, parent meetings, and connection with on-going resources.  Often schools identify special groups of individuals who may be impacted at a higher level.  The crisis team may target or provide extra support to these individuals.  These groups may include:  family members, members of a specific club/sport that the child participated in, or a group of teachers who taught the youth.  Those groups often have their own support group to address their unique needs.
On average, the crisis team spends two days onsite with the time spent responding to each crisis dependent on the type of crisis, the school, the number of previous crises the school has suffered, and the overall impact on the staff and students.  The DBH crisis response team supports the school until the mental health team at the school indicates they are prepared to manage the on-going needs of the school.

**Budget and spending**.  DBH's work on gun violence prevention and response is integrated in multiple administrations and is not tracked and reported as a discrete budget activity.

**Violence Prevention and Response, Department of Corrections & Behavioral Court Diversion**

61. Please provide a detailed narrative of DBH's role in the District's city-wide violence prevention and response strategy.  In the narrative, please include the following:
    a. The name(s) of DBH staff who lead DBH's violence prevention and response work within the agency;
    b. How DBH partners with the other agencies, such as the Office of the Deputy Mayor for Public Safety and Justice, the Office of Neighborhood Safety and Engagement, the Office of Gun Violence Prevention, the Office of the Attorney General for the District of Columbia, the Department of Parks and Recreation, the Office of the City Administration (Building Blocks), and other relevant agencies;
    c. How DBH works with community-based organizations;
    d. What services DBH provides to child and adult crime victims and how DBH communicates the availability of these services to the community;
    e. How DBH supports school communities after violent incidents. Please include the process (contact initiation, duration, types of support) DBH takes after a school community experiences violence; and
    f. DBH's budget and spending (in Microsoft Excel) in FY 2021, FY 2022, and FY 2023, to date, on violence prevention and response programming and resources.

**DBH Response**

The Juvenile Behavioral Diversion Program (JBDP) is a voluntary, mental health solution-based specialty court that provides intensive case management and mental health services to youth in the juvenile justice system with significant mental health concerns. The JBDP has operated within the DC Superior Court Juvenile Division since January 2011. This program connects and engages juveniles and their caregivers/families in appropriate community-based mental health services and supports and provides for a period of engagement during which time the court monitors both the implementation of mental health services and the youth and families' participation in those services. Court-involved juvenile status offenders are given the option of voluntarily participating in mental health services rather than being prosecuted.  If successful, participants can have their cases dismissed or shortened lengths of probation sentences.

The goals of the program are to: (1) increase the number of youth able to remain in the community with improved functioning in the home, school and community with appropriate mental health services and supports, (2) reduce the likelihood of the youth's further contact with the criminal justice system as a youth and later as an adult, and (3) to reduce crime in the community and protect public safety. This program is intended for children and youth who are often served within multiple systems who are at risk of re-offending without linkage to mental health services and other important supports. Participants are required to attend regular court status hearings to monitor progress and to participate in mental health services and other specified court conditions. Youth generally participate in the program from three months to one

year, depending on the pace of their overall progress towards individualized goals, as determined by the "team," i.e., all individuals assisting in the youth's service plan (e.g., the youth/family/service providers/probation officer/defense counsel/Education Attorney/AAG and JBDP Judge).

a. The Juvenile Behavioral Diversion Program (JBDP) serves juvenile offenders who are 18 years of age or younger at the time of the instant offense. All court-involved youth receive mental health screening at the time of initial intake, following arrest. Youth are administered the Connor's Comprehensive Behavior Rating Scale (CBRS) which measures social, emotional, behavioral, and academic problems in children and adolescents ages 8 to 18 years. Additionally, youth are administered the Sex Trafficking Assessment Review (STAR) to determine a child or adolescent's risk of sexual exploitation in the community. These screenings are used to initially identify youth who may be appropriate for either the JBDP or Here Opportunities Prepare You for Excellence (HOPE) Court for youth at-risk or involved in the commercial and sexual exploitation of children (CSEC).

Determining eligibility for the JBDP is a two-step process. The Office of the Attorney General (OAG) reserves the right to permit or deny a youth to participate in the program on a case-by-case basis as an initial step in determining a youth's overall eligibility for the program. The OAG makes its determination of "legal eligibility" based on a variety of factors including prior and current contacts with the court, nature and circumstances surrounding the offense, mental health needs, and other relevant social factors. The second step in determining eligibility is a referral to the "Suitability Committee" of the JBDP. There, the Committee determines if the youth meet basic, clinical criteria, i.e. (1) the presence of a primary mental health diagnosis and (2) that the youth can participate in community-based services at the time of entry into the program. The Committee then takes into consideration multiple, additional factors that may impact a youth's ability to fully participate in the program, utilizing a biopsychosocial model of assessment, to determine final, clinical "suitability."

b. A juvenile offender can be referred by the initial hearing judge, the juvenile calendar judge, the Assistant Attorney General (AAG), the youth's defense attorney or a Court Social Services Probation Officer. Once a juvenile is deemed legally eligible, a referral is made to the Suitability Committee whereupon clinical eligibility is determined. The Suitability Committee, co- chaired by a DBH and a Court Social Services Division (CSSD) representative, is otherwise comprised of members from CSSD, the Child Guidance Clinic (CGC), and the DBH "preferred providers," i.e., those Community Services Agencies (CSAs) that are affiliated with the JBDP. These CSAs provide services to the majority of the youth in the program and collectively offer the range of services most highly utilized by program participants, including trauma-focused services. Following the clinical review, the Committee establishes recommendations for individualized services for each youth that are both comprehensive and holistic. These recommendations are forwarded to all court officials involved in the youth's case, regardless of their outcome of eligibility for the program. The Committee's recommendations can be implemented outside of the JBDP, should a youth decline to enter the program or voluntarily op-out later. All youth enrolled in JBDP receive mental health services through the DBH provider network (or outside DBH's network, as needed) and are supervised by specialized probation officers (trained in the DC mental health System of Care) of Court Social Services Division (CSSD).

*Department of Behavioral Health*
*FY 2022*
*Performance Oversight Questions*

c. Court Social Services gathers data on a calendar basis. The number of youth who participated in the JBDP program in CY22 is 53.  The number of youth participating in JBDP thus far in CY23 is 54.  Though referrals can be prompted by multiple court or community sources, i.e., judges, probation officers, defense attorneys, etc., it is the OAG that ultimately becomes the main referral source, as all referrals must first be found legally eligible by the OAG.  Once legal eligibility is established, a referral is sent by OAG to the Child Guidance Clinic of CSSD, where the clinical referral packet is compiled for review for the Suitability Committee.

The chart below details the types of offenses committed by youth in CY22. Data for CY23 will not be captured until the end of year.

| Type of Offenses | Number of Offenses Of all youth enrolled in CY 22 |
|---|---|
| Unlawful Entry and Assault (Threats, Simple Assault, Assault on Police, Disorderly Conduct) | 32 |
| Theft (Shoplifting, Theft I & II) | 11 |
| Robbery – UUV-Unlawful Entry Motor Vehicle, Burglary-No Permit | 29 |
| Destruction of Property/Fare Evasion | 7 |
| Runaway | 1 |
| Truancy | 0 |
| Sex Abuse | 0 |
| Possession of Weapon/Ammunition | 27 |
| Robbery while armed/Assault with Weapon/Carjacking | 16 |
| Possession of Controlled Substance | 0 |
| Credit Card Fraud | 1 |
| **Total Offenses** | **124*** |

+*Youth are often charged with multiple offenses. This list includes pre- and post-adjudicated charges

d. Of the 53 youth that were involved in JBDP in CY22, 26 youth are receiving or have received Community-Based Intervention (CBI) services, i.e., CBI I (Multisystemic Therapy (MST), CBI II and III, and CBI IV (Functional Family Therapy (FFT)) for a total percentage of 49.05%. This data point indicates that a very high percentage of youth participants of the JBDP meet criteria for the most intensive, community-based services that DBH offers, further indicating that JBDP youth participants are among the highest at-risk youth (and families) served by DBH through this one program. Although CBI was not provided to all youth involved in JBDP, participants received an array of services that are offered through the Mental Health and Rehabilitation System (MHRS) through DBH, e.g., community support, individual and family-based therapies, evidence-based practices (Trauma-Focused CBT, Trauma Systems Therapy, High Fidelity Wraparound, Transition to Independence Process (TIP) and Transition Age Youth (TAY) services), and substance use services.  Each youth enters the program with a preliminary, individualized plan for services and treatment created by the Suitability Committee following a comprehensive review of the case. The plan is then implemented once the youth begin the program and is adjusted per the needs of the youth and family as they progress through the

program.  Recommendations for services while in JBDP are based on clinical determinants, services already in place, willingness to engage in intensive services and service criteria.

e. DBH does not have access to the universe of youth involved with Family Court Social Services Division. Therefore, we are unable to provide the number of youth receiving CBI services through Court Social Services Division.

f. The average and median wait time for a first appointment with a psychiatrist is within a two-week period from the time of referral for medication management, per the protocols established with preferred providers of the program.  However, advocacy is made on a case-by-case basis by the DBH Program Coordinator to assist program participants in securing earlier appointments with the youth's Core Service Agency (CSA) or through DBH's Urgent Care Clinic at 821 Howard Road SE, in the event of an urgent need.

g. Court Social Services' Child Guidance Clinic (CGC) is responsible for collecting and analyzing the majority of the JBDP data.  Recidivism is defined as "a plea or found involved" in a crime up to one year after completion of the program.  The data collected to date for the CY2021 cohort indicates a recidivism rate of 12%, far below the national average of 43% to 50%.  Recidivism rates are calculated one-year post-graduation.  Since youth enter and exit the JBDP on a rolling basis, data cannot be analyzed until the entire cohort for the year has reached one-year post-graduation.  Therefore, the rate of recidivism for the CY2022 cohort is not yet available as not all participants have reached the one-year post-graduation mark.
Below is the recidivism data for the JBDP since the program's inception in calendar year 2011.

| Calendar Year | Total Number of Youth Enrolled | Total Youth w/ Reconvictions within 12 months of exiting JBDP | Recidivism Rates |
|---|---|---|---|
| 2021 | 33 | 4 | 12% |
| 2020 | 25 | 7 | 28% |
| 2019 | 47 | 10 | 21% |
| 2018 | 56 | 17 | 30% |
| 2017 | 95 | 19 | 20% |
| 2016 | 61 | 9 | 14.5% |
| 2015 | 33 | 6 | 18% |
| 2014 | 54 | 12 | 22% |
| 2013 | 42 | 6 | 14% |
| 2012 | 62 | 19 | 30% |
| | | | |

h. The direct cost for DBH is the salary and fringe for one FTE Social Worker. The salary for the Social Worker FTE is currently $126,444.00.

i. The program capacity is 100 youth per year however the number of youths served in JBDP has decreased from previous years due to the pandemic and the existence of HOPE Court which is another specialty court for juveniles at-risk-of or engaged in commercial, sexual exploitation requiring behavioral health services.  Currently, there is no plan for expansion as the current program has sufficient capacity.

62. Please provide a description and an update on the Behavioral Court Diversion program including:
    a. A description of which youth are eligible to participate in the program;
    b. The process or protocol of selecting or referring youth to the program;
    c. The number of youth who participated in FY 2022 and FY 2023, to date, the type of status offense they were alleged to have committed, the referral source (i.e., judge, probation officer, prosecutor, etc.) and the outcomes for youth in the program;
    d. The number of youth currently receiving CBI services through the Juvenile Behavioral Diversion Program;
    e. The number of youth currently receiving CBI services through the Family Court Social Services Division;
    f. The average and median wait time for a first appointment with a psychiatrist after referral from the Juvenile Behavioral Diversion Program and the Family Court Social Services Division;
    g. The recidivism rate of the youth participants and an explanation of how recidivism rates are measured;
    h. Any costs associated with the program; and
    i. The program's capacity and any expansion plan or barriers to expansion.

**DBH Response**

Though the READY Center was closed from early March 2020 to late June 2022 due to the public health emergency, DBH has sustained its work supporting individuals with behavioral health needs in the custody of the Department of Corrections (DOC). The Forensic Services Division continues to link individuals to behavioral health services, track the contact of returning citizens with DBH community-based providers on a monthly basis, and report ongoing performance data to relevant partners including DOC.

To further assist consumers in custody, Forensic Services staff provide DOC and Unity, its contracted healthcare provider in the DC Jail, with pertinent mental health information on individuals while they remain in custody. Forensic Services staff cross-reference electronic medical records to identify whether new admittees have received mental health services locally

and, if so, their diagnosis, treatment provider, and when last seen. These efforts expedite the identification of individuals that need help and promote the continuity of care and delivery of mental health services while incarcerated.

While full in-person READY Center operations in the DC Jail were suspended, DBH worked with Unity Health Care's discharge planning team at DOC to maximize follow-up in the community after individuals with known behavioral health challenges were released. Additionally, a DBH liaison at DC Superior Court works with DOC representatives daily to link incarcerated residents who are suddenly released from the courthouse to the community.

Until the DBH team is able to resume in-reach to all individuals temporarily housed at DOC, DBH and Unity are prioritizing three distinct groups: (1) individuals who are linked to a DBH certified Core Service Agency (CSA) upon admission; (2) individuals not previously connected to a CSA but whose psychiatric symptoms are sufficiently acute that they are admitted to one of the acute behavioral health units during their time at the DC Jail, and (3) those who are participating in Medication Assisted Treatment (MAT) while at the jail. Unity is consistently proactive about arranging immediate community follow-up for MAT participants, has expanded its distribution of naloxone upon release, and now has the ability to provide greater prescription coverage for MAT upon release so individuals have up to a week to be connected or re-connected to a provider in the community. To promote continuity of care, funding was identified through the federal State Opioid Response grant and a technology transfer grant from the National Association of State Mental Health Program Directors to incentivize individuals to keep mental health appointments upon release from DOC custody.

Collectively, these efforts have allowed DBH's Forensic Services Division to sustain most of its READY Center functions despite the COVID-related closure. Prior to the public health emergency, the READY Center was operating and performing functions as designed. The Center was fully staffed, programmatic objectives were codified in the form of standard operating procedures (SOPs), which included regular communication to strengthen partnerships with relevant agencies including the Department of Human Services, Department of Employment Services, and the Department of Motor Vehicles.

In mid-November 2022, DBH and DOC executed a MOA to reestablish full in-person operations within the DC Jail.

63. Please provide an update on the DBH services to consumers under the custody of the Department of Corrections, including services provided in the READY Center.

**DBH Response**

**Inception**.  The Community Response Team (CRT) launched in June 2019, bringing together three existing services within DBH—homeless outreach, mobile crisis, and the pre-arrest diversion program—into a newly restructured, 24-hour crisis response program.  In her FY 20 budget, Mayor Bowser invested an additional $1.1 million to support the new CRT and expand it to a 24-hour program.  In testimony on the proposed FY 20 budget, Interim DBH Director, Dr. LaQuandra Nesbitt articulated a vision for the new Community Response Team that would allow the District to better respond to individual and community crises including public health emergencies and tragic events that traumatize entire communities. DBH was charged with creating an integrated, place-based approach to outreach and crisis response to residents who may be experiencing psychiatric emergencies, trauma, substance use disorders, or co-occurring mental health and substance use disorders. The vision called for teams of peers, behavioral health specialists, and licensed clinicians to have a regular and ongoing presence in communities to:

- Conduct low or no barrier assessment and referral to behavioral health care
- Engage individuals who are connected to care but are not actually in treatment due to barriers
- Provide short-term support in solving crisis issues to reduce barriers and increase access to available care, and
- Promote harm reduction options for individuals living with unmet needs who are unwilling to engage in behavioral health treatment.

