# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| M.J., et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| - against - | ) Civ. No. 1:18-cv-1901 (ACR) |
| | ) |
| The District of Columbia, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' REVISED OBJECTIONS AND RESPONSES TO
DEFENDANTS' FIRST SET OF INTERROGATORIES TO
PLAINTIFF UNIVERSITY LEGAL SERVICES, INC.**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiffs revise and supplement their prior objections and responses to Defendants' First Set of Interrogatories to Plaintiff University Legal Services, Inc. ("ULS") ("Interrogatories"), originally served on January 10, 2020, as follows:

**GENERAL OBJECTIONS**

The following general objections and responses ("General Objections") are incorporated into each specific objection and response that follows. The statement of any specific objection in any response shall in no way waive or prejudice Plaintiffs' assertion of General Objections:

1.      Plaintiffs object to the Interrogatories to the extent they seek to impose obligations on Plaintiffs that are inconsistent with, differ from, or exceed those imposed by applicable law.

2.      Plaintiffs object to the Interrogatories to the extent that they seek disclosure of documents or information protected by the attorney-client privilege, work-product doctrine, or any

CONFIDENTIAL

other applicable privilege, protection, or immunity. Plaintiffs also expressly reserve the right to redact non-responsive, proprietary, commercially sensitive, privileged or protected portions of any documents that may be produced in response to the Interrogatories or Defendants' accompanying Requests for the Production of Documents. Pursuant to Rule 502 of the Federal Rules of Evidence, as well as any other applicable laws, rules or regulations, if any privileged or otherwise protected document or information is inadvertently produced or disclosed, Plaintiffs do not waive or intend to waive any privilege, protection, or immunity from discovery pertaining to such documents or information or to any other documents or information and reserve the right to demand the return of all copies of any such document(s).

3.      Plaintiffs object to the Interrogatories to the extent that they are vague, ambiguous, overly broad, unduly burdensome, not reasonably related to the claims in this case, including seeking materials without limitation as to a time period or over a period of time so lengthy as to seek information that is immaterial, irrelevant, or otherwise inadmissible.

4.      Plaintiffs object to the Interrogatories as unduly burdensome and redundant to the extent that they seek the production of information already in the possession of Defendants or available from publicly accessible sources.

5.      Plaintiffs object to the Interrogatories to the extent they are vague, ambiguous, overly broad, unduly burdensome, not proportional to the needs of the case, and/or otherwise exceed the limitations imposed by Rules 26 and 45 of the Federal Rules of Civil Procedure. Plaintiffs further object to the Interrogatories to the extent they seek the production of documents, correspondence, communications, and/or any other information that are not relevant to any party's claim or defense and proportional to the needs of the case.

CONFIDENTIAL

6.     Plaintiffs object to the Interrogatories to the extent that they purport to seek "all communications" or "all facts and circumstances" (or similar language) regarding a given subject on the grounds that the attempt to produce or identify "all communications" or "all facts and circumstances" regarding a given subject would be unduly burdensome, expensive, and impractical.

7.     Plaintiffs do not concede that any of the information sought or provided is relevant to this action, and Plaintiffs expressly reserve and do not in any way waive or intend to waive:  (a) objections as to relevancy; (b) objections as to vagueness or ambiguity; and (c) the right to object on any ground to any further Interrogatories or other discovery requests involving or related to the Interrogatories.  Furthermore, Plaintiffs object to, and do not admit, adopt, or acquiesce to, any factual or legal conclusion, contention, assertion, or characterization contained in the Interrogatories.

8.     Plaintiffs' responses to the Interrogatories do not constitute, and shall not be construed as, a representation that responsive information exists or that such information is in Plaintiffs' possession, custody, or control.

9.     Plaintiffs object to the Definition in Paragraph B of "plaintiffs," "you," and "yours" as overly broad, vague, and ambiguous, and on the ground that it seeks to impose obligations on Plaintiffs to disclose information or produce documents that are not within their possession, custody, or control.

10.     Plaintiffs object to the use of the term "mental health services" as overly broad, vague, and ambiguous.

          CONFIDENTIAL

11.     Plaintiffs reserve the right to further supplement, clarify, and revise these objections and responses, including to the extent additional information becomes available and in any way consistent with the Federal Rules of Civil Procedure.

Subject to the foregoing General Objections, and without waiving the same, Plaintiffs respond to Defendants' individually numbered Interrogatories as follows:

**INTERROGATORY NO. 1**:  Describe with specificity the particular mental health services not currently provided by the District that you believe should be made available to your constituents.

**Response**:  Plaintiff ULS objects to this interrogatory as vague, ambiguous, and overbroad. Subject to and without waiving the foregoing and General Objections, Plaintiff ULS responds as follows:

The District does not, yet is legally required to, provide intensive community-based services ("ICBS") consisting of intensive care coordination, intensive behavior support services, and mobile crisis services to all of Plaintiff ULS's Medicaid-eligible constituents who need the services.  Each of these component services is fundamental to the provision of ICBS, and their composite total is widely accepted as necessary to "effectively address the needs of children with mental illness while maintaining their connection to their families and communities," and greatly reduc[ing] the rate of institutionalization for such children.  *See* Second Amended Complaint (ECF No. 99) ("SAC") ¶ 4 (quoting U.S. Dep't of Justice, *West Virginia Children's Mental Health System Findings Letter* ("DOJ Letter")), *see also* SAC ¶ 41 n.6.  Without each of these components, the services provided are not ICBS, which is what Plaintiff ULS's constituents need; simply naming or characterizing a service or set of services as "ICBS" does not make it so.

