## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **M.J.,** *et al.,* | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 1:18-01901-ACR** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

## <u>DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS</u>

## Table of Contents

INTRODUCTION ...................................................................................................... 1

BACKGROUND ....................................................................................................... 1

STANDARD OF REVIEW ........................................................................................ 2

ARGUMENT ............................................................................................................ 3

I.    The District Is Entitled to Judgment On Plaintiffs' Claims Under Count II Because

Plaintiffs Lack A Cause of Action. ............................................................................ 3

A.    Section 1983 Only Enables Enforcement of Unambiguous Federal Rights. ................ 3

B.    The EPSDT Provision Does Not Create A Federal Right. ............................................ 7

II.    *Medina* Affirms and Reiterates a Decades-Old "Clear Statement" Rule. ....................... 11

CONCLUSION ........................................................................................................ 18

## Table of Authorities

Page(s)

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ............................................................................................. 8, 17

*Armstrong v. Exceptional Child Center, Inc.,*
575 U.S. 320 (2015) ...................................................................................... 9, 11, 22

*Blessing v. Freestone,*
520 U.S. 329 (1997) .................................................................................................. 10

*Cannon v. Univ. of Chicago,*
441 U.S. 677 (1979) .................................................................................................. 10

*Davis v. Passman,*
442 U.S. 228 (1979) .................................................................................................... 8

*DuBerry v. District of Columbia,*
824 F.3d 1046 (D.C. Cir. 2016) ................................................................................. 9

*Equal Access for El Paso, Inc. v. Hawkins,*
509 F.3d 697 (5th Cir. 2007) ................................................................................... 18

*Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc.,*
598 U.S. 339 (2023) ............................................................................................ 20, 21

*Georgia v. Public.Resource.Org, Inc.,*
590 U.S. 255 (2020) ............................................................................................ 16, 20

*Gonzaga Univ. v. Doe,*
536 U.S. 273 (2002) ........................................................................................... Passim

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) .................................................................................................. 21

*Health and Hosp. Corp. v. Talevski,*
599 U.S. 166 (2023) ........................................................................................... Passim

*John B. v. Goetz,*
626 F.3d 356 (2010) .................................................................................................. 15

*Long Term Care Pharmacy Alliance v. Ferguson,*
362 F.3d 50 (1st Cir. 2004) ...................................................................................... 18

*Mallory v. Norfolk S. Ry. Co.,*
600 U.S. 122 (2023) ............................................................................................ 16, 19

*Medina v. Planned Parenthood,*
606 U.S. 357 (2025) ........................................................................................... Passim

*Nw. Illinois Area Agency on Aging v. Basta,*
145 F.4th 695 (7th Cir. 2025) .................................................................................. 13

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) ............................................................................................... Passim

*Peters v. Nat'l R.R. Passenger Corp.,*
966 F.2d 1483 (D.C. Cir. 1992) ................................................................................. 7

*Planned Parenthood v. Kerr,*
95 F.4th 152 (2024) .................................................................................................. 19

*Riley v. Bondi*,
    606 U.S. 259 (2025) ................................................................................ 20, 21
*Salazar v. District of Columbia*,
    729 F. Supp. 2d 257 (D.D.C. 2010) ................................................................ 18
*Schuler v. PricewaterhouseCoopers, LLP*,
    514 F.3d 1365 (D.C. Cir. 2008) ................................................................. 7, 16
*St. Anthony Hosp. v. Whitehorn*,
    132 F.4th 962 (7th Cir. 2025) ......................................................................... 18
*Timken v. South Denver Cardiology Assocs., P.C.*,
    --- F.4th ---, 2025 WL 2961546 (10th Cir. Oct. 21, 2025) ............................. 13
*Waters v. District of Columbia*,
    2022 WL 715474 (D.D.C. Mar. 10, 2022) ....................................................... 7
*Westside Mothers v. Olszewski*,
    454 F.3d 532 (6th Cir. 2006) .......................................................................... 15
*Wilder v. Virginia Hosp. Ass'n*,
    496 U.S. 498 (1990) ........................................................................................ 10
*Wright v. City of Roanoke Redevelopment & Hous. Auth.*,
    479 U.S. 418 (1987) ........................................................................................ 10

**Statutes**

42 U.S.C. § 1396a ........................................................................ 12, 14, 15, 22
42 U.S.C. § 1396a(a)(23) ...................................................................... 14, 22
42 U.S.C. § 1396a(a)(43) ................................................................. 6, 12, 15
42 U.S.C. § 1396c ..................................................................................... 14
42 U.S.C. § 1396d(a)(4) ...................................................................... 14, 22
42 U.S.C. § 1396r(c)(1)(A) ........................................................................ 11
42 U.S.C. § 1396d(r) ............................................................................. 6, 12
42 U.S.C. § 1983 ............................................................................... Passim