Communities had been calling for such an approach to crisis response to include sustained engagement with community leaders and community members to assess needs and report back to DBH executive leadership on emerging and unmet issues and to propose new solutions.

The CRT continues the close collaboration between DBH and MPD to support individuals in psychiatric crisis or whose behavior suggested mental or substance use disorders.  It is appropriate and necessary for law enforcement to respond to some mental health crisis calls. In these cases, we want the encounter to end with everyone safe and the people in crisis getting the help they need. DBH and MPD have jointly held Crisis Intervention Officer (CIO) training since 2009 to teach patrol officers the most effective de-escalation techniques when they encounter people who may be in a psychiatric crisis. During the training, the officers meet with consumers to better understand mental illness and to hear their perspectives and past experiences with police officers. In FY 22, the Mayor mandated that all officers receive Mental Health First Aid training.

The CRT and CIO officers often respond to the same crisis situations. In addition, DBH relies on MPD to transport consumers who the CRT clinicians have determined need emergency treatment against their will.

**Expansion**. In October 2019, just four months after its official launch, CRT expanded and began operating out of two locations—the DBH Comprehensive Psychiatric Emergency Program facility (CPEP) on the Hill East Campus in Southeast, and 35 K Street NE, the DBH's adult urgent care clinic.  A substantial portion of the funding for the expansion came from the

District's federal State Opioid Response grant to increase CRT's role in Naloxone education and distribution, outreach to "hotspots" where individuals congregate and use substances in public spaces, and to support individuals experiencing homelessness including those living in encampments.

In her FY 22 budget, the Mayor added $5 million to fund 36 new CRT positions and five AHL clinicians to expand crisis services and support the new 911 diversion program. CRT is now fully supported with local funds.

**Alternative 911 Responses**. Phase one of the Behavioral Health Call Diversion Initiative launched on June 1, 2021, with DBH and OUC serving as lead partners supported by MPD and FEMS. The pilot phase was 12 hours per day (6 a.m. to 6 p.m.). As the OUC and DBH teams gained experience and added staff, operations expanded to 24/7 beginning in the second quarter of FY22. Throughout FY 22, DBH, OUC, MPD, FEMS and the Lab @ DC met at least bi-weekly as a group with smaller working groups meeting regularly in between. MPD hired a behavioral health initiatives coordinator early in 2022, further strengthening the cross-agency team.

In July 2022, DBH along with MPD and FEMS participated in a 3-day joint site visit with law enforcement in Houston and the surrounding county and the local behavioral health authority. The delegation received extensive training on their 911 diversion program and co-responder program and observed a new initiative designed to link officers in the field with clinicians for real-time video-consults when co-responder teams were not available. MPD and DBH are currently planning for the soft-launch of a co-response model with five CIO-trained officers paired with five crisis specialists from CRT.

In July 2022, the District's 911 Behavioral Health Diversion program was selected to participate in a year-long technical assistance program and learning collaborative provided by the Harvard Kennedy School of Government's Government Performance Lab (GPL). The District of Columbia is one of just four jurisdictions in the country selected for the second cohort of the GPL's 911 Alternative Response program.

The GPL team is currently assisting OUC in developing its methodology for selecting calls that are eligible for transfer. OUC has procured a new platform known as PowerPhone that will both standardize the screening questions for call-takers and generate a recommended action (e.g., dispatch MPD or divert call to DBH). This new platform will strengthen consistency in decision making and is expected to significantly increase the number of calls being transferred. To date, a fraction of the projected number of eligible calls are being diverted to DBH instead of referral to MPD or FEMS. In FY 22, a total of 327 calls were diverted to DBH, of which 90 (28%) resulted in a referral to CRT. Thus, more than 70% of calls are resolved through telephone-only support. Phase 2 of the Harvard GPL technical assistance will focus on training and preparation for Access Helpline and CRT team members to manage the higher volume of calls we anticipate will be diverted.

DBH has procured and is working with its vendor to customize and implement a "Customer Relationship Manager" platform or CRM that will have the capability of interfacing with OUC's and MPD's call tracking systems. The CRM will strengthen the clinical response by giving DBH

clinicians access to information directly from OUC's system with much greater efficiency as they work to address the needs of callers in real-time. It also will increase the comfort and confidence of the caller by reducing redundant questioning. The CRM will enhance our ability to track calls across all three agencies and to report out on key data elements, like follow-up services and the frequency with which calls diverted to DBH subsequently require MPD support, that will support system analysis and improvements.

**DBH Crisis Calls**

64. Please provide a narrative on the Community Response Team, established in 2019, as a partnership between DBH, the Office of the Deputy Mayor for Public Safety and Justice, Office of the Deputy Mayor for Health and Human Services, Office of the City Administrator, and the Office of Unified Communications. Please provide details on Community Response Team operations including how they partner with Metropolitan Police Department, how call center representatives determine which calls from 911 are diverted to DBH, whether services are billed to insurance or Medicaid, and call follow-up protocol.

**DBH Response**

**Inception**. The Community Response Team (CRT) launched in June 2019, bringing together three existing services within DBH—homeless outreach, mobile crisis, and the pre-arrest diversion program—into a newly restructured, 24-hour crisis response program. In her FY 20 budget, Mayor Bowser invested an additional $1.1 million to support the new CRT and expand it to a 24-hour program. In testimony on the proposed FY 20 budget, Interim DBH Director, Dr. LaQuandra Nesbitt articulated a vision for the new Community Response Team that would allow the District to better respond to individual and community crises including public health emergencies and tragic events that traumatize entire communities. DBH was charged with creating an integrated, place-based approach to outreach and crisis response to residents who may be experiencing psychiatric emergencies, trauma, substance use disorders, or co-occurring mental health and substance use disorders. The vision called for teams of peers, behavioral health specialists, and licensed clinicians to have a regular and ongoing presence in communities to:

- Conduct low or no barrier assessment and referral to behavioral health care
- Engage individuals who are connected to care but are not actually in treatment due to barriers
- Provide short-term support in solving crisis issues to reduce barriers and increase access to available care, and
- Promote harm reduction options for individuals living with unmet needs who are unwilling to engage in behavioral health treatment.

Communities had been calling for such an approach to crisis response to include sustained engagement with community leaders and community members to assess needs and report back to DBH executive leadership on emerging and unmet issues and to propose new solutions.

The CRT continues the close collaboration between DBH and MPD to support individuals in psychiatric crisis or whose behavior suggested mental or substance use disorders.  It is appropriate and necessary for law enforcement to respond to some mental health crisis calls. In these cases, we want the encounter to end with everyone safe and the people in crisis getting the help they need. DBH and MPD have jointly held Crisis Intervention Officer (CIO) training since 2009 to teach patrol officers the most effective de-escalation techniques when they encounter people who may be in a psychiatric crisis. During the training, the officers meet with consumers to better understand mental illness and to hear their perspectives and past experiences with police officers. In FY 22, the Mayor mandated that all officers receive Mental Health First Aid training.

The CRT and CIO officers often respond to the same crisis situations. In addition, DBH relies on MPD to transport consumers who the CRT clinicians have determined need emergency treatment against their will.

**Expansion**. In October 2019, just four months after its official launch, CRT expanded and began operating out of two locations—the DBH Comprehensive Psychiatric Emergency Program facility (CPEP) on the Hill East Campus in Southeast, and 35 K Street NE, the DBH's adult urgent care clinic.  A substantial portion of the funding for the expansion came from the District's federal State Opioid Response grant to increase CRT's role in Naloxone education and distribution, outreach to "hotspots" where individuals congregate and use substances in public spaces, and to support individuals experiencing homelessness including those living in encampments.

In her FY 22 budget, the Mayor added $5 million to fund 36 new CRT positions and five AHL clinicians to expand crisis services and support the new 911 diversion program. CRT is now fully supported with local funds.

**Alternative 911 Responses**. Phase one of the Behavioral Health Call Diversion Initiative launched on June 1, 2021, with DBH and OUC serving as lead partners supported by MPD and FEMS.  The pilot phase was 12 hours per day (6 a.m. to 6 p.m.).  As the OUC and DBH teams gained experience and added staff, operations expanded to 24/7 beginning in the second quarter of FY22.  Throughout FY 22, DBH, OUC, MPD, FEMS and the Lab @ DC met at least bi-weekly as a group with smaller working groups meeting regularly in between.  MPD hired a behavioral health initiatives coordinator early in 2022, further strengthening the cross-agency team.

In July 2022, DBH along with MPD and FEMS participated in a 3-day joint site visit with law enforcement in Houston and the surrounding county and the local behavioral health authority. The delegation received extensive training on their 911 diversion program and co-responder program and observed a new initiative designed to link officers in the field with clinicians for real-time video-consults when co-responder teams were not available.  MPD and DBH are

currently planning for the soft-launch of a co-response model with five CIO-trained officers paired with five crisis specialists from CRT.

In July 2022, the District's 911 Behavioral Health Diversion program was selected to participate in a year-long technical assistance program and learning collaborative provided by the Harvard Kennedy School of Government's Government Performance Lab (GPL).  The District of Columbia is one of just four jurisdictions in the country selected for the second cohort of the GPL's 911 Alternative Response program.

The GPL team is currently assisting OUC in developing its methodology for selecting calls that are eligible for transfer.  OUC has procured a new platform known as PowerPhone that will both standardize the screening questions for call-takers and generate a recommended action (e.g., dispatch MPD or divert call to DBH).  This new platform will strengthen consistency in decision making and is expected to significantly increase the number of calls being transferred.  To date, a fraction of the projected number of eligible calls are being diverted to DBH instead of referral to MPD or FEMS.  In FY 22, a total of 327 calls were diverted to DBH, of which 90 (28%) resulted in a referral to CRT.  Thus, more than 70% of calls are resolved through telephone-only support.  Phase 2 of the Harvard GPL technical assistance will focus on training and preparation for Access Helpline and CRT team members to manage the higher volume of calls we anticipate will be diverted.

DBH has procured and is working with its vendor to customize and implement a "Customer Relationship Manager" platform or CRM that will have the capability of interfacing with OUC's and MPD's call tracking systems. The CRM will strengthen the clinical response by giving DBH clinicians access to information directly from OUC's system with much greater efficiency as they work to address the needs of callers in real-time.  It also will increase the comfort and confidence of the caller by reducing redundant questioning.  The CRM will enhance our ability to track calls across all three agencies and to report out on key data elements, like follow-up services and the frequency with which calls diverted to DBH subsequently require MPD support, that will support system analysis and improvements.

65. Please provide (via spreadsheet) the following information on the Community Response Team for FY 2021, FY 2022, and FY 2023, to date:
    a.  Number of Helpline/Mental Health Hotline FTEs;
    b.  Number of Community Response Team FTEs;

    c.  Helpline/Mental Health Hotline budget and spending;
    d.  Community Response Team Budget and spending;
    e.  Number of calls received and responded to;
    f.  The locations where the team was dispatched including the ward;
    g.  Breakdown of how many calls related to children and youth or adults; and
    h.  Types of crisis.

**DBH Response:**

DBH's crisis services division works to improve clinical outcomes for individuals experiencing behavioral health crises—to provide the right response at the right by the right responder—and to move away from an automatic law enforcement response.  The Mayor has invested additional resources to expand both Access Helpline (AHL), the DBH operated call center, and the Community Response Team (CRT).  Specifically, AHL is expanding from 16 to 31 staff and CRT is expanding from 38 to 65 team members.  DBH is recruiting for the new positions and have added two new crisis counselors to the AHL and five to the CRT. AHL has 14 staff onboard and 17 vacancies for which 2 candidates have been selected and are in the pre-employment process.  CRT currently has 43 team members and 22 vacancies with five candidates in the pre-employment process.

It is important to note, however, behavioral health staff shortages are severe and projected to worsen nationwide.  DBH is working with SAMHSA to develop alternative recruitment and retention strategies with other states in the region in the short-term while pursuing longer term strategies for growing the pipeline for the behavioral health workforce.

The CRT data shows referrals for children and youth under the age of 18 more than doubled from nine  in FY21 to 21 in FY22 though most requests for mobile crisis for youth are directed to ChAMPS, the District's youth mobile crisis service.  We believe the CRT has begun to receive more youth referrals because of its high visibility in the community and because crises often involve multiple individuals experiencing a shared crisis within their family or community.  This has prompted a reexamination of the organization of crisis services including further alignment and cross-training of the adult and youth mobile teams.  Joint responses have begun to happen more often.  To support this integration, the CRT will assume overnight and weekend responsibility for youth referrals. Beginning in January 2023, referrals from 8 pm to 8 am Monday through Friday and weekends are routed to CRT.

Reporting on crisis type is continuing to evolve as we implement the 911 Behavioral Health Call Diversion project, the nationwide 988 rollout, the newly configured youth mobile crisis program, and DBH and MPD explore a possible co-responder approach.  The data collection is being reshaped in consultation with a team from The Lab@DC who the City Administrator enlisted to support design and evaluation of the 911 diversion project as well.  In addition, the District was one of four jurisdictions to receive a year-long intensive technical assistance award from the Harvard Kennedy School's Government Performance Lab (HKS-GPL).  As a result, DBH and

OUC are plugged into emerging best practices and benefitting in real-time from other governments' experience implementing alternative 911 responses.

Extensive work is being done to establish data definitions and to achieve consistency in the way calls are coded across the DBH crisis continuum and assure good alignment with key partners like OUC, MPD, and FEMS. The DBH electronic health record known as iCAMS also is undergoing a reconfiguration in association with the Medicaid Managed Care Carve-In/System Redesign with the goal of improving data capture and reporting. Improved data quality in crisis services is a major objective which will also be supported by the addition of a supervisory level quality coordinator who will focus on training and documentation.

In response to the question for the location of dispatch, the CRT responds to thousands of calls for assistance and is dispatched in all eight wards. DBH can provide the addresses of individuals who receive services or interventions, but this frequently is different from the CRT dispatched location. There are several scenarios when using the address of the individuals as the location of the dispatch is misleading. For example, many of the calls are from residents for unhoused individuals who are transient and we may engage the same person in different locations but do not have an address. The CRT also responses to "hotspots" with spikes in opioid overdoses and to locations where a large number of people congregate, but again are not able to provide addresses for individuals in those cases as they refused services. Another example is an initial call to the CRT may be from a family member's home, but the individual has a home address different from the dispatch location. DBH can provide the addresses of only individuals who received services from our claims data by zip code which we can match to wards as much as possible. But, this is not the same as the CRT dispatch locations.

| Number of FTEs Assigned to Crisis Services (a. and b.) | | | |
|---|---|---|---|
| | FY21 | FY22 | FY23 YTD |
| Access Helpline (AHL) | 17 | 31 | 31 |
| Community Response Team (CRT) | 38 | 65 | 65 |
| Budget and Spending by Service ( c. and d.) | | | |
| AHL Budget | $1.8M | $2.3M | $2.4M YTD |

| | | | |
|---|---|---|---|
| Spending | $2.1M | $1.9M | $ .3M YTD |
| CRT | | | |
| Budget | $8.6M | $7.8M | $12.3M |
| Spending | $7.5M | $5.9M | $ 1.8M |

| | AHL and CRT Referrals by Service | | |
|---|---|---|---|
| e. | # Referrals to CRT | 5,645 | 5,828 | 1,586 |
| | # Services/Interventions | 3,229 | 3,145 | 803 |
| g. | # Referrals for Youth | 9 | 21 | 7 |
| | # Referrals for Adults | 5636 | 5807 | 1579 |

| | | | | |
|---|---|---|---|---|
| h. | Types of Crisis (CRT) | | | |
| | Crisis Assessment – | | 2399 | 0 |
| | Mental Health – | | 802 | 431 |
| | Non-Crisis Engagement – | | 331 | 0 |
| | MH and Substance Use – | | 89 | 50 |
| | Other (specify) – | | 51 | 0 |
| | Substance Use Outreach – | *Unavailable | 26 | 0 |
| | Substance Use – | Due to Change | 8 | 4 |
| | Co-Response – | In Coding | 5 | 0 |
| | DBH Internal – | | 4 | 0 |
| | Traveler's Aid – | | 3 | 0 |

| | | | | |
|---|---|---|---|---|
| | | Missing – | | 2110 | 1101 |
| | | Total | | 5828 | 1586 |

66. Please provide an update on DBH's implementation of the National Suicide Hotline Designation Act of 2020, which created a new 9-8-8 universal telephone number for the purpose of suicide prevention and mental health crisis response. Please include:
    a. The FY 2022 and FY 2023, to date, DBH cost for 9-8-8 implementation;
    b. How many calls were received through 9-8-8 in FY 2022 and FY 2023, to date; and
    c. Please share any updates to how DBH collaborates with the Office of Unified Communications or other public safety cluster agencies to implement this program.