ICBS includes the following components:

- ***Intensive Care Coordination ("ICC")***:  an intensive form of case management in which a provider convenes a "child and family team," including the child, the child's family,

CONFIDENTIAL

service providers, and other individuals identified by the family, to design and supervise a plan that provides and coordinates services for children with mental health disabilities. Other states provide ICC to Medicaid-eligible children who need them to treat and ameliorate their conditions. *Id.* (citing California Dep't of Healthcare Servs. & California Dep't of Soc. Servs., Medi-Cal Manual: For Intensive Care Coordination (ICC), Intensive Home-Based Services (IHBS), and Therapeutic Foster Care (TFC) Services for Medi-Cal Beneficiaries 15 (3rd ed. 2018), *available at* https://www.dhcs.ca.gov/services/MH/Pages/Manuals_And_Guides.aspx). For example, under California's Medicaid program, ICC is a:

> targeted case management service that facilitates assessment of, care planning for, and coordination of services to beneficiaries under age 21 who are eligible for the full scope of [Medicaid] services and who meet medical necessity criteria for this service.

> ICC service components include assessing; service planning and implementation; monitoring and adapting; and transition. ICC services are provided through . . . the establishment of [a] Child and Family Team (CFT) to ensure facilitation of a collaborative relationship among a child, their family, and involved child-serving systems.

> The CFT includes formal supports (such as the care coordinator, providers, and case managers from child-serving agencies), natural supports (such as family members, neighbors, friends, and clergy), and other individuals who work together to develop and implement the client plan and are responsible for supporting children and their families in attaining their goals. ICC also provides an ICC Coordinator who:

> - Ensures that medically necessary services are accessed, coordinated, and delivered in a strength-based, individualized, client-driven, and culturally and linguistically competent manner.
> - Ensures that services and supports are guided by the needs of the child.
> - Facilitates a collaborative relationship among the child, their family, and systems involved in providing services to them.
> - Supports the parent or caregiver in meeting their child's needs.
> - Helps establish the CFT and provides ongoing support.
> - Organizes and matches care across providers and child serving systems to allow the child to be served in their community.

CONFIDENTIAL

California Dep't of Healthcare Servs., Specialty Mental Health Services for Children and Youth (Feb. 2, 2023), *available at* https://www.dhcs.ca.gov/services/MH/Pages/Specialty_Mental_Health_Services.aspx.

ICC, such as that provided in Wraparound Milwaukee, centers the child and family in their own service planning and implementation experiences. Declaration of Bruce J. Kamradt ("Kamradt Decl.") (ECF No. 112-5), ¶ 45. This coordination should be available even in instances of out-of-home placements, "begin[ning] from day one of an episode of institutionalization." *Id.* at ¶ 47. The child and family team's intensive care coordinator first learns about the child's and family's "strengths, needs, and resources," and then "convenes a child and family team that identifies appropriate services and natural or informal supports, for the child and for the family supporting the child, that will be provided as part of an individualized care plan." *Id.* at ¶ 45. Such plans may incorporate non-traditional services, including mentoring or peer supports for the child or family members. *Id.* Finally, intensive care coordination is meant to be flexible – the child and family team work together to monitor the individualized care plan over time, to make any adjustments and add new services as clients may require. *Id.* Providing these services while the child is in a more restrictive setting especially ensures a smooth, strengths-based transition to the community and creates a continuity of care for the child. *Id.*

- ***Intensive behavior support services***: individualized therapeutic interventions provided on a frequent and consistent basis that are designed to improve behavior and delivered to children and families in any setting where the child is naturally located.

CONFIDENTIAL

Other states provide intensive behavior support services to Medicaid-eligible children who need them to treat and ameliorate their conditions. *See* SAC ¶ 41 n.6. For example, under California's Medicaid program, intensive behavior support services are:

> individualized, strength-based interventions designed to correct or ameliorate mental health conditions that interfere with a child or youth's functioning and are aimed at helping the child or youth build skills necessary for successful functioning in the home and community, and improving the child or youth's family's ability to help the child or youth successfully function in the home and community.
>
> [Intensive behavior support services] are provided according to an individualized treatment plan developed . . . by the CFT in coordination with the family's overall service plan, which may include, but are not limited to assessment, plan development, therapy, rehabilitation, and collateral. [Intensive behavior support services are] provided to beneficiaries under 21 who are eligible for full scope [Medicaid] services and who meet medical necessity criteria.

California Dep't of Healthcare Servs., Specialty Mental Health Services for Children and Youth (Feb. 2, 2023), *available at* https://www.dhcs.ca.gov/services/MH/Pages/Specialty_Mental_Health_Services.aspx.

Massachusetts offers intensive behavior support services to children who receive ICBS. Declaration of John Sargent, M.D. ("Sargent Decl.") (ECF No. 112-16), ¶ 21. The youth's child and family team assesses how the child interacts with their parents or caregivers, and how the parents interact with the child – whether the parents understand their child's strengths and challenges, whether they set appropriate limits for the child, and whether they provide positive support for the child's behavior, even in the face of the child's negative emotions. *Id.* Based on this assessment of the parent-child relationship, the team prescribes in-home behavioral supports for the child. *Id.* When the child's challenges involve both behavior and emotional issues, such that the child is prevented from pursuing age-appropriate developmental goals in school, during recreational

activities, and in the community with adults and peers, clinicians should be involved to provide some form of individual or family therapy. *Id.* But non-clinicians are involved to work with the child on skills identified in the child and family team's treatment plan, such as self-regulation and social skills. *Id.* Such skills training can be provided by trained paraprofessionals working under the supervision of a clinician. *Id.*

Intensive behavior support services are a collaborative effort to reduce problem behaviors while improving the social, educational, employment and leisure quality of life of individuals. Declaration of Robert Friedman, Ph.D. ("Friedman Decl.") (ECF No. 112-31), ¶ 35. These services must be of "sufficient frequency, intensity, comprehensiveness and duration to address the youth and family's needs." DOJ Letter at 22. Intensive behavior support services are based on principles including stimulus control, generalization, and maintenance, and strategies for assessing the function of behaviors and intervening to reduce problem behavior. Friedman Decl. ¶ 35. At the same time, intensive behavior support services are driven by the values of "person-centered planning," an approach to service planning for individuals with disabilities that entails ascertaining what would make an individual's life better, based on that person's interests and preferences, and then determining how to make that happen. *Id.*

- ***Mobile crisis services***: a 24/7 mobile, onsite, in-person response available at any time or place to a child experiencing a crisis, for the purpose of identifying, assessing, and stabilizing the situation and reducing any immediate risk of harm. These services should be delivered in the child's home, school, or community.