**Rules**

Fed. R. Civ. P. 12(c) ............................................................................... 7, 8
Fed. R. Civ. P. 12(h)(2)(B) .......................................................................... 8
Fed. R. Civ. P. 56 ......................................................................................... 8

**Other Authorities**

William N. Eskridge, Jr., *Overriding Supreme Court Statutory Interpretation Decisions*,
    101 Yale L.J. 331 (1991) ............................................................................... 22
William N. Eskridge, Jr. & Phillip P. Frickey, *Quasi-Constitutional Law: Clear Statement Rules As Constitutional Lawmaking*,
    45 Vand. L. Rev. 593 (1992) ......................................................................... 20
5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure (Wright & Miller),
    § 1368 (2d ed. 1990) ...................................................................................... 8
Wright & Miller § 1369 .................................................................................. 8

## INTRODUCTION

Defendants District of Columbia and three officials sued in their official capacities only (Mayor Muriel Bowser, Deputy Mayor Wayne Turnage, and agency director Barbara Bazron), collectively, the District, move for judgment on the pleadings with respect to Count II of Plaintiffs' Second Amended Complaint (SAC) [99].  In Count II, Medicaid-enrollees L.R., B.T., M.W., and I.C., on behalf of themselves and a putative class, and University Legal Services, Inc., on behalf of its constituents, claim that the District has failed to provide them medically necessary services to correct or ameliorate their mental health conditions, in violation of the Social Security Act (SSA).[1]  Specifically, they allege violation of a subsection widely known as the EPSDT provision (standing for Early Periodic Screening, Diagnosis and Treatment), codified at 42 U.S.C. § 1396a(a)(43).  SAC ¶ 89 (citing also 42 U.S.C. § 1396d(r), which defines terms used in the SSA).  The District is entitled to judgment because Plaintiffs have no cause of action to enforce the EPSDT provision.

## BACKGROUND

The Court is familiar with the basic facts of this case and has instructed the Parties to focus their briefing on the arguments.  The District therefore presents just relevant procedural facts.  Plaintiffs filed suit in 2018.  *See* Compl. [3].  Count II has been a part of this suit since the beginning.  *Id*. at 19–20.  The District moved to dismiss the complaint in October 2018.  *See* Defs.' Mot. to Dismiss [21]; Pls.' Opp'n [29]; Defs.' Reply Supp. Mot. to Dismiss [33].  The

---

[1]    The complaint alleges violation of "the Medicaid Act," SAC at 23; this is a popular name for amendments to the Social Security Act.  *E.g.*, U.S. National Archives, "Medicare and Medicaid Act (1965)," https://tinyurl.com/msbstfph [last accessed Nov. 17, 2025].  The District's briefing uses the SSA and Medicaid Act terminology interchangeably.

District did not argue, at that stage, that Plaintiffs lacked a cause of action to pursue Count II. *See generally* Defs.' Mot. to Dismiss.  Thus, the question has not yet been decided in this case.

On August 8, 2025, pursuant to the Court's Standing Order, the District filed a "Notice of Anticipated Motion for Partial Summary Judgment" [145] (Defs.' Notice) arguing Plaintiffs lacked a cause of action to sue for alleged violation of the ESPDT provision.  After receiving Plaintiffs' response [146] (Pls.' Response), the Court held a hearing on the Notice, in which it provided guidance to the Parties concerning questions they should address in this briefing.  *See* Minute Order of Oct. 10, 2025.

## STANDARD OF REVIEW

Where, as here, a party may be entitled to judgment as a matter of law even if all of the facts alleged in the complaint are accepted as true, the defense of failure to state a claim may be raised by a motion for judgment on the pleadings.  *See* Fed. R. Civ. P. 12(c) ("After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.") *and id*. at (h)(2)(B) (affirming that defense of failure to state a claim can be raised after pleadings are closed); *see also*, *e.g.*, *Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1370 (D.C. Cir. 2008).  The "factual allegations of the complaint must be taken as true, and any [factual] ambiguities or doubts concerning the sufficiency of the claim must be resolved in favor of the pleader."  *Schuler*, 514 F.3d at 1370 (citation modified).  The movant prevails if it shows that "no material fact is in dispute and that it is entitled to judgment as a matter of law."  *Id*. (citing *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure (Wright & Miller), § 1368 (2d ed. 1990)).  Except that under Rule 12(c) the complaint's allegations are taken as true, the standard applied is very similar, *see Waters v. District of*

2

*Columbia*, 2022 WL 715474, at \*9 (D.D.C. Mar. 10, 2022), even "identical," Wright & Miller

§ 1369, to the standard applied under Rule 56 for summary judgment.[2]

## ARGUMENT

**I.**    **The District Is Entitled to Judgment on Plaintiffs' Claims Under Count II Because Plaintiffs Lack a Cause of Action.**

    **A.**    **Section 1983 Only Enables Enforcement of Unambiguous Federal Rights.**

Plaintiffs cannot pursue claims for violation of the SSA's EPSDT provision because there

is no cause of action through which they can privately enforce it. "The question whether a

litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if

any, a litigant may be entitled to receive." *Davis v. Passman*, 442 U.S. 228, 240 (1979). The

"concept . . . is employed specifically to determine who may judicially enforce the statutory

rights or obligations." *Id.*; *see also id.* n.18. "Like substantive federal law itself, private rights of

action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S.