**DBH Response**:

a. Mayor Bowser announced the new 988 telephone number with a press release and social media on July 15, 2022, the day before the official launch. The DBH Access HelpLine (AHL), has been the District's sole National Suicide Prevention Lifeline affiliate for years and maintains its accreditation through the American Association of Suicidology. Therefore, the cost to launch the new 988 was absorbed by existing staff. However, the activation of the 988 three-digit call code and rebranding of the 988 Suicide & Crisis Lifeline are expected to increase call volume in the coming years. DBH was awarded $840,000 in federal funding that will be used to hire new AHL staff to support the anticipated increase and implement the chat and text functions required of all Lifeline affiliates in the next year.

b. DBH received 7709 incoming Lifeline calls in FY22 and 2564 through the first quarter of FY23. To assess the impact of the 988 implementation and to adjust for possible seasonal variation, we compared the number of calls in Q1 FY22 (1674) with Q1 FY23 (2564) and found an increase of more than 53% year-over-year for the same period. We attribute that increase directly to the introduction of the easy to remember 988 dialing code. However, we do not assume this reflects to a 50% increase in actual suicide related crises as we have observed that many callers are testing the line after learning of the change. This is generally consistent with what has been reported nationally.

DBH has maintained a local answer rate at or above 90%, the standard SAMHSA established for July 2023. SAMHSA and its vendor, Vibrant, track this metric because local call-takers are best positioned to assist callers in accessing local mental health resources if desired. The Lifeline comprises more than 200 calls centers that are networked. Calls that are not answered within a specified time are automatically rerouted to another call center in the network, thus callers can always reach a live, trained specialist for telephone support.

c. 988 Lifeline updates regularly are provided in the 911 cross-agency meetings so that OUC, MPD, and FEMS are aware of the work happening in parallel and jointly working to assure coordination and promote the new number. Information about 988 is included in the joint DBH/MPD Mental Health First Aid and Crisis Intervention Officer training classes. FEMS released a blast text message promoting the 988 Lifeline to its list of tens of thousands of residents during the week of Thanksgiving 2022.

# EXHIBIT V

*Q15. Please provide an update on the work of the children mobile crisis teams. What services are provided? How many individuals were served in FY21? To date in FY22? Please be sure to specifically speak to the work of the Children and Adolescent Mobile Psychiatric Service (ChAMPS), as well as any related services.*
*a.      What is the process in determining what calls are deployable and non-deployable?*
*b.      What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY21 and FY22 to date.*
*c.      How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?*
*d.      Please describe the extent to which these services and responses to (a) through (d) were impacted by the COVID-19 pandemic.*

**DBH Response**

The Department of Behavioral Health contracts through the Office of Contracts and Procurement for emergency mobile psychiatric services for children and youth. The current contractor is Anchor Mental Health, and the program is called Children and Adolescent Mobile Psychiatric Service (ChAMPS).  The ChAMPs program operates 24 hours a day, seven days per week and helps children and youth between six to 17 years of age manage extreme emotional behavior and supports families to wherever possible to prevent behavior from resulting in the child needing to leave the home or require a psychiatric hospitalization.  In the cases where a child or youth does require hospitalization, ChAMPs is able to facilitate the referral for both voluntary and involuntary hospitalization. ChAMPS services also include screening for mental health and substance use needs, crisis stabilization, referral to appropriate resources, including longer-term mental health or substance use services. ChAMPs also provides information dissemination, consultation to parents and service providers and outreach to the community regarding their services.

Services are provided in the community, schools, or in homes for District residents and children living in Maryland in the care and custody of the DC Child and Family Services Agency. After a family is involved with an emergency crisis intervention service, ChAMPS follows up with the family within 24 hours to check on the child's well-being and provides support for up to 30 days post-intervention.  The team links children and families to a behavioral health provider for ongoing support. For children already enrolled with a provider, the team communicates with the provider the child's status and recommendations based on the intervention.  ChAMPS also offers Family Peer Specialist services to support families in the steps necessary for the stabilization of their child to promote a culture that recognizes, understands, and respects the family's views and preferences.

*What is the process in determining what calls are deployable and non-deployable?*

Each call that is routed into ChAMPS is received by a Licensed Clinical Manager who is trained and equipped to make a clinical determination on how to manage crisis calls.  All calls involving children and youth in psychiatric crisis are deployable calls which results in an onsite response by a clinical team.  ChAMPS also provides telephone clinical consultation for families seeking support for concerns such as family functioning, oppositional defiance, and emotional dysregulation. Clinical consultation also takes place with providers.  A non-deployable call

includes requests for information about program services or resources only or when a caregiver declines an assessment.

*What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY21 and FY22 to date.*

In FY 21, Anchor reports the average deployment time was 50 minutes. The longest response time was 2 hours and 5 minutes due to inclement weather on 12/16/2020.  The shortest time was 6 minutes. In FY 22 to date, the average deployment time is 48 minutes. The longest response time was 1 hours, 38 minutes due to a parent providing the incorrect address during the initial call.  The shortest time was 5 minutes. The goal is to arrive to all deployments within one hour or less during the week and within 2 hours for overnight on call shifts and weekend on call shifts.

*How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?*

Anchor has six ChAMPS crisis teams available for deployment on the weekdays and one crisis team on the weekend with two new hires pending to begin in Q2 of FY22 which will increase team capacity. Teams are deployed in pairs. Staff are scheduled in a staggered manner to maximize coverage and the number of crisis teams available. Calls are triaged according to imminent risk and prioritized by the level of danger a child poses to self or to others. Additional considerations are the availability of a mental health clinician, MPD or a Crisis Intervention Officer at the deployment site if needed. The Clinical Manager maintains contact with the caller as needed until the crisis team is at the scene of the crisis.

*Please describe the extent to which these services and responses to (a) through (d) were impacted by the COVID-19 pandemic.*

**Utilization:**

| ChAMPS Utilization | FY 18 | FY19 | FY20 | FY21 | FY22 Q1 |
|---|---|---|---|---|---|
| Calls | 1,682 | 1880 | *1634 | 1237 | 329 |
| Telephone clinical consultations | 380 | 370 | 459 | 593 | 149 |
| Deployments | 837 | 938 | 806 | 457 | 117 |
| Unique Children/Youth Served | 857 | 873 | 710 | 416 | NA |

* March 2019 public health emergency

The data shows a significant decrease in calls during the pandemic.  DBH is working with Anchor to identify factors affecting the number of calls.   One change during the pandemic is that most calls were from parents while during the pre-pandemic months, the majority were from public schools.

**Staffing:** Due to the pandemic, hiring for licensed behavioral health practitioners has been a challenge, which has been a reported challenge nationwide.  In addition to difficulty with hiring, the pandemic has also impacted the Anchor's staffing matrix for ChAMPS, as staff who tested positive or staff who had been placed in quarantine were unable to participate in the field for 10 days. All calls were answered and teams were deployed as needed.  Due to these factors and with the opportunity to provide telehealth, ChAMPS established a contingency plan to continue to provide telehealth crisis intervention in the case of an extreme staff shortage

**Deployment time:** The contract requires deployment within one hour of the call.  Anchor met this requirement in FY21.  The shortest response time average for the month was 46 minutes compared to 39 minutes in FY 20.  The longest response time was 57 minutes. Anchor reports that logistics were more time consuming as the teams were teleworking and were to deploy to crisis calls from their homes rather than one work location.  In addition, the teams reported it took more time to park at deployment sites given limited spaces with more people at home due to the pandemic.

# EXHIBIT W

*Q16. Please provide an update on the work of the children mobile crisis teams. What services are provided? How many individuals were served in FY20? To date in FY21? Please be sure to specifically speak to the work of the Children and Adolescent Mobile Psychiatric Service (ChAMPS), as well as any related services.*

*a.      What is the process in determining what calls are deployable and non-deployable?*

*b.      What is the response time for deployable calls? Please include the longest and shortest response times that occurred in FY20 and FY21 to date.*

*c.      How many mobile crisis teams are there? How are calls triaged to ensure that a team is available upon request?*

*d.      Please describe the extent to which these services and responses to (a) through (d) were impacted by the COVID-19 pandemic.*

**DBH Response**

The Department of Behavioral Health contracts through the Office of Contracts and Procurement for emergency mobile psychiatric services for children and youth. The contract was awarded to Anchor Mental Health and the program is called Children and Adolescent Mobile Psychiatric Service (ChAMPS).   The 24 hour program helps children and youth between six to 17 years old manage extreme emotional behavior and supports families so that the behavior does not result in the child leaving the home or psychiatric hospitalization.   ChAMPS services include screening for mental health and substance use needs, crisis stabilization, involuntary crisis stabilization and referral to appropriate resources, including longer-term mental health or substance use services. Services are provided in the community, schools, or in homes for District residents and children in the care and custody of DC Child and Family Services Agency living in Maryland.

After emergency crisis intervention services, ChAMPS follows up with families within 24 hours to check on the child's well-being and provides support for up to 30 days post-intervention.  The team links children and families to a behavioral health provider for ongoing support. For children already enrolled with a provider, the team communicates the child's status and recommendations based on the intervention.   ChAMPS also offers Family Peer Specialist services to support families in the steps necessary for the stabilization of their child and to help promote a culture that recognizes, understands, and respects the family's views and preferences.

In FY 20, ChAMPS received 1,634 calls and deployed teams 806 times to support children in crisis, serving 710 unique children.  ChAMPS also provided 459 clinical consultation services.  In FY 21 Q1, ChAMPS received 301 calls and deployed teams 139 times to support children/youth in crisis, serving 114 unique children.  There have been 193 clinical consultation services.

a. Each call that is routed into ChAMPS is received by a Licensed Clinical Manager who is trained and equipped to make a clinical determination on how to manage crisis calls.   All calls involving children and youth in psychiatric crisis are deployable calls which results in an onsite response by a clinical team.  ChAMPS also responds to requests from families for immediate support related to concerns such as family functioning, oppositional defiance, and emotional dysregulation. A non-deployable call could be a request for a clinical consultation only, when a

caregiver declines an assessment, or for information about program services or community resources

b. In FY20, the average deployment time was 39 minutes. The longest response time was 2 hours, 39 minutes due to a delay in security clearance on a military base. The shortest time was one minute. In FY21 to date, the average deployment time was 49 minutes. The longest response time was 2 hours, 5 minutes during the snow storm the week of February 1, 2021. The shortest time was 20 minutes. The goal is to arrive to all deployments within one hour or less.

c. ChAMPS has seven crisis teams available for deployment on a week day and one crisis team on the weekend. Teams are deployed in pairs. Staff are scheduled in a staggered manner in order to maximize coverage and the number of crisis teams available. In addition, the program has three Clinical Managers who can be deployed if call volumes exceed normal level. Calls are triaged according to imminent risk and prioritized by the level of danger a child poses to self/others. Other considerations are the availability of a mental health clinician, MPD or a Crisis Intervention Officer at the deployment site. The Clinical Manager maintains contact with the caller as needed until the crisis team is at the scene of the crisis.

d. During the pandemic months of FY 20, the number of calls decreased compared to the pre-pandemic months. In the pre-pandemic months of October 2019 through March 2020, there were 1,066 calls that resulted in 541 deployments. During the pandemic months of April through September, the number dropped in half to 568 calls that resulted in 265 deployments.

DBH is looking at the data closely to determine reasons for the significant drop in calls for crisis services. Public schools were the primary source of calls pre-pandemic and the distance learning environment may might not generate the same behavior by the child or youth or provide an opportunity to observe such behavior. As more schools return to onsite learning, DBH will monitor whether calls return to the pre-pandemic levels or even increase.

With distance learning, parents or caregivers are now the source of calls and some may be reluctant to admit a non-family member into their homes. ChAMPS also reports that some parents expressed concerns about their child going to a hospital emergency department because they fear an increased risk of exposure to COVID-19.

DBH is also examining the date to assess whether there is evidence of more intense needs that result in more frequent calls for the same children, an increased proportion of deployments that lead to hospitalizations, or less engagement with enrolled providers.

The pandemic also has affected ChAMPS average response time with an increase from an average of 39 minutes to 49 minutes. Logistics are more time consuming as the teams are teleworking and deploy to crisis calls from their homes rather than one work location. In addition, the teams report it takes more time to park at deployment sites given limited spaces with more people at home due to the pandemic. The teams utilize personal protective equipment while working with consumers and families and will provide it to families if needed.

# EXHIBIT X

providers partner with SMYAL to ensure clients receive the full continuum of services to support their mental health.

To strengthen services for those who identify as LGBTQ+, DBH plans to host a forum in the coming months to hear directly from consumers, family members, providers and community stakeholders on what additional services and trainings are needed to increase access, support and services to those who identify as LGBTQ+.

## Children and Youth Services (Non-School Based Behavioral Health)

36. Please provide an update on the work of the children mobile crisis teams. What services are provided? In what languages are Children and Adolescent Mobile Psychiatric Service (ChAMPS) services provided? How many individuals were served in FY 2022 and in FY 2023, to date? Please include the following:

   a. The process for determining what calls are deployable and non-deployable;
   b. The response time for deployable calls including the longest and shortest response times that occurred in FY 2022 and FY 2023, to date, as well as the average;
   c. The number of mobile crisis teams;
   d. How are calls triaged to ensure that a team is available upon request;
   e. The relationships and coordination between the 911 call-takers, Access Helpline, and ChAMPS teams; and
   f. The findings of any review or evaluation of these services.

## DBH Response

The Department of Behavioral Health contracts through the Office of Contracts and Procurement for emergency mobile psychiatric services for children and youth. The current contractor is Anchor Mental Health, and the program is called Children and Adolescent Mobile Psychiatric Service (ChAMPS).  The ChAMPs program operates 24 hours a day, seven days per week and helps children and youth between six to 17 years of age manage extreme emotional behavior and supports families wherever possible to prevent behavior from resulting in the child needing to be removed from the home or a psychiatric hospitalization.  In the cases where a child or youth does require hospitalization, ChAMPs facilitates the referral for both voluntary and involuntary hospitalizations. ChAMPS services also include screening for mental health and substance use needs, crisis stabilization, referral to appropriate resources, including longer-term mental health or substance use services. ChAMPs also provides information dissemination, consultation to parents and service providers and outreach to the community regarding their services.