Other states provide mobile crisis services to Medicaid-eligible children who need them to treat and ameliorate their conditions. *See* SAC ¶ 41 n.6. For example, in

Wraparound Milwaukee's Medicaid program, ICBS mobile crisis services are provided to youth and are:

> a short-term or ongoing mental health intervention provided in or outside the youth's home, designed to evaluate, manage, monitor, stabilize and support the youth's well-being and appropriate behavior consistent with the youth's individual crisis/safety plan. The crisis stabilizer helps ensure adherence of the youth and caregiver to the crisis/safety plan including helping the family recognize high risk behaviors, modeling and teaching effective interventions to deescalate the crisis, identifying and assisting the youth with accessing community resources that will aide in the crisis intervention and/or stabilization.
>
> Appropriate Crisis 1:1 interventions may include:
>
> • Providing 1:1 counseling and support.
> • Providing crisis related transportation as needed.
> • Implementing strategies identified in the crisis plan.
> • Removing the youth from stressful situations, *i.e.*: take child to an activity to reduce stress.
> • Providing information and feedback to the Mobile Crisis Team and Child and Family Team.
> • Documenting and writing reports.
> • Attending Plan of Care, Child and Family Team and other team meetings.

Wraparound Milwaukee, Integrated Provider Network Service Description List 12-23 (last visited Jul. 20, 2023), *available at* https://wraparoundmke.com/wp-content/uploads/2014/01/ServDescList.pdf. The Wraparound Milwaukee mobile crisis team focuses on preventing hospitalization whenever possible. Kamradt Decl. ¶ 27. If needed, they follow the child to the hospital and help facilitate the transfer of the child from the psychiatric hospital whenever possible. *Id.* They also help families create or refine realistic, sustainable safety plans to use on their own in subsequent crises. *Id.*

Mobile crisis services for youth should consist of staff specifically trained to work with children and families, and they should "build on natural support structures and reduce reliance on hospitals and formal crisis response systems." Friedman Decl. ¶ 39. They must

include sufficient services to stabilize a youth during a crisis such that the "youth can spend the majority of his/her time living in a more integrated community setting." DOJ Letter at 22. Crisis stabilization staff should assist the child and family in resolving the crisis, identify potential triggers, and assist the family in learning "strategies for effectively dealing with future crises that may arise." Cindy Mann & Pamela S. Hyde, *Joint CMCS and SAMHSA Informational Bulletin: Coverage of Behavioral Health Services for Children, Youth, and Young Adults with Significant Mental Health Conditions*, Substance Abuse and Mental Health Servs. Admin. (SAMHSA) and Center for Medicaid and CHIP Services (CMCS), 5 (2013) ("Joint SAMHSA/CMCS Bulletin"), https://www.medicaid.gov/federal-policy-guidance/downloads/cib-05-07-2013.pdf.

- ***Therapeutic Foster Care***: To benefit from ICBS, children may also need a short-term, intensive, therapeutic placement outside the family home. Other states meet this need by providing the therapeutic foster care service to Medicaid-eligible children who need it to benefit from ICBS and to treat or ameliorate their condition. Therapeutic foster care is a "short-term, intensive, highly coordinated, trauma-informed, and individualized intervention, provided by a [therapeutic-foster care] parent to a child or youth who has complex emotional and behavioral needs." Cal. Dep't of Healthcare Servs. & Cal. Dep't of Social Servs., *Medi-Cal Manual: For Intensive Care Coordination (ICC), Intensive Home-Based Services (IHBS), and Therapeutic Foster Care (TFC) Services for Medi-Cal Beneficiaries* 34 (3rd. ed. 2018) ("Medi-Cal Manual"), https://www.dhcs.ca.gov/Documents/ChildrensMHContentFlaggedForRemoval/Manuals/Medi-Cal_Manual_Third_Edition.pdf.

    The therapeutic foster care parent works under the direction of a licensed mental

health professional to assist the child in achieving the "client plan goals and objectives, improve functioning and well-being, and help the child remain in a family-like home in a community setting, thereby avoiding residential inpatient or institutional care." *Id.* at 36. The therapeutic foster parent will participate in care planning, monitoring, and review; implement interventions as directed by the licensed mental health professional; and meet the needs of the child by reaching out to significant support persons involved in the child's life to help them understand and assist the child. *Id.* at 40-46. This service should not be the only ICBS the child is receiving. *Id.* at 47. Therapeutic foster care services incorporate an individualized treatment plan, a care team which meets every 30-90 days, specialized training and support for the therapeutic foster parent, supervision and in-home support for the therapeutic foster parent, access to behavioral health services, 24/7 crisis support, and structured activities to connect the child to the community. Friedman Decl. ¶ 47.

**INTERROGATORY NO. 2**: Identify all facts and circumstances supporting your allegation in Paragraph 38 of the Complaint that the District does not provide ICBS.

**Response**: Plaintiff ULS objects to this interrogatory as overbroad, unduly burdensome, and on the grounds that it seeks information that is not proportional to the needs of the case to the extent that it demands identification of "all facts and circumstances." Further, Plaintiff ULS objects to this interrogatory because the information is in Defendants' possession and/or is in the possession of a third party. Subject to and without waiving the foregoing and General Objections, Plaintiff ULS responds as follows:

As set forth in Plaintiffs' SAC and in further detail in response to Interrogatory No. 1, above, ICBS requires three key, necessary components, all of which must be delivered with fidelity to nationally recognized models: ICC, intensive behavior support services, and mobile crisis services. Each of these components is fundamental to the provision of ICBS. Despite years of

advocacy, Defendants have never created a functioning system for providing ICBS to District children who need and are entitled to it. *See* Disability Rights DC at Univ. Legal Servs., *Budget Oversight Hearing: Committee on Health, Department of Behavioral Health, Council of the District of Columbia: Written Budget Oversight Hearing Testimony of Disability Rights DC at University Legal Services*, at 3 (Feb. 2019). Although the District provides some services that resemble components of ICC, intensive behavior support services, and mobile crisis services, those services are not the ICBS described in Plaintiffs' Second Amended Complaint for the reasons described below. The District does not offer all of the services that constitute ICBS – whether through a single provider or a combination of providers – to all children in the District who need the services.