275, 286 (2001). "[C]ourts may not create one, no matter how desirable that might be as a policy

matter, or how compatible with the statute." *Id.* If a plaintiff lacks a cause of action, she has no

case and cannot proceed with litigation. *E.g.*, *Medina v. Planned Parenthood*, 606 U.S. 357, 385

(2025) (finding no cause of action to enforce a provision of the Medicaid Act).

Although Congress created Medicaid more than fifty years ago using its Spending Clause

authority, Congress has never yet codified a cause of action for private enforcement of its

---

[2]     In its notice of anticipated motion, the District framed the anticipated motion as one for partial summary judgment. Defs.' Notice. The District believes the relief requested could be properly sought under Rule 56 or Rule 12(c) but has brought the motion under Rule 12 for two reasons. First, there are no disputes of fact relevant to the argument presented, so there is no need for summary judgment procedures like competing statements of fact, as indicated by the Court at the October 10 hearing. Second, at that same hearing, Plaintiffs' counsel suggested the District may have waived or somehow forfeited its ability to raise this argument by not arguing it sooner; Rule 12(h)(2)(B) makes clear that there also should be no dispute about waiver.

provisions. *E.g.*, *supra* n.1; *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 328 (2015). Instead, with varying degrees of success, those who claim to be injured by violation of the program's terms have brought suit under 42 U.S.C. § 1983, which provides a cause of action for violation of federal rights. *See e.g.*, *Health and Hosp. Corp. v. Talevski*, 599 U.S. 166 (2023) (finding select amendments to Medicaid program enforceable through Section 1983); *Medina*, 606 U.S. at 385 (finding select Medicaid provision not enforceable through Section 1983).

To determine whether a statutory provision is privately enforceable under Section 1983, courts first ask "what right [has] Congress created," if any, in the statute, and then, if a right exists, whether Congress has "specifically foreclosed" any remedy under Section 1983. *DuBerry v. District of Columbia*, 824 F.3d 1046, 1052, 1056 (D.C. Cir. 2016) (citation modified); *see Talevski*, 599 U.S. at 183, 186. To create a right, the statute must use clear and unambiguous *rights-creating* language with an unmistakable focus on individuals like the plaintiff. *Medina*, 606 U.S. at 368 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284, 290 (2002) and citing *Talevski*, 599 U.S. at 183 in accord).

In June of this year, the Supreme Court reiterated the rule that Section 1983 can only be used to enforce federal *rights*; it does not create a remedy for alleged deprivations of federal *benefits*. *Medina*, 606 U.S. at 376 (citing *Gonzaga*, 536 U.S. at 290). The Court responded to "confusion in the lower courts" by expressly repudiating the reasoning of four prior opinions that took an overly "expansive view of" the Court's "power to imply private causes of action to enforce federal laws." *Id.* at 375. In particular, those decisions suggested that courts could infer privately enforceable federal rights if Congress "intended that the provision in question benefit the plaintiff"; if the provision is not "so vague and amorphous that its enforcement would strain judicial competence"; and if the provision "unambiguously impose[s] a binding obligation on the

4

States." *Blessing v. Freestone*, 520 U.S. 329, 340–41 (1997); *see also Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 509, 512, 519–20 (1990) (similar); *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 430–32 (1987) (similar); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 691 (1979) (similar). *Medina* clarified that those factors, even if relevant, are not sufficient, individually or collectively, to create a private cause of action. *See* 606 U.S. at 369 n.1, 375-76 (instructing courts not to rely on *Wright*, *Wilder*, *Blessing* or the "language" of *Cannon*).

Hence, contrary to Plaintiffs' outdated theories, *Medina* makes clear that for federal laws enacted under the Spending Clause to create privately enforceable federal rights:

- It is not enough that the statute confers benefits or protects interests. *Medina*, 606 U.S. at 376-77, 383 (rejecting *Blessing*, *Wilder*, and *Wright*).

- It is not enough that the statute also speaks in clear terms about the content of the benefit. *Id.* at 376.

- It is not enough that the statute also speaks in mandatory or compulsory terms. *Id.* at 376–77, 383–84.

- And it is not enough that the statute contains "individual-centric terminology." *Id.* at 369 n.1, 382–84.

*Cf.* Pls.' Response at 3–4 (arguing, contrary to *Medina*, that the EPSDT provision must create an enforceable federal right because it has clear beneficiaries, is mandatory in nature, and reflects an "individual-centric" focus).