Services are provided in the community, schools, or in homes for District residents and children living in Maryland in the care and custody of the DC Child and Family Services

Agency.  After a family is involved with an emergency crisis intervention service, ChAMPS follows up with them within 24 hours to check on the child's well-being and provides support for up to 30 days post-intervention.  The team links children and families to a behavioral health provider for ongoing support. For children already enrolled with a provider, the team communicates the child's status and recommendations based on the intervention.  ChAMPS also offers Family Peer Specialist services to support families in the stabilization of their child's behavior and to promote a culture that recognizes, understands, and respects the family's views and preferences.

 ChAMPS can provide services in the following languages with support of the Jeenie App: Akateko, Albanian, American Sign Language (ASL), Amharic, Arabic (Algerian Moroccan & Tunisian), Arabic (Egyptian or Sudanese), Arabic (Gulf), Arabic (Iraqi), Arabic (Levantine), Arabic (Modern Standard), Armenian, Bengali, Bosnian, Cape Verdean Creole, Chinese (Cantonese), Chinese (Mandarin), Dari (Persian), Farsi (Persian), French, Greek, Gujarati, Haitian Creole, Hebrew, Hindi, Hmong, Hungarian, Indonesian, Italian, Japanese, K'iche', Karen, Kinyarwanda, Korean, Lao (Laotian), Mam, Nebaj Ixil, Nepali, Oromo, Pashto, Polish, Portuguese, Portuguese (Brazil), Punjabi, Q'anjob'al / Kanjobal ,Q'eqchi, Romanian, Russian, Serbian, Somali, Spanish, Swahili, Sylheti, Tagalog (Filipi), Thai, Tigrinya, Turkish, and Vietnamese.  CHAMPS also has one Spanish speaking licensed clinician who can provide services and supports.

The table below shows the total number of calls to ChAMPs for FY22 and FY23 Quarter 1.

**Total Served:**

| Fiscal Year | Total Calls | Individual Number of Children and Youth Served |
|---|---|---|
| FY22 | 1555 | 607 |
| FY23 Q1 | 417 | 161 |

a. Each call that is routed into ChAMPS is received by a Licensed Clinical Manager who is trained and equipped to make a clinical determination on how to manage crisis calls. In making their clinical determination, the Licensed Clinical Manager considers the following:  whether there is an active mental health or behavioral crisis; the current safety concerns; whether or not there is a mental health clinician present; whether the client has an ongoing mental health provider; whether there are any current concerns that may require immediate medical attention; and whether the client is under the influence of any illegal substance.  All calls involving children and youth in psychiatric crisis are deployable calls which result in an onsite response by a clinical team.  ChAMPS also provides telephone clinical consultation to child serving agencies seeking support for concerns such as family conflict, oppositional defiant behavior, and emotional dysregulation of children and or youth.  A non-deployable call includes requests for information about program services or resources only or instances in which a caregiver

declines an on-site assessment. The table below shows the data with respect to response to calls:

| Service | FY22 | FY23 Quarter 1 |
|---|---|---|
| Deployments | 356 | 67 |
| Deployments – No intervention | 64 | 10 |
| Cancelled Calls | 141 | 30 |
| Clinical Consultations | 786 | 200 |
| Information Only | 208 | 109 |
| Total Deployments | 420 | 77 |
| Total Calls Not Deployable | 1135 | 339 |
| Total Calls | 1555 | 416 |

b. In FY 22, ChAMPS reported that the average deployment time was 44 minutes. The longest response time was 1 hours and 28 minutes.  The shortest time was under a minute due to crisis team already being on site for another crisis call.  In FY 23 to date, the average deployment time is 41 minutes. The longest response time was 1 hours, 21 minutes.  The shortest time was 9 minutes. The requirement is to arrive to all deployments within one hour or less during the week and within 2 hours for overnight on call shifts and weekend on call shifts.
c. Contractually, ChAMPS was required to have seven teams available in FY22 and FY23 Q1. However due to workforce challenges they were understaffed, often with the Clinical Manager completing deployments as well.  Currently, ChAMPS has four teams available.

d. ChAMPS teams are deployed in pairs. Staff are scheduled in a staggered manner to maximize coverage and the number of crisis teams available. Calls are triaged according to imminent risk and prioritized by the level of danger a child poses to self or to others. Additional considerations are the availability of a mental health clinician, and whether an MPD or a Crisis Intervention Officer is needed at the deployment site. The Clinical Manager maintains contact with the caller until the crisis team arrives at the scene.  There have been times when a ChAMPS crisis team has not been available due to other deployments or staffing issues however, an independent licensed social worker is always available via telephone to provide clinical consultations, recommendations, assist in connecting a client to ongoing mental health service, and contacting a service provider from the family's Care Service Agency (CSA).  Also, if there is an instance of eminent danger or safety concerns a Crisis Intervention Officer (CIO) officer can be deployed  to assist them immediately.

e. ChAMPS has a working relationship with 911, MPD, Access Helpline (AHL) and other District entities.  Most calls for Crisis Services are made directly to ChAMPS however in FY22, 9 calls were transferred from the AHL in FY22 and one in the first quarter of FY23.  ChAMPS often joins the parent or guardian on a call with AHL to link the youth and family to services.    ChAMPS does receive calls from MPD for support addressing psychiatric needs of children and youth.  In addition, when a child or youth is aggressive, ChAMPS will rely on MPD for support and transportation when FD-12 is required.  In addition, ChAMPS conducts information sessions about crisis services and advertises the program throughout the community, encouraging the public and private sector to use these services when needed.

f. ChAMPS conducts monthly surveys regarding the quality of care received by contacting the parents of child or youth after the case has been discharged.  ChAMPS created and uses a Likert Scale survey that asks if they were satisfied with the services provided, did they and/or child feel they were treated with dignity and respect and were the services received in a manner that demonstrated consideration for their beliefs, values, and cultural background.  Of the surveys received, 98% of the participants reported that they were satisfied with the services that were provided by ChAMPS.

37. For individuals served by ChAMPS, how many times did receipt of service result in psychiatric hospitalization in FY 2022 and in FY 2023, to date?  Of the individuals who were hospitalized, how many of those hospitalizations were involuntary (FD-12) and what agency, if any, had custody? Of the individuals who were hospitalized, how many had a diagnosis of "serious emotional disturbance" Please provide the same information for any other Youth Mobile Crisis provider.

**DBH Response**

The goal of emergency crisis support is to stabilize children and youth experiencing a behavioral health crisis and avoid inpatient hospitalization or placement disruptions in the case of children and youth in the care and custody of the child welfare system.  Of the 420 deployments in FY22, the clinician on the scene initiated an FD-12 process for involuntary treatment in 69 instances. Of that number, 23 children/youth required inpatient hospitalization.  In Q1 of FY23, of the 77 deployments, an FD-12 was initiated in 16 instances and of those, 11 children/youth required hospitalization.

ChAMPS is the only youth mobile crisis provider under contract with DBH.

38. During FY 2021, FY 2022, and FY 2023, to date, how many calls to ChAMPS were initiated by MDP?  How many calls were initiated by DCPS or a public charter school?  How many calls were initiated by family members?  How many calls were

# EXHIBIT Y

*Q41. In FY21, how many children have been discharged from inpatient psychiatric hospitalization or psychiatric residential treatment facilities and received in-home and community-based mental health services? This figure should include CBI, intensive care coordination, and intensive case management services—within 30 days, 60 days, or 90 or more days of their discharge. Please also explain how this data may reflect the impact of the COVID-19 pandemic.*

**DBH Response**

In FY 21, based on Department of Health Care Finance data, there were 138 youth discharged from a community hospital inpatient psychiatric hospitalization. Of the youth discharged, 49 were referred to CBI which includes intensive care coordination and intensive case management. Of that number, 36 youth were seen within 30 days, two youth within 60 days, and 11 youth in 90 days or more. The other 89 youth received services including therapy, substance use disorder treatment services, and wrap-around services.

In FY 21, 40 youth were discharged from a Psychiatric Residential Treatment Facility (PRTF). Out of the 40 youth discharged, 22 youth were referred to CBI. Of that number, 16 youth received CBI with 30 days, one youth was seen within 60 days, and five youth in 90 or more days. The other 18 youth discharged from a PRTF received community support, therapy, medication management, and Assertive Community Treatment (ACT). Once youth are discharged, DBH continues to monitor the youth's transition and assess the need for additional behavioral health services.

During the pandemic, providers have implemented the hybrid model for services that can be delivered by telehealth which is preferred by some families because of safety concerns. CBI providers also continue to provide onsite crisis services to the families when needed. DBH continued to provide support to CBI providers with training and consultation around implementing safety strategies and how to engage families and sustain safety of providers in the community and in family's homes throughout the past year.

# EXHIBIT Z

*Q42. For FY 20, FY 21, and FY22 to date, please list: a) the total number of psychiatric residential treatment facility (PRTF) and the total number of residential treatment center (RTC) admissions of a child and youth receiving MHRS (may include duplicate counts of those children or youth with multiple admissions during the Fiscal Year), b) the unduplicated number of children, and of youth, receiving MHRS and served in a PRTF or RTC, and c) the behavioral health conditions being treated. Please also explain how this data may reflect the impact of the COVID-19 pandemic.*

**DBH Response**

**a.** DBH maintains data for youth who are admitted to a Psychiatric Residential Treatment Facilities (PRTF). Residential Treatment Facilities (RTCs) are more aligned with the Juvenile Justice System During FY 21, 30 youth were admitted to a PRTF for treatment and 19 (63%) of those admitted had received a mental health service six months prior to admission. Through the 1st Quarter of FY 22 there have been 4 youth admitted to PRTFs for treatment and 1 of those admitted had received a mental health service six months prior to admission. In comparison, in FY 20, 37 youth were admitted to a PRTF for treatment and 26 (70%) of those admitted had received a mental health service six months prior to their admission. There was a small decrease in the number of PRTF admissions in FY21.

**b.** During FY 20, 43 youth were discharged from PRTFs and 37 (86%) received MHRS services post discharge. In FY 21, 40 youth were discharged from PRTFs and 30 (75%) received MHRS services. To date, through the 1st Quarter of FY 22, there have been 9 discharges and 5 (56%) of those discharge have received a MHRS service.

**c.** A wide range of behavioral health conditions are being treated and they include but are not limited to the following: Attention Deficit Disorder, combined and unspecified; Adjustment Disorder Unspecified; Autism Spectrum Disorder; Bipolar Disorder; Borderline Intellectual Functioning; Borderline Personality Disorder; Cannabis Use Disorder; Child Sexual Abuse; Conduct Disorder; Depressive Disorder with and without psychosis, recurrent, unspecified; Developmental disorder of speech and language, mathematics; Disruptive Mood Dysregulation Disorder; Encopresis; Enuresis; Impulse Control Disorder; Intellectual Disability; Intermittent Explosive Disorder; Post-Traumatic Stress Disorder; Oppositional Defiant Disorder; other problems related to primary support, education and literacy; Reactive Attachment Disorder; Schizo-affective Disorder; Unspecified Bipolar Disorder and Related Disorders, and Unspecified Mood Disorder.

It is difficult to determine the exact cause as to why the numbers of post-discharge MHRS services decreased from FY 20 to FY 21 by 11%. It is plausible that the pandemic had an influence on youth receiving services. In FY 20 when COVID-19 cases began appearing, there was an effort to make adaptations to the way in which services were delivered. Virtual platforms allowed for the provision of telehealth services. In addition, youth were more available for treatment as they were less likely to venture outside their homes. Enrollment was also simplified for parents as they did not have to physically go into an agency. Youth were not as engaged in outside activities and there were fewer competing activities because many activities were shut

down for a substantial period of time. Youth who needed treatment were more available to utilize treatment services.

However, in the 2nd quarter of FY 21 the COVID -19 vaccines became available and the rates of infection also had declined. Restrictions were lifted and youth and their families became more engaged in activities outside the home. Youth also returned to full-time in person school in the latter part of FY21.

# EXHIBIT AA

*Q43.Please provide an updated list of all Evidence-Based Practices (EBP) and for each EBP please note:*
> *a.The name of each provider who offers it;*
> *b.Each provider's capacity;*
> *c.Each provider's current enrollment;*
> *d.Whether the EBP is Medicaid-reimbursable and if so, under what code or rate;*
> *e.Any quality assessment or outcome measure that have been put in place to assess the program; and*
> *f. Whether the EBP is trauma-informed.*

**DBH Response:**

DBH currently offers eight evidenced-based programs (EBPs) which are Child Parent Psychotherapy (CPP), Parent Child Interaction Therapy (PCIT), Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), Functional Family Therapy (FFT), Multi-Systemic Therapy (MST), Trauma Systems Therapy (TST), Transition Into Independence (TIP) and Adolescent Community Reinforcement Approach (ACRA). In FY 21 the number of youth served in all of the eight EBPs decreased from 1166 in FY 20 to 925 in FY 21.  However, the utilization rate increased from 75% to 80%. In FY 21, although less youth were served, the youth in the various EBPs more consistently received the services and were more engaged in treatment. To address the challenges related to COVID, providers transitioned to the telehealth model. This allowed barriers around transportation costs and access to be eliminated and allowed families to be served while at home. Providers were able to increase sessions as a result. Providers also experienced staff turnover. In FY21, there was 50% turnover which was an increase of 6% compared to a 44% turnover in FY20. In addition, as the impact of DC SEED (Social and Emotional Early Childhood Development) SAMHA Grant ending in FY21 Q2, two of the providers closed their CPP and PCIT programs. As a response to this concern, DBH has been working to provide trainings and support to increase the network's capacity for early childhood services. To increase training capacity and cultural competency for early childhood models, both early childhood provider agencies are in the process of training regional trainers to establish local trainings and decrease costs. DBH's vendor, Evidence-Based Associates (EBA), the national subject matter expert on Evidence-Based Practices, has provided human resources support to assist with recruiting qualified staff.

Attachment A provides an updated list of all EBP providers and responses to a-d and f.

e. EBA provides fidelity monitoring which is completed annually by an assigned consultant to measure each providers' compliance with national model standards.

**Child Parent Psychotherapy (CPP)**
In FY21, 100% of CPP providers were within fidelity standards. In FY 21 Q2, at the conclusion of the DC SEED grant, two programs closed which decreased the capacity. In addition, both agencies experienced staff turnover as an outcome of the COVID-19 pandemic. Even though the capacity decreased by 50%, the utilization increased by 15% from 76% in FY20 to 91% in FY21. The number of youth served decreased from 67 in FY 20 to 48 in FY21.
Please see Attachment A for responses to a-d, and f.

**Parent Child Interaction Therapy (PCIT)**

In FY21, 100% of the PCIT providers were within fidelity standards. In FY 21, at the conclusion of the DC SEED grant, two programs closed which decreased the capacity. In addition, both agencies experienced staff turnover as an outcome of the COVID-19 pandemic. The number of youth served decreased from 87 in FY 20 to 56 in FY21. The number of successful discharges increased by 3% in FY 21 from 47% in FY20 to 50% in FY21. Please see Attachment A for responses to a-d, and f.