The first component, ICC, is one "crucial element" of ICBS. *Rosie D. v. Patrick*, 497 F. Supp. 2d 76, 78 (D. Mass. 2007). ICC is an intensive form of case management in which a provider convenes a "child and family team," including the child, the child's family, service providers, and other individuals identified by the family, to design and supervise a plan that provides and coordinates services for children with mental health disabilities. *See* Joint SAMHSA/CMCS Bulletin at 3-6; Medi-Cal Manual at 15. *See also* Friedman Decl., at ¶ 27 (discussing the "need for all of these children to receive intensive care coordination to help plan for the range of services to meet the multiple needs of the child and family, to coordinate the delivery of those services, to individualize the services, to monitor the delivery of those services, and to modify the treatment plan as needed").

The District does not provide ICC. Rather, the District has failed, and continues to fail, to provide treatment planning which adequately convenes support systems for youth delivered in the most integrated setting with the input of youth, their families, and their service providers. *See id.*

at ¶ 70 (summarizing Plaintiffs' expert review as showing "little indication of close coordination between the youth's schools and mental health providers," an absence of "child and family teams that met regularly, pulled together the best information and resources for the youth and their families, monitored progress, and made adjustments as needed in the youth's service plan," and "very little case management [and] use of the wraparound process . . . ."); *see also* Declaration of Cornelius R. Bird ("Bird Decl..") (ECF No. 112-6), at 15-16, 23-24, 33, 41-42 (describing the District's failure to provide ICC to putative class members, including failures to provide "child and family teams" focused on meeting their "underlying needs"); Sargent Decl. at ¶¶ 46, 49 (describing the District's failure to provide "coordinated, intensive services," noting particularly that "[the youth's] care has been siloed — [their] behavioral health care appears to exist in another world from [their] medical care, and from what happens at school"); Declaration of Kimberly Campbell ("Campbell Decl.") (ECF No. 112-19), at ¶¶ 71, 87, 123-126 (discussing the District's failure to provide youth with child and family teams or to account for their strengths, preferences, interests, and needs); Declaration of Narell Joyner ("Joyner Decl.") (ECF No. 112-26), at 12, 21, 30, 36-38, 46, 52 (concluding multiple youth all needed and would have benefited from "Intensive Care Coordination" or the support of "a Child and Family Team," which the District failed to provide any of them); Declaration of Sara Boyd ("Boyd Decl.") (ECF No. 112-33), at ¶¶ 47, 80, 178 (describing how two putative class members needed and would have benefitted from participation in a "child and family team," and concluding their service planning lacked their input and "meaningful involvement of [their] family members").

Moreover, the District has failed to provide ICC to each of the named Plaintiffs, and continues to do so. *See* Declaration of I.C. ("I.C. Decl.") (ECF No. 112-11), at ¶ 18 (describing the lack of coordination among service providers, school educators, and family in his treatment

planning); Supplemental Declaration of Sara Boyd ("Boyd Supp. Decl.") (ECF No. 112-34), at ¶¶ 39, 55, 68-70 (describing how I.C. needed and would have benefitted from ICC, and still needs ICC); Campbell Decl. at ¶ 50 ("I do not see that a 'child and family team' - comprised both of professionals working with L.R. and her family and of 'natural supports,' like family members, other caregivers, and others who know and could support L.R.—has ever been convened to help her. I do not see that a child and family team has ever conducted a thorough assessment of her strengths, interests, preferences, and needs, and of her family's resources for supporting her. I do not see that such an assessment has informed a service plan for L.R., or that a child and family team has monitored her plan and changed it if it wasn't working."), ¶¶ 138-139, 171-172 (discussing the District's failure to provide M.W. with ICC, including, specifically, a failure to provide a "functioning child-family team with someone responsible for managing his care across systems and domains"); Reply Declaration of Sara Boyd ("Boyd Reply Decl.") (ECF No. 114-2), at ¶¶ 7-8, 10 (describing the District's failure to provide B.T. with ICC).

Defendants purport to provide ICC by offering a service they call "High Fidelity Wraparound" ("HFW"). Even if that service did provide ICC consistent with the nationally-recognized model for this component of ICBS—and it does not, as demonstrated by Plaintiffs' experts' review of the services provided to members of the putative class—Defendants fund High Fidelity Wraparound only to a small handful of youth and "its full potential has not been utilized." *See* Disability Rights DC at Univ. Legal Servs., *Written Testimony of Disability Rights DC at University Legal Services before the Council of the District of Columbia Committee on Health: Fiscal Year 2017 Agency Performance Oversight Hearings Department of Behavioral Health* (Feb. 2018) ("2018 DRDC Testimony") at 7; Am. Insts. for Research, Nat'l Ctr. for Healthy Safe Children, *District of Columbia Department of Behavioral Health Services System Transformation:*

*Children's Mental Health Services Fiscal Study* (Feb. 2019) ("AIR Report") at 33-34 (noting benefits of care coordination "provided best through the wraparound approach" and quoting provider that "DBH funds case management only for adult [substance abuse disorder] and residential services . . . [n]eed to be able to bill for case management in child/youth services . . . ."). Only one provider, MBI, currently provides High Fidelity Wraparound, and its contract only allows for a maximum of 85 children to receive this service "out of the hundreds or potentially thousands who need it." 2018 DRDC Testimony at 7; D.C. Dep't of Behavioral Health, *FY 22 Performance Oversight Questions*, at Response No. 45. Plaintiffs' expert declarant Bruce Kamradt, former Director of Wraparound Milwaukee, further notes that "[g]iven that the eligibility criteria for the District's HFW program are substantively similar to those used by Wraparound Milwaukee for its 'wraparound' program (which had an average daily census of 1,120 children in 2020), and the fact that Washington has a population that is similar to Milwaukee in size and demographics, I continue to believe that at least hundreds of District children with serious emotional disturbance need and are not receiving the ICBS that Plaintiffs seek in their Complaint, including intensive care coordination on a 'wraparound' model." Reply Declaration of Bruce J. Kamradt ("Kamradt Reply Decl.") (ECF No. 114-6), at ¶ 6. As of March 2023, only 52 children were receiving this service. D.C. Dep't of Behavioral Health, *FY 22 Performance Oversight Questions*, at Response No. 45.