Put simply, Spending Clause legislation cannot confer federal rights enforceable under Section 1983 unless Congress used truly unambiguous terms that create more than a specific, mandatory *benefit* for certain individuals. *Medina*, 606 U.S. at 385. And as *Medina* explained, "the statutes at issue in *Talevski* supply the only reliable yardstick against which to measure whether spending-power legislation confers a privately enforceable right," and those statutes

used the words "right" or "rights" *six* times (e.g., "'nursing facility must protect and promote the *rights* of each resident, including . . . [t]he *right* to choose a personal attending physician'"). *Id.* at 377–78 (quoting 42 U.S.C. § 1396r(c)(1)(A)); *see Talevski*, 599 U.S. at 192 (Gorsuch, J., concurring) (concurring because "the Act's operative provisions refer to individual 'rights'"). It is little wonder, then, that all nine Justices agreed in *Medina* that the Court's precedent on private rights establishes "a restrictive test" under which "only 'atypical' statutes confer enforceable rights." 606 U.S. at 368, 383 (quoting *id.* at 405 (Jackson, J., dissenting)); *see id.* at 416 (Jackson, J., dissenting) (recognizing same).

The need for clear notice is not a mere formality—it is a constitutional imperative. Because Spending Clause legislation is essentially a contract between the federal government and State and local recipients, Congress cannot impose conditions on those sovereign entities without first providing them clear, explicit notice of such conditions in the statutory text. *See Armstrong*, 575 U.S. at 323, 331–32. This is why Congress must "give a grantee clear and unambiguous notice that, if it accepts federal funds, it may face private suits asserting an individual right." *Medina*, 606 U.S. at 378. To imply an enforceable right based on anything less would impermissibly alter the statutory bargain that Congress struck with its State and local partners. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'"). Such actions exceed the proper role of Article III courts and burden the federal judiciary with policy questions that the Constitution assigns to other branches. *See Medina*, 606 U.S. at 369 (emphasizing that, because "the decision whether to let private plaintiffs enforce a new statutory right poses delicate

questions of public policy," the "job of resolving how best to weigh those competing costs and benefits belongs to the people's elected representatives, not unelected judges").

**B.**    **The EPSDT Provision Does Not Create a Federal Right.**

Unlike the provisions in *Talevski*, the statute at issue here is not privately enforceable. The EPSDT provision, 42 U.S.C. § 1396a(a)(43), while in the same subchapter as the provisions in *Talevski*, at most creates a state-provided benefit in requiring Medicaid plans to inform eligible persons of the availability of certain services and to arrange for certain treatments:

> 42 U.S.C. § 1396a (State plans for medical assistance)
>
> (a) Contents
>
> A State plan for medical assistance must—
>
> \*\*\*
>
> (43) provide for—
>
> (A) informing all [eligible] persons . . . who are under the age of 21 . . . of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title[.][3]
>
> \*\*\*
>
> (C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services[.]

42 U.S.C. § 1396a(a)(43).

---

[3]    42 U.S.C. § 1396d(r)(5) (defining "'early and periodic screening, diagnostic, and treatment services'" to include "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in subsection [1396d](a) to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan"); *id.* § 1396d(a)(4)(B) (incorporating the same services into the definition of "medical assistance").

Nothing in that provision qualifies as clear and unambiguous "rights-creating" language. *See Medina*, 606 U.S. at 383 (reinforcing "the longstanding line between mere benefits and enforceable rights"). As even a cursory reading reveals, the EPSDT provision says nothing about "rights," "privileges," "immunities," or any other arguably synonymous term. *See Timken v. South Denver Cardiology Assocs., P.C.*, --- F.4th ---, 2025 WL 2961546, at *4 (10th Cir. Oct. 21, 2025) (finding that Emergency Use Authorization law "lacks the unambiguous rights-creating terms required" because it "never mentions rights, privileges, or immunities"); *Nw. Illinois Area Agency on Aging v. Basta*, 145 F.4th 695, 704 (7th Cir. 2025) (reasoning that the Older Americans Act was not privately enforceable because it has "no mention of individual 'rights,' 'privileges,' 'immunities,' or any similar language"). Nor does it say anything about subjecting States that receive Medicaid funding to private suits for money damages for falling short of their statutory obligations. *See Gonzaga*, 536 U.S. at 280 (reiterating that, "unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983" (quoting *Pennhurst*, 451 U.S. at 17, 28 & n.21)). Instead, the EPSDT provision merely lists general duties imposed on States when formulating a Medicaid plan, which does not come close to creating a federal right enforceable under Section 1983. *See, e.g.*, *Medina*, 606 U.S. at 379 (requiring "explicit and unmistakable rights-creating language" (internal quotation marks omitted))