**Trauma-Focused Cognitive-Behavioral Therapy (TF-CBT)**

In FY 21, 75% of the providers were within fidelity standards. Utilization increased by 12% from 37% in FY20 to 49% in FY21. In FY21, the number of successful discharges increased by 8% from 63% to 71%. The number of youth served in FY20 remained the same in FY21.The impact of COVID-19 pandemic has decreased the number of referrals for each provider. Providers have had limited access to referral sources. In FY21, DBH held community presentations to increase community knowledge of trauma services and increase access. Please see Attachment A for responses to a-d, and f.

**Functional Family Therapy (FFT)**

In FY 21, 100% of the providers were within fidelity standards. Because of staff turnover, the number of youth served in FY20 decreased by 28% from 162 FY20 and 118 in FY21.DBH sustained Memorandum of Understanding (MOU) with CFSA which provided funding for hiring additional staff and leadership for both providers. Please see Attachment A for responses to a-d, and f.

**Multi-System Therapy (MST)**

In FY 21, 100% of the providers were within fidelity standards. In FY21 Q1, because of the impact of COVID-19, Life Changing Solutions closed which decreased the capacity by 50%. In FY21 Q4, MBI hired additional staff which increased the capacity by 100%. The number of youth served increased from 36 in FY20 to 40 in FY21. Please see Attachment A for responses to a-d, and f.

**Trauma Systems Therapy (TST)**

During FY21, because of the impact of COVID-19, both agencies experienced turnover in leadership and staff. This turnover decreased agencies' capacity. Utilization decreased by 28% from 71% in FY20 to 43% in FY21. In addition, providers' challenges with staff retention and access to treatment have been the contributing factors to low utilization. The impact of COVID-19 pandemic has decreased the number of referrals for each provider. Providers have had limited access to referral sources. Providers have worked to improve the initial screening process to implement TST approved screening tools and assessments which increases each agency's ability to screen for cases that meet criteria. DBH held community presentations to increase community knowledge of trauma services and increase access. Please see Attachment A for responses to a-d, and f.

**Transition into Independence (TIP)**

100% of the TIP providers are complying with full model fidelity standards. The number of youth served decreased from 703 in FY20 to 558 in FY21. TIP experienced 77% turnover which impacted the capacity. Utilization increased from 84% in FY20 to 91% in FY21. Please see Attachment A for responses to a-d, and f.

**Adolescent Community Reinforcement Approach (ACRA)**

During FY21, a total of 73 District youth received A-CRA services across two (2) of DBH's certified Adolescent Substance-use Treatment Expansion Program (ASTEP) providers.  DBH used funding from its DC's Changing and Improving Treatment for our Youth (DC CITY) grant to expand the reach of substance use treatment services.  The DC CITY grant is aimed at enhancing DBH services for youth (ages 12-18) and transition-age youth (ages 18-25) in order to provide a comprehensive, family centered, trauma-informed, evidence-based, coordinated system of care from early intervention through recovery. DBH has led the development of strategies and provided guidance to the three (3) ASTEP providers to increase program enrollment and connect youth to supports such as ACRA as an available service for youth in need of Substance Use Disorder (SUD) Treatment.

# EXHIBIT BB

*Q48.  How did DBH implement the National Suicide Hotline Designation Act of 2020, which creates a new 9-8-8 universal telephone number for the purpose of suicide prevention and mental health crisis response?  To what extent has DBH engaged the Office of Unified Communications or other public safety cluster agencies following the law's passage?*

**DBH Response**

DBH was awarded a grant on January 20, 2021 to support the implementation of the new 9-8-8 suicide prevention lifeline. Grant funding was made available to all states, territories, and the District of Columbia to support readiness.  Key legislative and planning grant requirements included:  transitioning to full utilization of 9-8-8 by July 16, 2022, as required nationwide; developing a clear roadmap to address key coordination, capacity, funding, and communication strategies that are foundational to the launching of 9-8-8; and assuring that all jurisdictions meet or exceed a minimum in-state answer rate of 80% for 9-8-8 calls.  Calls not answered in-state rollover to the next available call center in the lifeline network.  The District already exceeds this standard.

The DBH Access HelpLine is the District's only National Suicide Prevention Lifeline (NSPL) member center. As the 9-8-8 grant lead, the DBH driving planning and implementation efforts. DBH has engaged numerous stakeholders as 9-8-8 coalition members, including: representatives from the adult and child mobile crisis programs (CRT and ChAMPS respectively); law enforcement; community mental health providers; peer-based organizations; and family members who have experienced the attempted or completed suicide loss of a family member. The group, which serves as an advisory board to support the planning process for the implementation of 9-8-8, formed workgroups to address requirements of the grant.  The participants are listed in the table below.

The following represent the key building blocks on which the DBH is building out its 9-8-8 capacity for DC residents:

- Community Response Team (CRT) – The DBH's CRT is a 24-7 multidisciplinary direct service, crisis response team that expands our community-based direct service efforts and includes homeless outreach, mobile crisis, and pre-arrest diversion functions.
- Comprehensive Psychiatric Emergency Program (CPEP) - DBH's CPEP is a twenty-four hour/seven day a week operation that provides emergency psychiatric services and extended observation beds for individuals 18 years of age and older.  CPEP provides an alternative to hospital emergency rooms and inpatient psychiatric beds for those in acute distress and crisis.
- Crisis Beds – Through contracts DBH offers two short-term psychiatric stabilization programs, operated by SOME and Woodley House, and one Substance Use Disorder Crisis Program operated by Regional Addiction Prevention Inc. (RAP).
- Metropolitan Police Department(MPD)/Crisis Intervention Officer/Office of Unified Communications – When callers are assessed to be at imminent risk of suicide or harming themselves or others, the Access Help Line (AHL) routes the caller to 9-1-1, operated by the DC Office of Unified Communications

(OUC) to dispatch an ambulance or MPD. When law enforcement is needed, AHL requests that a Crisis Intervention Officer (CIO) respond to the scene. CIOs are officers who receive mental health training from the DBH in crisis management and de-escalation. Having these specially trained officers respond to individuals experiencing a mental health crisis enhances the clinical response and reduces the risk potential exacerbating the crisis.

*To what extent has DBH engaged the Office of Unified Communications or other public safety cluster agencies following the law's passage?*

DBH works closely with OUC, as well as MPD and the Fire and Emergency Medical Services Department (FEMS). OUC participated actively in monthly meetings of the 9-8-8 Planning Grant Coalition and will continue to be a key partner moving forward.

### 9-8-8 Planning Grant Coalition Membership

Johari Eligan, Access HelpLine Director, served as the designated lead for the planning grant. In addition to the lead, the funders required grantees to establish of an advisory coalition that included specified categories of representatives which are denoted by an asterisk in the table below:

| Category | Organization | Name |
|---|---|---|
| Individuals with lived experience of suicide thoughts, attempts and/or loss* | Wanda Alston Foundation | Williams, Celendra |
| A representative from one or more Lifeline crisis centers receiving stipends through the grant* | DBH Access Line/Care Coordination | Minges, Melanie |
| State suicide prevention coordinator* | DBH Linkage & Assessment Service Division | Williams, Lanada |
| Mobile crisis service providers* | Community Response Team<br><br>Catholic Charities – ChAMPS | Bebout, Dr. Richard<br><br>Thomas, Ethlynne |
| Providers of crisis respite/ stabilization services* | Jordan House/SOME | Nightingale, Susan |
| Peer support service providers* | Depression and Bipolar Support Alliance | Scharf, Eric |
| State/local mental health and suicide prevention advocacy groups* | DC National Alliance on Mental Illness | Harris, Jean |
| Other District Government Partners | DC Office of Unified Communications (OUC) | Jackson, Trayshelle |
| | Office of the State of Superintendent of Education | Price, Claudia |

| Other Community Partners | Washington Hospital Center | Colvin, Chandra<br>Gostel, Keith<br>Gentry, Larry |
|---|---|---|
| | Psychiatric Institute of Washington | Bolden, Bonita |
| | District of Columbia Behavioral Health Association | LeVota, Mark |
| | GWU Prevention & Community Health | Craw, Kaila |
| | GWU Prevention & Community Health | Lee, Jonathan |
| | GWU Prevention & Community Health | Price, Olga Acosta |
| | Education Development Center | Loudermilk, Amy |
| | American Foundation for Suicide Prevention | Steinberg, Deborah |
| Other DBH Staff | Comprehensive Psychiatric Emergency Program (CPEP) | Ward, Jonathan |
| | DBH Chief Information Officer | Chaudhry, Imran |
| | DBH New Initiatives Branch | Byam, Leslie-Ann |
| | DBH Data & Performance Manage Branch | Heaven, Laura |
| | DBH Director's Office | Moise, Jean |
| | DBH Prevention/Early Intervention Division | Barnes, Erica<br>Sullivan, Meghan |
| | DBH Provider Relations | Hamilton, Venida Y. |
| | DBH Integrated Care Division | Griffin, Chris<br>Queen, Robin |

# EXHIBIT CC

currently planning for the soft-launch of a co-response model with five CIO-trained officers paired with five crisis specialists from CRT.

In July 2022, the District's 911 Behavioral Health Diversion program was selected to participate in a year-long technical assistance program and learning collaborative provided by the Harvard Kennedy School of Government's Government Performance Lab (GPL). The District of Columbia is one of just four jurisdictions in the country selected for the second cohort of the GPL's 911 Alternative Response program.

The GPL team is currently assisting OUC in developing its methodology for selecting calls that are eligible for transfer. OUC has procured a new platform known as PowerPhone that will both standardize the screening questions for call-takers and generate a recommended action (e.g., dispatch MPD or divert call to DBH). This new platform will strengthen consistency in decision making and is expected to significantly increase the number of calls being transferred. To date, a fraction of the projected number of eligible calls are being diverted to DBH instead of referral to MPD or FEMS. In FY 22, a total of 327 calls were diverted to DBH, of which 90 (28%) resulted in a referral to CRT. Thus, more than 70% of calls are resolved through telephone-only support. Phase 2 of the Harvard GPL technical assistance will focus on training and preparation for Access Helpline and CRT team members to manage the higher volume of calls we anticipate will be diverted.

DBH has procured and is working with its vendor to customize and implement a "Customer Relationship Manager" platform or CRM that will have the capability of interfacing with OUC's and MPD's call tracking systems. The CRM will strengthen the clinical response by giving DBH clinicians access to information directly from OUC's system with much greater efficiency as they work to address the needs of callers in real-time. It also will increase the comfort and confidence of the caller by reducing redundant questioning. The CRM will enhance our ability to track calls across all three agencies and to report out on key data elements, like follow-up services and the frequency with which calls diverted to DBH subsequently require MPD support, that will support system analysis and improvements.

65. Please provide (via spreadsheet) the following information on the Community Response Team for FY 2021, FY 2022, and FY 2023, to date:
    a. Number of Helpline/Mental Health Hotline FTEs;
    b. Number of Community Response Team FTEs;

    c.  Helpline/Mental Health Hotline budget and spending;
    d.  Community Response Team Budget and spending;
    e.  Number of calls received and responded to;
    f.  The locations where the team was dispatched including the ward;
    g.  Breakdown of how many calls related to children and youth or adults; and
    h.  Types of crisis.

**DBH Response:**

DBH's crisis services division works to improve clinical outcomes for individuals experiencing behavioral health crises—to provide the right response at the right by the right responder—and to move away from an automatic law enforcement response.  The Mayor has invested additional resources to expand both Access Helpline (AHL), the DBH operated call center, and the Community Response Team (CRT).  Specifically, AHL is expanding from 16 to 31 staff and CRT is expanding from 38 to 65 team members.  DBH is recruiting for the new positions and have added two new crisis counselors to the AHL and five to the CRT. AHL has 14 staff onboard and 17 vacancies for which 2 candidates have been selected and are in the pre-employment process.  CRT currently has 43 team members and 22 vacancies with five candidates in the pre-employment process.

It is important to note, however, behavioral health staff shortages are severe and projected to worsen nationwide.  DBH is working with SAMHSA to develop alternative recruitment and retention strategies with other states in the region in the short-term while pursuing longer term strategies for growing the pipeline for the behavioral health workforce.

The CRT data shows referrals for children and youth under the age of 18 more than doubled from nine  in FY21 to 21 in FY22 though most requests for mobile crisis for youth are directed to ChAMPS, the District's youth mobile crisis service.  We believe the CRT has begun to receive more youth referrals because of its high visibility in the community and because crises often involve multiple individuals experiencing a shared crisis within their family or community.  This has prompted a reexamination of the organization of crisis services including further alignment and cross-training of the adult and youth mobile teams.  Joint responses have begun to happen more often.  To support this integration, the CRT will assume overnight and weekend responsibility for youth referrals. Beginning in January 2023, referrals from 8 pm to 8 am Monday through Friday and weekends are routed to CRT.

Reporting on crisis type is continuing to evolve as we implement the 911 Behavioral Health Call Diversion project, the nationwide 988 rollout, the newly configured youth mobile crisis program, and DBH and MPD explore a possible co-responder approach.  The data collection is being reshaped in consultation with a team from The Lab@DC who the City Administrator enlisted to support design and evaluation of the 911 diversion project as well.  In addition, the District was one of four jurisdictions to receive a year-long intensive technical assistance award from the Harvard Kennedy School's Government Performance Lab (HKS-GPL).  As a result, DBH and

OUC are plugged into emerging best practices and benefitting in real-time from other governments' experience implementing alternative 911 responses.

Extensive work is being done to establish data definitions and to achieve consistency in the way calls are coded across the DBH crisis continuum and assure good alignment with key partners like OUC, MPD, and FEMS. The DBH electronic health record known as iCAMS also is undergoing a reconfiguration in association with the Medicaid Managed Care Carve-In/System Redesign with the goal of improving data capture and reporting. Improved data quality in crisis services is a major objective which will also be supported by the addition of a supervisory level quality coordinator who will focus on training and documentation.

In response to the question for the location of dispatch, the CRT responds to thousands of calls for assistance and is dispatched in all eight wards. DBH can provide the addresses of individuals who receive services or interventions, but this frequently is different from the CRT dispatched location. There are several scenarios when using the address of the individuals as the location of the dispatch is misleading. For example, many of the calls are from residents for unhoused individuals who are transient and we may engage the same person in different locations but do not have an address. The CRT also responses to "hotspots" with spikes in opioid overdoses and to locations where a large number of people congregate, but again are not able to provide addresses for individuals in those cases as they refused services. Another example is an initial call to the CRT may be from a family member's home, but the individual has a home address different from the dispatch location. DBH can provide the addresses of only individuals who received services from our claims data by zip code which we can match to wards as much as possible. But, this is not the same as the CRT dispatch locations.

| Number of FTEs Assigned to Crisis Services (a. and b.) | | | |
|---|---|---|---|
| | FY21 | FY22 | FY23 YTD |
| Access Helpline (AHL) | 17 | 31 | 31 |
| Community Response Team (CRT) | 38 | 65 | 65 |
| Budget and Spending by Service ( c. and d.) | | | |
| AHL Budget | $1.8M | $2.3M | $2.4M YTD |

| | | | | |
|---|---|---|---|---|
| Spending | | $2.1M | $1.9M | $ .3M YTD |
| CRT | | | | |
| Budget | | $8.6M | $7.8M | $12.3M |
| Spending | | $7.5M | $5.9M | $ 1.8M |
| **AHL and CRT Referrals by Service** | | | | |
| e. | # Referrals to CRT | 5,645 | 5,828 | 1,586 |
| | # Services/Interventions | 3,229 | 3,145 | 803 |
| g. | # Referrals for Youth | 9 | 21 | 7 |
| | # Referrals for Adults | 5636 | 5807 | 1579 |
| h. | Types of Crisis (CRT) | | | |
| | Crisis Assessment – | | 2399 | 0 |
| | Mental Health – | | 802 | 431 |
| | Non-Crisis Engagement – | | 331 | 0 |
| | MH and Substance Use – | | 89 | 50 |
| | Other (specify) – | | 51 | 0 |
| | Substance Use Outreach – | *Unavailable | 26 | 0 |
| | Substance Use – | Due to Change | 8 | 4 |
| | Co-Response – | In Coding | 5 | 0 |
| | DBH Internal – | | 4 | 0 |
| | Traveler's Aid – | | 3 | 0 |

| | | Missing – | | 2110 | 1101 |
|---|---|---|---|---|---|
| | | Total | | 5828 | 1586 |
| | | | | | |

66. Please provide an update on DBH's implementation of the National Suicide Hotline Designation Act of 2020, which created a new 9-8-8 universal telephone number for the purpose of suicide prevention and mental health crisis response. Please include:
   a. The FY 2022 and FY 2023, to date, DBH cost for 9-8-8 implementation;
   b. How many calls were received through 9-8-8 in FY 2022 and FY 2023, to date; and
   c. Please share any updates to how DBH collaborates with the Office of Unified Communications or other public safety cluster agencies to implement this program.