Further, even when provided, the District's provision of High Fidelity Wraparound Services lacks fidelity to the nationally-recognized models and, accordingly, to what is required for intensive care coordination. Though the District's HFW may convene a Child and Family Team, it does not develop, coordinate, and adapt a strengths-based service plan for children and youth. *See, e.g.*, Declaration of Jane Brown ("Brown Decl. II") (ECF No. 112-15), at ¶¶ 12, 17

(describing how HFW services have not been "consistently effective or helpful" nor tailored to address the needs of the youth receiving these services); Campbell Decl. at ¶ 56 ("I do not see that the wraparound service was provided with fidelity to the model for wraparound as it is commonly understood across the United States. I did not see evidence in L.R.'s records of an assessment of her strengths, interests, preferences, and needs. I saw no evidence that a child and family team including both formal service providers and persons who could provide informal support was convened or met regularly. I did not see evidence of a service plan that identified what L.R., her family and caretakers, and her service providers would be working on. I did not see evidence of a crisis plan for L.R."); Declaration of L.R. ("L.R. Decl.") (ECF No. 112-21), at ¶ 58 ("I felt like [my High Fidelity Wraparound provider] didn't really listen to me in meetings and didn't respond to my mental health needs. Everyone I talked to about my problems just put me on more medication."); Reply Declaration of Betsy A. Biben ("Biben Reply Decl.") (ECF No. 114-1), at ¶¶ 20-21 ("The HFW child and family team meetings do not consistently and effectively function as a time for team members to come together to develop and monitor the child's service plan, to keep each other informed about the child's progress, and to hold each other accountable for providing the child and family with services and supports identified in the plan . . . Our clients tell us that they do not understand the HFW worker's role or why they are calling."); Reply Declaration of Kimberly Campbell ("Campbell Reply Decl.") (ECF No. 114-4), at ¶ 20 ("I do not believe that the HFW service provided to M.W. qualifies as a Wraparound approach delivered with fidelity as that model is commonly understood across the country because it lacks a service plan designed and monitored by a child and family team."), ¶¶ 22-28 (describing deficiencies in M.W.'s HFW services, including a lack of strengths-based assessment process, absence of a coordinated service plan, lack of child-family teaming, and lack of family engagement).

The second component of ICBS, intensive behavior support services, are "individualized therapeutic interventions provided on a frequent and consistent basis that are designed to improve behavior and delivered to children and families in any setting where the child is naturally located." Second Am. Compl. ¶ 41. The components of intensive behavior support services include skills training, behavioral interventions, and, when needed, therapy. The staff providing the services have small caseloads that permit them to work with the child and family intensively. *See* Joint CMCS/SAMHSA Bulletin at 3-6; Medi-Cal Manual at 15.

Critically, the District does not provide intensive behavior support services identified and developed by a "child and family identifying their own strengths and needs and, with a team of others who know and can support the family, driving the process by which the child's needs are met." Kamradt Reply Decl. at ¶ 11; *see also* Friedman Decl. at ¶ 36 ("Delivery of intensive behavior support services involves the identification and development of individualized interventions by the child and family team based on a functional behavioral assessment. . . . [which] is conducted to understand what reliably predicts and maintains an individual's problem behavior, and therefore is an essential part of the intervention."). The difference between intensive behavior support services and other services is that the former are "expected to be of significant intensity to address the mental health needs of the child or youth, *consistent with the child's or youth's client plan*." Medi-Cal Manual at 30. Intensive behavior support services help the child develop skills and achieve the goals and objectives of the plan that the child and family team has developed. *Id.*

The services provided by the District are not intensive behavior support services because they have not been identified and developed by the child and family team, and hence are not sufficiently individualized to the child's needs. Kamradt Decl. at ¶ 44. The services the District does provide, *inter alia*, have reflected:

- A failure to provide sufficiently intensive community-based services involving natural supports (*see* Declaration of B.T. ("B.T. Decl.") (ECF No. 112-3), at ¶ 29; Bird Decl. at 14-15, 40-41; Declaration of Gail Avent ("Avent Decl.") (ECF No. 112-9), at ¶¶ 15, 17-18; Sargent Decl. at ¶¶ 65, 76, 86; Campbell Decl. at ¶¶ 119, 178; Declaration of Louise W. Missildine ("Missildine Decl.") (ECF No. 112-22), at 37-41; Declaration of M.P. ("M.P. Decl.") (ECF No. 112-33), at ¶¶ 57-58; Joyner Decl. at 7-8, 13, 21, 30-31, 47, 52-53; Declaration of Rachel Russo ("Russo Decl.") (ECF No. 112-29), at ¶ 23; Friedman Decl. at ¶¶ 72-74, 77; Boyd Decl. at ¶¶ 129-130, 167; Boyd Reply Decl. at ¶¶ 4-5, 13, 26; Supplemental Reply Declaration of Sara Boyd ("Boyd Supp. Reply Decl.") (ECF No. 114-3), at ¶¶ 5, 7, 22, 25);

- Inconsistent staffing and high staff turnover (*see* Bird Decl. at 57; Sargent Decl. at ¶ 54; Campbell Decl. at ¶ 176; Missildine Decl. at 17; M.P. Decl. at ¶¶ 27-28; Declaration of M.W. ("M.W. Decl.") (ECF No. 112-24), at ¶¶ 33-36; Joyner Decl. at 13, 20, 47; Boyd Supp. Reply Decl. at ¶ 8; Campbell Reply Decl. at ¶¶ 13, 15)