In this way, the EPSDT provision is materially indistinguishable from the "Free Choice" provision that *Medina* held is *not* privately enforceable. *Medina*, 606 U.S. at 377–80. As the Court explained in *Medina*, the Free Choice provision (like the EPSDT provision) is located "in

a subsection titled 'Contents,'" it specifies "what a State must do to participate in Medicaid," and it sought "to benefit" patients by allowing them to select any qualified provider they wished:

> 42 U.S.C. § 1396a (State plans for medical assistance)
>
> (a) Contents
>
> A State plan for medical assistance must—
>
> ***
>
> (23) provide that (A) any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services, and (B) an enrollment of an individual eligible for medical assistance in a primary care case-management system (described in section 1396n(b)(1) of this title), a medicaid managed care organization, or a similar entity shall not restrict the choice of the qualified person from whom the individual may receive services under section 1396d(a)(4)(C) of this title, except as provided in subsection (g), in section 1396n of this title, and in section 1396u-2(a) of this title, except that . . . nothing in this paragraph shall be construed as requiring a State to provide medical assistance for such services furnished by a person or entity convicted of a felony under Federal or State law for an offense which the State agency determines is inconsistent with the best interests of beneficiaries under the State plan or by a provider or supplier to which a moratorium under subsection (kk)(4) is applied during the period of such moratorium;

42 U.S.C. § 1396a(a)(23). Just like the EPSDT provision, the Free Choice provision did not contain "clear and unambiguous 'rights-creating language.'" *Medina*, 606 at 377–80.

And there is more. As the Court explained in *Medina*, the Medicaid Act at issue there and here more broadly requires only "substantial" or "aggregate" compliance from the States, which further suggests that the statutory focus is not on individuals' rights but instead on the States' obligations. *Id.* at 379 (citing 42 U.S.C. § 1396c). And the exact same floodgates

problems identified in *Medina* apply with equal force here:  if the EPSDT provision "create[s] an individually enforceable right," "[m]any other Medicaid plan requirements would likely do the same," and thus "rights-creating provisions might more nearly become the rule" rather than "remaining 'atypical' exceptions."  *Id*. at 380.  No member of the *Medina* Court would endorse such an untenable result.  *See id.* at 366–69 (emphasizing repeatedly how "rare" and "unlikely" it is for "spending-power statutes like Medicaid" to satisfy the "'stringent' and 'demanding' test" for conferring "individual rights enforceable under § 1983" (quoting *Talevski*, 599 U.S. at 180)); *see also id.* at 415 (Jackson, J., dissenting) (indicating agreement that the Medicaid Act should not be treated "as a wellspring of generally enforceable rights").

In short, Supreme Court precedent forecloses Plaintiffs' efforts to enforce the EPSDT provision through Section 1983.  *See id.* at 377–80, 386.  And this is true regardless of the Sixth Circuit's pre-*Medina*, pre-*Talevski* decision in *John B. v. Goetz*, 626 F.3d 356 (2010), which stems from the very same outdated cases that *Medina* repudiated, *see Medina*, 606 U.S. at 376 (ordering "lower court judges" that "[t]hey should not" continue to "consult *Wilder*, *Wright*, and *Blessing* when asking whether a spending-power statute creates an enforceable individual right").  Indeed, the court in *Goetz* noted that, although the enforceability of 42 U.S.C. § 1396a(a) overall "remains uncertain," an earlier Sixth Circuit case had "implicitly determined" that "at least one of the requirements of" Section 1396a(a)(43) "may be enforced through an action under 42 U.S.C. § 1983."  *Id.* at 362–63 (citing *Westside Mothers v. Olszewski*, 454 F.3d 532 (6th Cir. 2006)).  Yet that earlier case expressly applied "the *Blessing* test," which eschewed the need for rights-creating language.  *Westside Mothers*, 454 F.3d at 539.  The Sixth Circuit's outlier decisions thus have no persuasive force in light of *Medina*'s admonition that "lower courts" are not "obliged," or even "*permitted*, to consider" the "reasoning of *Wilder*, *Wright*, or *Blessing*."

*Medina*, 606 U.S. at 376 (emphasis added).  Count II of Plaintiffs' complaint thus fails to state a claim, and the District is entitled to judgment on the pleadings.  *See id.*; *Schuler*, 514 F.3d at 1370.

## II.      *Medina* **Affirms and Reiterates a Decades-Old "Clear Statement" Rule.**

In response to the District's Notice, and at the hearing on it, Plaintiffs have urged this Court not to take the Supreme Court at its word, contending that a straightforward reading of *Medina* cannot be right because, to paraphrase, it would be just too big a change in the law.  *See*, *e.g.*, Pls.' Response at 1 ("Defendants ask this Court to impose the most reductionist view possible of *Medina* and upend decades of circuit and district court consensus[.]").  But the Supreme Court did not mince words in *Medina*, and Plaintiffs' disdain for the consequences of that decision is no reason to ignore its clear and controlling directives.  *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (emphasizing that lower courts cannot ignore a Supreme Court decision that "dictate[s] an answer" in the case simply because "the lower court thinks the precedent is in tension with some other line of decisions" (internal quotation marks omitted)).  Indeed, as the Supreme Court has instructed, "it is more consistent with the judicial role to apply the reasoning and results the Court voted on and committed to writing than to speculate about what practical considerations our predecessors may have had in mind[.]"  *Georgia v. Public.Resource.Org, Inc.*, 590 U.S. 255, 274 n.4 (2020) (cleaned up).  Plaintiffs' contrary arguments are beside the point and wrong at any rate.