**DBH Response**:

a. Mayor Bowser announced the new 988 telephone number with a press release and social media on July 15, 2022, the day before the official launch. The DBH Access HelpLine (AHL), has been the District's sole National Suicide Prevention Lifeline affiliate for years and maintains its accreditation through the American Association of Suicidology. Therefore, the cost to launch the new 988 was absorbed by existing staff. However, the activation of the 988 three-digit call code and rebranding of the 988 Suicide & Crisis Lifeline are expected to increase call volume in the coming years. DBH was awarded $840,000 in federal funding that will be used to hire new AHL staff to support the anticipated increase and implement the chat and text functions required of all Lifeline affiliates in the next year.

# EXHIBIT DD

# Fixing the District's Youth Behavioral Health System

Ending the Cycle of Institutionalization and Achieving True Community Integration through Intensive Community-Based Services

Disability Rights DC
at University Legal Services
220 I St., NE Suite 130
Washington, DC 20002



(202) 547-0198 (voice)
(202) 547-2657 (tty)
(202) 547-2083 (fax)
www.uls-dc.org

# WHY WE WROTE THIS REPORT

As the federally mandated Protection and Advocacy (P&A) Program for the District of Columbia, Disability Rights DC at University Legal Services, Inc. ("Disability Rights DC") staff directly serve hundreds of individual clients with disabilities each year. Part of this work involves assisting District children and youth with mental and behavioral health disabilities to access services that would enable them to thrive in their communities. But we have observed a distressing pattern: all too often, children do not receive the mental health services they need in their homes, schools, and neighborhoods. When this happens, they face months'—or years'—long placements in residential treatment facilities, psychiatric hospitals, and juvenile detention centers.

These placements isolate children from their families and communities and disrupt their educations. Many of these children lose their ability to act independently in their lives following the regimented environment of a facility. The return to the family is oftentimes brief, resulting in another institutionalization when the same unmet mental health needs that initiated the original placement resurface. Long wait times for intakes, disconnects between service providers, and poor transition planning result in these children cycling in and out of institutions, with each return characterized by the same or worsening issues integrating into their home communities.

The goal of this report is to shine a light on the District's broken youth behavioral health system, identifying the cracks and elevating the stories of the children and families who have fallen through them. Then, based on our work with local advocates,[1] national experts, and the children and families themselves, we propose a solution that could transform the system: Intensive Community-Based Services.[2]



# THE LANDSCAPE: THE YOUTH MENTAL HEALTH CRISIS

From American pediatric health experts[3] to the United States Surgeon General's Office, [4] public health entities across the country have raised the alarm about the youth mental health emergency. In the U.S., mental health issues were the leading cause of disability in children before the COVID-19 pandemic, with up to 1 in 5 children having a mental, emotional, developmental, or behavioral disorder.[5] Rates of childhood and adolescent mental health challenges have been steadily rising in recent years. From 2009 to 2019, the share of high school students reporting persistent feelings of sadness or hopelessness increased by 40%, to more than 1 in 3 students.[6] Between 2011 and 2015, there was a 28% increase in youth psychiatric visits to emergency departments for depression, anxiety, and behavioral challenges.[7] These dramatic changes likely stem from various societal forces and stressors, including increasing digital media use, heightened academic pressure, limited access to mental health care, rising income inequality, systemic racism, gun violence, and climate change.[8]

> **During the decade preceding COVID-19, the share of high school students seriously considering attempting suicide increased by 36%, suicide plans increased by 44%, and suicide rates among youth ages 10-24 increased by 57%.[9]**

COVID-19 has exacerbated what was already a dire situation. In October 2021, a coalition of leading pediatric health experts declared a national state of emergency in child and adolescent mental health.[10] And in March 2022, in his State of the Union address, President Biden discussed the unprecedented American mental health crisis more broadly and among youth in particular, outlining strategies for transforming U.S. mental and behavioral health systems.[11]

According to CDC data, from March 2020 to October 2020, the proportion of mental health-related emergency department visits increased 24% for U.S. children ages 5 to 11 and 31% for those ages 12 to 17, as compared with 2019 emergency department visits. [12] Moreover, although mental health-related emergency department visits among children and adolescents ages 0 to 17 remained stable during 2021 and January 2022, they accounted for a larger proportion of all emergency department visits as compared with 2019.[13]

Children have faced unprecedented challenges during the pandemic, including disruptions to in-person learning and extracurricular activities, fewer opportunities to socialize with friends and family, missed milestone life events, economic instability, and reduced access to mental health care, social services, and other necessary services.[14]

These disruptions have disproportionately affected young people in communities of color, with the ongoing struggle for racial justice inextricably tied to the worsening youth mental health crisis.[15] During the pandemic, more than 140,000 children in the U.S. experienced a life-altering death of a primary or secondary caregiver, with children of color disproportionally impacted.[16]

The landscape in the District of Columbia closely mirrors what has been happening on a national level, with District children who have behavioral health disabilities experiencing an ever-worsening crisis. Approximately 22% of District children—more than 20,000 individuals—have a mental, emotional, developmental, or behavioral problem.[17] Moreover, 47% of District children have experienced risk factors for developing behavioral health issues, known as adverse childhood experiences (ACEs).[18] In a 2019 study, more than one-third of District high school students reported feeling sad or hopeless almost every day for at least two weeks during the past year.[19] And, alarmingly, 14% of District middle school students and 15% of District high school students attempted suicide in the past year, with even more youth considering attempting suicide.[20]

## 22%
of District children have
a mental, emotional,
developmental, or behavioral problem

## 47%
of District children have
experienced risk factors for
developing behavioral health issues

Victoria is 21, and she loves to draw.[21] She has a quick sense of humor and values her role as a daughter, sister, and friend. Victoria experienced traumatic loss at the age of ten when her grandmother and primary caregiver died. Since this loss, Victoria has cycled through numerous institutionalizations in psychiatric hospitals and longer-term psychiatric residential treatment facilities in other states. She has also experienced a number of arrests and long-term placements at the District's juvenile detention facilities. During these placements, Victoria struggled to maintain contact with her father. When transitioning back into the community from these institutional placements, she was almost always discharged without community-based mental health services in place. And when she did receive intermittent community-based mental health services, they were continually disrupted because providers failed to work with her father in a responsive and supportive way. When she tried to resume services in the community, she faced significant delays and often ended up back in a psychiatric or juvenile detention facility.

Victoria explains her frustration: "I have never had a team that really listened to what I wanted and helped me get the services that I thought would help me. Instead, I was bounced around from hospital to hospital, from placement to placement. I didn't receive the services and support I needed in order for me to be mentally healthy, to have a proper education, and to feel loved and safe. I wish the District could have provided me with help."

03

As seen nationally, the COVID-19 pandemic has only worsened the youth mental health landscape in the District. Families of children admitted to Children's National Hospital for mental health-related reasons have reported a concerning new onset of behavioral and emotional health concerns since the start of the public health emergency.[22] However, despite the widely-documented negative impact of COVID-19 on youth mental and behavioral health, the number of District children receiving behavioral health care has decreased since the start of the pandemic. Children receiving Mental Health Rehabilitation Services (MHRS) decreased by 6% between fiscal year 2020 and fiscal year 2021,[23] and the percentage of children receiving MHRS upon discharge from psychiatric residential treatment facilities (PRTFs) decreased by 11 percentage points.[24] There was a 21% decrease in the number of children receiving certain community-based mental health services called Evidence-Based Practices (EBPs),[25] and children served by the Children and Adolescent Mobile Psychiatric Service (ChAMPS) decreased by over 40%.[26]

**FEWER DISTRICT CHILDREN RECEIVING MENTAL HEALTH SERVICES BETWEEN 2020 AND 2021**

↓**6%**

Decrease in District children receiving Mental Health Rehabilitation Services

↓**21%**

Decrease in District children receiving Evidence-Based Practices

↓**40%**

Decrease in District children served by the Children and Adolescent Mobile Psychiatric Service

## THE PROBLEM: THE DISTRICT'S YOUTH BEHAVIORAL HEALTH SYSTEM

Compounding the District's youth mental health crisis are problems specific to the District's youth behavioral health system that predate the pandemic. Disability Rights DC has been sounding the alarm about the system's failures for years.[27] When the District did not respond to our calls for action, we filed a lawsuit alleging that the District operates a system designed to provide, at most, a limited array of services on a limited basis with limited effect.[28] As a part of this lawsuit, we have talked with children and families who have been impacted by this broken system, as well as the advocates who support them. We have also worked with national experts in children's behavioral health, learning what we can about why the District's system is failing our children and what the District can do about it.

In fiscal year 2020, the District served more than 2,500 District children with mental health disabilities through its public mental health system.[29] As experts and advocates have attested in support of class certification for the lawsuit, District children with serious mental health disabilities lack the community-based mental and behavioral health services necessary to enable them to remain in the community. As a result of the system's limitations, children cycle in and out of institutions—including psychiatric hospitals, psychiatric residential treatment facilities (PRTFs) and other residential treatment facilities, the District's detention centers, and group homes—to children's detriment.



> In my experience, District children who are sent to residential placements are away from their families a long time, and they do not come back in better shape. Too often they come back in worse shape than before they left . . . Too often the family makes a sacrifice for the residential placement, but does not reap benefits from that sacrifice.

—Advocate from Advocates for Justice and Education, Inc.



When children leave institutional placements and return to their families, homes, and communities, they frequently receive few or ineffective follow-up community-based behavioral health services due to inadequate discharge planning. If new to the system, children and their families often do not have sufficient information about selecting a core service agency (CSA).[30] Moreover, it can take weeks or even months to get a first appointment with a CSA, causing lengthy gaps in critical services.[31]

## INSTITUTIONALIZATION OF DISTRICT CHILDREN
## BETWEEN SEPTEMBER 2016 AND SEPTEMBER 2019:[32]

| At least | More than | More than |
| --- | --- | --- |
| **98** | **400** | **200** |
| Medicaid-eligible District children were admitted to PRTFs | Medicaid-eligible District children were institutionalized in other residential treatment centers under DYRS custody | Medicaid-eligible District children were admitted more than once to a psychiatric hospital |

When community-based services are finally delivered, there are often many problems. In our conversations with advocates for children with mental health disabilities, we heard again and again about long waiting lists for certain services, the time-limited nature of more intensive services, and high rates of staff turnover. In fiscal year 2021, there was 50% staff turnover among the District's Evidence-Based Practice providers.[33] Advocates have also noted a consistent lack of client and family involvement and engagement by providers in the service planning process, as well as a lack of support for family members. Many children in the District are involved in more than one child-serving government system—for example, the behavioral health, special education, child welfare, or delinquency systems—and advocates have observed little coordination of care between these systems.



> Being sent away makes [children] see themselves as not worthy of being at home with their families.

—Advocate from Total Family Care Coalition



A big part of the problem is that, oftentimes, provider staff do not timely or effectively engage children in services. In many cases, a child may not get the support they need until a crisis occurs. Even then, the support is often inadequate. With respect to the District's mobile crisis team—the Children and Adolescent Mobile Psychiatric Service (ChAMPS)—advocates have observed numerous problems, including inadequate staffing, long wait times for crisis response deployments, deployments far too often resulting in psychiatric hospitalization or police encounters, and a lack of follow-up to ensure proper connection to community-based services. Once a new crisis happens, a child may be institutionalized again or placed at serious risk of institutionalization.



> It is a common scenario that a child is sent home from a residential placement, faces a gap in services due to a late start on planning and waitlists for services, does not receive services for a month or more, and then receives additional charges, which prompts yet another residential placement.

—Advocate from the Public Defender Service for the District of Columbia



This pattern of institutionalization affects children in profoundly detrimental ways. Many children spend their formative years moving in and out of institutional placements, isolated from their families and communities.[34] This causes significant disruption not only to the child's home and social life, but also to their existing mental health treatment. Oftentimes, service providers lose contact with a child who enters a residential treatment center or juvenile detention facility. As a result, children cycle through case workers and service providers, which prevents them from establishing and maintaining the stable relationships they need to access their treatment. Repeat institutionalization also disrupts a child's education, jeopardizing the child's ability to perform in school. This disruption increases the likelihood of involvement in the delinquency and criminal systems while decreasing employment and independent living opportunities in adulthood.

# THE LAW: A CHILD'S RIGHT TO RECEIVE SERVICES IN THE COMMUNITY

The District's children deserve more. And under federal law, they are entitled to more. When the District denies children with mental health disabilities the services they need to live and participate in their communities, it is discriminating against these children based on their disabilities. This discrimination violates the Americans with Disabilities Act,[35] the Rehabilitation Act,[36] and the Medicaid Act.[37]

## The Americans with Disabilities Act and the Rehabilitation Act

Title II of the Americans with Disabilities Act (ADA) forbids state and local governments from excluding or discriminating against people with disabilities.[38] The ADA also requires cities and states to provide services and programs for people with disabilities in the most integrated setting possible.[39] Governments cannot limit the provision of necessary treatment to institutional settings. If certain supports would allow a person with a disability to live in the community, the city or state must make those supports available.[40]

Congress wrote the ADA to ensure that people with disabilities have the same rights and opportunities as everyone else. For children with mental health disabilities, this means receiving the necessary supports to fully participate in their schools and communities. When a state or local government fails to provide supports needed to avoid placement in residential treatment centers, psychiatric hospitals, or juvenile detention facilities, this is discrimination under the ADA.



Section 504 of the Rehabilitation Act applies the same "most integrated setting" requirement to programs and activities that receive federal funding.[41]

## The Medicaid Act

The Medicaid Act is designed to provide medically necessary health and mental health services to children and families from underresourced communities.[42] States (including the District of Columbia) can decide whether to participate in the Medicaid program, but if they do opt to receive these federal matching funds, they must abide by certain regulations[43] and create a Medicaid state plan that describes how they run their program and which services they provide.[44]

Participating states must follow the Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) regulations.[45] These regulations require participating states to ensure children receive appropriate diagnoses and treatment to "correct or ameliorate" physical and mental illnesses.[46] This means both identifying children who have these conditions[47] and providing them with medically necessary treatments.[48] If a treatment is medically necessary, the participating state must provide it, regardless of whether that treatment is already included in the state's plan.[49]



Because the District participates in the Medicaid program, it must comply with the EPSDT provision, making medically necessary services available to all Medicaid-eligible District children who need them.