- Unresponsive services providers and untimely and/or long-delayed services (Campbell Decl. at ¶¶ 121, 176; M.P. Decl. at ¶¶ 35-36; Declaration of Maria Blaeuer ("Blaeuer Decl.") (ECF No. 112-25), at ¶ 27; Joyner Decl. at 10, 29);

- A failure to provide effective outpatient or transition services (*see* Bird Decl. at 13, 23, 32, 40; Missildine Decl. at 33, 37, 46-47; Joyner Decl. at 37-38);

- A failure to provide trauma-based treatment planning (*see* Bird Decl. at 13, 40, 55; Campbell Decl. at ¶¶ 63, 121, 173; Declaration of Betsy A. Biben ("Biben Decl.") (ECF No. 112-4), at ¶ 14; Joyner Decl. at 13, 18-19, 27, 43, 46; Boyd Decl. at ¶¶ 39,

102, 133, 184; Boyd Reply Decl. at ¶6; Boyd Supp. Decl. at ¶ 74; Boyd Supp. Reply Decl. at ¶ 42);

- A failure to provide crisis planning (*see* Bird Decl. at 55; I.C. Decl. at ¶ 19; Joyner Decl. at 52; Boyd Decl. at ¶¶ 163-64; Boyd Supp. Decl. at ¶¶ 28, 50-51; Boyd Supp. Reply Decl. at ¶¶ 21, 55);

- An over-reliance on medication management (*see* Bird Decl. at 10-11; M.W. Decl. at ¶¶ 27-28; M.P. Decl. at ¶ 17; Boyd Decl. at ¶ 121; Boyd Supp. Reply Decl. at ¶ 13);

- An over-reliance on talk therapy and compliance-based treatment (*see* Bird Decl. at 54-55; M.P. Decl. at ¶ 17; Boyd Supp. Reply Decl. at ¶¶ 16-17, 23, 43); and

- Use of seclusion and physical restraint (*see* Boyd Decl. at ¶¶ 122-123, 187-188; Boyd Supp. Decl. at ¶ 27; Boyd Reply Decl. at ¶¶ 22, 25; Boyd Supp. Reply Decl. at ¶¶ 14, 20).

As a result of the District's deficient services, putative members of the class have cycled in and out of institutional settings, including institutions outside of the District, which are inherently delivered outside of the children's communities and the purview of their natural supports. *See* Biben Decl. at ¶¶ 17-19, 21-22 (describing DYRS's failure to provide ICBS); Blaeuer Decl. at ¶¶ 19-22 (describing the District's failure to provide ICBS in residential placements, all of which are "outside the District"); Declaration of Penelope Spain ("Spain Decl.") (ECF No. 112-27), at ¶¶ 10-11, 20 (describing the District's failure to provide ICBS in residential placements and through DYRS); Russo Decl. at ¶¶ 12, 21 (describing the District's failure to provide ICBS in out-of-home placements, all outside of the District); Avent Decl. at ¶¶ 12-14, 19-22 (discussing how "the District's reliance on residential placements doesn't work"); Boyd Decl.

at ¶¶ 45, 51, 59-60, 65, 82 (describing putative class members' experiences with out-of-home institutional placements); Bird Decl. at 11-12, 17-18, 21, 29-30 (same); Joyner Decl. at 26-27 (same). Each of the named Plaintiffs have also been institutionalized as a result of the District's failure to provide ICBS and have failed to receive intensive behavior support services while institutionalized. *See, e.g.*, B.T. Decl. at ¶¶ 15, 17-20, Boyd Decl. at ¶¶ 120, 138-139, *and* Boyd Reply Decl. at ¶¶ 18, 20 (B.T.); I.C. Decl. at ¶¶ 20, 22, 24 *and* Boyd Supp. Decl. at ¶¶ 31-32, 59-62 (I.C.); L.R. Decl. at ¶¶ 31-35, 38-40 *and* Campbell Decl. at ¶ 53 (L.R.); Campbell Decl. at ¶¶ 141, 148 (M.W.).

The most intensive behavior support service that the District offers is "Community-Based Intervention" ("CBI"), available in three different levels of intensity. However, CBI as delivered by the District does not constitute intensive behavior support services. The District's CBI service is not designed or supervised by a child and family team, and is a time-limited service. *See* D.C. Dep't of Mental Health, *Community Based Intervention (CBI) Services for Children and Youth* (Jan. 10, 2011), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/TL148.pdf; AIR Report at 35 (noting that after time-limited CBI services are terminated, there is a need for other services that would stabilize children in the community), 39 (recommendation that family skill-building services/living skills training, in-home family therapy, respite, peer support, and intensive case management/wraparound be provided as Medicaid-funded behavioral health services). Because it is not designed and supervised by a child and family team, CBI does not provide sufficiently intensive behavior support services. *See* Kamradt Decl. at ¶¶ 45, 52-53 (describing how the District's CBI is not ICBS, does not provide a "robust child-and-family team process" or sufficiently "intensive, individualized, and flexible services," and focuses instead on "traditional

clinical services"); *see also* Cty. of L.A. Dep't of Children & Family Servs., Dep't of Mental Health, *Katie A. Strategic Plan* 32 (Oct. 2, 2008), http://dcfs.co.la.ca.us/katieA/docs/Strategic%20Plan.pdf:

> Individualized services must be designed to meet the unique needs of each child and build on the child's and family's strengths. It is essential to have birth, kinship, adoptive and foster families involved in planning services with professionals from mental health, child welfare, school and other agencies and the family's informal supports. The complex needs of these children require integrated services, and team planning is essential and cannot be separated from the interventions. . . . Effective services for emotionally disturbed children require enhanced care coordination, often daily individual clinical interventions for the child, and guidance for caregivers (including teachers) for which traditional outpatient therapy is not sufficient in number of hours, flexibility, or family functioning focus.