*First*, the Court made clear that *Medina* did in fact accomplish a clarifying change in the law by abrogating contrary lower court decisions and limiting certain of its own precedents.  *See Medina*, 606 U.S. at 376 ("To the extent lower courts feel obliged, or permitted, to consider the contrary reasoning of *Wilder*, *Wright*, or *Blessing*, they should resist the impulse.").  The

respondents' brief in *Medina*, after all, cited four circuits that "agreed" with the lower court's opinion in that case, as well as "an unbroken line of briefs over nearly 20 years" from the United States that "repeatedly stated that the free-choice-of-provider provision is privately enforceable under Section 1983."  *See* Resp. Br. at 24 & nn.3-4, No. 23-1275 (U.S. Mar. 5, 2025), https://tinyurl.com/5ym76x3s.  And the *Medina* Court expressly acknowledged that its holding meant that many, if not most, Medicaid provisions would *not* be privately enforceable as currently written—contrary to the implications of some earlier decisions.  *See* 606 U.S. at 376–80; *contra* Pls.' Response at 1–2 (arguing that the District's reading of *Medina* is wrong because it could "effectively end *any* Medicaid beneficiary's ability to enforce" the Medicaid Act).

*Second*, the *Medina* Court explained its work as course-correction, not sea-change:  "As we have explained at length, our decision simply applies the same test this Court applied in *Gonzaga* and again in *Talevski*[.]"  606 U.S. at 385 n.9.  Indeed, the Court first announced *more than forty years ago*, in *Pennhurst*, that Congress must "clearly" and "unambiguously" state its intent to create enforceable rights.  *Id*. at 373 (quoting *Pennhurst*, 451 U.S. at 6 (cleaned up)).  And approximately twenty years after *Pennhurst*, the Court in *Gonzaga* sought to dispel the "confusion" and "uncertainty" created by *Blessing*, *Wright*, and *Wilder*, by clarifying that *only* an "unambiguously conferred right," "not the broader or vaguer 'benefits' or 'interests,' "support[s] a cause of action brought under Section 1983."  536 U.S. at 282–83.  Relying on its textualist decision in *Sandoval*, the *Gonzaga* Court underscored the strictness of this test by equating the inquiry—"whether Congress *intended to create a federal right*"—with the first step in the process for determining whether a cause of action can be implied from a statute.  *Id*. at 283–85 (emphasis in original); *see Sandoval*, 532 U.S. at 287 (stating the Court had "abandoned" the methods for implying private rights of action used by "the *ancient regime*" that "held sway 40

12

years ago" and that "[h]aving sworn off the habit of venturing beyond Congress's intent," the Court "would not accept respondents' invitation to have one last drink").

But despite the clear holdings of *Pennhurst* and *Gonzaga*, "confusion persisted" in the lower courts about the proper view of enforceable rights under Section 1983. *St. Anthony Hosp. v. Whitehorn*, 132 F.4th 962, 970 (7th Cir. 2025) (en banc).[4]  As a result, approximately twenty years after *Gonzaga*, the Court tried to clarify matters again in *Talevski*.  599 U.S. at 183 (citing *Gonzaga* as the "established method for ascertaining unambiguous conferral" of rights).  Writing for the Court, Justice Jackson reiterated that federal statutes do not "create § 1983-enforceable rights" "as a matter of course," because the Court's "precedent sets a demanding bar" that will be met only in "the atypical case."  *Id.* at 180, 183.  Emphasizing the point, the *Talevski* Court explained that federal statutes must "'unambiguously confe[r]' individual rights [for] those rights" to be even "'presumptively enforceable' under § 1983," given that "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State."  *Id.* at 183 (quoting *Gonzaga*, 536 U.S. at 280, 283–84; *Pennhurst*, 451 U.S. at 28).

But again, despite the clarity of *Talevski*'s admonitions, some lower courts remained confused.  In *Planned Parenthood v. Kerr*, for example, the Fourth Circuit "did not read" *Talevski* "as toppling the existing doctrinal regime," and even if it did, the Fourth Circuit chose to stay in the "good company of four" sister circuits in holding that the Medicaid Act's Free

---

[4]     *Compare, e.g.*, *Equal Access for El Paso, Inc. v. Hawkins*, 509 F.3d 697, 704 (5th Cir. 2007) (relying on *Gonzaga* to hold that the Medicaid Act's Equal Access provision was not privately enforceable under Section 1983), *and Long Term Care Pharmacy Alliance v. Ferguson*, 362 F.3d 50, 57 (1st Cir. 2004) (recognizing that *Gonzaga* repudiated "the ready inference in favor of private enforcement"), *with, e.g.*, *Salazar v. District of Columbia*, 729 F. Supp. 2d 257, 263-68 (D.D.C. 2010) (cited in Pls.' Response at 3) (suggesting that *Gonzaga* did not reflect a significant change in the law).