Isaac is 17.[50] He enjoys listening to music, and he is devoted to his family. He grew up living with his grandmother, and her unexpected death when he was a child caused a major disruption for Isaac. After experiencing worsening behaviors at school, he was admitted to the District's two youth psychiatric hospitals a number of times. But upon discharge from these hospitals, he was never connected to mental health or grief counseling services in the community. He would be hospitalized, released without services or crisis planning, and then re-hospitalized. When Isaac was in the sixth grade, his school referred him to a psychiatric residential treatment facility in Virginia. He lived there for a full year. Again, when he returned to the District, he received no community-based mental health services.

DRDC began representing Isaac in 2018 when his great-grandmother requested help connecting him with community-based services. We encountered numerous obstacles dealing with multiple District agencies, and it took nearly eight months to secure consistent services from a reliable provider. During this turbulent period, Isaac cycled between the District's juvenile detention centers and more out-of-state psychiatric residential treatment facilities. Despite warnings from his great-grandmother, his DRDC attorneys, and Isaac's own expressed wishes, the District repeatedly placed him in group homes away from his family. And he repeatedly left those homes to find his family. His transition services were largely nonexistent, with his most recent discharge occurring before he had been enrolled in school, connected to services, or provided a stable place to live.

Isaac has spent much of his adolescence in institutional placements due to the District's recurring failure to provide him the intensive community-based services that he needs. His great-grandmother has advocated for him every step of the way, but her recommendations are ignored. She told us, "[Isaac] has many strengths, but I don't think that his service providers have actually followed through for him. He always wants to be home with me, but his service providers haven't given him the option of getting services at home. I don't think he would have had to go to residential placements if he had received services that helped him live at home."

# A SOLUTION: TRUE COMMUNITY INTEGRATION THROUGH INTENSIVE COMMUNITY-BASED SERVICES

Evidence from multiple states demonstrates that with a specific set of well-researched services, children with mental health disabilities can be served and thrive in their own communities.[51] These services include Intensive Care Coordination, Intensive Behavioral Support Services, and Mobile Crisis or Response Services. Collectively, they may be referred to as Intensive Community-Based Services (ICBS).

### INTENSIVE COMMUNITY-BASED SERVICES (ICBS)



ICBS are intensive, multi-faceted services that engage children with mental health disabilities and their families to support the child's full participation in community life. When children experience difficulties in just one environment—such as school, home, or the community—focusing on that single environment can be effective. But when a child struggles in multiple environments and these struggles are negatively affecting their development, behavior, and relationships with others, the child may well need the multi-layered approach of ICBS.

These children are often involved with multiple systems in addition to the mental health system, such as developmental disability services, special education, medical care, child welfare, and the juvenile and adult criminal legal systems. Without coordination, each system will offer its own plan to the family based on its own priorities, which can result in conflicting and overwhelming requirements as well as fragmented and duplicative services. Instead of trying to address each of the problem areas through a separate system, ICBS wrap around the child and family to develop an individualized, comprehensive, and coordinated response focused on the vision, strengths, and needs of the child and family.

A key feature of Intensive Community-Based Services is the inclusion of the child and family as full partners in supporting the child. The family (including the child) and other natural supports should play a central role in developing, implementing, monitoring, and adjusting the child's service plan. Their vision for success, their needs, and their

resources should drive the service delivery. ICBS must also be prompt, consistent, flexible and responsive to the child. Children and families should not experience lags in services during a child's transition to or from residential placements, nor should the quality or availability of services differ based on the service provider or caseworker. If a child's disabilities mean that traditional service delivery and clinical interventions will not work for them, services must be modified to accommodate their disability.

Engagement of the child and family is another critical piece of ICBS: it is the responsibility of the ICBS provider to engage the child and family, not the child and family's responsibility to engage based on the provider's expectations. Instead of labeling families as treatment-resistant, providers adapt their approach to meet the unique circumstances of the child and family. If service providers are not engaging the child and family, Intensive Community-Based Services are not being delivered. If the child's parents or legal guardians are not involved, the team draws upon extended family members and other adults in the child's life who are invested in their success and are willing to provide care or support.

Intensive Community-Based Services include three key components:[52]

## Intensive Care Coordination

Intensive Care Coordination (ICC) is an intensive form of team-based case management that uses clinical intervention along with professional and natural support systems to impact every area of the child's life. Intensive Care Coordination is the ICBS answer to the problem of siloed systems overwhelming children and families with conflicting plans that are unresponsive to their individual needs.



Intensive Care Coordination treats families as true partners in their child's care. A Care Coordinator's first step should be to get to know the child and family: What are their strengths? What kinds of supports do they have? How is their culture relevant? Are there other family members, friends, or neighbors who they trust and can call on when they need help? What are their needs? Where do they struggle? And then, what do they see as success? What are the family's goals? What are the child's goals? How do they define what they need and what it would look like to have those needs met? And finally, what supports and services—including newer approaches encompassed in services like mentoring or peer support, but also non-traditional services such as tutoring or enrollment in music or art classes—does the child and family see working for them? Based on responses from the child, family, and people familiar with the child's needs,[53] the Care Coordinator convenes a team of identified providers and informal supporters to create an individualized, flexible care plan for the child. This team, known as a "child-and-family team," is the centerpoint of Intensive Care Coordination.

10

Noah, 19, is quick to share his hope that his life will get better, particularly now that he is a father to a little girl.[54] Noah has several serious mental health disabilities as well as indications of a developmental disability. He endured significant trauma in his childhood. Despite being identified as a child who had experienced trauma and was at risk for sex trafficking, Noah's records indicate no follow-up services for either issue. His father acted as his primary caregiver, but their relationship was strained, and Noah often ran away from his father's home. While Noah received some community-based services, none of the providers successfully navigated his relationship with his father, nor did they engage other family or community members in his care.

Between 2017 and 2020, Noah was removed from his family home and institutionalized at least 18 times. These institutionalizations began when he was arrested and given into the custody of the Department of Youth Rehabilitation Services (DYRS). DYRS placed him in a juvenile detention facility before transferring him to a series of group homes. Most of these placements were complete failures: Noah did not receive the services he needed and repeatedly ran away.

After completing a therapeutic and educational program in Maryland for youth involved in the juvenile justice system, he was placed in a foster home where he was able to form a strong relationship with the home's supervisor. This was a meaningful moment for Noah: he described the man as the father he wished he had had. But despite the stability and success of this placement, the District decided to move him again. When he learned of this disruption, Noah ran away. Again, he was arrested and returned to the juvenile detention facility.

According to a national expert in youth mental and behavioral health, "ICBS would have been extremely effective . . . while [Noah] was finding his way to the group home where he experienced some stability. Had a child and family team been formed with a focus on building on [his] strengths, and building on the strengths of his relationships with individuals like his group home supervisor and his Credible Messenger mentor, [he and his team] could [have] then explore[d] ways to meet his underlying needs."

The child-and-family team should include the child, the child's family, service providers from multiple areas of the child's life (including teachers), and other natural supports. "Natural supports" are people in the child and family's lives who can work with the child to assess needs, build skills, and respond to challenges. These supports may include extended family, friends, neighbors, coaches, faith leaders, and other community members.

With Intensive Care Coordination, a child-and-family team's work should include providing individualized assessments; service planning (including crisis and transition planning); developing, accessing, and arranging for services; coordinating multiple services across different systems; working with the family and child to meet basic needs; and advocating for the family and child.[55] The child-and-family team works together to monitor whether the plan is working and adjust it when it falls short. Additionally, the ICC team collectively

11

defines what constitutes a crisis for the child and family and explores interventions and strategies for immediate implementation in the event of a mental health crisis situation. This process should result in a comprehensive crisis plan that serves to both prevent and respond to the crisis situation. Calling 911 should not be the default response for children who are experiencing a mental health crisis.

Intensive Care Coordination requires organization to work. A single case manager acts as the accountable party for leading the team and ensuring necessary services are accessible to the child and family. The Care Coordinator should facilitate discussions that encourage the various providers on the team to think beyond their own systems to dynamically engage with the child and family's strengths, goals, and needs. This approach extends beyond the necessary components of care coordination and individualized services: coordinated, individualized services are critical, but they must be done in partnership with the families and provided in the most natural and least restrictive environment for the child. Limiting service delivery to a provider's office during defined hours without regard for the preference or constraints of the family is unacceptable.



Our clients often tell us that they feel beaten down by the system in the District, or that they feel that the system has failed them. They are often very cynical about whether anyone cares about them.

—Advocate from the School Justice Project 

Intensive Care Coordination provides a response to the fragmented approach of uncoordinated systems. Disability Rights DC and other advocates have seen multiple clients experience the negative outcomes of systems working at cross purposes: service providers drop out of a child and family's life upon the child's entry into a residential treatment center or a juvenile detention facility. Children lose connections to trusted service providers as the facility takes over their behavioral health care, only to return home without the supports of the facility or reengagement with their previous provider.



With Intensive Care Coordination, the child-and-family team follows the child through every step of institutionalization, engaging in individualized, strengths-based transition planning. This planning ensures that the child can successfully rejoin their community upon their return and prevents further unnecessary institutionalization because supports are in place before they leave the institution.

12

## Intensive Behavioral Support Services

Intensive Behavioral Support Services (IBSS) aim to reduce problem behaviors while improving a child's social, educational, employment, and home life by offering frequent, consistent therapeutic interventions that meet the individual child's needs.[56] Following the plan developed by the child-and-family team, as facilitated by the Intensive Care Coordinator, these services should be delivered to children and families in the child's natural environment, whether that is a family home or elsewhere in the community. Services are not restricted to a practitioner's office or offered only during limited time-slots. Like Intensive Care Coordination, Intensive Behavioral Support Services center on the person receiving services, assessing how the child's life could improve based on their interests and preferences.[57] Intensive Behavioral Support Services can include Positive Behavioral Intervention Plans. These plans involve person-centered planning; collaborative teaming; assessing the person's behavior, including analyzing the antecedents and consequences of that behavior; hypothesizing about the reasons the person behaves in the way they do; multi-component planning for behavioral interventions; and evaluating how those interventions are working.[58]



Intensive Behavioral Support Services center on "person-centered planning," similar to the child-and-family team approach used in Intensive Care Coordination. This must be done in coordination with the child's family. If the child does not have a permanent caregiver, IBSS providers must work with other natural supports in the child's life. Intensive Behavioral Support Services must also follow the child, adapting to where the child is and what the child needs rather than confining services to locations or environments preferred by the provider. If the child is institutionalized in a long-term residential facility or sent to a group home, Intensive Behavioral Support Services should engage the child in that environment. An IBSS provider cannot lose contact with the child or family simply because the child's circumstances have changed; the service must conform to the child's needs.



Intensive Behavioral Support Services must be responsive to the individual needs of the child and family. Available services should involve not only therapy, as appropriate, and clinical interventions, such as skills building, but other services based on the child's age and needs. These additional services could include peer supports, transition services, and mentoring. Parents should have access to parenting support and parent advocacy

services. If a child or family needs another service to be provided in the community but that service is not available in the existing menu of supports, the service should be created. Consistency is also critical to Intensive Behavioral Support Services. The services must be available to the child when the child needs them. If a provider's quality, regularity, or family engagement differs from case worker to case worker, that provider is not offering Intensive Behavioral Support Services with fidelity to the child's plan.

When done properly, Intensive Behavioral Support Services are effective in decreasing problem behaviors, including destructive and self-harming behaviors in children.[59] When combined with Intensive Care Coordination, Intensive Behavioral Support Services can significantly reduce institutionalization of children in psychiatric facilities.[60]

Gabriel, 20, is dedicated to making music and parenting his infant daughter.[61] He remembers that he started having trouble with his emotions when he was in elementary school. He would get in trouble for fighting, but he says, "Nobody ever talked to me about how I was feeling when I got in fights except my mom." His clinical history indicates significant childhood trauma, but he received no evidence-based trauma treatment. He remembers receiving an evaluation in fourth or fifth grade, but he did not understand why he was receiving it: "I don't know what they were looking for. After it was over, I don't remember anything changing. No social workers came to my house, and I didn't get any therapy. It was just my mom helping me."

Since his early teenage years, Gabriel has been institutionalized over 30 times in juvenile detention facilities, group homes, and shelters. During these institutionalizations, he was isolated from his family and his long-time girlfriend. And oftentimes, he received no treatment. He says, "We would just sit in a room all day. There was no therapy, no services. After I got out . . . I didn't get any services. Nobody came to my house or talked to me about how I was doing."

When Gabriel did receive services, they failed to capture his spectrum of needs. While Gabriel has diagnoses for bipolar disorder and attention deficit/hyperactivity disorder, he also has indications of a developmental disability and cognitive limitations. But the services he received both in facilities and in the community were unresponsive to these cognitive needs. There was never an appropriate crisis plan in place, and the service providers failed to engage his mother or other important people in his life to support his transition to the community.

During his most recent institutionalization, Gabriel lost contact with his community service providers, disrupting his employment services application so that he had to reapply when he left the placement. He also missed the birth of his daughter. He says, "I think that was the worst part of everything: DYRS sent me out to a residential placement away from home when my daughter was about to be born . . . I only got to see her on Zoom for months . . . I felt like my DYRS case coordinator and the staff at [my Residential Treatment Center] didn't get what was important to me. Or they didn't care. I wanted to stay in the community, but DYRS sent me off anyway."

**14**

## Mobile Crisis or Response Services

Mobile Crisis or Response Services provide a 24/7, onsite response to a child experiencing a mental health crisis. These services are an alternative to traditional emergency services that often initiate unhelpful involvement by police and other first responders who lack necessary training in children's mental health. Instead, Mobile Crisis or Response providers employ specialized staff with training tailored to working with children experiencing a mental health crisis. These teams should not rely on adult-focused crisis response or hospitalization. Mobile Crisis or Response teams identify and assess the child's needs and stabilize the situation, reducing the risk of immediate harm to the child or others. These services should be delivered whenever and wherever the child experiences the crisis, including at school, at home, or elsewhere in the community.

Mobile Crisis or Response Services extend beyond the moment of crisis—these services should be employed before, during, and after a child needs acute support. Mobile Crisis or Response Service providers should proactively work with child-and-family teams and Intensive Behavioral Support Services providers to review the previously developed crisis plan, identify the child's past triggers as well as strategies and people that have been effective in responding to the child during a crisis, and make revisions as appropriate.[62] These plans must be individualized, enabling the child and family to define what types of behaviors constitute a "crisis" and choosing interventions that are both tailored to the child and responsive to more and less severe circumstances.



When a crisis occurs, these teams should stabilize a child in a natural environment. Once the child is stable, these teams should build on the child and family's network of natural supports to provide meaningful, timely connections to follow-up services, including clinical treatment.[63] Mobile Crisis or Response Services should keep children out of institutions and connect them to services in their communities designed to preempt future crises.[64] These child-specific, holistic crisis services work to support children with mental health disabilities and enable them to maintain their lives in their



communities. In one hallmark example of these services' success, 94% of New Jersey children who experienced crisis and received Mobile Crisis or Response Services were able to avoid hospitalization.[65]

## CONCLUSION

Intensive community-based services work.[66] With the proper services, children with mental health disabilities can live in their own homes or with a kinship or foster family, succeed in school, and participate in community life with their non-disabled peers. These services help children build the skills they need to fully engage in their community while aiding families in understanding their child's disability and supporting their child in the home.