The experiences of the putative class confirm significant problems with the District's provision of CBI. *See, e.g.*, Avent Decl. at ¶ 30 ("When our families experience crises or have needs during evenings, weekends — any time outside the CBI worker's usual workday — the family might call the CBI worker, but the worker won't come."); Spain Decl. at ¶ 25 ("Although many of our clients are referred to CBI, their experiences have not always been positive. First, there is significant staff turnover within CBI. Second, there is a lack of collaboration and cooperation between DYRS and the CBI program."); Russo Decl. at 27 ("[I]n most cases, our clients do not find CBI to be helpful. We have had experiences with CBI workers who do not appear to know how to work with teenagers, or who otherwise just were not very effective, because they were unreliable or inconsistent. Also, CBI workers are often replaced fairly quickly, which prevents our clients from forming good relationships with workers. These deficiencies are a problem for our clients, because cultivating trust and experiencing consistency are key elements of developing a beneficial working relationship."); Biben Reply Decl. at ¶¶ 7, 9-11 (describing how family involvement in "CBI has been inconsistent" and how CBI "clinical interventions" are "not adequately individualized to the child and family"); Brown Decl. II at ¶¶ 18-19 (discussing

how "CBI case workers do not engage effectively in therapeutic interventions in the home or elsewhere in the community," do "not have enough time with all of the children and families on the worker's caseload," and fail to provide "care coordination" between youth and their families); Campbell Decl. at ¶¶ 51-52 (describing how L.R. received CBI services "provided too inconsistently, and [] not effective in supporting her needs"); M.P. Decl. at ¶ 39 (describing how a putative class member's "CBI case worker didn't have much time for him [and] didn't connect to [him] very well"); Boyd Reply Decl. at ¶ 29 (describing how B.T.'s CBI services "were not individualized to B.T., did not maximize his independence, did not engage his family, and did not achieve treatment goals"); Boyd Supp. Reply Decl. at ¶¶ 27-31, 33 ("The CBI services that I.C. received did not create a child and family team and incorporate input from such team. They were not coordinated. And they were not intensive or provided frequently and consistently. Further, the CBI services were not individualized to I.C.'s needs.").

Although Defendants' "assertive community treatment" ("ACT") service includes some intensive behavior supports, Defendants limit provision of this service to very few children, providing it to just three children under age 18 in fiscal year 2017 and only 16 children under age 18 in fiscal year 2018. D.C. Dep't of Behavioral Health, *Mental Health and Substance Use Report on Expenditures and Services (MHEASURES)*, at 12 (Jan. 2018), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/MHEASURES%20Jan uary%202018%20%28002%29.pdf; D.C. Dep't of Behavioral Health, *Mental Health and Substance Use Report on Expenditures and Services (MHEASURES)*, at 12 (Jan. 2019), https://dbh.dc.gov/sites/default/files/dc/sites/dmh/publication/attachments/MHEASURES%20Jan uary%202018%20%28002%29.pdf. And, as has been the case with the provision of High-Fidelity Wraparound and CBI services, the District's provision of ACT services has also failed to provide

putative class members with intensive behavior support services consistent with an ICBS model. *See, e.g.*, Avent Decl. at ¶¶ 31-32 (describing how "the District's ACT service has not been effective for youth"); Brown Decl. II at ¶ 20 (describing high ACT staff turnover and inconsistent and inconvenient service provision); Boyd Reply Decl. at ¶ 38 (discussing "serious deficiencies" in the District's ACT services, including concerns about "excessively high caseloads" and a "lack of sufficient training in psychosocial evidence-based practices").

The third component of ICBS, mobile crisis services, involves a "mobile, onsite, in-person response, available at any time or place to a child experiencing a crisis, for the purpose of identifying, assessing, and stabilizing the situation and reducing any immediate risk of harm." The District asserts that it provides mobile crisis services through its Children and Adolescent Mobile Psychiatric Services ("ChAMPS") program, but these services only respond to limited types of crises. *See* AIR Report at 34 (quoting providers that "ChAMPS has four workers for whole city. Foster parents call and are told they cannot receive ChAMPS services because their child is in custody of CFSA. People call and are put on hold in emergencies."). Moreover, they do not include sufficient support services to stabilize children during a crisis and frequently respond to such crises by hospitalizing the child, often involuntarily. *See* D.C. Dep't of Behavioral Health, *FY 18-19 Performance Oversight Questions*, at Response No. 16 (reporting that between fiscal year 2017 and the first quarter of fiscal year 2019, 651 calls where ChAMPS was deployed resulted in 166 hospital admissions (over 25%); 117 of these (over 70%) were involuntary admissions); AIR Report at 34 (quoting provider that "[m]obile crisis stabilization teams should have staff well-trained in de-escalation and positive behavior support techniques; and should have capacity to support (foster) parents as well as youth in crisis."); Avent Decl. at ¶¶ 24-25 (discussing long ChAMPS response times and failures to connect families with long-term services and supports

post-crisis); Biben Decl. at ¶¶ 30-31 (describing parental fears of arrest or hospitalization from use of ChAMPS); Spain Decl. at ¶ 23 ("ChAMPS does not always arrive promptly and the crisis can escalate while the family waits for ChAMPS"); Boyd Reply Decl. at ¶ 40 (describing how "ChAMPS is not provided with fidelity to the standards of mobile crisis services under ICBS," including by lacking evidence-based practices for reducing the risk of suicide or self-harm); Kamradt Reply Decl. at ¶¶ 20-22 (discussing "staffing shortages" and noting "a significant number of [ChAMPS] calls were cancelled because no teams were available to respond at the time of the call"); Declaration of Kimberly Perry ("Perry Decl.") (ECF 112-18), at ¶¶ 23-25 ("ChAMPS is sometimes unavailable to respond, or cannot respond quickly enough to a crisis.").

To benefit from ICBS, children may also need therapeutic foster care ("TFC"), a short-term, intensive, therapeutic placement. *See* Medi-Cal Manual at 34. When this service is needed to correct or ameliorate a child's condition, Defendants must provide it. *See* AIR Report at 14, 18, 42 (recommending the addition of TFC as a Medicaid service for children who need it). The District's current service coordination for foster placements regularly cycles youth outside of the District, further disconnecting them from receiving intensive support services within their communities. *See, e.g.*, Boyd Supp. Reply Decl. at ¶ 54 ("I.C.'s eventual placement in a [Maryland] foster home entirely severed his ability to receive services in his home community"); L.R. Decl. at ¶ 39 (noting failure to receive therapy and community services while in a foster setting in Maryland).