Choice provision does create an enforceable right.  95 F.4th 152, 155–56 (2024).  The Supreme

Court, of course, reversed that decision in *Medina* and, in doing so, took pains to repudiate a

"doctrinal regime" that would accept anything less than *expressly* created federal rights.

Section I, *supra*.  Thus, *Medina* should be understood as course-correction, not sea-change.  *See*

606 U.S. at 383 n.8 ("[O]ur decisions have never suggested that anything less than clear statutory

language can supply States with the unambiguous notice required.").

      *Third*, although Plaintiffs scoff at *Medina* as a "magic words" test (Pls.' Response at 2),

their criticisms are immaterial and overstated.  To start, even had *Medina* established a magic

words test, that test would be binding in this case and foreclose Plaintiffs' claim all the same.

*See Mallory*, 600 U.S. at 136.  More fundamentally, *Medina* requires *unambiguous* words, not

*magic* ones.  Congress could potentially satisfy *Medina*'s test without using the word "right" by,

for example, employing terms such as "entitled to" or "guarantee," or by explicitly stating that a

given law is privately enforceable under Section 1983.  *See, e.g.*, *Medina*, 606 U.S. at 381–85.

Conversely, the mere appearance of the word "right" somewhere in a statute does not by itself

unambiguously confer federal rights that are privately enforceable under Section 1983.  *See, e.g.*,

*id.* at 368, 376 & n.6; *see also Pennhurst*, 451 U.S. at 13 (finding no privately enforceable right

despite congressional finding that "[p]ersons with developmental disabilities have a *right* to

appropriate treatment, services, and habilitation" (emphasis added)).  Put another way, courts are

simply required to read the statute Congress has written and determine whether, given the words

used—not judicial ideas about intent—Congress *unambiguously* intended to create federal rights.

      The *Medina* dissent, moreover, casts no doubt on this point simply because it indirectly

accused the Court of creating a "magic words" test, and implied that would be a bad thing.  606

U.S. at 412 (Jackson J., dissenting) (internal quotation marks omitted).  The *Medina* majority in

fact ignored the dissent's words on this issue, and for good reason: the dissent offered no viable alternative. Instead, the dissent acknowledged that "rights-creating language" requires, at the very least, "language classically associated with establishing rights," *id.* at 408, which necessarily encompasses only a narrow range of terms, phrases, and expressions given the inherent limits of written English, *see id.* at 416 (noting that it is only "the 'atypical' spending statute that creates individual rights"). But the mere fact that only certain words will be sufficiently clear and unambiguous to confer privately enforceable rights hardly suggests that only "magic" words will suffice. *See id.* at 378-79 (explaining that "Congress knows how to give a grantee clear and unambiguous notice" when it intends to "confer[] an individually enforceable right"). To the contrary, as shown above, that no particular term or phrase is independently necessary *or* sufficient all but confirms that *Medina* does not require magic words. Any contrary suggestion in the *Medina* dissent is mistaken and entitled to no weight. *See Public.Resource.Org.*, 590 U.S. at 273 ("As every judge learns the hard way, comments in a dissenting opinion about legal principles and precedents are just that: comments in a dissenting opinion." (cleaned up)).

*Fourth*, and relatedly, in response to this Court's request for cases requiring similarly specific words, the District notes that the Supreme Court has many times insisted that Congress use quite specific language in the form of "clear statement" or "plain statement" rules. *See, e.g.*, William N. Eskridge, Jr. & Phillip P. Frickey, *Quasi-Constitutional Law: Clear Statement Rules As Constitutional Lawmaking*, 45 Vand. L. Rev. 593, 598-629 (1992) (discussing cases). The Court, for example, has imposed a clear-statement rule when determining whether a statute is "jurisdictional." *Riley v. Bondi*, 606 U.S. 259, 274 (2025). A similar clear-statement rule governs statutory waivers of sovereign immunity. *Fin. Oversight & Mgmt. Bd. for Puerto Rico*

*v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 346-47 (2023).  And Congress must speak in equally clear terms when enacting laws that alter the typical constitutional balance between the federal and state governments.  *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991) (citing *Pennhurst*, 465 U.S. at 99).  While nominally disavowing a "magic words" formula in those cases, the Court made clear that its "demanding" clear-statement rules will not be satisfied "unless the signal is exceedingly strong."  *E.g.*, *Riley*, 606 U.S. at 274.