There are at minimum hundreds of children in the District who need these services to stay in their homes and out of facilities. But because the District has failed to provide Intensive Community-Based Services, these children cannot participate in their communities or attend their neighborhood schools. Disability Rights DC is committed to continuing our advocacy for these children and their families until they can access the services they need, the services federal law guarantees them, and the services the District owes them. Every child deserves the chance to grow up where they feel at home. For children with mental health disabilities, we must provide them the services they need to access this opportunity.



# REFERENCES

[1] Along with the Judge David L. Bazelon Center for Mental Health Law, the National Center for Youth Law, and Schulte Roth & Zabel LLP, Disability Rights DC—also acting as a plaintiff—filed a class action lawsuit in 2018 under Title II of the Americans with Disabilities Act and the Medicaid statute on behalf of District youth with significant mental and behavioral health challenges seeking Intensive Community-Based Services (ICBS) to prevent institutionalization. The Plaintiffs filed for class certification in July 2021. As part of this lawsuit, Disability Rights DC and our co-counsel have spoken with advocates from several DC-based organizations to increase our understanding of the District's behavioral health system for children. These organizations include: Advocates for Justice and Education, Children's Law Center, DC Action, Open City Advocates, Public Defender Service for the District of Columbia, School Justice Project, and Total Family Care Coalition. We have drawn from these conversations to build this report.

[2] Disability Rights DC is grateful for the contributions made to this report by our law clerk, Elle Jimenez, J.D. Candidate, Georgetown Law 2024.

[3] *A Declaration from the American Academy of Child and Adolescent Psychiatry, American Academy of Pediatrics, and Children's Hospital Association* (Oct. 2021), https://www.aacap.org/App_Themes/AACAP/Docs/press/Declaration_National_Crisis_Oct-2021.pdf [Coalition Declaration].

[4] *Protecting Youth Mental Health, The U.S. Surgeon General's Advisory*, Dec. 2021, https://www.hhs.gov/sites/default/files/surgeon-general-youth-mental-health-advisory.pdf [Surgeon General Advisory].

[5] Surgeon General Advisory at 8.

[6] Surgeon General Advisory at 8.

[7] Surgeon General Advisory at 8.

[8] Surgeon General Advisory at 8.

[9] Surgeon General Advisory at 8.

[10] Coalition Declaration at 1.

[11] *See* White House Press Release, *FACT SHEET: President Biden to Announce Strategy to Address Our National Mental Health Crisis, As Part of Unity Agenda in his First State of the Union* (Mar. 1, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/03/01/fact-sheet-president-biden-to-announce-strategy-to-address-our-national-mental-health-crisis-as-part-of-unity-agenda-in-his-first-state-of-the-union/.

[12] Centers for Disease Control and Prevention, *Mental Health-Related Emergency Department Visits Among Children Aged <18 Years During the COVID-19 Pandemic – United States, January 1-October 17, 2020* (Nov. 13, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6945a3.htm?s_cid=mm6945a3_w.

[13] Centers for Disease Control and Prevention, *Pediatric Emergency Department Visits Associated with Mental Health Conditions Before and During the COVID-19 Pandemic – United States, January 2019-January 2022* (Feb. 18, 2022), https://stacks.cdc.gov/view/cdc/114657.

[14] Surgeon General Advisory at 9.

[15] American Acad. of Pediatrics, *Pediatricians, Child and Adolescent Psychiatrists, and Children's Hospitals Declare National Emergency in Children's Mental Health* (Oct. 19, 2021), https://www.aap.org/en/news-room/news-releases/aap/2021/pediatricians-child-and-adolescent-psychiatrists-and-childrens-hospitals-declare-national-emergency-for-childrens-mental-health/ [Coalition Declaration News Release].

[16] Coalition Declaration News Release (citing S.D. Hillis et al., *COVID-19-Associated Orphanhood and Caregiver Death in the United States*, 148(6) Pediatrics (2021), https://publications.aap.org/pediatrics/article/148/6/e2021053760/183446/COVID-19-Associated-Orphanhood-and-Caregiver-Death). The death of a caregiver increases the risk for childhood short-term trauma and lifelong negative consequences, as it is an adverse childhood experience (ACE) linked to myriad mental health struggles, including lower education levels, lower self-esteem, riskier behaviors, and increased risk of substance abuse, violence, sexual abuse, exploitation, and suicide. National Institutes of Health, *More than 140,000 U.S. children lost a primary or secondary caregiver due to the COVID-19 pandemic* (Oct. 7, 2021), https://www.nih.gov/news-events/news-releases/more-140000-us-children-lost-primary-or-secondary-caregiver-due-covid-19-pandemic.

[17] Children's Law Center et. al., *A Path Forward: Transforming the Public Behavioral Health System for Children, Youth, and their Families in the District of Columbia* at 28 (Dec. 2021), https://childrenslawcenter.org/wp-content/uploads/2021/12/BHSystemTransformation_Final_121321.pdf [A Path Forward].

[18] A Path Forward at 28.

[19] A Path Forward at 28 (citing Government of District of Columbia: Office of the State Superintendent of Education, 2019 DC YRBS Data Files, https://osse.dc.gov/page/2019-dc-yrbs-data-files (last visited Apr. 3, 2022)).

[20] A Path Forward at 28.

[21] Pseudonym.

[22] A Path Forward at 26.

[23] D.C. Dep't of Behav. Health, *FY21 DBH Written Performance Oversight Responses* at 265-68 (Jan. 2022), https://dccouncil.us/wp-content/uploads/2022/01/dbh.pdf [DBH Oversight].

[24] DBH Oversight at 215-16.

[25] DBH Oversight at 217-20.

[26] DBH Oversight at 82-84.

[27] Disability Rights DC at Univ. L. Servs., *The Way Home: Child and Youth Access to Community-Based Services Post-Psychiatric Hospitalization in the District of Columbia* (Mar. 1, 2015), https://www.uls-dc.org/thewayhome.pdf.

[28] *See supra* note 1. To read the Complaint, visit https://secureservercdn.net/198.71.233.111/d25.2ac.myftpupload.com/wp-content/uploads/2018/08/DC-ADA-EPSDT-complaint.pdf.

[29] U.S. Dep't of Health &. Human Servs., Substance Abuse and Mental Health Servs. Admin. (SAMHSA), *District of Columbia 2020 Mental Health National Outcome Measures (NOMS): SAMHSA Uniform Reporting System* at 7 (June 25, 2021), https://www.samhsa.gov/data/report/2020-uniform-reporting-system-urs-table-dc. Almost all of these children are Medicaid-eligible.

[30] CSAs are community mental and behavioral health providers that contract with DC's Department of Behavioral Health (DBH) to provide community-based services to Medicaid-eligible youth in DC.

[31] We drew this information from our own client experience and our conversations with advocates as part of our litigation. *See supra* note 1.

[32] These figures derive from information we and our co-counsel received from the District during litigation. The District provided figures from September 1, 2016 to September 27, 2019 regarding Medicaid-eligible DC children under the age of 21 with serious emotional disturbance. These numbers indicate that there was a total population of 5,500 children with serious emotional disturbance.

[33] DBH Oversight at 217-20.

[34] Because there are no psychiatric residential treatment facilities (PRTFs) in the District, all youth admitted to PRTFs are sent to other states, in some cases hundreds or thousands of miles away. *See supra* note 31.

[35] 42 U.S.C. § 12132 *et seq.*

[36] 29 U.S.C. § 794.

[37] 42 U.S.C. §§ 1396a(a)(43), 1396d(a)(4)(B), 1396d(r) [Medicaid Act].

[38] Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 C.F.R. § 35.130.

[39] *Olmstead v. L.C.*, 527 U.S. 581 (1999) (interpreting Title II); *see also* 28 C.F.R. § 35.130(d) ("most integrated setting" regulation).

[40] Public entities also must make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that the modifications would fundamentally alter the nature of the service, program, or activity. 28 C.F.R. § 35.130(b)(7).

[41] *See, e.g.*, 45 C.F.R. § 84.4(b)(2) ("most integrated setting" regulation).

[42] *See* Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*

[43] 42 C.F.R. § 430.0 *et seq.*

[44] Medicaid Act § 1396a.

[45] Medicaid Act §§ 1396a(a)(43), 1396a(a)(4)(B), 1396d(r).

[46] Medicaid Act §§ 1396a(a)(43)(C), 1396d(r)(5).

[47] Medicaid Act § 1396d(r)(1).

[48] Medicaid Act § 1396d(r)(5).

[49] 42 C.F.R. § 441.56(c).

[50] Pseudonym.

19

[51] "Studies have shown that intensive community-based services of this nature effectively address the needs of children with mental illness while maintaining their connection to their families and communities. Programs across the country, including those in Wisconsin, Maine, New Jersey, and California have greatly reduced the rate of institutionalization and related costs while producing positive outcomes for children. Children with comparable levels of need who receive intensive services in their natural settings have improved school attendance and performance, increased behavioral and emotional strengths, improved clinical and functional outcomes, reduced suicide attempts, and decreased contacts with law enforcement when compared to children who received such care in segregated residential treatment facilities. Other benefits include reduced costs of care, more stable living situations, and improved attendance at work for caregivers." U.S. Dep't of Justice, *United States' Investigation of the West Virginia Children's Mental Health System Pursuant to the Americans with Disabilities Act* at 9 (June 1, 2015), https://www.justice.gov/sites/default/files/crt/legacy/2015/06/01/wv-ada_findings_6-1-15.pdf.

[52] To fully benefit from Intensive Community-Based Services, some children and families may need an option for short-term, intensive therapeutic treatment, typically known as therapeutic foster care (TFC). TFC programs provide an out-of-home space within the child's community that looks more like a family home than a traditional group home or a residential treatment center. These short-term respite services can reduce stressors on parents and families without isolating the child for long periods of time. TFCs are designed to serve children with emotional and behavioral needs, with no more than one to two children in each home at a time. TFC uses many of the same features of ICBS, including individual treatment plans, a treatment team, training and supports for the TFC parent, access to behavioral services, 24/7 crisis support, and structured activities to maintain the child's connections to family and community. U.S. Dep't of Health & Human Servs., *State Practices in Treatment/Therapeutic Foster Care* at 2-1 (Apr. 2018), https://aspe.hhs.gov/system/files/pdf/259121/TREATMENTFOSTERCARE.pdf.

[53] This could include former and current provider staff, teachers, and other individuals who have worked with the child.

[54] Pseudonym.

[55] C. Mann & P.S. Hyde, *Joint CMCS and SAMHSA Informational Bulletin: Coverage of Behavioral Health Services for Children, Youth, and Young Adults with Significant Mental Health Conditions*, Substance Abuse and Mental Health Servs. Admin. (SAMHSA) and Center for Medicaid and CHIP Services (CMHS) (2013), https://www.medicaid.gov/federal-policy-guidance/downloads/cib-05-07-2013.pdf.

[56] *See, e.g.*, E.G. Carr et al., *Positive Behavior Support: Evolution of an Applied Science*, 4 J. Pos. Behav. Interventions 4 (Winter 2002), https://kuscholarworks.ku.edu/bitstream/handle/1808/6147/PBS16_PBS%20Evolution.pdf?seque nce=1&isAllowed=y.

[57] D. Kincaid & L. Fox, *Person-Centered Planning and Positive Behavior Support, in* Person-Centered Planning: Research, Practice, and Future Directions (S. Holburn & P.M. Vietze eds., 2002).

[58] Ass'n of Positive Behav. Support, *Positive Behavior Support Standards of Practice: Individual Level* (Mar. 2007), https://www.apbs.org/files/apbs_standards_of_practice_2013_format.pdf.

[59] *See, e.g.*, G. Dunlap et al., *A Descriptive, Multiyear Examination of Positive Behavior Support* 35 Behav. Disorders 259 (2010); G. Dunlap et al., *Overview and History of Positive Behavior Support, in* Handbook of Positive Behavior Support 3-16 (W. Sailor et al. eds., 2009); K. Kutash et al., *School-based Mental Health Services in Systems of Care, in* The System of Care Handbook: Transforming Mental Health Services for Children, Youth, and Families (B.A. Stroul & G.M. Blau eds., 2008); G. Sugai & R.H. Horner, *Introduction to the Special Series on Positive Behavior Support in Schools* at 130-35, 10(3) J. Emot. & Behav. Disorders (2002); L. Eber et al., *Wraparound and Positive Behavioral Interventions and Supports in Schools* at 171-80, 10(3) J. Emot. & Behav. Disorders (2002).

[60] K. Matthews et al., *Putting the Pieces Together: Perceptions of Longitudinal Wraparound, Systems of Care, and Positive Behavior Support Implementation*, Cmty. Mental Heal. J. (2019).

[61] Pseudonym.

[62] B. Kamradt et al., *Services for High-Risk Populations in Systems of Care, in* The System of Care Handbook: Transforming Mental Health Services for Children, Youth, and Families (B.A. Stroul & G.M. Blau eds., 2008).

[63] Nat'l Assoc. of State Mental Health Program Directors, *Making the Case for a Comprehensive Children's Crisis Continuum of Care* (Aug. 2018), https://nasmhpd.org/sites/default/files/TACPaper8_ChildrensCrisisContinuumofCare_508C.pdf.

[64] U.S. Dep't of Health &. Human Servs., Substance Abuse and Mental Health Servs. Admin. (SAMHSA), *Crisis Services: Effectiveness, Cost-Effectiveness, and Funding Strategies* at 10-11 (2014), https://store.samhsa.gov/product/Crisis-Services-Effectiveness-Cost-Effectiveness-and-Funding-Strategies/sma14-4848.

[65] *See* CGS ResourceNet, *About New Jersey's Children's System of Care (CSOC)*, http://www.cgsresourcenet.org/about/about-new-jersey-s-children-s-system-of-care-csoc/ (last visited May 3, 2022); New Jersey Dep't of Children & Families, *Children's System of Care 15 Year Anniversary* (Oct. 2016), https://www.nj.gov/dcf/about/divisions/dcsc/CSOC_15.Year.Conference.Presentation.pdf.

[66] In jurisdictions that have received funding to develop and implement Intensive Community-Based Services, the services resulted in "decreased behavioral and emotional problems, suicide rates, substance use, and juvenile justice involvement, as well as increased strengths, school attendance and grades, and stability of living situations." Nat'l Tech. Assistance Ctr. for Children's Mental Health, *Return on Investment in Systems of Care for Children with Behavioral Health Challenges* at vi (2014), https://gucchd.georgetown.edu/products/Return_onInvestment_inSOCsReport6-15-14.pdf.

## ABOUT DISABILITY RIGHTS DC

Since 1996, Disability Rights DC at University Legal Services, Inc. ("Disability Rights DC"), a private, non-profit legal service agency, has been the federally mandated protection and advocacy (P&A) program for individuals with disabilities in the District of Columbia. Additionally, Disability Rights DC provides legal advocacy to protect the civil rights of District residents with disabilities.

Disability Rights DC staff directly serves hundreds of individual clients annually, with thousands more benefiting from the results of investigations, institutional reform litigation, outreach, education, and group advocacy efforts. Disability Rights DC staff addresses client issues relating to, among other things, abuse and neglect, community integration, accessible housing, financial exploitation, access to health care services, discharge planning, special education, and the improper use of seclusion, restraint and medication.

For more information about this report, please contact:

Jane Brown
Executive Director
University Legal Services, Inc.
220 I Street, N.E.
Suite 130
Washington, D.C. 20002
202.547.0198 (voice)
202.547.2657 (tty)

Website
www.uls-dc.org