Because Defendants do not provide all of the required components of ICBS, which are collectively necessary to meet the plaintiff children's mental health needs, these children are deprived of the ICBS that they need in order to improve their conditions and avoid unnecessary institutionalization or the serious risk of institutionalization. ULS's constituents include children

who have been institutionalized or who are at risk of institutionalization due to Defendants' failure to provide these services. ULS regularly monitors and interviews children who have been institutionalized at the Psychiatric Institute of Washington ("PIW") and Children's Hospital and has observed these outcomes, including the children interviewed for its 2015 report on Defendants' behavioral health system, *The Way Home: Child and Youth Access to Community-based Services Post-Psychiatric Hospitalization in the District of Columbia* ("*The Way Home*"). It also has provided testimony at Defendants' hearings concerning these issues. *See* Disability Rights DC at Univ. Legal Servs., *Budget Oversight Hearing: Committee on Health, Department of Behavioral Health, Council of the District of Columbia: Written Testimony of Disability Rights DC at University Legal Services* (Feb. 2018) at 1 (as of February 2018, many District children still were not receiving ICBS and were unnecessarily institutionalized or at serious risk of institutionalization); D.C. Dep't of Behavioral Health, *Testimony of the District of Columbia Behavioral Health Association, Performance Oversight Hearing* 1 (Feb. 12, 2019) (over past year, "too many children were psychiatrically hospitalized"); https://www.dcbehavioralhealth.org/public-policy/2019-policy-advocacy; *see also* AIR Report at 3 (leadership from largest provider within DBH network states that "many children and youth . . . are still needing services), 6 (DBH agency partner states that "[w]hat is going on with DBH system is frustrating . . . . By the time these children come to us they are bleeding . . . . Services need to support children to be in their home, back home, to receive treatment quickly"), 14 (recommendation that DBH provides in-home family therapy and peer support, and intensive case management/wraparound as Medicaid-funded [behavioral health] services), 40 ("DC's [Behavioral Health] system currently supports about 100-125 young people in (congregate) out-

of-home care placements . . . .  Agency partners (e.g., CFSA, DYRS) also place young people in congregate facilities outside the auspices of the [Behavioral Health] system . . . .").

**INTERROGATORY NO. 3**: Identify all facts and circumstances supporting your allegation in Paragraph 41 of the Complaint that no service provider in the District offers ICBS.

**Response**:  Plaintiff ULS objects to this interrogatory as overbroad, unduly burdensome, and on the grounds that it seeks information that is not proportional to the needs of the case to the extent that it demands identification of "all facts and circumstances."  Further, Plaintiff ULS objects to this interrogatory because the information requested is in Defendants' possession and/or in the possession of a third party.  Subject to and without waiving the foregoing and General Objections, Plaintiff ULS responds as follows:

Plaintiff ULS incorporates its Response to Interrogatory No. 2.  Although the District provides some services that resemble components of intensive care coordination, intensive behavior support services, and mobile crisis services, these services are not the ICBS described in Plaintiffs' Second Amended Complaint.  The District does not offer all of the services that constitute ICBS – whether through a single provider or a combination of providers – to children in the District, including Plaintiff ULS's constituents.



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



 CONFIDENTIAL



CONFIDENTIAL



 CONFIDENTIAL



33 CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



37



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



CONFIDENTIAL



 CONFIDENTIAL



 CONFIDENTIAL

Dated: August 11, 2023

Respectfully Submitted,

*/s/ Jason T. Mitchell*

Sandra J. Bernstein (D.C. Bar No. 455355)
Mary Nell Clark (D.C. Bar No. 419732)
Eva I. Richardson (D.C. Bar No. 1724670)
DISABILITY RIGHTS DC AT UNIVERSITY LEGAL SERVICES
220 I Street NE, Suite 130
Washington, D.C. 20002
202-547-0198

Ira A. Burnim (D.C. Bar No. 406154)
Lewis L. Bossing (D.C. Bar No. 984609)
Brittany Vanneman (D.C. Bar No. 1736194)
JUDGE DAVID L. BAZELON CENTER FOR MENTAL HEALTH LAW
1090 Vermont Avenue, NW, Suite 220
Washington, D.C. 20005
202-467-5730

Poonam Juneja (appearing *pro hac vice*)
Brenda Star Adams (appearing *pro hac vice*)
NATIONAL CENTER FOR YOUTH LAW
1212 Broadway, Suite 600
Oakland, CA 94612
510-835-8098

Howard Schiffman (D.C. Bar No. 358814)
Jason T. Mitchell (D.C. Bar No. 1005757)
Laurent M. Abergel (D.C. Bar No. 1718921)
SCHULTE ROTH + ZABEL LLP
555 13th Street, NW, Suite 6W
Washington, D.C. 20004
202-729-7470

*Counsel for Plaintiffs*

CONFIDENTIAL

## **VERIFICATION**

I, Jane Brown, am the Executive Director of Plaintiff University Legal Services, Inc. ("ULS"). I am the agent of ULS for purposes of answering Defendants' First Set of Interrogatories to Plaintiff University Legal Services, Inc. I have read the foregoing interrogatories and the revised answers to those interrogatories, which are true according to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

Dated this __9th__ day of August, 2023

Jane Brown
Executive Director
University Legal Services, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 11, 2023, a copy of Plaintiff University Legal Services, Inc.'s Revised Responses and Objections to Defendants' First Set of Interrogatories to Plaintiff University Legal Services, Inc. was served via email on counsel for Defendants.

*/s/ Jason T. Mitchell*
SCHULTE ROTH + ZABEL LLP
555 13th Street, NW, Suite 6W
Washington, D.C. 20004
Tel: (202) 729-7470