*Medina*, and the decisions on which it relies, are of a piece with these clear-statement-rule precedents.  To be sure, *Medina* and its predecessors did not use the phrase "clear statement" to describe their method of interpretation.  But they did cite to one such "principle in mind" as guiding their consideration, *Gonzaga*, 536 U.S. at 286–87 (citing *Pennhurst*, 465 U.S. at 99), and they relied upon the same line of cases to say that Congress has long been on notice that it must "speak with a clear voice" in order to create enforceable rights, *Medina*, 606 U.S. at 383 n.8 (quoting *Pennhurst*, 451 U.S. at 17).  Indeed, a clear-statement rule is precisely what the *Medina* Court harkened to when emphasizing that, "given the separation of powers and federalism concerns" inherent in Spending Clause legislation, States must not be left "guessing about the terms of their deals with the federal government."  *Id.* at 383 & n.8.  *Medina*'s apparent insistence on what Plaintiffs call "magic words" is therefore entirely "precedented."  *See Centro de Periodismo*, 598 U.S. at 346–48 (noting that the "stringent" test for sovereign immunity waivers is met only "when a statute says in so many words that it is stripping immunity from a sovereign entity" or "creates a cause of action and authorizes suit against a government on that claim").

*Finally*, the Court need not worry that a straightforward application of *Medina* would "retroactively" alter Congress's intent.  The EPSDT obligation was first enacted in 1967, in the

same Act that created the Free Choice provision at issue in *Medina*. *See* Social Security Amendments of 1967, Pub. L. No. 90-248 §§ 227, 302(a), 81 Stat. 821, 903–04, 929 (1967) (codified at 42 U.S.C. §§ 1396a(a)(23)(A), 1396d(a)(4)(B)). And Congress has amended the section containing the EPSDT provision more than 40 times since *Gonzaga* in 2002, which makes clear that Congress has reconsidered and reenacted the EPSDT provision against the backdrop of the Supreme Court's current approach to Section 1983 litigation—all the while never inserting the sort of unambiguous rights-creating language needed to confer privately enforceable federal rights. *See* 42 U.S.C. § 1396a (Westlaw) (count of Public Laws cited in "Credits" including and after Pub. L. 108-40 § 7(b), June 30, 2003, 117 Stat. 837).

Thus, regardless of how the Supreme Court might have decided the EPSDT provision's enforceability in 1967, it is clear that Congress knew how the Court would decide that issue under current doctrine when it last considered the EPSDT provision. As *Medina* explains, Congress has been on notice for decades that it must "speak clearly," and so if it wanted the EPSDT provision to create a federal right, it knew how to do so—and yet it never has. 606 U.S. at 383 n.8; *see Armstrong*, 575 U.S. at 331 (explaining that Congress was on notice by 1989 of the need for "express specification of the availability of private enforcement" of Medicaid Act). Besides, if a future Congress disagrees with the result of applying *Medina* in this case, it is free to change the EPSDT provision: "[I]f existing remedies prove insufficient, Congress can create new ones." *Medina*, 606 U.S. at 385; *see also*, *e.g.*, William N. Eskridge, Jr., *Overriding Supreme Court Statutory Interpretation Decisions*, 101 Yale L.J. 331, 334 (1991) ("Congress and its committees are aware of the Court's statutory decisions, devote significant efforts toward analyzing their policy implications, and override those decisions with a frequency heretofore unreported."). But the prospect of future legislative action is no reason to stray from *Medina*'s

17

controlling principles or otherwise impose new conditions on Medicaid grantees without clear, unambiguous notice in the text of the EPSDT provision. *See Medina*, 606 U.S. at 376-80; *Gonzaga*, 536 U.S. at 280; *Pennhurst*, 451 U.S. at 17, 28 & n.21.

## CONCLUSION

For all of these reasons, the Court should grant the District's motion and enter judgment for all Defendants on Count II of the Second Amended Complaint.


Dated: November 17, 2025.                    Respectfully Submitted,

                                             BRIAN L. SCHWALB
                                             Attorney General for the District of Columbia

                                             CHAD COPELAND
                                             Deputy Attorney General
                                             Civil Litigation Division

                                             */s/ Matthew R. Blecher*
                                             MATTHEW R. BLECHER [1012957]
                                             Chief, Civil Litigation Division, Equity Section

                                             */s/ Honey Morton*
                                             HONEY MORTON [1019878]
                                             Assistant Section Chief, Civil Litigation
                                             Division, Equity Section

                                             */s/ Mateya B. Kelley*
                                             MATEYA B. KELLEY [888219451]
                                             HELEN M. RAVE [90003876]
                                             Assistant Attorneys General
                                             400 6th Street, NW
                                             Washington, D.C. 20001
                                             Phone: (202) 724-7854
                                             Email: mateya.kelley@dc.gov

                                             *Counsel for Defendants*